WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

———————————————————————————x

In re:

LEHMAN BROTHERS HOLDINGS INC., *et al.*

           Debtors.

———————————————————————————x

LEHMAN BROTHERS SPECIAL FINANCING INC.

           Plaintiff,

-against-

BNY CORPORATE TRUSTEE SERVICES LIMITED

           Defendant.

———————————————————————————x

Chapter 11

Case No. 08-13555 (JMP)

Adversary Proceeding
No.: 09-_____ (JMP)

## COMPLAINT

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

       Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in

the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc.

("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its

nondebtor affiliates ("Lehman"), by and through undersigned counsel, hereby brings this Complaint for declaratory judgment against BNY Corporate Trustee Services Limited ("Defendant" or "BNY").

<h3 align="center">PRELIMINARY STATEMENT</h3>

1. LBSF files this adversary proceeding to prevent certain unenforceable *ipso facto* clauses from improperly modifying LBSF's right to priority of payments under certain swap agreements solely because it filed a chapter 11 bankruptcy case. Under at least two transactions in a series of swap agreements known as the "Dante program," LBSF would be subordinated beneath noteholders solely because of its bankruptcy filing. The two transactions, Saphir Finance Public Limited Company Series 2006-5 and 2004-11, provide for modification of LBSF's priority of payment rights when an "Event of Default" has occurred. The agreements expressly include the filing of a bankruptcy petition as an Event of Default. Therefore, as a direct result of its bankruptcy filing, LBSF's right to payment priority is in imminent danger of being modified, with the resulting loss of approximately AUD $90 million (or USD $70 million) to the bankruptcy estate and its creditors. The Court should declare that these provisions constitute unenforceable *ipso facto* clauses that inappropriately effect a modification of a debtor's interest in a contract because of a bankruptcy filing in violation of 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B).

2. The provisions do not fall within the limited "safe-harbor" for *ipso facto* clauses in swap agreements contained in 11 U.S.C. § 560 because that provision only protects "the liquidation, termination, or acceleration" of swap agreements or the "offset or net out" of the parties' positions under the agreements. The modification of LBSF's priority of payments as a result of its bankruptcy filing does not constitute a "liquidation, termination, or acceleration" of

the agreement, and nor is it an "offset or net out" of the parties' positions. Rather, by changing LBSF's priority of payments, the clause improperly modifies LBSF's rights under the contracts solely because of its bankruptcy filing, which §§ 365(e)(1) and 541(c)(1)(B) expressly forbid.

3.        Modification of LBSF's payment priority also violates the automatic stay under 11 U.S.C. § 362(a)(3) because it improperly exercises control over the property of LBSF's estate.

4.        LBSF is seeking declaratory relief to prevent BNY, as Trustee under the transactions, from modifying LBSF's payment priority in accordance with the unenforceable *ipso facto* clauses, and to prevent a violation of the automatic stay.

### PARTIES

5.        Plaintiff LBSF is a Delaware corporation with its former principal business address at 745 Seventh Avenue, New York, NY 10019 and its current principal business address at 1271 Avenue of the Americas, 46th Floor, New York, NY 10020.

6.        Upon information and belief, Defendant BNY is a company organized under English law with its principal office in London. It has submitted to the jurisdiction of this Court by entering a notice of appearance and participating in proceedings before this Court, including by filing an objection to the Debtors' motion to establish procedures for the settlement or assumption and assignment of prepetition derivative contracts. Dkt. 1728, 1892. BNY is an affiliate of Bank of New York Mellon, a Delaware corporation with its principal place of business in New York, NY.

### JURISDICTION AND VENUE

7.        The Court has subject-matter jurisdiction over this proceeding under 28 U.S.C. §§ 157, 1334. This is a "core proceeding" under 28 U.S.C. § 157(b).

8.        Venue is proper under 28 U.S.C. §§ 157(a), 1408, and 1409.

9.    The statutory prerequisites for the relief requested herein are sections 105(a), 362(a)(3), 365(e)(1), 541(c)(1)(B), and 560 of Title 11 of the United States Code, as amended (the "Bankruptcy Code"), section 2201 of Title 28 of the United States Code, Federal Rule of Civil Procedure 57, and Rules 7001 and 9006 of the Federal Rules of Bankruptcy Procedure.

**BACKGROUND**

10.    Lehman was formerly the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region.

11.    Commencing on September 15, 2008, LBHI and certain of its direct and indirect subsidiaries commenced with this Court voluntary cases under chapter 11 of the Bankruptcy Code. LBSF commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LBSF's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b).

12.    LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.    BNY entered into a Principal Trust Deed dated October 10, 2002 as amended and restated on July 18, 2008, with Dante Finance Public Limited Company ("Dante") pursuant to which a multi-issuer secured obligation program (the "Dante Program") was established. Ex. A

(Principal Trust Deed). Under the program, Dante issued secured Notes (the "Notes") to borrow, buy, sell or enter into other secured obligations, including swaps. BNY serves as Trustee under the program.[1] Ex. A at 1. One of the Issuers of Notes under the Dante program was Saphir Finance Public Limited Company ("Saphir"), an Irish corporation that issued the relevant Notes in this case, credit-linked synthetic portfolio notes that are tied to the credit-default swap transactions in the Saphir 2004-11 and Saphir 2006-5 transactions. Ex. B §§ 1.1, 1.3 (Saphir 2004-11 Supp. Trust Deed); Ex. C §§ 1.1, 1.3 (Saphir 2006-5 Supp. Trust Deed) (collectively, the agreements underlying the Saphir 2004-11 and Saphir 2006-5 transactions are referred to as the "Transaction Documents").[2] LBSF is the swap counterparty ("Swap Counterparty") under the transactions. Ex. B at 1 (Saphir 2004-11 Supp. Trust Deed); Ex. C at 1 (Saphir 2006-5 Supp. Trust Deed).

14. Under the ISDA Master Agreement & Schedule, the bankruptcy filing of any party is defined as an "Event of Default." Ex. D § 5(a)(vii) (ISDA Master Agreement). Ordinarily, absent any Event of Default by LBSF, "Swap Counterparty Priority" applies, which provides that LBSF receives any payments before noteholders. Ex. A § 6.2(i) (Principal Trust Deed); Ex. A Schedule 2, Pt. C § 4(b)(i) (Principal Trust Deed). However, upon an Event of Default by LBSF, such as its bankruptcy filing, the Supplemental Trust Deed and Drawdown

---

[1] BNY acquired J.P. Morgan Corporate Trustee Services Limited and succeeded it as Trustee under the Supplemental Trust Deeds. *See* Ex. A (Principal Trust Deed); Ex. B (Saphir 2004-11 Supp. Trust Deed); Ex. C (Saphir 2006-5 Supp. Trust Deed).

[2] The various Transaction Documents provide that they are governed by English law and that disputes "may be brought in [English] courts," but also specify that this provision "shall not limit the right of any of [the parties] to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not)." Ex. C §§ 14.1, 14.2 (Saphir 2006-5 Supp. Trust Deed); Ex. B §§ 14.1, 14.2 (Saphir 2004-11 Supp. Trust Deed); Ex. A §§ 20.1, 20.2 (Principal Trust Deed).

Agreements applicable to the Transaction Documents provide that LBSF's payment priority would change from "Swap Counterparty Priority" to "Noteholder Priority."  Ex. B § 5.5 (Saphir 2004-11 Supp. Trust Deed); Ex. C § 5.5.1 (Saphir 2006-5 Supp. Trust Deed).  Under Noteholder Priority, LBSF is effectively subordinated so that it would receive payments, if any, after payments are made to noteholders.  Ex. A § 6.2(iii) (Principal Trust Deed); Ex. A Schedule 2, Pt. C § 4(b)(iii) (Principal Trust Deed).[3]

15.     In addition, modification of the Early Redemption Amount under Condition 44 of the Terms and Conditions of the Notes detrimentally affects LBSF and further effectuates an inappropriate subordination of LBSF in the Event of Default by LBSF.  Ex. C at Schedule 2, Terms & Conditions of the Notes, Condition 44; *see also* Ex. A, Schedule 2, Pt. C § 6(g) (defining Early Redemption Amount).

16.     Together, the Transaction Documents have the effect of providing that the payment priority LBSF otherwise receives under the Transaction Documents will be modified so that LBSF will be paid out in a lower priority to payments made to the noteholders solely as a result of its bankruptcy filing.

17.     After LBSF's bankruptcy filing, counsel for the Debtors sent a letter on November 25, 2008 to the Bank of New York Mellon Trust Company, National Association, and the Bank of New York Mellon notifying them that (a) any actions with respect to transactions in which BNY serves as trustee may be subject to the automatic stay provisions of 11 U.S.C. § 362,

---

[3] The Terms and Conditions of the Notes, contained in Schedule 2 Part C of the Principal Trust Deed and Schedule 2 to the Supplemental Trust Deed of the Saphir 2006-5 transaction, also provide for the same modification of LBSF's payment priority.  Ex. A Schedule 2, Pt. C § 4(b)(i), (iii) (Principal Trust Deed); Ex. C at Schedule 2, Terms & Conditions of the Notes, Condition 38 (Saphir 2006-5 Supp. Trust Deed).

and (b) any provisions purporting to subordinate any amounts payable to LBSF would be unenforceable and unlawful. Ex. E (Nov. 25, 2008 Letter from L. Fife to BNY Mellon).

18.     On December 1, 2008, Saphir, as issuer of the Notes, sent putative notices to LBSF stating that LBSF's filing of its bankruptcy petition constituted an Event of Default under the ISDA Master Agreement and designating December 1, 2008 as the early termination date under that agreement. Ex. F (Saphir 2006-5 Termination Notice); Ex. G (Saphir 2004-11 Termination Notice). No distributions under the Transaction Documents have occurred since Saphir sent its notices. Because the parties continue to have unperformed obligations under them, the Transaction Documents were and remain existing executory contracts.

19.     On May 13, 2009, Perpetual Trustee Company Limited, an Australian noteholder under the Transaction Documents, in an effort to seek control of the Debtors' property but circumvent the proper forum—this Bankruptcy Court—filed a claim in the High Court of Justice Chancery Division, Royal Courts of Justice, in London seeking an order that BNY must pay it in accordance with Noteholder Priority under the Principal Trust Deed. Ex. H (Perpetual Claim).

20.     If LBSF's right to payment priority is modified as a result of its bankruptcy filing, and Noteholder Priority is applied, LBSF would receive no payments given that amounts that would be due to Noteholders would exceed available funds. The resulting loss to LBSF's bankruptcy estate and its creditors would be approximately AUD $50 million (or USD $39 million) for the Saphir 2004-11 transaction and approximately AUD $40 million (or USD $31 million) for the Saphir 2006-5 transaction. The total loss to the estate under both transactions would be AUD $90 million (or USD $70 million).

21.     LBSF files this complaint seeking a declaration that these provisions modifying LBSF's payment priority solely because of the commencement of its bankruptcy case are

unenforceable *ipso facto* clauses and that any action to enforce these provisions violates the automatic stay.

## COUNT I
### (*Declaratory Judgment—Provisions Modifying LBSF's Payment Priority as a Result of Its Bankruptcy Filing Are Unenforceable Ipso Facto Clauses*)

22.     LBSF repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

23.     The provisions in the Transaction Documents modifying LBSF's right to priority of payment under the Transaction Documents as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B).

24.     The Bankruptcy Code protects debtors from being penalized for filing a chapter 11 case, notwithstanding any contractual provisions or applicable law that would have that effect.  Under § 365(e)(1), the Bankruptcy Code provides that

> [n]otwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated *or modified*, and any right or obligation under such contract or lease may not be terminated *or modified*, at any time after the commencement of the case solely because of a provision in such contract or lease that is conditioned on— . . . (B) the commencement of a case under this title . . . .

11 U.S.C. § 365(e)(1) (emphases added).

25.     Similarly, § 541(c)(1) recognizes that a debtor's interest in property:

> becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law— . . . (B) that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1).

26.     Because the provisions in the Transaction Documents (a) condition LBSF's payment priority solely on "the commencement of a case" under the Bankruptcy Code, (b)

operate after LBSF's commencement date, and (c) modify LBSF's property interest in the right to receive payments under the agreements' otherwise applicable Swap Counterparty Priority, the provisions are unenforceable *ipso facto* clauses. *See* 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B).

27.     On their face, the provisions in the Transaction Documents also inappropriately "effect[ ] or give[ ] an option to effect a forfeiture, modification, or termination of the debtor's interest in property" solely as a result of "the commencement of a case under [Title 11]" in violation of 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B).

28.     The provisions do not fall within the limited "safe-harbor" for *ipso facto* clauses in swap agreements, because section 560 of the Bankruptcy Code protects only "[t]he exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of [the filing of a bankruptcy case]" or the "offset or net out [of] any termination values or payment amounts." 11 U.S.C. § 560. The *modification* of LBSF's payment priority solely as a result of its bankruptcy filing does not constitute a "liquidation, termination, or acceleration" of the agreement, nor is it an "offset or net out" of the parties' positions under those agreements. Rather, by changing LBSF's payment priority and subordinating LBSF to noteholders, the clause improperly modifies LBSF's property interest solely as a result of its bankruptcy filing, which is not within the safe harbor of section 560 but is clearly impermissible under sections 365(e)(1) and 541(c)(1)(B).

29.     The Court should declare that the provisions in the Swap Agreement modifying LBSF's payment priority are unenforceable pursuant to sections 365(e)(1) and 541(c)(1)(B).

30.     There is an actual controversy between the parties on this issue because the Transaction Documents require BNY to modify LBSF's payment priority in violation of the

Bankruptcy Code, and noteholders are actively seeking to enforce these provisions in an incorrect forum to the detriment of the estate and its creditors.

31.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that the provisions in the Swap Agreement modifying LBSF's payment priority constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and that LBSF is entitled to payment under Swap Counterparty Priority.

**COUNT II**
***(Declaratory Judgment—Provisions Modifying LBSF's Payment Priority as a Result of Its
Bankruptcy Filing Violate the Automatic Stay)***

32.     LBSF repeats and realleges each and every allegation set forth in the preceding paragraphs with the same force and effect as if hereinafter fully set forth at length.

33.     The provisions modifying LBSF's payment priority as a result of its bankruptcy filing are not only unenforceable *ipso facto* clauses, but any action to enforce those provisions also violates the automatic stay under 11 U.S.C. § 362(a).  Any action to exercise control over assets of LBSF's estate is subject to the automatic stay upon the commencement of a case under the Bankruptcy Code.  LBSF's rights to payments under the Transaction Documents are substantial assets of the estate, and any action by a party to exercise control over those assets is subject to the automatic stay.  *See* 11 U.S.C. § 362(a).

34.     Further, the provisions improperly seek to take property of LBSF because of its bankruptcy filing.  Property of a debtor becomes property of the estate, "notwithstanding any provision in an agreement . . . (B) that is conditioned . . . on the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."  11 U.S.C. § 541(c)(1).  By modifying LBSF's payment priority, its property interests are being forfeited because of "the commencement of a case under

this title." This violates not only sections 541(c)(1)(B) and 365(e)(1), but also the automatic stay in section 362(a).

35.     There is an actual controversy between the parties on this issue because the Transaction Documents require BNY to modify LBSF's payment priority in violation of the Bankruptcy Code, and noteholders are actively seeking to enforce these provisions in an incorrect forum to the detriment of the bankruptcy estate and its creditors.

36.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rule 7001, LBSF requests that this Court enter a declaratory judgment that any modification of LBSF's payment priority under the Transaction Documents constitutes a willful violation of the automatic stay under section 362(a)(3).

## PRAYER FOR RELIEF[4]

WHEREFORE, LBSF respectfully requests that the Court grant the following relief:

A.     For declaratory judgment that the provisions in the Transaction Documents modifying LBSF's right to priority of payments under the Transaction Documents as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and that LBSF is entitled to payment under Swap Counterparty Priority.

B.     For declaratory judgment that any action to enforce the provisions in the Transaction Documents modifying LBSF's right to priority of payments

---

[4] LBSF reserves the right to amend the complaint to state additional causes of action for damages including, without limitation, automatic-stay violations.

under the Transaction Documents as a result of its bankruptcy filing violates the automatic stay under 11 U.S.C. § 362(a).

C.    And for such other relief as the Court deems just and proper, including costs and attorneys' fees.

Respectfully submitted,


/s/ Ralph I. Miller
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession


Dated: New York, New York
       May 20, 2009

# EXHIBIT A

Dated 10 October 2002
as Amended and Restated on 18 July 2008

**DANTE FINANCE PUBLIC LIMITED COMPANY**
an Issuer

and

**BNY CORPORATE TRUSTEE SERVICES LIMITED**
as Trustee

# PRINCIPAL TRUST DEED

relating to
Multi-Issuer Secured Obligation Programme
arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

Ref: 01/200/MWAF/JZD/DNR/MSOL

Linklaters LLP

**This Principal Trust Deed** was originally made on 10 October 2002 and is amended and restated on 18 July 2008 between:

(1) **Dante Finance Public Limited Company** (an "**Issuer**"); and

(2) **BNY Corporate Trustee Services Limited** (the "**Trustee**", which expression, where the context so admits, includes any other trustee for the time being of this Principal Trust Deed for any Series).

**Whereas:**

(A) The Issuer (as defined in Schedule 7) proposes to issue from time to time secured notes to borrow, buy, sell or enter into other secured obligations in the form of loans, options, schuldscheine or swaps in accordance with the Programme Agreement (the "**Programme**").

(B) A trust deed dated 10 October 2002 (the "**Original Principal Trust Deed**") was entered into by the parties thereto (the "**Parties**"). The Parties wish to amend and restate the Original Principal Trust Deed by entering into this amended and restated principal trust deed dated 18 July 2008 (the "**Principal Trust Deed**").

(C) The Trustee has agreed to act as trustee of this Principal Trust Deed on the following terms and conditions.

(D) Each Series will be constituted and secured by a Supplemental Trust Deed and any Other Security Document made between the relevant Issuer, the Trustee and (if applicable) the Swap Counterparty.

(E) It is intended that certain companies (each a "**Specified Company**") may incur Obligations pursuant to the Programme. Pursuant to the provisions of this Principal Trust Deed, any such Specified Company, by executing a Deed of Accession will agree to be bound by all the terms of this Principal Trust Deed and any other document executed in accordance with this Principal Trust Deed, and from and after execution and delivery of such Deed of Accession such Specified Company shall become and be treated as an "Issuer" for all the purposes hereof. References herein to the "Issuer" are references to the relevant Specified Company (including Dante Finance Public Limited Company) only in respect of the Notes issued by it and only in respect of the Master Documents (as defined in Schedule 7) to the extent that the Master Documents are applicable in respect of Notes issued by it, all in accordance with sub-Clauses 2.7 and 2.8, the terms of the other Master Documents and the relevant Supplemental Trust Deed.

(F) The Trustee, being of the opinion that to do so is not materially prejudicial to the interests of the Noteholders, hereby agrees in exercise of the power conferred on it by sub-Clause 13.1 of the Original Principal Trust Deed to make the amendments to the Original Principal Trust Deed contained herein.

(G) The Principal Trust Deed, as amended hereby, shall henceforth in relation to Obligations incurred by any Specified Company on or after the date hereof have effect as so amended. For the avoidance of doubt, the Principal Trust Deed without the amendments made hereby shall continue to have effect in relation to Obligations incurred by any Specified Company prior to the date hereof.

**This deed witnesses and it is declared** as follows:

**1 Interpretation**

**1.1 Definitions:** Capitalised terms used in this Principal Trust Deed but not defined in this Principal Trust Deed shall have the meanings given to them in Schedule 7 hereto or in the Conditions unless the context does not allow.

**1.2 Construction of Certain References:** References to:

**1.2.1** the records of Euroclear and Clearstream, Luxembourg shall be to the records that each of Euroclear and Clearstream, Luxembourg holds for its customers which reflect the amount of such customers' interests in the Notes;

**1.2.2** costs, charges, remuneration or expenses include any value added, turnover or similar tax charged in respect thereof; and

**1.2.3** an action, remedy or method of judicial proceedings for the enforcement of creditors' rights include references to the action, remedy or method of judicial proceedings in jurisdictions other than England as shall most nearly approximate thereto.

**1.3 Headings:** Headings shall be ignored in construing this Principal Trust Deed.

**1.4 Contracts:** References in this Principal Trust Deed to this Principal Trust Deed or any other document are to this Principal Trust Deed or those documents as amended, supplemented or replaced from time to time in relation to the Programme and include any document that amends, supplements or replaces them.

**1.5 Schedules:** The Schedules are part of this Principal Trust Deed and have effect accordingly.

**1.6 Alternative Clearing System:** References in this Principal Trust Deed to Euroclear and/or Clearstream, Luxembourg shall, wherever the context so permits, be deemed to include reference to any additional or alternative clearing system approved by the Issuer, the Trustee and the Issuing and Paying Agent. In the case of NGNs, such alternative clearing system must also be authorised to hold such Notes as eligible collateral for Eurosystem monetary policy and intra-day credit operations.

**2 Issue of Notes and Covenant to Pay**

**2.1 Issue of Notes:** Each Issuer may from time to time issue Notes in Tranches of one or more Series on a continuous basis with no minimum issue size in accordance with the relevant Programme Agreement. Before issuing any such Tranche, each Issuer shall give written notice or procure that such notice is given to the Trustee of the proposed issue of such Tranche, specifying the details to be included in the Final Terms or Series Prospectus in respect of the relevant Series. For each Series, any Notes created and issued pursuant to the provisions of this Clause shall be constituted by this Principal Trust Deed and the relevant Supplemental Trust Deed and secured as set out in this Principal Trust Deed and such Supplemental Trust Deed and the relevant Issuer shall execute and deliver to the Trustee in respect of each Series such a Supplemental Trust Deed (if applicable, duly stamped or denoted) containing such provisions as the Trustee shall require. A memorandum of

every Supplemental Trust Deed shall be endorsed by the Trustee on Schedule 5 to this Principal Trust Deed and by the relevant Issuer on the duplicate of this Principal Trust Deed.

**2.2** **Separate Series:** Where any Notes are issued, unless for any purposes the Trustee in its absolute discretion shall determine otherwise, all the provisions of this Principal Trust Deed shall apply separately to each Series and the expressions "**Notes**", "**Noteholders**", "**holders**", "**Certificates**", "**Coupons**", "**Couponholders**", "**Conditions**", "**Mortgaged Property**", "**Receipts**", "**Talons**", "**Credit Support Document**" (as defined in the relevant Prospectus), "**Credit Enhancement Provider**", "**Swap Agreement**" and "**Swap Counterparty**" together with all other terms that relate to Notes or to their Conditions shall be construed as referring to those of the particular Series in question and not of all Series unless expressly so provided, so that each Series shall be constituted by a separate trust and that, unless expressly provided, events affecting one Series shall not affect any other. However, in respect of a Series of Notes where there are Related Notes, unless for any purpose the Trustee in its absolute discretion shall determine otherwise, all the provisions of this Principal Trust Deed shall apply to such Notes and Related Notes together and *mutatis mutandis* (save for the provisions relating to the expressions, "**Noteholders**", "**holders**", "**Certificates**", "**Receipts**", "**Coupons**, "**Couponholders**" and "**Talons**") and in respect of such Notes and Related Notes, the expressions "**Mortgaged Property**", "**Credit Support Document**", "**Credit Enhancement Provider**", "**Swap Counterparty**" and "**Swap Agreement**" shall be construed as referring to both and each of the Notes and Related Notes unless expressly otherwise provided so that the Notes and Related Notes shall be constituted by a single trust and unless expressly provided, events affecting the Notes and Related Notes shall not affect any Series of Notes which are not Related Notes.

**2.3** **Covenant to Pay:** The relevant Issuer shall on any date when the Notes of any Series become due to be redeemed, in whole or in part, unconditionally pay to or to the order of the Trustee to that Series in the Contractual Currency, in the case of any Contractual Currency other than euro, in the principal financial centre for the Contractual Currency and, in the case of euro, in the city in which banks have access to the TARGET system, in same day funds the Redemption Amount of the Notes of that Series becoming due for redemption on that date together with any applicable premium and shall (subject to the Conditions) until such payment (both before and after judgment) unconditionally so pay to or to the order of the Trustee as aforesaid interest on the principal amount of the Notes of such Series outstanding as set out in the Conditions (subject to sub-Clause 2.6) provided that (1) payment of any sum due in respect of the Notes of such Series made to the Issuing and Paying Agent for that Series as provided in the Agency Agreement shall, to that extent, satisfy such obligation except to the extent that there is failure in its subsequent payment to the relevant Noteholders or Couponholders of such Series under the Conditions and (2) a payment made after the due date or as a result of the Notes of such Series becoming repayable following an Event of Default shall be deemed to have been made when the full amount due has been received by the Issuing and Paying Agent or the Trustee for that Series and notice to that effect has been given to the Noteholders for that Series (if required under sub-Clause 7.1.8), except to the extent that there is failure in its subsequent payment to the relevant Noteholders or Couponholders under the Conditions. The Trustee will upon execution of the

relevant Supplemental Trust Deed hold the benefit of this covenant on trust for the Noteholders and Couponholders of the relevant Series.

2.4 **Discharge:** Subject to sub-Clause 2.5, any payment to be made in respect of the Notes, Receipts or the Coupons of any Series by the relevant Issuer or the Trustee for that Series may be made as provided in the Conditions and any payment so made shall (subject to sub-Clause 2.5) to that extent be a good discharge to the relevant Issuer or the Trustee, as the case may be (including, in the case of Notes represented by a NGN, whether or not the corresponding entries have been made in the records of Euroclear and Clearstream, Luxembourg).

2.5 **Payment After a Default:** At any time after an Event of Default or a Potential Event of Default has occurred in respect of any Series, the Trustee may:

2.5.1 by notice in writing to the relevant Issuer and the Agents, require the Agents, until notified by the Trustee to the contrary, so far as permitted by applicable law:

(i) to act as Agents of the Trustee under the Trust Deed and the Notes of such Series on the terms of the Agency Agreement or, in the case of the Custodian, the Custody Agreement (in each case, with consequential amendments as necessary and except that the Trustee's liability for the indemnification, remuneration and expenses of the Agents shall be limited to the amounts for the time being held by the Trustee in respect of such Series on the terms of the Trust Deed) and thereafter to hold all Notes, Certificates, Receipts, Coupons and Talons comprising such Series and, in the case of the Custodian, the Collateral and all moneys, documents and records held by them in respect of such Series to the order of the Trustee; or

(ii) to deliver all Notes, Certificates, Receipts, Coupons and Talons comprising such Series and, in the case of the Custodian, the Collateral and all moneys, documents and records held by them in respect of such Series to the Trustee or as the Trustee directs in such notice; and

2.5.2 by notice in writing to the relevant Issuer require it to make all subsequent payments in respect of the Notes, Certificates, Receipts, Coupons and Talons of such Series to or to the order of the Trustee and not to the Issuing and Paying Agent.

2.6 **Rate of Interest After a Default**: If the Notes comprising any Series bear interest at a floating or other variable rate and they become immediately payable under the Conditions, the rate of interest payable in respect of them shall continue to be calculated by the Calculation Agent in accordance with the Conditions (with consequential amendments as necessary) except that the rates of interest need not be published unless the Trustee otherwise requires. The first period in respect of which interest shall be so calculable shall commence on the expiry of the Interest Period (as defined in the relevant Prospectus) during which such Notes become so repayable.

2.7 **Issues of Notes by Specified Companies:** On or prior to the issue of any Series by a Specified Company other than Dante Finance Public Limited Company, such Specified Company will execute a Supplemental Trust Deed pursuant to which such Specified Company will agree to be bound by all the terms of this Principal Trust Deed and all Related Agreements, and from and after execution and delivery of such Supplemental Trust Deed such Specified Company shall become and be treated as an "**Issuer**" for all the purposes hereof. References herein to the "**Issuer**" are references to the Specified Company in respect of any Series (including Dante Finance Public Limited Company) only in respect of the Notes of such Series issued by it and only in respect of this Principal Trust Deed to the extent that this Principal Trust Deed is applicable in respect of such Notes issued by it, all in accordance with the terms of this Principal Trust Deed and the relevant Supplemental Trust Deed. (For the avoidance of doubt, any issue of any Series by any Specified Company (including Dante Finance Public Limited Company) will be constituted by this Principal Trust Deed and the relevant Supplemental Trust Deed.)

2.8 **Rights and Liabilities of the Issuer:** The Issuer shall be bound by this Principal Trust Deed and each of the other Master Documents and Related Agreements to which it is a party only to the extent that the provisions of such documents relate to any Series of Notes issued by it and matters relating thereto. The Issuer shall not be bound by this Principal Trust Deed or any of the Master Documents and other Related Agreements to which it is a party to the extent that the provisions of such documents relate to any Series of Notes issued by any other Specified Company.

The liability of the Issuer under this Principal Trust Deed and each of the Master Documents and Related Agreements to which it is a party is several and is separate in respect of each Series of Notes issued by the Issuer. The Issuer shall not be responsible for the obligations of any other Specified Company under this Principal Trust Deed or under any of the Master Documents or other Related Agreements. The failure of the Issuer to perform its obligations in respect of any Series issued by the Issuer under this Principal Trust Deed or under any of the Master Documents and Related Agreements to which it is a party shall not release the Issuer from its obligations under this Principal Trust Deed or under any of the Master Documents or other Related Agreements in respect of any other Series issued by the Issuer and shall not release any other Specified Company from its obligations under this Principal Trust Deed or under any of the Master Documents or other Related Agreements. No Specified Company has any obligations in respect of Notes of the Series issued by any other Specified Company. The rights of the Specified Companies under this Principal Trust Deed and each of the Master Documents or other Related Agreements are also several and are also separate in respect of each Series of Notes issued by any such Specified Company.

The provisions in this Principal Trust Deed concerning costs, expenses, fees, remuneration and other financial obligations (whether arising under indemnities or otherwise) shall apply separately to each Series of Notes in respect of the costs, expenses, fees, remuneration and financial obligations which arise in respect of such Series of Notes. No such amount incurred in respect of any Series of Notes will be deducted from any amount payable to Noteholders or Couponholders, as the case may be, in respect of any other Series of Notes nor will any such amount be in any other way charged to any other such holders. The provisions of this Principal Trust Deed shall be read accordingly.

# 3 Form of the Notes

**3.1** **The Global Notes:** Each Series of Notes shall be represented by a Temporary Global Note or a Permanent Global Note or one or more Certificates in the principal amount of the Tranche being issued. Interests in Temporary Global Notes shall be exchangeable for interests in Permanent Global Notes as set out in each Temporary Global Note. Interests in Permanent Global Notes shall be exchangeable for Definitive Notes and/or Registered Notes as set out in each Permanent Global Note.

**3.2** **The Definitive Notes:** For each Series, the Definitive Notes, Receipts, Coupons and Talons shall be security printed and the Certificates shall be printed, in each case in accordance with applicable legal and stock exchange requirements substantially in the forms set out in Schedule 2. The Notes and Certificates (other than Global Certificates) shall be endorsed with the Conditions.

**3.3** **Signature:** For each Series the Bearer Notes shall be signed manually or in facsimile by two directors of the Issuer and all other Notes and Certificates may be signed by an authorised signatory of the Issuer. Notes shall be authenticated by or on behalf of the Issuing and Paying Agent, effectuated manually by or on behalf of the Common Safekeeper, in case of a Global Note which is a NGN, and Certificates shall be authenticated by or on behalf of the Registrar. Notes and Certificates on which are affixed the facsimile signature of a director or authorised signatory of the Issuer during the period that director held office or that authorised signatory was an authorised signatory may be used, even if at the time of issue of the relevant Notes and Certificates that director no longer holds office or that authorised signatory is no longer an authorised signatory. Notes and Certificates so executed, authenticated and effectuated (if applicable) shall be or, in the case of Certificates, represent binding and valid obligations of the Issuer.

# 4 Stamp Duties and Taxes

For each Series the Issuer shall pay any stamp, issue, documentary or other taxes and duties, including interest and penalties, payable in the jurisdiction of incorporation of the Specified Company, Belgium, Luxembourg, the United Kingdom and the country of each Contractual Currency in respect of the creation, issue and offering of the Notes, Certificates, Receipts, Coupons and Talons of that Series and the execution or delivery of the Trust Deed. The Issuer shall also indemnify the Trustee, the Noteholders and the Couponholders of each Series from and against all stamp, issue, documentary or other taxes paid by any of them in any jurisdiction in connection with any action taken by or on behalf of the Trustee or, as the case may be, the Noteholders or the Couponholders to enforce the Issuer's obligations under the Trust Deed or the Notes, Certificates, Receipts, Coupons or Talons of such Series.

# 5 Security

This Clause 5 shall apply separately to the security for each Series, save as varied in respect of any Series by the relevant Supplemental Trust Deed.

**5.1** **The Mortgaged Property:** The Issuer with full title guarantee and as continuing security grants in favour of the Trustee such charge and/or security interest as set out in the relevant Supplemental Trust Deed in respect of the relevant Series.

**5.2** **Mortgaged Property as Continuing Security:** For each Series, the charges and/or security interest created pursuant to sub-Clause 5.1 are granted to the Trustee as

continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and the Coupons of such Series, and (ii) for the performance of the Issuer's obligations (if any) under certain agreements as set out in the relevant Supplemental Trust Deed in respect of such Series. The Trustee shall release from such charges any part of the Mortgaged Property when it becomes payable or deliverable to the extent that payment or delivery of it may be obtained and duly paid or made (as the case may be) to a Swap Counterparty under a Swap Agreement and/or to the holders of Notes, Coupons and Receipts. The Trustee shall also release from the charges thereby granted any sum held by the Custodian and/or the Account Bank and/or Issuing and Paying Agent and/or the Registrar to meet payments due in respect of the Notes to the extent that payment of all sums due under the Trust Deed and the Notes and Coupons of the relevant Series be duly made.

5.3    **Liability in respect of Mortgaged Property:** For each Series, the Trustee shall not be responsible for, nor shall it have any liability with respect to any loss or theft or reduction in value of any of the Mortgaged Property and shall not be obliged to insure the same and shall have no responsibility or liability arising from the fact that the same will (if applicable) be held in safe custody by the Custodian or other custodian approved beforehand in writing by the Trustee. The Trustee shall not be responsible for the validity, value, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property for that Series.

5.4    **Rights of the Issuer:** For each Series until any security over any of the Mortgaged Property becomes enforceable the Issuer may, with the sanction of an Extraordinary Resolution (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series) or with the prior written approval of the Trustee:

5.4.1    take such action in relation to the Mortgaged Property as it may think expedient; and

5.4.2    exercise the rights incidental to the ownership of the Mortgaged Property and, in particular (but without limitation and without responsibility for their exercise), any voting rights in respect of such property and all rights to enforce it.

The Issuer will not exercise any rights with respect to any Mortgaged Property unless it has the Trustee's consent or is directed to do so by an Extraordinary Resolution of Noteholders (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series) and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

5.5    **Enforcement of Security:** For each Series, the security over the Mortgaged Property shall become enforceable if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty. In addition, if part of the principal amount of the Notes of such Series is mandatorily redeemed under Condition 6(c), the security created over that part of the Mortgaged Property which relates to such Notes and with respect to any part of a Swap Agreement to that Series which terminates as a result of such redemption shall become enforceable. In that event references herein to the Trustee

exercising powers of enforcement of such security shall be read accordingly. If, in respect of a Series of Notes where there are Related Notes, the security in respect of the Notes becomes enforceable, the Trustee shall, if in its opinion there is a conflict of interest between its duties as trustee for the Noteholders and as trustee for the holders of the relevant Related Notes, act solely with respect to the interests of the Controlling Series.

5.6 **Trustee taking possession of Mortgaged Property:** At any time after any security in relation to any Series of Notes shall have become enforceable in whole or in part, (i) if requested in writing by the holders of at least one-fifth in aggregate principal amount of the relevant Notes (or, in respect of a Series of Notes where there are Related Notes, if so required in writing by the holders of at least one fifth in aggregate principal amount of the Controlling Series) then outstanding or (ii) if directed by an Extraordinary Resolution of the holders of the Notes of such Series (or, in respect of a Series where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series) or (iii) if so directed in writing by the Swap Counterparty for such Series when sums the claims in respect of which are secured are due to the Swap Counterparty, (unless this would in the Trustee's opinion be contrary to the interests of the holders of Notes, Coupons or Receipts for that Series (whichever shall be the first request or direction to be given)), the Trustee shall, and otherwise in its discretion may, (in each case subject to it having been indemnified to its satisfaction against any loss, liability, cost, claim, action, demand or expense which may be incurred or made against it in connection therewith) enforce the security over the Mortgaged Property. To do this it may, at its discretion, take possession of all or part of the Mortgaged Property for that Series over which the security shall have become enforceable and may in its discretion sell, call in, collect and convert into money all or part of the Mortgaged Property in such manner and on such terms as it shall think fit. The power of sale under Section 101 of the Law of Property Act 1925 (but without the restrictions imposed by Sections 93 and 103 of such Act) shall apply and have effect on the basis that the relevant Supplemental Trust Deed constitutes a mortgage within the meaning of that Act and the Trustee is a mortgagee exercising the power of sale conferred on mortgagees by that Act with limited title guarantee.

5.7 **Discharge:** For each Series the Trustee's receipt for any moneys paid to it in relation to such Series shall discharge the person paying them and such person shall not be responsible for their application.

5.8 **Appointment of Receiver:** In relation to any Series, the Trustee may in writing appoint a receiver of all or part of the Mortgaged Property over which any security shall have become enforceable and may remove any receiver so appointed and appoint another in his place. No delay or waiver of the right to exercise these powers shall prejudice their future exercise. The following provisions shall have effect:

5.8.1 Such appointment may be made before or after the Trustee shall have taken possession of all or part of the relevant Mortgaged Property.

5.8.2 Such receiver may be vested by the Trustee with such powers and discretions as the Trustee may think expedient including, without limitation, all the powers set out in Schedule 1 to the Insolvency Act 1986 (subject to sub-Clause 18.2) and may sell, concur in selling, assign or release any of the relevant Mortgaged Property without restriction and on such terms as

he may think fit and may effect any such transaction in the name or on behalf of the Issuer or otherwise.

5.8.3    Such receiver shall in the exercise of his functions conform to the regulations from time to time made by the Trustee.

5.8.4    The Trustee may from time to time fix such receiver's remuneration and direct its payment out of moneys accruing to him in respect of such Series in the exercise of his powers as such receiver.

5.8.5    The Trustee may from time to time and at any time require such receiver to give security for the due performance of his duties as receiver and may fix the nature and amount of the security to be given. The Trustee need not, however, in any case require any such security nor shall it be responsible for its adequacy or sufficiency.

5.8.6    All moneys received by such receiver shall be paid over to the Trustee unless the Trustee directs otherwise.

5.8.7    Such receiver shall be the Issuer's agent for all purposes. The Issuer alone shall be responsible for his acts, defaults and misconduct and neither the Trustee, the Noteholders nor the Swap Counterparty for such Series shall incur any liability therefor.

5.8.8    None of the Trustee, the Noteholders or the Swap Counterparty for such Series shall be responsible for any misconduct or negligence on the part of any such receiver.

5.9    **Perfecting the Security:** For each Series the relevant Issuer shall take such action as the Trustee may reasonably require (1) to perfect or protect the security created or intended to be created by or pursuant to the Trust Deed over the Mortgaged Property for that Series and (2) from time to time and at any time after the security constituted by or pursuant to the Trust Deed shall have become enforceable to facilitate the realisation of such security and the exercise of the functions of the Trustee or any receiver of any such Mortgaged Property. A certificate from the Trustee to the effect that a particular action is reasonably required by it shall be conclusive evidence of that fact.

5.10    **Ability to Borrow on Mortgaged Property:** For each Series the Trustee may raise and borrow money on the security of the Mortgaged Property for that Series or any part of it in order to defray moneys, costs, charges, losses and expenses paid or incurred by it in relation to the Trust Deed (including the costs of realising any security and the remuneration of the Trustee) or in exercise of any of the powers contained in the Trust Deed in relation to such Series. The Trustee may raise and borrow such money on such terms as it shall think fit and may secure its repayment with interest thereon by mortgaging or otherwise charging all or part of such Mortgaged Property whether or not in priority to the security constituted by or pursuant to the Trust Deed and generally in such manner and form as the Trustee shall think fit and for such purposes may take such action as it shall think fit. The Trustee shall not, however, permit such security to be used by way of stocklending before such security becomes enforceable.

5.11    **Attorney:** For each Series the relevant Issuer by way of security irrevocably appoints the Trustee and every receiver of any Mortgaged Property appointed

pursuant to this Principal Trust Deed to be severally its attorney (with full power of substitution) on its behalf and in its name to do anything which the Issuer ought to do under this Principal Trust Deed and generally to exercise all or any of the functions of the Trustee or any such receiver. The relevant Issuer ratifies and confirms and agrees to ratify and confirm whatever any such attorney shall do or purport to do in the exercise or purported exercise of such functions.

5.12    **Liability of Trustee:** For each Series neither the Trustee nor any such receiver or any attorney or agent of the Trustee shall by reason of taking possession of any Mortgaged Property for that Series or any other reason and whether or not as mortgagee in possession be liable to account for anything except actual receipts or be liable for any loss or damage arising from the realisation of such Mortgaged Property or from any act, default or omission in relation to such Mortgaged Property or from any exercise or non-exercise by it of any of its powers, authorities or discretions in relation to such Mortgaged Property or otherwise unless such loss or damage shall be caused by its own fraud.

5.13    **Powers additional to the Law of Property Act 1925:** The powers conferred by this Principal Trust Deed in relation to the Mortgaged Property of any Series on the Trustee or on any receiver of any such property shall be in addition to those conferred on mortgagees or receivers under the Law of Property Act 1925. If there is any ambiguity or conflict between the powers contained in such Act and those conferred by this Principal Trust Deed, the terms of this Principal Trust Deed shall prevail.

5.14    **Dealings with Trustee:** For each Series no one dealing with the Trustee or any receiver of any of the Mortgaged Property for that Series appointed by the Trustee need enquire whether any of the powers, authorities and discretions conferred by or pursuant to this Principal Trust Deed in relation to such property are or may be exercisable by the Trustee or such receiver or as to the propriety or regularity of acts purporting or intended to be in exercise of any such powers. The protection to purchasers contained in Sections 104 and 107 of the Law of Property Act 1925 shall apply to anyone dealing with the Trustee or such receiver as if the statutory powers of sale and of appointing a receiver in relation to the property hereby charged had not been varied or extended by this Principal Trust Deed.

6    **Application of Moneys received by the Trustee and Payments**

6.1    **Declarations of Trust:** For each Series, save for any moneys received in connection with the realisation or enforcement of all or part of the security constituted by or pursuant to the Supplemental Trust Deed or any other Security Document in relation to that Series, all moneys received by the Trustee in respect of the Notes of that Series or amounts payable under the Trust Deed in relation to that Series will, despite any appropriation of all or part of them by the Issuer, be held by the Trustee on trust to apply them (subject to sub-Clause 6.3):

(i)    first, in payment of all costs, charges, expenses and liabilities properly incurred by the Trustee (including remuneration payable to it) in carrying out its functions under the Trust Deed in relation to that Series;

(ii)    secondly, in payment of any amounts owing to the Swap Counterparty for that Series, the Custodian or the Noteholders or Couponholders in respect of the Notes or Coupons for that Series *pari passu* and rateably; and

(iii)    thirdly, in payment of any balance to the Issuer for itself.

If the Trustee holds any moneys in respect of Notes or Coupons which have become void or Notes, the claims in respect of which have become prescribed under Condition 9, the Trustee will hold them on these trusts.

**6.2**    **Application of Moneys Received:** Subject to the provisions of each relevant Supplemental Trust Deed and sub-Clause 6.3, the Trustee shall apply all moneys received by it under this Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any Other Security Document as follows:

(i)    if "**Swap Counterparty Priority**" is specified in the relevant Supplemental Trust Deed:

(A)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)    secondly, in meeting claims of the Paying Agents and/or the Transfer Agents and/or the Custodian and/or the Account Bank for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(C)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement;

(D)    fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(E)    fifthly, in payment of the balance (if any) to the Issuer,

provided that, if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)    if "**Pari Passu Ranking**" is specified in the relevant Supplement Trust Deed;

(A)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including

any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(B) secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Account Bank for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(C) thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts and the Swap Counterparty under each Swap Agreement. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(D) fourthly, in payment of the balance (if any) to the Issuer.

(iii) if "**Noteholder Priority**" is specified in the relevant Supplemental Trust Deed:

(A) first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(B) secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Account Bank for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(C) thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment;

(D) fourthly, in meeting the claims (if any) of the Swap Counterparty under each Swap Agreement; and

(E) fifthly, in payment of the balance (if any) to the Issuer.

(iv) if "**Other Priority**" is specified in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus.

6.3 **Accumulation:** If the amount of the moneys at any time available for payment in respect of any Notes of any Series under sub-Clause 6.1 or 6.2 shall be less than 10 per cent. of the principal amount of such Notes then outstanding, the Trustee may at its discretion invest such moneys. The Trustee may retain such investments and accumulate the resulting income until the investments and the accumulations, together with any other funds for the time being under its control and available for

such payment, amount to at least 10 per cent. of the principal amount of such Notes then outstanding and then such investments, accumulations and funds (after deduction of, or provision for, any applicable taxes) will be applied as specified in sub-Clause 6.1 or 6.2, as the case may be.

6.4 **Investment:** Moneys held by the Trustee may be invested in its name or under its control in any investments or other assets for the time being authorised by English law for the investment by trustees of trust moneys or in any other investments, whether or not similar thereto, which may be selected by the Trustee **provided that** all such investments made by the Trustee shall be in investments denominated in the currency of such Series and, at the time of investment, in respect of each Series rated by Standard & Poor's, rated "AAA" by Standard & Poor's or in respect of each Series rated by Moody's, rated "Aaa" by Moody's (in the case of long-term investments of more than one year), "A1" by Standard & Poor's or

"P-1" by Moody's, as the case may be, (in the case of short-term investments of one year or less) or such alternative rating as may be advised by Standard & Poor's or Moody's, as the case may be, as being acceptable for being commensurate with the rating assigned to such Series or by placing the same on deposit in the name or under the control of the Trustee at a bank or other financial institution, including itself, if appropriate, **provided that** such bank or other financial institution shall, at the time of investment, be rated at least "A1" by Standard & Poor's or "P-1" by Moody's, as the case may be. If that bank or institution is the Trustee or a subsidiary, holding or associated company of the Trustee, it need only account for an amount of interest equal to the standard amount of interest payable by it on such a deposit to an independent customer. The Trustee may at any time or times vary any such investments for or into other investments or convert any moneys so deposited into any other currency and shall not be responsible for any loss due to depreciation in value, fluctuations in exchange rates or otherwise resulting from any such investments or deposits. For the avoidance of doubt in this sub-Clause 6.4, any rating which has an "r" will not be acceptable.

6.5 **Cancellation upon Payment:** If any payment is made to the holder of any Bearer Note, Receipt or Coupon in relation to any Series in accordance with the order set out in sub-Clause 6.1 or 6.2 (and the corresponding provision in the relevant Supplemental Trust Deed), the Bearer Note, Receipt or Coupon in respect of which such payment is made shall be produced to the Trustee or the Agent by or through whom such payment is made who shall, in the case of a partial payment, cause the Bearer Note, Receipt or Coupon concerned to be endorsed with details of the amount and date of payment on such Bearer Note, Receipt or Coupon and, in the case of payment in full, cancel such Bearer Note, Receipt or Coupon and surrender it to the Issuer or the Trustee, as the case may be, and certify or procure the certification of such cancellation.

7 **Covenants**

7.1 **Issuer's Covenants:** So long as any Note is outstanding, the Issuer shall:

7.1.1 **Books of Account:** keep proper books of account and, at any time after an Event of Default or Potential Event of Default has occurred or if the Trustee believes that such an event has occurred, so far as permitted by applicable law, allow the Trustee and anyone appointed by it to whom the Issuer has

no reasonable objection, access to its books of account at all reasonable times during normal business hours;

7.1.2   **Notice of Events of Default:** notify the Trustee in writing immediately on becoming aware of the occurrence of any Event of Default or Potential Event of Default;

7.1.3   **Information:** so far as permitted by applicable law, give the Trustee such information as it requires to perform its functions;

7.1.4   **Financial Statements etc.:** send to the Trustee at the time of their issue and in the case of annual financial statements in any event within 180 days of the end of each financial year two copies in English of every balance sheet, profit and loss account, report or other notice, statement or circular issued (if any), or that legally or contractually should be issued, to the members or creditors (or any class of them) of the Issuer generally in their capacity as such;

7.1.5   **Certificate of Directors:** send to the Trustee on each anniversary of the date of this Principal Trust Deed, and also within 14 days of any request by the Trustee a certificate of the Issuer signed on its behalf by any two of its Directors that, having made all reasonable enquiries, to the best of the knowledge, information and belief of the Issuer as at a date (the "**Certification Date**") not more than five days before the date of the certificate no Event of Default or Potential Event of Default or other breach of this Principal Trust Deed or other matter required to be brought to the Trustee's attention had occurred since the Certification Date of the last such certificate or (if none) the date of this Principal Trust Deed or, if such an event had occurred, giving details of it;

7.1.6   **Notices to Noteholders:** for each Series send to the relevant Trustee the form of each notice to be given to Noteholders and, once given, two copies of each such notice, such notice to be in a form previously approved by the Trustee (such approval, unless so expressed, not to constitute approval for the purposes of Section 21 of the Financial Services and Markets Act 2000 of any such notice which is a communication within the meaning of Section 21 of the Financial Services and Markets Act 2000);

7.1.7   **Further Acts:** so far as permitted by applicable law, do such further things as may be necessary in the opinion of the Trustee to give effect to this Principal Trust Deed and each Supplemental Trust Deed;

7.1.8   **Notice of Late Payment:** forthwith upon request by the Trustee give notice to the Noteholders of any Series of any unconditional payment to the Issuing and Paying Agent or the Trustee of any sum due in respect of the Notes, the Receipts or Coupons of such Series made after the due date for such payment;

7.1.9   **Listing and Trading:** if the Notes are listed and/or admitted to trading, use all reasonable endeavours to maintain the listing of the Notes on the relevant stock exchange and/or the admission of the Notes to trading on the relevant market, however, if:

(i)     the Issuer is unable to do so, having used such endeavours;

(ii)    the Issuer determines that the provisions of the EU Transparency Obligations Directive would make the maintenance of such listing and/or admission to trading unduly onerous; or

(iii)    for any reason other than (ii) above, the maintenance of such listing and/or admission to trading is agreed by the Trustee to be unduly onerous and the Trustee is satisfied that the interests of the Noteholders would not be thereby materially prejudiced,

the Issuer will instead use all reasonable endeavours to obtain and maintain a listing of the Notes on such other stock exchange and/or admission of the Notes to trading on such other market as it may (with the consent in writing of the Trustee, in the case of (i) and (iii) above) decide;

7.1.10    **Change in Agents:** give at least 14 days' prior notice to the relevant Noteholders of any future appointment, resignation or removal of an Agent or of any change by an Agent of its specified office and not make any such appointment or removal without the Trustee's prior written approval;

7.1.11    **Agency Agreement:** comply with its obligations under the Agency Agreement executed in relation to any Series and, without prejudice to the generality of the foregoing, at all times maintain an Agent and (where relevant) a Custodian and, in respect of a Series of Registered Notes, a Registrar and a Transfer Agent and in respect of any Global Notes in NGN form, a Common Safekeeper and, where appropriate, a Calculation Agent in respect of such Series in each case as specified in the Conditions;

7.1.12    **Notice of Redemption:** give, in respect of any Note, notice of not less than 14 days more than the number of days' notice specified in the Conditions applicable to such Note, to the Trustee of any proposed redemption by it pursuant to the Conditions;

7.1.13    **Compliance:** in relation to each Series, comply and procure that each of the parties thereto complies with its obligations under any Swap Agreement and (if it is a party thereto) any Credit Enhancement Agreement and use its reasonable endeavours to make such amendments to the Agency Agreement, Custody Agreement or any Swap Agreement or Credit Enhancement Agreement as may be required by the Trustee;

7.1.14    **Provision of Legal Opinions:** procure the delivery of legal opinions addressed to the Trustee dated the date of such delivery, in form and content acceptable to the Trustee (i) on each occasion on which a legal opinion is given to any Dealer in relation to any Notes pursuant to the Programme Agreement from the legal adviser giving such opinion (ii) from Linklaters LLP (or such other legal advisers acceptable to the Trustee) as to the laws of England on the date of any amendment to this Principal Trust Deed and on each Issue Date and (iii) from legal advisers acceptable to the Trustee as to such law as may be requested by the Trustee in the event of a proposed issue of such nature and having such features as might lead the Trustee properly to conclude that it would be prudent to obtain such opinions;

7.1.15    **Restrictions:** not, without the prior consent in writing of the Trustee:

(i)        engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes, issuing further bonds and notes (which may be consolidated and form a single series with the Notes), creating other Obligations or entering into similar limited recourse transactions, entering into related agreements and transactions and performing any act incidental to or necessary in connection with any of the foregoing;

(ii)       dispose of any Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (a) the security referred to in Clause 5 or any similar limited recourse transaction (whether such limited recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and any Swap Counterparty as provided below) and (b) in connection with a transfer under the Swap Agreement);

(iii)     cause or permit any Swap Agreement or Credit Enhancement Agreement or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv)    release any party to any Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v)       have any subsidiaries (other than in connection with any substitution of the principal debtor under Clause 13);

(vi)     consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of any Swap Agreement, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or any other agreement relating to the issue of the Notes any relevant documentation entered into in connection with the issue, buying, borrowing, selling or entering into of other obligations or any related transactions;

(vii)    (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii)   have any employees;

(ix)    (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders; or

(x)      open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to any Notes or any Mortgaged Property, any other obligation, or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of such Mortgaged Property or save where such account is opened

in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account;

(xi)    (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of incorporation of the Issuer;

7.1.16    **Residence:** at all times maintain its residence outside the United Kingdom for the purposes of United Kingdom taxation and, in addition, not establish a branch, agency or place of business within the United Kingdom such as would require registration of a charge under Section 395 of the Companies Act 1985;

7.1.17    **Taxes:** at all times use its best efforts to minimise taxes and any other costs arising in connection with its activities;

7.1.18    **Taxation Status:**

(i)    in the case of a Specified Company incorporated in Ireland, not prejudice its status as a qualifying company within the meaning of section 110 of the Taxes Consolidation Act 1997 of Ireland, as amended;

(ii)    in the case of a Specified Company incorporated in Ireland, not make an election pursuant to subsection (6)(b) of section 110 of the Taxes Consolidation Act 1997 of Ireland, as amended, if its cash flows would be affected adversely thereby;

(iii)    in the case of a Specified Company incorporated in Ireland, not apply to become party of any group for the purpose of section 8 of the Value Added Tax Act 1972 of Ireland, as amended, with any other company or group of companies, or any such act, regulation, order, statutory instrument or directive which may from time to time re-enact, replace, amend, modify, vary, codify, consolidate or repeal such Act; and

(iv)    at all times to maintain a Paying Agent in a member state of the European Union that will not be obliged to withhold or deduct tax pursuant to European Council Directive 2003/48/EC or any law implementing or complying with, or introduced in order to conform to, such Directive;

7.1.19    **Collateral:** procure that Collateral forming part of the Mortgaged Property shall at all times (if required by the Conditions) be held in safe custody by the Custodian and/or Account Bank or other reputable custodian or bank approved by the Trustee;

7.1.20    **Mortgaged Property:** save as provided in the relevant Supplemental Trust Deed, any other Security Document and Final Terms or Series Prospectus procure that the Mortgaged Property for any Series (and its proceeds, if any) is at all times distinguishable from the Mortgaged Property for each other Series (and its proceeds, if any) and from its other assets;

**7.1.21 Conditions binding:** comply with, perform and observe all of the provisions of this Principal Trust Deed, any Supplemental Trust Deed and any other Security Document expressed to be binding on it. The Conditions will be binding on the Issuer and the Noteholders. The Trustee will be entitled to enforce the obligations of the Issuer under the Notes and the Conditions. The provisions contained in Schedule 2 Part C have effect in the same manner as if set forth herein; and

**7.1.22 Registration of mortgages and charges:** comply with any registration requirements in the jurisdiction of incorporation of the Specified Company (and any other jurisdiction where such registration requirements may apply) in relation to any and all mortgages or charges created by the Supplemental Trust Deed or any other Security Document securing the Notes of such Tranche or Series and, forthwith upon execution of any further instruments or documents pursuant thereto, creating or purporting to create or to perfect or to protect any security interest by the Issuer, enter in such Register, and register in any other jurisdiction where such registration may be required, details of such instrument or document.

**7.2 Swap Counterparty Covenants:** In relation to any Series in respect of which there is a Swap Counterparty, such Swap Counterparty shall, by execution of the relevant Supplemental Trust Deed, covenant and agree:

**7.2.1** with the Trustee and the Issuer that it will comply with and is bound by the terms of the Swap Agreement and that it will not amend the Swap Agreement without the prior written consent of the Trustee (provided that the Trustee shall agree to any amendment to the Swap Agreement to allow a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement in accordance with its terms in accordance with sub-Clause 13.4); that its recourse in respect of its claims under the Swap Agreement is limited to the proceeds of the Mortgaged Property in relation to such Series as it is entitled to, as provided in the Trust Deed and no debt shall be owed by the Issuer in respect of any shortfall; and that, without prejudice to its rights to bring Enforcement Proceedings against any person other than the Issuer or to its rights to bring proceedings other than Enforcement Proceedings against any person, the Swap Counterparty may not take any Enforcement Proceedings against the Issuer; and

**7.2.2** with the Trustee that all provisions of the Trust Deed as regards the entitlement of the Trustee to appoint agents and delegates, to rely upon experts' opinions and otherwise defining the rights and responsibilities of the Trustee with regard to the Mortgaged Property in relation to such Series shall also apply as between the Trustee and the Swap Counterparty.

# 8 Remuneration and Indemnification of the Trustee

**8.1 Normal Remuneration:** So long as any Notes of any Series are outstanding, the Issuer shall pay the Trustee as remuneration for its services as Trustee such sum on such dates in each case as they may from time to time agree. Such remuneration shall accrue from day to day from the date of this Principal Trust Deed. However, if any payment to a Noteholder or Couponholder of moneys due in respect of any Note, Receipts or Coupon for such Series is improperly withheld or refused, such

remuneration shall again accrue as from the date of such withholding or refusal until payment to such Noteholder or Couponholder is duly made.

8.2 **Extra Remuneration:** If an Event of Default or Potential Event of Default shall have occurred in respect of any Series or if the Trustee finds it expedient or necessary or is requested by the Issuer to undertake duties that they both agree to be of an exceptional nature or otherwise outside the scope of the Trustee's normal duties under the Trust Deed, the Issuer shall pay such additional remuneration as they may agree or, failing agreement as to any of the matters in this Clause (or as to such sums referred to in sub-Clause 8.1), as determined by an international investment bank (acting as an expert) selected by the Trustee and approved by the Issuer or, failing such approval, nominated by the President for the time being of The Law Society of England and Wales. The expenses involved in such nomination and such international investment bank's fee shall be paid by the Issuer. The determination of such international investment bank shall be conclusive and binding on the Issuer, the Trustee, the Noteholders and the Couponholders.

8.3 **Expenses:** For each Series the Issuer shall also on demand by the Trustee pay or discharge all costs, charges, liabilities and expenses properly incurred by the Trustee in the preparation and execution of this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document and the performance of its functions under this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document including, in relation to such Series, but not limited to, legal and travelling expenses and any stamp, documentary or other taxes or duties paid by the Trustee in connection with any legal proceedings brought or contemplated by the Trustee against the Issuer to enforce any provision of the Trust Deed, the Notes, the Receipts, the Coupons or the Talons. Such costs, charges, liabilities and expenses shall:

8.3.1 in the case of payments made by the Trustee before such demand, carry interest from the date of the demand at the rate of 2 per cent. per annum over the base rate of The Bank of New York Mellon on the date on which the Trustee made such payments; and

8.3.2 in other cases, carry interest at such rate from 30 days after the date of the demand or (where the demand specifies that payment is to be made on an earlier date) from such earlier date.

8.4 **Indemnity:** The relevant Issuer shall indemnify the Trustee in respect of all liabilities and expenses incurred by it or by anyone appointed by it or to whom any of its functions may be delegated by it in relation to any Series in the carrying out of its functions and against any loss, liability, cost, claim, action, demand or expense (including, but not limited to, all costs, charges and expenses paid or incurred in disputing or defending any of the foregoing) that any of them may incur or that may be made against any of them arising out of or in relation to or in connection with, its appointment or the exercise of its functions. The Contracts (Rights of Third Parties) Act 1999 applies to this sub-Clause 8.4.

8.5 **Continuing Effect:** Sub-Clauses 8.3 and 8.4 shall continue in full force and effect as regards the Trustee even if it no longer is Trustee.

8.6 **Amount due to the Trustee:** At any time when any amount is due from the relevant Issuer to the Trustee under this Clause 8, the Issuer for such Series shall pay such

amount to the Trustee before making payment of any amount then due to the Noteholders for such Series under the Conditions or any Swap Counterparty under any Swap Agreement in respect of such Series.

## 9 Provisions Supplemental to the Trustee Act 1925 and the Trustee Act 2000

**9.1** **Advice:** The Trustee may in respect of any Series act on the opinion or advice of, or information obtained from, any expert and shall not be responsible to anyone for any loss occasioned by so acting. Any such opinion, advice or information may be sent or obtained by letter,email or fax and the Trustee shall not be liable to anyone for acting in good faith on any opinion, advice or information purporting to be conveyed by such means even if it contains some error or is not authentic.

**9.2** **Trustee to Assume Performance:** The Trustee need not notify anyone of the execution of the Trust Deed or do anything to find out if an Event of Default or Potential Event of Default has occurred in relation to any Series. Until it has actual knowledge or express notice to the contrary, the Trustee may assume that no such event has occurred and that the Issuer is performing all its obligations under the Trust Deed, the Notes, the Receipts, the Coupons and the Talons of such Series.

**9.3** **Resolutions of Noteholders:** The Trustee shall not be responsible for having acted in good faith on a resolution purporting to have been passed at a meeting of Noteholders in respect of which minutes have been made and signed even if it is later found that there was a defect in the constitution of the meeting or the passing of the resolution or that the resolution was not valid or binding on the Noteholders or Couponholders.

**9.4** **Certificate Signed by Directors:** If the Trustee, in the exercise of its functions, requires to be satisfied or to have information as to any fact or the expediency of any act, it may call for and accept as sufficient evidence of that fact or the expediency of that act a certificate signed on the Issuer's behalf by any two Directors of the Issuer as to that fact or to the effect that, in their opinion, that act is expedient and the Trustee need not call for further evidence and shall not be responsible for any loss occasioned by acting on such a certificate.

**9.5** **Deposit of Documents:** The Trustee may appoint as custodian, on any terms, any bank or entity whose business includes the safe custody of documents or any lawyer or firm of lawyers believed by it to be of good repute and may deposit this Trust Deed and any other documents with such custodian and pay all sums due in respect thereof. The Trustee is not obliged to appoint a custodian of securities payable to bearer.

**9.6** **Discretion:** The Trustee shall have absolute and uncontrolled discretion as to the exercise of its functions and shall not be responsible for any loss, liability, cost, claim, action, demand, expense or inconvenience that may result from their exercise or non-exercise in respect of any Series.

**9.7** **Agents:** Whenever it considers it expedient in the interests of the Noteholders of any Series, the Trustee may, in the conduct of its trust business, instead of acting personally, employ and pay an agent selected by it, whether or not a lawyer or other professional person, to transact or conduct, or concur in transacting or conducting, any business and to do or concur in doing all acts required to be done by the Trustee (including the receipt and payment of money).

**9.8**     **Delegation:** Whenever it considers it expedient in the interests of the Noteholders for any Series, the Trustee may delegate to any person on any terms (including power to sub-delegate) all or any of its functions.

**9.9**     **Nominees:** In relation to any asset held by it under this Trust Deed, the Trustee may appoint any person to act as its nominee on any terms.

**9.10**     **Forged Notes:** The Trustee shall not be liable to the Issuer or any Noteholders or Couponholder by reason of having accepted as valid or not having rejected any Note, Certificate, Receipt, Coupon or Talon purporting to be such and later found to be forged or not authentic.

**9.11**     **Confidentiality:** Unless ordered to do so by a court of competent jurisdiction, the Trustee shall not be required to disclose to any Noteholder or Couponholder any confidential financial or other information made available to the Trustee by the Issuer.

**9.12**     **Determinations Conclusive:** As between itself and the Noteholders and Couponholders, the Trustee may determine all questions and doubts arising in relation to any of the provisions of this Principal Trust Deed or any Supplemental Trust Deed. Such determinations, whether made upon such a question actually raised or implied in the acts or proceedings of the Trustee, shall be conclusive and shall bind the Trustee, the Noteholders and the Couponholders.

**9.13**     **Currency Conversion:** Where it is necessary or desirable to convert any sum from one currency to another, it shall (unless otherwise provided hereby or required by law) be converted at such rate or rates, in accordance with such method and as at such date as may reasonably be specified by the Trustee but having regard to current rates of exchange, if available. Any rate, method and date so specified shall be binding on the Issuer, the Noteholders, the Couponholders and the Swap Counterparty (if any).

**9.14**     **Title of the Issuer to Mortgaged Property:** The Trustee shall accept without investigation, requisition or objection such right and title as the Issuer has to any of the Mortgaged Property and shall not be bound or concerned to examine or enquire into or be liable for any defect or failure in the right or title of the Issuer to the Mortgaged Property or any part thereof whether such defect or failure was known to the Trustee or might have been discovered upon examination or enquiry and whether capable of remedy or not.

**9.15**     **Insurance:** The Trustee shall not be under any obligation to insure any of the Mortgaged Property or any certificate, note, bond or other evidence in respect thereof, or to require any other person to maintain any such insurance.

**9.16**     **Deficiency Arising from Tax:** The Trustee shall have no responsibility whatsoever to the Issuer or any Noteholder as regards any deficiency which might arise because the Trustee or Custodian is subject to any tax in respect of any of the Mortgaged Property, income therefrom or the proceeds thereof.

**9.17**     **Indemnity:** Without prejudice to the right of indemnity by law given to trustees and subject to the provisions of Section 192 of the Companies Act 1985, the Trustee and every receiver, attorney, manager, agent or other person appointed by the Trustee hereunder in relation to each Series shall be entitled to be indemnified out of the Mortgaged Property (in respect of such Series) in respect of all liabilities and

expenses properly incurred by them or him in the execution or purported execution of the trusts hereof or of any powers, authorities or discretions vested in them or him pursuant to the Trust Deed and against all actions, proceedings, costs, claims and demands in respect of any matter or things done or omitted in any way relating to the Mortgaged Property, and the Trustee may retain any part of any moneys in its hands arising from the trusts of the Trust Deed all sums necessary to effect such indemnity and also the remuneration of the Trustee hereinbefore provided and the Trustee shall have a lien on such Mortgaged Property for all moneys payable to it under the Trust Deed or otherwise howsoever. The Contracts (Rights of Third Parties) Act 1999 applies to this sub-Clause 9.17.

9.18    **Validity of Security:** The Trustee assumes no responsibility for the validity, sufficiency or enforceability (which the Trustee has not investigated) of the security purported to be created by this Principal Trust Deed, any Supplemental Trust Deed, any other Security Document, any Swap Agreement, any pledge or other document. In addition, the Trustee has no duty to monitor the performance by the Agents or any Swap Counterparty or any Credit Enhancement Provider of their obligations to the Issuer nor is it obliged (unless indemnified to its satisfaction) to take any action which may involve the Trustee in any personal liability or expense.

9.19    **Payment for and Delivery of Notes:** The Trustee shall not be responsible for the receipt or application by the Issuer of the proceeds of the issue of the Notes of any Series, any exchange of such Notes or the delivery of such Notes to the persons entitled to them.

9.20    **Legal Opinions:** The Trustee shall not be responsible to any person for failing to request, require or receive any legal opinion relating to any Notes or for checking or commenting upon the content of any such legal opinion.

9.21    **Exercise of Voting Rights:** The Trustee shall not be responsible for the exercise or non-exercise of any voting rights in respect of the Collateral.

9.22    **Consents:** Any consent or approval given by the Trustee for the purposes of the Trust Deed may be given on such terms and subject to such conditions (if any) as the Trustee thinks fit.

9.23    **Swap Counterparty:** In acting as Trustee under the Trust Deed in respect of Notes of any Series the Trustee shall not assume any duty or responsibility to any Swap Counterparty or any Credit Enhancement Provider (other than to pay to such Swap Counterparty any moneys received and payable to it for it and to act in accordance with the provisions of Conditions 4(b) and 4(g)) and shall have regard solely to the interests of the Noteholders of such Series and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders of such Series.

9.24    **Determination or Calculation by the Trustee:** For each Series, if the Issuing and Paying Agent does not at any time for any reason so determine the Interest Rate or calculate the Interest Amount for an Interest Accrual Period, the Trustee shall do so and such determination or calculation shall be deemed to have been made by the Issuing and Paying Agent. In doing so, the Trustee shall apply the provisions of Condition 5, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

9.25  **Rating and Rating Agencies:** The Trustee assumes no responsibility for the rating of the Notes of any Series or for providing information to, or soliciting information from, any rating agency.

9.26  **Swap Counterparty Certificates:** The Trustee may call for (and the Issuer will use its best endeavours to procure the delivery of) and rely on certificates of any authorised person on behalf of the Swap Counterparty as to amounts owed to it.

9.27  **Responsibility for agents etc.:** If the Trustee exercises reasonable care in selecting any custodian, agent, delegate or nominee appointed under this sub-Clause 9.27 (an "**Appointee**"), it will not have any obligation to supervise the Appointee or be responsible for any loss, liability, cost, claim, action, demand or expense incurred by reason of the Appointee's misconduct or default or the misconduct or default of any substitute appointed by the Appointee.

9.28  **Conflict between Noteholders and Related Noteholders:** Where, in the opinion of the Trustee, there is a conflict between the interests of the holders of the Notes and those of any Related Notes and/or its duties as Trustee for the holders of Notes and for the holders of any Related Notes, the Trustee shall, unless otherwise specified in the Supplemental Trust Deed, act solely on behalf of the holders of the Controlling Series following enforcement of the security over the Mortgaged Property and shall have regard to their interests alone and shall not be responsible to the holders of the Notes that do not comprise the Controlling Series for so doing.

## 10    Trustee liable for Negligence

Section 1 of the Trustee Act 2000 shall not apply to any functions of the Trustee under this Trust Deed, provided that if the Trustee fails to show the degree of care and diligence required of it as trustee, nothing in the Trust Deed shall, having regard to the provisions hereof conferring on the Trustee powers, authorities and discretions, relieve or indemnify it from or against any liability that would otherwise attach to it in respect of any negligence, default, breach of duty or breach of trust of which it may be guilty.

## 11    Waiver, Consents and Proof of Default

11.1  **Waiver:** The Trustee may, in respect of the Notes of each Series, without the consent of the Noteholders or Couponholders of such Series and without prejudice to its rights in respect of any subsequent breach, from time to time and at any time, if in its opinion the interests of the Noteholders of such Series will not be materially prejudiced thereby, waive or authorise, on such terms as seem expedient to it, any breach or proposed breach by the Issuer of this Principal Trust Deed, any other Security Document or any relevant Supplemental Trust Deed or the Conditions or any relevant Swap Agreement or determine that an Event of Default or Potential Event of Default shall not be treated as such provided that the Trustee shall not do so in contravention of an express direction given by an Extraordinary Resolution or a request made pursuant to Condition 10. No such direction or request shall affect a previous waiver, authorisation or determination. Any such waiver, authorisation or determination shall be binding on the Noteholders and the Couponholders of such Series and, if the Trustee so requires, shall be notified to the Noteholders of such Series as soon as practicable.

11.2  **Consents:** For each Series, in giving any consent under the Trust Deed the Trustee may require the Issuer to agree to such modifications or additions to the provisions

of the Trust Deed as the Trustee may deem expedient in the interests of the Noteholders of such Series.

**11.3    Proof of Default:** Proof that the Issuer has failed to pay a sum due to the holder of any one Note, Receipt or Coupon shall (unless the contrary be proved) be sufficient evidence that it has made the same default as regards all other Notes, Receipts or Coupons of the same Series that are then payable.

## 12    Trustee not precluded from entering into Contracts

The Trustee and any other person, whether or not acting for itself, may acquire, hold or dispose of any Note, Receipt, Coupon, Talon or other security (or any interest therein) of the Issuer of such Series or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depositary or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Trustee were not acting as Trustee and need not account for any profit.

## 13    Modification and Substitution

**13.1    Modification:** The Trustee may, in respect of each Series, agree without the consent of the Noteholders or Couponholders to any modification to the Conditions or to this Principal Trust Deed or any Supplemental Trust Deed or Swap Agreement which is, in the opinion of the Trustee, of a formal, minor or technical nature or to correct a manifest error. The Trustee may also so agree to any modification to this Principal Trust Deed or any Supplemental Trust Deed or Swap Agreement that is in its opinion not materially prejudicial to the interests of the Noteholders of such Series, but such power does not extend to any such modification as is mentioned in the proviso to paragraph 2 of Schedule 3.

**13.2    Substitution:**

13.2.1    The Trustee may, without the consent of the holders of the Notes, Coupons, Receipts or Talons but subject to the consent of the relevant Swap Counterparty, agree to the substitution, in place of the Issuer, or any previous substituted company, as the principal debtor under this Principal Trust Deed and any Supplemental Trust Deed, any other Security Document, the Notes, Receipts, Coupons and Talons in respect of any one or more series, of any other company (incorporated in any jurisdiction) (the "**Substituted Issuer**"), provided that:

(i)    the outstanding ratings of any Notes issued by the Issuer are not adversely affected as confirmed in writing by the appropriate rating agency;

(ii)    a deed is executed or an undertaking given by the Substituted Issuer to the Trustee in a form satisfactory to the Trustee, agreeing to be bound by this Principal Trust Deed, any other Security Document, any relevant Supplemental Trust Deed and by the Notes, Receipts, Coupons and Talons of the relevant Series (with any consequential amendments which may be appropriate) as if the Substituted Issuer had been named herein and in the Notes, Receipts, Coupons and Talons of such Series as the principal debtor in place of the Issuer;

(iii)     the Substituted Issuer acquires the Issuer's equity of redemption in the relevant Mortgaged Property (if any) or otherwise assumes all rights, obligations and liabilities in relation to the Mortgaged Property, acknowledges the security created in respect thereof pursuant to the relevant Supplemental Trust Deed, any other Security Document, and takes all such action as the Trustee may require so that each such security constitutes a valid legal charge, pledge or other security interest as was originally created by the Issuer for the obligations of the Substituted Issuer;

(iv)     if any two Directors of the Substituted Issuer certify that the Substituted Issuer will be solvent immediately after the time at which the said substitution is to be effected, the Trustee need not have regard to the financial condition, profits or prospects of such Substituted Issuer or compare the same with those of the Issuer;

(v)     the Trustee is satisfied that (I) all necessary governmental and regulatory approvals and consents necessary for or in connection with the assumption by the Substituted Issuer of liability as principal debtor in respect of, and of its obligations under, the Notes, Receipts, Coupons, Talons and any Swap Agreement have been obtained and (II) such approvals and consents are at the time of substitution in full force and effect;

(vi)     the Issuer and the Substituted Issuer execute and the Issuer procures that the Swap Counterparty executes such other deeds, documents and instruments (if any) as the Trustee may require in order that such substitution is fully effective and complies with such other requirements in the interests of the holders of the Notes, Receipts, Coupons and Talons as the Trustee may direct;

(vii)     in connection with any proposed substitution of the Issuer, the Trustee may, without the consent of the holders of such Notes, Receipts, Coupons or Talons agree to a change of the law from time to time governing the Notes and Coupons and/or this Principal Trust Deed and/or any relevant Supplemental Trust Deed, provided that such change of governing law is not, in the opinion of the Trustee, materially prejudicial to the interests of such Noteholders and Couponholders in respect of the Mortgaged Property; and

(viii)     a legal opinion satisfactory to the Trustee is provided concerning any proposed substitution.

13.2.2    Upon the execution of such documents and compliance with such requirements as are referred to in sub-Clause 13.2.1, the Substituted Issuer shall be deemed to be named as the Issuer in this Principal Trust Deed (insofar as it affects the relevant Series), any other Security Documents, the relevant Supplemental Trust Deed, and the relevant Notes, Receipts, Coupons or Talons, all of which shall thereupon be deemed to be amended in such manner as is necessary to give effect thereto. Agreement by the Trustee to such substitution shall operate to release the Issuer from all of its obligations as principal debtor in respect of the relevant Series under

this Principal Trust Deed, any other Security Document, and the relevant Supplemental Trust Deed. Not later than 14 days after the execution of any such undertaking and such other deeds, documents and instruments as aforesaid and compliance with the said requirements of the Trustee the Substituted Issuer shall, unless the Trustee agrees otherwise, give notice thereof to the relevant Noteholders.

**13.3 Change in tax residence:** The Trustee may agree to or require, without the consent of the Noteholders or the Couponholders, the change in the place of residence of the Issuer for taxation purposes, provided that:

**13.3.1** the Trustee is satisfied that (a) all governmental and regulatory approvals and consents necessary for or in connection with the change by the Issuer of its place of tax residence have been obtained and (b) such approvals and consents are at the time of change in full force and effect;

**13.3.2** the Issuer executes such other deeds, documents and instruments (if any) as the Trustee may require in order that such change in place of tax residence is fully effective and complies with such other requirements in the interest of the Noteholders as the Trustee may direct;

**13.3.3** in connection with any proposed change in the place of tax residence of the Issuer, the Trustee may, without the consent of the Noteholders or the Couponholders agree to a change of the law from time to time governing such Notes and Coupons and/or this Principal Trust Deed and/or any relevant Supplemental Trust Deed, provided that such change of governing law is not, in the opinion of the Trustee, materially prejudicial to the interests of such Noteholders in respect of the Mortgaged Property;

**13.3.4** such change shall not adversely affect any existing rating of any Notes issued by the Issuer as confirmed in writing by the appropriate rating agency; and

**13.3.5** a legal opinion satisfactory to the Trustee is provided concerning any change in the place of tax residence of the Issuer.

**13.4 Transfer under the Swap Agreement:** In relation to any outstanding Notes which are rated, the Trustee shall agree to a transfer of any Swap Counterparty's rights and obligations under any Swap Agreement in accordance with its terms and shall agree to any amendment to such Swap Agreement to allow such transfer, provided that the transferee Swap Counterparty has obtained a rating for its obligations under such Swap Agreement at least equal to that obtained by the transferor Swap Counterparty in relation to its obligations under such Swap Agreement from Standard & Poor's and/or Moody's and/or Fitch, if applicable, or from any other statistical rating organisation generally recognised by banks, securities houses and investors in the euro-markets.

**14 Appointment, Retirement and Removal of the Trustee**

**14.1 Appointment:** The Issuer has the power of appointing new Trustees but no one may be so appointed unless previously approved by an Extraordinary Resolution of the relevant Noteholders (or in respect of a Series where there are Related Notes, the approval of holders of the Controlling Series by Extraordinary Resolution). A trust corporation shall at all times be a Trustee and may be the sole Trustee.

14.2 **Retirement and Removal:** Any Trustee may retire in respect of any Series at any time on giving at least three months' written notice to the Issuer without giving any reason or being responsible for any costs occasioned by such retirement and the relevant Noteholders may by Extraordinary Resolution (or, in respect of a Series of Notes where there are Related Notes, the holders of the Controlling Series may by Extraordinary Resolution) remove any Trustee provided that the retirement or removal of a sole trust corporation shall not be effective until a trust corporation is appointed as successor Trustee. If a sole trust corporation gives notice of retirement or an Extraordinary Resolution is passed for its removal, the Issuer shall use all reasonable endeavours to procure that another trust corporation be appointed as Trustee and if it does not procure the appointment of a new trustee within 30 days of the expiry of the Trustee notice referred to in this Clause, the Trustee shall be entitled to procure forthwith a new trustee acting on the same or substantially the same terms at the Trustee.

14.3 **Co-Trustees:** The Trustee may, despite sub-Clause 14.1, by written notice to the Issuer appoint anyone to act as an additional trustee jointly with the Trustee:

14.3.1 if the Trustee considers the appointment to be in the interests of the Noteholders and/or the Couponholders;

14.3.2 to conform with a legal requirement, restriction or condition in a jurisdiction in which a particular act is to be performed; or

14.3.3 to obtain a judgment or to enforce a judgment or any provision of this Principal Trust Deed or any Supplemental Trust Deed in any jurisdiction.

Subject to the provisions of this Principal Trust Deed and/or any relevant Supplemental Trust Deed the Trustee may confer on any person so appointed such functions as it thinks fit. The Trustee may by written notice to the Issuer and that person, remove that person. At the Trustee's request, the Issuer shall forthwith do all things as may be required to perfect such appointment or removal and it irrevocably appoints the Trustee as its attorney in its name and on its behalf to do so.

14.4 **Competence of a Majority of Trustees:** If there are more than two Trustees the majority of them shall be competent to perform the Trustee's functions provided the majority includes a trust corporation.

14.5 **Merger:** Any corporation into which the Trustee may be merged or converted, any corporation with which the Trustee may be consolidated, amalgamated or any corporation resulting from any merger, amalgamation, conversion or consolidation to which the Trustee shall be a party, any corporation to which the Trustee shall sell or otherwise transfer all or substantially all of its assets or any corporation to which the Trustee shall sell or otherwise transfer all or substantially all of its corporate trust business, shall, to the extent permitted by applicable law, be the relevant successor Trustee under this Principal Trust Deed without the execution or delivery of any papers or any further act on the part of the parties hereto whereupon the Issuer and such successor shall acquire and become subject to the same rights and obligations between themselves as if they had entered into an agreement in the form *mutatis mutandis* of this Principal Trust Deed. Notice of any such merger, amalgamation, conversion, consolidation, sale or transfer shall forthwith be given by the Trustee to the Issuer and, as soon as practicable, to the Noteholders in accordance with Condition 14.

## 15 Notes held in Clearing Systems and Couponholders

**15.1** **Notes held in Clearing Systems:** If, and so long as, any Global Note is, or any Notes represented by a Global Certificate are, held on behalf of a clearing system, in considering the interests of Noteholders, the Trustee may have regard to any information provided to it by such clearing system or its operator as to the identity (either individually or by category) of its accountholders or participants with entitlements to any such Global Note or the Registered Notes and may consider such interests on the basis that such accountholders or participants were the holder(s) thereof.

**15.2** **Couponholders:** No notices need be given to Couponholders. They shall be deemed to have notice of the contents of any notice given to Noteholders. Even if it has express notice to the contrary, in exercising any of its functions by reference to the interests of the Noteholders, the Trustee shall assume that the holder of each Note is the holder of all Receipts, Coupons and Talons relating to it.

## 16 Currency Indemnity

**16.1** **Currency of Account and Payment:** The Contractual Currency is the sole currency of account and payment for all sums payable by the Issuer under or in connection with the Trust Deed, the Notes, the Receipts and the Coupons, including damages.

**16.2** **Extent of Discharge:** An amount received or recovered in a currency other than the Contractual Currency (whether as a result of, or of the enforcement of, a judgment or order of a court of any jurisdiction, in the insolvency, winding-up or dissolution of the Issuer or otherwise), by the Trustee or any Noteholder or Couponholder in respect of any sum expressed to be due to it from the Issuer shall only discharge the Issuer to the extent of the Contractual Currency amount that the recipient is able to purchase with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).

**16.3** **Indemnity:** If that Contractual Currency amount is less than the Contractual Currency amount expressed to be due to the recipient under the Trust Deed, the Notes, the Receipts or the Coupons, the Issuer shall indemnify it against any loss sustained by it as a result. In any event, the Issuer shall indemnify the recipient against the cost of making any such purchase.

**16.4** **Indemnity Separate:** The indemnities in this Clause 16 and in sub-Clauses 8.4 and 9.17 constitute separate and independent obligations from the other obligations in this Trust Deed, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Trustee and/or any Noteholder or Couponholder or Swap Counterparty and shall continue in full force and effect despite any judgment, order, claim or proof for a liquidated amount in respect of any sum due under this Trust Deed, the Notes, the Receipts and/or the Coupons or any other judgment or order.

## 17 Communications

**17.1** **Method:** Each communication under this Principal Trust Deed shall be made by fax, email or otherwise in writing. Each communication or document to be delivered to any party under this Principal Trust Deed shall be sent to that party at the fax

number, postal address, or email address and marked for the attention of the person (if any), from time to time designated by that party to each other party for the purpose of this Principal Trust Deed.

The initial telephone number, fax number, postal address or email address and person so designated by each party to this Principal Trust Deed are set out below:

The Issuer

| | |
|---|---|
| telephone: | 00 353 1 874 0777 |
| fax: | 00 353 1 874 3050 |
| email: | jonna.l.taylor@aib.ie |
| address: | AIB International Centre International Financial Services Centre Dublin 1 |
| attention: | The Directors |

Trustee

| | |
|---|---|
| telephone: | + 44 20 7777 5422 |
| fax: | +44 20 7777 5410 |
| email: | cttrusteeadmin@bnymellon.com |
| address: | One Canada Square London E14 5AL |
| attention: | Manager, Trust Administration |

In the case of communications to any other Specified Company, the communication details shall be as specified in the relevant Supplemental Trust Deed.

**17.2 Deemed Receipt:** Any communication from any party to any other under this Principal Trust Deed shall be effective, (if by fax) when good receipt is confirmed by the recipient following enquiry by the sender, (if by email) when the relevant receipt of such communication being read is given, or where no read receipt is requested by the sender, at the time of sending, provided that no delivery failure notification is received by the sender within 24 hours of sending such communication and (if in writing) when delivered, except that a communication received outside normal business hours shall be deemed to be received on the next business day in the city in which the recipient is located.

## 18 Enforcement and Non-recourse

**18.1 Enforcement:** Only the Trustee may enforce the rights of the holders of Notes, Coupons, Receipts and Talons and/or the Swap Counterparty against the relevant Issuer, whether the same arise under general law, this Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Coupons, the Receipts or Talons (if any) or otherwise, and the holders of Notes, Coupons, Receipts and Talons and/or the Swap Counterparty shall not be entitled to proceed directly against that Issuer unless the Trustee, having become bound to proceed in accordance with the terms of this Trust Deed, fails or neglects to do so.

**18.2    Non-Recourse:** The Trustee, Swap Counterparty (if any) and the holders of Notes, Coupons, Receipts and Talons shall have recourse only to the Mortgaged Property in respect of the relevant Series and, the Trustee having realised the same, the Trustee, Swap Counterparty (if any) and the holders of Notes, Coupons, Receipts or Talons, or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any further sum and no debt shall be owed to any of such persons by the Issuer in respect of any such further sum. In particular, neither the Trustee, Swap Counterparty (if any) nor any holder of Notes, Coupons, Receipts or Talons shall be entitled to institute, or join with any other person in bringing, instituting or joining, insolvency proceedings (whether court based or otherwise) in relation to the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series.

## 19    Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Principal Trust Deed has no rights, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Principal Trust Deed except that and to the extent (if any) that this Principal Trust Deed expressly provides for that Act to apply to any of its terms.

## 20    Governing Law and Jurisdiction

**20.1    Governing Law:** This Principal Trust Deed, the Notes, the Coupons, the Talons and the Receipts shall be governed by and construed in accordance with English law.

**20.2    Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with this Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons and accordingly any legal action or proceedings arising out of or in connection with this Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons ("**Proceedings**") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of the Trustee and the holders of Notes, Receipts, Coupons and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

**20.3    Service of Process:** The Issuer irrevocably appoints Lehman Brothers International (Europe) to receive, for it and on its behalf, service of process in any Proceedings in England. Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason such process agent ceases to be able to act as such or no longer has an address in England the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the Trustee and shall immediately notify the Trustee of such appointment. Nothing shall affect the right to serve process in any other manner permitted by law.

## 21    Counterparts

This Principal Trust Deed may be executed in counterparts which when taken together shall constitute one and the same instrument.

**Schedule 1**

**Part A**

**Form of CGN Temporary Global Note**

THIS TEMPORARY GLOBAL NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "**SECURITIES ACT**"). NEITHER THIS TEMPORARY GLOBAL NOTE NOR ANY PORTION HEREOF MAY BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO ANY U.S. PERSON UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

**[SPECIFIED COMPANY]**

**[●]**

**Registered Office: [●]**

**[REGISTERED NUMBER]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Temporary Global Note No: [     ]**

This Temporary Global Note is issued in respect of the Notes (the "**Notes**") of the Tranche(s) and Series specified in the Second Schedule hereto of [Specified Company] (the "**Issuer**").

**1      Interpretation and Definitions**

References in this Global Note to the "**Conditions**" are to the Terms and Conditions applicable to the Notes (which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and BNY Corporate Trustee Services Limited as Trustee as amended and restated on 18 July 2008 (the "**Principal Trust Deed**") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being  the "**Trust Deed**")), as such form is supplemented and/or modified and/or superseded by the provisions of this Temporary Global Note (including the supplemental definitions and any modifications or additions set out in the Second Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Temporary Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

**2      Aggregate Principal Amount**

The aggregate principal amount from time to time of this Temporary Global Note shall be an amount equal to the aggregate principal amount of the Notes as shall be shown by the latest entry in the fourth column of the First Schedule hereto, which shall be completed by or on behalf of the Issuing and Paying Agent upon (i) the issue of the Notes represented hereby, (ii) the exchange of the whole or a part of this Temporary Global Note for a corresponding interest in a Permanent Global Note or Registered Notes, (iii) the redemption or purchase and cancellation of Notes represented hereby and/or (iv) in the case of partly-paid Notes,

the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

## 3    Promise to Pay

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Temporary Global Note, upon presentation and (when no further payment is due in respect of this Temporary Global Note) surrender of this Temporary Global Note, on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Temporary Global Note and (unless this Temporary Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

## 4    Exchange

If this Temporary Global Note is an Exchangeable Bearer Note, this Temporary Global Note may be exchanged in whole or from time to time in part for one or more Registered Notes in accordance with the Conditions on or after the Issue Date but before the Exchange Date (as defined below) by its presentation to the Issuing and Paying Agent. On or after the Exchange Date, the outstanding principal amount of this Temporary Global Note may be exchanged in accordance with the next paragraph.

Subject as provided in the Conditions applicable to Partly-paid Notes, on or after the first day following the expiry of 40 days after the Issue Date (the "**Exchange Date**"), this Temporary Global Note may be exchanged (free of charge to the holder) in whole or from time to time in part by its presentation and, on exchange in full, surrender to or to the order of the Issuing and Paying Agent for interests in a Permanent Global Note and (if this Temporary Global Note is an Exchangeable Bearer Note), in each case, for Registered Notes in an aggregate principal amount equal to the principal amount of this Temporary Global Note submitted for exchange; provided that, there shall have been Certification with respect to such principal amount submitted for such Certification (as defined below) with respect to such principal amount submitted for such exchange dated no earlier than the Exchange Date.

"**Certification**" means the presentation to the Issuing and Paying Agent of a certificate or certificates with respect to one or more interests in this Temporary Global Note, signed by Euroclear or Clearstream, Luxembourg, substantially to the effect set out in Schedule 4 to the Agency Agreement to the effect that it has received a certificate or certificates substantially to the effect set out in Schedule 3 to the Agency Agreement with respect thereto and that no contrary advice as to the contents thereof has been received by Euroclear or Clearstream, Luxembourg, as the case may be.

Upon the whole or a part of this Temporary Global Note being exchanged for a Permanent Global Note, such Permanent Global Note shall be exchangeable in accordance with its terms for Definitive Notes or Registered Notes.

The Definitive Notes or the Certificates representing the Registered Notes for which this Temporary Global Note or a Permanent Global Note may be exchangeable shall be duly

executed and authenticated, shall, in the case of Definitive Notes, have attached to them all Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect of Instalment Amounts, that have not already been paid on this Temporary Global Note or the Permanent Global Note, as the case may be, shall be security printed or, in the case of Certificates, printed in accordance with applicable legal and stock exchange requirements and shall be substantially in the form set out in the Schedules to the Trust Deed as supplemented and/or modified and/or superseded by the terms of the Second Schedule hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or any other clearing system.

On any exchange of a part of this Temporary Global Note for an equivalent interest in a Permanent Global Note or for Registered Notes, as the case may be, the portion of the principal amount hereof so exchanged shall be endorsed by or on behalf of the Issuing and Paying Agent in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so exchanged and endorsed.

## 5 Benefit of Conditions

Except as otherwise specified herein, this Temporary Global Note is subject to the Conditions and the Trust Deed and, until the whole of this Temporary Global Note is exchanged for Definitive Notes or Registered Notes, the holder of this Temporary Global Note shall in all respects be entitled to the same benefits as if it were the holder of the Permanent Global Note (or the relevant part of it) for which it may be exchanged and as if such Permanent Global Note had been issued on the Issue Date.

## 6 Payments

No person shall be entitled to receive any payment in respect of the Notes represented by this Temporary Global Note that falls due after an Exchange Date for such Notes, unless upon due presentation of this Temporary Global Note for exchange, delivery (or, in the case of a subsequent exchange, due endorsement of) a Permanent Global Note or delivery of Certificates is improperly withheld or refused by or on behalf of the Issuer or the Issuer does not perform or comply with any of its obligations under the Permanent Global Note.

Payments due in respect of this Temporary Global Note before the Exchange Date shall only be made in relation to such principal amount of this Temporary Global Note with respect to which there shall have been Certification dated no earlier than such due date for payment.

Any payments that are made in respect of this Temporary Global Note shall be made to its holder against presentation and (if no further payment falls to be made on it) surrender of it at the specified office of the Issuing and Paying Agent or of any other Paying Agent provided for in the Conditions.

If any payment in full of principal is made in respect of any Note represented by this Temporary Global Note, the portion of this Temporary Global Note representing such Note shall be cancelled and the amount so cancelled shall be endorsed by or on behalf of the Issuing and Paying Agent in the First Schedule hereto (such endorsement being *prima facie*

evidence that the payment in question has been made) whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

If any other payments are made in respect of the Notes represented by this Temporary Global Note, a record of each such payment shall be endorsed by or on behalf of the Issuing and Paying Agent on an additional schedule hereto (such endorsement being *prima facie* evidence that the payment in question has been made). The second exception to Condition 6(d)(i) and Condition 7(e) will apply to the Definitive Notes only.

## 7 Cancellation

Cancellation of any Note represented by this Temporary Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Temporary Global Note representing such Note on its presentation to or to the order of the Issuing and Paying Agent for endorsement in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

## 8 Notices

Notwithstanding Condition 14, notices in respect of the Notes represented by this Temporary Global Note may be given by their being delivered (so long as this Temporary Global Note is held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system) to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

No provisions of this Temporary Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions. This Temporary Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent. This Temporary Global Note shall be governed by and construed in accordance with the laws of England.

**In witness** whereof the Issuer has caused this Temporary Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:


By:



**Certificate of Authentication of the Issuing and Paying Agent**

This Temporary Global Note is authenticated by or on behalf of the Issuing and Paying Agent

The Bank of New York Mellon as Issuing and Paying Agent

By:

Authorised Signatory

For the purposes of authentication only.

## The First Schedule

## Principal Amount of Notes Represented by this Temporary Global Note

The following (i) issues of Notes initially represented by this Temporary Global Note, (ii) exchanges of the whole or a part of this Temporary Global Note for interest in a Permanent Global Note or for Registered Notes, and/or (iii) cancellations or forfeitures of interests in this Temporary Global Note have been made, resulting in the principal amount of this Global Note specified in the latest entry in the fourth column:

| Date | Amount of increase/ decrease in principal amount of this Global Note | Reason for decrease in principal amount of this Temporary Global Note (exchange, cancellation or forfeiture) | Principal amount of this Temporary Global Note on issue or following such decrease | Notation made by or on behalf of the Issuing and Paying Agent |
| --- | --- | --- | --- | --- |

## The Second Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions or the Global Note as the Second Schedule]

# Schedule 1
## Part B
## Form of CGN Permanent Global Note

**[SPECIFIED COMPANY]**
**[●]**
**Registered Office: [●]**
**[●]**
**(Incorporated with limited liability in [●])**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Permanent Global Note No:**

This Global Note is issued in respect of the Notes (the "**Notes**") of the Tranche(s) and Series specified in the Third Schedule hereto of [SPECIFIED COMPANY] (the "**Issuer**").

## 1       Interpretation and Definitions

References in this Global Note to the "**Conditions**" are to the Terms and Conditions applicable to the Notes, which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and BNY Corporate Trustee Services Limited as Trustee as amended and restated on 18 July 2008 (the "**Principal Trust Deed**") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being the "**Trust Deed**")) , as such form is supplemented and/or modified and/or superseded by the provisions of this Global Note (including the supplemental definitions and any modifications or additions set out in the Third Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

## 2       Aggregate Principal Amount

The aggregate principal amount from time to time of this Global Note shall be an amount equal to the aggregate principal amount of the Notes as shall be shown by the latest entry in the fourth column of the First Schedule hereto, which shall be completed by or on behalf of the Issuing and Paying Agent upon (i) the exchange of the whole or a part of a Temporary Global Note initially representing the Notes for a corresponding interest herein (in the case of Notes represented by a Temporary Global Note upon issue) (ii) the issue of the Notes represented hereby, (iii) the exchange of the whole or, where the limited circumstances so permit, a part of this Global Note for Definitive Notes or Registered Notes, (iv) the redemption or purchase and cancellation of Notes represented hereby and/or (v) in the case of Partly-paid Notes, the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

## 3       Promise to Pay

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Global Note, upon presentation and (when no further payment is due in

respect of this Global Note) surrender of this Global Note, on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Global Note and (unless this Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

## 4    Exchange

This Global Note is exchangeable (free of charge to the holder) on or after the Exchange Date in whole but not, except as provided in the next paragraph, in part for Definitive Notes or (if this Global Note is an Exchangeable Bearer Note) Registered Notes represented by the Certificates described below:

(a)      if this Global Note is an Exchangeable Bearer Note, by the holder hereof giving notice to the Issuing and Paying Agent of its election to exchange the whole or a part of this Global Note for Registered Notes; or

(b)      if this Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an "Alternative Clearing System") and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so.

This Global Note is exchangeable in part (provided, however, that if this Global Note is held by or on behalf of Euroclear and/or Clearstream, Luxembourg, the rules of Euroclear and/or Clearstream, Luxembourg, as the case may be, so permit) (i) if this Global Note is an Exchangeable Bearer Note and the part hereof submitted for exchange is to be exchanged for Registered Notes or (ii) if so provided, and in accordance with, the Conditions relating to Partly-paid Notes.

"**Exchange Date**" means a day falling not less than 60 days, or in the case of an exchange for Registered Notes five days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Issuing and Paying Agent is located and, except in the case of exchange pursuant to (d) above, in the cities in which Euroclear and Clearstream, Luxembourg or, if relevant, the Alternative Clearing System, are located.

Subject as provided in the Conditions applicable to Partly-paid Notes, any such exchange may be effected on or after an Exchange Date by the holder of this Global Note surrendering this Global Note or, in the case of a partial exchange, presenting it for endorsement to or to the order of the Issuing and Paying Agent.

In exchange for this Global Note, or part thereof to be exchanged, the Issuer shall deliver, or procure the delivery of, duly executed and authenticated Definitive Notes and/or (if this Global Note is an Exchangeable Bearer Note) Certificates in an aggregate principal amount equal to the principal amount of this Global Note submitted for exchange (if appropriate, having attached to them all Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect of Instalment Amounts, that have not already been paid on this Global Note), security printed or, in the case of Certificates, printed in accordance with any applicable legal and stock exchange requirements and substantially in the form set out in

Schedule 2 to the Trust Deed as supplemented and/or modified and/or superseded by the terms of the Third Schedule hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or an Alternative Clearing System.

On any exchange of a part of this Global Note the portion of the principal amount hereof so exchanged shall be endorsed by or on behalf of the Issuing and Paying Agent in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so exchanged and endorsed.

## 5    Benefit of Conditions

Except as otherwise specified herein, this Global Note is subject to the Conditions and the Trust Deed and, until the whole of this Global Note is exchanged for Definitive Notes or Registered Notes, the holder of this Global Note shall in all respects be entitled to the same benefits as if it were the holder of the Definitive Notes for which it may be exchanged and as if such Definitive Notes had been issued on the Issue Date.

## 6    Payments

No person shall be entitled to receive any payment in respect of the Notes represented by this Global Note that falls due after an Exchange Date for such Notes, unless upon due presentation of this Global Note for exchange, delivery of Definitive Notes or Certificates is improperly withheld or refused by or on behalf of the Issuer or the Issuer does not perform or comply with any one or more of what are expressed to be its obligations under any Definitive Notes.

Payments in respect of this Global Note shall be made to its holder against presentation and (if no further payment falls to be made on it) surrender of it at the specified office of the Issuing and Paying Agent or of any other Paying Agent provided for in the Conditions. A record of each such payment shall be endorsed on the First or Second Schedule hereto, as appropriate, by the Issuing and Paying Agent or by the relevant Paying Agent, for and on behalf of the Issuing and Paying Agent, which endorsement shall (until the contrary is proved) be *prima facie* evidence that the payment in question has been made. The second exception to Condition 6(d)(i) and Condition 7(e) will apply to the Definitive Notes only.

## 7    Prescription

Claims in respect of principal and interest (as each is defined in the Conditions) in respect of this Global Note shall become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date.

## 8    Meetings

The holder of this Global Note shall (unless this Global Note represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders and, at any such meeting, as having one vote in respect of each integral currency unit of the specified currency of the Notes.

## 9 Cancellation

Cancellation of any Note represented by this Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Global Note representing such Note on its presentation to or to the order of the Issuing and Paying Agent for endorsement in the First Schedule hereto, whereupon the principal amount hereof shall be reduced for all purposes by the amount so cancelled and endorsed.

## 10 Purchase

Notes may only be purchased by the Issuer if they are purchased together with the right to receive all future payments of interest and Instalment Amounts (if any) thereon.

## 11 Issuer's Options

Any option of the Issuer provided for in the Conditions shall be exercised by the Issuer giving notice to the Noteholders within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required.

## 12 Noteholders' Options

Any option of the Noteholders provided for in the Conditions may be exercised by the holder of this Permanent Global Note giving notice to the Issuing and Paying Agent within the time limits relating to the deposit of Notes with a Paying Agent set out in the Conditions substantially in the form of the notice available from any Paying Agent, except that the notice shall not be required to contain the serial numbers of the Notes in respect of which the option has been exercised, and stating the principal amount of Notes in respect of which the option is exercised and at the same time presenting this Permanent Global Note to the Issuing and Paying Agent, or to a Paying Agent acting on behalf of the Issuing and Paying Agent, for notation accordingly in the Fourth Schedule hereto.

## 13 Notices

Notwithstanding Condition 14, notices in respect of the Notes represented by this Global Note may be given by their being delivered (so long as this Global Note is held on behalf of Euroclear, Clearstream, Luxembourg or any other clearing system) to Euroclear, Clearstream, Luxembourg or such other clearing system, as the case may be.

## 14 Negotiability

This Global Note is a bearer document and negotiable and accordingly:

(a) is freely transferable by delivery and such transfer shall operate to confer upon the transferee all rights and benefits appertaining hereto and to bind the transferee with all obligations appertaining hereto pursuant to the Conditions;

(b) the holder of this Global Note is and shall be absolutely entitled as against all previous holders to receive all amounts by way of Redemption Amount interest or otherwise payable in respect of this Global Note and the Issuer has waived against such holder and any previous holder of this Global Note all rights of set-off or

counterclaim that would or might otherwise be available to it in respect of the obligations evidenced by this Global Note; and

(c)     payment upon due presentation of this Global Note as provided herein shall operate as a good discharge against such holder and all previous holders of this Global Note.

No provisions of this Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions.

This Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent.

This Global Note shall be governed by and construed in accordance with the laws of England.

**In witness** whereof the Issuer has caused this Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:


**Certificate of Authentication of the Issuing and Paying Agent**

This Global Note is authenticated by or on behalf of the Issuing and Paying Agent

The Bank of New York Mellon. as Issuing and Paying Agent

By:


Authorised Signatory

For the purposes of authentication only.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

# The First Schedule

## Principal Amount of Notes Represented by this Global Note

The following (i) issues of Notes initially represented by this Global Note, (ii) exchanges of interests in a Temporary Global Note for interests in this Global Note, (iii) exchanges of the whole or a part of this Global Note for Definitive Notes or for Registered Notes, (iv) cancellations or forfeitures of interests in this Global Note and/or (v) payments of the Redemption Amount in respect of this Global Note have been made, resulting in the principal amount of this Global Note specified in the latest entry in the fourth column:

| Date | Amount of increase/ decrease in principal amount of this Global Note | Reason for increase/decrease in principal amount of this Global Note (initial issue, exchange, cancellation, forfeiture or payment, stating amount of payment made) | Principal amount of this Temporary Global Note following such increase/decrease | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|---|

## The Second Schedule

### Payments of Interest

The following payments of interest or Interest Amount in respect of this Global Note have been made:

| Due date of payment | Date of payment | Amount of interest | Notation made by or on behalf of the Issuing and Paying Agent |
| --- | --- | --- | --- |

# The Third Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions for the Global Note as the Third Schedule]

## The Fourth Schedule

### Exercise of Noteholders' Option

The following exercises of the option of the Noteholders provided for in the Conditions have been made in respect of the stated principal amount of this Permanent Global Note:

| Date of exercise | Principal amount of this Permanent Global Note in respect of which exercise is made | Date on which exercise of such option is effective | Notation made by or on behalf of the Issuing and Paying Agent |
|---|---|---|---|

**Schedule 1**

**Part C**

**Form of NGN Temporary Global Note**

THIS TEMPORARY GLOBAL NOTE HAS NOT BEEN AND WILL NOT BE REGISTERED UNDER THE U.S. SECURITIES ACT OF 1933 (THE "**SECURITIES ACT**"). NEITHER THIS TEMPORARY GLOBAL NOTE NOR ANY PORTION HEREOF MAY BE OFFERED OR SOLD WITHIN THE UNITED STATES OR TO ANY U.S. PERSON UNLESS AN EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT IS AVAILABLE.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

**[SPECIFIED COMPANY]**

**[●]**

**Registered Office: [●]**

**[REGISTERED NUMBER]**


**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Temporary Global Note No: [    ]**

This Temporary Global Note is issued in respect of the Notes (the "**Notes**") of the Tranche(s) and Series specified in the Second Schedule hereto of [Specified Company] (the "**Issuer**").

**15     Interpretation and Definitions**

References in this Global Note to the "**Conditions**" are to the Terms and Conditions applicable to the Notes (which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and BNY Corporate Trustee Services Limited as Trustee as amended and restated on 18 July 2008 (the "**Principal Trust Deed**") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being  the "**Trust Deed**")), as such form is supplemented and/or modified and/or superseded by the provisions of this Temporary Global Note (including the supplemental definitions and any modifications or additions set out in the Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Temporary Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

**16     Aggregate Principal Amount**

The aggregate principal amount from time to time of this Temporary Global Note shall be an amount equal to the aggregate principal amount of the Notes from time to time entered in the records of both Euroclear and Clearstream, Luxembourg (together the "**ICSDs**" and "**ICSD**" means either one of them), which shall be completed and/or amended, as the case may be, upon (i) the issue of the Notes represented hereby, (ii) the exchange of the whole or a part of this Temporary Global Note for a corresponding interest recorded in the records of the ICSDs in a Permanent Global Note or Registered Notes, (iii) the redemption or purchase and cancellation of Notes represented hereby and/or (iv) in the case of partly-paid

Notes, the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

The records of the ICSDs (which expression in this Temporary Global Note means the records that each ICSD holds for its customers which reflect the amount of such customers' interests in the Notes but excluding any interest in any Notes of one ICSD shown in the records of another ICSD) shall be conclusive evidence of the aggregate principal amount outstanding of the Notes represented by this Temporary Global Note and, for these purposes, a statement issued by an ICSD (which statement shall be made available to the bearer upon request) stating the aggregate principal amount of outstanding Notes represented by this Temporary Global Note at any time shall be conclusive evidence of the records of such at that time.

## 17 Promise to Pay

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Temporary Global Note, upon presentation and (when no further payment is due in respect of this Temporary Global Note) surrender of this Temporary Global Note, on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Temporary Global Note and (unless this Temporary Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

## 18 Exchange

If this Temporary Global Note is an Exchangeable Bearer Note, this Temporary Global Note may be exchanged in whole or from time to time in part for one or more Registered Notes in accordance with the Conditions on or after the Issue Date but before the Exchange Date (as defined below) by its presentation to the Issuing and Paying Agent. On or after the Exchange Date, the outstanding principal amount of this Temporary Global Note may be exchanged in accordance with the next paragraph.

Subject as provided in the Conditions applicable to Partly-paid Notes, on or after the first day following the expiry of 40 days after the Issue Date (the "**Exchange Date**"), this Temporary Global Note may be exchanged (free of charge to the holder) in whole or from time to time in part by its presentation and, on exchange in full, surrender to or to the order of the Issuing and Paying Agent for interests recorded in the records of the ICSDs in a Permanent Global Note and (if this Temporary Global Note is an Exchangeable Bearer Note), in each case, for Registered Notes in an aggregate principal amount equal to the principal amount of this Temporary Global Note submitted for exchange; provided that, there shall have been Certification with respect to such principal amount submitted for such Certification (as defined below) with respect to such principal amount submitted for such exchange dated no earlier than the Exchange Date.

"**Certification**" means the presentation to the Issuing and Paying Agent of a certificate or certificates with respect to one or more interests in this Temporary Global Note, signed by Euroclear or Clearstream, Luxembourg, substantially to the effect set out in Schedule 4 to the Agency Agreement to the effect that it has received a certificate or certificates

substantially to the effect set out in Schedule 3 to the Agency Agreement with respect thereto and that no contrary advice as to the contents thereof has been received by Euroclear or Clearstream, Luxembourg, as the case may be.

Upon the whole or a part of this Temporary Global Note being exchanged for a Permanent Global Note, such Permanent Global Note shall be exchangeable in accordance with its terms for Definitive Notes or Registered Notes.

The Definitive Notes or the Certificates representing the Registered Notes for which this Temporary Global Note or a Permanent Global Note may be exchangeable shall be duly executed and authenticated, shall, in the case of Definitive Notes, have attached to them all Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect of Instalment Amounts, that have not already been paid on this Temporary Global Note or the Permanent Global Note, as the case may be, shall be security printed or, in the case of Certificates, printed in accordance with applicable legal and stock exchange requirements and shall be substantially in the form set out in the Schedules to the Trust Deed as supplemented and/or modified and/or superseded by the terms of the Schedule hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or any other clearing system.

On any exchange of a part of this Temporary Global Note for an equivalent interest recorded in the records of the ICSDs in a Permanent Global Note or for Registered Notes, as the case may be, the portion of the principal amount hereof so exchanged shall by or on behalf of the Issuing and Paying Agent be entered *pro rata* in the records of the ICSDs, whereupon the principal amount of the Notes recorded in the records of the ICSDs and represented by this Temporary Global Note shall be reduced by an amount equal to such portion so exchanged.

## 19 Benefit of Conditions

Except as otherwise specified herein, this Temporary Global Note is subject to the Conditions and the Trust Deed and, until the whole of this Temporary Global Note is exchanged for Definitive Notes or Registered Notes, the holder of this Temporary Global Note shall in all respects be entitled to the same benefits as if it were the holder of the Permanent Global Note (or the relevant part of it) for which it may be exchanged and as if such Permanent Global Note had been issued on the Issue Date.

## 20 Payments

No person shall be entitled to receive any payment in respect of the Notes represented by this Temporary Global Note that falls due after an Exchange Date for such Notes, unless it upon due presentation of this Temporary Global Note for exchange, delivery (or, in the case of a subsequent exchange, a corresponding entry being recorded in the records of the relevant Clearing Systems) a Permanent Global Note or delivery of Certificates is improperly withheld or refused by or on behalf of the Issuer or the Issuer does not perform or comply with any of its obligations under the Permanent Global Note.

Payments due in respect of this Temporary Global Note before the Exchange Date shall only be made in relation to such principal amount of this Temporary Global Note with

respect to which there shall have been Certification dated no earlier than such due date for payment.

Upon any payment being made in respect of the Notes represented by this Temporary Global Note, the Issuer shall procure that details of such payment shall be entered *pro rata* in the records of the ICSDs and in the case of any payment of principal, or, in the case of Instalment Notes, payment of an Instalment Amount, the principal amount of the Notes recorded in the records of the ICSDs and represented by this Temporary Global Note shall be reduced by the aggregate principal amount so paid or by the aggregate amount of the Instalment Amount so paid.

Payments due in respect of Notes for the time being represented by this Temporary Global Note, shall be made to the bearer of this Temporary Global Note and each payment so made will discharge the Issuer's obligations in respect thereof. Any failure to make the entries referred to above shall not affect such discharge.

## 21    Cancellation

Cancellation of any Note represented by this Temporary Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Temporary Global Note representing such Note to be entered *pro rata* in the records of the ICSDs, whereupon the principal amount of the Notes recorded in the records of the ICSDs and represented by this Temporary Global Note shall be reduced by the aggregate principal amount of the Notes so cancelled.

## 22    Notices

Notwithstanding Condition 14, notices in respect of the Notes represented by this Temporary Global Note may be given by their being delivered (so long as this Temporary Global Note is deposited with the Common Safekeeper) to Euroclear, Clearstream, Luxembourg or such other permitted clearing system, as the case may be.

No provisions of this Temporary Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions. This Temporary Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent and until effectuated for and on behalf of the Common Safekeeper. This Temporary Global Note shall be governed by and construed in accordance with the laws of England.

**In witness** whereof the Issuer has caused this Temporary Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:


By:

**Certificate of Authentication of the Issuing and Paying Agent**

This Temporary Global Note is authenticated by or on behalf of the Issuing and Paying Agent

The Bank of New York Mellon as Issuing and Paying Agent

By:


Authorised Signatory

For the purposes of authentication only.



**Effectuation**

This Temporary Global Note is effectuated by or on behalf of the Common Safekeeper.

[Common Safekeeper]

as Common Safekeeper

By:


Authorised Signatory

For the purposes of effectuation only.

## The Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions or the Global Note as the Schedule]

# Schedule 1
## Part D
## Form of NGN Permanent Global Note

**[SPECIFIED COMPANY]**
**[●]**
**Registered Office: [●]**
**[●]**
**(Incorporated with limited liability in [●])**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Permanent Global Note No:**

This Global Note is issued in respect of the Notes (the "**Notes**") of the Tranche(s) and Series specified in the Schedule hereto of [SPECIFIED COMPANY] (the "**Issuer**").

## 23 Interpretation and Definitions

References in this Global Note to the "**Conditions**" are to the Terms and Conditions applicable to the Notes, which are in the form set out in Schedule 2 Part C to the principal trust deed dated 10 October 2002 between the Issuer and BNY Corporate Trustee Services Limited as Trustee as amended and restated on 18 July 2008 (the "**Principal Trust Deed**") (as amended or supplemented by the Supplemental Trust Deed dated the date hereof (the Principal Trust Deed and the Supplemental Trust Deed together being the "**Trust Deed**")), as such form is supplemented and/or modified and/or superseded by the provisions of this Global Note (including the supplemental definitions and any modifications or additions set out in the Third Schedule hereto), which in the event of any conflict shall prevail). Other capitalised terms used in this Global Note shall have the meanings given to them in the Conditions or the Trust Deed.

## 24 Aggregate Principal Amount

The aggregate principal amount from time to time of this Global Note shall be an amount equal to the aggregate principal amount of the Notes from time to time entered in the records of both Euroclear and Clearstream, Luxembourg (together the "**ICSDs**" and "**ICSD**" means either of them), which shall be completed and/or amended, as the case may be, upon (i) the exchange of the whole or a part of the interests recorded in the records of the ICSDs in the Temporary Global Note initially representing the Notes for a corresponding interest herein (in the case of Notes represented by a Temporary Global Note upon issue) (ii) the issue of the Notes represented hereby, (iii) the exchange of the whole or, where the limited circumstances so permit, a part of this Global Note for Definitive Notes or Registered Notes, (iv) the redemption or purchase and cancellation of Notes represented hereby and/or (v) in the case of Partly-paid Notes, the forfeiture of Notes represented hereby in accordance with the Conditions relating to such Partly-paid Notes, all as described below.

The records of the ICSDs (which expression in this Global Note means the records that each ICSD holds for its customers which reflect the amount of such customers' interests in the Notes but excluding any interest in any Notes of one ICSD shown in the records of

another ICSD) shall be conclusive evidence of the aggregate principal amount of the Notes represented by this Global Note and, for these purposes, a statement issued by an ICSD (which statement shall be made available to the bearer upon request) stating the aggregate principal amount of Notes represented by this Global Note at any time shall be conclusive evidence of the records of the ICSDs at that time.

## 25    Promise to Pay

Subject as provided herein, the Issuer, for value received, hereby promises to pay to the bearer of this Global Note,  on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the aggregate principal amount of Notes represented by this Global Note and (unless this Global Note does not bear interest) to pay interest in respect of such aggregate principal amount of Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

## 26    Exchange

This Global Note is exchangeable (free of charge to the holder) on or after the Exchange Date in whole but not, except as provided in the next paragraph, in part for Definitive Notes or (if this Global Note is an Exchangeable Bearer Note) Registered Notes represented by the Certificates described below:

(c)    if this Global Note is an Exchangeable Bearer Note, by the holder hereof giving notice to the Issuing and Paying Agent of its election to exchange the whole or a part of this Global Note for Registered Notes; or

(d)    if this Global Note is held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an "Alternative Clearing System") and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so.

This Global Note is exchangeable in part (provided, however, that if this Global Note is held by or on behalf of Euroclear and/or Clearstream, Luxembourg, the rules of Euroclear and/or Clearstream, Luxembourg, as the case may be, so permit) (i) if this Global Note is an Exchangeable Bearer Note and the part hereof submitted for exchange is to be exchanged for Registered Notes or (ii) if so provided, and in accordance with, the Conditions relating to Partly-paid Notes.

"**Exchange Date**" means a day falling not less than 60 days, or in the case of an exchange for Registered Notes five days, after that on which the notice requiring exchange is given and on which banks are open for business in the city in which the specified office of the Issuing and Paying Agent is located and, except in the case of exchange pursuant to (d) above, in the cities in which Euroclear and Clearstream, Luxembourg or, if relevant, the Alternative Clearing System, are located.

Subject as provided in the Conditions applicable to Partly-paid Notes, any such exchange may be effected on or after an Exchange Date by the holder of this Global Note surrendering this Global Note or, in the case of a partial exchange, presenting it to be

entered *pro rata* in the records of the ICSDs by or on behalf of the Issuing and Paying Agent.

In exchange for this Global Note, or part thereof to be exchanged, the Issuer shall deliver, or procure the delivery of, duly executed and authenticated Definitive Notes and/or (if this Global Note is an Exchangeable Bearer Note) Certificates in an aggregate principal amount equal to the principal amount of this Global Note submitted for exchange (if appropriate, having attached to them all Coupons (and, where appropriate, Talons) in respect of interest, and all Receipts in respect of Instalment Amounts, that have not already been paid on this Global Note), security printed or, in the case of Certificates, printed in accordance with any applicable legal and stock exchange requirements and substantially in the form set out in Schedule 2 to the Trust Deed as supplemented and/or modified and/or superseded by the terms of the Schedule hereto.

Certificates issued upon exchange for Registered Notes shall not be Global Certificates unless the holder so requests and certifies to the Issuing and Paying Agent that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or an Alternative Clearing System.

On any exchange of a part of this Global Note the portion of the principal amount hereof so exchanged shall be by or on behalf of the Issuing and Paying Agent, whereupon the principal amount of the Notes recorded in the records of the ICSDs and represented by this Global Note shall be reduced by an amount equal to such portion so exchanged.

## 27 Benefit of Conditions

Except as otherwise specified herein, this Global Note is subject to the Conditions and the Trust Deed and, until the whole of this Global Note is exchanged for Definitive Notes or Registered Notes, the holder of this Global Note shall in all respects be entitled to the same benefits as if it were the holder of the Definitive Notes for which it may be exchanged and as if such Definitive Notes had been issued on the Issue Date.

## 28 Payments

No person shall be entitled to receive any payment in respect of the Notes represented by this Global Note that falls due after an Exchange Date for such Notes, unless it is improperly withheld or refused by or on behalf of the Issuer or the Issuer does not perform or comply with any one or more of what are expressed to be its obligations under any Definitive Notes.

Upon any payment being made in respect of the Notes represented by this Global Note, the Issuer shall procure that details of such payment shall be entered *pro rata* in the records of the ICSDs and, in the case of any payment of principal, or in the case of Instalment Notes, payment of an Instalment Amount, the principal amount of the Notes recorded in the records of the ICSDs and represented by this Global Note shall be reduced by the principal amount so paid or by the aggregate amount of the Instalment Amount so paid.

## 29 Prescription

Claims in respect of principal and interest (as each is defined in the Conditions) in respect of this Global Note shall become void unless it is presented for payment within a period of 10 years (in the case of principal) and five years (in the case of interest) from the appropriate Relevant Date.

## 30    Meetings

The holder of this Global Note shall (unless this Global Note represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders and, at any such meeting, as having one vote in respect of each integral currency unit of the specified currency of the Notes.

## 31    Cancellation

Cancellation of any Note represented by this Global Note that is required by the Conditions to be cancelled (other than upon its redemption) shall be effected by reduction in the principal amount of this Global Note representing such Note to be entered *pro rata* in the records of the ICSDs, whereupon the principal amount of the Notes recorded in the records of the ICSDs and represented by this Global Note shall be reduced by the aggregate principal amount of the Notes so cancelled.

## 32    Purchase

Notes may only be purchased by the Issuer if they are purchased together with the right to receive all future payments of interest and Instalment Amounts (if any) thereon.

## 33    Issuer's Options

Any option of the Issuer provided for in the Conditions shall be exercised by the Issuer giving notice to the Noteholders and the ICSDs (or procuring that such notice is given on its behalf) within the time limits set out in and containing the information required by the Conditions, except that the notice shall not be required to contain the serial numbers of Notes drawn in the case of a partial exercise of an option and accordingly no drawing of Notes shall be required. In the case of a partial exercise of an option, the rights of accountholders with a clearing system in respect of the Notes will be governed by the standard procedures of Euroclear and/or Clearstream, Luxembourg and shall be reflected in the records of Euroclear and/or Clearstream, Luxembourg as either a pool factor or a reduction in principal amount, at their discretion. Following the exercise of any such option, the Issuer shall procure that the principal amount of the Notes recorded in the records of the ICSDs and represented by this Global Note shall be reduced accordingly.

## 34    Noteholders' Options

Any option of the Noteholders provided for in the Conditions may be exercised by the holder of this Global Note giving notice to the Issuing and Paying Agent within the time limits relating to the deposit of Notes with a Paying Agent set out in the Conditions substantially in the form of the notice available from any Paying Agent, except that the notice shall not be required to contain the serial numbers of the Notes in respect of which the option has been exercised. Following the exercise of any such option, the Issuer shall procure that the principal amount of all the Notes recorded in the records of the ICSDs and represented by this Global Note shall be reduced by the aggregate principal amount stated in the relevant exercise notice.

## 35    Notices

Notwithstanding Condition 14, notices in respect of the Notes represented by this Global Note may be given by their being delivered (so long as this Global Note is deposited with

the Common Safekeeper) to Euroclear, Clearstream, Luxembourg or such other permitted clearing system, as the case may be.

## 36    Negotiability

This Global Note is a bearer document and negotiable and accordingly:

(d)    is freely transferable by delivery and such transfer shall operate to confer upon the transferee all rights and benefits appertaining hereto and to bind the transferee with all obligations appertaining hereto pursuant to the Conditions;

(e)    the holder of this Global Note is and shall be absolutely entitled as against all previous holders to receive all amounts by way of Redemption Amount interest or otherwise payable in respect of this Global Note and the Issuer has waived against such holder and any previous holder of this Global Note all rights of set-off or counterclaim that would or might otherwise be available to it in respect of the obligations evidenced by this Global Note; and

(f)    payment upon due presentation of this Global Note as provided herein shall operate as a good discharge against such holder and all previous holders of this Global Note.

No provisions of this Global Note shall alter or impair the obligation of the Issuer to pay the principal and premium of and interest on the Notes when due in accordance with the Conditions.

This Global Note shall not be valid or become obligatory for any purpose until authenticated by or on behalf of the Issuing and Paying Agent and until effectuated for and on behalf of the Common Safekeeper.

This Global Note shall be governed by and construed in accordance with the laws of England.

**In witness** whereof the Issuer has caused this Global Note to be duly signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:


**Certificate of Authentication of the Issuing and Paying Agent**

This Global Note is authenticated by or on behalf of the Issuing and Paying Agent

The Bank of New York Mellon. as Issuing and Paying Agent

By:


Authorised Signatory

For the purposes of authentication only.

**Effectuation**

This Global Note is effectuated by or on behalf of the Common Safekeeper.

[Common Safekeeper]

as Common Safekeeper

By:


Authorised Signatory

For the purposes of effectuation only.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

## The Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions for the Global Note as the Schedule]

**Schedule 1**
**Part E**
**Form of Global Certificate**

**[SPECIFIED COMPANY]**
**[●]**
**Registered Office: [●]**
**[REGISTERED NUMBER]**

**Secured Obligation Programme**

**GLOBAL CERTIFICATE**

**Global Certificate No. [●]**

Registered Holder: ……..................……..................................................

Address of Registered Holder: ...........................................................................

...........................................................................

...........................................................................

Principal amount of Notes
represented by this
Global Certificate: ...............................................……...........................................

This Global Certificate is issued in respect of the principal amount specified above of the Notes (the "**Notes**") of the Tranche and Series specified in the Schedule hereto of [Specified Company] (the "**Issuer**"). This Global Certificate certifies that the Registered Holder (as defined above) is registered as the holder of such principal amount of the Notes.

**1      Interpretation and Definitions**

References in this Global Certificate to the "**Conditions**" are to the Terms and Conditions applicable to the Notes (which are in the form set out in Schedule 2 Part C to the Principal Trust Deed (as amended or supplemented by the Supplemental Trust Deed dated the date hereof, the "**Trust Deed**") dated 18 July 2008 between the Issuer and BNY Corporate Trustee Services Limited as trustee, as such form is supplemented and/or modified and/or superseded by the provisions of this Global Certificate (including the supplemental definitions and any modifications or additions set out in the Schedule hereto), which in the event of any conflict shall prevail).

Other capitalised terms used in this Global Certificate shall have the meanings given to them in the Conditions or the Trust Deed.

**2      Promise to Pay**

The Issuer, for value received, hereby promises to pay to the Registered Holder upon presentation and (when no further payment is due in respect of the Notes represented by this Global Certificate) surrender of this Global Certificate on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the

Conditions) the Redemption Amount in respect of the Notes represented by this Global Certificate and (unless the Notes represented by this Certificate do not bear interest) to pay interest in respect of such Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

For the purposes of this Global Certificate, (a) the Registered Holder is bound by the provisions of the Agency Agreement, (b) the Issuer certifies that the Registered Holder is, at the date hereof, entered in the Register as the holder of the Notes represented by this Global Certificate, (c) this Global Certificate is evidence of entitlement only, (d) title to the Notes represented by this Global Certificate passes only on due registration on the Register, and (e) only the Registered Holder is entitled to payments in respect of the Notes represented by this Global Certificate.

3    **Transfer of Notes Represented by Permanent Global Certificates**

If the Schedule hereto states that the Notes are to be represented by a permanent Global Certificate on issue, transfers of the holding of Notes represented by this Global Certificate pursuant to Condition 2(b) may only be made in part:

(i)    if the Notes represented by this Global Certificate are held on behalf of Euroclear or Clearstream, Luxembourg or any other clearing system (an "**Alternative Clearing System**") and any such clearing system is closed for business for a continuous period of 14 days (other than by reason of holidays, statutory or otherwise) or announces an intention permanently to cease business or does in fact do so; or

(ii)    with the consent of the Issuer,

provided that, in the case of the first transfer of part of a holding pursuant to (i) above, the Registered Holder has given the Registrar not less than 30 days' notice at its specified office of the Registered Holder's intention to effect such transfer. Where the holding of Notes represented by this Global Certificate is only transferable in its entirety, the Certificate issued to the transferee upon transfer of such holding shall be a Global Certificate. Where transfers are permitted in part, Certificates issued to transferees shall not be Global Certificates unless the transferee so requests and certifies to the Registrar that it is, or is acting as a nominee for, Clearstream, Luxembourg, Euroclear and/or an Alternative Clearing System.

4    **Meetings**

The Registered Holder shall (unless this Global Certificate represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders and at any such meeting as having one vote in respect of each integral currency unit of the specified currency of the Notes.

This Global Certificate shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Registrar.

**In witness** whereof the Issuer has caused this Global Certificate to be signed on its behalf.

Dated as of the Issue Date.

[[SPECIFIED COMPANY]]

By:

**Certificate of Authentication of the Registrar**

This Global Certificate is authenticated by or on behalf of the Registrar.

The Bank of New York Mellon, New York Branch as Registrar

By:

Authorised Signatory

For the purposes of authentication only.

## Form of Transfer

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers to

....................................................................

....................................................................

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF TRANSFEREE)

[    ] principal amount of the Notes represented by this Global Certificate, and all rights under them.

Dated..............................

Signed...........................                              Certifying Signature ...................................

Notes:

(i)     The signature of the person effecting a transfer shall conform to a list of duly authorised specimen signatures supplied by the Registered Holder or (if such signature corresponds with the name as it appears on the face of this Global Certificate) be certified by a notary public or a recognised bank or be supported by such other evidence as a Transfer Agent or the Registrar may reasonably require.

(ii)    A representative of the Noteholder should state the capacity in which he signs e.g. executor.

## Schedule

[Insert the provisions of the relevant Final Terms or Series Prospectus that relate to the Conditions or the Global Certificate as the Schedule.]

**Schedule 2**
**Part A**
**Form of Bearer Note**

On the front:

[Denomination]       [ISIN]       [Series]       [Certif. No.]

[Currency and denomination]

**[SPECIFIED COMPANY]**
**[●]**
**Registered Office [●]**
**[REGISTERED NUMBER]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

**Series No. [●]**

**[Title of Issue]**

This Note forms one of the Series of Notes referred to above (the "**Notes**") of [Specified Company] (the "**Issuer**") designated as specified in the title hereof.

The Notes are subject to the Terms and Conditions (the "**Conditions**") endorsed hereon and are issued subject to, and with the benefit of, the Principal Trust Deed and Supplemental Trust Deed referred to in the Conditions.

Expressions defined in the Conditions have the same meanings in this Note.

The Issuer for value received hereby promises to pay to the bearer of this Note, on presentation and (when no further payment is due in respect of this Note) surrender of this Note on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount and (unless this Note does not bear interest) to pay interest from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

This Note shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Issuing and Paying Agent.

**In witness** whereof the Issuer has caused this Note to be signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]


By:




## Certificate of Authentication of the Issuing and Paying Agent

This Note is authenticated by or on behalf of the Issuing and Paying Agent.

The Bank of New York Mellon as Issuing and Paying Agent

By:




Authorised Signatory

For the purposes of authentication only.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

On the back:

## Terms and Conditions of the Notes

[The Terms and Conditions that are set out in Schedule 2 Part C to the Principal Trust Deed as amended by and incorporating any additional provisions forming part of such Terms and Conditions and set out in the relevant Final Terms or Series Prospectus shall be set out here.]

### Issuing and Paying Agent and Transfer Agent

### [●]

### Attention: Manager, [●]

### [Paying and ]Transfer Agent

### [●]

### Attention: Manager, [●]

## Schedule 2
## Part B
## Form of Certificate

On the front:

### [SPECIFIED COMPANY]

### [●]

### Registered office [●]

### MULTI-ISSUER SECURED OBLIGATION PROGRAMME

### Series No. [●]

### [Title of issue]

This Certificate certifies that the Registered Holder (as defined below) is registered as the holder of [principal amount] of Notes of the Series of Notes referred to above (the "**Notes**") of [Specified Company] (the "**Issuer**"), designated as specified in the title hereof. The Notes are subject to the Terms and Conditions (the "**Conditions**") endorsed hereon and are issued subject to, and with the benefit of, the Principal Trust Deed and Supplemental Trust Deed referred to in the Conditions. Expressions defined in the Conditions have the same meanings in this Certificate.

The Issuer, for value received, hereby promises to pay to [                ] of [                ] (the "**Registered Holder**") upon presentation and (when no further payment is due in respect of the Note(s) represented by this Certificate) surrender of this Certificate on the Maturity Date (or on such earlier date as the Redemption Amount may become repayable in accordance with the Conditions) the Redemption Amount in respect of the Notes represented by this Certificate and (unless the Note(s) represented by this Certificate do not bear interest) to pay interest in respect of such Notes from the Interest Commencement Date in arrear at the rates, in the amounts and on the dates for payment provided for in the Conditions together with such other sums and additional amounts (if any) as may be payable under the Conditions, in accordance with the Conditions.

For the purposes of this Certificate, (a) the Registered Holder is bound by the provisions of the Agency Agreement, (b) the Issuer certifies that the Registered Holder is, at the date hereof, entered in the Register as the holder of the Note(s) represented by this Certificate, (c) this Certificate is evidence of entitlement only, (d) title to the Note(s) represented by this Certificate passes only on due registration on the Register, and (e) only the Registered Holder is entitled to payments in respect of the Note(s) represented by this Certificate.

This Certificate shall not become valid or obligatory for any purpose until the certificate of authentication hereon shall have been duly signed by or on behalf of the Registrar.

**In witness** whereof the Issuer has caused this Certificate to be signed on its behalf.

Dated as of the Issue Date.

[SPECIFIED COMPANY]

By:

**Certificate of Authentication of the Registrar**

This Certificate is authenticated by or on behalf of the Registrar.

The  Bank of New York Mellon, New York as Registrar

By:


Authorised Signatory

For the purposes of authentication only.

On the back:

**Terms and Conditions of the Notes**

[The Conditions that are set out in Schedule 2 Part C to the Principal Trust Deed as amended or supplemented by and incorporating any additional provisions forming part of such Terms and Conditions and set out in the relevant Final Terms or Series Prospectus shall be set out here.]

# Form of Transfer

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers to

......................................................................

......................................................................

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS OF TRANSFEREE)

[      ] principal amount of the Notes represented by this Certificate, and all rights under them.

Dated............................

Signed...........................                    Certifying Signature.............................

**Notes**:

(i)     The signature of the person effecting a transfer shall conform to a list of duly authorised specimen signatures supplied by the Registered Holder or (if such signature corresponds with the name as it appears on the face of this Certificate) be certified by a notary public or a recognised bank or be supported by such other evidence as a Transfer Agent or the Registrar may reasonably require.

(ii)    A representative of the Noteholder should state the capacity in which he signs e.g. executor.

**Issuing and Paying Agent and Transfer Agent**

**[●]**

**[Paying and] Transfer Agent**

**[●]**

# Schedule 2
## Part C
## TERMS AND CONDITIONS OF THE NOTES

*The following is the text of the terms and conditions that, subject to completion and amendment and as supplemented or varied in accordance with, or replaced by, the provisions of the relevant Final Terms in relation to a particular Series of Notes, shall be applicable to the Notes in definitive form (if any) issued in exchange for the Global Note(s) representing each Series. Either (i) the full text of these terms and conditions together with the relevant provisions of the Final Terms or (ii) these terms and conditions, as so completed, amended, supplemented or varied (and subject to simplification by the deletion of non-applicable provisions), shall be endorsed on such Bearer Notes or on the Certificates relating to such Registered Notes. All capitalised terms that are not defined in these Conditions will have the meanings given to them in the Principal Trust Deed and/or the relevant Supplemental Trust Deed. Those definitions will be endorsed on the Definitive Notes or Certificates, as the case may be. References in the conditions to "Notes" are to the Notes of one Series of a relevant Issuer only, not to all Notes that may be issued under the Programme and references to the "Issuer" are to the Specified Company that is stipulated as such in the relevant Final Terms.*

*These Conditions may be amended, modified, varied or replaced in relation to any Series of Notes by the terms of the relevant Supplemental Trust Deed in relation to such Series. Italicised text set out herein does not form part of the Conditions and is set out for information purposes only.*

The Notes are constituted and secured by a relevant supplemental trust deed (the "**relevant Supplemental Trust Deed**"), dated the date of issue of the Notes (the "**Issue Date**"), between the Issuer, BNY Corporate Trustee Services Limited (the "**Trustee**", which expression shall include all persons for the time being the trustee or trustees under the Trust Deed (as defined below)) as trustee for, *inter alia*, the Noteholders (as defined below) and, if applicable, the person specified therein as a Swap Counterparty (as defined in Condition 3(a)). The relevant Supplemental Trust Deed is supplemental to a principal trust deed dated 10 October 2002 as amended and restated on 18 July 2008 and made between Dante Finance plc (the "**First Issuer**") and the Trustee (the "**Principal Trust Deed**", which expression shall include any amendments or supplements thereof and together with the relevant Supplemental Trust Deed, the "**Trust Deed**"). These terms and conditions include summaries of, and are subject to, the detailed provisions of the Trust Deed, which includes the form of the Bearer Notes, Certificates, Receipts, Coupons and Talons referred to below. An agency agreement dated 10 October 2002 as amended and restated on 18 July 2008 has been entered into in relation to the Notes between the First Issuer, the Trustee, The Bank of New York Mellon (formerly known as The Bank of New York) as, *inter alia*, initial issuing and paying agent and as custodian and account bank and the other agents named in it (as amended or supplemented as at the Issue Date, the "**Agency Agreement**"). The issuing and paying agent, the custodian, the account bank, the paying agents, the registrar, the transfer agents and the calculation agent(s) for the time being (if any) are referred to below respectively as the "**Issuing and Paying Agent**", the "**Custodian**", the "**Account Bank**", the "**Paying Agents**" (which expression shall include the Issuing and Paying Agent), the "**Registrar**", and the "**Transfer Agents**" (which expression shall include the Registrar). A Programme Agreement dated 10 October 2002 as amended and restated on 18 July 2008 has been entered into in relation to the Notes between the First Issuer and Lehman Brothers International (Europe) as Dealer (the "**Dealer**") and where appropriate as Arranger (the "**Arranger**") in relation to a particular Series, the Trustee, the Issuing and Paying Agent and Registrar (the "**Programme Agreement**"). The Issuer (save for the First Issuer) has acceded to the Principal Trust Deed, the Agency Agreement and the

Programme Agreement pursuant to a Deed of Accession dated on or before the Issue Date. Copies of the Principal Trust Deed, the Agency Agreement and the Programme Agreement are available for inspection during usual business hours at the principal office of the Trustee (at present at One Canada Square, London E14 5AL) and at the specified offices of the Paying Agents and the Transfer Agents.

The Noteholders, the holders (the "**Couponholders**") of the interest coupons (the "**Coupons**") appertaining to interest bearing Bearer Notes and, where applicable in the case of such Notes, talons for further Coupons (the "**Talons**") and the holders of the receipts for the payment of instalments of principal (the "**Receipts**") relating to Bearer Notes of which the principal is payable in instalments are entitled to the benefit of, are bound by, and are deemed to have notice of, all the provisions of the Trust Deed and are deemed to have notice of those provisions applicable to them of the Agency Agreement and the Programme Agreement.

Under the Principal Trust Deed the Issuer may also borrow under, buy, sell or enter into other secured obligations in the form of loans ("**Loans**"), options ("**Options**"), schuldscheine ("**Schuldscheine**") or swaps ("**Swaps**") (each, including the obligations under the Notes, an "**Obligation**").

References in these Conditions to "**Mortgaged Property**" are to the assets and agreements comprising the mortgaged property upon which the Notes are secured as described in the Final Terms.

*Full details of the relevant Mortgaged Property will be set out in the relevant Final Terms.*

If so specified in the relevant Supplemental Trust Deed, the Issuer has, in relation to the Notes, entered into one or more derivative transactions confirmed in a Swap Agreement (as defined in Condition 3(a)) with a Swap Counterparty with an effective date as of the Issue Date.

## 1    Form, Denomination and Title

The Notes are issued in bearer form ("**Bearer Notes**", which expression includes Notes that are specified to be Exchangeable Bearer Notes), in registered form ("**Registered Notes**") or in bearer form exchangeable for Registered Notes ("**Exchangeable Bearer Notes**") in each case in the denomination(s) shown thereon provided that in the case of any Notes which are to be admitted to trading on a regulated market within the European Economic Area or offered to the public in a Member State of the European Economic Area in circumstances which require the publication of a prospectus under the Prospectus Directive (Directive 2003/71/EC), the minimum denomination shall be €50,000 (or its equivalent in any other currency as at the date of issue of those Notes).

All Registered Notes shall have the same denomination. Where Exchangeable Bearer Notes are issued, the Registered Notes for which they are exchangeable shall have the same denomination as the lowest denomination of Exchangeable Bearer Notes.

Bearer Notes are serially numbered and are issued with Coupons (and, where appropriate, a Talon) attached, save in the case of Notes that do not bear interest in which case references to interest (other than in relation to interest due after the Maturity Date (as defined in the relevant Final Terms)), Coupons and Talons in these Conditions are not applicable. Any Bearer Note the principal amount of which is redeemable in instalments is issued with one or more Receipts attached.

Registered Notes are represented by registered certificates ("**Certificates**") and, save as provided in Condition 2(c), each Certificate shall represent the entire holding of Registered Notes by the same holder.

Title to the Bearer Notes and the Receipts, Coupons and Talons shall pass by delivery. Title to the Registered Notes shall pass by registration in the register that the Issuer shall procure to be kept by the Registrar in accordance with the provisions of the Agency Agreement (the "**Register**"). Except as ordered by a court of competent jurisdiction or as required by law, the holder (as defined below) of any Note, Receipt, Coupon or Talon shall be deemed to be and may be treated as its absolute owner for all purposes whether or not it is overdue and regardless of any notice of ownership, trust or an interest in it, any writing on it (or on the Certificate representing it) or its theft or loss (or that of the related Certificate) and no person shall be liable for so treating the holder.

In these Conditions, "**Noteholder**" means the bearer of any Bearer Note and the Receipts relating to it or the person in whose name a Registered Note is registered (as the case may be), "**holder**" (in relation to a Note, Receipt, Coupon or Talon) means the bearer of the Bearer Note, Receipt, Coupon or Talon or the person in whose name a Registered Note is registered (as the case may be) and capitalised terms have the meanings given to them herein, the absence of any such meaning indicating that such term is not applicable to the Notes.

## 2 Exchanges of Exchangeable Bearer Notes and Transfers of Registered Notes

**(a)** *Exchange of Exchangeable Bearer Notes*

Subject as provided in Condition 2(f), Exchangeable Bearer Notes may be exchanged for the same principal amount of Registered Notes at the request in writing of the relevant Noteholder and upon surrender of each Exchangeable Bearer Note to be exchanged, together with all unmatured Receipts, Coupons and Talons relating to it, at the specified office of any Transfer Agent; provided, however, that where an Exchangeable Bearer Note is surrendered for exchange after the Record Date (as defined in Condition 7(b)) for any payment of interest, the Coupon in respect of that payment of interest need not be surrendered with it. Registered Notes may not be exchanged for Bearer Notes. Bearer Notes of one denomination may not be exchanged for Bearer Notes of another denomination. Bearer Notes that are not Exchangeable Bearer Notes may not be exchanged for Registered Notes.

**(b)** *Transfer of Registered Notes*

One or more Registered Notes may be transferred upon the surrender (at the specified office of the Registrar or any Transfer Agent) of the Certificate representing such Registered Notes to be transferred, together with the form of transfer endorsed on such Certificate duly completed and executed and any other evidence as the Registrar or Transfer Agent may reasonably require. In the case of a transfer of part only of a holding of Registered Notes represented by one Certificate, a new Certificate shall be issued to the transferee in respect of the part transferred and a further new Certificate in respect of the balance of the holding not transferred shall be issued to the transferor. All transfers of Notes and entities on the Register will be made in accordance with the detailed regulations concerning transfers of Notes scheduled to the Agency Agreement. The regulations may be changed by the Issuer, with the prior written approval of the Registrar and the Trustee. A copy of the

current regulations will be made available by the Registrar to any Noteholder upon request.

**(c)**     *Exercise of Options or Partial Redemption in Respect of Registered Notes*

In the case of an exercise of an Issuer's option in respect of, or a partial redemption of, a holding of Registered Notes represented by a single Certificate, a new Certificate shall be issued to the holder to reflect the exercise of such option or in respect of the balance of the holding not redeemed. In the case of a partial exercise of an option resulting in Registered Notes of the same holding having different terms, separate Certificates shall be issued in respect of those Notes of that holding that have the same terms. New Certificates shall only be issued against surrender of the existing Certificates to the Registrar or any Transfer Agent.

**(d)**     *Delivery of New Certificates*

Each new Certificate to be issued pursuant to Conditions 2(a), (b) or (c) shall be available for delivery within five business days of receipt of the request for exchange, form of transfer or Exercise Notice or surrender of the Certificate for exchange. Delivery of the new Certificate(s) shall be made at the specified office of the Registrar or of the Transfer Agent (as the case may be) to whom delivery or surrender of such request for exchange, form of transfer, Exercise Notice or Certificate shall have been made or, at the option of the holder making such delivery or surrender as aforesaid and as specified in the relevant request for exchange, form of transfer, Exercise Notice or otherwise in writing, be mailed by uninsured post at the risk of the holder entitled to the new Certificate to such address as may be so specified, unless such holder requests otherwise and pays in advance to the Registrar or Transfer Agent the costs of such other method of delivery and/or such insurance as it may specify. In this Condition 2(d), "business day" means a day, other than a Saturday or Sunday, on which banks are open for business in the place of the specified office of the relevant Transfer Agent or the Registrar, as the case may be.

**(e)**     *Exchange Free of Charge*

Exchange and transfer of Notes and Certificates on registration, transfer, exercise of an option or partial redemption shall be effected without charge by or on behalf of the Issuer, the Registrar or the Transfer Agents, but upon payment of any tax or other governmental charges that may be imposed in relation to it (or the giving of such indemnity as the Registrar or the relevant Transfer Agent may require).

**(f)**     *Closed Periods*

No Noteholder may require the transfer of a Registered Note to be registered or an Exchangeable Bearer Note to be exchanged for one or more Registered Note(s) (i) during the period of 15 days ending on the due date for redemption of, or payment of any Instalment Amount (as defined in the relevant Final Terms) in respect of, that Note, (ii) during the period of 15 days prior to any date on which Notes may be called for redemption by the Issuer at its option pursuant to Condition 6(e), (iii) after any such Note has been called for redemption or (iv) during the period of seven days ending on (and including) any Record Date. An Exchangeable Bearer Note called for redemption may, however, be exchanged for one or more Registered

Note(s) in respect of which the Certificate is simultaneously surrendered not later than the relevant Record Date.

## 3    Status and Non-applicability

**(a)**    *Status of Notes*

The Notes are secured, limited-recourse obligations of the Issuer, ranking *pari passu* without any preference or priority amongst themselves (except in the case of Notes with Related Notes in respect of which a Series of Notes may rank senior or junior for the purposes of rights over the Mortgaged Property), and are secured in the manner described in Condition 4(f) and Condition 11. In connection with the issue of the Notes there may be executed one or more derivative agreements (each a "**Swap Agreement**") between the Issuer and one or more swap counterparties (each a "**Swap Counterparty**") and one or more credit enhancement agreements (each a "**Credit Enhancement Agreement**") as further described in the relevant Supplemental Trust Deed.

In the case of Notes with Related Notes, details of the Notes' relationship with the relevant Related Notes will be set out in the relevant Final Terms or the relevant Supplemental Trust Deed including (to the extent relevant in the context of the Notes), without limitation, in relation to the following issues: (i) the Mortgaged Property over which such Notes and Related Notes are secured, (ii) events of default, (iii) meetings of Noteholders, (iv) fungible issues, (v) conflicts between the interests of the Noteholders and the relevant Related Noteholders and the duties of the Trustee as Trustee for holders of the Notes and as Trustee for holders of the relevant Related Notes and (vi) realisation of the Mortgaged Property.

If so specified in the relevant Final Terms prior to the security over the Mortgaged Property becoming enforceable in accordance with the Trust Deed and the Conditions, certain amounts received by the Issuer in connection with the Collateral and/or any Swap Agreement or otherwise will be applied in such manner and order of priority (if any) as may be specified in the relevant Final Terms.

For these purposes and unless otherwise provided:

"**Related Notes**" means the outstanding Notes of any other Series which shares the same Mortgaged Property as the Notes and which was issued as part of the same transaction.

"**Related Noteholders**" means the holders of Related Notes.

**(b)**    *Non-applicability*

Where no reference is made in the relevant Supplemental Trust Deed to any Swap Agreement or Credit Enhancement Agreement, references in these Terms and Conditions to any such document or agreement and to any Swap Counterparty, as the case may be, shall not be applicable.

## 4    Mortgaged Property, Realisation of Mortgaged Property and Restrictions

**(a)**    *Mortgaged Property*

The Notes will be secured pursuant to the relevant Supplemental Trust Deed. The form of the Mortgaged Property may comprise some or all of the assets and assignments set out below.

**(b)**     *Secured Assets*

The obligations of the Issuer under the Trust Deed, the Notes and the Coupons are secured by a first fixed charge over certain bonds, warrants, notes, receivables or equity securities of any form, denomination, type or issuer, monoline guarantees, options, swaps, loans or any other financial obligations assigned to or assumed by the Issuer or any other agreed assets owned by the Issuer as specified in the relevant Supplemental Trust Deed (the "**Collateral**") and a first fixed charge on all funds held from time to time by the Custodian and/or the Account Bank and/or by the Issuing and Paying Agent and/or the Registrar for payment of principal and interest on the Notes or of amounts due under the Swap Agreement. If so specified in the relevant Supplemental Trust Deed, the obligations of the Issuer under any Swap Agreement are also secured by a first fixed charge over the Collateral. Unless otherwise specified in the relevant Supplemental Trust Deed, the Collateral is held by the Custodian or the Account Bank on behalf of the Issuer subject to the charges set out in the Trust Deed. If so specified in the relevant Supplemental Trust Deed, under the terms of the relevant Swap Agreement the Swap Counterparty may require all or part of the Collateral to be transferred to it as security for the performance of the Issuer's obligations to the Swap Counterparty under the terms of the Swap Agreement on terms that the Swap Counterparty will be required to return equivalent collateral or the market value thereof to the Issuer on or before the termination of such Swap Agreement (subject to any enforcement of such security). In such circumstances the security over the Collateral in respect of the Issuer's obligations under the Trust Deed, the Notes and the Coupons will be over the Issuer's rights against the Swap Counterparty in relation to the Collateral as aforesaid.

If so specified in the relevant Supplemental Trust Deed, the Issuer's obligations under the Trust Deed, the Notes and the Coupons are also secured by an assignment by way of security of the Issuer's rights under the Swap Agreement and/or the Credit Enhancement Agreement in favour of the Trustee for itself and for the benefit of the holders of the Notes, Coupons and Receipts.

Additionally, the obligations of the Issuer may be secured pursuant to a security document other than the Trust Deed (an "**Other Security Document**") as specified in the relevant Supplemental Trust Deed.

The Trustee shall (subject to the provisions of the relevant Supplemental Trust Deed and to sub-Clause 6.3 of the Principal Trust Deed) apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby and by any relevant Other Security Document:

*(i)*      *if "Swap Counterparty Priority" is specified in the relevant Supplemental Trust Deed:*

(a)      first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any

taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)    secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Account Bank and/or the Transfer Agents for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(c)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s);

(d)    fourthly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(e)    fifthly, in payment of the balance (if any) to the Issuer,

provided that, if "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms to be subject to adjustment on a Swap Counterparty default, and if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

(ii)    *if "Pari Passu Ranking" is specified in the relevant Supplemental Trust Deed:*

(a)    first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)    secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Account Bank and/or the Transfer Agents for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(c)    thirdly, rateably in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s) and the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them *pro rata* on the basis of the amount due to each party entitled to such payment; and

(d)    fourthly, in payment of the balance (if any) to the Issuer.

(iii)    *if "Noteholder Priority" is specified in the relevant Supplemental Trust Deed:*

(a)  first, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Trustee or any receiver in preparing and executing the trusts in the Trust Deed (including any taxes required to be paid, the costs of realising any security and the Trustee's remuneration);

(b)  secondly, in meeting claims of the Paying Agents and/or the Custodian and/or the Account Bank and/or the Transfer Agents for reimbursement in respect of payments properly made to any person in discharge of an Obligation;

(c)  thirdly, rateably in meeting the claims (if any) of the holders of Notes, Coupons and Receipts. If the moneys received by the Trustee are not enough to pay such amounts in full, the Trustee shall apply them pro rata on the basis of the amount due to each party entitled to such payment;

(d)  fourthly, in meeting the claims (if any) of the Swap Counterparty under the relevant Swap Agreement(s); and

(e)  fifthly, in payment of the balance (if any) to the Issuer.

(iv)  if *"Other Priority"* is specified in the relevant Supplemental Trust Deed and Final Terms, the Trustee shall apply all moneys received by it under the provisions of the Principal Trust Deed and the relevant Supplemental Trust Deed in connection with the realisation or enforcement of the security constituted thereby, as set out in the relevant Supplemental Trust Deed and the relevant Final Terms.

*The applicable priority and ranking provisions in respect of each Series of Notes will be disclosed in the relevant Final Terms.*

*To the extent that a Swap Counterparty fails to make payments due to the Issuer under any relevant  Swap Agreement, the Issuer would be unable to meet its obligations when due in respect of the Notes. In such event the Swap Agreement would be terminated and the Notes would become repayable together with interest accrued in accordance with Condition 10.*

**(c)**  *Shareholdings*

*Details of the issued shares and the shareholders of the Issuer are as set out in the Issuer Disclosure Annex.*

**(d)**  *Swap Agreement(s)*

If specified in the relevant Supplemental Trust Deed, the Issuer has entered into one or more Swap Agreements with the Swap Counterparty under which:

(i)  the Issuer will (subject to the terms thereof) make payments to the Swap Counterparty, on receipt by the Issuer of sums receivable by the Issuer on the Mortgaged Property; and

(ii)  the Swap Counterparty will make payments towards or equal to the obligations of the Issuer in respect of amounts due on the Notes.

*The terms of each Swap Agreement will, if applicable, be set out in the relevant Final Terms.*

*Swap Agreements may provide that the Swap Counterparty may transfer its rights and obligations under a Swap Agreement, as described in the relevant Supplemental Trust Deed, provided that, in relation to Notes that are rated by a rating agency, such transfer shall not adversely affect any existing rating of the Notes of that Series as confirmed in writing by the relevant rating agency. The Trust Deed provides that, subject as provided therein, the Trustee shall agree to a transfer of the Swap Counterparty's rights and obligations under such Swap Agreement and shall agree to any amendment to such Swap Agreement to allow such transfer in such circumstances.*

**(e)**     *Disposal Agent*

If so specified in the relevant Supplemental Trust Deed, the Disposal Agent will act as disposal agent in relation to the disposal of the Collateral. Unless otherwise provided in the relevant Supplemental Trust Deed, the Disposal Agent may itself make an offer to purchase the Collateral.

**(f)**     *Realisation of the Mortgaged Property upon Enforcement*

For each Series, the security over the Mortgaged Property shall become enforceable if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty. In addition, if part of the principal amount of the Notes of such Series is mandatorily redeemed under Condition 6(c), the security created over that part of the Mortgaged Property which relates to such Notes and with respect to any part of a Swap Agreement to that Series which terminates as a result of such redemption shall become enforceable. In such event, references herein to the Trustee exercising powers of enforcement of such security shall be read accordingly.

In the event of the security over the Mortgaged Property constituted under the relevant Supplemental Trust Deed or by an Other Security Document becoming enforceable either in whole or in part, the Trustee may at its discretion and shall if so required in writing by the holders of at least one fifth in aggregate principal amount of the Notes (or, in respect of a Series of Notes where there are Related Notes, if so required in writing by the holders of at least one fifth in aggregate principal amount of the Controlling Series) then outstanding (as defined in the Trust Deed) or if so directed by an Extraordinary Resolution (as defined in the Trust Deed) of the holders of the Notes (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series), or, if sums are due to any Swap Counterparty (except in the case where action may be taken against any Swap Counterparty), if so directed in writing by any such Swap Counterparty, but without liability as to the consequence of such action on individual holders of Notes, Receipts or Coupons enforce the security. To do so it may, in its discretion, realise all or a part of the Collateral in a proportion equal to the proportion of the principal amount of the Notes which are subject to such acceleration, terminate any Swap Agreement *pro rata* in accordance with its terms and exercise any rights under a Credit Enhancement Agreement, provided that the Trustee shall not be required to take any action that would involve the Trustee in personal liability or expense unless indemnified to its satisfaction. On being so directed by the

Trustee, the Disposal Agent shall use its reasonable endeavours to solicit offers from third parties to purchase the Collateral in accordance with the terms of the relevant Supplemental Trust Deed.

For the purposes hereof, "**Controlling Series**" shall mean, in respect of any Notes where there are Related Notes, the Series of Notes or other Obligations identified as the Controlling Series in the relevant Supplemental Trust Deed or failing that, the most senior ranking of the Notes, relevant Related Notes and other Obligations secured on the same Mortgaged Property as the Notes. References in these Conditions to the Controlling Series shall not be applicable in the case of any Notes where there are no Related Notes.

**(g)** *Application of Proceeds*

The Trust Deed requires that the net proceeds of the security, after deduction of the Trustee's expenses and remuneration and other amounts due to the Trustee and the Paying Agents and/or the Custodian and/or the Transfer Agents and/or the Account Bank and any taxes required to be paid prior to any such application, be applied in meeting claims of any Swap Counterparty and of the holders of the Notes, Receipts and Coupons as specified in the relevant Supplemental Trust Deed.

**(h)** *Shortfall after Application of Proceeds*

If the net proceeds of realisation of the Mortgaged Property becoming enforceable under paragraph (g) above are not sufficient for the Issuer to make all payments due in respect of the Notes and the Coupons and for the Issuer to meet its obligations in respect of the termination of any relevant Swap Agreement, the other assets of the Issuer will not be available for payment of any shortfall arising therefrom. Any such shortfall shall be borne by the holders of Notes, Coupons and Receipts and any Swap Counterparty as specified in the relevant Supplemental Trust Deed. The Issuer will not be obliged to make any further payment in excess of the net proceeds and accordingly no debt shall be owed by the Issuer in respect of any such shortfall remaining after realisation of the Mortgaged Property and application of the proceeds in accordance with the Trust Deed. None of the Trustee or any Swap Counterparty or any Noteholder may take any further action to recover such shortfall.

Failure to make any payment in respect of any such shortfall shall in no circumstances constitute an Event of Default under Condition 10.

**(i)** *Issuer's Rights as Holder of the Mortgaged Property*

The Issuer may, with the prior written consent of the Trustee or as directed by an Extraordinary Resolution of the Noteholders (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the holders of the Controlling Series), (i) take such action in relation to the Mortgaged Property as it thinks expedient and (ii) exercise the rights incidental to the ownership of the Mortgaged Property. In particular, the Issuer may exercise (without responsibility for such exercise) any voting rights in respect of such property and all rights to enforce it. The Issuer will not exercise any rights with respect to the Mortgaged Property unless it has the Trustee's consent or is directed by an Extraordinary Resolution of the holders of the Notes (or, in respect of a Series of Notes where there are Related Notes, a direction by Extraordinary Resolution of the

holders of the Controlling Series) and, if such direction or consent is given, the Issuer will act only in accordance with such direction or consent.

**(j)**    *Restrictions on Further Issues and Transactions*

The Issuer shall be at liberty from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) to issue further bonds and notes (which may be consolidated and form a single series with the Notes if issued in accordance with paragraph (*k*) of this Condition) and to borrow under, buy, sell or enter into other secured Obligations in the form of Loans, Options, Schuldscheine or Swaps. Such further bonds, notes and other secured Obligations (other than those obligations that are not, in the opinion of the Trustee, material in the context thereof and in respect of which another party has made arrangements to discharge the Issuer from claims related thereto) must be secured (save in the case of (i) such further bonds or notes forming a single series with the Notes or other existing bonds, notes or other secured Obligations and (ii) Obligations which, at the time of their issue or effective date, provide that other Obligations may be secured upon the same assets as those on which such Obligations are secured) on assets of the Issuer other than the Mortgaged Property or the assets on which such other Obligations of the Issuer are secured or the Issuer's share capital and on terms in substantially the form contained in these Conditions and that provide for the extinction of all claims in respect of such bonds, notes and related Obligations after application of the proceeds of enforcement of the security over the assets on which such further bonds, notes and related Obligations are secured (or arrangements have been entered into that, to the satisfaction of the Trustee, have a like result). In addition, where the Issuer has issued other bonds and/or notes which have been rated by a particular rating agency ("**Old Rated Securities**") and proposes to issue any further bonds and/or notes which are not to be rated by that rating agency ("**New Unrated Securities**") then, provided that such Old Rated Securities and their related ratings remain outstanding, then the ratings of the Old Rated Securities must not be adversely affected by the issue of the New Unrated Securities, as confirmed in writing by the appropriate rating agency. Any further securities forming a single series with the outstanding securities of any series (including the Notes) constituted and secured by the Trust Deed or any deed supplemental and/or any Other Security Document to it shall, and any other securities may (with the prior written consent of the Trustee), be constituted and secured by the Trust Deed and/or any Other Security Document. The Trust Deed contains provisions for convening a single meeting of the Noteholders and the holders of securities of other series where the Trustee so decides.

**(k)**    *Restrictions on Fungible Issues*

The Issuer, if permitted under the Conditions, may from time to time (without the consent of the Noteholders or the Couponholders, but provided that the Trustee is satisfied that the restrictions contained in this Condition will be complied with) issue further bonds and notes that have, when issued, the same terms and conditions as the Notes in all respects (or in all respects except for the first payment of interest thereon and any amendments made pursuant to (iii) below) and that are consolidated and form a single series with the Notes; provided that (unless otherwise approved by an Extraordinary Resolution (as defined in the Trust Deed) of

the Noteholders), (i) the Issuer provides additional security for such new bonds or notes that comprises assets that are fungible with, and have the same proportionate composition as, the Mortgaged Property in respect of the relevant existing Notes and that has an aggregate principal amount at least equal to the principal amount of such existing security multiplied by a fraction, the numerator of which is the aggregate principal amount of such new bonds or notes and the denominator of which is the aggregate principal amount of the existing Notes; (ii) the Issuer enters into an additional or supplemental swap agreement or credit enhancement agreement varying the terms of the Swap Agreement or, as applicable, the Credit Enhancement Agreement to take account of the new bonds or notes on terms no less favourable than those of the Swap Agreement or, as applicable, the Credit Enhancement Agreement; and, in relation to Notes which are rated by a rating agency, (iii) in the case of an issue of portfolio credit linked notes, the Issuer amends the terms and conditions of the Notes to preserve the economic effect of a holding of the Notes (including, without limitation, by amending the Reference Entity Notional Amount, the Subordination Amount and, where applicable, by amending any Factor (howsoever such terms are defined in the relevant terms and conditions)) in each case solely so as to preserve the economic effect of a holding of the Notes, such amendments to be determined by the Calculation Agent and notified to the Issuer and (iv) such further bonds and notes shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Upon issue of such new bonds or notes, the Notes and such new bonds or notes shall form a single series and be secured on the Mortgaged Property relating to the Notes and such additional security. Such further bonds or notes shall be constituted and secured by a further relevant Supplemental Trust Deed. In the case of a Series of Notes where there are Related Notes, the relevant Supplemental Trust Deed shall specify such other conditions as it may be necessary to satisfy to issue such further bonds or notes.

**(l)**    *Restrictions on Indebtedness*

Save as provided above, so long as any of the Notes remains outstanding, the Issuer, without the prior written consent of the Trustee, shall not incur any other indebtedness for borrowed moneys or engage in any other business (other than acquiring and holding the Mortgaged Property in respect of each Series, creating further Obligations, as provided for in this Condition 4, entering into related transactions, subject to Condition 4*(j)* and performing any act incidental to or necessary in connection with the foregoing), shall not have any subsidiaries (except in connection with the substitution of the Issuer as principal obligor under the Notes) and shall not dispose of the Mortgaged Property or any part thereof or interest therein (other than in connection with a substitution of the Swap Counterparty).

**(m)**    *Covenants*

The Issuer has covenanted in the Principal Trust Deed that it will not, without the prior written consent of the Trustee, *inter alia*:

(i)        engage in any business whatsoever, other than acquiring and holding Mortgaged Property, issuing Notes or issuing further bonds and notes (which may be consolidated and form a single series with the Notes) or creating other Obligations or entering into similar limited-recourse transactions, entering into related agreements and transactions and

performing any act incidental to or necessary in connection with any of the foregoing;

(ii) dispose of the Mortgaged Property or any interest therein, or create any mortgage, charge or other security interest or right of recourse in respect thereof in favour of any person (other than (x) the security referred to above or any similar limited-recourse transaction (whether such limited-recourse transaction is by means of a debt issue or by loan, option or swap) entered into by the Issuer in the future with the consent of the Trustee and the Swap Counterparty as provided below and (y) in connection with a transfer under the Swap Agreement);

(iii) cause or permit the Swap Agreements or Credit Enhancement Agreements or the priority of the security interests created by the Trust Deed to be amended, terminated or discharged (other than in connection with a transfer under the Swap Agreement);

(iv) release any party to the Swap Agreement (other than in connection with a transfer under the Swap Agreement), any Credit Enhancement Agreement, the Principal Trust Deed or any Supplemental Trust Deed from any existing obligations thereunder;

(v) have any subsidiaries (other than in connection with any substitution of the obligor under the Notes and the Trust Deed);

(vi) consent to any variation of, or exercise any powers or consent or waiver pursuant to, the terms of the Swap Agreements, any Credit Enhancement Agreement, the Conditions, the Principal Trust Deed, any Supplemental Trust Deed or other agreement relating to the issue of the Notes, any relevant documentation entered into in connection with the creation of other Obligations or any related transactions;

(vii) (to the extent the same is within the control of the Issuer) consolidate or merge with any other person or convey or transfer its properties or assets substantially as an entirety to any person;

(viii) have any employees;

(ix) (to the extent the same is within the control of the Issuer) pay any dividends or make any distribution to its shareholders;

(x) open or have any interest in any account whatsoever with any bank or financial institution unless such account relates to the Notes or any Mortgaged Property (as will be defined in the Trust Deed), any other Obligation or any party thereto, save where such account or the Issuer's interest therein is simultaneously charged in favour of the Trustee so as to form part of the Mortgaged Property or save where such account is opened in connection with the administration and management of the Issuer and only moneys necessary to the administration and management of the Issuer are credited to such account; or

(xi) (to the extent the same is within the control of the Issuer) issue or allot shares to persons other than such shares as were in issue on the date of the incorporation of the Issuer.

## 5    Interest and Other Calculations

**(a)**    *Interest Rate and Accrual*

Each Note bears interest on its outstanding principal amount from the Interest Commencement Date (as defined in the relevant Final Terms) at the rate per annum (expressed as a percentage) equal to the Interest Rate, such interest being payable in arrear on each Interest Payment Date.

Interest shall cease to accrue on each Note on the due date for redemption unless, upon due presentation, payment of principal is improperly withheld or refused, in which event interest shall continue to accrue (as well after as before judgment) at the Interest Rate in the manner provided in this Condition 5 to the Relevant Date. As used in these Conditions, "**Relevant Date**" in respect of any Note, Receipt or Coupon means the date on which payment in respect of it first becomes due or (if any amount of the money payable is improperly withheld or refused) the date on which payment in full of the amount outstanding is made or (if earlier) the date seven days after that on which notice is duly given to the Noteholders that, upon further presentation of the Note (or relative Certificate), Receipt, or Coupon being made in accordance with the Conditions, such payment will be made, provided that payment is in fact made upon such presentation.

**(b)**    *Business Day Convention*

If any date referred to in these Conditions that is specified to be subject to adjustment in accordance with a Business Day Convention would otherwise fall on a day that is not a Business Day, then, if the Business Day Convention specified is (i) the Floating Rate Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event (A) such date shall be brought forward to the immediately preceding Business Day and (B) each subsequent such date shall be the last Business Day of the month in which such date would have fallen had it not been subject to adjustment, (ii) the Following Business Day Convention, such date shall be postponed to the next day that is a Business Day, (iii) the Modified Following Business Day Convention, such date shall be postponed to the next day that is a Business Day unless it would thereby fall into the next calendar month, in which event such date shall be brought forward to the immediately preceding Business Day or (iv) the Preceding Business Day Convention, such date shall be brought forward to the immediately preceding Business Day.

**(c)**    *Interest Rate on Floating Rate Notes*

If the Interest Rate is specified as being Floating Rate, the Interest Rate for each Interest Accrual Period shall be determined in the manner specified hereon and the provisions below relating to either ISDA Determination or Screen Rate Determination shall apply, depending upon which is specified hereon:

(i)    ISDA Determination for Floating Rate Notes

Where ISDA Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period shall be determined by the Calculation Agent as a rate equal to the relevant ISDA Rate. For the purposes of this sub-paragraph (i), "**ISDA Rate**" for an Interest Accrual Period means a rate equal to the

Floating Rate that would be determined by the Calculation Agent under a Swap Transaction under the terms of an agreement incorporating the ISDA Definitions and under which:

(a)     the Floating Rate Option is as specified hereon;

(b)     the Designated Maturity is a period specified hereon; and

(c)     the relevant Reset Date is the first day of that Interest Accrual Period unless otherwise specified hereon.

For the purposes of this sub-paragraph (i), "**Floating Rate**", "**Calculation Agent**", "**Floating Rate Option**", "**Designated Maturity**", "**Reset Date**" and "**Swap Transaction**" have the meanings given to those terms in the ISDA Definitions.

(ii)    Screen Rate Determination for Floating Rate Notes

(A)     Where Screen Rate Determination is specified hereon as the manner in which the Interest Rate is to be determined, the Interest Rate for each Interest Accrual Period will, subject as provided below and to Condition 5(e) be either:

(1)     the offered quotation; or

(2)     the arithmetic mean of the offered quotations,

(expressed as a percentage rate per annum) for the Reference Rate which appears or appear, as the case may be, on the Relevant Screen Page as at either 11.00 a.m. (London time in the case of LIBOR or Brussels time in the case of EURIBOR) on the Interest Determination Date in question as determined by the Calculation Agent. If five or more of such offered quotations are available on the Relevant Screen Page, the highest (or, if there is more than one such highest quotation, one only of such quotations) and the lowest (or, if there is more than one such lowest quotation, one only of such quotations) shall be disregarded by the Calculation Agent for the purpose of determining the arithmetic mean of such offered quotations.

If the Reference Rate from time to time in respect of Floating Rate Notes is specified hereon as being other than LIBOR or EURIBOR, the Interest Rate in respect of such Notes will be determined as provided hereon.

(B)     if the Relevant Screen Page is not available or if sub-paragraph (A)(1) above applies and no such offered quotation appears on the Relevant Screen Page or if sub-paragraph (A)(2) above applies and fewer than three such offered quotations appear on the Relevant Screen Page in each case as at the time specified above, subject as provided below, the Calculation Agent shall request, if the Reference Rate is LIBOR, the principal London office of each of the Reference Banks or, if the Reference Rate is EURIBOR, the principal Euro-zone office of each of the Reference Banks, to provide the Calculation Agent with its offered quotation (expressed

as a percentage rate per annum) for the Reference Rate if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time), or if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time) on the Interest Determination Date in question. If two or more of the Reference Banks provide the Calculation Agent with such offered quotations, the Interest Rate for such Interest Period shall be the arithmetic mean of such offered quotations as determined by the Calculation Agent; and

(C)     if paragraph (B) above applies and the Calculation Agent determines that fewer than two Reference Banks are providing offered quotations, subject as provided below, the Interest Rate shall be the arithmetic mean of the rates per annum (expressed as a percentage) as communicated to (and at the request of) the Calculation Agent by the Reference Banks or any two or more of them, at which such banks were offered, if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time) or, if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time) on the relevant Interest Determination Date, deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate by leading banks in, if the Reference Rate is LIBOR, the London inter-bank market or, if the Reference Rate is EURIBOR, the Euro-zone inter-bank market, as the case may be, or, if fewer than two of the Reference Banks provide the Calculation Agent with such offered rates, the offered rate for deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate, or the arithmetic mean of the offered rates for deposits in the Relevant Currency for a period equal to that which would have been used for the Reference Rate, at which, if the Reference Rate is LIBOR, at approximately 11.00 a.m. (London time) or, if the Reference Rate is EURIBOR, at approximately 11.00 a.m. (Brussels time), on the relevant Interest Determination Date, any one or more banks (which bank or banks is or are in the opinion of the Trustee and the Issuer suitable for such purpose) informs the Calculation Agent it is quoting to leading banks in, if the Reference Rate is LIBOR, the London inter-bank market or, if the Reference Rate is EURIBOR, the Euro-zone inter-bank market, as the case may be, provided that, if the Interest Rate cannot be determined in accordance with the foregoing provisions of this paragraph, the Interest Rate shall be determined as at the last preceding Interest Determination Date (though substituting, where a different Margin or Maximum or Minimum Interest Rate is to be applied to the relevant Interest Accrual Period from that which applied to the last preceding Interest Accrual Period, the Margin or Maximum or Minimum Interest Rate relating to the relevant Interest Accrual Period), in place of the Margin or Maximum or Minimum Interest Rate relating to that last preceding Interest Accrual Period.

**(d)**     *Interest Rate on Zero Coupon Notes*

Where a Note the Interest Rate of which is specified to be Zero Coupon is repayable prior to the Maturity Date and is not paid when due, the amount due and payable prior to the Maturity Date shall be the Redemption Amount (as defined in the relevant Final Terms) of such Note. As from the Maturity Date, the Interest Rate for any overdue principal of such a Note shall be a rate per annum (expressed as a percentage) equal to the Amortisation Yield (as set out in Condition 6(b)).

**(e)**     *Margin, Maximum/Minimum Interest Rates, Instalment Amounts and Redemption Amounts and Rounding*

(i)     If any Margin is specified hereon (either (x) generally, or (y) in relation to one or more Interest Accrual Periods), an adjustment shall be made to all Interest Rates, in the case of (x), or the Interest Rates for the specified Interest Accrual Periods, in the case of (y), calculated in accordance with (c) above by adding (if a positive number) or subtracting the absolute value (if a negative number) of such Margin, subject always to the next paragraph.

(ii)     If any Maximum or Minimum Interest Rate, Instalment Amount or Redemption Amount is specified hereon, then any Interest Rate, Instalment Amount or Redemption Amount shall be subject to such maximum or minimum, as the case may be.

(iii)     For the purposes of any calculations required pursuant to these Conditions (unless otherwise specified), (x) all percentages resulting from such calculations shall be rounded, if necessary, to the nearest one hundred-thousandth of a percentage point (with halves being rounded up), (y) all figures shall be rounded to seven significant figures (with halves being rounded up) and (z) all currency amounts that fall due and payable shall be rounded to the nearest unit of such currency (with halves being rounded up), save in the case of yen, which shall be rounded down to the nearest yen, and in the case of euro, which shall be rounded down to the nearest €0.01. For these purposes "**unit**" means the lowest amount of such currency that is available as legal tender in the country(ies) of such currency.

**(f)**     *Calculations*

The amount of interest payable in respect of any Note for any period shall be calculated by multiplying the product of the Interest Rate and the outstanding principal amount of such Note by the Day Count Fraction, unless an Interest Amount (or a formula for its calculation) is specified in respect of such period, in which case the amount of interest payable in respect of such Note for such period shall equal such Interest Amount (or be calculated in accordance with such formula). Where any Interest Period comprises two or more Interest Accrual Periods, the amount of interest payable in respect of such Interest Period shall be the sum of the amounts of interest payable in respect of each of those Interest Accrual Periods.

**(g)**     *Determination and Publication of Interest Rates, Interest Amounts, Redemption Amounts and Instalment Amounts*

The Calculation Agent shall, as soon as practicable on each Interest Determination Date or such other time on such date as the Calculation Agent may be required to calculate any Redemption Amount or Instalment Amount, obtain any quote or make any determination or calculation, determine the Interest Rate and calculate the Interest Amounts in respect of each denomination of the Notes for the relevant Interest Accrual Period, calculate the Redemption Amount or Instalment Amount, obtain such quote or make such determination or calculation, as the case may be, and cause the Interest Rate and the Interest Amounts for each Interest Period and the relevant Interest Payment Date and, if required to be calculated, the Redemption Amount or any Instalment Amount to be notified to the Trustee, the Issuer, each of the Paying Agents, the Noteholders, any other Calculation Agent appointed in respect of the Notes that is to make a further calculation upon receipt of such information and, if the Notes are listed on a stock exchange and the rules of such exchange so require, such exchange as soon as possible after their determination but in no event later than (i) the commencement of the relevant Interest Period, if determined prior to such time, in the case of notification to such exchange of an Interest Rate and Interest Amount, or (ii) in all other cases, the fourth Business Day after such determination. Where any Interest Payment Date or Interest Period Date is subject to adjustment pursuant to Condition 5(b), the Interest Amounts and the Interest Payment Date so published may subsequently be amended (or appropriate alternative arrangements made with the consent of the Trustee by way of adjustment) without notice in the event of an extension or shortening of the Interest Period. If the Notes become due and payable under Condition 10, the accrued interest and the Interest Rate payable in respect of the Notes shall nevertheless continue to be calculated as previously in accordance with this Condition but no publication of the Interest Rate or the Interest Amount so calculated need be made unless the Trustee otherwise requires. The determination of each Interest Rate, Interest Amount, Redemption Amount and Instalment Amount, the obtaining of each quote and the making of each determination or calculation by the Calculation Agent(s) shall (in the absence of manifest error) be final and binding upon all parties. No Noteholders shall (in the absence aforesaid) be entitled to proceed against the Reference Banks, the Calculation Agent, the Trustee or any of them in connection with the exercise or non-exercise by them of their powers, duties and discretions under this Condition 5.

**(h)**     *Determination or Calculation by Trustee*

If the Calculation Agent does not at any time for any reason determine or calculate the Interest Rate for an Interest Period or any Interest Amount, Instalment Amount or Redemption Amount, the Trustee shall do so (or shall appoint an agent on its behalf to do so) and such determination or calculation shall be deemed to have been made by the Calculation Agent. In doing so, the Trustee shall apply the foregoing provisions of this Condition, with any necessary consequential amendments, to the extent that, in its opinion, it can do so, and, in all other respects it shall do so in such manner as it shall deem fair and reasonable in all the circumstances.

**(i)**    *Definitions*

In these Conditions, unless the context otherwise requires, the following defined terms shall have the meanings set out below:

"**Business Day**" means:

(i)    in the case of a specified currency other than euro, a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in the principal financial centre for that currency; and/or

(ii)    in the case of euro, a day on which the TARGET system is open (a "TARGET Business Day"); and/or

(iii)    in the case of a specified currency and/or one or more specified financial centres, a day (other than a Saturday or a Sunday) on which commercial banks and foreign exchange markets settle payments in the specified currency or, if none is specified, generally in each of the financial centres so specified (which, in the case of Australian dollars, shall be Melbourne and Sydney).

"**Day Count Fraction**" means, in respect of the calculation of an amount of interest on any Note for any period of time (whether or not constituting an Interest Period, the "**Calculation Period**"):

(i)    if "**Actual/Actual**" or "**Actual/Actual- ISDA**" is specified hereon, the actual number of days in the Calculation Period divided by 365 (or, if any portion of that Calculation Period falls in a leap year, the sum of (A) the actual number of days in that portion of the Calculation Period falling in a leap year divided by 366 and (B) the actual number of days in that portion of the Calculation Period falling in a non-leap year divided by 365; provided that no adjustment shall be made for any portion of a Calculation Period falling in a leap year in the case of Notes denominated in Japanese yen or any other currency specified hereon);

(ii)    if "**Actual/365 (Fixed)**" is specified hereon, the actual number of days in the Calculation Period divided by 365;

(iii)    if "**Actual/360**" is specified hereon, the actual number of days in the Calculation Period divided by 360;

(iv)    if "**30/360**", "**360/360**" or "**Bond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360 calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"$Y_1$" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"$Y_2$" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"**M₁**" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"**M₂**" is the calendar month, expressed as number, in which the day immediately following the last day included in the Calculation Period falls;

"**D₁**" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case D1 will be 30; and

"**D₂**" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31 and D1 is greater than 29, in which case D2 will be 30

(v)     if "**30E/360**" or "**Eurobond Basis**" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"**Y₁**" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"**Y₂**" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"**M₁**" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"**M₂**" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"**D₁**" is the first calendar day, expressed as a number, of the Calculation Period, unless such number would be 31, in which case D₁ will be 30; and

"**D₂**" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless such number would be 31, in which case D₂ will be 30

(vi)    if "**30E/360 (ISDA)**" is specified hereon, the number of days in the Calculation Period divided by 360, calculated on a formula basis as follows:

$$\text{Day Count Fraction} = \frac{[360 \times (Y_2 - Y_1)] + [30 \times (M_2 - M_1)] + (D_2 - D_1)}{360}$$

where:

"**Y₁**" is the year, expressed as a number, in which the first day of the Calculation Period falls;

"**Y₂**" is the year, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"**M₁**" is the calendar month, expressed as a number, in which the first day of the Calculation Period falls;

"**M₂**" is the calendar month, expressed as a number, in which the day immediately following the last day included in the Calculation Period falls;

"**D₁**" is the first calendar day, expressed as a number, of the Calculation Period, unless (i) that day is the last day of February or (ii) such number would be 31, in which case $D_1$ will be 30; and

"**D₂**" is the calendar day, expressed as a number, immediately following the last day included in the Calculation Period, unless (i) that day is the last day of February but not the Maturity Date or (ii) such number would be 31, in which case $D_2$ will be

(vii)  if "**Actual/Actual- ICMA**" is specified hereon:

(a)  if the Calculation Period is equal to or shorter than the Determination Period during which it falls, the number of days in the Calculation Period divided by the product of (x) the number of days in such Determination Period and (y) the number of Determination Periods normally ending in any year; and

(b)  if the Calculation Period is longer than one Determination Period, the sum of:

(x)  the number of days in such Calculation Period falling in the Determination Period in which it begins divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year; and

(y)  the number of days in such Calculation Period falling in the next Determination Period divided by the product of (1) the number of days in such Determination Period and (2) the number of Determination Periods normally ending in any year

where:

"**Determination Date**" means the date specified as such hereon or, if none is so specified, the Interest Payment Date.

"**Determination Period**" means the period from and including a Determination Date in any year to but excluding the next Determination Date.

"**Euro-zone**" means the region comprised of Member States of the European Union that adopt the single currency in accordance with the Treaty establishing the European Community, as amended by the Treaty on European Union.

"**Interest**" shall be deemed to include all Interest Amounts and all other amounts payable pursuant to Condition 5 or any amendment or supplement to it.

"**Interest Accrual Period**" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Period Date and each successive period beginning on (and including) an Interest Period Date and ending on (but excluding) the next succeeding Interest Period Date.

"**Interest Amount**" means the amount of interest payable in respect of each denomination of the Notes.

"**Interest Commencement Date**" means the Issue Date or such other date as may be specified herein.

"**Interest Determination Date**" means, with respect to an Interest Rate and Interest Accrual Period, the date specified as such hereon or, if none is so specified, (i) the first day of such Interest Accrual Period if the Relevant Currency is Sterling or (ii) the day failing two Business Days in London for the Relevant Currency prior to the first day of such Interest Accrual Period if the Relevant Currency is neither Sterling nor euro or (iii) the day falling two TARGET Business Days prior to the first day of such Interest Accrual Period if the Relevant Currency is euro.

"**Interest Period**" means the period beginning on (and including) the Interest Commencement Date and ending on (but excluding) the first Interest Payment Date and each successive period beginning on (and including) an Interest Payment Date and ending on (but excluding) the next succeeding Interest Payment Date.

"**Interest Period Date**" means each Interest Payment Date unless otherwise specified hereon.

"**Interest Rate**" means the rate of interest payable from time to time in respect of this Note and that is either specified or calculated in accordance with the provisions hereon.

"**ISDA Definitions**" means the 2006 ISDA Definitions (as amended or supplemented from time to time) published by the International Swaps and Derivatives Association, Inc., unless otherwise specified hereon.

"**Principal**" shall be deemed to include any premium payable in respect of the Notes, all Instalment Amounts, Redemption Amounts, Amortised Face Amounts and all other amounts in the nature of principal payable pursuant to Condition 6 or any amendment or supplement to it.

"**Reference Banks**" means, in the case of a determination of LIBOR, the principal London office of four major banks in the London inter-bank market and, in the case of a determination of EURIBOR, the principal Euro-zone office of four major banks in the Euro-zone inter-bank market, in each case selected by the Calculation Agent or as specified hereon.

"**Reference Rate**" means the rate specified as such hereon.

"**Relevant Currency**" means the currency specified hereon or, if none is specified, the currency in which the Notes are denominated.

"**Relevant Screen Page**" means such page, section, caption, column or other part of a particular information service as may be specified hereon.

"**TARGET System**" means the Trans-European Automated real-time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

(j)    *Calculation Agent*

The Issuer shall procure that there shall at all times be one or more Calculation Agents if provision is made for them hereon and for so long as any Note is

outstanding (as defined in the Trust Deed). Where more than one Calculation Agent is appointed in respect of the Notes, references in these Conditions to the Calculation Agent shall be construed as each Calculation Agent performing its respective duties under the Conditions. If the Calculation Agent is unable or unwilling to act as such or if the Calculation Agent fails duly to establish the Interest Rate for an Interest Period or Interest Accrual Period or to calculate any Interest Amount, Instalment Amount or the Redemption Amount or to comply with any other requirement, the Issuer shall (with the prior written approval of the Trustee) appoint a leading bank or investment banking firm engaged in the inter-bank market (or, if appropriate, money, swap or over-the-counter index options market) that is most closely connected with the calculation or determination to be made by the Calculation Agent (acting through its principal London office or any other office actively involved in such market) to act as such in its place. The Calculation Agent may not resign its duties without a successor having been appointed as aforesaid.

## 6 Redemption, Purchase and Options

**(a)** *Redemption by Instalments and Final Redemption*

(i) Unless previously redeemed or purchased and cancelled as provided in this Condition 6, each Note that provides for Instalment Dates and Instalment Amounts shall be partially redeemed on each Instalment Date at the related Instalment Amount specified hereon. The outstanding principal amount of each such Note shall be reduced by the Instalment Amount (or, if such Instalment Amount is calculated by reference to a proportion of the principal amount of such Note, such proportion) for all purposes with effect from the related Instalment Date, unless payment of the Instalment Amount is improperly withheld or refused, in which case, such amount shall remain outstanding until the Relevant Date relating to such Instalment Amount.

(ii) Unless previously redeemed, purchased and cancelled as provided below, each Note shall be finally redeemed on the Maturity Date specified hereon at its Redemption Amount (which, unless otherwise provided herein, is its principal amount) or, in the case of a Note falling within paragraph (i) above, its final Instalment Amount. Notes with no final maturity date will only be redeemable or repayable in accordance with the following provisions of this Condition 6 or Condition 10.

**(b)** *Early Redemption of Zero Coupon Notes*

(i) The Redemption Amount payable in respect of any Note that does not bear interest prior to the Maturity Date, the Redemption Amount of which is not linked to an index and/or a formula, upon redemption of such Note pursuant to Condition 6*(d)* or upon it becoming due and payable as provided in Condition 10 shall be the Amortised Face Amount (calculated as provided below) of such Note.

(ii) Subject to the provisions of sub-paragraph (iii) below, the Amortised Face Amount of any such Note shall be the scheduled Redemption Amount of such Note on the Maturity Date discounted at a rate per annum (expressed as a percentage) equal to the Amortisation Yield (which, if none is shown hereon, shall be such rate as would produce an Amortised Face Amount

equal to the issue price of the Notes if they were discounted back to their issue price on the Issue Date) compounded annually. Where such calculation is to be made for a period of less than one year, it shall be made on the basis of the Day Count Fraction shown hereon.

(iii)  If the Redemption Amount payable in respect of any such Note upon its redemption pursuant to Condition 6*(d)* or upon it becoming due and payable as provided in Condition 10 is not paid when due, the Redemption Amount due and payable in respect of such Note shall be the Amortised Face Amount of such Note as defined in sub-paragraph (ii) above, except that such sub-paragraph shall have effect as though the reference therein to the date on which the Note becomes due and payable were replaced by a reference to the Relevant Date. The calculation of the Amortised Face Amount in accordance with this sub-paragraph shall continue to be made (as well after as before judgment) until the Relevant Date, unless the Relevant Date falls on or after the Maturity Date, in which case the amount due and payable shall be the scheduled Redemption Amount of such Note on the Maturity Date together with any interest that may accrue in accordance with Condition 5*(d)*.

**(c)**  *Mandatory Redemption*

Subject to the terms of the relevant Supplemental Trust Deed, if any of the Collateral becomes repayable prior to its stated date of maturity for whatever reason or (unless the Trustee otherwise agrees) there is a payment default (after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the later of the Issue Date and the date on which such Collateral was issued) in respect of any of the Collateral, a proportion of the principal amount of the Notes outstanding equal to the proportion of the Collateral comprised by the Collateral repaid or in respect of which there is a default will become immediately repayable. The Issuer shall forthwith give not more than 45 nor less than 30 Business Days' prior notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee and the Noteholders (which notice shall be irrevocable) and upon expiry of such notice the Issuer will redeem either, as the case may be, all of the Notes at their Early Redemption Amount together with accrued interest or, in the case of a redemption in part, either (x) some of the Notes at their Early Redemption Amount together with accrued interest (if redemption is to be effected in accordance with Partial Redemption - Method A (as specified in the relevant Supplemental Trust Deed)) or (y) all of the Notes on a *pro rata* basis in an aggregate principal amount equal to that of the Collateral repaid or in respect of which there is a default (if redemption is to be effected in accordance with Partial Redemption - Method B (as specified in the relevant Supplemental Trust Deed)), failing which all of the Notes shall become repayable and the security constituted by the relevant Supplemental Trust Deed and/or any Other Security Document shall become enforceable and the Trustee will take such action as is provided in Condition 4. In this Condition, "Business Day" means a day on which commercial banks and foreign exchange markets are open in the cities specified in the relevant Supplemental Trust Deed.

**(d)**     *Redemption for Taxation and Other Reasons*

(i)      If the Issuer, on the occasion of the next payment due in respect of the Notes or Coupons, would be required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due, the Issuer shall so inform the Trustee, shall use its best endeavours to arrange the substitution of a company incorporated in another jurisdiction approved by the Trustee as the principal debtor (provided that, in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as affirmed in writing by the appropriate rating agency) or to change (to the satisfaction of the Trustee (provided that in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as affirmed in writing by the appropriate rating agency)) its residence for taxation purposes to another jurisdiction approved beforehand in writing by the Trustee and if it is unable to arrange such substitution or change before the next payment is due in respect of the Notes it shall forthwith give notice thereof to the Trustee, the Noteholders, the appropriate rating agency (if any) and the Swap Counterparty and upon the giving of such notice all but not some only of the Notes shall become due for redemption on the date specified in such notice at their Early Redemption Amount together with interest accrued to the date fixed for redemption;

(ii)     If a Swap Agreement is terminated in whole for any reason then the Issuer shall forthwith give not more than 45 nor less than 15 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee, the Noteholders and the Swap Counterparty (which notice shall be irrevocable), and on the expiry of such notice shall redeem all but not some only of the Notes at their Early Redemption Amount together with any interest accrued to the date fixed for redemption. Such notice shall be given promptly upon the termination of the relevant Swap Agreement and such redemption made, unless the Trustee shall certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the holders of the Notes that such notice and redemption be delayed or not given or made, as the case may be, or an Extraordinary Resolution of the holders of the Notes shall otherwise direct; or

(iii)    If the Issuer (i) is or will be unable to receive any payment due in respect of the Collateral forming part of the Mortgaged Property in full on the due date therefor without deduction for or on account of any withholding tax, back-up withholding or other tax, duties or charges of whatsoever nature imposed by any authority of the jurisdiction of the issuer of the Collateral, (ii) is required to pay any tax, duty or charge of whatsoever nature in respect of any payment received in respect of the Collateral forming part of the Mortgaged Property or (iii) is required to comply with any reporting requirement of any such authority (unless such reporting requirement does not involve any material expense or is not unduly onerous), except in any case where the Issuer is able to obtain such payment in full on the due date therefor or gain exemption from such payment or reporting requirement by

filing a declaration that it is not a resident of such jurisdiction and/or by executing any certificate, form or other document in order to make a claim under a double taxation treaty or other exemption available to it and such filing or execution does not involve any material expense and is not unduly onerous, or such reporting requirement does not involve any material expense and is not unduly onerous, then the Issuer shall so inform the Trustee, and shall use its best endeavours to arrange the substitution of a company incorporated in another jurisdiction approved beforehand in writing by the Trustee and the Swap Counterparty (provided that in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such substitution shall not adversely affect any existing rating of the Notes as affirmed in writing by the appropriate rating agency) as the principal debtor in respect of the Notes and the Swap Agreement or to change (to the satisfaction of the Trustee and the Swap Counterparty (provided that in relation to Notes rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as affirmed in writing by the appropriate rating agency)) its residence for taxation purposes to another jurisdiction approved beforehand in writing by the Trustee and the Swap Counterparty and if it is unable to arrange such substitution or change before the next payment is due in respect of the Notes it shall forthwith give notice thereof to the Trustee, the Noteholders, the appropriate rating agency (if any) and the Swap Counterparty and upon the giving of such notice all but not some only of the Notes shall become due for redemption on the date specified in such notice at the Early Redemption Amount together with interest accrued to the date fixed for redemption.

Notwithstanding the foregoing, if any of the taxes referred to in paragraph (d)(i) above arises by reason of any Noteholder's connection with the jurisdiction of the Issuer otherwise than by reason only of the holding of any Note or receiving or being entitled to any principal or interest in respect thereof, then to the extent it is able to do so, the Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed as provided in the previous provisions. Any such deduction shall not constitute an Event of Default under Condition 10.

Notwithstanding the foregoing, if the requirement to withhold or account for tax set out in Condition 6(d)(i) arises as a result of:

(i)     a withholding or deduction imposed on a payment by or on behalf of the relevant Issuer to an individual required to be made pursuant to European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000 on the taxation of savings income or any law implementing or complying with, or introduced in order to conform to, such Directive or any other law introduced as a consequence of the adoption or implementation of such Directive; or

(ii)     the presentation for payment of any Bearer Note, Receipt or Coupon by or on behalf of a holder who would have been able to avoid such withholding or deduction by presenting the relevant Bearer Note, Receipt or Coupon to another Paying Agent in a Member State of the European Union,

then Condition 6(d)(i) shall not apply. The relevant Issuer shall deduct such taxes from the amounts payable to such Noteholder, all other Noteholders shall receive the due amounts payable to them and the Notes shall not be redeemed. Any such deduction shall not constitute an Event of Default under Condition 10.

**(e)**     *Redemption at the Option of the Issuer*

If so specified in the relevant Supplemental Trust Deed, the Issuer may, on giving not more than 45 nor less than 30 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Noteholders and the Trustee (which notice shall be irrevocable) redeem all or, if so provided in the relevant Supplemental Trust Deed, some of the Notes at the Early Redemption Amount on the Issuer's Optional Redemption Date or Dates so provided in the relevant Supplemental Trust Deed. Upon expiration of such notice, the Issuer shall be bound to redeem the Notes at their Early Redemption Amount, together, if appropriate, with interest accrued to, but excluding, such date or dates of redemption.

**(f)**     *Redemption at the Option of Noteholders*

If so specified in the relevant Supplemental Trust Deed, the Issuer shall, at the option of the holder of any Note, redeem such Note on the date or dates so provided at its Early Redemption Amount together with interest accrued to the date fixed for redemption.

To exercise such option the holder must deposit (in the case of Bearer Notes) such Note (together with all unmatured Receipts and Coupons and unexchanged Talons) with any Paying Agent or (in the case of Registered Notes) the Certificate representing such Note(s) with the Registrar or any Transfer Agent at its specified office, together with a duly completed option exercise notice ("**Exercise Notice**") in the form obtainable from any Paying Agent, the Registrar or any Transfer Agent (as applicable) within the Noteholders' Option Period as specified in the Final Terms. No Note or Certificate so deposited and option exercised may be withdrawn (except as provided in the Agency Agreement) without the prior consent of the Issuer.

**(g)**     *Early Redemption Amount*

Unless otherwise specified in the relevant Supplemental Trust Deed, the Early Redemption Amount payable upon a redemption of any Note pursuant to Condition 6 (c), (d), (e), (f) and (k) and Condition 10 shall be an amount, determined by the Calculation Agent in its absolute discretion, equal to the Recovery Fraction of the principal amount of the Note (or, if applicable, the part of the Note) being redeemed (the "**Early Redemption Amount**").

Where:

"**Counterparty**" means each party (other than the Issuer) to a Credit Enhancement Agreement.

"**Credit Enhancement Termination Payment**" means the total amount payable to the Issuer by a Counterparty (being a positive number) on the termination of (or as the case may be, the *pro rata* portion of) any related Credit Enhancement Agreement.

"**Recovery Amount**" means the amount received by or on behalf of the Issuer upon the sale of the Collateral (or, if applicable the *pro rata* portion of the Collateral) after the deduction of all costs, fees (including, without limitation, legal fees), charges, taxes and expenses of or incurred by the Issuer or, if applicable, the Disposal Agent in connection with the sale of the relevant Collateral and the early redemption of the Notes plus, if a positive number, the aggregate amount of, or minus, if a negative number, the aggregate amount of the Swap Termination Payment and/or the Credit Enhancement Termination Payment.

"**Recovery Fraction**" means a fraction of which the numerator is the Recovery Amount and the denominator is the aggregate principal amount of the Notes falling due for redemption.

"**Swap Termination Payment**" means the amount payable to the Issuer by the Swap Counterparty (in which case, it shall be a positive number) or by the Issuer to the Swap Counterparty (in which case, it shall be a negative number) on the termination of (or, as the case may be, the *pro rata* portion of) the related Swap Agreement.

(h)    *Notice of Redemption and Drawings*

All Notes in respect of which any notice of redemption is given under this Condition shall be redeemed on the date specified in such notice in accordance with this Condition. In the case of a partial redemption if the relevant Supplemental Trust Deed specifies "Partial Redemption - Method A", then the notice shall also contain the certificate numbers of the Notes to be redeemed, which shall have been drawn in such place as the Trustee may approve and in such manner as it deems appropriate, subject to compliance with any applicable laws and stock exchange requirements. If the relevant Supplemental Trust Deed specifies "Partial Redemption - Method B", then each Note will be redeemed on a *pro rata* basis.

(i)    *Purchases*

If the Issuer has satisfied the Trustee that in relation to the reduction in the notional amount of any other Obligation and for the purchase of Notes and an equivalent proportion of any Related Notes:

(a)    it has made arrangements for the realisation of no more than the equivalent proportion of the Collateral and such transaction will leave the Issuer with no net liabilities in respect thereof, or

(b)    it has made arrangements for the realisation of an amount of the Collateral in such manner that (i) the amount of Collateral realised does not exceed an amount equal to the outstanding notional amount of such Collateral multiplied by the Reduction Factor (as defined below) (and where the Collateral comprises more than one issue of securities or other type of obligation, the Issuer is not required to realise each issue of securities or other type of obligation in an equivalent proportion to the amount of Obligations, Notes or Related Notes being purchased, but may select the

proportions of the relevant issue of securities or other type of obligations to be so realised), (ii) where such other Obligation, Notes or Related Notes is rated, the relevant Rating Agency confirms that the then current rating of such Obligation, Note or Related Notes shall not be affected as a result of such realisation of the Collateral and (iii) such transaction will leave the Issuer with no net liabilities in respect thereof,

then the Issuer may at any time reduce the notional amount of such Obligation or purchase Notes (provided that they are purchased together with all unmatured Coupons and Talons related to them) in the open market or otherwise at any price provided that, notwithstanding anything to the contrary in (a) or (b) above, where (A) the denomination or its equivalent in respect of the Obligations, Notes or Related Notes, as the case may be, is not an integer multiple of the denomination or its equivalent in respect of the Collateral or vice versa and (B) the Collateral is trading above par at the time of such realisation of the Collateral, the Issuer may (x) in the case of (a) above, realise a proportion of the Collateral which is more than an equivalent proportion of the Obligations, Notes or Related Notes, as the case may be, or (y) in the case of (b) above, realise an amount of Collateral which exceeds an amount equal to the outstanding notional amount of such Collateral multiplied by the Reduction Factor and, in the case of (a) above, the excess of the realisation proceeds over the notional amount of such equivalent proportion of the Obligations, Notes or Related Notes, as the case may be, or in the case of (b) above, the excess of the realisation proceeds over the outstanding notional amount of such Collateral multiplied by the Reduction Factor, shall be held in a cash account, which will be subject to a security interest created pursuant to the relevant Supplemental Trust Deed.

The "**Reduction Factor**" means, in relation to a reduction in the notional amount of any other Obligation and for the purchase of Notes and an equivalent proportion of any Related Notes, a factor where (1) the numerator is the amount by which the notional amount of such Obligation is reduced or the notional amount of Notes to be purchased (as the case may be) and (2) the denominator is the notional amount of the Obligation prior to such reduction or the outstanding notional amount of Notes prior to such purchase.

**(j)** *Cancellation*

The Issuer may, but shall not be obliged to, surrender for cancellation all Notes purchased by or on behalf of it, in the case of Bearer Notes, by surrendering each such Note together with all unmatured Receipts and Coupons and all unexchanged Talons to, or to the order of, the Issuing and Paying Agent and, in the case of Registered Notes, by surrendering the Certificate representing such Notes to the Registrar and, in each case, shall, together with all Notes redeemed by the Issuer, be cancelled forthwith (together with all unmatured Receipts and Coupons and unexchanged Talons attached thereto or surrendered therewith). Any Notes so surrendered for cancellation may not be reissued or resold and the obligations of the Issuer in respect of any such Notes shall be discharged.

**(k)** *Exchange*

If so specified in the relevant Supplemental Trust Deed, any holder may at its option (subject to, if so specified in the Supplemental Trust Deed, the consent of each

relevant Counterparty) exchange any or all of its Notes for (i) an amount (the "**Net Asset Amount**") calculated by the Issuer, equal to the then market value of such proportion of the Collateral (the "**attributable Collateral**") or, as the case may be, the Issuer's rights in respect thereof (the "**attributable rights**") or (ii) physical delivery ("**Physical Delivery**") of such proportion of the Collateral itself, in each case as equals the proportion (rounded down to the nearest whole number) which the Notes to be exchanged bears to the total principal amount outstanding of the Notes (less the costs of such valuation) adjusted as appropriate by the value realised or cost incurred, as the case may be, as a result of the termination of any Swap Agreement and/or Credit Enhancement Agreement, or part thereof in accordance with this Condition 6*(k)*. To exercise such option, the holder shall, if the Notes are in bearer form, deposit the relevant Notes (together with all (if any) unmatured Coupons or Talons appertaining thereto) or, if the Notes are in registered form, deposit the Certificate representing the Notes at the office of Register, together with written notice that such option is to be exercised and (if the holder has elected for Physical Delivery, where available) a delivery instruction form (a "**Delivery Instruction Form**") substantially in the form set out in the Agency Agreement (and available upon request from the specified office of any Paying Agent or Transfer Agent during normal office hours). The Issuing and Paying Agent will forthwith notify the Issuer, each Counterparty, each Swap Counterparty, the Custodian, the Disposal Agent, the Registrar and the Trustee of receipt of such written notice. Each Counterparty and each Swap Counterparty shall forthwith notify the Issuer, the Trustee, the Custodian and the Issuing and Paying Agent (who shall then notify the relevant holder) of the net sum payable by such Counterparty and by, or, as the case may be, to such Swap Counterparty on termination of the relevant part of the relevant Credit Enhancement Agreement or Swap Agreement, as appropriate. The part of the relevant Credit Enhancement Agreement or, as the case may be, the relevant Swap Agreement to be terminated will be the *pro rata* amount thereof corresponding to that proportion of the Notes to be exchanged. The calculation of the Net Asset Amount in accordance with this Condition 6*(k)* shall be binding on the relevant holder(s) in the absence of manifest error. Any such Net Asset Amount shall be payable to the holder at the specified office of any Paying Agent or Transfer Agent at which the relevant Notes were deposited on the twentieth calendar day after such deposit (the "**Delivery Date**") or (if the holder has elected for Physical Delivery) (subject to receipt of a Delivery Instruction form) delivered on, or as soon as practicable after, the Settlement Date to the account at Euroclear Bank S.A./N.V. ("**Euroclear**") or Clearstream Banking, société anonyme ("**Clearstream, Luxembourg**" and, together with Euroclear and/or any alternative clearing system agreed by the Trustee, the "**Clearing Systems**") (or in such other manner as shall be provided in the relevant Supplemental Trust Deed) as specified in the relevant Delivery Instruction Form.

Notwithstanding the foregoing provisions of this Condition 6(*k*), the Issuer may, at its discretion, elect to satisfy the obligations hereunder by delivery to the relevant holder of the attributable Collateral or, as the case may be, by assignment to the relevant holder of the attributable rights even though the holder may not have elected for Physical Delivery. In any such case, the Issuer will procure that, subject to any payment due from the holder to the Swap Counterparty being made, the relevant attributable Collateral is delivered to the holder (or to any other place or account specified in the written notice referred to above) or, as the case may be, the

relevant attributable rights are assigned to the holder on the Delivery Date and shall use all reasonable endeavours to procure that any payment being due from the relevant Counterparty and/or relevant Swap Counterparty to the holder on termination of the relevant Credit Enhancement Agreement and/or relevant Swap Agreement or part thereof is duly made.

Accountholders at the Clearing Systems will be required to give an irrevocable instruction to the relevant Clearing System, as the case may be, in respect of such delivery in the form prescribed by the relevant Clearing System (which may be in a form other than that set out in the Agency Agreement), not later than 10.00 a.m. Brussels or Luxembourg time, as the case may be (or, in the case of an instruction to Euroclear via EUCLID or EUCLID 90, 11.00 a.m. Brussels time), on the Clearing Business Day prior to the Delivery Date.

No interest will be payable with respect to Notes deposited for exchange pursuant to this Condition in respect of the period from the date of issue of the Notes (in the case of exchange prior to the first due date for the payment of interest on the Note) or the previous date for the payment of interest on the Note (in any other case) to the date of such exchange.

The relevant Supplemental Trust Deed will contain provisions for the release of the relevant Mortgaged Property for which Notes have been exchanged from the remaining charges upon them.

In these Conditions:

"**Clearing Business Day**" means a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is open for the acceptance and execution of settlement instructions other than a day on which Euroclear or Clearstream, Luxembourg, as the case may be, is scheduled to close prior to its regular weekday closing time.

"**Delivered**" means the satisfaction of any obligation of the Issuer to complete all matters necessary to transfer the relevant Net Asset Amount to the relevant Noteholder (or the first-named of joint holders) with full title guarantee. Accordingly, and for the avoidance of doubt, there shall be no obligation on the Issuer to concern itself with any formalities or requirements that shall be placed on the relevant Noteholder (or the first-named of joint holders) as the transferee of the relevant Net Asset Amount in connection with the acquisition by such Noteholder of the relevant Net Asset Amounts.

"**Recovery Value**" means the value, expressed as a percentage, of a claim against the obligor in respect of the relevant Collateral, as determined by the Swap Counterparty acting in good faith and in a commercially reasonable manner and by way of example but without limitation, the Swap Counterparty may in making this determination, take account of the mean of the market prices of all securities issued by the relevant obligor, disregarding any securities which have a market price which is at an artificially inflated level.

"**Settlement Date**" means the Delivery Date, except and to the extent that (i) a Settlement Disruption Event prevents delivery of the relevant Net Asset Amount on that day, (ii) pursuant to the terms of the relevant Swap Agreement and due to an event (the "**Impossibility Event**") beyond the control of the Swap Counterparty it is

impossible (including due to market illiquidity) or illegal for the Swap Counterparty to deliver to the Issuer any Net Asset Amount, in which event the Settlement Date shall be postponed to the next following day after receipt by the Issuer of the relevant Net Asset Amount, provided that if by the 31st calendar day following the original Settlement Date the Impossibility Event is still continuing, the Notes shall become immediately repayable at their Early Redemption Amount and (iii) due to circumstances beyond the control of the Swap Counterparty the market price of any or all Net Asset Amount is at an artificially inflated level, in which event the Swap Counterparty may, in full satisfaction of its obligation to deliver the relevant Net Asset Amount, pay to the Issuer, on the Settlement Date, the True Value of the relevant Net Asset Amount. In the case of (ii) and to such extent, the Settlement Date will be the first succeeding day (if such day is after the Delivery Date) on which settlement of that Net Asset Amount can take place through Euroclear or Clearstream, Luxembourg unless a Settlement Disruption Event prevents delivery in accordance with the relevant Delivery Instruction form on each of the ten (10) Clearing Business Days immediately following that Delivery Date. In that case, (A) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount can be delivered in any other commercially reasonable manner, then the Settlement Date will be the first day on which settlement of a sale of the relevant Net Asset Amount executed on that tenth (10th) Clearing Business Day customarily would take place using such other commercially reasonable manner of delivery, and (B) to the extent, as determined by the Calculation Agent, that the relevant Net Asset Amount cannot be delivered in any other commercially reasonable manner, then the Settlement Date will be postponed until such delivery can be effected through Euroclear or Clearstream, Luxembourg or, as determined by the Calculation Agent, in any other commercially reasonable manner. If a Settlement Disruption Event applies to a part only of the relevant Net Asset Amount, the Settlement Date shall be postponed, in accordance with the above provisions, in respect of the affected part of the relevant Net Asset Amount only. No additional amounts will be payable by the Issuer by virtue of any delay of the Settlement Date by virtue of a Settlement Disruption Event. In the case of (iii) the determination as to whether the market price of the Collateral is at an "artificially inflated level" will be made by the Swap Counterparty acting in good faith and in a commercially reasonable manner and, by way of example but without limitation, such market price will be considered to be at an artificially inflated level if due to a default or prospect of default by the obligor in relation to the relevant Collateral, there is an increase in demand for the Collateral caused principally by contractual obligations to deliver such Net Asset Amount upon the occurrence of such a default or prospect of default.

"**Settlement Disruption Event**" means an event beyond the control of the Issuer as a result of which the Clearing Systems cannot, in the determination of the Calculation Agent, deliver all or any part of the relevant Net Asset Amount.

"**True Value**" means, in relation to any particular securities, an amount equal to the product of the Recovery Value of the particular securities and the aggregate principal amount of such securities.

7    **Payments and Talons**

   **(a)**    *Bearer Notes*

Payments of principal and interest in respect of Bearer Notes shall, subject as mentioned below, be made against presentation and surrender of the relevant Receipts (in the case of payments of Instalment Amounts other than on the due date for redemption and provided that the Receipt is presented for payment together with its relative Note), Notes (in the case of all other payments of principal and, in the case of interest, as specified in Condition 7(f)(vi)) or Coupons (in the case of interest, save as specified in Condition 7(f)(vi)), as the case may be, at the specified office of any Paying Agent by a cheque payable in the currency in which such payment is due drawn on, or, at the option of, and on three Business Days' notice from, the holder, by transfer to an account denominated in that currency with, a Bank. "Bank" means a bank in the principal financial centre for that currency or, in the case of euro, in a city in which banks have access to the TARGET System.

**(b)** *Registered Notes*

(i) Payments of principal (which for the purposes of this Condition 7*(b)* shall include final Instalment Amounts but not other Instalment Amounts) in respect of Registered Notes shall be made against presentation and surrender of the relevant Certificates at the specified office of any of the Registrar or of the Transfer Agents and in the manner provided in paragraph (ii) below.

(ii) Interest (which for the purpose of this Condition 7*(b)* shall include all Instalment Amounts other than final Instalment Amounts) on Registered Notes shall be paid to the person shown on the Register at the close of business on the fifteenth day before the due date for payment thereof (the "**Record Date**"). Payments of interest on each Registered Note shall be made in the currency in which such payments are due by cheque drawn on a Bank and mailed to the holder (or to the first named of joint holders) of such Note at its address appearing in the Register. Upon application by the holder to the specified office of the Registrar or any Transfer Agent before the Record Date, such payment of interest may be made by transfer to an account in the relevant currency maintained by the payee with a Bank.

**(c)** *Payments in the United States*

Notwithstanding the foregoing, if any Bearer Notes are denominated in U.S. dollars, payments in respect thereof may be made at the specified office of any Paying Agent in New York City in the same manner as aforesaid if (i) the Issuer shall have appointed Paying Agents with specified offices outside the United States with the reasonable expectation that such Paying Agents would be able to make payment of the amounts on the Notes in the manner provided above when due, and payment in full of such amounts at all such offices is illegal or effectively precluded by exchange controls or other similar restrictions on payment or receipt of such amounts and (ii) such payment is then permitted by United States law, without involving, in the opinion of the Issuer, any adverse tax consequence to the Issuer.

**(d)** *Payments Subject to Fiscal Laws*

All payments are subject in all cases to any applicable fiscal or other laws, regulations and directives, but without prejudice to the provisions of Condition 8. No commission or expenses shall be charged to the Noteholders or Couponholders in respect of such payments.

**(e)**     *Appointment of Agents*

The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent initially appointed by the Issuer and their respective specified offices are listed below. The Issuing and Paying Agent, the Paying Agents, the Registrar, the Transfer Agents, the Calculation Agent and the Disposal Agent act solely as agents of the Issuer and do not assume any obligation or relationship of agency or trust for or with any Noteholder or Couponholder. The Issuer reserves the right at any time with the prior written approval of the Trustee to vary or terminate the appointment of the Issuing and Paying Agent, any other Paying Agent, the Registrar, any Transfer Agent, the Calculation Agent or the Disposal Agent and to appoint additional or other Paying Agents or Transfer Agents, provided that the Issuer shall at all times maintain (i) an Issuing and Paying Agent, (ii) a Registrar in relation to Registered Notes, (iii) a Transfer Agent in relation to Registered Notes having its specified office in a major European city (which shall be Dublin), (iv) one or more Calculation Agent(s) where the Conditions so require, (v) a Disposal Agent where the Conditions so require, (vi) a Paying Agent having its specified office in a major European city and (vii) such other agents as may be required by any other stock exchange on which the Notes may be listed, in each case as approved by the Trustee and (viii) a Paying Agent with a specified office in a European Union Member State that will not be obliged to withhold or deduct tax pursuant to any law implementing European Council Directive 2003/48/EC or any other Directive implementing the conclusions of the ECOFIN Council meeting of 26-27 November 2000.

In addition, the Issuer shall forthwith appoint a Paying Agent in New York City in respect of any Bearer Notes denominated in U.S. dollars in the circumstances described in paragraph (c) above.

Notice of any such change or any change of any specified office shall promptly be given to the Unmatured Coupons and Receipts and Unexchanged Talons.

**(f)**     *Unmatured Coupons and Receipts and Unexchanged Talons*

(i)     Unless the Notes provide that the relative Coupons are to become void upon the due date for redemption of those Notes, Bearer Notes should be surrendered for payment together with all unmatured Coupons (if any) appertaining thereto, failing which an amount equal to the face value of each missing unmatured Coupon (or, in the case of payment not being made in full, that proportion of the amount of such missing unmatured Coupon that the sum of principal so paid bears to the total principal due) shall be deducted from the Redemption Amount due for payment. Any amount so deducted shall be paid in the manner mentioned above against surrender of such missing Coupon within a period of 10 years from the Relevant Date for the payment of such principal (whether or not such Coupon has become void pursuant to Condition 9).

(ii)    If the Notes so provide, upon the due date for redemption of any Bearer Note, unmatured Coupons relating to such Note (whether or not attached) shall become void and no payment shall be made in respect of them.

(iii)      Upon the due date for redemption of any Bearer Note, any unexchanged Talon relating to such Note (whether or not attached) shall become void and no Coupon shall be delivered in respect of such Talon.

(iv)      Upon the due date for redemption of any Bearer Note that is redeemable in instalments, all Receipts relating to such Note having an Instalment Date falling on or after such due date (whether or not attached) shall become void and no payment shall be made in respect of them.

(v)      Where any Bearer Note that provides that the relative unmatured Coupons are to become void upon the due date for redemption of those Notes is presented for redemption without all unmatured Coupons and any unexchanged Talon relating to it, and where any Bearer Note is presented for redemption without any unexchanged Talon relating to it, redemption shall be made only against the provision of such indemnity as the Issuer may require.

(vi)      If the due date for redemption of any Note is not a due date for payment of interest, interest accrued from the preceding due date for payment of interest or the Interest Commencement Date, as the case may be, shall only be payable against presentation (and surrender if appropriate) of the relevant Bearer Note or Certificate representing it, as the case may be. Interest accrued on a Note that only bears interest after its Maturity Date shall be payable on redemption of such Note against presentation of the relevant Note or Certificate representing it, as the case may be.

**(g)**    *Talons*

On or after the Interest Payment Date for the final Coupon forming part of a Coupon sheet issued in respect of any Bearer Note, the Talon forming part of such Coupon sheet may be surrendered at the specified office of the Issuing and Paying Agent or, as it may direct, in exchange for a further Coupon sheet (and, if necessary, another Talon for a further Coupon sheet) (but excluding any Coupons that may have become void pursuant to Condition 9).

**(h)**    *Non-Business Days*

If any date for payment in respect of any Note, Receipt or Coupon is not a business day, the holder shall not be entitled to payment until the next following business day nor to any interest or other sum in respect of such postponed payment. In this paragraph, "business day" means a day (other than a Saturday or a Sunday) on which banks and foreign exchange markets are open for business in the relevant place of presentation, in such jurisdictions as shall be specified as "Business Day Jurisdictions" hereon and:

(i)      (in the case of a payment in a currency other than euro) where payment is to be made by transfer to an account maintained with a bank in the relevant currency, on which foreign exchange transactions may be carried on in the relevant currency in the principal financial centre of the country of such currency; or

(ii)      (in the case of a payment in euro) which is a TARGET Business Day.

## 8 Taxation

All payments in respect of the Notes will be made without withholding or deduction for, or on account of, any present or future taxes, duties or charges of whatsoever nature unless the Issuer or the Registrar or any Transfer Agent or any Paying Agent is required by applicable law to make any such payment in respect of the Notes subject to any withholding or deduction for, or on account of, any present or future taxes, duties or charges of whatsoever nature. In that event the Issuer or such Paying Agent, Registrar or Transfer Agent (as the case may be) shall make such payment after such withholding or deduction has been made and shall account to the relevant authorities for the amount so required to be withheld or deducted. Neither the Issuer nor any Paying Agent, Registrar or Transfer Agent will be obliged to make any additional payments to holders of Notes in respect of such withholding or deduction.

## 9 Prescription

Claims against the Issuer for payment in respect of the Notes, Receipts and Coupons (which, for this purpose, shall not include Talons) shall be prescribed and become void unless made within 10 years (in the case of principal) or five years (in the case of interest) from the appropriate Relevant Date in respect of them.

## 10 Events of Default

If any of the following events ("**Events of Default**") occurs, the Trustee at its discretion may, and if so requested by holders of at least one-fifth in principal amount of the Notes then outstanding (or, if so specified in the relevant Supplemental Trust Deed, in respect of a Series of Notes where there are Related Notes, if so requested by holders of at least one fifth in aggregate principal amount of the Controlling Series) or if so directed by an Extraordinary Resolution (or, if so specified in the relevant Supplemental Trust Deed, in respect of a Series of Notes where there are Related Notes, if so directed by an Extraordinary Resolution of the Controlling Series) shall, give notice to the Issuer that the Notes are, and they shall immediately become, due and payable at their Early Redemption Amount together with accrued interest and the security constituted by the Trust Deed shall become enforceable (as provided in the Trust Deed):

(a) if default is made for a period of 14 days or more in the payment of any sum due in respect of the Notes or any Related Notes or any of them; or

(b) if the Issuer fails to perform or observe any of its other obligations under the Notes, any Related Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, incapable of remedy, in which case no notice shall be required; or

(c) if an administrator shall be appointed or any order shall be made by any competent court or any resolution passed for the winding-up or dissolution of the Issuer or the appointment of an examiner, liquidator or similar official in relation to the Issuer save for the purposes of amalgamation, merger, consolidation, reorganisation or other similar arrangement on terms previously approved by the Trustee or by an Extraordinary Resolution; or

**(d)**  it is or will become unlawful for the Issuer to comply with any one or more of its obligations under any of the Notes or any Related Notes; or

**(e)**  any event occurs which under the laws of any relevant jurisdiction has an analogous effect to any of the events referred to in any of the foregoing paragraphs.

The Issuer has undertaken in the Principal Trust Deed that, on each anniversary of the date of the Principal Trust Deed and also within 14 days after any request by the Trustee, it will send to the Trustee a certificate signed by two Directors of the Issuer to the effect that, since the date of the Principal Trust Deed or, as the case may be, the date of the last such certificate, no Event of Default, Potential Event of Default or other matter required to be brought to the Trustee's attention has occurred.

## 11  Enforcement

At any time after the Notes become due and payable, the Trustee may, at its discretion and without further notice, institute such proceedings against the Issuer as it may think fit to enforce the terms of the Trust Deed, the Notes and Coupons, but it need not take any proceedings unless (i) it shall have been so directed by an Extraordinary Resolution (or, if so specified in the relevant Supplemental Trust Deed, in respect of a Series of Notes where there are Related Notes, if so directed by an Extraordinary Resolution of the Controlling Series) or so requested in writing by Noteholders holding at least one-fifth in principal amount of Notes outstanding, (or, if so specified in the relevant Supplemental Trust Deed, in respect of a Series of Notes where there are Related Notes, if so requested by holders of at least one fifth in aggregate principal amount of the Controlling Series) and (ii) it shall have been indemnified to its satisfaction.

Only the Trustee may pursue the remedies available under the Trust Deed to enforce the rights of the Noteholders and Couponholders and no Noteholder or Couponholder is entitled to proceed against the Issuer unless the Trustee, having become bound to proceed in accordance with the terms of the Trust Deed, fails or neglects to do so and such failure or neglect is continuing. Having realised the security or, in the case of a partial redemption of Notes pursuant to Condition 6*(c)*, part of the security corresponding to the proportion of Notes redeemed, and distributed the net proceeds in accordance with Condition 4, the Trustee may not take any further steps against the Issuer to recover any sum still unpaid and the Issuer will not be obliged to make any further payment in respect of any such sum and accordingly no debt shall be owed by the Issuer in respect of any such sum.

## 12  Meeting of Noteholders, Modification, Waiver and Substitution

**(a)**  *Meetings of Noteholders*

The Trust Deed contains provisions for convening meetings of Noteholders to consider any matter affecting their interests, including the sanctioning by Extraordinary Resolution (as defined in the Trust Deed) of a modification of any of these Conditions or any provisions of the Trust Deed or the restructuring of the Notes. Such a meeting may be convened by Noteholders holding not less than 10 per cent. in principal amount of the Notes for the time being outstanding. The quorum for any meeting convened to consider an Extraordinary Resolution shall be two or more persons holding or representing a clear majority in principal amount of the Notes for the time being outstanding, or at any adjourned meeting two or more persons being or representing Noteholders whatever the principal amount of the

Notes held or represented, unless the business of such meeting includes consideration of proposals, *inter alia*, (i) to amend the dates of maturity or redemption of the Notes, any Instalment Date or any date for payment of interest or Interest Amounts on the Notes, (ii) to reduce or cancel the nominal amount of, or any Instalment Amount of, or any premium payable on redemption of, the Notes, (iii) to reduce the rate or rates of interest in respect of the Notes or to vary the method or basis of calculating the rate or rates or amount of interest or the basis for calculating any Interest Amount in respect of the Notes, (iv) if a Minimum and/or a Maximum Rate of Interest, Instalment Amount or Redemption Amount is shown hereon to reduce any such Minimum and/or Maximum, (v) to vary any method of, or basis for, calculating the Redemption Amount or the Early Redemption Amount including the method of calculating the Amortised Face Amount, (vi) to vary the currency or currencies of payment or denomination of the Notes, (vii) to modify the provisions concerning the quorum required at any meeting of Noteholders or the majority required to pass an Extraordinary Resolution, (viii) to modify the provisions of the Trust Deed concerning this exception or (ix) to modify the Mortgaged Property, in which case the necessary quorum shall be two or more persons holding or representing not less than 75 per cent., or at any adjourned meeting not less than 25 per cent., in principal amount of the Notes for the time being outstanding. Any Extraordinary Resolution duly passed shall be binding on all Noteholders (whether or not they were present at the meeting at which such resolution was passed) and on all Couponholders. A written resolution of the holders of not less than 90 per cent. in principal amount of the Notes for the time being outstanding shall take effect as an Extraordinary Resolution.

No Extraordinary Resolution to modify the terms of the Mortgaged Property or affecting terms concerning the amount, currency or the due dates of payment of the Notes, Receipts, Coupons or Talons relating thereto, which would in the opinion of the Trustee affect the corresponding terms of any Related Notes or adversely affect the interests of the holders of any Related Notes shall take effect, unless it has been sanctioned by an Extraordinary Resolution of the holders of any Related Notes.

The Conditions may be amended, modified or varied in relation to the Notes by the terms of the relevant Supplemental Trust Deed in relation to such Notes.

**(b)** *Single and separate meetings for holders of Notes and holders of any Related Notes*

A single meeting of the holders of the Notes and the holders of any Related Notes may be convened if to do so would not, in the opinion of the Trustee, be materially prejudicial to the holders of the Notes and/or the Related Notes. In all other circumstances, separate meetings of the holders of the Notes and the holders of any Related Notes shall be convened.

**(c)** *Modification of the Trust Deed*

The Trustee may agree, without the consent of the Noteholders or Couponholders, to (i) any modification of any of these Conditions or any of the provisions of the Trust Deed or any relevant Swap Agreement that is in its opinion of a formal, minor or technical nature or is made to correct a manifest error, and (ii) any other modification (except as mentioned in the Trust Deed), and any waiver or authorisation of any breach or proposed breach, of any of the provisions of the Trust Deed that is in the opinion of the Trustee not materially prejudicial to the interests of the Noteholders.

Any such modification, authorisation or waiver shall be binding on the Noteholders and the Couponholders and, if the Trustee so requires, such modification shall be notified to the Noteholders as soon as practicable. In relation to Notes which are rated by a rating agency, the Issuer shall notify the relevant rating agency of any modification made in accordance with this Condition 12*(c)*.

**(d)** *Substitution*

The Trust Deed contains provisions permitting the Trustee to agree, subject to such amendment of the Trust Deed and such other conditions as the Trustee may require including the transfer of the Mortgaged Property and subject to the consent of the relevant Swap Counterparty, but without the consent of the Noteholders or the Couponholders, to the substitution of any other company in place of the Issuer, or of any previous substituted company, as principal debtor under the Trust Deed and the Notes provided that, in relation only to Notes which are rated by a rating agency, the Issuer shall notify the appropriate rating agency and that such change shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. In the case of such a substitution the Trustee may agree, without the consent of the Noteholders or the Couponholders, to a change of the law governing the Notes, the Receipts, the Coupons, the Talons and/or the Trust Deed provided that such change (i) would not in the opinion of the Trustee be materially prejudicial to the interests of the Noteholders and (ii) in relation only to Notes rated by a rating agency, shall not adversely affect any existing rating of the Notes as confirmed in writing by the appropriate rating agency. Under the Trust Deed, the Trustee may agree or require the Issuer to procure the substitution as principal debtor under the Trust Deed of a company incorporated in some other jurisdiction in the event of the Issuer becoming subject to any form of tax on its income or payments in respect of the Notes.

**(e)** *Entitlement of the Trustee*

In connection with the exercise of its functions (including but not limited to those referred to in this Condition) the Trustee shall have regard to the interests of each Series of Noteholders as a class subject to Condition 11 and shall not have regard to the consequences of such exercise for individual Noteholders or Couponholders and the Trustee shall not be entitled to require, nor shall any Noteholder or Couponholder be entitled to claim, from the Issuer any indemnification or payment in respect of any tax consequence of any such exercise upon individual Noteholders or Couponholders.

Where, in the opinion of the Trustee, there is a conflict between the interests of the holders of the Notes and those of any Related Notes and/or its duties as Trustee for the holders of Notes and for the holders of any Related Notes, the Trustee shall, unless otherwise specified in the relevant Supplemental Trust Deed, act solely on behalf of the holders of the Controlling Series following enforcement of the security over the Mortgaged Property and shall have regard to their interests alone and shall not be responsible to the holders of the Notes that do not comprise the Controlling Series for so doing.

**(f)** *Retirement or Removal of the Trustee*

The Trust Deed contains detailed provisions for the appointment, retirement and removal of the Trustee. The Issuer has the power of appointing new trustees in

respect of any Series of Notes with the approval of Noteholders by Extraordinary Resolution (or in respect of a Series where there are Related Notes, the approval of holders of the Controlling Series by Extraordinary Resolution). Any trustee may retire by giving three months' written notice to the Issuer and any trustee may be removed by Extraordinary Resolution (or in respect of a Series of Notes where there are Related Notes by Extraordinary Resolution of holders of the Controlling Series). However, if the Trustee is a sole trust corporation then any such retirement or removal shall not be effective until a successor Trustee is appointed.

## 13  Replacement of Notes, Certificates, Receipts, Coupons and Talons

If a Note, Certificate, Receipt, Coupon or Talon is lost, stolen, mutilated, defaced or destroyed, it may be replaced, subject to applicable laws, regulations and stock exchange regulations, at the specified office of the Paying Agent (in the case of Bearer Notes, Receipts, Coupons or Talons) and of the Registrar (in the case of Certificates) or such other Paying Agent, as the case may be, as may from time to time be designated by the Issuer for the purpose and notice of whose designation is given to Noteholders, in each case on payment by the claimant of the fees and costs incurred in connection therewith and on such terms as to evidence, security and indemnity (which may provide, *inter alia*, that if the allegedly lost, stolen or destroyed Note, Certificate, Receipt, Coupon or Talon is subsequently presented for payment or, as the case may be, for exchange for further Coupons, there shall be paid to the Issuer on demand the amount payable by the Issuer in respect of such Notes, Certificates, Receipts, Coupons or further Coupons) and otherwise as the Issuer may require. Mutilated or defaced Notes, Certificates, Receipts, Coupons or Talons must be surrendered before replacements will be issued.

## 14  Notices

Notices to the holders of Registered Notes shall be mailed to them at their respective addresses in the Register and deemed to have been given on the fourth weekday (being a day other than a Saturday or a Sunday) after the date of mailing. Notices to the holders of Bearer Notes shall be valid if published in a daily newspaper of general circulation in London (which is expected to be the *Financial Times*) and (so long as the Notes are listed on a stock exchange and the rules of that stock exchange so require) in any such other newspaper in which publication is so required by the rules of that stock exchange (which, in the case of Notes listed on the Irish Stock Exchange, is expected to be the *Irish Times*). If in the opinion of the Trustee any such publication is not practicable, notice shall be validly given if published in another leading daily English language newspaper with general circulation in Europe. Any such notice shall be deemed to have been given on the date of such publication or, if published more than once or on different dates, on the first date on which publication is made, as provided above.

Couponholders shall be deemed for all purposes to have notice of the contents of any notice given to the holders of Bearer Notes in accordance with this Condition.

## 15  Indemnification and Obligations of the Trustee

The Trust Deed contains provisions for the indemnification of the Trustee and for its relief from responsibility including for the exercise of any voting rights in respect of the Mortgaged Property, for the validity, sufficiency and enforceability (which the Trustee has not investigated) of the security created over the Mortgaged Property and for taking

proceedings to enforce repayment unless indemnified to its satisfaction. The Trustee and any affiliate is entitled to enter into business transactions with the Issuer, any issuer or guarantor (where applicable) of any of the Mortgaged Property, any Swap Counterparty or any of their subsidiary, holding or associated companies without accounting to the Noteholders for profit resulting therefrom.

The Trustee is exempted from liability with respect to any loss or theft or reduction in value of the Mortgaged Property, from any obligation to insure or to procure the insuring of the Mortgaged Property and from any claim arising from the fact that the Mortgaged Property will be held in safe custody by the Custodian or other custodian approved in writing by the Trustee (in each case, if applicable).

The Trust Deed provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) or any Credit Enhancement Provider and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders or Couponholders.

## 16 Governing Law and Jurisdiction

**(a)** *Governing Law*

The Trust Deed, the Notes, the Receipts, the Coupons and the Talons are governed by, and shall be construed in accordance with, English law.

**(b)** *Jurisdiction*

The Courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons and accordingly any legal action or proceedings arising out of or in connection with the Trust Deed, any Notes, Receipts, Coupons or Talons ("**Proceedings**") may be brought in such courts.

**(c)** *Service of Process*

The Issuer has irrevocably appointed Lehman Brothers International (Europe) as its agent in England to receive, for it and on its behalf, service of process in any Proceedings in England.

## 17 Contracts (Rights of Third Parties) Act 1999

No person shall have any right to enforce any term or condition of the Notes under the Contracts (Rights of Third Parties) Act 1999 except to the extent (if any) that the Notes expressly provide for such Act to apply to any of their terms.

# Schedule 2
## Part D
## Form of Coupon

On the front:

**[SPECIFIED COMPANY]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

Series No. [                    ]

[Title of issue]

Coupon for [[set out amount due, if known]/the amount] due on [the Interest Payment Date falling in]* [                    ], [                    ].

[Coupon relating to Note in the principal amount of [                    ]]**

This Coupon is payable to bearer (subject to the Conditions endorsed on the Note to which this Coupon appertains, which shall be binding upon the holder of this Coupon whether or not it is for the time being attached to such Note) at the specified offices of the Issuing and Paying Agent and the Paying Agents set out on the reverse hereof (or any other Issuing and Paying Agent or further or other Paying Agents or specified offices duly appointed or nominated and notified to the Noteholders).

[If the Note to which this Coupon appertains shall have become due and payable before the Maturity Date of this Coupon, this Coupon shall become void and no payment shall be made in respect of it.]***

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.


[SPECIFIED COMPANY]

By:

[Cp. No.      ]           [Denomination]           [ISIN]           [Series]           [Certif. No.]

On the back:

**Issuing and Paying Agent**

[●]


**[Paying Agent]**

[●]
 Attention: [●]

 [*Only necessary where Interest Payment Dates are subject to adjustment in accordance with a Business Day Convention; otherwise the particular Interest Payment Date should be specified.]

[**Only required for Coupons relating to Floating Rate or Variable Coupon Amount Notes that are issued in more than one denomination.]

[***Delete if Coupons are not to become void upon early redemption of Note.]

**Schedule 2**

**Part E**

**Form of Talon**

On the front:

**[SPECIFIED COMPANY]**

**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

Series No. [•]

[Title of issue]

Talon for further Coupons falling due on [the Interest Payment Dates falling in]*[                    ]
[                    ].

[Talon relating to Note in the principal amount of [                    ]]**

After all the Coupons appertaining to the Note to which this Talon appertains have matured, further Coupons (including if appropriate a Talon for further Coupons) shall be issued at the specified office of the Issuing and Paying Agent set out on the reverse hereof (or any other Issuing and Paying Agent or specified office duly appointed or nominated and notified to the Noteholders) upon production and surrender of this Talon.

If the Note to which this Talon appertains shall have become due and payable before the original due date for exchange of this Talon, this Talon shall become void and no exchange shall be made in respect of it.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

 [Talon No.]                    [ISIN]                    [Series]                    [Certif. No.]

On the back:

**Issuing and Paying Agent**

[●]

**[Paying Agent]**

[●]

[* The maturity dates of the relevant Coupons should be set out if known, otherwise reference should be made to the months and years in which the Interest Payment Dates fall due.]

[** Only required where the Series comprises Notes of more than one denomination.]

**Schedule 2**
**Part F**
**Form of Receipt**


**[SPECIFIED COMPANY]**


**MULTI-ISSUER SECURED OBLIGATION PROGRAMME**

Series No. [            ]

Receipt for the sum of [                    ] being the instalment of principal payable in accordance with the Terms and Conditions endorsed on the Note to which this Receipt appertains (the "**Conditions**") on [                ].

This Receipt is issued subject to and in accordance with the Conditions which shall be binding upon the holder of this Receipt (whether or not it is for the time being attached to such Note) and is payable at the specified office of any of the Paying Agents set out on the reverse of the Note to which this Receipt appertains (and/or any other or further Paying Agents and/or specified offices as may from time to time be duly appointed and notified to the Noteholders).

This Receipt must be presented for payment together with the Note to which it appertains. If the Note to which this Receipt appertains shall have become due and payable on or before the Maturity Date of this Receipt, this Receipt shall become void and no payment shall be made in respect of it. The Issuer shall have no obligation in respect of this Receipt if it is presented without the Note to which it appertains.

ANY UNITED STATES PERSON WHO HOLDS THIS OBLIGATION WILL BE SUBJECT TO LIMITATIONS UNDER THE UNITED STATES INCOME TAX LAWS, INCLUDING THE LIMITATIONS PROVIDED IN SECTIONS 165(j) AND 1287(a) OF THE INTERNAL REVENUE CODE.

[SPECIFIED COMPANY]

By:

# Schedule 3

## Provisions for Meetings of Noteholders

### Interpretation

**1** In this Schedule:

**1.1** references to a meeting are to a meeting of Noteholders and include, unless the context otherwise requires, any adjournment;

**1.2** "**agent**" means a holder of a voting certificate or a proxy for, or representative of, a Noteholder;

**1.3** "**block voting instruction**" means an instruction issued in accordance with paragraphs 8 to 14;

**1.4** "**Extraordinary Resolution**" means a resolution passed at a meeting duly convened and held in accordance with this Principal Trust Deed by a majority of at least 75 per cent of the votes cast;

**1.5** "**voting certificate**" means a certificate issued in accordance with paragraphs 5, 6, 7 and 14;

**1.6** references to persons representing a proportion of the Notes are to Noteholders or agents holding or representing in the aggregate at least that proportion in principal amount of the Notes for the time being outstanding.

### Powers of meetings

**2** A meeting shall, subject to the Conditions and without prejudice to any powers conferred on other persons by this Principal Trust Deed, have power by Extraordinary Resolution:

**2.1** to sanction any proposal by the Issuer or the Trustee for any modification, abrogation, variation or compromise of, or arrangement in respect of, the rights of the Noteholders and/or the Couponholders against the Issuer, whether or not those rights arise under this Principal Trust Deed;

**2.2** to sanction the exchange or substitution for the Notes of, or the conversion of the Notes into, shares, bonds or other obligations or securities of the Issuer or any other entity;

**2.3** to assent to any modification of the Trust Deed, the Notes, the Receipts, the Talons or the Coupons proposed by the Issuer or the Trustee;

**2.4** to authorise anyone to concur in and do anything necessary to carry out and give effect to an Extraordinary Resolution;

**2.5** to give any authority, direction or sanction required to be given by Extraordinary Resolution;

**2.6** to appoint any persons (whether Noteholders or not) as a committee or committees to represent the Noteholders' interests and to confer on them any powers or discretions which the Noteholders could themselves exercise by Extraordinary Resolution;

**2.7** to approve a proposed new Trustee and to remove a Trustee;

**2.8** to approve the substitution of any entity for the Issuer (or any previous substitute) as principal debtor under the Trust Deed; and

**2.9** to discharge or exonerate the Trustee from any liability in respect of any act or omission for which it may become responsible under the Trust Deed, the Notes, the Receipts, the Talons or the Coupons,

provided that the special quorum provisions in paragraph 19 shall apply to any Extraordinary Resolution (a "**special quorum resolution**") for the purpose of sub-paragraph 2.2 or 2.8, any of the proposals listed in Condition 12 or any amendment to this proviso.

A resolution in writing signed by or on behalf of the holders of not less than 90 per cent. in principal amount of the Notes who for the time being are entitled to receive notice of a meeting in accordance with the provisions herein contained shall for all purposes be as valid and effectual as an Extraordinary Resolution passed at a meeting of such Noteholders duly convened and held in accordance with the provisions herein contained. Such resolution in writing may be contained in one document or in several documents in like form each signed by or on behalf of one or more Noteholders.

## 3 Convening a meeting

The Issuer or the Trustee may at any time convene a meeting. If it receives a written request by Noteholders holding at least 10 per cent. in principal amount of the Notes for the time being outstanding and is indemnified to its satisfaction against all costs and expenses, the Trustee shall convene a meeting.

Every meeting shall be held at a time and place approved by the Trustee.

**4** At least 21 days' notice (exclusive of the day on which the notice is given and of the day of the meeting) shall be given to the Noteholders.

A copy of the notice shall be given by the party convening the meeting to the other parties.

The notice shall specify the day, time and place of meeting and, unless the Trustee otherwise agrees, the nature of the resolutions to be proposed and shall explain how Noteholders may appoint proxies or representatives, obtain voting certificates and use block voting instructions and the details of the time limits applicable.

## 5 Arrangements for voting

If a holder of a Bearer Note wishes to obtain a voting certificate in respect of it for a meeting, he must deposit it for that purpose at least 48 hours before the time fixed for the meeting with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose. The Paying Agent shall then issue a voting certificate in respect of it.

**6** A voting certificate shall:

**6.1** be a document in the English language;

**6.2** be dated;

**6.3** specify the meeting concerned and the serial numbers of the Notes deposited; and

**6.4** entitle, and state that it entitles, its bearer to attend and vote at that meeting in respect of those Notes.

**7** Once a Paying Agent has issued a voting certificate for a meeting in respect of a Note, it shall not release the Note until either:

**7.1** the meeting has been concluded; or

**7.2** the voting certificate has been surrendered to the Paying Agent.

**8** If a holder of a Bearer Note wishes the votes attributable to it to be included in a block voting instruction for a meeting, then, at least 48 hours before the time fixed for the meeting, (i) he must deposit the Note for that purpose with a Paying Agent or to the order of a Paying Agent with a bank or other depositary nominated by the Paying Agent for the purpose and (ii) he or a duly authorised person on his behalf must direct the Paying Agent how those votes are to be cast. The Paying Agent shall issue a block voting instruction in respect of the votes attributable to all Notes so deposited.

**9** A block voting instruction shall:

**9.1** be a document in the English language;

**9.2** be dated;

**9.3** specify the meeting concerned;

**9.4** list the total number and serial numbers of the Notes deposited, distinguishing with regard to each resolution between those voting for and those voting against it;

**9.5** certify that such list is in accordance with Notes deposited and directions received as provided in paragraphs 8, 11 and 14; and

**9.6** appoint a named person (a "**proxy**") to vote at that meeting in respect of those Notes and in accordance with that list. A proxy need not be a Noteholder.

**10** Once a Paying Agent has issued a block voting instruction for a meeting in respect of the votes attributable to any Notes:

**10.1** it shall not release the Notes, except as provided in paragraph 11, until the meeting has been concluded; and

**10.2** the directions to which it gives effect may not be revoked or altered during the 48 hours before the time fixed for the meeting.

**11** If the receipt for a Note deposited with a Paying Agent in accordance with paragraph 8 is surrendered to the Paying Agent at least 48 hours before the time fixed for the meeting, the Paying Agent shall release the Note and exclude the votes attributable to it from the block voting instruction.

**12** Each block voting instruction shall be deposited at least 24 hours before the time fixed for the meeting at such place as the Trustee shall designate or approve, and in default it shall not be valid unless the chairman of the meeting decides otherwise before the meeting proceeds to business.

If the Trustee requires, a notarially certified copy of each block voting instruction shall be produced by the proxy at the meeting but the Trustee need not investigate or be concerned with the validity of the proxy's appointment.

**13** A vote cast in accordance with a block voting instruction shall be valid even if it or any of the Noteholders' instructions pursuant to which it was executed has previously been revoked or amended, unless written intimation of such revocation or amendment is received from the relevant Paying Agent by the Issuer or the Trustee at its registered office or by the chairman of the meeting in each case at least 24 hours before the time fixed for the meeting.

**14** No Note may be deposited with or to the order of a Paying Agent at the same time for the purposes of both paragraph 5 and paragraph 8 for the same meeting.

## Representations

**15** A holder of a Registered Note may, by an instrument in writing in the form available from the specified office of a Transfer Agent in the English language executed by or on behalf of the holder and delivered to the Transfer Agent at least 24 hours before the time fixed for a meeting, appoint any person (a "**proxy**") to act on his behalf in connection with that meeting. A proxy need not be a Noteholder.

A corporation which holds a Registered Note may by delivering to a Transfer Agent at least 24 hours before the time fixed for a meeting a certified copy of a resolution of its directors or other governing body (with, if it is not in English, a certified translation into English) authorise any person to act as its representative (a "**representative**") in connection with that meeting.

## Chairman

**16** The chairman of a meeting shall be such person as the Trustee may nominate in writing, but if no such nomination is made or if the person nominated is not present within 15 minutes after the time fixed for the meeting the Noteholders or agents present shall choose one of their number to be chairman, failing which the Issuer may appoint a chairman. The chairman need not be a Noteholder or agent. The chairman of an adjourned meeting need not be the same person as the chairman of the original meeting.

## Attendance

**17** The following may attend and speak at a meeting:

    **17.1** Noteholders and agents;

    **17.2** the chairman;

    **17.3** the Issuer and the Trustee (through their respective representatives) and their respective financial and legal advisers;

    **17.4** the Dealers and their advisers.

No-one else may attend or speak.

## Quorum and Adjournment

**18** No business (except choosing a chairman) shall be transacted at a meeting unless a quorum is present at the commencement of business. If a quorum is not present within 15 minutes from the time initially fixed for the meeting, it shall, if convened on the requisition of Noteholders or if the Issuer and the Trustee agree, be dissolved.

In any other case it shall be adjourned until such date, not less than 14 nor more than 42 days later, and time and place as the chairman may decide.

If a quorum is not present within 15 minutes from the time fixed for a meeting so adjourned, the meeting shall be dissolved.

19    Two or more Noteholders or agents present in person shall be a quorum:

    19.1    in the cases marked "No minimum proportion" in the table below, whatever the proportion of the Notes which they represent;

    19.2    in any other case, only if they represent the proportion of the Notes shown by the table below.

| COLUMN 1 | COLUMN 2 | COLUMN 3 |
|---|---|---|
| Purpose of meeting | Any meeting except one referred to in column 3 | Meeting previously adjourned though want of a quorum |
| | Required proportion | Required proportion |
| To pass a special quorum resolution | 75 per cent. | 25 per cent. |
| To pass any other Extraordinary Resolution | A clear majority | No minimum proportion |
| Any other purpose | 10 per cent. | No minimum proportion |

20    The chairman may with the consent of (and shall if directed by) a meeting adjourn the meeting from time to time and from place to place. Only business which could have been transacted at the original meeting may be transacted at a meeting adjourned in accordance with this paragraph or paragraph 18.

21    At least 10 days' notice of a meeting adjourned through want of a quorum shall be given in the same manner as for an original meeting and that notice shall state the quorum required at the adjourned meeting. No notice need, however, otherwise be given of an adjourned meeting.

## Voting

22    Each question submitted to a meeting shall be decided by a show of hands unless a poll is (before, or on the declaration of the result of, the show of hands) demanded by the chairman, the Issuer, the Trustee or one or more persons representing 2 per cent. of the Notes.

23    Unless a poll is demanded a declaration by the chairman that a resolution has or has not been passed shall be conclusive evidence of the fact without proof of the number or proportion of the votes cast in favour of or against it.

24    If a poll is demanded, it shall be taken in such manner and (subject as provided below) either at once or after such adjournment as the chairman directs. The result of the poll shall be deemed to be the resolution of the meeting at which it was demanded as at the date it was taken. A demand for a poll shall not prevent the meeting continuing for the transaction of business other than the question on which it has been demanded.

**25** A poll demanded on the election of a chairman or on a question of adjournment shall be taken at once.

**26** On a show of hands every person who is present in person and who produces a Bearer Note, a Certificate of which he is the registered holder or a voting certificate or is a proxy or representative has one vote. On a poll every such person has one vote for each Note so produced or represented by the voting certificate so produced or for which he is a proxy or representative.

Without prejudice to the obligations of proxies, a person entitled to more than one vote need not use them all or cast them all in the same way.

**27** In case of equality of votes the chairman shall both on a show of hands and on a poll have a casting vote in addition to any other votes which he may have.

### Effect and Publication of an Extraordinary Resolution

**28** An Extraordinary Resolution shall be binding on all the Noteholders, whether or not present at the meeting, and on all the Couponholders and each of them shall be bound to give effect to it accordingly. The passing of such a resolution shall be conclusive evidence that the circumstances justify its being passed. The Issuer shall give notice of the passing of an Extraordinary Resolution to Noteholders within 14 days but failure to do so shall not invalidate the resolution.

### Minutes

**29** Minutes shall be made of all resolutions and proceedings at every meeting and, if purporting to be signed by the chairman of that meeting or of the next succeeding meeting, shall be conclusive evidence of the matters in them. Until the contrary is proved every meeting for which minutes have been so made and signed shall be deemed to have been duly convened and held and all resolutions passed or proceedings transacted at it to have been duly passed and transacted.

### Trustee's Power to Prescribe Regulations

**30** Subject to all other provisions in this Trust Deed the Trustee may without the consent of the Noteholders prescribe such further regulations regarding the holding of meetings and attendance and voting at them as it in its sole discretion determines including (without limitation) such requirements as the Trustee thinks reasonable to satisfy itself that the persons who purport to make any requisition in accordance with this Trust Deed are entitled to do so and as to the form of voting certificates or block voting instructions so as to satisfy itself that persons who purport to attend or vote at a meeting are entitled to do so.

**31** The holder of a Global Note or Global Certificate shall (unless such Global Note or Global Certificate represents only one Note) be treated as two persons for the purposes of any quorum requirements of a meeting of Noteholders.

**32** The foregoing provisions of this Schedule shall have effect subject to the following provisions:

**32.1** meetings of Noteholders of separate Series will normally be held separately. A single meeting of the holders of the Notes and the holders of any Related Notes may be convened if to do so would not, in the opinion of the Trustee, be materially prejudicial to the holders of the Notes and/or the Related Notes. However, the Trustee may

from time to time determine that meetings of Noteholders of separate Series shall be held together;

**32.2** a resolution that in the opinion of the Trustee affects one Series alone shall be deemed to have been duly passed if passed at a separate meeting of the Noteholders of the Series concerned;

**32.3** a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series but does not give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed if passed at a single meeting of the Noteholders of the relevant Series provided that for the purposes of determining the votes a Noteholder is entitled to cast pursuant to paragraph 26, each Noteholder shall have one vote in respect of each U.S.$1,000 principal amount of Notes held, converted, if such Notes are not denominated in U.S. dollars, in accordance with sub-Clause 9.12;

**32.4** a resolution that in the opinion of the Trustee affects the Noteholders of more than one Series and gives or may give rise to a conflict of interest between the Noteholders of the different Series concerned shall be deemed to have been duly passed only if it shall be duly passed at separate meetings of the Noteholders of the relevant Series;

**32.5** to all such meetings as aforesaid all the preceding provisions of this Schedule shall *mutatis mutandis* apply as though references therein to Notes and to Noteholders were references to the Notes and Noteholders of the Series concerned.

**32.6** No Extraordinary Resolution to modify the terms of the Mortaged Property or affecting certain terms concerning the amount and currency and the due dates of payment of the Notes and the Receipts and Coupons relating thereto, which would in the opinion of the Trustee affect the corresponding terms of any Related Notes or adversely affect the interests of the holders of any Related Notes shall take effect, unless it has been sanctioned by an Extraordinary Resolution of the holders of the relevant Related Notes.

**32.7** If this Trust Deed specifies that a direction or an Extraordinary Resolution is to be given by the Controlling Series, then such direction or Extraordinary Resolution need only to be given or passed by the Controlling Series.

# Schedule 4

# Form of Supplemental Trust Deed

Dated [ISSUE DATE]

[SPECIFIED COMPANY]

- and -

[●]

- and -

[●]

- and -

[PAYING/TRANSFER AGENT]

[- and -]

[SWAP COUNTERPARTY]

[- and -]

[COUNTERPARTY]

**SUPPLEMENTAL TRUST DEED**

in respect of

**[NEW ISSUER]**
**[SPECIFIED COMPANY]**
**Series [●] [currency and amount]**
**[description of the Notes]**
**issued pursuant to the Multi-Issuer Secured Obligation Programme**

**arranged by**
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

One Silk Street
London EC2Y 8HQ

Linklaters LLP

**This Supplemental Trust Deed** is made on [ISSUE DATE] **between**:

(1)    **[SPECIFIED COMPANY]** (the "**Issuer**");

(2)    **[●]** (the "**Trustee**", which expression shall, wherever the context so admits, include all persons for the time being the trustee or trustees of this Supplemental Trust Deed);

(3)    **[●]** as Issuing and Paying Agent and Custodian; [and]

(4)    **[PAYING/TRANSFER AGENT]** as Paying Agent and Transfer Agent[./;and]

(5)    **[SWAP COUNTERPARTY]** of [ADDRESS] (the "**Swap Counterparty**")[./;and]

(6)    **[COUNTERPARTY]** of [ADDRESS] (the "**Counterparty**")]

**Whereas:**

(A)    [The Issuer] and the Trustee are parties to a trust deed dated [●] (the "**Principal Trust Deed**") establishing a programme for the issuance from time to time of secured notes.

(B)    [Pursuant to sub-Clause 2.7 of the Principal Trust Deed, the] [The] Issuer has authorised and determined to issue Series [   ] [currency and amount] [description of the Notes] to be constituted and secured as set out below.]

(C)    The Issuing and Paying Agent[,/and] the Paying Agent [and the Swap Counterparty] have each resolved to enter into this Supplemental Trust Deed for the purposes set out below.

**Now this deed witnesses and it is hereby declared** as follows:

# 1    Definitions

1.1    **Principal Trust Deed:** Expressions defined in the Principal Trust Deed shall have the same meanings when used herein save to the extent supplemented or modified hereby.

1.2    **Additional Definitions:** The following expressions shall have the following meanings:

["**Credit Enhancement Agreement**" means the [guarantee] [specify other document] dated [ISSUE DATE] [between] [of] [the provider of the credit enhancement agreement] (the "**Credit Enhancement Provider**") [and the Issuer]]

["**Custodian Account**": means the account of the Custodian with [details] [(account number [   ] sub account [   ])];]

["**Custody Agreement**" means [complete if separate agreement to Agency Agreement];]

["**Final Terms**" means the Final Terms dated [ISSUE DATE] specifying the relevant issue details of the Notes, the form of which appears as the Schedule hereto]

"**Mortgaged Property**" means the Collateral, the Agency Agreement, the Custody Agreement, the Swap Agreement] and the other assets and/or agreements from time to time charged in the manner set out herein and in Clause 5 of the Principal Trust Deed;

"**Notes**" means the Series [      ] [currency and amount] [description of the Notes] of the Issuer hereby constituted or the amount thereof for the time being outstanding and includes the Global Note to be issued in respect thereof;

"**Obligation**" means an obligation and duty of the Issuer under the Trust Deed, each Note and the Swap Agreement;

["**Securities**" means [Securities in Schedule [●] hereto]]

["**Securities Agreement**" means the agreement with an effective date of [ISSUE DATE] between the Issuer and the Counterparty under which the Issuer has agreed to [DETAILS] [;/ and]

["**Series Prospectus**" means the prospectus dated [ISSUE DATE] specifying the relevant issue details of the Notes, the form of which appears as the Schedule hereto]

["**Swap Agreement**"] means the ISDA Master Agreement with an effective date of [ISSUE DATE] between the Issuer and the Swap Counterparty under which the Issuer has agreed to [DETAILS] against payment by the Swap Counterparty of [DETAILS]]

## 2    Incorporation by Reference

Except as otherwise provided herein, the terms of the Principal Trust Deed shall apply to this Supplemental Trust Deed as if they were set out herein and the Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this Supplemental Trust Deed.

## 3    Amount and Status of Notes

**3.1**    **Amount:** The aggregate principal amount of the Notes is limited to [DETAILS].

**3.2**    **Status:** The Notes and Coupons constitute secured and limited recourse obligations of the Issuer, secured as provided below.

## 4    Form of the Notes

The Notes will be [Bearer]/[Registered] Notes represented by the Global [Note/Certificate issued in the principal amount of [DETAILS]. [The Global Note will be exchangeable for Definitive Notes in the circumstances set out therein.]

## 5    Security and Covenants

**5.1**    **Security:** The Issuer hereby creates security over the Mortgaged Property comprising the assets and agreements described in the Schedule hereto in accordance with the provisions of Clause 5 of the Principal Trust Deed [in addition to the [security interest] created under [other security document]].

**5.2**    **The Mortgaged Property:** Without prejudice to the generality of sub-Clause 5.1, the Issuer with full title guarantee and as continuing security for the benefit of the holders of Notes, Coupons [and the Swap Counterparty] hereby:

**5.2.1** charges and assigns by way of first fixed charge in favour of the Trustee, the Securities and all rights and sums and other property and assets derived therefrom and all rights against the Custodian in respect thereof;

**5.2.2** assigns by way of security in favour of the Trustee all rights, title and interest under the [Swap Agreement,] [Securities Agreement,] and [Credit Enhancement Agreement] and any sums received thereunder;

**5.2.3** charges by way of first fixed charge in favour of the Trustee (a) all sums held by the Agent and/or the Custodian and/or the Registrar to meet payments due in respect of the Notes and (b) any sums received under the [Swap Agreement,] [Securities Agreement,] and [Credit Enhancement Agreement]; and

**5.2.4** assigns by way of security in favour of the Trustee all rights, title and interest under the Agency Agreement and all sums derived therefrom in respect of the Notes, including all rights against the Custodian under the Custody Agreement in respect of the Securities.

**5.3** **Benefit of Security**: The security created pursuant to sub-Clauses 5.1 and 5.2 is granted to the Trustee as trustee for itself and/or the holders of Notes, Coupons and the Swap Counterparty as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes and Coupons, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement, (iii) for the payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Securities in discharge of an Obligation) and (iv) for the payment of all claims of the Issuing and Paying Agent (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Issuing and Paying Agent or the Custodian shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Securities or the Swap Agreement.

**5.4** **Covenants:**

**5.4.1** [The Swap Counterparty covenants with the Trustee in the terms of sub-Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.]

**5.4.2** [The Issuer covenants with the Trustee to promptly give notice to the Credit Enhancement Provider of the assignment by way of security of the Issuer's rights under the Credit Enhancement Agreement and to use its reasonable endeavours to procure that the Credit Enhancement Provider acknowledges such notice.]

**5.5** **Securities:** The Issuer confirms that it has, or there has been on its behalf, delivered to the Custodian Account on or before the date hereof, the Securities.

**5.6** **Covenant to pay:** The Trustee hereby agrees to hold the covenant set out in sub-Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes[, the Coupons] [and the Receipts].

**5.7** **Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Agents, [Counterparty] [and the Swap Counterparty] hereby acknowledges that it

has notice of the assignment by way of security by the Issuer of all of its rights under the Agency Agreement, [Securities Agreement,] [Custody Agreement,] [and Swap Agreement] and consents to any further assignment by way of security by the Issuer of such rights to any successor Trustee under this Supplemental Trust Deed.

5.8 **Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Supplemental Trust Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: [DETAILS].

5.9 **Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of sub-Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "prior-day" basis, and that the provisions of sub-Clause 4.1.2 of the Agency Agreement are amended so that the Issuer shall transfer the amounts required in respect of any particular payment at least • Business Day[s] prior to the date on which that payment in respect of the Notes becomes due.]

# 6 [OTHER PROVISIONS - EG SUBORDINATION]

# 7 Communications

Communications under this Supplemental Trust Deed shall be made in accordance with Clause 17 of the Principal Trust Deed.

The telephone number, fax number, email address, postal address and person designated by the Issuer are set out below:

telephone: [●]

fax: [●]
email: [●]
address: [●]
attention: [The Directors].

[The telephone number, fax number, email address, postal address and person designated by the Swap Counterparty are set out below:

telephone: [●]
fax: [●]
email: [●]
address: [●]
attention: [●]

The telephone number, fax number, email address, postal address and person designated by the Trustee are set out below:

telephone: [●]

fax: [●]
email: [●]
address: [●]
attention: [●]

The telephone number, fax number, email address, postal address and person designated by the Custodian are set out below:

telephone:  [●]

fax:        [●]
email:     [●]
address:  [●]
attention:  [●]

## 8 Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Supplemental Trust Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Supplemental Trust Deed except that and to the extent (if any) that this Supplemental Trust Deed expressly provides for that Act to apply to any of its terms.

## 9 Governing Law and Jurisdiction

**9.1** **Governing Law:** This Supplemental Trust Deed shall be governed by and construed in accordance with English Law.

**9.2** **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Supplemental Trust Deed, the Principal Trust Deed, the Notes, the Receipts, the Talons or the Coupons and accordingly any legal action or proceedings arising out of or in connection with this Supplemental Trust Deed, the Principal Trust Deed, the Notes, the Receipts, the Talons or the Coupons ("**Proceedings**") may be brought in such courts. [[The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum.] [The Swap Counterparty irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the ground that the Proceedings have been brought in an inconvenient forum.] [This submission is] [These submissions are] for the benefit of each of the other party[ies] to this Supplemental Trust Deed and the holders of Notes, Coupons, Receipts and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).]

**9.3** **Service of Process:** [The Issuer irrevocably appoints [   ] of [   ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England [and the][.]] [The Swap Counterparty irrevocably appoints [   ] of [   ] as its agent to receive, for it and on its behalf, service of process in any Proceedings in England.] Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason such process agent ceases to be able to act as such or no longer has an address in England the Swap Counterparty irrevocably agrees to appoint a substitute process agent acceptable to the Trustee, and to deliver to the Trustee a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.]

**Schedule**

**Form of Final Terms or Series Prospectus**

[RELEVANT FINAL TERMS OR SERIES PROSPECTUS TO BE INSERTED]

This Supplemental Trust Deed has been delivered on the date stated at the beginning.

**[SPECIFIED COMPANY]**


By:


**[•]**

By:


**[PAYING/TRANSFER AGENT]**

By:


**[SWAP COUNTERPARTY]**

By:


**[COUNTERPARTY]**

By:

## Schedule 5
## Memorandum of Supplemental Trust Deeds

| Date | Parties | Principal Amount of Series | Title of Series | Final Maturity Date |
|------|---------|----------------------------|-----------------|---------------------|
|      |         |                            |                 |                     |

## Schedule 6
## Form of Deed of Accession

**This Deed** is made on [●] **between**:

(1)     **[ISSUER]** (the "**Issuer**");

(2)     **BNY CORPORATE TRUSTEE SERVICES LIMITED** (the "**Trustee**");

(3)     **THE BANK OF NEW YORK Mellon** (the "**Issuing and Paying Agent**");

(4)     **LEHMAN BROTHERS SPECIAL FINANCING**, **INC**. ("**LBSF**");

(5)     **LEHMAN BROTHERS FINANCE S.A.** ("**LBF**"); and

(6)     **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in its capacity as calculation agent, the "**Calculation Agent**" and, in its capacity as dealer under the Programme, the "**Dealer**").

**Whereas**:

Dante Finance Public Limited Company ("**Dante**") and the Trustee are parties to a trust deed dated 10 October 2002 as amended and restated on 18 July 2008 (the "**Principal Trust Deed**") establishing the Multi-Issuer Secured Obligation Programme (the "**Programme**") for the issuance from time to time of secured notes to which the Issuer wishes to accede as set out below.

**Now this deed witnesses and it is hereby declared** as follows:

## 1       Definitions

"**Agency Agreement**" means the agency agreement dated 10 October 2002, between Dante, the Trustee and the Agents as amended and restated on 18 July 2008;

"**LBF Swap**" means an ISDA Master Agreement (including the Schedule thereto) between Dante and LBF dated 10 October 2002, as amended and restated on 18 July 2008; and

"**LBSF Swap**" means an ISDA Master Agreement (including the Schedule thereto) between Dante and LBSF dated 10 October 2002, as amended and restated on 18 July 2008

"**Master Documents**" means the Agency Agreement, the Programme Agreement and the Principal Trust Deed; and

"**Programme Agreement**" means the programme agreement dated 10 October 2002, between Dante and the Dealer as amended and restated on 18 July 2008.

## 2       Accession

2.1     With effect from the date of this Deed, the Issuer hereby agrees to become and be treated as an "Issuer" for all purposes set out in the Master Documents and agrees to assume all rights, obligations and liabilities of an "Issuer" as set out in the Master Documents and each of the other parties to this Deed (in each capacity in which it is a party to one or more of the Master Documents) agrees to the Issuer becoming and being treated as an "Issuer" for such purposes and assuming the rights, obligations and liabilities of an "Issuer" as set out in the Master Documents.

2.2     With effect from the date of this Accession Deed, the Issuer hereby agrees to become and be treated as "Party B" for all purposes of the LBF Swap and the LBSF Swap and agrees to assume all rights, obligations and liabilities of "Party B" as set

out in the LBF Swap and the LBSF Swap and LBF and LBSF (in the capacity in which it is a party to the LBF Swap and the LBSF Swap respectively) agrees to the Issuer becoming and being treated as "Party B" for such purposes and assuming the rights, obligations and liabilities of "Party B" as set out in the LBF Swap and the LBSF Swap.

## 3 Counterparts

This Deed of Accession may be executed in counterparts which when taken together shall constitute one and the same instrument.

## 4 Contracts (Rights of Third Parties) Act 1999

A person who is not a party to this Deed of Accession has no right under the Contracts (Rights of Third Parties) Act 1999 to enforce any term of this Deed of Accession.

## 5 Governing Law

This Deed of Accession shall be governed by and construed in accordance with English law.

**In witness whereof** this Deed has been executed as a deed as of the date stated at the beginning.

**[ISSUER]**

By:


By:



**BNY CORPORATE TRUSTEE SERVICES LIMITED**

By:



**THE BANK OF NEW YORK MELLON**

By:




**LEHMAN BROTHERS SPECIAL FINANCING, INC.**

By:



**LEHMAN BROTHERS FINANCE S.A.**

By:



**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

By:

# Schedule 7
## Definitions

"**Account Bank**" means the person named as such in the Conditions or any Successor Account Bank in each case at its specified office.

"**Agency Agreement**" means the agency agreement relating to the Programme dated 10 October 2002 as amended and restated on 18 July 2008 between the Issuer, the Trustee, JPMorgan Chase Bank, N.A. as initial Issuing and Paying Agent.

"**Agents**" means the Issuing and Paying Agent, the other Paying Agents, the Calculation Agent, the Registrar, the other Transfer Agents, the Account Bank and the Custodian or any of them.

"**Arranger**" means Lehman Brothers International (Europe) and shall include any additional or replacement arranger appointed, and exclude any Arranger whose appointment has terminated, pursuant to Clause 14 of the Programme Agreement.

"**Base Prospectus**" means, the base prospectus relating to the Company and the Programme as from time to time amended, supplemented or replaced and which shall include those documents incorporated in it by reference (but shall not include any information or documents replaced or superceded by any information subsequently included or incorporated).

"**Bearer Note**" means a Note that is in bearer form, and includes any replacement Bearer Note issued pursuant to the Conditions and any Global Note.

"**Calculation Agent**" means any person named as such in the Conditions or any Successor Calculation Agent.

"**Certificate**" means a registered certificate representing one or more Registered Notes of the same Series and, save as provided in the Conditions, comprising the entire holding by a Noteholder of his Registered Notes of that Series and, save in the case of Global Certificates, being substantially in the form set out in Schedule 2 of the Principal Trust Deed.

"**CGN**" or "**Classic Global Note**" means a Temporary Global Note in form set out in Part A of Schedule 1 or a Permanent Global Note in the form set out in Part B of Schedule 1.

"**Clearstream, Luxembourg**" means Clearstream Banking, société anonyme.

"**Common Depositary**" means, in relation to a Series, a depositary common to Euroclear and Clearstream, Luxembourg.

"**Common Safekeeper**" means, in relation to a Series of Notes which are intended to be eligible collateral for Eurosystem monetary policy and intra-day credit operations, Euroclear or Clearstream, Luxembourg in its capacity as common safekeeper or a person nominated by Euroclear or Clearstream, Luxembourg to act as common safekeeper as elected in accordance with the Agency Agreement.

"**Common Service Provider**" means, in relation to a Series of Notes which are intended to be eligible collateral for Eurosystem monetary policy and intra-day credit operations, the common service provider appointed by Euroclear and/or Clearstream, Luxembourg in respect of such Notes.

"**Conditions**" means in respect of the Notes of each Series the terms and conditions applicable thereto which shall be substantially in the form set out in Schedule 2 to the Principal Trust Deed as modified, with respect to any Notes represented by a Global Certificate or a Global Note, by the provisions of such Global Certificate or Global Note, shall incorporate any additional provisions

forming part of such terms and conditions set out in the Final Terms or Series Prospectus(es) relating to the Notes of that Series and shall be endorsed on the Definitive Notes subject to amendment and completion as referred to in the first paragraph of Schedule 2 Part C of the Principal Trust Deed and any reference to a particularly numbered Condition shall be construed accordingly.

"**Contracts**" means the Programme Agreement, the Agency Agreement and the Trust Deed in relation to any Syndicated Issue, the related Subscription Agreement, the Issuer/ICSD Agreement and any further agreements entered into in relation to a Series.

"**Contractual Currency**" means, in relation to any payment obligation arising under any Note, the currency in which that payment obligation is expressed and, in relation to Clause 8 of the Principal Trust Deed, United States dollars or such other currency as may be agreed between the Issuer and the Trustee from time to time.

"**Controlling Series**" shall mean the Series of Notes or other Obligations identified as the Controlling Series in the relevant Supplemental Trust Deed or failing that, the most senior ranking of the Notes, relevant Related Notes and other Obligations secured on the same Mortgaged Property as the Notes.

"**Counterparty**" means the counterparty to any Securities Agreement as specified in the Supplemental Trust Deed.

"**Coupons**" means the bearer coupons relating to interest bearing Bearer Notes or, as the context may require, a specific number of them and includes any replacement coupons issued pursuant to the Conditions and, where the context may require, any Talons.

"**Credit Enhancement Agreement**" means the agreement or undertaking described as such in the Supplemental Trust Deed.

"**Credit Enhancement Provider**" means the person specified to be such in the relevant Supplemental Trust Deed.

"**Dealer**" means Lehman Brothers International (Europe) and includes each other person who has been, or, for the purposes of Clause 2 of the Programme Agreement, who is subsequently, appointed as a Dealer pursuant to Clause 14 of the Programme Agreement (but excludes each person who has ceased to be a Dealer pursuant to Clause 14 of the Programme Agreement or whose appointment has lapsed pursuant to its terms).

"**Deed of Accession**" means a deed of accession substantially in the form set out in Schedule 6 of the Principal Trust Deed between a Specified Company, the Trustee, the Issuing and Paying Agent, the Transfer Agent, the Custodian and the Calculation Agent pursuant to which the relevant Specified Company agrees to become bound by each of the Master Documents as an "Issuer" therein in respect of any Series issued by it.

"**Definitive Note**" means a Bearer Note in definitive form having, where appropriate, Coupons, Receipt(s) and/or a Talon attached on issue and, unless the context requires otherwise, means a Certificate (other than a Global Certificate) and includes any replacement Note or Certificate issued pursuant to the Conditions.

"**directive**" includes any present or future directive, regulation, request, requirement, rule or credit restraint programme of any relevant agency, authority, central bank, department, government, legislature, minister, ministry, official, public or statutory corporation, self-regulating organisation or stock exchange.

"**Disposal Agent**" means in relation to any Series, any person named as such in the Conditions or the relevant Supplemental Trust Deed.

"**Enforcement Proceedings**" means, in relation to action taken against any person, any distress, attachment, execution or other legal process levied, enforced or sued out on or against any part of the property, assets or revenues of that person, any action or petition for the winding up of that person, for an administration order in respect of that person or for the appointment by a court of any official or officer over or in respect of any part of the property, assets or revenues of that person or any other action that under the laws of any relevant jurisdiction has an analogous effect to any of the actions referred to above.

"**Euroclear**" means Euroclear Bank S.A./N.V..

"**Event of Default**" means an event described in Condition 10.

"**Exchange Notice**" means the notice in the form or substantially in the form set out in Schedule 1 Part B of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"**Exchangeable Bearer Note**" means a Bearer Note that is exchangeable in accordance with its terms for a Registered Note.

"**Exercise Notice**" means the notice in or substantially in the form set out in Schedule 1 Part A of the Agency Agreement or such other form of notice referred to in or annexed to the relevant Supplemental Trust Deed.

"**Extraordinary Resolution**" in relation to the Noteholders, has the meaning set out in Schedule 3 of the Principal Trust Deed.

"**Final Terms**" means, in relation to a Series Tranche, the Final Terms issued specifying the relevant issue details of such Tranche, substantially in the form set out in the Base Prospectus and which in the case of Notes to be listed and admitted to trading on a regulated market constitute final terms of the Notes for the purpose of Article 5(4) of the Prospectus Directive.

"**Fitch**" means Fitch Ratings Ltd.

"**Global Certificate**" means a Certificate substantially in the form set out in Schedule 1 Part C of the Principal Trust Deed representing Registered Notes of one or more Tranches of the same Series that are registered in the name of a nominee for Euroclear, Clearstream, Luxembourg and/or any other clearing system.

"**Global Note**" means a Temporary Global Note and/or a Permanent Global Note, which may be represented by a CGN or a NGN, as the context may require.

"**holder**" in relation to a Note, Receipt, Coupon or Talon, and "**Couponholder**" and "**Noteholder**" have the meanings given to them in the Conditions.

"**Irish Stock Exchange**" means The Irish Stock Exchange Limited.

"**Issue Date**" means, in relation to each Tranche, the date on which the Notes of that Tranche have been issued or, if not yet issued, the date agreed for their issue between the Issuer and the Relevant Dealer(s).

"**Issuer**" means Dante Finance Public Limited Company and any other Specified Company as the context requires as set out in sub-Clause 2.7.

"**Issuing and Paying Agent**" means the person named as such in the Conditions or any Successor Issuing and Paying Agent in each case at its specified office.

"**Issuer/ICSD Agreement**" means the agreement between the Issuer and each of Euroclear and Clearstream, Luxembourg entered into in connection with this Programme which sets out certain obligations of the Issuer and Euroclear and Clearstream, Luxembourg and refers to the Common Service Provider appointed by Euroclear and Clearstream, Luxembourg in relation to any Series of Notes represented by a Global Note in NGN form.

"**Lead Manager**" means, in relation to a Syndicated Issue, the Relevant Dealer specified as such in the related Subscription Agreement.

"**Listing Agent**" means McCann FitzGerald Listing Services Limited (or its replacement Irish Stock Exchange listing agent) and any other listing agent appointed in relation to any listing of Notes on any other Stock Exchange.

"**Master Documents**" means the Programme Agreement, the Principal Trust Deed, and the Agency Agreement.

"**Moody's**" means Moody's Investors Service Limited.

"**Mortgaged Property**" means the assets and agreements comprising the mortgaged property on which the Notes of a Series are secured, all as specified in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus.

"**NGN**" or "**New Global Note**" means a Temporary Global Note in the form set out in Part C of Schedule 1 or a Permanent Global Note in the form set out in Part D of Schedule 1 which is intended to be eligible collateral for Eurosystem monetary policy and intra-day credit operations as stated in the applicable Final Terms.

"**Notes**" means the notes to be issued by the Issuer pursuant to the Programme Agreement, constituted by the Trust Deed and for the time being outstanding or, as the context may require, a specific number of them.

"**outstanding**" means, in relation to the Notes of a Series, all the Notes issued except (a) those that have been redeemed in accordance with the Conditions, (b) those in respect of which the date for redemption has occurred and the redemption moneys (including all interest accrued on such Notes to the date for such redemption and any interest payable after such date) have been duly paid to the Trustee or to the Issuing and Paying Agent as provided in Clause 2 of the Principal Trust Deed and remain available for payment against presentation and surrender of Notes, Certificates, Receipts and/or Coupons, as the case may be, (c) those that have become void or in respect of which claims have become prescribed, (d) those that have been purchased and cancelled as provided in the Conditions, (e) those mutilated or defaced Bearer Notes that have been surrendered in exchange for replacement Bearer Notes, (f) (for the purpose only of determining how many Notes are outstanding and without prejudice to their status for any other purpose) those Bearer Notes alleged to have been lost, stolen or destroyed and in respect of which replacement Notes have been issued, (g) those Exchangeable Bearer Notes that have been exchanged for Registered Notes, and (h) any Global Note to the extent that it shall have been exchanged for one or more Definitive Notes, pursuant to its provisions; provided that for the purposes of (1) ascertaining the right to attend and vote at any meeting of the Noteholders, (2) the determination of how many Notes are outstanding for the purposes of the Conditions and Schedule 3 of the Principal Trust Deed and (3) the exercise of any discretion, power or authority that the Trustee is required, expressly or impliedly, to exercise in or by reference to the interests of the Noteholders, those Notes that are beneficially held by or on behalf of the Issuer and not

cancelled shall (unless no longer so held) be deemed not to remain outstanding. Save for the purposes of the proviso herein, the Trustee shall rely on the records of Euroclear and Clearstream, Luxembourg in relation to any determination of the nominal amount outstanding of each NGN.

"**Paying Agents**" means the persons (including the Issuing and Paying Agent) referred to as such in the Conditions or any Successor Paying Agents in each case at their respective specified offices.

"**Permanent Dealers**" means all Dealers other than those appointed as such solely in respect of one or more specified Tranches.

"**Permanent Global Note**" means a Global Note representing Bearer Notes of one or more Tranches of the same Series, either on issue or upon exchange of a Temporary Global Note, or part of it, and which shall be substantially in the form set out in Schedule 1, Part B or Part D, as the case may be.

"**Potential Event of Default**" means an event or circumstance that could with the giving of notice, lapse of time, issue of a certificate and/or fulfilment of any other requirement provided for in Condition 10 become an Event of Default.

"**Principal Trust Deed**" means this principal trust deed dated 10 October 2002 as amended and restated on 18 July 2008 between the Issuer and the Trustee.

"**Programme**" means the Multi Issuer Secured Obligation Programme arranged by Lehman Brothers International (Europe).

"**Programme Agreement**" means the Programme Agreement relating to the Programme dated 10 October 2002 as amended and restated on 18 July 2008 between the Issuer and Lehman Brothers International (Europe).

"**Prospectus**" means, in the case of each Specified Company, the relevant Base Prospectus and in relation to any Tranche, the Final Terms together with the relevant Base Prospectus or, in relation to a Tranche in respect of which a Series Prospectus has been prepared, the Series Prospectus, in each case including all supplements thereto or replacements therefor and such documents as are from time to time incorporated therein by reference (but not including any information or documents replaced or superceded by any information subsequently included or incorporated).

"**Prospectus Directive**" means Directive 2003/71/EC.

"**Purchase Information**" means, in relation to any Tranche that is not a Syndicated Issue, the terms of such Notes and of their issue agreed between the Issuer and the Relevant Dealer pursuant to this Agreement.

"**Receipts**" means the receipts for the payment of instalments of principal in respect of Bearer Notes of which the principal is repayable in instalments or, as the context may require, a specific number of them and includes any replacement Receipts issued pursuant to the Conditions.

"**Redemption Amount**" has the meaning given to it in the Conditions.

"**Register**" means the register maintained by the Registrar.

"**Registered Note**" means a Note in registered form.

"**Registrar**" means the person named as such in the Conditions or any Successor Registrar in each case at its specified office.

"**Related Agreement**" means any agreement entered into by the Issuer relating to a Series which is referred to in, or contemplated by, this Trust Deed or any Supplemental Trust Deed.

"**Related Notes**" means the outstanding Notes of any other Series which shares the same Mortgaged Property as the Notes and which is issued as part of the same transaction.

"**Relevant Dealer(s)**" means, in relation to any Tranche, the Dealer or Dealers with or through whom an agreement to issue Notes has been concluded, or is being negotiated, by the relevant Issuer.

"**Relevant Transaction**" means Notes, any Related Notes and/or other Obligations that are secured on the same Mortgaged Property and issued as part of the same transaction.

"**Securities**" means one or more transferable securities issued by or representing obligations of one or more persons as specified in the Supplemental Trust Deed.

"**Securities Act**" means the United States Securities Act of 1933

"**Securities Agreement**" has the meaning specified in the Supplemental Trust Deed.

"**Series**" means a series of Notes comprising one or more Tranches, whether or not issued on the same date, that (except in respect of the first payment of interest and their issue price) have identical terms on issue and are expressed to have the same series number.

"**Series Prospectus**" means any prospectus or offering document (whether or not approved as a prospectus for the purposes of and in compliance with the Prospective Directive) relating to a Specified Company and a Tranche (including, without limitation to the generality of the foregoing, a prospectus or offering document which incorporates by reference all or part of the relevant Base Prospectus) but excluding a prospectus consisting of the relevant Base Prospectus and Final Terms.

"**Specified Company**" means Dante Finance Public Limited Company and such other company as has executed and delivered a Deed of Accession agreeing to be bound by each of the Master Documents and any other document executed in accordance with a Master Document.

"**specified office**" means, in relation to a Paying Agent, the Registrar or a Transfer Agent the office identified with its name at the end of the Conditions or any other office approved by the Trustee and notified to Noteholders pursuant to sub-Clause 7.1.10 of the Principal Trust Deed.

"**Standard & Poor's**" means Standard & Poor's Rating Services, a division of The McGraw-Hill Companies, Inc.

"**Stock Exchanges**" means the Irish Stock Exchange and/or, subject as provided in sub-Clause 6.1 of the Programme Agreement, such other stock exchange on which any Notes may be listed or whose market on which the Notes may be admitted to trading.

"**Subscription Agreement**" means an agreement between two or more Relevant Dealers and the Issuer made pursuant to sub-Clause 2.2 of the Programme Agreement

"**Successor**" means, in relation to an Agent such other or further person as may from time to time be appointed by the Issuer as such Agent with the written approval of, and on terms approved in writing by, the Trustee and notice of whose appointment is given to Noteholders pursuant to Clause 7.1.6 of the Principal Trust Deed.

"**Supplemental Trust Deed**" means a supplemental trust deed dated the Issue Date between the Issuer, the Trustee and (if applicable) the Swap Counterparty substantially in the form set out in Schedule 4 of the Principal Trust Deed.

"**Swap Agreement**" means, in relation to any Series, any interest rate and/or currency exchange agreement entered into by the Issuer and a Swap Counterparty in relation to that Series.

"**Swap Counterparty**" means the counterparty to any Swap Agreement entered into by the Issuer in relation to that Series as specified in the related Supplemental Trust Deed.

"**Syndicated Issue**" means an issue of Notes pursuant to sub-Clause 2.2 of the Programme Agreement.

"**Talons**" mean talons for further Coupons or, as the context may require, a specific number of them and includes any replacement Talons issued pursuant to the Conditions.

"**TARGET System**" means the Trans-European Automated Real-Time Gross Settlement Express Transfer (TARGET) System or any successor thereto.

"**Temporary Global Note**" means a Global Note representing Bearer Notes of one or more Tranches of the same Series on issue and which shall be substantially in the form set out in Schedule 1, Part A or Part C, as the case may be.

"**Trade Date**" means each date on which the Issuer concludes an agreement with one or more Relevant Dealers for the issue and sale of Notes pursuant to Clause 2 of the Programme Agreement which, in the case of a Syndicated Issue, shall be the execution date of the relevant Subscription Agreement.

"**Trade Time**" means the time on the Trade Date at which the agreement for the issue and sale of Notes is entered into.

"**Tranche**" means in relation to a Series, those Notes of that Series which are issued on the same date.

"**Transaction**" means any financial transaction entered into by the Issuer, not involving the issue of Notes and not involving the guarantee by it, or its becoming obligated for, the debts of any other person or entity, but including, without limitation, the incurring by the Issuer of indebtedness in forms other than the Notes, and swaps and options, where the obligations of the Issuer in respect thereof are limited to the proceeds of enforcement of the security over the assets of the Issuer on which such obligations are secured pursuant to a Supplemental Trust Deed.

"**Transfer Agents**" means the persons (including the Registrar) referred to as such in the Conditions or any Successor Transfer Agents in each case at their specified offices.

"**trust corporation**" means a trust corporation (as defined in the Law of Property Act 1925) or a corporation entitled to act as a trustee pursuant to applicable foreign legislation relating to trustees.

"**Trust Deed**" means, in relation to a Tranche of Notes, this Principal Trust Deed and the relevant Supplemental Trust Deed constituting the Notes and any Other Security Document.

"**Trustee**" means BNY Corporate Trustee Services Limited or any replacement appointed as trustee under the Trust Deed in relation to one or more Series.

"**Warranty Date**" means each Trade Date, each Issue Date, each date of any Base Prospectus or Prospectus or on which any Base Prospectus or Prospectus or any of the Contracts is amended, supplemented or replaced.

This Trust Deed has been delivered on the date stated at the beginning.


**SIGNED, SEALED AND DELIVERED for and on behalf of DANTE FINANCE PUBLIC LIMITED COMPANY** by its lawfully appointed attorney


in the presence of


Witness Signature:

Address:


Occupation:


**BNY CORPORATE TRUSTEE SERVICES LIMITED** (as Trustee)

By:


Authorised Signatory



Authorised Signatory

**TABLE OF CONTENTS**

1    Interpretation ................................................................................................................ 2

2    Issue of Notes and Covenant to Pay ............................................................................... 2

3    Form of the Notes .......................................................................................................... 6

4    Stamp Duties and Taxes ................................................................................................ 6

5    Security .......................................................................................................................... 6

6    Application of Moneys received by the Trustee and Payments ..................................... 10

7    Covenants ...................................................................................................................... 13

8    Remuneration and Indemnification of the Trustee ........................................................ 18

9    Provisions Supplemental to the Trustee Act 1925 and the Trustee Act 2000 ............... 20

10   Trustee liable for Negligence ......................................................................................... 23

11   Waiver, Consents and Proof of Default .......................................................................... 23

12   Trustee not precluded from entering into Contracts ...................................................... 24

13   Modification and Substitution ......................................................................................... 24

14   Appointment, Retirement and Removal of the Trustee .................................................. 26

15   Notes held in Clearing Systems and Couponholders ..................................................... 28

16   Currency Indemnity ....................................................................................................... 28

17   Communications ............................................................................................................ 28

18   Enforcement and Non-recourse ..................................................................................... 29

19   Contracts (Rights of Third Parties) Act 1999 ................................................................. 30

20   Governing Law and Jurisdiction ..................................................................................... 30

21   Counterparts .................................................................................................................. 30

Schedule 1 Part A Form of CGN Temporary Global Note ...................................................... 32

Schedule 1 Part B Form of CGN Permanent Global Note ..................................................... 39

Schedule 1 Part C Form of NGN Temporary Global Note...................................................... 48

Schedule 1 Part D Form of NGN Permanent Global Note ............................................................ 54

Schedule 1 Part E Form of Global Certificate ............................................................................. 61

Schedule 2 Part A Form of Bearer Note .................................................................................... 66

Schedule 2 Part B Form of Certificate ....................................................................................... 69

Schedule 2 Part C TERMS AND CONDITIONS OF THE NOTES ................................................... 73

Schedule 2 Part D Form of Coupon ........................................................................................114

Schedule 2 Part E Form of Talon ...........................................................................................116

Schedule 2 Part F Form of Receipt .........................................................................................118

Schedule 3  Provisions for Meetings of Noteholders ...................................................................119

Schedule 4  Form of Supplemental Trust Deed ....................................................................... 126

Schedule 5 Memorandum of Supplemental Trust Deeds........................................................... 134

Schedule 6 Form of Deed of Accession ................................................................................. 135

Schedule 7 Definitions............................................................................................................ 138

# EXHIBIT B

Dated 10 December 2004

# SAPHIR FINANCE PUBLIC LIMITED COMPANY

and

# J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED

and

# JPMORGAN CHASE BANK, LONDON BRANCH

and

# J.P. MORGAN BANK (IRELAND) PLC

and

# LEHMAN BROTHERS SPECIAL FINANCING, INC.

and

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)

# SUPPLEMENTAL TRUST DEED AND DRAWDOWN AGREEMENT

in respect of

Saphir Finance Public Limited Company Series 2004-11 AUD75,000,000 Synthetic Portfolio Notes due 2011

issued pursuant to the

Multi-Issuer Secured Obligation Programme

arranged by

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

10th Floor, Alexandra House
Chater Road
Hong Kong

Telephone (852) 2842 4888
Facsimile (852) 2810 8133/2810 1695

Ref

**This Deed** is made on 10 December 2004 **between:**

(1)     SAPHIR FINANCE PUBLIC LIMITED COMPANY (the "Issuer");

(2)     J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (the "Trustee");

(3)     JPMORGAN CHASE BANK, LONDON BRANCH (in its capacity as issuing and paying agent, the "Issuing and Paying Agent" and in its capacity as custodian, the "Custodian");

(4)     J.P. MORGAN BANK (IRELAND) PLC (the "Paying Agent" and, together with the Issuing and Paying Agent, the "Agents");

(5)     LEHMAN BROTHERS SPECIAL FINANCING, INC. (the "Swap Counterparty");

(6)     LEHMAN BROTHERS INTERNATIONAL (EUROPE) (in its capacity as calculation agent, the "**Calculation Agent**", in its capacity as disposal agent, the "**Disposal Agent**" and, in its capacity as dealer under the Programme, the "**Dealer**").

**Whereas:**

(A)     Dante Finance Public Limited Company ("**Dante**") and the Trustee are parties to a principal trust deed dated 10 October 2002, as amended and restated on 30 January 2004, to which the Issuer has acceded pursuant to a Deed of Accession dated 9 April 2003, as amended and restated on 30 January 2004 (the "**Accession Deed**") establishing a programme for the issuance from time to time of secured notes (the principal trust deed dated 10 October 2002, as amended and restated on 30 January 2004, as acceded to by the Issuer pursuant to the Accession Deed, the "**Principal Trust Deed**").

(B)     Pursuant to Clause 2.7 of the Principal Trust Deed, the Issuer has authorised and determined to issue its Series 2004-11 AUD75,000,000 Synthetic Portfolio Notes due 2011 to be constituted and secured as set out below.

(C)     The parties hereto have each resolved to enter into this Deed for the purposes set out below. For the avoidance of doubt each party's obligation is several.

**Now this deed witnesses and it is hereby declared** as follows:

## SECTION I: DETAILS OF THE TRANSACTION

**1       The Drawdown**

1.1       **Description of the Notes:**

| | |
|---|---|
| The Notes: | Credit-Linked Synthetic Portfolio Notes |
| Principal Amount: | AUD75,000,000 |

1.2       **Process Agent Appointment Information:**

| | |
|---|---|
| Relevant Agreements: | This Deed |
| | The Swap Agreement |
| | The Global Note |

1.3       **Details of Swap Agreement:**

| | |
|---|---|
| Counterparties: | Issuer, Swap Counterparty |

| Master Agreement: | ISDA Master Agreement dated 10 October 2002, as amended and restated on 30 January 2004, between Dante and the Swap Counterparty |
|---|---|
| Transaction Type: | Credit Default Swap Transaction |
| Effective Date | 10 December 2004 |
| 4    Collateral: | |
| The Initial Collateral: | AUD75,000,000 in principal amount of an issue of AUD75,000,000 Floating Rate Notes due 2011 by the Collateral Issuer on 10 December 2011 under its euro medium term note programme (ISIN: XS0208078732). |
| Collateral Obligor: | Australia and New Zealand Banking Group Limited |
| Custodian Account for the transfer of the Collateral: | Lehman Brothers Holdings, Inc. |

# SECTION II: PROVISIONS SUPPLEMENTAL TO THE PRINCIPAL TRUST DEED AND THE AGENCY AGREEMENT

## 2    Definitions

2.1    **Principal Trust Deed:** Expressions defined in the Principal Trust Deed and the Conditions shall have the same meanings when used herein save to the extent supplemented or modified hereby.

2.2    **Additional Definitions:** The following expressions shall have the following meanings:

"**Agency Agreement**" means the agency agreement dated 10 October 2002, as amended and restated on 30 January 2004, between the Issuing and Paying Agent and others in respect of the Programme as further amended by this Deed;

"**Collateral**" means the Initial Collateral described in Section I of this Deed (together with, for the avoidance of doubt, any interest accrued thereon up to and including the Issue Date) to be transferred to the Custodian Account pursuant to this Deed together with any Qualifying Assets upon such Qualifying Assets being delivered into the Custodian Account following any exchange of the Collateral pursuant to the terms of the Swap Agreement and held subject to the charges securing the Notes;

"**Conditions**" means the terms and conditions of the Notes in the form set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed;

"**Custodian Account**" means the account described as such in Section I of this Deed;

"**Issue Date**" means the date (expected to be the date of this Deed) on which the Notes constituted hereby are issued by the Issuer;

"**Mortgaged Property**" means the assets and/or agreements from time to time charged in favour of the Trustee for the purpose of securing the Notes;

"**Notes**" means the Notes of the Issuer described in Section I of this Deed, constituted and secured by this Deed or the amount of them for the time being outstanding and includes the Global Note to be issued in respect of them;

**"Obligation"** means an obligation and duty of the Issuer under the Trust Deed, each Note, the Agency Agreement and the Swap Agreement;

"Offering Circular Supplement" means the Offering Circular Supplement specifying the relevant issue details of the Notes, the form of which appears as Schedule 2 to this Deed;

"Principal Amount" means the principal amount of the Notes as set out in Section 1 of this Deed;

"Qualifying Assets" shall have the meaning given to it in the Conditions; and

"Swap Agreement" means the ISDA Swap Agreement described in Section 1 of this Deed, comprising the Master Agreement (including the Schedule thereto) (the **"ISDA Master"**) and a confirmation relating to the Notes with an effective date of the Effective Date and the guarantee of the obligations of the Swap Counterparty given by Lehman Brothers Holdings Inc. (the **"Swap Guarantee"**).

2.3 **Definitions in Principal Trust Deed**: References in the Principal Trust Deed to the "Securities" shall be construed as references to the Collateral.

2.4 **Incorporation by Reference**: Except as otherwise provided herein, the terms of the Principal Trust Deed shall apply to this Deed as if they were set out herein and the Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this Deed. For the avoidance of doubt, the conditions set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed shall constitute the Conditions of the Notes.

## 3 Amount and Status of Notes

3.1 **Amount:** The aggregate principal amount of the Notes is limited to AUD75,000,000.

3.2 **Status:** The Notes constitute secured and limited recourse obligations of the Issuer, secured as provided below.

## 4 Form of Notes:

The Notes will be Bearer Notes represented by a Global Note issued in the Principal Amount. The Global Note will be substantially in the form set out in Schedule 1 Part B to the Principal Trust Deed and exchangeable for Definitive Notes in the circumstances set out therein.

## 5 Security and Covenants

5.1 **Security:** The Issuer hereby creates security over the Mortgaged Property in accordance with the provisions of Clause 5 of the Principal Trust Deed.

5.2 **The Mortgaged Property:** Without prejudice to the generality of sub-Clause 5.1, the Issuer as sole beneficial owner with full title guarantee and as continuing security in favour of the Trustee hereby:

5.2.1 charges by way of first fixed charge the Collateral, which charge, in the case of Qualifying Assets, shall be effective upon the Qualifying Assets being transferred to, or to the order of, the Issuer

5.2.2 assigns by way of security all the Issuer's rights, title and interest attaching to or relating to the Collateral and all sums derived therefrom including, without limitation, any right to delivery thereof or to an equivalent number or nominal value thereof which

arises in connection with any such assets being held in a clearing system or through a financial intermediary;

5.2.3 assigns by way of security all the Issuer's rights, title and interest against the Custodian, to the extent that they relate to the Collateral;

5.2.4 assigns by way of security all the Issuer's rights, title and interest against the Disposal Agent, to the extent that they relate to any Collateral or the proceeds of sale of any such Collateral;

5.2.5 assigns by way of security all the Issuer's rights, title and interest under the Agency Agreement (the Issuer's "**Agency Rights**"), to the extent that they relate to the Notes and all sums derived therefrom;

5.2.6 assigns by way of security all the Issuer's rights, title and interest under the Swap Agreement and under the Swap Guarantee and in respect of any sums received thereunder (the Issuer's "**Swap Rights**"); and

5.2.7 charges by way of first fixed charge (a) all sums held by the Issuing and Paying Agent and/or the Custodian to meet payments due in respect of the obligations and duties of the Issuer under the Trust Deed, the Notes and the Swap Agreement and (b) any sums received by the Issuing and Paying Agent and/or the Custodian under the Swap Agreement and under the Swap Guarantee (together with the Issuer's Agency Rights and Swap Rights, its "**Note Rights**").

5.3 **Benefit of Security**: Clause 5.2 of the Principal Trust Deed is hereby amended in relation to the issue of the Notes so that the security created pursuant to Clause 5.1 and 5.2 of this Deed is granted to the Trustee as trustee for itself and/or the holders of Notes, and the Swap Counterparty, the Custodian and the Paying Agents as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement and (iii) for payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Collateral in discharge of an Obligation) and (iv) for the payment of all claims of the Paying Agents (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Custodian or any of the Paying Agents shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Swap Agreement or the Agency Agreement.

5.4 **Release of Mortgaged Property**: The Trustee shall release from such charges created pursuant to this Deed:

5.4.1 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that (i) payment of the same may be obtained and duly paid to the Swap Counterparty under the terms of the Swap Agreement and/or to the holders of Notes or (ii) such part of the Mortgaged Property may be disposed of by the Disposal Agent on behalf of the Issuer in accordance with the terms of this Deed;

5.4.2 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that the Swap Counterparty exercises its rights under the Swap Agreement to exchange any Mortgaged Property pursuant to the terms of the Swap Agreement and the Swap Counterparty elects for such Mortgaged Property to be delivered to, or to the order of, the Swap Counterparty;

**5.4.3** such sums as arise under the Issuer's Note Rights to the intent that payment of all sums due under the Trust Deed be duly made; and

**5.4.4** such sums as arise under the Issuer's Swap Rights to the intent that payment of all sums and delivery of all amounts under the Swap Agreement be duly made.

**5.5 Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:

Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply.

For the purposes of Clause 6.2(i) of the Principal Trust Deed, references to "Pricing Supplement" shall be read as references to "Offering Circular Supplement".

**5.6 Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "same-day" basis, and that the provisions of Clause 4.1.1 of the Agency Agreement apply so that the Issuer shall transfer the amounts required in respect of any particular payment on the date on which that payment in respect of the Notes becomes due.

**5.7 Collateral:** The Issuer confirms that it has made arrangements for the Initial Collateral to be delivered to or to the order of the Custodian on or before the date hereof. The Custodian agrees to notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral.

**5.8 Covenant to pay:** The Trustee hereby agrees to hold the covenant set out in Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes according to their respective interests.

**5.9 Covenants:** The Swap Counterparty covenants with the Trustee in the terms of Clause 7.2 of the Principal Trust Deed and agree to comply with and be subject to all other applicable provisions of the Principal Trust Deed.

**5.10 Additional Covenant:** The Issuer covenants with the Trustee that upon receipt of the draft transaction agreements in respect of a subsequent Series of Notes it shall provide Standard & Poor's Rating Services, a division of McGraw-Hill Companies, Inc. (**"S&P"**) with such draft transaction agreements prior to the issue date of such Series of Notes (whether or not the relevant Series of Notes is to be rated by S&P)

**5.11 Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Paying Agents, the Custodian, the Disposal Agent and the Swap Counterparty hereby acknowledges that it has notice of the assignments and security given by the Issuer pursuant to this Deed and each of the above parties together with the Trustee consent to any further assignments and security by the Issuer to any successor trustee under this Deed.

**5.12 Agency Agreement:** The Agency Agreement is hereby amended by the addition of Clause 15.16 of the following: "The Custodian agrees to open and maintain in its books cash and securities accounts for and on behalf of the Issuer to which amounts and securities transferred to the Issuer under the Swap Agreement will be credited and held subject to the Security in favour of the Trustee. The Issuer and the Trustee hereby authorise the Custodian and the Custodian hereby agrees to debit such accounts in accordance with the instructions of the

Trustee except prior to any Event of Default or Potential Event of Default where they shall be debited in accordance with the instructions of the Issuer only".

6    Limited Recourse and Non Petition

The parties to this Deed and the holders of Notes shall have recourse only to sums derived from the Mortgaged Property, and the Trustee having realised the same, the parties to this Deed, the holders of Notes, or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any sum still unpaid and all sums due but still unpaid shall be extinguished. In particular, neither the parties to this Deed nor any holder of any Note shall be entitled to petition or take any other step for the winding up of the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series.

## SECTION III: PROVISIONS RELATING TO THE DRAWDOWN

### 7    Issue of and Subscription for the Notes

7.1   **Agreement to subscribe:** The Dealer agrees to subscribe and pay for the Notes in an amount equal to the Principal Amount and for a price equal to the issue price of the Notes in accordance with the terms of the Programme Agreement.

7.2   **Agreement to issue:** The Issuer confirms its agreement to issue the Notes to the Dealer.

### 8    Sale of Collateral

8.1   **Agreement to sell and purchase**: The Dealer agrees to sell with full title guarantee, and the Issuer agrees to purchase, the Collateral for the Purchase Price on the Issue Date by delivery of the Collateral to, or to the order of, the Custodian in consideration of the payment of the Purchase Price on the Issue Date by the Issuer to, or to the order of, the Dealer. The Dealer and the Issuer acknowledge that it is their express intention that the transaction shall be a sale and it is not their intention that the sale and purchase of the Collateral shall be deemed to create in favour of the Issuer a mortgage, charge, pledge or any other security interest over such Collateral.

8.2   **Completion**: In respect of the sale and purchase of the Collateral, the Dealer and the Issuer confirm that completion of the sale and purchase shall take place on the Issue Date by:

8.2.1   the transfer of such Collateral from the Dealer to or to the order of the Custodian; and

8.2.2   payment of the Purchase Price in respect of the Collateral to or to the order of the Dealer;

8.3   **Representations and Warranties**: The Dealer and the Issuer represent and warrant to each other that:

8.3.1   on the Issue Date and on the date of this Deed, it was and is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

8.3.2   on the Issue Date and in respect of the Collateral sold or bought on such date:

(i)   it has the power to enter into the sale (in the case of the Dealer) or purchase (in the case of the Issuer) of such Collateral and has taken all necessary action to authorise such sale or (as the case may be) purchase; and

(ii)     its obligation to sell (in the case of the Dealer) or buy (in the case of the Issuer) such Collateral constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application); and

8.3.3    on the date of this Deed:

(i)     it has the power to enter into this Deed and to perform its obligations hereunder in accordance with the terms and conditions hereof and has taken all necessary action to authorise the execution, delivery and performance of this Deed; and

(ii)    this Deed constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application).

8.4    **Additional Representations and Warranties**:  In respect of the sale of the Collateral by the Dealer on the Issue Date, the Dealer hereby represents and warrants to the Issuer that:

8.4.1    the Dealer sells all rights, title and interest therein free and clear of all mortgages, pledges, liens, charges, assignments, security interests, options, equities (including, without limitation, rights of set-off or counterclaim) or any other encumbrances of any nature whatsoever (other than any claims of the clearing system (or its operator) through which such Collateral is held);

8.4.2    the Dealer is not, both prior to the sale of such Collateral nor will be as a result of such sale, unable to pay its debts as they fall due within the meaning of Section 123 of the Insolvency Act 1986;

8.4.3    (i) the Dealer is entering into such sale of the Collateral in good faith and for the purpose of carrying on its business, (ii) the Dealer considers such sale to be in its best interests and (iii) the Dealer has not entered into such sale of the Collateral in order to defraud its creditors; and

8.4.4    the sale of such Collateral is not made below fair market value

# 9    Disposal Agent

9.1    **Appointment**: The Issuer appoints the Disposal Agent as its agent for the purposes of arranging for the disposal or transfer of the Collateral or any part of it that is required to be disposed of or transferred pursuant to the Conditions or in order to meet its obligations under the Swap Agreement (the "**Affected Collateral**") on the following terms and conditions.

9.2    **Duties**: The Disposal Agent shall:

9.2.1    on any date (the "**Solicitation Date**") on which the Issuer becomes obliged under the Conditions or the Swap Agreement to sell the Affected Collateral, use its reasonable endeavours to solicit:

(i)     offers from third parties (which, for the avoidance of doubt, may not include itself) ("**Offerors**") to purchase the Affected Collateral for settlement on a date no later than 5 Business Days after the Solicitation Date (the "**Disposal Date**"); and

(ii) quotations from such Offerors of the price at which each would be prepared to purchase the Affected Collateral on such terms;

9.2.2 as the Issuer's agent, arrange the sale of the Affected Collateral on the Issuer's behalf (the "Sale") for settlement on the Disposal Date to the Offeror which made the highest offer to purchase it (the "Purchaser"). The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Sale;

9.2.3 as the Issuer's agent, arrange the transfer of the Affected Collateral on the Issuer's behalf (the "Transfer") for settlement on the Disposal Date to the Purchaser. The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Transfer.

If the Disposal Agent fails to take any action that it is required to take pursuant to this Deed, it shall forthwith notify the Issuer, S&P, the Trustee and the Issuing and Paying Agent in writing.

9.3 **Dealings in Collateral**: The Custodian may:

9.3.1 accept settlement instructions from the Disposal Agent in connection with the Sale;

9.3.2 upon the instruction of the Disposal Agent, accept delivery of the purchase moneys (if any) for the Affected Collateral from the Purchaser. Clause 15.8 of the Agency Agreement shall apply to such purchase moneys in payment to the Swap Counterparty in accordance with the terms of the Swap Agreement;

9.3.3 deliver the Affected Collateral to, or for the account of, the recipient specified in the instruction of the Disposal Agent against, in the case of the sale of the Affected Collateral, such receipt of the purchase moneys.

The Swap Counterparty hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement) and Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

9.4 **General**: In acting under this Deed, the Disposal Agent:

9.4.1 may take such steps as it considers appropriate in order to effect an orderly sale of the Affected Collateral but may not delay arrangements of the sale beyond the Disposal Date in the hope of achieving a higher price and will not be liable to the Issuer or any party hereto merely because a higher price could have been obtained had the sale been delayed;

9.4.2 shall not be liable for any costs, charges, losses, damages, liabilities or expenses ("**Losses**") arising from or connected with the sale or from any act or omission in relation to the Affected Collateral or otherwise unless such Losses are caused by its own fraud, negligence, misconduct or wilful default;

9.4.3 shall not have any obligations towards or relationship of agency or trust with the Noteholders;

9.4.4 may consult on any legal matter any legal adviser selected by it, who may be an employee of or adviser to the Issuer, and it shall not be liable in respect of anything

done or omitted to be done relating to that matter in good faith in accordance with that adviser's opinion;

9.4.5 shall not be liable in respect of anything done or suffered by it in reliance on a document it reasonably believed to be genuine and to have been signed by the proper parties or on information to which it should properly have regard and which it reasonably believed to be genuine and to have been originated by the proper parties;

9.4.6 may acquire, hold or dispose of any Notes or other security (or any interest therein) of the Issuer or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depository, trustee or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Disposal Agent were not the Disposal Agent, and need not account for any profit.

## 9.5 Changes In Disposal Agent

9.5.1 The Disposal Agent may resign its appointment hereunder at any time by giving prior written notice to the Issuer (which notice shall not expire less than 30 days before or after the Disposal Date). If the Disposal Agent is unable or unwilling or otherwise fails to act, the Issuer shall immediately appoint a leading bank or investment banking firm to act as its successor. Resignation by the Disposal Agent shall not take effect, nor may the Disposal Agent be removed (save as set out herein), until the Issuer has appointed a replacement disposal agent upon substantially the same terms. The Issuer agrees with the Disposal Agent that if, 10 days before the expiry of any notice under this Clause, the Issuer has not appointed a replacement disposal agent, the Disposal Agent shall be entitled, on behalf of the Issuer, to appoint a disposal agent in its place meeting the requirements set out above to which the Issuer shall have no reasonable objection.

9.5.2 The Issuer may forthwith terminate the appointment of the Disposal Agent if (i) at any time the Disposal Agent becomes incapable of acting, or is adjudged bankrupt or insolvent, or files a voluntary petition in bankruptcy or makes an assignment for the benefit of its creditors or consents to the appointment of a receiver, administrator or other similar official of all or any substantial part of its property or admits in writing its inability to pay or to meet its debts as they mature or suspends payment thereof, or if a resolution is passed or an order made for its winding-up or dissolution, or if a receiver, administrator or other similar official of itself or all or any substantial part of its property is appointed, or if an order of any court is entered approving any petition filed by or against it under the provisions of any applicable bankruptcy or insolvency laws, or if any public officer takes charge or control of it or its property or affairs for the purpose of rehabilitation, conservation or liquidation; or (ii) it fails duly to perform any act required to be performed by it under this Deed and the Issuer gives it notice that it intends to appoint a replacement disposal agent.

9.5.3 In accordance with the Conditions the Issuer shall give the Noteholders, the Trustee, Standard & Poor's Rating Services, a division of the McGraw-Hill Companies ("S&P") and the Issuing and Paying Agent at least 30 days' notice of any such proposed resignation or termination or, where the appointment is terminated forthwith in accordance with this Clause, shall give notice as soon as possible after such termination.

9.5.4 Any organisation into which the Disposal Agent may be merged or converted or with which the Disposal Agent may be consolidated or which results from any merger,

conversion or consolidation ("**Merger**") to which the Disposal Agent shall be a party shall, to the extent permitted by applicable law, be the successor disposal agent under this Deed without any further formality. Notice of any such Merger shall forthwith be given to the parties hereto. In addition, the Disposal Agent may transfer all of its rights and obligations to any organisation to which the Disposal Agent transfers all or substantially all of the Disposal Agent's assets and business and that assumes such obligations. Upon any such transfer and assumption of obligations, the Disposal Agent shall be relieved of and fully discharged from all obligations under this Deed, whether such obligations arose before or after such transfer and assumption.

## 10    Appointment of Calculation Agent

10.1    The Issuer hereby appoints the Calculation Agent to act as calculation agent for the Notes on the terms of, and as if it were expressed to be a party (as Calculation Agent) to, the Agency Agreement. This appointment relates only to the Notes and not to other issues of other obligations under the Programme.

10.2    The Calculation Agent accepts its appointment as Calculation Agent on the terms set out herein.

10.3    The Trustee consents to the appointment of the Calculation Agent as Calculation Agent relating to the Notes.

10.4    Each Noteholder and the Issuing and Paying Agent may request that the Calculation Agent shall, as soon as practicable, deliver to or to the order of such Noteholder or the Issuing and Paying Agent, as the case may be, reasonable information as to the manner of, and the bases and assumptions upon which, amounts have been calculated pursuant to the Conditions.

10.5    Upon notification from the Custodian that there has been a material amendment to the terms and conditions of the Collateral, the Calculation Agent will notify S&P of such material amendment.

## 11    Notices

All notices to be given in connection with the Notes shall be given or made by facsimile transmission or letter (by first class post) and shall be deemed to be delivered on receipt (when delivered in person), upon transmission (when made by facsimile transmission) and seven business days after the date of posting (if posted by first class post). The relevant addresses for notices are set out in Schedule 2.

## 12    Offering Circular Supplement

The parties to this Deed acknowledge that the form of Offering Circular Supplement set out in Schedule 2 hereto may be amended after the date of this Deed in connection with, amongst other things, the listing of the Notes on the Irish Stock Exchange. No such amendment may amend the Conditions unless made in accordance with Condition 12.

## 13    Contracts (Rights of Third Parties) Act 1999

A person who is not party to this Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Deed except that and to the extent (if any) that this Deed expressly provides for that Act to apply to any of its terms.

## 14  Governing Law and Jurisdiction

**14.1**  Governing Law: This Deed shall be governed by and construed in accordance with English law.

**14.2**  Jurisdiction: The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Deed, the Principal Trust Deed or the Notes and accordingly any legal action or proceedings arising out of or in connection with this Deed, the Principal Trust Deed or the Notes ("Proceedings") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties to this Deed and the holders of Notes, and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

**14.3**  Service of Process: The Issuer irrevocably appoints Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LM to receive, for it and on its behalf, service of process in any Proceedings in England. Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason its process agent ceases to be able to act as such or no longer has an address in England, the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the parties hereto, and to deliver to the parties hereto a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.

**In witness** whereof this Deed has been executed as a deed as of the date stated at the beginning.

SIGNED, SEALED AND DELIVERED for and on behalf of Saphir Finance Public
Limited Company

by

its lawfully appointed attorney:

in the presence of:

Witness signature:

Address:

Occupation:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED** (as Trustee)
By:

**JPMORGAN CHASE BANK, LONDON BRANCH** (as Issuing and Paying Agent, and Custodian)
By:

**J.P. MORGAN BANK (IRELAND) PLC**
By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (as Calculation Agent, Disposal Agent and Dealer)
By:

**LEHMAN BROTHERS SPECIAL FINANCING, INC.** (as Swap Counterparty)
By:

# EXHIBIT C

Dated 17 March 2006

# SAPHIR FINANCE PUBLIC LIMITED COMPANY

and

# J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED

and

# JPMORGAN CHASE BANK, N.A.

and

# J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED

and

# J.P. MORGAN BANK (IRELAND) PLC

and

# LEHMAN BROTHERS SPECIAL FINANCING INC.

and

# LEHMAN BROTHERS INTERNATIONAL (EUROPE)

# SUPPLEMENTAL TRUST DEED AND DRAWDOWN AGREEMENT

in respect of

Saphir Finance Public Limited Company Series 2006-5 AUD50,000,000 Synthetic Portfolio Notes due 2011 and extendable up to 2016
issued pursuant to the
Multi-Issuer Secured Obligation Programme

arranged by
**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters

10th Floor, Alexandra House
Chater Road
Hong Kong

Telephone (852) 2842 4888
Facsimile (852) 2810 8133/2810 1695

Ref ACM/KKYI

**This Deed** is made on 17 March 2006 **between:**

(1)     **SAPHIR FINANCE PUBLIC LIMITED COMPANY** (the "**Issuer**");

(2)     **J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED** (the "**Trustee**");

(3)     **JPMORGAN CHASE BANK, N.A.** (in its capacity as issuing and paying agent, the "**Issuing and Paying Agent**" and in its capacity as custodian, the "**Custodian**");

(4)     **J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED** (in its capacity as Australian paying agent, the "**Australian Paying Agent**" and in its capacity as registrar, the "**Registrar**");

(5)     **J.P. MORGAN BANK (IRELAND) PLC** (in its capacity as Irish paying agent, the "**Irish Paying Agent**" and, together with the Australian Paying Agent, the "**Paying Agents**" and, together with the Issuing and Paying Agent and the Australian Paying Agent, the "**Agents**");

(6)     **LEHMAN BROTHERS SPECIAL FINANCING INC.** (in its capacity as swap counterparty, the "**Swap Counterparty**");

(7)     **LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (in its capacity as calculation agent, the "**Calculation Agent**", in its capacity as disposal agent, the "**Disposal Agent**" and, in its capacity as dealer under the Programme, the "**Dealer**").

**Whereas:**

(A)     Dante Finance Public Limited Company ("**Dante**") and the Trustee are parties to a principal trust deed dated 10 October 2002, as amended and restated on 22 July 2005, to which the Issuer has acceded pursuant to a Deed of Accession dated 22 July 2005, as amended and restated on 30 January 2004 (the "**Accession Deed**") establishing a programme for the issuance from time to time of secured notes (the principal trust deed dated 10 October 2002, as amended and restated on 22 July 2005, as acceded to by the Issuer pursuant to the Accession Deed, the "**Principal Trust Deed**").

(B)     Pursuant to Clause 2.7 of the Principal Trust Deed, the Issuer has authorised and determined to issue its Series 2006-5 AUD50,000,000 Synthetic Portfolio Notes due 2011 extendable up to 2016 to be constituted and secured as set out below.

(C)     The parties hereto have each resolved to enter into this Deed for the purposes set out below. For the avoidance of doubt each party's obligation is several.

**Now this deed witnesses and it is hereby declared** as follows:

## SECTION I: DETAILS OF THE TRANSACTION

**1**    **The Drawdown**

**1.1**    **Description of the Notes:**

        The Notes:                         Credit-Linked Synthetic Portfolio Notes

        Principal Amount:                    AUD50,000,000

**1.2**    **Process Agent Appointment Information:**

        Relevant Agreements:               This Deed
                                       The Swap Agreement
                                       The Agency and Registry Agreement

| 1.3 | **Details of Swap Agreement:** | |
|---|---|---|
| | Counterparties: | Issuer, Swap Counterparty |
| | Master Agreement: | ISDA Master Agreement dated 10 October 2002, as amended and restated on 22 July 2005, between Dante and the Swap Counterparty |
| | Transaction Type: | Credit Default Swap Transaction |
| | Effective Date | 17 March 2006 |
| 1.4 | **Collateral:** | |
| | The Initial Collateral: | |
| | | The Collateral will comprise: |
| | | AUD50,000,000 in principal amount of an issue of AUD50,000,000 Floating Rate Notes due 2016 by the Collateral Issuer on 17 March 2006 under its euro medium term note programme (ISIN: XS0247983058). |
| | Collateral Issuer: | The Royal Bank of Scotland plc |
| | Custodian Account for the transfer of the Collateral: | JP Morgan Chase Bank, N.A., Euroclear Account No 22066 |

# SECTION II: PROVISIONS SUPPLEMENTAL TO THE PRINCIPAL TRUST DEED AND THE AGENCY AGREEMENT

## 2    Definitions

**2.1    Principal Trust Deed:** Expressions defined in the Principal Trust Deed and the Conditions shall have the same meanings when used herein save to the extent supplemented or modified hereby.

**2.2    Additional Definitions:** The following expressions shall have the following meanings:

"**Agency and Registry Agreement**" means the agreement dated 17 March 2005 between the Issuer, the Australian Paying Agent, the Registrar and the Trustee;

"**Agency Agreement**" means the agency agreement dated 10 October 2002, as amended and restated on 22 July 2005, between the Issuing and Paying Agent and others in respect of the Programme as further amended by this Deed;

"**Collateral**" means the Initial Collateral described in Section I of this Deed (together with, for the avoidance of doubt, any interest accrued thereon up to and including the Issue Date) to be transferred to the Custodian Account pursuant to this Deed and held subject to the charges securing the Notes;

"**Collection Account**" means the interest bearing account established with the Custodian in the name of the Issuer;

"**Conditions**" means the terms and conditions of the Notes in the form set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed;

"**Custodian Account**" means the account described as such in Section I of this Deed;

"**Issue Date**" means the date (expected to be the date of this Deed) on which the Notes constituted hereby are issued by the Issuer;

"**Mortgaged Property**" means the assets and/or agreements from time to time charged in favour of the Trustee for the purpose of securing the Notes;

"**Notes**" means the Notes of the Issuer described in Section I of this Deed, constituted and secured by this Deed or the amount of them for the time being outstanding;

"**Obligation**" means an obligation and duty of the Issuer under the Trust Deed, each Note, the Agency Agreement, the Agency and Registry Agreement and the Swap Agreement;

"**Principal Amount**" means the principal amount of the Notes as set out in Section I of this Deed; and

"**Purchase Price**", in respect of the purchase of the Collateral, means such valuable consideration as is agreed separately between the Dealer and the Issuer;

"**Series Prospectus**" means the Series Prospectus specifying the relevant issue details of the Notes, the form of which appears as Schedule 2 to this Deed; and

"**Swap Agreement**" means the ISDA Swap Agreement described in Section I of this Deed, comprising the Master Agreement (including the Schedule thereto) (the "**ISDA Master**") and a confirmation relating to the Notes with an effective date of the Effective Date and the guarantee of the obligations of the Swap Counterparty given by Lehman Brothers Holdings Inc. (the "**Swap Guarantee**").

2.3 **Definitions in Principal Trust Deed**: References in the Principal Trust Deed to the "Securities" shall be construed as references to the Collateral.

2.4 **Incorporation by Reference**: Except as otherwise provided herein, the terms of the Principal Trust Deed shall apply to this Deed as if they were set out herein and the Principal Trust Deed shall be read and construed, in relation to the Notes, as one document with this Deed. For the avoidance of doubt, the conditions set out in Schedule 2 Part C to the Principal Trust Deed, as supplemented by Schedule 2 to this Deed shall constitute the Conditions of the Notes.

## 3  Amount and Status of Notes

3.1 **Amount:** The aggregate principal amount of the Notes is limited to AUD50,000,000.

3.2 **Status:** The Notes constitute secured and limited recourse obligations of the Issuer, secured as provided below.

## 4  Form of Notes:

The Notes are issued in registered form evidenced by inscription in the register maintained by the Registrar and not represented by a certificate subject to and with the benefit of the Conditions set out in the Principal Trust Deed as modified by the Series Prospectus set out in Schedule 2 to this Deed.

## 5  Security and Covenants

5.1 **Security:** The Issuer hereby creates security over the Mortgaged Property in accordance with the provisions of Clause 5 of the Principal Trust Deed.

5.2 **The Mortgaged Property:** Without prejudice to the generality of sub-Clause 5.1, the Issuer as sole beneficial owner with full title guarantee and as continuing security in favour of the Trustee hereby:

5.2.1 charges by way of first fixed charge the Collateral;

5.2.2 assigns by way of security all the Issuer's rights, title and interest attaching to or relating to the Collateral and all sums derived therefrom including, without limitation, any right to delivery thereof or to an equivalent number or nominal value thereof which arises in connection with any such assets being held in a clearing system or through a financial intermediary;

5.2.3 assigns by way of security all the Issuer's rights, title and interest against the Custodian, to the extent that they relate to the Collection Account, the Collateral or any other assets held by the Custodian in relation to the Notes and/or the Swap Agreement;

5.2.4 assigns by way of security all the Issuer's rights, title and interest against the Disposal Agent, to the extent that they relate to any Collateral or the proceeds of sale of any such Collateral;

5.2.5 assigns by way of security all the Issuer's rights, title and interest under the Agency Agreement and the Agency and Registry Agreement (the Issuer's "**Agency Rights**"), to the extent that they relate to the Notes and all sums derived therefrom;

5.2.6 assigns by way of security all the Issuer's rights, title and interest under the Swap Agreement and under the Swap Guarantee and in respect of any sums received thereunder (the Issuer's "**Swap Rights**"); and

5.2.7 charges by way of first fixed charge (a) all sums held by the Issuing and Paying Agent and/or the Custodian and/or the Registrar to meet payments due in respect of the obligations and duties of the Issuer under the Trust Deed, the Notes and the Swap Agreement (including, without limitation, all sums standing to the credit of the Collection Account) and (b) any sums received by the Issuing and Paying Agent and/or the Custodian and/or the Registrar under the Swap Agreement and under the Swap Guarantee (together with the Issuer's Agency Rights and Swap Rights, its "**Note Rights**").

5.3 **Benefit of Security:** Clause 5.2 of the Principal Trust Deed is hereby amended in relation to the issue of the Notes so that the security created pursuant to Clause 5.1 and 5.2 of this Deed is granted to the Trustee as trustee for itself, the holders of Notes, the Swap Counterparty, the Custodian, the Paying Agents and/or the Registrar as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes, (ii) for the performance of the Issuer's obligations (if any) under the Swap Agreement and (iii) for payment of all claims of the Custodian (for reimbursement in respect of payments properly made to any party of sums receivable in respect of the Collateral in discharge of an Obligation) and (iv) for the payment of all claims of the Paying Agents and/or the Registrar (for reimbursement in respect of payments properly made to any person in discharge of an Obligation).

None of the Swap Counterparty, the Custodian, the Registrar nor any of the Paying Agents shall benefit from the security in respect of which it is itself the party that owes an obligation to the Issuer pursuant to the Swap Agreement, the Agency Agreement or the Agency and Registry Agreement.

5.4 **Release of Mortgaged Property:** The Trustee shall release from such charges created pursuant to this Deed:

> 5.4.1 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that (i) payment or delivery of the same may be obtained and duly paid or delivered to the Swap Counterparty under the terms of the Swap Agreement and/or to the holders of Notes or (ii) such part of the Mortgaged Property may be disposed of by the Disposal Agent on behalf of the Issuer in accordance with the terms of this Deed;

> 5.4.2 any part of the Mortgaged Property when the same becomes payable or deliverable to the extent that the Swap Counterparty exercises its rights under the Swap Agreement to exchange any Mortgaged Property pursuant to the terms of the Swap Agreement and the Swap Counterparty elects for such Mortgaged Property to be delivered to, or to the order of, the Swap Counterparty;

> 5.4.3 such sums as arise under the Issuer's Note Rights to the intent that payment of all sums due under the Trust Deed be duly made; and

> 5.4.4 such sums as arise under the Issuer's Swap Rights to the intent that payment of all sums and delivery of all amounts under the Swap Agreement be duly made.

5.5 **Application of Moneys Received:** The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows:

> 5.5.1 Subject to the amendment in Clause 5.5.2 below, "Swap Counterparty Priority" shall apply unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply.

> 5.5.2 Clause 6.2(i)(b) of the Principal Trust Deed shall be amended to read as follows:

> > "secondly, in payment or satisfaction of the fees, costs, charges, expenses and liabilities incurred by the Paying Agents and/or the Registrar and/or the Transfer Agents and/or the Calculation Agent and/or the Disposal Agent and/or the Custodian;

> 5.5.3 For the purposes of Clause 6.2(i) of the Principal Trust Deed, references to "Pricing Supplement" shall be read as references to "Series Prospectus".

5.6 **Payments:** The Issuer and the Issuing and Paying Agent hereby agree in accordance with the provisions of Clause 4.1 of the Agency Agreement that payments in respect of the Notes shall be made on a "same-day" basis, and that the provisions of Clause 4.1.1 of the Agency Agreement apply so that the Issuer shall transfer the amounts required in respect of any particular payment on the date on which that payment in respect of the Notes becomes due.

5.7 **Collateral:** The Issuer confirms that it has made arrangements for the Initial Collateral to be delivered to or to the order of the Custodian on or before the date hereof. The Custodian agrees to notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral.

5.8 **Covenant to pay:** The Trustee hereby agrees to hold the covenant set out in Clause 2.3 of the Principal Trust Deed on trust for the holders of the Notes according to their respective interests.

**5.9** **Covenants:** The Swap Counterparty covenants with the Trustee in the terms of Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.

**5.10** **Additional Covenant:** The Issuer covenants with the Trustee that upon receipt of the draft transaction agreements in respect of a subsequent Series of Notes it shall provide Standard & Poor's Rating Services, a division of McGraw-Hill Companies, Inc. ("**S&P**") with such draft transaction agreements prior to the issue date of such Series of Notes (whether or not the relevant Series of Notes is to be rated by S&P).

**5.11** **Notice and Acknowledgement:** The Trustee hereby gives notice and each of the Paying Agents, the Custodian, the Registrar, the Disposal Agent and the Swap Counterparty hereby acknowledges that it has notice of the assignments and security given by the Issuer pursuant to this Deed and each of the above parties together with the Trustee consent to any further assignments and security by the Issuer to any successor trustee under this Deed.

**5.12** **Agency Agreement:**

    **5.12.1** The Agency Agreement is hereby amended by the addition of Clause 15.16 of the following: "The Custodian agrees to open and maintain in its books cash and securities accounts for and on behalf of the Issuer to which amounts and securities transferred to the Issuer under the Swap Agreement will be credited and held subject to the Security in favour of the Trustee. The Issuer and the Trustee hereby authorise the Custodian and the Custodian hereby agrees to debit such accounts in accordance with the instructions of the Trustee except prior to any Event of Default or Potential Event of Default where they shall be debited in accordance with the instructions of the Issuer only".

    **5.12.2** The Agency Agreement is hereby amended in relation to the issue of the Notes by the addition of Clause 15.17 of the following: "On redemption of the Collateral, the Custodian shall arrange for the deposit into the Collection Account of the redemption proceeds of such Collateral".

## 6 Limited Recourse and Non Petition

The parties to this Deed and the holders of Notes shall have recourse only to sums derived from the Mortgaged Property, and the Trustee having realised the same, the parties to this Deed, the holders of Notes, or anyone acting on behalf of any of them shall not be entitled to take any further steps against the Issuer to recover any sum still unpaid and all sums due but still unpaid shall be extinguished. In particular, neither the parties to this Deed nor any holder of any Note shall be entitled to petition or take any other step for the winding up of the Issuer, nor shall any of them have any claim in respect of any sum arising in respect of the Mortgaged Property for any other Series.

## SECTION III: PROVISIONS RELATING TO THE DRAWDOWN

## 7 Issue of and Subscription for the Notes

**7.1** **Agreement to subscribe:** The Dealer agrees to subscribe and pay for the Notes in an amount equal to the Principal Amount and for a price equal to the issue price of the Notes in accordance with the terms of the Programme Agreement.

**7.2** **Agreement to issue:** The Issuer confirms its agreement to issue the Notes to the Dealer.

## 8    Sale of Collateral

**8.1    Agreement to sell and purchase**: The Dealer agrees to sell with full title guarantee, and the Issuer agrees to purchase, the Collateral for the Purchase Price on the Issue Date by delivery of the Collateral to, or to the order of, the Custodian in consideration of the payment of the Purchase Price on the Issue Date by the Issuer to, or to the order of, the Dealer. The Dealer and the Issuer acknowledge that it is their express intention that the transaction shall be a sale and it is not their intention that the sale and purchase of the Collateral shall be deemed to create in favour of the Issuer a mortgage, charge, pledge or any other security interest over such Collateral.

**8.2    Completion**: In respect of the sale and purchase of the Collateral, the Dealer and the Issuer confirm that completion of the sale and purchase shall take place on the Issue Date by:

   **8.2.1**    the transfer of such Collateral from the Dealer to or to the order of the Custodian; and

   **8.2.2**    payment of the Purchase Price in respect of the Collateral to or to the order of the Dealer;

**8.3    Representations and Warranties**: The Dealer and the Issuer represent and warrant to each other that:

   **8.3.1**    on the Issue Date and on the date of this Deed, it was and is duly incorporated and validly existing under the laws of the jurisdiction of its incorporation;

   **8.3.2**    on the Issue Date and in respect of the Collateral sold or bought on such date:

   (i)    it has the power to enter into the sale (in the case of the Dealer) or purchase (in the case of the Issuer) of such Collateral and has taken all necessary action to authorise such sale or (as the case may be) purchase; and

   (ii)    its obligation to sell (in the case of the Dealer) or buy (in the case of the Issuer) such Collateral constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application); and

   **8.3.3**    on the date of this Deed;

   (i)    it has the power to enter into this Deed and to perform its obligations hereunder in accordance with the terms and conditions hereof and has taken all necessary action to authorise the execution, delivery and performance of this Deed; and

   (ii)    this Deed constitutes its legal, valid, binding and enforceable obligations (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and, as to enforceability, subject to equitable principles of general application).

**8.4    Additional Representations and Warranties**: In respect of the sale of the Collateral by the Dealer on the Issue Date, the Dealer hereby represents and warrants to the Issuer that:

   **8.4.1**    the Dealer sells all rights, title and interest therein free and clear of all mortgages, pledges, liens, charges, assignments, security interests, options, equities (including, without limitation, rights of set-off or counterclaim) or any other encumbrances of any nature whatsoever (other than any claims of the clearing system (or its operator) through which such Collateral is held);

8.4.2 the Dealer is not, both prior to the sale of such Collateral nor will be as a result of such sale, unable to pay its debts as they fall due within the meaning of Section 123 of the Insolvency Act 1986;

8.4.3 (i) the Dealer is entering into such sale of the Collateral in good faith and for the purpose of carrying on its business, (ii) the Dealer considers such sale to be in its best interests and (iii) the Dealer has not entered into such sale of the Collateral in order to defraud its creditors; and

8.4.4 the sale of such Collateral is not made below fair market value

## 9 Disposal Agent

9.1 **Appointment**: The Issuer appoints the Disposal Agent as its agent for the purposes of arranging for the disposal or transfer of the Collateral or any part of it that is required to be disposed of or transferred pursuant to the Conditions or in order to meet its obligations under the Swap Agreement (the "**Affected Collateral**") on the following terms and conditions.

9.2 **Duties**: The Disposal Agent shall:

9.2.1 on any date (the "**Solicitation Date**") on which the Issuer becomes obliged under the Conditions or the Swap Agreement to sell the Affected Collateral, use its reasonable endeavours to solicit:

(i) offers from third parties (which, for the avoidance of doubt, may not include itself) ("**Offerors**") to purchase the Affected Collateral for settlement on a date no later than 5 Business Days after the Solicitation Date (the "**Disposal Date**"); and

(ii) quotations from such Offerors of the price at which each would be prepared to purchase the Affected Collateral on such terms;

9.2.2 as the Issuer's agent, arrange the sale of the Affected Collateral on the Issuer's behalf (the "**Sale**") for settlement on the Disposal Date to the Offeror which made the highest offer to purchase it (the "**Purchaser**"). The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Sale; and

9.2.3 as the Issuer's agent, arrange the transfer of the Affected Collateral on the Issuer's behalf (the "**Transfer**") for settlement on the Disposal Date to the Purchaser. The Issuer hereby authorises the Disposal Agent to give settlement instructions to the Custodian in connection with such Transfer.

If the Disposal Agent fails to take any action that it is required to take pursuant to this Deed, it shall forthwith notify the Issuer, S&P, the Trustee and the Issuing and Paying Agent in writing.

9.3 **Dealings in Collateral**: The Custodian may:

9.3.1 accept settlement instructions from the Disposal Agent in connection with the Sale or the Transfer;

9.3.2    upon the instruction of the Disposal Agent, accept delivery of the purchase moneys (if any) for the Affected Collateral from the Purchaser. Clause 15.8 of the Agency Agreement shall apply to such purchase moneys in payment to the Swap Counterparty in accordance with the terms of the Swap Agreement; and

9.3.3    deliver the Affected Collateral to, or for the account of, the recipient specified in the instruction of the Disposal Agent against, in the case of the sale of the Affected Collateral, such receipt of the purchase moneys.

The Swap Counterparty hereby agrees that, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement) and Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation of the Collateral (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

9.4    **General**: In acting under this Deed, the Disposal Agent:

9.4.1    may take such steps as it considers appropriate in order to effect an orderly sale of the Affected Collateral but may not delay arrangements of the sale beyond the Disposal Date in the hope of achieving a higher price and will not be liable to the Issuer or any party hereto merely because a higher price could have been obtained had the sale been delayed;

9.4.2    shall not be liable for any costs, charges, losses, damages, liabilities or expenses ("**Losses**") arising from or connected with the sale or from any act or omission in relation to the Affected Collateral or otherwise unless such Losses are caused by its own fraud, negligence, misconduct or wilful default;

9.4.3    shall not have any obligations towards or relationship of agency or trust with the Noteholders;

9.4.4    may consult on any legal matter any legal adviser selected by it, who may be an employee of or adviser to the Issuer, and it shall not be liable in respect of anything done or omitted to be done relating to that matter in good faith in accordance with that adviser's opinion;

9.4.5    shall not be liable in respect of anything done or suffered by it in reliance on a document it reasonably believed to be genuine and to have been signed by the proper parties or on information to which it should properly have regard and which it reasonably believed to be genuine and to have been originated by the proper parties; and

9.4.6    may acquire, hold or dispose of any Notes or other security (or any interest therein) of the Issuer or any other person, may enter into or be interested in any contract or transaction with any such person and may act on, or as depository, trustee or agent for, any committee or body of holders of any securities of any such person in each case with the same rights as it would have had if the Disposal Agent were not the Disposal Agent, and need not account for any profit.

9.5    **Changes In Disposal Agent**

9.5.1    The Disposal Agent may resign its appointment hereunder at any time by giving prior written notice to the Issuer (which notice shall not expire less than 30 days before or

after the Disposal Date). If the Disposal Agent is unable or unwilling or otherwise fails to act, the Issuer shall immediately appoint a leading bank or investment banking firm to act as its successor. Resignation by the Disposal Agent shall not take effect, nor may the Disposal Agent be removed (save as set out herein), until the Issuer has appointed a replacement disposal agent upon substantially the same terms. The Issuer agrees with the Disposal Agent that if, 10 days before the expiry of any notice under this Clause, the Issuer has not appointed a replacement disposal agent, the Disposal Agent shall be entitled, on behalf of the Issuer, to appoint a disposal agent in its place meeting the requirements set out above to which the Issuer shall have no reasonable objection.

9.5.2   The Issuer may forthwith terminate the appointment of the Disposal Agent if (i) at any time the Disposal Agent becomes incapable of acting, or is adjudged bankrupt or insolvent, or files a voluntary petition in bankruptcy or makes an assignment for the benefit of its creditors or consents to the appointment of a receiver, administrator or other similar official of all or any substantial part of its property or admits in writing its inability to pay or to meet its debts as they mature or suspends payment thereof, or if a resolution is passed or an order made for its winding-up or dissolution, or if a receiver, administrator or other similar official of itself or all or any substantial part of its property is appointed, or if an order of any court is entered approving any petition filed by or against it under the provisions of any applicable bankruptcy or insolvency laws, or if any public officer takes charge or control of it or its property or affairs for the purpose of rehabilitation, conservation or liquidation; or (ii) it fails duly to perform any act required to be performed by it under this Deed and the Issuer gives it notice that it intends to appoint a replacement disposal agent.

9.5.3   In accordance with the Conditions the Issuer shall give the Noteholders, S&P and the Issuing and Paying Agent at least 30 days' notice of any such proposed resignation or termination or, where the appointment is terminated forthwith in accordance with this Clause, shall give notice as soon as possible after such termination.

9.5.4   Any organisation into which the Disposal Agent may be merged or converted or with which the Disposal Agent may be consolidated or which results from any merger, conversion or consolidation ("**Merger**") to which the Disposal Agent shall be a party shall, to the extent permitted by applicable law, be the successor disposal agent under this Deed without any further formality. Notice of any such Merger shall forthwith be given to the parties hereto. In addition, the Disposal Agent may transfer all of its rights and obligations to any organisation to which the Disposal Agent transfers all or substantially all of the Disposal Agent's assets and business and that assumes such obligations. Upon any such transfer and assumption of obligations, the Disposal Agent shall be relieved of and fully discharged from all obligations under this Deed, whether such obligations arose before or after such transfer and assumption.

## 10   Appointment of Calculation Agent

10.1   The Issuer hereby appoints the Calculation Agent to act as calculation agent for the Notes on the terms of, and as if it were expressed to be a party (as Calculation Agent) to, the Agency Agreement. This appointment relates only to the Notes and not to other issues of other obligations under the Programme.

10.2   The Calculation Agent accepts its appointment as Calculation Agent on the terms set out herein.

**10.3**   The Trustee consents to the appointment of the Calculation Agent as Calculation Agent relating to the Notes.

**10.4**   Each Noteholder and the Issuing and Paying Agent may request that the Calculation Agent shall, as soon as practicable, deliver to or to the order of such Noteholder or the Issuing and Paying Agent, as the case may be, reasonable information as to the manner of, and the bases and assumptions upon which, amounts have been calculated pursuant to the Conditions.

**10.5**   Upon notification from the Custodian that there has been a material amendment to the terms and conditions of the Collateral, the Calculation Agent will notify S&P of such material amendment.

## 11   Notices

All notices to be given in connection with the Notes shall be given or made by facsimile transmission or letter (by first class post) and shall be deemed to be delivered on receipt (when delivered in person), upon transmission (when made by facsimile transmission) and seven business days after the date of posting (if posted by first class post). The relevant addresses for notices are set out in Schedule 1 to this Deed.

## 12   Series Prospectus

The parties to this Deed acknowledge that the form of Series Prospectus set out in Schedule 2 hereto may be amended after the date of this Deed in connection with, amongst other things, the listing of the Notes on the Irish Stock Exchange. No such amendment may amend the Conditions unless made in accordance with Condition 12.

## 13   Contracts (Rights of Third Parties) Act 1999

A person who is not party to this Deed has no right, whether under the Contracts (Rights of Third Parties) Act 1999 or otherwise, to enforce any term of this Deed except that and to the extent (if any) that this Deed expressly provides for that Act to apply to any of its terms.

## 14   Governing Law and Jurisdiction

**14.1**   **Governing Law:** This Deed shall be governed by and construed in accordance with English law.

**14.2**   **Jurisdiction:** The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Deed, the Principal Trust Deed or the Notes and accordingly any legal action or proceedings arising out of or in connection with this Deed, the Principal Trust Deed or the Notes ("**Proceedings**") may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties to this Deed and the holders of Notes, and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).

**14.3    Service of Process:** The Issuer irrevocably appoints Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE to receive, for it and on its behalf, service of process in any Proceedings in England. Such service shall be deemed completed on delivery to such process agent (whether or not it is forwarded to and received by the Issuer). If for any reason its process agent ceases to be able to act as such or no longer has an address in England, the Issuer irrevocably agrees to appoint a substitute process agent acceptable to the parties hereto, and to deliver to the parties hereto a copy of the new agent's acceptance of that appointment, within 30 days. Nothing shall affect the right to serve process in any other manner permitted by law.

This deed is delivered the day and year first before written

EXECUTED AS A DEED BY
SAPHIR FINANCE PUBLIC LIMITED COMPANY

by

Its lawfully appointed attorney:

In the presence of:  SIMON FREITAG

Witness signature:  S. L. Freitag

Address:

Occupation:

J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (as Trustee)
By:


JPMORGAN CHASE BANK, N.A. (as Issuing and Paying Agent and Custodian)
By:


J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED (as Australian Paying Agent and
Registrar)
By:


J.P. MORGAN BANK (IRELAND) PLC (as Irish Paying Agent)
By:


LEHMAN BROTHERS INTERNATIONAL (EUROPE) (as Calculation Agent, Disposal Agent and
Dealer)
By:

This deed is delivered the day and year first before written

EXECUTED AS A DEED BY
SAPHIR FINANCE PUBLIC LIMITED COMPANY

by

its lawfully appointed attorney:

In the presence of:

Witness signature:

Address:

Occupation:

*2497*

J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED (as Trustee)
By:

JPMORGAN CHASE BANK, N.A. (as Issuing and Paying Agent and Custodian)
By:

J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED (as Australian Paying Agent and Registrar)
By:

J.P. MORGAN BANK (IRELAND) PLC (as Irish Paying Agent)
By:

LEHMAN BROTHERS INTERNATIONAL (EUROPE) (as Calculation Agent, Disposal Agent and Dealer)
By:

**This deed is delivered the day and year first before written**

**EXECUTED AS A DEED BY**
**SAPHIR FINANCE PUBLIC LIMITED COMPANY**

by

its lawfully appointed attorney:

in the presence of:

Witness signature:

Address:

Occupation:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED** (as Trustee)
By:

**JPMORGAN CHASE BANK, N.A.** (as Issuing and Paying Agent and Custodian)
By:

**J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED** (as Australian Paying Agent and Registrar)
By:

**J.P. MORGAN BANK (IRELAND) PLC** (as Irish Paying Agent)
By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (as Calculation Agent, Disposal Agent and Dealer)
By:

This deed is delivered the day and year first before written

**EXECUTED AS A DEED BY**
**SAPHIR FINANCE PUBLIC LIMITED COMPANY**

by

its lawfully appointed attorney:

In the presence of:

Witness signature:

Address:

Occupation:

**J.P. MORGAN CORPORATE TRUSTEE SERVICES LIMITED** (as Trustee)
By:

**JPMORGAN CHASE BANK, N.A.** (as Issuing and Paying Agent and Custodian)
By:

**J.P. MORGAN INSTITUTIONAL SERVICES AUSTRALIA LIMITED** (as Australian Paying Agent and Registrar)
By:

**J.P. MORGAN BANK (IRELAND) PLC** (as Irish Paying Agent)
By:

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (as Calculation Agent, Disposal Agent and Dealer)
By:

ANDREW MACLEAN

Authorised Signatory

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** (as Calculation Agent, Disposal Agent and Dealer)

By:

**EXECUTED AS A DEED BY**

**LEHMAN BROTHERS SPECIAL FINANCING INC.** (as Swap Counterparty)

By:

# Schedule 1

## Addresses for Service and Notices

**Issuer:**

AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

| | |
|---|---|
| Tel: | 00 353 1 874 0777 |
| Fax: | 00 353 1 874 3050 |
| Attn: | The Directors |

**Lehman Brothers International (Europe):**

25 Bank Street
London E14 5LE

| | |
|---|---|
| Fax: | +44 20 7260 1266 |
| Attn: | General Counsel |

**Lehman Brothers Special Financing Inc.**

745 Seventh Avenue
New York
NY10019

| | |
|---|---|
| Fax: | +1646 758 1670 |
| Attn: | General Counsel |

**Issuing and Paying Agent and Custodian:**

JPMorgan Chase Bank, N.A.
Trinity Tower
9 Thomas More Street
London E1W 1YT

| | |
|---|---|
| Tel: | +44 1 202 347430 |
| Telex: | 8954681 CMB G |
| Fax: | +44 1 202 347438 |
| Attn: | Manager, Institutional Trust Services |

**Australian Paying Agent and Registrar:**

J.P.Morgan Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 32 Grosvenor Place
225 George Street
Sydney
New South Wales 2000
Australia

**Irish Paying Agent:**

J.P. Morgan Bank (Ireland) PLC
JPMorgan House
International Financial Centre
Dublin 1

| | |
|---|---|
| Tel: | +353 1612 3000 |
| Fax: | +353 1612 3123 |
| Attn: | Manager, Institutional Trust Services |

**Trustee:**

J.P. Morgan Corporate Trustee Services Limited
Trinity Tower

9 Thomas More Street
London E1W 1YT

| | |
|---|---|
| Tel: | + 44 (0)20 7777 5422 |
| Telex: | 8954681 CMB G |
| Fax: | + 44 (0)20 7777 5410/20 |
| Attn: | Manager, Trust Administration |

**Process Agent:**

25 Bank Street
London E14 5LE

| | |
|---|---|
| Fax: | 00 353 1 874 3050 |
| Attn: | The Directors |

**Standard & Poor's Ratings Services:**

Suite 3601, 36th Floor
Edinburgh Tower, The Landmark
15 Queen's Road Central
Hong Kong

| | |
|---|---|
| Fax: | 852 2533 3566 |
| Attn: | S&P Surveillance |

**SERIES PROSPECTUS**

**SAPHIR FINANCE PUBLIC LIMITED COMPANY**
*(incorporated with limited liability in Ireland)*
**SERIES NO: 2006 – 5**
**AUD 50,000,000**
**SYNTHETIC PORTFOLIO NOTES DUE 2011 AND EXTENDABLE UP TO 2016**

**Issue Price: 100 per cent.**

**issued pursuant to the**
**Multi-Issuer**
**Secured Obligation Programme**
**arranged by**

**LEHMAN BROTHERS INTERNATIONAL (EUROPE)**

Linklaters
ACM/AMIS

The date of this Series Prospectus 16 March 2006

This Series Prospectus relating to the issue of Series 2006-5 AUD50,000,000 Synthetic Portfolio Notes due 2011 and extendable up to 2016 (the "**Notes**") by Saphir Finance Public Limited Company (the "**Issuer**") should be read in conjunction with the base prospectus dated 22 July 2005 (the "**Base Prospectus**") and together with "**Series Prospectus**"), which is deemed to be incorporated herein by reference.

This Series Prospectus sets out the specific terms and conditions of the Notes and certain information relating thereto. This Series Prospectus incorporates by reference the base terms and conditions of the Notes set out in full in the Base Prospectus, which are supplemented by the specific terms and conditions set out under "Terms and Conditions of the Notes" below.

The obligations of the Issuer under the Notes will be secured as described in "Security Arrangements".

Subject as set out below, the Issuer (whose registered address appears on page 85 of this Series Prospectus) accepts responsibility for the information contained in this Series Prospectus. To the best of the Issuer's knowledge and belief (having taken all reasonable care to ensure that such is the case), the information contained in this document is in accordance with the facts and does not omit anything likely to affect the import of such information.

The delivery of the Series Prospectus at any time does not imply that any information contained therein is correct at any time subsequent to the date hereof. The information on page 24 in relation to the Collateral (as defined herein), the information on page 38 in relation to the Reference Registries (as defined herein), and the information on page 83 in relation to the Swap Counterparty and the Swap Guarantor has, in each case, been accurately extracted from publicly available information. So far as the Issuer is aware and is able to ascertain from information published in relation to the Reference Registries, the Collateral, the Swap Counterparty and the Swap Guarantor, no facts have been omitted which would render the reproduced information misleading.

Application may be made by the Issuer, through its listing agent A&L Listing Limited, to the Irish Financial Services Regulatory Authority ("**IFSRA**"), as competent authority under Directive 2003/71/EC, for this Series Prospectus to be approved. Application may also be made to The Irish Stock Exchange Limited (the "**Irish Stock Exchange**") for the Notes to be admitted the Official List and to trading on the regulated market on the Irish Stock Exchange. Such market is a regulated market for the purposes of the Investment Services Directive 93/22/EEC.

This Series Prospectus constitutes a prospectus for the purposes of Regulation 13 of the Prospectus (Directive 2003/71/EC) Regulations 2005 and Article 5 of Directive 2003/71/EC (the "**Prospectus Directive**") and for the purpose of giving information with regard to the Issuer which is necessary to enable investors to make an informed assessment of the assets and liabilities, financial position, profit and losses and prospects of the Issuer. This Series Prospectus is to be read in conjunction with all documents which are deemed to be incorporated herein by reference.

The Notes are expected on issue to be assigned a rating of "AAp N.R.i." in respect of payment of principal only by Standard & Poor's Rating Services, a division of The McGraw Hill Companies, Inc. ("**S&P**"). However, there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to S&P's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. The occurrence of Credit Events and/or a suspension, reduction or withdrawal of the rating assigned to any Reference Entity may result in a severe reduction of the rating assigned to the Notes.

The Arranger makes no representation, recommendation or warranty, express or implied, regarding the accuracy, adequacy, reasonableness or completeness of the information contained herein or in any further information, notice or other document which may at any time be supplied in connection with the Notes and accepts no responsibility or liability therefor.

The Notes will be issued on the terms set out in this Series Prospectus and should be read together with the Base Prospectus.

This Series Prospectus does not constitute, and may not be used for the purposes of, an offer or solicitation by anyone in any jurisdiction in which such offer or solicitation is not authorised or to any person to whom it is unlawful to make such offer or solicitation, and no action is being taken to permit an offering of the Notes or the distribution of this Series Prospectus or any other offering material in any jurisdiction where such action is required.

In this Series Prospectus, references to "**euro**", "**EUR**" and "**€**" refer to the currency introduced from the third stage of European economic and monetary union pursuant to the Treaty establishing the European Community, as amended by the Treaty on European Union, references to "**AUD**" and "**A$**" are to Australian dollars and references to "**USD**", "**US$**" and "**U.S. dollars**" are to United States dollars.

## DOCUMENTS DEEMED TO BE INCORPORATED BY REFERENCE

The provisions of the Base Prospectus which constitutes a base prospectus for the purposes of the Prospectus Directive shall be deemed to be incorporated into and form part of this Series Prospectus in its entirety, save that any statement contained in the Base Prospectus shall be deemed to be modified or superseded for the purpose of this Series Prospectus to the extent that a statement contained herein modifies or supersedes such earlier statement (whether expressly, by implication or otherwise). Any statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Series Prospectus. This Series Prospectus must be read in conjunction with the Base Prospectus and full information on the Issuer and the offer of the Notes is only available on the basis of the combination of the provisions set out within this document and the Base Prospectus.

The Base Prospectus is available for viewing at, and copies may be obtained free of charge from, the office of the Irish Paying Agent specified below.

# Table of Contents

Page

RISK FACTORS ..................................................................................................................6

TERMS AND CONDITIONS OF THE NOTES .....................................................................8

ANNEX 1 - USE OF PROCEEDS .......................................................................................23

ANNEX 2 - THE COLLATERAL .........................................................................................24

ANNEX 3 – FORM OF SWAP CONFIRMATION ...............................................................25

ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY AND THE SWAP GUARANTOR ...........85

GENERAL INFORMATION ................................................................................................86

## RISK FACTORS

*The purchase of Notes may involve substantial risks and is suitable only for sophisticated investors who have the knowledge and experience in financial and business matters necessary to enable them to evaluate the risks and the merits of an investment in the Notes. Before making an investment decision, prospective purchasers of Notes should consider carefully, in the light of their own financial circumstances and investment objectives, all the information set forth in this Series Prospectus, including the Base Prospectus.*

*The Issuer does not represent that the statements below regarding the risk of holding any Notes are exhaustive and the Issuer may be unable to pay interest, principal or other amounts on or in connection with any Notes for reasons other than those described below. The Issuer and the Dealers disclaim any responsibility to advise prospective investors of such risks as they exist at the date of this Series Prospectus or as they change from time to time.*

*The attention of prospective investors is also drawn to the section headed "Risk Factors" in the Base Prospectus.*

**Credit Linked Notes**

**Investors should note that the Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry. The performance of any investment in the Notes will be dependent on the Reference Entities from time to time comprised in the Reference Registry.**

**Credit Events**

The likelihood of a Credit Event occurring in respect of a Reference Entity will generally fluctuate with, among other things, the financial condition and other characteristics of the Reference Entity, general economic conditions, the condition of certain financial markets, political events, developments or trends in any particular industry and changes in prevailing interest rates.

Purchasers of Notes should conduct such independent investigation and analysis regarding the Issuer, the security arrangements and the Notes as they deem appropriate to evaluate the merits and risks of an investment in the Notes. In particular, purchasers should note that the credit risk of the Notes includes that of the Collateral, the Swap Counterparty, the Swap Guarantor and the Reference Entities and that the Notes allow a purchaser to obtain the stated coupon in exchange for assuming such credit risk. The coupon and Outstanding Principal Amount may reduce if Credit Events occur and in certain circumstances the Notes may redeem at zero.

Based on a Subordination Amount of AUD195,000,000 and on the Principal Reference Registry as set out on page 38 herein and the Reference Entity Notional Amount of each Reference Entity as set out therein, upon the occurrence of 7 Credit Events, assuming a recovery rate of 35%, the Outstanding Principal Amount of the Notes will begin to reduce. Upon the occurrence of 8 Credit Events, assuming a recovery rate of 35%, the Outstanding Principal Amount of the Notes will be reduced to zero.

**Limited information regarding the Reference Entities**

None of the Issuer, the Trustee nor the Noteholders will have any right, except as specifically required under the terms of the Swap Agreement and the Notes, to receive any information regarding any Reference Entity. The Dealer, the Swap Counterparty or their affiliates may have acquired, or during the term of the Notes may acquire, confidential information with respect to any Reference Entity and it shall not be under any duty to disclose such confidential information to any Noteholder. None of the Issuer, the Swap Counterparty, the Trustee or any other person on their behalf makes any representation or warranty, express or implied, as to the credit quality of the Reference Entities.

**No Legal or Beneficial Interest in Obligations of the Reference Entities**

Under the Swap Agreement, the Issuer will have a contractual relationship only with the Swap Counterparty and not with any Reference Entities. Consequently, the Swap Agreement will not constitute a purchase or other acquisition or assignment of any interest in the Reference Entities. The Issuer and the Trustee will have rights solely against the Swap Counterparty and will have no recourse against the Reference Entities. None of the Issuer, the Swap Counterparty, the Trustee or any other person on their behalf has undertaken any legal due diligence in respect of the Reference Entity.

**Interest on Early Redemption**

If the Notes become subject to Early Redemption, then interest will cease to accrue on the Notes on the date of redemption and no further interest shall be payable to Noteholders after the Early Redemption Date.

## TERMS AND CONDITIONS OF THE NOTES

The terms of the Notes and additional provisions relating to their issue are as follows.

Capitalised terms used but not otherwise defined in these Conditions shall have the meanings given to such terms in the Swap Confirmation, the form of which is set out in Annex 3 hereto.

The Notes are credit-linked to the Reference Entities for the time being comprised in the Reference Registry maintained by the Calculation Agent in accordance with the Swap Confirmation.

The Reference Registry in effect as of the Issue Date is set out in Schedule A to the Swap Confirmation.

| | | |
|---|---|---|
| 1 | Issuer: | Saphir Finance Public Limited Company. |
| 2 | Series No: | 2006-5. |
| 3 | Tranche No: | Not applicable. |
| 4 | ISIN (N.B. see paragraph 55 below for Common Code): | AU300SAPR014 |
| 5 | Currency: | Australian dollars. |
| 6 | Principal Amount of Tranche: | |

   (i)   Initial Principal Amount:

AUD 50,000,000.

The Aggregate Outstanding Principal Amount (as defined below) of the Notes is subject to reduction from time to time in accordance with the provisions set out below.

   (ii)   Reduction of Principal Amount:

If, at any time, the Swap Counterparty under the Swap Agreement determines that one or more Credit Events has or have occurred during the Credit Observation Period in the Principal Reference Portfolio with respect to a Reference Entity in the Principal Reference Portfolio, a Benchmark Obligation or the Obligations of such Reference Entity and the Conditions to Settlement with respect to such Credit Event have been satisfied by the Swap Counterparty, the aggregate Outstanding Principal Amount of the Notes (the "**Aggregate Outstanding Principal Amount**" of the Notes) will be reset by the Calculation Agent with effect from the relevant Event Determination Date with respect to such Credit Event(s) so as to equal:

(i)    the Initial Principal Amount of the Notes, minus;

(ii)    the amount (if any) by which the Cumulative Loss Amount (following calculation of the Cash Settlement Amount in respect of such Credit Event(s)) exceeds the Subordination Amount, subject to a minimum of zero and a maximum of the Loss Cap.

The "**Outstanding Principal Amount**" means, with respect to each Note at any time, an amount in AUD (rounded down

to the nearest AUD 1) equal to the Aggregate Outstanding Principal Amount of the Notes, divided by the total number of Notes outstanding as at such time, as determined by the Calculation Agent in its sole discretion.

The Calculation Agent hereunder shall determine the amount by which the Aggregate Outstanding Principal Amount is reduced and the date of such reduction .

The Calculation Agent shall promptly notify the Issuer, the Trustee, the Principal Paying Agent, S&P and the Swap Counterparty of any reduction of the Aggregate Outstanding Principal Amount of the Notes hereunder. Notwithstanding anything to the contrary contained in Condition 14, upon receipt of such notification from the Calculation Agent, the Principal Paying Agent shall promptly notify Noteholders of the same in accordance with the Conditions.

| 7 | Issue Date: | | 17 March 2006. |
|---|---|---|---|
| 8 | Form: | | |
| | (a) | Form of Notes | Registered. The Notes will be issued in registered uncertificated (or inscribed) form. They will be debt obligations of the Issuer which are constituted by, and owing under, the Trust Deed and take the form of entries on the Register to be maintained by the Registrar. |
| | (b) | Registrar | J.P. Morgan Institutional Services Australia Limited (ABN 48 002 916 396) appointed as registrar pursuant to an Agency and Registry Agreement dated on or about 17 March 2006 entered into between the Issuer, the Trustee, the Registrar or any other person appointed by the Issuer to establish and maintain the Register on the Issuer's behalf from time to time. |
| | (c) | Title | Title to the Registered Notes shall pass by registration in the Register. |
| | | | No certificate or other evidence of title will be issued to holders of the Notes unless the Issuer determines that certificates should be available or it is required to do so pursuant to any applicable law or regulation. |
| | (d) | Payments and Record Date | Notwithstanding the provisions of Condition 7(b), payments in respect of the Notes will be made to the persons whose names are entered in the Register as at 5.00pm (Sydney time) on the relevant Record Date. |
| | | | Payments to persons who hold Notes through a Clearing System will be made by transfer to their relevant account in accordance with the rules and regulations of the relevant Clearing System. |
| | | | If Notes are not lodged in a Clearing System, payments will be made to the account of the registered holder noted in the |

Register. If no account is notified, then payments will be made by cheque mailed on the Relevant Business Day immediately preceding the relevant payment date to the registered holder at its address appearing in the Register on the Record Date.

"**Clearing System**" means each of the settlement systems operated by Austraclear Limited (ABN 94 002 060 773) (the "**Austraclear System**"), Euroclear Bank S.A./N.V., as operator of the Euroclear system ("**Euroclear**") or Clearstream Banking société anonyme ("**Clearstream, Luxembourg**"), as the case may be.

"**Record Date**" means the eighth calendar day before a payment date.

For the purpose of the Notes only:

(e)  Details of any other additions *(in relation to paragraphs 8(a) to 8(d) above)*

(i)  The provisions of Conditions 1, 2 and 7 shall be amended and construed according to paragraphs 8(a) to 8(d) above. In case of any inconsistency between those Conditions and paragraphs 8(a) to 8(d) above, paragraphs 8(a) to 8(d) shall prevail.

(ii)  Condition 2(f) concerning closed periods immediately preceding each Record Date, shall, for the purposes of the Notes, be deleted and no such closed periods shall apply to the Notes.

(iii)  Notwithstanding Condition 12, the Conditions, the Trust Deed and the Agency Agreement may subsequently be amended by the Issuer without the consent of the Noteholders, to provide for the exchange of Notes in registered form for Notes in bearer form.

9   Denomination:                    AUD 100,000

10  Status:                          Secured and limited recourse obligations, as described under "Security Arrangements" below.

11  Interest Commencement Date:      17 March 2006.

12  Interest Rate:                   The product of (a) the Interest Ratio and (b) Floating Rate plus 3.00 per cent. per annum.

"**Interest Ratio**" means:

(a)  For the first twenty Interest Payment Dates:

(i)   100 per cent. if the number of Affected Reference Entities is less than two;

(ii)  80 per cent. if the number of Affected Reference Entities is two;

(iii) 60 per cent. if the number of Affected

Reference Entities is three;

(iv) 40 per cent. if the number of Affected Reference Entities is four;

(v) 20 per cent. if the number of Affected Reference Entities is five; and

(vi) zero if the number of Affected Reference Entities is six or more.

(b) For all the remaining Interest Payment Dates, the percentage determined in accordance with (a) above in respect of the 20th Interest Payment Date scheduled to fall on 17 March 2011.

Notwithstanding anything to the contrary in the Conditions, the amount payable in respect of any Interest Payment Date shall be calculated by the Calculation Agent on the relevant Interest Determination Date by calculating the product of (a) the relevant Interest Rate; (b) the Weighted Average Outstanding Principal Amount of such Note for the relevant Interest Accrual Period; and (c) the Day Count Fraction. For the purposes hereof:

"Affected Reference Entities" means (a) the number of Reference Entities in the Long Coupon Portfolio in respect of which an Event Determination Date has occurred less (b) the number of Reference Entities in the Short Coupon Portfolio in respect of which an Event Determination Date has occurred, each as of the relevant Interest Determination Date;

"Business Day" means a day (other than a Saturday or Sunday) on which commercial banks and foreign exchange markets settle payments in London, Sydney, New York and the TARGET System;

"Interest Determination Date" means, in respect of each Interest Payment Date, one Business Day immediately preceding such Interest Payment Date; and

"Weighted Average Outstanding Principal Amount" means, in respect of each Note in respect of each period for which such amount is calculated, the sum of the Outstanding Principal Amounts of such Note for each calendar day during such period, divided by the actual number of calendar days in such period.

| 13 | Interest Payment Date(s): | 17 March, 17 June, 17 September and 17 December in each year, commencing on 17 June 2006, subject in each case to adjustment in accordance with the Following Business Day Convention. |
| --- | --- | --- |
| 14 | Manner in which the Interest Rate is due to be determined (Floating Rate | ISDA Determination. |

Notes):

| 15 | Screen Rate Determination Condition 5(c) (ii): | Not applicable. |
| --- | --- | --- |
| 16 | ISDA Determination (Condition 5(c)(i)): | Applicable. |
| | (a) Floating Rate Option: | AUD-BBR-BBSW |
| | (b) Designated Maturity: | 3 (three) months. |
| | (c) Reset Date: | The first day of the Interest Accrual Period. |
| | (d) ISDA Definitions: | ISDA Definitions (as defined in Condition 5(c)(i)). |
| 17 | Margin (if applicable): | Not Applicable. |
| 18 | Rate Multiplier (if applicable): | Not applicable. |
| 19 | Maximum/Minimum Interest Rate (if applicable): | Not applicable. |
| 20 | Maximum/Minimum Instalment Amount (if applicable): | Not applicable. |
| 21 | Maximum/Minimum Redemption Amount (if applicable): | Not applicable. |
| 22 | Interest Amount (Fixed Rate Note or Variable Coupon Amount Note): | Not applicable. |
| 23 | Determination Date(s) (Condition 5(i)): | Not applicable. |
| 24 | Day Count Fraction: | Actual/365 (Fixed) |
| 25 | Interest Period Date(s) (if applicable): | Not applicable. |
| 26 | Maturity Date: | The earliest to occur of: |

(i) 17 March 2011 (the "**Legal Maturity Date**"), subject to (a) automatic annual extension for one year on the Legal Maturity Date and each anniversary thereof up to but excluding 17 March 2016 (each such new maturity date, scheduled to be 17 March 2012, 17 March 2013, 17 March 2014, 17 March 2015 and 17 March 2016, being an "**Extended Maturity Date**") unless the Issuer gives not more than 30 days nor less than 15 days' notice to the Noteholders prior to the Legal Maturity Date or an Extended Maturity Date (excluding the Extended Maturity Date occurring on 17 March 2016), as appropriate, to redeem the Notes in whole but not in part on the Legal Maturity Date or such Extended Maturity Date, as appropriate, and (b) adjustment in accordance with the Following Business Day Convention (the Legal Maturity Date or the final Extended Maturity Date, as the case may be, being the "**Scheduled Maturity Date**");

(ii)  the Early Redemption Date (as defined in paragraph 38); and

(iii)  the Zero Principal Amount Redemption Date.

For the purposes hereof:

**"Zero Principal Amount Redemption Date"** means the Event Determination Date with effect from which the Aggregate Outstanding Principal Amount is reduced to zero.

| | | |
|---|---|---|
| 27 | Redemption for Taxation Reasons permitted on days other than Interest Payment Dates: | Yes. |
| 28 | Amortisation Yield: | Not applicable. |
| 29 | Exchange (Condition 6(k)): | No. |
| 30 | Mandatory Partial Redemption (in accordance with Condition 6(c)): | For the purposes of the Notes only, Condition 6(c) shall be amended by the insertion of the following words after "payment default": |
| | | "(after the expiry of any grace period specified in the terms and conditions of the Collateral in existence as at the Issue Date)" |
| 31 | Instalment Date(s) (if applicable): | Not applicable. |
| 32 | Instalment Amount(s) (if applicable): | Not applicable. |
| 33 | Unmatured Coupons to become void upon early redemption: | Yes. |
| 34 | Talons to be attached to Notes and, if applicable, the number of Interest Payment Dates between the maturity of each Talon (if applicable): | Not applicable. |
| 35 | Business Day Jurisdictions for Condition 7(h) (jurisdictions required to be open for payment): | London, Sydney, New York and TARGET System. |
| 36 | Additional steps that may only be taken following approval by an Extraordinary Resolution in accordance with Condition 12(a) (if applicable): | Not applicable. |
| 37 | Additional Fungible Issues Permitted: | No. |
| 38 | Details of any other additions or variations to the Conditions (if applicable): | For the purposes of the Notes only: |
| | | Notwithstanding anything to the contrary contained in Conditions 6 and 10, upon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10 (the date of the relevant occurrence, as determined by the Calculation Agent in its sole discretion, being the "Early |

Redemption Event Date"), the Issuer shall forthwith notify the Trustee, S&P and the Noteholders informing them of the occurrence of such event giving notice of the date fixed for redemption, being the day falling six Business Days following the relevant Early Redemption Event Date (the "**Early Redemption Date**"). Upon the expiry of such notice, the Issuer shall redeem each Note at its Early Redemption Amount as set out in paragraph 44 below.

Condition 6(d)(ii) shall be amended to read as follows:

"If a Swap Agreement is terminated in whole for any reason (other than for the reason of a failure by the Swap Counterparty to make, when due, any payment of a Fixed Amount or an Event of Default by the Swap Counterparty under Conditions 5(a)(ii), 5(a)(vii) and 5(a)(viii) of the Swap Agreement or an Event of Default by the Issuer under Condition 5(a)(ii) of the Swap Agreement) then the Issuer shall forthwith give not more than 45 nor less than 15 days' notice (or such other notice period as indicated in the relevant Supplemental Trust Deed) to the Trustee, the Noteholders and the Swap Counterparty (which notice shall be irrevocable), and on the expiry of such notice shall redeem all but not some only of the Notes at their Early Redemption Amount together with any interest accrued to the date fixed for redemption. Such notice shall be given promptly upon the termination of the relevant Swap Agreement and such redemption made, unless the Trustee shall certify to the Issuer that it considers in its absolute discretion that it is in the best interests of the holders of the Notes that such notice and redemption be delayed or not given or made, as the case may be, or an Extraordinary Resolution of the holders of the Notes shall otherwise direct."

Condition 6(d)(iii) shall be added immediately following Condition 6(d)(ii) as follows:

"If a Swap Agreement is terminated in whole for the reason of a failure by the Swap Counterparty to make, when due, any payment of a Fixed Amount or an Event of Default by the Swap Counterparty under Conditions 5(a)(ii), 5(a)(vii) and 5(a)(viii) of the Swap Agreement or an Event of Default by the Issuer under Condition 5(a)(ii) of the Swap Agreement, then, unless the Notes are otherwise previously redeemed for any other reason or purchased or cancelled, the Issuer shall redeem all but not some only of the Notes on the Scheduled Maturity Date at a Redemption Amount equal to the Early Redemption Amount as determined in accordance with paragraph 44 below together with any interest accrued to the date fixed for redemption."

Condition 10(a) shall be amended to read as follows:

"if default is made for a period of 30 days or more in the payment of the principal amount due in respect of the Notes or any of them; or"

Condition 10(b) shall be amended to read as follows:

"if the Issuer fails to perform or observe any of its other obligations under the Notes or the Trust Deed and such failure continues for a period of 30 days (or such longer period as the Trustee may permit) next following the service by the Trustee on the Issuer of notice requiring the same to be remedied unless, in the opinion of the Trustee, it is incapable of remedy, in which case no notice shall be required, provided that such failure to perform or observe any of its obligations will, in the sole and absolute determination of the Trustee, lead to a failure to pay any amounts due on the Notes."

Notwithstanding anything to the contrary contained in Condition 6(i) (*Purchases*), the Issuer may purchase the Notes so long as an equivalent notional amount of the Swap Agreement is terminated and an equivalent principal amount of the Securities are delivered to the Swap Counterparty and/or the Noteholders or liquidated, as the case may be, by the Issuer. The Issuer shall have no further liability in respect of the purchased amount of Notes or the terminated amount of the Swap Agreement. If the Issuer purchases the Notes it will notify S&P of such purchase. Condition 6(i) shall be deemed to be amended accordingly.

Notwithstanding Condition 14, so long as the Notes are represented by a Global Note or a non-materialised form held on behalf of Euroclear, Clearstream International or any other clearing system, notices in respect thereof may be given by their being delivered to Euroclear, Clearstream International or such other clearing system, as the case may be. For the avoidance of doubt, such notices shall be deemed given on the date and, if applicable, at the time they are delivered to Euroclear, Clearstream International or such other clearing system, as the case may be.

| 39 | The Agents (including any Calculation Agent and/or Issuing and Paying Agent and/or Custodian) appointed in respect of the Notes are: | **Issuing and Paying Agent and Custodian**<br>JPMorgan Chase Bank, N.A.<br>Trinity Tower,<br>9 Thomas More Street,<br>London E1W 1YT<br><br>If the short-term senior unsecured rating of the Paying Agent or the Custodian is downgraded at any time below "A-1" by S&P, the Issuer shall, within 30 calendar days appoint a replacement Paying Agent or a replacement Custodian (as the case may be) that has a rating of at least "A-1" by S&P unless the Trustee has an alternative proposal pursuant to which |

S&P confirms in writing that the then current rating of the Notes will not be reduced. The Issuer shall notify S&P of any such replacement of the Paying Agent or Custodian (as the case may be).

**Australian Paying Agent and Registrar**

J.P. Morgan Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 32 Grosvenor Place
225 George Street
Sydney
New South Wales 2000
Australia

**Irish Paying Agent**

J.P. Morgan Bank (Ireland) p.l.c.
JPMorgan House
International Financial Services Centre
Dublin 1
Ireland

**Calculation Agent**

Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**Listing Agent**

A&L Listing Limited
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**Security Arrangements**

40    Mortgaged Property:

    (i)    Collateral:

The Collateral comprises AUD 50,000,000 in principal amount Floating Rate Notes due 17 March 2016 issued by Royal Bank of Scotland Plc (the "**Collateral Issuer**") (ISIN: XS0247983058).

On redemption of any Collateral, the redemption proceeds of such Collateral will be deposited by the Issuer in the Collection Account, subject to the security interest created pursuant to the Trust Deed.

The Collateral will be acquired by the Issuer on or before the Issue Date and held by JPMorgan Chase Bank, N.A. of Trinity Tower, 9 Thomas More Street, London E1W 1YT in its capacity as Custodian pursuant to the Agency Agreement in the Custody Account (being the account of the Custodian at Euroclear, Account No 22066) subject to the security interest created pursuant to the Trust Deed. The Custodian

shall notify the Issuer and the Calculation Agent if it becomes aware of any material amendment to the terms and conditions of the Collateral. Upon such notification from the Custodian, the Calculation Agent will notify S&P of such material amendment.

If the short-term senior unsecured rating of the provider of the Collection Account is downgraded to below "A-1+" the Issuer shall, within 30 calendar days, appoint a replacement Collection Account provider that has a rating assigned by S&P of at least "A-1+" unless the Trustee has an alternative proposal which S&P confirms will mean that the then current rating of the Notes will not be reduced.

The Issuer shall notify S&P of such replacement of Collection Account provider.

(ii)   Security (order of priorities):   The Trustee shall apply all moneys received by it under the Trust Deed in connection with the realisation or enforcement of the Security constituted by the Trust Deed in the following order of priorities:

Swap Counterparty Priority unless (i) an Event of Default under the Swap Agreement (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) or (ii) a Tax Event (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement), in which case Noteholder Priority shall apply.

(iii)  Swap Agreement (if applicable)   Under (a) a Deed of Accession dated 9 April 2003, as amended and restated on 22 July 2005, pursuant to which the Issuer acceded to an ISDA Master Agreement and Schedule thereto dated as of 10 October 2002, as amended and restated on 22 July 2005, (together, the "**ISDA Master Agreement**") and (b) a confirmation thereto with an effective date of the Issue Date made between the Issuer and the Swap Counterparty (the "**Swap Confirmation**" and, together with the ISDA Master Agreement, the "**Swap Agreement**"), the Issuer will pay to the Swap Counterparty sums equal to interest payable in respect of the Collateral and the Swap Counterparty will pay to the Issuer amounts due under the Notes.

In addition, the Issuer will make a final payment to the Swap Counterparty equal to the redemption proceeds due under the Collateral as at the date the Swap Agreement is scheduled to terminate and the Swap Counterparty will make a final payment to the Issuer equal to the Redemption Amount of the Notes.

The form of the Swap Confirmation is set out in Annex 3.

The Swap Agreement may be terminated early, (either in whole or, in certain circumstances, in part only) among other circumstances:

(i) on the due date for payment of the Notes if at any time any of the Notes becomes repayable in accordance with the Conditions prior to the Maturity Date;

(ii) at the option of one party, if there is a failure by the other party to pay any amounts due under the Swap Agreement;

(iii) if (subject as provided in the Swap Agreement) withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement or it becomes illegal for either party to perform its obligations under the Swap Agreement (see "Transfer to avoid Termination Event" below); and

(iv) if at any time there is a default or event of default that has been declared pursuant to the terms of (and as defined in) the Collateral.

Consequences of Early Termination:

Upon any such early termination of the Swap Agreement, the Issuer or the Swap Counterparty may (subject as set out below and provided, in the case of certain tax events that the Issuer may first be obliged to use all reasonable endeavours to transfer its obligations) be liable to make a termination payment to the other (regardless, if applicable, of which of such parties may have caused such termination).

Such termination payment will be based on the replacement cost or gain for a swap transaction that would have the effect of preserving for the party making the determination the economic equivalent of the Swap Agreement. In all cases of early termination occurring other than by reason of a default by the Swap Counterparty or a Tax Event (as defined in the Swap Agreement) where the Swap Counterparty is the sole Affected Party (as defined in the Swap Agreement) (in either case the determination will be made by the Issuer) or illegality (in which case the party which is not the Affected Party (as defined in the ISDA Master Agreement) will make the determination (or, if there are two Affected Parties, each party will make a determination which will be averaged)), the termination payment will be determined by the Swap Counterparty on the basis of quotations received from at least five market-makers (failing which, by the Swap Counterparty or the Issuer, as aforesaid).

Regardless of which party makes the determination of the termination payment (if any), there is no assurance that the

proceeds from the sale of the Collateral plus or minus, as the case may be, such termination payment will be sufficient to repay the principal amount due to be paid in respect of the Notes and any other amounts in respect thereof that are due.

Transfer to avoid Termination Event:    If withholding taxes are imposed on payments made by the Issuer or the Swap Counterparty under the Swap Agreement, then the Swap Counterparty shall, at its sole option, have the right to require the Issuer:

(i)    to transfer all of the Issuer's interests and obligations under the Swap Agreement together with its interests and obligations under the Notes, the Trust Deed and the Agency Agreement to another entity, whether or not in the same tax jurisdiction as the Issuer, as would not have any obligation to withhold or deduct (if the Issuer is or would be required to make such deduction or withholding) or to which the Swap Counterparty would be entitled to make payments free from the relevant deduction or withholding (if the Swap Counterparty is or would otherwise be required to make such withholding or deduction), subject to obtaining the prior written consent of the Trustee; or

(ii)   to transfer the Issuer's residence for tax purposes to another jurisdiction, subject to obtaining the prior written consent of the Trustee.

If the Issuer is unable to transfer its interests to another party or to transfer its tax residence in accordance with the preceding provisions prior to the 30th day following the date of imposition of such withholding taxes or, if earlier, the 10th day prior to the first date on which it or the Swap Counterparty would otherwise be required to make a payment net of withholding taxes, the Swap Counterparty may terminate the swap transaction under the Swap Agreement. If the Issuer transfers its interests and obligations or residence for tax purposes, it shall notify S&P of such transfer.

Swap Counterparty(ies):    Lehman Brothers Special Financing Inc.

Swap Guarantor (if applicable):    Lehman Brothers Holdings Inc. whose registered address is at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

(i)    Details of Credit Support
Document (if applicable):    The obligations of the Swap Counterparty under the Swap Agreement are unconditionally guaranteed by Lehman Brothers Holdings Inc. pursuant to a guarantee dated 17 March 2006 issued in favour of the Issuer (the "Swap Guarantee").

(ii)   Credit Support Provider:    With respect to the Swap Counterparty, Lehman Brothers Holdings Inc.

**Provisions relating to Redemption**

| | | |
|---|---|---|
| 41 | Call Option (Condition 6(e)): | Not applicable. |
| 42 | Put Option (Condition 6(f)): | Not applicable. |
| 43 | Redemption Amount: | Unless previously redeemed or purchased and cancelled, the Redemption Amount payable in respect of each Note on the Scheduled Maturity Date shall be an amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of: |

(a) such Note's Outstanding Principal Amount as at the Final Cut-off Date; and

(b) AUD 0.

For the purposes hereof:

"**Final Cut-off Date**" means the Business Day immediately preceding the Scheduled Maturity Date.

| | | |
|---|---|---|
| 44 | Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions): | Subject as provided in the immediately succeeding paragraph below, in respect of each Note, an amount in AUD (rounded down to the nearest cent and subject to a minimum of AUD 0) determined by the Calculation Agent in its sole discretion and acting in good faith as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement (or in the case where Condition 6(a)(iii) as set out in paragraph 38 above is applicable, the proceeds from the redemption of the Collateral), plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above exceeds (the amount of any such excess being the "**Excess Amount**") such Note's Outstanding Principal Amount as of the Early Redemption Date together with interest accrued from, and including, the immediately preceding Interest Payment Date (or if the Early Redemption Date falls in the initial Interest Accrual Period, from, and including, the Issue Date) to, but excluding, such Early Redemption Date (such interest being the "**Accrued Early Redemption Interest Amount**" and being calculated on the basis of the most recently determined Interest Rate) and, such Excess Amount shall be payable by way of an additional payment of interest on each Note. |

Notwithstanding the above, if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting

Party (as defined in the ISDA Master Agreement) or if a Tax Event (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the sole Affected Party (as defined in the ISDA Master Agreement), the Early Redemption Amount in respect of each Note shall be an amount in AUD (rounded down to the nearest cent and subject to a minimum of AUD0) determined by the Calculation Agent in its sole discretion as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral on behalf of the Issuer by the Disposal Agent pursuant to the Supplemental Trust Deed and Drawdown Agreement (or in the case where Condition 6(a)(iii) as set out in paragraph 38 above is applicable, the proceeds from the redemption of the Collateral), plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding; provided that if the amount determined pursuant to sub-paragraphs (i) and (ii) above results in an Excess Amount (as defined above), such Excess Amount shall be payable by way of an additional payment of interest on each Note. In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation or redemption of the Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its Outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

For the purpose thereof:

"**Unwind Costs**" means the value of (i) the termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement in respect of the termination of the Swap Agreement (as determined by reference to the Reference Registry as at the date of such termination) and (ii) any transfer or stamp tax costs, early redemption or termination cost (howsoever defined), if any, incurred by the Issuer or the Trustee, as determined by the Calculation Agent in its sole and absolute discretion, in relation to any swap agreement (but, for the avoidance of doubt, not including the Swap Agreement), financing arrangement or other hedging transaction entered into by or on behalf of the Issuer in relation to the issue of the Notes.

**Provisions applicable to Global Notes**

45    Notes to be represented on issue by:    Non-materialised form evidenced by inscription into the relevant Register

| 46 | Applicable TEFRA exemption: | D Rules. |
|----|---|---|
| 47 | Global Note exchangeable for Definitive Notes at the request of the holder: | Not applicable. |
| 48 | Exchange Date: | Not applicable. |

**Provisions relating only to the sale, listing and rating of the Notes**

| 49 | Details of any additions or variations to the selling restrictions: | The Notes will not be offered or sold except in circumstances which do not constitute an offer to the public within the meaning of the Irish Companies Act, 1963 (as amended). |
|----|---|---|
| | | **Any onsale of the Notes by Noteholders shall be made in compliance with all applicable selling restrictions.** |
| 50 | Listing: | Application may be made to the Irish Financial Services Regulatory Authority, as competent authority under Directive 2003/71/EC for this Series Prospectus to be approved. Application may also be made to the Irish Stock Exchange for the Notes to be admitted to the Official List and trading on the regulated market of the Irish Stock Exchange. |
| | | Where notices are given by or on behalf of the Issuer in accordance with these Conditions, such notice may also be given to the Irish Stock Exchange or the Irish Financial Services Regulatory Authority as required by S.1.324 of 2005. |
| 51 | Dealer's Commission | Not applicable. |
| 52 | Net Proceeds of issue | AUD 50,000,000. |
| 53 | Method of issue of Notes: | Individual Dealer. |
| 54 | The following Dealer is subscribing the Notes: | Lehman Brothers International (Europe) of 25 Bank Street, London E14 5LE, United Kingdom, an investment bank engaged in, *inter alia*, underwriting new securities issues and trading in fixed income financial instruments. |
| 55 | Common Code (N.B. See paragraph 4 above for ISIN): | Not Applicable |
| 56 | Rating: | In respect of payment of principal only, a rating of "AAp N.R.i" is expected to be assigned by S&P. However, there is no assurance that the Issuer will be able to obtain such a rating for the Notes as it is subject to S&P's information and other requirements. A security rating is not a recommendation to buy, sell or hold securities and may be subject to suspension, reduction or withdrawal at any time. A suspension, reduction or withdrawal of the rating assigned to the Notes may adversely affect the market price of the Notes. |

## ANNEX 1 - USE OF PROCEEDS

The net proceeds of the issue of the Notes, which are expected to amount to AUD 50,000,000, will be applied by the Issuer on the Issue Date to fund the purchase of the Collateral (as described in Annex 2).

## ANNEX 2 - THE COLLATERAL

*The following information relating to the Collateral is a summary only of certain terms and conditions of such Collateral and has, save as provided below, been extracted from the pricing supplement relating to the Collateral. None of the Issuer, the Arranger, the Trustee, the Agents or the Swap Counterparty has verified, or accepts any liability whatsoever for the accuracy of, such information and prospective investors of the Notes should make their own independent investigations and enquiries into the Collateral and the Collateral Issuer.*

| | |
|---|---|
| **Collateral Issuer** | The Royal Bank of Scotland plc |
| **Registered Address** | 36 St Andrew Square<br>Edinburgh<br>EH2 2YB |
| **Country of Incorporation** | Scotland |
| **Nature of Business** | The Royal Bank of Scotland plc is the principal operating subsidiary of The Royal Bank of Scotland Group plc. It is a major UK clearing banks engaging principally in providing a comprehensive range of banking, insurance and other financial services and each controls, directs and promotes the operations of various subsidiary companies. |
| **Collateral** | AUD 50,000,000 in principal amount of an issue of Floating Rate Notes due 17 March 2016 by the Collateral Issuer on 17 March 2006 under its euro medium term note programme (ISIN: XS0247983058). |
| **Listing** | London Stock Exchange |
| **Governing Law** | English law |
| **Maturity** | 17 March 2016 |
| **Business Days** | London, New York and Sydney |
| **Method of Origination/Creation** | The Collateral was issued pursuant to a pricing supplement dated 17 March 2006 (the "**Collateral Pricing Supplement**"). Copies of the Collateral Pricing Supplement are available for inspection during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the registered office of the Issuer and at the specified offices of the Issuing and Paying Agent, the Australian Paying Agent and the Irish Paying Agent. |

# ANNEX 3 – FORM OF SWAP CONFIRMATION

In addition to the description of the Swap Agreement set out in paragraph 40(iii), the form of the Swap Confirmation is as set out below.

## SWAP CONFIRMATION

| | |
|---|---|
| Date: | 17 March 2006 |
| To: | Saphir Finance Public Limited Company |
| From: | Lehman Brothers Special Financing Inc. |
| Re: | Credit Derivative Transaction relating to Saphir Finance Public Limited Company Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes due 2011 and extendable up to 2016 |
| Reference No.: | 538204L |

Dear Sirs,

The purpose of this letter agreement and the schedules hereto (this "**Confirmation**") is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below (the "**Transaction**"). This Confirmation constitutes a "Confirmation" as referred to in the ISDA Master Agreement specified below.

The definitions and provisions contained in the 2003 ISDA Credit Derivatives Definitions, as supplemented by the May 2003 Supplement, in each case as published by the International Swaps and Derivatives Association Inc. ("ISDA") (together, the "**Credit Derivatives Definitions**") and the 2000 ISDA Definitions as published by ISDA (the "**2000 Definitions**") are incorporated into this Confirmation. In the event of any inconsistency between the Credit Derivatives Definitions and this Confirmation, this Confirmation will govern. In addition, the definitions and provisions set out in Schedule B hereto shall prevail in the event of any inconsistency with the Credit Derivative Definitions. In the event of any inconsistency between Schedule B hereto and sections 1 to 10 of this Confirmation, the provisions of sections 1 to 10 shall prevail.

This Confirmation supplements, forms a part of, and is subject to the ISDA Master Agreement dated as of 10 October 2002, as amended and restated on 22 July 2005 and as further amended and supplemented from time to time (the "**Agreement**") between us and Dante Finance Public Limited Company to which you have acceded under a Deed of Accession dated 9 April 2003, as amended and restated on 22 July 2005. All provisions contained in the relevant Agreement govern this Confirmation except as expressly modified below.

In this Confirmation, the "**Notes**" refers to Saphir Finance Public Limited Company Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes due 2011 and extendable up to 2016 and "**Conditions**" refers to the terms and conditions of the Notes.

Capitalised terms used but not defined herein will have the meanings given to them in the Conditions.

In the event of any inconsistency between this Confirmation and the Agreement, this Confirmation shall prevail.

In this Confirmation, "**Party A**" means Lehman Brothers Special Financing Inc. and "**Party B**" means Saphir Finance Public Limited Company.

The terms of the Transaction to which this Confirmation relates are as follows:

## 1 General Terms

| | |
|---|---|
| Trade Date: | 10 March 2006 |
| Effective Date: | 17 March 2006 |
| Scheduled Termination Date: | 17 March 2011 |
| Termination Date: | The Scheduled Termination Date, subject to (a) Automatic Extension as described in paragraph 7 below; and (b) adjustment in accordance with the Following Business Day Convention. |
| Floating Rate Payer: | Saphir Finance Public Limited Company (the "**Seller**") |
| Fixed Rate Payer: | Lehman Brothers Special Financing Inc. (the "**Buyer**") |
| Calculation Agent | Lehman Brothers International (Europe) |
| | Any determination, calculation or selection made by the Calculation Agent under this Transaction shall be made by the Calculation Agent in a commercially reasonable manner and based on best market practice. |
| Calculation Agent City | London |
| Business Days | London, Sydney, New York and TARGET Settlement Day. |
| Business Day Convention | Following (which, subject to Sections 1.4 and 1.6 of the Credit Derivatives Definitions, shall apply to any date referred to in this Confirmation that falls on a day that is not a Business Day). |

## 2 Reference Entities

| | |
|---|---|
| Reference Entity: | Each of the entities (and any Successor thereto) listed in the Reference Registry from time to time, subject to the provisions of "Successor Substitution" below; provided that, upon the occurrence of a Credit Event during the Credit Observation Period with respect to a Reference Entity, or the Obligations of a Reference Entity, and satisfaction of the Conditions to Settlement with respect to such Credit Event, such Reference Entity will be deemed deleted from the Reference Registry from the Event Determination Date with respect to such Reference Entity and the Reference Registry shall be amended accordingly. |
| | "**Reference Registry**" means the register of Reference Entities set out in Schedule A, maintained by the Calculation Agent in accordance with this Confirmation and amended from time to time in accordance with the provisions of "Successor Substitution" below. |
| | The Reference Registry shall contain the following information in respect of each Reference Entity included therein: |
| | (a) the Reference Portfolio(s) in which such Reference Entity is a constituent; |
| | (b) the applicable Credit Observation Period for such |

Reference Entity;

(c)    the notional amount applicable to such Reference Entity (the "**Reference Entity Notional Amount**") in the case of Reference Entities in the Principal Reference Portfolio;

(d)    the Entity Type applicable to the Reference Entity;

(e)    the Benchmark Obligation applicable to the Reference Entity in the Principal Reference Portfolio; and

(f)    the effective date of each Merger Substitution executed with respect to the Reference Entity and the change to the Reference Entity Notional Amount resulting from such Merger Substitution.

| | |
|---|---|
| Reference Portfolio: | Each of the Principal Reference Portfolio, the Long Coupon Portfolio and the Short Coupon Portfolio. |
| Principal Reference Portfolio: | The 100 Reference Entities specified as such in the Reference Registry. |
| Long Coupon Portfolio: | The 150 Reference Entities specified as such in the Reference Registry. |
| Short Coupon Portfolio: | The 50 Reference Entities specified as such in the Reference Registry. |

Each Reference Entity has been designated as a particular "Entity Type" in the Reference Registry set out in Schedule A. References to "Standard Terms" mean, in respect of a Reference Entity, the corresponding standard terms specified for such Entity Type in Schedule C.

In respect of any Reference Entity for which "Monoline" is specified as the relevant Entity Type, the "Standard Terms for North American Monoline Entities" set out in Schedule C and the "Additional Terms for Monolines" set forth in Schedule B shall be deemed to apply.

| | |
|---|---|
| Successor Substitution: | Notwithstanding anything to the contrary herein (in particular in the terms relating to Successors set out in Schedule B), upon the occurrence of a Succession Event (as defined in Schedule B) between two or more of the Reference Entities, which for the avoidance of doubt is not a Credit Event, the Calculation Agent may, by written notice to Buyer and Seller and S&P indicating the Succession Event Date and the Succession Event Effective Date, give notice to remove one or more of those Reference Entities that are subject to the Succession Event (the "**Removed Reference Entities**") from the Reference Registry, and to replace such Removed Reference Entities with one or more entities (each an "**Added Reference Entity**") such that the Reference Entities resulting from the Successor Substitution shall be: |

(i)    the entity which the Calculation Agent determines has been formed as a result of the Succession Event; and /or

(ii)    a number of entities chosen in accordance with the Successor Substitution Criteria,

provided that, in any case the total number of Reference Entities in the Reference Registry following the occurrence of such Succession Event will be equal to the number of Reference Entities as of the Business Day prior to such Succession Event, and also, provided that such notice from the Calculation Agent will be effective two Business Days following the date the notice is sent to Buyer and Seller (the "**Succession Event Effective Date**") to remove or replace such Reference Entities from the Reference Registry. Each Added Reference Entity will be a Reference Entity for the purposes of this Transaction and each Removed Reference Entity will be deemed deleted from the Reference Registry, in each case as of the Succession Event Effective Date. Upon the request of any parties hereto, the Calculation Agent shall provide such party with an updated Reference Registry as soon as is reasonably practicable after a Successor Substitution.

Each Added Reference Entity shall have a Reference Entity Notional Amount equal to the sum of the Reference Entity Notional Amounts of the Removed Reference Entities divided by the number of Added Reference Entities, provided that the entity described in (i) above shall be ignored for the purposes of such calculation.

In the event that the Calculation Agent fails to exercise its right to remove one or more Reference Entities in accordance with the above provisions by the day which is three Business Days following the Succession Event Date, the provisions set out in Schedule B relating to Successors shall apply, except that if a Reference Entity becomes a Successor to another Reference Entity, such Successor Reference Entity shall be deemed to be a Reference Entity only once in respect of each relevant Portfolio with respect to this Transaction.

Succession Event Date:    The occurrence of a Succession Event, and the date at which such Succession Event is deemed to occur (the "**Succession Event Date**"), shall be determined by the Calculation Agent.

Successor Substitution Criteria:    Each Added Reference Entity shall, on the date of its inclusion in the Reference Registry, have a credit rating assigned to its unsecured, senior long-term debt or deposit obligations (not supported by third party credit enhancement) by S&P (or successor) equal to or higher than the lowest such rating of the Removed Reference Entities on the Business Day prior to the Succession Event Effective Date.

Each such determination shall be made by the Calculation

Agent.

| | |
|---|---|
| Benchmark Obligation: | In respect of each Reference Entity, the corresponding obligation set forth under the heading "Benchmark Obligation" in the Reference Registry. |
| Obligations: | Any obligation of the relevant Reference Entity (either directly or as provider of a Qualifying Affiliate Guarantee or, if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity, any Qualifying Guarantee), and which falls within the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type and (ii) has all of the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type. |
| | Obligations shall also include, in respect of each Reference Entity, the relevant Benchmark Obligation (if any) specified with respect to such Reference Entity in the Reference Registry. |
| All Guarantees: | Applicable with respect to a Reference Entity only if All Guarantees is specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Reference Price: | 100 per cent. |
| Subordination Amount: | AUD195,000,000 |
| Notional Amount: | AUD50,000,000 |
| Outstanding Notional Amount: | With respect to any day, the Notional Amount less the Mezzanine Tranche Loss (as defined below) as of that day, subject to a minimum of zero. |
| Mezzanine Loss Amount: | Cumulative Loss Amount minus the Subordination Amount, subject to a maximum of the Loss Cap. |
| Loss Cap: | AUD50,000,000 |
| Mezzanine Tranche Loss: | The greater of: |
| | (a)    the Mezzanine Loss Amount; and |
| | (b)    zero. |
| Cumulative Loss Amount: | With respect to any day, the aggregate of all Cash Settlement Amounts, in respect of the Principal Reference Portfolio only, calculated with respect to the Transaction from, and including the Trade Date, to and including such day a Cumulative Loss Amount is calculated. |

## 3    Buyer Payments

### (a)    Buyer Payments 1

| | |
|---|---|
| Fixed Rate Payer Calculation Amount: | Subject as provided below, the Weighted Average Outstanding |

Notional Amount with respect to a Fixed Rate Payer Calculation Period, calculated by the Calculation Agent.

"**Weighted Average Outstanding Notional Amount**" means the amount calculated by the Calculation Agent on the Business Day immediately preceding each Fixed Rate Payer Payment Date with respect to the Fixed Rate Payer Calculation Period for which such amount is calculated by adding together the Outstanding Notional Amounts for each calendar day during such period and dividing such amount by the actual number of calendar days in such period. For the avoidance of doubt, in the event that, with respect to a Fixed Rate Payer Calculation Period, the Outstanding Notional Amount is reduced as a result of the occurrence of a Credit Event in respect of a Reference Entity which is included in the Principal Reference Portfolio, such reduced Outstanding Notional Amount shall be used to calculate the Weighted Average Outstanding Notional Amount (for the purposes of calculating the Fixed Amount) as of, and from, the Event Determination Date which resulted in a reduction of the Outstanding Notional Amount.

| | |
|---|---|
| Fixed Rate Payer Calculation Period: | Section 2.9 of the Credit Derivatives Definitions shall apply, except that the final Fixed Rate Payer Calculation Period will end on, but exclude, the Termination Date. |
| Fixed Rate Payer Payment Dates: | 17 March, 17 June, 17 September and 17 December of each year commencing on 17 June 2006. |
| Fixed Rate: | The product of (a) the Fixed Rate Ratio and (b) AUD-BBR-BBSW plus 3.00% per annum. |

"**Fixed Rate Ratio**" means:

(a)   For the first twenty Fixed Rate Payer Payment Dates:

  (i)   100 per cent. if the number of Affected Reference Entities is less than two;

  (ii)  80 per cent. if the number of Affected Reference Entities is two;

  (iii) 60 per cent. if the number of Affected Reference Entities is three;

  (iv)  40 per cent. if the number of Affected Reference Entities is four;

  (v)   20 per cent. if the number of Affected Reference Entities is five; and

  (vi)  zero if the number of Affected Reference Entities is six or more.

(b)   For all the remaining Fixed Rate Payer Payment Dates, the percentage determined in accordance with (a) above in respect of the 20th Fixed Rate Payer Payment Date.

"**Affected Reference Entities**" means (a) the number of

Reference Entities in the Long Coupon Portfolio in respect of which an Event Determination Date has occurred less (b) the number of Reference Entities in the Short Coupon Portfolio in respect of which an Event Determination Date has occurred, each as of the Business Day immediately preceding the relevant Fixed Rate Payer Payment Date.

"**AUD-BBR-BBSW**" means "AUD-BBR-BBSW" as defined in the 2000 Definitions with a 'Designated Maturity' of three (3) months and the 'Reset Date' being the day which is the first day of the Fixed Rate Payer Calculation Period.

| | |
|---|---|
| Fixed Rate Day Count Fraction: | Actual/365 (Fixed) |

**(b)  Buyer Payments 2**

Buyer Final Payment: In addition to the Fixed Amounts payable in accordance with the provisions set out above, Buyer shall pay to Seller the Buyer Final Payment Amount on the Termination Date.

Buyer Final Payment Amount: An amount in AUD determined by the Calculation Agent in its sole discretion as being equal to the greater of:

(a)  the Outstanding Notional Amount as at the Final Cut-off Date; and

(b)  AUD 0.

Final Cut-off Date: The Business Day immediately prior to the Termination Date.

**4     Seller Payments**

**(a)     Seller Payments 1**

Interim Seller Payments: In addition to the Seller Final Payment payable in accordance with the provisions set out below, during the period from, and including, the Effective Date to, and including, the Termination Date, on each day that any principal, interest and other payments and distributions of cash and other property is scheduled to be received under the Collateral, Seller will promptly thereafter transfer to Buyer an amount equal to the aggregate amount so scheduled to be received from the Collateral Issuer in respect of the Collateral.

"**Collateral**" and "**Collateral Issuer**" shall bear the meaning given to those terms in the Conditions.

**(b)     Seller Payments 2**

Seller Final Payment: In addition to the Interim Seller Payments payable in accordance with the provisions set out above, Seller shall pay to Buyer the Seller Final Payment Amount on the Termination Date.

Seller Final Payment Amount: An amount equal to the aggregate redemption amount scheduled to be received from the Collateral Issuer on the

Termination Date in respect of the Collateral.

## 5 Provisions relating to Credit Events

| | | |
|---|---|---|
| Conditions to Settlement: | Credit Event Notice | |
| | Notifying Party: | Buyer (provided that the Buyer shall act in commercially reasonable manner in delivering the Credit Event Notice) |
| | Notice of Publicly Available Information: | Applicable. |

If a Credit Event Notice contains the information required in the Notice of Publicly Available Information such Credit Event Notice shall be deemed to be both a Credit Event Notice and a Notice of Publicly Available Information.

| | | |
|---|---|---|
| | Public Sources: | Applicable |
| | Specified Number: | Two |

| | |
|---|---|
| Credit Observation Period: | In respect of each Reference Entity in the Principal Reference Portfolio, the period commencing on the Effective Date and ending on the Scheduled Maturity Date. In respect of each Reference Entity in the Long Coupon Portfolio and the Short Coupon Portfolio, the period commencing on the Effective Date and ending on the fifth anniversary of the Effective Date. |
| Credit Events: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Credit Events specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Category: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Category specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| Obligation Characteristics: | With respect to each Reference Entity for the time being comprised in the Reference Registry, the Obligation Characteristics specified in the Standard Terms in Schedule C hereto as being applicable to the Entity Type with respect to such Reference Entity. |
| | For the avoidance of doubt, where "Domestic Currency" and "Standard Specified Currencies" are specified as "Applicable" in Schedule C, Obligations need only satisfy one of these characteristics. |
| Excluded Obligations: | None |

## 6 Calculation of Cash Settlement Amounts

| | |
|---|---|
| Settlement Method: | Cash Settlement in accordance with the Credit Derivative Definitions, as modified by the following terms: |
| | Notwithstanding anything to the contrary contained in the Credit Derivative Definitions (including without limitation Section 7.1 (Cash Settlement)) following the occurrence of an Event Determination Date in respect of a Reference Entity in the Principal Reference Portfolio only, the Calculation Agent shall determine the applicable Cash Settlement Amount. There shall be no Cash Settlement Amount in respect of any Reference Entity in the Long Coupon Portfolio or the Short Coupon Portfolio. |
| | For the avoidance of doubt, Seller shall not pay Buyer the Cash Settlement Amount, if any, with respect to such Reference Entity but each Cash Settlement Amount will be added to the Cumulative Loss Amount which will in turn be used to determine, inter alia, the reduction, if any, in the Outstanding Notional Amount payable by Buyer on the Termination Date. |
| Final Price: | 35% |
| Settlement Currency: | AUD |

## 7 Automatic Extension

The Scheduled Termination Date is subject to automatic annual extension for one year on the fifth anniversary of the Effective Date and each anniversary thereafter up to but excluding 17 March 2016 (each such new termination date, scheduled to be 17 March 2012, 17 March 2013, 17 March 2014, 17 March 2015 and 17 March 2016, being an "**Extended Termination Date**") unless Party A gives not more than 30 days nor less than 15 days' notice to Party B prior to the Scheduled Termination Date or an Extended Termination Date (excluding the Extended Maturity Date occurring on 17 March 2016), as appropriate, to terminate the Transaction in whole but not in part on the Scheduled Termination Date or such Extended Termination Date, as appropriate.

## 8 Relationship Between Parties

Each of Buyer and Seller represents to the other that:

**(a)    Non-Reliance**

It is acting for its own account and it is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction. It has not received from the other party any assurance or guarantee as to the expected results of this Transaction;

**(b)    Acceptance**

It accepts the terms, conditions and risks of this Transaction. It is also capable of assuming, and assumes, the financial and other risks of this Transaction;

**(c)    Status of Parties**

The other party is not acting as a fiduciary or an advisor for it in respect of this Transaction; and

**(d)    Risk Management**

It has entered into this Transaction for the purpose of (i) managing its borrowings or investments, (ii) hedging its underlying assets or liabilities or (iii) in connection with its line of business.

## 9    Additional Termination Provisions

(i)     The following shall constitute Additional Termination Events for the purposes of this Transaction:

(a)     The Notes being declared due and payable following the occurrence of an Event of Default (as defined in the Conditions) under the terms thereof.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(b)     A default or event of default declared pursuant to the terms of (and as defined in) the Collateral prior to the Termination Date.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the sole Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(c)     The Notes being declared redeemable pursuant to the Seller, on the occasion of the next scheduled Interim Seller Payment date or the Termination Date being required by law to withhold or account for tax or would suffer tax in respect of its income so that it would be unable to make payment of the full amount due and the Noteholders not having received, either directly or indirectly, from Buyer the amounts referred to under "Optional Payments" below.

For the purposes of such Additional Termination Event, the Affected Party shall be Seller and this Transaction shall be the Affected Transaction. Notwithstanding anything to the contrary in Section 6(a) and (b) of the Agreement, an Early Termination Date in respect of this Transaction will occur immediately upon the occurrence of such Additional Termination Event.

(ii)    **Optional Payments:** If, for any reason beyond the control of Buyer or Seller the Noteholders do not receive payment under their Notes for any reason including the imposition of any withholding tax or a default or other circumstance linked to the Paying Agents, Buyer may elect to make any necessary payments to, or to the order of, the Noteholders to prevent either a redemption of the Notes for taxation reasons pursuant to Condition 6(d) of the Notes or an event of default pursuant to Condition 10 of the Notes from occurring.

## 10   Other Terms

### (i)    Non-insurance business

Party A and Party B acknowledge and agree that this Transaction is not intended to constitute insurance business and is not a contract of insurance, assurance, suretyship or guarantee and payments may be

made under this Transaction by each party independently and without proof of the economic loss (if any) of the other party.

**(ii)   Third party rights**

No person shall have any right to enforce any provision of this Transaction under the Contracts (Rights of Third Parties) Act 1999.

**(iii)   Credit Support Document. Details of any Credit Support Document**

With respect to Party A, Guarantee dated as of the date hereof by Lehman Brothers Holdings Inc. in favour of Party B as beneficiary thereof in the form attached hereto as Exhibit A.

**(iv)   Credit Support Provider**

Credit Support Provider means in relation to Party A: Lehman Brothers Holdings Inc.

**(v)   Credit Support Annex**

Party A and Party B agree that the provisions of the ISDA Credit Support Annex attached hereto as Annex A shall apply to this Transaction.

**(vi)   Misrepresentation**

For the purpose of this Confirmation only, Section 5(a)(iv) of the Agreement will not apply to either Party A or Party B.

**(vii)   Breach of Agreement**

For the purpose of this Confirmation only, Section 5(a)(ii) of the Agreement will not apply to Party B.

**(viii)   Bankruptcy**

For the purposes of this Confirmation only, section 5(a)(vii)(2) will not apply to Party B.

## 11   Account Details

| | |
|---|---|
| Account details of Buyer: | ANZBAU3MXXX |
| | Australia And New Zealand Banking Group |
| | 570 Church Street |
| | Melbourne, |
| | |
| | Beneficiary Details (Fbo): |
| | Account:26504100001 |
| | FBO SLHIUS3xxxx |
| | Lehman Brothers Inc. |
| | Lehman Brothers |
| | New York, NY |
| | |
| | Intermediary Details (Int): |
| | Special Instructions: |
| | /Bnf/Lehman Bros Special Finance |
| Account details of Seller: | SWIFT Code:        _____CHASAU2X |
| | Account Bank:          JPMorgan Chase Bank, Brisbane |

| | |
|---|---|
| Account No: | 10048091~~010047670~~ |
| Account Name: | ~~JPMCB Paying Agent Account~~JP Morgan Institutional Services Australia Ltd Paying Agency Account |
| Reference: | Saphir Finance Series 2006-5 |
| | ~~Reference:        ITS  SYDNEY~~ |

This Confirmation shall be governed by and construed in accordance with English law.

Please confirm your agreement to be bound by the terms of the foregoing by executing a copy of this Confirmation and returning it to us by facsimile.

Yours faithfully,

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

By:

Name:

Title:


**LEHMAN BROTHERS INTERNATIONAL (EUROPE)** hereby agrees to perform its obligations as Calculation Agent set out herein.

By:

Name:

Title:


Confirmed on the date first above written:

**SAPHIR FINANCE PUBLIC LIMITED COMPANY**

By:

Name:

Title:

## Schedule A
## Reference Registry

### Principal Reference Portfolio (as of 10 March 2006)

| No. | Reference Entity | Benchmark Obligation | | | Entity Type | Reference Entity Notional Amount |
|---|---|---|---|---|---|---|
| | | ISIN/CUSIP | Coupon | Maturity | | |
| 1 | ALLTEL Corporation | US020039DB64 | 7.000% | Jul 1 2012 | North America | AUD50,000,000 |
| 2 | Altria Group, Inc. | US02209SAA15 | 7.000% | Nov 4 2013 | North America | AUD50,000,000 |
| 3 | Ambac Assurance Corporation | No benchmark obligation | | | North America Monoline | AUD50,000,000 |
| 4 | American Express Company | US025816AQ27 | 4.875% | Jul 15 2013 | North America | AUD50,000,000 |
| 5 | Archer-Daniels-Midland Company | US039483AJ11 | 8.125% | Jun 1 2012 | North America | AUD50,000,000 |
| 6 | ASTRAZENECA PLC | US98934KAB61 | 7.000% | Nov 15 2023 | Western Europe | AUD50,000,000 |
| 7 | AutoZone, Inc. | US053332AC61 | 5.875% | Oct 15 2012 | North America | AUD50,000,000 |
| 8 | BRITISH TELECOMMUNICATIONS public limited company | XS0123684887 | 6.875% | Feb 15 2011 | Western Europe | AUD50,000,000 |
| 9 | B A S F Aktiengesellschaft | DE0008846718 | 3.500% | Jul 8 2010 | Western Europe | AUD50,000,000 |
| 10 | BCE INC. | CA05534BAJ85 | 7.350% | Oct 30 2009 | North America | AUD50,000,000 |
| 11 | The Bear Stearns Companies Inc. | US073902BR87 | 7.625% | Dec 7 2009 | North America | AUD50,000,000 |

| 12 | Berkshire Hathaway Inc. | US084664AD30 | 4.625% | Oct 15 2013 | North America | AUD50,000,000 |
|---|---|---|---|---|---|---|
| 13 | BHP BILLITON LIMITED | US055450AG50 | 7.250% | Mar 1 2016 | Australia/New Zealand | AUD50,000,000 |
| 14 | BorgWarner Inc. | US099724AB20 | 6.500% | Feb 15 2009 | North America | AUD50,000,000 |
| 15 | Boston Scientific Corporation | US101137AB33 | 5.450% | Jun 15 2014 | North America | AUD50,000,000 |
| 16 | BP P.L.C. | XS0205367997 | 3.375% | Dec 15 2008 | Western Europe | AUD50,000,000 |
| 17 | Campbell Soup Company | US134429AS81 | 4.875% | Oct 1 2013 | North America | AUD50,000,000 |
| 18 | Cargill, Incorporated | US141781AC86 | 7.375% | Oct 1 2025 | North America | AUD50,000,000 |
| 19 | Cendant Corporation | US151313AP87 | 7.375% | Jan 15 2013 | North America | AUD50,000,000 |
| 20 | Centrica Plc | XS0137672381 | 5.875% | Nov 2 2012 | Western Europe | AUD50,000,000 |
| 21 | CenturyTel, Inc. | US156700AG13 | 7.875% | Aug 15 2012 | North America | AUD50,000,000 |
| 22 | Chevron Corporation | US166760AB48 | 3.375% | Feb 15 2008 | North America | AUD50,000,000 |
| 23 | CIT Group Inc. | US125581AB41 | 7.750% | Apr 2 2012 | North America | AUD50,000,000 |
| 24 | COMPASS GROUP PLC | XS0148362501 | 6.375% | May 29 2012 | Western Europe | AUD50,000,000 |
| 25 | Computer Sciences Corporation | US205363AE42 | 7.375% | Jun 15 2011 | North America | AUD50,000,000 |

| 26 | Ryder System, Inc. | US783549AZ16 | 6.950% | Dec 1 2025 | North America | AUD50,000,000 |
|----|--------------------|--------------|--------|------------|---------------|---------------|
| 27 | Countrywide Home Loans, Inc. | US22237LMY55 | 5.625% | Jul 15 2009 | North America | AUD50,000,000 |
| 28 | CVS Corporation | US126650AV25 | 4.875% | Sep 15 2014 | North America | AUD50,000,000 |
| 29 | E. I. du Pont de Nemours and Company | US263534BN84 | 4.875% | Apr 30 2014 | North America | AUD50,000,000 |
| 30 | E.ON AG | XS0148578262 | 5.750% | May 29 2009 | Western Europe | AUD50,000,000 |
| 31 | Eaton Corporation | US278058AW21 | 7.650% | Nov 15 2029 | North America | AUD50,000,000 |
| 32 | ELECTRICITE DE FRANCE | FR0000481152 | 5.750% | Oct 25 2010 | Western Europe | AUD50,000,000 |
| 33 | Essent N.V. | XS0170641426 | 4.500% | Jun 25 2013 | Western Europe | AUD50,000,000 |
| 34 | Financial Security Assurance Inc. | No benchmark obligation | | | North America Monoline | AUD50,000,000 |
| 35 | First Data Corporation | US319963AF10 | 5.625% | Nov 1 2011 | North America | AUD50,000,000 |
| 36 | DEUTSCHE BANK AKTIENGESELLSCHAFT | DE0006495807 | 5.500% | May 18 2011 | Western Europe | AUD50,000,000 |
| 37 | FPL GROUP CAPITAL INC | US302570AJ58 | 7.375% | Jun 1 2009 | North America | AUD50,000,000 |
| 38 | Gannett Co., Inc. | US364725AC59 | 6.375% | Apr 1 2012 | North America | AUD50,000,000 |
| 39 | General Electric Capital Corporation | US36962GYY42 | 6.000% | Jun 15 2012 | North America | AUD50,000,000 |
| 40 | Genworth Financial, Inc. | US37247DAE67 | 5.750% | Jun 15 | North America | AUD50,000,000 |

| | | | | 2014 | | |
|---|---|---|---|---|---|---|
| 41 | Gerling-Konzern Allgemeine Versicherungs-Aktiengesellschaft | XS0198106238 | 7.000% | Aug 12 2024 | Western European Insurance | AUD50,000,000 |
| 42 | The Goldman Sachs Group, Inc. | US38141GBU76 | 6.600% | Jan 15 2012 | North America | AUD50,000,000 |
| 43 | GROUPE AUCHAN | FR0010075531 | 4.125% | May 4 2011 | Western Europe | AUD50,000,000 |
| 44 | H.J. HEINZ COMPANY | US423074AG80 | 6.000% | Mar 15 2008 | North America | AUD50,000,000 |
| 45 | The Home Depot, Inc. | US437076AL65 | 3.750% | Sep 15 2009 | North America | AUD50,000,000 |
| 46 | Hutchison Whampoa Limited | USG4671XAC41 | 7.000% | Feb 16 2011 | Asia | AUD50,000,000 |
| 47 | Illinois Tool Works Inc. | US452308AE97 | 5.750% | Mar 1 2009 | North America | AUD50,000,000 |
| 48 | International Business Machines Corporation | US459200BA86 | 4.750% | Nov 29 2012 | North America | AUD50,000,000 |
| 49 | International Lease Finance Corporation | US459745EZ45 | 6.375% | Mar 15 2009 | North America | AUD50,000,000 |
| 50 | Investor Aktiebolag | XS0143736162 | 6.125% | Mar 5 2012 | Western Europe | AUD50,000,000 |
| 51 | Johnson & Johnson | US478160AK00 | 6.625% | Sep 1 2009 | North America | AUD50,000,000 |
| 52 | JPMorgan Chase & Co. | US46625HBH21 | 3.500% | Mar 15 2009 | North America | AUD50,000,000 |
| 53 | KELDA GROUP PLC | XS0109437441 | 6.625% | Apr 17 2031 | Western Europe | AUD50,000,000 |
| 54 | Knight-Ridder, Inc. | US499040AM59 | 7.125% | Jun 1 2011 | North America | AUD50,000,000 |

| 55 | L'AIR LIQUIDE SOCIETE ANONYME A DIRECTOIRE ET CONSEIL DE SURVEILLANCE POUR L'ETUDE ET L'EXPLOITATION DES PROCEDES GEORGES CLAUDE | FR0000487936 | 5.250% | Dec 28 2011 | Western Europe | AUD50,000,000 |
|----|----|----|----|----|----|----|
| 56 | Liberty Mutual Insurance Company | US53079QAC15 | 7.875% | Oct 15 2026 | North America | AUD50,000,000 |
| 57 | Loews Corporation | US540424AE80 | 8.875% | Apr 15 2011 | North America | AUD50,000,000 |
| 58 | Bristol-Myers Squibb Company | US110122AG36 | 5.750% | Oct 1 2011 | North America | AUD50,000,000 |
| 59 | MBIA Insurance Corporation | No benchmark obligation | | | North America Monoline | AUD50,000,000 |
| 60 | McDonald's Corporation | US58013MDM38 | 6.000% | Apr 15 2011 | North America | AUD50,000,000 |
| 61 | Medtronic, Inc. | US585055AB27 | 1.250% | Sep 15 2021 | North America | AUD50,000,000 |
| 62 | Merck & Co., Inc. | US589331AE71 | 5.950% | Dec 1 2028 | North America | AUD50,000,000 |
| 63 | Merrill Lynch & Co., Inc. | US590188JP48 | 6.000% | Feb 17 2009 | North America | AUD50,000,000 |
| 64 | MGIC Investment Corporation | US552845AF69 | 6.000% | Mar 15 2007 | North America | AUD50,000,000 |
| 65 | Morgan Stanley | US617446HC69 | 6.600% | Apr 1 2012 | North America | AUD50,000,000 |
| 66 | N.V. Nuon | XS0208469253 | 4.125% | Dec 17 2014 | Western Europe | AUD50,000,000 |
| 67 | Nestle S.A. | XS0144994232 | 4.750% | Sep 25 | Western Europe | AUD50,000,000 |

| | | | | 2007 | | |
|---|---|---|---|---|---|---|
| 68 | Novartis AG | XS0158284801 | 3.750% | Dec 6 2007 | Western Europe | AUD50,000,000 |
| 69 | Pfizer Inc. | US717081AQ68 | 4.650% | Mar 1 2018 | North America | AUD50,000,000 |
| 70 | The PMI Group, Inc. | US69344MAE12 | 2.500% | Jul 15 2021 | North America | AUD50,000,000 |
| 71 | PPG Industries, Inc. | US693506AY35 | 7.050% | Aug 15 2009 | North America | AUD50,000,000 |
| 72 | The Procter & Gamble Company | US742718DA47 | 4.950% | Aug 15 2014 | North America | AUD50,000,000 |
| 73 | TESCO PLC | XS0159012847 | 4.750% | Apr 13 2010 | Western Europe | AUD50,000,000 |
| 74 | Cooperatieve Centrale Raffeisen-Boerenleenbank B.A. | XS0075088913 | 6.000% | Apr 15 2009 | Western Europe | AUD50,000,000 |
| 75 | Radian Group Inc. | US750236AB78 | 7.750% | Jun 1 2011 | North America | AUD50,000,000 |
| 76 | RadioShack Corporation | US750438AB90 | 7.375% | May 15 2011 | North America | AUD50,000,000 |
| 77 | RIO TINTO LIMITED | XS0147367436 | 5.125% | May 10 2007 | Australia/New Zealand | AUD50,000,000 |
| 78 | AT&T Inc. | US78387GAK94 | 5.875% | Aug 15 2012 | North America | AUD50,000,000 |
| 79 | The Sherwin-Williams Company | US824348AL09 | 7.375% | Feb 1 2027 | North America | AUD50,000,000 |
| 80 | Siemens Aktiengesellschaft | XS0131224155 | 5.750% | Jul 4 2011 | Western Europe | AUD50,000,000 |
| 81 | Kimberly-Clark Corporation | US494368AQ68 | 6.875% | Feb 15 2014 | North America | AUD50,000,000 |
| 82 | Southwest Airlines Co. | US844741AV08 | 6.500% | Mar 1 2012 | North America | AUD50,000,000 |

| 83 | The Standard Life Assurance Company | XS0151267522 | 6.375% | Jul 12 2022 | Western European Insurance | AUD50,000,000 |
|---|---|---|---|---|---|---|
| 84 | Svenska Cellulosa Aktiebolaget SCA | XS0149915653 | 5.375% | Jun 25 2007 | Western Europe | AUD50,000,000 |
| 85 | Swiss Reinsurance Company | CH0012491335 | 4.000% | Jun 29 2015 | Western Europe | AUD50,000,000 |
| 86 | Deutsche Telekom AG | XS0148956559 | 8.125% | May 29 2012 | Western Europe | AUD50,000,000 |
| 87 | Telephone and Data Systems, Inc. | US87943HAF64 | 10.000% | Jan 15 2021 | North America | AUD50,000,000 |
| 88 | Koninklijke KPN N.V. | US780641AG12 | 8.000% | Oct 1 2010 | Western Europe | AUD50,000,000 |
| 89 | TELSTRA CORPORATION LIMITED | XS0131858838 | 6.375% | Jun 29 2011 | Australia/New Zealand | AUD50,000,000 |
| 90 | The TJX Companies, Inc. | US872540AH26 | 7.450% | Dec 15 2009 | North America | AUD50,000,000 |
| 91 | Tribune Company | US89604KAG31 | 5.500% | Oct 6 2008 | North America | AUD50,000,000 |
| 92 | UBS AG | CH0009367886 | 3.500% | Aug 27 2008 | Western Europe | AUD50,000,000 |
| 93 | United Parcel Service, Inc. | US911308AB04 | 8.375% | Apr 1 2030 | North America | AUD50,000,000 |
| 94 | UNITED STATES CELLULAR CORPORATION | US911684AD06 | 6.700% | Dec 15 2033 | North America | AUD50,000,000 |
| 95 | UST Inc. | US902911AM82 | 6.625% | Jul 15 2012 | North America | AUD50,000,000 |
| 96 | Verizon Communications Inc. | US92344GAL05 | 7.250% | Dec 1 2010 | North America | AUD50,000,000 |
| 97 | V.F. Corporation | US918204AN83 | 8.500% | Oct 1 2010 | North America | AUD50,000,000 |

| 98 | VOLKSWAGEN AKTIENGESELLSCHAFT | XS0168882495 | 4.875% | May 22 2013 | Western Europe | AUD50,000,000 |
|---|---|---|---|---|---|---|
| 99 | Wal-Mart Stores, Inc. | US931142BE24 | 6.875% | Aug 10 2009 | North America | AUD50,000,000 |
| 100 | Washington Mutual, Inc. | US939322AL70 | 4.000% | Jan 15 2009 | North America | AUD50,000,000 |

# Long Coupon Portfolio (as of 10 March 2006)

| No. | Reference Entity | Benchmark Obligation ISIN/CUSIP | Coupon | Maturity | Entity Type |
|---|---|---|---|---|---|
| 1 | Adecco S.A. | CH0016469279 | 0.000% | Aug 26 2013 | Western Europe |
| 2 | AIFUL CORPORATION | JP310504B356 | 1.740% | May 28 2013 | Japan |
| 3 | Aktiebolaget Electrolux | XS0126231199 | 6.000% | Mar 20 2008 | Western Europe |
| 4 | Alcan Inc. | US013716AR64 | 4.875% | Sep 15 2012 | North America |
| 5 | Ambac Financial Group, Inc. | US023139AA61 | 9.375% | Aug 1 2011 | North America |
| 6 | AMCOR LTD | XS0188426372 | 4.250% | Mar 25 2011 | Australia/New Zealand |
| 7 | American Axle & Manufacturing, Inc. | US02406PAE07 | 5.250% | Feb 11 2014 | North America |
| 8 | Anadarko Petroleum Corporation | US032511AT44 | 6.125% | Mar 15 2012 | North America |
| 9 | ARCELOR FINANCE | XS0176671732 | 5.125% | Sep 24 2010 | Western Europe |
| 10 | Avnet, Inc. | US053807AK91 | 9.750% | Feb 15 2008 | North America |
| 11 | BAE SYSTEMS PLC | GB0001272664 | 10.750% | Nov 24 2014 | Western Europe |
| 12 | Belo Corp. | US080555AG03 | 8.000% | Nov 1 2008 | North America |
| 13 | Best Buy Co., Inc. | US086516AF82 | 2.250% | Jan 15 2022 | North America |
| 14 | BOOTS GROUP PLC | XS0097335318 | 5.500% | May 26 2009 | Western Europe |
| 15 | BRITISH SKY BROADCASTING GROUP PLC | US111013AC22 | 8.200% | Jul 15 2009 | Western Europe |
| 16 | THOMSON | FR0000188369 | 1.000% | Jan 1 2008 | Western Europe |
| 17 | Ingersoll-Rand Company | US456866AG74 | 9.000% | Aug 15 2021 | North America |
| 18 | Cardinal Health, Inc. | US14149YAF51 | 6.750% | Feb 15 2011 | North America |
| 19 | CARLTON COMMUNICATIONS LIMITED | XS0094626941 | 5.625% | Mar 2 2009 | Western Europe |
| 20 | CASINO GUICHARD-PERRACHON | FR0000488413 | 6.000% | Feb 27 2012 | Western Europe |
| 21 | CenterPoint Energy, Inc. | US15189TAC18 | 3.750% | May 15 2023 | North America |
| 22 | Centex Corporation | US152312AG95 | 7.875% | Feb 1 2011 | North America |
| 23 | CHARTERED SEMICONDUCTOR MANUFACTURING LTD. | US16133RAA41 | 2.500% | Apr 2 2006 | Singapore |
| 24 | CIR S.P.A. - COMPAGNIE INDUSTRIALI | XS0169896817 | 6.375% | Jan 10 2011 | Western Europe |

|    |                                           |              |        |             |                |
|----|-------------------------------------------|--------------|--------|-------------|----------------|
|    | RIUNITE                                   |              |        |             |                |
| 25 | Clear Channel Communications, Inc.        | US184502AK84 | 7.650% | Sep 15 2010 | North America  |
| 26 | CNA Financial Corporation                 | US126117AL40 | 5.850% | Dec 15 2014 | North America  |
| 27 | CNOOC LIMITED                             | USU17469AA25 | 6.375% | Mar 8 2012  | Asia           |
| 28 | Commercial Metals Company                 | US201723AC71 | 6.750% | Feb 15 2009 | North America  |
| 29 | Compagnie Financiere Michelin             | XS0145903406 | 6.125% | Apr 16 2009 | Western Europe |
| 30 | Computer Associates International, Inc.    | US204912AG49 | 6.500% | Apr 15 2008 | North America  |
| 31 | Continental Aktiengesellschaft            | XS0139722069 | 6.875% | Dec 5 2008  | Western Europe |
| 32 | Corning Incorporated                      | US219350AG04 | 6.300% | Mar 1 2009  | North America  |
| 33 | CSX Corporation                           | US126408AP85 | 6.750% | Mar 15 2011 | North America  |
| 34 | Cummins Inc.                              | US231021AM83 | 9.500% | Dec 1 2010  | North America  |
| 35 | Cytec Industries Inc.                     | US232820AB61 | 6.750% | Mar 15 2008 | North America  |
| 36 | DAILY MAIL AND GENERAL TRUST PLC          | XS0109428705 | 7.500% | Mar 29 2013 | Western Europe |
| 37 | Degussa AG                                | XS0181557454 | 5.125% | Dec 10 2013 | Western Europe |
| 38 | Deutsche Lufthansa Aktiengesellschaft     | XS0140276618 | 1.250% | Jan 4 2012  | Western Europe |
| 39 | Devon Energy Corporation                  | US251799AA02 | 7.950% | Apr 15 2032 | North America  |
| 40 | DSG INTERNATIONAL PLC                     | XS0157632562 | 6.125% | Nov 15 2012 | Western Europe |
| 41 | DTE Energy Company                        | US233331AE76 | 7.050% | Jun 1 2011  | North America  |
| 42 | Eastman Chemical Company                  | US277432AE06 | 7.000% | Apr 15 2012 | North America  |
| 43 | Electronic Data Systems Corporation       | US285661AD69 | 6.000% | Aug 1 2013  | North America  |
| 44 | Enbridge Energy Partners, L.P.            | US29250RAC07 | 4.750% | Jun 1 2013  | North America  |
| 45 | The Walt Disney Company                   | US25468PBX33 | 6.375% | Mar 1 2012  | North America  |
| 46 | Federal National Mortgage Association     | US31359MPF40 | 4.375% | Sep 15 2012 | North America  |
| 47 | Federated Department Stores, Inc.         | US31410HAS04 | 6.625% | Apr 1 2011  | North America  |
| 48 | Fortum Oyj                                | XS0180180985 | 4.625% | Nov 19 2010 | Western Europe |
| 49 | Gallaher Group PLC                        | XS0193805214 | 4.625% | Jun 10 2011 | Western Europe |
| 50 | GKN HOLDINGS PLC                          | XS0147740335 | 7.000% | May 14 2012 | Western Europe |
| 51 | Glencore International AG                  | XS0202202957 | 5.375% | Sep 30 2011 | Western Europe |
| 52 | GUS PLC                                   | XS0162820228 | 5.625% | Dec 12 2013 | Western Europe |
| 53 | HILTON GROUP PLC                          | XS0145190681 | 6.500% | Jul 17 2009 | Western Europe |

| 54 | Holcim Ltd | XS0170227093 | 4.375% | Jun 23 2010 | Western Europe |
| 55 | XL CAPITAL LTD | US98372PAF53 | 5.250% | Sep 15 2014 | North America |
| 56 | IMPERIAL CHEMICAL INDUSTRIES PLC | US449909AL48 | 5.625% | Dec 1 2013 | Western Europe |
| 57 | IMPERIAL TOBACCO GROUP PLC | US453144AA55 | 7.125% | Apr 1 2009 | Western Europe |
| 58 | International Paper Company | US460146BN29 | 6.750% | Sep 1 2011 | North America |
| 59 | iStar Financial Inc. | US45031UAB70 | 6.000% | Dec 15 2010 | North America |
| 60 | J SAINSBURY PLC | XS0132124735 | 5.625% | Jul 11 2008 | Western Europe |
| 61 | Jones Apparel Group, Inc. | US480081AH15 | 5.125% | Nov 15 2014 | North America |
| 62 | KELLOGG COMPANY | US487836AS72 | 6.600% | Apr 1 2011 | North America |
| 63 | Kinder Morgan Energy Partners, L.P. | US494550AH91 | 6.750% | Mar 15 2011 | North America |
| 64 | KINGFISHER PLC | XS0178322474 | 5.625% | Dec 15 2014 | Western Europe |
| 65 | Korea Exchange Bank | No benchmark obligation | | | Asia |
| 66 | L-3 Communications Corporation | US502413AJ62 | 7.625% | Jun 15 2012 | North America |
| 67 | LAFARGE | FR0010032730 | 5.448% | Dec 4 2013 | Western Europe |
| 68 | Lennar Corporation | US526057AG99 | 5.950% | Mar 1 2013 | North America |
| 69 | Limited Brands, Inc. | US532716AH08 | 6.125% | Dec 1 2012 | North America |
| 70 | Linde Aktiengesellschaft | DE0002465952 | 6.375% | Jun 14 2007 | Western Europe |
| 71 | Altria Group, Inc. | US02209SAA15 | 7.000% | Nov 4 2013 | North America |
| 72 | UST Inc. | US902911AM82 | 6.625% | Jul 15 2012 | North America |
| 73 | Manpower Inc. | XS0099959354 | 5.625% | Jul 26 2006 | North America |
| 74 | MARKS AND SPENCER p.l.c. | XS0138137285 | 6.375% | Nov 7 2011 | Western Europe |
| 75 | MARSH & McLENNAN COMPANIES, INC. | US571748AM43 | 5.375% | Jul 15 2014 | North America |
| 76 | Masco Corporation | US574599AW60 | 0.000% | Jul 20 2031 | North America |
| 77 | MATTEL, INC. | US57708QAX51 | 7.250% | Jul 9 2012 | North America |
| 78 | MBIA Inc. | US55262CAF77 | 6.625% | Oct 1 2028 | North America |
| 79 | ConAgra Foods, Inc. | US205887BA91 | 6.750% | Sep 15 2011 | North America |
| 80 | TELEFONICA, S.A. | XS0162867880 | 5.125% | Feb 14 2013 | Western Europe |
| 81 | MeadWestvaco Corporation | US583334AA59 | 6.850% | Apr 1 2012 | North America |
| 82 | METRO AG | DE000A0BCGN2 | 4.625% | May 26 2011 | Western Europe |
| 83 | ABB International Finance Limited | XS0181196170 | 6.500% | Nov 30 2011 | Western Europe |

| 84 | Newmont Mining Corporation | US651639AE60 | 5.875% | Apr 1 2035 | North America |
|---|---|---|---|---|---|
| 85 | Norske Skogindustrier ASA | USR80036AN77 | 7.625% | Oct 15 2011 | Western Europe |
| 86 | Office Depot, Inc. | US676220AF38 | 6.250% | Aug 15 2013 | North America |
| 87 | Olin Corporation | US680665AD83 | 9.125% | Dec 15 2011 | North America |
| 88 | PCCW-HKT Telephone LTD | US69319CAA27 | 6.000% | July 15, 2013 | Asia |
| 89 | Pepco Holdings, Inc. | US713291AC69 | 6.450% | Aug 15 2012 | North America |
| 90 | Petroleos Mexicanos | US71654QAM42 | 9.500% | Sep 15 2027 | Emerging Markets |
| 91 | Phelps Dodge Corporation | US717265AK88 | 8.750% | Jun 1 2011 | North America |
| 92 | PILKINGTON PLC | XS0136984654 | 6.500% | Oct 10 2008 | Western Europe |
| 93 | Progress Energy, Inc. | US743263AD77 | 7.100% | Mar 1 2011 | North America |
| 94 | Promise Co., Ltd. | JP383375A363 | 1.370% | Jun 4 2013 | Japan |
| 95 | PSEG Power LLC | US69362BAF94 | 7.750% | Apr 15 2011 | North America |
| 96 | Pulte Homes, Inc. | US745867AL56 | 7.875% | Aug 1 2011 | North America |
| 97 | Raytheon Company | US755111BH39 | 8.300% | Mar 1 2010 | North America |
| 98 | RENAULT | FR0000474843 | 4.625% | May 28 2010 | Western Europe |
| 99 | RENTOKIL INITIAL 1927 PLC | XS0138467237 | 6.125% | Nov 19 2008 | Western Europe |
| 100 | Republic of South Africa | US836205AD62 | 8.500% | Jun 23 2017 | Emerging Markets |
| 101 | Republic Services, Inc. | US760759AA83 | 7.125% | May 15 2009 | North America |
| 102 | Residential Capital Corporation | US76113BAC37 | 6.375% | Jun 30 2010 | North America |
| 103 | REXAM PLC | XS0145441191 | 6.625% | Mar 27 2007 | Western Europe |
| 104 | Russian Federation | XS0114288789 | 2.250% | Mar 31 2030 | Emerging Markets |
| 105 | Ryder System, Inc. | US783549AZ16 | 6.950% | Dec 1 2025 | North America |
| 106 | Sabre Holdings Corporation | US785905AA83 | 7.350% | Aug 1 2011 | North America |
| 107 | Safeway Inc. | US786514BF54 | 5.800% | Aug 15 2012 | North America |
| 108 | SAFEWAY LIMITED | XS0100362911 | 6.500% | Aug 5 2014 | Western Europe |
| 109 | The Hertz Corporation | US428040BS77 | 7.625% | Jun 1 2012 | North America |
| 110 | Sara Lee Corporation | US80311TCF75 | 6.150% | Jun 19 2008 | North America |
| 111 | SCOTTISH & NEWCASTLE PLC | XS0139288863 | 5.625% | Dec 4 2006 | Western Europe |
| 112 | Sealed Air Corporation | US81211KAA88 | 6.950% | May 15 2009 | North America |
| 113 | Securitas AB | XS0126389062 | 6.125% | Mar 14 2008 | Western Europe |

| 114 | Sempra Energy | US816851AF69 | 6.000% | Feb 1 2013 | North America |
|-----|---------------|--------------|--------|------------|---------------|
| 115 | Shinhan Bank | XS0174160654 | L+1.00% | Aug 5 2008 | Asia |
| 116 | SPRINT NEXTEL CORPORATION | US852060AS17 | 8.375% | Mar 15 2012 | North America |
| 117 | STAGECOACH GROUP PLC | US85255BAA61 | 8.625% | Nov 15 2009 | Western Europe |
| 118 | BRITISH TELECOMMUNICATIONS public limited company | XS0123684887 | 6.875% | Feb 15 2011 | Western Europe |
| 119 | SUNOCO, INC. | US86764PAB58 | 6.750% | Apr 1 2011 | North America |
| 120 | SUPERVALU INC. | US868536AR44 | 7.500% | May 15 2012 | North America |
| 121 | TAKEFUJI CORPORATION | USJ81335AH45 | 9.200% | Apr 15 2011 | Japan |
| 122 | Clariant AG | CH0010519475 | 4.250% | Mar 15 2008 | Western Europe |
| 123 | TDC A/S | XS0146556385 | 6.500% | Apr 19 2012 | Western Europe |
| 124 | Telefonos de Mexico, Sociedad Anonima de Capital Variable | USP9048DDD86 | 4.500% | Nov 19 2008 | Emerging Markets |
| 125 | Telekom Austria Aktiengesellschaft | XS0172844283 | 5.000% | Jul 22 2013 | Western Europe |
| 126 | Temple-Inland Inc. | US879868AH09 | 7.875% | May 1 2012 | North America |
| 127 | The Black & Decker Corporation | US091797AJ96 | 7.125% | Jun 1 2011 | North America |
| 128 | The Gap, Inc. | US364760AA65 | 6.900% | Sep 15 2007 | North America |
| 129 | THE KROGER CO. | US501044CE98 | 5.500% | Feb 1 2013 | North America |
| 130 | ThyssenKrupp AG | DE0008506254 | 7.000% | Mar 19 2009 | Western Europe |
| 131 | Toll Brothers, Inc. | US88947EAA82 | 6.875% | Nov 15 2012 | North America |
| 132 | TXU Corp. | US882848AH73 | 6.375% | Jan 1 2008 | North America |
| 133 | TYCO INTERNATIONAL LTD. | US902118BF40 | 2.750% | Jan 15 2018 | North America |
| 134 | Tyson Foods, Inc. | US902494AM53 | 8.250% | Oct 1 2011 | North America |
| 135 | Union Carbide Corporation | US905581AV67 | 6.700% | Apr 1 2009 | North America |
| 136 | UNION FENOSA S.A. | XS0181571364 | 5.000% | Dec 9 2010 | Western Europe |
| 137 | Union Pacific Corporation | US907818CN66 | 6.125% | Jan 15 2012 | North America |
| 138 | United Mexican States | US91086QAN88 | 7.500% | Apr 8 2033 | Emerging Markets |
| 139 | Universal Corporation | US91345HAT23 | 5.200% | Oct 15 2013 | North America |
| 140 | UPM-Kymmene Oyj | XS0142044824 | 6.125% | Jan 23 2012 | Western Europe |
| 141 | VALEO | FR0010007468 | 2.375% | Jan 1 2011 | Western Europe |

| 142 | CBS Corporation | US925524AJ95 | 7.700% | Jul 30 2010 | North America |
|-----|-----------------|--------------|--------|-------------|---------------|
| 143 | VIVENDI UNIVERSAL | FR0010160929 | 3.875% | Feb 15 2012 | Western Europe |
| 144 | VNU N.V. | XS0168516713 | 5.625% | May 22 2017 | Western Europe |
| 145 | Vornado Realty LP | US929042AA73 | 5.675% | Jun 15 2007 | North America |
| 146 | Waste Management, Inc. | US94106LAK52 | 7.375% | Aug 1 2010 | North America |
| 147 | Wendy's International, Inc. | US950590AJ84 | 6.250% | Nov 15 2011 | North America |
| 148 | Wing Hang Bank, Limited | XS0178307830 | 5.250% | Oct 10 2012 | Asia |
| 149 | Wolters Kluwer N.V. | XS0181273342 | 5.125% | Jan 27 2014 | Western Europe |
| 150 | Woori Bank | XS0155783276 | 4.500% | Oct 10 2007 | Asia |

# Short Coupon Portfolio (as of 10 March 2006)

| No. | Reference Entity | Benchmark Obligation ISIN/CUSIP | Coupon | Maturity | Entity Type | |
|-----|------------------|-------------------------------|--------|----------|-------------|--|
| 1 | Yamaha Motor Co., Ltd. | JP394280P238 | 0.000% | Mar 31 2009 | Japan | |
| 2 | Amerada Hess Corporation | US023551AH71 | 6.650% | Aug 15 2011 | North America | |
| 3 | Arrow Electronics, Inc. | US042735AL41 | 6.875% | Jun 1 2018 | North America | |
| 4 | Bank of China Limited | US061194AB21 | 8.250% | Mar 15 2014 | Asia | |
| 5 | Bayer Aktiengesellschaft | XS0145758040 | 6.000% | Apr 10 2012 | Western Europe | |
| 6 | Bertelsmann AG | XS0169240164 | 4.625% | Jun 3 2010 | Western Europe | |
| 7 | Capital One Financial Corporation | US14040HAD70 | 7.125% | Aug 1 2008 | North America | |
| 8 | CE ELECTRIC UK FUNDING COMPANY | XS0082800375 | 7.250% | Dec 15 2022 | Western Europe | |
| 9 | CIGNA Corporation | US125509BG36 | 6.375% | Oct 15 2011 | North America | |
| 10 | COLES MYER LTD. | XS0132722397 | 1.050% | Jul 24 2006 | Australia/New Zealand | |
| 11 | CSR LIMITED | AU300CSRL019 | 6.000% | Mar 17 2009 | Australia/New Zealand | |
| 12 | Duke Energy Corporation | US264399DW34 | 6.250% | Jan 15 2012 | North America | |
| 13 | KAJIMA CORPORATION | JP321020B525 | 1.150% | Feb 23 2012 | Japan | |
| 14 | Eli Lilly and Company | US532457AN86 | 6.570% | Jan 1 2016 | North America | |
| 15 | FirstEnergy Corp. | US337932AB30 | 6.450% | Nov 15 2011 | North America | |
| 16 | FOSTER'S GROUP LIMITED | USU34574AA89 | 6.875% | Jun 15 2011 | Australia/New Zealand | |
| 17 | GATX Financial Corporation | US36804PAA49 | 8.875% | Jun 1 2009 | North America | |
| 18 | HALLIBURTON COMPANY | US406216AR24 | 5.500% | Oct 15 2010 | North America | |
| 19 | HANKYU CORPORATION | JP377420AV96 | 2.460% | Sep 17 2010 | Japan | |
| 20 | John Fairfax Holdings Ltd | No benchmark obligation | | | Australia/New Zealand | |
| 21 | Kinder Morgan, Inc. | US494553AB60 | 6.500% | Sep 1 2012 | North America | |
| 22 | WOODSIDE PETROLEUM LTD. | USQ98229AC30 | 5.000% | Nov 15 2013 | Australia/New Zealand | |
| 23 | Kookmin Bank | XS0159385870 | 4.625% | Dec 10 2007 | Asia | |
| 24 | Korea Electric Power Corporation | USY48406AZ86 | 4.250% | Sep 12 2007 | Asia | |

| 25 | KT Corporation | US48268FAA03 | 5.875% | Jun 24 2014 | Asia | |
|----|----------------|--------------|--------|-------------|------|--|
| 26 | LEND LEASE CORPORATION LTD | USU52538AA03 | 6.750% | Jun 30 2005 | Australia/New Zealand | |
| 27 | Macquarie Bank Ltd | XS0189263188 | L+0.15% | Mar 30 2009 | Australia/New Zealand | |
| 28 | Mazda Motor Corporation | JP386840A439 | 1.390% | Mar 18 2009 | Japan | |
| 29 | PUBLISHING AND BROADCASTING LIMITED | XS0103534086 | 6.250% | Nov 1 2006 | Australia/New Zealand | |
| 30 | MITSUBISHI MATERIALS CORPORATION | XS0200955556 | 0.000% | Oct 2 2009 | Japan | |
| 31 | Motorola, Inc. | US620076AR03 | 7.625% | Nov 15 2010 | North America | |
| 32 | Omnicom Group Inc. | US681919AM84 | 0.000% | Jul 31 2032 | North America | |
| 33 | PETROLIAM NASIONAL BERHAD (PETRONAS) | USY68856AA47 | 7.000% | May 22 2012 | Asia | |
| 34 | QANTAS AIRWAYS LIMITED | USQ77974AW52 | 5.125% | Jun 20 2013 | Australia/New Zealand | |
| 35 | Republic of Bulgaria | XS0145623624 | 8.250% | Jan 15 2015 | Emerging Markets | |
| 36 | ROLLS-ROYCE plc | XS0188009004 | 4.500% | Mar 16 2011 | Western Europe | |
| 37 | Schering-Plough Corporation | US806605AE11 | 5.300% | Dec 1 2013 | North America | |
| 38 | Stockland | AU300SPT0090 | 6.000% | May 15 2013 | Australia/New Zealand | |
| 39 | Stora Enso Oyj | US86210MAA45 | 7.375% | May 15 2011 | Western Europe | |
| 40 | TAISEI CORPORATION | JP344360ATA7 | 2.550% | Oct 27 2009 | Japan | |
| 41 | The Dow Chemical Company | US260543BR36 | 6.000% | Oct 1 2012 | North America | |
| 42 | ERAC USA Finance Company | US26882PAN24 | 8.000% | Jan 15 2011 | North America | |
| 43 | UNITED BUSINESS MEDIA PLC | US911202AB50 | 7.750% | Jul 1 2009 | Western Europe | |
| 44 | Valero Energy Corporation | US91913YAB65 | 8.750% | Jun 15 2030 | North America | |
| 45 | WestLB AG | DE0003079406 | 5.250% | Apr 4 2011 | Western Europe | |
| 46 | Weyerhaeuser Company | US962166BP84 | 6.750% | Mar 15 2012 | North America | |
| 47 | Whirlpool Corporation | US963320AK24 | 8.600% | May 1 2010 | North America | |
| 48 | THE AUSTRALIAN GAS LIGHT COMPANY | USG06483AB02 | 6.850% | April 15, 2018 | Australia/New Zealand | |
| 49 | Wyeth | US983024AA80 | 5.250% | Mar 15 2013 | North America | |
| 50 | XTO Energy Inc. | US98385XAD84 | 4.900% | Feb 1 2014 | North America | |

## Definitions relating to Credit Events

Bankruptcy:

means a Reference Entity (a) is dissolved (other than pursuant to a consolidation, amalgamation or merger); (b) becomes insolvent or is unable to pay its debts or fails or admits in writing in a judicial, regulatory or administrative proceeding or filing its inability generally to pay its debts as they become due; (c) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (d) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (i) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (ii) is not dismissed, discharged, stayed or restrained in each case within thirty calendar days of the institution or presentation thereof; (e) has a resolution passed for its winding-up, official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (f) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (g) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within thirty calendar days thereafter; or (h) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (a) to (g) (inclusive).

Default Requirement:

USD10,000,000 or its equivalent in any other currency.

Failure to Pay:

means, after the expiration of any applicable (or deemed) Grace Period (after the satisfaction of any conditions precedent to the commencement of such Grace Period), the failure by a Reference Entity to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, in accordance with the terms of such Obligations at the time of such failure.

| Payment Requirement: | USD1,000,000 or its equivalent in any other currency. |

Restructuring:

(a) Restructuring means that, with respect to one or more Obligations and in relation to an aggregate amount of not less than the Default Requirement, any one or more of the following events occurs in a form that binds all holders of such Obligation, is agreed between the Reference Entity or a Governmental Authority and a sufficient number of holders of such Obligation to bind all holders of the Obligation or is announced (or otherwise decreed) by a Reference Entity or a Governmental Authority in a form that binds all holders of such Obligation, and such event is not expressly provided for under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred:

(i) a reduction in the rate or amount of interest payable or the amount of scheduled interest accruals;

(ii) a reduction in the amount of principal or premium payable at maturity or at scheduled redemption dates;

(iii) a postponement or other deferral of a date or dates for either (A) the payment or accrual of interest or (B) the payment of principal or premium;

(iv) a change in the ranking in priority of payment of any Obligation, causing the Subordination of such Obligation to any other Obligation; or

(v) any change in the currency or composition of any payment of interest or principal to any currency which is not a Permitted Currency.

"**Permitted Currency**" means (i) the legal tender of any Group of 7 (G7) country (or any country that becomes a member of G7 if G7 expands its membership); or (ii) the legal tender of any country which, as of the date of such change, is a member of the Organisation for Economic Cooperation and Development and has a local currency long-term debt rating of either AAA or higher assigned to it by Standard & Poor's, a division of The McGraw-Hill Companies, Inc. or any successor to the rating business thereof, Aaa or higher assigned to it by Moody's Investors Service, Inc. or any successor to the rating business thereof or AAA or higher assigned to it by Fitch Ratings or any successor to the rating business thereof.

(b) Notwithstanding the provisions of (a), above, none of the following shall constitute a Restructuring:

(i) the payment in euros of interest or principal in relation to an Obligation denominated in a currency of a Member State of the European Union that adopts or has adopted the single currency in accordance with the Treaty establishing

the European Community, as amended by the Treaty on European Union;

(ii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) due to an administrative adjustment, accounting adjustment or tax adjustment or other technical adjustment occurring in the ordinary course of business; or

(iii) the occurrence of, agreement to or announcement of any of the events described in (a)(i) to (v) in circumstances where such event does not directly or indirectly result from a deterioration in the creditworthiness or financial condition of the Reference Entity.

(c) For purposes of paragraphs (a) and (b) (above), the term Obligation shall be deemed to include Underlying Obligations for which the Reference Entity is acting as provider of a Qualifying Affiliate Guarantee or, if "All Guarantees" is specified as Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, as provider of any Qualifying Guarantee. In the case of a Qualifying Guarantee and an Underlying Obligation, references to a Reference Entity in paragraph (a) of this definition shall be deemed to refer to the relevant Underlying Obligor and the reference to a Reference Entity in paragraph (b) of this definition shall continue to refer to such Reference Entity.

(d) With respect to a Reference Entity, unless "Multiple Holder Obligation" is specified as Not Applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to such Reference Entity, notwithstanding anything to the contrary in this definition of Restructuring the occurrence of, agreement to, or announcement of, any of the events described in (a)(i) to (v) (above) shall not be a Restructuring where the Obligation in respect of any such events is not a Multiple Holder Obligation.

"**Multiple Holder Obligation**" means an Obligation that (i) at the time the Credit Event Notice is delivered, is held by more than three holders that are not Affiliates of each other and (ii) with respect to which a percentage of holders (determined pursuant to the terms of the Obligation) at least equal to sixty-six-and-two-thirds is required to consent to the event which would otherwise constitute a Restructuring Credit Event, provided that (ii) above shall not apply to any Obligations which are Bonds.

Obligation Acceleration:                  means one or more Obligations in an aggregate amount of not

less than the Default Requirement have become due and payable before they would otherwise have been due and payable as a result of, or on the basis of, the occurrence of a default, event of default or other similar condition or event (however described), other than a failure to make any required payment, in respect of the Reference Entity under one or more Obligations.

Repudiation/Moratorium:
means the occurrence of both of the following events: (i) an authorised officer of a Reference Entity or a Governmental Authority (x) disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, one or more Obligations in an aggregate amount of not less than the Default Requirement, or (y) declares or imposes a moratorium, standstill, roll-over or deferral, whether de facto or de jure, with respect to one or more Obligations in an aggregate amount of not less than the Default Requirement and (ii) a Failure to Pay, determined without regard to the Payment Requirement, or a Restructuring, determined without regard to the Default Requirement, with respect to any such Obligation occurs on or prior to the Repudiation/Moratorium Evaluation Date.

Credit Event Notice:
an irrevocable notice (which may be oral, including by telephone) from Buyer to Seller (with a written copy to S&P) which describes a Credit Event that occurred during the Credit Observation Period. The Credit Event which is the subject of the Credit Event Notice need not be continuing on the date the Credit Event Notice is effective.

Credit Event Notice After Restructuring:
with respect to a Reference Entity, notwithstanding anything to the contrary in the Credit Derivative Definitions, upon the occurrence of a Restructuring Credit Event during the term of the Transaction:

(a) the Buyer may deliver multiple Credit Event Notices with respect to the Reference Entity to which such Credit Event applies (with a written copy to S&P), each such Credit Event Notice setting forth the amount of the Floating Rate Payer Calculation Amount to which such Credit Event Notice applies (the "**Exercise Amount**");

(b) if the Buyer has delivered a Credit Event Notice that specifies an Exercise Amount that is less than the Floating Rate Payer Calculation Amount for the Reference Entity to which such Credit Event applies, it shall be construed as if the Reference Registry contained two entries for that specific Reference Entity, one which has a Floating Rate Payer Calculation Amount equal to the Exercise Amount and, upon satisfaction of the Conditions to Settlement, will be settled in accordance with the terms herein, and the other of which will have a Floating Rate Payer Calculation

Amount equal to the Floating Rate Payer Calculation Amount outstanding prior to such Credit Event Notice minus the Exercise Amount and will continue in effect; and

(c) the Exercise Amount in connection with a Credit Event Notice describing a Restructuring must be in the amount of 1,000,000 units of the currency in which the Floating Rate Payer Calculation Amount is denominated or an integral multiple thereof.

Grace Period: means the lesser of (a) the applicable grace period with respect to payments under the relevant Obligation under the terms of such Obligation in effect as of the later of the Trade Date and the date as of which such Obligation is issued or incurred and (b) 30 calendar days.

Grace Period Extension Date: in the event of a Potential Failure to Pay occurring on or prior to the Termination Date, and if Grace Period Extension is specified as applicable, and the relevant Grace Period ends after the Termination Date, the Grace Period Extension Date will be (i) in the event that the Calculation Agent determines that the Potential Failure to Pay is remedied during the Grace Period, and, in the absence of further Credit Events or further Potential Failures to Pay prior to or on the Termination Date, the later of (A) the Termination Date, and (B) the date which is three Business Days after the date of such remedy, or (ii) in the event that such Potential Failure to Pay is not remedied (as determined by the Calculation Agent in its sole and absolute discretion) before the expiry of the Grace Period and does not result in the occurrence of a Failure to Pay occurring prior to the expiry of the Grace Period, the date that is three Business Days following the Termination Date.

Notice of Publicly Available Information: means an irrevocable notice from the Buyer (which may be oral, including by telephone) to the Seller (with a written copy to S&P) that cites Publicly Available Information confirming the occurrence of the Credit Event described in the Credit Event Notice. The notice given must contain a copy, or a description in reasonable detail, of the relevant Publicly Available Information.

Event Determination Date: means the first date on which both the Credit Event Notice and the Notice of Publicly Available Information are effective.

Potential Failure to Pay: means the failure by any one of the Reference Entities to make, when and where due, any payments in an aggregate amount of not less than the Payment Requirement under one or more Obligations, without regard to any grace period or any conditions precedent to the commencement of any grace period applicable to such Obligations, in accordance with the terms of such Obligations at the time of such failure.

| | |
|---|---|
| Potential Repudiation/Moratorium: | means the occurrence of an event described in clause (i) of the definition at Repudiation/Moratorium. |
| Repudiation/Moratorium Evaluation Date: | means, if a Potential Repudiation/Moratorium occurs on or prior to the Termination Date, (i) if the Obligations to which such Potential Repudiation/Moratorium relates include Bonds, the date that is the later of (A) the date that is 60 days after the date of such Potential Repudiation/Moratorium and (B) the first payment under any such Bond after the date of such Potential Repudiation/Moratorium (or, if later, the expiration date or of any applicable Grace Period in respect of such payment date) and (ii) if the Obligations to which such Potential Repudiation/Moratorium relates do not include Bonds, the date that is 60 days after the date of such Potential Repudiation/Moratorium. |
| | If (i) the Repudiation/Moratorium Extension Condition is satisfied and (ii) an Event Determination Date in respect of that Repudiation/Moratorium does not occur during the Notice Delivery Period, the Repudiation/Moratorium Evaluation Date will be the Termination Date (even if a Repudiation/ Moratorium occurs after the Termination Date). |
| Repudiation/Moratorium Extension Condition: | The "Repudiation/Moratorium Extension Condition" is satisfied by the delivery of a Repudiation/Moratorium Extension Notice and, if specified as applicable in the related Confirmation, Notice of Publicly Available Information by the Notifying Party to the other party that is effective during the period described in clause (a) of the definition of Notice Delivery Period. |
| Repudiation/Moratorium Extension Notice: | means an irrevocable notice (which may be by telephone) from Notifying Party to the other party that describes a Potential Repudiation/Moratorium that occurred during the Credit Observation Period. A Repudiation/Moratorium Extension Notice must contain a description in reasonable detail of the facts relevant to the determination that a Potential Repudiation/Moratorium has occurred and indicate the date of the occurrence. The Potential Repudiation/Moratorium that is the subject of the Repudiation/Moratorium Extension Notice need not be continuing on the date the Repudiation/Moratorium Extension Notice is effective. A Repudiation/Moratorium Extension Notice shall be subject to the requirements regarding notices set forth in Section 1.10 of the Credit Derivatives definitions. |
| Qualifying Guarantee: | means an arrangement evidenced by a written instrument pursuant to which a Reference Entity irrevocably agrees (by guarantee of payment or equivalent legal arrangement) to pay all amounts due under an obligation (the "**Underlying Obligation**") for which another party is the obligor (the |

"**Underlying Obligor**"). Qualifying Guarantees shall exclude any arrangement (i) structured as a surety bond, financial guarantee insurance policy, letter of credit or equivalent legal arrangement or (ii) pursuant to the terms of which the payment obligations of the Reference Entity can be discharged, reduced or otherwise altered or assigned (other than by operation of law) as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). The benefit of a Qualifying Guarantee must be capable of being Delivered together with the Delivery of the Underlying Obligation.

Qualifying Affiliate Guarantee:
means a Qualifying Guarantee provided by a Reference Entity in respect of an Underlying Obligation of a Downstream Affiliate of that Reference Entity.

Downstream Affiliate:
means an entity whose outstanding Voting Shares were, at the date of issuance of the Qualifying Guarantee, more than 50 per cent. owned, directly or indirectly, by the Reference Entity.

Voting Shares:
means those shares or other interests that have power to elect the board of directors or similar governing body of an entity.

Governmental Authority:
means any de facto or de jure government (or any agency, instrumentality, ministry or department thereof), court, tribunal, administrative or other governmental authority or any other entity (private or public) charged with the regulation of the financial markets (including the central bank) of a Reference Entity or of the jurisdiction of organisation of a Reference Entity.

Convertible Obligation:
means any obligation that is convertible, in whole or in part, into Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

Exchangeable Obligation:
means any obligation that is exchangeable, in whole or in part, for Equity Securities solely at the option of holders of such obligation or a trustee or similar agent acting for the benefit only of holders of such obligation (or the cash equivalent thereof, whether the cash settlement option is that of the issuer or of (or for the benefit of) the holders of such obligation).

Accreting Obligation:
means any obligation (including, without limitation, a Convertible Obligation or an Exchangeable Obligation), the terms of which expressly provide for an amount payable upon acceleration equal to the original issue price (whether or not equal to the face amount thereof) plus an additional amount or amounts (on account of original issue discount or other accruals of interest or principal not payable on a periodic basis) that will or may accrete, whether or not (A) payment of such additional amounts is subject to a contingency or determined by reference

to a formula or index, or (B) periodic cash interest is also payable.

Equity Securities:        means:

(A) in the case of a Convertible Obligation, equity securities (including options and warrants) of the issuer of such obligation or depositary receipts representing those equity securities of the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time; and

(B) in the case of an Exchangeable Obligation, equity securities (including options and warrants) of a person other than the issuer of such obligation or depositary receipts representing those equity securities of a person other than the issuer of such obligation together with any other property distributed to or made available to holders of those equity securities from time to time.

## Obligation Definitions

Borrowed Money:        with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) (excluding an obligation under a revolving credit arrangement for which there are no outstanding unpaid drawings in respect of principal) for the payment or repayment of borrowed money (which term shall include, without limitation, deposits and reimbursement obligations arising from drawings pursuant to letters of credit).

Bond:        means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is in the form of, or represented by, a bond, note (other than notes delivered pursuant to Loans), certificated debt security or other debt security, and shall not include any other type of borrowed money obligation.

Loan:        means with respect to any one of the Reference Entities, any one or more obligations (whether as principal or surety or otherwise) in respect of borrowed money that is an obligation that is documented by a term loan agreement, revolving loan agreement or other similar credit agreement, and shall not include any other type of borrowed money obligation.

Bond or Loan:        means any obligation that is either a Bond or a Loan.

Specified Currencies:        meaning (a) Standard Specified Currencies and (b) any additional currencies specified as applicable in the Standard Terms in Schedule C hereto as being applicable to the Entity Type specified in the Reference Registry with respect to a Reference Entity.

| | |
|---|---|
| Standard Specified Currency: | means an obligation payable in any of the lawful currencies of Canada, Japan, Switzerland, the United Kingdom and the United States of America and the euro (and any successor currency to any of the abovementioned currencies). |
| Domestic Currency: | means an obligation payable in the lawful currency and any successor currency of (a) the relevant Reference Entity, if the Reference Entity is a Sovereign, or (b) the jurisdiction in which the relevant Reference Entity is organised, if the Reference Entity is not a Sovereign. In no event shall Domestic Currency include any successor currency if such successor currency is the lawful currency of any of Canada, Japan, Switzerland, the United Kingdom or the United States of America or the euro (or any successor currency to any such currency). |
| Subordinated: | means an obligation that is subordinated to an obligation that is Not Subordinated. |
| Not Subordinated: | means an obligation that is not subordinated to: (i) the Benchmark Obligation specified for the relevant Reference Entity in the Reference Registry or (ii) if no Benchmark Obligation is specified for the relevant Reference Entity, any unsubordinated Borrowed Money obligation of the relevant Reference Entity. For the purposes of determining whether an obligation satisfies the "Not Subordinated" Obligation Characteristic, the ranking in priority of payment of the Benchmark Obligation shall be determined as of the later of: (1) the Trade Date and (2) the date on which such obligation was issued or incurred and shall not reflect any change to such ranking after such later date. |
| Not Contingent: | means any obligation having an outstanding principal balance or, in the case of obligations that are not Borrowed Money, a Due and Payable Amount, that pursuant to the terms of such obligation may not be reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than payment). A Convertible Obligation, an Exchangeable Obligation and an Accreting Obligation shall satisfy the Not Contingent Obligation Characteristic if such Convertible Obligation, Exchangeable Obligation or Accreting Obligation otherwise meets the requirements of the preceding sentence so long as, in the case of a Convertible Obligation or an Exchangeable Obligation, the right (A) to convert or exchange such obligation or (B) to require the issuer to purchase or redeem such obligation (if the issuer has exercised or may exercise the right to pay the purchase or redemption price, in whole or in part, in Equity Securities) has not been exercised (or such exercise has been effectively rescinded). |
| Transferable: | means an obligation that is transferable to institutional investors without any contractual, statutory or regulatory restriction, |

provided that none of the following shall be considered contractual, statutory or regulatory restrictions:

(A) contractual, statutory or regulatory restrictions that provide for eligibility for resale pursuant to Rule 144A or Regulation S promulgated under the United States Securities Act of 1933, as amended (and any contractual, statutory or regulatory restrictions promulgated under the laws of any jurisdiction having a similar effect in relation to the eligibility for resale of an obligation); or

(B) restrictions on permitted investments such as statutory or regulatory investment restrictions on insurance companies and pension funds,

provided that such characteristics shall be applicable only in respect of obligations that are Bonds.

| | |
|---|---|
| Maximum Maturity 30 years: | means an obligation that has a remaining maturity of not greater than 30 years. |
| Not Bearer: | means any obligation that is not a bearer instrument unless interests with respect to such bearer instrument are cleared via the Euroclear system, Clearstream International or any other internationally recognised clearing system provided that such characteristic shall be applicable only in respect of obligations that are Bonds. |
| Not Sovereign Lender: | means any obligation that is not primarily owed to a Sovereign or Supranational Organisation, including, without limitation, obligations generally referred to as "Paris Club Debt". |
| Not Domestic Law: | means any obligation that is not governed by the laws of (A) the relevant Reference Entity, if such Reference Entity is a Sovereign, or (B) the jurisdiction or organisation of the relevant Reference Entity, if such Reference Entity is not a Sovereign. |
| Not Domestic Issuance: | means any obligation other than an obligation that was, at the time the relevant obligation was issued (or reissued, as the case may be) or incurred, intended to be offered for sale primarily in the domestic market of the relevant Reference Entity. Any obligation that is registered or qualified for sale outside the domestic market of the relevant Reference Entity (regardless of whether such obligation is also registered or qualified for sale within the domestic market of the relevant Reference Entity) shall be deemed not to be intended for sale primarily in the domestic market of the Reference Entity. |
| Not Domestic Currency: | means any obligation that is payable in a currency other than the Domestic Currency. |
| Assignable Loan: | means a Loan that is capable of being assigned or novated to (a) any third party or (b) at a minimum, commercial banks or financial institutions (irrespective of their jurisdiction of organisation) that are not then a lender or a member of the |

|  | relevant lending syndicate, without the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the applicable borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans. |
| Consent Required Loan: | means a Loan that is capable of being assigned or novated with the consent of the relevant Reference Entity or the guarantor, if any, of such Loan (or the consent of the relevant borrower if the Reference Entity is guaranteeing such Loan) or any agent, provided that such characteristics shall be applicable only in respect of obligations that are Loans. |

## Certain definitions relating to Successors

(a)    In relation to a Reference Entity that is not a Sovereign, "**Successor**" means the entity or entities, if any, determined as set forth below:

(i)    if an entity directly or indirectly succeeds to 75 per cent. or more of the Relevant Obligations of the Reference Entity by way of a Succession Event, that entity will be the sole Successor;

(ii)    if one entity directly or indirectly succeeds to more than 25 per cent. (but less than 75 per cent.) of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entity that succeeds to more than 25 per cent. of the Relevant Obligations will be the sole Successor;

(iii)    if more than one entity each directly or indirectly succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and not more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, the entities that succeed to more than 25 per cent. of the Relevant Obligations will each be Successors;

(iv)    if one or more entities each directly or indirectly succeed to more than 25 per cent. of the Relevant Obligations of the Reference Entity by way of a Succession Event, and more than 25 per cent. of the Relevant Obligations of the Reference Entity remains with the Reference Entity, each such entity and the Reference Entity will be Successors;

(v)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity continues to exist, there will be no Successor and the Reference Entity and the Transaction will not be changed in any way as a result of the Succession Event; and

(vi)    if one or more entities directly or indirectly succeed to a portion of the Relevant Obligations of the Reference Entity by way of a Succession Event, but no entity succeeds to more than 25 per cent. of the Relevant Obligations of the Reference Entity and the Reference Entity ceases to exist, the entity which succeeds to the greatest percentage of Relevant Obligations (or, if two or more entities succeed to an equal percentage of

Relevant Obligations, the entity from among those entities which succeeds to the greatest percentage of obligations) of the Reference Entity will be the sole Successor.

The Calculation Agent will be responsible for determining, as soon as reasonably practicable after it becomes aware of the relevant Succession Event (but no earlier than 14 days after the legally effective date of the Succession Event), and with effect from the legally effective date of the Succession Event, whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable. In calculating the percentages used to determine whether the relevant thresholds set forth above have been met, or which entity qualifies under paragraph (a)(vi) above, as applicable, the Calculation Agent shall use, in respect of each applicable Relevant Obligation included in such calculation, the amount of the liability in respect of such Relevant Obligation listed in the Best Available Information.

(b)     "**Succession Event**" means an event such as a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event in which one entity succeeds to the obligations of another entity, whether by operation of law or pursuant to any agreement. Notwithstanding the foregoing, "Succession Event" shall not include an event in which the holders of obligations of the Reference Entity exchange such obligations for the obligations of another entity, unless such exchange occurs in connection with a merger, consolidation, amalgamation, transfer of assets or liabilities, demerger, spin-off or other similar event.

(c)     Where, pursuant to Section (a) above, one or more Successors have been identified in relation to a particular Reference Entity:

(i)     each such Successor will be a Reference Entity (a "**Successor Reference Entity**") for the purposes of this Transaction (and, for the avoidance of doubt, the original Reference Entity shall cease to be a Reference Entity except where it is a Successor Reference Entity); and

(ii)    the Floating Rate Payer Calculation Amount in respect of each such Successor Reference Entity shall be the Floating Rate Payer Calculation Amount in respect of the original Reference Entity divided by the number of Successor Reference Entities.

(d)     "**Relevant Obligations**" means the Obligations constituting Bonds and Loans of the Reference Entity outstanding immediately prior to the effective date of the Succession Event, excluding any debt obligations outstanding between the Reference Entity and any of its Affiliates, as determined by the Calculation Agent. The Calculation Agent will determine the entity which succeeds to such Relevant Obligations on the basis of the Best Available Information. If the date on which the Best Available Information becomes available or is filed precedes the legally effective date of the relevant Succession Event, any assumptions as to the allocation of obligations between or among entities contained in the Best Available Information will be deemed to have been fulfilled as of the legally effective date of the Succession Event, whether or not this is in fact the case.

(e)     "**Best Available Information**" means:

(i)     in the case of a Reference Entity which files information with its primary securities regulator or primary stock exchange that includes unconsolidated, pro forma financial information which assumes that the relevant Succession Event has occurred or which provides such information to its shareholders, creditors or other persons whose approval of the Succession Event is required, that unconsolidated, pro forma financial information and, if provided subsequently to the provision of unconsolidated, pro forma financial information but before the Calculation Agent makes its determination for the purposes of the definition of "**Successor**", other relevant information that is contained in any written communication

provided by the Reference Entity to its primary securities regulator, primary stock exchange, shareholders, creditors or other persons whose approval of the Succession Event is required; or

(ii)    in the case of a Reference Entity which does not file with its primary securities regulators or primary stock exchange, and which does not provide to shareholders, creditors or other persons whose approval of the Succession Event is required, the information contemplated in (i) above, the best publicly available information at the disposal of the Calculation Agent to allow it to make a determination for the purposes of the definition of "Successor".

Information which is made available more than 14 days after the legally effective date of the Succession Event shall not constitute Best Available Information.

(f)    In relation to a Sovereign Reference Entity, "**Successor**" means any direct or indirect successor(s) to that Reference Entity irrespective of whether such successor(s) assumes any of the obligations of such Reference Entity.

"**Sovereign**" means any state, political subdivision or government, or any agency, instrumentality, ministry, department or other authority (including, without limiting the foregoing, the central bank) thereof.

## Additional Terms For Monolines

**Qualifying Policy.** "Qualifying Policy" means a financial guaranty insurance policy or similar financial guarantee pursuant to which a Reference Entity irrevocably guarantees or insures all Instrument Payments (as defined below) of an instrument that constitutes Borrowed Money (modified as set forth below) (the "Insured Instrument") for which another party (including a special purpose entity or trust) is the obligor (the "Insured Obligor"). Qualifying Policies shall exclude any arrangement (i) structured as a surety bond, letter of credit or equivalent legal arrangement or (ii) pursuant to the express contractual terms of which the payment obligations of the Reference Entity can be discharged or reduced as a result of the occurrence or non-occurrence of an event or circumstance (other than the payment of Instrument Payments). The benefit of a Qualifying Policy must be capable of being Delivered together with the Delivery of the Insured Instrument.

"**Instrument Payments**" means (A) in the case of any Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, (x) the specified periodic distributions in respect of interest or other return on the Certificate Balance on or prior to the ultimate distribution of the Certificate Balance and (y) the ultimate distribution of the Certificate Balance on or prior to a specified date and (B) in the case of any other Insured Instrument, the scheduled payments of principal and interest, in the case of both (A) and (B) (1) determined without regard to limited recourse or reduction provisions of the type described in paragraph (d) below and (2) excluding sums in respect of default interest, indemnities, tax gross-ups, make-whole amounts, early redemption premiums and other similar amounts (whether or not guaranteed or insured by the Qualifying Policy).

"**Certificate Balance**" means, in the case of an Insured Instrument that is in the form of a pass-through certificate or similar funded beneficial interest, the unit principal balance, certificate balance or similar measure of unreimbursed principal investment.

**Obligation and Deliverable Obligation.** Sections 2.14(a) and 2.15(a) of the Definitions are hereby amended by adding "or Qualifying Policy" after "or as provider of a Qualifying Affiliate Guarantee".

**Interpretation of Provisions.** In the case of a Reference Entity in respect of which Monoline is specified as being an Entity Type in the Reference Registry, in the event that an Obligation or a Deliverable Obligation is a Qualifying Policy, the terms of Section 2.21(d) of the Definitions will apply, with references to the

Qualifying Guarantee, the Underlying Obligation and the Underlying Obligor deemed to include the Qualifying Policy, the Insured Instrument and the Insured Obligor, respectively, except that:

(i) the Obligation Category Borrowed Money and the Obligation Category and Deliverable Obligation Category Bond shall be deemed to include distributions payable under an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the Deliverable Obligation Category Bond shall be deemed to include such an Insured Instrument, and the terms "obligation" and "obligor" as used in the 2003 ISDA Credit Derivatives Definitions in respect of such an Insured Instrument shall be construed accordingly;

(ii) references in the definitions of Assignable Loan and Consent Required Loan to the guarantor and guaranteeing shall be deemed to include the insurer and insuring, respectively;

(iii) neither the Qualifying Policy nor the Insured Instrument must satisfy on the relevant date the Deliverable Obligation Characteristic of Accelerated or Matured, whether or not that characteristic is otherwise specified as applicable herein;

(iv) if the Assignable Loan, Consent Required Loan, Direct Loan Participation or Transferable Deliverable Obligation Characteristics are specified herein and if the benefit of the Qualifying Policy is not transferred as part of any transfer of the Insured Instrument, the Qualifying Policy must be transferable at least to the same extent as the Insured Instrument; and

(v) with respect to an Insured Instrument in the form of a pass-through certificate or similar funded beneficial interest, the term "outstanding principal balance" shall mean the outstanding Certificate Balance and "maturity", as such term is used in the Maximum Maturity Deliverable Obligation Characteristic, shall mean the specified date by which the Qualifying Policy guarantees or insures, as applicable, that the ultimate distribution of the Certificate Balance will occur.

**Not Contingent.** An Insured Instrument will not be regarded as failing to satisfy the Not Contingent Deliverable Obligation Characteristic solely because such Insured Instrument is subject to provisions limiting recourse in respect of such Insured Instrument to the proceeds of specified assets (including proceeds subject to a priority of payments) or reducing the amount of any Instrument Payments owing under such Insured Instrument, provided that such provisions are not applicable to the Qualifying Policy by the terms thereof and the Qualifying Policy continues to guarantee or insure, as applicable, the Instrument Payments that would have been required to be made absent any such limitation or reduction.

**Deliver.** For purposes of Section 8.2 of the Definitions, "Deliver" with respect to an obligation that is a Qualifying Policy means to Deliver both the Insured Instrument and the benefit of the Qualifying Policy (or a custodial receipt issued by an internationally recognized custodian representing an interest in such an Insured Instrument and the related Qualifying Policy), and "Delivery" and "Delivered" will be construed accordingly.

**Provisions for Determining a Successor.** Section 2.2(c) of the Definitions is hereby amended by adding "or insurer" after "or guarantor".

**Other Provisions.** For purposes of Sections 2.15(a)(ii), 4.1, 8.2, 9.1 and 9.2(a) of the Definitions, references to the Underlying Obligation and the Underlying Obligor shall be deemed to include Insured Instruments and the Insured Obligor, respectively.

## Schedule C

The standard terms relating to each Entity Type are set out in this Schedule C.

### STANDARD TERMS FOR WESTERN EUROPEAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable |
| | Multiple Holder Obligation: Applicable |
| Obligation | |

| | | |
|---|---|---|
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |

## STANDARD TERMS FOR WESTERN EUROPEAN INSURANCE ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Obligation

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

## STANDARD TERMS FOR AUSTRALIAN AND NEW ZEALAND ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Obligation

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

## STANDARD TERMS FOR JAPANESE ENTITIES

All Guarantees     Applicable

Credit Events      Bankruptcy

Failure to Pay

Restructuring

 Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

 Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

 Multiple Holder Obligation: Not Applicable

Repudiation/Moratorium (applicable only to Sovereigns)

Section 3.9 of the Credit Derivatives Definitions shall not apply.

Obligation

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | Not Subordinated |

## STANDARD TERMS FOR SINGAPOREAN ENTITIES

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Repudiation/Moratorium (applicable only to Sovereigns)

Obligation

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Specified Currency – Standard |
| | Specified Currencies, plus SGD |
| | Not Sovereign Lender |

## STANDARD TERMS FOR ASIAN ENTITIES

All Guarantees          Applicable

Credit Events          Bankruptcy

Failure to Pay

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Applicable

Repudiation/Moratorium (applicable only to Sovereigns)

Obligation

| | |
|---|---|
| Obligation Category: | Bond or Loan |
| Obligation Characteristics: | Not Subordinated |
| | Not Sovereign Lender |
| | Not Domestic Currency |
| | Not Domestic Issuance |
| | Not Domestic Law |

## STANDARD TERMS FOR NORTH AMERICAN ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| | Restructuring |
| | Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable |
| | Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable |
| | Multiple Holder Obligation: Applicable |
| Obligation | |

| | | |
|---|---|---|
| | Obligation Category: | Borrowed Money |
| | Obligation Characteristics: | None |

## STANDARD TERMS FOR NORTH AMERICAN MONOLINE ENTITIES

| | |
|---|---|
| All Guarantees | Not Applicable |
| Credit Events | Bankruptcy |
| | Failure to Pay |
| Obligation | |

| | |
|---|---|
| Obligation Category: | Borrowed Money |
| Obligation Characteristics: | None |

## STANDARD TERMS FOR EMERGING MARKET SOVEREIGNS

| | |
|---|---|
| All Guarantees | Applicable |
| Credit Events | Failure to Pay |
| | Obligation Acceleration |
| | Repudiation/ Moratorium |
| | Restructuring |

          Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

          Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

          Multiple Holder Obligation: Not Applicable

Obligation

| | |
|---|---|
| Obligation Category: | Bond |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |

## STANDARD TERMS FOR EMERGING MARKETS ENTITIES

All Guarantees               Applicable

Credit Events              Bankruptcy

Failure to Pay

Obligation Acceleration

Repudiation/Moratorium

Restructuring

Restructuring Maturity Limitation and Fully Transferable Obligation: Not Applicable

Modified Restructuring Maturity Limitation and Conditionally Transferable Obligation: Not Applicable

Multiple Holder Obligation: Not Applicable

Obligation

| | |
|---|---|
| Obligation Category: | Bond |
| Obligation Characteristics: | Not Subordinated |
| | Not Domestic Currency |
| | Not Domestic Law |
| | Not Domestic Issuance |
| | Not Sovereign Lender |

## STANDARD TERMS FOR NORTH AMERICAN HIGH YIELD ENTITIES

All Guarantees                    Not Applicable

Credit Events                     Bankruptcy
                                  Failure to Pay

Obligation

                  Obligation Category:        Borrowed Money

                  Obligation Characteristics:  None

PARAGRAPH 11
to the
CREDIT SUPPORT ANNEX
to the Schedule to the ISDA Master Agreement
dated as of 10 October 2002 as amended as restated on 22 July 2005

**between**

**Lehman Brothers Special Financing Inc.**   and   **Saphir Finance Public Limited Company**
         **("Party A")**                                        **("Party B")**

## Paragraph 11. Elections and Variables

(a)   **Base Currency and Eligible Currency**

    (i)   "**Base Currency**" means AUD.

    (ii)   "**Eligible Currency**" means the Base Currency and each other currency specified here: none.

(b)   **Credit Support Obligations**

    (iii)   Delivery Amount, Return Amount and Credit Support Amount

        (A)   "**Delivery Amount**" has the meaning specified in Paragraph 2(a).

        (B)   "**Return Amount**" has the meaning specified in Paragraph 2(b) except that the Transferor shall be deemed to have made a demand on each Valuation Date.

        (C)   "**Credit Support Amount**" has the meaning specified in Paragraph 10.

    (iv)   *Eligible Credit Support*

    The following items will qualify as "**Eligible Credit Support**" for the party specified:

|  |  | Party A | Party B | Valuation Percentage |
|---|---|:---:|:---:|:---:|
| (A) | Cash in an Eligible Currency | X | X | 100% |
| (B) | AUD denominated government debt obligations having a maturity of one year or less assigned a rating of "AAA" by Standard & Poor's, a division of McGraw Hill Companies, Inc. ("S&P") (or successor) | X | X | 98% |

    (v)   *Thresholds*

        (A)   "**Independent Amount**" means with respect to Party A and to Party B: not applicable.

        (B)   "**Threshold**" means with respect to Party A: zero.

"**Threshold**" means with respect to Party B: not applicable

(C) "**Minimum Transfer Amount**" means with respect to Party A: AUD 1

"**Minimum Transfer Amount**" means with respect to Party B: AUD 1

(D) **Rounding**. Not applicable.

(c) **Valuation and Timing**

    (i) "**Valuation Agent**" means Party A.

    (ii) "**Valuation Date**" means:17 March 2006 and, thereafter, Friday of each calendar week, provided that if such day is not a day on which commercial banks are open for business in London, the Valuation Date shall be the day on which commercial banks are open for business in London immediately following such day.

    (iii) "**Valuation Time**" means:

        [X] the close of business in the place of location of the Valuation Agent on the Valuation Date or date of calculation, as applicable;

        [ ] the close of business on the Local Business Day immediately preceding the Valuation Date or date of calculation, as applicable;

        *provided* that the calculations of Value and Exposure will, as far as practicable, be made as of approximately the same time on the same date.

    (iv) "**Notification Time**" means 1:00 p.m., London time, on a Local Business Day.

(d) **Exchange Date**

"**Exchange Date**" has the meaning specified in Paragraph 3(c)(ii).

(e) **Dispute Resolution**

    (i) "**Resolution Time**" means 1:00 p.m., London time, on the Local Business Day following the date on which the notice is given that gives rise to a dispute under Paragraph 4.

    (ii) **Value**. For the purpose of Paragraphs 4(a)(4)(i)(C) and 4(a)(4)(ii), the Value of the outstanding Credit Support Balance or of any transfer of Eligible Credit Support or Equivalent Credit Support, as the case may be, will be calculated by Party A reasonably and in good faith.

    (iii) **Alternative**. The provisions of Paragraph 4 will apply.

(f) **Distributions and Interest Amount**

    (i) *Interest Rate*. The "Interest Rate" in relation to each Eligible Currency will be AUD-BBR-BBSW (as defined in the 2000 ISDA Definitions). The interest calculated at the rate referred to above shall be compounded on a daily basis.

    (ii) *Transfer of Interest Amount*. The transfer of the Interest Amount will be made on any Local Business Day that a Return Amount is transferred to the Transferor pursuant to Paragraph 2(b).

    (iii) *Alternative to Interest Amount*. The provisions of Paragraph 5(c)(ii) will apply.

(g) **Addresses for Transfers**

Party A: As notified by the parties from time to time.

Party B: As notified by the parties from time to time.

Account details of Transferee: The Transferee will notify the Transferor of its relevant account details on or before 16 March 2006.

**(h)     Other Provisions**

**(i)     Scope**

This Annex relates to the Transaction (the "**Swap Transaction**") between Party A and Party B with an Effective Date of 17 March 2006. The provisions of the Agreement shall apply both to the Swap Transaction and the Transaction evidenced by the Annex so that the Agreement, the Confirmation relating to the Swap Transaction and this Annex form a single agreement.

**(ii)     Exposure**

The definition of "**Exposure**" shall be deleted and replaced with the following:

""**Exposure**" means, with respect to Party B on a Valuation Date, and subject to Paragraph 4 in the case of a dispute, the amount (expressed as a positive number) equal to the Costs Exposure."

**(iii)     Additional definitions for calculating Exposure**

For the purposes herein, the following definitions shall apply:

"**Costs Exposure**" means the following amounts:

For the first Valuation Date falling on the Effective Date, USD310,000; and

For all Valuation Dates falling from, and including 17 March 2006, to but excluding the Termination Date of the Swap Agreement, an amount equal to USD25,000 multiplied by the number of the remaining years (rounded to the second decimal place) to 17 March 2016. For the avoidance of doubt, Costs Exposure includes an amount, reasonably estimated by the Calculation Agent, equal to any transfer or stamp tax or other costs, if any, which would be incurred by Party B, in relation to the delivery of the Collateral pursuant to (and as defined in) the terms and conditions of the Notes.

"**Aggregate Outstanding Principal Amount**" shall bear the meaning given to such term in the Series Prospectus with respect to the Notes.

**(iv)     Single Transferor**

Notwithstanding anything contained in this Annex, Party A only shall be a Transferor and Party B only shall be a Transferee.

**(v)     No set-off**

Notwithstanding any set-off right between Party A and Party B, whether now or hereafter in existence, each of Party A and Party B agrees that, subject as provided in this Agreement, all payments required to be made by it under this Transaction shall be made without set-off and that it shall not withhold payment or delivery under this Transaction in respect of any default by the other party under any agreement other than this Agreement or any amount relating to any agreement other than this Agreement between the other party on the one hand and it on the other. For the avoidance of doubt, references in this paragraph to "this Agreement" include the ISDA Master Agreement.

**Signed for and on behalf of**
**Lehman Brothers Special Financing**
**Inc.**

By:

Name: _____

Date: _____

**Signed for and on behalf of**
**Saphir Finance Public Limited Company**

By:

Name: _____

Date: _____

## Exhibit A

## GUARANTEE OF LEHMAN BROTHERS HOLDINGS INC.

LEHMAN BROTHERS SPECIAL FINANCING INC. ("**Party A**") and SAPHIR FINANCE PUBLIC LIMITED COMPANY ("**Party B**") have, pursuant to a Deed of Accession dated 22 July 2005 entered into a Master Agreement dated as of 10 October 2002, as amended and restated on 22 July 2005 (the "**Master Agreement**"), pursuant to which Party A and Party B have entered and/or anticipate entering into one or more transactions (each a "**Transaction**"), the Confirmation of each of which supplements, forms part of, and will be read and construed as one with, the Master Agreement (collectively referred to as the "**Agreement**"). This Guarantee is a Credit Support Document as contemplated in the Agreement for the Transaction evidenced by a Confirmation dated 17 March 2006 relating to the Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes due 2011 extendable up to 2016 of Party B (the "**2006-5 Transaction**"). For value received, and in consideration of the financial accommodation accorded to Party A by Party B under the Agreement, LEHMAN BROTHERS HOLDINGS INC., a corporation organized and existing under the laws of the State of Delaware ("**Guarantor**"), hereby agrees to the following:

(a)     Guarantor hereby unconditionally guarantees to Party B the due and punctual payment of all amounts payable by Party A under the 2006-5 Transaction when and as Party A's obligations thereunder shall become due and payable in accordance with the terms of the Agreement. In case of the failure of Party A to pay punctually any such amounts, Guarantor hereby agrees, upon written demand by Party B, to pay or cause to be paid any such amounts punctually when and as the same shall become due and payable.

(b)     Guarantor hereby agrees that its obligations under this Guarantee constitute a guarantee of payment when due and not of collection.

(c)     Guarantor hereby agrees that its obligations under this Guarantee shall be unconditional, irrespective of the validity, regularity or enforceability of the Agreement against Party A (other than as a result of the unenforceability of the Agreement against Party B), the absence of any action to enforce Party A's obligations under the Agreement, any waiver or consent by Party B with respect to any provisions thereof, the entry by Party A and Party B into additional Transactions under the Agreement or any other circumstance which might otherwise constitute a legal or equitable discharge or defence of a guarantor (excluding the defence of payment or statute of limitations, neither of which are waived); provided, however, that Guarantor shall be entitled to exercise any right that Party A could have exercised under the Agreement to cure any default in respect of its obligations under the Agreement or to setoff, counterclaim or withhold payment in respect of any Event of Default or potential Event of Default in respect of Party B or any Affiliate, but only to the extent such right is provided to Party A under the Agreement. The Guarantor acknowledges that Party A and Party B may from time to time enter into one or more Transactions pursuant to the Agreement.

(d)     This Guarantee shall remain in full force and effect until such time as Party B shall receive written notice of termination. Termination of this Guarantee shall not affect Guarantor's liability hereunder as to obligations incurred or arising out of Transactions entered into prior to the termination hereof and for the avoidance of doubt this Guarantee will remain in effect until all payment obligations of Party A under the 2006-5 Transaction have been fully performed notwithstanding such termination.

(e)     Guarantor further agrees that this Guarantee shall continue to be effective or be reinstated, as the case may be, if at any time, payment, or any part thereof, of any obligation or interest thereon is rescinded

## ANNEX 4 - DESCRIPTION OF THE SWAP COUNTERPARTY
## AND THE SWAP GUARANTOR

### Lehman Brothers Special Financing Inc.

Lehman Brothers Special Financing Inc. (the "**Swap Counterparty**") was incorporated under the laws of the State of Delaware of the United States of America on 17 August 1984.

The principal executive office of the Swap Counterparty is located at 745 Seventh Avenue, New York, New York 10019, U.S.A. The Swap Counterparty's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Counterparty is engaged in the fixed income and currency, swaps and derivatives business. The Swap Counterparty's principal activities are to provide a wide range of derivative products including interest rate, currency, credit and mortgage derivatives.

The Swap Counterparty is a wholly-owned subsidiary of Lehman Brothers Inc.

### Lehman Brothers Holdings Inc.

Lehman Brothers Holdings Inc. (the "**Swap Guarantor**") was incorporated under the laws of the State of Delaware of the United States of America on 29 December 1983.

The principal executive office of the Swap Guarantor is located at 745 Seventh Avenue, New York, New York 10019. The Swap Guarantor's registered office in the State of Delaware is located at 1013 Centre Road, Wilmington, Delaware 19805, U.S.A.

The Swap Guarantor is a holding company that is primarily engaged in funding activities. Through its U.S. and non-U.S. subsidiaries and affiliates it provides equity and fixed income sales, trading and research, investment banking, mortgage, private equity and private client services on a global basis. The Swap Guarantor provides these products and services to a wide array of clients, including corporations, governments and municipalities, institutional clients, and high-net-worth individuals.

The Swap Guarantor funds its activities through a combination of master notes, commercial paper, bank credit facilities and other money market related instruments, medium and long-term debt, and an unsecured flexible cash capital facility.

The common stock of the Swap Guarantor is listed on the New York Stock Exchange.

# GENERAL INFORMATION

1.  From the date of this Series Prospectus and for so long as the Notes remain outstanding, the following documents will be available for inspection in physical format during usual business hours on any weekday (Saturdays, Sundays and public holidays excepted) at the Issuer's registered office and the specified offices of the Irish Paying Agent. Copies of the documents referred to below may be obtained free of charge from the specified offices of the Irish Paying Agent:

    (1)     this Series Prospectus;

    (2)     the Supplemental Trust Deed and Drawdown Agreement in relation to the Notes; and

    (3)     the Collateral Pricing Supplement.

2.  The issue of the Notes was authorised by a resolution of the board of directors of the Issuer passed on or about 13 March 2006.

3.  Except as disclosed in this Series Prospectus, the Issuer has not been involved in any governmental, legal or arbitration proceedings (including any such proceedings which are pending or threatened of which the Issuer is aware) during the 12 months preceding the date of this Series Prospectus which may have or have had in the recent past significant effects, in the context of the issue of the Notes, on the financial position or profitability of the issuer.

4.  Save as set out in this Series Prospectus, there has been no significant change in the financial or trading position of the Issuer and no material adverse change in the financial position or prospectus of the Issuer since the date of its last published audited financial statements.

5.  Save as discussed in "Subscription and Sale" in the Base Prospectus, so far as the Issuer is aware, no person involved in the offer of the Notes has an interest material to the offer.

6.  Lehman Brothers International (Europe) shall settle on the Issuer's behalf or reimburse the Issuer against any fees or expenses relating to the application to the Irish Stock Exchange for the Notes to be admitted to the Official List and to be admitted to trading on the regulated market of the Irish Stock Exchange.

7.  A&L Listing Limited has been appointed by the Issuer to act as its listing agent and as such is not seeking admission to listing of the Notes on the Irish Stock Exchange for the purposes of the Prospectus Directive on its own behalf, but as the agent on behalf of the Issuer.

**REGISTERED OFFICE OF THE ISSUER**
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland


**TRUSTEE**
J.P. Morgan Corporate Trustee Services Limited
Trinity Tower,
9 Thomas More Street,
London E1W 1YT


**SWAP COUNTERPARTY**
Lehman Brothers Special Financing Inc.
1013 Centre Road,
Wilmington,
Delaware 19805,
U.S.A.

**ISSUING AND PAYING AGENT AND CUSTODIAN**
JPMorgan Chase Bank, N.A.
Trinity Tower,
9 Thomas More Street,
London E1W 1YT

**IRISH PAYING AGENT**
J.P. Morgan Bank (Ireland) p.l.c.
JPMorgan House
International Financial Services Centre
Dublin 1.
Ireland


**AUSTRALIAN PAYING AGENT AND REGISTRAR**
J.P. Morgan Institutional Services Australia Limited
(ABN 48 002 916 396)
Level 32 Grosvenor Place
225 George Street
Sydney
New South Wales 2000
Australia

**CALCULATION AGENT**
Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

**LISTING AGENT**
A&L Listing Limited
International Financial Services Centre
North Wall Quay
Dublin 1
Ireland

**LEGAL ADVISERS**

*to the Issuer*
*as to Irish law*

*to the Arranger and the Trustee*
*as to English law*

**A&L Goodbody Solicitors**
International Financial Services Centre
North Wall Quay
Dublin 1, Ireland

**Linklaters**
10th Floor, Alexandra House
Chater Road
Central
Hong Kong

# EXHIBIT D



**ISDA**®

International Swaps & Derivatives Association. Inc.

# MASTER AGREEMENT

dated as of 10 October 2002
as Amended and Restated on 22 July 2005

Dante Finance Public Limited Company and Lehman Brothers Special Financing, Inc.

have entered and/or anticipate entering into one or more transactions (each a "Transaction") that are or will be governed by this Master Agreement, which includes the schedule (the "Schedule"), and the documents and other confirming evidence (each a "Confirmation") exchange between the parties confirming those Transactions.

Accordingly, the parties agree as follows:-

**1      Interpretation**

(a)      ***Definitions***. The terms defined in Section 14 and in the Schedule will have the meanings therein specified for the purpose of this Master Agreement.

(b)      ***Inconsistency.*** In the event of any inconsistency between the provisions of the Schedule and the other provisions of this Master Agreement, the Schedule will prevail. In the event of any inconsistency between the provisions of any Confirmation and this Master Agreement (including the Schedule), such Confirmation will prevail for the purpose of the relevant Transaction.

(c)      ***Single Agreement.*** All Transactions are entered into in reliance on the fact that this Master Agreement and all Confirmations form a single agreement between the parties (collectively referred to as this "Agreement"), and the parties would not otherwise enter into any Transactions.

**2      Obligations**

(a)      ***General Conditions.***

(i)      Each party will make each payment or delivery specified in each Confirmation to be made by it, subject to the other provisions of this Agreement.

(ii)      Payments under this Agreement will be made on the due date for value on that date in the place of the account specified in the relevant Confirmation or otherwise pursuant to this Agreement, in freely transferable funds and in the manner customary for payments in the required currency. Where settlement is by delivery (that is, other than by payment), such delivery will be made for receipt on the due date in the manner customary for the relevant obligation unless otherwise specified in the relevant Confirmation or elsewhere in this Agreement.

(iii)      Each obligation of each party under Section 2(a)(i) is subject to (1) the condition precedent that no Event of Default or Potential Event of Default with respect to the other party has occurred and is continuing, (2) the condition precedent that no Early Termination Date in respect of the relevant Transaction has occurred or been effectively designated and (3) each other applicable condition precedent specified in this Agreement.

(b)      ***Change of Account.*** Either party may change its account for receiving a payment or delivery by giving notice to the other party at least five Local Business Days prior to the scheduled date for the payment or delivery to which such change applies unless such other party gives timely notice of a reasonable objection to such change.

(c)      ***Netting***. If on any date amounts would otherwise be payable:-

    (i)      in the same currency; and

    (ii)      in respect of the same Transaction,

by each party to the other, then, on such date, each party's obligation to make payment of any such amount will be automatically satisfied and discharged and, if the aggregate amount that would otherwise have been payable by one party exceeds the aggregate amount that would otherwise have been payable by the other party, replaced by an obligation under the party by whom the larger aggregate amount would have been payable to pay to the other party the excess of the larger aggregate amount over the smaller aggregate amount.

The parties may elect in respect of two or more Transactions that a net amount will be determined in respect of all amounts payable on the same date in the same currency in respect of such Transactions, regardless of whether such amounts are payable in respect of the same Transaction.  The election may be made in the Schedule or a Confirmation by specifying that subparagraph (ii) above will not apply to the Transactions identified as being subject to the election, together with the starting date (in which case subparagraph (ii) above will not, or will cease to, apply to such Transactions from such date). This election may be made separately for different groups of Transactions and will apply separately to each pairing of Offices through which the parties make and receive payments or deliveries.

(d)      ***Deduction or Withholding for Tax.***

    (i)      ***Gross-Up.*** All payments under this Agreement will be made without any deduction or withholding for or on account of any Tax unless such deduction or withholding is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, then in effect. If a party is so required to deduct or withhold, then that party ("X") will:-

        (1)      promptly notify the other party ("Y") of such requirement;

        (2)      pay to the relevant authorities the full amount required to be deducted or withheld (including the full amount required to be deducted or withheld from any additional amount paid by X to Y under this Section 2(d)) promptly upon the earlier of determining that such deduction or withholding is required or receiving notice that such amount has been assessed against Y;

        (3)      promptly forward to Y an official receipt (or a certified copy), or other documentation reasonably acceptable to Y, evidencing such payment to such authorities; and

        (4)      if such Tax is an Indemnifiable Tax, pay to Y, in addition to the payment to which Y is otherwise entitled under this Agreement, such additional amount as is necessary to ensure that the net amount actually received by Y (free and clear of Indemnifiable Taxes, whether assessed against X or Y) will equal the full amount Y would have received had no such deduction or withholding been required. However, X will not be required to pay any additional amount to Y to the extent that it would not be required to be paid but for:-

(A)    the failure by Y to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d); or

(B)    the failure of a representation made by Y pursuant to Section 3(f) to be accurate and true unless such failure would not have occurred but for (I) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (II) a Change in Tax Law.

(ii)    ***Liability.*** If:-

(1)    X is required by any applicable law, as modified by the practice of any relevant governmental revenue authority, to make any deduction or withholding in respect of which X would not be required to pay an additional amount to Y under Section 2(d)(i)(4);

(2)    X does not so deduct or withhold; and

(3)    a liability resulting from such Tax is assessed directly against X,

then, except to the extent Y has satisfied or then satisfies the liability resulting from such Tax, Y will promptly pay to X the amount of such liability (including any related liability for interest, but including any related liability for penalties only if Y has failed to comply with or perform any agreement contained in Section 4(a)(i), 4(a)(iii) or 4(d)).

(e)    ***Default Interest; Other Amounts.***  Prior to the occurrence of effective designation of an Early Termination Date in respect of the relevant Transaction, a party that defaults in the performance of any payment obligation will, to the extent permitted by law and subject to Section 6(c), be required to pay interest (before as well as after judgment) on the overdue amount to the other party on demand in the same currency as such overdue amount, for the period from (and including) the original due date for payment to (but excluding) the date of actual payment, at the Default Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed. If, prior to the occurrence or effective designation of an Early Termination Date in respect of the relevant Transaction, a party defaults in the performance of any obligation required to be settled by delivery, it will compensate the other party on demand if and to the extent provided for in the relevant Confirmation or elsewhere in this Agreement.

**3      Representations**

Each party represents to the other party (which representations will be deemed to be repeated by each party on each date on which a Transaction is entered into and, in the case of the representations in Section 3(f), at all times until the termination of this Agreement) that:-

(a)    ***Basic Representations.***

(i)    ***Status***. It is duly organised and validly existing under the laws of the jurisdiction of its organisation or incorporation and, if relevant under such laws, in good standing;

(ii)    ***Powers.*** It has the power to execute this Agreement and any other documentation relating to this Agreement to which it is a party, to deliver this Agreement and any other documentation relating to this Agreement that it is required by this Agreement to deliver and to perform its obligations under this Agreement and any obligations it has under any

Credit Support Document to which it is a party and has taken all necessary action to authorise such execution, delivery and performance;

(iii) **No Violation or Conflict.** Such execution, delivery and performance do not violate or conflict with any law applicable to it, any provision of its constitutional documents, any order or judgment of any court or other agency of government applicable to it or any of its assets or any contractual restriction binding on or affecting it or any of its assets;

(iv) **Consents.** All governmental and other consents that are required to have been obtained by it with respect to this Agreement or any Credit Support Document to which it is a party have been obtained and are in full force and effect and all conditions of any such consents have been complied with; and

(v) **Obligation Binding.** Its obligations under this Agreement and any Credit Support Document to which it is a party constitute its legal, valid and binding obligations, enforceable in accordance with their respective terms (subject to applicable bankruptcy, reorganisation, insolvency, moratorium or similar laws affecting creditors' rights generally and subject, as to enforceability, to equitable principles of general application (regardless of whether enforcement is sought in a proceeding in equity or at law)).

(b) **Absence of Certain Events.** No Event of Default or Potential Event of Default or, to its knowledge, Termination Event with respect to it has occurred and is continuing and no such event or circumstance would occur as a result of its entering into or performing its obligations under this Agreement or any Credit Support Document to which it is a party.

(c) **Absence of Litigation.** There is not pending or, to its knowledge, threatened against it or any of its Affiliates any action, suit or proceeding at law or in equity or before any court, tribunal, governmental body, agency or official or any arbitrator that is likely to affect the legality, validity or enforceability against it of this Agreement or any Credit Support Document to which it is a party or its ability to perform its obligations under this Agreement or such Credit Support Document.

(d) **Accuracy of Specified Information.** All applicable information that is furnished in writing by or on behalf of it to the other party and is identified for the purpose of this Section 3(d) in the Schedule is, as of the date of the information, true, accurate and complete in every material respect.

(e) **Payer Tax Representations.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(e) is accurate and true.

(f) **Payee Tax Representations.** Each representation specified in the Schedule as being made by it for the purpose of this Section 3(f) is accurate and true.

**4      Agreements**

Each party agrees with the other that, so long as either party has or may have any obligation under this Agreement or under any Credit Support Document to which it is a party:-

(a) **Furnish Specified Information.** It will deliver to the other party or, in certain cases under subparagraph (iii) below, to such government or taxing authority as the other party reasonably directs:-

(i) any forms, documents or certificates relating to taxation specified in the Schedule or any Confirmation;

(ii) any other documents specified in the Schedule or any Confirmation; and

(iii)     upon reasonable demand by such other party, any form or document that may be required or reasonably requested in writing in order to allow such other party or its Credit Support Provider to make a payment under this Agreement or any applicable Credit Support Document without any deduction or withholding for or on account of any Tax or with such deduction or withholding at a reduced rate (so long as the completion, execution or submission of such form or document would not materially prejudice the legal or commercial position of the party in receipt of such demand), with any such form or document to be accurate and completed in a manner reasonably satisfactory to such other party and to be executed and to be delivered with any reasonably required certification,

in each case by the date specified in the Schedule or such Confirmation or, if none is specified, as soon as reasonably practicable.

(b)     ***Maintain Authorisations.*** It will use all reasonable efforts to maintain in full force and effect all consents of any governmental or other authority that are required to be obtained by it with respect to this Agreement or any Credit Support Document to which it is a party and will use all reasonable efforts to obtain any that may become necessary in the future.

(c)     ***Comply with Laws.*** It will comply in all material respects with all applicable laws and orders to which it may be subject if failure so to comply would materially impair its ability to perform its obligations under this Agreement or any Credit Support Document to which it is a party.

(d)     ***Tax Agreement.*** It will give notice of any failure of a representation made by it under Section 3(f) to be accurate and true promptly upon learning of such failure.

(e)     ***Payment of Stamp Tax.*** Subject to Section 11, it will pay any Stamp Tax levied or imposed upon it or in respect of its execution or performance of this Agreement by a jurisdiction in which it is incorporated, organised, managed and controlled, or considered to have its seat, or in which a branch or office through which it is acting for the purpose of this Agreement  is located ("Stamp Tax Jurisdiction") and will indemnify the other party against any Stamp Tax levied or imposed upon the other party or in respect of the other party's execution or performance of this Agreement by any such Stamp Tax Jurisdiction which is not also a Stamp Tax Jurisdiction with respect to the other party.

**5     Events of Default and Termination Events**

(a)     ***Events of Default.*** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:-

(i)     ***Failure to Pay or Deliver.*** Failure by the party to make, when due, any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) required to be made by it if such failure is not remedied on or before the third Local Business Day after notice of such failure is given to the party;

(ii)     ***Breach of Agreement.*** Failure by the party to comply with or perform any agreement or obligation (other than an obligation to make any payment under this Agreement or delivery under Section 2(a)(i) or 2(e) or to give notice of a Termination Event of any agreement or obligation under Section 4(a)(i),  4(a)(iii) or 4(d)) to be complied with or performed by the party in accordance with this Agreement if such failure is not remedied on or before the thirtieth day after notice of such failure is given to the party;

(iii)    **Credit Support Default.**

(1)  Failure by the party or any Credit Support Provider of such party to comply with or perform any agreement or obligation to be complied with or performed by it in accordance with any Credit Support Document if such failure is continuing after any applicable grace period has elapsed;

(2)  the expiration or termination of such Credit Support Document or the failing or ceasing of such Credit Support Document to be in full force and effect for the purpose of this Agreement (in either case other than in accordance with its terms) prior to the satisfaction of all obligations of such party under each Transaction to which such Credit Support Document relates without the written consent of the other party; or

(3)  the party or such Credit Support Provider disaffirms, disclaims, repudiates or rejects, in whole or in part, or challenges the validity of, such Credit Support Document;

(iv)    **Misrepresentation.** A representation (other than a representation under Section 3(e) or (f)) made or repeated or deemed to have been made or repeated by the party or any Credit Support Provider of such party in this Agreement or any Credit Support Document proves to have been incorrect or misleading in any material respect when made or repeated or deemed to have been made or repeated;

(v)    **Default under Specified Transaction.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party (1) defaults under a Specified Transaction and, after giving effect to any applicable notice requirement or grace period, there occurs a liquidation of, an acceleration of obligations under, or an early termination of, that Specified Transaction, (2) defaults, after giving effect to any applicable notice requirement or grace period, in making any payment or delivery due on the last payment, delivery or exchange date of, or any payment on early termination of, a Specified Transaction (or such default continues for at least three Local Business Days if there is no applicable notice requirement or grace period) or (3) disaffirms, disclaims, repudiates or rejects, in whole or in part, a Specified Transaction (or such action is taken by any person or entity appointed or empowered to operate it or act on its behalf);

(vi)    **Cross Default.** If "Cross Default" is specified in the Schedule as applying to the party, the occurrence or existence of (1) a default, event of default or other similar condition or event (however described) in respect of such party, any Credit Support Provider of such party or any applicable Specified Entity of such party under one or more agreements or instruments relating to Specified Indebtedness of any of them (individually or collectively) in an aggregate amount of not less than the applicable Threshold Amount (as specified in the Schedule) which has resulted in such Specified Indebtedness becoming, or becoming capable at such time of being declared, due and payable under such agreements or instruments, before it would otherwise have been due and payable or (2) a default by such party, such Credit Support Provider or such Specified Entity (individually or collectively) in making one or more payments on the due date thereof in an aggregate amount of not less than the applicable Threshold Amount under such agreements or instruments (after giving effect to any applicable notice requirement or grace period);

(vii)    **Bankruptcy.** The party, any Credit Support Provider of such party or any applicable Specified Entity of such party:-

(1)  is dissolved (other than pursuant to a consolidation, amalgamation or merger); (2) becomes insolvent or is unable to pay its debts or fails or admits in writing its inability generally to pay its debts as they become due; (3) makes a general assignment, arrangement or composition with or for the benefit of its creditors; (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation, and, in the case of any such proceeding or petition instituted or presented against it, such proceeding or petition (A) results in a judgment of insolvency or bankruptcy or the entry of an order for relief or the making of an order for its winding-up or liquidation or (B) is not dismissed, discharged, stayed or restrained in each case within 30 days of the institution or presentation thereof; (5) has a resolution passed for its winding-up official management or liquidation (other than pursuant to a consolidation, amalgamation or merger); (6) seeks or becomes subject to the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official for it or for all or substantially all its assets; (7) has a secured party take possession of all or substantially all its assets or has a distress, execution, attachment, sequestration or other legal process levied, enforced or sued on or against all or substantially all its assets and such secured party maintains possession, or any such process is not dismissed, discharged, stayed or restrained, in each case within 30 days thereafter; (8) causes or is subject to any event with respect to it which, under the applicable laws of any jurisdiction, has an analogous effect to any of the events specified in clauses (1) to (7) (inclusive); or (9) takes any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the foregoing acts; or

(viii)  **Merger Without Assumption.** The party or any Credit Support Provider of such party consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and, at the time of such consolidation, amalgamation, merger or transfer:-

(1)  the resulting, surviving or transferee entity fails to assume all the obligations of such party or such Credit Support Provider under this Agreement or any Credit Support Document to which it or its predecessor was a party by operation of law or pursuant to an agreement reasonably satisfactory to the other party to this Agreement; or

(2)  the benefits of any Credit Support Document fail to extend (without the consent of the other party) to the performance by such resulting, surviving or transferee entity of its obligations under this Agreement.

(b)  **Termination Events.** The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party or any Specified Entity of such party of any event specified below constitutes an Illegality if the event is specified in (i) below, a Tax Event if the event is specified in (ii) below or a Tax Event Upon Merger if the event is specified in (iii) below, and, if specified to be applicable, a Credit Event Upon Merger if the event is specified pursuant to (iv) below or an Additional Termination Event if the event is specified pursuant to (v) below:-

(i)  **Illegality.** Due to the adoption of, or any change in, any applicable law after the date on which a Transaction is entered into, or due to the promulgation of, or any change in, the interpretation by any court, tribunal or regulatory authority with competent

jurisdiction of any applicable law after such date, it becomes unlawful (other than as a result of a breach by the party of Section 4(b)) for such party (which will be the Affected Party):

> (1) to perform any absolute or contingent obligation to make a payment or delivery or to receive a payment or delivery in respect of such Transaction or to comply with any other material provision of this Agreement relating to such Transaction; or

> (2) to perform, or for any Credit Support Provider of such party to perform, any contingent or other obligation which the party (or such Credit Support Provider) has under any Credit Support Document relating to such Transaction;

(ii) **Tax Event.** Due to (x) any action taken by a taxing authority, or brought in a court of competent jurisdiction, on or after the date on which a Transaction is entered into (regardless of whether such action is taken or brought with respect to a party to this Agreement) or (y) a Change in Tax Law, the party (which will be the Affected Party) will, or there is a substantial likelihood that it will, on the next succeeding Scheduled Payment Date (1) be required to pay to the other party an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount is required to be deducted or withheld for or on account of a Tax (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) and no additional amount is required to be paid in respect of such Tax under Section 2(d)(I)(4) (other than by reason of Section 2(d)(i)(4)(A) or (B));

(iii) **Tax Event Upon Merger.** The party (the "Burdened Party") on the next succeeding Scheduled Payment Date will either (1) be required to pay an additional amount in respect of an Indemnifiable Tax under Section 2(d)(i)(4) (except in respect of interest under Section 2(e), 6(d)(ii) or 6(e)) or (2) receive a payment from which an amount has been deducted or withheld for or on account of any Indemnifiable Tax in respect of which the other party is not required to pay an additional amount (other than by reason of Section 2(d)(i)(4)(A) or (B)), in either case as a result of a party consolidating or amalgamating with, or merging with or into, or transferring all or substantially in its assets to, another entity (which will be the Affected Party) where such action does not constitute an event described in Section 5(a)(viii);

(iv) **Credit Event Upon Merger.** If "Credit Event Upon Merger" is specified in the Schedule as applying to the party, such party ("X"), any Credit Support Provider of X or any applicable Specified Entity of X consolidates or amalgamates with, or merges with or into, or transfers all or substantially all its assets to, another entity and such action does not constitute an event described in Section 5(a)(viii) but the creditworthiness of the resulting, surviving or transferee entity is materially weaker than that of X, such Credit Support Provider or such Specified Entity, as the case may be, immediately prior to such action (and, in such event, X or its successor or transferee, as appropriate, will be the Affected Party); or

(v) **Additional Termination Event.** If any "Additional Termination Event" is specified in the Schedule or any Confirmation as applying, the occurrence of such event (and, in such event, the Affected Party or Affected Parties shall be as specified for such Additional Termination Event in the Schedule or such Confirmation).

(c) **Event of Default and Illegality.** If an event or circumstance which would otherwise constitute or give rise to an Event of Default also constitutes an Illegality, it will be treated as an Illegality and will not constitute an Event of Default.

**6**     **Early Termination**

(a)     ***Right to Terminate Following Event of Default.*** If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions,. If, however, "Automatic Early Termination" is specified in the Schedule as applying to a party, then an Early Termination Date in respect of all outstanding Transactions will occur immediately upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(1), (3), (5), (6) or, to the extent analogous thereto, (8), and as of the time immediately preceding the institution of the relevant proceeding or the presentation of the relevant petition upon the occurrence with respect to such party of an Event of Default specified in Section 5(a)(vii)(4) or, to the extent analogous thereto, (8).

(b)     ***Right to Terminate Following Termination Event.***

    (i)     ***Notice.*** If a Termination Event occurs, an Affected Party will, promptly upon becoming aware of it, notify the other party, specifying the nature of that Termination Event and each Affected Transaction and will also give such other information about that Termination Event as the other party may reasonably require.

    (ii)     ***Transfer to Avoid Termination Event.*** If either an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there is only one Affected Party, or if a Tax Event Upon Merger occurs and the Burdened Party is the Affected Party, the Affected Party will, as a condition to its right to designate an Early Termination Date under Section 6(b)(iv), use all reasonable efforts (which will not require such party to incur a loss, excluding immaterial, incidental expenses) to transfer within 20 days after it gives notice under Section 6(b)(i) all its rights and obligations under this Agreement in respect of the Affected Transactions to another of its Offices or affiliates so that such Termination Event ceases to exist.

    If the Affected Party is not able to make such a transfer it will give notice to the other party to that effect within such 20 day period, whereupon the other party may effect such a transfer within 30 days after the notice is given under Section 6(b)(i).

    Any such transfer by a party under this Section 6(b)(ii) will be subject to and conditional upon the prior written consent of the other party, which consent will not be withheld if such other party's policies in effect at such time would permit it to enter into transactions with the transferee on the terms proposed.

    (iii)     ***Two Affected Parties.*** If an Illegality under Section 5(b)(i)(1) or a Tax Event occurs and there are two Affected Parties, each party will use all reasonable efforts to reach agreement within 30 days after notice thereof is given under Section 6(b)(i) on action to avoid that Termination Event.

    (iv)     ***Right to Terminate.*** If:-

        (1) a transfer under Section 6(b)(ii) or an agreement under Section 6(b)(iii), as the case may be, has not been effected with respect to all Affected Transactions within 30 days after an Affected Party gives notice under Section 6(b)(i); or

        (2) an Illegality under Section 5(b)(i)(2), a Credit Event Upon Merger or an Additional Termination Event occurs, or a Tax Event Upon Merger occurs and the Burdened Party is not the Affected Party,

either party in the case of an Illegality, the Burdened Party in the case of a Tax Event Upon Merger, any Affected Party in the case of a Tax Event or an Additional Termination Event if there is more than one Affected Party, or the party which is not the Affected Party in the case of a Credit Event Upon Merger or an Additional Termination Event if there is only one Affected Party may, by not more than 20 days notice to the other party and provided that the relevant Termination Event is then continuing, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all Affected Transactions.

(c)     **Effect of Designation.**

(i)     If notice designating an Early Termination Date is given under Section 6(a) or (b), the Early Termination Date will occur on the date so designated, whether or not the relevant Event of Default or Termination Event is then continuing.

(ii)    Upon the occurrence or effective designation of an Early Termination Date, no further payments or deliveries under Section 2(a)(i) or 2(e) in respect of the Terminated Transactions will be required to be made, but without prejudice to the other provisions of this Agreement. The amount, if any, payable in respect of an Early Termination Date shall be determined pursuant to Section 6(e).

(d)     **Calculations.**

(i)     **Statement.** On or as soon as reasonably practicable following the occurrence of an Early Termination Date, each party will make the calculations on its part, if any, contemplated by Section 6(e) and will provide to the other party a statement (1) showing, in reasonable detail, such calculations (including all relevant quotations and specifying any amount payable under Section 6(e)) and (2) giving details of the relevant account to which any amount payable to it is to be paid. In the absence of written confirmation from the source of a quotation obtained in determining a Market Quotation, the records of the party obtaining such quotation will be conclusive evidence of the existence and accuracy of such quotation.

(ii)    **Payment Date.** An amount calculated as being due in respect of any Early Termination Date under Section 6(e) will be payable on the day that notice of the amount payable is effective (in the case of an Early Termination Date which is designated or occurs as a result of an Event of Default) and on the day which is two Local Business Days after the day on which notice of the amount payable is effective (in the case of an Early Termination Date which is designated as a result of a Termination Event). Such amount will be paid together with (to the extent permitted under applicable law) interest thereon (before as well as after judgment) in the Termination Currency, from (and including) the relevant Early Termination Date to (but excluding) the date such amount is paid, at the Applicable Rate. Such interest will be calculated on the basis of daily compounding and the actual number of days elapsed.

(e)     **Payments on Early Termination.** If an Early Termination Date occurs, the following provisions shall apply based on the parties' election in the Schedule of a payment measure, either "Market Quotation" or "Loss", and a payment method, either the "First Method" or the "Second Method". If the parties fail to designate a payment measure or payment method in the Schedule, it will be deemed that "Market Quotation" or the "Second Method", as the case may be, shall apply. The amount, if any, payable in respect of an Early Termination Date and determined pursuant to this Section will be subject to any Set-off.

(i)     **Events of Default.** If the Early Termination Date results from an Event of Default:-

(1) *First Method and Market Quotation.* If the First Method and Market Quotation apply, the Defaulting Party will pay to the Non-defaulting Party the excess, if a positive number, of (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party over (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party.

(2) *First Method and Loss.* If the First Method and Loss apply, the Defaulting Party will pay to the Non-defaulting Party, if a positive number, the Non-defaulting Party's Loss in respect of this Agreement.

(3) *Second Method and Market Quotation.* If the Second Method and Market Quotation apply, an amount will be payable equal to (A) the sum of the Settlement Amount (determined by the Non-defaulting Party) in respect of the Terminated Transactions and the Termination Currency Equivalent of the Unpaid Amounts owing to the Non-defaulting Party less (B) the Termination Currency Equivalent of the Unpaid Amounts owing to the Defaulting Party. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting Party will pay the absolute value of that amount to the Defaulting Party.

(4) *Second Method and Loss.* If the Second Method and Loss apply, an amount will be payable equal to the Non-defaulting Party's Loss in respect of this Agreement. If that amount is a positive number, the Defaulting Party will pay it to the Non-defaulting Party; if it is a negative number, the Non-defaulting party will pay the absolute value of that amount to the Defaulting Party.

(ii) **Termination Events.** If the Early Termination Date results from a Termination Event:-

(1) *One Affected Party.* If there is one Affected Party, the amount payable will be determined in accordance with Section 6(e)(i)(3), if Market Quotation applies, or Section 6(e)(i)(4), if Loss applies, except that, in either case, references to the Defaulting Party and to the Non-defaulting Party will be deemed to be references to the Affected Party and the party which is not the Affected Party, respectively, and, if Loss applies and fewer than all the Transactions are being terminated, Loss shall be calculated in respect of all Terminated Transactions.

(2) *Two Affected Parties.* If there are two Affected Parties:-

(A)     If Market Quotation applies, each party will determine a Settlement Amount in respect of the Terminated Transactions, and an amount will be payable equal to (I) the sum of (a) one-half of the difference between the Settlement Amount of the party with the higher Settlement Amount ("X") and the Settlement Amount of the party with the lower Settlement Amount ("Y") and (b) the Termination Currency Equivalent of the Unpaid Amounts owing to X less (II) the Termination Currency Equivalent of the Unpaid Amounts owing to Y; and

(B)     If Loss applies, each party will determine its Loss in respect of this Agreement (or, if fewer than all the Transactions are being terminated, in respect of all Terminated Transactions) and an amount will be payable equal to one-half of the difference between the Loss of the party with the higher Loss ("X") and the Loss of the party with the lower Loss ("Y").

If the amount payable is a positive number, Y will pay it to X; if it is a negative number , X will pay the absolute value of that amount to Y.

(iii)    **_Adjustment for Bankruptcy._** In circumstances where an Early Termination Date occurs because "Automatic Early Termination" applies in respect of a party, the amount determined under this Section 6(e) will be subject to such adjustments as are appropriate and permitted by law to reflect any payments or deliveries made by one party to the other under this Agreement (and retained by such other party) during the period from the relevant Early Termination Date to the date for payment determined under Section 6(d)(ii).

(iv)    **_Pre-Estimate._** The parties agree that if Market Quotation applies an amount recoverable under this Section 6(e) is a reasonable pre-estimate of loss and not a penalty. Such amount is payable for the loss of bargain and the loss of protection against future risks and except as otherwise provided in this Agreement  neither party will be entitled to recover any additional damages as a consequence of such losses.

## 7      Transfer

Subject to Section 6(b)(ii), neither this Agreement nor any interest or obligation in or under this Agreement may be transferred (whether by way of security or otherwise) by either party without the prior written consent of the other party, except that:-

(a) a party may make such a transfer of this Agreement pursuant to a consolidation or amalgamation with, or merger with or into, or transfer of all or substantially all its assets to, another entity (but without prejudice to any other right or remedy under this Agreement); and

(b) a party may make such a transfer of all or any part of its interest in any amount payable to it from a Defaulting Party under Section 6(e).

Any purported transfer that is not in compliance with this Section will be void.

## 8      Contractual Currency

(a) **_Payment in the Contractual Currency._**  Each payment under this Agreement will be made in the relevant currency specified in this Agreement for that payment (the "Contractual Currency"). To the extent permitted by applicable law, any obligation to make payments under this Agreement in the Contractual Currency will not be discharged or satisfied by any tender in any currency other than the Contractual Currency, except to the extent such tender results in the actual receipt by the party to which payment is owed, acting in a reasonable manner and in good faith in converting the currency so tendered into the Contractual Currency, of the full amount in the Contractual Currency of all amounts payable in respect of this Agreement. If for any reason the amount in the Contractual Currency so received falls short of the amount in the Contractual Currency payable in respect of this Agreement, the party required to make the payment will, to the extent permitted by applicable law, immediately pay such additional amount in the Contractual Currency as may be necessary to compensate for the shortfall. If for any reason the amount in the Contractual Currency so received exceeds the amount in the Contractual Currency payable in respect of this Agreement, the party receiving the payment will refund promptly the amount of such excess.

(b) **Judgments.** To the extent permitted by applicable law, if any judgment or order expressed in a currency other than the Contractual Currency is rendered (i) for the payment of any amount owing in respect of this Agreement, (ii) for the payment of any amount relating to any early termination in respect of this Agreement or (iii) in respect of a judgment or order of another court for the payment of any amount described in (i) or (ii) above, the party seeking recovery, after recovery in full of the aggregate amount to which such party is entitled pursuant to the judgment or order, will be entitled to receive immediately from the other party the amount of any shortfall of the Contractual Currency received by such party as a consequence of sums paid in such other currency and will refund promptly to the other party any excess of the Contractual Currency received by such party as a consequence of sums paid in such other currency if such shortfall or such excess arises or results from any variation between the rate of exchange at which the Contractual Currency is converted into the currency of the judgment or order for the purposes of such judgment or order and the rate of exchange at which such party is able, acting in a reasonable manner and in good faith in converting the currency received into the Contractual Currency, to purchase the Contractual Currency with the amount of the currency of the judgment or order actually received by such party. The term "rate of exchange" includes, without limitation, any premiums and costs of exchange payable in connection with the purchase of or conversion into the Contractual Currency.

(c) **Separate Indemnities.** To the extent permitted by applicable law, these indemnities constitute separate and independent obligations from the other obligations in this Agreement, will be enforceable as separate and independent causes of action, will apply notwithstanding any indulgence granted by the party to which any payment is owed and will not be affected by judgment being obtained or claim or proof being made for any other sums payable in respect of this Agreement.

(d) **Evidence of Loss.** For the purpose of this Section 8, it will be sufficient for a party to demonstrate that it would have suffered a loss had an actual exchange or purchase been made.

**9      Miscellaneous**

(a) **Entire Agreement.** This Agreement constitutes the entire agreement and understanding of the parties with respect to its subject matter and supersedes all oral communication and prior writings with respect thereto.

(b) **Amendments.** No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

(c) **Survival of Obligations**. Without prejudice to Sections 2(a)(iii) and 6(c)(ii), the obligations of the parties under this Agreement will survive the termination of any Transaction.

(d) **Remedies Cumulative.** Except as provided in this Agreement, the rights, powers, remedies and privileges provided in this Agreement are cumulative and not exclusive of any rights, powers, remedies and privileges provided by law.

(e) **Counterparts and Confirmations.**

(i)      This Agreement (and each amendment, modification and waiver in respect of it) may be executed and delivered in counterparts (including by facsimile transmission), each of which will be deemed an original.

(ii)      The parties intend that they are legally bound by the terms of each Transaction from the moment they agree to those terms (whether orally or otherwise). A Confirmation

shall be entered into as soon as practicable and may be executed and delivered in counterparts (including by facsimile transmission) or be created by an exchange of telexes or by an exchange of electronic messages on an electronic messaging system, which in each case will be sufficient for all purposes to evidence a binding supplement to this Agreement. The parties will specify therein or through another effective means that any such counterpart, telex or electronic message constitutes a Confirmation.

(f) **No Waiver of Rights.** A failure or delay in exercising any right, power or privilege in respect of this Agreement will not be presumed to operate as a waiver, and a single or partial exercise of any right, power or privilege will not be presumed to preclude any subsequent or further exercise, of that right, power or privilege or the exercise of any other right, power or privilege.

(g) **Headings.** The headings used in this Agreement are for convenience of reference only and are not to affect the construction of or to be taken into consideration in interpreting this Agreement.

## 10    Offices; Multibranch Parties

(a)     If Section 10(a) is specified in the Schedule as applying, each party that enters into a Transaction through an Office other than its head or home office represents to the other party that, notwithstanding the place of booking office or jurisdiction of incorporation or organisation of such party, the obligations of such party are the same as if it had entered into the Transaction through its head or home office. This representation will be deemed to be repeated by such party on each date on which a Transaction is entered into.

(b)     Neither party may change the Office through which it makes and receives payments or deliveries for the purpose of a Transaction without the prior written consent of the other party.

(c)     If a party is specified as a Multibranch Party in the Schedule, such Multibranch Party may make and receive payments or deliveries under any Transaction through any Office listed in the Schedule, and the Office through which it makes and receives payments or deliveries with respect to a Transaction will be specified in the relevant Confirmation.

## 11    Expenses

A Defaulting Party will, on demand, indemnify and hold harmless the other party for and against all reasonable out-of-pocket expenses, including legal fees and Stamp Tax, incurred by such other party by reason of the enforcement and protection of its rights under this Agreement or any Credit Support Document to which the Defaulting Party is a party or by reason of the early termination of any Transaction, including, but not limited to, costs of collection.

## 12    Notices

(a)     **Effectiveness.** Any notice or other communication in respect of this Agreement may be given in any manner set forth below (except that a notice or other communication under Section 5 or 6 may not be given by facsimile transmission or electronic messaging system) to the address or number or in accordance with the electronic messaging system details provided (see the Schedule) and will be deemed effective as indicated:-

(i)        if in writing and delivered in person or by courier, on the date it is delivered;

(ii)       if sent by telex, on the date the recipient's answerback is received;

(iii)      if sent by facsimile transmission, on the date that transmission is received by a responsible employee of the recipient in legible form (it being agreed that the burden of proving receipt will be on the sender and will not be met by a transmission report generated by the sender's facsimile machine);

(iv)     if sent by certified or registered mail (airmail, if overseas) or the equivalent (return receipt requested), on the date that mail is delivered or its delivery is attempted; or

(v)     if sent by electronic messaging system, on the date that electronic message is received;

unless the date of that delivery (or attempted delivery) or that receipt, as applicable, is not a Local Business Day or that communication is delivered (or attempted) or received, as applicable, after the close of business on a Local Business Day, in which case that communication shall be deemed given and effective on the first following day that is a Local Business Day.

(b)     **Change of Addresses.** Either party may by notice to the other change the address, telex or facsimile number of electronic messaging system details at which notices or other communications are to be given to it.

## 13     Governing Law and Jurisdiction

(a)     **Governing Law.** This Agreement will be governed by and construed in accordance with the law specified in the Schedule.

(b)     **Jurisdiction.** With respect to any suit, action or proceedings relating to this Agreement ("Proceedings"), each party irrevocably:-

(i)     submits to the jurisdiction of the English courts, if this Agreement is expressed to be governed by English law, or to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City, if this Agreement is expressed to be governed by the laws of the State of New York; and

(ii)     waives any objection which it may have at any time to the laying of venue of Proceedings brought in any such court, waives any claim that such Proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such Proceedings, that such court does not have any jurisdiction over such party.

Nothing in this Agreement precludes either party from bringing Proceedings in any other jurisdiction (outside, if this Agreement is expressed to be governed by English law, the Contracting States, as defined in Section 1(3) of the Civil Jurisdiction and Judgments Act 1982 or any modification, extension or re-enactment thereof for the time being in force) nor will the bringing of Proceedings in any one or more jurisdictions preclude the bringing of Proceedings in any other jurisdiction.

(c)     **Service of Process.** Each party irrevocably appoints the Process Agent (if any) specified opposite its name in the Schedule to receiver, for it and on its behalf, service of process in any Proceedings. If for any reason any party's Process Agent is unable to act as such, such party will promptly notify the other party and within 30 days appoint a substitute process agent acceptable to the other party. The parties, irrevocably consent to service of process given in the manner provided for notices in Section 12. Nothing in this Agreement will affect the right of either party to serve process in any other manner permitted by law.

(d)     **Waiver of Immunities.** Each party irrevocably waives, to the fullest extent permitted by applicable law, with respect to itself and its revenues and assets (irrespective of their use or intended use), all immunity on the grounds of sovereignty or other similar grounds from (i) suit, (ii) jurisdiction of any court, (iii) relief by way of injunction, order for specific performance or for recovery of property, (iv) attachment of its assets (whether before or after judgment) and (v) execution or enforcement of any judgment to which it or its revenues or assets might otherwise be

entitled in any Proceedings in the courts of any jurisdiction and irrevocably agrees, to the extent permitted by applicable law, that it will not claim any such immunity in any Proceedings.

**14    Definitions**

As used in this Agreement:-

"*Additional Termination Event*" has the meaning specified in Section 5(b).

"*Affected Party*" has the meaning specified in Section 5(b).

"*Affected Transactions*" means (a) with respect to any Termination Event consisting of an Illegality, Tax Event or Tax Event Upon Merger, all Transactions affected by the occurrence of such Termination Event and (b) with respect to any other Termination Event, all Transactions.

"*Affiliate*" means, subject to the Schedule, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of a majority of the voting power of the entity or person.

"*Applicable Rate*" means:-

(a)      in respect of obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Defaulting Party, the Default Rate;

(b)      in respect of an obligation to pay an amount under Section 6(e) of either party from and after the date (determined in accordance with Section 6(d)(ii)) on which that amount is payable, the Default Rate;

(c)      in respect of all other obligations payable or deliverable (or which would have been but for Section 2(a)(iii)) by a Non-defaulting Party, the Non-default Rate; and

(d)      in all other cases, the Termination Rate.

"*Burdened Party*" has the meaning specified in Section 5(b).

"*Change in Tax Law*" means the enactment, promulgation, execution or ratification of, or any change in or amendment to, any law (or in the application or official interpretation of any law) that occurs on or after the date on which the relevant Transaction is entered into.

"*consent*" includes a consent, approval, action, authorisation, exemption, notice, filing, registration or exchange control consent.

"*Credit Event Upon Merger*" has the meaning specified in Section 5(b).

"*Credit Support Document*" means any agreement or instrument that is specified as such in this Agreement.

"*Credit Support Provider*" has the meaning specified in the Schedule.

"*Default Rate*" means a rate per annum equal to the cost (without proof or evidence of any actual cost) to the relevant payee (as certified by it) if it were to fund or of funding the relevant amount plus 1% per annum.

"*Defaulting Party*" has the meaning specified in Section 6(a).

"*Early Termination Date*" means the date determined in accordance with Section 6(a) or 6(b)(iv).

"*Event of Default*" has the meaning specified in Section 5(a) and, if applicable, in the Schedule.

"**Illegality**" has the meaning specified in Section 5(b).

"**Indemnifiable Tax** means any Tax other than a Tax that would not be imposed in respect of a payment under this Agreement but for a present or former connection between the jurisdiction of the government or taxation authority imposing such Tax and the recipient of such payment or a person related to such recipient (including, without limitation, a connection arising from such recipient or related person being or having been a citizen or resident of such jurisdiction, or being or having been organised, present or engaged in a trade or business in such jurisdiction, or having or having had a permanent establishment or fixed place of business in such jurisdiction, but excluding a connection arising solely from such recipient or related person having executed, delivered, performed its obligations or received a payment under, or enforced, this Agreement or a Credit Support Document).

"**law**" includes any treaty, law, rule or regulation (as modified, in the case of tax matters, by the practice of any relevant governmental revenue authority) and "**lawful**" and "**unlawful**" will be construed accordingly.

"**Local Business Day**" means, subject to the Schedule, a day on which commercial banks are open for business (including dealings in foreign exchange and foreign currency deposits) (a) in relation to any obligation under Section 2(a)(i), in the place(s) specified in the relevant Confirmation or, if not so specified as otherwise agreed by the parties in writing or determined pursuant to provisions contained, or incorporated by reference, in this Agreement, (b) in relation to any other payment, in the place where the relevant account is located and, if different, in the principal financial centre, if any, of the currency of such payment, (c) in relation to any notice or other communication, including notice contemplated under Section 5(a)(i), in the city specified in the address for notice provided by the recipient and, in the case of a notice contemplated by Section 2(b), in the place where the relevant new account is to be located and (d) in relation to Section 5(a)(v)(2), in the relevant locations for performance with respect to such Specified Transaction.

"**Loss**" means, with respect to this Agreement or one or more Terminated Transactions, as the case may be, and a party, the Termination Currency Equivalent of an amount that party reasonably determines in good faith to be its total losses and costs (or gain, in which case expressed as a negative number) in connection with this Agreement or that Terminated Transaction or group of Terminated Transactions, as the case may be, including any loss of bargain, cost of funding or, at the election of such party but without duplication, loss or cost incurred as a result of its terminating, liquidating, obtaining or re-establishing any hedge or related trading position (or any gain resulting from any of them). Loss includes losses and costs (or gains) in respect of any payment or delivery required to have been made (assuming satisfaction of each applicable condition precedent) on or before the relevant Early Termination Date and not made, except, so as to avoid duplication, if Section 6(e)(i)(1) or (3) or 6(e)(ii)(2)(A) applies. Loss does not include a party's legal fees and out-of-pocket expenses referred to under Section 11. A party will determine its Loss as of the relevant Early Termination Date, or, if that is not reasonably practicable, as of the earliest date thereafter as is reasonably practicable. A party may (but need not) determine its Loss by reference to quotations of relevant rates or prices from one or more leading dealers in the relevant markets.

"**Market Quotation**" means, with respect to one or more Terminated Transactions and a party making the determination, an amount determined on the basis of quotations from Reference Market-makers. Each quotation will be for an amount, if any, that would be paid to such party (expressed as a negative number) or by such party (expressed as a positive number) in consideration of an agreement between such party (taking into account any existing Credit Support Document with respect to the obligations of such party) and the quoting Reference

Market-maker to enter into a transaction (the "Replacement Transaction") that would have the effect of preserving for such party the economic equivalent of any payment or delivery (whether the underlying obligation was absolute or contingent and assuming the satisfaction of each applicable condition precedent) by the parties under Section 2(a)(i) in respect of such Terminated Transaction or group of Terminated Transactions that would, but for the occurrence of the relevant Early Termination Date, have been required after that date. For this purpose, Unpaid Amounts in respect of the Terminated Transaction or group of Terminated Transactions are to be excluded but, without limitation, any payment or delivery that would, but for the relevant Early Termination Date, have been required (assuming satisfaction of each applicable condition precedent) after that Early Termination Date is to be included. The Replacement Transaction would be subject to such documentation as such party and the Reference Market-maker may, in good faith, agree. The party making the determination (or its agent) will request each Reference Market-maker to provide its quotation to the extent reasonably practicable as of the same day and time (without regard to different time zones) on or as soon as reasonably practicable after the relevant Early Termination Date. The day and time as of which those quotations are to be obtained will be selected in good faith by the party obliged to make a determination under Section 6(e), and, if each party is so obliged, after consultation with the other. If more than three quotations are provided, the Market Quotation will be the arithmetic mean of the quotations, without regard to the quotations having the highest and lowest values. If exactly three such quotations are provided, the Market Quotation will be the quotation remaining after disregarding the highest and lowest quotations. For this purpose, if more than one quotation has the same highest value or lowest value, then one of such quotations shall be disregarded. If fewer than three quotations are provided, it will be deemed that the Market Quotation in respect of such Terminated Transaction or group or Terminated Transactions cannot be determined.

"**Non-default Rate**" means a rate per annum equal to the cost (without proof or evidence of actual cost) to the Non-defaulting Party (as certified by it) if it were to fund the relevant amount.

"**Non-defaulting Party**" has the meaning specified in Section 6(a).

"**Office**" means a branch or office of a party, which may be such party's head or home office.

"**Potential Event of Default**" means any event which, with the giving of notice or the lapse of time or both, would constitute an Event of Default.

"**Reference Market-makers**" means four leading dealers in the relevant market selected by the party determining a Market Quotation in good faith (a) from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit and (b) to the extent practicable, from among such dealers having an office in the same city.

"**Relevant Jurisdiction**" means, with respect to a party, the jurisdictions (a) in which the party is incorporated, organised, managed and controlled or considered to have its seat, (b) where an Office through which the party is acting for purpose of this Agreement is located, (c) in which the party executes this Agreement and (d) in relation to any payment, from or through which such payment is made.

"**Scheduled Payment Date**" means a date on which a payment or delivery is to be made under Section 2(a)(i) with respect to a Transaction.

"**Set-off**" means set-off, offset, combination of accounts, right of retention or withholding or similar right or requirement to which the payer of an amount under Section 6 is entitled or subject

(whether arising under this Agreement, another contract, applicable law or otherwise) that is exercised by, or imposed on, such payer.

"**Settlement Amount**" means, with respect to a party and any Early Termination Date, the sum of:-

(a)    the Termination Currency Equivalent of the Market Quotations (whether positive or negative) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation is determined; and

(b)    such party's Loss (whether positive or negative and without reference to any Unpaid Amounts) for each Terminated Transaction or group of Terminated Transactions for which a Market Quotation cannot be determined or would not (in the reasonable belief of the party making the determination) produce a commercially reasonable result.

"**Specified Entity**" has the meaning specified in the Schedule.

"**Specified Indebtedness**" means, subject to the Schedule any obligations (whether present or future, contingent or otherwise, as principal or surety or otherwise) in respect of borrowed money.

"**Specified Transaction**" means, subject to the Schedule, (a) any transaction (including an agreement with respect thereto) now existing or hereafter entered into between one party to this Agreement (or any Credit Support Provider of such party or any applicable Specified Entity of such party) and the other party to this Agreement (or any Credit Support Provider of such other party or any applicable Specified Entity of such other party) which is a rate swap transaction, basis swap, forward rate transaction, commodity swap, commodity option, equity or equity index swap, equity or equity index option, bond option, interest rate option, foreign exchange transaction, cap transaction, floor transaction, collar transaction, currency swap transaction, cross-currency rate swap transaction, currency option or any other similar transaction (including any option with respect to any of these transactions), (b) any combination of these transactions and (c) any other transaction identified as a Specified Transaction in this Agreement or the relevant confirmation.

"**Stamp Tax** " means any stamp, registration, documentation or similar tax.

"**Tax**" means any present or future tax, levy, impost, duty, charge, assessment or fee of any nature (including interest, penalties and additions thereto) that is imposed by an government or other taxing authority in respect of any payment under this Agreement other than a stamp, registration, documentation or similar tax.

"**Tax Event**" has the meaning specified in Section 5(b).

"**Tax Event Upon Merger**" has the meaning specified in Section 5(b).

"**Terminated Transactions**" means with respect to any Early Termination Date (a) if resulting from a Termination Event, all Affected Transactions and (b) if resulting from an Event of Default, all Transactions (in either case) in effect immediately before the effectiveness of the notice designating that Early Termination Date (or, if "Automatic Early Termination" applies, immediately before that Early Termination Date).

"**Termination Currency**" has the meaning specified in the Schedule.

"**Termination Currency Equivalent**" means, in respect of any amount denominated in the Termination Currency, such Termination Currency amount and, in respect of any amount denominated in a currency other than the Termination Currency (the "Other Currency"), the amount in the Termination Currency determined by the party making the relevant determination as being required to purchase such amount of such Other Currency as at the relevant Early Termination Date, or, if the relevant Market Quotation or Loss (as the case may be) is determined

as of a later date, that later date, with the Termination Currency at the rate equal to the spot exchange rate of the foreign exchange agent (selected as provided below) for the purchase of such Other Currency with the Termination Currency at or about 11:00 a.m. (in the city in which such foreign exchange agent is located) on such date as would be customary for the determination of such a rate for the purchase of such Other Currency for value on the relevant Early Termination Date or that later date. The foreign exchange agent will, if only one party is obliged to make a determination under Section 6(e), be selected in good faith by that party and otherwise will be agreed by the parties.

"**Termination Event**" means an Illegality, a Tax Event or a Tax Event Upon Merger or, if specified to be applicable, a Credit Event Upon merger or an Additional Termination Event.

"**Termination Rate**" means a rate per annum equal to the arithmetic mean of the cost (without proof or evidence of any actual cost) to each party (as certified by such party) if it were to fund or of funding such amounts.

"**Unpaid Amounts**" owing to any party means, with respect to an Early Termination Date, the aggregate of (a) in respect of all Terminated Transactions, the amounts that became payable (or that would have become payable but for Section 2(a)(iii)) to such party under Section 2(a)(i) on or prior to such Early Termination Date and which remain unpaid as at such Early Termination Date and (b) in respect of each Terminated Transaction, for each obligation under Section 2(a)(i) which was (or would have been but for Section 2(a)(iii)) required to be settled by delivery to such party on or prior to such Early Termination Date and which has not been so settled as at such Early Termination Date, an amount equal to the fair market value of that which was (or would have been) required to be delivered as of the originally scheduled date for delivery, in each case together with (to the extent permitted under applicable law) interest, in the currency of such amounts, from (and including) the date such amounts or obligations were or would have been required to have been paid or performed to (but excluding) such Early Termination Date, at the Applicable Rate. Such amounts of interest will be calculated on the basis of daily compounding and the actual number of days elapsed. The fair market value of any obligation referred to in clause (b) above shall be reasonably determined by the party obliged to make the determination under Section 6(e) or, if each party is so obliged, it shall be the average of the Termination Currency Equivalents of the fair market values reasonably determined by both parties.

IN WITNESS WHEREOF the parties have executed this document on the respective dates specified below with effect from the date specified on the first page of this document.

|  |  |
|---|---|
| Dante Finance Public Limited Company | Lehman Brothers Special Financing, Inc. |
| (Name of Party) | (Name of Party) |

By:     HUW MERRIMAN       By:     CAROLYN MELENDEZ

   Name:                             Name:

   Title:                                Title:

   Date:                                Date:

# EXHIBIT E

# WEIL, GOTSHAL & MANGES LLP

767 FIFTH AVENUE

NEW YORK, NY 10153

(212) 310-8000

FAX: (212) 310-8007

AUSTIN
BOSTON
BUDAPEST
DALLAS
FRANKFURT
HONG KONG
HOUSTON
LONDON
MIAMI
MUNICH
PARIS
PRAGUE
PROVIDENCE
SHANGHAI
SILICON VALLEY
WARSAW
WASHINGTON, D.C.

LORI R. FIFE
DIRECT LINE (212) 310-8318
E-MAIL: lori.fife@weil.com

November 25, 2008

## BY FEDERAL EXPRESS, FACSIMILE AND ELECTRONIC MAIL

The Bank of New York Mellon Trust Company, National Association
601 Travis Street
16th Floor
Houston, Texas 77002
Facsimile: (713) 483-6656
Attention: Elaine P. Mah
elaine.mah@bnymellon.com

The Bank of New York Mellon Trust Company, National Association
601 Travis Street
16th Floor
Houston, Texas 77002
Attention: Shawn Teel
shawn.teel@bnymellon.com

Mr. Douglas MacInnes
Bank of New York Mellon
101 Barclay Street
New York, New York 10286

Ladies and Gentlemen:

We represent Lehman Brothers Special Financing Inc. ("LBSF") and certain of its related debtor affiliates in their Chapter 11 proceedings in the Bankruptcy Court for the Southern District of New York. We are contacting you in your capacity as trustee with respect to certain transactions listed in Schedule A hereto (the "Transactions") as to which LBSF or an affiliate thereof (other than Lehman Brothers Inc.) is a party (in such capacity, the "Swap Counterparty" and collectively, the "Swap Counterparties") under certain swap agreements relating to these Transactions. Reference is made to (i) those certain ISDA Master Agreements (together with

any schedules, credit support annexes, and confirmations thereto, the "Swap Agreements") between the relevant issuers in such Transactions (collectively, the "Issuers") and the relevant Swap Counterparties, and (ii) any other transaction documents relating to the Transactions (together with the Swap Agreements, collectively, the "Transaction Documents").

We hereby request that you provide us with the following documents and information as soon as possible:

a. any notices received or given by or on behalf of you or the Issuers in connection with the Transactions from January 1, 2008 to and including the date hereof, including, but not limited to, notices concerning any purported event of default, termination event, termination, acceleration of notes, liquidation of assets, or distribution of proceeds thereof;

b. a description (including dates and names of parties) of all remedies purported to be exercised pursuant to the Transaction Documents and all actions taken in connection therewith by any party in connection with the Transactions from January 1, 2008 to and including the date hereof; and

c. all reports delivered to any party pursuant to the Transaction Documents, including, but not limited to, trustee reports, periodic reports, and valuation reports, from January 1, 2008 to and including the date hereof.

In addition, we hereby give you notice that:

1. with respect to a number of Transactions, we have received termination notices that are defective;

2. we believe that any actions that may have been taken by you or on behalf of any Issuer pursuant to the Transaction Documents other than the Swap Agreements on or after September 15, 2008, including any remedies purported to be exercised thereunder, may be subject to the automatic stay provisions of Section 362 of the Bankruptcy Code. Accordingly, we believe that any such actions taken by you or on behalf of any such Issuer may have been in violation of such provisions and, therefore, such actions would be null and void. In addition, we believe that any future actions taken by you or on behalf of any such Issuer pursuant to the Transaction Documents other than the Swap Agreements may also be subject to the automatic stay; and

3. we believe that any provisions of any Transaction Documents purporting to subordinate any amounts payable to any Swap Counterparty would not be enforceable, and any effort to apply such provisions under the present circumstances would be unlawful.

Therefore, based upon the foregoing, we hereby demand that you immediately cease and desist from taking any further actions pursuant to the Transaction Documents,

including, but not limited to, exercising any remedies thereunder, and to contact us to discuss these matters.

Please note that all notices and correspondence to Lehman Brothers Special Financing Inc. should forthwith be sent to the following addresses:

> Lehman Brothers Special Financing Inc.
> 1271 Avenue of the Americas
> 43rd Floor
> New York, New York 10020
> Attention: Vincent DiMassimo
> Telephone: (646) 333-6032
> Facsimile: (646) 758-1811

with copies to:

> Lehman Brothers Special Financing Inc.
> 1271 Avenue of the Americas
> 43rd Floor
> New York, New York 10020
> Attention: Locke McMurray, Esq.
> Telephone: (212) 526-7186
> Facsimile: (646) 758-2634

> Lehman Brothers Special Financing Inc.
> 1271 Avenue of the Americas
> 45th Floor
> New York, New York 10020
> Attention: Chief Financial Officer

and

> Weil, Gotshal & Manges LLP
> 767 Fifth Avenue
> New York, New York 10153
> Attention: Robert J. Lemons, Esq.
> Telephone: (212) 310-8924
> Facsimile: (212) 310-8007

with an additional copy via electronic mail to:

> LBHISPVNotices@lehman.com

November 25, 2008
Page 4

       In addition, Lehman Brothers Special Financing Inc. has retained Natixis Capital Markets Inc. ("Natixis") as its adviser and you are hereby directed to respond to any questions or requests relating to the Transactions from any individuals listed on Schedule B hereto (the "Approved List", as such list may be updated from time to time by a notice from Natixis to you) and to provide all information relating to the Transactions requested by any individuals on the Approved List.  For the avoidance of doubt, Natixis is not an agent of LBSF or any of its related debtor affiliates.

       We reserve all rights and remedies of each Swap Counterparty and the related credit support provider under the Swap Agreements, the Transaction Documents, and applicable law and will hold the Trustee accountable for any breaches of such rights.

Very truly yours,

Lori R. Fife

cc:    Martin Winter (via e-mail: mwinter@alvarezandmarsal.com) (Alvarez & Marsal, LLC)
       Ken Wormser (via e-mail: ken.wormser@cm.natixis.com) (Natixis Capital Markets Inc.)

# SCHEDULE A

801 GRAND CDO SPC SERIES 2006-1
801 GRAND CDO SPC SERIES 2006-2
81 VH HOLDING SARL
A.L.L STRUCTURED CAPITAL MANAGEMENT LTD.
A-CAMPUS BRAUNSCHWEIG SARL
ACCESS GROUP INC SERIES 2005-A
ACCESS GROUP INC SERIES 2005-B
ACCESS GROUP SERIES 2007-A
ADAGIO III CLO PLC
AIRLIE CDO I LIMITED
AIRLIE LCDO I (AVIV LCDO 2006-3) LIMITED
AIRLIE LCDO II (PEBBLE CREEK 2007-1), LTD.
AJAX RE LIMITED
ALLIANCE LAUNDRY EQUIPMENT RECEIVABLES TR 2005-A
ALPHA MEZZ CDO 2007-1, LTD.
ALTA CDO 2007-1 LTD
ALTA CDO SPC SERIES 2007-2 SEGREGATED PORTFOLIO
ALTERNATIVE MULTI-STRATEGY FUND LTD (THE)
AMBER FINANCE LTD
AMERICREDIT 2005-B-M
AMERICREDIT AUTOMOBILE RECEIVABLES TRUST 2007-D-F
AMMC CLO III LTD
AMMC CLO IV LTD
AMMC CLO V LTD
AMMC CLO VI LTD
ANGLIOLIERI FINANCE PLC
ANTHRACITE BALANCE COMPANY (DIS 1) LTD
ANTHRACITE BALANCED COMPANY (32) LTD
ANTHRACITE BALANCED COMPANY (36) LTD
ANTHRACITE BALANCED COMPANY (40) LTD
ANTHRACITE BALANCED COMPANY (41) LTD
ANTHRACITE BALANCED COMPANY (44) LTD
ANTHRACITE BALANCED COMPANY (46) LIMITED
ANTHRACITE BALANCED COMPANY (50) LIMITED
ANTHRACITE BALANCED COMPANY (7) LTD
ANTHRACITE BALANCED COMPANY (AWF) LTD
ANTHRACITE BALANCED COMPANY (BPI) LTD
ANTHRACITE BALANCED COMPANY (GMN) LTD
ANTHRACITE BALANCED COMPANY (HFRX) LTD
ANTHRACITE BALANCED COMPANY (IR-16) LTD
ANTHRACITE BALANCED COMPANY (IR-4) LTD
ANTHRACITE BALANCED COMPANY (J R-38) LTD
ANTHRACITE BALANCED COMPANY (JR-12) LTD
ANTHRACITE BALANCED COMPANY (JR-13) LTD
ANTHRACITE BALANCED COMPANY (JR-20) LTD
ANTHRACITE BALANCED COMPANY (JR-21) LTD
ANTHRACITE BALANCED COMPANY (JR-23) LTD
ANTHRACITE BALANCED COMPANY (JR-27) LTD

ANTHRACITE BALANCED COMPANY (JR-28) LTD
ANTHRACITE BALANCED COMPANY (JR-33) LTD
ANTHRACITE BALANCED COMPANY (JR-34) LTD
ANTHRACITE BALANCED COMPANY (JR-35) LTD
ANTHRACITE BALANCED COMPANY (JR-40) LTD
ANTHRACITE BALANCED COMPANY (JR-42) LTD
ANTHRACITE BALANCED COMPANY (JR46)
ANTHRACITE BALANCED COMPANY (JR-47)
ANTHRACITE BALANCED COMPANY (JR48)
ANTHRACITE BALANCED COMPANY (JR-49)
ANTHRACITE BALANCED COMPANY (JR-50) LIMITED
ANTHRACITE BALANCED COMPANY (JR-51) LIMITED
ANTHRACITE BALANCED COMPANY (JR-53) LIMITED
ANTHRACITE BALANCED COMPANY (JR-54) LIMITED
ANTHRACITE BALANCED COMPANY (JR-57) LIMITED
ANTHRACITE BALANCED COMPANY (JR-58) LIMITED
ANTHRACITE BALANCED COMPANY (JR-59) LIMITED
ANTHRACITE BALANCED COMPANY (JR-60) LIMITED
ANTHRACITE BALANCED COMPANY (JR-8) LTD
ANTHRACITE BALANCED COMPANY (JR-9) LTD
ANTHRACITE BALANCED COMPANY (LBGDF3) LTD
ANTHRACITE BALANCED COMPANY (LIBGDF) LTD
ANTHRACITE BALANCED COMPANY (ODSF) LTD
ANTHRACITE BALANCED COMPANY (R-10) LTD
ANTHRACITE BALANCED COMPANY (R-20) LTD
ANTHRACITE BALANCED COMPANY (R-22)
ANTHRACITE BALANCED COMPANY (R-23) LIMITED
ANTHRACITE BALANCED COMPANY (R-24) LIMITED
ANTHRACITE BALANCED COMPANY (R-25) LIMITED
ANTHRACITE BALANCED COMPANY (R-26) LIMITED
ANTHRACITE BALANCED COMPANY (R-5) LTD
ANTHRACITE BALANCED COMPANY (R-7) LTD
ANTHRACITE BALANCED COMPANY (SWISSCA) LTD
ANTHRACITE BALANCED COMPANY IR-19
ANTHRACITE CFO ISSUER NO. 1 LTD
ANTHRACITE FEEDER COMPANY (JR-4) LTD
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 1)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 10)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 12)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 17)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 18)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 23)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 26)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 27)
ANTHRACITE INVESTMENT (IRELAND) PLC (SERIES 7)
ANTHRACITE INVESTMENTS (CAYMAN ) LTD
ANTHRACITE INVESTMENTS (IRELAND) PLC
ANTHRACITE MASTER CO (2) LTD
ANTHRACITE MASTER COMPANY (4) LTD
ANTHRACITE RATED INVESTMENTS (CAYMAN) LTD

ANTHRACITE RATED INVESTMENTS (JERSEY) LTD
ANTHRACITE RATED INVESTMENTS (JR-14) LTD
ANTHRACITE RATED INVESTMENTS (R-15) LTD
ANTHRACITE RATED INVESTMENTS JERSEY SERIES 45
ANTHRACITE REFERENCE COMPANY (12) LTD
ANTHRACITE REFERENCE COMPANY (23) LTD
AQUAMARINE FINANCE PLC SERIES 2004-1
AQUAMARINE FINANCE PLC SERIES 2004-2
AQUAMARINE FINANCE PLC SERIES 2007-1
ARES ENHANCED LOAN INVESTMENT STRATEGY II LTD
ARES IIR CLO LTD
ARES IX CLO LTD
ARES VIII CLO LTD
ARES VIR CLO LTD
ARES X CLO LIMITED
ARES XII CLO LTD
ARG FUNDING CORP SERIES 2005-1B
ARG FUNDING CORP SERIES 2005-2A
ARG FUNDING CORP SERIES 2005-2B
ASPEN AMBROSE LIMITED
ASPEN BELL LIMITED
ASPEN LUCIAN LIMITED
ASPEN NOAH LIMITED
ASTREA LLC
ATLANTIC INTERNATIONAL FINANCE LTD SERIES 1
ATRIUM CDO LTD
ATRIUM III CLO LTD
AVIV LCDO 2006-1 LIMITED
AVIV LCDO 2006-2 LIMITED
BALBOA CDO I LTD
BALLYROCK ABS CDO 2007-1 LTD
BANYAN TREE 2004-1 LTD
BARTON SPRINGS CDO LIMITED SPC SERIES 2005-1
BARTON SPRINGS CDO LIMITED SPC SERIES 2005-2
BELLE HAVEN ABS CDO 2005-1 LTD
BELLE HAVEN ABS CDO 2006-1
BERICA 6 RESIDENTIAL MBS S.R.L.
BERYL FINANCE LIMITED SERIES 2005-10
BERYL FINANCE LIMITED SERIES 2005-11
BERYL FINANCE LIMITED SERIES 2005-12
BERYL FINANCE LIMITED SERIES 2005-14
BERYL FINANCE LIMITED SERIES 2005-15
BERYL FINANCE LIMITED SERIES 2005-16
BERYL FINANCE LIMITED SERIES 2005-7
BERYL FINANCE LIMITED SERIES 2006-12
BERYL FINANCE LIMITED SERIES 2006-13
BERYL FINANCE LIMITED SERIES 2006-14
BERYL FINANCE LIMITED SERIES 2006-15
BERYL FINANCE LIMITED SERIES 2006-16
BERYL FINANCE LIMITED SERIES 2006-17

BERYL FINANCE LIMITED SERIES 2006-2
BERYL FINANCE LIMITED SERIES 2006-4
BERYL FINANCE LIMITED SERIES 2006-5
BERYL FINANCE LIMITED SERIES 2006-6
BERYL FINANCE LIMITED SERIES 2007-1
BERYL FINANCE LIMITED SERIES 2007-10
BERYL FINANCE LIMITED SERIES 2007-11
BERYL FINANCE LIMITED SERIES 2007-13
BERYL FINANCE LIMITED SERIES 2007-14
BERYL FINANCE LIMITED SERIES 2007-15
BERYL FINANCE LIMITED SERIES 2007-16
BERYL FINANCE LIMITED SERIES 2007-17
BERYL FINANCE LIMITED SERIES 2007-18
BERYL FINANCE LIMITED SERIES 2007-19
BERYL FINANCE LIMITED SERIES 2007-2
BERYL FINANCE LIMITED SERIES 2007-3
BERYL FINANCE LIMITED SERIES 2007-4
BERYL FINANCE LIMITED SERIES 2007-5
BERYL FINANCE LIMITED SERIES 2007-7
BERYL FINANCE LIMITED SERIES 2007-8
BERYL FINANCE LIMITED SERIES 2007-9
BERYL FINANCE LIMITED SERIES 2008-1
BERYL FINANCE LIMITED SERIES 2008-10
BERYL FINANCE LIMITED SERIES 2008-11
BERYL FINANCE LIMITED SERIES 2008-12
BERYL FINANCE LIMITED SERIES 2008-13
BERYL FINANCE LIMITED SERIES 2008-14
BERYL FINANCE LIMITED SERIES 2008-15
BERYL FINANCE LIMITED SERIES 2008-16
BERYL FINANCE LIMITED SERIES 2008-17
BERYL FINANCE LIMITED SERIES 2008-2
BERYL FINANCE LIMITED SERIES 2008-3
BERYL FINANCE LIMITED SERIES 2008-4
BERYL FINANCE LIMITED SERIES 2008-5
BERYL FINANCE LIMITED SERIES 2008-6
BERYL FINANCE LIMITED SERIES 2008-7
BERYL FINANCE LIMITED SERIES 2008-8
BERYL FINANCE LIMITED SERIES 2008-9
BERYL FINANCE LTD SERIES 2005-1
BERYL FINANCE LTD SERIES 2005-2
BERYL FINANCE LTD SERIES 2005-4
BERYL FINANCE LTD SERIES 2006-10
BERYL FINANCE LTD SERIES 2006-11
BLUE POINT CDO LIMITED SPC SERIES 2005-1
BLUE POINT CDO LIMITED SPC SERIES 2005-2
BLUESTEP FINANCE (NO2) LIMITED
BNC MORTGAGE LOAN TRUST, MORTGAGE PASS THROUGH CERTIFICATES, SERIES 2007-4
BOCCACCIO FINANCE PLC
BOSTON HARBOR CLO 2004-1 LIMITED
BPL CONSUMERS SRL

BRIARWOOD COMMERCIAL PAPER TRUST
BTDJM PHASE II ASSOCIATE
C.P.G. SOCIETA DI CARTOLARIZZAZIONE A R. L.
CALIFORNIA COUNTY TOBACCO SECU RITIZATION AGENCY - LOS ANGELES COUNTY (THE)
CALIFORNIA COUNTY TOBACCO SECURITIZATION AGENCY - PLACER COUNTY
CANYON CAPITAL CLO 2004-1 LTD
CAPSTAR COPLEY LLC
CARILLON LTD
CARLYLE EUROPE REAL ESTATE 2005-1
CARLYLE HIGH YIELD PARTNERS IX LTD
CARTESIO SRL
CBTC 2004-6
CEAGO ABS CDO 2007-1 LTD
CERT LINKED ALT STRUCTURES, SE RIES 2005-1 TRUST
CHAMPLAIN CLO LTD
CHERRY HILL CDO SPC 2007-1
CHERRY HILL CDO SPC 2007-2
CIF EUROMORTGAGE
CIF EUROMORTGAGE
CIRRUS CERT INDIA D LTD.
CIRRUS INVEST C LTD.
CIRRUS INVEST E LTD.
CIRRUS INVEST G LTD.
CIRRUS INVEST INDIA H LTD
CIRRUS INVEST K LTD
COMOROS INVESTMENTS SARL
COMPAGNIE DE FINANCEMENT FONCI ER (CFF)
COMPAGNIE D'INVESTISSEMENT DE PARIS
CONSECO FINANCE HOME EQUITY LOAN TRUST 2001-D
CONSECO FINANCE MANUFACTURED HOUSING SERIES 2001-4
CONSECO FINANCE MANUFACTURED HOUSING SERIES 2002-1
CONSUMER UNSECURED REPERFORMING LOANS (CURL) PLC
COPPER CREEK CDO
CORAL CP TRUST PROGRAM
CPT ASSET BACKED CERTIFICATES TRUST SER. 2004-EC1
CRIMSON COMMERCIAL PAPER TRUST
CROWN CITY CDO 2005-1 LTD
CROWN CITY CDO 2005-2 LTD
CSAM SYNDICATED LOAN FUND
CWABS 2007 SEA2
CWABS ASSET BACKED CERTS SERIES 2006-26
CWABS ASSET BACKED CERTS SERIES 2006-SD4
CWABS ASSET-BACKED CERTIFICATES TRUST 2007-12
CWABS ASSET-BACKED CERTIFICATES TRUST 2007-BC2
CWABS ASSET-BACKED CERTIFICATES, SERIES 2006-22
CWABS ASSET-BACKED CERTS SERIES 2007-6
CWABS ASSET-BACKED NOTES TRUST 2007-SD1
CWABS INC ASSET BACKED CERTS SERIES 2004-14
CWABS INC ASSET BACKED CERTS SERIES 2005-14
CWABS INC ASSET BACKED CERTS SERIES 2005-15

CWABS INC ASSET BACKED CERTS SERIES 2005-AB4
CWABS INC ASSET BACKED CERTS SERIES 2005-AB5
CWABS INC ASSET BACKED CERTS SERIES 2005-BC5
CWABS INC ASSET BACKED CERTS SERIES 2006-13
CWABS INC ASSET BACKED CERTS SERIES 2006-14
CWABS INC ASSET BACKED CERTS SERIES 2006-16
CWABS INC ASSET BACKED CERTS SERIES 2006-19
CWABS INC ASSET BACKED CERTS SERIES 2006-3
CWABS INC ASSET BACKED CERTS SERIES 2006-4
CWABS INC ASSET BACKED CERTS SERIES 2006-5
CWABS INC ASSET BACKED NOTES SERIES 2006-SD3
CWABS INC ASSET-BACKED CERTS SERIES 2006-BC2
CWALT 2007-OH3
CWALT ALTERNATIVE LOAN TRUST 2006-OC10
CWALT INC ALTERNATIVE LOAN TRUST 2006-OC6
CWALT INC ALTERNATIVE LOAN TRUST 2006-OC8
CWALT INC ALTERNATIVE LOAN TRUST 2007-OH2
CWALT INC MORTGAGE PASS-THROUGH CERTIFICATES SERIES 2006-OC3
CWALT INC. ALTERNATIVE LOAN TRUST 2006-OC7
CWHEQ REVOLVING HOME EQUITY LOAN TRUST SERIES 2006-I
DAIKOKU DISTRIBUTION CENTER TMK
DAINI SAKURABASHI GODO KAISHA
DANTE FINANCE PLC
DEXIA MUNICIPAL AGENCY SA
DIADEM CITY CDO LIMITED 2005-1
DIADEM CITY CDO LIMITED SERIES 2008-1
DIADEM CITY CDO LIMITED SERIES 2008-2
DIADEM CITY CDO LIMITED SERIES 2008-3
DIAMOND FINANCE 2006-1
DIAMOND FINANCE 2006-2
DIAMOND FINANCE 2007-4
DIAMOND FINANCE 2008-1
DIAMOND FINANCE SERIES 2003-2
DIAMOND FINANCE SERIES 2003-2
DIAMOND FINANCE SERIES 2007 - 3A
DIAMOND FINANCE SERIES 2007-2
DIAMOND FINANCE SERIES 2007-3B
DIAMOND FINANCE SERIES 2007-5
DIAMOND FINANCE SERIES 2007-7
DIAMOND FINANCE SERIES 2007-8
DOW JONES CDX.NA.HY.3 TRUST 1 DECEMBER 2009
DOW JONES CDX.NA.HY.3 TRUST 2 DECEMBER 2009
DOW JONES CDX.NA.HY.3 TRUST 3 DECEMBER 2009
DOW JONES CDX.NA.HY.3 TRUST 4 DECEMBER 2009
EFG HELLAS PLC
EGYPT TRUST 1 - SERIES 2000 A
EMERALDS 2006-1
EMERALDS SERIES 2007-1 TRUST
EMERALDS SERIES 2007-3 TRUST
EMF NL 2008-2 BV

EMF-NL PRIME 2008-A.BV
ENCORE 2003-1
ENHANCED MORTGAGE BACKED SECURITIES FUND I LIMITED
ENHANCED MORTGAGE BACKED SECURITIES FUND IV LIMITED
ESP FUNDING I, LTD.
ESPRIT INTERNATIONAL LIMITED SERIES 1
ESPRIT INTERNATIONAL LIMITED SERIES 9
ESPRIT INTERNATIONAL LTD SERIE S 10
ESPRIT INTERNATIONAL LTD SERIES 11
EUROSAIL 2006-1 PLC
EUROSAIL 2006-2BL PLC
EUROSAIL 2006-3NC PLC
EUROSAIL 2006-4NP PLC
EUROSAIL -NL 2007-2 BV
EUROSAIL NL 2008-1 B.V
EUROSAIL PRIME-UK 2007 A PLC
EUROSAIL UK 2007 5NP PLC
EUROSAIL UK 2007 6NC PLC
EUROSAIL -UK-2008-1NP PLC
EUROSAIL-NL 2007-1 B.V.
EUROSAIL-UK 2007-1NC PLC
EUROSAIL-UK 2007-2NP PLC
EUROSAIL-UK 2007-3BL PLC
EUROSAIL-UK 2007-4BL PLC
EXCALIBUR FUNDING NO 1 PLC
EXUM RIDGE CBO 2006-1 LTD
EXUM RIDGE CBO 2006-2 LTD
EXUM RIDGE CBO 2006-4 LTD
EXUM RIDGE CBO 2006-5 LTD
EXUM RIDGE CBO 2007-1, LTD
EXUM RIDGE CBO 2007-2 LTD
FANNIE MAE REMIC 07-116
FANNIE MAE REMIC 08-46
FANNIE MAE REMIC TRUST 2007-103
FANNIE MAE REMIC TRUST 2007-88
FIRST FRANKLIN MORTGAGE LOAN TRUST 2006-FF8
FLATROCK TRUST
FNMA REMIC 08-53
FORD CREDIT AUTO OWNER TRUST 2007-B
FREEDOM PARK CDO LIMITED SPC SERIES 2005-1
FREMONT HOME LOAN TRUST 2006-E
FULLERTON DRIVE CDO LIMITED
G. K. ALSACE
G. K. ASOK
G. K. OAKMONT
G. K. VALLETTA
G.K. LOVINA
GALLEON LUXEMBOURG FUNDING SARL
GAZPROMBANK MORTGAGE BACKED SECURITIES SERIES 2007-2 CLASS A1
GEMSTONE CDO VI LTD

GENERIC CHINA PROTECTION 6
GENERIC EUROPE PROTECTION ELEVEN LTD.
GENERIC JAPAN PROTECTION A LTD.
GENERIC JAPAN PROTECTION B LTD.
GENERIC JAPAN PROTECTION C LTD.
GENERIC KOREA PROTECTION D LTD
GENERIC PROGRESSIVE TWO LTD
GENERIC PROTECTED CHINA FOUR LTD
GENERIC PROTECTION BIK E LTD
GENERIC PROTECTION BIK F LTD
GENERIC PROTECTION CHINA 5 LTD
GENERIC PROTECTION CHINA EIGHT LTD
GENERIC PROTECTION CHINA SEVEN LTD
GENERIC PROTECTION EUROPE NINE LTD
GENERIC PROTECTION EUROPE TEN LTD.
GENERIC PROTECTION INDIA TWELVE LTD.
GK DAVINCI RF1
GODO KAISHA BONDAI
GODO KAISHA CV6
GODO KAISHA KIWI
GOLDEN STATE TOBACCO SECURITIZATION CORPORATION
GPMF 06-AR8
GPMF 2007-AR1
GRANITE FINANCE 2007-1-C LTD
GRANITE FINANCE LIMITED SERIES 2005-9
GRANITE FINANCE LIMITED SERIES 2006-11
GRANITE FINANCE LIMITED SERIES 2006-6
GRANITE FINANCE LTD
GRANITE FINANCE LTD 2003-5
GRANITE FINANCE LTD 2003-6
GRANITE FINANCE LTD 2003-7
GRANITE FINANCE LTD 2004-1
GRANITE FINANCE LTD SERIES 2001-10
GRANITE FINANCE SPC 2008-1
GRANITE SERIES 2005-1
GRANITE SERIES 2005-10
GRANITE SERIES 2005-2
GRANITE SERIES 2005-3
GRANITE SERIES 2005-4
GRANITE SERIES 2005-5
GRANITE SERIES 2005-7
GREENBRIER YUGEN KAISHA
GREYSTONE CDO LIMITED SPC SERIES 2006-1
GREYSTONE CDO LIMITED SPC SERIES 2006-2
GREYSTONE CDO LIMITED SPC SERIES 2006-3
GREYSTONE CDO SPC SERIES 2008-4 SEGREGATED PORTFOLIO
GSC CAPITAL CORP MORTGAGE TRUST 2006-1
GSC EUROPEAN CDO I-R SA
GSC EUROPEAN CDO IV S.A
GSC EUROPEAN MEZZANINE LUXEMBOURG I SARL

GSC EUROPEAN MEZZANINE LUXEMBOURG II SARL
GSC EUROPEAN MEZZANINE LUXEMBOURG III SARL
GSEF AL NAWRAZ (CAYMAN) LIMITED
GSEF YAMAMA (CAYMAN) LIMITED
GSW GRUNDBESITZ GMBH & CO KG
GUADELETE INVESTMENTS S.A.R.L
GUAM ECONOMIC DEVELOPMENT AUTHORITY
GULF STREAM-COMPASS CLO 2003-1 LTD
GULF STREAM-COMPASS CLO 2004-1 LTD
GULF STREAM-COMPASS CLO 2005-1 LTD
GULFSTREAM - SEXTANT CLO 2006-1, LTD.
GULFSTREAM-COMPASS CLO-2005 II, LTD.
H/2 REAL ESTATE CDO 2006-1 LTD
H2001/PHIN GMBH & CO. KG
H21 ABSOLUTE RETURN CONCEPTS SPC ARC-B02-30140: H21 RESOURCES SP
HARBOURVIEW CDO III LIMITED
HDK PURCHASER TRUST
HHMI XVI LLC
HORIZON II INTERNATIONAL LTD SERIES 114
HORIZON II INTERNATIONAL LTD SERIES 115
HORIZON II INTERNATIONAL LTD SERIES 116
HORIZON II INTERNATIONAL LTD SERIES 121
HORIZON II INTERNATIONAL LTD SERIES 126
HORIZON II INTERNATIONAL LTD SERIES 130
HORIZON II INTERNATIONAL LTD SERIES 134
HORIZON II INTERNATIONAL LTD SERIES 135
HORIZON II INTERNATIONAL LTD SERIES 136
HORIZON II INTERNATIONAL LTD SERIES 145
HORIZON II INTERNATIONAL LTD SERIES 148
HORIZON II INTERNATIONAL LTD SERIES 158
HORIZON II INTERNATIONAL LTD SERIES 162
HORIZON II INTERNATIONAL LTD SERIES 178
HORIZON II INTERNATIONAL LTD SERIES 181
HORIZON II INTERNATIONAL LTD SERIES 183
HORIZON II INTERNATIONAL LTD SERIES 193
HORIZON II INTERNATIONAL LTD SERIES 207
HORIZON II INTERNATIONAL LTD SERIES 208
HORIZON II INTERNATIONAL LTD SERIES 211
HORIZON II INTERNATIONAL LTD SERIES 217
HORIZON II INTERNATIONAL LTD SERIES 219
HORIZON II INTERNATIONAL LTD SERIES 220
HORIZON II INTERNATIONAL LTD SERIES 221
HORIZON II INTERNATIONAL LTD SERIES 222
HORIZON II INTERNATIONAL LTD SERIES 223
HORIZON II INTERNATIONAL LTD SERIES 225
HORIZON II INTERNATIONAL LTD SERIES 226
HORIZON II INTERNATIONAL LTD SERIES 227
HORIZON II INTERNATIONAL LTD SERIES 228
HORIZON II INTERNATIONAL LTD SERIES 229
HORIZON II INTERNATIONAL LTD SERIES 230

HORIZON II INTERNATIONAL LTD SERIES 77
HT FINANZANLAGE LIMITED SERIES 13
I.E. JERSEY PROPERTY CO. NO.1 LTD
IEIL JAPAN CO., LTD.
IMPAC CMB TRUST SERIES 2003-11
IMPAC CMB TRUST SERIES 2004-04
IMPAC CMB TRUST SERIES 2004-05
IMPAC CMB TRUST SERIES 2004-08
IMPAC CMB TRUST SERIES 2004-10
IMPAC CMB TRUST SERIES 2005-03
IMPAC CMB TRUST SERIES 2005-04
IMPAC CMB TRUST SERIES 2005-05
IMPAC CMB TRUST SERIES 2005-08
IMPAC SECURED ASSETS TRUST 2006-3
IMPAC SECURED ASSETS TRUST 2007-3, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-3
IMSER SECURITISAT. GIA ISP III
ING INVESTMENT MANAGEMENT CLO I, LTD
ING INVESTMENT MANAGEMENT CLO II, LTD
ITALEASE FINANCE SPA
JASPER FINANCE LIMITED SERIES 2005-1
JEFFERSON VALLEY CDO LIMITED SPC SERIES 2006-1
JUPITER QUARTZ FINANCE PLC 2004-1 CLASS A
JUPITER QUARTZ FINANCE PLC 2004-1 CLASS B
JUPITER QUARTZ PLC 2004-2
KBC INVESTMENTS CAYMAN ISLANDS V LTD
KINGS RIVER LIMITED
KONA TMK
KP GERMANY ZWEITE GMBH
LAKEVIEW CDO 2007-2
LAKEVIEW CDO SPC 2007-1
LAKEVIEW CDO SPC 2007-3
LAKEVIEW CDO SPC SERIES 2007-4 SEGREGATED PORTFOLIO
LB COMMERCIAL TRUST 2007-C3 COMMERCIAL MORTGAGE PASS-THROUGH CERTIFICATES
LB PERU TRUST II, 1998-A
LB-UBS COMMERCIAL MORTGAGE TRUST 2007-C6
LB-UBS COMMERCIAL MORTGAGE TRUST 2008-C1
LDVF1 FIP SARL
LDVF1 MAIN FIP SARL
LEEDS TMK
LEH MORTGAGE TRUST, SERIES 2007-6
LEHMAN ABS MANUFACTURED HOUSING CONTRACT TRUST 2002-A
LEHMAN BROTHERS CDO MEZZANINE FUND 2005-1, LTD
LEHMAN BROTHERS CDO OPPORTUNITY PARTNERS 2004-3 LP
LEHMAN BROTHERS SMALL BALANCE COMMERCIAL MORTGAGE TRUST 2007-2
LEHMAN MORTGAGE TRUST 2006-4
LEHMAN MORTGAGE TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-9
LEHMAN MORTGAGE TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-5
LEHMAN MORTGAGE TRUST, SERIES 2005-02
LEHMAN MORTGAGE TRUST, SERIES 2005-03

LEHMAN MORTGAGE TRUST, SERIES 2006-01
LEHMAN MORTGAGE TRUST, SERIES 2006-05
LEHMAN XS TRUST  MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-9
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-1
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2005-9N
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-11
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-13
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-15
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-17
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-19
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-3
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-6
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-7
LEHMAN XS TRUST MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2007-10H
LIBERTY SQUARE CDO I LIMITED
LIBERTY SQUARE CDO II LIMITED
LIBRA CDO LIMITED
LION CITY CDO 2006-2 LTD
LION CITY CDO 2006-3 LTD
LION CITY CDO LIMITED SERIES 2006-1
LION CITY CDO LTD SERIES 2006-5
LION CREDIT OPPORTUNITY FUND PLC
L-JAC ONE SPECIAL PURPOSE COMPANY
LMT 2008-6
LOAN FUNDING III LLC
LUSITANO MORTGAGES NO. 5 PLC
LXS 2006-10N
LXS 2006-16N
LXS 2006-18N
MADISON AVENUE CDO I LTD
MADISON AVENUE STRUCTURED FINANCE CDO I, LIMITED
MALACHITE 2006-1 TRUST
MARSEILLE REPUBLIQUE SAS
MCDONNELL LOAN OPPORTUNITY LTD
MERLIN FINANCE SA
MICROACCESS TRUST 2007
MINIBOND LIMITED SERIES 1
MINIBOND LIMITED SERIES 10
MINIBOND LIMITED SERIES 2
MINIBOND LIMITED SERIES 3
MINIBOND LIMITED SERIES 5
MINIBOND LIMITED SERIES 6
MINIBOND LIMITED SERIES 7
MINIBOND LIMITED SERIES 8
MINIBOND LIMITED SERIES 9
MKP VELA CBO LTD
MONROE TOBACCO ASSET SECURIZATION CORPORATION
MT WILSON CLO II LTD
MUNICIPAL ASSET SECURITIZATION TRUST SECURITIES, SERIES 2008-1 TRUST
MURSUK GRUNDSTUCKS-VERWALTUNGSGESELLS CHAFT MBH

MUSTIQUE 2007-1 A2A
MUSTIQUE 2007-1 A2B
MUSTIQUE 2007-1 B
MUSTIQUE 2007-1 C
MUSTIQUE 2007-1 D
MUSTIQUE 2007-1 E
NATIONALE-NEDERLANDEN INTERFINANCE BV
NATIXIS ABM LLC
NEW ALLIANCE GLOBAL CDO LIMITED
NEWTON RE LIMITED
NOMURA HOME EQUITY LOAN INC HOME EQUITY LOAN TRUST SERIES 2007-3
NORTHWOODS CAPITAL VII LTD
OAK HILL CREDIT PARTNERS IV LIMITED
ONE MADISON INVESTMENTS (CAYCO) LIMITED
ONYX FINANCE LIMITED
ONYX FUNDING LIMITED 2004-1
ONYX FUNDING LIMITED SERIES 2006-1
ONYX FUNDING LTD 2005-1
ONYX FUNDING LTD SERIES 2008-1
OPTION ONE MORTGAGE E LOAN TRUST 2007-5
OPTION ONE MORTGAGE LOAN TRUST 2007-1
OPTION ONE MORTGAGE LOAN TRUST 2007-3
OPTION ONE MORTGAGE LOAN TRUST 2007-4
ORKNEY TOKUTEI MOKUTEKI KAISHA
OSCART INTERNATIONAL LIMITED
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 10
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 11
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 15
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 17
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 18
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 19
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 21
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 22
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 25
PACIFIC INTERNATIONAL FINANCE LIMITED SERIES 9
PACIFIC INTERNATIONAL FINANCE LTD SERIES 12
PACIFIC INTERNATIONAL FINANCE LTD SERIES 16
PACIFIC INTERNATIONAL FINANCE LTD SERIES 20
PACIFIC INTERNATIONAL FINANCE LTD SERIES 23
PACIFIC INTERNATIONAL FINANCE LTD SERIES 26
PACIFIC INTERNATIONAL FINANCE LTD SERIES 27
PACIFIC INTERNATIONAL FINANCE LTD SERIES 28
PACIFIC INTERNATIONAL FINANCE LTD SERIES 29
PACIFIC INTERNATIONAL FINANCE LTD SERIES 30
PACIFIC INTERNATIONAL FINANCE LTD SERIES 31
PACIFIC INTERNATIONAL FINANCE LTD SERIES 32
PACIFIC INTERNATIONAL FINANCE LTD SERIES 33
PACIFIC INTERNATIONAL FINANCE LTD SERIES 34
PACIFIC INTERNATIONAL FINANCE LTD SERIES 35
PACIFIC INTERNATIONAL FINANCE LTD SERIES 36

PANTERA VIVE CDO LIMITED SPC SERIES 2007-1
PARAMOUNT GLOBAL LIMITED
PARIS PRIME COMMERCIAL REAL ESTATE FCC
PEARL FINANCE PLC SERIES 2005-1
PEARL FINANCE SERIES 2003-1
PEARL FINANCE SERIES 2003-4
PEARL FINANCE SERIES 2003-5
PEARL FINANCE SERIES 2003-6
PEARL FINANCE SERIES 2003-8
PEARL FINANCE SERIES 2003-9
PEBBLE CREEK 2007-3 LIMITED
PEBBLE CREEK LCDO 2006-1 LTD
PEBBLE CREEK LCDO 2007-2 LTD
PENNS LANDING CDO 2007-1
PETRAECA FINANCE PLC
PHOENIX F1 NEUBRANDENBURGSTRASSE
PHOENIX II MIXED L
PHOENIX III MIXED U
PHOENIX SERIES 2002-1
PHOENIX SERIES 2002-2
PICASSO INVESTMENTS 1 LIMITED
PINYON TREE 2005-1
PORTFOLIO CDS TRUST 103 - SARATOGA
PORTFOLIO CDS TRUST 104 - AMMC
PORTFOLIO CDS TRUST 105 - STANFIELD VEYRON
PORTFOLIO CDS TRUST 162
PORTFOLIO CDS TRUST 18
PORTFOLIO CDS TRUST 187
PORTFOLIO CDS TRUST 191
PORTFOLIO CDS TRUST 192
PORTFOLIO CDS TRUST 193
PORTFOLIO CDS TRUST 194
PORTFOLIO CDS TRUST 195
PORTFOLIO CDS TRUST 196
PORTFOLIO CDS TRUST 208
PORTFOLIO CDS TRUST 209
PORTFOLIO CDS TRUST 210
PORTFOLIO CDS TRUST 211
PORTFOLIO CDS TRUST 212
PORTFOLIO CDS TRUST 213
PORTFOLIO CDS TRUST 214
PORTFOLIO CDS TRUST 233
PORTFOLIO CDS TRUST 234
PORTFOLIO CDS TRUST 235
PORTFOLIO CDS TRUST 236
PORTFOLIO CDS TRUST 237
PORTFOLIO CDS TRUST 238
PORTFOLIO CDS TRUST 239
PORTFOLIO CDS TRUST 240
PORTFOLIO CDS TRUST 241

PORTFOLIO CDS TRUST 242
PORTFOLIO CDS TRUST 243
PORTFOLIO CDS TRUST 244
PORTFOLIO GREEN GERMAN CMBS GMBH
POSILLIPO FINANCE II S.R.L.
POSILLIPO FINANCE S.R.L.
PRIMUS FINANCIAL PRODUCTS LLC
PUMICE INVESTMENTS (NETHERLANDS) BV
PYXIS ABS CDO 2007-1 LTD
PYXIS FINANCE LTD
QUARTZ FINANCE 2003-1
QUARTZ FINANCE 2003-4
QUARTZ FINANCE 2003-5
QUARTZ FINANCE 2004-1
QUARTZ FINANCE 2005-1
QUARTZ FINANCE 2005-2
QUARTZ FINANCE LIMITED
QUARTZ FINANCE SERIES 2003-3
RACE POINT IV CLO LTD
RACERS 2000-19-C HILTON
RACERS 2000-22-A UBS
RACERS 2000-24-A HSBC
RACERS 2001-13-C
RACERS 2001-6-S-BLS
RACERS 2002-10-TR
RACERS 2002-45-L
RACERS 2003-07-A CITI
RACERS 2004-25-TR
RACERS 2004-26-E
RACERS 2004-27-E
RACERS 2005-03-TR
RACERS 2005-06-A
RACERS 2005-10-C
RACERS 2005-13-C
RACERS 2005-19-C
RACERS 2005-21-C
RACERS 2006-15-A
RACERS 2006-16-TR
RACERS 2006-18-C ABX-A-06-1-I
RACERS 2006-18-C ABX-A-06-1-II
RACERS 2006-18-C ABX-A-06-1-III
RACERS 2006-18-C ABX-A-06-2-I
RACERS 2006-18-C ABX-A-06-2-II
RACERS 2006-18-C ABX-A-06-2-III
RACERS 2006-1-C
RACERS 2006-20-AT
RACERS 2007-4-C FTD
RACERS 2008-2-C
RACERS 2008-3-C
RACERS 2008-5-A

RACERS 2008-6-TR
RACERS SERIES 2002-20
RACERS SERIES 2002-26
RACERS SERIES 2002-39
RACERS-2007-5-TRS
RADIAN CREDIT LINKED TRUST 2003-1
RELATIONSHIP FUNDING COMPANY LLC
REPACKAGED AMERICAN GENERAL FRTC 2003-1
RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A15
RMB LEVERAGED (CAYMAN) LTD
ROBANIA CDO LIMITED
ROBECO CDO VII LIMITED
ROBECO CREDIT LIMITED
RRR LOAN FUNDING TRUST
RUBY FINANCE 2003-4
RUBY FINANCE 2004-2
RUBY FINANCE 2004-3
RUBY FINANCE 2005-1
RUBY FINANCE 2006-2
RUBY FINANCE 2006-3
RUBY FINANCE 2006-4
RUBY FINANCE 2006-5
RUBY FINANCE 2006-7
RUBY FINANCE 2007-1
RUBY FINANCE 2007-3
RUBY FINANCE 2007-6
RUBY FINANCE 2007-7
RUBY FINANCE 2008-01
RUBY FINANCE PLC 2007-2
S&P LICENSING FEE
SACHER FUNDING LTD.
SAGAMORE CLO LTD
SAIL 2005-1
SAIL 2005-2
SAIL ASSOCIATES, LLC
SAPHIR FINANCE 2006-6
SAPHIR FINANCE 2006-8
SAPHIR FINANCE PLC 2004-11
SAPHIR FINANCE PLC 2004-12
SAPHIR FINANCE PLC 2004-2
SAPHIR FINANCE PLC 2004-4
SAPHIR FINANCE PLC 2004-5
SAPHIR FINANCE PLC 2004-7
SAPHIR FINANCE PLC 2005-11
SAPHIR FINANCE PLC 2005-1
SAPHIR FINANCE PLC 2005-10
SAPHIR FINANCE PLC 2005-12
SAPHIR FINANCE PLC 2005-3
SAPHIR FINANCE PLC 2005-4
SAPHIR FINANCE PLC 2005-7

SAPHIR FINANCE PLC 2006-1
SAPHIR FINANCE PLC 2006-10
SAPHIR FINANCE PLC 2006-11
SAPHIR FINANCE PLC 2006-2
SAPHIR FINANCE PLC 2006-3
SAPHIR FINANCE PLC 2006-4
SAPHIR FINANCE PLC 2006-5
SAPHIR FINANCE PLC 2007-1
SAPHIR FINANCE PLC 2007-2
SAPHIR FINANCE PLC 2007-4
SAPHIR FINANCE PLC 2007-5
SAPHIR FINANCE PLC 2007-7
SAPHIR FINANCE PLC 2007-9
SAPHIR FINANCE PLC 2008-1
SAPHIR FINANCE PLC SERIES 2008-10
SAPHIR FINANCE PLC SERIES 2008-11
SAPHIR FINANCE PLC SERIES 2008-12
SAPHIR FINANCE PLC SERIES 2008-13
SAPHIR FINANCE PLC SERIES 2008-6
SAPHIR FINANCE PLC SERIES 2008-7
SAPHIR FINANCE PLC SERIES 2008-8
SAPHIR FINANCE PLC SERIES 2008-9
SAPPHIRE COMMERCIAL PAPER TRUST
SAPPORO NISHIMACHI YUGEN GAISYA
SARATOGA CLO I LTD
SARM 2006-11
SARM 2006-12
SARM 2007-1
SARM 2007-2
SARM 2007-3
SARM 2008-1
SARM 2008-1B
SARM LOAN TRUST SERIES 2004-18
SARM LOAN TRUST SERIES 2005-1
SARM NIM1 2005 -19XS
SASCO 2002-NP1
SASCO 2003-NP1
SASCO 2005-NC1
SASCO 2005-RF1
SASCO 2005-RF2
SASCO 2005-RF3
SASCO 2005-RF4
SASCO 2005-WF1
SASCO 2008-1
SASCO NIM 2005-9XS
SASCO SERIES 2005-RF6
SASCO SERIES 2006 RF-2
SASCO SERIES 2006 RF-4
SASCO SERIES 2007 RF-1
SASCO SERIES 2007 RF-2

SASCO SERIES 2008 RF-1
SASCO, SERIES 2005-RF5
SCHILLER PARK CLO
SEALINK FUNDING LIMITED
SECURITIZED PRODUCT OF RESTRUCTURED COLLATERAL LTD SPC - SERIES 2007-1 FEDERATION
A1
SECURITIZED PRODUCT OF RESTRUCTURED COLLATERAL LTD SPC - SERIES 2007-1 FEDERATION
A2
SEGREGATED PORTFOLIO SPRC D-FORCE LLC SERIES 2007-1
SEQUOIA FUNDING LIMITED SERIES 1998-2
SGS HY CREDIT FUND I (EXUM RIDGE CBO 2006-3) LTD
SIRIUS INTERNATIONAL LIMITED SERIES 11
SIRIUS INTERNATIONAL LTD SERIES 13
SIRIUS INTERNATIONAL LTD SERIES 16
SLB LEASING-FONDS GMBH&CO. THOR KG
SLB LEASING-FONDS GMBH&CO. URANUS KG
SLM STUDENT LOAN TRUST 2004-1
SOCIETA' DI CARTOLARIZZAZIONE ITALIANA CREDITI A RESPONSABILITA'
SOCIETE CIVILE IMMOBILIERE KARANIS
SOCIETE IMMOBILIERE PRIVAT
SOLAR INVESTMENT GRADE CBO I
SOLAR INVESTMNT GRADE CBO II
SOLAR V CDO
SOUTHPORT CLO LTD
SPEEDWAY ASSOCIATES L.L.C
STANFIELD MODENA CLO
STANFIELD VANTAGE CLO LTD
STANFIELD VEYRON CLO LTD
STATE SUPER FINANCIAL SERVICES LIMITED
STONY HILL CDO III LIMITED
STONY HILL CDO SPC SERIES 2005-1
STOWE CDO LIMITED SPC SERIES 2006-1
STOWE CDO SPC SERIES 2008-1 SEGREGATED PORTFOLIO
STOWE CDO SPC SERIES 2008-2A SEGREGATED PORTFOLIO
STRUCTURED ADJUSTABLE RATE MORG LNTR SER 2004-10
STRUCTURED ADJUSTABLE RATE MORTGAGE LNTR 2004-9XS
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN 2004-12
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TR 2004-8
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRST SER 2004-20
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST SER 2004-16
STRUCTURED ADJUSTABLE RATE MORTGAGE LOAN TRUST SER 2004-6
STRUCTURED ADJUSTABLE RATE MORTGAGE SERIES 2004-14
STRUCTURED ASSET INVESTMENT LOAN TRUST 2004-4
STRUCTURED ASSET RECEIVABLES TRUST SERIES 2003-1
STRUCTURED ASSET RECEIVABLES TRUST, SERIES 2003-2
STRUCTURED ASSET RECEIVABLES TRUST, SERIES 2004-1
STRUCTURED ASSET SEC CORPREF SARM 2008-2
STRUCTURED ASSET SECURITES CORPORATION PASS-THROUGH CERTIFICATES, SERIES 2007-4
STRUCTURED ASSET SECURITIES CORPORATION 2003-37A
STRUCTURED ASSET SECURITIES CORPORATION 2003-NP3

STRUCTURED ASSET SECURITIES CORPORATION 2004-23XS
STRUCTURED ASSET SECURITIES CORPORATION 2005-RF7
STRUCTURED ASSET SECURITIES CORPORATION 2006-RF1
STRUCTURED ASSET SECURITIES CORPORATION BNC SERIES 2007-1 (SASCO)
STRUCTURED ASSET SECURITIES CORPORATION BNC SERIES 2007-BC2 (SASCO)
STRUCTURED ASSET SECURITIES CORPORATION BNC SERIES 2007-BNC1
STRUCTURED ASSET SECURITIES CORPORATION MORTGAGE LOAN TR 2004-NP2
STRUCTURED ASSET SECURITIES CORPORATION SERIES 2007-EQ1 (SASCO)
STRUCTURED ASSET SECURITIES CORPORATION SERIES 2007-OSI SASCO
STRUCTURED ASSET SECURITIES CORPORATION SERIES 2007-SC1 (SASCO)
SUMMER STREET 2005-HG1 LTD
SUNSET PARK CDO LIMITED SPC SERIES 2004-1
SUNSET PARK CDO LIMITED SPC SERIES 2004-2
SUNSET PARK CDO LIMITED SPC SERIES 2004-4
SUNSET PARK CDO LIMITED SPC SERIES 2005-3
SUNSET PARK CDO LIMITED SPC SERIES 2005-5
SUNSET PARK CDO LIMITED SPC SERIES 2005-6
SUNSUPER PTY LTD CURRENCY OVERLAY
SWIFT MASTER AUTO RECEIVABLES TRUST
TAVARES SQUARE CDO LIMITED
TAYLOR CREEK LIMITED
THE SERIES 2007-1 TABXSPOKE SEGREGATED PORTFOLIO
THETA CORPORATION
TIAA STRUCTURED FINANCE CDO I LIMITED
TIZIAN WOHNEN 1 GMBH
TLLB2002 INTERNATIONAL LIMITED SERIES 6
TMK GOLDEN CHILD PROPERTY
TOBACCO ASSET SECURITIZATION CORPORATION
TOBACCO SETTLEMENT AUTHORITY
TOBACCO SETTLEMENT FINANCE CORPORATION - LOUISIANA
TOBACCO SETTLEMENT FINANCE CORPORATION - NEW JERSEY
TOBACCO SETTLEMENT FINANCE CORPORATION - NEW YORK
TOBACCO SETTLEMENT FINANCE CORPORATION - OHIO
TOBACCO SETTLEMENT FINANCING CORPORATION VIRGINIA
TOPAZ FINANCE LTD 2005-1
TOPAZ FINANCE LTD 2005-2
TORANOMON INVESTMENTS TMK
TORRE RE FUND I
TRADEWINDS II CDO LIMITED SPC SERIES 2006-1
VERDE CDO LTD (SEG AC CDS ONLY)
VOX PLACE CDO LIMITED
WAVELAND INGOTS LTD
WELLS FARGO MORTGAGE BACKED SECURITIES 2008-AR2 TRUST
WH2005 / NIAM III EAST HOLDING OY
WHITE MARLIN CDO 2007-1 LIMITED
WILLOW RE LTD
WINDERMERE IX CMBS (MULTIFAMILY) S.A.
WINDERMERE PRIVATE PLACEMENT I S.A.
WINDERMERE VI CMBS PLC
WINDERMERE X CMBS LIMITED

WINDERMERE XIV CMBS LIMITED
Y. K. AKASAKA INTERNATIONAL
Y.K. TRENCH
YAESU FIVE TMK
ZIRCON FINANCE  2007-5
ZIRCON FINANCE 2007-6
ZIRCON FINANCE LIMITED SERIES 2007-10
ZIRCON FINANCE LIMITED SERIES 2007-11
ZIRCON FINANCE LIMITED SERIES 2007-3
ZIRCON FINANCE LIMITED SERIES 2007-9
ZIRCON FINANCE LTD SERIES 2007-1
ZIRCON FINANCE LTD SERIES 2007-12
ZIRCON FINANCE LTD SERIES 2007-13
ZIRCON FINANCE LTD SERIES 2007-14
ZIRCON FINANCE LTD SERIES 2007-15
ZIRCON FINANCE LTD SERIES 2007-16
ZIRCON FINANCE LTD SERIES 2007-17
ZIRCON FINANCE LTD SERIES 2007-18
ZIRCON FINANCE LTD SERIES 2007-19
ZIRCON FINANCE LTD SERIES 2007-2
ZIRCON FINANCE LTD SERIES 2007-8
ZWINGER OPCO 6 BV

## SCHEDULE B

## Natixis Representatives

Ken Wormser
Ralph Inglese
David Powar
Michael Hopson
William Fischer
Lorraine Medvecky
David Duncan
Ninat Lekagul
Joseph Di Prospero
Aimee Means
Dan Strong
Naz Majidi
Mark David
Abhishek Shukla
Craig Reckin
Greg Chow
Marianne Medora
Joe Falcone
Adam True

# EXHIBIT F

*03 1506 SAPH*

FORM OF EARLY TERMINATION NOTICE

SAPHIR FINANCE PUBLIC LIMITED COMPANY
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

RECEIVED DEC 0 1 2008
*Hand*

01 December 2008

VIA COURIER AND/OR FACSIMILE

To:   Lehman Brothers Special Financing Inc.
      Suite 400
      Wilmington, Delaware 19808
      U.S.A.

Copy: See Annex attached

Re:   Early Termination Date Designation Notice under the ISDA Master Agreement and related
      Schedule thereto dated 10 October 2002 as amended and restated on 22 July 2005 and as
      further amended or restated from time to time between Lehman Brothers Special Financing
      Inc. ("**Lehman**") and Saphir Finance Public Limited Company (the "**Issuer**")

Ladies and Gentlemen:

Reference is made to the ISDA Master Agreement (and related Schedule thereto), as amended and
supplemented from time to time, between Lehman and the Issuer (by deed of accession) (together
with the related Guarantee, issued in favour of the Issuer by Lehman Brothers Holdings Inc. (the
"**Guarantor**"), the related Credit Support Annex to the Schedule and the credit default swap
confirmation dated 17 March 2006 (the "**Confirmation**") entered into thereunder in connection with
the issue by the Issuer of, *inter alios*, the Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes
due 2011 and extendable up to 2016 (the "**Notes**"), the "**ISDA Master Agreement**"). Pursuant to the
Confirmation, the Issuer and the Swap Counterparty have entered into a transaction in respect of the
Notes (the "**Transaction**"). Capitalised terms not otherwise defined herein, will have the meanings
set forth in respect thereof in the ISDA Master Agreement.

On 3 October 2008, Lehman filed a voluntary petition for relief under chapter 11 of title 11 of the
United States Code. Pursuant to Section 5(a)(vii)(*Bankruptcy*) of the ISDA Master Agreement, this
chapter 11 filing by Lehman constitutes an Event of Default under the ISDA Master Agreement with
respect to Lehman.

This letter constitutes formal written notice of the existence of an Event of Default under the ISDA
Master Agreement. The Issuer, as the Non-defaulting Party, in accordance with Section 6(a) of the
ISDA Master Agreement hereby designates 1 December 2008 as the Early Termination Date under
the ISDA Master Agreement for the Transaction.

This notice is given without prejudice to any other rights, remedies or privileges we may have under or pursuant to the ISDA Master Agreement or under applicable law or principles of equity, which rights, remedies and privileges shall continue and remain in full force and effect.

This notice, including any non-contractual obligations arising out of or in connection with this notice, and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this notice shall be governed by, and shall be construed in accordance with, English law.

Very truly yours,

SAPHIR FINANCE PUBLIC LIMITED COMPANY

By:

By:

Annex

Copy to:      Lehman Brothers International (Europe)
                   25 Bank Street
                   London E14 5LE

                   Attention: General Counsel
                   Fax: +44 20 7067 8388

                   Lehman Brothers Special Financing Inc.
                   1271 Avenue of the Americas
                   43rd Floor
                   New York, New York 10020

                   Attention: Vincent DiMassimo
                   Telephone: (646) 333-6032
                   Fax: (646) 758-1811

                   Lehman Brothers Special Financing Inc.
                   1271 Avenue of the Americas
                   43rd Floor
                   New York, New York 10020

                   Attention: Locke McMurray
                   Telephone: (212) 526-7186
                   Fax: (646) 758-2634

                   Weil, Gotshal & Manges LLP
                   767 Fifth Avenue
                   New York, New York 10153

                   Attention: Robert J. Lemons, Esq.
                   Telephone: (212) 310 -8924
                   Fax: (212) 310-8007


                   With an additional copy via electronic mail to:

                   LBHISPVNotices@lehman.com

# EXHIBIT G

*recd by hand*
*01/12/08*
*LUCY VW7E 16.18*

## FORM OF EARLY TERMINATION NOTICE

**SAPHIR FINANCE PUBLIC LIMITED COMPANY**
AIB International Centre
International Financial Services Centre
Dublin 1
Ireland

01 December 2008

### VIA COURIER AND/OR FACSIMILE

To:    Lehman Brothers Special Financing Inc.
       Suite 400
       Wilmington, Delaware 19808
       U.S.A.

Copy:  See Annex attached

Re:    Early Termination Date Designation Notice under the ISDA Master Agreement and related
       Schedule thereto dated 10 October 2002 as amended and restated on 30 January 2004 and as
       further amended or restated from time to time between Lehman Brothers Special Financing
       Inc. ("**Lehman**") and Saphir Finance Public Limited Company (the "**Issuer**")

Ladies and Gentlemen:

Reference is made to the ISDA Master Agreement (and related Schedule thereto), as amended and
supplemented from time to time, between Lehman and the Issuer (by deed of accession) (together
with the related Guarantee, issued in favour of the Issuer by Lehman Brothers Holdings Inc. (the
"**Guarantor**"), the related Credit Support Annex to the Schedule and the credit default swap
confirmation dated 10 December 2004 (the "**Confirmation**") entered into thereunder in connection
with the issue by the Issuer of, *inter alios*, the Series 2004-11 AUD 75,000,000 Synthetic Portfolio
Notes due 2011 (the "**Notes**"), the "**ISDA Master Agreement**"). Pursuant to the Confirmation, the
Issuer and the Swap Counterparty have entered into a transaction in respect of the Notes (the
"**Transaction**"). Capitalised terms not otherwise defined herein, will have the meanings set forth in
respect thereof in the ISDA Master Agreement.

On 3 October 2008, Lehman filed a voluntary petition for relief under chapter 11 of title 11 of the
United States Code. Pursuant to Section 5(a)(vii)(*Bankruptcy*) of the ISDA Master Agreement, this
chapter 11 filing by Lehman constitutes an Event of Default under the ISDA Master Agreement with
respect to Lehman.

This letter constitutes formal written notice of the existence of an Event of Default under the ISDA
Master Agreement. The Issuer, as the Non-defaulting Party, in accordance with Section 6(a) of the
ISDA Master Agreement hereby designates 1 December 2008 as the Early Termination Date under
the ISDA Master Agreement for the Transaction.

1

This notice is given without prejudice to any other rights, remedies or privileges we may have under or pursuant to the ISDA Master Agreement or under applicable law or principles of equity, which rights, remedies and privileges shall continue and remain in full force and effect.

This notice, including any non-contractual obligations arising out of or in connection with this notice, and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this notice shall be governed by, and shall be construed in accordance with, English law.

Very truly yours,

**SAPHIR FINANCE PUBLIC LIMITED COMPANY**

By:

By:

Annex

2

Copy to:     Lehman Brothers International (Europe)
25 Bank Street
London E14 5LE

Attention: General Counsel
Fax: +44 20 7067 8388

Lehman Brothers Special Financing Inc.
1271 Avenue of the Americas
43rd Floor
New York, New York 10020

Attention: Vincent DiMassimo
Telephone: (646) 333-6032
Fax: (646) 758-1811

Lehman Brothers Special Financing Inc.
1271 Avenue of the Americas
43rd Floor
New York, New York 10020

Attention: Locke McMurray
Telephone: (212) 526-7186
Fax: (646) 758-2634

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153

Attention: Robert J. Lemons, Esq.
Telephone: (212) 310 -8924
Fax: (212) 310-8007


With an additional copy via electronic mail to:

LBHISPVNotices@lehman.com

**176**

# EXHIBIT H



**Claim Form**
**(CPR Part 8)**

1 3 MAY 2009

CHANCERY
JUDGES
LISTING

<table>
<tr><td>In the</td><td>HIGH COURT OF JUSTICE<br>CHANCERY DIVISION<br>ROYAL COURTS OF JUSTICE</td></tr>
<tr><td>Claim No.</td><td>HC09C01612</td></tr>
</table>

Claimant

PERPETUAL TRUSTEE COMPANY LIMITED
Level 12
Angel Place
123 Pitt Street
GPO 4172
Sydney NSW 2001
Australia

Defendant(s)

BNY CORPORATE TRUSTEE SERVICES LIMITED



Does your claim include any issues under the Human Rights Act 1998?   ☐ Yes   ☑ No

Details of claim *(see also overleaf)*

Please see additional sheets, attached.

NOTICE OF HEARING:
APPLICATION WILL BE HEARD AT THE ROYAL COURTS
OF JUSTICE, STRAND, LONDON WC2A 2LL ON.
DATE ............................. 21/5/09
TIME ............................. UR 10.30
AT ............................. CT 50

<table>
<tr><td rowspan="3">Defendant's<br>name and<br>address</td><td>BNY Corporate Trustee Services Limited<br>1 Canada Square<br>London<br>E14 5AL</td></tr>
</table>

<table>
<tr><td></td><td>£</td></tr>
<tr><td>Court fee</td><td>400.00</td></tr>
<tr><td>Solicitor's costs</td><td></td></tr>
<tr><td>Issue date</td><td>1 3 MAY 2009</td></tr>
</table>

The court office at

CHANCERY CHAMBERS, ROYAL COURTS OF JUSTICE, STRAND, LONDON WC2A 2LL
is open between 10 am and 4 pm Monday to Friday. When corresponding with the court, please address forms or letters to the Court Manager and quote the case number.

N208 Claim form (CPR Part 8) (10.00)                                    *Printed on behalf of The Court Service*

Claim No.

Details of claim *(continued)*

Statement of Truth
*(I believe)*(The Claimant believes) that the facts stated in these particulars of claim are true.
* I am duly authorised by the claimant to sign this statement

Full name    Dorothy McNaughton Cory-Wright

Name of claimant's solicitor's firm   Sidley Austin LLP

signed   *Dorothy Cory-Wright*                    , position or office held   Partner

*(Claimant)(Litigation friend)(Claimant's solicitor)  (if signing on behalf of firm or company)

*delete as appropriate

Sidley Austin LLP                    Claimant's or claimant's solicitor's address to
Woolgate Exchange                    which documents should be sent if different
25 Basinghall Street                 from overleaf. If you are prepared to accept
London                               service by DX, fax or e-mail, please add details.
EC2V 2HA

Ref: RP/SJF/41442-30020

Detail of Claim

1.  Part 8 of the Civil Procedure Rules applies to this claim.

2.  The Claimant, Perpetual Trustee Company Limited ("Perpetual"), is:

    (1)  The holder of the entirety of the Saphir Series 2004-11 AUD$75,000,000 Synthetic Portfolio Notes due 2011 ("the Saphir I Notes"); and

    (2)  The holder of the entirety of the Saphir Series 2006-5 AUD$50,000,000 Synthetic Portfolio Notes due 2011 extendable up to 2016 ("the Saphir II Notes").

3.  The Defendant, BNY Corporate Trustee Services Ltd ("BNY Trustee") is:

    (1)  Pursuant to the terms of a principal trust deed dated 10 October 2002 ("the Principal Trust Deed") and a supplemental trust deed and drawdown agreement dated 10 December 2004 ("STTDI"), the note trustee of the Saphir I Notes and the security trustee of the collateral purchased with the proceeds of the Saphir I Notes; and

    (2)  Pursuant to the terms of the Principal Trust Deed and a supplemental trust deed and drawdown agreement dated 17 March 2006 ("STTDII"), the note trustee of the Saphir II Notes and the security trustee of the collateral purchased with the proceeds of the Saphir II Notes.

4.  For the reasons and circumstances set out in the witness statement of Anna Patricia O'Sullivan filed herewith, Perpetual seeks the following relief:

    (1)  An order that BNY Trustee do immediately give notice to Saphir Finance Public Limited Company, as issuer of the Saphir I Notes, that the Saphir I Notes are, and shall immediately become, due and payable at their Early Redemption Amount together with accrued interest and that the security constituted by the Principal Trust Deed and STTDI shall become enforceable.

    (2)  An order that BNY Trustee do immediately enforce the security over the Mortgaged Property (as defined in the Principal Trust Deed and the STTDI) as

directed by the Extraordinary Resolution of the holders of the Saphir I Notes dated 8 May 2009.

(3) A declaration that that pursuant to Clause 6.2 of the Principal Trust Deed and Clause 5.5 of the STTDI, BNY Trustee is obliged to apply all moneys received by it under the Principal Trust Deed and the STTDI in connection with the realisation or enforcement of the security constituted thereby and by any Other Security Document (as defined in the Principal Trust Deed) in accordance with Noteholder Priority (as defined at Clause 6.2(iii) of the Principal Trust Deed).

(4) An order that BNY Trustee do immediately enforce the security over the Mortgaged Property (as defined in the Principal Trust Deed and the STTDII) as directed by the Extraordinary Resolution of the holders of the Saphir II Notes dated 8 May 2009.

(5) A declaration that that pursuant to Clause 6.2 of the Principal Trust Deed and Clause 5.5 of the STTDII, BNY Trustee is obliged to apply all moneys received by it under the Principal Trust Deed and the STTDII in connection with the realisation or enforcement of the security constituted thereby and by any Other Security Document (as defined in the Principal Trust Deed) in accordance with Noteholder Priority (as defined at Clause 6.2(iii) of the Principal Trust Deed).

(6) An order that BNY Trustee do pay Perpetual's costs of and incidental to these proceedings.

(7) Any such further orders as the Court sees fit.

5.   The claim does not include any issues under the Human Rights Act 1998.

UKI 3228653v.2