WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

—————————————————————————x

In re:                                              :

LEHMAN BROTHERS HOLDINGS INC., *et al.*              :

                    Debtors.                         :

—————————————————————————x

LEHMAN BROTHERS SPECIAL FINANCING INC.               :

                    Plaintiff,                       :

-against-                                            :

BNY CORPORATE TRUSTEE SERVICES LIMITED

                                                     :

                    Defendant.                       :

                                                     :

—————————————————————————x

Chapter 11

Case No. 08-13555 (JMP)

Adv. Proc.
No. 09-01242 (JMP)

**OPPOSITION TO BNY'S MOTION FOR LEAVE**
**TO APPEAL ORDER DENYING MOTION TO DISMISS**

Table of Authorities ............................................................................................................ ii

Preliminary Statement ......................................................................................................... 1

Statement of Facts .............................................................................................................. 4

    A.    The Lehman Bankruptcy ....................................................................... 4

    B.    The Background of This Adversary Proceeding .................................... 5

Argument .......................................................................................................................... 10

I.    BNY Has Failed to Demonstrate Exceptional Circumstances Warranting an
Interlocutory Appeal on the Rule 19 Issues ............................................................ 10

    A.    The Rule 19 Issues Are Not "Controlling." ....................................... 13

        1.    The Rule 19 Issues Cannot Be Quickly or Cleanly Decided ................... 14

        2.    Reversal Would Not Necessarily Terminate This Action ....................... 15

        3.    There Is No Substantial Ground for Difference of Opinion with
Respect to the Bankruptcy Court's Determination That Perpetual Is
Not an Indispensable Party ................................................................. 15

    B.    Immediate Resolution of the Rule 19 Issue Is Unlikely to Materially
Advance the Ultimate Termination of the Litigation .......................... 21

    C.    Promotion of Fair and Just Adjudications Does Not Require Review of the
Bankruptcy Court's Decision Allowing Issues of U.S. Bankruptcy Law to
Go Forward in U.S. Bankruptcy Court ............................................... 22

II.    There Are No Exceptional Circumstances Warranting Interlocutory Review of the
Bankruptcy Court's Decision Not to Dismiss the Complaint on the Grounds of
International Comity ............................................................................................... 23

    A.    The Comity Issues Are Not "Controlling." ....................................... 24

    B.    There Is No Substantial Ground for Difference of Opinion on the Comity
Issue .................................................................................................. 24

    C.    Immediate Review Would Not Materially Advance the Ultimate
Termination of the Litigation ............................................................. 26

Conclusion and Relief Requested ..................................................................................... 27

CASES

*Americare Health Group, Inc. v. Melillo*,
    223 B.R. 70 (E.D.N.Y. 1998) ....................................................................10

*Arellano v. Starwood Hotels & Resorts*,
    448 F.Supp.2d 520 (S.D.N.Y. 2006)..........................................................20

*Benger Labs, Ltd. v. R.K. Laros Co.*,
    24 F.R.D. 450 (E.D. Pa. 1959)...................................................................13

*Bigio v. Coca- Cola Co.*,
    239 F.3d 440 (2d Cir. 2000)........................................................................27

*Burka v. Aetna Life Ins. Co.*,
    87 F.3d 478 (D.C. Cir. 1996) .....................................................................13

*CP Solutions PTE, Ltd. v. Gen. Elec. Co.*,
    553 F.3d 156 (2d Cir. 2009)........................................................................17

*Chadwick v. Arabian Am. Oil Co.*,
    656 F.Supp. 857 (D. Del. 1987)..................................................................20

*Colo. River Water Conservation Dist. v. United States*,
    424 U.S. 800 (1976)....................................................................................24

*Coopers & Lybrand v. Livesay*,
    437 U.S. 463 (1978)....................................................................................12

*Dor Energy Corp. v. Prospective Inv. & Trading Co.*,
    570 F.3d 219 (5th Cir. 2009) .................................................................12-13

*Dow Jones & Co. v. Harrods, Ltd.*,
    237 F.Supp.2d 394 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003) ........................25

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    No. 01-16034, 2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006) .................................... *passim*

*Escondido Mission Village L.P. v. Best Prods. Co.*,
    137 B.R. 114 (S.D.N.Y. 1992).....................................................................11

*FDIC v. Bank of N.Y.*,
    479 F.Supp.2d 1 (D.D.C. 2007), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007)................................17

*Flor v. BOT Fin. Corp.*,
    79 F.3d 281 (2d Cir. 1996)..........................................................................................16

*German v. Fed. Home Loan Mortgage Corp.*,
    896 F.Supp. 1385 (S.D.N.Y. 1995)...........................................................................21

*In re Aquatic Dev. Group, Inc.*,
    196 B.R. 666 (N.D.N.Y. 1996) ...................................................................................10

*In re Chateaugay Corp.*,
    213 B.R. 633 (S.D.N.Y. 1997)....................................................................................11

*In re Enron Corp.*,
    No. M-47, 01-16034, 2006 WL 1222035 (S.D.N.Y. May 3, 2006) .................................11

*In re Johns-Manville Corp.*,
    47 B.R. 957 (S.D.N.Y. 1985)......................................................................................11

*In re Orange Boat Sales*,
    239 B.R. 471 (S.D.N.Y. 1999)....................................................................................11

*In re WorldCom, Inc. Sec. Litig.*,
    No. 02 Civ. 3288, 2003 WL 22953644 (S.D.N.Y. Dec. 16, 2003)...................................12

*In re Worldcom, Inc.*,
    No. M-47, 2003 WL 21498904 (S.D.N.Y. June 30, 2003)...............................................13

*JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*,
    412 F.3d 418 (2d Cir. 2005)..........................................................................24, 25, 27

*Johnston v. H.G. Cartwright*,
    355 F.2d 32 (8th Cir. 1966) .......................................................................................12

*Klinghoffer v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990)...................................................................................12, 16

*Koehler v. Bank of Bermuda Ltd.*,
    101 F.3d 863 (2d Cir. 1996)............................................................................. 11-12, 21

*Lerner v. Millenco, L.P.*,
    23 F.Supp.2d 345 (S.D.N.Y. 1998).............................................................................21

*Liebert v. Levine (In re Levine)*,
    No. 94-44257, 2004 WL 764709 (S.D.N.Y. Apr. 9, 2004) ...............................................11

*MCI Worldcom Comm'cns v. Comm'cns Network Int'l, Ltd.*,
    358 B.R. 76 (S.D.N.Y. 2006) ............................................................................. 15, 16, 24

*Marlin v. U.S. Tr.*,
    333 B.R. 14 (W.D.N.Y. 2005) ....................................................................................... 11

*Muniz v. Rexnord Corp.*,
    No. 04-2405, 2007 WL 257710 (N.D. Ill. Jan. 23, 2007) ............................................ 12

*N. Fork Bank v. Abelson*,
    207 B.R. 382 (E.D.N.Y. 1997) ...................................................................................... 16

*Nat'l Wildlife Fed'n v. Burford*,
    676 F.Supp. 280 (D.D.C. 1986), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987) ..................... 12

*Parkson Corp. v. Fruit of the Loom, Inc.*,
    No. LR-C-91-853, 1992 WL 541570 (E.D. Ark. 1992) ................................................ 13

*Pujol v. Shearson/Am. Express, Inc.*,
    877 F.2d 132 (1st Cir. 1989) ........................................................................................ 21

*Rapoport v. Banco Mexicano Somex, S. A.*,
    668 F.2d 667 (2d Cir. 1982) .................................................................................... 19, 20

*Royal & Sun Alliance Ins. of Can. v. Century Int'l Arms, Inc.*,
    466 F.3d 88 (2d Cir. 2006) ............................................................................................ 25

*Runkle v. Genesis Worldwide II, Inc.*,
    143 F. App'x 515, 2005 WL 1750523 (4th Cir. July 26, 2005) .................................... 12

*Seneca Nation of Indians v. New York*,
    383 F.3d 45 (2d Cir. 2004) ............................................................................................ 17

*St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*,
    664 F.Supp. 824 (S.D.N.Y. 1987) ................................................................................ 13

*Tick v. Cohen*,
    787 F.2d 1490 (11th Cir. 1986) .................................................................................... 13

*Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*,
    312 F.3d 82 (2d Cir. 2002) ....................................................................... 15, 16, 17, 21

*Va. Elec. & Power Co. v. Westinghouse Elec. Corp.*,
    485 F.2d 78 (4th Cir. 1973) .......................................................................................... 13

*Weber v. U.S. Tr.*,
    484 F.3d 154 (2d Cir. 2007)........................................................................12

*Yerushalmi v. Shiboleth*,
    405 B.R. 44 (E.D.N.Y. 2009) ....................................................................11

## STATUTES AND RULES

11 U.S.C. §362 ..............................................................................................7

11 U.S.C. §1527..............................................................................................21

28 U.S.C. §158(a)(3)........................................................................................10

28 U.S.C. §1292(b) ................................................................................. *passim*

28 U.S.C. §1334(e) ..........................................................................................25

FED. R. CIV. P. 19(b) .......................................................................................17

FED. R. BANKR. P. 8002(c)................................................................................3

FED. R. BANKR. P. 8003(c)................................................................................3

## OTHER AUTHORITIES

Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. §1292(b)*, 88 HARV.
    L. REV. 607 (1975)..................................................................................12

7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE
    & PROCEDURE §1602 (3d ed. 2001) .........................................................21

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), by and through undersigned counsel, hereby files this opposition in response to BNY Corporate Trustee Services Limited's ( "BNY") motion for leave to appeal the bankruptcy court's August 12, 2009 order denying BNY's motion for dismissal of complaint.

## PRELIMINARY STATEMENT

The Court should deny BNY's motion for leave for leave to appeal the interlocutory order of the bankruptcy court denying its motion to dismiss because BNY cannot satisfy the stringent criteria required to permit an interlocutory appeal, much less demonstrate exceptional circumstances to overcome the bedrock principle that appeals ordinarily should await final judgment rather than being heard piecemeal. BNY cannot demonstrate that the bankruptcy court's order denying its motion to dismiss (1) involves a controlling question of law (2) over which there is substantial ground for difference of opinion, and that (3) an immediate appeal would materially advance the ultimate termination of the litigation. *See* 28 U.S.C. §1292(b).

First, the bankruptcy court's order denying BNY's motion to dismiss under Federal Rule of Civil Procedure 19 for failure to join the noteholder Perpetual as a necessary and indispensable party is not "controlling" as that term is interpreted by courts because it cannot be decided "quickly and cleanly without having to study the record." To fully understand the court's ruling, a reviewing court must review complex transactions as well as the records in three courts: the bankruptcy court, the English court, and a related adversary proceeding. Second, there is not a substantial ground for difference of opinion regarding the bankruptcy court's Rule 19 decision. The bankruptcy court properly decided that the absence of Perpetual did not warrant dismissal of this case given the presence of its trustee BNY, which has contractual

obligations to represent Perpetual despite the indemnification dispute BNY raises. The bankruptcy court agreed with BNY that the English court in the Perpetual action had already conclusively decided that BNY is entitled to indemnification from Perpetual, thus resolving all but the amount and other details of that dispute. Moreover, the bankruptcy court pointed to the existence of another adversary proceeding, *LBSF v. American Family Life Assurance Co.*, No. 01261 (JMP) (the "Aflac proceeding"), raising the exact same legal issues and involving similar transactions in which the noteholder and BNY are both present in the litigation. Thus, the court concluded that Perpetual is not indispensable because BNY will be able to defend the position of noteholders without any underlying concern about the details of its indemnification dispute with Perpetual. Third, granting BNY's request for interlocutory appeal would not materially advance the termination of this litigation because reversal would require further proceedings below to determine if Perpetual can be joined in this litigation.

Regarding the bankruptcy court's determination that principles of international comity do not require dismissal of the complaint, BNY similarly fails to establish the necessary factors to bring an interlocutory appeal. First, the comity issue cannot be determined quickly and cleanly by the reviewing court because it again requires an examination of complex transactions and the records of at least two courts: the bankruptcy court and the English court. Second, there is not a substantial ground for difference of opinion regarding the correctness of the bankruptcy court's ruling on the comity issue. The bankruptcy court properly recognized that it—rather than the English court—was the proper forum to decide novel issues of U.S. bankruptcy law involving the property of LBSF's estate. The issues in this case—regarding the enforceability of *ipso facto* clauses and the application of safe harbors under the Bankruptcy Code—are not suited for determination by the English court, which has before it only issues of English contract law.

Indeed, the English court itself underscored in its judgment that the bankruptcy court is the proper forum to hear the Bankruptcy Code issues in this case, because it repeatedly made reference to the bankruptcy court's role in deciding the U.S. bankruptcy law issues and deferred final adjudication in England until at least sometime this fall so that the bankruptcy court can consider and rule on the pleadings before it.  Third, an immediate appeal on the comity issue will not materially advance the termination of the litigation because reversal would not necessarily end the litigation given that decisions to dismiss on comity grounds are committed to the sound discretion of the bankruptcy court.  Therefore, even were BNY successful in reversing the order, a remand may be required to permit the bankruptcy court to consider additional factors deemed relevant by the reviewing court.

BNY's motion for leave to appeal should be denied not only because it fails to meet the criteria for interlocutory appeals, but because the timing of its motion directly contradicts the bankruptcy court's specific request for sufficient notice prior to filing any such appeal to allow the court to prepare a memorandum opinion outlining its reasoning.  Ex. A at 73:25-74:3 (Mot. Dismiss Hr'g Tr., Aug. 11, 2009) ("To the extent that anyone wishes to seek judicial review of that ruling, which has been made, as you can observe, extemporaneously, I would like the opportunity to prepare a memorandum decision.").[1]  Beyond BNY's decision to ignore the bankruptcy court's request, the practical effect of granting BNY's motion and reversing the bankruptcy court's order would be for this Court to permit an English court to decide an issue of first impression of U.S. bankruptcy law, or to effectively deny LBSF the opportunity for

---

[1] BNY could have filed a motion to extend the time for filing its notice of appeal and motion for leave to appeal under FED. R. BANKR. P. 8002(c), 8003(c), thereby permitting the bankruptcy court to file a memorandum decision as it requested.

meaningful relief altogether concerning serious Bankruptcy Code repercussions. To do so is ill-advised and unnecessary.

In sum, BNY has not met its burden under 28 U.S.C. §1292(b) to show that the bankruptcy court's interlocutory order satisfies the criteria for obtaining immediate appellate relief. Nor has BNY pointed to any exceptional circumstances to warrant this Court's departure from the normal rules requiring a final judgment prior to any appeal. Therefore, this Court should deny BNY's motion for leave to appeal and allow the case to go forward, in accordance with the decision of the bankruptcy court and the expectations of the English court.

<div align="center">STATEMENT OF FACTS</div>

**A.    The Lehman Bankruptcy.**

Lehman was formerly the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region. Commencing on September 15, 2008, LBHI and certain of its direct and indirect subsidiaries commenced in the bankruptcy court voluntary cases under chapter 11 of the Bankruptcy Code. LBSF commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LBSF's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## B.  The Background of This Adversary Proceeding.

LBSF filed the adversary proceeding below solely to seek a declaratory judgment on two issues: (1) that certain contractual provisions in two transactions, known as Saphir 2006-5 and 2004-11, are unenforceable because they violate the Bankruptcy Code's prohibitions on "*ipso facto*" clauses by modifying LBSF's right to receive priority of payments solely because of its chapter 11 filing, and (2) that any attempt to enforce these *ipso facto* clauses would violate the automatic stay.

Under the Saphir 2006-5 and 2004-11 transactions, Saphir Finance Public Limited Co. issued notes secured by various assets and certain secured obligations, including credit-default swap transactions between LBSF and Saphir that were executed in connection with the issuance of the notes.[2]  LBSF Mot. for Summ. J. Saphir Ex. C (Dkt. 6, Attachment 2); *Id.* Ex. D.  LBSF is the swap counterparty under the transactions.  *Id.* Ex. C at 1; *Id.* Ex. D at 1.  BNY Corporate Trustee Services Limited ("BNY"), formerly know as J.P. Morgan Corporate Trustee Services Limited, serves as Trustee under the program.  *Id.* Ex. A at 1; *Id.* Ex. B; BNY Mot. for Leave at 6.

Perpetual Trustee Company Limited ("Perpetual"), an Australian company, is the sole noteholder under the Saphir 2006-5 and 2004-11 transactions.  Perpetual is not a party in this suit.

The Supplemental Trust Deeds under the transactions reference a Swap Agreement (the "Swap Agreement") that incorporates the terms of an ISDA Master Agreement between Dante

---

[2] The Saphir 2006-5 and 2004-11 transactions were created under a larger program known as the Dante series of transactions. LBSF's suit in this case does not address any other Dante transactions, but the Aflac proceeding addresses similar *ipso facto* clauses in other Dante transactions.

and LBSF (the "ISDA").  LBSF Mot. for Summ. J. Saphir Ex. C §§1.3, 2.2 (Dkt. 6, Attachment 2); *Id.* Ex. D at §§1.3, 2.2.

Under the applicable ISDAs, the bankruptcy filing of any party constitutes an "Event of Default."  *Id.* Ex. E §5(a)(vii) & Sched. Pt. 1(e); *Id.* Ex. F §5(a)(vii) & Sched. Pt. 1(e). Ordinarily, absent an Event of Default by LBSF, the Transaction Documents provide that LBSF receives any payments before noteholders, *i.e.*, "Swap Counterparty Priority" applies.  *Id.* Ex. C §5.5; *Id.* Ex. D §5.5.1; *Id.* Ex. A §6.2(i) & Sched. 2, Pt. C §4(b)(a); *Id.* Ex. B §6.2(i) & Sched. 2, Pt. C §4(b)(i).

However, upon an Event of Default by LBSF under the Swap Agreement, such as its chapter 11 filing, the agreements provide that LBSF's payment priority would change such that LBSF would receive payments, if any, after payments are made to noteholders, *i.e.*, a change from "Swap Counterparty Priority" to "Noteholder Priority."  *Id.* Ex. A §6.2(iii) & Sched. 2, Pt. C §4(b)(vi); *Id.* Ex. B §6.2(iii) & Sched. 2, Pt. C §4(b)(iii).  Under Noteholder Priority, LBSF's payment priority is modified so that it would receive payments, if any, only after payments are made to noteholders.  *Id.* Ex. A §6.2(iii) & Sched. 2, Pt. C §4(b)(vi); *Id.* Ex. B §6.2(iii) & Sched. 2, Pt. C §4(b)(iii).

The various Transaction Documents provide that they are governed by English law and that disputes "may be brought in [English] courts," but also specify that these provisions "shall not limit the right of any of [the parties] to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not)."  *Id.* Ex. D §§14.1, 14.2; *Id.* Ex. C §§14.1, 14.2; *Id.* Ex. A §§20.1, 20.2; *Id.* Ex. B §§20.1, 20.2.

After LBSF's chapter 11 filing, counsel for the Debtors sent a letter on November 25, 2008 to the Bank of New York Mellon Trust Company, National Association, and the Bank of New York Mellon notifying them that (a) any actions with respect to transactions in which BNY serves as trustee may be subject to the automatic stay provisions of 11 U.S.C. §362, and (b) any provisions purporting to subordinate any amounts payable to LBSF would be unenforceable and unlawful. *Id.* Ex. G.

On December 1, 2008, Saphir, as issuer of the Notes, sent putative notices to LBSF stating that LBSF's filing of its bankruptcy petition constituted an Event of Default under the ISDA and designating December 1, 2008, as the Early Termination Date under section 6(a) of the ISDA. *Id.* Ex. H; *Id.* Ex. I. The termination notices do not purport to terminate the Supplemental Trust Deeds themselves. No distributions under the Transaction Documents have occurred since Saphir sent its notices.

If LBSF's right to payment priority is modified as a result of its bankruptcy filing, and Noteholder Priority is applied, LBSF would receive no payments because amounts that would be due to noteholders would exceed available funds. The resulting loss to LBSF's bankruptcy estate and its creditors would total approximately AUD $90 million (or USD $70 million). Compl. ¶ 20 (Dkt. 1).[3]

BNY continues to hold the security over the mortgaged property granted under the agreements as continuing security for (among other things), (i) the payment of all sums due under the Supplemental Trust Deeds and the Notes and (ii) the performance of the Issuer's obligations under the Swap Agreement, and shall release the mortgaged property when it

---

[3] The loss would total approximately AUD $50 million (or USD $39 million) for the Saphir 2004-11 transaction and approximately AUD $40 million (or USD $31 million) for the Saphir 2006-5 transaction. Compl. ¶ 20 (Dkt. 1).

becomes payable or deliverable to LBSF or the noteholders.  LBSF Mot. for Summ. J. Saphir Ex. C §§5.1, 5.3, 5.4, 5.5 (Dkt. 6, Attachment 2); *Id.* Ex. D §§5.1, 5.3, 5.4, 5.5.

On May 13, 2009, Perpetual, in an effort to seek control of the Debtors' property but circumvent the proper forum—the bankruptcy court—filed a claim in the High Court of Justice Chancery Division, Royal Courts of Justice, in London seeking an order that BNY must pay it in accordance with Noteholder Priority under the Principal Trust Deed ("Perpetual action").  *Id.* Ex. J.  LBSF intervened in the Perpetual action and filed an application to stay those proceedings so that the bankruptcy court may resolve the *ipso facto* and automatic stay claims raised by LBSF in this case.  *Id.* Ex. K.

On May 20, 2009, LBSF filed its complaint seeking declaratory judgment with the bankruptcy court.  Following a pre-motion for summary judgment conference and requisite authorization from the bankruptcy court, LBSF filed its summary judgment motion outlining its claims on June 10, 2009.  *Id.*

On June 22, 2009, BNY moved to dismiss this action on several grounds, including: (1) failure to join Perpetual as a necessary and indispensable party under Federal Rule of Civil Procedure 12(b)(7) and 19, (2) *forum non conveniens*, and (3) abstention from adjudication in the interest of justice or on the basis of comity.  In the alternative, BNY requested that the court stay the LBSF action pending a determination of the Perpetual action by the English court.  BNY asserted that Perpetual is a necessary and indispensable party to the action and that unless Perpetual is joined as a defendant, complete relief cannot be granted so the suit must be dismissed.  *See* BNY Mot. to Dismiss at 1, 11 (Dkt. 16).  BNY also argued that the rules of international comity direct the court to dismiss the LBSF action or at least stay its proceedings until the English court had resolved the Perpetual action.  *See id.* at 28-29.

On July 28, 2009, the English court issued its ruling in the Perpetual action following a three-day trial.  The English court ruled that, according to English law, the Noteholder Priority provisions are valid.  LBSF Surreply Mot. to Dismiss Ex. A ¶ 65 (Dkt. 41).  However, the English court cited provisions of the UNCITRAL Model Law of Insolvency providing for coordination between foreign courts in insolvency proceedings and observed that the bankruptcy court may wish to make requests for assistance from the English court.  *Id.* ¶¶ 59-63.  The English court also ruled that BNY was entitled to indemnification from Perpetual, but adjourned further determination relating to indemnification until after October 1, 2009.  *Id.* ¶¶ 10, 56, 63.  The English court further noted that the adjournment "ought to give . . . the US Bankruptcy Court sufficient time to determine what [it] wish[es] to do in relation to these proceedings."  *Id.* ¶ 63.  LBSF has appealed the English court's ruling.  BNY Mot. for Leave Decl. of E.  Schaffer Ex. L.

On August 11, 2009, the bankruptcy court heard extensive oral argument on BNY's motion to dismiss from both LBSF and BNY.  Ex. A.  After hearing the arguments, the court ruled from the bench that determination of the question whether Perpetual was a necessary party was not required, because, as a matter of law, Perpetual is not an indispensable party.  *See* Ex. A at 72:22-24.  Furthermore, the Court rejected the argument that BNY cannot adequately represent the interests of Perpetual.  *See id.* at 68: 20-25; 69:1-4; 70:14-22.  Moreover, with respect to BNY's arguments about international comity, the court stated that it understood the English court's decision in the Perpetual action to "allow[ ] time for the U.S. Bankruptcy Court to hear, consider and determine issues that are unique to U.S. bankruptcy practice."  *See id.* at 72:12-15.  The court stated its intention to coordinate its proceedings with the English court to

try to avoid the issuance of conflicting rulings. *See id.* at 72:12-21.[4] One day later, the bankruptcy court issued its formal order and denied the BNY motion to dismiss. *See* Order Den. Mot. to Dismiss (Dkt. 43).

BNY now moves for leave to permit interlocutory review of the bankruptcy court's denial of its motion to dismiss, challenging the court's rulings on two of the issues it raised below: whether Perpetual is a necessary and indispensable party under Rule 19 and whether the bankruptcy court should defer to the English court based on the principles of international comity. For reasons explained below, neither challenge should be sustained.

<div align="center">ARGUMENT</div>

**I. BNY HAS FAILED TO DEMONSTRATE EXCEPTIONAL CIRCUMSTANCES WARRANTING AN INTERLOCUTORY APPEAL ON THE RULE 19 ISSUES.**

BNY has failed to demonstrate the required factors for interlocutory appeal or exceptional circumstances warranting piecemeal review of the bankruptcy court's order denying its motion to dismiss the complaint in this adversary proceeding.

Under 28 U.S.C. §158(a)(3), parties have a limited right to appeal non-final bankruptcy court orders. *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006). The denial of a motion to dismiss a complaint in an adversary proceeding is an interlocutory and non-final order. *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (N.D.N.Y. 1996) (noting the well-settled law that denial of a motion to dismiss a complaint is an interlocutory order); *see also Americare Health Group, Inc. v. Melillo*, 223 B.R. 70, 74 (E.D.N.Y. 1998) (explaining that a bankruptcy court's denial of a

---

[4] The bankruptcy court asked LBSF to draft a letter to the English court describing the coordination that was being accomplished in the U.S. *See* Ex. A at 71:19-24. BNY participated in drafting such letter which LBSF delivered to the bankruptcy court, and the court sent on August 20, 2009. Ex. B.

defendant's motion to dismiss is not a final order because it does not end the litigation on the merits).

Because §158 does not provide criteria for determining when leave to appeal should be granted, district courts generally apply the standard set forth in 28 U.S.C. §1292(b) governing interlocutory appeals from district courts to the courts of appeals. *See, e.g.*, *Liebert v. Levine (In re Levine)*, No. 94-44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004); *Enron*, 2006 WL 2548592, at *3; *In re Chateaugay Corp.*, 213 B.R. 633, 636 (S.D.N.Y. 1997); *Escondido Mission Village L.P. v. Best Prods. Co.*, 137 B.R. 114, 116 (S.D.N.Y. 1992); *In re Johns-Manville Corp.*, 47 B.R. 957, 960 (S.D.N.Y. 1985). Under §1292(b), to permit an interlocutory appeal, the order being appealed must (1) involve a controlling question of law (2) over which there is substantial ground for difference of opinion, and the movant must also show that (3) an immediate appeal would materially advance the ultimate termination of the litigation. 28 U.S.C. §1292(b); *Enron*, 2006 WL 2548592, at *3; *Liebert*, 2004 WL 764709, at *2. The decision whether to grant leave to appeal an interlocutory order of a bankruptcy court "lies with the district court's discretion." *Enron*, 2006 WL 2548592, at *3; *see also In re Orange Boat Sales*, 239 B.R. 471, 473 (S.D.N.Y. 1999).

Despite this discretion, "interlocutory appeals from bankruptcy courts' decisions are 'disfavored' in the Second Circuit" and are "limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation.'" *Enron*, 2006 WL 2548592, at *3 (citing *In re Enron Corp.*, No. M-47, 01-16034, 2006 WL 1222035, at *1 (S.D.N.Y. May 3, 2006) and *Liebert*, 2004 WL 764709, at *2); *see also Yerushalmi v. Shiboleth*, 405 B.R. 44, 48 (E.D.N.Y. 2009); *Marlin v. U.S. Tr.*, 333 B.R. 14, 15 (W.D.N.Y. 2005). Section 1292 is "a rare exception to the final judgment rule that generally prohibits piecemeal appeals." *Koehler v.*

*Bank of Bermuda Ltd*., 101 F.3d 863, 865 (2d Cir. 1996); *see also In re WorldCom, Inc. Sec. Litig*., No. 02 Civ. 3288, 2003 WL 22953644, at *3-4 (S.D.N.Y. Dec. 16, 2003). "Congress did not intend 28 U.S.C. §1292(b) to serve an error-correction function." *Weber v. U.S. Tr*., 484 F.3d 154, 159 n.3 (2d Cir. 2007) (citing Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. §1292(b)*, 88 HARV. L. REV. 607, 609 (1975)).

Therefore, the movant seeking interlocutory review must demonstrate "exceptional circumstances to overcome the general aversion to piecemeal litigation and to justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment." *Enron*, 2006 WL 2548592, at *3 (citations and internal quotations omitted); *see also Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (citing *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)) ("[O]nly 'exceptional circumstances will justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'")

Although BNY cites several instances in which the district courts have certified and the appellate courts had granted interlocutory appellate review of a Rule 19 issue, BNY Mot. for Leave at 28, these cases are the exception, not the rule,[5] and equally important, they are demonstrably distinguishable from the situation at hand.[6]

---

[5] *See, e.g., Runkle v. Genesis Worldwide II, Inc.*, 143 F. App'x 515, 2005 WL 1750523, at *1 (4th Cir. July 26, 2005) (denying defendants' appeal of the district court's ruling on Rule 19 in part because the district court did not certify the ruling under 28 U.S.C. §1292(b)); *Johnston v. H.G. Cartwright*, 355 F.2d 32, 38 (8th Cir. 1966) (refusing to grant an appeal under 28 U.S.C. §1292(b) because the opinion had attained finality for appeals purposes and the parties were not indispensable parties); *Muniz v. Rexnord Corp.*, No. 04-2405, 2007 WL 257710, at *2 (N.D. Ill. Jan. 23, 2007) (denying Corning's motion for a finding pursuant to 28 U.S.C. §1292(b) on the grounds that the court's ruling did not meet the criteria necessary for a 28 U.S.C. §1292(b) appeal because the issue involved more than just legal analysis but also consideration of several other factors and because reversal of the order would not resolve the litigation); *Nat'l Wildlife Fed'n v. Burford*, 676 F.Supp. 280, 283-84 (D.D.C. 1986), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987) (refusing to certify for appeal under 28 U.S.C. §1292(b) the court's denial of motion to dismiss for failure to join indispensable parties).

[6] Here, bankruptcy court jurisdiction attaches because the property of debtor is being endangered by potential acts of BNY. Hence, in contrast to many of the cases cited by BNY, BNY Mot. for Leave at 28, a decision to overturn the bankruptcy court's denial of BNY's Rule 19 motion would not destroy the subject matter jurisdiction of the suit and would not lead to termination of this action. *See, e.g., Doré Energy Corp. v. Prospective Inv. & Trading Co.*, 570

BNY has not satisfied the §1292(b) factors, much less established that any exceptional circumstances exist to warrant a departure from the normal policy of postponing appeals until a final judgment is entered.

## A.    The Rule 19 Issues Are Not "Controlling."

The first criterion required under §1292 for leave to appeal a non-final bankruptcy court order is that the order contain "a controlling question of law," meaning that it is one that "the reviewing court could decide quickly and cleanly without having to study the record." *Enron*, 2006 WL 2548592, at *3-4 (citing *In re Worldcom, Inc.*, No. M-47, 2003 WL 21498904, at *10 (S.D.N.Y. June 30, 2003)).   The question must also be controlling in that (1) "reversal of the bankruptcy court's order would terminate the action," or (2) "determination of the issue on appeal would materially affect the litigation's outcome."  *Enron*, 2006 WL 2548592, at *4. BNY contends that its Rule 19 argument presents such a controlling question of law "because it turns on inquiries that this Court can decide without studying the record or resolving factual disputes, and because a ruling in BNY's favor very likely would result in dismissal of LBSF's

F.3d 219, 224 (5th Cir. 2009) (stating that the district court certified the interlocutory review because a reversal of its motion to dismiss would lead to the joinder of Louisiana citizens thereby destroying diversity); *Burka v. Aetna Life Ins. Co.*, 87 F.3d 478, 479-80 (D.C. Cir. 1996) (reviewing the district court's decision to add American University as a defendant under Rule 25 as opposed to Rule 19 which would have destroyed diversity and led to the dismissal of the case for lack of subject matter jurisdiction); *Tick v. Cohen*, 787 F.2d 1490 (11th Cir. 1986) (reviewing the district court's denial of the motion to dismiss because a reversal of the decision would destroy the case's diversity jurisdiction and lead to dismissal*); Va. Elec. & Power Co. v. Westinghouse Elec. Corp.*, 485 F.2d 78, 81 (4th Cir. 1973) (agreeing to review the certified question of whether INA was an indispensable party because joinder would destroy the diversity of the parties and the action would be dismissed).

Likewise, the bankruptcy court did not affirmatively recommend interlocutory appeal of its Rule 19 analysis, as done in the other decisions cited by BNY.  *See Parkson Corp. v. Fruit of the Loom, Inc.*, No. LR-C-91-853, 1992 WL 541570, at *6 (E.D. Ark. 1992) (recommending an interlocutory appeal of its decision because "an immediate appeal from this order may materially advance the ultimate termination of the litigation"); *St. Charles Cable TV, Inc. v. Eagle Comtronics, Inc.*, 664 F.Supp. 824, 831-32 (S.D.N.Y. 1987) (stating that because the decision involved controlling questions of law that, if determined otherwise, would result in termination, the court certified the issue for appeal under 28 U.S.C. §1292(b)); *Benger Labs, Ltd. v. R.K. Laros Co.*, 24 F.R.D. 450, 455 (E.D. Pa. 1959) ("This court is of the opinion that there is substantial ground for differences of opinion with respect to this decision . . . .   It would, therefore, materially advance the ultimate termination of this litigation if an immediate appeal from this decision was allowed pursuant to 28 U.S.C.A. §1292(b).").

complaint." BNY Mot. for Leave at 17. BNY errs. Reversal of the bankruptcy court's order would not necessarily terminate the action because this Court or the bankruptcy court could permit or require BNY or LBSF to attempt to join Perpetual. Moreover, the Rule 19 issue as to whether Perpetual is a necessary and indispensable party cannot, as BNY incorrectly maintains, be "quickly and cleanly" decided.

### 1. The Rule 19 Issues Cannot Be Quickly or Cleanly Decided.

The bases of the bankruptcy court's decision to deny BNY's motion to dismiss go beyond the record in this action. The reviewing Court would be required to review the records in not one, but three separate actions. First, to determine whether Perpetual is indispensable and whether the indemnification dispute BNY raises is relevant to that inquiry, the reviewing Court would have to review the complex transaction documents in this case, as well as the English court pleadings filed in the bankruptcy court. Moreover, in the hearing on BNY's motion to dismiss, the bankruptcy court emphasized the interaction of this case with the related Aflac proceeding in which BNY is litigating a similar priority of payment issue in its capacity as trustee for the noteholder Aflac. The bankruptcy court, familiar with both actions, noted that

> if BNY does nothing other than ardently present the legal argument that it will be advancing in the AFLAC case, it will coincidentally also be ardently advocating the very same points in the Perpetual case. Accordingly, it seems to me clear that BNY will at least indirectly be adequately representing the interests of Perpetual.

Ex. A at 70:16-20. However, for the reviewing Court to be able to make the same determination that the legal issues presented in the Aflac action and this case are identical, and that no factual differences exist that would make the cases relevantly distinguishable, the Court would have to review not only the record in this case but that of the Aflac action. These added layers of complexity invalidate BNY's argument that the reviewing Court could decide the Rule 19 issue

quickly and cleanly without having to study the record.  *See Enron*, 2006 WL 2548592, at *4 (citation omitted).

<h2 align="center">2.      Reversal Would Not Necessarily Terminate This Action.</h2>

BNY contends that reversal on appeal would be "controlling" because it would necessarily require the bankruptcy court to dismiss LBSF's action.  BNY Mot. for Leave at 22.  However, BNY cannot prove that Perpetual will not voluntarily join this action as a party, and certainly has not yet attempted to prove that it cannot be joined as a party.  If Perpetual were joined, there would be no reason this action could not go forward.  *See* Ex. A at 45:19-24 (LBSF's counsel, stating, "[w]e don't believe they're a necessary party and we certainly don't think they're going to prove to be an indispensable party if they were a necessary party.  But we're not at all certain that Perpetual could not be subjected to jurisdiction if that's what the Court concluded he wanted to have done.").  Under Rule 19, if Perpetual is both a necessary and indispensable party, dismissal is only appropriate if Perpetual cannot be joined.  *See Universal Reinsurance Co., Ltd. v. St. Paul Fire & Marine Ins. Co.*, 312 F.3d 82, 86 (2d Cir. 2002).  Because determination of the Rule 19 issue in an interlocutory appeal would not necessarily "materially advance the ultimate termination of the litigation," 28 U.S.C. §1292(b), BNY has not met its burden with respect to this factor.

### 3.      There Is No Substantial Ground for Difference of Opinion with Respect to the Bankruptcy Court's Determination That Perpetual Is Not an Indispensable Party.

Section 1292(b) further requires that the order present a question upon which there is "substantial ground for difference of opinion."  28 U.S.C. §1292(b).  As BNY acknowledges, there can be a substantial ground for difference of opinion  only if there is "a genuine doubt as to whether the bankruptcy court applied the correct legal standard."  *MCI Worldcom Comm'cns v. Comm'cns Network Int'l, Ltd.*, 358 B.R. 76, 79 (S.D.N.Y. 2006); *Enron*, 2006 WL 2548592, at

*4; BNY Mot. for Leave at 22. There is no doubt, however, that the bankruptcy court correctly applied Rule 19 and denied BNY's motion to dismiss. Indeed, BNY does not contend that the bankruptcy court applied an incorrect legal standard—it merely disagrees with the result reached by the court, which is insufficient. *See MCI*, 358 B.R. at 79; BNY Mot. for Leave at 22-26.

Moreover, "[f]or there to be 'substantial grounds for difference of opinion' regarding an issue, it must involve more than strong disagreement between the adversary parties . . . . For example, there are substantial grounds for difference of opinion when the issue is 'difficult and of first impression.'" *N. Fork Bank v. Abelson*, 207 B.R. 382, 390 (E.D.N.Y. 1997) (quoting *Klinghoffer*, 921 F.2d at 25). Yet even an issue of first impression, by itself, is insufficient to demonstrate a substantial ground for difference of opinion. *Flor v. BOT Fin. Corp.*, 79 F.3d 281, 284 (2d Cir. 1996) (stating that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion"). A district court must analyze the strength of the arguments before deciding that there is a substantial ground for dispute. *Id.*

Even were Perpetual found to be a necessary party under Rule 19,[7] dismissal is not appropriate unless the absent party is indispensable and joinder is not feasible. *Universal Reinsurance*, 312 F.3d at 86. As LBSF established in its opposition and the bankruptcy court agreed, BNY will effectively represent Perpetual's interests in this litigation and Perpetual is not an indispensable party under Rule 19.

To determine whether a party is indispensable, courts examine (i) the extent to which a judgment rendered in the person's absence might be prejudicial to the person or those already

---

[7] LBSF will not address the necessary party factors it briefed below because, as noted *supra*, the bankruptcy court did not reach that issue, Ex. A at 72:22-24, and, regardless, the operative question before this Court on BNY's motion for leave to appeal is whether there is a substantial ground for difference of opinion as to whether the bankruptcy court applied the correct legal standard on the issues the court did reach.

parties, the extent to which such prejudice can be lessened or avoided by protective provisions in the judgment, by the shaping of relief, or other measures; (ii) whether a judgment rendered in the person's absence would be adequate; and (iii) whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder. FED. R. CIV. P. 19(b); *Seneca Nation of Indians v. New York*, 383 F.3d 45, 48 (2d Cir. 2004). If these factors are met such that "in equity and good conscience" the suit cannot proceed in the absence of a necessary party, dismissal is appropriate. *Universal Reinsurance*, 312 F.3d at 86.

As the bankruptcy court correctly determined, Perpetual's interest will not be prejudiced if it is not joined and LBSF and BNY proceed with this litigation. The mere absence of a participant in a transaction does not equal prejudice. *CP Solutions PTE, Ltd. v. Gen. Elec. Co.*, 553 F.3d 156, 159 (2d Cir. 2009) (rejecting a "bright-line rule that all parties to a contract are indispensable"). Moreover, "[i]t is well settled that adjudicating an absent person's claim cannot 'impair or impede the person's ability to protect [his] interest' if he is adequately represented by one of the existing parties." *FDIC v. Bank of N.Y.*, 479 F.Supp.2d 1, 10 (D.D.C. 2007), *aff'd*, 508 F.3d 1 (D.C. Cir. 2007). Thus, courts have concluded that noteholders are not necessary parties where their trustee is present in the litigation. *Id.* (rejecting BNY's argument that noteholders were necessary parties because BNY as trustee could adequately represent their interests).

BNY, the trustee for Perpetual, is contractually obligated to act in Perpetual's interests, and it is well established that representation of a party's interests can mitigate prejudice arising from that party's absence. *CP Solutions*, 553 F.3d at 160 (holding no prejudice to absent party where defendant could "could champion its interest"). The Principal Trust Deed requires BNY to represent Perpetual's interests:

> The Trust Deed contains provisions for the indemnification of the Trustee and . . . provides that in acting as Trustee under this Trust Deed the Trustee shall not, in respect of Notes of any Series, assume any duty or responsibility to any Swap Counterparty (other than to pay to any Swap Counterparty any moneys received and payable to it and to act in accordance with the provisions of Condition 4) . . . and shall have regard solely to the interests of the Noteholders and shall not be obliged to act on any directions of the Swap Counterparty if this would in the Trustee's opinion be contrary to the interests of the Noteholders . . . .

LBSF Mot. for Summ. J. Ex. A at 94 (Dkt. 6, Attachment 2); *Id.* Ex. B at 88. These provisions oblige BNY to represent the legal interests of Perpetual in determining the appropriate payment priority scheme and to "have regard solely to the interests of the Noteholders." *Id.* Ex. A at 94.

BNY argues that it is obligated only to do so if it has an indemnity from Perpetual, and, as BNY urged it to do, the English court has ruled that BNY is entitled to such an indemnity. The bankruptcy court acknowledged this in its ruling: "BNY is here as trustee, entitled to indemnification as a matter of English law. The form of such indemnification being, at this point, not yet finally determined. It is exposed to only a theoretical risk at this juncture." Ex. A at 73:5-9; BNY Reply to LBSF Opp. to Mot. to Dismiss at 2, 3 (Dkt. 37).

What is more, even if BNY "sits on its hands" in this case, Ex. A at 70:4, it will nevertheless represent Perpetual's interest as noteholder, as the bankruptcy court noted, because BNY is trustee for the noteholder Aflac in the related adversary proceeding raising identical claims involving substantially similar transactions that are likewise part of the Dante series of transactions. Ex. A at 70:8-10. Therefore, BNY can be expected in the Aflac case to advocate for a position "exactly congruent with the position that it would be taking here, in the Perpetual case." *Id.* If BNY will, in the Aflac proceedings, be presenting legal arguments that represent Perpetual's interests, then Perpetual will not be prejudiced by its absence from this case. Moreover, if Perpetual believes its interests are not adequately represented, it is capable of

intervening in this litigation, which it is watching closely.[8]  There is thus no substantial ground for difference of opinion as to whether Perpetual is an indispensable party under Rule 19.

BNY's contention that the bankruptcy court's Rule 19 analysis incorrectly applied controlling Second Circuit precedent lacks merit.  BNY asserts that the bankruptcy court "departed from *Rapoport* [*v. Banco Mexicano Somex, S. A.*, 668 F.2d 667 (2d Cir. 1982)] without explanation."  BNY Mot. for Leave at 23.  Perhaps had BNY complied with the bankruptcy court's direct request for notice prior to any appeal of its order, the memorandum opinion the court stated it would prepare would have explained why it did not find *Rapoport* to be a persuasive analogue to this case.  *See* Ex. A at 73:25-74:4.  In any event, the case BNY cites casts no genuine doubt on the bankruptcy court's ruling.

In *Rapoport*, the Second Circuit held that Mexican depositors were indispensable parties to a U.S.-filed case where resolution "would require witnesses, documentary evidence, and court transcripts all located in Mexico."  668 F.2d at 669.  But there is no ground, much less the "substantial ground" required by §1292, to suggest that such factual discovery would be required in this case to resolve the relevant legal question of whether certain contractual provisions constitute unenforceable *ipso facto* clauses under U.S. law.  The contracts containing these provisions are already before the bankruptcy court and no documents in the custody or control of Perpetual are required to decide this issue.

*Rapoport* is further distinguished by the Second Circuit's determination that the district court "could not protect the rights of the Mexican non-parties" and "Rapoport would have an adequate remedy in the Mexican de consignacion actions, where the rights of all parties could be

---

[8] Perpetual is undeniably aware of the proceedings in the bankruptcy court because the motion for summary judgment filed by LBSF below and a declaration describing the proceeding were filed in the papers in the High Court in London.  In addition, LBSF has been informed, and believes, that Perpetual has sent representatives to observe the proceedings before the bankruptcy court.

protected." *Id.* As explained above, BNY will, even if it does not act at all in this case, effectively represent Perpetual's interest. But "the most important" factor in indispensable-party analysis is whether LBSF "will have an adequate remedy if the action is dismissed for nonjoinder." *Chadwick v. Arabian Am. Oil Co.*, 656 F.Supp. 857, 863 (D. Del. 1987). To dismiss LBSF's complaint for nonjoinder of Perpetual will cede this dispute to the English court, which is not an adequate forum for deciding the issues of first impression regarding the interpretation of the U.S. Bankruptcy Code intrinsic to this dispute. *See Arellano v. Starwood Hotels & Resorts*, 448 F.Supp.2d 520, 527-28 (S.D.N.Y. 2006) (holding that Spanish courts were not an appropriate alternative forum in a case involving "issues of corporate law and vicarious liability" that were "uniquely American and intrinsic to the law of the polity under which the corporation was created").

LBSF's rights under U.S. bankruptcy law would go unprotected were this case dismissed and all control yielded to the English courts. With respect to the Bankruptcy Code's treatment of *ipso facto* clauses, this is an issue of first impression and one that falls uniquely within the purview of the U.S. bankruptcy court. Only the U.S. bankruptcy court can provide adequate relief as to this question, and the English court itself expects it to weigh in:

> As these claims have to be adjourned . . . that ought to give the foreign representative and the US Bankruptcy Court sufficient time to determine what they wish to do in relation to these proceedings and in the light of my conclusion on the validity of clause 5.5 of the Supplemental Trust Deeds under English law by which all the relevant documents are governed and are to be interpreted.

LBSF Surreply on Mot. to Dismiss Ex. A ¶ 63 (Dkt. 41). Thus, the English court denied Perpetual's request to make its declaration and order subject only to that court's final decision on indemnity, because "[s]uch relief would effectively preclude any request or other application made by the foreign representative or the US Bankruptcy Court." *Id.* The bankruptcy court acknowledged this, noting that the English court's decision "can be understood to be allowing

time for the U.S. Bankruptcy Court to hear, consider and determine issues that are unique to U.S. bankruptcy practice." Ex. A at 72:13-15.

It is entirely appropriate for the English court to await the bankruptcy court's determination of the *ipso facto* issue in this case because this is the only forum in which the application of the Bankruptcy Code can be effectively determined. Given the unsuitability of the English courts to resolve this question, dismissal is inappropriate.

BNY's fear of inconsistent judgments is addressed by the English court's decision to defer final determination until the bankruptcy court has the opportunity to consider the arguments raised in this case and to make any requests of the English court it deems appropriate. Far from demanding that the bankruptcy court dismiss or abstain from considering the issues in this case, the English court recognizes the bankruptcy court's jurisdiction to hear the U.S. bankruptcy law issues in this case and invites cooperation and communication between the courts, whether through chapter 15 of the Bankruptcy Code, which enacted the UNCITRAL Model Law, or otherwise. LBSF Surreply on Mot. to Dismiss Ex. A ¶ 63 (Dkt. 41); *see also* 11 U.S.C. §1527 (providing methods of communication and coordination among courts).

Given the lack of prejudice to Perpetual and the inadequacy of the English court to deal with an issue of first impression in U.S. bankruptcy law, the bankruptcy court correctly applied the correct legal standard in determining that Perpetual is not an indispensable party to this case.

**B.    Immediate Resolution of the Rule 19 Issue Is Unlikely to Materially Advance the Ultimate Termination of the Litigation.**

BNY's treatment of the third §1292(b) factor—that an immediate interlocutory appeal would materially advance the ultimate termination of the litigation—fails scrutiny. *See* 28 U.S.C. §1292(b). An interlocutory appeal materially advances the ultimate termination of the litigation if it "promises to advance the time for trial or shorten the time required for trial."

*Enron*, 2006 WL 2548592, at \*4.  The Second Circuit has placed particular emphasis on this factor, explaining that "[t]he use of §1292(b) is reserved for those cases where an intermediate appeal may avoid protracted litigation."  *Koehler*, 101 F.3d at 865-66; *see also Enron*, 2006 WL 2548592, at \*4; *Lerner v. Millenco, L.P.*, 23 F.Supp.2d 345, 347 (S.D.N.Y. 1998).  As discussed above, BNY has not shown that Perpetual cannot be joined as a party, and if this case is reversed on appeal, a remand for further proceedings would be required given that Rule 19 requires that the bankruptcy court first determine whether Perpetual can be joined before dismissing the complaint.  *See supra* Part I.A.2; *Universal Reinsurance*, 312 F.3d at 86.  When a reversal on appeal would not "end the litigation," the §1292(b) standard is not met.  *German v. Fed. Home Loan Mortgage Corp.*, 896 F.Supp. 1385, 1398 (S.D.N.Y. 1995).  Rather than advancing the ultimate termination of the litigation, granting an interlocutory appeal would unnecessarily protract the litigation, not only in the U.S. proceedings below, but also in the English proceedings, in which the English court is awaiting a decision by the bankruptcy court on the U.S. bankruptcy law issues raised in the litigation.  *See supra* Part I.A.3, *infra* Part II.

C.    **Promotion of Fair and Just Adjudications Does Not Require Review of the Bankruptcy Court's Decision Allowing Issues of U.S. Bankruptcy Law to Go Forward in U.S. Bankruptcy Court.**

BNY argues that Rule 19's roots in concern for protecting absent parties and promoting efficiency mandate review of the bankruptcy court's decision.  BNY Mot. for Leave. at 27 (citing 7 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE §1602 (3d ed. 2001) and *Pujol v. Shearson/Am. Express, Inc.*, 877 F.2d 132, 134 (1st Cir. 1989)).  As the bankruptcy court noted, however, Perpetual will be protected even in its absence due to its trustee's presentation of arguments supporting its interests.  *See supra* Part I.A.3.  And efficiency is not promoted by having to duplicate before this Court the history and context of this case and the arguments already weighed by the bankruptcy court.  Efficiency

is also undermined, not promoted, by having issues of first impression of U.S. bankruptcy law analyzed by an English court, especially when it will almost certainly be necessary for the U.S. bankruptcy court to rule on the same questions of law in the Aflac action and in other litigation within the LBSF bankruptcy proceeding.

Because BNY cannot satisfy any of the §1292(b) factors or show exceptional circumstances warranting an interlocutory appeal, its motion for leave should be denied.

## II. THERE ARE NO EXCEPTIONAL CIRCUMSTANCES WARRANTING INTERLOCUTORY REVIEW OF THE BANKRUPTCY COURT'S DECISION NOT TO DISMISS THE COMPLAINT ON THE GROUNDS OF INTERNATIONAL COMITY.

As with the Rule 19 issues, BNY has failed to show that either the §1292(b) factors or exceptional circumstances warrant an interlocutory appeal of the bankruptcy court's decision denying BNY's motion to dismiss on international comity grounds. The bankruptcy court correctly recognized that international comity did not warrant dismissal of the complaint given that the English court is awaiting a determination by the bankruptcy court of U.S. bankruptcy law issues. Ex. A at 69:14-23. While noting that the English court had not expressly deferred to its future decisions on U.S. bankruptcy law, the bankruptcy court explained that "the decision can be understood to be allowing time for the U.S. Bankruptcy Court to hear, consider and determine issues that are unique to U.S. bankruptcy practice." *Id.* at 72:13-15. Moreover, the bankruptcy court expressed its intention to initiate communication with the English court initially regarding scheduling, and possibly regarding substantive issues of law in the future. *Id.* at 71:16-72:9.[9] Given the bankruptcy court's sensitivity to comity concerns and willingness to communicate with the English court to alleviate comity concerns, BNY cannot show any basis for an immediate appeal on comity grounds.

---

[9] *See supra* note 4.

## A.     The Comity Issues Are Not "Controlling."

The comity issues are not "controlling" because they cannot be decided "quickly and cleanly without having to study the record."  *Enron*, 2006 WL 2548592, at *4.   Instead, reviewing the comity issues would require a study not only of the record in this case, but also the record in the English court in order to understand the interplay between the two actions. Moreover, any study of the English action is necessarily complicated given the differences in procedure and law in that action.  Nor would reversal of the comity issues be "controlling" in the sense that it would terminate the action.  Reversal would likely require a remand for further determination by the bankruptcy court given that dismissal on comity grounds is committed to the lower court's sound discretion.  *See JP Morgan Chase Bank v. Altos Hornos de Mexico, S.A. de C.V.*, 412 F.3d 418, 423-24 (2d Cir. 2005).  Thus, rather than expediting the termination of the action, an interlocutory appeal would only prolong it.

## B.     There Is No Substantial Ground for Difference of Opinion on the Comity Issue.

BNY cannot demonstrate any substantial ground for differing with the opinion of the bankruptcy court that it is unnecessary to decline to exercise jurisdiction in this case on the grounds of international comity.  Again, BNY does not contend that the bankruptcy court applied an incorrect legal standard.  *See MCI*, 358 B.R. at 79; BNY Mot. for Leave at 31.  Moreover, as LBSF detailed in its briefing in response to BNY's motion to dismiss, there is no justification for a U.S. bankruptcy court to abstain on the grounds of international comity from considering issues of U.S. bankruptcy law that an English court is not well suited to address.  LBSF Opp. to Mot. to Dismiss at 30-31 (Dkt. 30); LBSF Surreply at 8-10 (Dkt. 41).  Given that courts have a "virtually unflagging obligation . . . to exercise the jurisdiction given them," *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976), the bankruptcy court was correct

to reject BNY's motion to dismiss on the basis of international comity. The interest of the bankruptcy court in hearing issues of first impression interpreting the U.S. Bankruptcy Code is even greater given that only the U.S. bankruptcy court is vested with exclusive jurisdiction over the property, causes of action, and claims of the LBSF estate. *See* 28 U.S.C. §1334(e); *JP Morgan*, 412 F.3d at 424 (emphasizing that the "equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding"). Given the bankruptcy court's exclusive jurisdiction, it properly recognized that it is required to retain jurisdiction unless there are exceptional circumstances that militate in favor of abstention. *See Royal & Sun Alliance Ins. of Can. v. Century Int'l Arms, Inc.*, 466 F.3d 88, 94 (2d Cir. 2006).

BNY cites *Dow Jones & Co. v. Harrods, Ltd.*, 237 F.Supp.2d 394, 444 (S.D.N.Y. 2002), *aff'd*, 346 F.3d 357 (2d Cir. 2003), to argue that the bankruptcy court should have deferred to the interests and laws of the English court, BNY Mot. for Leave at 29, but *Dow Jones* recognizes that "comity ceases where a foreign judgment's actual conflict with vital public concerns of the forum state begins to prejudice or undermine domestic interests." 237 F.Supp.2d at 446. That is precisely the case here given the strong public interest in having all claims involving the debtor's property consolidated in a single proceeding before a U.S. bankruptcy court with the necessary expertise to interpret the nuances of the U.S. Bankruptcy Code. *See JP Morgan*, 412 F.3d at 424 (explaining that "the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding").

BNY skirts the strong policy favoring the consolidation of proceedings involving the debtor's property, suggesting that the English court is capable of considering all of the issues in this case given that the parties are the same, with the exception of Perpetual, and the governing documents are the same. BNY Mot. for Leave at 29-30. However, BNY has never been able to

explain how an English court is equipped to consider novel issues of U.S. bankruptcy law, especially when the English court has never indicated any intention of deciding those issues. Instead, the English court has expressly sought the bankruptcy court's substantive decisions on U.S. bankruptcy law.  LBSF Surreply on Mot. to Dismiss Ex. A ¶¶ 62-64 (Dkt. 41).  Abstaining on the grounds of comity would deprive the English court of its requested input from the U.S. bankruptcy court, and it would also effectively deprive LBSF of any forum to consider its claims under the U.S. Bankruptcy Code.

The bankruptcy court expressly recognized the English court's role in determining issues of English law, but properly concluded that only the bankruptcy court should decide issues related to U.S. bankruptcy law.  As the bankruptcy court explained:

> I'm sensitive to the issues of comity and cooperation and coordination that have been discussed throughout the argument.  But I also recognize that the only rational outcome here that makes good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal if not exclusive decider of issues relating to U.S. bankruptcy law.  And similarly, it makes sense for the High Court in London to be the principal if not exclusive decider of issues of English law.  I think it's very difficult for rational and fair-minded people to disagree with that proposition.

Ex. A at 69:14-23.  Given the bankruptcy court's intention to communicate with the English court regarding scheduling and potentially substantive issues of law, dismissal on international comity grounds would frustrate both courts' efforts to coordinate the proceedings before them. Ex. A at 71:16-72:9.

BNY cannot show any substantial ground for difference of opinion on the international comity issue, and therefore cannot satisfy the § 1292(b) factors.

### C.    Immediate Review Would Not Materially Advance the Ultimate Termination of the Litigation.

Finally, as discussed above, immediate review in this case is not likely to materially advance the ultimate termination of the litigation because, even if this Court holds that reversal is

warranted on comity grounds, a remand for further proceedings below likely would be required because of the discretionary nature of abstention on comity grounds. *JP Morgan*, 412 F.3d at 423-24. Given that lower courts must decide in the first instance whether to dismiss on comity grounds, even if BNY prevails on appeal, a remand would be warranted to permit the bankruptcy court to further consider the issue in light of any ruling by this Court. *See, e.g.*, *Bigio v. Coca-Cola Co.*, 239 F.3d 440, 455 (2d Cir. 2000) (reversing and remanding case to district court to decide in the first instance whether deciding case is consistent with international comity). As such, there is no material advancement provided by interlocutory review.

Accordingly, because BNY cannot satisfy any of the § 1292(b) factors, the Court should deny BNY's motion for leave.

### CONCLUSION AND RELIEF REQUESTED

For all of the foregoing reasons, LBSF requests that the Court deny BNY's motion for leave to appeal the order denying BNY's motion to dismiss. LBSF also requests any other relief to which it is entitled.

<div style="margin-left: 40%;">

Respectfully submitted,

 /s/ Ralph I. Miller
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

</div>

Dated: New York, New York
        September 3, 2009

# EXHIBIT A

UNITED STATES BANKRUPTCY COURT

SOUTHERN DISTRICT OF NEW YORK

Case Nos. 08-13555, 08-01420 (SIPA)

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS HOLDINGS INC., ET AL.,

                  Debtors.

- - - - - - - - - - - - - - - - - - - -x

In the Matter of:

LEHMAN BROTHERS INC.,

                  Debtor.

- - - - - - - - - - - - - - - - - - - -x

                U.S. Bankruptcy Court

                One Bowling Green

                New York, New York

                August 11, 2009

                10:02 a.m.

B E F O R E:

HON. JAMES M. PECK

U.S. BANKRUPTCY JUDGE

1    MOTION of Bank of New York to Dismiss Complaint in Case No. 09-

2    01242

3

4    SCHEDULING Conference on Defendant's Motion for Summary

5    Judgment and Debtors' Cross-Motion for Summary Judgment

6

7    MOTION of Trustee to Dismiss Complaint in Case No. 09-01160

8

9    MOTION of Unclaimed Property Recovery Service's Motion for

10   Orders (A) Compelling Payment of Unclaimed Funds by the New

11   York State Comptroller, (B) Lifting the Automatic Stay, or,

12   Alternatively, Providing Relief From the Automatic Stay, (C)

13   Allowing Payment for Services Provided Post-Petition and (D)

14   Other Relief

15

16

17

18

19

20

21

22

23

24   Transcribed By:  Esther Accardi

25

1    A P P E A R A N C E S :

2    WEIL GOTSHAL & MANGES, LLP

3          Attorneys for Debtors

4          767 Fifth Avenue

5          New York, New York 10153

6

7    BY:   HARVEY R. MILLER, ESQ.

8          PETER GRUENBERGER, ESQ.

9

10

11   WEIL GOTSHAL & MANGES, LLP

12         Attorneys for Debtors

13         1300 Eye Street, N.W.

14         Washington, D.C. 20005

15

16

17   BY:   RALPH I. MILLER, ESQ.

18

19

20   WEIL GOTSHAL & MANGES, LLP

21         Attorneys for Debtors

22         8911 Capital of Texas Highway

23         Austin, Texas 78759

24

25   BY:   MEREDITH B. PARENTI, ESQ.

```
 1    A P P E A R A N C E S : (continued)
 2    HUGHES HUBBARD & REED, LLP
 3          Attorneys for SIPA Trustee
 4          One Battery Park Plaza
 5          New York, New York 10004
 6
 7    BY:   JEFFREY S. MARGOLIN, ESQ.
 8          DANIEL S. LUBELL, ESQ.
 9
10
11    REED SMITH, LLP
12          Attorneys for Bank of New York
13          599 Lexington Avenue
14          New York, New York 10022
15
16    BY:   ERIC A. SCHAFFER, ESQ.
17
18
19    FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP
20          Attorneys for HWA 555 Owners LLC
21          One New York Plaza
22          New York, New York 10004
23
24    BY:   STEPHANIE J. GOLDSTEIN, ESQ.
25          BRIAN D. PFEIFFER, ESQ.
```

```
1    A P P E A R A N C E S : (continued)

2    MILBANK TWEED HADLEY & MCCLOY, LLP

3         Attorneys for Creditors' Committee

4         1850 K Street, NW

5         Washington, D.C. 20006

6

7    BY:   DAVID S. COHEN, ESQ.

8

9

10   SKADDEN ARPS SLATE MEAGHER & FLOM, LLP

11        Attorneys for American Family Life Assurance

12        One Rodney Square

13        Wilmington, Delaware 19899

14

15   BY:   ROBERT A. WEBER, ESQ.

16

17

18   SULLIVAN & CROMWELL, LLP

19        Attorneys for Barclays

20        125 Broad Street

21        New York, New York 10004

22

23   BY:   PENNY SHANE, ESQ.

24

25
```

1   A P P E A R A N C E S : (continued)

2   APPEARING TELEPHONICALLY:

3   JEFFREY H. DAVIDSON, ESQ., STUTMAN TREISTER & GLATT

4   MARINA FINEMAN, ESQ., STUTMAN TREISTER & GLATT

5   WHITMAN L. HOLT, ESQ., STUTMAN TREISTER & GLATT

6   NATALIE FOY, BANK OF AMERICA

7   STEPHEN GRISANTI, TRICADIA CAPITAL

8   SCOTT HARTMAN, PRO SE

9   JAMES HEISER, CHAPMAN & CUTLER

10  FRANKLIN TOP, CHAPMAN & CUTLER

11  GERARD UZZI, ESQ., WHITE & CASE

12  STEPHANIE TUDWAY, ESQ., MILBANK TWEED HADLEY & MCCLOY

13

14

15

16

17

18

19

20

21

22

23

24

25

1              P R O C E E D I N G S

2        THE COURT:  Please be seated.  Mr. Miller, good

3   morning.

4        MR. MILLER:  Good morning, Your Honor.  May it please

5   the Court.  Ralph Miller here from Weil Gotshal & Manges on

6   behalf of the debtor, Lehman Brothers Special Financing, known

7   as LBSF.

8        There are two matters on the docket this morning for

9   LBSF.  And we understand that the Court wants to take up first

10  a motion to dismiss, which has been filed by BNY Corporate

11  Trust Services.  And in just a moment I will yield to Mr.

12  Schaffer who will present that argument.

13       I do want to note that the second matter concerns

14  scheduling in another adversary proceeding, case number 8-

15  13555, Lehman Brothers Special Financing Inc. v. American

16  Family Assurance Company, knows as AFLAC.

17       I do believe that there is a relationship between the

18  issues in the motion to dismiss and the second scheduling

19  issue, because it presents a unique situation where there are

20  many people who are eager to make the legal arguments that are

21  before the Court in the first motion, Your Honor.  We think

22  that does bear on the other issues.  So in some instances these

23  may go together.  That is, the presence of parties in Court who

24  are eager to make these arguments, which the absent party

25  Perpetual presumably would make i, they were here, we think is

1    a factor to be considered.  But we understand the order that

2    the Court would prefer us to start, and we're happy to do that,

3    of course, whatever the Court wants with that motion.  But we

4    note that there may end up being some interaction between them

5    at the end of the day.

6         If that is the order the Court wishes to proceed,

7    which we understand it is, I will allow Mr. Schaffer to proceed

8    with this motion, unless the Court has --

9         THE COURT:  Before we start on the BNY motion to

10   dismiss and the Perpetual litigation is there anyone else who

11   wishes to be heard in respect of the order in which we proceed

12   today?

13        MR. WEBER:  Good morning, Your Honor.  Rob Weber from

14   Skadden Arps on behalf of AFLAC.

15        We're happy to proceed in the order of the agenda.

16        THE COURT:  Fine.

17        MR. WEBER:  Thank you.

18        THE COURT:  Let's do that.  And in terms of the

19   subject matter relationship that appears to exist between the

20   two cases, I'm aware of that.  And for that reason I don't

21   think the order matters.

22        MR. SCHAFFER:  Your Honor, Eric Schaffer from Reed

23   Smith.  I'm here today on behalf of BNY Corporate Trustee

24   Services Ltd.

25        Your Honor, why are we here?  Our goal here and in

1   England is to avoid getting caught in the middle of a fight

2   between LBSF and Perpetual.  We have a real risk of conflicting

3   judgments.

4        THE COURT:  Let me ask you a question, Mr. Schaffer,

5   and I don't mean to interject after your second sentence.  But

6   in light of what Mr. Miller said about the AFLAC litigation

7   let's just hypothesize something for a moment.

8        Let's assume, and this is purely a hypothetical, that

9   you succeed on your motion to dismiss, and let's also assume,

10  for the sake of discussion, that I promptly hear a summary

11  judgment in the AFLAC litigation and find as a matter of law

12  that the issues raised by your adversary in this litigation

13  should be found their way and that the Lehman priority is the

14  priority that applies as a matter of law and it can be applied

15  to all similar transactions, including this one, are you not

16  stuck in the very same problem of conflicting determinations

17  that make it impossible for you to act?

18       MR. SCHAFFER:  Your Honor, first of all for purposes

19  of the Perpetual litigation, we're here in one case with one

20  holder, two discreet bond issues and we'll argue how applying

21  the law to the facts before us there is no alternative but to

22  dismiss or to stay or to abstain.

23       But to directly respond to your point, assuming that

24  the AFLAC litigation goes forward, it presents what LBSF has

25  referred to as a near-identical fact scenario, very similar

1    issues.  If this Court were to find in favor of LBSF then I

2    think what would happen next is LBSF would take the High Court

3    up on its offer to say come back here, tell us what you'd like

4    under the UNCITRAL Model Law and we'll consider it.  The High

5    Court has said if you want to come back and ask for application

6    of bankruptcy law -- of U.S. Bankruptcy law, we'll consider it.

7    It may be that it would be, if not res judicata, collateral

8    estoppel, it may be that the High Court would say we here in

9    England have made a decision with regard to applicable non-

10   bankruptcy law and now we will defer to the U.S. Court with

11   regard to the overlay of bankruptcy law.

12            I think this is something that -- there's one thing

13   that Mr. Miller and I agree on, that there should be some

14   coordination between the courts.  And I think the question

15   you've raised is one we've all thought about.  And we need to

16   find a way to ensure that there is consistency.  We need to

17   find, at least from my perspective, that we don't have

18   conflicting judgments.  And I think that's one way that it

19   could play out.  Now, having said that you appreciate that

20   AFLAC is our co-defendant in that litigation, that in that case

21   we have an active noteholder and we have indemnification.  So

22   it would be incumbent upon me to say I think AFLAC has gotten a

23   winning argument there.

24            THE COURT:  Well, whether you're rooting for AFLAC or

25   not doesn't matter for purposes of this question.

1      MR. SCHAFFER:  Right.

2      THE COURT:  And the question really goes to the

3   conflict that your client is exposed to, not to court

4   communication or issues under the UNCITRAL Model Law, which

5   we'll get to at some point.

6      My question really goes to the dilemma that your

7   client seems to be in.  Because even if you should prevail in

8   respect of the arguments you're making on the motion to

9   dismiss, you're exposed to the very same issue of potential

10  conflicting law, that maybe conflicting governing law that puts

11  you in a I can't win situation unless you have an indemnity

12  from a party in the case of Perpetual unwilling to give you

13  one.  So what do you do about that?

14     MR. SCHAFFER:  Well, we focus here on the case before

15  us.  And in the Perpetual case, as we've written, as I'll

16  argue, we think dismissal is appropriate.  That resolves the

17  issue with regard to the Perpetual litigation, which is what

18  we're here on first.  It is conceivable that there could be a

19  different decision in AFLAC from what ultimately transpires in

20  England with regard to Perpetual.  But if we're correct,

21  applying Rule 119, the other doctrines we've referenced, this

22  case should be dismissed or you should defer it to the court in

23  England.  And, understand, the trustee, BNY, didn't create the

24  problem here.  LBSF and related entities went out and

25  structured this transaction -- all of these transactions with

1    the intent to market them throughout Europe, Asia, Australia.

2    We didn't create the problem, we wish Perpetual were here.  But

3    it's not and that's why we're just focusing on what we have

4    before us and the rules that we have.  We do see AFLAC as an

5    opportunity if the English court would defer or will accept

6    that as being binding consistent with the model law.

7         THE COURT:  Well, let me understand something very

8    basic.  You're here.

9         MR. SCHAFFER:  Yes.

10        THE COURT:  Why is Perpetual a necessary and

11   indispensable party if you're here and obviously prepared to

12   vigorously defend the litigation and/or dismiss the litigation

13   which is certainly part of the defense.

14        MR. SCHAFFER:  Your Honor, we are not here prepared to

15   defend on the merits.  We are here because we were sued.  We

16   are here on a motion to dismiss.  If you look at Rule 19 you

17   start with the analysis, what's a necessary party and then

18   what's indispensable.  And under necessary there are three

19   alternatives that can make a party necessary.  Lehman has

20   argued at great length with regard to one of them, and they've

21   said that we are a necessary -- but Perpetual is not necessary

22   because we're an adequate representative.  And that's simply

23   not the case.

24        If we had gotten direction and indemnification.  If it

25   were satisfactory to us as required under the documents as

1    required under English law, we might be here as an adequate

2    representative.  But there's no dispute that we have not been

3    indemnified.  And the chancellor made clear in the course of

4    the proceeding and in the judgment, we don't have a duty.  So

5    it would be a mistake to presume that whatever happens on the

6    motion before you today, if we lose that we are here on behalf

7    of Perpetual.  I can't say that we will be.

8            THE COURT:  Okay.  Well, if you're not there on behalf

9    of Perpetual and if the case is not dismissed it looks as if

10   there will be nobody opposing the legal arguments made by LBSF.

11   And there'll be potentially a conflict in law.  Alternatively,

12   if you are going to be appearing in the AFLAC litigation and

13   making arguments that are opposed to LBSF in that litigation

14   what's to prevent you from considering those arguments in the

15   AFLAC litigation as the equivalent arguments that you'd make

16   here if you were a party that was representing Perpetual here?

17           MR. SCHAFFER:  Your Honor --

18           THE COURT:  Because you're not going to take

19   inconsistent positions, are you?

20           MR. SCHAFFER:  I think that's unlikely.  I think that

21   with regard to Perpetual we may have no position.  With regard

22   to the AFLAC litigation, you're correct, it's a separate case,

23   it involves common issues.  And --

24           THE COURT:  Aren't the legal issues for all practical

25   purposes the same?

1        MR. SCHAFFER:  I think they are.

2        THE COURT:  So if BNY is before me in a separate

3 litigation that involves identical legal issues, and is

4 asserting consistent with what it views as its obligations in

5 the AFLAC case, a position that is opposed to LBSF's legal

6 position, can I take that into consideration in deciding the

7 Perpetual case?

8        MR. SCHAFFER:  Your Honor, I don't think that's a

9 basis for you to deny the motion to dismiss.

10       THE COURT:  I wasn't asking that question.  I was

11 asking can I, in your view, take into consideration for

12 purposes of the Perpetual litigation, arguments that BNY would

13 make in the AFLAC litigation that are of the same legal import?

14       MR. SCHAFFER:  Assuming that we were here on the

15 merits of the Perpetual litigation, I think that it would be

16 difficult for you not take that into account.  I think that --

17 I think it's likely that you would be consistent in your

18 approach and I don't know that I would have a basis for arguing

19 against that except to say that the real party-in-interest, the

20 necessary and indispensable party is Perpetual.  As to whether

21 a decision would be in AFLAC, would effectively be binding on

22 Perpetual I think I have to leave that for another day.  And

23 who knows, Perpetual might appear here.

24       THE COURT:  Well, let me ask, is there anybody here

25 representing the interest of Perpetual?  Is there any observer

1  in Court who has been sent to Court on behalf of Perpetual?  Is

2  there any lawyer who has been retained to observe this

3  proceeding?  Is there any business person who's been sent here

4  to observe this proceeding?

5       Apparently not, or they're choosing to be quiet.

6       Have you made any efforts, Mr. Schaffer, to encourage

7  Perpetual to participate actively in this case so as to get you

8  off the horns of this particular dilemma?

9       MR. SCHAFFER:  Your Honor, I can say that English

10  counsel levels have expressed my concerns in direct language,

11  that we think it is very useful for them to be here; for them

12  to participate.  We don't want to be here caught in the middle.

13  And my client, my co-counsel, have unquestionably told them we

14  think they should be here.

15       THE COURT:  And what have they said as far as you

16  know?

17       MR. SCHAFFER:  they understand our request.

18       THE COURT:  Okay.  Why don't you proceed with your

19  argument.

20       MR. SCHAFFER:  Your Honor, I started out why are we

21  here?  We want to get out of the middle in this fight.  To

22  quote from LBSF's skeleton argument that it filed in England.

23  It would be wholly wrong for the English court needlessly to

24  place BNY in a position where it might become subject to

25  conflicting decisions and orders of the courts in England and

1    the U.S.  That's one thing we agree on, it would be wholly

2    wrong.  We agree the courts should coordinate.  And we think

3    that letting the two cases proceed independently risk chaos.

4         What I'd like to address this morning, Your Honor,

5    briefly, what's the record, what are the issues before you and

6    not before you, and then get into how does the law apply on the

7    facts of this case?  The record I think is pretty

8    straightforward.  We have a complaint here, we have the English

9    action, we have a lot of transaction documents.  We've got

10   judgments and orders.  There are several declarations,

11   including a declaration from levels that authenticates English

12   documents, cites to relevant English case law.

13        Your Honor's aware, we have two cases filed.  The one

14   in England filed on May 13 seeks a declaration -- Perpetual

15   seeks a declaration.  First, that the assets held by BNY as

16   trustee must be distributed pursuant to noteholder priority.

17   And, second, they seek a declaration that Perpetual is not

18   obligated to indemnify BNY against the risk that this Court

19   might require distribution to LBSF.  A week later we had this

20   case filed here where LBSF is seeking a declaration that BNY is

21   required to make payment pursuant to SWAP counterparty

22   priority.  The intervened in England, of course, Perpetual is

23   not here but we have LBSF seeking exactly the opposite relief

24   with regard to distribution.

25        Your Honor, you've seen the English judgment, the

1    order.  It holds that noteholder priority is effective as

2    between Perpetual and LBSF.  And it's relevant, I think, in two

3    particular respects.

4         First, it confirms that we have a right to

5    indemnification as a condition to enforcement by Perpetual of

6    its interest in collateral.  Without indemnification we have no

7    duty to act.  And we have no duty to take any action that could

8    subject us to any liability.  Again, Perpetual has refused to

9    provide indemnification.

10        Now, Lehman said that even without indemnification

11   we're an adequate representative.  But under the judgment we

12   have no obligation, and English law controls there.

13        The English court deferred the question as to what

14   constitutes appropriate indemnification, but it never

15   questioned our right.  Now, on this point, I think LBSF's sur

16   reply mischaracterizes the law.  LBSF says the Court recognized

17   that we claim a right to indemnification, but reserve judgment

18   on the issue until after this Court rules on summary judgment

19   in this case.

20        Well, that's wrong for a couple of reasons.  First,

21   the High Court recognized, not a claim, but a right to

22   indemnification.  The only thing reserved is a determination of

23   what constitutes "appropriate indemnities."  And there I look

24   at paragraphs 56 and 63.

25        And the chancellor is quite clear on this in response

1  to questions that were raised about indemnification during the

2  trial.  If I may quote the chancellor.  He says, "I did not

3  understand it to be an issue because it is quite clear from the

4  wording of the relevant clause that you cannot be made to do

5  anything without an indemnity.  You have not been offered any

6  indemnity.  Therefore, there can't be any question at the

7  moment of telling you to do anything.  There was further

8  discussion, the chancellor repeated, it's quite clear from the

9  document and nobody has suggested otherwise, you do not have to

10  do anything without an indemnity.

11       THE COURT:  Let me ask you something, Mr. Schaffer,

12  because you're obviously quite familiar with the proceedings in

13  the High Court.

14       Assuming for a moment, the judgment of the High Court,

15  and I recognize that it's on appeal.

16       MR. SCHAFFER:  Yes.

17       THE COURT:  Has agreed to do a right to

18  indemnification, but there's an open question as to the form

19  that that indemnity will take.  Why are you not now subject to

20  whatever appeal risk may exist, able to appear and be heard

21  fully in this Court on behalf of Perpetual because you've been

22  granted a right to indemnity?

23       THE COURT:  But, Your Honor, the English court says

24  you have a right, but we don't have the indemnification.  If we

25  appear here we still don't have the indemnity, we still don't

1    have a duty.  And we don't know that we'll ever get the

2    indemnification.

3         Now, the amount at issue here is, I think, ninety

4    million Australian dollars which at the time this litigation

5    started was about seventy million dollars U.S.  It is

6    conceivable that a further hearing, the English court would

7    say, the form of indemnification should take the form of a

8    letter of credit for seventy million U.S., for ninety million

9    Australian dollars.  Could that be adequate?  It might be.  But

10   we don't have that.

11        And so if this case were to go forward we're in a

12   position where we might say well, we've got a right to

13   indemnification, let's go do our best.  But we could be second-

14   guessed.

15        THE COURT:  Do you need indemnification in respect of

16   positions that you take in litigation?  Or do you need

17   indemnification in respect of acting by virtue of authority

18   obtained in the litigation?  In other words, if you simply sits

19   on the money that's there and don't act, what indemnity do you

20   need, what risk are you exposed to?

21        MR. SCHAFFER:  If we never distribute the money, it's

22   hard to say there's a risk.

23        THE COURT:  Correct.  So the risk then is if you fail

24   to exercise fiduciary duties in respect of your beneficiary,

25   which would mean a risk in failing to articulate arguments

1  consistent with their economic objectives.  That seems to me to

2  be a risk.

3        MR. SCHAFFER:  Well, Your Honor, I will argue against

4  you on that one.

5        THE COURT:  You can argue against me on anything you

6  like.

7        MR. SCHAFFER:  Well, I'm going to pick on this one in

8  particular and say we don't have a fiduciary duty on this.  The

9  documents are clear and the English court agrees.  If we don't

10 have indemnification there's no duty.  And the English case law

11 appended to the Lyon's affidavit says, "Where there's a dispute

12 between two claimants to a trust fund, the trustee's job is to

13 remain neutral," and that's the position we've taken in England

14 and that's the position we take here.  We don't have a duty.

15 And in the absence of a duty we can't be an adequate

16 representative.

17       THE COURT:  To what extent -- I'll withdraw that.

18 Just proceed.

19       MR. SCHAFFER:  Your Honor, I was talking about the sur

20 reply saying it mischaracterized the position, also, of the

21 High Court with regard to the suggestion that it would wait

22 until after this Court rules on summary judgment.  The High

23 Court never said anything about waiting for this Court to

24 decide summary judgment.  To the contrary, the English court

25 rejected LBSF's request to stay the English litigation until

1  their could be a decision on the merits here.  And the

2  chancellor also recognized in his judgment that we have a

3  pending motion to dismiss.  The reason that we have the delay

4  until October in the High Court as set forth in paragraphs 61

5  and 63, is to give LBSF's foreign representative or this Court

6  time to determine what they may wish to do in the English

7  proceedings pursuant to the common law or the UNCITRAL Model

8  Law.  And the Court was clearly anticipating that the 1505

9  motion since granted would be filed.

10          Even then what the court invited the foreign

11  representative of this Court to do was to make requests, "in

12  light of" the conclusion that noteholder priority is effective.

13  The judgment on leave to appeal also is clear, English courts

14  aren't waiting for a judgment on the summary judgment motion.

15  They simply want to have this Court have the benefit of a final

16  non-appealable order from the English court with regard to

17  English law and to make it possible for this Court to determine

18  what it would wish the English court to continue.  And there I

19  point to paragraphs 8 and 9 of the judgment on leave to appeal.

20  So the High Court invited coordination, but it certainly did

21  not ask this Court to do anything specific and, certainly, did

22  not ask this Court to proceed to the merits of summary

23  judgment.

24          THE COURT:  Wait one moment, Mr. Schaffer.

25  Coordination is meaningless unless the U.S. Bankruptcy Court is

1    given the space and the item to deal with U.S. Bankruptcy law

2    issues.  Coordination makes sense, at least in theory.  Let's

3    look at this from 30,000 feet.  To the extent we have English

4    law governed contractual documents the English court will be

5    dealing with enforceability of those English law documents.

6         But to the extent that we have a U.S. Chapter 11

7    debtor that is asserting rights under the peculiarities of safe

8    harbor provisions of the U.S. Bankruptcy law, that are, I

9    think, in everybody's estimation unprecedented.  And as to

10   which there appears to be little governing authority, I would

11   think that the U.K. High Court would consider it rationale,

12   although I'm not looking into their brains on this, for the

13   U.S. Court to deal with U.S. law issues and for the U.K. court

14   to deal with U.K. law issues, and for us to be coordinating so

15   we come out with the most rationale result possible.  That to

16   me would be sensible.  Why isn't that sensible?

17        MR. SCHAFFER:  It is sensible if the Courts have

18   reached an agreement on how things should proceed.  As I

19   understand Your Honor, you're saying the English court is well

20   suited to decide English law, and you are well suited to decide

21   issues under the Bankruptcy Code.  It's hard to argue with

22   that.

23        THE COURT:  That seems right to me so far.

24        MR. SCHAFFER:  It's hard to argue with that.  Now,

25   would it make sense for the English court to say I'll defer to

1   you with regard to how bankruptcy law applies as an overlay

2   upon the English law that I have decided.  That makes good

3   sense too.  And were I on the phone with you and the Lord

4   Chancellor, I think that that would make eminent sense.  But

5   I'm here not knowing how you and the chancellor might

6   communicate, if at all.  How you might coordinate.  And on the

7   facts and law before us.  I'm encouraging coordination.  I've

8   been consistent on that.  And on this, I think LBSF is also

9   consistent.  It's good not to have conflicting judgments.  It

10  may be that through the vehicle of the 1505 order and the model

11  law that that's exactly where the two courts come out.  It may

12  be that the English court says I appreciate that there's been a

13  decision on the merits in the AFLAC case, and I'm going to

14  follow that.  Those would be sound decisions, those would be

15  rationale decisions.  But if we don't have that, if the two

16  courts just proceed on parallel paths, completely

17  independently, we've got a problem.  And unless the courts are

18  going to find some accommodation, I come back to the rules, to

19  the doctrines that I've addressed and say dismissal is

20  appropriate.

21          Your Honor, I said that I wanted to talk about the

22  issues before the Court.  I think you understand them.  What I

23  would like to focus on perhaps more is what are the issues not

24  before the Court?  We are not here today on the merits of

25  LBSF's claim.  We're not here to oppose them on the merits.

1    We're here because if they were to prevail on the merits we can

2    have a conflicting order.  There's no question they're saying

3    Judge, you have here an opportunity to set a precedent

4    applicable to hundreds of transactions, to thousands of

5    holders.  But you have before you just the one case, involving

6    one absent holder, and two particular notes.  I think the sur

7    reply captures the essence of the dispute.  They're saying why

8    should the debtor lose the right to get a declaratory judgment

9    on important issues of bankruptcy law just because some

10   noteholder refuses to submit to jurisdiction here?  Well,

11   they're looking to leapfrog the rules and go to the merits.

12   But the merits are not before you unless the rules are

13   satisfied, they're not guidelines.  The Supreme Court says that

14   the rules have the force of a federal statute, there's no

15   carve-out based on amounts at issue.  Or a desire, however well

16   meaning, to get a substantive decision.

17        And they can't disagree, Your Honor, because the

18   reason they didn't sue Perpetual is based on the same Rule

19   12(b); that they're worried there may not be jurisdiction, they

20   couldn't get service.  Well, 12(b)(7) provides that you have to

21   have an indispensable party absent which you need to dismiss.

22   So the questions not should Perpetual be rewarded for not

23   showing up, it's whether the debtor can satisfy the

24   requirements of the rules in the face of unrefuted evidence

25   that we have not received any indemnification as required under

1   English law.  The answer's not to ignore the rules, is to try

2   to work within them, to have coordination to proceed pursuant

3   to the model law to do the things they are now starting to do.

4           THE COURT:  But, Mr. Schaffer, they argue that

5   Perpetual is not a necessary indispensable party because you're

6   before the Court and you're fully equipped, should you elect to

7   do so, to argue all of the purely legal issues that need to be

8   addressed in this litigation, and they'll be the very same

9   legal issues that you've acknowledged you will be presenting in

10  the context of the AFLAC litigation at more or less the same

11  time.  So how's that prejudicial to your client?

12          MR. SCHAFFER:  Your Honor, if we are forced to go

13  forward, put aside all the time and expense of being involved

14  in the litigation, we are at risk of being second-guessed, we

15  are at risk of having Perpetual to proceed to try and execute

16  in London.  Perpetual can come in here -- come in here, I wish.

17  Forgive me, Your Honor.

18          Perpetual could take the position that we didn't do a

19  very good job when we were litigating in New York, and,

20  therefore, that vitiates our right to indemnification.

21          THE COURT:  They could take that very same position if

22  the motion to dismiss is granted and make the arguments that

23  you're going to make in the context of the AFLAC case, you lose

24  because then law which is applicable in the U.K., which

25  demonstrates that Perpetual's rights have been adversely

1   affected and they argue you didn't do a good job.

2       MR. SCHAFFER:  Your Honor, in that instance it's not a

3   situation in which we would have been deemed by the Court to

4   have been acting on their behalf.  I hope that we do a good job

5   in the other litigation.

6       THE COURT:  I expect based on this performance that

7   you will.

8       MR. SCHAFFER:  I thank you for that, Your Honor.  But

9   having said that still doesn't give us a duty, we don't want to

10   be second-guessed.  But beyond that, we don't want to have a

11   situation where they say we don't care what you did in New

12   York, we have a judgment in London and we have jurisdiction

13   over you in London, now pay us the money.

14       Now, admittedly then, we can say show us the

15   indemnification.  But we will be at risk that there's a

16   judgment here for which they have offered no indemnification.

17   We have an opportunity applying the rules to get the trustee

18   out of the middle.  I appreciate that we have some issues here

19   that are of great significance in this bankruptcy case, they

20   truly are.  But that's not a reason to leapfrog the rules,

21   particularly, since the Court has the ability to set a

22   precedent in some other case that is not only before you,

23   there's been a summary judgment motion filed.  It's teed up

24   ready to go and it doesn't present the sticky questions of Rule

25   19, the sticky questions of due process.

1    I think that it makes a lot of sense to say we have

2    AFLAC, it is an opportunity.  The Court concedes upon that.

3    But it's all the more opportunity not to go down what is a very

4    uncertain path in having this case and the Perpetual case in

5    London going down parallel cases without any -- without any

6    harmonization.

7        THE COURT:  Well, let's touch on that point for a

8    moment.  At various times during your presentation you've

9    talked about coordination with the High Court as it relates to

10   the Perpetual case, in particular, because that's the only one

11   we're arguing right now.

12       MR. SCHAFFER:  Yes.

13       THE COURT:  Do you have a proposal for coordination?

14   If you were designing the coordination, what would it consist

15   of?

16       MR. SCHAFFER:  Your Honor, I thought about a lot of

17   questions you might ask me, that wasn't on the list.

18       THE COURT:  Okay.  Well then I succeeded.

19       MR. SCHAFFER:  But I think what would make a lot of

20   sense, consistent with the colloquy we had a few minutes ago,

21   the English court should decide what is English law, what do

22   the documents mean, what is English case law with regard to the

23   priority, with regard to indemnification?  This Court should

24   use that as a basis consistent with Supreme Court decisions

25   like Butner, saying that's applicable non-bankruptcy law, let's

now figure out what bankruptcy law means.  I think it would

make sense for you to defer to the English court on English

law.  And I think it would make sense for the English court to

issue an order that says and I'm going to defer to the

bankruptcy court or to whatever appellate proceedings might

ultimately transpire from here with regard to the U.S.

Bankruptcy Code.  I think that makes a lot of sense.

My concern is there may not be an agreement.  And if

there's not that doesn't let me out of my dilemma.  It doesn't

let this Court out of its dilemma.  And that's why we've got a

practical answer that I think might move along the lines I've

just suggested.  But absent that we have a legal answer.  And a

legal answer absent a practical decision is to say let's apply

the rules, let's look to comity, let's look to everything to be

wise arguing, which I think is a basis for dismissing the case

if we can't have coordination.

THE COURT:  So do I understand you to say that your

motion to dismiss is in some respects conditional?  That is,

you would be content to be a party to this litigation and not

to press your motion to dismiss to conclusion if there were in

place a workable protocol that coordinated the two proceedings?

MR. SCHAFFER:  Your Honor, I don't think I've gone

that far.  But our motions --

THE COURT:  But I did ask you that question.

MR. SCHAFFER:  You did.  Your Honor, we've asked for

1    dismissal, but alternatively, we've asked for abstention or a

2    stay.  And so it is within the scope of our motion to say stay

3    things pending some further harmonization, pending some

4    rationalization between the two courts.  If we had the English

5    court telling us BNY, go forward and litigate and we've got

6    things covered here, you will not be subjected to an

7    inconsistent decision, I think that goes a long way toward

8    helping us out of our dilemma.  We still have the question of

9    indemnification.  I don't want to avoid that.

10          To the contrary, we've got the chancellor saying you

11   are entitled to appropriate indemnities.  And so when I say we

12   could work things out that way, I am assuming that the Court,

13   consistent with its judgment, would say and, of course, as part

14   of this, BNY, you get appropriate indemnities and the Court

15   would tell us what that is.  The appropriate indemnities,

16   certainly to mind, mean something that enables us to be held

17   harmless except in our capacity as the holder of the funds that

18   ultimately are distributed to one side or the other.  And I

19   hope that's responsive to the Court's question.

20          THE COURT:  I'm not going to press for a further

21   answer, so let's deem it responsive.

22          MR. SCHAFFER:  Your Honor, let me drill down into Rule

23   19.  I won't cite you to any of the treatises that are in the

24   briefs.  I think all of that is sufficiently covered.  You

25   understand there's a two-step inquiry under Rule 19.  First, is

1   the missing party necessary?  Second, if it's necessary the

2   joinder's not feasible if the Court determines whether in

3   equity and good conscience the case can proceed without the

4   necessary party.  One of the cases that we cited in our reply

5   was the Supreme Court decision in Pimentel.  And under the

6   Pimentel analysis, this is a textbook example of a case where

7   Rule 19 requires dismissal.

8           Let's start with necessary party under 19(a)(1).  A

9   party's necessary in any of three circumstances.  Let me leave

10  for the third the whole idea we might be an adequate

11  representative.  Because any of the three would be sufficient

12  for our purposes.

13          First, under 19(a)(1)(A), if the Court cannot accord

14  complete relief among the existing parties.  Well, we don't

15  have a stake in the priority issue.  The competing interest

16  here are Perpetual and LBSF, and we don't think there's any

17  complete relief possible as between them in this case.  That's

18  one alternative.

19          Second, under 19(a)(1)(B)(2), a party is necessary if

20  the claims and interest relating to the subject of the action

21  and are so situated that the disposition of the action in the

22  person's absence may subject any existing party, that's BNY, to

23  a substantial risk of incurring double, multiple, or otherwise

24  inconsistent obligations by reason of the claimed interest.

25  Well, obviously, we have got that risk here.  Perpetual says we

1  want a distribution in London pursuant to noteholder priority,

2  LBSF says no, SWAP counterparty governs distribute the same

3  funds to us.  We have got a risk that if Perpetual's not here

4  and not bound we are subject to double or inconsistent

5  obligations.  Indeed, LBSF's goal here is to create a conflict.

6  They want you to reach the opposite answer of what the High

7  Court did.  It's precisely the risk against which the rule

8  protects.

9       Then the last necessary party prong, 19(a)(1)(B)(1), a

10  party is necessary if disposition in a person's absence may, as

11  a practical matter, impede or impair the person's ability to

12  protect that interest.  Well, Perpetual's not here, obviously

13  can't protect its interest.  We've talked about is BNY an

14  adequate representative.  We don't have a beneficial interest

15  other than to collect our fees and expense which, thankfully,

16  everyone agrees come off the top.  We are not, as has been

17  suggested by LBSF, joined at the hip.  Far from having an

18  identity of interest, we were sued.  And the reason we were

19  sued is we're taking LBSF seriously.  We're saying they might

20  win.  And that's why we need indemnification.  The decision to

21  sue us rather than indemnify us shows that we and Perpetual are

22  antagonistic.

23       Now, we talked before does the English court say that

24  we have the right to indemnification?  Again, it's not a right,

25  it's satisfactory indemnification that we're entitled to.  We

1    don't have that.  Repeating that we could be an adequate

2    representative doesn't make us one.  We don't have a duty.

3            We've talked about the AFLAC case.  What that case

4    recognizes is that a noteholder really is necessary otherwise

5    why sue AFLAC?  Why not just come after us again?  LBSF is

6    recognized that in a priority dispute you should have the

7    noteholder there.  You need to bind the noteholder.

8            And what that case also shows is the importance of

9    indemnification.  We're there in AFLAC because we have it.  We

10   really are neutral.  Under the documents, under English case

11   law we have an obligation to remain neutral.  So we think that

12   under all three alternative prongs of 19(a) Perpetual is

13   necessary, not just the adequate representative issue under all

14   three.

15           So we then go onto 19(b), is Perpetual an

16   indispensable party?  Well, 19(b) sets forth several factors

17   that I think warrant dismissal here.

18           The first consideration is the extent to which the

19   judgment might prejudice the missing person or the existing

20   parties?  Obviously, a decision in Perpetual's absence could

21   prejudice Perpetual.  Look again to what the Supreme Court said

22   in Pimentel.  "Conflicting claims by beneficiaries to a common

23   trust present a textbook example of a case where one party may

24   be severely prejudiced by a decision in his absence."  We could

25   be greatly prejudiced.  This is squarely within the Pimentel

1    decision, where the case was dismissed under Rule 19.

2        Second consideration under 19(b) is the extent to

3    which prejudice could be lessened or avoided.  I don't think it

4    could happen unless somehow the courts found a way to

5    coordinate, and we've talked about that.

6        Third consideration is whether a judgment rendered in

7    a person's absence, Perpetual's absence, could be adequate?

8    Now, as the Pimentel court explains what this refers to is the

9    social interest in efficient administration of justice and

10   avoidance of multiple litigation.  A judgment entered in

11   Perpetual's absence here would certainly undermine the public

12   state in settling disputes in their entirety.  So we have the

13   risks of conflicting judgments, multiple litigation,

14   inefficiency.  There, again, it weighs heavily in favor of

15   dismissal.

16       The fourth and the last consideration I'll address is

17   whether the plaintiff would have an adequate remedy if the

18   action's dismissed.  The English court is competent to apply

19   U.S. law.  LBSF said so.  It's in the judgment.  LBSF says as

20   set forth in paragraph 63 of the judgment, "You can apply

21   bankruptcy law here Lord Chancellor."  They certainly have the

22   ability to go to England, they have an adequate remedy, they

23   have all of the parties.  And, indeed, they're actively

24   pursuing an appeal.  And, presumably, they will actively

25   follow-up on this Court's 1505 order.

1          Your Honor, I referred you to the decision of the

2     Second Circuit in Rappaport.  I think that's a close parallel

3     to what we have here.  There a bank was sued in the U.S. with

4     regard to who owned an account where competing claimants were

5     in Mexico.  The Mexico claimants were not subject to personal

6     jurisdiction in this Court, all the parties in the Mexican

7     inaction.  In that case, the Court of Appeals affirmed, said

8     that where the defendant bank faces a substantial risk of

9     inconsistent obligations if there are conflicting judgments,

10    dismissal is appropriate under Rule 19.

11         That's our case.  We've met our burden of showing

12    under Rule 19 the nature of our interest, the nature of the

13    interest possessed by the absent party.  And we've shown that

14    the protection of those interest are impaired unless the case

15    is dismissed.

16         Your Honor, I'm happy to put aside Rule 19 and move on

17    to forum nonconvenience, which I think I can treat a little bit

18    more quickly appreciating the Court has been very good in

19    giving us adequate time to fully go through these issues.

20         Your Honor, forum nonconvenience also supports

21    dismissal.  Considerations that apply here are the extent to

22    which the plaintiff's choice of forum is entitled to deference,

23    the existence of adequate alternatives, the balance of private

24    and public interests.

25         Your Honor, you understand that the plaintiff's choice

1    of forum as a general rule gets a lot of deference.  But that's

2    not true where there's forum shopping.  Here we have an

3    interesting situation where Perpetual and LBSF are both forum

4    shopping.  Perpetual sued first, while LBSF joined they also

5    have sued here to try and force Perpetual, to try and force the

6    issues into this Court.  And they're each happy to proceed

7    without the other in the first instance.

8         Perpetual, itself a trustee, has no desire to submit

9    to jurisdiction in the U.S. it would seem.  And LBSF, with all

10   deference to my good friends representing LBSF, they're not

11   worried about our lack of indemnification, and they'd be happy

12   to litigate against an empty chair.

13        So we look then and we say is England the more

14   appropriate forum?  Well, the bankruptcy case is here, but the

15   transactions were all structured there.  English law governs

16   and the English court, alone, has jurisdiction over all the

17   competing claimants.  There's a judgment that is now binding on

18   everyone including LBSF.  In our reply brief we discuss res

19   judicata, collateral estoppel.  We think with regard to those

20   decisions -- those issues of English law that the judgment is

21   binding.

22        Now, one thing that LBSF says in its sur reply is that

23   we all agree the only issues now before this Court are issues

24   of bankruptcy law.  Your Honor, I want to quickly respond to

25   that.  We have never addressed the merits, let alone agreed on

1    the issues presented.  But where LBSF has willingly

2    participated in the English court and is seeking further relief

3    under the Bankruptcy Code, we think that forum nonconvenience

4    warrants dismissal because that's the only court that right now

5    has all the parties and can decide all the issues.

6            Let me move on to comity.  Bankruptcy does not negate

7    considerations of comity.  To the contrary, Section 1334(c)

8    expressly provides for abstention in the interest of justice or

9    comity.  Section 1505 of the Bankruptcy Code is founded on the

10   Doctrine of Comity.  Now, LBSF does not question the fairness

11   or competence of the English court, or the relevance of the

12   English jurisdiction where it is still seeking further relief.

13   We think, however, that LBSF misreads the English court with

14   regard to its view of its relationship with this Court.

15   They're wrong when they say the English court recognizes that

16   only this court has jurisdiction over bankruptcy issues.

17           In paragraph 61 the English court invited LBSF to

18   raise bankruptcy issues in England under the Common Law or the

19   UNCITRAL Model Law.  That's why they are proceeding pursuant to

20   this Court's 1505 order.

21           And in paragraph 63 of the judgment the English court

22   notes "that LBSF submitted that under the model law that the

23   model law clerk could entitle this court, the English court, to

24   apply provisions of the U.S. Bankruptcy Code."

25           The question's not which court is more familiar with

1    the Bankruptcy Code or more familiar with non-bankruptcy law.

2    Your Honor, I think both courts could fairly consider these

3    issues.  The question is which court is in the better

4    position -- the best position to hear from all parties.  To

5    adjudicate the issues and to reach a final decision binding on

6    all.

7         We think comity also warrants communication between

8    the courts to avoid inconsistent judgments.  We were concerned

9    that before the sur reply LBSF didn't seem to take note that

10   the issues that it had forcefully advocated in seeking an

11   international protocol in it's 1505 motion.  But, again, we're

12   now in agreement on that.

13        Moving on then to the last of our substantive

14   arguments.  And that is the stay.  We ask that if this action

15   is not dismissed that it be stayed pending resolution of the

16   English action.  Any decision's going to require non-bankruptcy

17   law to be decided.  It's going to be res judicata or collateral

18   estoppel.  We've got an appeal.  It can only be helpful to this

19   Court to know what the English law is with a final non-

20   appealable order.  LBSF, it worries about conflicting

21   decisions.  And it looks that AFLAC presumably is what might be

22   a conflict.  It says, in this case, don't miss an opportunity

23   to provide substantive import on important issues.  Your Honor,

24   I think we agree AFLAC is an opportunity.  And if the goal is a

25   precedential ruling the Court can go to that case teed-up for

1    summary judgment without the risk of conflicting orders,

2    without the due process problems where they seek to litigate in

3    the absence of a noteholder.

4         Let me try and wrap up at this point.  To go back to

5    where I started.  In England LBSF wrote it would be wholly

6    wrong needlessly to place BNY in a position where it might be

7    subject to conflicting positions and orders.  With this in

8    mind, this Court can't skip to the ultimate merits.  The rules,

9    the other doctrines we've referenced exist precisely to deal

10   with the kind of problems you have here.

11        What can you do about this?  We've talked about this.

12   Certainly dismissal takes care of the problem in this case.

13   Alternatives, you can coordinate with the English court.  You

14   might have a consensus that that court would defer to you on

15   the merits.  And assuming that we have a judgment that covers

16   us on indemnification from the English court I think that's

17   perfectly workable.  But a failure to address conflicting

18   orders it seems to me is not an option.

19        Your Honor, in our reply memorandum we quoted from

20   another case in this Court, petition of Briarley.  And I'd like

21   to recite to that.  "Working in all transnational bankruptcies

22   is the potential for chaos if the courts involved ignore the

23   importance of comity.  Yet it is critical to harmonize the

24   proceedings into different courts less decrees at war with one

25   another result."  It's critical to avoid warring decrees here.

1    And, Your Honor, we think on the record, on the facts, on the

2    law, this complaint should be dismissed.  Alternatively, we

3    would ask that you abstain in the interest of comity or stay

4    until it's clear that BNY will not be at risk of conflicting

5    judgments.  Thank you very much, Your Honor.

6              THE COURT:  Thank you.

7              MR. MILLER:  Your Honor, Ralph Miller again, here for

8    LBSF.

9              I'd like to start with a practical question that the

10   Court asked which LBSF has given some thought to.  And that is

11   what might be an orderly way to deal with the coordination

12   issue.  And I'd like to talk a little bit about the necessary

13   party issue and the separate and distinct indispensable party

14   issue.

15             THE COURT:  Okay.

16             MR. MILLER:  First, with regard to coordination, there

17   are as the Court knows, interim rules that were opposed for

18   coordination which have actually been adopted by this district.

19   And they make a distinction between scheduling coordination,

20   which, for example, does not require any sort of advance

21   notice.  And coordination that amounts to a request for

22   recognition or assistance on some kind of action.  We think

23   there are two separate phases of coordination that would be

24   appropriate in this case.  And, Your Honor, referred to the

25   need for this Court to have space and time to deal with these

1   issues.

2           We suggest that the English court, the Vice Chancellor

3   has recognized that, noting that the court will not be back in

4   session to consider this until October.  And we would suggest

5   that after the scheduling conference that we're going to have

6   later today and whatever scheduling decisions this Court might

7   make, it would be perfectly appropriate for this Court to have

8   a scheduling communication with the London court indicating

9   what sort of space and time this Court anticipates it might

10  require to have guidance on these issues.  And then to make a

11  further decision on whether this Court wishes or does not wish

12  to seek assistance with coordination in light of the ruling it

13  makes.  Although, LBSF believes that it's going to be a ruling

14  which hopefully would require some coordination.  There are

15  certainly outcomes here in which no coordination is necessary.

16  So we don't think that that decision can be made now as to what

17  the coordination is going to be.

18          At that same time, these issues are potential conflict

19  that were raised by Mr. Schaffer, could be address.  And I'll

20  talk about that in a moment.  So we suggest that the first

21  coordination request should be once the Court decides what he

22  schedule is to let the Vice Chancellor know that this Court

23  will have a hearing say, in October or November, or whenever

24  it's going to have it.  And anticipate that after that the

25  Court will make a further decision.  In which, by the way, it

1    may choose to give some advance notice of what it's going to

2    do, because there is -- although we don't think the advance

3    notice provisions directly apply, that would be an option the

4    Court would have.  You can decide whether to do that or not.

5    But in any event, if at a later stage the Court would be in a

6    position to tell the London court whether it does or does not

7    need a substantive sort of court action.  But it needs the

8    space and time.  And we think that is the first coordination

9    requirement.  And we think that that is something that we have

10    confidence the London court will be amenable to.

11        During the same time the appeal will be continuing, I

12    don't know how fast that guidance might come back.  But it is

13    possible that that guidance may or may not be useful in this

14    Court's deliberation.  I don't think that you should wait for

15    the appeal in London.

16        I do want to talk about this issue of indemnity for

17    just a moment and then go to Rule 19.  The position of Mr.

18    Schaffer is, and we think it is correct, that the London court

19    has determined that indemnity is required.  It just has not

20    determined what the form that indemnity is going to take.

21        One of the cases, for example, cited in their brief at

22    page 5, the House of Wilkinson v. Neary case.  Notes that the

23    trustee entitled to indemnity had a lien on the trust assets to

24    secure that indemnity.  And it also is possible that the court

25    can issue direction on how a trustee is to act, that's

1    mentioned in that case.

2        So while there are some details to be worked out the

3    basic principle here we think is the principle of equity that

4    the court presumes has done that which should be done.  And in

5    this case, indemnity should be granted.  The English court has

6    said it's going to be granted.  And the fact that the details

7    are not known is certainly no reason to dismiss this case.  It

8    might be a reason to take -- to take into consideration if and

9    when a potential conflict down the road comes to arise, which

10   is -- there's a lot of ways that that might not happen.

11       Turning to Rule 19, Your Honor, there's actually a

12   case very much in point.  And if I might approach with some

13   highlighted copies?

14       THE COURT:  You may approach.

15       (Pause)

16       MR. MILLER:  The facts are actually surprisingly

17   similar here because, Your Honor, the parent corporation of

18   BNY, Bank of New York, which was a trustee, and it was arguing

19   in a case with the Federal Deposit Insurance Corporation that

20   the noteholders in the trust it was dealing with were necessary

21   parties.  The court in that case found that applying Rule 19

22   analysis, and this is Federal Deposit Insurance Corporation v.

23   Bank of New York, 479 F.Supp.2d 1, which was affirmed by the DC

24   Circuit 508 F.3d 1 in 2008, so it's a recent case very much in

25   point and very similar facts.  And as we noted in our brief,

1    the court said on it's numbered page 10 of this decision under

2    Rule 19(a)(2)(1), "It is well settled in adjudicating an absent

3    person's claim cannot impair or impede the person's ability to

4    protect its interest if he is adequately represented by one of

5    the existing parties."  Now, in that case Bank of New York, the

6    parent, said well, we have an antagonism here because we filed

7    an interpleader and we're not in agreement with the

8    noteholders.  And the court said that was not the kind of

9    antagonism that was required.  The court noted that in another

10   case BNY had represented the noteholders -- those same

11   noteholders in their pending appeal before the DC Circuit.

12   there was indemnity in that case.

13        The court found that there was not a potential for

14   double, multiple or otherwise inconsistent obligations.

15   Because BNY did represent the noteholders as the indemnity

16   trustee, this is over on page 11 under the 19(a)(2)(ii)

17   analysis.  And they would -- in effect, they would be bound by

18   the Court's decision, which we believe is the result it would

19   incur here.  Because if you go over to page 13, the Court

20   concluded because venue in the district is proper, the first

21   file rule may not be applied.  And the noteholders are not

22   necessary party, so the defendant's motion to dismiss was

23   denied.

24        We believe that marches through the elements of

25   necessary party, and it is absolutely the correct analysis in

1  this case.

2      THE COURT:  Let me break in, Mr. Miller, and ask you a

3  question that's been borrowing me, though.

4      MR. MILLER:  Yes, Your Honor.

5      THE COURT:  One of the arguments made by BNY in this

6  case is that if you look at what LBSF did in the AFLAC

7  litigation you see that there is either an express or a tacit

8  acknowledgement that noteholders are, if not necessary parties,

9  certainly entirely appropriate parties to be named in

10  litigation involving the resolution of these issues.  How do

11  you reconcile the fact that the noteholder is a party in the

12  AFLAC case, and that you named them as a party in that case?

13  And that don't add Perpetual in this case when BNY is, in

14  effect, a totally different position in those two litigations

15  because hearing Perpetual there on their own and lacking

16  direction or indemnity from their noteholder, and in AFLAC

17  their taking active positions with indemnity presumably, how do

18  I reconcile that?

19      MR. MILLER:  Well, Your Honor, I think you can

20  reconcile that easily on a couple of grounds.  First of all,

21  the predicate of that case was that AFLAC was in discussion

22  with LBSF and it threatened to initiate suit and is a U.S.

23  entity.  So the feeling was that it was important to go ahead

24  and activate a litigation to get a declaratory judgment.  And

25  rather than have another possibility of the case in London and

1    a case here, LBSF concluded that the orderly proceeding was to

2    go ahead and initiate a declaratory judgment with the parties

3    in this case, and with the party it was dealing with.  Because

4    LBSF had come forward.

5        So far as we know there's been no communication

6    between Perpetual and LBSF before Perpetual filed its suit in

7    London.  And it's notable that Perpetual's suit only BNY.  It

8    obviously felt that was sufficient.  LBSF did intervene.  LBSF

9    has not asked that court to decide the bankruptcy issues that

10    are before this Court.  There were some Insolvency Act issues

11    under English law that are somewhat analogous that were

12    submitted and were considered under English law.

13        But the difference is, first of all, that there was a

14    direct communication, a threat of litigation, and a response to

15    that.  And the other answer, Your Honor, is that there was no

16    jurisdictional issues.

17        I want to come back to jurisdictional issue because

18    Mr. Schaffer keeps saying that there is, in effect, a test of

19    admission, there's no jurisdiction.  We don't believe they're a

20    necessary party and we certainly don't think they're going to

21    prove to be an indispensable party if they were a necessary

22    party.  But we're not at all certain that Perpetual could not

23    be subjected to jurisdiction if that's what the Court concluded

24    he wanted to have done.  That becomes a scheduling issue and

25    I'll deal with that in a moment.

1      One of the things I might do if I might put up the

2  chart, Your Honor, that you've seen before.

3      (Pause)

4      MR. MILLER:  We do have small copies of this.  This is

5  a chart that was used before the court in an argument which Mr.

6  Schaffer was present for in the long motion to intervene in

7  this case, in the earlier intervention motion, so it's been

8  used in this case.  And it simply illustrates the relationship

9  of these parties.

10      And one of the things that I think the Court

11  recognizes is there's no contractual relationship between LBSF

12  as the SWAP counterparty and Perpetual as a noteholder.  In

13  many transactions, Your Honor, there are many noteholders.  And

14  in many transactions those noteholders -- some of them cannot

15  be found and cannot be reached.  As a general principle LBSF

16  does not believe that noteholders should be parties to these

17  kinds of proceedings.  Otherwise, for one thing, it become

18  completely unworkable.  But it was not contemplated by these

19  transactions that all the noteholders had to be drawn in.

20      THE COURT:  Thank you.

21      (Pause)

22      THE COURT:  These are copies of the same demonstrative

23  that's up on the board?

24      MR. MILLER:  Yes, Your Honor.  I'm simply handing the

25  Court copies of a demonstrative which is up on the board.

1    There's a two-step analysis under Rule 19.  And as we

2  believe the FDIC case against Bank of New York illustrates

3  under the elements of Rule 19 and as our brief set out, we

4  think that Perpetual is not a necessary party.  We believe that

5  BNY is an adequate representative.  We also suggest, as I did

6  at the beginning, that the presence of BNY and AFLAC in a case

7  with virtually identical issues is something that this Court

8  can consider under the broad discretionary issues of Rule 19.

9    There's going to be a very adequate representative

10  here in the form of AFLAC and Skadden Arps, its counsel making

11  these arguments.  And BNY has said that they are not conflicted

12  in that case.  So those arguments are going to be presented and

13  that's going to provide adequate protection, we believe, for

14  the rights of Perpetual, for the arguments on that side of

15  these bankruptcy and statutory issues.  And we think that

16  that's part of the equity in good conscious analysis when you

17  reach the indispensable party part of the analysis.

18    Even if Perpetual were a necessary party, whether

19  dismissal is appropriate or not requires a consideration of

20  additional factors.  And I might point out that in the equity

21  in good conscious category BNY could have taken a number of

22  steps that it didn't take that could have brought this issue

23  more clearly before this Court

24    One we encouraged BNY to consider was an interpleader.

25  That was something that was done, as the Court knows, in

1    Ballyrock case by the trustee.  And that has allowed those

2    parties to gather around the race that existed.

3         If the trustee were concerned it could, as it did in

4    the FDIC case, interplead into this court and that would have

5    resolved any issue.  It could have interpleaded in the London

6    court and that might have affected the issues as well, Your

7    Honor, but it chose not to do that.

8         BNY also could have tried to bring Perpetual in

9    itself.  It actually, in its motion to dismiss, suggested that

10   the Court order jurisdictional discovery to be taken by LBSF

11   which seemed strange.  If it wanted jurisdictional discovery

12   BNY could take jurisdictional discovery.  So it has, sort of,

13   taken a position of sitting on its hands and saying we don't

14   have an indemnity and we're certainly not going to do anything

15   without an indemnity.  And we don't have this party here and

16   we're not going to do anything to bring that party in so the

17   case should be dismissed.

18        And while we understand that position from their self

19   interest, as a matter of equity in good conscious we don't

20   think that dismissal could possibly be the appropriate remedy

21   that would arise here.  We think, at most, the second step

22   would be to say the parties can proceed and see if they can

23   bring Perpetual in.

24        Now the problem with bring Perpetual in, in addition

25   to the fact that we don't think it's required under the law and

1    we think it would delay the entire process, is that it would

2    impact the scheduling and the coordination in London.  And that

3    is, again, an issue of coordination with the London court.  We

4    don't know whether the London court would go through the time

5    necessary for that or not.  It's true that if BNY has asked

6    Perpetual to come in, presumably they have not wanted to do so,

7    if they changed their mind and came in Perpetual would have the

8    ability to speed this whole process.  Perpetual could come in

9    and then it could facilitate a resolution here but it has

10   chosen not to do that.

11        So Perpetual is taking the position that it's in a big

12   hurry in London.  It wants expedited adjudication.  It's done

13   nothing to allow that case to slow down and to suppose the

14   stay.  It has opposed the delays that were sought by LBSF to

15   let this Court act.  And yet it has not done anything to

16   facilitate the resolution of this case by either coming in to

17   participate or trying to authorize BNY to participate by giving

18   it in the indemnity.

19        I'd also point out, Your Honor, that as a practical

20   matter if the indemnity is confirmed by the English court, and

21   this is really the point that's made in the FDIC case, if a

22   judgment is rendered against BNY and BNY has an indemnity then

23   if BNY does have to pay the money over it has the indemnity to

24   get that money back if it had paid it twice.  In other words

25   there's no real possibility that BNY is going to have to pay

1    this money twice.  And I think it's also safe to assume it's

2    not going to release the money until it's certain that it's not

3    going to have to pay it twice.

4          Finally, in terms of this, sort of, hypothetical

5    conflict, I cannot imagine any possibility where the vice

6    chancellor and this Court would both issue contempt citations

7    or directions to BNY if their judgments were in conflict.

8    That's precisely what this coordination is for.  It's too early

9    to decide how that's going to happen.  But the fight is about

10   the box in the lower left corner here, these notes issued by

11   Australia, New Zealand Bank or Royal Bank of Scotland.  The

12   question is which of two parties will get those notes and BNY

13   has those notes in its control and its possession and they're

14   only going to go out once.  And they're going to go out after

15   the issues are sorted out as to which court has authority to

16   direct the payment of those notes.  We're not there yet because

17   the final judgment has not been appealed in London and because

18   this Court has not reached the merits.

19         And I might stress, we're not trying to jump ahead to

20   the merits.  It is critical, Your Honor, that in the

21   indispensable party analysis the most important question for

22   determination, as the briefs made clear, is whether there is an

23   adequate alternative for it.  And in this case, Your Honor, the

24   English court has not ever suggested that it is an adequate

25   forum for these statutory bankruptcy issues.  And there's a

1    case law in English law as well as case law cited in our brief

2    in the United States that recognizes that United States

3    Bankruptcy Courts are by far the most appropriate court for any

4    sort of resolution of bankruptcy issues.  And there is an

5    English court case that it cited it's in the briefing by BNY

6    which has similar recognition of the importance of cooperation

7    between English courts and U.S. bankruptcy courts.  And this is

8    the Bunk Indosuez  S.A. vs. Pharamet Resources, Inc. (ph.) case

9    from the chancery division where the Court notes that the Court

10   would do its utmost to cooperate with the U.S. bankruptcy court

11   and avoid any action that might disturb the orderly

12   administration of Inc. in Texas.

13        The English courts have recognized that there should

14   be a unitary bankruptcy proceeding, generally speaking in

15   world-wide bankruptcies.  And this Court has control over these

16   assets and the disposition of the assets of LBSF in which it

17   has security interests are something that can only be resolved,

18   we believe, fairly and effectively in this court.

19        So the simple solution, we believe, is to conclude

20   that Perpetual is not a necessary party.  In the alternative,

21   it's certainly not a necessary and indispensable party.  And

22   coordination, which we're going to discuss, I think, this

23   afternoon, is quite practical between the AFLAC matter and this

24   matter so that the briefing will be before the Court one time.

25        The debtor does not believe, by the way, that

1    coordination is always necessary just because the same legal

2    issue is going to come up in several cases.  But because, as

3    the Court's noted, this is a case of the first impression on

4    some of these issues and the cases are moving together and we

5    have some commonality of parties with BNY and LBSF in both

6    cases.  It may make sense to coordinate that and I think the

7    Court has expressed some interest in reading these briefs only

8    once and hearing arguments, maybe, that come together at one

9    time on some of these issues.

10          And we are, by the way, very cognizant of the

11   tremendous number of cases that this case has before it the

12   issues are weighty and difficult, there's a lot of paper and

13   we, the debtor, wants to make certain that the Court has

14   adequate space and time, as it referred to, to consider these

15   matters.  We'll take that up in the scheduling conference but

16   to summarize, our belief is that the motion to dismiss should

17   be denied.  That coordination should be discussed in the next

18   session that we're going to have and that BNY should be given

19   an opportunity to file a summary judgment if it wants to.  It

20   should be given adequate time to respond to the summary

21   judgment that's already on file in this case.  If it wishes, to

22   adopt by reverence the arguments that are made by AFLAC, is

23   certainly can do that as courts of course recognize adoption by

24   reference even between different cases, if necessary.

25          And we suggest that we then develop a coordinated

1    briefing schedule, which we think probably takes us into

2    October and November as we will discuss, but not far beyond the

3    schedule that the London court has set out.  And the Court, we

4    would suggest, may want to have a scheduling coordination

5    communication, once this is all sorted out, with the London

6    court to explain when this Court thinks these issues will be

7    presented.  And that, of course, does not anticipate what the

8    London court's going to do with that information but as the

9    London court clearly suggested, the vice chancery, it would be

10   helpful to the London court to know what assistance this Court

11   might be requesting.  And this would be simply notice of when

12   this Court might be in a position to make the decision on

13   whether it needs assistance and what sort of assistance or

14   coordination it might request.

15        So we think in that logical order the Court will have

16   space and time to consider things, all the parties will be

17   heard.  There's going to be adequate briefing on the issues.

18   Nobody's rights are going to be prejudiced and the concerns of

19   BNY that it's going to somehow have to pay this money out twice

20   or not get guidance from the courts, we think is completely

21   fictitious and is not something that has any realistic

22   possibility of existing under these circumstances.

23        I'd be happy to take any questions, Your Honor.

24        THE COURT:  I have a couple.

25        MR. MILLER:  Yes, Your Honor.

1          THE COURT:  I note the Federal Deposit Insurance

2     Corporation vs. Bank of New York decision that you handed up

3     and I've really only focused on the highlighted language on

4     page 10, which states a proposition that's probably beyond

5     doubt.  It's really just a question of its application.

6          The highlighted sentence reads, "It is well settled

7     that adjudicating an absent person's claim cannot impair or

8     impede the person's ability to protect his interest if he is

9     adequately represented by one of the existing parties."  And it

10    goes on to talk about the role of the indentured trustee under

11    a bond issue.

12         What concerns me here, in light of the argument made

13    by BNY though is their argument that they have no duty to

14    represent the interests of Perpetual in this litigation absent

15    an indemnity.  And that that question remains in dispute and

16    that as a result they can just sit on their hands, whether they

17    choose to do that remains to be seen.

18         If they just sit on their hands how are the interests

19    of Perpetual represented adequately?

20         MR. MILLER:  Well Your Honor, let me respond to that

21    in two ways.  First of all, I understand Mr. Schaffer takes the

22    position, and we believe this is a correct reading if our

23    language was not precise we apologize, that the vice chancellor

24    has decided that they are indemnified.  The vice chancellor has

25    just not decided what the form of that indemnity is going to

1    be.

2          THE COURT:  And that's consistent with my questioning

3    of Mr. Schaffer during his argument.

4          MR. MILLER:  Yes, Your Honor.  So we think that it's

5    not factually the case that they don't have an indemnity.  They

6    don't quite have the form of the indemnity but that doesn't

7    prevent them from going forward and in fact we think they're

8    obligated to go forward and assert the interests of Perpetual.

9          But to answer your second question, how are the

10   interests adequately protected, the interests are adequately

11   protected because precisely the same statutory and legal issues

12   are going to be briefed by BNY and by AFLAC in the coordinated

13   proceeding which is occurring.  And this Court is going to have

14   all the legislative history, if you decide legislative history

15   is relevant, and the case law and all of the other issues.

16         This is distinct in the sense that in neither of these

17   cases is there any suggestion of factual disputes.  And that,

18   by the way, is the one of the reasons that forum non conveniens

19   makes no sense here.  There is no witnesses, there is no

20   documents, there's nothing that's a convenience issue here that

21   implicates forum non conveniens.  This is unique because it is

22   a legal dispute and the legal issues are going to be before

23   this Court from this very same party, BNY, with indemnity.  So

24   in that sense the interests of Perpetual will be protected and

25   will be fully asserted and will be considered by the Court.

1   And certainly LBSF agrees that it's appropriate for the Court

2   to take into consideration the briefing in that other case and

3   to rely upon it.

4        And if BNY simply chooses to incorporate its position

5   by reference, I think Mr. Schaffer said he thought it would be

6   unlikely he would take an inconsistent position in the cases.

7   It can do so and it can do so with or without indemnity.  And

8   in those circumstances Perpetual's interests are protected.

9        THE COURT:  I'm a little unclear as to the status of

10  the UNCITRAL Model Law provisions as they have been activated

11  in the U.K. and where things stand procedurally.  Is there, at

12  this point, an authorized and empowered foreign representative

13  for LBSF speaking on behalf of that estate in the high court?

14       MR. MILLER:  Your Honor, I haven't had that updated in

15  the last day or two.  My understanding is that an application

16  has been made for a foreign representative to be appointed but

17  there has not actually been a ruling on that application yet.

18  It is expected, I believe, and I think the vice chancellor

19  recognized that this is a fairly formalistic thing and it's

20  very likely that that will proceed and will occur.  Exactly

21  when, I don't know but certainly before October and we

22  anticipate that there will be a foreign representative.

23       Now that foreign representative then has to take

24  actions and do things, I mean the mere appointment does not

25  change things.  That foreign representative will, of course, be

1    acting for the Lehman estates.

2           The Court, by the way, I'm told that would deal with

3    this is in recess in England as are other courts in summer

4    recess that we've discussed before, Your Honor, as a very

5    civilized practice.  So I believe it is the recess that has

6    caused this delay and we don't believe any substantive issues.

7           THE COURT:  I've expressed my envy as to that in the

8    past.

9           MR. MILLER:  I understand, Your Honor.  It's about

10   space and time, right?

11          THE COURT:  Well, yes.  And the opportunity to

12   refresh.

13          Now, I'm unfamiliar with outbound practice in the

14   model law context, all of my experience is inbound experience

15   in which foreign representatives come to this court and seek

16   recognition under Chapter 15.  Ordinarily the foreign

17   representatives who are appointed are representatives of

18   accounting firms or other liquidators acting on behalf of

19   foreign entities.

20          Is the party to be authorized to speak on behalf of

21   LBSF as a foreign representative a current employee of the

22   debtor in possession or is there some mechanism for appointing

23   a third-party fiduciary to act on behalf of LBSF?

24          MR. MILLER:  My understanding is, Your Honor, that it

25   is a representative of the debtor.  Of course to the extent

1    that a debtor is, to some extent, a fiduciary of its

2    constituencies --

3         THE COURT:  Oh, I understand that.

4         MR. MILLER:  -- it would have that.  But yes, the

5    foreign representative is just a debtor's representative.

6         THE COURT:  It will be a designated individual, is

7    that correct?

8         MR. MILLER:  Yes, I believe that's correct Your Honor.

9         THE COURT:  Okay.

10        MR. MILLER:  And I'm not certain I know who that is,

11   it may be someone in our law firm's London office but I'm not

12   certain who that is.

13        THE COURT:  All right.  Under the American Law

14   Institute procedures on court-to-court communication, such

15   communication typically only occurs upon the adoption of a

16   protocol in which, in this instance, the U.S. Bankruptcy Court

17   and the chancellor of the High Court would be empowered to

18   confer with one another pursuant to a set of approved

19   procedures and principles.  Is there any understanding, at this

20   point, as to such a protocol?  I know that in the Lehman case

21   itself the adoption of a multi-lateral protocol has been a

22   subject of some controversy as it has related to LBIE in

23   particular.  This is not an LBIE issue but I do recognize the

24   potential for there being some sensitivity as it relates to

25   court-to-court communication between me in my capacity as the

1   bankruptcy judge administering these adversary proceedings and

2   me in my capacity as the bankruptcy judge who has overall case

3   authority for the Lehman bankruptcy as a whole.  Recognizing

4   that at least as it relates to LBIE, I note that there has been

5   some pushback from the joint administrators of LBIE as it

6   relates to that multi-lateral protocol which has been

7   characterized as the Alvarez & Marsal protocol by them.

8        To what extent do any of these broader political

9   issues in the case represent a potential area of controversy as

10  it involves court-to-court communication?

11       MR. MILLER:  Your Honor, Mr. Lemmons has confirmed, my

12  understanding is that this case does not have any relationship

13  to those protocols or the issues that are involved there.  We

14  did speak earlier to some of the people who were dealing with

15  those and they didn't think that this was a related issue.

16  There, of course, LBIE does have its own administrators.  As

17  the Court has noted, LBIE is not involved in this and we don't

18  believe LBIE has anything to do with this nor any other

19  bankruptcy administration.

20       We think that the procedure here could be a letter,

21  for example, requesting scheduling which the Court could simply

22  send to the vice chancellor that would make reference to the

23  various procedures.  And we would be pleased, Your Honor, to

24  draft such a letter if we were authorized to do so and

25  circulate it to the parties and try to present it to the Court.

1    The only purpose of the letter at this point, we are

2    suggesting, is to advise that court of scheduling constraints

3    so that it can take those into account with regard to its

4    schedule.  We think that's all that's needed at this point.

5    But we think it would be helpful and fair to the London court

6    to understand that and of course we're not familiar with what

7    scheduling constraints the Court might have and I think that

8    may be some of the subject of the discussion in this next

9    session we're going to have.  So we think that that -- we have

10   a high degree of confidence that that would lead -- we

11   certainly believe there will be a cooperative attitude.  The

12   vice chancellor has expressed nothing but graciousness and

13   understanding of the complexity and a great deal of sensitivity

14   to these issues.  And we anticipate that this will be

15   considered receptively.  We don't know what the outcome would

16   be, of course, but at least it would be an appropriate way, we

17   think, to frame the issue and let the London court know what

18   this Court needs in the way of space and time.

19            THE COURT:  Fine.  Okay.  One follow-up question on

20   court-to-court communication.  You have been focusing, at least

21   initially, on scheduling coordination as opposed to allocation

22   of responsibility for determining issues that overlap in the

23   two courts.  Is it your contemplation, consistent with some of

24   the conversations that I had with Mr. Schaffer during his

25   presentation, that it would be reasonable to work out, if

1  feasible, an allocation of responsibility in which the English

2  high court would deal with matters of English law and would be

3  primary, if not exclusive, in that area.  And the U.S.

4  Bankruptcy Court would deal with issues of U.S. bankruptcy law

5  with the English court deferring to the United States

6  Bankruptcy Court as to issues of U.S. bankruptcy law?

7          MR. MILLER:  Certainly, Your Honor, and it seems to us

8  that is a logical and a reasonable way to deal with that.  I

9  think, in fairness, until the issues of bankruptcy law are

10  determined, how they may be relevant to the English court

11  judgment is impossible to predict.  But we certainly think that

12  the English court has already expressed an interest in how this

13  Court is going to resolve these bankruptcy issues.  And we

14  think that that proposed allocation is something that not only

15  makes sense but we think it's consistent with all the case law

16  and the residents.

17          THE COURT:  And I mention this only for discussion

18  purposes and not because I think it's a desirable option; in my

19  experience, recently, I have had joint hearings, televised

20  joint hearings with the Canadian court in Montreal in a cross-

21  border bankruptcy case, Quebecor World.  Those joint hearings

22  took place as recently as this summer, quite successfully I

23  might add.  Is there any contemplation that a matter of this

24  sort might be reasonably adjudicated through some kind of joint

25  hearing in which arguments are being made simultaneously, both

1    in the High Court and here with video hookups or is that simply

2    unnecessary and unduly complicating?

3           MR. MILLER:  Well certainly, Your Honor, as far as

4    LBSF is concerned, if the Court has any interest in doing that

5    it would certainly be happy to cooperate.  But there are no

6    factual issues here.  There are no witnesses that we think are

7    relevant.  Everything is in the documents.  And under the

8    circumstances we're not certain that the benefit of a televised

9    hearing would be worth the complexity and the burden.  It's

10   essentially an issue of oral arguments.  And again, I don't

11   believe that --

12          THE COURT:  It would, however, be a way for me to hear

13   from counsel for Perpetual.

14          MR. MILLER:  It would.  That's a very good point, Your

15   Honor.  And there certainly is an issue here of ultimately if

16   we had a finding that U.S. bankruptcy law ipso facto

17   provisions, for example, invalidated these clauses that change

18   priority based on bankruptcy, which is what LBSF is seeking.

19   And the English court had concluded its appeals and had decided

20   that setting aside all U.S. bankruptcy issues under English law

21   that the priority was noteholder priority, there's ultimately

22   going to have to be a question of -- essentially a choice of

23   law question between U.S. bankruptcy law and the law of the

24   contract under the circumstances.  That would certainly seem to

25   be an appropriate issue, perhaps, for a joint hearing Your

1    Honor because that's going to be something where both courts

2    are going to have to deal with that issue.  But that's far down

3    the road, it seems to us.  It would certainly be an opportunity

4    for Perpetual to be heard on that issue.  They have chosen, in

5    effect, to rest on that issue rather than to come in to contest

6    on this issue.  They've chosen to rest on the premise that the

7    London court should trump this Court regardless of U.S.

8    bankruptcy law.  So we assume that would be their position that

9    might be in that hearing and that would be a very appropriate

10   time for such a joint hearing, Your Honor.

11        THE COURT:  All right.  Thank you.

12        MR. MILLER:  Thank you.  Is there anyone else that

13   wishes to be heard on this?  Mr. Schaffer do you have any

14   follow up comments?

15        MR. SCHAFFER:  Your Honor, I don't know if the

16   committee wishes to be heard, if not I have just a few remarks.

17        THE COURT:  Does the committee have any --

18        MR. COHEN:  No, Your Honor.  As I promised when you

19   granted our intervention we would not be duplicative and we

20   agree with the debtors' arguments and position and have worked

21   closely with them on formulating those.

22        THE COURT:  Understood.

23        MR. SCHAFFER:  Your Honor, if I may briefly speak to

24   some of Mr. Miller's remarks.  The FDIC case is something that

25   we addressed in our memorandum at pages 14 and 15.  And what I

1   think is significant there is that it notes that where the

2   beneficiary and the trustee are antagonistic, there is no

3   adequate representation.  Here, unlike in the FDIC case, we

4   haven't represented the beneficiary before.  We don't have

5   indemnification, they sued us.  We are antagonistic.  This

6   really is the textbook example referred to in Pimentel.

7           Your Honor, there was some brief discussion of could

8   Perpetual be joined and Mr. Miller suggest that perhaps they

9   could be.  If they can be, I don't know why we wouldn't want to

10  have them joined.  In the briefing there was a suggestion that

11  is this Court dismisses the complaint they'd like to have leave

12  to amend to join Perpetual and we don't object to that.

13          Your Honor, there was a question you asked, why should

14  the holders be sued?  Who has the beneficial interest?  And we

15  looked at this chart, there are a couple of lines that are

16  missing from the chart and that is the lines between BNY

17  corporate trustee, I'd say there are dotted lines to LBSF and

18  to Perpetual because we as trustee are holding funds and they

19  are the two competing claimants.  There really are lines there;

20  they just haven't been put on that chart.

21          There was a question about interpleader, Your Honor.

22  Interpleader works if you have consistent decisions from both

23  courts.  If we had no risk of inconsistent decisions an

24  interpleader might work.

25          Of course this case is not the AFLAC case.  Our

1   appearance there is not an appearance for Perpetual.  And in

2   any event, whatever happens in AFLAC would not necessarily

3   resolve the risk of inconsistent judgments in this case.

4       As a final point, I was somewhat heartened to hear Mr.

5   Miller say that unless and until we have indemnification,

6   there's no real risk for us, we're not going to have to pay the

7   money out to two different parties.  If we have that assurance,

8   if they're telling us that they'll agree we don't have to pay

9   something out until we've got an order that appropriately

10  covers us from both courts, well that's a very good thing.  If

11  we know we're --

12      THE COURT:  So are you withdrawing your motion on that

13  representation?

14      MR. SCHAFFER:  Your Honor, I am not but I would invite

15  an order from this or the English court that says you will

16  never be exposed to conflicting orders, and I'll end on that

17  note.

18      THE COURT:  I can't imagine anybody ever giving you

19  that assurance.  But I think it makes some sense for me to give

20  everybody a break, we've been at this for an hour and forty

21  minutes and I'm going to take fifteen minutes to reflect on

22  what I've heard and I'll come back at about five to 12.  We're

23  adjourned till then.

24      (Recess from 11:39 a.m. until 12:02 p.m.)

25      THE COURT:  Please be seated.  This is a very

1    challenging motion to dismiss, and I've given this matter

2    considerable attention, both before the argument in reading the

3    briefing, and since the argument, following what I think was a

4    very well-presented argument on both sides.

5         One of my initial judgments, and it hasn't been

6    altered by the argument, is that the legal argument in the

7    AFLAC litigation is, in effect, a derivative for this

8    litigation.  What makes this an especially challenging matter

9    to decide as a free-standing motion to dismiss or to stay or to

10   abstain, is that BNY as a party-defendant here, is a party-

11   defendant in another litigation in which it is comfortable to

12   articulate the very same legal arguments that would otherwise

13   be articulated in this litigation.

14        As a result, this is not about BNY's saving time and

15   expense or avoiding discovery, because we're not dealing with

16   discovery or witnesses or evidence; we're dealing purely with

17   legal issues as far as I can tell.  This motion practice is

18   really about BNY's attempting to avoid being caught in the

19   middle of a conflict in which the High Court in London may

20   declare that noteholder priorities are applicable, and the

21   bankruptcy court in New York may declare that swap counterparty

22   priorities are applicable.

23        In stating what I have just stated, I am not, by any

24   stretch of the imagination, suggesting what I would decide

25   after considering the matter on the merits, but that is, in

1    effect, BNY's problem.  What's a fiduciary to do when presented

2    with conflicting legal authority, that is, by definition,

3    irreconcilable?

4         The narrow question presented, however, is whether

5    dismissal of this action is required under the strict

6    application of Rule 19 principles involving allegedly necessary

7    or allegedly indispensable parties.  In this case that party is

8    Perpetual.  I understand Perpetual to be a large and

9    sophisticated financial institution based in Australia with

10   billions of Australian dollars under management.  I have no

11   knowledge one way or the other as to whether Perpetual does

12   business in the United States and is subject to the

13   jurisdiction of the U.S. Courts.  But by virtue of the fact

14   that they're not here and no effort has been made by either

15   LBSF or BNY to join Perpetual, I'm going to assume for purposes

16   of what I'm about to say that Perpetual either could not be

17   joined, or if joined, that there would be some kind of

18   jurisdictional argument made by Perpetual in which Perpetual

19   would seek to extricate itself from the litigation and argue

20   that there are insufficient contacts to permit the exercise of

21   jurisdiction over them.

22        I further assume that what's going on here involves

23   some measure of game theory on both sides of the Atlantic.  I

24   assume that Perpetual has brought the litigation that it has

25   brought in the High Court because it perceives tactical

1    advantages and substantive advantages in having its claims

2    against BNY heard there.  I further assume that LBSF has made

3    the judgment that this bankruptcy court is probably the best

4    forum in which to litigate issues that relate to the proper

5    interpretation of certain provisions of the United States

6    Bankruptcy Code, and that it makes sense for that litigation to

7    be pursued, regardless of whether Perpetual is a party or can

8    be named as a party.

9          This gets us to the crux of the matter.  To what

10   extent is BNY a fair representative of Perpetual for purposes

11   of adjudicating this dispute?  BNY is, after all, a corporate

12   trustee.  I made some reference to the highlighted quote from

13   the FDIC v. Bank of New York case from the district court in

14   the District of Columbia.  And the highlighted portion, which

15   appears to be black-letter law, it's just a question of how

16   it's to be applied, states that, "It is well settled that

17   adjudicating an absent person's claim cannot 'impair or impede

18   the person's ability to protect his interest' if he is

19   adequately represented by one of the existing parties."

20         BNY asserts that it cannot be such an existing party

21   that can adequately represent the interests of Perpetual in

22   this litigation, because they're actually adverse in litigation

23   in the High Court, and that antagonism represents an effective

24   bar to BNY's standing here in a representative capacity.  I'm

25   not convinced of that.  I believe that the litigation in the

1    High Court -- and I have only a limited understanding of that

2    litigation, and so I comment on it at my peril -- is

3    fundamentally not about the issues that are presented to me in

4    this litigation.

5         In a sense, both litigations touch on BNY's duties as

6    a fiduciary.  And their rights and entitlements to indemnity

7    are certainly center stage in the U.K. litigation.  But this is

8    really forum selection that goes to the heart of substantive

9    rights.  The substantive issues are not before me at the

10   moment.  But at some point, I will be asked to consider whether

11   noteholder priorities, as those terms are defined in the

12   documents, or swap counterparty priorities, are applicable in

13   light of bankruptcy provisions.

14        I'm sensitive to the issues of comity and cooperation

15   and coordination that have been discussed throughout the

16   argument.  But I also recognize that the only rational outcome

17   here that makes good sense in a cross-border setting, is for

18   the United States Bankruptcy Court to be the principal if not

19   exclusive decider of issues relating to U.S. bankruptcy law.

20   And similarly, it makes sense for the High Court in London to

21   be the principal if not exclusive decider of issues of English

22   law.  I think it's very difficult for rational and fair-minded

23   people to disagree with that proposition.

24        The question becomes whether BNY, feeling some self-

25   described insecurity with respect to its own status, is, at

1       this juncture, a person that can fairly represent the interests

2       of Perpetual in this litigation?  And I answer that, yes, it

3       is.  It is, in part, because it will be doing exactly that if

4       it simply sits on its hands in this litigation and actively

5       prosecutes its position in the AFLAC case.

6               As noted during argument, Mr. Schaffer, on behalf of

7       his client, acknowledged this point.  It's inconceivable that

8       BNY will be taking a position in the AFLAC case that isn't

9       exactly congruent with the position that it would be taking

10      here, in the Perpetual case.  Presumably, and I don't know what

11      it will be saying in substance, BNY will be rooting for its

12      beneficiary, AFLAC, that I gather will be arguing in favor of

13      noteholder priority.

14              While the facts may be subtly different, the legal

15      issues are exactly the same, as I'm understanding the situation

16      presented here.  And so, if BNY does nothing other than

17      ardently present the legal argument that it will be advancing

18      in the AFLAC case, it will coincidentally also be ardently

19      advocating the very same points in the Perpetual case.

20      Accordingly, it seems to me clear that BNY will at least

21      indirectly be adequately representing the interests of

22      Perpetual.

23              What we end up with, as a result, is a fairly subtle

24      issue that seems to be more about the interests of the

25      corporate trustee than it is about strict application of

1    pleading principles. BNY has quite appropriately sought to

2    extricate itself from a difficult situation here so as not to

3    be at the wrong end of conflicting directions from two courts.

4    I believe that coordination is the most appropriate answer to

5    this problem. Both counsel for BNY and counsel for LBSF have

6    spoken to the issue of coordination during argument today.

7    It's not clear to me that they are on exactly the same page as

8    it relates to the nature of this coordination. Mr. Miller has

9    been very precise in talking about scheduling coordination;

10   whereas Mr. Schaffer has been broader in his approach, and has

11   acknowledged the wisdom of a more comprehensive form of

12   allocation of responsibility. I'm not sure if that's something

13   that he actually believes or if he was simply agreeing with

14   something that I had said. But either way, that's the message

15   that I took from him.

16        Accordingly, I have some uncertainty as I make these

17   comments from the bench as to whether the parties are in a

18   position to stipulate as to the nature of the coordination that

19   should take place here. But I did hear Mr. Miller volunteer to

20   be the drafter of a letter that presumably would be shared with

21   counsel for BNY, and that presumably I might send, with

22   everybody's consent, to my counterparty in London, to initiate

23   court-to-court communication, and at least to get into the

24   question of scheduling as an initial matter.

25        Whether the coordination is simply scheduling

1    coordination or broader coordination that deals with abstention

2    and deferring to other courts for purposes of avoiding

3    conflicting adjudications, I believe that some level of

4    coordination is mandated here.  And my reading of the High

5    Court's decision is more consistent with LBSF's reading than it

6    is BNY's reading.  I do not know what the Chancellor was

7    meaning to say, nor do I interpret his words.  I do know what I

8    understood them to be telling me.  He was giving me space and

9    time.  Space and time to do what, is what's in dispute.

10        I believe that the decision does not represent an

11   express deferral in favor of the U.S. Bankruptcy Court as it

12   relates to U.S. bankruptcy law issues.  But I do believe that

13   the decision can be understood to be allowing time for the U.S.

14   Bankruptcy Court to hear, consider and determine issues that

15   are unique to U.S. bankruptcy practice.

16        Given that, and given what I believe to be BNY's real

17   purpose here, which is to avoid being torn apart by conflicting

18   decisions, the best means to achieve that is through

19   coordination.  That doesn't mean that that will be the outcome.

20   That just means that it's a means to avoid bad adverse result,

21   without guarantees that it will be avoided.

22        I believe, as a matter of law, that Perpetual is not

23   an indispensable party.  Perpetual may or may not be a

24   necessary party, but I don't need to decide that question.

25   Without doubt, Perpetual is a directly interested and affected

1    party, and a sophisticated one, at that.  Perpetual has the

2    capacity, should it elect to do so, to closely monitor and

3    participate in this litigation.  For tactical reasons, I

4    assume, it has decided to stay away, which is its right.

5         BNY, however, doesn't have a choice to stay away.  BNY

6    is here as trustee, entitled to indemnification as a matter of

7    English law.  The form of such indemnification being, at this

8    point, not yet finally determined.  It is exposed to only a

9    theoretical risk at this juncture.

10        The motion to dismiss the litigation is denied for the

11   reasons I have stated.  But I also believe that in order to

12   achieve coordination and consistency here, in this Court, that

13   the scheduling of matters in the Perpetual litigation should be

14   coordinated fully with the scheduling of matters in the AFLAC

15   separate litigation.  That way BNY in particular will be able,

16   to some extent, to finesse its position.  It will be able to

17   make arguments at the same time with the benefit of full

18   indemnity in the AFLAC case that I assume will be the very same

19   arguments that it would make in the Perpetual case.

20        Furthermore, that kind of coordination will be of

21   benefit of the Court by giving the Court the opportunity to

22   hear at one time from sophisticated lawyers, issues that I'm

23   told are of first impression and that should be as fully and

24   effectively briefed as possible.

25        That's the Court's ruling.  To the extent that anyone

1    wishes to seek judicial review of that ruling, which has been

2    made, as you can observe, extemporaneously, I would like the

3    opportunity to prepare a memorandum decision.  But otherwise,

4    this bench ruling will suffice.

5         What's the next matter?

6         MR. MILLER:  Your Honor, we do have a form of order

7    and a disk for editing purposes, if you'd like to have it.  Or

8    the Court may simply let the transcript cover this.  I don't

9    know what the Court would like to have.  I can present it to

10   you.

11        THE COURT:  Well, we'll probably modify it to make

12   clear that the order is incorporating by reference the bench

13   comments made within the last twenty minutes.

14        MR. MILLER:  Continuing, Ralph Miller for LBSF.  I

15   believe the next matter on the agenda, Your Honor, is based on

16   a letter that we sent the Court asking for a conference in case

17   number 8-13555.  Is that the matter the Court wants to consider

18   now?  That's the Lehman Brothers Special Financing v. American

19   Family Life Assurance Company of Columbus and BNY Corporate

20   Trustee Services case.

21        THE COURT:  Let's to there.

22        MR. MILLER:  All right, Your Honor.  I think, first of

23   all, it is important to distinguish between cases that have

24   some commercial imperatives and cases where we are dealing with

25   administration and judicial efficiency and other issues.

1    So far as we know, there is no commercial imperative.

2  I might contrast that with the Libra case, for example, where

3  we have an expiring option and market conditions have changed

4  and there's some considerable doubt as to whether that is a

5  melting snowball of some sort.  In this case, the funds in both

6  the AFLAC case and the present case that we were just

7  discussing, which we called the Saphir or Mahogany case, are

8  held by trustees, in this case BNY.  This is also true of other

9  cases where this issue might ultimately come up.  And these are

10  sophisticated parties on the other side.  We're not talking

11  about individuals who are not getting money.  That money's

12  invested at interest.  So I want to start out by stressing that

13  there is no great urgency as between one month and the next

14  month in terms of when this has to be resolved.

15    There is a summary judgment that has been filed in the

16  Saphir Mahogany case some time ago, but we assured the Court at

17  that time, and we've assured BNY, that we want to give them

18  adequate time to respond to that, now that this motion to

19  dismiss has been ruled.  We're not trying to squeeze them.

20  More importantly, we understand the Court has many issues that

21  it is considering, and we're not trying to squeeze the Court

22  with briefing on things that are unnecessary in terms of not

23  enough time, particularly between the reply brief and the

24  hearing dates.

25    For those reasons, we have proposed a schedule.

1   Summary judgment has been filed, as you know, by AFLAC.  And

2   LBSF would like, with leave of Court, to file a cross summary

3   judgment.  And we proposed to do that by August the 21st --

4   this is in my letter -- with responses due by September the

5   11th, and replies due October the 2nd, and hearing the week of

6   October 12th or thereafter.  We also have, by the way, a

7   corresponding suggestion on how the Saphir schedule could be

8   coordinated with that, which is not in my letter; but just to

9   note that it would be possible for BNY, if it wished to file a

10  motion for summary judgment, which it may not, to file by

11  August 21st.  Responses could be simultaneously done September

12  the 18th, a little later, to give more time; October 9th

13  replies, and then a hearing thereafter, as the Court might see

14  fit.  We don't know whether BNY would want to file a cross

15  motion for summary judgment in the Saphir Montgomery (sic)

16  case, or not, but we certainly believe that's appropriate, if

17  it chooses to do that.

18          And -- something I want to clarify.  The Perpetual

19  case is the same as the Saphir case.  I mean, the Saphir

20  Mahogany case is what we call the Perpetual case.  Just to make

21  sure the record is clear.  Perpetual, of course, is not a

22  party, so we used the names of those entities that are parties.

23          Now, there is, and you will shortly hear from, I

24  believe, Mr. Weber here on behalf of AFLAC.  And they are

25  suggesting that there is some need to get all this done by

1    September the 17th, which is a date where some matters are set

2    in the Ballyrock case.  We don't believe that's necessary, Your

3    Honor.  We don't think the issues are the same, and I'll

4    explain why briefly.

5            The Ballyrock setting is on a motion to dismiss, it's

6    not a summary judgment.  There's nothing, in our view, that can

7    happen on September the 17th that's going to implicate any

8    determinative outcome in these cases.  Obviously, if the Court

9    should grant the motion the dismiss and find -- first of all,

10   there are issues ahead of the issue of ipso facto and Safe

11   Harbors which have to be resolved issues wrongful termination,

12   other issues that may well cause that issue never to be

13   reached.  If it were reached, the only possibility that it

14   could have any impact here, would be if the Court decided not

15   to dismiss the pleading.

16           Well, these pleadings already have not been dismissed.

17   There has not been dismissal practice.  So that just puts them

18   on the same footing.  We don't think that would have any

19   implication.  It's not the same standard.

20           So we don't believe there is any need to try to rush

21   toward something basically a month from now on September the

22   17th.  And I think that's the primary issue of dispute.  There

23   have been some discussions about whether the Court might be

24   willing to put off that September 17th hearing.  I think there

25   may be counsel here for Barclays and some of the parties in the

1   Ballyrock case, and they can speak for themselves.  My

2   understanding is those parties don't want to put off that

3   hearing.  So we're not suggesting a change in that hearing.

4        THE COURT:  The hearing was already put off at my

5   request because of some congestion in my own trial calendar.

6   So that was already an adjourn date.  So I can appreciate

7   parties saying let's get on with it.

8        MR. MILLER:  Well, so we're not suggesting that, Your

9   Honor.  But our suggestion is that those are not linked

10  matters.  We believe that if the Court adopted a schedule along

11  the lines that we have suggested, there would be ample time for

12  briefing; there would be ample time for the Court to consider

13  the replies; and you would have the briefing before you, and we

14  think that that would be logical.  We also believe it is

15  consistent with the general schedule that the High Court has

16  set.  The coordination letter could then set out what the date

17  of this hearing was and the Court would know -- obviously date

18  of decision would not be clear from that, but it would at least

19  know that that matter was moving forward, and it would be

20  submitted to the Court in an orderly fashion and in a

21  coordinated fashion.

22       And that is our proposal, Your Honor, for scheduling.

23  I believe other parties have other views, and we want to let

24  them --

25       THE COURT:  Fine.

1          MR. MILLER:  -- discuss it.

2          THE COURT:  Let's hear what others have to say.

3          MR. WEBER:  Your Honor, Rob Weber from Skadden Arps,

4    again for AFLAC.  Your Honor, let me start with an apology.  If

5    we surprised or offended the Court or our adversaries by our

6    filing before formal leave to file for summary judgment had

7    been granted, we didn't intend to do so, and that's not the way

8    we wanted to start off.  So I wanted --

9          THE COURT:  I understand.

10         MR. WEBER:  -- to clear air on that.

11         THE COURT:  You jumped the gun, but it's okay.

12         MR. WEBER:  It does seem to have refined the

13   scheduling discussion a bit.  So now that we're on that, where

14   to start?  AFLAC is not involved in the Perpetual proceeding.

15         THE COURT:  I understand that.

16         MR. WEBER:  The common legal issues are of dire

17   concern to us, and we have been, since this case began,

18   speaking loudly and to anyone who would listen, that a

19   coordinated, comprehensive approach to all of the adversaries

20   with the common legal issues, needs to be developed.  And

21   unfortunately, it hasn't happened yet.

22         The reason that we are pressing for the September 17th

23   hearing date as the date in our proceeding, Your Honor, is that

24   because we do believe the Court could reach one of the common

25   legal issues.  It may not happen in the chain of possibilities

1  until near the end, but the debtors have raised their arguments

2  regarding 541(c) and 365(e), and to some extent the Safe

3  Harbors.  Ballyrock does not think the Safe Harbors are

4  involved, because they terminated pre-petition and didn't rely

5  on the Safe Harbors.  But there is a chance that the Court

6  could reach the common legal issues on September 17th.

7        Now, it's not a lot of time, but I will say this.

8  When we were here a month ago, Mr. Miller told you that his

9  summary judgment brief in the AFLAC case would look just like

10  the one he had already filed in the Perpetual case.  He's

11  already briefed those issues.  I'm not sure of the extent to

12  which additional work will be required, our brief is pretty

13  good, but they'll have to respond.

14        To clarify one point on the way the issues are being

15  characterized.  It's not just an issue of noteholder priority

16  versus swap counterparty priority.  One doesn't even reach the

17  noteholder priority issue, as we've set out in our summary

18  judgment papers, Your Honor.  There's a termination provision.

19  And if the swaps are terminated because of an LBSF default,

20  they get no termination payment, period.  And it doesn't matter

21  whether that termination is based upon an ipso facto provision,

22  which the Safe Harbors would insulate, or some other form of

23  default which the contracts also contemplate.  So that is a

24  threshold issue.

25        There are a number of proceedings that are already

1    filed where these common legal issues appear in some form or

2    another.  And because of the different facts, it may well be

3    like in our case, that a termination occurred post-petition,

4    but the collateral has been tied up and is still sitting there.

5    It may well be, as in the Ballyrock case, that the termination

6    occurred and the collateral was mostly disbursed, and the

7    fight's happening after the fact, trying to reel it in or do

8    something else.

9         But the common legal issues are looming, they're

10   large, and from what I understand, there's 10 to 12 billion

11   dollars more of transactions waiting to be decided based on the

12   results of these common issues.  Who knows?  They may end up in

13   adversaries before Your Honor.

14        So we don't think, as a threshold matter, that the

15   September 17th date is going to be as difficult to meet as

16   perhaps others do.  We are happy to meet whatever briefing

17   schedule the Court would like, working backwards from that

18   date, or alternatively, the mechanism that Mr. Miller alluded

19   to, we had discussed briefly with the Ballyrock parties.  To

20   the extent the Court wants to rule on anything other than the

21   common issues in the Ballyrock case, go forward on the 17th.

22   But if the Court were to reach the common issues, we had

23   suggested that we ask jointly the Court to defer ruling until

24   it could hear in the AFLAC matter.  Ballyrock was not agreeable

25   to that, and I understand their position.

1          So, does the Court have any questions?

2          THE COURT:  Not at this moment.  Is there anyone else

3   who wishes to speak to scheduling?

4          MR. WEBER:  Thank you, Your Honor.

5          MR. COHEN:  Good afternoon, Your Honor.  David Cohen

6   with Milbank Tweed Hadley & McCloy here on behalf of the

7   committee.

8          We agree with the Court's direction on the last

9   motion, that the Perpetual and AFLAC matters should be closely

10  coordinated.  We agree with the Court that those cases should

11  be heard together on the same day.  We also agree that the

12  schedule put forward by Mr. Miller with respect to scheduling

13  summary judgment is an appropriate schedule.  It gives the

14  parties time to work through these novel issues.  It gives the

15  Court time to digest these issues.

16         While there may be certain overlap on some factual

17  issues in the Ballyrock case or the Harrier's RACERS case,

18  which are being heard on the 17th, we don't think every

19  adversary or every motion that touches upon these issues needs

20  to be scheduled on the same day.  So we would support a hearing

21  in the Perpetual and the AFLAC matters during the week of

22  October 12th, with the schedule set forth by the debtors.

23         THE COURT:  Anyone else wishes to be heard on this?

24  Mr. Schaffer?

25         MR. SCHAFFER:  Your Honor, Eric Schaffer, BNY

1    Corporate Trustee Services.  I have no problem with anything

2    Mr. Weber has said with regard to AFLAC.  I am troubled by the

3    proposed schedule with regard to Perpetual, where the Court

4    understands, we haven't been focused on the merits in any way.

5    We've been focused on some very different issues.  And the idea

6    that we would now have ten days to file a summary judgment

7    motion and memorandum, when we haven't even filed an answer, is

8    certainly troubling.

9          It seems to be inconsistent with giving this Court an

10    opportunity to get things organized, perhaps, with the English

11    Court.  And we may want to join Perpetual, we may want to do a

12    lot of things.  I haven't spoken to my client.  But I do know

13    that hearkening back to when LBSF first came before you with

14    its summary judgment motion on June 3rd, I remember alluding to

15    the argument right before us, and saying we shouldn't be jammed

16    on this.  And you assured that we would have adequate time

17    to --

18          THE COURT:  I remember telling you that you were not

19    going to be jammed.

20          MR. SCHAFFER:  Yes.  And, Your Honor, I think ten days

21    is inappropriate in the context of how the Perpetual case is

22    unfolding.  I don't want to in any way take away from what Mr.

23    Weber has said, but that schedule does not work for us in the

24    context of the Perpetual case.

25          THE COURT:  Okay.  Someone else wishes to be heard.  I

1    see another lawyer coming forward.

2         MS. SHANE:  Thank you, Your Honor.  Penny Shane from

3    Sullivan & Cromwell on behalf of Barclays.  I just wanted to

4    confirm that Barclays does, in the Ballyrock matter, oppose

5    very much any further delay, precisely for the reason Your

6    Honor first articulated.  There has been some delay already.

7    We certainly don't want to jam anybody, least of all the Court,

8    but agree with the position that's been stated, that there's

9    very little reason to expect that any overlapping issue would

10   implicate anybody else's rights.  We don't think it's likely

11   the Court will get to those issues.

12        And in that unlikely event that the Court thought on

13   September 17th that an arguably overlapping issue might play a

14   role in the decision, we would ask that the Court consider then

15   what should flow from that in the way of postponing a decision,

16   if that were the way the Court was going.  But we think it's so

17   unlikely, that it would be best addressed at that time.

18        THE COURT:  Okay.

19        MS. SHANE:  Thank you, Your Honor.

20        THE COURT:  Let me just explain my schedule.  I'm the

21   one who's jammed.  And I'm not in a position to hear the AFLAC

22   matter on the 17th of September.  And I also recognize from

23   what has been stated by certain parties that it would be

24   potentially burdensome, especially in the Perpetual case, for

25   BNY to be forced to a definitive argument on a summary judgment

1    as early as that.

2         I don't hear much objection to the schedule proposed

3    by Mr. Miller, although it seems to me that that's a schedule

4    that should be consensual to the greatest extent possible.  And

5    so I think it makes some sense, during the lunch break, and

6    we're going to take one before we get to the matter in the LBI

7    case, for those parties who are in court and who are interested

8    in scheduling, to meet and confer about the dates that have

9    been proposed.  And to the extent that there is agreement,

10   fine.  To the extent that there needs to be adjustment, fine.

11   And you can then give me a status report at 2 o'clock on your

12   efforts to reach an agreement on scheduling.

13        I do think it make sense for there to be coordination

14   between the briefing schedule applicable to the Perpetual case

15   and the briefing schedule applicable to the AFLAC case.  If

16   there isn't coordination as to briefing, there should at least

17   be coordination as to the timing of the hearing on those

18   dispositive motions.

19        I will note that the week of the 19th of October is

20   the annual conference of NCBJ, and I will be out for most of

21   that week.  So we can't have oral argument that week.  I will

22   also note, and I'm just saying this for purposes of fair notice

23   to everyone, that I have an unusually crowded docket at the

24   moment with demands for hearing dates that are sometimes

25   driven, not by the consent of the parties, but by the purported

1   demands of transactions within particular cases.  For that

2   reason, even though I know that parties to the Ballyrock

3   litigation have already been adjourned once, not at their

4   urging, but at rather the Court's direction, it is conceivable,

5   that even if everybody agrees to a date, that there may be a

6   need to push dates around, just to accommodate and juggle my

7   calendar.

8         I'm going to try to do that minimally, and I'm going

9   to try to respect the dates that you select.  But I'm only one

10   person, and there are many of you.  Let's take a lunch break,

11   and hopefully you'll work out a schedule.  And I'll hear that

12   at 2 o'clock.  We're adjourned.

13       (Recess from 12:46 p.m. until 2:04 p.m.)

14       THE COURT:  Please be seated.  And I want to talk

15   about the scheduling of a conference as well as talking about

16   the schedule for the adversary proceedings that we were

17   discussing before the lunch break.  First of all, has there

18   been some agreement reached on dates, or is there still a

19   disagreement?

20       MR. MILLER:  Your Honor, Ralph Miller.  There is great

21   progress.  I'm not certain whether there's agreement or not,

22   but I'll report what we have learned and see if anybody wishes

23   to speak to the issue.

24       Mr. Schaffer has indicated that if BNY is going to

25   file a cross motion for summary judgment, which he thinks he

1    probably will, but I understand he's not spoken to his clients

2    yet, that he would need until the end of September for that.

3    So if we work off of that schedule, it would look like -- and

4    we did discuss these dates, but I'm then going to give the

5    qualifier on what the problems with that might be -- that would

6    give LBSF filing a summary judgment in AFLAC and BNY filing a

7    summary judgment in the Saphir/Perpetual/Mahogany case, on

8    Friday, September the 25th.  Four weeks later, for joint

9    responses in all cases would be Friday, October 23rd.  Then

10   giving ourselves two weeks and a weekend for replies, would be

11   November the 9th.  And then giving the Court more than a week

12   before the week of the hearing, and we understand there's

13   nothing -- we don't know of anything that's scheduled that week

14   of the 9th, would mean that it could be scheduled the week of

15   the 16th and be heard before Thanksgiving, if the Court had

16   time before Thanksgiving.  If not it could be heard afterward.

17             And that is a schedule that's certainly acceptable to

18   LBSF.  It would obviously need to go through the coordination

19   process.  Our understanding is that there probably -- Mr. Weber

20   may wish to speak about how he -- or not.  And I don't know if

21   Mr. Schaffer wants to speak.  But those are the dates that were

22   discussed with the group.  And at least, they were the

23   proposals of Mr. Schaffer, and they're acceptable to the

24   debtor, LBSF.

25             THE COURT:  Okay.  We're partway there.

1      MR. SCHAFFER:  Your Honor, Eric Schaffer for BNY

2   Corporate Trustee Services.  Mr. Miller is accurate in reciting

3   the dates we discussed.  At this point, you'll understand that

4   I can't commit to what, if anything, we might do with regard to

5   Perpetual.  But certainly with regard to the AFLAC case,

6   there's no objection.  Perpetual's a bit of a moving target.

7   And it may very well be that we'll be here in that respect as

8   well.

9      One thing that I mentioned to Mr. Miller and others is

10  that we're dealing with a bit of a moving target based on what

11  has happened in England.  Right now we have a judgment of the

12  High Court that would have noteholder priority effective prior

13  to the filing of LBSF.  That is very significant for purposes

14  of whether there could be an ipso facto issue at all.

15  Obviously, if that decision would be reversed on appeal, it

16  would have us writing a very different brief.

17     Mr. Miller's response was, well you can write in the

18  alternative.  And I think he's right.  But I simply wanted to

19  note that.  And depending upon what applicable English law is,

20  we might have very different arguments.

21     A last point, Your Honor.  I mentioned, I have not

22  been able to reach my client.  It is possible we would be

23  seeking leave to appeal, and I don't want to leave court today

24  without noting that that's a possibility.

25     THE COURT:  I considered everything possible.

1       MR. SCHAFFER: Thank you.

2       MR. WEBER: Good afternoon, Your Honor. Rob Weber,

3 from Skadden on behalf of AFLAC. Without bellyaching too much,

4 we can live with the schedule. But I do want to note a

5 concern. Because of the uncertainty in the Perpetual matter

6 with what happens in England, I am a little bit concerned about

7 coupling the two proceedings. AFLAC has no involvement in the

8 proceeding in England nor in the Perpetual case here. There

9 are common issues of bankruptcy law in the case here.

10       But to the extent that the scheduling or the timing in

11 the London proceeding or in the Perpetual proceeding gets held

12 up because there are appeals, etcetera, we still think we

13 should be moving ahead in the AFLAC matter.

14       THE COURT: I understand that. Here's what I think

15 makes sense. I think that since you started out by saying

16 you're not bellyaching too much, we should assume that you can

17 at least come up with a provisional schedule that assumes the

18 ability to manage the cases in tandem. If it turns out that

19 there is a development that makes it unworkable or unfair from

20 the perspective of your client to maintain that schedule, or

21 that there are delays associated with the Perpetual matter, we

22 can make adjustments at that time, or at least we can consider

23 making adjustments.

24       MR. WEBER: Understood, Your Honor. Thank you.

25       THE COURT: Okay.

1    MR. WEBER:  One follow-up point.  And I haven't

2    discussed this yet with Mr. Miller, so I hope I don't surprise

3    him too much.  We're not fighting about the entire pot of cash.

4    There's no dispute that the amounts over and above what the

5    debtors claim in this pot of cash comes back to AFLAC.  And

6    given the relaxed -- slightly more relaxed schedule that we're

7    now talking about, I would hope that we could work with the

8    debtors over the intervening weeks to come up with a mechanism

9    to release those excess funds back to AFLAC.

10    THE COURT:  It sounds like it's at least a fruitful

11    topic for discussion and perhaps could lead to a stipulation.

12    But I can't mandate that.

13    MR. WEBER:  Thank you, Your Honor.

14    THE COURT:  Are we done, then, with scheduling, for

15    the time being?  I suggest that some kind of prehearing

16    scheduling order be prepared and submitted.

17    MR. MILLER:  Your Honor, Ralph Miller again.  If it's

18    acceptable with the Court and the parties, we'll then put

19    together an order and circulate it for comments and try to

20    present it to the Court.

21    THE COURT:  That sounds fine.  If the parties wish to

22    be excused, who are involved in the Perpetual and the AFLAC

23    proceedings, that's fine.  They can leave now.  But I did want

24    to also talk about the chambers conference that had been

25    requested.  I think it slipped off my calendar.  And I see Mr.

1    Gruenberger here.  I would be inclined to have that conference

2    at your convenience, which may mean taking a break so that we

3    can have that conference, and then we can go to the LBI

4    adversary proceeding.  But I don't want people to be

5    inconvenienced.

6         MR. GRUENBERGER:  Your Honor, Peter Gruenberger, Weil

7    Gotshal & Manges, for the debtors.  I don't think we'll be more

8    than fifteen minutes, Your Honor.  And whenever Your Honor

9    believes best for Your Honor's schedule, we'll do it whenever

10   you'd like.

11        THE COURT:  Let me just ask LBI's counsel and counsel

12   for the landlord in San Francisco for an estimate of time on

13   the argument relating to the motion to dismiss.

14        MR. LUBELL:  I think it will be reasonably brief,

15   under half an hour.

16        THE COURT:  Total?

17        MR. LUBELL:  I think my opening will be ten minutes.

18        THE COURT:  You think under a half hour total?

19        MR. LUBELL:  Yes.

20        MS. GOLDSTEIN:  I think that sounds fair, but in my

21   experience, lawyers tend to underestimate how much time they'll

22   be speaking.

23        THE COURT:  That's true in my experience as well.

24        MS. GOLDSTEIN:  Myself included.  But I think it will

25   be relatively brief.

1        THE COURT:  You know what I think makes sense, if it's

2    all right with you?  Let's take a break until 2:30 to take care

3    of the chambers conference.  And then we can release LBHI's

4    counsel and simply proceed with the LBI matter.

5        MR. MILLER:  Thank you, Your Honor.

6        THE COURT:  And I'm going to suggest that we, if it's

7    available, use the large conference room down the hall, 608.

8    Okay.  We're adjourned.

9        (Recess from 2:12 p.m. until 2:36 p.m.)

10        THE COURT:  Be seated.  Let's proceed.

11        MR. LUBELL:  Good afternoon, Your Honor.  Dan Lubell

12    from Hughes Hubbard & Reed for James W. Giddens, trustee of

13    Lehman Brothers Inc.

14        We're here today on the trustee's motion to dismiss

15    the complaint of HWA 555 Owners, LLC, the landlord of the San

16    Francisco premises previously occupied by LBI.  HWA's complaint

17    seeks a declaration that LBI assume the lease of the San

18    Francisco property in connection with the purchase agreement

19    among Lehman Brothers Holdings Inc., Lehman Brothers Inc., LB

20    745 LLC and Barclays Capital Inc.

21        The trustee submits that, based upon the well-pleaded

22    allegations of the complaint and the record of this proceeding

23    as to which this Court may take judicial notice, that the

24    complaint should be dismissed because it fails to state a claim

25    upon which relief may be granted for at least three reasons.

1    First and foremost, there was neither a motion by the trustee

2    nor an order of the Court approving a standalone assumption of

3    the lease by the LBI estate, as is required by Section 365 of

4    the Bankruptcy Code.  And when I'm talking about a standalone

5    assumption, I assume Your Honor understands I mean an

6    assumption by the estate itself under Section 365(b) as opposed

7    to the less risky assumption and assignment under 365(f), which

8    your sale order did address.

9          Second, HWA lacks rights to enforce the provisions of

10    the clarification letter upon which it relies for a standalone

11    assumption as section 13.9 of the purchase agreement

12    specifically disclaims third-party beneficiary rights and

13    allows under section 13.5 the parties themselves to amend the

14    provisions of their agreement, which the parties did in this

15    case under a waiver agreement filed with this Court.

16          And finally, even if HWA has standing to enforce the

17    clarification letter to compel the trustee to assume the San

18    Francisco lease, as HWA waited until the day the lease was

19    deemed rejected by Section 365(d)(4) to bring its complaint,

20    its time to do so has past.

21          As to the first reason, Section 365(a) of the

22    Bankruptcy Code requires a motion by the trustee and court

23    approval.  It provides, quote, "The trustee, subject to the

24    court's approval, may assume or reject any executory contract

25    or unexpired lease of the debtor," unquote.  Section 365(b)(1)

1    is specific that the trustee, quote, "may not assume", unquote,

2    a lease unless the trustee cures any defaults under the lease

3    and provides adequate assurances of future performance under

4    the lease.

5        Moreover, it's well-established law in this

6    jurisdiction under the Second Circuit's Burger Boys decision,

7    93 (sic) F.3d 755, that the trustee's intention to assume or

8    reject an unexpired lease must be made by formal motion filed

9    pursuant to Bankruptcy Rules 6006, 9014 and 9013.

10        The complaint here fails to state a claim because it

11    fails to allege any motion by the trustee seeking a standalone

12    assumption of the lease by the LBI estate.  No notice was

13    provided to creditors, the parties-in-interest of a standalone

14    assumption; no cure amounts were offered by the trustee; no

15    adequate assurances were offered by the trustee.  Indeed, as we

16    demonstrated in our paper, the clarification letter upon which

17    HWA relies for finding an assumption did not even exist at the

18    time the trustee made his application to approve the purchase

19    agreement nor at the time the application was granted by this

20    Court.

21        And for your reference to the record, the trustee's

22    application is docket number 2 in the LBI case; it was dated

23    9/19, September 19th.  The order approving that application,

24    docket number 3, was dated September 20th.  And the

25    clarification letter was not entered into or filed with this

1    Court until September 22nd; it's LBI docket number 280.

2        Accordingly, Your Honor, without any notice, motion or

3    intention of the trustee to assume the lease for LBI's own

4    estate at the time of the sale order, the requisite elements

5    for a lease assumption cannot be found.  We believe, Your

6    Honor, a sale order bears that out.  While it has specific

7    provisions dealing with assumption and assignment of leases to

8    Barclays, it has no provisions regarding any standalone

9    assumptions of any contracts, including the lease.

10   Furthermore, it has specific instructions as to contracts that

11   weren't being dealt with immediately by the sale order, which

12   required the parties to come back by separate motion at a later

13   time.

14        We believe that, consistent with the Second Circuit

15   and your own instructions in the sale order, Your Honor would

16   have required a separate motion at a later time with respect to

17   the assumption of the San Francisco lease.

18        I'm fairly confident that by approving the purchase

19   agreement in general, Your Honor was not, by the terms of the

20   sale order itself, purporting to approve any leases that it had

21   not examined.  And, indeed, I've sat in this court enough time

22   to know that Your Honor does not like surprises, but in HWA's

23   view of the world you may be surprised to learn that you

24   purportedly approved an assumption of a lease that had never

25   been submitted to this Court and that you had not actually

1    considered according to the dictates of the Second Circuit

2    Orion Picture case.

3          THE COURT:  Let me ask a question about the lease

4    itself.  Did Barclays use the space?  And if so, for how long

5    and pursuant to what agreements?

6          MR. LUBELL:  Barclays did use the space.  It was

7    operating under LBI's right to use the space.  It used it

8    until -- under that, until the lease was deemed rejected in

9    April.  I believe it has -- it's occupying the space still

10   under an agreement with HWA.  And it's only a portion of the

11   space.  I believe the other part of the space was used by an

12   LBHI entity until April when the lease was deemed rejected.

13         THE COURT:  And how much of the space is being

14   occupied?

15         MR. LUBELL:  Roughly half.

16         THE COURT:  And it's being occupied presently pursuant

17   to a direct agreement between HWA 555 or its agent as landlord

18   and Barclays as tenant, or is it being operated under some

19   other agreement that includes a sublease?

20         MR. LUBELL:  I believe it's a direct relationship.

21   There is no sublease agreement.

22         THE COURT:  Okay.

23         MR. LUBELL:  I think that HWA just doesn't want to own

24   up to the distinction between court approval of a contract

25   among contracting parties and a lease assumption order.  The

1    lease assumption that they seek to enforce here is an agreement

2    entered into after the sale order was entered and it plainly

3    states that the trustee shall assume the lease, quote, "in

4    connection with the bankruptcy proceedings", unquote.

5    Moreover, it's an agreement that envisions modifications of the

6    provisions by the parties themselves.

7          I heard the term "moving parts" today, the purchase

8    agreement had several moving parts.  And this was done here, as

9    was documented by the waiver letter filed as part of the record

10   of the proceeding in this case in connection with the trustee's

11   motion to extend his time to assume or reject the San Francisco

12   lease.  I believe it's something you could take judicial notice

13   of as it's in fact part of the purchase agreement and part of

14   the record of the proceedings involving HWA here.

15         And, finally, the purchase agreement disclaims third-

16   party beneficiary rights by approving the purchase agreement.

17   The Court, we submit, was not ordering relief, that it had not

18   been sought, nor changing the terms of the agreement that

19   allowed the parties themselves to modify their agreement and

20   that limited enforcement to the parties themselves.

21         However, even assuming that a landlord has standing to

22   enforce the sale order so as to enforce the purchase agreement

23   as to the now-waived obligation of the trustee under the

24   clarification letter to assume the San Francisco lease with or

25   without a sublease to Barclays, its time to do so has elapsed.

1       As I'm sure Your Honor will recall, this is round two

2    of this dispute.  You had previously said to HWA at the time we

3    moved for the extension of our time to assume or reject the

4    lease that it could seek a declaratory judgment that the lease

5    had been deemed assumed.  It's noteworthy that HWA waited until

6    the lease had actually been deemed rejected under Section

7    365(d)(4) before it filed its complaint here.  So, Your Honor,

8    even if a third party may enforce the purchase agreement

9    through the sale order, HWA's time to do so has now lapsed.

10       In sum, as the trustee never sought a standalone

11    assumption of the lease; as this Court did not approve the

12    assumption of the lease by the LBI estate; as HWA does not have

13    third-party rights to enforce the purchase agreement; as

14    Barclays, the actual counterparty to the purchase agreement,

15    has waived the requirement of the trustee to assume the lease;

16    and as the time to assume the lease has expired, we believe

17    that there are multiple reasons why this complaint fails to

18    state a claim on which relief may be granted and why it must be

19    dismissed.  Thank you, Your Honor.

20       THE COURT:  Thank you.

21       MS. GOLDSTEIN:  Good afternoon, Your Honor.  Stephanie

22    Goldstein from Fried, Frank, Harris, Shriver & Jacobson, for

23    HWA Owners; it's an affiliate of Vornado, and that is in fact

24    the landlord for the space in California.

25       Just before I get to my overall presentation, I did

1    want to clarify an issue with respect to Barclays' current use

2    of the space.  In fact, the clarification letter that's dated

3    as of September 20th, and specifically referencing Your Honor's

4    sale order, specifically deals with Barclays' entitlement to

5    use the space.  As I'm sure Your Honor recalls, there's a

6    provision that deals with one assumption of a number of leases,

7    the one in San Francisco being assumed and not assumed and

8    assigned, and I'll get back to that language.  There's then a

9    second provision in the clarification letter that provides that

10   Barclays and LBI would, and the language is actually "shall",

11   enter into a sublease with respect to the premises.  And then

12   there's about another half a page dealing with Barclays' right

13   to continue to use the space, pending the parties' -- and

14   that's Barclays' and LBI's -- entry into a sublease agreement.

15          So following the entry of the sale order, Barclays

16   continued to use space at 555 California Street in California,

17   in San Francisco.  They used one of two floors in that

18   building; Neuberger Berman was in the other space on the other

19   floor.  And their right to use the floor was specified and laid

20   out in the clarification order.

21          As alleged in the complaint, there never has been a

22   sublease entered or presented to the landlord for approval.  A

23   sublease satisfactory to the landlord is a requirement of the

24   underlying lease.

25          Subsequent to the deemed rejection date in this

1    proceeding, and because Barclays wanted to continue to use the

2    space, we entered into a contingent license agreement with

3    Barclays that provided if the lease had been rejected as a

4    result of the proceedings before Your Honor, they would have a

5    separate independent right to remain in the premises separate

6    from the clarification letter.  That wasn't part of the

7    complaint, but it's come up.  We're happy to present you with

8    that underlying license agreement if you find it necessary.

9             THE COURT:  Let me just understand one aspect of what

10   you last said.  The license agreement is between HWA 555, your

11   client, and Barclays?

12            MS. GOLDSTEIN:  That's correct, Your Honor.

13            THE COURT:  And when was it entered into?

14            MS. GOLDSTEIN:  On April 17th.

15            THE COURT:  And the deemed rejection date of the lease

16   is what date?

17            MS. GOLDSTEIN:  I believe it's April 9th.

18            MR. PFEIFFER:  April 17th, Your Honor.

19            MS. GOLDSTEIN:  April 17th, sorry.

20            THE COURT:  So on the very same day that the lease is

21   deemed rejected, two nondebtors enter into an agreement

22   relating to the occupancy of the space, and that's in lieu of

23   the lease, is that right?

24            MS. GOLDSTEIN:  It's contingent.  So if in fact as a

25   result of the proceedings the lease had been assumed by the

1    estate and there would be a separate sublease, that would be an

2    alternative.  But I think the concern was whether or not

3    Barclays had a right to continue to use the space, which they

4    needed to continue to do, and the landlord was happy to comply

5    with their request to continue to use the space, provided that

6    their right to use the space was not intended to be an argument

7    about whether or not -- the effect of the sale order as it

8    related to the lease in its totality.

9         THE COURT:  All right, and what's the term of the

10   sublease -- excuse me, of the sublease -- of the license?

11        MR. PFEIFFER:  Brian Pfeiffer from Fried Frank, Your

12   Honor.  It expires at the end of August.  And, again, just to

13   step back --

14        THE COURT:  At the end of this month?

15        MS. GOLDSTEIN:  Correct.

16        MR. PFEIFFER:  At the end of this month.

17        THE COURT:  Okay.  And then if it expires within days,

18   do the parties contemplate that it will be extended?  Are there

19   negotiations underway relating to continued occupancy and use

20   of the premises?

21        MS. GOLDSTEIN:  Yeah, Your Honor, our client is

22   continuing to have a dialogue with Barclays about continued use

23   of the space, and it's hopeful something -- some form of

24   arrangement can be reached.  Those conversations are ongoing,

25   and like all of those types of things they remain fluid.

1          THE COURT:  Okay.  Understood.  I just was trying to

2     understand the on-the-ground view of this property.

3          MS. GOLDSTEIN:  We're trying to reach a constructive

4     result.

5          I want to return, having answered the questions, those

6     questions, to what got us here to begin with, or at least what

7     put the ball in motion, and going back to almost a year ago now

8     when the Barclays-Lehman deal was presented to this Court for

9     approval.  And our very strong view on this is that in this

10    case LBHI made a motion to approve the asset purchase

11    agreement.  At that time, the lease affecting the San Francisco

12    property was going to be assumed and assigned to Barclays.

13    Subsequently, after the SIPC proceeding commenced, the trustee

14    obviously -- the trustee for LBI joined LBHI's motion and

15    sought approval as well of the asset purchase agreement.

16         Your Honor obviously recalls more than I, because I

17    wasn't here, but that following the hearing there was a

18    clarification letter as of September 20th that was entered

19    into.  And with respect to the lease affecting the San

20    Francisco property, the language was slightly changed from what

21    was originally envisioned in terms of there being an

22    assignment, an assumption and then assignment of the lease in

23    California.  And, instead, the language that was put in there,

24    which I just referred to, and probably discussed at some length

25    before, was that on the closing date, and the clarification

1    letter is quite specific that it's a reference to "on the

2    closing date", but the precise language is "Notwithstanding

3    anything to the contrary contained in Sections 4.2(d), 4.3(c),

4    8.14 or any other provisions of the Agreement with respect to

5    the Leased Premises located in (i) 555 California Street, San

6    Francisco, California," and I'll skip over the reference to the

7    other leases, "the Parties agree as follows:  (a) as

8    contemplated in the Agreement, on the Closing Date," and then

9    there's (i) dealing with three other leases in other cities.

10   And then it says, "and (ii)", quote, "the underlying lease

11   affecting the San Francisco Property shall be assumed by Seller

12   in connection with the Bankruptcy Proceedings."  And that's the

13   precise and exact language that was in the clarification

14   letter.  So -- and then we talked about the sublease

15   provisions, et cetera, that went on after that.

16        THE COURT:  One of the problems with language,

17   especially when we're trying to find its plain meaning, is that

18   sometimes it isn't so plain.  And I'm struggling with "shall be

19   assumed", which is different from "shall be assumed pursuant to

20   the Sale Order" or "shall be deemed assumed pursuant to the

21   Sale Order", both of which are references to the order that was

22   entered on September 20th, versus "shall be assumed", meaning

23   something to be done in the future pursuant to some other

24   motion practice in the bankruptcy court, which never took

25   place.

1      So how do you conclude that it's an actual assumption

2  pursuant to the sale order as opposed to an undertaking to do

3  something in the future that was never done?

4      MS. GOLDSTEIN:  A couple of answers to that, Your

5  Honor.  With respect to the leases respecting the other

6  properties, and I understand there are different issues there

7  as well, it also uses that same language, which is "shall

8  assume".

9      Additionally, with respect to what qualifies that,

10 it's not just a standalone provision that says "it shall be

11 assumed in connection with the Bankruptcy Proceedings".  What

12 qualifies it is the language that precedes it which says "on

13 the Closing Date", which as I read that is that it's specifying

14 a point in time when something is going to happen as opposed to

15 reflecting something that had optionality attached to it.

16     And when you look at the other provisions in the

17 clarification letter dealing with the leases, and I'm referring

18 to the PIM B business leases that come in paragraph 22, it

19 specifically refers to optionality, to whether or not people

20 can choose to assume and assign agreements later, some that

21 would only be assumed and wouldn't be subsequently assigned.

22     But there are specific provisions in the clarification

23 letter that draw a distinction between something saying "on the

24 Closing Date, this is what shall happen" and then having

25 separate provisions in the clarification letter just a couple

1   of paragraphs later that actually go on to say "We shall have

2   the option and that reflect conditionality."

3         And so I think it's laid out in our briefs that we

4   then say yes, the terms and -- all of the conditions of the

5   purchase agreement will become effective, and that's a little

6   bit of a summary and not the language there.  But basically I

7   think the fact that it does reference and tie back to the

8   closing date, and I think, in the context of what was happening

9   at the time, it wasn't as if this was not thought about.  It's

10   specified quite precisely in the clarification letter.  And the

11   San Francisco lease was obviously being thought about from the

12   outset of this transaction because it's referenced in the asset

13   purchase agreement as well when it was going to be assumed and

14   assigned to Barclays.

15         But I think the clarification letter in the

16   negotiations, it gave Barclays the right to use that space

17   following the closing of the transaction, which everyone knew

18   was imminent.  And the fact that it says on the closing date

19   the lease shall be assumed, everyone knew the closing date was

20   coming fast and furious, that we weren't -- no one was waiting

21   six months to get antitrust approvals or all sorts of other

22   approvals that sometimes are necessary in other types of

23   transactions.

24         THE COURT:  Well, a variety of mistakes were made in

25   the heat of the moment last September, and several motions were

1    presented in the months that followed, seeking to cure mistakes

2    that were made in the listing of executory contracts that were

3    supposedly closing-date contracts.  There was a computer error

4    alleged by Cleary Gottlieb in connection with a post-closing

5    adjustment.  There was litigation with American Express

6    concerning whether or not a particular contract was in fact

7    assumed and assigned.  And that's understandable because a

8    tremendous amount of work was being done during a crisis over

9    just a few days.

10            Was this lease ever expressly listed in a decretal

11   paragraph of any order of the Court?

12            MS. GOLDSTEIN:  It is not expressly listed in a

13   decretal paragraph.  It is listed on the schedules to the asset

14   purchase agreement, and it's listed on schedules to the

15   clarification letter, but it's not specifically referenced in

16   the order.

17            THE COURT:  One of the problems, I think, with the

18   clarification letter is that my best recollection is I never

19   approved that.  My recollection is that it was entered into

20   either the Monday or the Tuesday following the weekend when the

21   transaction was closing.  And a variety of issues arose in

22   respect of the clarification letter during the period

23   immediately following the closing, but it was never actually

24   made the subject of a formal motion that it be approved,

25   although it was a long time ago.  So if you have either a

1  better recollection or have checked out what the docket

2  reflects, I'll be happy to hear what you have to say, but my

3  recollection is that I never approved it.

4      MS. GOLDSTEIN:  Your Honor, I wasn't here so I can't

5  comment.  I do know that in the order that approves the sale

6  transaction it does refer to and it defines the purchase

7  agreement as including the asset purchase agreement.  There was

8  a first amendment and then the clarification letter.  My

9  understanding from some of my colleagues is that some of the

10  terms of the clarification letter were discussed in court over

11  that Friday, that marathon --

12      THE COURT:  We've had a lot of hearings that have

13  touched on the sale to Barclays, both contemporaneously and

14  after the fact, and the clarification letter obviously will

15  speak for itself and it's not in evidence other than through

16  judicial notice at this point, but it is my recollection that

17  it was entered into after the closing, during the business days

18  that followed, and that it was never the subject of a separate

19  motion for court approval.  To the extent that it was somehow

20  obliquely referenced in transaction documents doesn't

21  necessarily mean that it's the subject of a formal court order.

22  And that's one of the problems that I'm having with your legal

23  position, which is, as argued by the trustee, there really is

24  no freestanding motion to assume the lease at 555 California

25  Street, nor is there an omnibus motion to assume leases.  It's

1    hard to connect the dots.

2         And so I'm going to listen carefully to your argument,

3    but one of my concerns here is that there is actually no clear

4    court order that covers this lease.  And it becomes difficult

5    as a result, in the face of the trustee's objection, to

6    demonstrate that this was in fact assumed.

7         MS. GOLDSTEIN:  Well, I hear you.  And many of our

8    arguments, quite frankly, are teed off the fact that the

9    purchase agreement and the order approving the sale transaction

10   is defined to include the clarification letter.  And, quite

11   frankly, everyone operated, at least on our end, after the fact

12   in letting Barclays continue to use the premises on the

13   assumption that the terms of the clarification letter were part

14   of that purchase agreement and that it gave the Barclays

15   employees a right to use that space.

16        You know, the other arguments do come from the fact of

17   whether or not -- and they're laid out in our briefs, so I

18   won't belabor them now.  We do believe it was assumed.  We do

19   believe the clarification order, in terms of the clear language

20   provided in that, knew how to contemplate future action when it

21   was necessary.  And that's following the closing of the

22   transaction.  It was quite some time before we heard that LBI

23   was taking a different position with respect to the lease

24   that's currently at issue.

25        We also believe --

1          THE COURT:  So one of the questions I have, and this

2     really isn't addressed to you as much as it is to the people

3     who are sitting in the courtroom, is there anybody here who is

4     representing the interests of Barclays?

5          Apparently not.

6          What's concerning to me is that there's this very

7     technical legal argument being made by the LBI trustee and by

8     you with regard to what parties contemplated last September at

9     the time of the sale transaction.  Barclays has been using the

10    space.  And since April, you've told me, Barclays has been

11    using the space by private agreement with HWA 555.

12         So the real parties-in-interest here as it relates to

13    the use and occupancy of the space are the landlord and, in

14    this instance, the contingent licensee.  I presume your

15    position is they're either there because the lease was assumed

16    or they're there pursuant to the license agreement, but they're

17    there and they're paying rent, or something in lieu of rent,

18    which is acceptable, at least for the time being, to your

19    client, correct?

20         MS. GOLDSTEIN:  For the time being, Your Honor,

21    they're using one of two floors; they're not using all of the

22    space.  So it impacts half of the overall -- of the lease.

23         THE COURT:  Well, I understand, but what I'm finding

24    baffling here is that the party potentially to be adversely

25    affected by the conclusion that the lease is assumed is

1    Barclays, I presume, since they're the ones that would be using

2    the space pursuant to the assumed lease because they allegedly

3    bought the right to use it.  Why aren't they here?  Where have

4    they been in all this?

5         MR. LUBELL:  If you recall, Your Honor, this issue did

6    come up at the time we moved to extend our time to assume or

7    reject the leases.  Barclays did put in papers to the effect

8    that a standalone assumption had not been done and that it was

9    in fact in this waiver letter, the intent of the parties, that

10   it would be done by separate motion, and that it was in fact

11   waived if they weren't going to order us to assume it by April

12   17th.

13        This is an adversary complaint that was brought; they

14   weren't named as a party in the complaint itself.  If HWA were

15   to prevail on the complaint, it would make the LBI estate

16   liable for the entire space for the entire two years, that it's

17   an administrative expense, which is something that was never

18   addressed in any of the motions to approve the purchase

19   agreement.

20        And at least in the trustee's motion, the

21   clarification letter was not in the trustee's motion or in the

22   form of order that he was seeking to approve.  There was a

23   mention of it that did get slipped in into the one that was

24   entered in the LBHI case that you were approving the purchase

25   agreement, which included the clarification letter.

1    But we still say that HWA does not have the right to

2    enforce that agreement by the terms of it and that under that

3    agreement, as you pointed out, we were supposed to, if Barclays

4    made us, assume the lease in connection with the bankruptcy

5    proceedings.  But like many things else, it was all a moving

6    target that the parties agreed to modify and which they

7    modified in writing.  And the obligation, from our point of

8    view, disappeared.  And from HWA's point of view, there had

9    never been a motion to approve a standalone assumption of this

10   lease.

11       And your sale order only addressed assumption and

12   assignment of leases to Barclays, which from the LBI estate

13   really has the effect of releasing us from liabilities, not

14   imposing ten million dollars and two years' worth of

15   liabilities on the estate, which is quite a different issue and

16   which was never addressed with the Court at the time it entered

17   its order.

18       THE COURT:  I appreciate that explanation, but I still

19   don't understand why Barclays isn't here to be heard.  I

20   recognize this is an adversary proceeding between the trustee

21   of LBI and HWA 555 as landlord, but it directly affects

22   Barclays' use and occupancy of at least one floor at this

23   location in San Francisco.  They're well aware of the fact that

24   there's a dispute concerning this because they entered into a

25   private agreement with the landlord relating to the occupancy

1  of this space that had presumably, although it's not before me,

2  as one of its contingencies the fact that there's this dispute

3  over lease assumption.  They don't care.  You haven't sought

4  indemnity from them.  You haven't sought to involve them.  I

5  don't get this.  I don't understand how the LBI trustee --

6      MR. LUBELL:  I believe --

7      THE COURT:  -- could be on the hook for millions of

8  dollars relating to a transaction that you had nothing to do in

9  designing.

10     MR. LUBELL:  I believe we may have some agreement with

11 Barclays in terms of, if the lease were deemed assumed, that

12 they would still be obligated to the sublease in the

13 clarification letter.  But as I say, this is something that HWA

14 is trying to enforce in essentially an agreement among the

15 contracting parties that, according to your sale order and

16 according to the agreement itself, allowed for modification and

17 which was in fact modified.

18     THE COURT:  You just told me two very inconsistent

19 things in the last five minutes.

20     MR. LUBELL:  Okay.

21     THE COURT:  I just want to be sure I know what's

22 right.  On the one hand you told me that the estate of LBI

23 would be exposed to millions of dollars of unintended liability

24 associated with the assumption of this lease, and on the other

25 hand you told me that there's some kind of back agreement with

1    Barclays that in the event that happens Barclays is

2    responsible.  Which is it?

3           MR. LUBELL:  Well, but you've got to recall, Your

4    Honor, that the lease -- the Barclays space is only half the

5    lease.  So when I say that it's ten million dollars, five

6    million dollars, you know, would relate to the sublease.  And

7    there was some formula in there.

8           And I believe, in connection with one of our last

9    lease rejection -- extension rejection motions, that there was

10   some provision that did deal with this contingency, if this

11   came up, that gave the LBI trustee some recourse against

12   Barclays.  I mean, we are in a strange situation too where they

13   proceeded with a sublease of what they're saying is still

14   property of the estate and the like, which to me suggests that

15   they don't believe it themselves that there's an ongoing lease.

16          THE COURT:  Well, just so it's clear, I heard it

17   described as a license, not a sublease.

18          MR. LUBELL:  Right, but it's essentially using what

19   they're saying is our space that we assumed.

20          THE COURT:  Well, that document's not in front of me;

21   we don't need to spend a lot of time on it.

22          MR. LUBELL:  Okay.

23          THE COURT:  I was just trying to confirm --

24          MR. LUBELL:  Okay.

25          THE COURT:  -- the term that you used.

1    MR. LUBELL:  I really think the point is that, you

2  know, there were motions here to assume and assign leases, that

3  there was no termination by the trustee to proceed with a

4  standalone assumption of the lease.  They did enter into an

5  agreement after the Court approved the purchase agreement in

6  our proceeding.  It did say we would -- shall assume the lease

7  in connection with the bankruptcy proceedings.  The parties

8  continue to negotiate about that and about many other things.

9    And we never brought a formal motion.  You never

10  entered a formal order.  They -- you know, I heard it referred

11  to as a clarification order, but it's just an agreement among

12  the parties that didn't give them any rights to enforce it,

13  that gave us the right to modify it, which we did, and that

14  when they did come around to seek to enforce it, it was the day

15  that the lease was in fact deemed rejected and it was the day

16  that they seemed to have entered into their license agreement

17  there.

18    And I think all those facts together require dismissal

19  of the complaint because there was not a standalone assumption

20  of the lease by the LBI estate.

21    THE COURT:  Okay, well, you ended up getting two bites

22  at the apple because I was in the middle of hearing from HWA

23  555's counsel.  As a point of clarification, you came up, we

24  had some colloquy, and you've now made a second argument why

25  you should win.  I think I should give landlord's counsel an

115

opportunity to --

MR. LUBELL: That's fine. That's fine.

THE COURT: -- push back.

MR. LUBELL: Okay. And there goes our half hour.

MS. GOLDSTEIN: That's why I always say that the time estimates are usually incorrect.

Just reflecting as I was listening, and also on Your Honor's point about, sort of, technical arguments on both sides, and I think this goes back to Burger Boys and the substance of Burger Boys, which is that yes, you need a motion, but nothing in Burger Boys dictates the type of motion that has to be presented or what it has to actually say.

The point of it, and it's made perfectly clear in Burger Boys, is that the party is to give opportunity to the landlord to be heard. Here we had an opportunity to be heard; we were here. And I use "we" because it wasn't me; my colleagues were here at the time of the sale order. There was an opportunity to be heard if there was an issue with respect to the assumption. LBI happened to be up to date on its payments on the lease, so there was really nothing for us to complain about at the time.

And so I think the whole flavor of Burger Boys and what that's intended to address is that unfairness to the landlord and being deprived of the opportunity to object to a motion to assume is not the situation Your Honor was presented

VERITEXT REPORTING COMPANY
212-267-6868                                        516-608-2400

1    with here.

2          We are mindful, obviously, that there was a lot going

3    on at the time, and a lot of people were working incredibly

4    hard to try to ensure that the sale to Barclays would take

5    place.  The one thing that remains somewhat mystifying to me

6    and unanswered in my mind is with respect to the clarification

7    letter, which is how language that said "On the Closing Date,

8    the lease affecting the San Francisco Property shall be assumed

9    by Seller in connection with the Bankruptcy Proceedings" was

10   put in followed by a page and a half discussing subleases and

11   the requirement of the parties to enter into subleases and the

12   use of the underlying premises in the interim.  It was clearly

13   something that was thought about at the time, and we clearly

14   relied on it following the sale to Barclays.

15         With respect to the waiver letter, I think we all --

16   all of it returns to the same point that we were talking about

17   earlier, which is what is the impact of the Court's order.

18   Insofar as the court order, which has specific provisions

19   providing that all of its provisions of the asset purchase

20   agreement, which is defined to include the clarification

21   letter, are being approved and the debtors were supposed to

22   take actions to effectuate the provisions of those agreements,

23   insofar as the order effectuated the assumption of the lease,

24   which we believe was the case, based on the language in the

25   transaction documents, there's nothing for the parties to waive

1    after the fact.

2         And, in fact, there are a number of cases that look

3    quite skeptically at parties who after the fact tried to modify

4    obligations to say something, saying -- and that's the Delta

5    case and the Chabor (ph.) case that are cited in our papers --

6    saying you have to look most skeptically when after the fact

7    people are offering interpretations about what the intent was

8    at the time.  We don't think the waiver letter complies with

9    paragraph 26, in any event, of the sale order because I

10   don't -- LBHI hasn't approved it, and neither has the

11   creditors' committee.  It was an agreement signed only by

12   Barclays and by LBI.

13        So we think -- for all of those reasons, we believe

14   the lease was assumed in connection with the sale order.  We

15   think that if there's any doubt as to what the trustee intended

16   at the time and what they were thinking about as between LBI

17   and Barclays, the proper approach is to conduct discovery,

18   which could be limited to particular issues as to the lease at

19   that point in time and what was contemplated as to the lease

20   and as between LBI and Barclays, so that we have a clear

21   picture of what truly was intended as opposed to after-the-fact

22   rationalizations about what was intended.

23        As to the argument my colleague here raises about now

24   that we've waited too long, that was never an argument that

25   they've raised before this argument.  So I think it's not

1   properly subject to consideration.  As I reflect on it before

2   Your Honor, though, we were working with people, we were trying

3   our best to get things resolved in a way that would be most

4   productive for the estate and for our client and all concerned.

5   We obviously took until as much time as we thought was

6   appropriate in the hope that we wouldn't need to burden the

7   Court with this issue.  Unfortunately, that didn't come to

8   pass, which necessitated the filing of the adversary complaint,

9   but it was filed before the deemed rejected date and we think

10  it's proper for consideration by the Court.

11          If you have no other questions --

12          THE COURT:  I actually have a question for counsel for

13  the trustee.  And it's just, in part, a function of the passage

14  of time and my lack of direct recollection of something.  Were

15  any leases assumed in connection with the sale order itself?

16          MR. LUBELL:  Standalone assumption, no.

17          THE COURT:  No, I'm not -- that's not my question.  My

18  question is --

19          MR. LUBELL:  Were they assumed and assigned to

20  Barclays?  Yes.

21          THE COURT:  Let me start over.  The principle argument

22  that I hear being made by counsel for HWA 555 is that the

23  transaction documents, when read together with the order --

24  actually, orders, plural -- approving the sale to Barclays on

25  September 20th constitute an assumption by the trustee of the

1   lease at 555 California Street in San Francisco.  My question

2   is whether there are any leases which were in fact assumed in

3   accordance with that order, and if so, what leases are they and

4   is Barclays occupying premises pursuant to such leases?

5        MR. LUBELL:  Your Honor, there were several leases, by

6   the specific terms of your order, that were assumed and

7   assigned to Barclays under 365(f), and Barclays presumably are

8   occupying those leases.  I think originally the San Francisco

9   lease may have been on that list, but it was specifically

10  excluded as one of the leases to be specifically assumed and

11  assigned to Barclays.  And -- well, that's the answer to your

12  question.

13       So, no, this specific contract was not assumed and

14  assigned to Barclays, nor was there any standalone assumption

15  by the trustee.  I think that's the point of Burger Boys, that

16  you need to find that intention in the motion to approve.

17       And in the liquidation context, I think it's important

18  that it's not just the landlord who has a concern here, as in

19  the assumption and assignment context, but the whole estate

20  about taking on a ten million dollar liability two years when

21  you're liquidating.

22       There was supposed to be a -- I mean, we're getting a

23  little far afield, but this idea of a sublease, I believe, was

24  initially rejected by HWA when they were approached about it

25  and then was one of the reasons why there never was any push to

1    proceed with the sublease.

2         In terms of reliance, there couldn't really be

3    reliance because there was never a standalone motion to --

4    never a motion to approve a standalone assumption of the lease.

5    And like I've -- I don't mean to be repetitive, but we did have

6    the right in the agreement that you approved to modify that

7    agreement, and this is the whole purchase agreement itself, and

8    we did have the right.  And third parties were not to have the

9    right to essentially tell us that we have to assume after the

10   parties have agreed that was not necessary, and especially now

11   when Barclays has made its own arrangements with the landlord.

12        I also don't believe in the sale order, the form of

13   the sale order that we sought approval for in this proceeding,

14   that there was any requirement that LBHI or the creditors'

15   committee agreed to any modifications of agreements between

16   Barclays and ourselves.  You won't find that in the form of the

17   approval order, just like you won't find any reference to the

18   clarification letter.  And even if LBHI and the committee

19   needed to consent, I believe you could find their consent when

20   this issue was raised back when we were seeking further time to

21   assume or reject the lease and extension of time to assume or

22   reject the lease.

23        THE COURT:  I have a question for counsel for the

24   landlord.  You mentioned discovery.  What discovery would you

25   need and what discovery is pertinent to this dispute?

1    MS. GOLDSTEIN:  I think the pertinent discovery

2    relates to the communications between the debtors and Barclays,

3    and I'm not saying lumped together but around the time of the

4    sale transaction and the negotiations with respect to the lease

5    in San Francisco and the discussions after the fact with

6    Barclays about the sublease.

7        Mr. Lubell referred to -- or stated that HWA was not

8    amenable to a sublease.  That is not accurate.  I don't know

9    where that comes from.  And that certainly is not the case.

10   But clearly those would be the two main categories of discovery

11   that I think would be appropriate with respect to the issues

12   here, which I think are quite straightforward.

13       THE COURT:  Okay.

14       The trustee has presented a very strong motion to

15   dismiss, but notwithstanding that, I'm not going to grant it

16   today and would urge that instead it be converted into a motion

17   for summary judgment to be presented on a future date following

18   the taking of such discovery as is appropriate under the

19   circumstances of this case.

20       Now, in making this proposal, I am mindful of the

21   Second Circuit's recent decision in the Dana case in which, in

22   the context of a claim objection, the district court and the

23   bankruptcy court were reversed because of a failure on the part

24   of the bankruptcy court to permit requested discovery.  That's

25   not to say that every time a party requests discovery that the

1    discovery is appropriate.  Nor is it true that every time a

2    party requests discovery that it's a reason not to grant an

3    otherwise strong motion to dismiss as a matter of law.  But

4    there are aspects of this argument that trouble me.  One of the

5    things that troubles me is that Barclays isn't here and that

6    there seems to be a real party-in-interest, with real economics

7    and real interest in the space, apparently relying on LBI to do

8    its dirty work.  That may or may not be the case, but that's

9    the appearance.

10         It's also not at all clear to me what the actual

11    consequences to the LBI estate will be if the lease is deemed

12    assumed versus the lease is deemed rejected.  When I asked some

13    questions about that, counsel provided some answers but they

14    were general in nature:  Ten million dollars went to five

15    million dollars.

16         I also don't understand the circumstances surrounding

17    Barclays' waiver of whatever rights it had under the

18    clarification letter.  And the clarification letter is one of

19    the most incorrectly named documents ever written.  It's just

20    not that clear, and never was.

21         So while I totally agree with the notion that it takes

22    a motion in order to assume a lease, it's not clear to me

23    whether or not, in all of the pushing and shoving that was

24    going on last September, there was or was not an intention to

25    sweep this lease into the sale transaction.  There may or may

1    not have been.  And the fact that the option was included to

2    assume this lease in the clarification letter suggests that

3    Barclays may have wanted to retain the option, but that's not

4    clear to me either.

5         So I'm not granting the motion to dismiss, nor am I

6    denying it.  I'm going to permit the parties to enter into a

7    stipulation to take reasonable discovery, not burdensome

8    discovery, and that when such discovery has been completed the

9    parties may submit supplemental briefing, to the extent

10   necessary, that references that discovery.

11        And the motion to dismiss will be converted into a

12   dispositive motion.  There'll be no need to file an answer.

13   And I am assuming that there will be no need for a trial.  This

14   is a summary matter.

15        Mr. Lubell?

16        MR. LUBELL:  I just think that Burger Boys is your

17   bright-line test.  There's either --

18        THE COURT:  Why don't you stand up if you're going to

19   be speaking to the law?

20        MR. LUBELL:  I was going to say Burger Boys is your

21   bright-line test as to whether there was a motion to -- for a

22   standalone assumption of the lease.  And under that, no

23   matter -- I mean, that's a fact you could look into the record

24   on already.  I mean, we were in this case all of one day when

25   the sale order was granted.  I'm not sure that going over

1    discovery after that point is going to change the fact that

2    there was never a motion.

3         THE COURT:  Look, I'm not a fan of needless discovery,

4    nor am I a fan of needless litigation, but a number of things

5    have happened in the last eleven months as it relates to the

6    sale transaction:  One is that special counsel for LBHI, Jones

7    Day, has come forward to take 2004 discovery relating to

8    whether or not Barclays did everything it was supposed to do in

9    connection with the original deal.  It's within that setting

10   that when questions are raised as to whether parties have done

11   the right thing I look closely.

12        MR. LUBELL:  Okay.  I understand, Your Honor.  I was

13   just hoping to --

14        THE COURT:  And there were enough moving parts at that

15   time.  The questions relating to the intent of the parties,

16   including Barclays, not here, as it relates to this lease,

17   represent issues that I'm concerned about, and I think that

18   some discovery may be appropriate.  I'm hardly directing it,

19   and it shouldn't be a fishing expedition.  If the parties

20   determine that discovery is either limited in nature or

21   unnecessary, and as a result with letter briefs you can simply

22   advise me as to what the status is, there's no need to further

23   argue this; I'll consider it on the papers.  But I'm holding

24   the motion to dismiss in abeyance pending the completion of

25   discovery, and it shouldn't take a lot of time.

1          MR. LUBELL:  Okay, Your Honor.  I understand.

2          THE COURT:  I'd like to think that it would be

3      concluded within no more than sixty days.

4          MR. LUBELL:  Thank you, Your Honor.

5          THE COURT:  Is there anything more?

6          We're adjourned.

7          (Proceedings concluded at 3:35 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                          I N D E X

3

4                        R U L I N G S

5                                                    PAGE LINE

6    Motion to dismiss the litigation is denied      73    10

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                  C E R T I F I C A T I O N

3

4    I, Esther Accardi, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7    _____

     ESTHER ACCARDI (CET**D-485)

8    AAERT Certified Electronic Transcriber

9

     Also Transcribed By:     Clara Rubin (CET**D-491)

10

11

     Veritext LLC

12

     200 Old Country Road

13

     Suite 580

14

     Mineola, New York 11501

15

16

     Date: August 12, 2009

17

18

19

20

21

22

23

24

25

# EXHIBIT B

Chambers of James M. Peck
United States Bankruptcy Judge
(212) 668-5632

August 20, 2009

The Right Honorable Sir Robert Andrew Morritt, CVO
Royal Courts of Justice
Strand
London WC2A 2LL

Re:     *Perpetual Trustee Co. Ltd. v. BNY Corporate Trustee Services Ltd., et al.*, Nos.
HC09C011612 & HC09C01931 (the "High Court Proceedings"); *Lehman Brothers
Special Financing Inc. et al. v. BNY Corporate Trustee Services Ltd.*, Adv. Pro. No. 09-
1242 (JMP).

My Lord:

        I am United States Bankruptcy Court Judge James M. Peck of the United States Bankruptcy
Court for the Southern District of New York. I am the judge with responsibility for overseeing the
chapter 11 cases of various Lehman Brothers entities in the United States. Among the proceedings
before me is the adversary proceeding, *Lehman Brothers Special Financing Inc. v. BNY Corporate
Trustee Services Ltd.*, Adversary Proceeding No. 09-1242 (JMP) (the "Adversary Proceeding").

        This letter is a communication pursuant to the UNCITRAL Model Law on Cross-Border
Insolvency, as adopted in chapter 15 of title 11 of the United States Bankruptcy Code, 11 U.S.C.
section 1525, and United States Interim Bankruptcy Rules 2002(q)(2) and 5012, which have been
adopted by the United States Bankruptcy Court for the Southern District of New York, to coordinate
the schedules in related cases, referenced above, that are pending before our respective Courts.

        On June 22, 2009, Defendant BNY Corporate Trustee Services Limited ("BNY") moved to
either dismiss or stay the Adversary Proceeding in favor of disposition by the High Court of England
of the issues raised in the Adversary Proceeding (which raises claims solely under the U.S.
Bankruptcy Code) on the grounds that a party in interest, Perpetual Trustee Company Limited
("Perpetual"), was a necessary and indispensable party that had not been joined to the Adversary
Proceeding. On August 11, 2009, I denied BNY's motion after making the determination required

under Federal Rule of Civil Procedure 19(b) that, as a matter of law, Perpetual was not an indispensable party. Therefore, the proceedings in my Court will continue with the briefing and consideration of the motion for summary judgment filed by the plaintiff, Lehman Brothers Special Financing Inc. ("LBSF"). In light of the similarity of the issues and potential for overlap in these cases, which your Lordship recognized in your July 28, 2009 Judgment in the High Court Proceedings, and the concern expressed by BNY about consistency, I believe that it would be beneficial for the Courts to communicate and coordinate to the extent possible. BNY and LBSF both agree with communication and coordination between our Courts. Therefore, pursuant to Rules 2002(q)(2) and 5012, I hereby give notice to the parties to Case No. 09-1242 and to the High Court Proceedings that I intend to communicate with you.

Initially, in light of your Judgment and your adjournment of Perpetual's case until October 2009, I write to communicate my order approving a schedule for briefing on motions for summary judgment in the case before me. In an effort to give the parties adequate time to brief the complex issues in this case, I set the following schedule for motions for summary judgment: BNY would file any motion for summary judgment on September 25, 2009, both BNY and LBSF would file any responses on October 23, 2009 and any replies on November 9, 2009. This Court intends to hold a hearing during the week of November 16, 2009. LBSF is not responsible for any delay in the briefing schedule.

In this context, and in accordance with the provisions of Article 25 of the UNCITRAL Model Law (as given effect in England by the Cross-Border Insolvency Regulations 2006), I would invite your Lordship to consider this Court's schedule and not to make any final disposition of the High Court Proceedings, with the exception of the indemnification issues, until I am able to consider and rule on the United States bankruptcy law issues raised in the summary judgment briefing. Once I have considered and ruled on the issues in the Adversary Proceeding, I intend to communicate further with your Lordship in an attempt to reach a coordinated result in light of each Court's rulings.

Thank you for your courtesies in considering my requests. I welcome the opportunity to further communicate with you as these cases progress.

Yours sincerely,

James M. Peck
United States Bankruptcy Judge

cc: Hugh Lyons
Lovells LLP
Atlantic House
Holborn Viaduct
London EC1A 2FG
*Counsel for BNY Corporate Trustee Services Limited in High Court Proceedings*

Sidley Austin LLP
Woolgate Exchange
25 Basinghall Street
London EC2V 2HA
*Counsel for Perpetual Trustee Company Limited in High Court Proceedings*

Matthew Shankland
Weil, Gotshal & Manges LLP
One South Place
London, EC2M 2WG
*Counsel for LBSF in High Court Proceedings*

Jean-Pierre G. Douglas-Henry
Lawrence Graham LLP
4 More London Riverside, London SE1 2AU
*Counsel for Belmont Park Investments Pty Limited in High Court Proceedings*

Eric A. Schaffer
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, PA 15222
*Counsel for BNY Corporate Trustee Services Limited*

David S. Cohen,
Milbank, Tweed, Hadley & McCloy LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
*Counsel for the Official Committee of Unsecured Creditors of Lehman Brothers Holdings Inc., et al.*

Ralph I. Miller
1300 Eye Street, NW,
Suite 900
Washington, DC 20005
*Counsel for LBSF*