**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In re:

LEHMAN BROTHERS HOLDINGS, INC., et al.

Debtors.

Chapter 11

Case No. 08-13555 (JMP)

LEHMAN BROTHERS SPECIAL FINANCING INC.,

Plaintiff,

- against -

BNY CORPORATE TRUSTEE SERVICES LIMITED,

Defendant.

Adv. Proc. No. 09-01242 (JMP)

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY**
**JUDGMENT OF BNY CORPORATE TRUSTEE SERVICES LIMITED**

**REED SMITH LLP**
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450
   Eric A. Schaffer
   Michael J. Venditto
   David M. Schlecker

*Attorneys for BNY Corporate Trustee*
*Services Limited*

Dated:  September 25, 2009

**TABLE OF CONTENTS**

                                                                                                        Page

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ..................................................................................................... 1

FACTUAL BACKGROUND ...................................................................................... 2

    A.    Procedural History ........................................................................... 4

        1.    Bankruptcy Court Proceedings .................................. 4

        2.    English Court Proceedings ........................................ 5

    B.    Structure of the Transactions ........................................................ 8

    C.    The Transaction Documents ....................................................... 11

    D.    Termination of the Derivative Agreement .................................. 15

ARGUMENT .......................................................................................................... 16

I.    SUMMARY JUDGMENT STANDARD ......................................................... 16

II.    LBSF CANNOT USE THE BANKRUPTCY CODE TO REVERSE THE
    PREPETITION EFFECTIVENESS OF NOTEHOLDER PRIORITY AND
    CONDITION 44. ......................................................................................... 17

    A.    LBSF's Interests are Confined to those Existing as of its Petition Date. ............. 18

    B.    Because Noteholder Priority And Condition 44 Were Effective
        Prepetition, They Remain Effective Postpetition ...................... 20

III.    NOTEHOLDER PRIORITY AND CONDITION 44 MUST BE ENFORCED IN
    ACCORDANCE WITH SECTION 510(a). ...................................................... 24

IV.    NOTEHOLDER PRIORITY AND CONDITION 44 ARE ENFORCEABLE
    UNDER SECTION 560 OF THE BANKRUPTCY CODE. .............................. 26

    A.    Section 560 Provides A Broadly Worded "Safe Harbor" For Enforcement
        Of Swap Agreements. ................................................................. 26

    B.    The Parties' Swap Agreements Include The Provision For Noteholder
        Priority and Subordination Under Condition 44. ....................... 29

    C.    Noteholder Priority and Subordination Under Condition 44 Come Within
        The Safe Harbor Of Section 560 ............................................... 31

## <u>TABLE OF CONTENTS</u>
### (Continued)

**Page**

CONCLUSION.............................................................................................................................36

# TABLE OF AUTHORITIES

**Cases**                                                                                                     **Page**

Ackerman v. Ackerman,
  676 F.2d 898 (2d Cir. 1982) ..............................................................................................21

Arthur Anderson LLP v. United States,
  544 U.S. 696 (2005)...........................................................................................................32

Butner v. United States,
  440 U.S. 48 (1979)........................................................................................................18, 19

Calpine Energy Servs., L.P. v. Reliant Energy Electric Solutions,
  L.L.C. (In re Calpine Corp.), Adv. No. 08-1251(BRL), 2009 WL 1578282
  (Bankr. S.D.N.Y. May 7, 2009).........................................................................................33

Calyon New York Branch v. Am. Home Mortgage Corp.
  (In re Am. Home Mortgage, Inc.), 379 B.R. 503 (Bankr. D. Del. 2008) ..............................28

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)...........................................................................................................17

Clark v. Amoco Production Co.,
  794 F.2d 967 (5th Cir. 1986) .............................................................................................21

Commander Oil Corp. v. Advance Food Serv. Equip.,
  991 F.2d 49 (2d Cir. 1993) ................................................................................................31

Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.),
  136 B.R. 636 (Bankr. S.D.N.Y. 1992)................................................................................23

Connecticut v. United States Dep't of the Interior,
  228 F.3d 82 (2d Cir. 2000) *cert. denied*, 532 U.S. 1007 (2001)...........................................35

Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.,
  No. 08 Civ. 9565 (DLC), 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008)..............................30

Enstar Group, Inc. v. Bank of New York (In re Amret, Inc.),
  174 B.R. 315 (1994) (M.D. Ala. 1994) ........................................................................24, 25

Everett v. Judson,
  228 U.S. 474 (1913)...........................................................................................................17

Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,
  --- U.S. ---, 128 S. Ct. 2326 (2008).....................................................................................18

# TABLE OF AUTHORITIES
## (Continued)

**Cases**                                                                    **Page**

Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P.,
    846 F. Supp. 1184 (S.D.N.Y. 1994) ................................................................32

Garcia v. Shanahan,
    615 F. Supp. 2d 175 (S.D.N.Y. 2009) .........................................................35

Hartford Underwriters Ins. Co. v. Union Planters Bank,
    530 U.S. 1 (2000).......................................................................24, 26, 31

Hutson v. E.I du Pont de Nemours and Co. (In re Nat'l Gas
    Distribs., LLC), 556 F.3d 247 (4th Cir. 2009)............................................ *passim*

In re Advent Corp.,
    24 B.R. 612 (B.A.P. 1st Cir. 1982)..............................................................18

In re Amcor Funding Corp.,
    117 B.R. 549 (D. Ariz. 1990) ....................................................................23

In re American Home Mortgage Holdings, Inc.,
    No. 07-11047(CSS), --- B.R. --,
    2009 WL 2855888 (Bankr. D. Del. Sept. 8., 2009)...................................28

In re Best Products Co., Inc.,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994).........................................................25

In re Carmania Corp.,
    154 B.R. 160 (S.D.N.Y 1993) ..................................................................19

In re Central Medical Center, Inc.,
    122 B.R. 568 (Bankr. E.D. Mo. 1990).......................................................19

In re Credit Industrial Corp.,
    366 F.2d 402 (2d Cir. 1966) .....................................................................25

In re Delta Air Lines,
    341 B.R. 439 (Bankr. S.D.N.Y. 2006).......................................................24

In re Enron Corp.,
    349 B.R. 96 (Bankr. S.D.N.Y. 2006).........................................................30

In re FCX, Inc.,
    853 F.2d 1149 (4th Cir. 1988) ..................................................................18

**Cases**                                                                 **Page**

In re Image Innovations Holdings, Inc.,
    391 B.R. 255 (Bankr. S.D.N.Y. 2008)...................................................................21

In re Schokbeton Industries, Inc.,
    466 F.2d 171 (5th Cir. 1972) ...................................................................18

In re Seven Stars Restaurant, Inc.,
    122 B.R. 213 (Bankr. S.D.N.Y. 1990)...................................................................22

In re TTS, Inc.,
    158 B.R. 583 (D. Del. 1993)...................................................................18

In re Village Rathskeller, Inc.,
    147 B.R. 665 (Bankr. S.D.N.Y. 1992)...................................................................25

Integrated Solutions, Inc. v. Service Support Specialties, Inc.,
    124 F.3d 487 (3d Cir. 1997) ...................................................................18

LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.),
    22 B.R. 556 (Bankr. S.D. Fla. 1982) ...................................................................23

Lamie v. U.S. Trustee,
    540 U.S. 526 (2004)...................................................................35

Moody v. Amoco Oil Co.,
    734 F.2d 1200 (7th Cir. 1984) ...................................................................18

Musso v. N.Y.S. Higher Educ. Servs. Corp. (In re Royal Bus. Sch., Inc.),
    157 B.R. 932 (Bankr. E.D.N.Y. 1993) ...................................................................18, 19

Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.),
    163 B.R. 927 (Bankr. E.D.N.Y. 1994) ...................................................................23

Perrin v. United States,
    444 U.S. 37 (1979)...................................................................32

Pieco, Inc. v. Atlantic Computer Sys., Inc. (In re Atlantic
    Computer Sys., Inc.),173 B.R. 844 (S.D.N.Y. 1994) ...................................................................30

**Cases**                                                                  **Page**

Pioneer Commercial Funding Corp. v. United Airlines, Inc.
(In re Pioneer Commercial Funding Corp.), 122 B.R. 871 (S.D.N.Y. 1991) ........................22

Robinson v. Howard Bank (In re Kors, Inc.),
819 F.2d 19 (2d Cir. 1987) ...................................................................................................25

SSIH Equipment S.A. v. United States Int'l Trade Comm'n,
718 F.2d 365 (Fed. Cir.1983) ...............................................................................................21

Sec. Mortgage Co. v. Powers,
278 U.S. 149 (1928)...............................................................................................................19

State Bank of Hardinsburg v. Brown,
317 U.S. 135 (1942)...............................................................................................................19

Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co.,
549 U.S. 443 (2007)...............................................................................................................19

Tripati v. Henman,
857 F.2d 1366 (9th Cir. 1988) ..............................................................................................21

United States v. Ron Pair Enters., Inc.,
489 U.S. 235 (1989)...............................................................................................................31

Universal Church v. Geltzer,
463 F.3d 218 (2d Cir. 2006) ..................................................................................................36

Warwick v. Maryland Dep't of Transp.,
573 F. Supp. 1011 (D.Md.1983), *aff'd without opinion*, 735 F.2d 1359 (4th Cir.1984) ........21

White v. Stump,
266 U.S. 310 (1924)...............................................................................................................17

**ENGLISH CASES**

*In re Maxwell Communications Corporation Plc*
(No. 2) [1993] 1 W.L.R. 1402 ...............................................................................................25

*In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 ..................................................................25

# TABLE OF AUTHORITIES
### (Continued)

**Cases**                                                    **Page**

*Money Markets International Stockbrokers Ltd v. London Stock
    Exchange Ltd* [2002] 1 WLR 1150, ¶ 87 .......................................................................7

## STATUTES, RULES, AND LEGISLATIVE MATERIAL

11 U.S.C. § 101(53B) ...........................................................................................27

11 U.S.C. § 362 ............................................................................................. *passim*

11 U.S.C. § 365(e) ........................................................................................ *passim*

11 U.S.C. § 510(a) ........................................................................................ *passim*

11 U.S.C. § 541 ............................................................................................. *passim*

11 U.S.C. § 560 ............................................................................................. *passim*

H.R. Rep. No. 101-484 (1990) ........................................................................27, 34

H.R. Rep. No. 109-31 (2005) .................................................................................34

H.R. Rep. No. 109-648 (2006) ...............................................................................34

Fed. R. Bankr. P. 7056 ........................................................................................1, 16

Fed. R. Civ. P. 56 ...............................................................................................1, 16

Pub. L. No. 97-222, Stat. 235 (1982) .....................................................................27

Pub. L. No. 98-353, 98 Stat. 333 (1984) ................................................................27

Pub. L. No. 101-311, 104 Stat. 267 (1990) ............................................................27

Pub. L. No. 103-394, 108 Stat. 4106 (1994) ..........................................................27

Pub. L. No. 109-8, 119 Stat 23, 179 (2005) ......................................................27, 35

Pub. L. No. 109-390, 120 Stat. 2692 (2006) ..........................................................27

# TABLE OF AUTHORITIES
## (Continued)

## OTHER REFERENCES

**Page**

5 Allan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ("COLLIER") (15th ed. rev. 2009) ................................................................................. *passim*

Bryan A. Garner, BLACK'S LAW DICTIONARY (17th ed. 1999). ............................................24, 32

CHITTY ON CONTRACTS, Common Law Library, Vol. I at 12-067 (13th ed.) ..............................30

Edward R. Morrison and Joerg Riegel, *Financial Contracts and the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges*, 13 ABI L. Rev. 641, 643 (2005) ................................................................................. *passim*

International Swaps and Derivative Association, Inc., Memorandum of Law dated December 15, 2007, *Enforceability of the Termination, Close-Out and Multibranch Netting Provisions of the 1987, 1992 and 2002 ISDA Master Agreements* available at *www.isda.com* ...........................................................................35

International Swaps and Derivative Association, Inc., Memorandum of Law dated May 15, 2008, *Validity and Enforceability of Collateral Arrangements under the ISDA Credit Support Documents* available at *www.isda.com* ...........................................33

Michael Krimminger, *The Evolution of U.S. Insolvency Law for Financial Market Contracts*, U.S. FEDERAL DEPOSIT INSURANCE CORP. at 84 (June 13, 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm? abstract_id=916345 ......................28

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

Defendant BNY Corporate Trustee Services Limited (the "<u>Trustee</u>"), by its undersigned counsel, respectfully submits this Memorandum of Law in support of its motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, as made applicable in this adversary proceeding by Rule 7056 of the Federal Rules of Bankruptcy Procedure, seeking dismissal of this action for declaratory judgment commenced by Plaintiff Lehman Brothers Special Financing Inc. ("<u>LBSF</u>" or the "<u>Debtor</u>"), and respectfully states as follows:

**<u>INTRODUCTION</u>**

While this case involves complicated transactions and offers some novel issues, the threshold issue is almost routine. What property interests existed as of the filing of LBSF's bankruptcy petition? Chapter 11 debtors cannot claim rights that did not exist on the petition date. If LBSF only had a subordinated interest in trust property at the time of filing, it cannot use its bankruptcy filing as a basis to assert a senior interest. If LBSF had no right to claim priority on the petition date, it has no such right now.

If the Debtor's claims were not subordinated at the time of its filing, what protections can it claim under the Bankruptcy Code? While LBSF insists that its interests in executory contracts are insulated against subordination by sections 365(e) and 362(b) of the Bankruptcy Code, it acknowledges that it is dealing with swap agreements and that Congress enacted section 560 for the purpose of eliminating certain protections in the context of swap agreements. Assuming the Debtor's claims were not subordinated prepetition, LBSF's case rests on a narrow reading of the Code by which it hopes to escape the safe harbors established by Congress.

Although the complexity of the subject transactions calls for careful consideration of the underlying documents, the arguments that follow are straightforward. Under applicable non-

bankruptcy law, "Noteholder Priority" and subordination under Condition 44, as defined below, determine LBSF's rights as of the date of its bankruptcy petition. Noteholder Priority and subordination under Condition 44 also are enforceable pursuant to a negotiated subordination agreement. Alternatively, Noteholder Priority and subordination under Condition 44 are effective and enforceable under the safe harbor of section 560.

## FACTUAL BACKGROUND

Perpetual Trustee Company Limited ("Perpetual" or "Noteholder") is the sole holder of two series of credit-linked synthetic notes (the "Notes")[1] originally purchased by Mahogany Capital Limited ("Mahogany") from Saphir Finance Public Limited Company ("Saphir"). Mahogany and Saphir are special purpose entities that were created as vehicles for synthetic collateralized debt obligation transactions structured and arranged by Lehman Brothers International (Europe) ("LBIE"). Mahogany was created to own the Notes issued by Saphir. Mahogany defaulted following events initiated by the bankruptcy filing of LBHI, and Perpetual now holds the Notes as trustee for investors who purchased notes issued by Mahogany.

Each Series of Notes is linked to a credit default swap agreement evidenced by a written confirmation (the "Confirmation")[2] and related ISDA Master Agreement,[3] schedules (the "ISDA

---

[1]     The two series of Notes comprise the following series issuances by Saphir:  (i) Series 2004-11 AUD 75,000,000 Synthetic Portfolio Notes Due 2011; (ii) Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes Due 2011 and Extendable Up to 2016.

[2]     The Confirmation is annexed to the Supplemental Trust Deed and Drawdown Agreement (the "Supplemental Trust Deed") pertaining to each Series.  A copy of the Supplemental Trust Deed pertaining to Series 2006-5 is attached to the Complaint ("Comp.") as Exhibit C.  Although a copy of the Supplemental Trust Deed pertaining to Series 2004-11 is attached to the Complaint as Exhibit B, it omits attached schedules and annexes; therefore, a complete copy of the Supplemental Trust Deed pertaining to Series 2004-11 is attached as Exhibit 1 to the Affirmation of Michael J. Venditto (the "Venditto Aff."), filed contemporaneously herewith.

[3]     See Comp. Ex. D.

Schedules"),[4] and annexes (collectively, the "Derivative Agreement"), entered into between Saphir, the issuer of the Notes, and LBSF, as the swap counterparty (the "Swap Counterparty"). With regard to each Series of Notes, Saphir's obligations to the Noteholder under the Notes and its obligations to LBSF under the related Derivative Agreement are secured by the same assets (the "Collateral"), which assets have been pledged to the Trustee to hold for the benefit of various creditors of Saphir, including Perpetual (as holder of the Notes) and LBSF (as Swap Counterparty under the Derivative Agreement). The Trustee holds the Collateral pursuant to a Trust Deed, as defined below, to which Saphir, LBSF, and the Trustee are parties.

As more fully set forth in the Supplemental Trust Deed, the Swap Counterparty's interest in the Collateral takes priority ("Swap Counterparty Priority") over the interest of Perpetual, unless an event of default occurs on the part of LBSF as Swap Counterparty under the Derivative Agreement. If an event of default occurs on the part of LBSF under the Derivative Agreement, the priorities are reversed and Perpetual is entitled to priority over LBSF ("Noteholder Priority").

Condition 44 of the supplemented Terms and Conditions of the Notes ("Condition 44") similarly subordinates certain interests of LBSF if early redemption of the Notes is required and LBSF is in default under the Derivative Agreement. Where LBSF has defaulted under the Derivative Agreement and is owed a termination payment by its counterparty (Saphir), Condition 44 entitles the Noteholder to receive from the proceeds of the sale of the Collateral (a) the Outstanding Principal Amount of the Notes, plus (b) accrued interest as the Early Redemption

---

[4]     Schedules to the ISDA Master Agreement pertaining to each Series are as follows:  (i) the Schedule to the ISDA Master Agreement, dated as of October 10, 2002, as amended and restated on January 30, 2004, pertaining to the 2004-11 Series (Venditto Aff. Ex. 2); and (ii) the Schedule to the ISDA Master Agreement, dated as of October 10, 2002, as amended and restated on July 21, 2006, pertaining to the 2006-5 Series (Venditto Aff. Ex. 3).

Amount, prior to any application of the Collateral proceeds towards LBSF's claims under the Derivative Agreement.

Under the Derivative Agreements, an event of default on the part of LBSF occurred on September 15, 2008, when LBHI, LBSF's guarantor and credit support provider, filed bankruptcy. On December 1, 2008, Saphir, at the direction of the Noteholder, delivered notices to LBSF terminating the Derivative Agreements.

Upon LBHI's bankruptcy filing, Noteholder Priority became effective. Assuming an amount is due to LBSF as a termination payment under the Derivative Agreements, LBHI's bankruptcy also entitles the Noteholder to priority under Condition 44.

## A.    Procedural History

### 1.    Bankruptcy Court Proceedings

On September 15, 2008, LBHI, the third-party guarantor (the "Credit Support Provider") under the Derivative Agreements, filed its petition for relief under the Bankruptcy Code.[5] On October 3, 2008, LBSF filed its Chapter 11 petition for relief.

LBSF commenced the instant adversary proceeding against the Trustee on May 20, 2009. See Complaint (D.I. 1). On June 22, 2009, the Trustee filed a Motion to Dismiss the Complaint or Alternatively Staying the Adversary Proceeding on grounds of failure to join an indispensable party under FRCP 19, comity, and *forum non conveniens* (D.I. 13). On August 12, 2009, this Court denied the motion to dismiss (D.I. 43).[6] The Trustee filed its Answer and Affirmative Defenses on August 24, 2009 (D.I. 44).

---

[5]    LBHI's guarantee is attached to the Supplemental Trust Deed pertaining to each Series.

[6]    The Trustee has maintained that the matters at issue in this proceeding should be determined by the English Courts and under English law. The present summary judgment motion is focused solely on whether or not U.S. bankruptcy law, to the extent applicable, would preclude the enforcement of certain provisions of the Transaction Documents. The Trustee reserves the right to further brief and argue when appropriate its primary argument that

Continued on following page

Shortly after the filing of the Complaint, but prior to the deadline for the Trustee to file a responsive pleading, LBSF requested and received permission to file a motion for summary judgment.  <u>See</u> Letter to Judge Peck, dated June 1, 2009 (D.I. 5).  LBSF sought to place its legal argument before the English Court in the *Perpetual* action, defined below, prior to trial in that action.  <u>Id.</u>  LBSF submitted its motion for summary judgment on June 10, 2009 (D.I. 6).

This Court subsequently entered an Order authorizing the Trustee to file a cross-motion for summary judgment and setting a briefing schedule for LBSF's and the Trustee's motions.  <u>See</u> Order Regarding Briefing Schedule and Hearing for Cross-Motions for Summary Judgment, dated August 27, 2009 (D.I. 51).

## 2. <u>English Court Proceedings</u>

The Trustee declined to comply with Perpetual's request to enforce Noteholder Priority because LBSF's claim of priority remained unresolved and because Perpetual failed to offer the Trustee the requisite indemnity.  On May 13, 2009, Perpetual commenced an action against the Trustee in the High Court of Justice, Chancery Division, Royal Court of Justice, London, England, captioned *Perpetual Trustee Company Limited, Claimant, against BNY Corporate Trustee Services Limited and Lehman Brothers Special Financing Inc., Defendants*, Claim No. HC09C01612 ("<u>*Perpetual*</u>"), seeking a declaration that the Trustee is required to make payment to Perpetual, in priority to LBSF, under Noteholder Priority.  Perpetual contended, *inter alia*, that Noteholder Priority applied as a result of an event of default attributable to LBSF under the Derivative Agreement by virtue of the September 15, 2008 bankruptcy filing of LBHI.  <u>See</u> *Perpetual* Claim Form (CPR Part 8) (Comp. Ex. H).

---

Continued from previous page
English law governs and that the English Court should be the Court which makes any binding decisions on the enforceability of the Transaction Documents.

On May 20, 2009, LBSF moved to intervene in *Perpetual* and sought a stay of that action. LBSF's motion to intervene was not contested by Perpetual or the Trustee and was granted by the English Court on May 21, 2009.

The English Court held a trial in *Perpetual* from July 7 through 9, 2009. LBSF, Perpetual, and the Trustee appeared through counsel and submitted evidence. See Hearing Transcripts, dated July 7 – 9, 2009 (Venditto Aff. Exs. 4, 5, 6).

On July 28, 2009, the English Court issued a Judgment in which it held, *inter alia*, that Noteholder Priority became effective on September 15, 2008, when LBHI, the Credit Support Provider under the Derivative Agreements to which LBSF was Swap Counterparty, filed its Chapter 11 petition. See Judgment, ¶¶ 24, 49 ("Accordingly I do not think there can be any doubt that an event of default, as defined, arose on 15th September 2008, Lehman BSF was the defaulting party in respect of it and that that was an event other than the insolvency of Lehman BSF.") (Venditto Aff. as Ex. 7).

In so holding, the English Court expressly rejected LBSF's argument that Noteholder Priority became effective only upon termination of the swap transactions. See Judgment, ¶ 52. LBSF contended that, because the Notices of Early Termination of the swap agreements identified the bankruptcy filing of LBSF as the event of default triggering Saphir's right to terminate the swaps and causing Noteholder Priority to become effective, the LBHI bankruptcy filing had no effect upon the parties' rights. The English Court held that Noteholder Priority became effective independently of the early termination of the swap transactions and did not depend on the event of default referenced in the Notices of Early Termination:

> I do not accept [LBSF's] submission. The security may become enforceable under clause 5.5 of the [Supplemental] Trust Deed otherwise than on the termination of the swap agreement. Had it been intended that the priorities should depend on any such termination, clause 5.5 of the Supplemental Trust Deed could

easily have so provided. Plainly the event of default sufficient to trigger clause 5.5 of the Supplemental Trust Deed must precede the termination of the swap agreement. I see no reason why . . . Perpetual . . . should not be entitled to rely on the event of default constituted by Lehman Brothers Holdings Inc filing for Chapter 11 protection as triggering clause 5.5 of the Supplemental Trust Deed.

Judgment, ¶ 55.

Separately, the English Court found: "There is no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency." Judgment, ¶ 46. The Chancellor held that the "plain . . . intention of all parties was that the priority afforded to Lehman BSF was conditional on Lehman BSF continuing to perform the swap agreement." Id. ¶ 45. "[S]o regarded, the priority of Lehman BSF never extended to a time after the event of default in respect of which it was the defaulting party had occurred." Id. Accordingly, the English Court determined that LBSF's interest in the Collateral was "always limited and conditional." Because LBSF's interest was limited under the Derivative Agreement, a priority interest in the Collateral "never could have passed to a liquidator or trustee in bankruptcy free from those limitations and conditions as to its priority." Id.

The Chancellor held that, because Noteholder Priority took effect prior to LBSF's bankruptcy filing, and because in any event LBSF never had more than a limited right to priority, the Noteholder Priority provisions did not violate the anti-deprivation principle under English law.[7] Judgment, ¶¶ 49-55.

On August 17, 2009, LBSF filed a notice of its intent to appeal the Judgment. See LBSF's Notice of Appeal filed in *Perpetual* (Venditto Aff. Ex. 8). A hearing to consider the

---

[7] The "anti-deprivation principle" is the English equivalent to the ban on *ipso facto* clauses codified in section 365(e)(1) of the Bankruptcy Code. As explained by the Court in *Money Markets International Stockbrokers Ltd v. London Stock Exchange Ltd* [2002] 1 WLR 1150, ¶ 87: "there cannot be a valid contract that a man's property shall remain his until bankruptcy, and on the happening of that event go over to someone else, and be taken from his creditors." See Judgment, ¶ 26 (citing *Money Markets*).

appeal has yet to be scheduled, but unless and until the Judgment is overturned, the principle of *res judicata* precludes LBSF from seeking to relitigate the determination that Noteholder Priority took effect prior to LBSF's bankruptcy filing.

**B.    Structure Of The Transactions**

In each Series of Notes, Saphir contracted to pay the holder of the Notes quarterly interest payments on the outstanding principal amount of the Notes, and to repay principal upon maturity.  <u>See</u> Terms and Conditions of the Notes, as supplemented, Condition 13.[8]  Throughout the life of these transactions, the amounts payable with regard to each Series of Notes was dependent upon the credit performance of the hypothetical portfolio of certain entities (the "<u>Reference Portfolio</u>") that was the subject of the Derivative Agreement entered into between Saphir, as issuer of the Notes, and LBSF, as Swap Counterparty.  <u>See</u>, *e.g.*, Series Prospectus, Risk Factors at 6 (Comp. Ex. C).  In certain circumstances, the Notes may be required to be redeemed early, in which case special rules apply to determine the amount payable to the Noteholder.[9]

Each transaction was effectuated through several contemporaneous parts, all governed by and construed in accordance with English law.  Upon the issuance of each Series of Notes, Saphir used funds invested by the Noteholder to purchase the Collateral (consisting of highly-

---

[8]    The base Terms and Conditions of the Notes are attached as Schedule 2, Part C to the Principal Trust Deed (Comp. Ex. A).  A copy of the supplemented Terms and Conditions of the Notes, in which Condition 44 appears, is attached to the Offering Circular Supplement for the 2004-11 Notes, which is part of the Supplemental Trust Deed pertaining to the 2004-11 Series (Venditto Aff. Ex. 1) and to the Series Prospectus for the 2006-5 Notes, which is part of the Supplemental Trust Deed pertaining to the 2006-5 Series (Comp. Ex. C).

[9]    <u>See</u> Conditions 6 and 10 of the base Terms and Conditions in the Principal Trust Deed, as modified by Conditions 38 and 44 of the supplemented Terms and Conditions appearing in the Supplemental Trust Deed.

rated bank debt securities).[10]  At the same time, Saphir entered into the Derivative Agreements, corresponding to each Series of Notes, with LBSF as Swap Counterparty.  See ISDA Master Agreement; ISDA Schedules; Confirmations.  LBSF's obligations under the Derivative Agreements were guaranteed by LBHI, as Credit Support Provider, pursuant to a third party guarantee.

Payments from Saphir to the Noteholders of each Series were designed in the ordinary course to be funded through the operation of the Derivative Agreement for that Series.  In each Derivative Agreement, LBSF agreed to pay Saphir amounts equal to those Saphir was obligated to pay to the Noteholder under the Notes, and Saphir agreed to pay LBSF amounts equal to those due to Saphir in respect of the Collateral.  So long as LBSF performed its obligations under each Derivative Agreement and the Collateral performed in accordance with its terms, the Noteholder and LBSF could be assured of receiving the amounts for which they bargained.

The Transaction Documents (as defined below) contemplated that Saphir might default under the Terms and Conditions of the Notes and/or the Derivative Agreement and that LBSF might default under the Derivative Agreement.  Accordingly, the Transaction Documents provided for the termination of the Derivative Agreement and early redemption of the Notes in such circumstances.  In that event, Saphir would be obligated to make a lump sum payment to the Noteholder for redemption of the Notes, and either LBSF or Saphir would be obligated to make a lump sum payment to the other based on the termination value of the Derivative Agreement.

---

[10]    Collateral for the Saphir Series 2004-11 primarily consists of AUD 75 million floating rate notes issued by Australia and New Zealand Banking Group Limited.  See Series 2004-11 Supp. Deed, § 1.4 (Venditto Aff. Ex. 1).  Collateral for Saphir Series 2006-5 primarily consists of AUD 50 million floating rate notes issued by the Royal Bank of Scotland plc.  See Series 2006-5 Supp. Deed,§ 1.4 (Comp. Ex. C).  The property is held in custody accounts in England and Australia that are administered in England.

In the event of a default attributable to LBSF (such as the bankruptcy of LBHI as Credit Support Provider), the Collateral for each transaction would serve as the principal source of payment by the issuer (Saphir) of its obligations both to the holder of the Notes and to LBSF under the Derivative Agreement. The Transaction Documents, as defined below, contemplated the possibility that the available assets might be insufficient to pay the amount due from Saphir to the Noteholder as well as any amount due from Saphir to LBSF. Therefore, Condition 44 set forth the parties' agreement as to the amount payable to the Noteholder and the order of priorities in the event of any shortfall.

Because the Collateral had been purchased with the Noteholder's money, Condition 44 gives the Noteholder priority in the event that the transaction fails to function due to LBSF's default. The early redemption and security provisions enable the Noteholder to recover the value of the Collateral or the Outstanding Principal Amount of the Notes in priority over any claim by LBSF for a termination payment under the Derivative Agreement. In a case where LBSF is the defaulting party and a termination payment is due from Saphir to LBSF under the Derivative Agreement, the bargain between the Noteholder and LBSF requires the value of the Collateral to be applied first in paying the Outstanding Principal Amount to the Noteholder before paying the termination value to LBSF under the Derivative Agreement.

Instead of entering into this credit-linked synthetic portfolio transaction, LBSF and the Noteholder could have achieved a substantially equivalent economic result by entering into swap agreements directly with one another. But in structuring the transactions as it did, LBIE created a more liquid and marketable product, and increased the volume of business for the participating Lehman entities. Further, the structure utilized here insulated each of LBSF and Saphir – the Lehman-created special purpose entity that issued the notes – from the credit risk associated with

the other. By making its initial investment in the Notes with which the Collateral was purchased, the Noteholder in substance posted collateral to LBSF covering the maximum amount of credit protection relating to the Reference Entities to which LBSF was entitled under each related Derivative Agreement. This equivalent of full up-front collateral allowed LBSF to be indifferent to the creditworthiness of its counterparty (*i.e.*, Saphir). The transaction structure also included features that served to shield investors from LBSF's credit risk by providing for a guarantee by LBHI and, pursuant to Noteholder Priority and Condition 44, subordination of LBSF's rights. The result of these added investor protections was a much more liquid and marketable product for the Lehman entities.

The priority provisions that LBSF now challenges were structured, arranged, marketed, and sold by LBIE, LBSF, and LBHI, presumably at a considerable profit. LBSF's position in this adversary proceeding is that it should not be bound by the bargain it made with the Noteholders.

## C.     The Transactions Documents

The parties' rights and obligations pertaining to each issuance of Notes and related swaps are embodied in the following documents:

> (i)     the Derivative Agreement, defined herein as the ISDA Master Agreement executed on October 10, 2002, as amended and restated from time to time; the related ISDA Schedule, and annexes thereto; and the related Confirmation evidencing a transaction thereunder; and

> (ii)    the Principal Trust Deed entered into between the Trustee and Dante Finance Public Limited Company ("Dante"),[11] dated October 10, 2002, as amended and restated from time to time, which includes in Schedule 2, Part C the Terms and Conditions of the Notes (Comp. Ex. A), and the Supplemental

---

[11]    Pursuant to a Deed of Accession, dated January 30, 2004, Saphir succeeded as a party to the rights and obligations of Dante under the Principal Trust Deed. See Deed of Accession (Venditto Aff. Ex. 9).

Trust Deed,[12] entered into among LBSF, Saphir, and the Trustee,[13] which contains amendments to the Terms and Conditions of the Notes (the Principal Trust Deed and the Supplemental Trust Deed are referred to together as the "Trust Deed").

The Derivative Agreement and the Trust Deed, which incorporates the Terms and Conditions of the Notes, are referred to herein as the "Transaction Documents." The Transaction Documents are governed by and construed in accordance with English law. See Principal Trust Deed, § 20.1 (Comp. Ex. A.), Supp. Trust Deed, § 14.1 (Comp. Ex. C; Venditto Aff. Ex. 1), ISDA Master Agreement, § 13(a) (Comp. Ex. D), ISDA Schedules (Venditto Aff. Exs. 2, 3).

The Trust Deed sets forth the "Terms and Conditions" of the Notes and binds LBSF as Swap Counterparty under the Derivative Agreement to the terms and conditions in the Trust Deed. See, e.g., ISDA Schedules, § 5(g) (Venditto Aff. Exs. 2, 3). The Trust Deed embodies the security arrangement made in connection with both the Notes and the Derivative Agreement and contains a liquidation mechanism setting forth the priority of interests in the Collateral. See Supp. Trust Deed, § 5.5 (Comp. Ex. C; Venditto Aff. Ex. 1). In all circumstances, certain senior obligations rank ahead of both the Noteholder and LBSF. The respective rankings of the Noteholder and LBSF in relation to the net proceeds available after satisfaction of the senior obligations depend on whether "Swap Counterparty Priority" or "Noteholder Priority" is effective[14] and whether the subordination provisions in Condition 44 apply.

---

[12]     A separate, yet virtually identical, Supplemental Trust Deed was executed in connection with each of the two Series: specifically, the Series 2004-11 Supplemental Trust Deed, dated December 10, 2004 (Venditto Aff. Ex. 1), and the Series 2006-5 Supplemental Trust Deed, dated March 17, 2006 (Comp. Ex. C).

[13]     In certain documents, the Trustee is referred to by its former name, J.P. Morgan Corporate Trustee Services Limited.

[14]     Two other priority options, "Pari Passu Ranking" and "Other Priority," are not relevant in this case.

The Supplemental Trust Deed requires the Trustee to distribute the proceeds in accordance with either Swap Counterparty Priority or Noteholder Priority, depending on the circumstances. See Supp. Trust Deed, § 5.5.1 (Comp. Ex. C; Venditto Aff. Ex. 1). Under Swap Counterparty Priority, net proceeds are paid to LBSF, until its claims under the Derivative Agreement are satisfied fully, before any liquidation payment is made to the Noteholder. Pursuant to Noteholder Priority, the net proceeds are used to satisfy fully the obligations to the Noteholder before any distributions are made to LBSF. See Principal Trust Deed, §§ 6.2(i), 6.2(iii) (Comp. Ex. A).

In particular, Section 5.5 of the Supplemental Trust Deed provides that Swap Counterparty Priority shall apply unless:

> an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement) . . . in which case Noteholder Priority shall apply.

Supplemental Trust Deed § 5.5 (Comp. Ex. C; Venditto Aff. Ex. 1). In turn, an Event of Default under the ISDA Master Agreement is defined as:

> The occurrence at any time with respect to a party or, if applicable, any Credit Support Provider of such party . . . of any of the following events constitutes an event of default (an "Event of Default") with respect to such party:
>
>        *                *              *
>
> (vii)  Bankruptcy. The party, any Credit Support Provider of such party or any applicable Specified entity of such party: . . . (4) institutes or has instituted against it a proceeding seeking a judgment of insolvency or bankruptcy or any other relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights, or a petition is presented for its winding-up or liquidation . . . .

ISDA Master Agreement § 5(a)(vii)(4) (Comp. Ex. D).

Separately, the Trust Deed (through Conditions 6 and 10 of the Note Conditions in the Principal Trust Deed, as modified by Condition 38 in the Supplemental Trust Deed) obligates Saphir to make an early redemption of the Notes if Saphir defaults in payment to the Noteholder

or if the Derivative Agreement is terminated for any reason. Determination of the amount payable to the Noteholder is governed by Condition 44, which provides different priorities depending on whether or not LBSF is in default under the Derivative Agreement.

LBSF concedes that, "[u]nder Noteholder Priority, LBSF is effectively subordinated so that it would receive payments, if any, after payments are made to noteholders." Comp. ¶ 14. Under Noteholder Priority, LBSF receives no payments because the amounts due to the Noteholder exceeds the available funds. Comp. ¶ 20. LBSF also concedes that Condition 44 of the Terms and Conditions of the Notes effectuates a subordination. Comp. ¶ 15.

The bankruptcy filing of LBHI (the Credit Support Provider) on September 15, 2008 – eighteen days before the bankruptcy of LBSF – constituted an Event of Default under the ISDA Master Agreement of the Swap Counterparty, LBSF. Based on this Event of Default, Noteholder Priority and subordination of LBSF under Condition 44 became applicable under the Trust Deed prior to the date of LBSF's petition.[15]

---

[15] The Event of Default of September 15, 2008, triggered a number of provisions in the Transaction Documents that were designed to operate in conjunction with one another in order to give effect to the bargain between the Noteholder and LBSF. In addition to Section 5.5 of the Supplemental Trust Deed (Noteholder Priority) and Condition 44 (Early Redemption Amount equal to Outstanding Principal Amount plus accrued interest), these include:

- *Section 6 of the ISDA Master Agreement:* Gives Saphir the right to terminate the Derivative Agreement if an Event of Default by LBSF occurs. Upon such termination, a termination payment is required. Here, pursuant to Condition 44, this termination payment (assumed to be due to LBSF in this case) cannot be satisfied with the Collateral proceeds until after the Noteholder receives the Outstanding Principal Amount of the Notes, plus accrued interest.

- *Section 5.4 of the Principal Trust Deed:* Requires Saphir to terminate the Derivative Agreement only as directed by the Noteholder or as consented to by the Trustee.

- *Condition 6, as modified by Condition 38, of the base and supplemented Terms and Conditions of the Notes*: Requires Saphir to redeem the Notes in accordance with Condition 44.

- *Section 5.6 of the Principal Trust Deed*: Requires the Trustee, subject to satisfaction as to indemnification, to enforce the security over the Collateral, if it has become enforceable and enforcement has been directed by the Noteholder.

Continued on following page

**D      Termination Of The Derivative Agreement**

Until September 2008, all relevant payments were made as they fell due.  Since LBHI's bankruptcy filing on September 15, 2008, LBSF has made no payments under the Derivative Agreements.  Saphir, in turn, has made no payments of interest to the Noteholder under the Notes.  As a result, LBSF is in default under the Derivative Agreements and Saphir is in default under the Notes.

Pursuant to the terms of the ISDA Master Agreement, either party can terminate all outstanding transactions under the Derivative Agreement, in connection with each Series, upon the other party's default.  See ISDA Master Agreement, § 6 (Comp. Ex. D).  Under the ISDA Master Agreement, the specified "Events of Default" with respect to LBSF, giving rise to Saphir's right to early termination, include:  (i) the failure to pay amounts due under the Derivative Agreement; (ii) the financial condition of insolvency or the filing of bankruptcy in respect of LBSF or LBHI; and (iii) the failure to perform or comply with obligations under the Derivative Agreements.  Id. at § 5.  The bankruptcy filing of LBHI on September 15, 2008, constituted an "Event of Default" under the ISDA Master Agreement.

On December 1, 2008, at the direction of the Noteholder and with the consent of the Trustee in accordance with Section 4.5 of the Principal Trust Deed, Saphir sent Forms of Early Termination Notice designating that date as the Early Termination Date in respect of the Derivative Agreements.  See Form of Early Termination Notice for Series 2006-5 (Comp. Ex. F) and Series 2004-11 (Comp. Ex. G).  This obligated Saphir to redeem the Notes and entitled the

---

Continued from previous page
- *Section 6.2 of the Principal Trust Deed*:  Sets forth the ranking of Saphir's various creditors in relation to enforcement of the Collateral.  Where Swap Counterparty Priority applies, LBSF ranks ahead of the Noteholder; where Noteholder Priority applies, the Noteholder ranks ahead of LBSF.

Noteholder to early redemption in accordance with Condition 44.  Under Condition 44, the Noteholder has a priority claim for the Outstanding Principal Amount as of the Early Redemption Date, plus certain accrued interest.

LBSF admits that the value of the Collateral (together with any other assets forming part of the Mortgaged Property, as defined in the Transaction Documents, of each of these two Series of Notes) is insufficient to pay both the Early Redemption Amount due to the Noteholder and any termination payment due to LBSF under the Derivative Agreement.  <u>See</u> Comp. ¶ 20.

Perpetual directed the Trustee to enforce its security over the Collateral and other Mortgaged Property for each Series of Notes and to apply all moneys received by the Trustee in connection with the realization or enforcement of such security in accordance with Noteholder Priority.  Perpetual did not, however, provide the Trustee with satisfactory indemnification in accordance with the Transaction Documents.

LBSF, in its Complaint, seeks to prevent application of Noteholder Priority and Condition 44 in accordance with their terms.  <u>See</u> Comp. ¶ 21.

<u>ARGUMENT</u>

LBSF claims that Noteholder Priority and Condition 44 violate the ban on *ipso facto* clauses codified in section 365(e)(1) of the Bankruptcy Code, infringe upon the estate's property interests in violation of section 541(c)(1)(B), and violate the automatic stay set forth in section 362(a)(3).  These arguments all fail on the merits.  For reasons explained below, the Trustee should be granted summary judgment on all counts of the Complaint.

## I.      SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where there exists no genuine issue of material fact and the movant is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56(c).  Where the party bearing the burden of proof at trial fails to prove an essential element of its case all

other facts are rendered immaterial and no genuine issue of material fact exists, thereby

warranting the grant of summary judgment.  Celotex Corp. v. Catrett,  477 U.S. 317, 322-323

(1986).  Stated differently:  "The moving party is 'entitled to a judgment as a matter of law'

because the nonmoving party has failed to make a sufficient showing on an essential element of

[its] case with respect to which [it] has the burden of proof."  Id. at 323.

## II.   LBSF CANNOT USE THE BANKRUPTCY CODE TO REVERSE THE PREPETITION EFFECTIVENESS OF NOTEHOLDER PRIORITY AND CONDITION 44.

It is axiomatic that property interests of the estate are determined as of the petition date.

11 U.S.C. § 541(a)(1) (estate includes all property and legal and equitable interests of the debtor

"as of the commencement of the case").

> The most significant limitation in determining the scope of property of the estate
> is one of timing. . . .  [T]he bankruptcy estate consists of all of the *debtor's* legal
> and equitable property interests that existed *as of the commencement of the case*,
> that is, as of the time that the bankruptcy petition is filed.

5 Allan N. Resnick & Henry J. Sommer, COLLIER ON BANKRUPTCY ("COLLIER") ¶ 541.02 (15th

ed. rev. 2009) (emphasis in original).[16]

With this in mind, the threshold inquiry in this case is, "what rights did LBSF actually

have when it filed its bankruptcy petition on October 3, 2008?"  If LBSF's interest in the

Collateral was subordinated to the interests of the Noteholder as of that date, it cannot use

bankruptcy to enhance its interest.  The automatic stay will not protect an interest that the Debtor

did not have as of the petition date.  And the prohibition on enforcement of *ipso facto* clauses has

no relevance to actions or events occurring prior to the petition date.

---

[16]      The rule that the petition operates as a date of "cleavage" on which property that is owned by the debtor passes into the estate long predates the Bankruptcy Code.  See, *e.g.*, White v. Stump, 266 U.S. 310, 313 (1924) (petition date is the "point of time" which separates the "old situation from the new in the bankrupt's affairs"); Everett v. Judson, 228 U.S. 474, 479 (1913) ("We think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition is filed ….").

Determination of the Debtor's rights on the petition date requires reference to applicable non-bankruptcy law, in this case English law. As a matter of English law, LBSF's rights as of the petition date are determined in accordance with Noteholder Priority and Condition 44. Accordingly, giving effect to Noteholder Priority and Condition 44 is wholly consistent with section 541, contravening neither the automatic stay of section 362 nor the limitation on *ipso facto* clauses codified in section 365(e)(1).

### A.     LBSF's Interests are Confined to those Existing as of its Petition Date.

Section 541 provides a "framework" for determining the scope of the debtor's estate, but it does not determine whether the debtor has an interest in the property in the first instance. COLLIER ¶ 541.05. Determination of a debtor's interests is made under applicable non-bankruptcy law, and the debtor's rights are limited to those held on the petition date. Id.; see also Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc., --- U.S. ---, 128 S. Ct. 2326, 2339 (2008) (court looks to applicable non-bankruptcy law to determine the debtor's property rights in assets); Butner v. United States, 440 U.S. 48, 53-55 (1979) (applying state law to determine debtor's interest in post-petition, pre-foreclosure rents).

As a corollary to this principle, a debtor cannot use its bankruptcy to expand the rights it held immediately prior to the petition. See, *e.g.*, Integrated Solutions, Inc. v. Service Support Specialties, Inc., 124 F.3d 487, 492 (3d Cir. 1997); In re FCX, Inc., 853 F.2d 1149, 1153 (4th Cir. 1988); Moody v. Amoco Oil Co., 734 F.2d 1200, 1213 (7th Cir. 1984). A debtor has no greater contractual rights in bankruptcy than it would have outside of bankruptcy. See, *e.g.*, In re Schokbeton Industries, Inc., 466 F.2d 171, 175 (5th Cir. 1972); In re Advent Corp., 24 B.R. 612, 614 (B.A.P. 1st Cir. 1982); In re TTS, Inc., 158 B.R. 583, 583 (D. Del. 1993) ("541 can provide the debtor's estate no greater interest in property after filing for bankruptcy than the debtor had prior to filing."); see also Musso v. N.Y.S. Higher Educ. Servs. Corp. (In re Royal Bus. Sch.,

Inc.), 157 B.R. 932, 941 (Bankr. E.D.N.Y. 1993) ("§ 541(a) was not designed to enlarge the debtor's rights against others beyond those existing at the commencement of the case.").  Section 541 is not a tool by which a debtor may acquire broader rights or interests than it held outside of bankruptcy.  See, *e.g.*, In re Central Medical Center, Inc., 122 B.R. 568, 573 (Bankr. E.D. Mo. 1990) (denying confirmation of a proposed plan that would subordinate bondholders' interest in funds held by an indenture trustee).[17]

Consistent with this rule, the Supreme Court in Butner stated that a "bankruptcy court should take whatever steps are necessary" to ensure that a creditor receives "the same protection he would have under state law if no bankruptcy had ensued."  440 U.S. at 56.  This means that the intervention of bankruptcy should not deprive a creditor of a priority claim arising under state law.  Id.; see also Travelers Cas. and Sur. Co. of America v. Pacific Gas and Elec. Co., 549 U.S. 443, 450-51 (2007); In re Carmania Corp., 154 B.R. 160, 165 (S.D.N.Y 1993) ("Butner stands for the proposition that [a creditor's] rights in this respect should not diminish or vanish due to the happenstance of bankruptcy").

Accordingly, the interests of LBSF's estate are defined by and limited to those existing under the Transaction Documents as of its petition date.  Bankruptcy does not enable LBSF to resurrect any claim of priority that was lost prior to its petition, nor any right to require subtraction of the swap termination payment from the Noteholder's Early Redemption Amount.

---

[17] This principle also is well-established in bankruptcy jurisprudence.  See, *e.g.*, Sec. Mortgage Co. v. Powers, 278 U.S. 149, 157 (1928).  Interests lawfully extinguished prepetition cannot be resurrected by virtue of bankruptcy.  See State Bank of Hardinsburg v. Brown, 317 U.S. 135, 138-39 (1942) (interest extinguished prepetition under state law cannot be revived; "if Congress intended that bankruptcy might reach back into the past and bring under the court's jurisdiction a former interest in property, which, under state law, had irrevocably passed to a third person, it would have so stated in terms too clear to leave any doubt").

**B.  Because Noteholder Priority And Condition 44 Were Effective Prepetition, They Remain Effective Postpetition.**

Noteholder Priority became effective automatically upon LBHI's bankruptcy filing.  As explained above, the Transaction Documents are governed by and construed in accordance with English law.  Determination of the applicability of Noteholder Priority under English law is simple here because the English Court held in *Perpetual* that Noteholder Priority took effect upon LBHI's bankruptcy filing on September 15, 2008.[18]  This Court reached the same conclusion under the terms of a similar agreement in considering a motion to compel performance under certain swap agreements filed by LBHI against Metavante Corporation.[19]  Because Noteholder Priority took effect weeks prior to LBSF's petition date, the interests of LBSF's estate are subordinated in accordance with Noteholder Priority.  For the same reasons, the subordination of LBSF's rights in accordance with Condition 44 became effective on September 15, 2008, and remains effective today.

While LBSF admits that LBHI filed its petition eighteen days before LBSF filed its own petition, Comp. ¶ 11, LBSF is careful to avoid any reference to the effect of the LBHI

---

[18]      The English Court also found:  "There is no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency."  Judgment, ¶ 46.  As LBSF did not have an unlimited interest, subject to forfeit upon condition of its insolvency, the proscription of forfeitures in § 541(c )(1) and of enforcement of *ipso facto* provisions in § 365(e)(1) are not applicable.  LBSF never had an unqualified right to Swap Counterparty Priority in the first place and its rights do not expand postpetition.

[19]      See Debtors' Motion Pursuant to Sections 105(A), 362 and 365 of the Bankruptcy Code to Compel Performance of Metavante Corporation's Obligations under an Executory Contract and to Enforce the Automatic Stay (D.I. 3691 in Case No. 09-13555 (JMP)).  In its September 15, 2009, bench ruling on the motion to compel in the Metavante matter, the Court stated:

> It is clear that the filing of bankruptcy petitions by LBHI and LBSF constitute events of default under the Agreement.  Specifically, Section 5(a)(vii) of the Agreement provides that it shall constitute an event of default should a party to the Agreement or any credit support provider of such party institute a proceeding seeking a judgment of insolvency or bankruptcy, or any other relief under any bankruptcy insolvency law or similar law affecting creditors' rights.

Transcript of Hearing, dated September 15, 2009, at 108: 12-19 (D.I. 5261).

bankruptcy under the Transaction Documents.  Indeed, LBSF's Complaint repeatedly alleges

that its rights have been diminished "*solely because it filed a chapter 11 bankruptcy case*."

Comp. ¶¶ 1, 2, 16, 20, 21 .  The English Court rejected LBSF's argument that Perpetual could

not treat LBHI's filing as an Event of Default.

The determination in *Perpetual* is binding in this case under the doctrine of *res judicata*.

See Ackerman v. Ackerman, 676 F.2d 898, 905-06 (2d Cir. 1982) (giving *res judicata* effect to

judgment rendered in English action).  *Res judicata* applies if (i) there is an identity of parties in

the two proceedings; (ii) the actions involve the same claims; (iii) the prior judgment was

rendered by a court of competent jurisdiction; and (iv) the decision was final and rendered on the

merits.  Clark v. Amoco Production Co., 794 F.2d 967, 972 (5th Cir. 1986); In re Image

Innovations Holdings, Inc., 391 B.R. 255, 260 (Bankr. S.D.N.Y. 2008).  Applying these factors

in this case, (i) the Trustee and LBSF are parties here and in *Perpetual*; (ii) both actions involve

the applicability and enforceability of Noteholder Priority under the Transaction Documents; (iii)

the English Judgment was rendered by a court of competent jurisdiction in connection with a

transaction governed by English law; and (iv) the English Judgment constitutes a final

disposition of the issues decided there, rendered after trial and in accordance with applicable

rules of procedure.  Accordingly, LBSF must concede that Noteholder Priority took effect prior

to LBSF's petition date.[20]

---

[20]       The force and effect of the English Judgment are not altered by LBSF's pending appeal of that Judgment.
As explained in Tripati v. Henman, 857 F.2d 1366, 1367 (9th Cir. 1988):

> "The established rule in the federal courts is that a final judgment retains all of its *res judicata*
> consequences pending decision of the appeal ...." 18 C. Wright, A. Miller & E. Cooper, FEDERAL
> PRACTICE AND PROCEDURE § 4433, at 308 (1981).  See SSIH Equipment S.A. v. United States Int'l
> Trade Comm'n, 718 F.2d 365, 370 (Fed. Cir.1983).  To deny preclusion in these circumstances
> would lead to an absurd result:  Litigants would be able to refile identical cases while appeals are
> pending, enmeshing their opponents and the court system in tangles of duplicative litigation. See
> Warwick v. Maryland Dep't of Transp., 573 F. Supp. 1011, 1014 (D.Md.1983), *aff'd without
> opinion*, 735 F.2d 1359 (4th Cir.1984).

Because LBSF's interests were governed by Noteholder Priority and subordinated under Condition 44 on the date of LBSF's petition, enforcement of Noteholder Priority and Condition 44 does not implicate the provision in section 541(c)(1) that a debtor's interest in property becomes property of the estate notwithstanding a provision in a contract or under applicable non-bankruptcy law that is conditioned on the debtor's insolvency. 11 U.S.C § 541(c)(1)(B). Section 541 cannot be used to expand the rights LBSF held immediately prior to its bankruptcy petition under applicable non-bankruptcy law. Because the estate, as of the filing of the bankruptcy petition, had no right to claim Swap Counterparty Priority or to claim a swap termination payment by way of subtraction from the Noteholder's Early Redemption Amount, section 541(c)(1) simply does not apply in this case.

For the same reason, application of Noteholder Priority and subordination under Condition 44 does not violate the automatic stay of section 362(a)(3). Section 362(a)(3) enjoins any act to obtain possession of or exercise control over estate property. 11 U.S.C. § 362(a)(3). As discussed above, property of the estate is determined in accordance with Noteholder Priority and Condition 44. LBSF's bankruptcy does not provide a basis for it to create any rights or claims it lost prepetition. See, e.g., In re Seven Stars Restaurant, Inc., 122 B.R. 213, 218 (Bankr. S.D.N.Y. 1990) (debtor could not resurrect lease terminated prepetition because it never became property of the debtor's estate). It follows that application of Noteholder Priority and Condition 44 do not violate section 362(a)(3). See Pioneer Commercial Funding Corp. v. United Airlines, Inc. (In re Pioneer Commercial Funding Corp.), 122 B.R. 871, 877 (S.D.N.Y. 1991) (prepetition setoff of $3.5 million did not violate the automatic stay).

Similarly, the prohibition in section 365(e)(1) on enforcement of certain *ipso facto* clauses has no application here. That section relates only to rights affected "after the

commencement of the [bankruptcy] case." 11 U.S.C. § 365(e)(1)(B).[21] Here, however, Noteholder Priority and subordination under Condition 44 became effective weeks before LBSF's bankruptcy filing. Where the rights of a non-debtor are established prepetition, "section 365(e)(1) does not authorize the bankruptcy court to reach beyond the veil of the petition to reinstate the contract." Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.), 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992) (termination of franchise agreement one day prior to petition day did not violate section 365(e)(1); court had no power to reinstate franchise agreement even where termination was solely on account of impending bankruptcy filing); see also Nemko, Inc. v. Motorola, Inc. (In re Nemko, Inc.), 163 B.R. 927, 938 (Bankr. E.D.N.Y. 1994) (contractor did not violate section 365(e)(1) by terminating purchase orders three days prior to commencement of debtor's bankruptcy); LJP, Inc. v. Royal Crown Cola Co. (In re LJP, Inc.), 22 B.R. 556, 558 (Bankr. S.D. Fla. 1982) ("There is no provision in the Bankruptcy Code which prohibits termination before bankruptcy of a contract on account of insolvency."). In this case, because Noteholder Priority and subordination under Condition 44 became effective prepetition, there is no postpetition attempt to enforce an *ipso facto* provision.[22]

In sum, any changes in the priorities occurring prepetition and pursuant to the terms of the parties' agreement are beyond the scope of sections 541(c), 362(a)(3), and 365(e)(1). Because the Code "does not authorize the bankruptcy court to reach beyond the veil of the

---

[21]    Conditions specified in section 365(e)(1) relate exclusively to the debtor and not to any third party. See In re Amcor Funding Corporation, 117 B.R. 549, 551 (D. Ariz. 1990).

[22]    For the same reason, Condition 44, governing the Early Redemption Payment due under the Notes, does not violate the Code. The event of default that required the Early Redemption Payment under Condition 44 is the same event of default that caused Noteholder Priority to take effect: the bankruptcy filing of LBHI weeks prior to LBSF's bankruptcy. See Supplemented Terms and Condition of the Notes, Condition 44 (Comp. Ex. C; Venditto Aff. Ex. 1).

petition" to create new rights or resurrect rights lost prepetition, the respective rights of LBSF

and the Noteholder are determined in accordance with Noteholder Priority and Condition 44.

## III. NOTEHOLDER PRIORITY AND CONDITION 44 MUST BE ENFORCED IN ACCORDANCE WITH SECTION 510(a).

LBSF's interest here is that of one of two competing claimants to certain assets, the

relative rights of which are established in the Transaction Documents.  Section 5.5 of the

Supplemental Trust Deed sets forth the respective priorities of the two claimants, LBSF and the

Noteholder, and Condition 44 determines the amount due to the Noteholder.  On the facts

presented here, LBSF's claims are subordinated in accordance with the Supplemental Trust

Deed, the Notes, and section 510(a) of the Bankruptcy Code.

The provisions of Section 5.5 and Condition 44 constitute subordination agreements,

enforceable under section 510(a) of the Bankruptcy Code "to the same extent that such

agreement is enforceable under applicable nonbankruptcy law."  11 U.S.C. § 510(a).  The scope

of section 510(a) is one of "unqualified breadth," meaning that, "if an agreement is a

subordination agreement, it must be enforced according to its terms."  COLLIER ¶ 510.03[2].

Although not defined under the Bankruptcy Code, a "subordination agreement," by its plain

terms, is one in which a party to an agreement that otherwise holds "a senior interest[,] agrees to

subordinate that interest to a normally lesser interest."  Bryan A. Garner, BLACK'S LAW

DICTIONARY 68 (17th ed. 1999).  Section 5.5. and Condition 44, on their face, fall within the

broad ambit of section 510(a).  See, e.g., In re Delta Air Lines, 341 B.R. 439, 445 (Bankr.

S.D.N.Y. 2006) ("Statutes are to be construed and applied in accordance with the plain meaning

of the words used by Congress.") (citing Hartford Underwriters Ins. Co. v. Union Planters Bank,

530 U.S. 1, 10 (2000)).  Section 510(a) applies to subordination agreements between a debtor

and third parties no less than as to agreements between non-debtors.  See Enstar Group, Inc. v.

Bank of New York (In re Amret, Inc.), 174 B.R. 315, 319-20 (1994) (M.D. Ala. 1994) (enforcing debtor's subordination of claims against subsidiary pursuant to section 510(a)); see also In re Village Rathskeller, Inc., 147 B.R. 665, 672-73 (Bankr. S.D.N.Y. 1992) (enforcing debtor's subordination of rights under lease to those of its landlord's mortgagee).

The enforceability of a subordination agreement is determined by applicable non-bankruptcy law. In re Best Products Co., Inc., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994) (contract law applies under section 510(a)). The Supplemental Trust Deed is governed by English law and English law enforces subordination agreements in accordance with their terms. The court in *In re Maxwell Communications Corporation Plc* (No. 2) [1993] 1 W.L.R. 1402, 1405, 1420, recognizing the general principle that subordination provisions in a trust deed are enforceable, opined that it "would be a matter of grave concern if . . . English law alone refused to give effect to a contractual subordination [in the context of insolvency proceedings]." [1993] 1 W.L.R. at 1420 (citing, *inter alia*, 11 U.S.C. § 510(a) and In re Credit Industrial Corp., 366 F.2d 402 (2d Cir. 1966)). See also *In re SSSL Realisations (2002) Ltd.* [2006] Ch. 610 (enforcing agreement subordinating debtors' intercompany claims to claims of a surety).[23]

There can be no question as to the enforceability of the Section 5.5 subordination agreement, because the English Court found the parties' agreement valid and enforceable under English law. Where a subordination agreement is enforceable under non-bankruptcy law, it must be enforced according to its terms. See Robinson v. Howard Bank (In re Kors, Inc.), 819 F.2d 19, 24 (2d Cir. 1987); see also In re Credit Industrial Corp., 366 F.2d at 410 ("A bankruptcy court, in order to effectuate its duty to do equity, must enforce lawful subordination agreements according to their terms and prevent junior creditors from receiving funds where they have

---

[23]  Copies of the *Maxwell* and *SSSL Realisations* decisions are attached to the Venditto Aff. as Exs. 10, 11.

explicitly agreed not to accept them.") (internal quotations and citations omitted). Enforcing these agreements in accordance with section 510(a), LBSF's rights are subordinated pursuant to Noteholder Priority and in accordance with Condition 44.

## IV. NOTEHOLDER PRIORITY AND CONDITION 44 ARE ENFORCEABLE UNDER SECTION 560 OF THE BANKRUPTCY CODE.

If Noteholder Priority and subordination under Condition 44 are deemed not to have taken effect prior to LBSF's petition date, they nevertheless are enforceable as part of an integrated "swap agreement" that qualifies for the safe harbor protections codified in section 560 of the Bankruptcy Code, 11 U.S.C. § 560. Section 560 broadly defines swap agreements and related contractual rights, and authorizes termination of such agreements and liquidation of collateral in accordance with the terms thereof, regardless of whether or not such actions might otherwise be barred by section 365(e)(1).

### A. Section 560 Provides A Broadly Worded "Safe Harbor" For Enforcement Of Swap Agreements.

Consideration of section 560 begins with the language of the statute. See Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000). Section 560 provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1) of this title or to offset or net out any termination values of payment amount arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements shall not be stayed, avoided or otherwise limited by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title. As used in this section, the term "contractual right" includes a right . . . arising under common law, under law merchant, or by reason of normal business practice.

11 U.S.C. § 560. Section 101(53B) defines "swap agreement" broadly to include any agreement, including the terms and conditions incorporated by reference in such agreement, which is, *inter alia*, an interest rate swap, currency swap, equity swap, credit swap, or other similar agreement

or transaction.  See 11 U.S.C. § 101(53B).  The definition is functional, encompassing whatever

documents the market deems part of the parties' transaction, and including agreements or

transactions that are similar to any other agreement or transaction referred to in Section 101(53B)

that are of a type that has been, is presently, or in the future becomes, the subject of recurrent

dealings in the swap or other derivatives markets.  Id.; see also Edward R. Morrison and Joerg

Riegel, *Financial Contracts and the New Bankruptcy Code:  Insulating Markets from Bankrupt*

*Debtors and Bankruptcy Judges*, 13 ABI L. REV. 641, 643 (2005).

Section 560 and the definition of "swap agreement" are the culmination of a series of

amendments to the Code in the course of which Congress expanded the scope of the safe harbors

to include documents relating to swap instruments.[24]  In adding section 560 to the Code in 1990,

Congress noted that "U.S. bankruptcy law has long accorded special treatment to transactions

involving financial markets, to minimize volatility."  H.R. Rep. No. 101-484, at 2.  In Hutson v.

E.I du Pont de Nemours and Co. (In re Nat'l Gas Distribs., LLC), 556 F.3d 247, 253 (4th Cir.

2009), where the court held that natural gas supply contracts constituted "swap agreements" even

though they were not traded on the financial markets, were not assignable, and involved physical

delivery of the commodity, the court noted that the "current definition of 'swap agreement' is

---

[24]     These statutory changes began in 1982, when Congress created safe harbors for termination and setoff rights under certain types of financial contracts.  An Act to Amend Title 11, United States Code, to Correct Technical Errors, and to Clarify and Make Substantive Changes with Respect to Securities and Commodities, Pub. L. No. 97-222, Stat. 235 (1982).  These protections were extended to "repurchase agreements" in 1984.  The Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984).  Swap agreements were referenced expressly in 1990, when Congress added section 560 and related definitions.  See An Act to Amend Title 11 of the United States Code Regarding Swap Agreements and Forward Contracts, Pub. L. No. 101-311, 104 Stat. 267 (effect. June 25, 1990); see also The Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106 (effect. Oct. 22, 1994) (amending the definition of swap agreements); The Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23 (effect. Oct. 17, 2005) (amending derivatives-related definitions, including swap agreement); The Financial Netting Improvements Act of 2006, Pub. L. No. 109-390, 120 Stat. 2692 (2006) (broadening the safe harbor provisions and amending the definition of swap agreement).

now extremely broad, covering several dozen enumerated contracts and transactions, as well as combinations of them, options on them, and similar contracts or transactions."

In enacting and expanding the safe harbors, Congress sought to preserve liquidity in the derivatives markets and insulate the financial systems from a systemic liquidity crisis.[25]  See In re Nat'l Gas Distribs., 556 F.3d at 252; In re American Home Mortgage Holdings, Inc., No. 07-11047(CSS), --- B.R. ---, 2009 WL 2855888, at *6 (Bankr. D. Del. Sept. 8., 2009); see also Morrison and Riegel, 13 ABI L. REV. at 663.  Congress's concern was that, absent special protections, non-defaulting participants in derivatives transactions could find themselves subject to the automatic stay for extended periods of time upon the bankruptcy filing of their counterparty.  In re Nat'l Gas Distribs., 556 F.3d at 252.  Were non-defaulting counterparties unable to "liquidate volatile contracts and thereby limit their exposure to market movements," they might default on their own obligations, creating a domino effect in the market.  Id. at 252-53.  The 2005 amendments, in addition to extending safe harbor protection to a universe of derivative-type transactions, confirmed the protections for closing out transactions, and made the "vital" clarification of "enhanced protection to recover claims using pledged collateral and other credit enhancements."  Michael Krimminger, *The Evolution of U.S. Insolvency Law for Financial Market Contracts*, U.S. FEDERAL DEPOSIT INSURANCE CORP. at 84 (June 13, 2006), *available at* http://papers.ssrn.com/sol3/papers.cfm? abstract_id=916345.

By giving "swap agreements" the broadest possible meaning, Congress sought to ensure that these transactions were exempt from the bankruptcy process, thereby creating certainty in the derivatives markets.  See In re Nat'l Gas Distribs., 556 F.3d at 259 ("Congress intended to

---

[25]     The scope of the protections extended to derivatives contracts pursuant to the safe harbors codified in, *inter alia*, section 560, is best understood through Congressional intent.  Calyon New York Branch v. Am. Home Mortgage Corp. (In re Am. Home Mortgage, Inc.), 379 B.R. 503, 514 (Bankr. D. Del. 2008).

serve a countervailing policy of protecting financial markets and therefore favoring an entire class of instruments and participants.").  Section 560 and related code sections, as amended, insulate "entire markets" from the effects of a bankruptcy filing.  13 ABI L. REV. at 652-53.

**B.      The Parties' Swap Agreements Include The Provision For Noteholder Priority and Subordination Under Condition 44.**

Determination of the scope of the "swap agreements" in this case focuses on the documents themselves.  In accordance with section 101(53B)(A) they include, not just the Derivative Agreement (defined herein as the ISDA Master Agreement, ISDA Schedules, annexes and Confirmation), but all terms and conditions incorporated by reference and all documents that the market deems part of the parties' transaction.  In this case, the Transaction Documents form a single, integrated agreement.

The Transaction Documents contain more than 40 internal cross-references, demonstrating their interdependence and confirming that the individual component documents of each Derivative Agreement would not have been executed on a stand-alone basis without execution of the other Transaction Documents.  Evidence as to the integrated nature of the transaction includes, *inter alia*, the following:

- The Principal Trust Deed and the ISDA Master Agreement were executed contemporaneously on October 10, 2002;

- The Supplemental Trust Deed, incorporating by reference and amending, the terms and conditions of the Principal Trust Deed, was executed contemporaneously with the issuance of the Notes (see Terms and Conditions of the Notes, Schedule 2, Part C to the Principal Trust Deed at 73 (Comp. Ex. A) ("The Notes are constituted and secured by a relevant supplemental trust deed . . . dated the date of issue of the Notes")) and with the execution of the Confirmation effecting the Derivative Agreement;

- The Supplemental Trust Deed defines the transaction (*i.e.*, each series issuance) as comprising the Notes, the Derivative Agreement, and the Trust Deed:  See Supplemental Trust Deed, Section I, Details of the Transaction, ¶ 1 (Comp. Exs. B, C);

- The Deed of Accession, to which LBSF is a party, treats the Derivative Agreement and the Trust Deed as parts of an integrated transaction. <u>See</u> Deed of Accession §§ 2.1, 2.2.

Because the Transaction Documents create an integrated transaction, none of which would have been executed without the others, they should be read together as a single contract. <u>See</u> <u>Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.</u>, No. 08 Civ. 9565 (DLC), 2008 WL 5170178, at *11-*12 (S.D.N.Y. Dec. 10, 2008) (hedge agreement had to be read in conjunction with indenture containing waterfall provision and other transaction documents that comprised single, integrated transaction).[26]

This conclusion is consistent with applicable non-bankruptcy law. English courts consider the nature of the transaction as a whole, and hold that multiple documents comprise a single, indivisible contract where it would make little sense for one of the documents to exist without reference to the others. CHITTY ON CONTRACTS, Common Law Library, Vol. I at 12-067 (13th ed.) ("Several instruments made to effect one object may be construed as one instrument, and be read together, but so that each shall have its distinct effect in carrying out the main design.").[27]

---

[26] LBSF cannot contend otherwise, as it has argued in other adversary proceedings involving similar provisions that ISDA agreements and related trust indentures must be read together as part of a single transaction. <u>See</u> *Lehman Brothers Holdings Inc. v. Libra CDO Limited*, Adv. Pro. No. 09-01177 (JMP), Response to Cross-Motion for Summary Judgment (D.I. 18) at ¶¶ 24-25, 29, 38 (cross-references demonstrate that documents "operate together inextricably" and that the indenture serves "to establish the structure of the transaction for all the participants"); <u>see</u> <u>also</u> *Lehman Brothers Special Financing Inc. v. Ballrock ABS CDO 2001-1 Limited*, Adv. Proc. No. 09-01032(JMP), Lehman Brothers Special Financing Inc.'s Response in Opposition to Ballrock ABS CDO 2007-1 Limited's Motion to Dismiss, dated July 7, 2009 (D.I. 37) at ¶¶ 19-20 ("[t]hese documents were executed on the same day, function together, and cross-reference each other … [a]nd each agreement expressly contemplated events occurring under another agreement.").

[27] This is similar to the analysis under New York law, considering whether the separate instruments were executed contemporaneously, by the same parties, for the same purpose, and in the course of the same transaction, and whether interdependence appears from cross-references. <u>See</u> <u>Pieco, Inc. v. Atlantic Computer Sys., Inc. (In re Atlantic Computer Sys., Inc.)</u>, 173 B.R. 844, 851 (S.D.N.Y. 1994); <u>In re Enron Corp.</u>, 349 B.R. 96, 106 (Bankr. S.D.N.Y. 2006). "Even if the writings are executed at different times . . . Williston tells us that contracts should be interpreted together if 'the parties assented to all the promises as a whole, so that there would have been no bargain

Continued on following page

The Supplemental Trust Deed, including the provision for Noteholder Priority in Section 5.5 and subordination under Condition 44, clearly is part of the parties' "swap agreement." Consistent with section 101(53B)(A)(ii)(I), ISDA Schedule, ¶ 5(g) incorporates terms and conditions of the Trust Deed into the Derivative Agreement and provides that the Trust Deed controls in the event of any conflict. And consistent with sections 101(53B)(A)(iii) and (vi), the Supplemental Trust Deed, having been marketed as part of the transaction, is a document that "the market deems part of the parties' transaction." See Morrison and Riegel, 13 ABI L. REV. at 643. As an integral part of the "swap agreements" in these cases, the Trust Deed, as supplemented, details many of the rights, duties, and obligations of the parties, establishes the respective priority of the parties' rights and claims, and provides the liquidation mechanism for enforcement of such rights.

### C. Noteholder Priority and Subordination Under Condition 44 Come Within The Safe Harbor Of Section 560.

Section 5.5 of the Supplemental Trust Deed and Condition 44 set forth the priorities applicable in connection with the liquidation of Collateral following default by LBSF (as Swap Counterparty). As "contractual rights" governing liquidation – rights "arising under common law, under law merchant, or by reason of normal business practice" – these provisions come within the safe harbor of section 560. This conclusion is supported by the plain meaning of the statute, the broader structure of the Code, and legislative history.[28]

---

Continued from previous page

whatever if any promise or set of promises had been stricken.'" Commander Oil Corp. v. Advance Food Serv. Equip., 991 F.2d 49, 53 (2d Cir. 1993) (citations omitted).

[28]     Where "a statute's language is plain, the sole function of the courts, at least where the disposition by the text is not absurd, is to enforce it according to its terms." Hartford Underwriters Ins. Co. v. Union Planters Bank, 530 U.S. 1, 6 (2000); United States v. Ron Pair Enters., Inc., 489 U.S. 235, 240 (1989) (interpreting revised section 506(b) in accordance with plain meaning to allow recovery of interest on oversecured creditor's claim despite holdings to the contrary based on previous iterations of bankruptcy law).

Starting with the language of the statute, section 560 expressly authorizes netting out the termination value of a "payment amount" arising in connection with liquidation of a swap agreement. The Code clearly anticipates payment, and payment necessarily is in accordance with the priority established in the documents as a "contractual right." Consistent with this reading, the terms "liquidate" and "liquidation" contemplate payment.[29] The common meaning of "liquidate" includes "[t]o settle (an obligation) by payment or other adjustment," and "[t]o ascertain the liability and distribute the assets of (an entity), esp. in bankruptcy or dissolution." BLACK'S LAW DICTIONARY 941. Similarly, "liquidation" involves "[t]he act of settling a debt by payment or other satisfaction." BLACK'S LAW DICTIONARY 942. See Arthur Anderson LLP v. United States, 544 U.S. 696, 705 (2005) (obtaining plain meaning from dictionary definition); In re Nat'l Gas Distribs., 556 F.3d at 255, 257 (citing BLACK'S LAW DICTIONARY); Four Points Shipping & Trading, Inc. v. Poloron Israel, L.P., 846 F. Supp. 1184 (S.D.N.Y. 1994).

While LBSF has advocated a narrow interpretation of section 560, treating Noteholder Priority and subordination under Condition 44 each as a "modification" of the parties' rights, in truth, nothing is modified by application of Noteholder Priority and Condition 44. Where there is an event of default attributable to LBSF, Section 5.5 of the Supplemental Trust Deed and Condition 44 are unequivocal in providing that the parties' rights are determined in accordance with Noteholder Priority with no deduction of the termination amount due LBSF from the Noteholder's Early Redemption Amount. Because the contractual right to liquidate a swap under section 560 has its origins, not in the statute, but in the parties' written agreement, Collier ¶ 560.04, Noteholder Priority and Condition 44 are the embodiment of the parties' relative rights

---

[29]    "[U]nless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." Perrin v. United States, 444 U.S. 37, 42 (1979).

with regard to liquidation of the transactions at issue here.  As such, Noteholder Priority and Condition 44 do not effect a "modification" of rights, but rather set forth the agreement of the parties with regard to liquidation of the swap agreements.  As liquidation mechanisms, Section 5.5 of the Supplemental Trust Deed and Condition 44 fall squarely within the safe harbor.[30]

The statutory authorization given non-defaulting parties to liquidate or net out pursuant to "normal business practices" reinforces this conclusion.  Payment in accordance with contractual priorities is an integral part of the normal business practice for liquidation or netting out of swap agreements.  Upon an event of a default, swap agreements require immediate payment.  Collier ¶ 560.04.  As a matter of normal business practice, liquidation of a swap requires closing out the transaction by delivering collateral or making a cash payment in final settlement and termination of the swap.  See, e.g., International Swaps and Derivative Association, Inc., Memorandum of Law dated May 15, 2008, *Validity and Enforceability of Collateral Arrangements under the ISDA Credit Support Documents* at 34 (non-defaulting party may "use any Collateral held to satisfy amounts due from the Security Collateral Provider free from any automatic stay"); 37 ("[B]y permitting a party to 'net out any termination values', section 560 of the Code makes clear that the provision contained in the ISDA Master Agreement for close-out netting will be enforceable upon termination of a 'swap agreement' ….").[31]

---

[30]    By analogy, the Court in <u>Calpine Energy Servs., L.P. v. Reliant Energy Electric Solutions, L.L.C. (In re Calpine Corp.)</u>, Adv. No. 08-1251(BRL), 2009 WL 1578282, at *1, *7 (Bankr. S.D.N.Y. May 7, 2009), enforced the termination settlement calculation clause contained in a master power purchase and sale agreement.  While the Court held that provisions incidental or ancillary to an *ipso facto* clause fall outside the safe harbor for derivatives, a provision for determining the amount payable upon termination is protected.  <u>Id.</u> at *7.  Section 5.5 of the Supplemental Trust Deed serves the same function as the clause enforced in <u>Calpine</u>, governing payment in connection with liquidation of the swap agreement.

[31]    Available at <u>www.isda.org</u>.

Section 560 also must be construed in the context of contemporaneous amendments exempting derivatives from the automatic stay of section 362. Sections 362(b)(17) and 362(o) were enacted to confirm that derivatives transactions are exempt from the automatic stay. Section 362(b)(17) provides that the automatic stay does not bar "the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement." 11 U.S.C. § 362(b)(17). Section 362(b)(17) extends, not just to netting out transactions, but to self-help foreclosure on collateral pledged in connection with a swap transaction.[32] Section 362(o) provides that the exercise of any rights under section 362(b)(17) cannot be stayed by any order of the court. 11 U.S.C. § 362(o). As a consequence, "[p]rotected parties enjoy the same rights in bankruptcy as they do outside." Morrison and Riegel, 13 ABI L. REV. at 645.

Section 362(b)(17) confirms that the safe harbor extends to distributions made in accordance with the parties' written agreement. This section leaves no room for reading section 365(e)(1) to limit the scope of section 362(b)(17), in effect imposing a stay where Congress expressly stated that none should apply. A contrary reading of these sections, permitting termination, but subjecting distribution to the automatic stay, would make section 362(b)(17)

---

[32] The forerunner to Section 362(b)(17) was section 362(b)(14), as added to the Code in 1990. This section, exempting setoff between parties to a swap agreement, was enacted for the purpose of permitting the non-defaulting party to "use of any collateral previously pledged by the debtor to guarantee, secure, or settle any swap agreement." H.R. Rep. No. 101-484, 101st Cong., 2d Sess. 226-27 (1990). Section 362(b)(17) was amended in 2005 so as to better "protect enforcement, free from the automatic stay, of setoff or netting provisions in swap agreements." Congress made clear in the Committee report that the references to "setoff" in this section were "intended to refer also to right to foreclose on … collateral securing swap agreements." H.R. Rep. No. 109-31, at 132 (2005). Further amendments in 2006 confirmed that this section exempted from the automatic stay, *inter alia*, "self-help foreclosure-on-collateral rights …." H.R. Rep. No. 109-648, 109th Cong., 2d Sess. 7 (2006).

superfluous.[33]  It would be wholly inconsistent with Congress's deliberate creation and subsequent confirmation and expansion of safe harbors for swap agreements.[34]  Reading sections 560 and 362 together leaves no doubt that Congress intended that final settlements – distributions of cash or other property in accordance with contractual priorities – be exempt from the automatic stay.

This conclusion is further buttressed by statutory history.[35]  As explained above, the purpose of section 560 is to remove derivative transactions from limitations imposed by the Bankruptcy Code, including sections 365(e)(1) and 362(a)(3).  The breadth of the section was confirmed in 2005, when Congress expanded the statute from "termination of a swap agreement" to "liquidation, termination, or acceleration of one or more swap agreements" and concomitantly expanded the definition of protected "contractual rights."  Pub. Law. 109-8, 119 Stat 23, 179 (2005).  Reading the Code to permit a swap agreement to be terminated, yet staying distributions pursuant to the swap agreement, would defeat the statutory purpose:  the non-defaulting party would remain subject to the automatic stay, unable to access amounts payable following termination.  This would serve only to frustrate the congressional goal of preserving liquidity in the derivatives markets by permitting non-defaulting parties to close out transactions and recover

---

[33]      *Cf.* Connecticut v. United States Dep't of the Interior, 228 F.3d 82, 88 (2d Cir. 2000) *cert. denied*, 532 U.S. 1007 (2001) (court disfavors an interpretation of a statute that renders language superfluous); Garcia v. Shanahan, 615 F. Supp. 2d 175, 183 (S.D.N.Y. 2009) ("cardinal principle of statutory construction [is] that a statute should, upon the whole, be construed so that, if possible, no clause, sentence or word is rendered superfluous, void or insignificant") (modification in original).

[34]      "Normal business practice" confirms this construction.  See International Swaps and Derivative Association, Inc., Memorandum of Law dated December 15, 2007, *Enforceability of the Termination, Close-Out and Multibranch Netting Provisions of the 1987, 1992 and 2002 ISDA Master Agreements* at 19 (The exception to the automatic stay in 362(b)(17) "permits netting of payment (or other property transfer) obligations at any time, including obligations arising after the filing of the bankruptcy petition.").  Available at www.isda.org.

[35]      Although legislative history need not be consulted where the terms of a statute are plain and unambiguous, reference to such history can serve to confirm statutory interpretation based upon the plain meaning.  See, *e.g.*, Lamie v. U.S. Trustee, 540 U.S. 526, 539 (2004) (plain meaning interpretation of statute supported by legislative history and policy considerations).

claims, thereby insulating derivatives markets from the effects of bankruptcy. Such a construction cannot be condoned. See Universal Church v. Geltzer, 463 F.3d 218, 224 (2d Cir. 2006) (legislative history used to discern congressional intent and avoid statutory interpretation that would lead to absurd result, contrary to policies underlying Bankruptcy Code).

To summarize, because Noteholder Priority and Condition 44 constitute the mechanisms pursuant to which the parties' transactions are liquidated, and because the parties' transactions are the embodiment of a "swap agreement" as defined in the Code, these provisions fall within the scope of the safe harbor protections codified in section 560. Accordingly, Noteholder Priority and Condition 44 should be enforced.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Trustee's motion for summary judgment and dismiss the Debtor's claims for declaratory judgment and for such other and further relief as the Court deems just and proper.


Dated: September 25, 2009
      New York, New York

**REED SMITH LLP**


/s/ *Eric A. Schaffer*
Eric A. Schaffer
Michael J. Venditto
David M. Schlecker
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450

*Attorneys for BNY Corporate Trustee*
*Services Limited*
