WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re:                                                           :         Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :         Case No. 08-13555 (JMP)

                              Debtors.                    :

———————————————————————— x

LEHMAN BROTHERS SPECIAL FINANCING INC.    :

                              Plaintiff,                    :

-against-                                                       :         Adversary Proceeding
                                                                    :         No.: 09-01242 (JMP)

BNY CORPORATE TRUSTEE SERVICES LIMITED    :

                              Defendant.                  :

———————————————————————— x

**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO BNY CORPORATE TRUSTEE**
**SERVICES LIMITED'S MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ........................................................................................................ iii

Preliminary Statement ..................................................................................................... 1

Argument ........................................................................................................................ 5

I.  LBSF Had a Property Interest in the Collateral as of the Commencement of Its Bankruptcy Case ............................................................................................. 5

    A.  LBSF Maintained a Property Interest in the Collateral at the Time it Commenced Its Bankruptcy Case ..................................................................... 7

    B.  The Transaction Documents Clearly Show That No Modification of LBSF's Property Rights Took Place Prior to LBSF's Bankruptcy Filing ........... 12

        1.  Noteholder Priority Does Not Go into Effect Until Preconditions Are Met and the Collateral Is Realized or Enforced ............................... 12

        2.  Condition 44 Is Inoperative Until Early Termination of the Swap Agreements or Acceleration for an Event of Default Under the Notes ............................................................................................................. 15

    C.  Because No Termination Notice Was Sent Until After LBSF's Bankruptcy Filing, LBHI's Chapter 11 Filing Did Not Deprive LBSF of Its Property Interest in the Collateral ..................................................................... 16

    D.  LBSF's Chapter 11 Filing Was the Only Event of Default Designated in Saphir's Termination Notices ............................................................................. 18

    E.  Any Modification of LBSF's Property Rights Based on LBHI's Filing Would Also Constitute an Unenforceable *Ipso Facto* Provision ......................... 19

II.  The English Court's Interpretation of the Transaction Documents Does Not Have a Binding Effect on This Court ............................................................................ 23

    A.  The English Court's Comments Regarding the Effect of LBHI's Filing Were Based on a Conclusory Analysis of the Transaction Documents .............. 25

    B.  Comity Should Not Be Extended to the English Court's Interpretation of the Transaction Documents .............................................................................. 27

    C.  The English Court's Decision Does Not Have Binding Effect Pursuant to *Res Judicata* ....................................................................................................... 33

III.  Section 510(a) Is Inapplicable and May Not Be Used to Immunize Section 5.5 and Condition 44 from Being Held Invalid *Ipso Facto* Provisions ......................................... 37

A. Section 5.5 and Condition 44 Do Not Constitute Subordination Agreements Under § 510(a) ................................................................. 38

B. Parties Cannot Contract to Violate the Bankruptcy Code Under the Guise of § 510(a) ........................................................................................... 41

IV. The Safe Harbor Provisions of Section 560 Do Not Apply to Protect the Exercise of Rights Under Section 5.5 and Condition 44 .............................................. 44

    A. Section 5.5 and Condition 44 Are Not Swap Agreements .................................. 44

        1. Section 5.5 and Condition 44 Are Not "Incorporated by Reference" into the Derivative Transactions. ............................................................. 44

        2. The Transaction Documents Are Not a Single Integrated "Swap" ......... 46

        3. The Amendments in 2006 Do Not Protect the Exercise of Rights Under Non-Swap Agreements ................................................................. 47

    B. Section 560 Does Not Protect Enforcement Section 5.5 and Condition 44 ......... 48

        1. "Liquidation" in Section 560 Means Close-Out or Termination. ............ 48

Conclusion and Relief Requested ........................................................................................... 53

CASES

*Alesayi Beverage Corp. v. Canada Dry Corp.*,
   947 F.Supp. 658 (S.D.N.Y. 1996), *aff'd*, 122 F.3d 1055 (2d Cir. 1997) ....................32, 33

*Allied Bank Int'l v. Banco Credito Agricola de Cartago*,
   757 F.2d 516 (2d Cir. 1985)....................................................................................28

*Altmayer-Pizzorno v. L-Soft Int'l, Inc.*,
   Nos. 07-1600, 07-1613, 2008 WL 5082105 (4th Cir. 2008) ...........................................18

*Andrus v. Hamlin (In re Hamlin)*,
   No. 07-50774, 2009 WL 910511 (Bankr. W.D. La. Mar. 31, 2009) ..................................8

*Bank of N.Y. v. Alison J. Treco (In re Treco)*,
   240 F.3d 148 ..................................................................................................29, 30

*Barrett v. United States*,
   651 F.Supp. 611 (S.D.N.Y. 1986).............................................................................34

*Calpine Energy Servs. v. Reliant Energy Elec. Solutions (In re Calpine Corp.)*,
   No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282 (Bankr. S.D.N.Y.
   May 7, 2009)......................................................................................................52

*Calyon N.Y. v. Am. Home  Mortgage, Inc. (In re Am. Home Mortgage, Inc.)*,
   379 B.R. 503 (Bankr. D. Del. 2008) ......................................................................45, 46

*Cervantes-Ascencio v. United States I.N.S.*,
   326 F.3d 83 (2d Cir 2003)......................................................................................20

*Cohen v. Drexel Burnham Lambert Group, Inc.*
   *(In re Drexel Burnham Lambert Group, Inc.)*,
   138 B.R. 687 (Bankr. S.D.N.Y. 1992) .........................................................................8

*Cousins v. Duane Street Assoc.*,
   No. 00-7580, 2001 WL 327084 (2d Cir. 2001) ..............................................................35

*Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*,
   233 F.3d 697 (2d Cir. 2000)....................................................................................35

*Dore v. Kleppe*,
   522 F.3d 1369 (5th Cir. 1975) .................................................................................35

*Edwin C. Levy Co., Inc. v. McLouth Steel Corp. (In the Matter of McLouth Steel Corp.)*,
   20 B.R. 688 (Bankr. E.D. Mich. 1982) .......................................................................11

*Esquire Trade & Fin., Inc. v. CBQ, Inc.*,
   562 F.3d 516 (2d Cir. 2009) .................................................................33

*Farm Credit of Cent. Florida, ACA v. Polk*,
   160 B.R. 870 (M.D. Fla. 1993) ...........................................................41

*Films by Jove Inc. v. Berov*,
   250 F.Supp.2d 156 (E.D.N.Y. 2003) ...................................................28

*Gelb v. Royal Globe Ins. Co.*,
   798 F.2d 38 (2d Cir. 1986) ...................................................................36

*Gozlon-Peretz v. United States*,
   498 U.S. 395 (1991) ...............................................................................19

*Grubin v. Rattet (In re Food Mgmt. Group, LLC)*,
   380 B.R. 677 (Bankr. S.D.N.Y. 2008) ..................................................8

*Herendeen v. Champion Int'l Corp.*,
   525 F.2d 130 (2d Cir. 1975) .................................................................33

*Hertzberg v. Loyal Am. Life Ins. Co. (In re B & K Hydraulic Co.)*,
   106 B.R. 131 (Bankr. E.D. Mich. 1989) .......................................10, 11

*In re Air Safety Int'l, L.C.*,
   336 B.R. 843 (S.D. Fla. 2005) ..............................................................39

*In re Amcor Funding Corp.*,
   117 B.R. 549 (D. Ariz. 1990) ........................................................22, 23

*In re Ames Dep't Stores, Inc.*,
   287 B.R. 112 (Bankr. S.D.N.Y. 2002) ...................................................9

*In re Bank of New Eng. Corp.*,
   364 F.3d 355 (1st Cir. 2004) ................................................................39

*In re Ben Franklin Retail Store, Inc.*,
   202 B.R. 955 (Bankr. N.D. Ill. 1996) ....................................................9

*In re Best Prods. Co.*,
   168 B.R. 35 (Bankr. S.D.N.Y. 1994), *aff'd* 68 F.3d 26 (2d Cir. 1995) ...........................38

*In re Braniff, Inc.*,
   118 B.R. 819 (Bankr. M.D. Fla. 1989) .................................................18

*In re C.A.F. Bindery, Inc.*,
    199 B.R. 828 (Bankr. S.D.N.Y. 1996) ..........................................................................40

*In re Enron Corp.*,
    306 B.R. 465 (Bankr. S.D.N.Y. 2004) ..........................................................................51

*In re GISC, Inc.*,
    130 B.R. 346 (Bankr. M.D. Fla. 1991) ..........................................................................11

*In re Gilbreath*,
    395 B.R. 356 (Bankr. S.D. Tex. 2008) ............................................................................5

*In re Holly's Inc.*,
    140 B.R. 643 (Bankr. W.D. Mich. 1992) ...............................................................39, 41

*In re Margules*,
    323 B.R. 130 (Bankr. S.D.N.Y. 2005) ...................................................................10, 11

*In re Martinez*,
    196 B.R. 225 (D. Puerto Rico May 15, 1996) ..............................................................19

*In re McLean Indus.*,
    68 B.R. 690 (Bankr. S.D.N.Y. 1986) ............................................................................32

*In re McLean Indus., Inc.*,
    74 B.R. 589 (Bankr. S.D.N.Y. 1987) ............................................................................31

*In re Musikahn Corp.*,
    57 B.R. 938 (Bankr. E.D.N.Y. 1986) ............................................................................18

*In re Nakash*,
    190 B.R. 763 (Bankr. S.D.N.Y. 1996) ..........................................................................32

*In re Nat'l Gas Distribs.*,
    556 F.3d 247 (4th Cir. 2009) ........................................................................................46

*In re Operation Open City, Inc.*,
    170 B.R. 818 (S.D.N.Y. 1994) ......................................................................................19

*In re Papeleras Reunidas, S.A.*,
    92 B.R. 584 (Bankr. E.D.N.Y. 1998) ............................................................................30

*In re Pine Lake Vill. Apartment Co.*,
    19 B.R. 819 (Bankr. S.D.N.Y. 1982) ......................................................................38, 39

*In re Rimsat*,
    98 F.3d 956 (7th Cir. 1996) ........................................................................32, 42

*In re Simon*,
    153 F.3d 991 (9th Cir. 1998) .......................................................................31, 32

*In re Sky Group Int'l, Inc.*,
    108 B.R. 86 (Bankr. W.D. Pa. 1989) ..................................................................41

*In re St. Casimir Dev. Corp.*,
    358 B.R. 24 (S.D.N.Y. 2007)...........................................................................10

*In re Texaco*,
    73 B.R. 960 (Bankr. S.D.N.Y. 1987).............................................................10, 41

*In re Village Rathskeller, Inc.*,
    147 B.R. 665 (Bankr. S.D.N.Y. 1992)..............................................................8, 41

*Interbulk v. Dreyfus Corp. (In re Interbulk Ltd.)*,
    240 B.R. 195 (Bankr. S.D.N.Y. 1999)..................................................................46

*Jamaica Shipping Co. v. Orient Shipping Rotterdam (In re Millenium Seacarriers)*,
    354 B.R. 674 (Bankr. S.D.N.Y. 2006) .................................................................29

*Jean-Gilles v. County of Rockland*,
    463 F.Supp.2d 437 (S.D.N.Y. 2006)...................................................................35

*Lehman Bros. Special Financing v. Am. Family Life Assurance Co.,*
    *(In re Lehman Bros. Holding Inc.)*,
    Case No. 08-13555, Adv. Proc. No. 09-1261 ...................................................51

*Mercoid Corp. v. Mid-Continent Inv. Co.*,
    320 U.S. 661 (1944).............................................................................................35

*Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield*
    *(In re Mid-Island Hosp., Inc.)*,
    276 F.3d 123 (2d Cir. 2002)..................................................................................9

*Morrison v. Blitz*,
    No. 88 CIV 5607, 1995 WL 679259 (S.D.N.Y. Nov. 15, 1995) ......................34

*New York Stock Exch. v. Pickard & Co., Inc.*,
    296 A.2d 143 (Del. Ch. 1972)..............................................................................39

*Official Comm. of Unsecured Creditors v. PSS S.S. Co., Inc.*
    *(In re Prudential Lines, Inc.)*,
    928 F.2d 565 (2d Cir. 1991)........................................................................8

*PaineWebber Inc. v. Bybyk*,
    81 F.3d 1193 (2d Cir. 1996)....................................................................45

*Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Techs., Inc.*,
    369 F.3d 645 (2d Cir. 2004)....................................................................23

*Perrotta v. Western Regional Off-Track Betting Corp.*,
    469 N.Y.S.2d 504 (N.Y. App. Div. 1983) ...............................................18

*Pike v. Freeman*,
    266 F.3d 78 (2d Cir. 2001)......................................................................33

*Pravin Banker Assoc., Ltd. v. Banco Popular Del Peru*,
    109 F.3d 850 (2d Cir. 1997)....................................................................28

*R.S. Pinellas Motel P'ship v. Ramada Inns, Inc. (In the Matter of R. S. Pinellas Motel*
    *P'ship)*,
    2 B.R. 11 (Bankr. M.D. Fla. 1979) .........................................................11

*RX Data Corp. v. Dep't of Soc. Servs.*,
    684 F.2d 192 (2d Cir. 1982)....................................................................34

*Salvatore LaMonica v. N. of Eng. Protecting & Indemnity Ass'n Ltd. (In re Probulk Inc.)*,
    407 B.R. 56 (Bankr. S.D.N.Y. 2009).......................................................29

*Select Portfolio Servicing, Inc. v. Love (In re Love)*,
    353 B.R. 216 (Bankr. W.D. Tenn. 2006) ..................................................8

*Slater v. Smith (In re Albion Disposal, Inc.)*,
    152 B.R. 794 (Bankr. W.D.N.Y. 1993) ....................................................9

*United States Lines v. Am. Steamship Owners Mut. Protection & Indemnity Assoc. (In re*
    *United States Lines, Inc.)*,
    197 F.3d 631 (2d Cir. 1999)....................................................................29

*United States v. Whiting Pools, Inc.*,
    462 U.S. 198 (1983)..................................................................................8

*Victrix S.S. Cov., S.A. v. Salen Dry Cargo, A.B.*,
    825 F.2d 709 (2d Cir. 1987)....................................................................31

*Weyant v. Okst*,
198 F.3d 311 (2d Cir. 1999)..............................................................................33

**STATUTES, RULES, AND LEGISLATIVE MATERIALS**

11 U.S.C. § 101(53B) ...............................................................................42, 43, 44, 45

11 U.S.C. § 101(53B)(A)(i) .........................................................................................48

11 U.S.C. § 101(53B)(A)(ii)(I) ...................................................................................48

11 U.S.C. § 101(53B)(A)(iii)-(iv) ...............................................................................48

11 U.S.C. § 362 .............................................................................................. *passim*

11 U.S.C. § 365(e)(1) ..................................................................................... *passim*

11 U.S.C. § 365(e)(1)(B) ................................................................................ *passim*

11 U.S.C. § 510(a) .......................................................................................... *passim*

11 U.S.C. § 541 .............................................................................................. *passim*

11 U.S.C. § 541(c)(1).................................................................................................6, 9

11 U.S.C. § 541(c)(1)(B) ...........................................................................17, 18, 19, 20

11 U.S.C. § 560..........................................................................................................1, 51

28 U.S.C. § 2201......................................................................................................50, 52

Bankruptcy: Swap Agreements & Forward Contracts, Pub. L. 101-311, 104 Stat. 267
(1990)...........................................................................................................45, 47

Bankruptcy Reform Act of 1999 (Predecessor to BAPCPA) (Part III): Hearing on H.R.
833 Before the Subcomm. on Comm'l & Admin. L., 106th Cong. 1 (1999) ...................45

H.R. REP. NO. 101-484 (1990)...........................................................................46, 47, 49

H.R. REP. NO. 109-31 (2005)..............................................................................45, 46, 48

H.R. REP. NO. 95-595, 95th Cong., 1st Sess. (1997), *as reprinted in* 1978 U.S.C.C.A.N.
5963.......................................................................................................................38

*Interest Swap: Hearing on S. 396 Before the S. Subcomm. on Cts. and Admin. Prac. L.* 101st Cong. (1989) ..............................................................................45

S. Rep. No. 989, 95th Cong., 2d Sess. 59 (1978) ........................................38

U.S. Code Cong. & Admin. News 1978 6020 ..............................................38

## Other Authorities

Black's Law Dictionary (5th ed. 1979). ..................................................13

Rhett G. Campbell, *Energy Future & Forward Contracts, Safe Harbors & the Bankruptcy Code,* 78 Am. Bankr. L. J. 1, 22 (2004) .....................................47

Corpus Juris Secondum Guaranty § 2 .....................................................19

International Swaps Dealers Association, User's Guide to the Standard Form Agreements (1987) .............................................................................45

1 Anthony C. Gooch & Linda B. Klein, Documentation for Derivatives: Annotated Sample Agreements & Confirmation for Swaps & Other Over the Counter Transactions (4th ed. 2002) ...............................................45

R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1410 (2d ed. 2002) ............................................................................................33, 34

18 James W. Moore et al., Moore's Federal Practice § 131.41[2] (3d ed. 2009)...............32

Edward Morrison & Joerg Riegel, *Financial Contracts & the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges*, 13 Am. Bankr. L. Rev. 641 (2005) ..................................................................46

6 Charles Alan Wright & Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 1410 (2d ed. 2002).............................................37

Restatement (Second) Judgments § 22 (1981).......................................33

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), by and through undersigned counsel, hereby files this memorandum of law in opposition to the motion for summary judgment filed on by BNY Corporate Trustee Services Limited ("BNY") and in further support of the motion for summary judgment filed by LBSF on June 10, 2009.

PRELIMINARY STATEMENT

1.       LBSF established in its motion for summary judgment that contractual provisions in the Saphir 2006-5 and 2004-11 transactions improperly deprive LBSF of its property interest in receiving payments in priority over noteholders and Unwind Costs, solely because LBSF commenced a chapter 11 bankruptcy case.[1]   These provisions, hence, are unenforceable *ipso facto* clauses that violate sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code.   LBSF also conclusively established that enforcement against LBSF of rights under these contractual provisions is not protected by and does not fall within the limited safe harbors for *ipso facto* clauses contained in 11 U.S.C. §§ 560 and 362(b)(17) because such modification, indeed eradication, of LBSF's rights to payment does not constitute a "liquidation, termination, or acceleration" of a swap agreement, nor it is an "offset or net out" of any termination value arising under or in connection with a swap agreement.

---

[1] Capitalized terms have the same meaning herein as ascribed to them in LBSF's motion for summary judgment.

2. LBSF's summary judgment motion also demonstrates that after having waited almost two months following LBSF's October 3 chapter 11 filing, BNY as the sole noteholder directed the issuer, Saphir, to deliver on December 1, 2008 a notice terminating the swap agreements because of the following single event of default—the chapter 11 filing by LBSF.

3. Rather than dealing head-on with LBSF's contentions or the indisputable facts in the record, much less refute them, BNY attempts to change history merely by waiving a magic wand. Once again, BNY is attempting to foreclose this Court from exercising its proper jurisdiction to decide issues of law arising only under the U.S. Bankruptcy Code—issues that are critical to resolution of this adversary proceeding. BNY seeks to do so by adopting what are now familiar tactics. These include: (1) trying to push backwards to September 15, 2008 the date on which the modification of LBSF's property rights took place by ignoring its own expressly stated reason for the issuer's notice of early termination; (2) creating arguments here that BNY never made to the English court in an effort to expand the reach of that court's limited statements regarding the effect of LBHI's chapter 11 filing; (3) inventing a supposititious *res judicata* argument out of whole cloth that fails of its own weight; and (4) without any analysis or precedent foisting upon the Court the notion that section 510(a) of the Bankruptcy Court is applicable and immunizes the *ipso facto* effect inherent in the modification of LBSF's property rights to receive payments.

4. The Court should note that this is the same BNY that has single-mindedly and to date unsuccessfully sought to dismiss or stay these proceedings in favor of adjudication by the English court. This is the same BNY that, in the face of the Court's explicit request not to appeal denial of its motion to dismiss or stay on indispensability of party and comity grounds until the Court could render a written decision, nonetheless appealed without so waiting. That appeal was

denied by the district court on October 14. This also is the same BNY that participated in preparation of the scheduling order entered on August 7, 2009 that was specifically designed and timed to allow this Court to adjudicate distinct U.S. Bankruptcy Code issues on summary judgment. The schedule was created specifically to accommodate the English court's desire to finalize a judgment in the English case if possible in 2009 following this Court's decision on summary judgment. Finally, this is the same BNY that participated in and gave approval to the process by which this Court transmitted a letter to the English court outlining a clear division of responsibility: this Court to rule on U.S. bankruptcy law issues and the English court to rule on distinct English law issues including English contract and common-law anti-deprivation principles. The English court stated that it would "have regard to [the Court's] request." Ex. A at 1. BNY never voiced an objection or argued to the English court that its judgments would be binding here.[2]

5. BNY's motion for summary judgment ignores this history, as if these events never occurred. BNY now contends that this Court is somehow bound, under the principles of *res judicata*, by the statements of the English court in the July 2009 judgment that an Event of Default under the swap agreement had been triggered by LBHI's chapter 11 filing. Therefore, BNY now contends for the first time that LBSF had no property interest in the collateral at the time of its chapter 11 filing. BNY cannot, however, hide so easily behind the English court's judgment to dictate this Court's decision regarding the effect of LBHI's bankruptcy filing on the property of a U.S. debtor. The Transaction Documents make clear that the challenged *ipso facto* provisions do not take effect immediately upon an Event of Default, but rather require that

---

[2] BNY's primary focus in the English litigation has been to obtain an indemnity from Perpetual, should the English court require it to release the collateral to it.

several additional preconditions be satisfied before they go into effect. The provisions are applicable only in connection with the sale or enforcement of the collateral securing the notes, which undisputedly had not occurred as of the date of LBSF's chapter 11 filing on October 3, 2008. To date, that still has not occurred. Indeed, the entire basis of Perpetual's suit against BNY in England is to force BNY to sell or enforce the collateral and apply the *ipso facto* provisions to modify LBSF's payment rights. Moreover, based on the undisputed facts in this case, the sale or enforcement of the collateral could not have occurred until after the issuer, Saphir, filed a termination notice designating December 1, 2008 as the Early Termination Date. Therefore, LBSF's property interest in the collateral was unchanged as of the commencement of its chapter 11 case on October 3, 2008.[3]

6.     The English court's July decision is not entitled to comity and is not binding on this Court. Not only did the English court not consider the operation of the Transaction Documents in light of U.S. bankruptcy law, but its conclusion regarding LBHI's chapter 11 filing was either pure *dicta* or an alternative finding reached with little discussion after the court had already held that the English anti-deprivation principles did not apply. Therefore, this Court should reject BNY's latest attempt to prevent this Court from considering LBSF's request for a declaratory judgment under the Bankruptcy Code.

7.     This Court should also reject BNY's argument that the *ipso facto* provisions are enforceable as "subordination agreements" under section 510(a) of the Bankruptcy Code. The provisions do not fall within the definition of subordination agreements applied by courts interpreting section 510(a). Moreover, BNY's sweeping interpretation of that section would

---

[3] BNY seeks to inject pure conjecture about LBSF's motivations regarding deal structure, credit risk, and economic consequences inherent in these transactions. BNY Mem. at 10-11. The Court should either reject these unsubstantiated speculations or deny BNY's motion on the grounds that genuine questions of material fact exist.

vitiate the Bankruptcy Code's prohibitions on *ipso facto* clauses.  Section 510(a) should not be read to invalidate or swallow other key provisions of the Bankruptcy Code.

8.        Finally, BNY fails to demonstrate that the *ipso facto* provisions are enforceable under the narrow safe harbor in section 560 or the exception from the automatic stay in section 362(b)(17) for swap agreements.  BNY's strained interpretation of section 560 and the term "swap agreement" cannot be reconciled with the Bankruptcy Code or congressional intent.  As LBSF demonstrated in its motion for summary judgment, the modification of LBSF's payment priority and its right to receive Unwind Costs does not fall within the limited exceptions to the Bankruptcy Code's strict rule against enforcement of *ipso facto* clauses.  Accordingly, this Court should deny BNY's motion for summary judgment and grant summary judgment in favor of LBSF and declare these provisions unenforceable *ipso facto* clauses that violate sections 365(e)(1) and 541(c)(1)(B).

ARGUMENT

## I.        LBSF HAD A PROPERTY INTEREST IN THE COLLATERAL AS OF THE COMMENCEMENT OF ITS BANKRUPTCY CASE.

9.        BNY contends that LBSF lost its property interest in the collateral under the Transaction Documents automatically upon LBHI's bankruptcy filing on September 15, 2008.  BNY Mem. at 20.  BNY relies solely on the English court's statements regarding LBHI's chapter 11 filing to support this conclusion, but those statements are not binding on this Court, which has an independent duty to review the facts and the documents in light of the U.S. Bankruptcy Code.  *See In re Gilbreath*, 395 B.R. 356, 358-59 (Bankr. S.D. Tex. 2008) ("It is this Court's duty to see that the rules are complied with and that the letter and purpose of the Bankruptcy Code are carried out."); *see infra* Part II.  Nor did the English court purport to be bind this Court in interpreting the Transaction Documents under the Code.  Rather, the English court made its

comments after holding that the British anti-deprivation principle did not apply to invalidate section 5.5 of the Supplemental Trust Deeds. Ex. B ¶¶ 44-46. The court noted that, in light of its holding on the anti-deprivation principle, neither of the remaining issues addressed in paragraph 28 of its judgment arises—including whether the anti-deprivation principle "operates upon an event other than the bankruptcy of Lehman BSF." *Id.* ¶¶ 28, 47. However, the court stated its alternative finding on the grounds that given that "this case is likely to go further it may help if, briefly, I express my views on them." *Id.* ¶ 47. Thus, the English court made the following statements upon which BNY now exclusively relies:

> Accordingly I do not think there can be any doubt that an event of default, as defined, arose on 15th September 2008, Lehman BSF was the defaulting party in respect of it and that that was an event other than the insolvency of Lehman BSF.
>
> . . . .
>
> I see no reason why, given the forms of their respective notices, Perpetual and Belmont should not be entitled to rely on the event of default constituted by Lehman Brothers Holdings Inc. filing for Chapter 11 protection as triggering clause 5.5 of the Supplemental Trust Deed. Accordingly, *had I considered that the **British Eagle** [anti-deprivation] principle did apply I should also have held that it was not, on the facts of this case, engaged so as to invalidate the operation of clause 5.5 of the Supplemental Trust Deed.*

*Id.* ¶¶ 49, 55 (emphasis added). Prof. Gerard McCormack, an English law professor and former Dean of the University of Essex Law School, has explained in the attached Declaration that "the English Court did not purport to decide that English law should affect US Bankruptcy Court proceedings or the application of American law in such proceedings." Decl. of Prof. Gerard McCormack ¶ 46 (hereinafter "Decl. of McCormack").

10. Aside from relying on the English courts dicta, which is not binding on another English court, *see id.*, much less on this Court, operating under the U.S. Bankruptcy Code, s*ee infra* Part II, BNY fails to explain how the Transaction Documents could automatically deprive

LBSF of its interest in the collateral under the transactions.[4]   In fact, the plain language of the Transaction Documents does not support BNY's argument that LBSF had no property interest in the collateral as of the date it commenced its bankruptcy case. BNY does not explain how the change from Swap Counterparty Priority to Noteholder Priority could be effectuated automatically upon LBHI's commencement of its bankruptcy case, nor could it.  BNY ignores that the Transaction Documents on their face clearly demonstrate that Saphir was required to take affirmative steps and provide appropriate notice to the parties to the agreements before any modification of LBSF's payment rights could take place.  There is no dispute that Saphir did not send its termination notice notifying the parties of an Event of Default and designating the relevant Event of Default as required by the ISDA until December 1, 2008, well after LBSF commenced its bankruptcy case on October 3, 2008.  That termination notice only designated LBSF's bankruptcy filing as the relevant Event of Default.  Nor did Saphir purport to take other affirmative steps prior to LBSF's bankruptcy filing required to effectuate the modification of LBSF's rights to payment priority or to Unwind Costs otherwise owed it.  *See infra* Part I.B, C. Therefore, LBSF's property interest in the collateral remained intact upon the commencement of its bankruptcy case.

A. **LBSF Maintained a Property Interest in the Collateral at the Time it Commenced Its Bankruptcy Case.**

11.     It is a fundamental principle of United States bankruptcy law that all the property of the debtor is included in the debtor's estate upon the commencement of a bankruptcy case and

---

[4] And, even if the English court was correct that LBHI's bankruptcy caused LBSF to lose its payment priority, under English law, LBSF still has a property interest in the collateral.  Decl. of McCormack ¶¶ 14, 28 ("After the change of priorities the swap counterparty, LBSF, still had a property interest in the collateral, but this property interest was inferior to that of the noteholders in the English judge's view.  This continuing property interest of LBSF in the collateral is in nature of a security interest which is a property right under English law. . . .  By way of conclusion on this point, the swap counterparty, LBSF, clearly has a property interest (a security interest) in the collateral and this property interest would continue even after any alleged switch in priorities.").

is afforded protection by the automatic stay of the United States Bankruptcy Code.  *See* 11 U.S.C. §§ 362, 541.

12.     According to section 541(a)(1) of the Bankruptcy Code, "property of the estate" is defined broadly as "all legal or equitable interests of the debtor in property as of the commencement of the case."   The Supreme Court has recognized that Congress intended property of the estate to be broadly construed.  *See United States v. Whiting Pools, Inc.*, 462 U.S. 198, 204-05 (1983) (The "House and Senate Reports on the Bankruptcy Code indicate that Section 541(a)(1)'s scope is broad.").   Likewise, the Second Circuit has recognized that Congress wished to "bring anything of value that the debtors have into the estate."  *Official Comm. of Unsecured Creditors v. PSS S.S. Co., Inc. (In re Prudential Lines, Inc.)*, 928 F.2d 565, 573 (2d Cir. 1991); *see also Grubin v. Rattet (In re Food Mgmt. Group, LLC)*, 380 B.R. 677, 691(Bankr. S.D.N.Y. 2008) (stating that under § 541, property of the estate includes all kinds of property).

13.     All of the debtor's property at the commencement of the bankruptcy case, including all legal and equitable interests of the debtor, are included as property of the estate. *See In re Village Rathskeller, Inc.*, 147 B.R. 665, 671 (Bankr. S.D.N.Y. 1992) (stating that "the estate comprises, among other things, all legal or equitable interests of the debtor in property as of the commencement of the case."); *Cohen v. Drexel Burnham Lambert Group, Inc. (In re Drexel Burnham Lambert Group, Inc.)*, 138 B.R. 687, 710 (Bankr. S.D.N.Y. 1992) (holding that interests held by the debtor at the commencement of the bankruptcy case pass into the debtor's estate); *see also Andrus v. Hamlin (In re Hamlin)*, No. 07-50774, 2009 WL 910511, at *1 (Bankr. W.D. La. Mar. 31, 2009) ("[The bankruptcy] estate is comprised of all the property listed under section 541, wherever located and by whomever held, including 'all legal or equitable

interests of the debtor in property as of the commencement of the case.'" (internal citations omitted)); *Select Portfolio Servicing, Inc. v. Love (In re Love)*, 353 B.R. 216, 218 (Bankr. W.D. Tenn. 2006) ("Upon the commencement of the chapter 13 case, an estate was created by operation of law . . . consist[ing] of all property of the debtor, no matter where it is located or by whom it is possessed or held, and whether the property is real or personal.").

14.     The Second Circuit has observed that "property of the estate" is sufficiently broad to include even strictly contingent interests. *See Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)*, 276 F.3d 123, 128 (2d Cir. 2002). In applying this precedent, the Southern District of New York Bankruptcy Court stated that the scope of the Bankruptcy Code affords protection to rights of the estate that have "acquired a pecuniary value" in finding that the accrued value of property leases were assets of the estate. *See In re Ames Dep't Stores, Inc.*, 287 B.R. 112, 122 (Bankr. S.D.N.Y. 2002) (quoting *Slater v. Smith (In re Albion Disposal, Inc.)*, 152 B.R. 794, 807 (Bankr. W.D.N.Y. 1993).

15.     Moreover, the breadth of property included under the umbrella of the bankruptcy estate is not to be limited by *ipso facto* clauses, conditioning the termination of an agreement upon a bankruptcy filing. Section 541(c)(1) explicitly provides that bankruptcy filing does not divest a debtor of property. *See* 11 U.S.C. § 541(c)(1) (stating that debtor's interest in property "becomes property of the estate . . . notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law— . . . (B) that is conditioned on . . . the commencement of a case under this title . . . and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property."). The purpose of section 541(c)(1)(B) is to ensure that "all of the interests of the debtor in property will become property of the estate." H.R. REP. NO. 95-595, at 369 (1978), *as reprinted in* 1978 U.S.C.C.A.N.

5787, 6325.  Thus, section 541(c) invalidates *ipso facto* clauses.  *See In re Ben Franklin Retail Store, Inc.*, 202 B.R. 955, 959 n.5 (Bankr. N.D. Ill. 1996) (holding that section 541(c) rendered an *ipso facto* clause unenforceable); *In re Texaco*, 73 B.R. 960, 968 (Bankr. S.D.N.Y. 1987) ("Congress specifically rejected ipso facto clauses geared to the commencement of title 11 cases not only with respect to executory contracts, but also with respect to the concept of what constitutes property of the estate, as expressed in 11 U.S.C. § 541(c)(1)(B).").

16.     With respect to a debtor's property interest in executory contracts, such as the ones at issue in this case, courts determine whether a debtor had a property interest in the executory contract as of the commencement of the bankruptcy case by looking at whether "termination requires the non-debtor party to undertake some post-petition affirmative act." *In re Margules*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (quoting *Hertzberg v. Loyal Am. Life Ins. Co. (In re B & K Hydraulic Co.)*, 106 B.R. 131, 135-36 (Bankr. E.D. Mich. 1989)).[5]  "When termination of the contract requires an affirmative act of the non-debtor party [which was not performed prior to the bankruptcy filing], the contract remains executory because such an act is stayed under 11 U.S.C. § 362(a)." *Id.*  Conversely, "[w]hen termination occurs without any action by the non-debtor party, the contract is no longer executory and no longer subject to assumption or rejection." *Id.*

---

[5] Other courts have described this difference between contracts requiring affirmative acts and those that terminate automatically as the difference between a conditional limitation clause and a condition subsequent clause. *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 38-39 (S.D.N.Y. 2007).  A conditional limitation clause provides for the automatic termination of a contract upon the occurrence of a triggering act.  For instance, if a contract contains a provision which states that the agreement will expire 30 days after one of the parties has defaulted, the contract will automatically end at the conclusion of the thirtieth day after default.  *Id.*  In contrast, in a contract containing a condition subsequent, the terminating party has the duty to complete an additional affirmative act once the triggering event occurs.  For example, a contract may provide that once the party has defaulted under the contract, the other party may terminate the contract upon the provision of a notice of termination.  Under this contract, the agreement will remain valid until a notice of termination is given to the other party.  *Id.*

17.     Thus, when the non-debtor party has failed to perform the designated affirmative act prior to the bankruptcy filing, the contract remains valid and becomes the property of the bankruptcy estate. *In re St. Casimir Dev. Corp.*, 358 B.R. 24, 39-42 (S.D.N.Y. 2007) (stating that because Alliant had failed to provide adequate notice of removal to terminate the Debtor as General Partner under the Partnership Agreement, the Debtor remained the General Partner and still possessed equity in the Partnership and still possessed the general partnership as an asset of the Debtor); *In re GISC, Inc*., 130 B.R. 346, 348 (Bankr. M.D. Fla. 1991) (finding that the commercial lease agreement was not terminated prior to the bankruptcy filing because the lessor failed to provide written notice of its intent to terminate the lease); *Edwin C. Levy Co., Inc. v. McLouth Steel Corp. (In the Matter of McLouth Steel Corp.)*, 20 B.R. 688, 691 (Bankr. E.D. Mich. 1982) (holding that where the contract required affirmative notice and the passage of 30 days, the executory sales contract was not terminated since Debtor had filed for bankruptcy prior to the conclusion of the 30 day period); *R.S. Pinellas Motel P'ship v. Ramada Inns, Inc. (In the Matter of R. S. Pinellas Motel P'ship)*, 2 B.R. 11, 117 (Bankr. M.D. Fla. 1979) (ruling that the intangible property rights possessed by the Debtor under the executory licensing agreement were still possessed by the Debtor's estate since Debtor/Licensee had filed for bankruptcy prior to the completion of the 48 hour waiting period and prior to Debtors' receipt of the notice). *Cf. In re Margules*, 323 B.R. at 135 (stating that the settlement agreement was no longer an executory contract and the optional settlement payment was no longer available to the Debtor's estate because the agreement had terminated automatically after the debtor had failed to make the settlement payment by May 15, 2004 and failed to cure his default within 10 days); *In re B & K Hydraulic Co.*, 106 B.R. at 135-36 (finding that the life insurance contract was no longer an

executory contract and could not be assumed by the debtor's estate because the policy had terminated automatically once the grace period for a default had expired).

18.     In this case, the Transaction Documents expressly require affirmative acts to be taken prior to any modification of LBSF's property rights.  Because there is no dispute that these affirmative acts were not taken prior to the commencement of LBSF's bankruptcy case, LBSF maintained its property interest in the collateral as of that date.

**B.     The Transaction Documents Clearly Show That No Modification of LBSF's Property Rights Took Place Prior to LBSF's Bankruptcy Filing.**

19.     Contrary to BNY's argument, the Transaction Documents do not provide for automatic deprivation of a party's payment rights upon an Event of Default.  As an initial matter, BNY misstates this Court's ruling in the *Metavante* contested matter when it contends that the Court agreed that similar provisions in that case took effect automatically.  BNY Mot. for Summ. J. at 20 & n.19.  This Court did not reach the conclusion BNY suggests in *Metavante*, but simply recognized that the bankruptcy filings of LBHI and LBSF constituted Events of Default under the documents in that case.  Ex. C 108:12-10 (Hr'g Tr. Sept. 15, 2009).  The Court did not conclude that these Events of Default were automatically effective absent proper termination notices designating the relevant Events of Default.  Indeed, the Court held just the opposite, concluding that Metavante could not withhold performance under the contract if it failed to exercise its remedies of termination.  *Id.* at 111:23-113:9.

**1.     Noteholder Priority Does Not Go into Effect Until Preconditions Are Met and the Collateral Is Realized or Enforced.**

20.     The Transaction Documents do not provide for automatic Noteholder Priority as BNY contends.  BNY Mem. at 20.  Rather, the Principal Trust Deeds and the Supplemental Trust Deeds make clear that any switch from Swap Counterparty Priority to Noteholder Priority does not take place until the collateral is realized or enforced, which may only occur after several

preconditions are met. Those preconditions were not satisfied prior to LBSF's commencement of its case on October 3, 2008, and realization or enforcement of the collateral has still not taken effect as of this date.

21. First, the Principal Trust Deeds provide in section 6.2, under the heading "Application of Moneys Received," that "the Trustee shall apply all moneys received by it under this Principal Trust Deed and the relevant Supplemental Trust Deed *in connection with the realisation or enforcement of the security* constituted thereby and by any Other Security Document" in accordance with the priority specified in the supplemental trust deed. LBSF Mot. for Summ. J. Ex. A § 6.2 (emphasis added); *id.* Ex. B § 6.2 (emphasis added). Section 5.5 of the Supplemental Trust Deeds, which is likewise entitled "Application of Moneys Received," makes clear that Swap Counterparty Priority is changed to Noteholder Priority only when monies are to be paid in connection with the *realization or enforcement* of the collateral:

> The Trustee shall apply all moneys received by it under this Deed *in connection with the realisation or enforcement of the Mortgaged Property* as follows:
>
> Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) . . . , in which case Noteholder Priority shall apply.

*Id.* Ex. C § 5.5 (emphasis added); *id.* Ex. D § 5.5 (emphasis added).

22. There can be no dispute that realization or enforcement of the collateral had not taken place as of as of October 3, 2008—the operative time period for determining whether LBSF maintained a property interest as of the commencement of its bankruptcy case—and it still has not occurred to date. While the transaction documents do not define the term, "realize" means "[t]o convert any kind of property into money; but especially to receive the returns from an investment." BLACK'S LAW DICTIONARY 1137 (5th ed. 1979). BNY as trustee has not sold the collateral.

23. Nor had BNY enforced the collateral as of October 3, 2008. Indeed, the sole noteholder, Perpetual, sued BNY in England on May 13, 2009—seven months after LBSF's chapter 11 filing—on the grounds that BNY had failed to enforce the collateral. *See* BNY Statement of Undisputed Facts at 6, ¶ 45; LBSF Saphir Mot. for Summ. J. Ex. J (Perpetual claim). Moreover, it is clear that the BNY could not have enforced the collateral prior to October 3, 2008 because the Transaction Documents require that certain prerequisites be met for the collateral to become enforceable: (i) there must be a failure to pay an amount due in respect of the notes or (ii) the Swap Agreement must have terminated. LBSF Mot. for Summ. J. Ex. A § 5.5; *id.* Ex. B § 5.5. There is no dispute that these prerequisites had not occurred as of October 3, 2008 and BNY accordingly had not sought to enforce the security as of that date, and still has not done so.

24. In addition, section 9.3 of the Supplemental Trust Deeds makes clear that the switch in priority contained in section 5.5 cannot occur until the amount of Unwind Costs has been determined and the proceeds from the sale of realization of the collateral are available for distribution:

> [I]f an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as Defined in the ISDA Master Agreement) . . . *and Unwind Costs are payable by the Issuer to the Swap Counterparty*, the Issuer *shall apply the net proceeds from the sale or realisation of the Collateral* (1) first in redeeming the Notes in an amount as set out in the Conditions and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

*Id.* Ex. C § 9.3 (emphases added); *id.* Ex. D § 9.3 (emphases added).

25. Therefore, in order to determine if Noteholder Priority is to be applied, the Unwind Costs first must be calculated to determine whether they are otherwise payable to the Swap Counterparty, and only then may the Issuer apply the proceeds from the sale or realization of the collateral to pay Noteholders in priority to LBSF.

26.     Section 6.2 of the Principal Trust Deeds further confirms that any switch from Swap Counterparty Priority is not automatic, and cannot occur until three preconditions are satisfied: (1) default by LBSF, (2) failure to pay by LBSF, and (3) prompt written notice:

> provided that, [1] if the "Swap Counterparty Priority" is expressed in the relevant Supplemental Trust Deed and Final Terms or Series Prospectus to be subject to adjustment on a Swap Counterparty default, and [2] if and to the extent that the Swap Counterparty fails to make payments due to the Issuer under any Swap Agreement and [3] the Issuer promptly notifies the Trustee in writing of any such failure (which notice shall be conclusive and binding), the above application of moneys [pursuant to Swap Counterparty Priority] shall be amended so that the claims of the Swap Counterparty will, to the extent that there has been such failure, rank after the claims (if any) of the holders of Notes, Coupons and Receipts and before the claims of the Issuer in relation to the balance (if any).

*Id.* Ex. A § 6.2; *id.* Ex. B. § 6.2.

27.     Thus, for any change in the normal priority scheme to take place, (1) there must be a Swap Counterparty default, (2) the Swap Counterparty must fail to make payments due, and (3) the Issuer must promptly notify the trustee in writing of any failure to pay. *Id.* Ex. A § 6.2; *id.* Ex. B. § 6.2.   There is no dispute that these prerequisites were not satisfied as of the commencement of LBSF's bankruptcy case.

### 2.     Condition 44 Is Inoperative Until Early Termination of the Swap Agreements or Acceleration for an Event of Default Under the Notes.

28.     As with section 5.5, Condition 44 does not go into effect automatically upon an Event of Default.   The second paragraph of Condition 44 changes the calculation of the Early Redemption Amount payable upon an early redemption of the notes to deprive LBSF of Unwind Costs to which it is otherwise entitled in the first paragraph of Condition 44, solely because of its chapter 11 filing.   *See* LBSF Mot. for Summ. J. at 5-6.   By definition, Unwind Costs are not payable until a termination payment is due under the Swap Agreement, which cannot occur until

after a termination notice is sent designating the relevant Event of Default.[6]  *See infra* Part I.C,

D.  Thus, the final paragraph of Condition 44 defines "Unwind Costs," in relevant part, to

"mean[ ] the value of . . . the termination payment due from or, as the case may be, to the Swap

Counterparty under the Swap Agreement *in respect of the termination of the Swap Agreement* (as

determined by reference to the Reference Registry as at the date of such termination)."  *Id.* Ex.

C, Offering Circular Supp., Terms & Conditions of Notes, Condition 44 ¶ 4 (emphasis added);

*id.* Ex. D, Sched. 2, Terms & Conditions of Notes, Condition 44 ¶ 4 (emphasis added).  In

addition, the calculations of the Early Redemption Amount payable to Noteholders under

Condition 44 may only be made after the "sale or realisation of the Collateral" and cannot be

determined until Unwind Costs are calculated by the Calculation Agent—after termination.  *Id.*

Ex. C, Offering Circular Supp., Terms & Conditions of Notes, Condition 44 ¶¶ 1, 2, 4; *id.* Ex. D,

Sched. 2, Terms & Conditions of Notes, Condition 44 ¶¶ 1, 2, 4.

29.     Together, the Transaction Documents confirm that neither section 5.5 nor

Condition 44 operates automatically upon an Event of Default.  Therefore, LBSF's property

interest in the collateral remained intact as of the date of its filing.

**C.      Because No Termination Notice Was Sent Until After LBSF's Bankruptcy Filing, LBHI's Chapter 11 Filing Did Not Deprive LBSF of Its Property Interest in the Collateral.**

30.     Not only are the challenged *ipso facto* provisions not automatic, but the

provisions modifying LBSF's payment rights based upon an Event of Default by LBSF under the

---

[6] The Base Conditions of the Notes, found in Schedule 2 of the Principal Trust Deeds, specifies that the Early Redemption of the Notes occurs if the swap agreement is terminated, after which the Issuer shall give between 15 and 45 days notice to the Trustee, the Noteholders, and the Swap Counterparty, and only after this notice period has expired may the Issuer redeem the Notes at their Early Redemption Amount.  LBSF Mot. for Summ. J. Ex. A, Sched. 2, Condition 6(d)(ii); *id.* Ex. B, Sched. 2, Condition 6(d)(ii).  Early Redemption may also occur upon an Event of Default under the Notes, which is not alleged in this case.  *Id.* Ex. A, Sched. 2, Condition 10(a); *id.* Ex. B, Sched. 2, Condition 10(a).  Therefore, absent either termination of a swap agreement or Early Redemption for an Event of Default under the Notes, the Early Redemption Amount never becomes payable.

credit default swap agreements are inoperative until after the relevant Event of Default is designated in a termination notice. Under section 6(a) of the ISDAs, an Event of Default gives the nondefaulting party the *option* to terminate the credit default swap agreement by filing a termination notice specifying the relevant Event of Default and designating an Early Termination Date.[7] Saphir did not exercise its right to terminate until December 1, 2008, and it designated only LBSF's chapter 11 filing on October 3, 2008 as the relevant Event of Default. *Id.* Exs. H, I (defining "Lehman" as Lehman Brothers Special Financing Inc.). Section 6(a) of the ISDAs provides for "Automatic Early Termination" with respect to certain Events of Default under section 5(a)(vii) of the ISDAs "[i]f, however, 'Automatic Early Termination' is specified in the Schedule as applying to a party," but the Schedule to the ISDAs provides that Automatic Early Termination will not apply to LBSF. *See id.* Ex. E § 6(a), 5(a)(vii) & Schedule pt. 1(h); *id.* Ex. F § 6(a), 5(a)(vii) & Schedule pt. 1(h). Nor did Saphir suggest Automatic Early Termination was applicable in its termination notices, which followed the standard procedure for designating an Early Termination Date. *Id.* Exs. H, I.

31. Therefore, Saphir's termination notices were not effective until December 1, 2008, and LBSF's property interest in the collateral remained unchanged as of the commencement of its bankruptcy case on October 3, 2008.

---

[7] Section 6(a) provides:

> If at any time an Event of Default with respect to a party ('the Defaulting Party') has occurred and is then continuing, the other party (the 'Non-defaulting Party') *may*, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."

LBSF Mot. for Summ. J. Ex. E § 6(a) (emphasis added); *id.* Ex. § 6(a) (emphasis added).

**D.     LBSF's Chapter 11 Filing Was the Only Event of Default Designated in Saphir's Termination Notices.**

32.     The termination notices themselves confirm that LBSF maintained its property interest in the collateral as of the commencement of its chapter 11 case because the notices specified only LBSF's bankruptcy filing as the relevant Event of Default.[8]  *Id.* Exs. H, I.  Under the ISDAs, an Event of Default is without effect until it is duly specified in a termination notice.  *Id.* Ex. E § 6(a); *id.* Ex. § 6(a).  In fact, the *only* effect of an Event of Default is to provide the non-defaulting party the ability to terminate the swap agreements through a termination notice should it so choose.  Parties can choose to disregard Events of Default, as Saphir did, by not sending a termination notice with respect to LBHI's chapter 11 filing.  Thus, BNY cannot now contend that LBHI's chapter 11 filing was the relevant Event of Default when that filing was not specified in the termination notices.

33.     It is well established that a notice of termination must provide the specific basis for default and is otherwise ineffective.  *See Altmayer-Pizzorno v. L-Soft Int'l, Inc.*, Nos. 07-1600, 07-1613, 2008 WL 5082105, at *4 (4th Cir. 2008) ("In order to terminate a contract, one party must give the other party a notice of termination that is definite, specific, positive, and unconditional.") (internal quotations and citations omitted); *In re Braniff, Inc.*, 118 B.R. 819, 841 (Bankr. M.D. Fla. 1989) (applying New York law and finding termination notice ineffective based on failure to provide specificity regarding alleged default because "a notice that fails to specify the grounds for termination of an executory contract is invalid and does not act to terminate the contract"); *In re Musikahn Corp.*, 57 B.R. 938, 940-41 (Bankr. E.D.N.Y. 1986)

---

[8] Although the termination notice in the Aflac proceeding cited both LBHI's and LBSF's chapter 11 filings, Beryl filed the termination notice after LBSF's filing, therefore confirming that LBSF maintained its property interest in the collateral as of the commencement of its case.

(finding termination notice insufficient to effectuate termination where lease agreement specifically defined the grounds for default and landlord failed to provide the requisite detail); *Perrotta v. Western Regional Off-Track Betting Corp.*, 469 N.Y.S.2d 504 (N.Y. App. Div. 1983) (holding that landlord's notice of termination failed to actuate a conditional limitation on the lease because it made no reference to the relevant lease provision and did not specify the reason for default).

34.     Accordingly, BNY may not now, after the fact, claim that termination was based upon any default other than LBSF's filing for bankruptcy.

**E.      Any Modification of LBSF's Property Rights Based on LBHI's Filing Would Also Constitute an Unenforceable *Ipso Facto* Provision.**

35.     BNY also attempts to justify the modification of LBSF's contractual rights based on the bankruptcy of LBSF's parent/guarantor by arguing that "[c]onditions specified in section 365(e)(1) relate exclusively to the debtor and not to any third party."   BNY Mem. at 23 n.21. This argument ignores the plain language of the Bankruptcy Code and the circumstances of this case and should be rejected.

36.     Section 541(c)(1)(B) provides three conditions:   (i) "on   the insolvency or financial condition of the debtor," (ii) "on the commencement of a case under this title," or (iii) "on the appointment of or taking possession by a trustee in a case under this title." 11 U.S.C. § 541(c)(1)(B) (emphasis added).  Notably, neither the second nor the third condition uses the qualifying phrase "of the debtor."   Thus, under well recognized maxims of statutory construction, Congress's deliberate omission of the phrase "commencement of *the debtor's* case under this title," means that the statute was not limited to only those situations in which a contract effects a forfeiture based on the debtor's bankruptcy filing.  *See Gozlon-Peretz v. United States*, 498 U.S. 395, 404 (1991) ("[w]here Congress includes particular language in one section

of a statute but omits it in another section of the same Act, it is generally presumed that Congress

acts intentionally and purposely in the disparate inclusion or exclusion") (quotations and citation

omitted); *In re Operation Open City, Inc.*, 170 B.R. 818 (S.D.N.Y. 1994) (same), *superseded by*

*statute on other grounds as stated in In re Martinez*, 196 B.R. 225 (D. Puerto Rico May 15,

1996); *see also Cervantes-Ascencio v. United States I.N.S.*, 326 F.3d 83, 85 -86 (2d Cir 2003)

(declining to read an exception contained in one part of the Immigration and Nationality Act into

a subsequent part because of Congress's "intentional" omission of the exception and the court's

lack of authority to "add terms or provisions where Congress has omitted them" (quotation and

citation omitted)).

37.     Thus, the Bankruptcy Code is clear that once LBSF filed for bankruptcy, its rights

to receive performance under the Agreement may not be modified because of a provision in an

agreement that is conditioned on "the commencement of *a case* under this title."  11 U.S.C.

§ 541(c)(1)(B) (emphasis added); *see* also 11 U.S.C. § 365(e)(1)(B).  This language must be

contrasted with the words used by Congress in the beginning paragraph of section 365(e)(1).

When Congress intended to refer to the filing by a specific debtor it used the words "the case."

*See* 11 U.S.C. § 365(e)(1) ("any right or obligation under such contract or lease may not be

terminated or modified, at any time after commencement of *the case* solely because of a

provision in such contract or lease" (emphasis added)).  The plain words of the Bankruptcy Code

thus make it clear that the contractual provisions relied on by BNY are unenforceable *ipso facto*

clauses regardless of whether they modify LBSF's rights based on its own bankruptcy *or* the

bankruptcy of its parent/guarantor, LBHI.

38.     Any interpretation of the Bankruptcy Code that would permit parties to terminate

or modify a contract based on the bankruptcy filing of a closely related affiliate corporation

would allow parties to evade easily the proscription on *ipso facto* clauses. As this, and many other recent corporate bankruptcies have demonstrated, the modern corporate structure often consists of multiple layers of subsidiaries and affiliates. Because many such affiliates have interlinked obligations, if one files for bankruptcy many more within the corporate chain also are likely to do so. Thus, if a party were permitted to enforce a provision that terminated or modified a contract based on the commencement of a bankruptcy case of a closely related corporate affiliate, then parties could create *de facto ipso facto* provisions and contract around important bankruptcy protections. This Court should not construe the Bankruptcy Code to create such a gaping loophole and, instead, should construe the Code according to the words Congress used: that a party may not deprive a debtor of its property rights simply based on the commencement of "a case" rather than "the case."

39. Moreover, the provision relied upon by BNY also is directly connected to the "financial condition" of LBSF. The sole purpose of LBHI's guarantee of LBSF's performance and the existence of LBHI as a Credit Support Provider is to protect against the financial condition of LBSF. Indeed, a guarantor is needed only if there are concerns regarding the financial condition of the principal obligor and its ability to perform. *See* Corpus Juris Secondum Guaranty § 2 ("A 'guaranty' is a contract of secondary liability, and a guarantor will be required to make payment only when the primary obligor has first defaulted."). Absent concerns about the financial condition of LBSF, LBHI's guarantee would be irrelevant. Therefore, any provision that subordinates or eliminates LBSF's contract rights based on the bankruptcy of LBHI constitutes an unenforceable *ipso facto* provision as to LBSF. *See generally* Ex. C at 112:13-18 (Hr'g Tr. Sept. 15, 2009) ("[T]he argument that LBSF or LBHI may have defaulted under other specified indebtedness, as that term is defined in the Agreement, relies

upon the financial condition of bankruptcy debtors to withhold performance. That is also unenforceable as an *ipso facto* clause that may not be enforced under the Bankruptcy Code Section 365(e)(1)(A).").

40.     BNY relies on *In re Amcor Funding Corp.*, 117 B.R. 549, 553 (D. Ariz. 1990) for the proposition that the conditions in section 365(e)(1) apply only to the debtor's bankruptcy and not the bankruptcy of a third party. BNY Mem. at 23 n.21. However, *Amcor* dealt with a very different situation than the one presented here. The contract at issue in *Amcor* was a margin account agreement between Amcor (the bankrupt debtor) and its broker/dealer Drexel Burnham Lambert, Inc. ("Drexel"). The margin account agreement permitted Drexel to liquidate the account for "any reason," but Drexel did not liquidate the account for more than a year after Amcor's bankruptcy. *Id.* at 550. Upon the bankruptcy of Drexel's parent company, Drexel Burnham Lambert Group, Inc., Drexel sought to liquidate the account. Amcor argued that this action was protected by the automatic stay. *See id.* at 551. Drexel argued that the liquidation was safe harbored pursuant to section 555 of the Bankruptcy Code. The Court rejected this argument and held that the liquidation under the facts of that case was not safe harbored:

> Drexel argues that its contract with Amcor permits it to liquidate for any reason, and that this broad language encompasses reasons triggered by § 365(e)(1). Such contract language, however, does not entitle Drexel to liquidate for any reason in disregard of the automatic stay. Drexel may liquidate without constraint by the automatic stay only if it is in fact doing so for one of the three reasons set forth in § 365(e)(1), or if some other exception applies.

*Id.*

41.     Here, LBSF challenges the eradication of its contract rights based upon the bankruptcy of its guarantor/parent, a bankruptcy that was closely connected to LBSF's performance by the nature of the LBHI guaranty. In contrast, Drexel sought to deprive a debtor of rights based on a bankruptcy of an entity with no connection to the debtor or its performance

under the contract. *See id.* ("Drexel's current effort to liquidate Amcor's securities is precipitated exclusively by the bankruptcy of Drexel's parent, rather than by any condition of Amcor."). Moreover, the liquidation in *Amcor* occurred more than one year later and was based on a contractual provision that did not specifically provide for termination or liquidation based on a bankruptcy filing. *See id.* ("In the year that Amcor has conducted its business as debtor in possession, Drexel has neither demanded payment of the debit balance nor attempted to invoke the provisions of the statutes set forth herein."). In light of these facts, the holding in *Amcor*—that the safe harbor provisions did not permit a debtor's counterparty to liquidate the debtor's account one year after the debtor's bankruptcy and based on an unrelated bankruptcy—makes sense and serves to protect the debtor from the loss of valuable property. Under the facts of this case, where BNY argues that LBSF's contractual rights have been forfeited based on the bankruptcy filing of LBSF's parent/guarantor, the Court should hold that BNY's attempted forfeiture of LBSF's rights is impermissible.

## II. THE ENGLISH COURT'S INTERPRETATION OF THE TRANSACTION DOCUMENTS DOES NOT HAVE A BINDING EFFECT ON THIS COURT.

42.     Once again, BNY argues that this Court should defer to the decision of the English High Court of Justice, indeed, that it is bound by *res judicata* principles to do so. BNY Mem. at 20-21. BNY wants to have its cake and eat it too.[9]

43.     BNY is simply incorrect. It is well established that "United States courts may choose to give *res judicata* effect to foreign judgments on the basis of comity, but are not obliged

---

[9] Significantly, BNY concedes, BNY Mem. at 4 n.6, that "[t]he present summary judgment motion is focused solely on whether or not U.S. bankruptcy law, to the extent applicable, would preclude the enforcement of certain provisions of the Transaction Documents," but at the same time it seeks to preserve its primary argument that the English court is the court to make binding decisions on the enforceability of the transaction documents.

to do so." *Paramedics Electromedicina Comercial, Ltda v. GE Medical Sys. Info. Techs., Inc.*, 369 F.3d 645, 654 (2d Cir. 2004) (internal quotations omitted).

44.    As this Court has already determined in denying BNY's motion to dismiss and its leave to appeal, it is not appropriate to extend comity to the English court's decisions to the extent that they affect this Court's interpretation of the Transaction Documents and its application of United States law.    As this Court stated in the August 11 hearing on BNY's motion to dismiss:

> I'm sensitive to the issues of comity and cooperation and coordination that have been discussed throughout the argument.   But I also recognize that the only rational outcome here that makes good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal if not exclusive decider of issues relating to U.S. bankruptcy law.

Ex. D at 69:14-19 (Hr'g Tr. Aug. 11, 2009).  The Court's decision was correct then and is correct now.[10]   Granting comity to the English court's decision would contravene several important policy interests of the United States.  Moreover, this Court may evaluate the merits of the foreign decision before granting comity and, with all due respect to the learned English court, its interpretation of the Transaction Documents is incorrect, for the reasons discussed above.  *See supra* Part I.

45.    Should this Court, *arguendo*, choose to grant comity to the English court's decision, it is, at best, of limited persuasive value.  It lacks *res judicata* effect because, among other things, the claims Perpetual brought before the English court were based on English

---

[10] And, indeed, the English court appears to be operating on the same understanding as to the proper division of labor between the courts.  As Professor McCormack summarizes: "The most fundamental point is that the decision of the English High Court in <u>Perpetual Trustee</u> . . . is a decision on matters of English law and on the interpretation of the relevant documentation as applied to the facts as the court found, or assumed, them to be.  It does not purport in any way to be a decision on the application of the US Bankruptcy Code or on the application of US Bankruptcy law to the relevant documentation."  Decl. of McCormack ¶ 4.

common-law doctrine and are simply not the United States Bankruptcy Code claims at issue here.[11]

### A. The English Court's Comments Regarding the Effect of LBHI's Filing Were Based on a Conclusory Analysis of the Transaction Documents.

46.     As an initial matter, it is important to clarify the extent and nature of the English court's holdings.  The English court addressed three issues: (1) whether the English common-law, anti-deprivation principle invalidated the shift in payment priorities based on LBSF's bankruptcy filing, pursuant to clause 5.5 of the Supplemental Trust Deeds; (2) if that shift was invalidated under the anti-deprivation principle, would the principle still "appl[y] if there is no insolvency process in relation to Lehman BSF in England"; and (3) if that shift was invalidated under the anti-deprivation principle, would the principle still apply "if [clause 5.5] operates on an event other than the bankruptcy of Lehman BSF."  Ex. B ¶ 27-28.  It is the English court's statements about this third issue upon which BNY relies.  Neither BNY nor Perpetual had filed any pleading with the English court dealing with this issue, as is clear from the record in the English proceedings.  The third issue was raised in oral argument (and not by BNY) for the first time during the trial.

47.     The anti-deprivation principle (also referred to by the English court as the *British Eagle* principle after one of its originating cases) provides that

> there cannot be a valid contract that a man's property shall remain his until bankruptcy, and on the happening of that event go over to someone else, and be taken from his creditors.

Ex. B ¶ 26.  It is indisputable that the Bankruptcy Code *ipso facto* provisions are not and never were intended to be equivalent to the English anti-deprivation principle.  Decl. of McCormack

---

[11] *See infra* Part II.C (discussing *res judicata*).

¶ 32 ("[I]t has been judicially recognised in England, by Lord Neuberger in <u>Money Markets International Ltd v London Stock Exchange Ltd</u> [2002] 1 WLR 1150 that the prohibition of *ipso facto* clauses in the US Bankruptcy Code is far broader and more comprehensive thereby striking down priority shifting agreements that may be valid under English law.").

48.     The English court spent the bulk of its efforts on addressing the first issue, whether the anti-deprivation principle invalidated the payment-priority shift assuming LBSF's filing was the relevant Event of Default.  The court held that the anti-deprivation principle did not invalidate the payment-priority shift, relying on a controversial exception to that doctrine that has no equivalent under the Bankruptcy Code.  Decl. of McCormack ¶¶ 32-36, 53.

49.     Professor McCormack summarized the English court's reasoning regarding the application of the anti-deprivation principle as:

> In short the judge appeared to conclude that the limited priority of LBSF in the collateral was integral to the formulation of its interest at the outset.  LBSF did not have an unlimited right in respect of priority to the collateral which was then liable to be cut down by subsequent events.  In para 44 and 45 of the judgment, the judge made use of the distinction between determinable and conditional interests and stated that LBSF's claim to priority over the noteholders was in the nature of a determinable interest rather than a conditional interest. . . . [T]he determinable/conditional interest distinction, while it exists as a matter of English law, is very technical and has been highly criticised.

Decl. of McCormack ¶ 31-32.

50.     Given the court's ruling that the anti-deprivation principle did not apply, resolving the remaining two issues was, therefore, unnecessary to the court's ultimate decision, which the court recognized.  Ex. B ¶ 47 ("[N]either of the other two issues referred to in paragraph 28 arise[ ].").  It nonetheless decided to "briefly . . . express [its] views on them" because "this case is likely to go further."

51.     In addressing the third issue[12], the court stated that even if the anti-deprivation principle would prevent the payment priority shift based on LBSF's filing, there was an exception to the principle if the Transaction Documents provided for the shift on an event other than LBSF's insolvency.  Ex. B ¶¶ 49-51.

52.     The court then briefly analyzed the Transaction Documents, spending barely two numbered paragraphs on this issue out of 65 paragraphs in total, and concluded that LBHI's bankruptcy caused the payment priority to shift pursuant to section 5.5 of the Supplemental Trust Deed.  Ex. B ¶¶ 54-54.  The court did not apply any principle of English statutory or common law or doctrine of contractual interpretation to reach this conclusion.  It relied solely on its own reading of the documents.

53.     BNY relies on the English court's statements about this third issue, invoking them as if they constituted a binding decision on this Court.  Such briefly discussed and admittedly unnecessary statements about the Transaction Documents, that relied neither on the English court's specialized knowledge of English law or doctrine, *see* Ex. B at ¶¶ 49, 55, cannot be binding on this Court under the doctrine of comity, *see infra* Part II.B, or *res judicata*, *see infra* Part II.C.

**B.      Comity Should Not Be Extended to the English Court's Interpretation of the Transaction Documents.**

54.     BNY claims that this Court should be bound by an English court's interpretation of a contract entered into between a United States debtor currently in United States bankruptcy proceedings, with numerous United States creditors, and an Australian investment firm, that has attempted to "strategically" avoid resolving its claims in this Court by bringing suit in England.

---

[12] The English court's resolution of the second issue is of no moment here.

Yet, as this Court has recognized, it is the only appropriate forum to interpret the Transaction Documents in light of the United States Bankruptcy Code. Indeed, the English court itself did not purport to bind the U.S. court on any matter, let alone on issues of U.S. bankruptcy law. Decl. of McCormack ¶¶ 4, 5, 46. Rather, the court invited this Court to make "any request or other application" necessary, implying "that ultimately the English court might be asked to implement US bankruptcy law in the English proceedings via a letter of request from the US Bankruptcy Court either under the common law or pursuant to the UNCITRAL Model Law on Cross-Border Insolvency." *See* Ex. B ¶ 63; Decl. of McCormack ¶ 5.

55. In determining whether comity should be extended to foreign judgments, the Second Circuit has recognized that "[a]lthough more than mere courtesy and accommodation, comity does not achieve the force of an imperative or obligation." *Pravin Banker Assoc., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). Courts "will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States." *Id.* Additionally, courts may consider the merits of the foreign decision in determining whether comity is warranted. *See Films by Jove Inc. v. Berov*, 250 F.Supp.2d 156, 191-92, 197-204 (E.D.N.Y. 2003).

56. Thus, before even reaching the more complicated issues of whether granting comity to the English court's decision would contravene United States policy interests, this Court may evaluate the English court's decision on its merits and choose whether to grant comity on that basis. This is particularly appropriate here, where the statements on which BNY relies were not grounded in any principle of English statutory or common law or doctrine of contractual interpretation. *See Films by Jove Inc.*, 250 F.Supp.2d at 191-92, 197-204 (denying comity to a Russian decision interpreting Russian law because, in part, the court found the decision to lack

persuasive value); *cf. Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 552 (2d Cir. 1985) (denying recognition to foreign government's directive when recognition of the directive "would also be counter to principles of contract law . . . if we were to give effect to the directives, our decision would vitiate an express provision of the contracts between the parties"). With all due respect to the English court, its brief analysis of the Transaction Documents is, for the reasons expressed, *supra*, Part I.A-C, simply incorrect.  LBHI's filing for bankruptcy did not cause the payment priority to shift.

57.     Additionally, deferring to the English court's decision would contravene several United States policy interests and thus comity should not be extended to its decision.  *See Bank of N.Y. v. Alison J. Treco (In re Treco)*, 240 F.3d 148, 157 ("The principle of comity has never meant categorical deference to foreign proceedings. . . . [T]hat deference should be withheld where appropriate to avoid the violation of the laws, public policies, or rights of the citizens of the United States.").

58.     First, in core adversary proceedings involving a United Sates debtor, engaged in United States bankruptcy proceedings, the United States has a strong policy interest in having a federal bankruptcy court resolve issues of bankruptcy law and the intertwined ancillary issues of the interpretation of the Transaction Documents.  In cases like this, involving core issues of bankruptcy law, courts have frequently recognized that a U.S. court, rather than a foreign proceeding, is the appropriate forum to resolve disputed issues.  *See Salvatore LaMonica v. N. of Eng. Protecting & Indemnity Ass'n Ltd. (In re Probulk Inc.)*, 407 B.R. 56, 62 (Bankr. S.D.N.Y. 2009) (holding that when the effect of a clause in a contract governed by English law implicated

core bankruptcy issues, the bankruptcy court was the appropriate forum to resolve issues and the matter "need[ ] not be referred to arbitration in London or anywhere else").[13]

59.     Not only, though, is this Court the appropriate forum because of its understanding of the Bankruptcy Code and its effect on the operation of the Transaction Documents, but also because this Court is already well versed in the Transaction Documents in this case and similar documents in other Lehman proceedings.  This Court has heard multiple arguments and studied numerous briefings regarding the operation of these documents.  Given the Court's familiarity with similar matters in these bankruptcy proceedings, it is the only appropriate forum to render a definitive interpretation of the validity of the documents under the Bankruptcy Code.

60.     The United States' interest in having this forum interpret the Transaction Documents and determine their effect under the Bankruptcy Code is further heightened when the English court's interpretation of the Transaction Documents may lead to a less favorable result to LBSF than would be the case under the Bankruptcy Code.  The English court determined that LBHI's filing shifted the payment priority, but this reading of the Transaction Documents would run afoul of sections 541(c)(1)(B) and 365(e)(1) of the Bankruptcy Code.  *See supra* Part I.E.  In numerous cases involving U.S. creditors and debtors, courts have held that when the decision of a foreign proceeding would substantially impair the rights of a United States entity under United States law, the foreign decision should not be recognized.  *See Bank of N.Y. v. Alison J. Treco (In re Treco)*, 240 F.3d 148, 159-60 (2d Cir. 2001) (refusing to extend comity to foreign proceeding

---

[13] *See also United States Lines v. Am. Steamship Owners Mut. Protection & Indemnity Assoc. (In re United States Lines, Inc.)*, 197 F.3d 631, 640-41 (2d Cir. 1999) (affirming bankruptcy court's denial of effect to international arbitration clause and retention of core adversary proceedings); *Jamaica Shipping Co. v. Orient Shipping Rotterdam (In re Millenium Seacarriers)*, 354 B.R. 674, 679-80 (Bankr. S.D.N.Y. 2006) ("This Court, and not a London arbitration panel, is the best forum to interpret . . . issues of bankruptcy practice and bankruptcy law relating to executory contracts . . . .").

when foreign law disadvantaged U.S. secured creditor); *In re Papeleras Reunidas, S.A.*, 92 B.R. 584, 593-94 (Bankr. E.D.N.Y. 1998) (same).

61.     Second, the United States has a strong policy interest in ensuring that this Court is the central and exclusive forum for resolving LBHI's and LBSF's adversary proceedings, so that they can be adjudicated consistently and fairly for the benefit of the bankruptcy estates and their creditors.  This interest speaks against granting comity to the English court's decision.

62.     In cases in which a foreign entity was a party in a United States proceeding and there was an ongoing foreign bankruptcy case, the Second Circuit has long counseled extending comity to foreign bankruptcy proceedings because "the equitable and orderly distribution of a debtor's property requires assembling all claims against the limited assets in a single proceeding."  *Victrix S.S. Cov., S.A. v. Salen Dry Cargo, A.B.*, 825 F.2d 709, 713-14 (2d Cir. 1987).  This rationale applies just as equally to U.S. debtors with interests abroad who are in the process of bankruptcy in the United States.  As one court has observed: "If any philosophy can be attributed to the structure of the Code it is that of deference to the country where the primary insolvency proceeding is located, including the United States if the plenary proceeding is located here, and flexible cooperation in administration of assets."  *In re Simon*, 153 F.3d 991, 999 (9th Cir. 1998).

63.     Ensuring that a single, centralized forum—this Court—resolves all of the disputes surrounding Lehman's various synthetic collateralized debt obligations will ensure a consistent interpretation of the Transaction Documents, an equitable result to creditors and noteholders alike, and enhance judicial efficiency both in this Court and on any appeal.

64.     Third, the United States has a significant policy interest in discouraging breaches of the automatic stay and forum-shopping. Granting comity to the English court's decision would reward Perpetual for engaging in these very activities.

65.     The automatic stay, *see* 11 U.S.C. § 362, applies upon commencement of chapter 11 bankruptcy and applies to all of the debtor's assets, including those located extraterritorially. *See In re McLean Indus., Inc.*, 74 B.R. 589, 601 (Bankr. S.D.N.Y. 1987) ("[t]he automatic stay applies extraterritorially"). The stay serves important policies

> exist[ing] to protect the estate from a chaotic and uncontrolled scramble for the Debtor's assets in a variety of uncoordinated proceedings in different courts. This serves to protect and preserve the estate for the benefit of all creditors. The stay also serves to protect and preserve the jurisdiction of the bankruptcy court so that the court can administer the debtor's estate in an orderly fashion.

*In re Nakash*, 190 B.R. 763, 769 (Bankr. S.D.N.Y. 1996) (holding that action against debtor in Israeli court violated the stay). Evidencing the importance United States courts place on the stay, the courts have not hesitated to sanction or enjoin parties for bringing proceedings in foreign courts after the stay was imposed. *See In re Simon*, 153 F.3d at 996 (affirming injunction against foreign creditor from proceeding against debtor in Hong Kong courts); *In re Rimsat*, 98 F.3d 956, 961 (7th Cir. 1996) (Posner, C.J.) (affirming injunction against shareholder from proceeding against debtor in Nevis courts).[14]

66.     Extending comity to the English court's decision would operate to Perpetual's benefit. It would reward Perpetual for bringing its suit in England in violation of the stay— conduct that LBSF would have sought to enjoin if Perpetual were before the Court. Not only would extending comity be inequitable, but it would encourage similar forum-shopping and

---

[14] *See also Nakash*, 190 B.R. at 768-69; *In re McLean Indus.*, 68 B.R. at 690, 694 (Bankr. S.D.N.Y. 1986) (imposing injunction and sanctions against foreign creditor from proceeding against debtor in Hong Kong and Singapore courts).

foreign litigation in the Lehman case, as well as future bankruptcies involving U.S. debtors with multinational estates, increasing all of the evils associated with this practice: duplicative litigation, inconsistent judgments, and inequitable distributions to creditors. Such a result is clearly in contravention of United States policy interests. *See In re Simon*, 153 F.3d at 999.

      **C.**      **The English Court's Decision Does Not Have Binding Effect Pursuant to *Res Judicata*.**

      67.      Should the Court decide to grant comity to the English court's decision, it must then evaluate separately whether the decision is binding pursuant to the doctrine of *res judicata*, as BNY maintains. *See Alesayi Beverage Corp. v. Canada Dry Corp.*, 947 F.Supp. 658, 663-66 (S.D.N.Y. 1996), *aff'd*, 122 F.3d 1055 (2d Cir. 1997) (granting comity to a Saudi Arabian judgment, but then holding that it did not satisfy the requirements of either *res judicata* or collateral estoppel). A court will look to federal common law in determining whether a foreign court's decision has *res judicata* effect in a domestic case. *Id.*

      68.      BNY is incorrect in contending that the English court's decision is binding on this Court under the doctrine of *res judicata*. BNY Mem. at 21. The doctrine of *res judicata* "bars later litigation if an earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) involving the same cause of action." *Esquire Trade & Fin., Inc. v. CBQ, Inc.*, 562 F.3d 516, 520 (2d Cir. 2009). *Res judicata*, or claim preclusion, also operates to bar "claims asserted in the subsequent action [that] were, or could have been raised in the prior action." *Pike v. Freeman*, 266 F.3d 78, 91 (2d Cir. 2001); *Herendeen v. Champion Int'l Corp.*, 525 F.2d 130, 133 (2d Cir. 1975) ("For a judgment in a prior action to be a bar . . . the same cause of action and the same parties . . . [must have been] involved in both suits.").

69.     BNY cannot demonstrate either (1) that the English court's decision was a final judgment on the merits, (2) that the cases involve the same parties or their privies, or (3) that the case involved the same cause of action or claims raised in the United States.[15]  First, BNY is incorrect that the English court issued a final judgment on the merits.  BNY Mem. at 21.  The English judgment was not final because it adjourned the proceedings for further consideration, after the court's recess, of the indemnification dispute between BNY and Perpetual, and invited future cooperation and communication between it and this Court regarding the U.S. bankruptcy law issues raised in this Court, in addition to granting leave to appeal its judgment in the Court of Appeal.  Ex. B ¶ 63; Decl. of McCormack ¶ 5; *see Weyant v. Okst*, 198 F.3d 311, 314 (2d Cir. 1999) (explaining that a judgment is final only "if it conclusively determines the rights of the parties to the litigation and leaves nothing for the court to do but execute the order or resolve collateral issues" (internal citations omitted)).  Indeed the courts have already exchanged correspondence and this Court has specifically requested that the English court not "make any final disposition of the High court proceedings" until this Court has the opportunity to consider and rule on the U.S. bankruptcy law issues raised in this case.  Ex. F (Letter from Peck, J.).  In response, the English court stated that it would "have regard to [the Court's] request."  Ex. A at 1 (Letter from Morritt, J.).  Moreover, the English court expressed that it "look[ed] forward to receiving [this court's] rulings in due course and any further requests you decide to make."  *Id.* Therefore, the English court's judgment cannot be a final judgment that supports a finding of *res judicata.*

70.     Second, BNY and LBSF were co-defendants in the English suit.  It is a well-established principle of *res judicata* doctrine that where "co-defendants [in the prior suit] did not

---

[15] LBSF does not question the competency of the English court.

actively litigate as adversaries, there can be no res judicata effect." *RX Data Corp. v. Dep't of Soc. Servs.*, 684 F.2d 192, 196 (2d Cir. 1982) (when parties were co-defendants in earlier state court litigation, holding no *res judicata* effect to state court's resolution of claim at issue); *Barrett v. United States*, 651 F.Supp. 611, 612-13 (S.D.N.Y. 1986) (applying *RX Data Corp.* rule to hold that earlier decision in ongoing federal litigation lacked preclusive effect).[16]

71.    Finally, BNY cannot demonstrate that the actions involve the same causes of action or claims. LBSF was the defendant in the English proceeding. It raised no claims or causes of action in the English court, nor does BNY argue that it should have raised its Bankruptcy Code-based claims in that forum. In fact, LBSF had a very good reason for not asserting claims under the U.S. Bankruptcy Code in the English court given its consistent position that this Court is the forum best equipped to hear those claims, as this Court has agreed. *See* Ex. D at 22:10-13 (Hr'g Tr. Aug. 11, 2009) ("I would think that the U.K. High Court would consider it rational . . . for the U.S. court to deal with U.S. law issues . . . .").[17] Thus, the doctrine of *res judicata* does not bar LBSF from litigating its Code-based claims here. *See Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 702 (2d Cir. 2000) ("'[T]he fact that [a claim] might have been asserted as a counterclaim in [a] prior suit . . . does not mean that the

---

[16] *RX Data Corp* involved prior state court litigation, as did several other cases within the Second Circuit that have applied the rule that co-defendants in a prior suit are not bound by *res judicata* in a subsequent suit—so these cases were applying state law, rather than federal common law. *See, e.g.*, *Morrison v. Blitz*, No. 88 CIV 5607, 1995 WL 679259 at *3-4 (S.D.N.Y. Nov. 15, 1995) (applying *RX Data Corp*'s holding to prior state court litigation and noting "whether a claim is barred by a prior state court decision depends on the law of the state in which the prior judgment was rendered"). However, authority suggests that the *RX Data Corp* rule has been adopted generally into federal common law as well. *See Barrett*, 651 F.Supp. at 612-13 (applying *RX Data Corp*. rule to decision in prior federal litigation); 18 JAMES W. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 131.41[2] (3d ed. 2009) ("Claim preclusion applies only to parties who were adversaries in prior proceedings.").

[17] *See* Order Denying BNY's Leave to Appeal, United States District Court for the Southern District of New York, Oct. 14, 2009, at 6 ("The Bankruptcy Court determined, based on its knowledge of the record, the relationships of the parties and the British action . . . that the Bankruptcy Court should adjudicate the issues relating to United States bankruptcy law.").

failure to do so renders the prior judgment res judicata as respects it.'" (quoting *Mercoid Corp. v. Mid-Continent Inv. Co.*, 320 U.S. 661, 671 (1944))).[18]

72.     More generally the policies underlying the preclusive doctrines of *res judicata* counsel against considering the English judgment as preclusive. *Dore v. Kleppe*, 522 F.3d 1369, 1374 (5th Cir. 1975) ("res judicata is a principle of public policy and should be applied so as to give rather than deny justice"); *Jean-Gilles v. County of Rockland*, 463 F.Supp.2d 437, 454 (S.D.N.Y. 2006) ("Application of res judicata principles is not a rigid exercise. . . .  It must be given a flexible, common-sense construction that recognizes the reality of the situation.").  The parallel proceedings in the U.S. Bankruptcy Court and the English High Court do not significantly implicate the traditional concerns of the prevention of inconsistent decisions and the conservation of judicial resources that underlay the preclusive doctrines.  *See* 18 CHARLES ALAN WRIGHT & ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4403 (2d ed. 2002).  These cases involve significantly different doctrines of law.  Decl. of G. McCormack ¶¶ 32, 43, 52, 53.  To the extent that the courts reach inconsistent judgments, they can be reconciled through the UNCITRAL methods of inter-court communication.  It will not waste this Court's limited time and resources to interpret the Transaction Documents, as this Court has already agreed in denying BNY's Motion to Dismiss that it is the proper forum to resolve issues affecting a U.S. debtor and its numerous U.S. creditors, and many of the issues here are present in the other Lehman-related proceedings before this Court.  *Id.*  Moreover, to the

---

[18] *See also Cousins v. Duane Street Assoc.*, No. 00-7580, 2001 WL 327084, at *2 (2d Cir. 2001) ("Only compulsory, and not permissive, counterclaims are subject to res judicata."); 6 CHARLES ALAN WRIGHT & ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 1410 (2d ed. 2002) ("That is, absent a compulsory counterclaim rule, a pleader is never barred by claim preclusion from suing independently on a claim that he refrained from pleading as a counterclaim in a prior action."); RESTATEMENT (SECOND) JUDGMENTS § 22 (1981) ("Where the defendant may interpose a claim as a counterclaim, but he fails to do so, he is not thereby precluded from subsequently maintaining an action on that claim, except as stated in Subsection (2).").

extent that these concerns are implicated, the fault lies with Perpetual, who brought suit in England and whose proxy, BNY, now seeks to bind this Court with the results of that improper conduct.[19]

### III. SECTION 510(A) IS INAPPLICABLE AND MAY NOT BE USED TO IMMUNIZE SECTION 5.5 AND CONDITION 44 FROM BEING HELD INVALID *IPSO FACTO* PROVISIONS.

73.     BNY also advances the conclusory argument that section 5.5 of the Supplemental Trust Deeds and Condition 44 of the Terms & Conditions of the Notes constitute valid and enforceable "subordination agreements." Having placed the rabbit in the hat, BNY pulls it out by the pure *ipse dixit* that under § 510(a), "[a] subordination agreement[ ] [is] enforceable . . . to the same extent that such agreement is enforceable under applicable nonbankruptcy law." BNY Mem. at 24. BNY, however, fails to advance, much less demonstrate, any basis for interpreting these clauses as valid subordination agreements. Furthermore, to sustain its contention that these are enforceable provisions, BNY takes a myopic view of the Bankruptcy Code, ignoring that these terms of the Transaction Documents constitute unenforceable *ipso facto* clauses that violate §§ 365(e)(1) and 541(c)(1)(B).

74.     Section 5.5 and Condition 44 improperly modify LBSF's priority of payments and the calculation of the Early Redemption Amount solely as a result of LBSF's bankruptcy filing, which §§ 365(e)(1) and 541(c)(1)(B) expressly forbid. The enforcement of these provisions as valid subordination agreements would enable parties to circumvent the prohibition on *ipso facto* clauses, and in doing so, violate the fundamental principle that a debtor's property must be

---

[19] The English court's judgment regarding the anti-deprivation principle is currently on appeal, and the Court of Appeal heard arguments on October 13-15, 2009. To the extent that the Court is inclined to give preclusive effect to the English High Court finding that LBHI's filing caused the payment priority to shift, LBSF respectfully requests that it defer judgment until the appeal in England is resolved. The English Court of Appeal may issue its decision without addressing the English court's alternative finding regarding the effect of LBHI's filing and "if an appeal is taken and the appellate court affirms on one ground and disregards the other, there is no collateral estoppel as to the unreviewed ground." *Gelb v. Royal Globe Ins. Co.*, 798 F.2d 38, 45 (2d Cir. 1986).

preserved for the estate upon the initiation of bankruptcy proceedings.[20]  In addition, giving

effect to these provisions would violate the automatic stay imposed by § 362(a)(3).  The Court

should reject BNY's attempt to avoid a thorough analysis of the relevant Bankruptcy Code

sections by hiding behind the language of § 510(a), and should hold that these provisions are

unenforceable *ipso facto* clauses.

**A.     Section 5.5 and Condition 44 Do Not Constitute Subordination Agreements Under § 510(a).**

75.     By its own terms, § 510(a) applies only to subordination agreements.  Therefore,

the first step of the inquiry is to examine whether section 5.5 and Condition 44 of the Transaction

Documents fairly can be categorized as subordination agreements.  There is no binding source of

law defining a "subordination agreement" under § 510, but a long line of case law within the

Second Circuit and across other jurisdictions demonstrates that subordination agreements are

characterized by a common set of qualities.  A review of the existent case law demonstrates that

section 5.5 and Condition 44 are fundamentally unlike a "subordination agreement" recognized

under § 510(a).

76.     It is apparent on the face of the Transaction Documents that section 5.5 and

Condition 44 do not constitute "subordination agreement[s]," as the term is commonly

understood by courts applying § 510(a).  *See* BNY Mot. for Summ. J. Ex. 1.  BNY has not

offered a single case in which a court construed a clause bearing a resemblance to those

contained in the Transaction Documents as a subordination agreement.  Under a subordination

agreement, a creditor with a superior or equal right to the repayment of a debt agrees to

subordinate its claim to another creditor; here, section 5.5 alters the priority of payments

---

[20] This danger is not merely academic: billions of dollars are at stake under other similar agreements that modify LBSF's payment priority solely as a result of its bankruptcy filing.

applicable upon the realization or enforcement of collateral only when the transactions terminate based on LBSF's bankruptcy filing. *See* LBSF Mot. for Summ. J. at 5. Condition 44 modifies the calculation of the Early Redemption Amount based on LBSF's bankruptcy filing. *Id.* Neither provision involves the repayment of a debt. These clauses in the Transaction Documents are not subordination agreements, and instead effect a deprivation of property upon the commencement of LBSF's bankruptcy.

77.     A number of courts have defined "subordination agreement" under § 510(a). In *Best Prods. Co.*, the court stated that "[a] contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another." *In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994), *aff'd* 68 F.3d 26 (2d Cir. 1995). Consistent with this definition, in *Pine Lake*, the court rejected a party's argument that a contract should be construed as a subordination agreement, holding that the contract clause merely directed the priority of payments among creditors and "[i]n order for there to be a consensual or contractual subordination, there must first exist an agreement where a creditor and a debtor agree to create priorities among *debts*." *In re Pine Lake Vill. Apartment Co.*, 19 B.R. 819, 822, 830-31 (Bankr. S.D.N.Y. 1982) (emphasis added). In *Holly's Inc.*, noting that it was providing "a broad definition," the court stated that

> [A] subordination agreement is simply a contract in which a creditor (the "subordinated" or "junior" creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor. The contracting parties may include the senior creditor or . . . the contract may be between the debtor and the subordinated creditor for the benefit of the senior creditor. Unless the specific terms of the contract provide otherwise, the contract's effect runs between the subordinated creditor and the senior creditor, i.e., the subordination of the junior creditor's right to payment until after the senior creditor has been paid.

*In re Holly's Inc.*, 140 B.R. 643, 667-68 (Bankr. W.D. Mich. 1992) (quoting *New York Stock Exch. v. Pickard & Co., Inc.*, 296 A.2d 143, 146-47 (Del. Ch. 1972)). The definition of

"subordination agreement" found in other cases is consistent with the preceding definitions.  In *Systems Impact, Inc.*, the court stated that "[a] subordination agreement requires three necessary parties:  (1) common debtor, (2) a junior creditor who agrees to be subordinate, and (3) a senior creditor who acquires priority."  229 B.R. 363, 369 (Bankr. E.D. Va. 1998); *see also In re Air Safety Int'l, L.C.*, 336 B.R. 843, 857 (S.D. Fla. 2005) ("Case-law defines a subordination agreement as one in which 'a party having a superior right of some sort agrees with someone having an inferior right that, as between the two of them, the inferior right shall be treated as if it were superior.'"); *In re Bank of New Eng. Corp.*, 364 F.3d 355, 361 (1st Cir. 2004) (stating that "subordination agreements are essentially inter-creditor agreements").  Evidently, although there is no single, binding definition of "subordination agreement" under the Bankruptcy Code, there is a broad consensus on the fundamental elements that must be present for a court to recognize a contract as a "subordination agreement."

78.     Because these contract clauses deprive the estate of its property solely as a result of its bankruptcy filing, they constitute unenforceable *ipso facto* provisions.  *See* 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B).  "*Ipso facto*, or bankruptcy, clauses 'automatically terminate the contract or lease, or permit the other contracting party to terminate the contract or lease, in the event of bankruptcy.'"  *In re C.A.F. Bindery, Inc.*, 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996) (quoting H.R. REP. NO. 595, 95th Cong., 1st Sess. 348-49 (1977) and S. REP. NO. 989, 95th Cong., 2d Sess. 59 (1978)).  In contrast to BNY's attempt to shoehorn these clauses as subordination agreements under § 510(a), the clauses patently violate the prohibition on *ipso facto* provisions contained in §§ 365(e)(1) and 541(c)(1)(B).

79.     Because section 5.5 and Condition 44 are not subordination agreements, but rather invalid *ipso facto* clauses, the Court need not reach the second prong of section 510(a),

which provides that a court should determine whether a "subordination agreement" is "enforceable . . . under nonbankruptcy law." 11 U.S.C. § 510(a). The applicable nonbankruptcy law for measuring enforceability in this instance would be English law, based on the Transaction Documents. *See* LBSF Mot. for Summ. J. Ex. C §§ 14.1, 14.2; *id.* Ex. D §§ 14.1, 14.2; *id.* Ex. A §§ 20.1, 20.2; *id.* Ex. B §§ 20.1, 20.2. The enforceability of these clauses under English law is presently on appeal in the *Perpetual* action, but the ultimate disposition of this issue is of no effect for purposes of the instant question, because section 5.5 and Condition 44 are not subordination agreements under section 510(a).

**B.      Parties Cannot Contract to Violate the Bankruptcy Code Under the Guise of § 510(a).**

80.      Furthermore, even if the Court were inclined to interpret one or both of these provisions as subordination agreements under section 510(a), and also finds that they are enforceable under English law, this would not end the inquiry as to the validity of these contract clauses. Contracts affecting the debtor's estate, including subordination agreements, must comply with sections 365(e)(1) and 541(c)(1)(B). Additionally, parties cannot privately contract to violate the automatic stay imposed by section 362(a)(3). *See In re Sky Group Int'l, Inc.*, 108 B.R. 86, 89 (Bankr. W.D. Pa. 1989) ("Relief from stay must be authorized by the Bankruptcy Court."); *Farm Credit of Cent. Florida, ACA v. Polk*, 160 B.R. 870, 873 (M.D. Fla. 1993) ("Since the purpose of the stay is to protect the creditors, as well as [debtor], [debtor] could not have unilaterally waived the automatic stay against the interest of his creditors."); 11 U.S.C. § 362(a)(3). There is no suggestion in the Bankruptcy Code or case law that a contract that is valid under section 510(a) may escape the application of any of these Code sections any more than they could effectively contract away the prohibitions in the Bankruptcy Code for preferential payments or fraudulent conveyances. In fact, there is authority suggesting the

opposite is true.  As a court in the Second Circuit stated in *Village Rathskeller*, otherwise valid agreements "may be held unenforceable 'when it is clear that they were designed to thwart policies underlying the Bankruptcy Code by circumventing certain of its provisions.'"  *Village Rathskeller*, 147 B.R. at 672; *see also Holly's, Inc.*, 140 B.R. at 679 (noting that section 510(a) measures the "enforceability of subordination agreements under applicable state law" unless there is a "demonstrable federal purpose that would mandate a different result").  The Court must ensure that parties do not utilize one section of the Bankruptcy Code to avoid other provisions that are central to the equitable and orderly disposition of a debtor's assets.

81.     The prohibitions on *ipso facto* provisions in sections 365(e)(1) and 541(c)(1)(B) are fundamental to the integrity of proceedings under the Bankruptcy Code.  *See, e.g.*, H.R. REP. NO. 95-595, 95th Cong., 1st Sess., at 348-49 (1997), *as reprinted in* 1978 U.S.C.C.A.N. 5963, 6304-6305 ("Subsection (e) [of Section 365] invalidates *ipso facto* or bankruptcy clauses.  These clauses, protected under present law . . . . frequently hamper[ ] rehabilitation efforts.")[21]; *In re Texaco Inc.*, 73 B.R. 960, 965 (Bankr. S.D.N.Y. 1987) ("Congress specifically rejected *ipso facto* clauses geared to the commencement of title 11 cases not only with respect to executory contracts [as provided by § 365(e)(1)], but also with respect to the concept of what constitutes property of the estate, as expressed in [ ] § 541(c)(1)(B).").  If parties were allowed to disguise invalid *ipso facto* provisions as subordination clauses, the bankruptcy court's ability to carry out its chief purpose of overseeing an orderly and equitable rehabilitation or liquidation of a debtor's estate would be severely undermined.  In essence, permitting parties to obviate the application of sections 365(e)(1) and 541(c)(1)(B) by crafting agreements that are ostensibly valid under

---

[21] *See* LBSF Mot. for Summ. J. at 15.

section 510(a) would create a gaping loophole inviting parties to avoid the prohibition on *ipso facto* provisions.

82.     Similarly, there is no authority for the proposition that parties can avoid the automatic stay imposed by section 362(a)(3) by contracting under section 510(a), and any such rule would have devastating implications for bankruptcy proceedings.   Section 362(a)(3) provides that a chapter 11 petition "operates as a stay, applicable to . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate[ ]."   11 U.S.C. § 362(a)(3).   This section prohibits the modification of payment priority under section 5.5 and the modification of the Early Redemption Amount under Condition 44, as both occur as a result of LBSF's bankruptcy filing.   Clearly, the enforcement of these provisions would violate the automatic stay and injure the property rights and property of LBSF.   "The efficacy of the bankruptcy proceeding depends on the bankruptcy court's ability to control and marshal the assets of the debtor wherever located . . . ."   *In re Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir. 1996).   There is no basis in the Bankruptcy Code or case law for the proposition that a party to a subordination agreement may violate the automatic stay.   The bankruptcy proceeding would be a hollow exercise if contracts that are ostensibly "subordination agreements" under section 510(a) were permitted to drain the debtor's estate.   As a result, even if section 5.5 and Condition 44 are viewed as subordination agreements, they are unenforceable because they violate the automatic stay imposed by section 362(a)(3).

83.     Put simply, there is no basis for interpreting section 5.5 and Condition 44 as valid subordination agreements under section 510(a).   Furthermore, any interpretation to the contrary would have severe consequences for LBSF's estate.

**THE SAFE HARBOR PROVISIONS OF SECTION 560 DO NOT APPLY TO PROTECT THE EXERCISE OF RIGHTS UNDER SECTION 5.5 AND CONDITION 44.**

84.    BNY argues that section 5.5 and Condition 44 in the Supplemental Trust Deeds are themselves "swap agreements" as defined in section 101(53B) of the Bankruptcy Code and therefore, BNY's exercise of "contractual rights" thereunder is protected as a "liquidation" of a swap agreement under section 560.  BNY Mot. at 29-35.  The enforcement of section 5.5 and Condition 44 is not protected by section 560 of the Bankruptcy Code, because (i) section 5.5 and Condition 44 are not swap agreements under section 101(53B) of the Bankruptcy Code, and (ii) the exercise of rights under section 5.5 and Condition 44 is not within the scope of section 560's safe harbor protections for the close-out of swap transactions.

   A.    **Section 5.5 and Condition 44 Are Not Swap Agreements.**

85.    BNY argues that the "swap agreements" in this case "[i]n accordance with section 101(53B)(A)" include not only the ISDA Master Agreement, ISDA Schedules, annexes and Confirmations (the "Derivative Agreement"), but also section 5.5 and Condition 44 as "terms and conditions incorporated by reference and all documents that the market deems part of the parties' transaction."   BNY Mem. at 29.   However, section 5.5 and Condition 44 are not "incorporated by reference" into the Derivative Agreement and they are not "deemed" swaps in accordance with section 101(53B)(A).

      1.    **Section 5.5 and Condition 44 Are Not "Incorporated by Reference" into the Derivative Transactions.**

86.    Section 101(53B)(A) includes as subsections within its definition (i) a list of specific types of "swap agreements" and the "terms and conditions incorporated by reference in such agreements"; (ii) any agreement or transaction that is "similar to any other agreement or transaction referred to in this paragraph" and that (I) "is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives market (including terms and

conditions incorporated by reference therein);" and (II) is a specifically listed type of forward, swap, future, option or spot transaction; (iii) any combination of the specified agreements or listed transactions; (iv) any option to enter into a listed agreement or transaction; (v) a master agreement for categories (i)–(iv); and (vi) a security agreement or arrangement or credit enhancement related to any agreements or transactions in (i)–(iv).  11 U.S.C. § 101(53B).

87.     In order for section 5.5 and Condition 44 to receive protections under either subsections 101(53B)(A)(i) or 101(53B)(A)(ii)(I), the swap agreement in question must specifically "incorporate them by reference" as is expressly required by those subsections. 11 U.S.C. § 101(53B)(A)(i), 101(53B)(A)(ii)(I).[22]  None of the ISDA Master Agreement, ISDA Schedules or Confirmations even refers once to the Supplemental Trust Deeds, section 5.5, or Condition 44.  It is clear black-letter law that in order for a document to be incorporated by reference, it must be clearly identified and sufficiently described in the principal document.  *See, e.g., PaineWebber Inc. v. Bybyk*, 81 F.3d 1193, 1200 (2d Cir. 1996).

---

[22] The inclusion of protections for "terms and conditions incorporated by reference" in any swap agreement in subsection 101(53B)(A)(i) or any agreement that is similar to a swap agreement in subsection 101(53B)(A)(ii)(I), most likely was intended to refer to the standard marketplace definitions or terms and conditions that are published by entities such as the International Swaps and Derivatives Association, Inc. ("ISDA").  Typically, parties incorporate standard definitions by reference into confirmations for transactions under a swap agreement.  *See* INTERNATIONAL SWAPS DEALERS ASSOCIATION, USER'S GUIDE TO THE STANDARD FORM AGREEMENTS 2 (1987) (describing the standard form swap agreements in effect when protections for swap agreements were initially enacted); *see also* 1 ANTHONY C. GOOCH & LINDA B. KLEIN, DOCUMENTATION FOR DERIVATIVES: ANNOTATED SAMPLE AGREEMENTS & CONFIRMATION FOR SWAPS & OTHER OVER THE COUNTER TRANSACTIONS 427 (4th ed. 2002) (addressing later ISDA standard forms).  Standardizing definitions and other terms and conditions increases liquidity and reduces transaction costs by ensuring that swaps can be efficiently executed and easily compared to other swaps on similar referents.  *Interest Swap: Hearing on S. 396 Before the S. Subcomm. on Cts. and Admin. Prac. L.* 101st Cong. 17 (1989) (statement of Mark C. Brickell, Chairman, Int'l Swap Dealers Assoc.).  The standard confirmations used in the Dante transactions, for example, incorporated by reference the definitions and provisions in the 2003 ISDA Credit Derivatives Definitions.  LBSF Mot. for Summ. J. Ex. C, Offering Circular Supplement, Annex 3 at 20; *id.* Ex. D, Sched. 2, Series Prospectus, Annex 3 at 25.  The use of standard definitions give content to capitalized terms, such as "Notional Amount" and/or "Fixed Amount," in the confirmation and provide parties with calculation guidelines and specific formulas to be utilized in connection with the transactions.  *See* USER'S GUIDE TO THE STANDARD FORM AGREEMENTS at 2; *see also* GOOCH & KLEIN, at 428-37 (noting in the annotation of a confirmation the meaning given to terms and calculations in the confirmation through the incorporation of the ISDA standard definitions and provisions).  Without the incorporation of the standard ISDA definitions, many of the terms in the confirmation would lack meaning.

88.     BNY argues that under section 101(53B)(A)(ii), the ISDA Schedule ¶ 5(g) incorporates the terms and conditions of the Trust Deeds into the Derivative Agreement, BNY Mem. at 31, but ¶ 5(g) merely confirms the parties' agreement to be bound by the Trust Deeds as it relates to each Transaction—neither the Supplemental Trust Deeds nor the Principal Trust Deeds are specifically incorporated or imported into the ISDA Master Agreement or the ISDA Schedules by operation of ¶ 5(g).  The Supplemental Trust Deeds, section 5.5, and Condition 44 are merely distribution agreements—not swap agreements themselves.

## 2.     The Transaction Documents Are Not a Single Integrated "Swap."

89.     BNY tries to blur the line as to what is a swap agreement under section 101(53B) by referring to the ISDA Master Agreement, Schedule, Confirmations, and the Principal Trust Deed and Supplemental Trust Deed as a single, integrated "swap agreement."  BNY Mem. at 29. Section 101(53B)'s definition does not extend to other agreements that may be "integrated" with the "swap."  11 U.S.C. § 101(53B).  Courts narrowly interpret the protections under the Safe Harbor Provisions to be strictly limited to agreements, or portions of agreements, that by their nature and purpose meet the true criteria of the underlying transaction.  *Calyon N.Y. v. Am. Home Mortgage, Inc. (In re Am. Home Mortgage, Inc.)*, 379 B.R. 503, 521, 523 (Bankr. D. Del. 2008) (finding servicing provision in repurchase agreement was different in nature and purpose and was separate asset from the repurchase agreement and thus, was not entitled to the safe harbor benefits afforded repurchase agreements).  Here, section 5.5 and Condition 44 are not, by their nature "swap agreements."  *See Interbulk v. Dreyfus Corp. (In re Interbulk Ltd.)*, 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999) (noting parties' undisputed understanding of a swap agreement to be "a bilateral agreement, . . . whereby cash payments are exchanged periodically (or a lump sum at termination) between the parties based upon changes in the price of the underlying asset or index as determined by an agreed-upon benchmark" (omitting internal citations)).  Instead, these

provisions dictate the *means* by which the proceeds of the swap agreement will be distributed without affecting the aggregate amount actually payable by the non-debtor swap participant. They were written with a separate nature, purpose, and intent than the swap agreement, and therefore, should not be afforded the protections for swap agreements under section 560. *In re Am. Home Mortgage, Inc.*, 379 B.R. at 521-23.

> **3.** **The Amendments in 2006 Do Not Protect the Exercise of Rights Under Non-Swap Agreements.**

90. BNY argues that the definition of "swap agreement" was expanded in 2005 to the "broadest possible meaning" to "ensure that these transactions were exempt from the bankruptcy process, thereby creating certainty in the derivatives market." BNY Mem. at 28 (citing *In re Nat'l Gas Distribs.*, 556 F.3d 247, 259 (4th Cir. 2009)). BNY's interpretation ignores the true history of the amendment to the definition of "swap agreement." First, the inclusion of "terms and conditions incorporated by reference" into subsection (A)(i) of the definition of swap agreement has been present since 1990, and therefore, was not added in connection with Congress's intent to provide "the broadest possible meaning" to "swap agreements," as BNY contends. Bankruptcy: Swap Agreements & Forward Contracts, Pub. L. 101-311, 104 Stat. 267, 267 (1990). The amendments in 2005 updated the definition of swap agreement to include more products within subsection (A)(i), thereby ensuring innovative derivative transactions are protected—they had no bearing on the "terms and conditions incorporated by reference." H.R. REP. NO. 109-31, pt. 1, at 128 (2005). Second, Congress in amending the statute in 2005, specifically noted that the definition in section 101(53B)(A)(i) "should not be interpreted to permit parties to document non-swaps as swap transactions. Traditional commercial arrangements . . ." or other non-swap transactions "cannot be treated as 'swaps' . . . because the parties purport to document or label the transactions as 'swap agreements.'" H.R. REP. NO. 109-

31, pt. 1, at 129 (2005).  While "swap agreement" was indeed broadened to include more derivative products, Congress never intended to incorporate into that definition standard commercial documents, including payment distribution agreements such as the Supplemental Trust Deeds.

91.     Finally, BNY argues that because the Supplemental Trust Deeds were "marketed" as part of the parties' overall transaction, they were swaps under section 101(53B)(A)(iii) and (iv) because "the market deems [them] part of the . . . 'swap agreement' in these cases."  BNY Mem. at 31.   Subsection 101(53B)(A)(iii) protects any combination of agreements or transactions referred to in section 101(53B)(A) and section 101(53B)(A)(iv) protects any option to enter into an agreement or transactions referred to in section 101(53B)(A).  Neither protects non-swap agreements that are "marketed" with swap agreements.  11 U.S.C. § 101(53B)(A)(iii)-(iv).  Moreover, BNY cites the wrong standard—a document does not become a "swap" because the market "deems" it "part of the parties' transactions."  BNY Mem. 31.  Rather, in order for  a transaction to be a "swap agreement" it, within the judgment of market participants, must itself "fall[ ] within the category of transactions included in the Code *and* [be] recognized in the marketplace."  Edward Morrison & Joerg Riegel, *Financial Contracts & the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges*, 13 AM. BANKR. L. REV. 641, 643 (2005) (emphasis added).  BNY cannot convert what is essentially a distribution or payment agreement into a "swap transaction" simply by wishing it so.

**B.      Section 560 Does Not Protect Enforcement Section 5.5 and Condition 44.**

**1.      "Liquidation" in Section 560 Means Close-Out or Termination.**

92.     BNY asserts that section 5.5 of the Supplemental Trust Deeds and Condition 44 "set forth the priorities applicable in connection with the liquidation of Collateral following default by LBSF," and therefore are within the bounds of section 560 as contractual rights

governing "liquidation." BNY Mem. at 31. BNY further argues that section 5.5 and Condition 44 are not modifications of LBSF's rights, but rather agreed-upon liquidation mechanisms. *Id.* at 32-33. The enforcement of a supplemental agreement that alters forth the priorities for distribution of payment under a swap transaction is not "liquidation" within the intended protections of section 560 of the Bankruptcy Code. *See generally* H.R. REP. NO. 101-484 (1990) (making no mention of protecting payment); H.R. REP. NO. 109-31, pt. 1 (2005) (same). BNY skirts the meaning of "liquidation" under the Bankruptcy Code, arguing instead that the "common meaning" and "normal business practice" of liquidation means payment. BNY Mem. at 32. But what is relevant in determining what rights are exercisable under derivative contracts is not the "common meaning" or "normal business practice" of liquidation, but rather the meaning of "liquidation" as it relates to derivatives. "Liquidation" as that term is used in derivative transactions and in section 560 under the Bankruptcy Code, specifically refers to the "liquidation of transactions" meaning reviewing terminated contracts and calculating amounts owed either way. Rhett G. Campbell, *Energy Future & Forward Contracts, Safe Harbors & the Bankruptcy Code*, 78 AM. BANKR. L. J. 1, 22 (2004).

93.     As is more fully set forth in the Debtors' Motion for Summary Judgment, the protections in section 560 were designed to reduce systemic risk by protecting counterparties' "termination and setoff" of swap transactions—collecting payment from a debtor was not included. H.R. REP. NO. 101-484, at 3 (1990); LBSF's Mot. for Summ. J. at 23-29. Specifically section 560 protected swap participants' ability to calculate amounts owed either way upon default and determine the net sum owing from one party to another. H.R. REP. NO. 101-484, at 3 (1990). Originally section 560 did not contain the word "liquidation," and referred only to the "termination" of swap transactions. Bankruptcy: Swap Agreements & Forward Contracts, Pub.

L. 101-311, 104 Stat. 267, at 268 (1990). Section 555 (securities contracts), section 556 (forward contracts), and section 559 (repurchase agreements), on the other hand, protected counterparties' right to "liquidate." *Id.* at 270; Bankruptcy Reform Act of 1999 (Predecessor to BAPCPA) (Part III): Hearing on H.R. 833 Before the Subcomm. on Comm'l & Admin. L., 106th Cong. 1, 172 (1999) (statement of Oliver Ireland, Assoc. Gen. Counsel, Bd. of Governors, Fed. Reserve Sys.). While it was understood in the industry that the use of "liquidation" and "termination" both meant "closing out" there was uncertainty about whether a party liquidating contracts under section 556 could also "terminate" its contracts. Rhett G. Campbell, *Energy Future & Forward Contracts, Safe Harbors & the Bankruptcy Code*, 78 AM. BANKR. L. J. 1, 22 (2004). Each of section 555, 556, 559, and 560 were, therefore, amended in 2005 to protect rights to "liquidate, terminate, or accelerate" as part of Congress's efforts to make its protection of Close-Out rights consistent regardless of industry-specific terminology. *See, e.g.*, H.R. REP. NO. 109-31, pt. 1, at 132 (2005).

94. Despite the inclusion of the words "liquidation" and "acceleration," Congress specifically noted that the 2005 amendments to these sections were intended to reduce systemic risk by allowing "the expeditious *termination or netting* of certain types of financial transactions." H.R. REP. NO. 109-31, pt. 1, at 20 (2005) (emphasis added). It was through protecting these specific rights to "*terminate* financial contracts with an insolvent entity in a timely manner, or to *offset or net* their various contractual obligations," that Congress intended to ensure market "uncertainty" and "liquidity." Bankruptcy Reform Act of 1999 (Predecessor to BAPCPA) (Part III): Hearing on H.R. 833 Before the Subcomm. on Comm'l & Admin. L., 106th Cong. 1, 5 (1999) (statement of Rep. James Leach) (emphasis added). Contrary to what BNY

contends, there is no mention of, and, therefore, no protection of, counterparties' right to *payment* on a liquidated claim. BNY Mem. at 32.

95. Nor are the protections for setoff and foreclosure against collateral in section 362(b)(17) intended to permit "distribution" or contemplation of payment, as BNY suggests. BNY Mem. at 34. Foreclosure is contemplated in the context of setoff—meaning counterparties can foreclose upon posted collateral in determining the net payment obligation owed to either counterparty to the transaction. H.R. REP. NO. 109-31, pt. 1 at 132 (2005). "Foreclosure involves the use of pledged assets to satisfy the net obligation." Bankruptcy Reform Act of 1999 (Predecessor to BAPCPA) (Part III): *Hearing on H.R. 833 Before the Subcomm. on Comm'l & Admin. L.*, 106th Cong. 1, 185 (1999) (statement of Seth Grosshandler, Partner, Cleary, Gottlieb, Steen & Hamilton). Contrary to what BNY asserts, foreclosure does not extend to permit a counterparty to receive "distributions made in accordance with the parties' written agreement." BNY Mem. at 34. If that were the case, then any counterparty to a swap would seize any assets of the debtor to secure its payment—in advance and to the detriment of other secured and unsecured creditors.

96. As stated in LBSF's motion for summary judgment, what BNY purports to do through the enforcement of section 5.5 and Condition 44 is modify LBSF's right to payment of liquidated amounts under the Swap Agreement. *See* LBSF Mot. for Summ. J. ¶¶ 55-56. The protected exercisable rights under section 560 do not include "modification" of a debtor's rights to receive payment. *See* 11 U.S.C. § 560. Moreover, the policies behind the Safe Harbor Provisions, to promote "certainty and liquidity" in the market, are not furthered by allowing the modification of LBSF's priority and elimination of a valuable asset. LBSF Mot. for Summ. J. ¶¶ 57-60. For these reasons, a decision in BNY's favor would be in sharp contrast to existing

jurisprudence, which to date, has interpreted the Safe Harbor Provisions as not granting the exercise of "unqualified rights." *See In re Enron Corp.*, 306 B.R. 465, 472 (Bankr. S.D.N.Y. 2004); *see also* LBSF & LBHI's Mot. for Summ. J., *Lehman Bros. Special Financing v. Am. Family Life Assurance Co., (In re Lehman Bros. Holding Inc.)*, Case No. 08-13555, Adv. Proc. No. 09-1261, ¶¶ 48-68.

97. Finally, BNY contends that the statutory history and purpose of section 560 "to remove derivative transactions from limitations imposed by the Bankruptcy Code" could only be furthered by permitting the flow of distributions under a swap agreement despite the automatic stay and the Bankruptcy Code. BNY Mem. at 35. Such broad sweeping assertions ignore the precise purpose of section 560 and, as is stated above, are wholly unsupported by the legislative history. The undeniable express purpose of section 560 and was to "make[ ] clear that a swap participant may exercise any contractual rights to *terminate and net out* a swap agreement in the event the other party files a bankruptcy petition, notwithstanding the automatic stay and trustee avoidance provisions of the Bankruptcy Code." H.R. REP. NO. 101-484, at 6 (1990). The protections of section 560 are limited to the exercise of contractual rights that trigger termination upon the filing of a bankruptcy petition. *See Calpine Energy Servs. v. Reliant Energy Elec. Solutions (In re Calpine Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282, at *7 (Bankr. S.D.N.Y. May 7, 2009) (under analogous section 556). The exercise of a rights to payment or distribution of payment in section 5.5 and Condition 44 are at most "ancillary" to termination and are not protected. *Id.*

98. Accordingly, BNY has failed to refute LBSF's arguments set forth in its motion for summary judgment that section 5.5 and Condition 44 constitute unenforceable *ipso facto* clauses that are not protected by any safe harbor.

## CONCLUSION AND RELIEF REQUESTED

99.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001 and 7056, LBSF requests that this Court (a) deny BNY's motion for summary judgment and (b) grant LBSF's motion for summary judgment disposing of this adversary proceeding in its entirety and enter final declaratory judgment and declaring that (1) the provisions in the Transaction Documents modifying LBSF's rights to priority of payments and/or modifying the calculation of the Early Redemption Amount as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and that LBSF is entitled to payment under Swap Counterparty Priority, and (2) any action to enforce the *ipso facto* provisions in the Transaction Documents as a result of its bankruptcy filing violates the automatic stay under 11 U.S.C. § 362(a).

Respectfully submitted,


 */s/ Ralph I. Miller*
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
       October 23, 2009