WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

――――――――――――――――――――――― x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |

――――――――――――――――――――――― x

| | | |
|---|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| -against- | : | Adversary Proceeding No.: 09-01242 (JMP) |
| BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| Defendant. | : | |

――――――――――――――――――――――― x

**DECLARATION OF GERARD MCCORMACK IN SUPPORT OF**
**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO BNY CORPORATE TRUSTEE**
**SERVICES LIMITED'S MOTION FOR SUMMARY JUDGMENT**

Background

1. My name is Gerard McCormack. I am currently Professor of International Business Law at the University of Leeds in the UK and have taught and researched law in England for over 20 years having held full Professorships at the Universities of Essex, Manchester and Leeds and been Dean of the Law School at the University of Essex. I am also a barrister of Kings Inns Dublin having been called to the Irish Bar in 1985. I am the author of numerous articles and books on Anglo-American law particularly in the secured credit and corporate bankruptcy fields including <u>Secured Credit under English and US law</u> (Cambridge University Press, 2004) and <u>Corporate Rescue Law – An Anglo-American Perspective</u> (Edward Elgar Publishing, 2008).

2. I have written this opinion on the basis of the following documentation submitted to me - (1) the Principal Trust Deed made on 10th October 2002 between Dante Finance Public Limited Company and the Trustee, (2) a Supplemental Trust Deed and Drawdown Agreement made between the issuer, the Trustee (together with its associated custodian and paying agent), LBSF (described as the swap counterparty) and LBIE and (3) the Terms and Conditions of the Notes which were attached to the prospectus sent to potential investors. I have also read the decision of the English High Court in <u>Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd</u> [2009] EWHC 1912 and other authorities as appropriate.

3. I reserve the right to revise and update this opinion when further facts and information come to my attention.

<u>The Perpetual Trustee decision – English Law does not purport to bind US Bankruptcy Court Proceedings</u>

4. The most fundamental point is that the decision of the English High Court in <u>Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd</u> [2009] EWHC 1912 is a decision on matters of English law and on the interpretation of the relevant documentation as applied to the facts as the court found, or assumed, them to be. It

2

does not purport in any way to be a decision on the application of the US Bankruptcy Code or on the application of US Bankruptcy law to the relevant documentation. This was simply not an issue in this case except incidentally to the extent that contrasts were drawn between the limited jurisdiction of the English courts to strike down priority-shifting provisions under the so-called anti-deprivation "principle" and the much more extensive jurisdiction of the American courts to disallow ipso facto clauses under the US Bankruptcy Code.

5. This point emerges very clearly from para 63 of the judgment where it was noted that parallel proceedings were in train in the United States and that ultimately the English court might be asked to implement US bankruptcy law in the English proceedings via a letter of request from the US Bankruptcy Court either under the common law or pursuant to the UNCITRAL Model Law on Cross-Border Insolvency which has passed into English law by the Cross-Border Insolvency Regulations 2007, and into US law by Chapter 15 of the US Bankruptcy Code. There was no question about the application of English law in the US Bankruptcy proceedings. It was assumed by all sides that US Bankruptcy law would apply to the US proceedings and the English Court proceeded on this assumption.

<u>The Limited Nature of the Holding in the Perpetual Trustee Case</u>

6. At para 9 of the judgment in <u>Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd</u> [2009] EWHC 1912 it is pointed out that the notes at issue in this case are governed by three documents "(1) the Principal Trust Deed made on 10th October 2002 between Dante Finance Public Limited Company (the first issuer under the programme) and the Trustee, (2) a Supplemental Trust Deed and Drawdown Agreement made between the particular issuer be it Saphir, Zircon or Beryl, the Trustee (together with its associated custodian and paying agent), Lehman BSF (described as the swap counterparty) and LBIE and (3) the Terms and Conditions of the Notes which were attached to the prospectus sent to potential investors."

7. At para 10 of his judgment the judge points that the Principal Trust Deed had effect in relation to any specific note issue as amended by the Supplemental Trust Deed relating to that issue. By clause 5.1 of the Principal Trust Deed the issuer granted "as continuing security" the charge and security interest set out in the Supplemental Trust Deed. Clause 5.5 stipulates that the security so granted shall become enforceable "...if (i) any amount due in respect of the Notes is not paid or delivered when due or (ii) a Swap Agreement terminates with sums due to the Swap Counterparty [Lehman BSF]."

8. Clause 5.2 of the Supplemental Trust Deed provides for a charge by the issuer "as continuing security in favour of the Trustee" over the collateral and other property representing it from time to time. Clause 5.3 states that such security "is granted to the Trustee as trustee for itself and/or the holders of Notes and the Swap Counterparty...as continuing security (i) for the payment of all sums due under the Trust Deed and the Notes (ii) for the performance of the issuer's obligations (if any) under the Swap Agreement...."

9. Clause 5.5 states: "The Trustee shall apply all moneys received by it under this Deed in connection with the realisation or enforcement of the Mortgaged Property as follows: Swap Counterparty Priority unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party, (as defined in the Swap Agreement) or....in which case Noteholder Priority shall apply."

10. At para 15 of the judgment it is pointed out that Swap Counterparty Priority and Noteholder Priority have the meanings ascribed to them in clause 6.2 of the Principal Trust Deed. This means that in the former after providing for payment of certain specified costs and charges, the claims of swap counterparty are payable in priority to the claims of the noteholders, whereas in the latter the claims of the noteholders are payable in priority to the claims of the swap counterparty.

11. The swap counterparty, LBSF, clearly has a security interest in the collateral, and the question in Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd [2009] EWHC 1912 was whether or not, in the events that happened, this security interest was superior or inferior to the claim by the noteholders to the collateral. It was not disputed by any of the parties to the English proceedings that LBSF had a security interest in the collateral by virtue of the trust documentation and the question in the case was about the relative priority of this security interest.

12. The judge took the view that the noteholders had a better claim to the collateral than the swap counterparty, LBSF, because, in his view, events of default occurred which, under the relevant trust deeds and the terms of issue of the notes, caused a change of priorities.

13. It is very important to note the precise ambit of the holding in the case. It was not disputed that the swap counterparty had a property interest in the collateral. This property interest was superior to that of the noteholders up until the occurrence of events of default which, in the Chancellor's view, caused a change of priorities.

14. After the change of priorities the swap counterparty, LBSF, still had a property interest in the collateral, but this property interest was inferior to that of the noteholders in the English judge's view. This continuing property interest of LBSF in the collateral is in the nature of a security interest which is a property right under English law.

Security Interests as Property Rights under English Law

15. A security interest under English law is a right given to one party in the asset of another party to secure payment or performance by that other party or by a third party. Lord Browne-Wilkinson in Re Paramount Airways Ltd [1990] BCC 130 at p 149 accepted that "security is created where a person (the creditor) obtains rights

exercisable against some property in which the debtor has an interest in order to enforce the discharge of the debtor's obligation to the creditor.'

16. So in broad terms a security right is a right over property which is intended to ensure the performance of some obligation. There are different types of security interest under English law.

17. In Re Cosslett (Contractors) Ltd [1998] Ch 495 at p 508 Lord Justice Millett provided a summary of the law in this area, stating: "There are only four kinds of consensual security known to English law: (i) pledge; (ii) contractual lien; (iii) equitable charge and (iv) mortgage. A pledge and a contractual lien both depend on the delivery of possession to the creditor. The difference between them is that in the case of a pledge the owner delivers possession to the creditor as security, whereas in the case of a lien the creditor retains possession of goods previously delivered to him for some other purpose. Neither a mortgage nor [an equitable] charge depends on the delivery of possession. The difference between them is that a mortgage involves a transfer of legal or equitable ownership to the creditor, whereas an equitable charge does not".

18. Terminology in England in respect of security interests is therefore somewhat different than in the United States. Technically, the expression "pledge" is confined to possessory security interests where possession of the asset used as security or documents of title thereto is handed over to the creditor.

19. A security in respect of financial collateral will technically speaking, almost invariably be a charge. Not least because of American influence "pledge" terminology is however, increasingly gaining currency and it is common to speak of a "pledge of financial collateral". In the trust deeds in this case traditional English usage is generally employed.

20. In the UK Companies Act 2006 the expression "charge" is defined to include a mortgage - section 861(5). On other occasions, however, the two expressions are used interchangeably. For example, both Lords Millett and Hoffmann used the expressions interchangeably in <u>Re Leyland Daf Ltd</u> [2004] 2 AC 298, and the trust deeds in this case also use the expressions in this fashion. In section 205 of the Law of Property Act 1925 "mortgage" is defined to include any charge or lien on any property.

21. Security rights in general and charges in particular are, under English law, property rights in the assets of another party. Security rights are capable of binding third parties to whom the assets are transferred unless the transfer is done with the consent of the holder of the charge.

22. In <u>Re BCCI (No 8)</u> [1998] AC 214 at p 226 Lord Hoffmann described a charge as a proprietary interest conferring rights in rem which, subject to questions of registration and the equitable doctrine of purchaser for value without notice, will be binding upon third parties.

23. A charge prevents the security giver from disposing of an unencumbered title to the assets that form the subject-matter of the charge.

24. If a security giver purported to dispose of assets that were the subject of a fixed charge in the ordinary course of business, then the charge holder is entitled to apply to the court for the appointment of a receiver over the assets on the basis that the security is in jeopardy. Sections 72A-H Insolvency Act and Schedule B1 Insolvency 1986 Act restrict the right of a charge holder to appoint a receiver in certain circumstances but this does not affect the general principle.

25. A charge holder has a power of sale over the mortgaged property. This is subject to the provisions of the Law of Property Act 1925 and in particular sections 101, 103 and 104 and the definition of "mortgage" and "property" in section 205. "Property"

is defined as including "any thing in action, and any interest in real or personal property".

26. The holders of a charge, including obviously the swap counterparty in this case, have priority over general unsecured creditors laying claim to the same assets. As Lord MacNaghten remarked as long ago as 1897 in Salomon v Salomon & Co [1897] AC 22 at p 53 the locus classicus on English company law: "Everybody knows that when there is a winding-up [charge] holders generally step in and sweep off everything …."

27. Charge holders are not even liable for general liquidation expenses as they are considered the owners of the charged assets to the extent of their security – see the discussion in Re Leyland Daf Ltd [2004] 2 AC 298.

28. By way of conclusion on this point, the swap counterparty LBSF, clearly has a property interest (a security interest) in the collateral and this property interest would continue even after any alleged switch in priorities.

The Alleged Change in Priorities

29. In Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd [2009] EWHC 1912 the judge decided that a change in priorities should occur by virtue of the provisions of clause 5.5 of the Supplemental Trust Deed. At para 44 the judge cited the arguments of counsel: "counsel for Lehman BSF relies strongly on the words in clause 5.5 of the supplemental trust deeds to the effect that Swap Counterparty Priority obtains 'unless' there is an event of default and the swap counterparty is the defaulting party. This, he submits, is a clear case of forfeiture by condition subsequent, the condition being the insolvency of Lehman BSF and the result the removal of the benefit of the swap counterparty priority from the bankrupt estate. Counsel for Perpetual and for Belmont rely on the structure of the transaction as a

whole as demonstrating that Lehman BSF never had an interest greater than one determinable on those events."

30. Ultimately the judge came down against LBSF stating at para 45 that "the priority of Lehman BSF never extended to a time after the event of default in respect of which it was the defaulting party had occurred….[I]t follows that such beneficial interest by way of security as Lehman BSF had in the collateral was, as to its priority, always limited and conditional. As such it never could have passed to a liquidator or trustee in bankruptcy free from those limitations and conditions as to its priority."

31. In short the judge appeared to conclude that the limited priority of LBSF in the collateral was integral to the formulation of its interest at the outset. LBSF did not have an unlimited right in respect of priority to the collateral which was then liable to be cut down by subsequent events. In para 44 and 45 of the judgment, the judge made use of the distinction between determinable and conditional interests and stated that LBSF's claim to priority over the noteholders was in the nature of a determinable interest rather than a conditional interest.

32. There are three points that should be made in this connection. Firstly, the judge may not have been correct in his interpretation of the contractual documentation that the swap counterparty's claim to priority over the noteholders fell on the determinable interest side of the line. Secondly, the determinable/conditional interest distinction, while it exists as a matter of English law, is very technical and has been heavily criticised. Thirdly, it has been judicially recognised in England, by Lord Neuberger in <u>Money Markets International Ltd v London Stock Exchange Ltd</u> [2002] 1 WLR 1150 that the prohibition of *ipso facto* clauses in the US Bankruptcy Code is far broader and more comprehensive thereby striking down priority shifting agreements that may be valid under English law.

33. On the first issue, the English law distinction between determinable and conditional interests is a very technical one. With a determinable interest the determining event is

integral to the formulation of the duration of the interest whereas in the case of a conditional interest the condition is some superadded event which operates to cut short the interest before it reaches out to its natural duration. The distinction has been likened to the difference between giving someone a 12-inch measuring tape subject to being cut down to a six-inch tape in certain conditions and giving someone a six-inch tape in the first place.

34. The distinction has been described as more a matter of words than anything else and by one judge as "extremely artificial" and by another as little short of disgraceful to our jurisprudence.[1] It is not to the credit of English law that it should depend on artifice and on distinctions that are judicially acknowledged to be "disgraceful".

35. In <u>Money Markets International v London Stock Exchange Ltd</u> [2002] 1 WLR 1150 Lord Neuberger, however, at para 92 referred to the fact that the distinction has been described as highly artificial. This narrow principle under English law was contrasted with the United States Bankruptcy Code which, it was said, "roundly declares ipso facto termination clauses ineffective, however they are formulated". Lord Neuberger however, said that because of existing English authorities it was not open to him to adopt the American approach.

36. Of course an American court has no such constraints being bound to apply the provisions of the United States Bankruptcy Code.

<u>The Anti-Deprivation Principle under English Law</u>

37. In <u>Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd</u> [2009] EWHC 1912 the judge decided that a change of priorities occurred by virtue of clause 5.5 of the Supplemental Trust Deed and this change of priorities was not invalidated by the

---

[1] See <u>Re Sharp's Settlement Trusts</u> [1973] Ch 331 at 340 and in <u>Re King's Trusts</u> (1892) 29 LR Ir 401 at 410

so-called anti-deprivation principle under English law.  It is appropriate now to consider the anti-deprivation principle and its application in English law.

38. It was accepted by Lord Neuberger in Money Markets International v London Stock Exchange Ltd [2002] 1 WLR 1150 at para 1 as a fundamental principle of English law that "there cannot be a valid contract that a man's property shall remain his until his bankruptcy, and on the happening of that event shall go over to someone else" citing Lord Justice Cotton in Ex p Jay; In re Harrison (1880) 14 Ch D 19 at 26.  This is often referred to as the anti-deprivation principle.  It should be noted that while the principle has been enshrined in case law for nearly two hundred years it has not been codified in any statute.  It may be argued however that Parliament has tacitly acknowledged and confirmed the common law principle through successive re-enactments of the Insolvency Code, most recently in the Insolvency Act 1986 as amended by the Enterprise Act 2002 and other recent statutes.

39. Early cases exemplifying the general principle include Whitmore v Mason (1861) 70 ER 1031 and Ex parte Mackay, In re Jeavons (1873) 8 Ch App 643.  In Mackay, Lord Justice James said at p 647 that "a man is not allowed, by stipulation with a creditor, to provide for a different distribution of his effects in the event of bankruptcy from that which the law provides".  Lord Justice Mellish said at p 648 that "a person cannot make it a part of his contract that, in the event of bankruptcy, he is then to get some additional advantage …."

40. The most authoritative exposition of the general principle comes from the leading court, the House of Lords (now the British Supreme Court), in British Eagle v Air France [1975] 1 WLR 758. This case concerned a multiparty clearing house agreement where all the debits and credits due to transactions between the parties within a clearing house agreement were totalled so as to avoid multiplicity of payments.  Giving the majority judgment, Lord Cross said the 'clearing house' creditors were clearly not secured creditors but they were claiming that they had achieved, by the medium of the 'clearing house' agreement, a position analogous to

that of secured creditors without the need for the creation and registration of security interests on the receivables in question.

41. Lord Cross said that the clearing house provisions were contrary to public policy and it was irrelevant that the parties to the arrangements had sound business reasons for entering into them and did not direct their minds to the question how the arrangements might be affected by the insolvency of one or more of the parties. He said that the power of the court to go behind agreement whose results were repugnant to the insolvency legislation was not confined to cases where the dominant purpose of the parties was to evade the operation of the legislation.

Non-application of the Anti-Deprivation Principle in the Perpetual Trustee Case

42. As noted at para 37 in Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd [2009] EWHC 1912 the judge decided that the anti-deprivation principle did not operate to invalidate the change of priorities from Swap Counterparty Priority to Noteholder Priority under clause 5.5 of the Supplemental Trust Deed.

43. The principal ground for the decision is discussed above at paras 29-31; namely that the claim to swap counterparty priority by LBSF was construed as being based on a determinable interest rather than a conditional interest and the anti-deprivation principle was much narrower than the provisions in the US Bankruptcy Code invalidating *ipso facto* clauses. As a subsidiary point, it was also suggested that the anti-deprivation principle could not be invoked because the event of default relied upon to cause the switch from one set of priorities to another was an event other than the Chapter 11 filing by LBSF.

44. At para 49 of his judgment the Chancellor commented that priority is changed if there is "an Event of Default (as defined in the Swap Agreement) and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement)". The "Events of Default" were set out in clause 5(a) of the Swap Agreement and included

bankruptcy events occurring in relation to the credit support provider of LBSF, defined in paragraph 10(iv) of the Swap Confirmation as Lehman Brothers Holdings Inc. In the judge's view, an event of default arose on 15th September 2008, LBSF was the defaulting party in respect of it and that was an event other than the insolvency of LBSF. It should be stressed however, that the main ground of decision was the perceived limitations of the anti-deprivation principle and the attention of the court was concentrated on that issue.

45. This view depends on an interpretation of the documentation and may not be correct as a matter of construction and on the facts. Clause 5.5 of the Supplemental Trust Deed suggests that a deprivation does not occur until the application of monies in connection with the enforcement or realisation of the collateral. In the present case no such application had taken place prior to LBSF's Chapter 11 filing. Therefore no deprivation of LBSF's superior priority claim to the collateral occurred before its bankruptcy filing on October 3rd 2008.

Conclusion

46. In <u>Perpetual Trustee Co Ltd v BNY Corporate Trustee Services Ltd</u> [2009] EWHC 1912 the English Court did not purport to decide that English law should affect US Bankruptcy Court proceedings or the application of American law in such proceedings.

47. Indeed in para 63 of its judgment the English court contemplated the reverse i.e. that US Bankruptcy law might be applied in the English proceedings via a letter of request from the US Bankruptcy Court.

48. In <u>Perpetual Trustee</u> it was not disputed that LBSF had a security interest i.e. a property interest in the collateral.

49. This property interest was a continuing interest and subsisted up to, and beyond, the time of LBSF's Chapter 11 filing on October 3rd 2008.

50. The English court in <u>Perpetual Trustee</u> held that by virtue of Clause 5.5 of the Supplemental Trust Deed of the notes a change of priorities from Swap Counterparty Priority to Noteholder Priority took place.

51. This conclusion was reached on an interpretation of Clause 5.5 but does not reflect the full wording of the clause which suggests that priorities should not switch until the application of monies in connection with the enforcement or realisation of the collateral. In the present case there was no application of such monies prior to LBSF's Chapter 11 filing on October 3rd 2008.

52. The conclusion in the <u>Perpetual Trustee</u> case was based on a highly technical distinction found in English law between determinable and conditional interests, which has been judicially described as "highly artificial" and "disgraceful to our jurisprudence."

53. There is no equivalent in England to section 365(e)(1) and 541(c)(1)(B) of the United States Bankruptcy Code operating to strike down *ipso facto* clauses on a bankruptcy filing. This absence has been judicially acknowledged in England and it is has also been judicially noted that courts must make do with a much more restricted anti-deprivation principle based on narrow dividing lines and lacking the comprehensive sweep of the United States Bankruptcy Code.

Declaration

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 23 October 2009

*Gerard M<sup>c</sup>Cormack*
Gerard McCormack