Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

and

David S. Cohen (admitted pro hac vice)
Adrian C. Azer (admitted pro hac vice)
MILBANK, TWEED, HADLEY & MᶜCLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500


Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————————x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | | Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | |
| Debtors. | : | |

———————————————————————————x

| | | |
|---|---|---|
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| -against- | : | Adversary Proceeding No.: 09-01242 (JMP) |
| BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| Defendant. | : | |

———————————————————————————x

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO BNY CORPORATE TRUSTEE SERVICES LIMITED'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND ................................................................................... 4

    I.     The Saphir Transactions ...................................................................... 4

    II.    Termination of the CDS Agreements and the High Court Action ........................ 7

ARGUMENT ..................................................................................................... 8

    I.     The Doctrine of *Res Judicata* Does Not Apply to the High Court Ruling ............ 9

    II.    LBSF's Property Interest Under Condition 44 ................................................... 11

        A.    Condition 44 Vests LBSF With a Distinct Property Interest  From That of Clause 5.5 ................................................................. 11

        B.    LBSF's Rights To the Collateral Proceeds Under Condition 44 Existed on the Petition Date .............................................................. 13

    III.   The Legislative History of Sections 365(e)(1)(B)  and 541(c)(1)(B) Demonstrate That They Apply  to the Commencement of LBHI's Bankruptcy Case .......................................................................... 17

    IV.   Section 560 of the Bankruptcy Code Does Not Apply to Noteholder Priority and Condition 44 .................................................................. 22

        A.    Relevant Facts with Respect to the Applicability of Section 560 ............ 22

        B.    The Enforcement of Noteholder Priority and Section 44 Does Not Involve the Exercise of Contractual Rights by a Swap Participant Under a Swap Agreement ...................................................... 24

        C.    The Enforcement of Noteholder Priority and Section 44 Does Not Involve the Exercise of Rights of the Kind That Are Protected by Section 560 ............................................................... 28

        D.    Legislative History ............................................................... 30

CONCLUSION .................................................................................................. 39

# TABLE OF AUTHORITIES

Page

## CASES

Aleyasi Beverage Corp. v. Canada Dry Corp.,
  947 F. Supplemental 658, 663 (S.D.N.Y. 1996), aff'd, 122 F.3d 1055 (2d Cir.
  1997) .................................................................................................................... 9

Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.),
  357 B.R. 231, 239 (Bankr. S.D.N.Y. 2006), leave to appeal denied, 377 B.R.
  69 (S.D.N.Y. 2007) ............................................................................................ 10

Geldermann & Co. v. Lane Processing, Inc., 527 F.2d 571, 574 (8th Cir. 1975) ...................... 35

Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics,
  905 F. Supp. 169, 179 (S.D.N.Y. 1995)............................................................... 10

Gordon and Breach, 905 F. Supp. at 179 ........................................................................... 9

In re Amcor Funding Corp.,
  117 B.R. 549, 551 (Bankr. D. Ariz. 1990)........................................................... 17

In re Margules,
  323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005).......................................................... 14

Pan Am Corp. v. Delta Air Lines,
  175 B.R. 438, 507 (S.D.N.Y. 1994).................................................................... 14

Playboy Enters., Inc. v. Dumas,
  960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir.
  1998) ................................................................................................................... 10

Scherer v. Equitable Life Assur. Soc'y of the U.S.,
  No. 01 Civ. 10193, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004) ...................... 10

Shanks v. Catskill Bd. of Trs.,
  No. 1:06-CV-1399, 2009 WL 2868240, at *10 n.6 (N.D.N.Y Sept. 2, 2009)...................... 10

Wakefield v. Northern Telecom, Inc.,
  769 F.2d 109, 113 (2d Cir. 1985)......................................................................... 14

## STATUTES

11 U.S.C. § 101(50) ............................................................................................................ 27

11 U.S.C. § 101(53B) ............................................................................................ 24, 26, 27

11 U.S.C. § 101(53C) ......................................................................................................... 24

11 U.S.C. § 362(b)(17) ...................................................................................................... 30

11 U.S.C. § 362(o) ............................................................................................................. 30

11 U.S.C. § 365(e)(1).............................................................................................. 1, 9, 33

11 U.S.C. § 541(c)(1)(B) .................................................................................................. 18

11 U.S.C. § 560............................................................................................................. passim

11 U.S.C. §§ 101(51) ......................................................................................................... 30

Pub. L. No. 91-354, 84 Stat. 468 ...................................................................................... 18

Pub. L. No. 93-463, 88 Stat. 1389 ..................................................................... 30

Pub. L. No. 95-598, 92 Stat. 2548 ..................................................................... 31

Pub. L. No. 97-222, § 17(c), 96 Stat. 240 .......................................................... 32

Pub. L. No. 97-222, § 4, 96 Stat. 236 ................................................................ 32

Pub. L. No. 97-222, § 6(a), 96 Stat. 237 ............................................................ 35

Pub. L. No. 97-222, §§ 3(b), 96 Stat. 236 ........................................................... 35

Pub. L. No. 98-353, § 351(2), 98 Stat. 358 ......................................................... 32

## LEGISLATIVE MATERIALS AND OTHER AUTHORITIES

124 Cong. Rec. H11,060 (daily ed. Sept. 28, 1978) ........................................... 21

124 Cong. Rec. H11,099 (daily ed. Sept. 28, 1978) ........................................... 32

124 Cong. Rec. S17,416 (daily ed. Oct. 6, 1978) .............................................. 32

124 Cong. Rec. S17,433 (daily ed. Oct. 6, 1978) .............................................. 35

Bankruptcy Act Revision: Hearings on H.R. 31 and H.R. 32 Before the
    Subcomm. on Civil and Constitutional Rights of the House Judiciary Comm.,
    94th Cong. 2377-2420 (1976) ....................................................................... 31

Bankruptcy of Commodity and Securities Brokers: Hearings Before the
    Subcomm. on Monopolies and Commercial law of the House Judiciary
    Comm., 97th Cong. (1981) ..................................................................... 30, 36

Bankruptcy Reform Act of 1978: Hearings Before the Subcomm. on
    Improvements in Judicial Machinery of the Senate Judiciary Comm., 95th
    Cong. (1978) ................................................................... 31, 32, 33, 35

Bankruptcy Treatment of Swap Agreements and Forward Contracts: Hearing
    Before the Subcomm. On Economic and Commercial Law of the House
    Judiciary Comm., 101st Cong. (1990) ............................................................ 38

H.R. 10792, 93d Cong., §§ 4-601(b) .................................................................. 19

H.R. 10792, 93d Cong., §§ 4-602(b) .................................................................. 19

H.R. 16643, 93d Cong., §§ 4-601(b) .................................................................. 19

H.R. 16643, 93d Cong., §§ 4-602(b) .................................................................. 19

H.R. 31, 94th Cong., §§ 4-601(b) ...................................................................... 19

H.R. 31, 94th Cong., §§ 4-602(b) ...................................................................... 19

H.R. 32, 94th Cong., §§ 4-601(b) ...................................................................... 19

H.R. 32, 94th Cong., §§ 4-602(b) ...................................................................... 19

H.R. 6, 95th Cong. § 341(c) .............................................................................. 20

H.R. 6, 95th Cong. § 365(e) .............................................................................. 19

H.R. 7330, 95th Cong. § 341(c) ......................................................................... 21

H.R. 7330, 95th Cong. § 365(b)(2) ..................................................................... 20

H.R. 7330, 95th Cong. § 365(e) ......................................................................... 20

H.R. 8200, 95th Cong., § 365(b)(2) .................................................................... 21

H.R. 8200, 95th Cong., § 365(e) ....................................................... 21

H.R. 8200, 95th Cong., § 541(c) ....................................................... 21

H.R. Doc. No. 93-137 ....................................................... 18

H.R. Rep. No. 109-31 ....................................................... 27

Interest Swap: Hearing Before the Subcomm. on Courts and Administrative
    Practice of the Senate Judiciary Comm. 101st Cong. 8 (1989) ..................................... 37, 38

John C. Hull, Options, Futures, & Other Derivatives 20 (4th ed. 2000) ..................................... 35

S. 2266, 95th Cong., § 341(c) ....................................................... 21

S. 2266, 95th Cong., § 365(e) ....................................................... 21

S. 235, 94th Cong., §§ 4-601(b) ....................................................... 19

S. 235, 94th Cong., §§ 4-602(b) ....................................................... 19

S. 236, 94th Cong., §§ 4-601(b) ....................................................... 19

S. 236, 94th Cong., §§ 4-602(b) ....................................................... 19

S. 2565, 93d Cong., §§ 4-601(b) ....................................................... 19

S. 2565, 93d Cong., §§ 4-602(b) ....................................................... 19

S. 4046, 93d Cong., §§ 4-601(b) ....................................................... 19

The Bankruptcy Reform Act:  Hearings Before the Subcomm. on Improvements
    in Judicial Machinery of the Senate Judiciary Comm., 94th Cong. (1977) ....................... 31

UCC § 9-102(12) ....................................................... 30

**FOREIGN CASES**

Woolworths Plc v. BBCW,
    [2009] EWHC 1954 (Ch) ....................................................... 8

The Official Committee of Unsecured Creditors (the "Committee") of Lehman

Brothers Holdings Inc. ("LBHI") and its affiliated debtors in possession, including Lehman

Brothers Special Financing Inc. ("LBSF", collectively, the "Debtors"), hereby files this

Statement in Support of the Debtors' Motions for Summary Judgment ("Debtors' Motion")[1] and

the Debtors' Memorandum of Law in Opposition (the "Debtors' Opposition") to BNY Corporate

Trustee Services Limited's ("BNY") Motion for Summary Judgment and Supporting

Memorandum of Law ("BNY's Memorandum"), and respectfully states:

## PRELIMINARY STATEMENT

1.      The Debtors filed this adversary proceeding to prevent BNY from

depriving LBSF of its property interests through unenforceable *ipso facto* clauses.  Significantly,

BNY seeks to modify LBSF's property rights solely because of LBSF's bankruptcy filing.

Sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code prohibit this conduct.  BNY

nevertheless wrongly contends that a decision by the High Court of Justice, Chancery Division,

Royal Courts of Justice, London, England (the "High Court") regarding LBSF's property

interests precludes this Court's consideration of these *ipso facto* provisions.  BNY is trying to

cloud the issues and obfuscate the true import of the High Court's finding.

2.      Issues arising under the Bankruptcy Code, including whether a debtor

holds a property interest under section 541 of the Bankruptcy Code, are properly decided by this

Court.  BNY incorrectly contends that the High Court's finding regarding LBSF's property

interest is *res judicata*.  Comity, however, not *res judicata* is the appropriate doctrine.  Here,

comity should not be granted with respect to the High Court's decision because (a) BNY failed

---

[1]      Capitalized terms used but not defined herein shall have the meanings given to them in the Debtors'
Motion.

to present a single argument regarding why comity is appropriate and (b) as addressed more fully in the Debtors' Opposition, the High Court's finding on LBSF's property interest was pure dicta, which did not take into consideration the impact of section 541 of the Bankruptcy Code.

3.      Even if comity were granted, contrary to BNY's assertions, LBSF retained a property interest under the Transaction Documents. Clause 5.5 of each Supplemental Trust Deed governs LBSF's property interest in priority of payment under the CDS Agreements (as defined below). Condition 44 of the of the Terms and Conditions of the Notes (annexed to the Supplemental Trust Deeds) governs the quantum owed to the holders of the notes and, in turn, LBSF. These provisions are separate and distinct, with independent conditions precedent, none of which were triggered prior to LBSF's bankruptcy filing.

4.      Notably, Condition 44 is triggered by early redemption of the notes, which allows for calculation of the early redemption amount. Although early redemption can occur under several circumstances, the only applicable event that would allow for early redemption here was the termination of the CDS Agreements. It is without question that BNY sent LBSF early termination notices on December 1, 2008 – six weeks after LBSF's bankruptcy filing. Accordingly, as of its petition date, LBSF held a property interest that was unaltered pursuant to Condition 44. And any attempt by BNY to modify LBSF's property interest postpetition as a result of its bankruptcy filing is precluded by sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code.

5.      Here, BNY contends that LBSF's interests are subject to modification pursuant to Clause 5.5 and Condition 44 because (a) sections 365(e)(1) and 541(c)(1)(B) do not apply, as LBSF was deprived of its interests prepetition as a result of LBHI's bankruptcy filing,

and (b) such modification is protected by section 560 of the Bankruptcy Code. These arguments are simply incorrect.

6.    First, the protections afforded under sections 365(e)(1) and 541(c)(1)(B) are broad enough that LBHI's bankruptcy filing allowed for the protection of LBSF's interests. As set forth by the legislative history of sections 365(e)(1) and 541(c)(1)(B), Congress specifically provided that the protections afforded under these sections vested upon "the commencement of *a case* under this title." (emphasis added). Thus, Congress intended that the filing of a parent entity, like LBHI, could extend this protection.

7.    Second, BNY fails to identify how section 560 of the Bankruptcy Code protects its actions. Notably, section 560 protects only the actions of a "swap participant." 11 U.S.C. § 560. Although BNY generally contends that Clause 5.5 and Condition 44 are enforceable, BNY fails to identify the "swap participant" that would be enforcing those rights. Indeed, BNY cannot do so. Neither BNY nor the noteholders under the Transaction Documents are "swap participants." Accordingly, section 560 does not protect BNY's attempt to modify LBSF's interests pursuant to unenforceable *ipso facto* clauses.

8.    Even if BNY could identify a "swap participant," which it cannot, the actions taken by BNY are not encompassed by the section 560 safe harbor. Section 560 is a limited safe harbor that allows for the "liquidation, termination, or acceleration of one or more swap agreements because of a condition of the kind specified in section 365(e)(1)." 11 U.S.C. § 560. Neither section 560 nor the relevant legislative history addresses modification of a debtor's rights in the manner that enforcement of Clause 5.5 and Condition 44 would modify LBSF's rights.

9. In sum, BNY's arguments are without merit, as LBSF held a property interest at the time of its bankruptcy filing and BNY cannot modify LBSF's interests postpetition pursuant to unenforceable *ipso facto* clauses. Accordingly, summary judgment should be granted to the Debtors.

## FACTUAL BACKGROUND

### I. The Saphir Transactions

10. This adversary proceeding arises out of two structured finance transactions involving two series of credit-linked notes issued under the Dante Program. Saphir Finance Public Limited Company ("Saphir") issued notes (the "Saphir Notes") pursuant to a Principal Trust Deed and a Supplemental Trust Deed specific to each series of notes (collectively, the "Trust Documents"). The Saphir Notes were synthetically credit-linked to portfolios of reference entities (the "Reference Entities") through two credit-default-swap agreements (the "CDS Agreements") between Saphir and LBSF. LBHI was the Credit Support Provider, or guarantor, of LBSF's obligations under the CDS Agreements. BNY is the trustee ("Trustee") for the Saphir Notes.

11. Pursuant to the terms of the CDS Agreements, the bankruptcy or insolvency of either LBSF or LBHI was an event of default (an "Event of Default").[2] After the occurrence of an Event of Default, the Non-defaulting Party has the right, but not the obligation, to terminate the CDS Agreement by giving notice to the Defaulting Party and designating an early termination date (the "Early Termination Date").[3]

---

[2] See Debtors' Mem., Ex. E § 5(a)(vii)(4) (ISDA Master Agreement 2005); id., Ex. F § 5(a)(vii)(4) (ISDA Master Agreement 2004).

[3] See Debtors' Mem., Ex. E § 6(a) (ISDA Master Agreement 2005) ("If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the"Non-defaulting Party") may, by not more than 20 days notice to the Defaulting Party specifying the relevant

12.     The Trust Documents govern payment to the holders of the Saphir Notes (the "Noteholders") and LBSF under the CDS Agreements.  Specifically, clause 5.5 ("Clause 5.5") of each Supplemental Trust Deed provides for priority of payment between the Noteholders and LBSF.  Pursuant to Clause 5.5, LBSF, as the "Swap Counterparty" is to be paid before the Noteholders, "unless (i) an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the Swap Agreement) . . . in which case Noteholder Priority shall apply."  (See Debtors' Mem., Ex. C § 5.5 (Saphir 2004-11 Supplemental Trust Deed).)[4]  The effect of a switch from "Swap Countparty Priority" to "Noteholder Party" is that Clause 5.5 modifies LBSF's priority to payment such that LBSF's priority is junior to that of the Noteholders.  (See id., Ex. A § 6.2 (Principal Trust Deed 2005).)  As noted more fully in the Debtors' Opposition, this switch from "Swap Counterparty Priority" to Noteholder Priority, however, is not automatic, but only occurs upon the satisfaction of several conditions precedent.  (See Debtors' Opp'n ¶¶ 20-27.)

13.     Apart from Clause 5.5, condition 44 of the Terms and Conditions of the Notes (annexed to the Supplemental Trust Deeds) ("Condition 44") governs the calculation of the amounts (i.e., the quantum of payment) due to the Noteholders upon the early redemption of the Saphir Notes ("Early Redemption Amount").  Condition 44 provides two methods for calculating the Early Redemption Amount, depending on whether an Event of Default has occurred.  By way of example, pursuant to paragraph 1 of Condition 44 under Schedule 2 for the Saphir 2006-5 Notes, absent an Event of Default by LBSF, the first paragraph of Condition 44 calculates the Early Redemption Amount due to the Noteholders as:

---

Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date in respect of all outstanding Transactions."); id., Ex. F § 6(a) (ISDA Master Agreement 2004).)

[4]     See also Debtors' Mem., Ex. D § 5.5 (Saphir 2006-5 Supplemental Trust Deed).

> Early Redemption Amount(s) payable . . . :Subject as provided in the immediately succeeding paragraph below, in respect of each Note, an amount . . . determined by the Calculation Agent in its sole discretion and acting in good faith as being equal to (i) such Note's pro rata share of the proceeds (net of any deductions on account of taxes or otherwise) from the sale or realisation of the Collateral . . . plus (if payable to the Issuer) or minus (if payable to the Swap Counterparty) (ii) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding . . . .

(See id., Ex. D Schedule 2, Condition 44 (Saphir 2006-5 Supplemental Trust Deed).)[5]  This

calculation method ensures that a payment is made to LBSF notwithstanding the occurrence of

Noteholder Priority.[6]

14.     If there is an Event of Default by LBSF, the second calculation method set

forth in the second paragraph of Condition 44 applies, resulting in a larger Early Redemption

Amount to the Noteholders at the expense of LBSF.  Specifically, paragraph 2 of Condition 44

under Schedule 2 to the Saphir 2006-5 Notes provides:

> if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party (as defined in the ISDA Master Agreement . . . the Early Redemption Amount in respect of each note shall be an amount . . . equal to (i) the Note's pro rata share of the proceeds . . . from the sale or realisation of the Collateral on behalf of the Issuer . . . plus (ii) (but only if payable to the Issuer) the amount of any applicable Unwind Costs divided by the total number of Notes outstanding . . . In the event that Unwind Costs are payable by the Issuer to the Swap Counterparty, the Issuer shall apply the net proceeds from the sale or realisation or redemption of the

---

[5]     See also Debtors' Mem., Ex. C Offering Circular Supplement, Condition 44 (Saphir 2004-11 Supplemental Trust Deed).

[6]     For example, if the Collateral Proceeds equal $100.00 and the Unwind Costs equal $40.00, the Noteholders Early Redemption Amount would be $60.00 (100.00-40.00).  Thus, the Early Redemption Amount is a function of the Unwind Costs and cannot be calculated without reference to the same.  Under the first paragraph of Condition 44, assuming the Trustee Expenses equal $2.00 and Noteholder Priority applies—to highlight the relative effects of Clause 5.5 – LBSF would recover $38.00 (40.00-2.00) and the Noteholders could recover $58.00 (60.00-2.00).  Conversely, if Swap Counterparty Priority applied, LBSF would recover $40.00 (40.00-0.00) and the Noteholders would recover $58.00 (60.00-2.00).  Regardless of which priority of payment applies, where the first paragraph of Condition 44 applies, LBSF should recover a minimum amount equal to the Unwind Costs (i.e., its Early Termination Amount) less the Trustee Expenses.

> Collateral as aforesaid (1) first in redeeming each Note in an amount equal to its Outstanding Principal Amount as of the Early Redemption Date plus the Accrued Early Redemption Interest Amount and (2) thereafter, in payment of such Unwind Costs to the Swap Counterparty.

(Id., Ex. D Schedule 2, Condition 44 (Saphir 2006-5 Supplemental Trust Deed); see also id., Ex. C Offering Circular Supplement, Condition 44 (Saphir 2004-11 Supplemental Trust Deed).)

15.     Condition 44, however, operates only upon the occurrence of certain conditions precedent. Specifically, Condition 44 takes effect upon (a) the early redemption of the Saphir Notes and (b) because of the necessity for calculation of the Unwind Costs, early termination of the CDS Agreements. Early redemption of the Saphir Notes is governed by Condition 38 of Supplemental Trust Deeds ("Condition 38"), which provides:

> *[U]pon the occurrence of any of the events set out in Condition 6(c) and (d) and Condition 10* (the date of the relevant occurrence . . . being the 'Early Redemption Event Date') *the Issuer shall forthwith notify the Trustee, S&P and the Noteholders* informing them of the occurrence of such event giving notice of the date fixed for redemption, being the day falling six Business Days following the relevant Early Redemption Event Date (the "Early Redemption Date"). *Upon the expiry of such notice, the Issuer shall redeem each Note at its Early Redemption Amount as set out in paragraph 44 below.*

(Id., Ex. D Condition 38 (Saphir 2006-5 Supplemental Trust Deed) (emphasis added); see also id., Ex. C Condition 38 (Saphir Series 2004-11 Supplemental Trust Deed).) Thus, early redemption of the Saphir notes can occur only upon the occurrence of an event set out in Base Conditions 6(c), 6(d), or 10, notice, and the expiration of the notice period, which sets the redemption date. (Id.)

## II.     Termination of the CDS Agreements and the High Court Action

16.     On December 1, 2008, Saphir sent purported early termination notices to LBSF (the "Early Termination Notices") designating December 1, 2008 as the Early Termination

Date.[7]  The Early Termination Notices only identified **_LBSF's_** chapter 11 petition as constituting an Event of Default under each CDS Agreement.[8]

17.    On May 13, 2009, Perpetual Trustee Company Limited ("Perpetual"), holder of the Saphir Notes,[9] filed a claim form[10] (the "Claim Form") commencing an action (the "Perpetual Action") against BNY in the High Court of Justice, Chancery Division, Royal Courts of Justice, London, England (the "High Court").[11]  After hearing arguments from Perpetual and LBSF, on July 28, the High Court issued its Approved Judgment (the "High Court Judgment"), finding that Clause 5.5 did not violate the anti-deprivation principle and therefore, was valid and enforceable under English law.  (See High Court J. ¶ 65.) [12]

18.    On August 18, LBSF filed an Appellant's Notice.  LBSF's appeal was heard the week of October 12, 2009.

## ARGUMENT

19.    On September 25, 2009, BNY filed its motion for summary judgment in the above-captioned proceeding.  BNY asserted that: (a) this Court must give _res judicata_ effect to the High Court's alternative finding that LBSF had no property interest in the proceeds of the

---

[7]     See Debtors' Mem., Ex. H (Saphir 2006-5 Termination Letter from Saphir to LBSF (Dec. 1, 2008)); id., Ex. I (Saphir 2004-11 Termination Letter from Saphir to LBSF (Dec. 1, 2008)).

[8]     Id.

[9]     Perpetual is the successor in interest to Mahogany Capital, the previous holder of the Saphir Notes.

[10]    A claim form is the equivalent of a complaint.

[11]    On June 9, 2009, a separate action was commenced in the High Court by a group of twenty-three Australian noteholders nominally led by Belmont Park Investments (collectively, the "Belmont Noteholders"), which asserted similar claims on certain Notes issued under the Dante Program and was procedurally consolidated with the Perpetual Action (the "Belmont Action").

[12]    In contrast, on August 20, the High Court issued its ruling in Woolworths Plc v. BBCW, [2009] EWHC 1954 (Ch) (the "Butters" case), in which a different Judge of the Chancery Division held that an insolvency clause in a Master Lease Agreement, which provided that, upon insolvency, Woolworth's would be forced to sell its shares in a Joint Venture at a discounted price, was void as a matter of public policy under the anti-deprivation principle.  Id.  This matter was also appealed and was heard in conjunction with the appeal in the Perpetual Action.

transaction at its petition date; (b) Clause 5.5 and Condition 44 must be enforced under section 510(a) of the Bankruptcy Code; and (c) Clause 5.5 and Condition 44 are enforceable under section 560 of the Bankruptcy Code. Each of these arguments is fatally flawed.[13]

## I. The Doctrine of *Res Judicata* Does Not Apply to the High Court Ruling

20.     BNY first contends that the High Court's finding that LBSF lost its property interest prior to its petition date is binding under the doctrine of *res judicata*. (See BNY Mem. at 20-21.) BNY's assertion that *res judicata* somehow prevents this Court from considering whether Clause 5.5 and Condition 44 are unenforceable *ipso facto* provisions under sections 365(e)(1) and 541(c)(1) of the Bankruptcy Code is wrong.

21.     BNY incorrectly contends that Ackerman v. Ackerman, 676 F.2d 898, 905-06 (2d Cir. 1982) stands for the proposition that the "determination in Perpetual is binding in this case under the doctrine of *res judicata*." (BNY Mem. at 21.) Far from "giving *res judicata* effect to a judgment rendered in [an] English action" (id.), Ackerman actually affirms the well-established principle that recognition of foreign judgments is governed by the ***doctrine of comity***. Ackerman, 676 F.2d at 902 ("Under New York law . . . the English judgment would be enforced under principles of comity."). This distinction is material because, unlike the doctrine of *res judicata*, comity does not preclude this Court from reviewing the High Court's finding.[14]

---

[13]     To avoid unnecessary repetition, the Court is respectfully referred to the Debtors' Opposition with regard to several of the arguments raised by BNY. The Committee limits its arguments to the property interest vested in LBSF pursuant to Condition 44 and the applicability of section 560 of the Bankruptcy Code. These arguments are in addition, and in the alternative, to the arguments made by the Debtors.

[14]     "It is well-established that United States courts are not *obliged* to recognize judgments rendered by a foreign state, but may *choose* to give *res judicata* effect on the basis of comity." Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 179 (S.D.N.Y. 1995) (emphasis in original); accord Aleyasi Beverage Corp. v. Canada Dry Corp., 947 F. Supplemental 658, 663 (S.D.N.Y. 1996), aff'd, 122 F.3d 1055 (2d Cir. 1997); see also In re Perry H. Koplik & Sons, Inc., 357 B.R. at 237 ("if . . . a litigant sought to invoke *res judicata* based on the substantive determination of a foreign court, an American court would necessarily have to consider whether comity requires respect for the foreign decision").

22.     Comity may be granted to a foreign judgment if "it is shown that the foreign court is a court of competent jurisdiction, and that the laws and public policy of the forum state and the rights of its residents will not be violated."  Fox v. Mandiri (In re Perry H. Koplik & Sons, Inc.), 357 B.R. 231, 239 (Bankr. S.D.N.Y. 2006), leave to appeal denied, 377 B.R. 69 (S.D.N.Y. 2007) (citations omitted).  The Court must be guided by principles of fairness and reasonableness.  See Gordon & Breach Sci. Publishers S.A., 905 F. Supp. at 179 ("it is primarily principles of fairness and reasonableness that should guide domestic courts in their preclusion determinations").  It is the burden of the party seeking recognition and enforcement of the foreign judgment to show that comity should be granted.  See In re Perry H. Koplik & Sons, Inc., 357 B.R. at 239.

23.     Here, BNY relies solely on the doctrine of *res judicata* as applied under the Full Faith and Credit Clause, which is inapplicable.  (See BNY Mem. at 21.)  There is absolutely no reference to the principles of fairness and reasonableness, nor any argument that comity should be granted to the High Court's finding regarding LBSF's property interest.  (Id.)  Accordingly, BNY has failed to satisfy its burden and cannot now contend that comity should be granted.[15]  Moreover, this Court is not required to grant comity to the High Court's finding where it violates the tenets of the Bankruptcy Code.[16]  As such, this Court is free to disregard the High Court's finding.

---

[15]     See Scherer v. Equitable Life Assur. Soc'y of the U.S., No. 01 Civ. 10193, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004) ("In its initial motion papers and main brief, *res judicata* and the law of the case were the only bases defendant urged in support of its motion.  Defendant suggests additional grounds in its reply brief.  ***This is improper practice.***") (citations omitted) (emphasis added); see also, e.g., Shanks v. Catskill Bd. of Trs., No. 1:06-CV-1399, 2009 WL 2868240, at *10 n.6 (N.D.N.Y Sept. 2, 2009) (declining to consider arguments raised in reply brief) (citing Knipe v. Skinner, 999 F.2d 708, 711 (2d Cir. 1993) ("Arguments may not be made for the first time in a reply brief.");  Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998) ("Arguments made for the first time in a reply brief need not be considered by a court.") (collecting sources).

[16]     In the alternative, the Committee concurs with and joins in the Debtors' arguments that the High Court's judgment should not be granted comity or *res judicata* effect.  (See Debtors' Opp'n ¶¶ 42-70.)

## II.    LBSF's Property Interest Under Condition 44

24.    Even if the Court were to consider the High Court's statements regarding LBSF's property interest, which it should not, LBSF was not deprived of its property interest under Condition 44.  BNY erroneously characterizes Condition 44 as a subordination provision similar to Clause 5.5.  Compounding that error, BNY goes on to wrongly assert that, as a result of the High Court's finding, LBSF did not have a property interest as of its petition date.  What BNY ignores, however, is that Condition 44 and Clause 5.5 vest LBSF with distinct and independent property interests.  Moreover, the conditions precedent that trigger Condition 44 are distinct from those of Clause 5.5, and none of the conditions precedent required for Condition 44 existed prior to LBSF's petition date.

### A.    Condition 44 Vests LBSF With a Property Interest Distinct From That of Clause 5.5

25.    Clause 5.5 and Condition 44 vest LBSF with distinct property interests that are not intertwined.  Clause 5.5 governs LBSF's priority to payment, while Condition 44 governs the quantum owed to the Noteholders and, in turn, LBSF.  Specifically, pursuant to Clause 5.5, absent a default by LBSF, Swap Counterparty Priority applies – i.e., LBSF's claims will be paid in priority to those of the Noteholders.[17]  After an Event of Default by LBSF and satisfaction of certain conditions precedent, "Noteholder Priority shall apply," which modifies the priority of payment of LBSF's claims to be junior to those of the Noteholders.[18]  Accordingly, Clause 5.5 solely addresses priority of payment between LBSF and the Noteholders.  (Id.)  *Clause 5.5 does not effect the calculation of the quantum owed to the Noteholders or LBSF.  That is governed solely by Condition 44*.

---

[17]    See Debtors' Mem., Ex. A § 6.2 (Principal Trust Deed 2005); see also id., Ex. C § 5.5 (Saphir 2004-11 Supplemental Trust Deed); id., Ex. D § 5.5 (Saphir 2006-5 Supplemental Trust Deed).

[18]    See id., Ex. C § 5.5 (Saphir 2004-11 Supplemental Trust Deed); id., Ex. D § 5.5 (Saphir 2006-5 Supplemental Trust Deed).

26.     Absent an Event of Default by LBSF, Condition 44 provides that the amount due to the Noteholders, the "Early Redemption Amount," is calculated – in simplified terms—by taking the Collateral Proceeds and adjusting according to the nature of the "Unwind Costs," which includes the "termination payment due from or, as the case may be, to the Swap Counterparty under the Swap Agreement."[19] If LBSF is "in-the-money" and, as a result, owed an Early Termination Payment under the CDS Agreements, as it is here, the Unwind Costs are subtracted from the Collateral Proceeds before the Early Redemption Amount is calculated (this first formula is referred to herein after as the "Original Formula").[20] Significantly, the Original Formula in Condition 44 provides LBSF a defined interest in property, even if Noteholder Priority applies. Specifically, LBSF is entitled to a portion of the Collateral Proceeds sufficient to ensure payment of LBSF's Early Termination Payment. LBSF's entitlement to payment under the Original Formula is illustrated by Table 1 below.

27.     If there is an Event of Default by LBSF, however, the second paragraph of Condition 44 penalizes LBSF by providing that the amount due to the Noteholders is calculated on a different and more generous basis at LBSF's expense. After an Event of Default by LBSF, rather than calculating the Early Redemption Amount as the Collateral Proceeds minus the Unwind Costs, the calculation of the Early Redemption Amount under Condition 44 would be equal to the Outstanding Principal Amount plus the Accrued Early Redemption Interest Amount (the "Penalty Formula"). This Penalty Formula deprives LBSF of its otherwise defined interest in the Collateral Proceeds and simultaneously provides a windfall to the Noteholders through an increase in their Early Redemption Amount.

---

[19]     See id., Ex. C Offering Circular Supplement, Condition 44 (Saphir 2004-11 Supplemental Trust Deed); id., Ex. D Schedule 2, Condition 44 (Saphir 2006-5 Supplemental Trust Deed).

[20]     Of course, if LBSF owed an Early Termination Payment under the CDS Agreements, the Unwind Costs would be added to the proceeds of the sale of the Collateral.

28.     The effect of both the Original Formula and the Penalty Formula is illustrated in the following examples:[21]

**Table 1: Illustrative Calculations of Amounts Due Under Condition 44 and Resulting Recoveries By Noteholders and LBSF.**

| Ex. | Initial Principal Amount | Outstanding Principal Amount | Collateral Proceeds | Trustee Expenses | Unwind Costs | Applying Original Formula of Condition 44[22] | | | Applying Penalty Formula of Condition 44 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Early Redempt. Amount | Amount recovered by Noteholders | Amount recovered by LBSF | Early Redempt. Amount | Amount recovered by Noteholders | Amount recovered by LBSF |
| 1 | 100 | 100 | 100 | 2 | 40 | 60 | 60 | 38 | 100 | 98 | 0 |
| 2 | 100 | 90 | 100 | 2 | 40 | 60 | 60 | 38 | 100 | 90 | 8 |
| 3 | 100 | 100 | 75 | 2 | 40 | 35 | 35 | 38 | 75 | 73 | 0 |
| 4 | 100 | 90 | 75 | 2 | 40 | 35 | 35 | 38 | 75 | 73 | 0 |

29.     Thus, notwithstanding BNY's best efforts to ignore the distinction, Clause 5.5 and Condition 44 differ significantly in purpose and effect. The Noteholder Priority provision of Clause 5.5 operates as an *ipso facto* modification of the priority of payments due to LBSF. Condition 44 separately operates as an *ipso facto* penalty that increases the amounts due to the Noteholders and deprives LBSF of its defined interest in the Collateral Proceeds. Thus, LBSF has separate and distinct property interests under Condition 44 and Clause 5.5.

**B.     LBSF's Rights To the Collateral Proceeds Under Condition 44 Existed on the Petition Date**

30.     Because Condition 44 vests LBSF with a distinct property interest, it must be determined whether that property interest existed as of LBSF's Petition Date. BNY contends that "the subordination of LBSF's rights in accordance with Condition 44 became effective on September 15, 2008," when LBHI filed its Chapter 11 petition. (See BNY Mem. at 20.) Again,

---

[21]     For simplicity, the illustrative examples (i) do not contemplate any Excess Amount (c.f. Condition 44), and (ii) assume that no interest has accrued on the Early Redemption Amount (i.e., assuming an Accrued Early Redemption Interest Amount of zero). Furthermore, the examples assume Noteholder Priority in order to demonstrate the larger significance to LBSF's recovery of switching between Condition 44's Original Formula and Penalty Formula.

[22]     If the Penalty Formula is void, then the Original Formula would apply.

BNY is wrong. Because none of the conditions precedent to Condition 44 took effect prior to October 3, 2008, LBSF held a property interest under Condition 44 on its Petition Date.

31. Condition 44 governs the determination of the Early Redemption Amount, which can be calculated only upon redemption of the Saphir Notes. Condition 38 sets forth the circumstances under which the Saphir Notes may be redeemed: Saphir "shall redeem each Note at its Early Redemption Amount as set out in paragraph [condition] 44" only "upon the occurrence of any of the events set out in [Base] Condition 6(c) and (d) and [Base] Condition 10."[23] Thus, until there is an "event" under Base Conditions 6(c), 6(d), or 10 that triggers early redemption of the Saphir Notes, notice, and expiration of the notice period, there can be no calculation of the Early Redemption Amount under Condition 44[24] and, correspondingly, no change in LBSF's property interest.[25]

32. First, Base Conditions 6(c) and 6(d)(i) are inapplicable, as no party alleges that events set out in Base Condition 6(c) (the Collateral becoming repayable prior to its stated maturity) or Base Condition 6(d)(i) (the imposition of tax on Saphir) have occurred. Accordingly, Condition 44 could not have been triggered pursuant to these provisions and LBSF's property interests could not have been affected.

---

[23] Debtors' Mem., Ex. D Condition 38 (Saphir 2006-5 Supplemental Trust Deed); see also id., Ex. C Condition 38 (Saphir Series 2004-11 Supplemental Trust Deed).

[24] Indeed, the introductory paragraph of Condition 44 reads: "Early Redemption Amount(s) payable on mandatory redemption (Condition 6(c)), redemption for taxation and other reasons (Condition 6(d)) or an event of default (Condition 10) and/or the method of calculating the same (if required or if different from that set out in the Conditions)" Condition 44 is "required" only when triggered by Base Conditions 6(c), 6(d), and 10.

[25] See, e.g., Pan Am Corp. v. Delta Air Lines, 175 B.R. 438, 507 (S.D.N.Y. 1994) ("If the occurrence[e] of a condition is required by the agreement of the parties, rather than as a matter of law, a rule of strict compliance traditionally applies.") (quoting Wakefield v. Northern Telecom, Inc., 769 F.2d 109, 113 (2d Cir. 1985) modified after remand on other grounds, 813 F.2d 535 (2d Cir. 1987)); cf. In re Margules, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (stating that a contract is executory when condition precedent to termination did not occur prepetition).

33.     <u>Second</u>, Base Condition 6(d)(ii)[26] and Base Condition 6(d)(iii) as set forth in Condition 38 of the Saphir Series 2006-5 Supplemental Trust Deed govern early redemption and calculation of the Early Redemption Amount based on termination of the CDS Agreements.[27]  These provisions are explicit that Saphir "shall redeem all but not some only of the Notes at their Early Redemption Amount" only "***[i]f a Swap Agreement is terminated in whole***."[28]  Early termination of the CDS Agreements is not automatic.[29]

34.     Termination of the CDS Agreements can be effectuated only through notice by the Non-defaulting Party and the setting of an Early Termination Date:

> If at any time an Event of Default with respect to a party (the "Defaulting Party") has occurred and is then continuing, the other party (the "Non-defaulting Party") ***may, by not more than 20 days notice to the Defaulting Party specifying the relevant Event of Default, designate a day not earlier than the day such notice is effective as an Early Termination Date*** in respect of all outstanding Transactions.

(<u>Id.</u> § 6(a) (emphasis added).)  Here, Early Termination Notices were provided to LBSF on December 1, 2008, almost six weeks after LBSF's Petition Date.  Consequently, Condition 44 could not have been triggered prior to LBSF's petition date so as to deprive LBSF of its property interest.[30]

---

[26]    Base Condition 6(d)(ii) applicable to the Saphir Series 2006-5 Notes is not relevant here because it addresses termination of the CDS Agreements for reasons other than LBSF's Event of Default, something no party has alleged in this action.  (<u>See</u> Ex. A Base Condition 6(d)(ii) (Principal Trust Deed), as amended by Ex. D Condition 38 (Saphir Series 2006-5 Supplemental Trust Deed).)

[27]    <u>See</u> <u>id.</u>, Ex. A Base Condition 6(d)(ii) (Principal Trust Deed), as amended by Ex. C Condition 38 (Saphir Series 2004-11); <u>id.</u>, as amended by Ex. D Condition 38 (Saphir Series 2006-5 Supplemental Trust Deed).

[28]    <u>Id.</u> (emphasis added); <u>see also</u> <u>id.</u>, Ex. D Condition 38 (Saphir Series 2006-5 Supplemental Trust Deed) (appending subsection (iii) to Base Condition 6(d)) ("If a Swap Agreement is terminated in whole… [Saphir] shall redeem all but not some only of the Notes at a Redemption Amount equal to the Early Redemption Amount as determined in accordance with Paragraph [Condition] 44….").

[29]    <u>See</u> Debtors' Mem., Ex. E Schedule Pt. 1(h) (ISDA Master Agreement 2005); <u>id.</u>, Ex. F Schedule Pt. 1(h) (ISDA Master Agreement 2004).

[30]    Because early termination under LBSF's Event of Default is not automatic (<u>see</u> Debtors' Mem., Ex. E Schedule Pt. 1(h) (ISDA Master Agreement 2005); <u>id.</u>, Ex. F Schedule Pt. 1(h) (ISDA Master Agreement

35.     Finally, Base Condition 10 triggers early redemption and calculation of the Early Redemption Amount under Condition 44 only upon a Trust Event of Default.[31]  A Trust Event of Default is defined as: (a) a failure to pay amounts due under the notes; (b) a failure of Saphir to perform its obligations under the Notes after BNY gives notice demanding such performance; and (c) Saphir commencing insolvency proceedings.[32]

36.     With respect to the Saphir Series 2006-5 Notes, the applicable Base Condition 10(a) defines a failure to make "payment of the principal amount due in respect of the Notes" for "30 days or more" to be a Trust Event of Default.  (Ex. A Base Condition 6(d)(ii) (Principal Trust Deed), as amended by Ex. D Condition 38 (Saphir Series 2006-5 Supplemental Trust Deed).)  No payments of principal were owed under the Saphir Series 2006-5 Notes prior to LBSF's petition date.  Indeed, to date, there has been no default under Base Condition 10(a) with respect to the Saphir Series 2006-5 Notes because no payments of principal have become due.

37.     With respect to the Saphir Series 2004-11 Notes, the applicable Base Condition 10(a) defines a failure to make "payment of any sum due in respect of the Notes" for "14 days or more" to be a Trust Event of Default.  (Ex. A Base Condition 6(d)(ii) (Principal Trust Deed).)  No payments were owed under the Saphir Series 2004-11 Notes prior to LBSF's petition date.  The earliest possible default date for failure to make a payment was not until December 24, 2008—well after LBSF's Petition Date.

---

2004)) and occurs only at the election of the Noteholders, Condition 44 need not have ever come into operation.  Moreover, the termination was predicated solely on LBSF's bankruptcy filing, not that of LBHI.

[31]     See Ex. A Base Condition 10  (Principal Trust Deed); id., as amended by Ex. D Condition 38 (Saphir Series 2006-5 Supplemental Trust Deed).

[32]     Id.

38. Similarly, with respect to the second two Trust Events of Default, it is undisputable that BNY did not provide notice to Saphir demanding it perform with regard to the Saphir Notes prior to LBSF's Petition Date and Saphir has not been subject to any insolvency proceedings.

39. Because no default under Base Conditions 6(c), 6(d), or 10 occurred prior to LBSF's petition date, neither early redemption under Condition 38 nor the calculation of an Early Redemption Amount under Condition 44 was triggered prior to LBSF's petition date. Therefore, contrary to BNY's arguments, LBSF's rights under Condition 44 were unaffected by LBHI's bankruptcy filing and LBSF had a clear, unaltered property interest at its Petition Date.

**III. The Legislative History of Sections 365(e)(1)(B) and 541(c)(1)(B) Demonstrates That They Apply to the Commencement of LBHI's Bankruptcy Case**

40. Because LBSF held a property interest under Clause 5.5 and Condition 44 as of its Petition Date, LBSF is afforded the protections of the Bankruptcy Code, including those provided by sections 365(e)(1)(B) and 541(c)(1)(B). Here, BNY attempts to modify LBSF's property interests pursuant to Clause 5.5 and Condition 44 as a result of LBSF's bankruptcy filing. Such modifications are improper. Significantly, BNY contends, or at least suggests, that the commencement of LBHI's bankruptcy case is irrelevant to the analysis of whether LBSF's property rights were modified based on an unenforceable *ipso facto* provision. (See BNY Mot. at 23 n.21 ("Conditions specified in section 365(e)(1) relate exclusively to the debtor and not to any third party.").) The Debtors' Opposition correctly points out that BNY's contention is (1) inconsistent with the plain language of sections 365(e)(1)(B) and 541(c)(1)(B) and the particular facts in this case, the *ipso facto* issue, and (2) not supported by the case that BNY cites in support, In re Amcor Funding Corp., 117 B.R. 549, 551 (Bankr. D. Ariz. 1990). (See Debtors'

Opp'n ¶¶ 35-40.)  BNY's contention is also inconsistent with the legislative history of sections 365(e)(1)(B) and 541(c)(1)(B).

41.     The statutory prohibitions on *ipso facto* provisions in sections 365(e)(1) and 541(c)(1)(B) originated in the work of the Commission on the Bankruptcy Laws of the United States (the "Commission"), which was formed to "study, analyze, evaluate, and recommend changes to" the Bankruptcy Act of 1898.  See Pub. L. No. 91-354, § 1(b), 84 Stat. 468 (1970) (Joint Resolution creating the Commission).  On June 30, 1973, the Commission filed a two-part report with Congress.  The first part, H.R. Doc. No. 93-137, pt. 1 (1973), consisted of "an analysis and evaluation of the present system of bankruptcy administration in the United States and [the Commission's] recommendations for changes therein to reflect and adequately meet the demands of present technical, financial, and commercial activities."  Id. at Letter of Transmittal.  The second part, H.R. Doc. No. 93-137, pt. 2 (1973), consisted of "the text of proposed statutory changes to effect [the Commission's] recommendations, including a new 'Bankruptcy Act of 1973.'"  Id. at Letter of Transmittal.

42.     Section 4-601 of the Commission's proposed Bankruptcy Act of 1973 (the "Proposed Act"), titled "Property of the Estate," included the following provision:  "Invalidity of Certain Restrictions and Forfeitures.  Any prohibition on the transfer of property by the debtor and any provision for forfeiture or termination conditioned on *the filing of a petition* are unenforceable as to property of the estate . . . ."  Id. § 4-601(b) (emphasis added).  Section 4-602 of the Commission's Proposed Act, titled "Executory Contracts and Unexpired Leases," included a subsection, titled "Unenforceability of Certain Contractual Provisions," that limited the enforceability of "[a] provision in a contract or lease, or in any law applicable thereto, which terminates or modifies, or permits a party other than the debtor to terminate or modify, the

contract or lease because of the insolvency of the debtor or *the commencement of a case under this Act by or against the debtor*." Id. § 4-602(b) (emphasis added).

43.     In the Ninety-Third and Ninety-Fourth Congresses, a number of bankruptcy bills were introduced that included, verbatim,[33] these provisions of the Commission's Proposed Act.  See H.R. 10792, 93d Cong., §§ 4-601(b), -602(b) (introduced Oct. 9, 1973); S. 2565, 93d Cong., §§ 4-601(b), -602(b) (introduced Oct. 11, 1973); H.R. 16643, 93d Cong., §§ 4-601(b), -602(b) (introduced Sept. 12, 1974); S. 4046, 93d Cong., §§ 4-601(b), -602(b) (introduced Sept. 26, 1974); H.R. 31, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 14, 1975); H.R. 32, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 14, 1975); S. 235, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 17, 1975); S. 236, 94th Cong., §§ 4-601(b), -602(b) (introduced Jan. 17, 1975).

44.     Subsequent bills in the Ninety-Fifth Congress, however, used new section numbers for, and changed the text of, these provisions.  The first was H.R. 6, 95th Cong. (introduced Jan. 4, 1977), which included the following provisions:

> Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease may not be terminated or modified, and any right or obligation under an executory contract or unexpired lease may not be terminated or modified, at any time because of – (1) the insolvency or financial condition of the debtor at any time before the closing of the case; (2)  *the commencement of the case under this title*; or (3)  the appointment of or taking possession by a custodian before such commencement.

Id. § 365(e) (emphasis added)  (paragraphing omitted).

> An interest of the debtor in property becomes property of the estate under subsection (a)(1), (2), or (5) of this section notwithstanding any provision – (1) that restricts or conditions transfer of such interest by the debtor; or (2) that is conditioned on the insolvency

---

[33]     One exception, which is not relevant here, is that in their proposed section 4-602(b), most of these bills used the words "under this title" rather than "under this Act".

or financial condition of the debtor, on *the commencement of a case under this title concerning the debtor*, or on the appointment of or the taking possession by a custodian, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

Id. § 541(c) (emphasis added)(paragraphing omitted).

45. A subsequent, superseding bill, H.R. 7330, 95th Cong (introduced May 23, 1977), revised section 365(e) to read as follows:

Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease, other than a contract or lease of the kind specified in subsection (c) of this section, may not be terminated or modified, and any right or obligation under an executory contract or unexpired lease, other than a contract or lease of the kind specified in subsection (c) of this section, may not be terminated or modified, at any time after the commencement of the case solely because of *a default of a kind specified in [section 365(b)(2)]*.

Id. § 365(e) (emphasis added) (paragraphing omitted).

46. Section 365(b)(2), in turn, specified the following kinds of default: "the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the *commencement of the case under this title*; or (C) the appointment of or taking possession by a custodian before such commencement." Id. § 365(b)(2) (emphasis added). Significantly, H.R. 7330 revised section 541(c) to read as follows:

(1) Except as provided in paragraph (2) of this subsection, an interest of the debtor in property becomes property of the estate under subsection (a)(1), (2), or (5) of this section notwithstanding any provision – (A) that restricts or conditions transfer of such interest by the debtor; or (B) that is conditioned on the insolvency or financial condition of the debtor, on *the commencement of a case under this title concerning the debtor*, or on the appointment of or the taking possession by a custodian, and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property. (2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under applicable nonbankruptcy law is enforceable in a case under this title.

Id. § 541(c) (emphasis added) (paragraphing omitted).

47.     H.R. 7330 was superseded by H.R. 8200, 95th Cong. (introduced July 11, 1977), which included (see id. §§ 365(b)(2), (e), 541(c) ), provisions identical to their counterparts in H.R. 7330, with one exception:  whereas section 541(c)(1)(B) of H.R. 7330 referred to "the commencement of a case under this title *concerning the debtor*" (emphasis added), section 541(c)(1)(B) of H.R. 8200 dropped "concerning the debtor," and instead referred more generally to "the commencement of a case under this title."

48.     Sections 365(e) and 541(c) of (a) S. 2266, 95th Cong. (1977), as introduced in the Senate on October 31, 1977, and reported on July 14 and August 10, 1978, respectively, and (b) the versions of H.R. 8200 that were reported and passed by the House on September 8, 1977, and February 8, 1978, respectively, all tracked, in relevant part, their counterparts in the original version of H.R. 8200.  In particular, in each of these four subsequent bills, (a) section 365(e), incorporating section 365(b)(2)(B) by reference, applied to a default that was a breach of a provision relating to "the commencement of *the* case under this title" (emphasis added), and (b) section 541(c)(1)(B) referred to "the commencement of *a* case under this title."  (emphasis added).

49.     In the final version of the bankruptcy bill, which both the House and Senate agreed to and approved, section 541(c)(1)(B) continued to refer to "the commencement of *a* case under this title."  See 124 Cong. Rec. H11,060 (daily ed. Sept. 28, 1978).  Section 365(e), however, was revised (a) to eliminate the reference to section 365(b)(2), and (b) to add the provisions that are now at section 365(e)(1)(A), (B), and (C), thereby changing the reference to "the commencement of *the* case under this title" to "the commencement of *a* case under this title."  See id. at H11,055.  Section 365(b)(2)(B) was similarly amended.  Id.

50.     In sum, the legislative history of sections 365(e)(1)(B) and 541(c)(1)(B) demonstrates that Congress considered, but ultimately rejected, drafting those provisions in a way that would have given them the narrow scope that BNY seeks to impose on them.

## IV.     Section 560 of the Bankruptcy Code Does Not Apply to Noteholder Priority and Condition 44

51.     In Part IV of its Memorandum, BNY contends that Noteholder Priority under Clause 5.5 and Condition 44 are enforceable under Bankruptcy Code § 560.  But both the plain language of the relevant provisions of the Bankruptcy Code, and the legislative history of those provisions, demonstrate that section 560 does not even apply to, and therefore does not protect the enforceability of, Noteholder Priority or Condition 44.

### A.     Relevant Facts with Respect to the Applicability of Section 560

52.     Although in their entirety the transactions are complex, and the documents related to the transactions are voluminous, the application of section 560 to Noteholder Priority and Condition 44 turns largely on several essential facts with respect to Transaction Documents and the enforcement of rights in connection with the Transaction Documents.  As evidenced not only by the Transaction Documents, but also by BNY's own statements in the BNY Memorandum, the principal facts are as follows:

- The Noteholder made two loans to Saphir, which were evidenced by the Notes. (See BNY Mem. at 2.)[34]

- LBSF, as Swap Counterparty, entered into a credit default swap agreement with Saphir, which was evidenced by the Derivative Agreement.  (See id. at 2-3.)

- Saphir's obligations to (a) the Noteholder under the Notes, and (b) LBSF under the Derivative Agreement, are secured by the same property of Saphir – that is, the Collateral.  (Id. at 3.)

---

[34]     The loans were actually made by Mahogany, but because Perpetual, the Noteholder, is a successor of Mahogany (see BNY Mem. at 2), that distinction is not relevant here.

- "The Collateral was pledged to the Trustee to hold for the benefit of . . . Perpetual (as holder of the Notes) and LBSF (as Swap Counterparty under the Derivative Agreement)." (Id.; see also id. at 10.)

- "The Trustee holds the Collateral pursuant to [the] Trust Deed . . . , to which Saphir, LBSF, and the Trustee are parties." (Id. at 3.)

- "The Trust Deed embodies the security arrangement made in connection with both the Notes and the Derivative Agreement . . . ." (Id. at 12.)

- Noteholder Priority and Condition 44 are provided for in the Trust Deed. (Id. at 3, 8 & nn.8-9, 13-14, 24.)

- In December 2008, Saphir sent a notice terminating the credit default swap with LBSF. (Id. at 15.)

- "This [termination] obligated Saphir to redeem the Notes and entitled the Noteholder to early redemption," which the Noteholder contends should be effected "in accordance with Condition 44." (Id. at 15-16; see also id. at 9.)

- Under the Derivative Agreement, LBSF has a net termination claim against Saphir that the Noteholder contends, pursuant to Noteholder Priority and Condition 44, is junior in priority to the claim asserted by the Noteholder for the Outstanding Principal Amount as of the Early Redemption Date, plus certain accrued interest. (See id. at 10, 12-13, 14 n.15.)

- Noteholder Priority and Condition 44 affect "[t]he respective ranking of the Noteholder and LBSF in relation to the net proceeds [of the Collateral] available" to pay their respective claims against Saphir. (Id. at 12; see also id. at 13-14, 24.)

- The Noteholder is the beneficiary of, and is the party that has instructed, and would be instructing, BNY to enforce Noteholder Priority and Condition 44. (See, e.g., id. at 5 ("Perpetual's request [to BNY] to enforce Noteholder priority"), 14 n.15 (section 5.6 of the Principal Trust Deed "[r]equires the Trustee, subject to satisfaction as to indemnification, to enforce the security over the Collateral, if it has become enforceable and enforcement has been directed by he Noteholder"), 16 ("Perpetual directed the Trustee to enforce its security over the Collateral and other Mortgaged Property for each Series of Notes and to apply all moneys received by the Trustee in connection with the realization or enforcement of such security in accordance with Noteholder Priority.").)

**B.** **The Enforcement of Noteholder Priority Under Clause 5.5 and
Condition 44 Does Not Involve the Exercise of Contractual Rights by
a Swap Participant Under a Swap Agreement**

53. By its plain terms, Bankruptcy Code section 560 protects only (a) the

exercise of specified rights, (b) by a swap participant,[35] (c) under a swap agreement. Bankruptcy

Code section 101(53C) defines "swap participant" as "an entity that, at any time before the filing

of the petition, has an outstanding swap agreement with the debtor," with "swap agreement"

being defined in Bankruptcy Code section 101(53B).

54. Although BNY spends ten pages arguing that Noteholder Priority and

Condition 44 are enforceable under section 560, it never identifies the swap participant that

would be enforcing these rights. Indeed, in its entire thirty-five pages, BNY's Memorandum

uses the term "swap participant" a mere two times, and then only when quoting provisions of the

Bankruptcy Code. (See BNY Mem. at 26, 34.) Given that the existence of such a swap

participant is an essential element of section 560, this is a surprising omission. But perhaps this

omission is not so surprising after all, given that the entity that would be enforcing Noteholder

Priority and Condition 44 does not qualify as a swap participant under section 101(53C).

55. BNY assumes that the CDS Agreements are swap agreements under

section 101(53B)(A). (See BNY Mem. at 29.) If that assumption is correct, then Saphir, the

entity that entered into the CDS Agreements with LBSF before the commencement of LBSF's

bankruptcy case, would be a swap participant under section 101(53C). BNY's Memorandum,

however, never identifies Saphir as the swap participant whose enforcement of Noteholder

Priority and Condition 44 would be protected by section 560.

---

[35]    Section 560 also applies to a financial participant as defined in Bankruptcy Code § 101(22A). Because (1)
BNY does not contend that the transactions involve a financial participant, and (2) under section 101(22A),
an entity's status as a financial participant turns on facts that BNY has not substantiated, or even asserted,
this response refers only to swap participants.

56.     The reason for this is that Saphir is not the entity that would be enforcing these provisions.  Rather, BNY—or perhaps arguably the Noteholder Perpetual, acting through BNY—would be enforcing them.  As BNY concedes, Noteholder Priority and Condition 44 are provided for in the Trust Documents.  (BNY Mem. at 3, 8 & nn. 8-9, 13-14, 24.)  As a legal and contractual matter, BNY—not Saphir—is the entity that would be enforcing provisions of the Trust Documents, and therefore enforcing Noteholder Priority pursuant to Clause 5.5 and Condition 44, at the direction, and for the benefit, of the Noteholder.

57.     This legal or contractual structure is consistent with the economic reality that enforcing, or not enforcing, Noteholder Priority and Condition 44 would not affect Saphir, but instead would affect only LBSF and the Noteholder.  As the facts summarized above demonstrate (see Part IV(A), *supra*), and as BNY itself concedes, enforcement of Noteholder Priority and Condition 44 is an intercreditor matter between LBSF and the Noteholder, in which Saphir does not have a financial stake.  As stated by BNY, the "two competing claimants to [the Collateral]" are LBSF and the Noteholder.  (BNY Mem. at 24.)  Noteholder Priority and Condition 44 are among the provisions in the Transaction Documents that "give effect to ***the bargain between the Noteholder and LBSF***" with respect to the payment of proceeds of the Collateral.  (Id. at 14 n.15 (emphasis added); see also id. at 10 ("In a case where LBSF is the defaulting party and a termination payment is due from Saphir to LBSF under the Derivative Agreement, ***the bargain between the Noteholder and LBSF*** requires the value of the Collateral to be applied first in paying the Outstanding Principal Amount to the Noteholder before paying the termination value to LBSF under the Derivative Agreement.") (emphasis added).)

58.     BNY tries to deal with this problem by asserting that: (a) "the 'swap agreements' in this case . . . include, not just the Derivative Agreement (defined herein as the

ISDA Master Agreement, ISDA Schedule, annexes and Confirmation), but all terms and conditions incorporated by reference and all documents that the market deems part of the parties' transaction," (id. at 29); (b) "[t]he Transaction Documents form a single, integrated agreement," (id.); and therefore (c) "[t]he Supplemental Trust Deed, including the provision for Noteholder Priority in Section 5.5 and subordination under Condition 44, clearly is part of the parties' swap agreement" (id. at 31). Contrary to BNY's assertions, however, whether the Trust Documents— of which the Supplemental Trust Deed is a part—are a swap agreement under the Bankruptcy Code depends not on what documents "the market deems part of the parties' transaction," (id. at 29); on whether particular "individual component documents . . . would not have been executed on a stand-alone basis without execution of the other Transaction Documents," (id.); or on "what documents were marketed as part of the transaction" (id. at 31). Rather, it depends on whether the Trust Documents qualify as a swap agreement under section 101(53B).

59.     In that regard, BNY cites section 101(53B)(A)(ii)(I), (iii), and (vi) as support for its argument that the Trust Documents qualify as a swap agreement under section 101(53B). (See BNY Mem. at 31.) There are two problems with BNY's argument. First, the Trust Documents do not fit within the plain terms of either section 101(53B)(A)(ii)(I) or (iii). Second, in any event section 101(53B)(A)(vi) is the provision of section 101(53B) that expressly applies to the Trust Documents, and exclusively determines whether the Trust Documents qualify as a swap agreement.

60.     Under section 101(53B)(A)(vi), a "security agreement or arrangement or other credit enhancement related to any agreements or transactions referred to in" section 101(53B)(A)(i)-(v) may qualify as a swap agreement. The legislative history of section 101(53B)(A)(vi) explains its purpose as follows:

26

> The definition of "swap agreement" . . . also includes any security agreement or arrangement, or other credit enhancement, related to a swap agreement . . . . This ensures that any such agreement, arrangement, or enhancement is itself deemed to be a swap agreement, and therefore eligible for treatment as such for purposes of termination, liquidation, acceleration, offset, and netting under the Bankruptcy Code.

H.R. Rep. No. 109-31, pt. 1, at 129 (2005) [hereinafter, the "2005 House Report"]. For this purpose, a "security agreement" is an "agreement that creates or provides for a security interest," Bankruptcy Code § 101(50), with a "security interest" being a "lien created by agreement, id. § 101(51), and a "lien" being a "charge against or interest in property to secure payment of a debt or performance of an obligation," id. § 101(37). By their terms, the Trust Documents qualify as a "security agreement." BNY, moreover, describes the Trust Documents as a "security arrangement made in connection with both the Notes and the Derivative Agreement." (BNY Mem. at 12.) Whether the Trust Documents are a swap agreement under section 101(53B) must therefore be determined under section 101(53B)(A)(vi).

61.     The Notes are not "agreements or transactions referred to in" section 101(53B)(A)(i)-(v). See 2005 House Report at 129 ("Traditional commercial arrangements, such as supply agreements, or other non-financial market transactions, such as commercial, residential, or consumer loans, cannot be treated as 'swaps' under . . . the Bankruptcy Code . . . ."). Consequently, the Trust Documents could qualify as a swap agreement under section 101(53B)(A)(vi) only because of their relationship to the CDS Agreements. But even if (a) the Trust Documents are a security agreement or arrangement, (b) they are "related to" the Derivative Agreement within the meaning of 101(53B)(A)(vi), and (c) the CDS Agreements are an "agreement or transaction referred to in" section 101(53B)(A)(i)-(v), and Saphir is a swap participant, the Trust Documents still would not qualify as a swap agreement under section 101(53B).

62.     Under the last clause of section 101(53B)(A)(vi), the Trust Documents would qualify as a swap agreement only to the extent of Saphir's "damages in connection with [the CDS Agreements], measured in accordance with section 562" of the Bankruptcy Code.  The legislative history explains the effect of this clause as follows:  "A security agreement or arrangement . . . related to a 'swap agreement,' . . . will be such an agreement or contract *only the extent of the damages in connection with such agreement measured in accordance with Section 562 of the Bankruptcy Code*."  See House Report at 129 (emphasis added).  Saphir, however, has no damages in connection with the CDS Agreement measured in accordance with section 562.  To the contrary, Saphir owes a termination payment to LBSF under the CDS Agreements.  LBSF, not Saphir, has damages in connection with the Derivatives Agreement.

63.     Accordingly, under section 101(53B)(A)(vi), the Trust Documents are not a swap agreement.  As a corollary, neither BNY nor the Noteholder[36] would be acting as a swap participant when enforcing, or directing the enforcement of, Noteholder Priority and Condition 44 pursuant to the Trust Document.  The lack of either a swap agreement or a swap participant with respect to the enforcement of Noteholder Priority and Condition 44 means that such enforcement would not satisfy even the minimum, threshold requirements for determining whether it might possibly be protected by section 560.

**C.     The Enforcement of Noteholder Priority and Section 44 Does Not Involve the Exercise of Rights of the Kind That Are Protected by Section 560**

64.     BNY asserts that enforcement of Clause 5.5 and Section 44 involves the exercise of a contractual right of "liquidation" of the kind that section 560 protects, stating:  "As 'contractual rights' governing liquidation – rights 'arising under common law, under law

---

[36]     Only Saphir, LBSF, and the Trustee are parties to the Trust Deed.  (See Trustee Memo at 3.)  So even if the Trust Deed were a swap agreement – and as discussed above, it is not – the Noteholder still would not qualify as a swap participant.

merchant, or by reason of normal business practice' – these provisions come within the safe harbor of section 560. This conclusion is supported by the plain meaning of the statute, the broader structure of the Code, and legislative history." (BNY Mem. at 31.) BNY is wrong on all counts.

### 1. The Plain Meaning of Section 560

65. By its plain terms, the purpose of section 560 is to protect the liquidation, termination, or acceleration of a swap agreement. See 11 U.S.C. § 560. That purpose has already been served in this case because, almost a year ago Saphir sent a notice terminating the CDS Agreements with LBSF, and that termination is not being challenged.

66. BNY nevertheless contends that enforcement of Clause 5.5 and Condition 44 are also protected because they constitute the exercise a right of "liquidation" under section 560. But by its plain terms, section 560 protects only the liquidation of a swap agreement. As BNY admits, enforcement of Clause 5.5 and Condition 44 does involve not the liquidation of a "swap agreement," but rather the liquidation of "collateral." (See BNY Mem. at 31 ("Section 5.5 of the Supplemental Trust Deed and Condition 44 set forth the priorities in connection with *the liquidation of collateral* following default by LBSF as Swap Counterparty.") (emphasis added).) Collateral is not a swap agreement as that term is defined in section 101(53B). See 11 U.S.C. § 101(53B).

### 2. The Broader Structure of the Code.

67. BNY contends that section 362(b)(17) and (o) support its position that the enforcement of Clause 5.5 and Condition 44 constitute "liquidation" under section 560. (See BNY Mem. at 34-35.) In fact, those provisions do the exact opposite – they undercut BNY's position.

68.     First, section 362(b)(17), which section 362(o) incorporates by reference, applies to, among other things, the exercise of rights under a security agreement.  See 11 U.S.C. § 362(b)(17).  Under the Bankruptcy Code, a "security agreement" is an "agreement that creates or provides for a security interest" (11 U.S.C. § 101(51)) and, in common usage, "collateral" is "the property subject to a security interest" (UCC § 9-102(12).  By its plain terms, section 362(b)(17) indicates that it, and not section 560, applies to the liquidation of collateral.  Compare 11 U.S.C. § 362(b)(17) with id. § 560.

69.     Second, in any event, section 362(b)(17) protects only "the exercise *by a swap participant*" of contractual rights under a security agreement or arrangement.  See 11 U.S.C. § 362(b)(17).  As discussed in Part IV(B) above, the enforcement of Noteholder Priority and Condition 44 would not be done by a swap participant.

### D.     Legislative History.

70.     The legislative history demonstrates that the derivatives safe harbors use the term "liquidate" to refer not to the liquidation of collateral, but to the elimination of market-movement risk by closing out the open contracts that give rise to that risk.

71.     Derivative safe harbors first appeared in U.S bankruptcy law with the enactment of the Bankruptcy Code in 1978.  The original safe harbors, which applied to the commodities industry, were enacted at the request of the then-recently created[37] Commodity Futures Trading Commission ("CFTC") and several commodities-industry participants.  See generally Bankruptcy of Commodity and Securities Brokers:  Hearings Before the Subcomm. on Monopolies and Commercial Law of the House Judiciary Comm., 97th Cong. 7 & n.1

---

[37]     The CFTC was created by the Commodity Futures Trading Commission Act of 1974, Pub. L. No. 93-463, 88 Stat. 1389 (1974).

(1981)(statement of CFTC Chairman Philip Johnson) (summarizing history) (hereinafter "<u>1981</u> <u>House Hearings</u>").

72.     In July 1976, William Bagley, the Chairman of the CFTC, submitted to the House and Senate extensive, substantially identical statements on the pending bankruptcy bills.  <u>See</u> Bankruptcy Act Revision:  Hearings on H.R. 31 and H.R. 32 Before the Subcomm. on Civil and Constitutional Rights of the House Judiciary Comm., 94th Cong. 2377-2420 (1976) (hereinafter "<u>1976 Bagley House Statement</u>"); The Bankruptcy Reform Act:  Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Senate Judiciary Comm., 94th Cong. 51-96 (1977).  In November 1977 and January 1978, the Senate heard testimony and received written statements regarding proposed additional amendments to the commodities-related provisions of the pending bankruptcy legislation.  <u>See</u> Bankruptcy Reform Act of 1978: Hearings Before the Subcomm. on Improvements in Judicial Machinery of the Senate Judiciary Comm., 95th Cong. 524-25 (testimony of Stuart Root), 1199-1203 (statement of New York Coffee and Sugar Clearing Association, Inc.), 1217-31 (statement of William Bagley, Chairman, CFTC), 1240-66 (statement of Board of Trade Clearing Corporation), 1283-1306 (statement of Commodity Exchange, Inc.) (1978) (hereinafter "<u>1978 Senate Hearings</u>").

73.     As a result of these submissions, the Bankruptcy Reform Act of 1978, Pub. L. No. 95-598, 92 Stat. 2548 (1978) (effective Oct. 1, 1979), as originally enacted, included the following safe harbor provisions:

> •     Section 362(b)(6), which provided that "[t]he filing of a petition . . . does not operate as a stay . . . under subsection (a)(7) of this section, of the setoff of any mutual debt and claim that are commodity futures contracts, forward commodity agreements, leverage transactions, options, warrants, rights to purchase or sell commodity futures contracts or securities, or options to purchase or sell commodities or securities" (92 Stat. 2570-71).

•       Section 548(d)(2)(B), which provided that "a commodity broker or forward contract merchant that receives a margin payment . . . takes for value" (92 Stat. 2601).

•       A clause in section 553(b)(1) that provided that section 553(b) did not apply to "a setoff of the kind described in section 362(b)(6)" (92 Stat. 2603).

•       Section 764(c), which provided that, "[n]ot withstanding sections 544, 545, 547, 548, and 724(a) of this title, the trustee may not avoid a transfer that is a margin payment to or deposit with a commodity broker or forward contract merchant or is a settlement payment made by a clearing organization before the commencement of the case, except under section 548(a)(1) of this title" (92 Stat. 2619).[38]

74.     One requested safe harbor that was not included in the enacted law was a proposed section 770,[39] which appeared only in S. 2266, as reported with amendment on July 14 and August 10, 1978, and provided as follows:

### § 770.  Contractual rights to liquidate or transfer

Nothing in this title or State law shall operate to prevent, stay, or otherwise prohibit a commodity broker from exercising a contractual right to liquidate or transfer a commodity contract, or to cause the liquidation or transfer of a commodity contract, nor shall any court issue any order preventing, staying, or otherwise prohibiting the exercise of such a contractual right.  As used in this section, the term contractual right includes, but is not limited to, a right set forth in a rule, regulation, or bylaw of a clearing organization or contract market or in a resolution of the board thereof.

75.     Although one witness had previously testified about on the need for such a provision, see 1978 Senate Hearings at 524-25 (testimony of Stuart Root), section 770 was largely the product of statements submitted at the end of the 1978 Senate Hearings.  These statements all stressed the need to ensure that commodity brokers and clearing organizations

---

[38]     Section 764(c) was later amended and moved, first to section 546(d), see Pub. L. No. 97-222, §§ 4, 17(c), 96 Stat. 236, 240  (1982), and then to section 546(e), see Pub. L. No. 98-353, § 351(2), 98 Stat. 358 (1984).

[39]     See 124 Cong. Rec. H11,099 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards); id. at S17,416 (daily ed. Oct. 6, 1978) (statement of Sen. DeConcini).

would be able to promptly "liquidate" or "close out" -- the terms were used interchangeably -- open positions of bankruptcy customers and clearing members.  For example:

> An essential ingredient in the proper functioning of the system is that if a clearing member defaults in making any payments when due, the clearing organization can immediately close out his position . . . .  In this way, the marketplace is reasonably well protected against the effects of clearing member insolvencies.

> Our Association is particularly concerned with . . . the continued ability of the clearing organization to liquidate the open positions of clearing members that default on their obligations.

> . . .

> Clearing organizations must have the right to liquidate the positions of any clearing member that fails to make a payment when due, irrespective of the juridical status of the clearing member at the time.

> . . . [I]t is imperative that clearing organizations retain the unfettered right to close out the open positions of any clearing member who fails to make any payments when due, regardless of whether that clearing member has come under the provisions of the Bankruptcy Act.

Id. at 1200-01, 1202 (statement of New York Coffee and Sugar Clearing Association, Inc.).  In a section titled "Liquidation of Open Contractual Commitments of Bankrupt Customers and Brokers," the CFTC stated:

> [A]nother issue that arises in both customer bankruptcy and broker bankruptcies is whether the bankruptcy should operate as a stay of any right possessed by the bankrupt's broker to close out the bankrupt's positions.  We understand that commodity brokers (by which we mean to include clearing houses) commonly have the right pursuant to contractual agreement to close out the positions of a customer (by which we mean to include a customer that is itself a broker upon the customer's bankruptcy.  According to a commentator on the Bill, however, it is possible that under proposed 11 U.S.C. § 365(e) the filing of a bankruptcy petition would operate as a stay of a broker's enforcement of a close-out provision.

> Since the stay of a close-out provision could cause substantial financial harm to a commodity broker, section 365(e) should be amended to make it clear that bankruptcy does not operate as such a stay.
>
> The danger of a stay if that if the market moves against the "frozen" positions of the bankrupt customer, the broker must use its own funds to make the variation margin payments on those positions that are owing to its carrying broker or the clearing house . . . .  Moreover as discussed above, the sudden collapse of a commodity broker could have a domino effect on other brokers and exchange clearing houses.

Id. at 1220-22 (statement of CFTC Chairman William Bagley) (footnotes omitted).[40]

76.    In this context, "liquidation" and "close out" typically referred to entering into an opposite trade to the original one, which would have the effect of determining, or liquidating, the trader's gain or loss on the contract.

> A close-out of an open position is accomplished by entering into an "opposite" trade.  For example, a trader who is obligated to buy 1,000 bushels of September 1978 when may close out his position by entering into a contract to sell 1,000 bushels of September 1978 wheat.  At that point, the trader's gain or loss on that contract has been determined.  The rules of most clearing organizations permit the clearing organization to enter [into] such offsetting trades in the name of the commodity broker as are necessary to close out its open positions in the event the broker fails to pay the variation margin calls.

---

[40]    See also 1978 Hearings at 1256-60 (statement of Board of Trade Clearing Corporation) ("Close-outs of Open Positions. . . .  In order to protect clearing organizations and thereby to protect the entire financial stability of a market, the Bill should expressly permit, but not require, a clearing organization at any time subsequent to the filing of the bankruptcy petition to close out all of the bankrupt's open positions which are not fully margined pursuant to the rules of the clearing organization.  Since similar problems are raised in connection with the ability of a futures commission merchant to close out its customers' undermargined open accounts, the Bill should specifically permit such close-outs as well."); id. at 1284-90 (statement of Commodity Exchange, Inc.) ("All open futures positions carried by a clearing association or a futures commission merchant ('FCM') for the account of an FCM should be required to be liquidated immediately after the filing of a petition for relief under the bankruptcy laws (or after notice or knowledge of such filing) by or against such FCM . . . [or] a clearing member other than an FCM. . . .  S. 2266 should be amended to provide that a clearing association, immediately after the filing of a petition in bankruptcy by or against a clearing member (or an FCM which is carrying positions for another FCM immediately following the filing of a petition in bankruptcy by or against such FCM) to close out all futures positions carried for such clearing member (FCM) and that such action is not subject to a stay by the court.").

The right of a clearing organization to enter [into] an offsetting claim on behalf of a bankrupt commodity broker seems well established. However, in light of the common law termination of an agent's authority upon bankruptcy, this right may be subject to question. In addition, it is not clear from S. 2266 whether the filing of the bankruptcy petition will act as an automatic stay, or permit the bankruptcy court to impose a stay of clearing organizations' exercise of their close-out powers.

Id. at 1257-58 (statement of Board of Trade Clearing Corporation) (footnotes omitted).[41]

77. One statement noted that section 362(b)(6) would not protect this right to liquidate or close out positions, because "it would not by itself permit the entry of an offsetting trade since [it] only relates to setoffs of obligations existing at the time of bankruptcy." 1978 Senate Hearings at 1258 (statement of Board of Trade Clearing Corporation). Although Senators Mathias and DeConcini attempted to address this issue through a colloquy on the Senate floor (see 124 Cong. Rec. S17,433 (daily ed. Oct. 6, 1978)), it was apparent that this and other points would need to be dealt with in future legislation (see id. (statement of Sen. Leahy)).

78. That legislation came in 1982, with the enactment of the law that added sections 555 and 556 to the Bankruptcy Code, and also amended section 362(b)(6). See Pub. L. No. 97-222, §§ 3(b), 6(a), 96 Stat. 236-37 (1982).) The testimony and statements at the hearings on this legislation establish that, as used in sections 555 and 556, "liquidation" referred to the

---

[41]   See also 1976 Bagley House Statement 2380 ("If the clearing member fails to make the required security or original margin deposit, the clearing house has the power to terminate its contractual relationship with the clearing member by entering into a corresponding bus opposite contract on the clearing member's behalf. By so doing, the clearing house liquidates the clearing member's trades; it closes out his position in the marker."), 2382 ("[D]elivery on a futures contract rarely occurs. Instead, most persons who have attained an open position by entering into a sutures contract, close out that position be entering into another corresponding contract, but on the opposite side from that on which they entered [into] their first contract. The two contracts offset each other."), 2386 ("to close out [of a] position" means "to enter into a corresponding but opposite contract"); Geldermann & Co. v. Lane Processing, Inc., 527 F.2d 571, 574 (8th Cir. 1975) ("The liquidation of the short position would be accomplished by purchasing an equivalent amount of futures."), cited and discussed in 1978 Senate Hearings at 524-25 (testimony of Stuart Root); John C. Hull, Options, Futures, & Other Derivatives 20 (4th ed. 2000) ("[M]ost traders choose to close out their [futures contract] positions prior to the delivery period specified in the contract. Closing out a position means entering into the opposite type of trade from the original one.").

"close out" or "termination" of open contract positions.  See, e.g., 1981 House Hearings at 3

("liquidate open positions"), 24-26 ("termination of futures contracts or their liquidation"; "the

closing out of positions held by a customer upon its bankruptcy"; "close out positions rapidly";

"prompt liquidation"), 66-73 ("permit such contracts to be closed, i.e., liquidated"; "permit the

termination of contracts"; "immediate closing of contracts"), 166 ("liquidate the debtor's open

positions"), 168 ("liquidate the contracts and define a loss"), 194 ("closed out by taking an equal

and opposite position in the same commodity for delivery in the same commodity for delivery in

the same month as the original position."), 212 ("liquidating open positions"), 303 ("close out

the securities positions of an insolvent participant without concern that the liquidation would be

subject to attack by a bankruptcy trustee").

       79.    They also establish that the purpose of protecting such liquidation or close

out of open contracts as "to freeze the status quo and eliminate further exposure . . . to the

consequences of adverse market movements subsequent to the commencement of the bankruptcy

case."  Id. at 211; see id. at 249  ("close out the insolvent's open positions . . . to prevent their

loss exposure from increasing as market prices continue to move"), 300 ("certainty of the

enforceability of the contractual right . . . to freeze its exposure in a volatile market by

liquidating open contractual commitments in the event of insolvency"), 314 (eliminate the

possibility of "unlimited market risk"), 315 ("freezing the status quo in the debtor's account . . .

can only be done by closing out the debtor's open positions"), 316 ("close out the securities

positions of insolvent debtors in order to protect against fluctuation in market price"), 373 ("it is

essential that stockbrokers and securities clearing agencies be able to freeze the status quo by

promptly liquidating the customer's positions"), 378  ("immediately closing out the open

positions . . . if the obligor becomes insolvent (so as to freeze the status quo and prevent their

loss exposure from mounting as the market continues to move"), 382 ("freezing the status quo in the debtor's account . . . can only be done by closing out the debtor's open positions").

80.     The legislative history of section 560 is to similar effect.  It states that the protection afforded by section 560 was based on the concern that a swap participant could be exposed to market risk if (a) its counterparty became a debtor in a case under the Bankruptcy Code and (b) the automatic stay (i) prevented the swap participant from terminating the swap agreement, and thereby (ii) forced the swap participant to be subjected to the risks of being a party to an open swap agreement with the debtor, including the risk that the debtor would "play the market" against the swap participant by assuming or rejecting the swap agreement depending on how the market moved after the commencement of the debtor's bankruptcy case.  See, e.g., Interest Swap: Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Judiciary Comm. 101st Cong. 8 (1989) (statement of Sen. Grassley) (noting "the risk that an outstanding swap transaction would be held open during the bankruptcy, despite contractual provisions for its termination"), 12 (testimony of Mark C. Brickell, International Swap Dealers Association) ("The nondefaulting party could face substantial market exposure if the automatic stay barred if from terminating all outstanding transactions and forced it to hold open those transactions with the debtor, particularly in a volatile market."), 15 (statement of Mark C. Brickell) ("Without [section 560], the counterparty would be required to remain exposed to interest or currency rate fluctuations without knowing if the debtor will assume or reject the agreement."), 54 (testimony of John J. Jerome) (noting "the possibility that a debtor with a swap can gamble, can play the market by delaying affirmance"), 56 (statement of John J. Jerome) ("[A] debtor may in effect be permitted an open-ended option not contemplated by the original agreement."), 69 (testimony of William J. Perlstein) ("to say to a swap dealer that they have to

keep the swap open while the debtor decides whether to assume or reject imposes mammoth risks on the dealer"), 94, 98  (statement of John J. Jerome) (citing "the possibilities of unfair prejudice to a nondebtor resulting from . . . delay by a debtor in deciding whether to assume or reject a swap transaction or agreement," and stating that "[p]ermitting such delay, in effect, gives the debtor an option on a swap.  This may result in a windfall to the debtor and force the nondebtor counterparty to suffer the consequences."); Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing Before the Subcomm. On Economic and Commercial Law of the House Judiciary Comm., 101st Cong. 15-16, 17, 20, 28, 30-32, 34, 35-36 (1990) (testimony and statement of Mark C. Brickell).[42]  As summarized by one witness at a Congressional hearing:

> If the market has turned favorable to the debtor, the trustee says fine, I will assume it.  If the market has turned unfavorable, the trustee says I will reject it.   In that time period, the [swap participant] has no idea whether it is going to be assumed or rejected, and you are basically just encouraging the trustee to play the market with the creditor's money.

Id. at 83 (testimony of William J. Perlstein).

---

[42]     See also The American Bankruptcy Institute Survey:  Hearing Before the Subcomm. on Courts and Administrative Practice of the Senate Judiciary Comm., 100th Cong. 665 (1988) (statement of Richard F. Kezer, Public Securities Association) ("avoid inequitable decisions by a trustee in bankruptcy to assume favorable swap transactions while rejecting unfavorable transactions"), 679 (statement of International Swap Dealers Association) ("The nondefaulting party could face substantial market exposure if the automatic stay barred it from terminating all outstanding transactions and forced it to hold open all transactions with the debtor, particularly in a volatile market."), 681 ("Any delay in obtaining authority to terminate outstanding transactions . . . would create unreasonable risks for the nondefaulting party. . . .  The possibility that the automatic stay could prevent such termination – possibly for weeks or months – creates a threat of a substantial increase in the nondefaulting party's potential exposure to the debtor and generally complicates any effort to hedge that exposure."), 682 (noting the costs and risks to a nondefaulting party arising from "the uncertainty as to whether the transaction will be assumed"), 692 (statement of New York Clearing House) (purpose of section 560 "is . . . to give assurance that the contractual right to terminate open transactions . . . will not be subject to inequitable or delayed decisions to assume favorable transactions or reject unfavorable ones"); 135 Cong. Rec. S1414 - 17 (daily ed. Feb. 9, 1989) (statement of Sen. DeConcini) ("[C]ounterparties could be faced with substantial losses if forced to await a bankruptcy court decision on assumption or rejection of [swap agreements]").

81. In sum, the legislative history of the original derivatives "liquidation" provisions – sections 555 and 556 – and the legislative history of section 560, consistently and emphatically demonstrates that, contrary to BNY's assertion, the word "liquidate" in those provisions refers not to liquidation of collateral, but rather to the closing out or termination of open contracts. That is the right that Saphir exercised, and the result that it effected, almost a year ago.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court grant Debtors' Motion for Summary Judgment, deny BNY's Motion for Summary Judgment, and grant such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          October 23, 2009

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ Dennis F. Dunne_____
Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan Fleck
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

David S. Cohen (admitted pro hac vice)
Adrian C. Azer (admitted pro hac vice)
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for the Official Committee
of Unsecured Creditors of Lehman Brothers
Holdings Inc., et al.