WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————— x | | |
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |
| ———————————————————— x | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| -against- | | Adversary Proceeding |
| | : | No.: 09-01242 (JMP) |
| BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| Defendant. | : | |
| ———————————————————— x | | |

**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**REPLY MEMORANDUM OF LAW IN OPPOSITION TO BNY CORPORATE**
**TRUSTEE SERVICES LIMITED'S MOTION FOR SUMMARY JUDGMENT AND IN**
**FURTHER SUPPORT OF LBSF'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

Table of Authorities ................................................................................................................. ii

Preliminary Statement ............................................................................................................ 1

Argument ................................................................................................................................ 3

I.     BNY Cannot Support Its Contention That LBSF Had No Property Interest in the
Collateral at the Time of Its Chapter 11 Filing ............................................................ 3

     A.     The English Court of Appeal's Decision in Favor of Perpetual Does Not
Change the Result in This Case .......................................................................... 4

     B.     The Contracts Remain Executory ...................................................................... 6

     C.     LBSF Seeks to Enforce the Bankruptcy Code,  Rather Than an Equitable
Exception to It .................................................................................................... 8

II.     Bankruptcy Code Section 510(a) Does Not Permit the Enforcement of Otherwise
Invalid *Ipso Facto* Clauses ........................................................................................... 9

III.     BNY Has Failed to Show That Section 5.5 and Condition 44 Are Enforceable
Under Section 560, Section 362(b)(17), or Section 362(o) of the Bankruptcy Code ...... 11

IV.     LBSF's Motion for Summary Judgment Should Not Be Denied Based on Comity
to the English Proceeding Nor Are Any Issues of Material Fact Present Here ............... 15

Conclusion and Relief Requested ......................................................................................... 21

C<small>ASES</small>

*Allstate Life Ins. Co. v. Linter Group, Ltd.*,
    994 F.2d 996 (2d Cir. 1993).................................................................................17

*Astropower, Inc. v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*,
    335 B.R. 309 (Bankr. D. Del. 2005) ...................................................................18

*Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine
    Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282 (Bankr.
    S.D.N.Y. May 7, 2009) .......................................................................................12

*Chase Manhattan Bank, N.A. v. T&N PLC*,
    905 F.Supp. 107 (S.D.N.Y. 1995).......................................................................15

*Cumis Ins. Soc'y v. Citibank, N.A.*,
    921 F.Supp. 1100 (S.D.N.Y. 1996).....................................................................15

*Diorinou v. Mezitis*,
    237 F.3d 133 (2d Cir. 2001)................................................................................17

*GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*,
    336 B.R. 843 (S.D. Fla. 2005) ............................................................................10

*Hardy v. N.Y. City Health & Hosp. Corp.*,
    164 F.3d 789 (2d Cir. 1999)................................................................................13

*HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*,
    364 F.3d 355 (1st Cir. 2004)...............................................................................10

*In re Best Prods. Co.*,
    168 B.R. 35 (Bankr. S.D.N.Y. 1994)....................................................................9

*In re Dairy Mart Convenience Stores, Inc.*,
    351 F.3d 86 (2d Cir. 2003)....................................................................................9

*In re Gilbreath*,
    395 B.R. 356 (Bankr. S.D. Tex. 2008) .................................................................6

*In re Margulis*,
    323 B.R. 130 (Bankr. S.D.N.Y. 2005)..................................................................7

*In re Momentum Mfg. Corp.*,
    25 F.3d 1132 (2d Cir. 1994)..................................................................................9

*In re Rimsat, Ltd.*,
  98 F.3d 956 (7th Cir. 1996) ........................................................................10

*In re WorldCom, Inc.*,
  343 B.R. 486 (Bankr. S.D.N.Y. 2006) ............................................................7

*Jamaica Shipping Co. v. Orient Shipping Rotterdam (In re Millennium Seacarriers)*,
  354 B.R. 674 (Bankr. S.D.N.Y. 2006) ..........................................................18

*Playboy Enters. Inc. v. Dumas*,
  960 F.Supp. 710 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) .........15

*Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.*,
  446 F.3d 88 (2d Cir. 2006) ..........................................................................16

*Salvatore LaMonica v. N. of Eng. Protecting & Indemnity Ass'n Ltd. (In re Probulk Inc.)*,
  407 B.R. 56 (Bankr. S.D.N.Y. 2009) ............................................................17

*Scherer v. Equitable Life Assur. Soc'y*,
  No. 01 Civ. 10193, 2004 WL 2101932 (S.D.N.Y. Sept. 21, 2004) ................15

*Shopper's World Cmty. Ctr. v. Bradlee Stores, Inc. (In re Bradlees Stores, Inc.)*,
  00-16035(BRL), 00-16036(BRL), 01-CV-3934 (SAS), 2001 WL 1112308
  (S.D.N.Y. Sept. 20, 2001) .......................................................................... 7-8

*Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's Inc.)*,
  140 B.R. 643 (Bankr. W.D. Mich. 1992) .................................................... 9-10

## STATUES, RULES, AND LEGISLATIVE MATERIALS

11 U.S.C. § 105(a) ...........................................................................................9

11 U.S.C. § 362(a) ......................................................................................7, 21

11 U.S.C. § 362(a)(3) .....................................................................................10

11 U.S.C. § 362(b)(17) ...............................................................11, 12, 13, 15

11 U.S.C. § 362(o) ....................................................................................11, 15

11 U.S.C. § 365(e)(1)................................................................................ *passim*

11 U.S.C. § 510(a) ......................................................................................9, 11

11 U.S.C. § 541(c)(1)(B) .......................................................................3, 8, 10, 21

11 U.S.C. § 547 ..............................................................................................6

11 U.S.C. § 548 ..............................................................................................6

11 U.S.C. § 560 ......................................................................................11, 15

28 U.S.C. § 2201 ..........................................................................................21

Act of June 25, 1990, Pub. L. No. 101-311, H.R. REP. NO. 101-484 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223 ..........................................................14

FED. R. CIV. P. 56(e)(2) ...............................................................................21

H.R. REP. NO. 101-484 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223 ...............................12, 13

H.R. REP. NO. 109-31 (2005) ..............................................................13, 14

**OTHER AUTHORITIES**

AM. JUR. 2D INT'L LAW § 10 (2009) ...........................................................17

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), by and through undersigned counsel, hereby files this reply to BNY Corporate Trustee Services Limited's ("BNY") opposition to the motion for summary judgment filed by LBSF on June 10, 2009.[1]

## PRELIMINARY STATEMENT

1.        On August 11, 2009, at the hearing on BNY's motion to dismiss this proceeding in favor of adjudication by the English court, BNY conceded on the record that:

> I think it would make sense for you to defer to the English court on English law. And I think it would make sense for the English court to issue an order that says and [sic] I'm going to defer to the bankruptcy court or to whatever appellate proceedings might ultimately transpire from here with regard to the U.S. Bankruptcy Code.  I think that makes a lot of sense.

Hr'g Tr. at 28, Aug. 11, 2009 (Dkt. 4929, Case No. 08-13555).[2]

2.        In contrast, in its summary judgment briefs, BNY tacks 180 degrees and argues that this Court is bound by the judgment of the English court, which it contends dictates the outcome of the U.S. bankruptcy law issues in this case.  BNY now ignores its previous view and this Court's statements, made in open court and in an exchange of letters with the English court,

---

[1] BNY incorrectly states, BNY Opp. at 2 n.3, that LBSF's summary judgment motion misidentified LBHI and its affiliated debtors as moving parties, but LBSF's motion clearly identifies LBSF as the sole movant.  It simply stated, as it does above, and in all of its filings, that LBSF is a debtor in possession in the jointly administered case of LBHI and its affiliated debtors.  This brief will refer to parties' opposition briefs as "Opp." and to motions for summary judgment as "Mot. for Summ. J."

[2] Similarly, BNY's counsel stated "[a]s I understand Your Honor, you're saying the English court is well suited to decide English law, and you are well suited to decide issues under the Bankruptcy Code.  It's hard to argue with that."  Hr'g Tr. at 22, Aug. 11, 2009.

that it is appropriate in this case to divide responsibility between the two Courts based on their separate jurisdiction and expertise regarding distinct issues of U.S. bankruptcy law and English law. As discussed below, nothing about the recent English Court of Appeal decision changes this conclusion, and BNY's posturing should be rejected as just that.

3.      Rather than providing any support for its arguments, which was sorely lacking in BNY's summary judgment motion, the opposition to LBSF's motion for summary judgment largely repeats BNY's summary judgment argument. BNY has simply rehashed many of its previous arguments; LBSF will not burden the Court by repeating its responses, but refers the Court to its opposition brief for a full response.[3]  LBSF will address BNY's new arguments and any arguments that merit further discussion, below.

4.      When BNY is not repeating itself, it seeks new relief, not previously requested in its summary judgment motion. BNY again invokes the doctrine of comity—which is by now a familiar refrain—but this time it asserts comity as a basis to deny LBSF's summary judgment motion or to delay these proceedings indefinitely so that it may "develop the record on the issue of comity to demonstrate how the English Court's determinations should affect the disposition of the Collateral." BNY Opp. at 24-25. BNY does not, and cannot, explain what factual record needs to be developed in order to determine the issues of bankruptcy law raised in this case. No factual record is needed for this Court to render a decision based on the U.S. bankruptcy law issues. Again, BNY seeks at all costs to avoid that decision. But as LBSF has amply demonstrated, this Court has the duty to decide the unique U.S. bankruptcy law issues, regardless of what the English courts might say about the validity of the Transaction Documents under English law. Moreover, as discussed below, the English Court of Appeal's recent decision does

---

[3] Capitalized terms have the same meaning herein as ascribed to them in LBSF's motion for summary judgment or its memorandum in opposition to BNY's motion for summary judgment.

nothing to change this conclusion, and neither it nor the decision below that it affirmed purports to bind this Court on the U.S. issues it must decide.

5.      Regardless, despite BNY's attempts, it may not seek relief in its opposition brief not previously requested in its summary judgment motion.  BNY's summary judgment motion sought summary judgment declaring that section 5.5 and Condition 44 are enforceable; it did not seek a delay to develop a factual record on the issue of comity, and it may not belatedly do so now.  *See* BNY Mem. in Supp. of Mot. for Summ. J. at 1-2.

6.      For the reasons stated in LBSF's summary judgment motion, its opposition, and in this reply, the Court should grant LBSF's summary judgment motion, deny BNY's motion, and declare that the *ipso facto* provisions in the Transaction Documents are unenforceable under sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code.

## ARGUMENT

### I.      BNY CANNOT SUPPORT ITS CONTENTION THAT LBSF HAD NO PROPERTY INTEREST IN THE COLLATERAL AT THE TIME OF ITS CHAPTER 11 FILING.

7.      BNY continues to press its unsubstantiated theory that LBSF automatically lost its property rights in the collateral securing the notes upon LBHI's chapter 11 filing, without regard to how the Transaction Documents actually operate or the undisputed fact that the issuer, Saphir Finance Public Limited Co., did not send termination notices until December 1, 2008, two months *after* LBSF filed its chapter 11 petition.  BNY's sole basis for its conclusion is the English court's statements about the effect of LBHI's filing in considering the English common-law anti-deprivation principle at issue in the *Perpetual* case, which did not purport to be, and cannot be, binding on this Court in deciding the issues raised in this case under the U.S. Bankruptcy Code.  LBSF conclusively established in its opposition to BNY's summary judgment motion that the Transaction Documents do not by their terms automatically trigger a switch in

payment priority or a change in the calculation of Unwind Costs upon an Event of Default, but require several preconditions before these provisions can take effect, including a termination notice and the sale or enforcement of the collateral. LBSF Opp. at 12-17. It is undisputed that Saphir sent termination notices on December 1, 2008. *Id.* at 16-17; LBSF Mot. for Summ. J. Exs. H, I. Moreover, there is no doubt that the sale or enforcement of the collateral still has not taken place because that is the sole basis for Perpetual's suit against BNY in England. Therefore, as LBSF has already established, its property interest in the collateral remained unchanged as of its chapter 11 filing on October 3, 2008. LBSF Opp. at 5-23.

8.     LBSF also conclusively established that *res judicata* does not bind this Court to the conclusions reached by the English court regarding the effect of LBHI's chapter 11 filing. LBSF Opp. at 33-37. Again, BNY raises nothing new that was not already addressed in LBSF's opposition, and LBSF does not repeat those arguments. Nor does the recent decision of the English Court of Appeal affirming the High Court's judgment change anything about LBSF's arguments or this Court's obligations to consider the U.S. bankruptcy law issues in this case. *See* Ex. A.

**A.     The English Court of Appeal's Decision in Favor of Perpetual Does Not Change the Result in This Case.**

9.     On November 6, the Court of Appeal of England and Wales ruled in favor of Perpetual in LBSF's and BNY's appeal from the English High Court's judgment.[4] Ex. A ¶ 67-69. The Court of Appeal's decision does not purport to have, nor as a matter of law can it have, any preclusive effect on this Court or otherwise alter the comity and *res judicata* arguments presented in LBSF's opposition to BNY's motion for summary judgment. LBSF Opp. at 23-37.

---

[4] LBSF has filed a request for leave to appeal to the Supreme Court of the United Kingdom and is awaiting the Court of Appeal's decision on this matter.

10. The Court of Appeal issued two rulings. First, the Court held that the shift to Noteholder Priority did not violate the English common-law anti-deprivation rule. Ex. A ¶¶ 59-68. Second, and in the alternative, the court held that if a shift based on LBSF's filing would violate the rule, it could be irrelevant because the shift was triggered by LBHI's filing. Ex. A ¶¶ 69-75. The second holding affirmed the High Court's alternative holding on this issue, which BNY has invoked as binding on this Court, and so warrants brief additional discussion.[5]

11. In reaching its second holding, the Court of Appeal, like the High Court, did not consider U.S. bankruptcy law and only briefly considered the Transaction Documents.[6] Ex. A ¶ 74. It never addressed the arguments presented by Debtors in this forum regarding the requirements that several preconditions must be satisfied before a shift to Noteholder Priority could occur, such as the receipt of a termination notice designating the appropriate Event of Default. LBSF Opp. at 12-19. It focused largely on whether LBSF's insolvency, rather than its formal chapter 11 filing, was sufficient to trigger the anti-deprivation rule, ultimately concluding that it was not. Ex. A ¶¶ 70-73. The Court of Appeal based this conclusion on English common-law, Ex. A ¶ 71, and on various policy concerns. Ex. A ¶¶ 72-73. The Court of Appeal also concluded that LHBI's filing did not invoke the anti-deprivation rule as to its subsidiaries, again basing its decision on English common-law and policy concerns. Ex. A ¶ 75.

---

[5] To the extent that LBSF argued the High Court's discussion on this point was *dicta* in its Opposition, LBSF now acknowledges that the Court of Appeal's treatment of the High Court's discussion indicates it should be treated as an alternative holding, rather than as *dicta*.

[6] The Court of Appeal's opinion was written by Master of the Rolls David Neuberger, the presiding officer of the Civil Division of the Court of Appeal. Concurring opinions were written by Lord Justice Longmore and Lord Justice Patton. Justice Longmore's opinion does not discuss any issues relevant to this proceeding. Ex. A ¶ 99-110. Justice Patton's opinion contains a very limited discussion of the operation of the Transaction Documents, *see* Ex. A ¶ 134, and, similarly to the Master of the Rolls' opinion, focused on the issue of whether a holding company's bankruptcy filing can invoke the anti-deprivation rule to protect its subsidiaries. Ex. A ¶¶ 162-72.

12.     Nothing in the Court of Appeal's decision binds this Court or otherwise alters its obligation to interpret and enforce the provisions of the U.S. Bankruptcy Code.  *See In re Gilbreath*, 395 B.R. 356, 358-59 (Bankr. S.D. Tex. 2008) ("It is this Court's duty to see that the rules are complied with and that the letter and purpose of the Bankruptcy Code are carried out."). This Court may still respectfully decline to grant comity to the English courts' interpretation of the Transaction Documents for U.K. anti-deprivation law purposes, on the grounds that a bankruptcy court may differently interpret the Transaction Documents and the effect of LBHI's chapter 11 filing on the payment priority shift for U.S. Bankruptcy Code purposes.  Granting comity also would reward Perpetual for its violation of the stay and encourage further such violations.  LBSF Opp. at 27-33.  Additionally, the Court of Appeal's decision does not alter the *res judicata* analysis outlined in LBSF's opposition: there is still no final decision in England as the Court of Appeals did not address the indemnification dispute between BNY and Perpetual, which remains before the High Court; BNY and LBSF remain co-defendants in the English proceedings; and the Court of Appeal clearly did not address LBSF's claims in this forum. LBSF Opp. at 33-37.[7]

**B.     The Contracts Remain Executory.**

13.     BNY briefly questions whether the contracts in this case are executory because it contends that the only performance due is payment, but quickly states that the issue need not be reached because section 5.5 and Condition 44 purportedly took effect prior to LBSF's bankruptcy filing.  BNY Opp. at 7.  However, as LBSF has already established, the Transaction Documents are executory contracts subject to the prohibition on *ipso facto* clauses contained in

---

[7] To the extent that this Court rules that LBSF was deprived of a property interest pre-petition, LBSF anticipates that it would seek leave of Court to amend its complaint to include an avoidable transfer claim.  *See* 11 U.S.C. §§ 547, 548.

section 365(e)(1) because, among other things, both BNY and LBSF had material, unperformed obligations under the Supplemental Trust Deeds *as of the commencement of LBSF's chapter 11 case*, which is the operative period of time to determine whether a modification of a debtor's interest as a result of a bankruptcy filing violates section 365(e)(1). LBSF Mot. for Summ. J. at 18-20; *see also* LBSF & LBHI Mot. for Summ. J. (Aflac) at 19-21. Because Saphir did not send termination notices until after LBSF filed its chapter 11 proceeding, the parties' ongoing obligations under the contracts continued unchanged as of that date. LBSF Opp. at 16-17. Moreover, the contracts remain executory because the parties' obligations under the contracts did not end simply because Saphir sent a termination notice, which only terminated the credit default swap agreements, not the Principal Trust Deeds or the Supplemental Trust Deeds. *See* Compl. Exs. H, I. In addition, when "termination requires the non-debtor party to undertake some post-petition affirmative act," courts recognize that "the contract remains executory because such act is stayed under 11 U.S.C. § 362(a)." *In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005); LBSF Opp. at 10. As LBSF established in its opposition, the Transaction Documents expressly require affirmative acts to be taken prior to termination and any subsequent modification of LBSF's rights. LBSF Opp. at 12-16.

14.     Moreover, the contracts also remain executory because they provide financial benefit to the estate. *See In re WorldCom, Inc.*, 343 B.R. 486, 493 (Bankr. S.D.N.Y. 2006) (explaining that in determining whether a contract is executory, courts may look to "whether assumption or rejection of the contract in question would benefit the debtor's estate."). This is so "regardless of whether any material obligations remain outstanding on the part of only one party to the contract." *Id.*; *see also Shopper's World Cmty. Ctr. v. Bradlee Stores, Inc. (In re Bradlees*

*Stores, Inc.)*, Nos. 00-16033 (BRL), 00-16035(BRL), 00-16036(BRL), 01-CV-3934 (SAS), 2001 WL 1112308, at *6 (S.D.N.Y. Sept. 20, 2001).

15.     Further, even if the contracts are deemed not to be executory, the result is the same under section 541(c)(1)(B).  That provision bars *ipso facto* clauses that impact any property interest of the estate solely because of the debtor's bankruptcy filing.  Section 541(c)(1)(B) thus serves to protect LBSF's property interest in the Transaction Documents regardless of whether those contracts are considered executory.

### C.     LBSF Seeks to Enforce the Bankruptcy Code,  Rather Than an Equitable Exception to It.

16.     In another new argument, BNY misreads LBSF's summary judgment motion by concocting a fictitious argument never advanced by LBSF to the effect that the Court should use its equitable powers to hold section 5.5 and Condition 44 unenforceable.  BNY Opp. at 9, 21-23 (citing LBSF Mot. for Summ. J. ¶¶ 23-30).  BNY's characterization should be rejected out of hand.  The discussion BNY cites from LBSF's motion is under the heading "Courts Disfavored *Ipso Facto* Clauses Even Prior to the Bankruptcy Code's Prohibitions."  That section of LBSF's motion provided the Court with the history of *ipso facto* clauses, which were enforceable prior to 1978, although bankruptcy courts developed an equitable doctrine to deny effect to bankruptcy termination clauses in appropriate circumstances.  LBSF Mot. for Summ. J. at 12-14.  After describing this history, LBSF explained that Congress reversed course with the enactment of Code provisions that invalidated *ipso facto* clauses.  *Id.* at 14-17.  LBSF is not seeking and has never sought to invoke the courts' previous reliance on equitable doctrines, but to enforce sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code as written to invalidate the *ipso facto* clauses in this case.

17.     In carrying out these provisions, however, bankruptcy courts are empowered to consider equitable factors as well.  The Second Circuit has "repeatedly emphasized the importance of the bankruptcy court's equitable power" and recognized that "bankruptcy courts are courts of equity, empowered to invoke equitable principles to achieve fairness and justice in the reorganization process."  *In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994); *see also In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (explaining that, while not an unbounded power to further the Code generally, "[t]he equitable power conferred on the bankruptcy court by section 105(a) is the power to exercise equity in carrying out the provisions of the Bankruptcy Code").

## II.     BANKRUPTCY CODE SECTION 510(a) DOES NOT PERMIT THE ENFORCEMENT OF OTHERWISE INVALID *IPSO FACTO* CLAUSES.

18.     In its opposition to LBSF's motion for summary judgment, BNY again presents the same faulty Bankruptcy Code section 510(a) argument that it first put forth in its motion for summary judgment.  *See* BNY Opp. at 10; BNY Mem. in Supp. of Mot. for Summ. J. at 24.  But BNY's opposition raises nothing new—LBSF has already addressed this argument in its opposition to BNY's motion for summary judgment.  *See* LBSF Opp. at 37-43.  As LBSF has already demonstrated, Supplemental Trust Deed section 5.5 and Condition 44 are not "subordination agreements" as contemplated by section 510(a) because neither possesses any of the basic elements that courts have ruled must be present to create a subordination agreement. *See id.* at 38-41.  Neither involves an agreement whereby a creditor with a superior or equal right to the repayment of a debt agrees to subordinate its claim to another creditor, and neither is an inter-creditor agreement setting priorities with respect to debts owed by a common debtor.  *See id.* at 38-40; *In re Best Prods. Co.*, 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994); *Sumitomo Trust & Banking Co. v. Holly's, Inc. (In re Holly's Inc.)*, 140 B.R. 643, 667-68 (Bankr. W.D. Mich.

1992); *GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)*, 336 B.R. 843, 857 (S.D. Fla. 2005); *HSBC Bank USA v. Branch (In re Bank of New Eng. Corp.)*, 364 F.3d 355, 361 (1st Cir. 2004). Rather, section 5.5 alters the priority of payments applicable upon the realization or enforcement of collateral only upon termination of the transactions pursuant to LBSF's bankruptcy filing. *See* LBSF Mot. for Summ. J. Ex. C § 5.5; *id.* Ex. D § 5.5. Condition 44, in relevant part, modifies the calculation of the Early Redemption Amount upon LBSF's default so that LBSF no longer receives Unwind Costs to which it would otherwise be entitled. *Id.* Ex. C at Condition 44; *id.* Ex. D at Condition 44. BNY cannot demonstrate how either provision satisfies section 510(a).

19. Moreover, as LBSF established in its opposition to BNY's summary judgment motion, section 510(a) cannot be used to circumvent the Bankruptcy Code's prohibitions on *ipso facto* clauses. LBSF Opp. at 37, 41-43. Both section 5.5 and Condition 44 penalize LBSF solely for its bankruptcy filing and, accordingly, are invalid *ipso facto* provisions prohibited by 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B). *See* LBSF Opp. at 40. BNY's argument that section 510(a) supports enforcement of section 5.5 and Condition 44 thus contradicts the Bankruptcy Code's restraints on *ipso facto* provisions. *See id.* at 42-43. In addition, BNY's proposed enforcement would violate the automatic stay that became effective under 11 U.S.C. § 362(a)(3) upon the filing of LBSF's petition. *See id.* at 43; *In re Rimsat, Ltd.*, 98 F.3d 956, 961 (7th Cir. 1996). As a result, section 5.5 and Condition 44 are not effective subordination agreements, but rather unenforceable *ipso facto* provisions whose enforcement is barred by the Bankruptcy Code.

20. But even if BNY could show that section 5.5 was enforceable under section 510(a) and not otherwise a prohibited *ipso facto* clause, BNY would still not be entitled to the relief that it seeks because it makes no effort to demonstrate that Condition 44 is a subordination

agreement under section 510(a). BNY cannot obtain the relief it seeks—paying Noteholders according to Noteholder Priority—without also enforcing Condition 44, which changes the calculation of amounts owed to ensure that that only Noteholders are paid after a Swap Counterparty Event of Default. *See* LBSF Mot. for Summ. J. Ex. C, Offering Circular Supp., Terms & Conditions of Notes, Condition 44 ¶ 4; *id.* Ex. D, Sched. 2, Terms & Conditions of Notes, Condition 44 ¶ 4. While section 5.5 changes LBSF's payment priority from "Swap Counterparty Priority" to "Noteholder Priority," it does not direct particular amounts to either party and so does not entitle BNY to make any specific payments. *See id.* Ex. C § 5.5; *id.* Ex. D § 5.5.

21.     Condition 44 clearly does not amount to a subordination agreement under section 510(a) and even if it did, it is barred by both the Bankruptcy Code's prohibition of *ipso facto* clauses and its automatic stay provision.

22.     Because BNY cannot demonstrate that section 510(a) applies to either section 5.5 or Condition 44, this Court should reject BNY's section 510(a) argument as meritless.

**III.   BNY HAS FAILED TO SHOW THAT SECTION 5.5 AND CONDITION 44 ARE ENFORCEABLE UNDER SECTION 560, SECTION 362(b)(17), OR SECTION 362(o) OF THE BANKRUPTCY CODE.**

23.     BNY can offer no argument that could possibly refute the fact that section 560 protects *only* the right of a swap participant to cause the "liquidation, termination and acceleration of one or more swap agreements" or to "offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or more swap agreements. . . ." 11 U.S.C. § 560. Likewise, BNY cannot show that section 362(b)(17), which allows swap participants to exercise setoffs of "termination values and payments amounts . . . under or in connection with one or more such agreements" and against

posted collateral, extends to protect the enforcement of section 5.5 and Condition 44—provisions that redirect and redistribute payment owed to LBSF under the swap transactions to other parties.

24.     Instead, BNY seeks to persuade this Court that the enforcement of section 5.5 and Condition 44 fall within the termination and setoff rights that are protected by section 560 and 362(b)(17).   Because these provisions are plainly not termination provisions, but rather provisions regarding the distribution of collateral subsequent to termination, BNY must persuade this Court that the safe harbor provisions are unlimited in scope, BNY Opp. at 12-14, incorporating any right that is in "accordance with 'normal business practice'" such that "[i]f an action is part of the termination or liquidation process it fits within the scope of the statute." BNY Opp. at 15.   Yet, such a reading ignores controlling jurisprudence which specifically draws a bright line between those rights that "trigger termination," and which are safe-harbored, and those rights that may be ancillary or subsequent to termination, which are not.   *Calpine Energy Servs., L.P. v. Reliant Energy Elec. Solutions, L.L.C. (In re Calpine Corp.)*, No. 05-60200, Adv. Proc. No. 08-1251, 2009 WL 1578282, at *7 (Bankr. S.D.N.Y. May 7, 2009); *see also* Hr'g Tr. 108:25-109:6, Sept. 15, 2009 (noting that section 560 protects "contractual rights solely to liquidate, terminate or accelerate one or more swap agreements" or to "'offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation or acceleration of one or more swap agreements'").

25.     Moreover, BNY's interpretation rebuffs the legislative history, which repeatedly references the scope of exercisable rights as being limited to those contractual rights to "terminate and net out a swap agreement."   H.R. REP. NO. 101-484, at 6 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223, 226-227.   The fact that Congress amended the definition of "swap agreement" in 2005 to incorporate more innovative products and protect "entire markets" is

unavailing. BNY Opp. at 12-14. The amendments may have clarified that safe harbor protections were available to a wider variety of swaps, but the protections themselves—the exercisable rights at issue here—were unaltered and the focus and intention of the safe harbor provisions remained to "allow the expeditious *termination or netting* of certain types of financial contracts." H.R. REP. NO. 109-31, pt. 1, at 20 (2005). The "safe harbors" are, by definition, exceptions to the traditional rule, for which "there is a reasonable inference that Congress did not intend to preempt matters beyond that reach . . . [because] the mention of one thing implies the exclusion of the other." *Hardy v. N.Y. City Health & Hosp. Corp.*, 164 F.3d 789, 794 (2d Cir. 1999) (internal quotation and citation omitted). Because Congress did not include, nor intend to include, protections to rights ancillary or subsequent to termination, such rights are plainly not within the safe harbors.

26.    Nor do the protections for setoff and foreclosure against collateral in section 362(b)(17) "confirm[ ] that the safe harbor extends to distributions" made in accordance with the parties' payment priority and distribution agreement as BNY contends. BNY Opp. at 16. Congress contemplated foreclosure on collateral specifically posted by the debtor, and for which inclusion was necessary to make a "final accounting of the net amount due from or owed to the debtor under any swap agreement." H.R. REP. NO. 101-484, 4-5 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223, 226-227; *see also* H.R. REP. NO. 109-31, pt. 1, at 132 (2005) (stating the reference is to "rights to foreclose on and set off against obligations to return collateral securing swap agreements"). Such rights enable a nondebtor to fix and preserve its economic position under the swap agreement as of the time of termination. In seeking to enforce section 5.5 and Condition 44, BNY seeks to go far beyond what was contemplated by section 362(b)(17) in enforcing a separate and subsequent agreement to alter the economics of the swap transactions as

of the time of termination and deprive LBSF of payment due and owing under the already-terminated swap agreements.

27. Finally, BNY is clearly mistaken—the underlying goals of the safe harbors would not be "best served" through the enforcement of section 5.5 and Condition 44. BNY Opp. at 18. BNY states that the goal of "liquidity would be ill-served were parties unable to access funds quickly, so as to make them whole, relegating them instead to the status of ordinary creditors subject to the automatic stay and the delays and limitations inherent in bankruptcy cases." *Id.* at 17. But the policies behind and purpose of the safe harbor provisions, was not to make parties "whole" upon the debtor's filing of a bankruptcy petition. Rather, they were to allow parties to terminate and close out transactions in order to fix their gains or losses as of the time of termination and protect against market fluctuations during the pendency of bankruptcy. *See* Act of June 25, 1990, Pub. L. No. 101-311, H.R. REP. NO. 101-484 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 223, 224. The purpose of the safe harbor provisions and the amendments thereto were to reduce the risk of "systemic risk," which is defined as:

> [T]he risk that the failure of a firm or disruption of a market or settlement system will cause widespread difficulties at other firms, in other market segments or in the financial system as a whole. If participants in certain financial activities are unable to enforce their rights to *terminate* their financial contracts with an insolvent entity in a timely manner, or to *offset or net* their various contractual obligations, the resulting uncertainty and potential lack of liquidity could increase the risk of an inter-market disruption.

H.R. REP. NO. 109-31, at 20 n.78 (2005) (emphases added). The key to reducing the risks of "uncertainty and potential lack of liquidity" was in allowing counterparties to *terminate* and *net* termination values. *Id.* It was not, as BNY contends, to permit parties to collect on their payments or receive "immediate access to liquidation proceeds." BNY Opp. at 17, 21. If that were the case, no derivatives counterparty would have to abide by the traditional bankruptcy administration and claims process, and instead could simply seize unrelated assets of the debtor

for the immediate satisfaction of their claims. Such unbridled chaos and stripping of a debtor's estate is not safe harbored. For this reason, and the others stated, this Court should not accept BNY's unsupportable position that section 5.5 and Condition 44 are enforceable under sections 362(b)(17), section 362(o), or section 560 of the Bankruptcy Code.

## IV. LBSF'S MOTION FOR SUMMARY JUDGMENT SHOULD NOT BE DENIED BASED ON COMITY TO THE ENGLISH PROCEEDING NOR ARE ANY ISSUES OF MATERIAL FACT PRESENT HERE.

28. BNY makes a new alternative argument that principles of international comity require this Court to deny LBSF's motion for summary judgment or delay its judgment so that BNY may "develop the record on the issue of comity to demonstrate how the English Court's determinations should affect the disposition of the Collateral." BNY Opp. at 24-25. BNY's belated attempt to argue new grounds for relief in its opposition brief violates standard summary judgment practice. It is well established that on summary judgment, a party may not properly raise new arguments or grounds for relief for the first time in its responsive brief. *See Scherer v. Equitable Life Assur. Soc'y*, No. 01 Civ. 10193, 2004 WL 2101932, at *5 n.1 (S.D.N.Y. Sept. 21, 2004) ("In its initial motion papers and main brief, *res judicata* and the law of the case were the only bases defendant urged in support of its motion. Defendant suggests additional grounds in its reply brief. This is improper practice."); *Chase Manhattan Bank, N.A. v. T&N PLC*, 905 F.Supp. 107, 122 n.5 (S.D.N.Y. 1995) ("Arguments for summary judgment cannot be raised for the first time in reply briefs.").[8] Accordingly, this Court should decline to consider these new arguments. But even if this Court considers them, BNY is not entitled to the indefinite delay or dismissal it seeks.

---

[8] This requirement is fundamental not only in summary judgment briefing, but for any motion practice or appellate briefing. *See Playboy Enters. Inc. v. Dumas*, 960 F.Supp. 710, 720 n.7 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) ("Arguments made for the first time in a reply brief need not be considered by a court."); *Cumis Ins. Soc'y v. Citibank, N.A.*, 921 F.Supp. 1100, 1110 n.7 (S.D.N.Y. 1996) (declining to consider an argument raised for the first time in a reply brief).

29.     BNY's current iteration of a comity argument fails because case law and concerns of judicial efficiency support this Court resolving the unique issues of U.S. bankruptcy law presented to it on their merits and only then attempting to resolve any conflicts with the English court's judgment. Indeed, this Court has preemptively rejected the argument that BNY is now proposing, stating at the August 11 hearing on BNY's motion to dismiss: "Coordination is meaningless unless the U.S. Bankruptcy Court is given the space and the [time] to deal with U.S. Bankruptcy law issues." Hr'g Tr. at 21-22, Aug. 11, 2009.

30.     BNY has already asked this Court to dismiss or stay this case in favor of the English proceeding, a request that this Court denied and the district court declined to hear on appeal. Having lost on its motions to dismiss and to stay, BNY now asks through the back door for the functional equivalent under a different guise—requesting that this Court refrain from deciding LBSF's motion for summary judgment on its merits until some unspecified future period of time when BNY has fully "develop[ed] the record" as to the issue of comity. BNY Opp. at 24-25.[9]

31.     BNY's current argument should be denied, then, for many of the same reasons that this Court denied BNY's motion to dismiss. In considering whether to dismiss a proceeding, or, as in this case, refrain from adjudicating a proceeding, in deference to a foreign proceeding, a court may consider factors

> such as the similarity of the parties, the similarity of the issues, the order in which the actions were filed, the adequacy of the alternate forum, the potential prejudice to either party, the convenience of the parties, the connection between the litigation and the United States, and the connection between the litigation and the foreign jurisdiction.

*See Royal & Sun Alliance Ins. Co. v. Century Int'l Arms, Inc.*, 446 F.3d 88, 94 (2d Cir. 2006).

---

[9] BNY does not explain how it will use its most recent request for delay to develop the record.

32.     The application of these factors to this case were discussed in more detail in Debtors' Opposition to BNY's Motion to Dismiss.[10]  *See* Opp. to Mot. to Dismiss at 30-32.  Out of these factors, perhaps most significantly, the connection between this litigation and the United States, in comparison to the connection between this litigation and England, strongly supports this Court fully exercising its jurisdiction and deciding LBSF's motion on its merits.

33.     As this Court is aware, the *ipso facto* issues raised here are ones of core bankruptcy law, the resolution of which will require a sophisticated analysis of the Bankruptcy Code and its legislative history, for which this Court is the most appropriate forum. Additionally, LBSF is a United States debtor, with many United States creditors who have significant financial interests at stake.  By contrast, the only English party in this dispute is BNY, which has no financial interest in the collateral.  Admittedly, the Transaction Documents provide for English law to govern, but in similar circumstances, even when the contracts at issue selected foreign law, United States bankruptcy courts have retained jurisdiction and reached the merits of the issues before them.  *See Salvatore LaMonica v. N. of Eng. Protecting & Indemnity Ass'n Ltd. (In re Probulk Inc.)*, 407 B.R. 56, 62 (Bankr. S.D.N.Y. 2009) (holding that when the effect of a clause in a contract governed by English law implicated core bankruptcy issues, the bankruptcy

---

[10] The focus of a comity analysis shifts, to a certain extent, depending on the context in which a party seeks comity for a foreign decision.  *See Diorinou v. Mezitis*, 237 F.3d 133, 139 & n.9 (2d Cir. 2001).  In *Diorinou*, the Second Circuit identified the "at least three different contexts" in which comity can be invoked as first, "the domestic court consider[ing] whether to proceed with litigation properly within its jurisdiction because of the pendency or availability of litigation in a foreign forum"; second, "the domestic court consider[ing] whether to enforce a foreign judgment"; and third "a domestic court consider[ing] whether to accept the adjudication of a foreign tribunal on a cause of action or a particular issue."  237 F.3d at 139.  Where a party requests that a court refrain from exercising its jurisdiction in deference to a foreign court's adjudication, which is effectively what BNY seeks in asking that the Court delay its ruling on LBFS's summary judgment motion, the commonly used factors are those cited in the text above.  Where a party seeks comity to the adjudication of a foreign court on a particular issue, as BNY did in its opposition, the commonly used factors are whether the foreign court is a court of competent jurisdiction and whether the laws and public policy of the of the forum state and the rights of its residents will be violated by granting comity to the foreign decision.  *See Allstate Life Ins. Co. v. Linter Group, Ltd.,* 994 F.2d 996, 999 (2d Cir. 1993); AM. JUR. 2D INT'L LAW § 10 (2009) (describing the factors applicable in "retroactive comity" and "prospective comity").  Ultimately, though, both contexts require an analysis and balancing of the interests of the various forums in deciding the controversy.

court was the appropriate forum to resolve these issues and the matter "need[ ] not be referred to arbitration in London or anywhere else"); *Jamaica Shipping Co. v. Orient Shipping Rotterdam (In re Millennium Seacarriers)*, 354 B.R. 674, 679-80 (Bankr. S.D.N.Y. 2006) ("This Court, and not a London arbitration panel, is the best forum to interpret . . . issues of bankruptcy practice and bankruptcy law relating to executory contracts . . . ."); *cf. Astropower, Inc. v. Xantrex Tech., Inc. (In re Astropower Liquidating Trust)*, 335 B.R. 309, 329 (Bankr. D. Del. 2005) (denying defendant's *forum non conveniens* motion because defendant failed to explain "why the courts of British Columbia are an adequate alternative forum to adjudicate disputes involving core bankruptcy matters").

34.     It was for these reasons that in the August 11 hearing on BNY's motion to dismiss, this Court concluded that "the only rational outcome here that makes good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal if not exclusive decider of issues relating to U.S. bankruptcy law." Hr'g Tr. at 69, Aug. 11, 2009.[11] Thus, this Court sent a letter to the English court outlining a clear division of responsibility between the U.S. bankruptcy law issues to be decided by this Court and the distinct English law issues before the English court. LBSF Opp. Ex. E. The English court responded that it would "have regard to [the Court's] request." *Id.* Ex. A at 1.

35.     Case law aside, BNY's argument that LBSF's motion should be denied because the "extent and manner of [the coordination between the courts] and how the issues are to be allocated between the Courts has not yet been determined" fails on the grounds of simple common sense. The most efficient means of handling the concurrent proceedings here is for this

---

[11] *See also* Hr'g Tr. at 22, Aug. 11, 2009 ("I would think that the U.K. High Court would consider it rationale [sic], although I'm not looking into their brains on this, for the U.S. Court to deal with U.S. law issues and for the U.K. court to deal with U.K. law issues, and for us to be coordinating so we come out with the most rationale [sic] result possible. That to me would be sensible.").

Court to rule on LBSF's motion for summary judgment before deciding how to resolve any conflict between its decision and the English judgment. If this Court holds against LBSF then it need not resolve any conflicts with the English judgment. BNY's suggestion that the Court first resolve any conflict of laws issue and only then resolve the substantive bankruptcy law issues ignores judicial economy and puts the cart before the horse.

36. Indeed, this Court has already recognized that the correct procedure is for both courts to reach the issues on their merits before attempting to resolve any conflicting judgments, as its statement regarding coordination, quoted above, indicates. And this Court has recognized that this was the English court's intent as well, stating: "I do believe that the [English] decision can be understood to be allowing time for the U.S. Bankruptcy Court to hear, consider, and determine issues that are unique to U.S. bankruptcy practice." Hr'g Tr. at 72, Aug. 11, 2009.

37. Moreover, contrary to BNY's suggestion, LBSF has never conceded that a final judgment on its motion for summary judgment would be premature. *See* BNY Opp. at 25. Nothing in the language quoted by BNY on page 25 of its Opposition supports such a conclusion; in fact, the quoted language supports the argument above—that it would be appropriate for this Court to resolve any choice of law issues only after both courts have ruled on the merits. LBSF's counsel made this point clear at the August 11 hearing, stating:

> [I]f we had a finding that U.S. bankruptcy law *ipso facto* provisions, for example, invalidated these clauses . . . . And the English court had concluded its appeals and had decided that setting aside all U.S. bankruptcy issues under English law that the priority was noteholder priority, there's ultimately going to have to be a question of . . . a choice of law question . . . .

Hr'g Tr. at 62, Aug. 11, 2009.

38. If BNY was significantly concerned about a conflict of law issue, it could have raised this point squarely in its motion to dismiss or its motion for summary judgment.[12] Or, as BNY phrases it, it could have tried to "develop the record on the issue of comity" at some point in the past many months in which this adversary proceeding has been ongoing. BNY Opp. at 24. Instead, BNY waited as long as possible, beyond the eleventh hour, to raise this complex issue in its opposition to LBSF's motion for summary judgment. This shows that BNY recognized (until filing its opposition) that the courts would each adjudicate the issues presented to them under U.S. and English law and then resolve any conflicts. And if that evidence is not enough, at the August 11 hearing, BNY's counsel acknowledged that both courts reaching the merits and then reconciling their judgments was the obvious procedure. *See supra* ¶ 1; Hr'g Tr. at 22-23, 28, Aug. 11, 2009.

39. Ultimately, this Court has already held, and rightly so, that it is the appropriate forum in which to adjudicate issues of United States bankruptcy law. Once this Court has ruled on the application of the Bankruptcy Code to this case, then, if necessary, the parties, this Court, and the English court can resolve any conflicts through additional briefing, if requested, and inter-court communication.

40. BNY's argument that "discovery may be warranted" and that this Court should deny LBSF's motion (and only LBSF's motion) if there are disputed issues of material fact is as specious as its comity argument. BNY Opp. at 24. From BNY's limited argument on this point, its not clear whether BNY is stating the truism that a disputed issue of material fact could prevent summary judgment or whether BNY is claiming that such disputed issues of material

---

[12] Instead, in BNY's motion to dismiss it argued both that "the English Court may resolve all of the issues presented here, including any issues under American bankruptcy law" and that the transactions at issue are "governed by English law." BNY Mem. in Supp. of Mot. to Dismiss at 6, 18, 21, 23.

fact do exist. To the extent it is the latter, BNY has the burden of specifying what these issues are and how they are material, which it has not even made a pretense of doing. *See* FED. R. CIV. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in the rule—set out specific facts showing a genuine issue for trial.").

## CONCLUSION AND RELIEF REQUESTED

41.     Accordingly, pursuant to 28 U.S.C. § 2201 and Bankruptcy Rules 7001 and 7056, LBSF requests that this Court (a) deny BNY's motion for summary judgment and (b) grant LBSF's motion for summary judgment disposing of this adversary proceeding in its entirety and enter final declaratory judgment declaring that (1) the provisions in the Transaction Documents modifying LBSF's rights to priority of payments and/or modifying the calculation of the Early Redemption Amount as a result of its bankruptcy filing constitute unenforceable *ipso facto* clauses that violate 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B) and LBSF is entitled to payment under Swap Counterparty Priority, and (2) any action to enforce the *ipso facto* provisions in the Transaction Documents as a result of its bankruptcy filing violates the automatic stay under 11 U.S.C. § 362(a).

Respectfully submitted,


*/s/ Ralph I. Miller*

Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
       November 9, 2009