# EXHIBIT B

HIGH COURT OF ENGLAND AND WALES
CHANCERY DIVISION

Claim Number HC09C01612

Anna Patricia O'Sullivan
Second
Claimant
Exhibit "AOS2"
25 June 2009

PERPETUAL TRUSTEE COMPANY LIMITED
Claimant

-and-

BNY CORPORATE TRUSTEE SERVICES LIMITED
First Defendant

LEHMAN BROTHERS SPECIAL FINANCING INC.
Second Defendant

## SECOND WITNESS STATEMENT OF ANNA PATRICIA O'SULLIVAN

I, **ANNA PATRICIA O'SULLIVAN** of Level 12, Angel Place, 123 Pitt Street, Sydney, Australia will say as follows:

1. This is my second witness statement in these proceedings and I am authorised by Perpetual to make this witness statement on its behalf. Except where otherwise stated, all the facts and matters referred to in this witness statement are from my own knowledge of this matter and are true. Insofar as facts and matters are not within my own knowledge, they are true to the best of my information and belief and derive from the sources identified in this witness statement. There is now produced and shown to me exhibit "AOS2". References to page numbers in this witness statement are references to pages in that exhibit and will be prefixed by the initials "AOS2".

2. Unless otherwise defined in this witness statement, capitalised terms used and not defined shall have the meaning referred to in my first witness statement in these proceedings dated 13 May 2009 (**"First Witness Statement"**). Any references in this witness statement to pages in the exhibit to my First Witness Statement shall be prefixed with the initials "AOS1"

**Application to stay the proceedings**

3. I understand that on 27 May 2009, the Second Defendant filed an application with the Court asking it to order that these proceedings be stayed pending the resolution of proceedings between the First Defendant and Second Defendant in the US Bankruptcy Court, Southern District of New York, United States of America. Evidence in support of that application and in opposition to Perpetual's claim was served on 11 June 2009. The purpose of this witness statement is to respond to certain factual matters raised in the Second Witness Statement of Andrew Norwood dated 11 June 2009 ("**Norwood 2**") and the re-served Witness Statement of Lori Fife dated 22 June 2009 ("**Fife 1**"), in relation to matters which are within my knowledge.

**Jurisdiction**

4. I have been provided with a copy of, and have read, Norwood 2. I make the following comments based on matters raised in that witness statement.

5. At paragraph 17 of Norwood 2, Mr Norwood states:

> *Obviously the non-exclusive jurisdiction clause is not helpful to Perpetual's stated case that this Court is the most appropriate forum, when it is open to parties other than the Issuer [sic] bring claims elsewhere.*

6. The full text of the Principal Trust Deed provides (at clause 20.2):

> *20.2 Jurisdiction: The courts of England are to have jurisdiction to settle any disputes that may arise out of or in connection with this Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons and accordingly any legal action or proceedings arising out of or in connection with this Principal Trust Deed, any Supplemental Trust Deed, the Notes, the Receipts, the Coupons or the Talons (**"Proceedings"**) may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objections to Proceedings in such courts on the ground of venue or on the*

> *ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of the Trustee and the holders of the Notes, Receipts, Coupons and Talons and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).*

7. Clause 14.2 or the Saphir I STDDA (at AOS1, page 318) and clause 14.2 of the Saphir II STDDA (at AOS1, page 333) provide as follows:

   > *14.2  Jurisdiction: The courts of England are to have jurisdiction to settle any disputes which may arise out of or in connection with this Deed, the Principal Trust Deed or the Notes and accordingly any legal action or proceedings arising out of or in connection with this Deed, the Principal Trust Deed or the Notes (**"Proceedings"**) may be brought in such courts. The Issuer irrevocably submits to the jurisdiction of such courts and waives any objection on the ground that the Proceedings have been brought in an inconvenient forum. This submission is for the benefit of each of the other parties to this Deed and the holders of Notes, and shall not limit the right of any of them to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdictions preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not).*

8. In Norwood 2, Mr Norwood relies upon the non-exclusive nature of the jurisdiction clause as supporting the submission that LBSF is entitled to commence proceedings in the US and that those proceedings should be heard first. I find it very difficult to understand the sense of this point for the reasons that I give below. Moreover, Mr Norwood appears to give no regard to any of the other factors indicative of the most appropriate forum for determining issues raised in Perpetual's claim.

9. Perpetual commenced proceedings in the English Court on 13 May 2009, pursuant to the express submission in clause 20.2 of the Principal Trust Deed and clause 14.2 of the Saphir I STTDA and clause 14.2 of the Saphir II STTDA. LBSF submitted to the jurisdiction of this Court by applying to be joined to the present proceedings on 20 May 2009. That LBSF chose also to commence proceedings in the U.S. Bankruptcy Court, Southern District of New York on 20 May 2009 does not affect the jurisdiction of the English Court to hear the current claim brought by Perpetual. In fact, Perpetual's contention is that having successfully applied to be joined into the English proceedings it was inconsistent for LBSF to commence rival proceedings in the US.

10. The commencement of proceedings in the United States - in respect of which Perpetual is not a party - does not affect the English Court's jurisdiction to hear the current claim. Neither do such later proceedings render the English Court a less appropriate or convenient forum in which the dispute should be resolved.

11. In paragraph 17 of Norwood 2, Mr Norwood says that the non-exclusive jurisdiction clause "*adds further weight to LBSF's argument ... that the US action should be heard first*". I note that Mr Norwood does not explain his reasons for concluding why the commencement of the US action on the basis that the choice of English jurisdiction is non-exclusive means that the US action should be heard first. Perpetual commenced its proceedings first. Further, all parties necessary for a complete disposal of the matters in dispute are, following LBSF's submission to the English Court's jurisdiction and joinder, parties to the proceedings before the English Court.

12. I would point out again that Perpetual is not a party to the United States' proceedings and does not carry on business in, or have any material connection to, the United States. As such, Perpetual is not subject to the US Bankruptcy Court's jurisdiction. A final determination of the matters in dispute which will be binding on all parties is only capable of being rendered by the English Court.

13. A number of additional factors support the view that the High Court of England and Wales is the most appropriate forum to hear this dispute. Moreover, these factors point to this jurisdiction having the most real and substantial connection to the matters in dispute in these proceedings. These factors are outlined in the following paragraphs.

**The governing law of the documents**

14. The Principal Trust Deed, the Saphir I STDDA, the Saphir II STDDA and the Swap Agreements are each governed by English law. These are the key documents in respect of the Transactions. The interpretation and effect of these documents forms the subject matter of the Part 8 claim.

15. The relevant provision in the Principal Trust Deed (clause 20.1 at AOS1, page 216) states:

> *20.1 Governing Law: This Principal Trust Deed, the Notes, the Coupons, the Talons and the Receipts shall be governed by and construed in accordance with English law.*

16. The relevant provision in the Saphir I STDDA (clause 14.1 at AOS1, page 318) states:

> *14.1 Governing Law: This Deed shall be governed by and construed in accordance with English law.*

17. The relevant provision in the Saphir II STDDA (clause 14.1 at AOS1, page 333) states:

> *14.1 Governing Law: This Deed shall be governed by and construed in accordance with English law.*

18. BNY Trustee is a party to the Principal Trust Deed, the Saphir I STDDA and the Saphir II STDDA.

19. The deed of accession dated 30 January 2004 (as amended and restated on 18 July 2008) (AOS2 pages 1-10) entered into by various issuers of credit-linked notes, including among others Saphir and also entered into by LBSF is governed by English law. This is the document by which Saphir acceded to the terms of the Principal Trust Deed and the Swap Agreements. Saphir is party to the Saphir I STDDA and the Saphir II STDDA.

20. LBSF is party to the Swap Agreements, the Saphir I STDDA and the Saphir II

STDDA. LBSF is defined as the "Swap Counterparty" in each of those documents.

21. The Saphir I STDDA (clause 5.9 at AOS1, page 312) states:

> *5.9 Covenants: The Swap Counterparty covenants with the Trustee in the terms of Clause 7.2 of the Principal Trust Deed and agree [sic] to comply with and be subject to all other applicable provisions of the Principal Trust Deed.*

22. The Saphir II STDDA (clause 5.9 at AOS1, page 328) states:

> *5.9 Covenants: The Swap Counterparty covenants with the Trustee in the terms of Clause 7.2 of the Principal Trust Deed and agrees to comply with and be subject to all other applicable provisions of the Principal Trust Deed.*

23. Clause 7.2 of the Principal Trust Deed (AOS1, page 204) states:

> *7.2 Swap Counterparty Covenants: In relation to any Series in respect of which there is a Swap Counterparty, such Swap Counterparty shall, by execution of the relevant Supplemental Trust Deed, covenant and agree:*
>
> > *7.2.2 with the Trustee that all provisions of the Trust Deed ... defining the rights and responsibilities of the Trustee with regard to the Mortgaged Property in relation to such Series shall also apply as between the Trustee and the Swap Counterparty.*

24. The Swap Agreements, subject to the standard terms of the ISDA Master Agreement, as supplemented by the Schedule, state at Part 4(i) of the Schedule that:

> *This Agreement will be governed by and construed in accordance with English law.*

25. Thus all the relevant documents to which LBSF agreed to be bound (the Principal Trust Deed) or is a party (the Saphir I STDDA, Saphir II STDDA, Swap Agreements and the deed of accession) are expressly stated to be governed by English law.

6

## The place of incorporation of BNY Trustee

26. The Part 8 claim concerns the obligations of BNY Trustee under the terms of the Principal Trust Deed, the Saphir I STDDA and the Saphir II STDDA.

27. As stated in my First Witness Statement, BNY Trustee is incorporated in England and Wales with its registered address at 1 Canada Square, London. Its company secretary, BNY Secretaries Limited, is a company incorporated in England and Wales, as is its immediate parent company, BNY Corporate Holdings (UK) Limited.

## The listing of the Saphir Note Collateral

28. As I explained in my First Witness Statement, the Saphir Note Collateral for the Saphir I Notes comprises AUD$75 million floating rate notes issued by Australia and New Zealand Banking Group Limited, maturing on 10 December 2011. The floating rate notes are listed on the London Stock Exchange.

29. As I explained in my First Witness Statement, the Saphir Note Collateral for the Saphir II Notes comprises AUD$50 million floating rate notes issued by The Royal Bank of Scotland plc and maturing in 2011, extendable up to 17 March 2016. The floating rate notes are listed on the London Stock Exchange.

## The extent of LBSF's right or interest in the proceeds of the Saphir Note Collateral

30. One of the issues before the Court is whether pursuant to Clause 6.2 of the Principal Trust Deed and Clause 5.5 of the Saphir I STDDA and Clause 5.5 of the Saphir II STDDA, the Saphir Note Trustee is obliged to apply all moneys received by it under the Principal Trust Deed and the Saphir I STDDA and the Saphir II STDDA in connection with the realisation or enforcement of the security constituted thereby in accordance with Noteholder Priority, or, alternatively, notwithstanding these express provisions, they should be applied in accordance with Swap Counterparty Priority.

31. The right or interest of LBSF in the proceeds of the Saphir Note Collateral arises under, and can only arise under, the trusts established by the Principal Trust Deed and the Saphir I STDDA or, as the case may be, the Saphir II STDDA.

7

32. LBSF's right or interest in the proceeds of the Saphir Note Collateral is defined and delimited by, and cannot extend beyond the scope of, what is provided for by the Principal Trust Deed and the Saphir I STDDA or, as the case may be, the Saphir II STDDA.

33. The governing law of each of these documents is English law. It is Perpetual's position that whether or not LBSF has an interest in the proceeds of the Saphir Note Collateral, and, if it has, what the extent of that interest is, can only be determined by the law governing the trusts under which the interest arose (i.e. English law).

34. The subordination of the swap counterparty on its default is an essential feature of synthetic credit-linked note transactions without which it would be difficult to market credit-linked notes. In order to obtain a suitable credit rating and thus obtain credit protection at an acceptable cost, a credit rating agency requires the holders of the notes on a default of the swap provider to receive their investment back ahead of the swap provider.

**Comments on points arising on other Witness Statements**

35. I would wish to comment upon certain of the points made in the Norwood 2 and in Fife 1. I understand that a Witness Statement of Marc David Wassermann, a US qualified attorney and partner of Sidley Austin LLP, will comment in more detail on Fife 1.

36. Mr Norwood comments at paragraph 15 of Norwood 2 that it is admitted in paragraph 33 of my First Witness Statement that Saphir has not undertaken its obligation to calculate the Early Termination Amount following the occurrence of an Early Termination Date under the Swap Agreements and the ISDA Master Agreement. He points out that this is in breach of the terms of the ISDA Master Agreement that a Calculation Statement should be provided *"on or as soon as reasonably practicable following the occurrence of an Early Termination Date"*. He expresses the view that the lack of access to funds that would be needed to pay appropriately qualified third parties to determine the Early Termination Amount does not relieve Saphir of its obligation to make the relevant calculation.

37. I do not disagree with what Mr Norwood says on this, but he fails to point out (a) that

the obligation to issue a Calculation Statement is an obligation of Saphir and Perpetual has no control of whether Saphir complies with its obligation or not, and (b) that clause 6.2 of the Principal Trust Deed (AOS1, page 198) and clause 5.5 of Saphir I STDDA (AOS1, page 312) or, as the case may be, clause 5.5 of Saphir II STDDA (AOS1, page 327), do not require the relevant Swap Agreement to be terminated or a Calculation Statement to be issued in order for Noteholder Priority to apply; all that is required is that an Event of Default should have occurred under the Swap Agreement and that LBSF should be the Defaulting Party.

38. Mr Norwood comments at paragraph 23 of Norwood 2:

> *"If the Court does not grant LBSF's application for a stay and continues with Perpetual's claim, I understand that it is possible that there will very likely be a number of similar claims brought by groups or Noteholders, all wishing to act in contradiction to the authority of the Bankruptcy Court."*

39. Quite apart from the speculative nature of this comment, I would point out that the fact that a number of different groups of noteholders seek redress in the English Courts is scarcely a reason for not allowing them to be heard. Indeed, as indicated above, the English Court is the most appropriate forum taking into account the governing law of the relevant documents and the other factors listed above. This matter was recognised by Mrs Justice Proudman when she commented at the hearing on 21 May 2009 that "*it certainly seems ...that this is the arena to have the issue about LBSF determined*". Finally, Perpetual does not accept that it wishes the English court to "*act in contradiction of the Bankruptcy Court*". As Judge Peck himself said at a hearing of the U.S. Bankruptcy Court that took place on 3 June 2009 (see Exhibit ANN2 page 13 of Norwood 2):

> *"... nor do I indicate, in permitting the motion to be filed, that it is reasonably appropriate for the court in London to defer to me or to pay attention to the document".*

(The document referred to was LBSF's motion for summary judgment).

40. Paragraph 19 of Fife 1 states that:

9

> *"LBSF has a duty to maximise the value of all property of the estate in order to maximise recovery to its creditors".*

41. I have no doubt that LBSF does have an interest in maximising its recovery for the benefit of the creditors of the LBSF bankruptcy estate. However Perpetual also has at least an equal interest in maximising its recovery for the benefit of holders of the Mahogany I Notes, which are retail investors in Australia, and for the benefit of the holders of Mahogany II Notes, which are retail investors in Australia, New Zealand and Papua New Guinea.

**Correction to my First Witness Statement**

42. I note that the copy of the Principal Trust Deed appended to my First Witness Statement at AOS1 pages 189 to 306 was the form as entered into by the relevant parties on 10 October 2002. The Principal Trust Deed was, in fact, amended and restated from time to time. I understand that the latest version of the Principal Trust Deed was amended and restated on 18 July 2008. While the latest iteration of this document does not differ materially from that appended to my First Witness Statement as regards the clauses in issue, for the sake of good order, the version of the Principal Trust Deed as amended and restated on 18 July 2008 is appended to this statement at AOS2 pages 11 to 159.

**Event of Default in respect of Saphir II Notes**

43. At paragraph 51(d) of my First Witness Statement, I stated that an Event of Default had not occurred in respect of the Saphir II Notes. I have now obtained from the Irish Stock Exchange website, a Notice issued by the Saphir Note Trustee to Saphir regarding non-payment of interest on an Interest Payment Date in respect of the Saphir II Notes on 23 October 2008. A copy of the Notice is appended at AOS2 pages 160-161. The Notice states that unless payment of the interest was made within 30 days an Event of Default would occur. I am aware that no payment of interest was made by Saphir within the stated period or thereafter. I therefore assume that no payment of interest in respect of the Saphir II Notes was made within the 30 day period. Upon this assumption, therefore, an Event of Default has, in fact, occurred in respect of Saphir II Notes.

## Conclusion

44. For the reasons stated above (and restated below in summary), it is Perpetual's position that the English Court is clearly the most appropriate forum to hear this dispute and the facts of this dispute have the most real and substantial connection to this jurisdiction.

45. The Principal Trust Deed, the Saphir I STDDA and the Saphir II STDDA, the key documents to the Transactions, provide that the English Courts have jurisdiction to settle any disputes that may arise out of or in connection with it. Further, nothing in the relevant Transaction documents, or in the nature of the proceedings commenced in the United States, entitles LBSF to assert that such United States proceedings should be heard before those in England, or that the decision of the United States court should take precedence over the decision of the English Court.

46. LBSF has submitted to the jurisdiction of the English Courts by its application to be joined as a party.

47. The proceedings commenced by LBSF in the US Bankruptcy Court were commenced after the proceedings before the English Court. Further, Perpetual is not a party to the proceedings in the United States and any decision reached in those proceedings will not be binding on Perpetual. The only proceedings in which all relevant entities are parties are those currently before the English Court.

48. The governing law of all documents relevant to the current dispute is English law. It is Perpetual's position that the issues of United States law advanced by LBSF are wholly irrelevant to the matters currently before the English Court.

49. As regards the place of incorporation of the parties, the only party connected to the United States is LBSF. LBSF has, as noted above, submitted to the jurisdiction of the English Courts.

50. The Collateral is listed on the London Stock Exchange.

51. LBSF's right or interest in the proceeds of the realisation of the Saphir Note Collateral is created under a trust governed by English law. It is clear, therefore, that the scope of such right or interest should be determined by English law.

**Statement of truth**

I believe that the facts in this statement are true.

Signed: *Anna O'Sullivan*

Date 25 JUNE 2009

## HIGH COURT OF ENGLAND AND WALES
## CHANCERY DIVISION

Claim Number HC09C01612

Anna Patricia O'Sullivan
Second
Claimant
Exhibit "AOS2"
25 June 2009

**PERPETUAL TRUSTEE COMPANY LIMITED**
**Claimant**

-and-

**BNY CORPORATE TRUSTEE SERVICES LIMITED (1)**

**LEHMAN BROTHERS SPECIAL FINANCING INC. (2)**
**Defendants**

---

**SECOND WITNESS STATEMENT OF ANNA PATRICIA O'SULLIVAN**

---

Sidley Austin LLP
Woolgate Exchange
25 Basinghall Street
London
EC2V 5HA

13

## HIGH COURT OF ENGLAND AND WALES
## CHANCERY DIVISION

Claim Number HC09C01612
Anna Patricia O'Sullivan
Claimant
25 June 2009
Exhibit "AOS2"

**PERPETUAL TRUSTEE COMPANY LIMITED**

Claimant

V

**BNY CORPORATE TRUSTEE SERVICES LIMITED**

First Defendant

**LEHMAN BROTHERS SPECIAL FINANCING INC.**

Second Defendant

### EXHIBIT "AOS2"

This forms **Exhibit AOS2** to the witness statement of **Anna Patricia O'Sullivan**, dated 25 June 2009.

Signed: *Anna O'Sullivan*
**Anna O'Sullivan**

Dated: 25 June 2009

9724493_1/LJF/3117305