# EXHIBIT E

**IN THE COURT OF APPEAL**                              2009/1794 and 2009/1797

**ON APPEAL FROM THE HIGH COURT OF JUSTICE**      Claim No: HC09C01612
**CHANCERY DIVISION**                                                     Claim No HC09CO1931

**BETWEEN:**

**PERPETUAL TRUSTEE COMPANY LIMITED**
**BELMONT PARK INVESTMENTS PTY LIMITED & OTHERS**
Claimants

**-and-**

(1) **BNY CORPORATE TRUSTEE SERVICES LIMITED**
(2) **LEHMAN BROTHERS SPECIAL FINANCING INC**
Defendants

---

**SKELETON ARGUMENT ON BEHALF**
**OF THE APPELLANT / SECOND DEFENDANT**

---

**INTRODUCTION**

**Bundles and pre-reading**

1.      Appeal Bundles have been prepared containing the following:

   **A**      Judgments and Order being appealed;

   **B**      Perpetual pleadings, orders and witness statements;

   **C**      Belmont pleadings, orders and witness statements;

   **D**      Skeleton arguments and transcripts;

   **E**      Perpetual core documents;

   **F**      Belmont core documents;

   **G**      US Proceedings.

2.      If time permits, the following, in addition to the Skeleton Arguments for the
        Appeal, are recommended for pre-reading:

   (1)      Appellant's Notice including grounds of appeal [**A/tab 1**];

   (2)      The Judgment of the Chancellor [**A/tab 5**];

   (3)      The contractual provisions referred to in this Skeleton argument (to be
            found in bundles **E** and **F**);

   (estimated reading time: up to ½ day)

**Parties and background**

3.      The present proceedings arise in relation to a synthetic debt repackaged note issuance programme of the Appellant/Second Defendant ("**LBSF**") called the "**Dante Programme**". At the time of Lehman's bankruptcy, there were 19 active Issuers with a total of approximately 180 series of notes under the Dante Programme ("**Notes**"), with an aggregate notional principal amount outstanding of in the region of US\$12.5 billion[1].

4.      As explained in the Judgment of the Chancellor[2], the essential elements of the Dante Programme were:

> *"(1) the issue of notes to investors by a special purpose vehicle ("the issuer") formed by a Lehman company in a tax friendly jurisdiction;*
>
> *(2) the purchase by the issuer with the subscription money paid for the notes of government bonds or other secure investments ("the collateral") vested in a trust corporation;*
>
> *(3) a swap agreement entered into by a Lehman company and the issuer under which the Lehman company paid the issuer the amounts due by the issuer to the noteholders in exchange for sums equal to the yield on the collateral;*
>
> *(4) the amount by which the sum payable under the swap agreement by the Lehman company exceeded the yield on the collateral represented the premium for the, in effect, credit insurance provided by the noteholders;*
>
> *(5) the amount payable by the Lehman company to the issuer on the maturity of the notes (or on early redemption or termination) was the initial principal amount subscribed by the investors less amounts calculated by reference to events defined as credit events occurring during a specified period by reference to one or more reference entities, thereby giving effect to the effective insurance aspect of the programme;*
>
> *(6) the collateral was charged by the issuer in favour of the trust corporation to secure its obligations to the noteholders and the Lehman company on terms which changed their respective priorities on the occurrence of certain specified events, including the insolvency of the Lehman company,*
>
> *(7) each of the transactions summarised above (except the purchase of the collateral) is governed by English law."*

---

[1] Jobanputra 1st ¶21 [**B/tab 6/50**]
[2] Judgment para 1 [**A/tab 5**]

2

5.  LBSF was the swap counterparty with the issuer in respect of each series of notes. In the case of each series of Notes, BNY Corporate Trustee Services Limited (R1/D1) (**"BNY"**) was the Trustee of the Collateral (**"Collateral"**) provided by the issuer of the Notes ("the **Issuer**") to secure its obligations to LBSF and to the holders of Notes.

6.  LBSF's evidence indicates that the value under the transactions for the Lehman companies, which are now in Chapter 11 bankruptcy proceedings in the US, was about US$2 billion[3]:

7.  The Claimants/Respondents are or represent noteholders who together hold notes under 12 series of Notes (including two series which are split into two tranches) within the Dante Programme. The Perpetual claim concerns Saphir I and Saphir II Notes. The Belmont claim concerns 5 series of Notes issued by Zircon Finance Limited, one by Saphir Finance Plc and 4 by Beryl Finance Limited. However, the issues raised are of potential application to very many more of the outstanding series of Notes.

8.  On 15.09.08, LBHI, the parent company of the Lehman Brothers Group, applied to the US Bankruptcy Court, Southern District of New York for protection under Chapter 11 of the US Bankruptcy Code. LBSF did the same on 03.10.08. Thereafter, periodic payments due by the issuers of the Notes held by Perpetual and Belmont were not made.

9.  As explained in the Judgment[4], between 28.11.08 and 03.12.08, the noteholders in respect of each of the 12 issues of Notes (except Saphir I and Beryl 2008-14) gave notice to BNY in reliance on the event of default constituted by LBSF's Chapter 11 filing on 03.10.08. In the case of Saphir II, the notice designated 01.12.08 as the Early Termination Date under Clause 6(a) ISDA Master Agreement. In the case of all the others (except Saphir I and Beryl 2008-14), the notice requested BNY to enforce its rights over the Collateral under Clause 5.6 of the Principal Trust Deed by requesting the issuer to give a termination notice to LBSF in respect of the swap agreement and, on termination, to convene a meeting of noteholders to consider the realisation of the collateral. On 22.12.08, the Trustee caused the issuer to give

---

[3] Norwood 1st (Belmont) ¶24 [**C/tab 4/79**]
[4] Judgment para 24 [**A/tab 4**]

notice to LBSF to terminate the swap agreement in respect of the Zircon 2007-9B issue with effect from 02.01.09. However, absent an indemnity from Belmont, the Trustee refused to give notice in relation to any other issue with which Belmont is concerned. On 20.03.09 and 24.03.09, the noteholders in all the series with which Belmont are concerned passed resolutions to ratify or authorise swap termination. On 24.03.09 for one series and 16.04.09 for the others, BNY caused the remaining issuers in respect of all the series with which Belmont is concerned to give notice to Lehman BSF terminating those swaps. On 06.05.09, the Trustee issued Condition 10 notices in respect of all the series with which Belmont is concerned (other than Beryl 2008-14) declaring the notes to be due and payable at their Early Redemption Amount. On 08.05.09, Perpetual as the noteholder in Saphir I and II, passed extraordinary resolutions requiring the Trustee to serve notice on the issuer to the effect that the notes were immediately due and requiring the Trustee to enforce its security.

## THE US AND ENGLISH PROCEEDINGS

10.     On the basis that BNY refused in the absence of a suitable indemnity to enforce the security in the Collateral and apply the proceeds in favour of Perpetual and Belmont in priority to any claim of LBSF, Perpetual and later Belmont thereafter issued Part 8 Claims[5] seeking to procure such a result[6] (a further 6 Claimants were added to the Belmont Action by Order of the Chancellor dated 08.07.09). LBSF intervened in the two actions and was joined as a Second Defendant[7]. It also applied for temporary stay of the Part 8 Claims in light of the US proceedings referred to below.

11.     On 20.05.09, LBSF issued a Complaint[8] in the US Bankruptcy Court against BNY, contending that the relevant clauses which provided the noteholders with priority in place of LBSF (referred to in this Skeleton Argument as the **"Flip Clauses"**) (both in respect of the series of notes in issue in these proceedings and in respect of other series) modified LBSF's right to priority of payments in the event of a bankruptcy filing, thereby acting as a deterrent to the filing of a Chapter 11 case, and therefore constituted unenforceable *ipso facto* clauses that violate Chapter 11 U.S.C. paragraphs 541(c)(1)(B) and 365(e)(1).

12.     LBSF also contends in those US proceedings that the English proceedings seeking to enforce such provisions in these cases constitute a violation of the automatic stay in force in relation to LBSF under the Chapter 11 U.S.C. paragraph 362(a).

13.     LBSF, with the authority of the US Bankruptcy Judge, filed an application for summary judgment on 10.06.09[9] in the US Bankruptcy Court seeking to have those issues determined and appropriate declaratory relief granted by the US Bankruptcy Court. On 22.06.09, BNY filed a Notice of Motion to dismiss, or alternatively to stay, the US Complaint[10].

14.     In the present proceedings, the hearing before the Chancellor took place between 07.07.07 and 09.07.09 and related to the scope and applicability under English law (which governs all the relevant contracts) of the "anti-

---

[5] Perpetual on 13.05.09 [**B/tab 1/1-4**] and Belmont on 09.06.09 [**C/tab 1/1-44**]
[6] Judgment para 3
[7] Order of Mrs. Justice Proudman (Perpetual) dated 21.05.09 [**B/tab 2/5-6**]; Order of Mr. Justice Warren (Belmont) dated 19.06.09 [**C/tab 2/45-46**]
[8] [**G/tab 1**]
[9] [**G/tab 5**]
[10] [**G/tabs 8-9**]

deprivation principle". The three basic issues, as identified by the Chancellor[11], were:

(1)     the breadth of the anti-deprivation principle;

(2)     whether the principle applies if there is no insolvency process in relation to LBSF in England; and

(3)     whether it applies if the clause operates on an event other than one arising from the bankruptcy filing of LBSF.

15.     In addition, the Chancellor considered LBSF's application for a temporary stay so as to permit the co-ordination of the insolvency jurisdictions of the US and the UK by permitting the US Court to determine the complaint made by LBSF and LGHI and to consider, and if appropriate, formulate and transmit a request for assistance to this Court;

16.     The Chancellor held (in his Judgment handed down on 28.07.09) that:

(1)     Clause 5.5 of the Supplemental Trust Deeds was not contrary to public policy[12];

(2)     If, contrary to finding (1), the anti-deprivation principle applied in the present case, as LBSF contended, the principle would apply even if there were no insolvency process in England in relation to LBSF[13];

(3)     If, contrary to finding (1), the anti-deprivation principle were capable of applying, it was not, on the facts of this case, engaged because Perpetual and Belmont were entitled to rely on the alternative event of default constituted by LBHI's filing for Chapter 11 protection as triggering Clause 5.5 of the Supplemental Trust Deed[14].

17.     The Chancellor acceded to LBSF's application for a temporary stay, holding that it was inappropriate at that stage to make the orders and declarations sought subject only to the provision of an appropriate indemnity for the

---

[11] Judgment para 28
[12] Judgment paras 45-46
[13] Judgment paras 47-48
[14] Judgment para 55

Trustee. He therefore adjourned the proceedings to follow on after the hearing of the appeal, so as to permit any foreign representative and the US Bankruptcy Court time to determine whether they wished to apply for any assistance from the English Court[15].

18. In relation to the Orders made[16], the declarations contained in paragraphs 1 and 2(1) and (2) of each Order were not disputed. However, paragraph 2(3) of each of the Belmont and Perpetual Orders represented the matter in dispute:

> *"Clause 6.2 of the Principal Trust Deed, clause 5.5 of the Supplemental Trust Deed and paragraph 44 of the Series Prospectus, (in each case as identified in Appendix 3) are valid, effective and enforceable under English law as the proper law of such contracts so as to give effect to Noteholder Priority (as defined therein)."*

> (Belmont Order)

> *"That clause 6.2 of the Principal Trust Deed and clause 5.5 of the Supplemental Trust Deed (in each case as identified in Appendix II) are valid, effective and enforceable under English law as the proper law of such contracts so as to give effect to Noteholder Priority (as defined at clause 6.2(iii) of the Principal Trust Deed)."*

> (Perpetual Order)

19. Permission to appeal was sought, and granted, by the Chancellor in relation to paragraphs 2(3) of each of the Orders[17].

20. On 05.08.09, the US Bankruptcy Court entered an order authorising LBSF (pursuant to Chapter 15 of the Bankruptcy Code and the UNCITRAL Model Law on Cross-Border Insolvency) to act as its own "foreign representative" of its bankruptcy estate in the UK, to seek recognition of its chapter 11 case on behalf of its estate and to request that the High Court lend assistance to the US Court in protecting the property of LBSF's estate[18]. It is anticipated that this application for recognition will be heard during the Long Vacation.

21. On 11.08.09, following the handing down of Judgment by the Chancellor in the English proceedings, the US Bankruptcy Court denied BNY's motion to

---

[15] Judgment para 63 and Order para 4
[16] Orders at [A/tab 4]
[17] See Judgment in relation to the application for permission to appeal at [A/tab 6]
[18] [G/tab 13]

dismiss LBSF's motion for summary judgment[19] (BNY has applied for leave to appeal). The US Bankruptcy Court also agreed with LBSF's submissions that BNY could adequately represent Perpetual and decided to coordinate the briefing in both the Saphir and additional proceedings with similar facts known as Aflac. To accommodate BNY's request for extra time to make its submissions, the US Court set out a timetable which will take proceedings in the US beyond the October timeframe envisaged by the Chancellor in his judgment (the hearing is scheduled to take place on 16.11.09).

**The application for expedition**

22.     In granting permission to appeal in the English proceedings, the Chancellor directed that LBSF should apply for expedition in relation to the hearing of its appeal. In his Judgment granting permission to appeal[20], he held that the issue to be appealed was fundamental and logically prior to the remaining issues:

(1)     If LBSF is correct, there would be no question of a stay or the application of US Bankruptcy Law, as the provisions would be invalid on the basis of the law of the relevant contracts. A final determination of the English Law issues may therefore assist the US Bankruptcy Court.

(2)     In addition, he noted that the English Court would only be able to rule on any remaining issues in the action, including the nature and extent of any indemnity to be granted to BNY, once this issue had been determined. If the appeal were successful, there would be no need for a further hearing.

---

[19] [G/tab 14]
[20] [A/tab 6]

## SUMMARY OF LBSF'S POSITION

23. Very broadly, LBSF contends that the Chancellor erred in:

    (1)    adopting an unduly narrow approach to the scope of the anti-deprivation principle;

    (2)    his approach to the construction of the relevant clauses; and

    (3)    accepting that the Claimants were entitled to rely on LBHI's Chapter 11 filing, given that it was LBSF's filing which they relied upon to terminate the relevant swap agreements (and they were obliged to specify the Event of Default relied upon) and no deprivation had been completed prior to LBSF's Chapter 11 filing.

24. In relation to the first point, it must be appreciated that the so-called "anti-deprivation" principle is founded on public policy. Its purpose is to uphold the fundamental principle underlying the insolvency legislation that, subject to any specific statutory provisions, the property of an insolvent company should be distributed to its creditors *pari passu*. Contractual provisions which have the effect of evading this fundamental principle and which operate to the detriment of creditors in the event of insolvency will not be given effect by the Courts.

25. The Flip Clauses in this case plainly operate to prejudice the creditors of LBSF in the event of its insolvency, and do so by the diversion to Noteholders of monies arising from realisation of the Collateral which would otherwise be paid to LBSF in respect of the debts due to it under its Swap Agreements. Those debts are due notwithstanding that LBSF was in default, and the effect of the diversion of monies is to reduce the value of LBSF's property – its receivables – in the event of its insolvency.

26. The Chancellor failed to recognise that this was the effect of the clauses in question. Instead the Chancellor focussed on what he thought was the intention of the parties - that LBSF's right to priority in respect of the monies to be used to pay the sums due to it under the Swap Agreements should not operate if LBSF was in default under the Swap Agreement. The intentions of the contracting parties cannot legitimise clauses if the effect of the clauses is to evade the requirements of public policy. After all, contractual provisions that effect a deprivation are almost always intended to do just that.

27.     The Chancellor then supported his conclusion by stating that the clauses were not of the type which had been specifically invalidated in earlier authorities. However, decided cases are only illustrative of the public policy involved, and in resorting to categorisation, the Chancellor pigeon-holed the cases too narrowly. In particular, the Chancellor failed to recognise that the effect of the Flip Clauses was precisely the same as produced by the clauses which were held to be invalid in the leading cases of *ex parte Mackay*[21] and *British Eagle International Air Lines Ltd v Compagnie Nationale Air France*[22] (**"British Eagle"**). In both those cases, clauses that operated to divert monies that would otherwise have been paid to the insolvent company in respect of debts owing to it were held to be invalid.

28.     The Chancellor's failure to recognise the effect of the Flip Clauses may in part have been due to the fact that he concentrated only on one of the two clauses in question, which in fact operate together. Effect was not given to the ordinary and natural meaning of the contractual provisions which together purported to make a clear change to the financial position of LBSF and the value of its property *"if"* or *"in the event of"* its insolvency.

29.     The Chancellor also held that he was bound by what he wrongly thought was the ratio of *ex parte Jay* in deciding that a provision which would be impermissible if exercised in reliance on an insolvency event would be enforceable if exercised in reliance on some other ground. That was not the ratio of *ex parte Jay*[23]. The true position is that the anti-deprivation principle applies if the clause in question is capable of operating on an insolvency event and is sought to be operated after such an insolvency event - i.e. the deprivation is not completed prior to the insolvency event.

30.     The Chancellor erred in holding that the Claimants were entitled to rely on the Event of Default constituted by LBHI's Chapter 11 filing. In the instant case, the Flip Clauses are plainly capable of being operated following the event of the insolvency of LBSF, and the Claimants in fact sought to operate them on that basis. However, deprivation is not automatic on the happening of an Event of Default. No deprivation occurs under Clause 5.5 of the Supplemental Trust Deed until the application of monies in connection with the realisation or

---

[21] (1873) LR 8 Ch App 643, CA
[22] [1975] 1 WLR 758, HL
[23] (1890) 14 Ch D 19, CA

enforcement of Collateral.

31.     If, contrary to this position, deprivation could be said to arise at an earlier
        stage, this could only be following the calculation of the amount payable to the
        noteholders on early termination.  This depends, where an Event of Default
        has occurred and LBSF is the Defaulting Party, on the calculation of the Early
        Redemption Amount under Condition 44.  This involves the calculation of the
        amount payable under the Swap Agreement, which itself first requires a
        decision to give a notice specifying an Early Termination Date.  Such a notice
        must, amongst other matters, specify the relevant Event of Default relied upon.

32.     In the present case, no deprivation had been completed prior to the Chapter 11
        filing by LBSF as no application of Collateral or its proceeds had occurred.
        Furthermore, no notice had been given specifying an Early Redemption Date
        until after that filing.  In addition, the relevant notices required that the Event
        of Default be specified, and the noteholders specified LBSF's Chapter 11
        filing and not that of LBHI as the relevant Event of Default.

## THE DANTE PROGRAMME AND THE CONTRACTUAL PROVISIONS
## Characterisation of the Dante Programme

33.     A helpful explanation of synthetic securitisations such as the Dante
        Programme can be found in:

> *Law & Practice of International Finance: Project Finance,
> Securitisations, Subordinated Debt by Philip R. Wood (2007, 2nd Edn)
> ¶6-024 to 6-028*

> *Law & Practice of International Finance: Set-off and Netting,
> Derivatives, Clearing Systems by Philip R. Wood (2007, 2nd Edn) ¶10-
> 31 to 10-33*

> *Derivatives: The Key Principles by John-Peter Castagnino (2009, 3rd
> Edn) ¶4.183-4.190.*

34.     By reference to these textbooks and the filed evidence, the following points
        are of note:

        (1)     The Dante Programme was a Lehman's proprietary debt product[24].

        (2)     Under each transaction, the Issuer agrees to pay LBSF losses on
                "reference obligations" under a credit default swap if adverse credit
                events occur in relation to those reference obligations.

> *"The primary commercial purpose of the Swap Agreement was
> for LBSF to receive credit protection in respect of certain
> entities listed in the Swap Confirmation for the Series, in return
> for the payment of a premium"[25]*

> *"Stripped of the jargon [LBSF] is effectively paying a premium
> or fee to the [Issuer] in return for a guarantee or insurance
> equivalent..."*

> *"The result is as if [LBSF] had insured the loans with the
> [Issuer] and the Issuer had reinsured with the noteholders.."*

> *"If certain conditions are satisfied [LBSF] will reduce its
> capital adequacy requirements because it has transferred the
> risk on its loans to a highly creditworthy entity (the [Issuer])
> and so does not need the same risk capital against them.
> Effectively, [LBSF] has obtained a cash collateralised*

---

[24] Jobanputra 1st ¶27 **[B/tab 6]**
[25] Douglas-Henry 1st ¶32 **[C/tab 3]**

> *'guarantee' which may attract a lower weight under capital adequacy rules": Wood ¶6-024.*

> *"If a credit event occurs, then the issuer pays to the arranging bank a cash settlement amount, and the principal outstanding of the...notes is correspondingly reduced by the amount of that cash settlement amount. In this way, the credit risk has been passed through to the investor...": Castagnino ¶4.187*

(3)     In order that the Issuer, which is a special purpose vehicle established by the originator in a tax advantageous jurisdiction, can make these loss payments to LBSF, it issues notes to investors on terms that, if the Issuer has to pay LBSF, the principal amount payable to the noteholders is reduced. The notes therefore transfer to the noteholder the credit risk of a default in the reference pool.

> *"The primary commercial purpose of the Notes for each Series was to provide the Noteholders with interest on the principal sum invested at a base rate plus a fixed margin payable for the term of the Notes together with return of the principal sum invested on the maturity of the Notes subject to certain agreed risks. The Notes include the risk that the principal amount repayable on maturity of the Notes might be reduced below the face value of the Notes if certain events linked to entities named in the Swap Agreement occur under the terms of the Swap Agreement"*[26]

> *"The investor earns a superior return relative to the prevailing investment benchmarks in return for assuming the credit risk emanating from the reference pool": Castagnino ¶4.184*

(4)     The Issuer applies the proceeds of the issue of the Notes to purchase Collateral for the particular Notes[27], comprising highly rated debt securities. The interest payable on the Notes is paid out of the return earned by the Issuer on the Collateral, effectively supplemented by the premium paid to the Issuer by LBSF.

(5)     On maturity of the Swap Agreement, which corresponds with the maturity of the Notes, the Issuer delivers to LBSF the principal proceeds of the Collateral in return for payment from LBSF which is

---

[26] Douglas-Henry ¶31 (see also ¶36-43) [C/tab 3/58, 59]
[27] In some of the Belmont series, LBSF made a sizeable contribution to the purchase of the Collateral: see for example Beryl Series 2008-6, Condition 40(i) where LBSF contributed 50%. This point was disregarded by the Chancellor.

calculated on the same formula, and should therefore be equal to, the principal amount of the Notes. If credit events have occurred under the Swap Agreement and the Swap Agreement terminates prior to maturity, unrealised gains or losses resulting from those credit events are crystallised through the calculation of Unwind Costs and the amount payable under the Notes is reduced. This will generate a difference in favour of LBSF because the amount LBSF receives by way of redemption proceeds of the Collateral will exceed the amount that LBSF has to pay to the Issuer under the Swap Agreement. It is important to bear in mind that such gains or losses are valuable assets which may be freely transferred pursuant to Section 7(b) of the Swap Agreement.

35. It is therefore important to note that, whilst the commercial aim of the Dante Programme must be considered from the point of view of all parties, including investors in the notes, it is a Lehman's product created by LBSF in order to obtain credit protection. The return on the noteholders' investment is dependent upon the residual value of the notes remaining after loss payments have been made to LBSF as a result of the occurrence of credit events. It is for this reason that the primary right of priority by way of security over the Collateral is afforded to LBSF[28]. It is this primary property right of LBSF which it contends is (impermissibly) negated in the event of the insolvency of LBSF by the Flip Clauses in issue.

**Transaction Documents**

36. Different versions of the relevant transaction documents were exhibited to various of the witness statements of the Claimants and BNY. A summary of these is dealt with in paras 10-23 of the Judgment. The following are the most material:

   (1) The **Principal Trust Deed**[29] dated 10 October 2002 between Dante Finance plc and BNY, establishing the Dante Programme. As held by the Chancellor[30], this has effect in relation to any specific note issue as amended by the Supplemental Trust Deed relating to that issue.

---

[28] The rights of noteholders by way of security over collateral are generally regarded as second-ranking charges: see *Wood* ¶6-024.
[29] [E/tab 1]
[30] Judgment para 10

14

The clauses which are of particular relevance and a brief summary of their purpose are as follows:

| | |
|---|---|
| *Clause 5.1* | specifies that the issuer grants charges/security interests as continuing security as set out in Supplemental Trust Deeds |
| *Clause 5.2* | specifies that such security is continuing security for payment of sums due under the Trust Deed and Notes |
| *Clause 5.5* | specifies that the security is enforceable if (i) any amount due in respect of Notes is not paid or delivered when due or (ii) if Swap Agreement terminates with sums due to Swap Counterparty (LBSF) |
| *Clause 5.6* | specifies circumstances in which the Trustee will take possession of the mortgaged property subject to the provision of a satisfactory indemnity |
| *Clause 6.2* | directs the Trustee, subject to the provisions of each relevant Supplemental Trust Deed, to apply monies received according to various orders of priority, including "Swap Counterparty Priority" and "Noteholder Priority". |
| *Schedule 2 Part C* | sets out terms and conditions of the notes, subject to the terms of the Supplemental Trust Deed in relation to that series. |
| *Condition 6(d)(ii)* | provides for the early redemption of the Notes if a swap agreement is terminated and requires the Issuer to give a notice to the Trustee to redeem the notes at their Early Redemption Amount. |
| *Conditions 10(a)* | sets out terms various Events of Default in relation to the Notes, including default in |

payment of sums due in respect of the Notes for a period of 14 days or more, following which the Issuer may be given notice that the Notes are due and payable at their Early Redemption Amount.

(2) The 12 Supplemental Trust Deed and Drawdown Agreements ("**Supplemental Trust Deed**")[31]. The precise wordings of these vary.

The following clauses are of particular relevance:

*Clause 5.2*   contains the charge by the issuer as continuing security in favour of the Trustee over the Collateral.

*Clause 5.5*   provides that, in applying all monies received in connection with the realisation or enforcement of the Mortgaged Property, Swap Counterparty Priority shall apply unless an Event of Default (as defined in the Swap Agreement) occurs under the Swap Agreement and the Swap Counterparty is the Defaulting Party, in which case Noteholder Priority shall apply.

*(Clause 5.5.2*   the Beryl 2008-06, Beryl 2008-14, Zircon 2007-01 Tranch A, Zircon 2007-1 Tranche B, Zircon 2007-3, Zircon 2008-9 Tranche A and Zircon 2007-9 Tranche B Supplemental Trust Deed is in slightly different terms, providing for the deletion and replacement of Clause 6.2(iii) of the Principal Trust Deed.)

*Clause 9.3*   provides that if an Event of Default (as defined in the ISDA Master Agreement) occurs under the Swap Agreement and the Swap Counterparty is the defaulting party and Unwind Costs are payable by the Issuer to the Swap Counterparty, the issuer shall apply the net proceeds from the sale or realisation of Collateral first in redeeming the Notes in an amount as set out in the

---

[31] **[E/tab 2]; [F/tab 2]**

conditions and (2) thereafter in payment of such
Unwind Costs to the Swap Counterparty

(3) **Series Prospectus** or **Offering Circular Supplement**[32] includes the
specific commercial terms of each series of notes. Of particular
importance is Condition 44[33].

   *Condition 44* establishes the Early Redemption Amounts and the
   Unwind Costs (the amounts due under the Swap
   Agreement) payable on an event of default under
   Condition 10 of the Principal Trust Deed in different
   circumstances. The terms of the Condition vary
   depending on the series of the Notes. In all cases,
   Condition 44 provides for special arrangements where
   the Swap Counterparty is the Defaulting party and
   Unwind Costs are payable by the Issuer to it. In this
   situation, Condition 44 may provide for payment of the
   Outstanding Principal Amount to Noteholders in
   priority to the Swap Counterparty or, where the
   underlying Collateral does not meet certain rating tests,
   for delivery of the entirety of the Collateral to the
   Noteholders in satisfaction of the Early Redemption
   Amount. It also provides that in the case of an Event of
   Default (as defined by the ISDA Master Agreement),
   the Early Redemption Amount is satisfied by the
   delivery of Collateral.

   (In the case of Series Beryl 2008-4, Condition 44
   provides that the relevant Swap Agreement shall
   *"terminate at zero"*[34].)

(4) **ISDA Master Agreement**[35] which sets out the master terms and
conditions of the swap transactions under the Dante Programme.

   The clauses which are of particular relevance are:

---

[32] **[F/tab 3/22-50]**
[33] see Douglas-Henry 1st ¶25-29 **[C/tab 3/56-58]**; **[F/tab 5/93-96]**
[34] **[F/tab 5/95]**
[35] **[F/tab 10]**

*Clause 5*       which defines an Event of Default as including (under 5(a)(vii):

> (4)       the institution of a proceeding seeking a judgment of insolvency or bankruptcy or similar relief under any bankruptcy or insolvency law or other similar law affecting creditors' rights;

> (8)       causing or being subject to any event which has an analogous effect; or

> (9)       taking any action in furtherance of, or indicating its consent to, approval of, or acquiescence in, any of the forgoing acts.

*Clause 6(a)*     provides for a right of a Non-Defaulting Party to specify an Early Termination Date in respect of all outstanding transactions in circumstances where an Event of Default has occurred and is continuing and a notice specifying the relevant Event of Default has been given.

*Clause 6(e)*     specifies the payment measure and payment method (either the "First Method" or the "Second Method") to apply if an Early Termination Date is specified.

(5)    **Swap Confirmation**[36], which confirms the terms and conditions of a Swap Agreement between the issuer and LBSF in respect of that Series, the terms of which are governed by the ISDA Master Agreement (as varied or supplemented by the Confirmation). The credit protection provided to LBSF under the swap agreement relates to the occurrence of "Credit Events" in relation to the Reference Entities set out in the Swap Confirmation.

The payment obligations for the Buyer (LBSF) and Seller (Issuer) are set out in paragraphs 3 and 4 of the Swap Confirmation[37].

---

[36] [F/tab 11]
[37] [F/tab 11/415-421]

<u>Periodic payments</u>

*Buyer Payments 1*[38]

LBSF pays monthly payments, subject to a minimum fixed rate. This is, broadly, the remuneration for the provision of credit protection expressed as an interest rate.

*Seller Payments 1* [39]

Issuer makes periodic payments to the Buyer of amounts equal to amounts received on the underlying Collateral

*Conclusion*

This means on a periodic basis the Issuer is passing on distributions on the Collateral to LBSF. LBSF, every six months, pays to the Issuer the amounts which the Issuer needs to make interest payments on the Notes.

<u>Maturity</u>

*Buyer Payments 2*[40]

This amount is equal to the outstanding notional principal amount of the Notes as payable to Noteholders.

*Seller Payments 2* [41]

This amount is the amount equal to the aggregate redemption amount received from the Collateral Issuer on the scheduled termination date in respect of the Collateral.

*Conclusion*

On the final payment date, the Issuer pays to LBSF the proceeds of the redemption of the Collateral. LBSF pays to the Issuer the amounts equal to the redemption amount of the Notes. Accordingly, under the general flows, Collateral proceeds are flowing to LBSF, and LBSF is providing the Issuer with the funds needed to pay principal and interest on the Notes.

---

[38] Swap Confirmation ¶3(a) **[F/tab 11/415-416]**.
[39] Swap Confirmation ¶4(a) **[F/tab 11/421]**
[40] Swap Confirmation ¶3(b) **[F/tab 11/418-421]**
[41] Swap Confirmation ¶4(b) **[F/tab 11/421]**

The credit protection to LBSF arises because the payment due from LBSF at maturity can be reduced during the term of the Swap Agreement if Credit Events are notified.

37.     As noted in paragraph 36, if an Early Termination Date occurs with respect to a swap, termination payments are payable under the Swap Agreement either to or from the Issuer (Clause 6(d) of the ISDA Master Agreement).  Generally, if such payment is made by the Issuer it is paid in priority to any redemption amounts paid on the Notes.  Critically, the priority in which each of the Issuer's obligations under the transaction documents fell to be discharged was altered by the Flip Clauses as a result of the LBSF's Chapter 11 filing.  Clause 6.2 of the Principal Trust Deed[42] and Clause 5.5 of the Supplemental Trust Deed[43] provide that, whereas in other circumstances Swap Counterparty Priority applies, this is replaced by Noteholder Priority if there has been an Event of Default under the Swap Agreement and LBSF is the Defaulting Party.

38.     If Noteholder Priority applies its effect is to prioritise "*meeting the claims (if any) of the holders of Notes, Coupons and Receipts*" (Clause 6.2(iii)(C) of the Principal Trust Deed) over and above the "*claims (if any) of the Swap Counterparty...*" (Clause 6.2(iii)(D) of the Principal Trust Deed).

39.     However, even where Noteholder Priority does apply, the general effect of Condition 44 where it operates in the absence of an Event of Default under the Swap Agreement would be to reduce or increase the amounts payable to Noteholders on an Early Redemption of the Notes by an amount equal to the Unwind Costs (being the value of the termination payment due to or from LBSF under the Swap Agreement).  As such, the establishment of Noteholder Priority alone would not necessarily deprive LBSF of Unwind Costs otherwise payable to it.

40.     However, in each case, Condition 44 contains further provisions (described in paragraph 36 above), which have the effect of further excluding LBSF's entitlement to receive the Unwind Costs either by providing that the Notes would be redeemed in full at their Outstanding Principal Amount (which is not reduced by reference to Unwind Costs payable to LBSF) or by other provisions according to which Collateral was to be delivered directly and

---

[42] **[E/tab 1/12]**
[43] **[E/tab 2/155]**

rateably to Noteholders and LBSF would be paid nothing. In those circumstances, these provisions have the effect of increasing the amount payable to the Noteholders (and decreasing or extinguishing the amount payable to LBSF).

**GROUNDS OF APPEAL**

**(1)    The nature and scope of the anti-deprivation principle**

41.    The so-called "anti-deprivation" principle is founded on public policy.  Its purpose is to uphold the fundamental principle underlying the insolvency legislation that, subject to any specific statutory provisions, the property of an insolvent company should be distributed to its creditors *pari passu*. Contractual provisions which run counter to this principle may be struck down or not enforced by the courts: *British Eagle*  at p.780E-H.

42.    The principle is concerned with the <u>effect</u> of the provision and not the intention of the parties or whether they are acting in good faith.  The principle requires the Court to take an objective view of the contractual provisions in question and to identify their effect in the event of an insolvency.  The facts that the parties have good business reasons for entering into the arrangements and enter into them at arm's length, are irrelevant: *British Eagle* at 780H; *Money Market International Stockbrokers Ltd (in liquidation) v London Stock Exchange & Or*[44] ("*Money Markets*") at [101] – [102], [118]).[45]

43.    The anti-deprivation principle also applies irrespective of whether the provision in question is included as part of the initial bargain between the parties, and irrespective of whether the provision in question can operate on an event other than insolvency: *Money Markets* at [104] – [109].

44.    As with the application of any rule of public policy, the principle is not limited to a closed category of cases; nor should it be constrained by narrow conceptual or artificial distinctions.  The cases in which the principle has been applied are illustrative and not exhaustive of the principle.

45.    So, for example, in *ex parte Mackay* (supra), A sold a patent to B in consideration of B paying him royalties on goods ordered from or supplied by B for a finite period.  At the same time, B lent A £12,500 and it was agreed that B could retain one half of the royalties otherwise payable to A in order to repay his loan to A.  However, the contracts also contained a proviso that if A became bankrupt, B might retain the whole of the royalties until A's debt was paid.

---

[44] [2002] 1 WLR 1150

[45] Bad faith may be relevant: where a provision which might otherwise be valid can be shown to have been entered into with the intention of depriving creditors of their rights on insolvency, that may be sufficient to invalidate the provision when it would not otherwise be invalid: *Money Markets* at [103].

46.  Whilst the term allowing B to retain the first half of the royalties due was valid, the Court of Appeal held the proviso purporting to permit B to retain the second half of the royalties in the event of A's bankruptcy was void and unenforceable. Mellish LJ said, at p.648:

> *"As I understand it, a person cannot make it a part of his contract that, in the event of bankruptcy, he is then to get some additional advantage which prevents the property being distributed under the bankruptcy laws."*

47.  In Mellish LJ's judgment, the reference to *"a person"* was to B; the reference to the *"event of bankruptcy"* was to the bankruptcy of A; and the reference to the *"property"* which was prevented from being distributed according to the bankruptcy laws was a reference to the property of A – namely A's contractual right to be paid royalties by B.

48.  In *Ex p Jay; in Re Harrison* (1880) 14 ChD 19, the contractual provisions in question provided that building materials belonging to a builder which had been brought on site would be forfeit to the owner of the land if the owner exercised a right of re-entry onto the land in the event of the bankruptcy of the builder. James LJ observed (at p. 25):

> *"The principle of those decisions [Ex parte Mackay and Ex parte Williams] is this, that a simple stipulation that, upon a man's becoming bankrupt, that which was his property up to the date of the bankruptcy should go over to someone else and be taken away from his creditors, is void as being a violation of the bankrupt law."*

To similar effect was the dictum of Cotton LJ at p.26:

> *"...that there cannot be a valid contract that a man's property shall remain his until his bankruptcy, and on the happening of that event shall go over to someone else, and be taken away from his creditors."*

49.  The comments in *ex p Jay* must be read in the context of the case which was concerned with a forfeiture clause. It is, however, apparent from the facts of *ex parte Mackay* that the principle is not limited to cases in which assets are actually "taken away" (forfeited) from the insolvent estate. It can equally apply where the effect of the contractual provision in question is to <u>reduce</u> the value of the contractual rights which form part of the property of the bankrupt by diverting monies which would otherwise be payable to the bankrupt in

accordance with such contractual rights.

50. So, in *ex parte Mackay* (supra), the "property" belonging to A was his contractual right to payment of royalties by B. A retained that contractual right at all times, and the proviso which was struck down did not seek to terminate that right. The proviso did, however, seek to reduce the value of that right in the event of A's bankruptcy by permitting B not to pay monies over but to appropriate them to the discharge of A's liabilities to B for so long as the loan made by B was outstanding. Thereafter B was obliged to resume the payment of royalties in full.

51. In *re Johns*[46], a widow made advances to her son who, by way of mortgage, assigned the share to which he was entitled to in reversion under his father's will subject to his mother's life interest. It was agreed that out of the advance of £1650, the mother should retain a bonus of £1000 and the remaining £650 would be paid to the son by monthly instalments of £10 with 5% interest. The mortgage provided that if the son became bankrupt, the mother could claim not only the £1000 (retained to satisfy the bonus) but any or all of the £10 advances. Holding that the mortgage was a device to secure that the mother received more if the son became bankrupt than if he did not and was therefore void, Tomlin J. held (at pp.747-748) that:

> "it seems to me reasonably plain that the scheme of that document is one which is to secure that something more shall come to her if he becomes bankrupt than if he does not; and that it falls exactly within the words in Ex parte Williams that I have read: "A person cannot make it a part of his contract that, in the event of bankruptcy, he is then to get some additional advantage which prevents the property being distributed under the bankruptcy laws." I read that as meaning not only the bankrupt cannot do that, but having regard to the position in that case of Ex parte Williams, the mortgagee cannot do it. He cannot make a bargain with the mortgagor which secures to him, the mortgagee, a greater advantage if the mortgagor becomes bankrupt than he would get if he does not."

52. Likewise, in *British Eagle* (supra), the House of Lords held invalid contractual terms which provided that debts arising from the provision of services between airlines who were members of IATA would not be payable directly between members but would only be payable through the medium of a clearing house. The liquidator of one member airline (British Eagle) sued

---

[46] [1928] 1 Ch 737

another airline (Air France) for recovery of the price of services provided to it, and was met with a defence based upon a contractual provision that debits or credits between member airlines of IATA would only be payable or receivable through the medium of the clearing house procedure and not otherwise.

53.  The majority of the House of Lords struck down the arrangements on the basis that they provided for "simple contract debts" to be satisfied in a way which "contracted out" of the statutory scheme for *pari passu* distribution of the property of an insolvent company under the insolvency legislation: see e.g. per Lord Cross at p.780C-781B.  The majority did not think that it was significant that the contracts did not contain any provisions which were designed to come into effect or to bring about a change in the event of an insolvency; what was significant was the effect of the provisions in the event of an insolvency.

54.  But even the minority, who would have upheld the clearing house arrangements, accepted that it would have been unlawful for the contracts to contain provisions which operated in the event of an insolvency of British Eagle to divert monies which would otherwise have been payable to British Eagle to other members of IATA.  So, for example, Lord Morris said, at p.761F,

> "So in the present case if the defendant company had owed money to the plaintiff company but if there was a direction to the defendant company which required them in the event of a liquidation to pay money to some particular persons rather than for the benefit of all the creditors the liquidator could prevent what would otherwise be an evasion of the law (see Ex Parte Mackay (1873) 8 Ch. App. 643)."

Lord Morris' references to "*the event of a liquidation*" and to "*the creditors*" were plainly references to a liquidation of the plaintiff and to the creditors of the plaintiff.

55.  The breadth of the principle is also apparent from the decision of the Court of Appeal of Hong Kong in *Peregrine Investments v. Asian Infrastructure Fund Management* [2004] 1 HKLRD 598 (see especially the dicta of Rogers V-P at para 33 and Woo V-P at para 86 cited by the Chancellor in para 40 of his judgment).  The principle is directed at clauses which seek to render property of a company less valuable in the event of its insolvency as well as clauses that seek to deprive the company of the property entirely: such was, for example, the case with the right to receive royalty payments in *ex parte Mackay*.

## (2) Application of principles

56. The provisions in issue in the instant case are objectionable for precisely the reasons illustrated by these cases. As indicated above, LBSF, as Swap Counterparty, has a contractual right under the Swap Agreement to payment of any amounts due to it on termination of the Swap – defined by Condition 44 as the "Unwind Costs". That debt is secured on, and payable only from the proceeds of realisation of the Collateral. It will be payable even if LBSF is a Defaulting Party. The debt is "property" of LBSF, and in so far as it is secured on the Collateral, LBSF also has a proprietary interest in the Collateral.

57. The effect of Clause 5.5 of the Supplemental Trust Deed is that the Trustee will apply the fund of monies comprising the proceeds of realisation of the Collateral in accordance with Swap Counterparty Priority so that the debt owing to LBSF under the Swap Agreement is paid. Moreover, the amounts payable to Noteholders on Early Redemption of the Notes under Condition 44 reflect LBSF's right to have the monies used to pay it the Unwind Costs due to it under the Swap Agreement.

58. However, Clause 5.5 and Condition 44 contain provisions designed to come into effect, inter alia, as a result of the insolvency of LBSF and to change the position. The agreements provide that in the event that LBSF is the Defaulting Party under the Swap Agreement, the Trustee is to pay the monies arising from realisation of the Collateral to the Noteholders rather than to LBSF. This is achieved both by the change in the directions as to payment from Swap Counterparty Priority to Noteholder Priority under Clause 5.5 and by the increase in the amounts payable to the Noteholders under Condition 44 in the event of LBSF being the Defaulting Party under the Swap Agreement.

59. The effect is precisely analogous to the proviso which was struck down in *ex parte Mackay*, to the arrangements invalidated by the majority in *British Eagle*, and to the situation postulated as unlawful by Lord Morris in *British Eagle*.

60. In *ex parte Mackay* the proviso operated in the event of A's bankruptcy and diverted monies which would otherwise have been payable to A by way of royalties instead to discharge of A's liability to B: it thereby rendered A's property – its contractual right to receive royalties – less valuable in the event of its insolvency.

61.    In *British Eagle*, the arrangements in question provided for monies which
       would otherwise have been payable by Air France to British Eagle for services
       rendered to Air France to be diverted and used to pay Air France's debts to
       other airlines, thereby rendering British Eagle's right to payment for the
       services rendered less valuable.

62.    Even on the minority view, as Lord Morris accepted, it would have been
       unlawful for the clearing house arrangements to have contained clauses
       providing that, in the event of British Eagle's insolvency, monies which would
       otherwise have been payable to it from Air France would instead be directed
       to be payable to third persons – the other airlines – rather than to British Eagle
       for the benefit of its creditors.

63.    So in the instant case, Clause 5.5 and Condition 44 contain provisions which
       provide that in events which include LBSF's bankruptcy monies which would
       have been payable to it in discharge of the Issuer's liability to LBSF for
       Unwind Costs under the Swap Agreement are instead directed to be payable to
       the Noteholders.  Such provisions operate to deprive LBSF's creditors of such
       monies in the event of LBSF's insolvency and to reduce the value of LBSF's
       property – namely its right to receive payment (receivable) from the Issuer
       under the Swap Agreement.

**Grounds of Appeal**

64.    Applying this overall approach, LBSF's grounds of appeal are as follows.

Appeal Ground 1

65.    The Chancellor considered that in order to determine whether the relevant
       clauses were contrary to the "anti-deprivation" principle it was "*necessary to
       consider the structure of the transaction as a whole*"[47].  This is accepted.
       However, in approaching this task, the starting point must be the relevant
       provisions themselves.

66.    In paragraph 26 of his Judgment, the Chancellor indicated that he would
       proceed to consider the submissions of LBSF in the context of Clause 5.5 of
       the Principal Trust Deed alone.  He did not consider Condition 44 of the Note
       Conditions at all.  Counsel for LBSF had indicated that, while Clause 5.5

---

[47] Judgment para 45, first point.

effected a change in priority between the amounts payable to Lehman BSF and Noteholders, the second paragraph of Condition 44 also changed the amount payable to Noteholders upon the early redemption of the Notes (by changing the means of calculating the same)[48] and thereby effected a forfeiture of the amount owed to LBSF.

67.     In carrying out an analysis of the structure of the transaction, the Chancellor therefore failed to take any account of the operation of Clause 5.5 and Condition 44 together.

Appeal Ground 2

68.     The Chancellor, in paragraph 45 of his Judgment, failed to make any reference to the actual wording of the relevant clauses.  Clause 5.5 of the Supplemental Trust Deed required the application of monies received in connection with the realisation or enforcement of Mortgaged Property according to Swap Counterparty Priority *"unless"* an Event of Default occurred under the Swap Agreement and LBSF was the Defaulting Party, in which case Noteholder Priority should be applied.  The use of *"unless"* is plainly indicative of a condition subsequent which operated to change the position in the event of LBSF's default under the Swap Agreement (which Event of Default included LBSF's insolvency).

69.     This is reinforced by an examination of Condition 44.   Whilst the exact form and operation of Condition 44 varies among different series of Notes, it provides that in the circumstances of an Early Redemption of Notes in the situation where there has <u>not</u> been a default by LBSF, the amounts due to LBSF under the Swap Agreement (the Unwind Costs) are deducted from payment to the Noteholders.  However, the "flip" provisions contained in the final section of Condition 44 provide that *"if"* or *"in the event"* that the Swap Counterparty is the Defaulting Party under the Swap Agreement, the amount payable to the Noteholders is not subject to deduction of the Unwind Costs.

70.     In certain cases (for example, the Beryl 2008-4 Series), Condition 44 even purports to provide that the Swap Agreement will in those circumstances, *"terminate at zero"*.  On its face, on LBSF's insolvency, this Condition 44 purports to deprive LBSF entirely of its receivable under the Swap Agreement and hence its resultant interest in the Collateral.

---

[48] Transcript, Day 3, Pages 164 to 168 **[E/tab 9/293-294]**

71. Moreover, this is not merely a question of syntax. Viewed together, the effect of Clause 5.5 and Condition 44 is to diminish the value of LBSF's property – its receivable under the Swap Agreement – in the event that LBSF is subject to an insolvency event.

Appeal Ground 3

72. The first of the Chancellor's reasons given at paragraph 45, namely that:

> *"the Collateral was bought by the issuer with the money subscribed by the investors for the notes. In no sense was it derived directly or indirectly from [LBSF]"*

was factually incorrect. In relation to 3 transactions (Beryl 2008-4, Beryl 2008-6 and Beryl 2008-14), LBSF in fact made a direct contribution totalling over 30 million AUD in relation to the acquisition of the Collateral.

73. It should be noted that, even if the Collateral had been bought by the issuer with the money subscribed by the investors for the notes, this is not a relevant consideration when applying the "anti-deprivation principle" in circumstances where, prior to insolvency, the overall arrangements between the parties conferred on LBSF a right to be paid the Unwind Costs ahead of the Noteholders out of the Collateral. That right was of value to LBSF's creditors and was diminished as a result of the operation of the Flip Clauses where there was an insolvency.

Appeal Ground 4

73. The Chancellor's second point was that:

> *"...on general principles the court should not be astute to interpret commercial transactions so as to invalidate them, particularly when, as counsel for Belmont suggested, consequential doubt might be cast on other long-standing commercial arrangements."*

74. It is accepted that in construing contractual provisions, where the words of a contract are capable of two meanings, one of which was lawful and the other unlawful, the former should be preferred: see Lewison on The Interpretation of Contracts (3rd Edn, 2007) para 7.11. However, that does <u>not</u> mean ignoring the clear language adopted by the parties: see *Re Baden's Deed Trusts* [1969] 2 Ch 388 at 399-400 per Harman LJ.

75. In any event, there was no evidence before the Court to suggest that such a

finding would "*cast doubt on other long-standing commercial arrangements*". The combined effect of Clause 5.5 and Condition 44 to which objection is taken are particular to the Dante Programme and are not to be found in the ISDA Master Agreement.

<u>Appeal Ground 5</u>

76.     In his second to fourth points in paragraph 45, the Chancellor considered the commerciality of the arrangements between the parties and drew conclusions based on his view that it was appropriate for LBSF to have a priority security interest for only so long as it performed its obligations under the Swap Agreement.  However, he failed to take account of the fact that LBSF's right to receive payment under the Swap Agreement  - its property - existed prior to and irrespective of whether the Swap Agreement had terminated on its default.

77.     LBSF's "credit protection" was provided for under the terms of the Swap Agreement.  There was no attempt under the terms of that agreement in the event of LBSF's insolvency to diminish or remove the extent to which LBSF was "in the money" as a result of relevant credit events.  Indeed, although the ISDA Schedule expressly provides for an option that would deprive a Defaulting Party of its Unwind Costs ("First Method"), the parties expressly elected that the "Second Method" (which did not deprive the party of Unwind Costs) should apply in the event an Early Termination Date was designated for any reason.

<u>Appeal Ground 6</u>

78.     As set out above and in the Grounds of Appeal, the five points which the Chancellor identified were not of themselves a sufficient basis upon which to determine that Clause 5.5 and/or Condition 44 gave LBSF a limited interest from the outset rather than an interest defeasible upon a condition subsequent.

<u>Appeal Ground  7</u>

79.     In his fifth point, the Chancellor held that:

> "...*it follows that such beneficial interest by way of security as [LBSF] had in the collateral was, as to its priority, always limited and conditional.*"

80.     Whilst it is accepted that the Chancellor was bound by authority to find that the grant of an inherently limited interest is permissible whilst an interest defeasible upon a condition subsequent, was not, it is respectfully submitted

that this distinction is one which is unprincipled and ought not to apply.

81.     It is, as Professor Goode has described: *"...redolent of the highly artificial distinction...between a determinable fee and a fee simple upon a condition."* The effect is that a contract right which immediately prior to liquidation constituted an asset of the company is removed from the reach of the general body of creditors. In form and substance, the termination operates as a forfeiture. In the case of a contract, the asset of the contract right on termination reduces the estate of the insolvent and frees the other party from the burden of the contract. It is submitted that, in line with the public policy emphasis on restructuring and preservation of the insolvent's estate for the benefit of creditors, there are strong policy reasons in favour of the English Court adopting a similar approach as is followed by US Bankruptcy law, namely to concentrate on the substantive effect of the provision rather than the manner in which it has been drafted.

Appeal Grounds 8-9

82.     In any event, the Chancellor, in paragraph 46 of the Judgment, adopted an unduly restrictive view of the "anti-deprivation principle". This is indicated by a number of points in the paragraph:

(1)     He stated that the principle related to an attempt to *"oust the mandatory provisions of the Insolvency Act"*, citing *British Eagle*. Whilst the principle undoubtedly does apply in relation to the mandatory provisions of the Insolvency Act, it could more appropriately be viewed in more general terms as seeking to ensure that the insolvent estate is not improperly diminished in the event of insolvency;

(2)     He approached the issue by reference to factual circumstances rather than applying the underlying rationale for the principle based on public policy to the facts of the case;

(3)     His suggestion that there was *"no determination of an unlimited interest in property owned by the insolvent at the commencement of the insolvency process by virtue of his insolvency"* was an overly restrictive summary of the authorities he cited. As indicated in *Peregrine*, the principle applies not merely in relation to dealings by the bankrupt in his own property; the court as a matter of public policy

would strike down any contractual provision diminishing the value of assets available to creditors where there was an insolvency.

(4)     Similarly, his suggestion that there was no "springing security" for the obligations of LBSF because "*the security enjoyed by the note-holders was security for the obligations of the issuer*", failed to take any account of the fact that LBSF had a continuing security interest in the Collateral, which was an asset of LBSF which was rendered less valuable by the "springing priority" imposed by the "flip clauses" in favour of the Noteholders.

(5)     Similarly, his suggestion that *ex parte Mackay* was distinguishable on its facts from the present case because the security was not for the obligations of the insolvent but for the obligations of the issuer is incorrect. In the same way as it was impermissible for the contract in *Mackay* to provide that in the event of A's bankruptcy, the half share of the royalties which would otherwise be payable to A would instead be used first to satisfy A's debt to B and only thereafter be paid to A, it is also impermissible for the Trust Deed in the instant case to provide that, in the event of LBSF's bankruptcy, the proceeds of the Collateral which would otherwise be payable to LBSF in discharge of the Issuer's debt to LBSF would instead be used first to satisfy the Issuer's debt to the Noteholders and only thereafter be paid to LBSF.  Condition 44, similarly, impermissibly increases the amounts payable to the Noteholders.

**Timing of deprivation**

Ground 10(a)

83.     In paragraph 24(1) of the Judgment, the Chancellor noted that "*Prima facie, [the Chapter 11 filing by LBHI] gave rise to Noteholder Priority under clause 5.5 of the Supplemental Trust Deed...*".  In paragraphs 49 to 55 of his Judgment, the Chancellor considered whether the anti-deprivation principle would apply where the event which caused the "flip" of priority was not the commencement of LBSF's insolvency, but rather the filing for Chapter 11 protection by LBHI, the Credit Support Provider (as defined by paragraph 10(iv) of the Swap Confirmation.  He held that the Claimants were entitled to rely on the event of default constituted by LBHI's Chapter 11 filing "*as triggering*" clause 5.5 of the Supplemental Trust Deed.

84.  It is not in dispute that a Bankruptcy Event under Clause 5(a) of the Swap Agreement[49] includes the bankruptcy of either LBSF or any Credit Support Provider, which in this case (as defined in paragraph 10(iv) of the Swap Confirmation[50]) was LBHI, the parent company of the Lehman Brothers Group.

85.  However, in failing to give any consideration to Condition 44, the Chancellor appears to have misconstrued the relevant contractual framework. Deprivation occurs under Clause 5.5 of the Supplemental Trust Deed not on the happening of an Event of Default but rather on the application of monies received by the Trustee in connection with the realisation or enforcement of the Mortgaged Property in accordance with Noteholder Priority. No such application had occurred prior to LBSF's Chapter 11 filing.

86.  In order for such application of monies to occur, the Trustee must ascertain what amounts are payable to the noteholders. This requires a determination of the Early Redemption Amount, which is specified by Condition 44 (a matter ignored by the Chancellor in paragraphs 49 to 55 of his Judgment). Under Condition 44, this requires a determination of whether, in which direction and in what amount Unwind Costs (the amount payable on the termination of the Swap Agreement) are payable.

87.  This is to be determined by reference to the Early Redemption Date under Clause 6(a) of the ISDA Master Agreement. Under Clause 6(a) of the ISDA Master Agreement, the Non-Defaulting Party is permitted if it wishes to terminate the Swap Agreement, where at any time an Event of Default has occurred and is then continuing, to specify the relevant Event of Default and designate an Early Termination Date.

88.  Therefore, if deprivation could be said to occur at a time of the determination of the Early Redemption Amount, rather than on the application of monies received by the Trustee in connection with the realisation or enforcement of the Collateral, this required the giving of a notice specifying the Event of Default and designating an Early Termination Date. In those circumstances, the noteholders were not entitled to rely upon the Event of Default constituted by LBHI's Chapter 11 filing, as this was not specified in their notice as

---

[49] [F/tab 10/383-384]
[50] [F/tab 11/427]

required by Clause 6(a).

<u>Appeal Grounds 10(b)-11</u>

89.     The Chancellor accepted the submission of Counsel for Belmont that *Ex Parte Jay*[51] was a binding decision on him to the effect that a forfeiture provision exercisable on a number of events of which bankruptcy is one is valid if exercised in reliance on such other events notwithstanding that it would have been invalid if exercised on the ground of insolvency.   In fact, this was <u>not</u> part of the *ratio* of *Ex Parte Jay*, which was that the provision for forfeiture of the materials on the bankruptcy of the builder was void and contrary to the policy of the bankruptcy law.  Whilst the relevant provisions did also provide for forfeiture in the event of default in relation to payment of rent and observance and performance of various terms and stipulations, it is clear that the builder had not committed any event of default[52].  The question therefore did not arise whether, if such an event of default had also occurred as well as bankruptcy, reliance on the former would suffice.

90.     In *Ex parte Newitt*[53], a forfeiture provision in relation to a builder's materials was held to apply in the event of non-payment of rent, failure to perform and observe the terms of the building agreement or failure to complete the buildings.  As explained by Neuberger J. in *Money Markets*[54], the *ratio* of the decision was that right to take possession of the materials was not dependent on the builder being bankrupt, but being in default, and the materials were specifically to become the property of the landowner on the basis that they represented liquidated damages in respect of the builder's breach of contract. The effect of the arrangements was to render the landowner a secured creditor (at least to the value of the builder's materials on the premises) so far as his claim for damages was concerned.

91.     It is respectfully submitted that the approach adopted by the Chancellor was wrong on two bases:

    (1)     There *is* sufficient inconsistency between the decision of the Court of Appeal in *Re Newitt* and the House of Lords in *British Eagle* to require the Court to follow the reasoning in *Money Markets* in this regard;

---

[51] (1880) 14 Ch D 19, CA
[52] *Ibid* at 21 (final paragraph), *per* James LJ at 25, *per* Brett at 26, *per* Cotton at 26
[53] (1881) 16 ChD 522
[54] At [104]

(2)    The event of default relied upon in the present case is a deprivation provision exercisable on an event so similar to insolvency as to fall within the basic principle.

92.    The Court of Appeal is bound to refuse to follow a decision of its own which, although not expressly overruled, cannot, in its opinion, stand with a decision of the House of Lords: *Young v Bristol Aeroplane Co Ltd* [1944] KB 718, CA[55]. This was the view expressed by Neuberger J. in *Money Markets*, the reasoning of which is respectfully adopted. He noted that the arrangement in *Ex parte Newitt* was to render the landowner a secured creditor so far as his claim for damages was concerned and that the House of Lords in *British Eagle* considered that this represented an objectionable feature of the arrangement from the point of view of bankruptcy principles[56]. It was also inconsistent with the way Lord Blanesburgh expressed himself in *Bombay Official Assignee v Shroff*[57].

93.    It is to be noted that, if the principles are capable of being reconciled, as Neuberger J. suggested, it would be on the basis that:

> "...*if the deprivation provision can be activated in an event other than bankruptcy or liquidation (irrespective of whether those events could also activate the provision) then, provided the right to implement the provision has arisen before the bankruptcy or liquidation, and provided that the deprivation has been completed by the date of the bankruptcy or liquidation, then it will not fall foul of the principle.*"[58]

94.    Whilst the Chancellor referred to LBSF's submissions that the "flip" applies only to the application of monies received from the realisation or enforcement of collateral[59], the Chancellor failed to consider Condition 44. Whilst the occurrence of an Event of Default would give rise to the right to seek enforcement, deprivation occurs on the activation of Condition 44, which is when the Collateral is enforced or realised, or, alternatively, when a notice designating an Early Termination Date is given. In the present case no enforcement or realisation of Collateral had occurred, and no notice designating an Early Termination Date had been given, prior to LBSF's filing for Chapter 11 protection. In those circumstances, no step had been taken to

---

[55] affd [1946] AC 163, HL
[56] *British Eagle* at p780 *per* Lord Cross; Money *Markets* at [105] *per* Neuberger J.
[57] (1932) 48 TLR 443, 446 PC; *Money Markets* [108] *per* Neuberger J.
[58] *Ibid* at [107]
[59] Judgment para 52

activate the deprivation provision prior to LBSF's insolvency and such deprivation had certainly not been completed prior to LBSF's Chapter 11 filing.

95. Applying the reasoning adopted by Neuberger J., the anti-deprivation principle should apply in either of the following situations where the deprivation provision can be activated in either an event of insolvency or in an event other than insolvency, but is activated on or after the insolvency event:

(1) where the party seeking to rely on the provision relied on the non-insolvency event but could in the circumstances have relied on the insolvency event; or

(2) the party seeking to rely on the provision in fact relied on the insolvency event but could in the circumstances have relied on the non-insolvency event.

96. This approach was followed in *Woolworths Plc v BBCW*[60] , where it was held that clauses in a joint venture agreement which permitted one party to acquire the shares of the other in an insolvency event, when read together with clauses in a license of intellectual property rights, which terminated the licence upon the insolvency of a member of the licensee's group, together contravened the anti-deprivation principle and were void. Peter Smith J. refused to follow the decision of the Chancellor in the present case. He noted that:

> *"I do not think the restricted basis for the decisions can stand in the light of British Eagle. In my view the Court is entitled to look at the overall position and if the result is to create a better position on insolvency by invoking a provision other than a default of the insolvent party the court applying **British Eagle** can look at the overall position and the result.*

97. It is also appropriate to consider the alternative event of default now relied upon by the Claimants. They seek to rely on the insolvency of LBSF's parent company. In the circumstances of the case, the alternative approach suggested by Neuberger J., namely to invalidate a deprivation provision exercisable on an event akin to insolvency, would apply here. This approach was also adopted by Peter Smith J. in *Woolworths Plc v BBCW*[61]. He held that:

---

[60] [200] EWHC 1954 (Ch)
[61] [200] EWHC 1954 (Ch)

> *"I do not accept with respect to the Chancellor that these decisions [Ex Parte Jay and Ex parte Newitt] have any relevance where on the facts in this case the "other event" is also an insolvency event. It is necessary to look at the overall position for the reasons set out above. This seems to me to be in accordance with the House of Lords in British Eagle."*

98.     In the circumstances of the present case, reliance by the Claimants on the insolvency of LBSF's parent company, when LBSF was also insolvent, cannot be said to be an event so dissimilar to insolvency so as to escape the application of the anti-deprivation principle. This is particularly apposite given the facts of the present case. The Claimants in fact elected to terminate at a time when LBSF was insolvent and relied on the same. Whether they had other grounds on which to give notice is not directly relevant for the purpose of the public policy rule, which is to prevent deprivation of value from the insolvent estate.

## CONCLUSION

99.    In all the circumstances, LBSF respectfully submits that the Appeal should be allowed and it should be declared that the "flip clauses" are invalid, ineffective and unenforceable under English law, that Swap Counterparty Priority rather than Noteholder Priority should be given effect to and that the second paragraph of Condition 44 is void and unenforceable.

**RICHARD SNOWDEN QC**
**JAMES POTTS**

Erskine Chambers
33, Chancery Lane
London
1 September 2009