# EXHIBIT F



Structured Finance

Global Cross-Sector Criteria Report

# Counterparty Criteria for Structured Finance Transactions

## Analysts

Andreas Wilgen
+44 20 7417 6332
andreas.wilgen@fitchratings.com

Stuart Jennings
+44 20 7417 6271
stuart.jennings@fitchratings.com

**Contacts**
**EMEA**
Ian Linnell
+44 20 7417 4344
ian.linnell@fitchratings.com

**APAC**
Ben McCarthy
+61 2 8256 0388
ben.mccarthy@fitchratings.com

**US**
John Olert
+1 212 908 0663
john.olert@fitchratings.com

Huxley Somerville
+1 212 908 0381
huxley.somerville@fitchratings.com

## Related Research

- *Global Structured Finance Rating Criteria (September 2009)*
- *Counterparty Criteria for Structured Finance Transactions: Derivative Addendum (October 2009)*
- *Feedback Analysis: Counterparty Criteria for Structured Finance Transactions (October 2009)*
- *Fitch's Advance Rates (ARs) for Government Bonds and Currency Risk (October 2009)*
- *Global Rating Criteria for Single- and Multi-Name Credit-Linked Notes (April 2009)*
- *Global Rating Criteria for Synthetic CDOs (March 2009)*

## Contents

Executive Summary .................... 1
Background ............................. 2
Fitch's Counterparty Criteria Framework.............................. 3
What if a Transaction Does Not Fully Follow the Criteria? ............. 5
Derivative Counterparties............. 7
Direct Support Counterparties ....... 11
Indirect Support Counterparties ..... 16
Collateralisation Criteria.............. 19
Other Considerations .................. 20
Appendix ................................ 24

## Summary

- This report describes Fitch Ratings' criteria approach to counterparty risk in structured finance (SF) transactions, including derivatives, direct counterparty exposures (including issuer account banks, liquidity facilities, qualified investments, guaranteed investment contracts (GICs) and charged assets, among others) and indirect counterparty exposures (including collection account banks and paying agents, among others).
- For most exposures, Fitch expects counterparties to satisfy certain eligibility criteria. The core criteria expects counterparties to have a minimum Fitch Long-Term Issuer Default Rating (IDR) of 'A' and a minimum Short-Term IDR of 'F1' to support note ratings of the 'AA' category or higher. If collateral is posted, this core criteria is extended to counterparties rated 'BBB+/F2'.
- For new ratings, counterparties that are on Rating Watch Negative (RWN) are treated as one notch below their actual current rating for eligibility purposes, to help address any potential short-term adverse rating action due to counterparty issues.
- Remedies are expected to be pursued by counterparties upon losing eligibility. These remedies include obtaining a guarantee from an eligible counterparty, securing replacement by an eligible counterparty or — where possible — collateralisation of the counterparty exposure.
- Where collateralisation is one of the feasible structural mechanisms (referred to as a "mitigant"), Fitch expects remedial action to be effected within 14 calendar days of losing eligibility. For those exposures that cannot be addressed by collateralisation, remedial action is expected within 30 calendar days.
- Where parties to a transaction choose not to follow Fitch's counterparty criteria for a new transaction, the materiality of counterparty exposure and other structural mitigants, if any, will be considered by Fitch in determining the appropriate rating. Downgrade will not automatically follow for existing transactions where counterparties lose eligibility. This will depend on materiality, other new or existing mitigants and transaction performance.
- Fitch will always apply its current criteria in surveillance. If criteria change in the future, then transactions may be subject to downgrade if the exposure is material and counterparties choose not to follow Fitch's criteria voluntarily.
- Fitch considers that replacement derivative counterparties are, in principle, available for the majority of derivative contracts, but at increased cost and after a lengthier timeframe where they are esoteric. Accordingly, Fitch has extended its exposure period to 45 business days and increased the collateral expectations for derivative instruments that are deemed to be more esoteric. Please refer to the report entitled "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*" for more detail.
- Despite remedies described in this report, certain counterparty exposures are deemed so excessive that they cannot be addressed by remedial action. Examples include structures in which the account bank holds the majority of enhancement supporting notes targeted for high investment-grade ratings. In such cases, ratings above those of the counterparty may not be possible.


## Background

All SF transactions include an element of reliance on counterparties, either in the form of operational reliance, or through credit dependency in the form of payment obligations, and often a combination of both. Typical examples of mainly operational reliance are servicers, calculation and paying agents, trustees and custodians. Examples of mainly payment obligation functions include swap counterparties, liquidity facility providers, issuer account banks and qualified investment providers. The rating opinion for SF transactions therefore needs to assess the risks associated with these counterparties and the roles they play in addition to the core credit risks related to the performance of the securitised assets.

- Achieving the maximum structural "isolation" of a transaction's performance from the credit or operational exposure of the counterparties involved is one of the basic principles of SF

One of the basic principles of SF is to achieve the maximum structural "isolation" of a transaction's performance from the credit or operational exposure of the counterparties involved. In other words, the aim is that any credit deterioration or default of transaction counterparties does not have a direct negative impact on the performance of the SF transaction itself. The intended result is that SF transaction performance reflects primarily that of the underlying collateral and is isolated from the specific risks that impact corporate counterparties.

In terms of a rating opinion, if sufficient isolation is not achieved, then the rating of the SF securities may not be capable of exceeding that of the lowest rated counterparty, if its failure to perform were material to the transaction.

It is Fitch's view that it will never be possible to fully "structure away" counterparty risk. However, it is possible to employ structural mitigants that allow for this risk to be minimised. The agency's counterparty criteria express its opinion as to the arrangements that are intended to maximise isolation from a counterparty and allow for SF ratings to be sufficiently isolated from the ratings of the key transaction counterparties.

The purpose of this criteria report is to express, in a transparent manner, Fitch's approach to analysing counterparty risk in SF transactions. Fitch's criteria represent expectations for the agency's rating analysis and are not requirements. The agency is not responsible for the structuring of transactions and determines its rating opinion based on structures presented to it. Transaction parties may choose to incorporate mitigants into their transaction structure and documents that are different from those discussed in this criteria report. Fitch will assess these against its criteria.

In addition to SF transactions, the essence of this criteria report is applicable to global infrastructure transactions and covered bonds. However, some deviations for these asset classes may apply and, if so, they are addressed in the relevant criteria reports.

This criteria updates and replaces the following Fitch criteria reports:

- Counterparty Risk in Structured Finance: Qualified Investment Criteria;
- Counterparty Risk in Structured Finance Transactions: Hedge Criteria;
- Commingling Risk in Structured Finance Transactions; and
- Liquidity Support in Structured Finance Transactions.

**Key criteria updates include:**

- Counterparties rated 'A/F1' and on RWN are no longer considered eligible
- The period for remedying ineligibility has been reduced to 14 calendar days where collateral can be used to cure the ineligibility
- Identifying transaction structures where the dependency on a counterparty is so excessive that the standard approach to eligible counterparties is not sufficient to achieve isolation


# Fitch's Counterparty Criteria Framework

## The Role of Counterparties Within Structured Finance Transactions

SF transactions typically include structural mechanisms with the aim of reducing counterparty risk. Fitch will consider all structural mitigants available to the transaction as a whole to determine whether, in the agency's view, these mitigants sufficiently reduce the counterparty dependency and achieve "isolation". In assessing this position, Fitch will separate counterparties into three basic categories, based on the role(s) each entity has in the transaction:

- Fitch defines three categories of counterparty: (i) derivative; (ii) direct support (eg liquidity); and (iii) indirect support (eg servicers)

- derivative counterparties such as swap providers;
- direct support counterparties such as issuer account banks, liquidity facility providers and guarantors; and
- indirect support counterparties such as collection account banks or servicers — these parties pose a greater degree of operational risk and to a lesser extent credit exposure.

Certain roles or functions might be structured such that they meet the basic definition of any of the above categories. Fitch will examine the details of the counterparty exposure and apply its criteria accordingly.

In this criteria report, any reference to "rating" or "ratings" means a Fitch rating, unless otherwise specified.

## Definition of Eligible Counterparty

Fitch expects that counterparties in SF transactions have the operational knowledge and capability to perform the functions for which they are mandated. In the majority of cases, counterparty roles are performed by highly rated institutions, usually banks, but Fitch will consider non-banks as eligible counterparties for certain functions on a case-by-case basis. In addition to the functional qualification, to achieve isolation, Fitch expects that an "eligible counterparty" will meet the key characteristics outlined below. Please note that some counterparty roles, for example servicers that do not provide advances, do not need to satisfy the definition of an eligible counterparty and are not covered in this report. Any deviations from this definition in the case of certain counterparty roles are highlighted in this report.

- A minimum Long-Term IDR of 'A' and Short-Term IDR of 'F1' are expected for eligible counterparties to support note ratings of 'AA-' and above
- If collateral is posted, then the lower minimum ratings of 'BBB+/F2' will be considered for counterparties supporting 'AA' category ratings and above

- A minimum Fitch Long-Term IDR of 'A' and a minimum Short-Term IDR of 'F1'. For transactions where the highest note rating does not exceed 'A+', counterparties with a minimum rating of 'BBB+/F2' will be considered to be eligible counterparties.
- To the extent an entity does not meet the first criterion, collateral can be used to mitigate the counterparty exposure (for example, for derivatives or certain liquidity facilities), provided such collateral is posted from day one, available for use when needed, and in line with the *Collateralisation Criteria* (described in this and the supporting report, "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*"). For the purpose of this criteria, if collateralisation is chosen, Fitch expects the entity to be rated at least 'BBB+/F2' at transaction closing (or 'BBB-/F3' if the highest note rating does not exceed 'A+') to achieve sufficient stability.
- Unrated strategically important subsidiaries of eligible parent institutions may be eligible, provided the structural mitigants are applied to the parent entity and additional mechanisms addressing the potential for a change in the ownership structure are included (typically ownership of less than 100% will trigger the ineligibility). Unrated non-strategically important subsidiaries of rated entities may also be eligible provided they benefit from an unconditional and irrevocable guarantee of the eligible parent entity and the structural mitigants are applied to the guarantor/parent entity.


- Entities that are on RWN are considered as one notch below their IDR for eligibility purposes for new transactions

For the purpose of this assessment, in the case of new ratings only, an entity on Rating Watch Negative (RWN) shall be considered to be rated one notch below its IDR. Please refer to the *Appendix* for a summary of the eligible counterparty guidelines.

An entity with only either a short-term or long-term rating will not be eligible under the basic provisions of the criteria, however Fitch may deviate from this assessment on a case-by-case basis and will provide commentary and reasoning in rating communications. For example, an entity that has an 'A+' Long-Term IDR or above, but no short-term rating might be considered as an eligible counterparty by a rating committee. However, an entity that has ratings at the minimum level 'A' flat long-term only or 'F1' short-term only are less likely to be accepted as eligible counterparties by a rating committee, because of greater uncertainty regarding their overall financial profile.

## Remedies Upon Becoming Ineligible

Where transaction parties specify remedial action upon failure of a counterparty to maintain eligibility, Fitch expects that, as of transaction closing, each counterparty will be contractually obliged to take certain minimum remedial actions within a predefined timeframe of becoming ineligible. In the absence of such minimum legally binding contractual obligations, the mitigants are unlikely to be considered sufficient (please refer to the section entitled *What if a Transaction does not Fully Follow the Criteria?*).

The remedial actions Fitch expects will depend on a specific counterparty's role, but generally include a combination of the following:

- Remedial actions include replacement or guarantee by another eligible counterparty or posting collateral (or a combination)

- Replacement with an eligible counterparty (novation). The replacement counterparty agreement is expected to be on substantially the same terms as the existing contract.
- Provision of a guarantee of the counterparty's obligation from another eligible counterparty.
- Posting collateral for the benefit of the transaction. The amount of collateral will depend on the type of counterparty obligation and will range, for example, from mark-to-market (MtM) plus a cushion for swap contracts to the full drawdown of available amounts in case of liquidity facilities. For certain types of exposures, such as issuer account banks and operational dependencies, collateral posting is not a feasible option.

Any costs associated with the remedial action are expected to be borne by the counterparty that becomes ineligible.

- Where collateral is a feasible mitigant, one of the remedies is expected to be taken within 14 calendar days of the counterparty becoming ineligible

Where collateral is a feasible mitigant (which is the case for the majority of counterparty functions), the remedial action is expected to be effected within 14 calendar days of the counterparty becoming ineligible. In Fitch's view, collateralisation can be achieved in such a short timeframe, although the implementation of the other mitigants of replacement or guarantee is likely to take considerably longer. Only if collateral cannot be used as a mitigant, for example in the case of issuer account banks, are the remedial actions expected to be taken within 30 calendar days of the counterparty becoming ineligible.

- Remedial action is not expected where the highest-rated notes are rated at least three notches below the counterparty itself

The above provides an overview of the general principles, but the specific definition of an eligible counterparty, the type of remedial actions and the applicable timeframes will depend on the exact type of counterparty exposure and are described throughout the report.

If the transaction documentation includes a provision to the effect that remedial action would not be needed if the highest-rated notes of a transaction are rated at least three notches below the rating of the counterparty, such a provision would be considered to be in line with this criteria.


## Key Underlying Criteria Assumptions

In principle, transactions where the counterparty arrangements include the above expectations, or variations thereof discussed later in this report, can in Fitch's view achieve sufficient "isolation" from a counterparty's credit/operational risk for SF rating purposes. This assessment is based fundamentally on the following key assumptions:

- Eligibility is established based on the assumption that the risk of 'A/F1' counterparties jumping to default within the remedial period is sufficiently remote to support 'AAA' note ratings
- Rating committees will however assess whether these assumptions hold for individual transactions

- The risk of counterparties rated 'A/F1' or higher defaulting prior to or upon downgrade below this level within the specified remedial period ("jump-to-default risk") is sufficiently remote to support SF ratings up to 'AAA'. Similarly, the risk of a 'BBB+/F2' counterparty "jumping to default" is sufficiently remote to support an 'A' category rating or below.
- The counterparty will have the capability and willingness to take one of the remedial actions specified above shortly after becoming ineligible, for example through a downgrade below the minimum rating level.
- The counterparty will have the appropriate operational capability to perform the designated functions.

The validity of these assumptions should be assessed in the context of each individual transaction and counterparty concerned. In some cases, Fitch may conclude that, due to the specific nature of the counterparty exposure, the replacement assumption cannot be relied upon and, as a result, sufficient isolation may not be achievable. In other cases, the aggregate impact on the counterparty of exposure from the transaction under consideration and other existing transactions might be of such a magnitude that it could, in and of itself, be an influencing factor on the counterparty's credit quality and therefore, potentially, its rating.

Fitch recognises that there is no single perfect mitigant whereby counterparty risk can be entirely eliminated. Nevertheless, the agency believes that the general framework of structural mitigants presented in this report is suited to address the relevant counterparty risk. In applying the criteria, Fitch's analysts and rating committees will operate within this general criteria framework, but will also make case-by-case assessments of counterparty risk, rather than take a simple rule-based approach. As a result, rating committees may choose to deviate from the provisions of the criteria in certain cases. A full description of the reasons for doing so will be provided in all rating communications where this is the case.

To provide further clarity on counterparty roles and transaction structures, the following sections provide guidance on Fitch's position with respect to the three basic counterparty categories of (i) derivative counterparties, (ii) direct support counterparties and (iii) indirect support counterparties. In each case, some examples are discussed, but this, by no means, covers all counterparty circumstances that might arise.

# What if a Transaction does not Fully Follow the Criteria?

## New Transactions

- Where counterparty criteria are not followed in a new transaction, the materiality of counterparty exposure and other structural mitigants applied will be considered in determining the appropriate rating
- A rating cap or analysing a transaction without the counterparty support are options for approaching mitigants that are not consistent with this criteria

As noted above, Fitch is not responsible for the structuring of transactions and determines its rating opinion based on structures presented to it. In the absence of the structural remedies described in this criteria in the transaction documentation, Fitch would first assess:

- whether the counterparty exposure is material to its rating opinion; and
- whether there are other structural mitigants that sufficiently address counterparty risks for transactions.

In the event that the exposure is not material to the rating opinion or other structural mitigants exist that provide sufficient support to the transaction, then


ratings above the level of the counterparty may prove possible. In this event, Fitch would explain in its rating communications how the criteria have not been followed and how materiality or other structural mitigants have been sufficient to maintain a rating at a higher level than that of the counterparty.

In the event that the exposure is material to the rating opinion or there are not other structural mitigants deemed to be sufficient to support the rating opinion, then Fitch's rating analysis would be based on one of the following courses of action — depending on the nature of the counterparty exposure:

- Cap the note ratings at the lowest counterparty rating.
- Analyse the transaction in the absence of the support provided by the counterparty — this may only be feasible for some of the counterparty roles. (For example, if a basis swap is provided by an ineligible counterparty, Fitch can analyse a transaction as if the swap were not present. This would result in higher minimum credit enhancement levels to support the rating opinion. On the other hand, no transaction can perform without certain roles such as the issuer account bank.) In some cases, a transaction may not be rateable.

Where effective "isolation" from the counterparty's credit/operational risk is not sufficiently achieved, with the effect that note ratings are impacted by counterparty ratings, this would be described fully in Fitch's rating reports.

## Existing Transactions

- Downgrades will not automatically follow for existing transactions where counterparties lose eligibility. This will depend on materiality, other new or existing mitigants and transaction performance
- Fitch will always apply its current criteria in surveillance. If criteria change, then downgrades can follow if counterparties fail to provide additional remedies, even though they may not be obliged to do so contractually

Fitch will apply the principles of its current criteria in assigning both new ratings and maintaining existing ratings as part of the surveillance process. For an existing transaction, where a counterparty fails to satisfy the criteria, the ultimate impact on the ratings will depend on:

1. any transaction-specific structural mechanisms available to the transactions;
2. any new mitigants proposed by transaction parties;
3. the materiality of the counterparty exposure to the transaction, and
4. transaction performance.

The agency will therefore not automatically take a rating action on a transaction where a counterparty no longer satisfies the provisions of its criteria. The specific circumstances of each transaction will always be considered. In such cases, Fitch will provide transaction-specific commentary and reasoning. For the large majority of transactions, the agency does not expect rating implications arising from this update to the counterparty criteria.

Fitch's criteria may change from time to time, following further analysis, incorporating new data or reflecting new developments in the market. The agency will use the most current criteria for the surveillance of the rating of the notes. Often transaction parties may choose only to reflect in legal documentation the criteria that was applicable at the time that the transaction closed. This means that there would be no contractual obligation on the part of the counterparty to follow future revised criteria, unless transaction parties have chosen to reflect such an obligation in documentation. As a consequence, there is a risk that transactions will be subject to adverse rating action, in the event that future revised criteria become more onerous, unless counterparties choose voluntarily to apply revised criteria when they are not contractually obliged to do so.

## Rating Approach if a Counterparty Becomes Ineligible and no Action Results

If no remedial actions are taken within the specified timeframe, the special-purpose vehicle (SPV) issuer usually has the right, but not the obligation, to terminate the contract with the given counterparty (for example, this is usually


defined as an additional termination event in derivative documentation). In practice, the termination without appointment of a replacement counterparty is usually undesirable for the issuer and hence is rarely exercised.

- If no action is taken when a counterparty becomes ineligible, Fitch will analyse the rating impact on the SF transaction

Irrespective of what the SPV's (or the trustee for the noteholders) actions are, Fitch will analyse the impact on the rated tranches of the SF transaction. In particular, the agency will investigate the background for the inaction to understand if action is expected to be forthcoming shortly or if immediate rating action is necessary. Fitch's analysis will also determine the impact on the notes based on the counterparty's services being unavailable for the transaction — for example, for derivatives this test can mean an analysis of the transaction assuming that the interest rate or foreign currency risk is unhedged and testing the tranches' ability to withstand the respective stresses.

For certain counterparty roles, if Fitch's analysis were to show that the credit enhancement available to the rated notes is sufficient to cover the expected loss for the respective tranche rating level, the ratings may not be impacted. However, this is only likely to apply to transactions where either the available credit enhancement has significantly increased — for example, through the deleveraging of the transaction — or the quality of the underlying portfolio has substantially improved giving some credit enhancement cushion to the rating. However, for other functions, such as issuer account banks, excess credit enhancement can rarely provide protection due to the type of counterparty exposure.

If available credit enhancement is not sufficient to support the current rating of the SF notes and no appropriate remedial action is taken within a reasonable timeframe, it is expected that the notes will be downgraded to the higher of the counterparty's rating and the rating of the transaction notes without the presence of the counterparty. If, for instance, the shortfall in credit enhancement indicates a tranche's downgrade from 'A' to 'BBB', but the counterparty's Long-Term IDR is at 'A-', the floor for the downgrade will be 'A-'.

It is not appropriate to determine the required rating action according to the current market value of the swap — ie no downgrade in cases where the derivative MtM is in favour of the counterparty — since the market value is volatile, whereas a rating should be less so. Exceptions may be made in limited cases, for example, where the instruments are significantly out of the money for the SPV combined with a limited remaining maturity of the derivative.

In the past, Fitch has seen transaction documentation where remedial action is not at the point a counterparty becomes ineligible, but only upon Fitch's negative rating action. Although transaction parties are free to choose the basis for remedial action, it must be noted that such a provision introduces uncertainty as to whether the obligation (to take one of the mitigating actions) will be triggered and, at best, extends the length of the cure period.

## Derivative Counterparties

This section covers counterparties participating in securitisation transactions through derivative contracts and should be read in conjunction with the report entitled "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*". Typically, derivative contracts are governed by the documentation framework published by the International Swaps and Derivatives Association (ISDA), with many arrangers choosing variations to the standard ISDA terms, but alternative documentation has been used in some jurisdictions. The type of contracts includes, among others:

- swap agreements (currency, interest rate, credit default, total return, basis, etc);
- caps, floors, call or put options, corridors, collars, etc; and
- repurchase agreements or security lending contracts.


- Fitch divides derivative counterparties into two groups — those where their default would “terminate” the transaction (eg many synthetics) and those where the transactions would “continue” regardless (eg cash flow transactions)

The most common contracts in Fitch-rated transactions are foreign currency (FX) swaps, interest rate (IR) swaps, IR caps or floors and credit default swaps (CDS). The specifics of each derivative contract need to be analysed in detail and are often highly tailored towards a given transaction. However, the mechanics of derivatives and the resulting structural mitigants can be subdivided into a termination and a continuation analysis.

### Termination Analysis

For transactions where the derivative contract is a crucial element of the transaction structure — or even effectively is the transaction structure — the termination of the derivative contract will result in the termination of the SF transaction itself.

In such transactions, the non-payment or default of the counterparty will be a termination event for the derivative contract (either automatic or at the option of the issuer), which in turn will trigger the early termination of the securitisation transaction. This type of structure can usually be found in synthetic securitisations involving CDS, or sometimes total return swaps (TRS).

In these cases, Fitch’s analysis focuses on the full repayment of the notes, including accumulated interest up to the termination.

### Continuation Analysis

The termination of a derivative contract seen in a cash flow SF transaction does not result in the termination of the securitisation transaction itself. Here the role of the derivative is usually for hedging purposes only and forms a relatively smaller component of the transaction. As a result, even in the event of a default by the derivative counterparty — and the subsequent termination of the derivative contract — the securitisation transaction will continue (although for material counterparty exposures, its performance may be significantly impaired if a new counterparty is not found, or only found on less favourable terms). In these cases, the structural mitigants of the criteria focus on the appointment of replacement counterparties, and/or on the provision of collateral that can ultimately be used to find a replacement counterparty once the original counterparty ceases to perform.

Usually termination payments, as other payments due to a derivative counterparty, are senior in a transaction’s priorities of payment. As a consequence, scenarios where such termination payments can arise and burden the transaction need to be considered as part of the rating analysis. Typically, the transaction documentation specifies (for some events of default and termination events) a subordination of termination payments due to the counterparty in the transaction’s priorities of

### Litigation Connected to Lehman Brothers

At the time of writing, litigation connected to the Lehman Brothers bankruptcy is ongoing in the US and UK regarding the validity of contractual subordination of derivative termination payments.

In the event that this litigation overturns the subordination of termination payments as described, the agency would need to assess the legal situation after the ruling.

This could result in a criteria revision and may result in substantial rating actions on transactions in which the counterparty could be subject to bankruptcy proceedings that would overturn subordination of these payments.

In the meantime, Fitch expects this aspect to be addressed by unqualified transaction legal opinions. If such opinions are not provided, Fitch will determine the rating impact for a transaction on a case-by-case basis with the effect that note ratings above the rating of the counterparty may not be possible.



payment, for example if the termination payment is triggered by a bankruptcy or failure to pay by the counterparty. Please note that, at the time of writing, litigation connected to the Lehman Brothers bankruptcy and the validity of such subordination of derivative payments is ongoing (see the box on page 8 for more detail).

Please refer to the sections entitled *Determination of the Termination Payment Amounts* and *Rating Impact of Early Termination Payments* in the "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*" report for a more detailed discussion of derivative termination events, the calculation of termination payments and their impact on Fitch's rating analysis.

## Applying the Criteria to Derivative Contracts

For the purpose of derivative counterparties, Fitch will apply the minimum standard definition of an eligible counterparty detailed above. The minimum remedial actions that the agency expects to be specified in the documentation from the beginning of the transaction usually include:

- posting collateral for the benefit of the transaction in line with Fitch's *Collateralisation Criteria*; or
- for continuation-type derivatives only, finding either (i) an eligible replacement counterparty, or (ii) an unconditional and irrevocable guarantee of the obligations under the derivative contract from an eligible counterparty.

Any costs associated with remedial actions adopted are expected to be borne by the counterparty that becomes ineligible.

- Fitch's criteria represent a minimum standard that it expects in rated transaction structures to address counterparty risk
- Transaction parties may choose to implement standards in excess of the minimum that serve to further protect against potential downgrade due to counterparty risk
- Fitch would highlight standards in excess of its criteria in rating communications

Transaction parties may choose standards that exceed the specified minimum. The provision of collateral from the date of closing on a MtM basis is, for example, an enhanced mitigant as it would ensure availability of the collateral amount independent of downgrade provisions. Therefore, the additional uncertainty involved with potential "jump-to-default" upon or shortly after becoming ineligible, but prior to providing collateral, may be reduced. Similarly, for continuation-type derivatives, the provision of back-up derivative arrangements available from transaction closing, rather than implemented as a remedial action, would also be an enhanced mitigant, since this minimises any risk that no such replacement or guarantor can be found, or can only be found after a protracted period. It therefore reduces the possibility of adverse rating action for the notes, due to the uncertainty that it removes at the time when a counterparty needs to be replaced.

Adoption of either of these enhanced mitigants will be likely to engender greater rating stability with respect to counterparty risk in the transactions that choose to adopt them. Where transactions choose to adopt either of these options, the greater expectation of rating stability with respect to counterparty risk would be highlighted in Fitch's rating communications.

With respect to derivative contracts, Fitch believes that collateralisation is a feasible mitigant. Therefore, the agency expects that a counterparty will have the obligation to implement remedial action within a maximum of 14 calendar days of ceasing to be an eligible counterparty. Without the necessary documentation and procedures in place at or around the transaction closing, this timeframe is, in Fitch's view, not achievable. Hence, the agency expects the credit support documentation (CSA or similar) to be signed, and the collateral accounts opened, at or around closing.

For continuation-type derivatives, Fitch's *Collateralisation Criteria* are primarily intended to address the immediate counterparty exposure. The agency found that "forced" replacement covenants within a short timeframe can rarely be effected in such a limited time for derivative contracts and, as such, provide limited additional


- Collateral posting is likely to be an initial remedy for ineligible derivative counterparties of continuation-type derivatives, as other remedies are unlikely to be capable of being effected within 14 calendar days

comfort. For termination-type derivatives, Fitch's *Collateralisation Criteria* focus on the avoidance of interest shortfalls and allocated losses — rather than loss of future interest due to an earlier repayment caused by early termination of the derivative contract and subsequently the SF transaction.

With respect to continuation-type derivatives only, it is also in line with Fitch's criteria for a guarantor or replacement counterparty to be found within the 14-day period. However, contract novation or guarantor appointment for these derivatives can, in Fitch's experience, often take considerably longer and sometimes more than two months, such that collateralisation is likely to be the only viable option within this short period. Indeed, the agency has found that covenants in the transaction documents that require a replacement/guarantor within a short timeframe can rarely be complied with and therefore provide limited additional comfort. Nevertheless, Fitch believes that contract novation or appointment of a guarantor are the only viable longer term options for a counterparty of a continuation-type derivative with a deteriorating creditworthiness and ideally the search for potential replacements or guarantors begins upon losing eligibility.

- Where counterparties that have become ineligible suffer further downgrade below 'BBB+/F2', the collateral expected to be posted for continuation derivatives increases further to provide additional protection

Specifically, if, upon becoming ineligible, the counterparty's chosen remedial action for a continuation-type derivative is the posting of collateral and the counterparty subsequently suffers a further deterioration below a Short-Term IDR of 'F2' or a Long-Term IDR of 'BBB+' (or where the initial downgrade already took the rating below 'F2' or 'BBB+'), Fitch will expect the collateral amount to be further increased within 14 calendar days to take into account a stressed market environment. Upon additional deterioration — from Fitch's perspective, a further downgrade below investment grade ('BBB-/F3') — the agency expects a replacement or guarantor to be found within 30 days. Pending such replacement or guarantor appointment, the agency expects counterparties to maintain the collateralisation at an adequate level, until a replacement or guarantor can be put in place. In the case of a guarantor, both the guarantee and the legal opinion with respect to it will be reviewed by Fitch to assess the enforceability of the guarantee.

Notwithstanding the remedial actions outlined above, Fitch believes that in instances where derivative arrangements provide for material exposure to one specific entity, a more stringent approach to rating a transaction may be needed. Please refer to the section entitled *Excessive or Undue Counterparty Dependency* below for more detail.

Derivative documentation usually follows the ISDA templates. Understanding and analysing the impact of the specific clauses of the derivative documentation is an essential aspect of Fitch's rating analysis. Therefore, the agency has published "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*" to supplement this criteria report with further details on Fitch's analysis of the impact of the derivative documentation and the *Collateralisation Criteria* included in this report.

## "Esoteric" Derivative Contracts

One of the key assumptions of Fitch's counterparty criteria for continuation-type derivatives is that the ultimate mitigating action, such as finding a replacement counterparty, is capable of being effected within a reasonable timeframe upon the occurrence of a counterparty downgrade. If collateral posting is chosen as a preliminary course of action, the collateral size is based on the replacement cost of the counterparty position. Ultimately, it is assumed that the collateral will be used to enter into a contract substantially on similar terms with an alternative counterparty.

- Fitch expects derivative counterparties to have performed their own assessment regarding their capacity for effecting the remedies — including replacement — both at the time of closing and in a stress scenario

It is the counterparty's obligation to assess at the time of closing whether it would be capable of novating a given derivative contract to another counterparty, both at the time of closing itself and subsequently in times of stress. Fitch needs to be


- In Fitch's view, replacement derivative counterparties are, in principle, available for the majority of derivative contracts, but at increased cost and after a lengthier timeframe for esoteric derivatives
- To reflect this, Fitch's collateral expectations increase for certain derivative categories that are deemed to be esoteric

comfortable for rating purposes that this process can be expected to work effectively. The key variable for the replaceability assessment is the perceived liquidity of a contract. Usually, liquidity decreases with the complexity of structures, often highlighted by extra optionality and/or conditionality embedded within contracts, and increases with the degree of standardisation and simplification of derivative contracts. Often esoteric derivatives may provide significant credit enhancement to SF transactions, which makes these contracts difficult, or at least very costly, to replace if needed, especially in a distressed market environment.

In Fitch's view, replacement counterparties are, in principle, available for the majority of derivative contracts, albeit often at an increased cost and only after an extended timeframe, particularly during a time of stress. But the difficulty in pricing and replacing esoteric derivative contracts will usually result in a higher premium being charged by a replacement counterparty. Therefore, Fitch's collateral criteria provide for higher collateral amounts for such contracts. The definition of what constitutes an esoteric and illiquid contract may vary in practice with the vagaries of the market. For the purpose of its collateralisation criteria, Fitch has, for example, classified those contracts tracking the outstanding amount of assets or liabilities of the transaction (balance guaranteed) and those that reference the standard variable rate of a single institution as esoteric.

Ultimately, if Fitch is not comfortable that the mitigating actions can be implemented if needed for transaction-specific esoteric derivatives, ratings above that of the counterparty may not be possible. Similarly, if the specific derivative structure provides for an excessive dependency on a given counterparty, a cap at the rating of the counterparty may also be applied (please refer to *Excessive or Undue Counterparty Dependency* below for more detail).

For further detail on Fitch's collateralisation criteria for derivatives, please refer to "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*".

## Direct Support Counterparties

- Direct support counterparties such as bank account providers can present a material exposure if holding substantial transaction funds. Collateralisation is typically not an option for mitigation of issuer account bank risk
- However, many direct support exposures are more straightforward in nature than derivatives and should be easier to replace

Direct support counterparties generally provide material direct credit or liquidity support to securitisation transactions. The functions and counterparties include, among others:

- issuer account banks and custodians;
- providers of GICs or other forms of reserve accounts;
- providers or issuers of qualified investments;
- the majority of liquidity facility counterparties, including for ABCP conduits;
- providers or issuers of charged assets in synthetic securitisation transactions; and
- providers of letters of credit, guarantees or bond insurance.

Direct support counterparties could also include bond insurance or similar guarantees, but only to the extent that the rating relies upon them and to the extent the assigned rating is not intended to be of a credit-linked nature. This would therefore typically exclude any security that is guaranteed by a financial guarantor, where the SF transaction is not intended to be isolated. If isolation from the bond insurer/guarantor is, however, intended, Fitch will apply the principles of this criteria, although in such cases it may be challenging to effect remedial actions.

Due to their nature, for example, exposure to issuer account banks, it is sometimes not possible to mitigate direct support counterparty dependency through cash drawdown or collateral arrangements. In such cases, the structural mitigants focus on the legal and operational arrangements and the high credit quality of the


participating counterparties combined with sufficient replacement provisions. The default of a direct support counterparty could have a material impact on a transaction, resulting in the need for strong structural mitigants to address this risk. For example, the default of the issuer account bank just prior to a payment date would usually also result in a default of the SF notes due to a failure to pay interest and the subsequent trapping of the funds in the account bank's administration or insolvency estate. However, many direct support exposures are more straightforward in nature than derivatives and are therefore likely to be more easily replaced in shorter periods.

The direct support counterparty category covers a variety of different functions — therefore, apart from the mitigants of collateral posting and appointment of a replacement counterparty or guarantor mentioned above, additional or alternative structural mitigants tailored to the specific counterparty risk may be needed.

## Applying the Criteria to Direct Support Counterparties

For the purpose of direct support counterparties, Fitch follows the general definition of an eligible counterparty provided above. The remedial actions usually include:

- replacing it with an eligible replacement counterparty;
- finding an eligible guarantor; or
- where feasible, drawing on originally unfunded amounts or on liquidity ("pre-funding") and transferral of the funds to an eligible counterparty. Investments in qualified investments through custodial arrangements may be an alternative (such cases would be addressed by the section entitled *Custodians and Security Trustees*).

- Fitch expects remedial action within 14 calendar days of becoming ineligible for those direct support exposures that can be drawn (eg liquidity facilities)
- Where this is not an option due to the nature of the counterparty role, replacement or guarantee within 30 calendar days is expected

Pre-funding is by its nature not a feasible remedy for all types of direct support counterparty functions. For example, exposure to banks holding transaction accounts can usually not be mitigated through a drawdown (commingling or set-off reserves are an exception, please see below). However, for roles such as liquidity facility providers, the pre-funding mechanism is often utilised as the ultimate replacement can take longer.

Fitch expects that, at transaction closing, the documentation provides for contractual remedies that will be effected within 14 calendar days of the counterparty becoming ineligible if pre-funding or drawdown of unfunded amounts can be used as a remedy, or within 30 calendar days of the counterparty becoming ineligible if pre-funding is not a feasible remedy.

If an issuer elects the pre-funding option to address a direct support counterparty's ineligibility (where this is feasible), the proceeds are expected to:

- be deposited in a segregated account maintained by an eligible account bank, or be invested in qualified investments with appropriate custodial arrangements, and
- be available to be used for liquidity support until the ineligible institution is replaced or until the related debt is repaid in full.

Please note that in case of drawdown or investments in qualified investments, Fitch will apply its collateralisation criteria. In all cases, the downgraded or ineligible counterparty is expected to bear all costs associated with the remedial action and any replacement counterparty is expected to be subject to substantially the same provisions.

Notwithstanding the above, Fitch believes that in instances where the bank account structures or other counterparty arrangements provide for sizeable exposure to one specific entity, a more stringent approach may be needed. Please refer to the


section entitled *Excessive or Undue Counterparty Dependency* below for more detail.

- Trust account structures may mitigate exposure in some jurisdictions. However, some residual risks remain (eg through the imposition of a stay delaying access to cash in the event of receivership)

## Trust Account Structures

Some jurisdictions such as the UK and the US allow for the creation of trust account structures that can isolate bank accounts even if the bank would be subject to insolvency proceedings. This may, in Fitch's view, sufficiently mitigate the credit exposure, but other exposures in the form of operational and liquidity risks may arise, for example, through a "stay" or other obstacles being imposed as a result of a receivership, which prevent timely access to funds or collateral.

If, in such cases, a legal opinion addressing the enforceability of the trust arrangements (with no application of a moratorium), and without any insolvency or bankruptcy carve outs is provided, no further liquidity may be expected. Where legal comfort can only be provided for the effectiveness of the trust arrangements, but not for the non-application of a moratorium and timely access to monies held in the trust arrangements, additional mechanisms such as a liquidity facility or reserve account from a different counterparty may be able to overcome such obstacles. Please refer to the section entitled *Transaction Liquidity*.

- Transaction account banks, reserve accounts and GICs can give rise to "commingling risk" in the event transaction funds are caught in an account bank receivership
- Such counterparties are expected to follow the criteria provisions regarding direct support counterparties

## Transaction Account Banks, Reserve Accounts and GICs

In most SF transactions, funds received from the collateral pool are held in different bank accounts before being released to investors as interest or principal payments. Transaction legal documents may stipulate that these funds can be sent to the bank accounts of the seller/servicer (collection accounts), if payments are not directly paid into the issuer's account, before being transferred into a bank account in the name of the issuer for the benefit of investors (issuer accounts). As a result, depending on the transaction's structure and the legal environment, each of these steps can result in counterparty risk related to the seller/servicer, its bank or the issuer's bank.

In the event of insolvency of any of the parties to the transaction, funds belonging to the issuer may be commingled with the insolvency estate of the defaulted party ("commingling risk"). Fitch classifies the exposure to the issuer account bank as a direct support counterparty, as it cannot be mitigated in the form of collateral, and it falls within the standard Fitch definition of eligible counterparty provided above. Exposure to a collection account bank or a seller/servicer is defined as an indirect support counterparty where the risk is of lesser magnitude and can be mitigated through collateralisation (see *Collection Account Banks*).

Usually reserve accounts, GICs or collateral accounts, for example in support of derivative contracts, are typically held with the issuer account bank and will be subject to the relevant mitigants. Likewise, a different institution chosen for such purpose is expected to be an eligible counterparty as the functions also meet the definition of direct support counterparties. However, reserve or GIC accounts can often provide for sizable exposure to a given counterparty such that exceptions may apply — please refer to the *Excessive or Undue Counterparty Dependency* section below for more detail.

- Generally, liquidity facility providers are expected to follow the criteria provisions regarding direct support counterparties
- ABCP conduits often enjoy full liquidity support and a rating above that of the liquidity provider is generally not achievable

## Specifics for Liquidity Facility Counterparties

Transaction liquidity support may be internal or external. Internal liquidity is generated by the cash flow from the underlying asset portfolio, in the form of interest and principal; internal liquidity can be utilised by match funding assets to liabilities and managing the maturity profile of the debt being issued so that the assets being financed have maturity or payment dates that coincide with or precede the maturity date of the liabilities. Short-term mismatches of interest payments received and interest payments due could be covered by incoming principal proceeds, even though this would impact credit enhancement.



Often, however, liquidity support is provided externally by banks in the form of committed loan agreements, under which the debt issuer may draw funds on a same-day basis to cover interest payments due or, in some instances, to repay maturing debt obligations. In such cases, the SF transactions depend on support from liquidity facilities to ensure timely payment of outstanding debt, to cover mismatched cash flows between the underlying assets and the related debt obligations or to cover instances of cash flow disruptions caused at the seller/servicer level. The notional of these facilities will usually aggregate only to a small proportion of the SF transaction and form only a component of the transaction. For such liquidity facilities, Fitch is comfortable with the standard definition of eligible support counterparties and specific remedial actions.

Other transactions, typically short-term SF debt instruments such as asset-backed commercial paper (ABCP), benefit from significant or even full liquidity support. The facilities typically only supply liquidity and do not bear credit risk. However, some "liquidity facilities" used in these structures are set up to protect against both liquidity and credit risk. In either case, Fitch views that for transactions where significant or full liquidity support is essential from a rating perspective, a short-term or long-term rating, as the case may be, above the short-term rating or IDR of the relevant counterparty as appropriate will usually not be achievable.

## Qualified Investments

The cash flow arrangements in securitisation transactions often mean that collections on the assets are more frequent than the distributions to noteholders. The available short-term surplus liquidity is usually invested in short-term interest-bearing instruments or accounts as a source of some additional income. These investments fall into the indirect support counterparty exposure category only if they are relatively small in size. Sizeable amounts, for example, often present in soft bullet amortisation structures where cash is being accumulated, would fall into the direct support counterparty category or be equivalent to charged assets explained below.

- Transaction cash flows are often invested on a short-term basis in "qualified investments" (eg securities, money market funds or GICs) to generate additional income. These investments are expected to satisfy minimum criteria

Ideally, the qualified investments or accounts are risk free, or as close to risk free as possible. Fitch considers the following instruments as eligible qualified investments:

- Investments in securities: Securities rated at least 'AA-' or 'F1+' where maturities are up to 365 days. For longer maturities, and in cases where the transactions rating is lower than 'AA-', the securities' ratings are expected to be commensurate with the highest note rating.
- Money market funds: Investments in money market funds that maintain the highest money market fund rating from either Fitch or at least two other global rating agencies are also eligible. These provide a source of daily liquidity and have covenanted to investment practices intended to result in a constant 100% net asset value (NAV). Variable net asset value funds may also be eligible if they carry the highest money market fund rating from Fitch or at least two other global ratings agencies. However, as investment in these may result in a minimal principal loss in limited circumstances, Fitch will make a case-by-case decision that will take into account the nature of the SF transactions and the variable NAV fund purpose within the transaction.
- GICs or similar accounts with eligible direct support institutions and associated mitigating mechanisms, such as replacement clauses upon the loss of a minimum creditworthiness.

If qualified investments or investment counterparties carry a long-term and a short-term rating, both the minimum long-term and short-term rating are expected to be met. This would typically apply to cash deposits with financial institutions that carry both a short-term and a long-term rating. However, if the qualified


investment only carries a short-term rating due to its short-term nature, the short-term rating is, from a Fitch perspective, sufficient.

- Qualified investments are generally expected to deliver full principal back prior to interest payment dates to avoid any market risk

In addition to the criteria described above, Fitch expects the following to apply:

- Qualified investments are expected to be due such that the full notional is available for payments when needed, usually before the next payment date on the rated notes. This is to avoid investments having to be liquidated at a discount, resulting in a market value loss to the transaction.
- All qualified investments should return the principal invested in full. "Interest-only" and "principal-only" securities, or any securities for which the principal repayment is subject to volatility, are not considered qualified investments.

Upon downgrade of the qualified investments, they would be subject to replacement only on their due date to avoid any MtM losses caused by early termination. However, early termination would be an option when a third party guarantees to cover any such MtM losses upon the liquidation of the qualified investments. In such a case, the general provisions of eligible direct support counterparties will apply to the guaranteeing entity with a 14 day (if collateral can be used) or 30 calendar day (if collateral is not feasible) remedy period upon becoming ineligible.

Qualified investments will usually be of a very short-term nature and of a high credit quality such that it is reasonable to assume that no, or very limited, impact on the SF transaction can be expected. However, in cases where larger amounts of qualified investments are combined with longer holding periods, the downgrade of a qualified investment may have an impact on the transaction rating. In such instances, specific provisions as explained in *Charged Asset in Funded Synthetic Transactions* and *Excessive or Undue Counterparty Dependency* may be applicable.

## Charged Assets in Funded Synthetic Transactions

- Upon early termination of funded synthetics, charged assets may be delivered in kind or liquidated to repay the notes
- The latter presents supplementary market risk that Fitch would need to analyse and which may prevent a rating unless sufficiently mitigated (eg through a put option at par)

In funded synthetic transactions, the entire note proceeds are usually invested in highly rated, liquid collateral (referred to as a "charged asset") to satisfy protection payments under a credit default swap or similar instrument and timely redemption of the notes. If the transaction ceases to exist (termination type derivative), the purpose of the charged asset is to ensure that the noteholder has no principal loss.

To cover the availability of funds at scheduled maturity, the charged asset usually has an equal or shorter maturity than the securitisation notes. Upon early termination (for example, because of default of the CDS counterparty), the collateral is often delivered in kind to the noteholders. Alternatively, the collateral is liquidated and the proceeds are used to repay the note. If liquidation is chosen, the full repayment is dependent on the market value of the collateral, resulting in market value risk in addition to the credit risk. In extreme cases, where the agency may not be comfortable with the market value risk, this could result in the capping of the SF notes at the counterparty's rating, or may prevent Fitch issuing any rating at all.

Fitch would expect that the collateral guidelines of the transaction should make it likely that collateral can be liquidated at par, whenever an issuer payment becomes due caused by a counterparty default (early termination) or final maturity. Such market value risk can be mitigated by structural protection in the form of a put option at par, an asset swap or a repo agreement. Such agreements are subject to the derivative counterparty risk as per the *Derivatives Counterparties* section above.

Alternatively, overcollateralisation (depending on the liquidity of the collateral), coupled with regular marking-to-market, may also mitigate potential MtM losses on the collateral. However, it should be noted that overcollateralisation is not suitable to cover any negative credit migration in the collateral.


- The rating of funded synthetics will usually be capped at the rating of the charged asset, so note proceeds are usually invested in highly rated securities

In rating terms, the ratings of the notes will be capped at the rating of the charged asset and will, all else being equal, also be downgraded should the charged asset be downgraded. The note proceeds are usually invested in highly rated government bonds or other securities following the principles of the *Qualified Investments* section above, with the securities having ratings commensurate with the rating assigned to the SF notes. Investments in GICs or similar accounts with eligible direct support institutions have also been utilised. However, given the magnitude of counterparty dependency, the analysis as per the section entitled *Excessive or Undue Counterparty Dependency* will apply such that, in the absence of further mitigants, ratings above the account bank provider may not be achievable.

If more than one asset is used as a charged asset, investors are exposed to the risk of default of any of the assets in the collateral pool. Consequently, Fitch will analyse each structure in line with its analysis of first-to-default structures (see the report entitled "*Global Rating Criteria for Single- and Multi-Name Credit-Linked Notes*").

Please refer to the structural risk section in the report entitled *Global Rating Criteria for Synthetic CDOs* for more detail on the charged asset mechanisms, the typical arrangements in synthetic securitisation transactions and Fitch's analysis of the structure.

## Indirect Support Counterparties

- Indirect support counterparties perform ancillary services that usually reflect operational reliance rather than a material credit exposure to the counterparty

Indirect support counterparties are those that perform ancillary, albeit sometimes crucial, roles to the transaction. These include all functions that are not part of the direct support or derivative categories above and in particular:

- collection accounts and other structural elements involving commingling exposure;
- paying and calculation agents; and
- servicers and trustees that do not provide advances or other credit support.

Providers of reserve accounts or funds providing liquidity support are classified as direct support counterparties.

Indirect counterparties are, with a few exceptions, characterised primarily by operational reliance rather than credit exposure. As a result, the standard definition of eligible counterparties does not usually apply to indirect support counterparties, but rather a specific approach focusing on the type of counterparty exposure is warranted. This section will focus on the ancillary functions performed by counterparties and the resulting risks and potential mitigants.

### Collection Accounts and Commingling

- Commingling risk can arise on collection account banks for the period that they usually hold funds, plus the period it would take for the borrowers to pay elsewhere in the event of collection bank default
- Fitch expects collection account banks to meet the definition of an eligible counterparty where exposure is more than two business days

In most SF transactions, funds received from the collateral pool are held in the issuer account bank before being released to investors as interest or principal payments. However, transaction legal documents may also stipulate that funds will initially be received into the bank accounts of the seller/servicer/originator, before being passed on to the issuer's account after a short period. As a result, depending on the transaction's structure and the legal environment, receipt of funds into the initial collection account can result in a counterparty risk exposure related to the seller/servicer/originator, as well as its bank. This is on top of the issuer's own account bank that is classified as a direct support counterparty. In the event of the default or insolvency of any of these parties, funds belonging to the issuer may get commingled with other funds of the insolvent party ("commingling risk").

The commingling risk will vary depending on the potential magnitude and duration of counterparty exposure, with the commingling duration usually depending on the holding period of the funds plus any time needed to allow for borrowers to redirect their payments. Differences will also exist between legal regimes, the underlying



payment pattern of the securitised assets (for example, direct debits or borrower transfers) and the transaction payment structure (for example, trust accounts). Generally, Fitch expects the collection account bank, paying agent or other counterparty as the case may be to meet the standard definition of an eligible counterparty if commingling of funds is permitted by the transaction documents for a period longer than two business days. This will be the case for the majority of collection account banks as notification to borrowers to pay into another account within a two-day period is very unlikely to be possible. Commingling of funds for up to two business days (which would include any notification period) can be supported by those counterparties rated at least 'BBB+/F2', although such a short period including notification is unlikely to be practically achievable.

- In most cases Fitch expects remedies addressing potential commingling to be specified at transaction closing and to be effected within 14 calendar days after becoming an ineligible counterparty
- Counterparties that do not meet the usual eligibility criteria can be utilised in the event that a commingling reserve is in place or adequate supplementary credit enhancement is in place

Fitch expects that, at transaction closing, the documentation provides for contractual remedies that should be effected within 14 calendar days of the counterparty becoming ineligible if the ineligibility is capable of being addressed through the posting of collateral (which would be the case for commingling reserves), or 30 calendar days otherwise. Commingling of funds with non-eligible counterparties can still be appropriate provided the counterparty implements a remedy, for example funding of a commingling reserve with an eligible counterparty, from transaction closing. The remedial actions may include:

- replacing itself with an eligible replacement counterparty: in the context of collection account banks this could mean the notification of the borrowers to pay into a different account held in the name of the SPV with an eligible institution, for example the issuer account bank; or
- finding an eligible guarantor for the commingling amounts; or
- providing a dynamic commingling reserve to cover any potential shortfalls that may arise from commingling of funds, that is held with an eligible counterparty.

At transaction closing, Fitch will assess the provisions for determining a transaction's dynamic commingling reserve based on the estimated commingling duration and the potential commingling amounts. The latter will depend on the interest and principal amounts held in the accounts at the point of commingling plus any payments received during the commingling period. At transaction maturity, such a commingling reserve would usually be returned to the collection account bank if there were no claim. If a commingling reserve is employed, Fitch will analyse the reserve on the basis of its collateralisation criteria. In particular, a legal opinion addressing the enforceability of the commingling arrangements will be expected.

Alternatively, supplementary credit enhancement may be provided to address expected commingling risk at transaction closing, which Fitch will assess to determine whether it believes the amount is sufficient to support a given note rating. However, given the dynamic nature of commingling risk this may not be feasible in all cases.

### Originator Set-Off Exposure

- Set-off risk arises when borrowers have amounts that are owed to them that might be offset against the securitised assets
- Set-off arises in a variety of ways and its validity will depend upon the specific legal situation in individual jurisdictions

Set-off risk typically does not arise from a counterparty function, but arises if the underlying borrowers in a securitisation transaction have the right to "set off" or net their contractual payment obligations against any deposits or other obligations owed to them by the seller/originator following the latter's default or insolvency.

The degree of set-off varies between jurisdictions, asset classes and transaction structures. In some cases, the set-off amounts can accumulate to very substantial amounts if, for example, borrowers have interest-only loans and save towards amortisation through deposits with the same institution. In case of the default or insolvency of the originating bank, the borrower may claim set-off that will effectively reduce the amount of money owed to the bank and subsequently the securitisation transaction. The validity of setting off in this way will depend upon the specifics of the legal regime in the jurisdiction in question. The securitisation



vehicle could be exposed to a shortfall in such circumstances, becoming an unsecured creditor against the defaulting bank.

In certain cases, set-off exposure may be mitigated through a specific legal structure or may not arise due to the specifics of the law. Even if the law rules that set-off is not valid, this does not change the fact that increased borrower default may occur if, for example, the deposits held with the originator were specifically saved for the purpose of repaying the mortgage loan.

Given the jurisdiction-specific nature of set-off, its mitigation is approached on a case-by-case basis, contingent upon the provisions of local law, the specific nature of the set-off exposure and the credit strength of the originator itself. Where material set-off exposure can arise without legal mitigation, Fitch expects mitigants to be incorporated into the transaction documentation that are similar to those used for commingling risk. An eligible counterparty will be expected to document remedial actions that should be effected within 14 calendar days of the counterparty becoming ineligible if collateral can be utilised (which would be the case for set-off reserves), or 30 calendar days otherwise. The remedial actions include:

- Where potentially valid set-off amounts exist and can be collateralised, Fitch expects remedial actions to be effected within 14 calendar days of losing eligibility
- Protection against set-off is expected to be dynamic where set-off amounts can vary over time

- finding an eligible guarantor for the amounts exposed to set-off risk; or
- providing a dynamic set-off reserve to cover any potential shortfalls that may arise from funds exposed to set-off.

In most jurisdictions, the notification of a borrower would crystallise the set-off amount and thereby reduce the dynamic nature of set-off exposure. Should a set-off reserve be employed, Fitch expects that a legal opinion addressing the enforceability of the arrangements will be provided.

Where significant set-off exposure exists towards an ineligible counterparty without legal mitigation, implementation of the remedial action from transaction closing, usually in the form of a dynamic set-off reserve, is expected. Alternatively, supplementary credit enhancement may be provided to address expected set-off risk at transaction closing, which Fitch will assess to determine if Fitch believes it is sufficient to support a given note rating. However, given the dynamic nature of set-off risk, this may not be feasible in all cases.

Set-off risk is in and of itself a complex and jurisdiction-specific topic. Fitch does not discuss this risk in detail in this report, as the main topic of this criteria is to address counterparty risks resulting from derivative and other counterparty exposures. Set-off will be the topic of a more detailed report at a later stage.

## Paying and Calculation Agents, Cash Administration Agents

- Paying, calculation and cash administration agents generally pose no or limited credit exposure, but present an operational risk to the transaction
- Fitch expects such functions to be undertaken by entities with a strong credit profile and proven track record

This section covers the operational transaction parties responsible for calculating the distributions on payment dates (calculation agent), responsible for the actual distribution of the funds to noteholders (paying agent), and/or managing short-term cash investments between payment periods (cash administrator). In many transactions, these roles are often performed by one single entity, but the title of the roles concerned may vary significantly between jurisdictions and asset classes. Often the roles may also be performed by another transaction entity such as the issuer account bank.

Generally, the counterparty exposure is characterised by operational risk rather than credit risk. Although these counterparties perform ancillary functions, the absence of these entities may lead to operational disruption that could in the worst instances result in missed coupon payments. Paying agents sometimes also hold funds for a very short period (usually one or two days); intraday transfers would be preferable and provide for no exposure to a paying agent. Please refer to *Collection Accounts and Commingling* for more detail on Fitch's analysis of commingling risk.


Fitch would expect such roles to be fulfilled by counterparties that have extensive experience and a proven operational track record in the functions they are undertaking. While, for most of these roles, there is no actual credit exposure, and Fitch does not expect specific rating levels for such support agent roles, the agency would still expect that such functions would be undertaken by entities that have a strong credit profile, or are part of a larger group with a strong credit profile, to minimise the likelihood of their default and any disruptions in the event that they might need to be replaced.

Fitch expects that the transaction documentation will also specify the courses of action to be taken, and which entity should take them, if one of the ancillary counterparties ceases to perform its function.

However, in the event that few alternative counterparties are available for the specific role in the relevant market or asset class, or the role being undertaken is more complex than others, which may significantly influence ability to replace, Fitch would expect more specific mitigants on a case-by-case basis, which might include back-up arrangements.

### Servicer and Trustee Advances

- Some RMBS and CMBS structures use servicers and trustees to advance funds to cover delinquencies
- Where such advancing facilities are material to the rating opinion, then Fitch expects that they will be provided by an eligible counterparty

Servicer and trustee advance mechanisms are most frequently seen in US CMBS and some global CMBS transactions, and US RMBS structures. These advances usually cover a borrower's delinquent payment of monthly principal and/or interest, provided the advances are considered to be ultimately recoverable by the servicer/trustee as part of the recovery proceeds. Usually the servicer's advancing obligation is backstopped by the trustee and, in some cases, by the fiscal agent. In the rating context, these advances can have a function similar to liquidity facilities as their main purpose is the avoidance of interest shortfalls on the notes.

In some structures, these advances are not essential for rating purposes as available principal proceeds may provide inherent liquidity. For other structures where principal cannot be used to cover interest shortfalls, where alternative liquidity facilities are not available or where the lack of granularity can mean that in certain periods principal may not be available (eg, often in CMBS), the advances may be essential from a rating perspective to provide for payment of the notes according to their terms and conditions. In such structures, where liquidity support is provided and material to the rating opinion, the same analysis with respect to the liquidity facilities in the *Direct Support Counterparty* section will apply to the agent ultimately responsible for the advancing.

### Custodians and Security Trustees

The role of a custodian or security trustee is to hold the transaction's collateral in trust, for the use and benefit of all present and future debt holders. The exact duties of the custodian or security trustee may vary by transaction. Fitch expects that the custodian or security trustee agreements will specify that the transaction assets are the property of the SPV and not of the custodian or security trustee. This is expected to be addressed in a corresponding legal opinion that opines on the enforceability of the custodial and security arrangements in an insolvency, ie that there will be no disruption to the arrangements, including without limitation the application of a moratorium or stay. In cases where such legal comfort cannot be provided, or is not feasible in a particular jurisdiction, Fitch will view the custodian or security trustee as a direct support counterparty and expect corresponding mitigating arrangements.

## Collateralisation Criteria

Fitch expects that where collateral is posted, it will be in line with the following principles:

- The collateral should be posted for the benefit of the transaction and deposited


with an eligible account bank/custodian legally isolated from the posting counterparty.

- If possible, at transaction closing and in any case upon the actual collateral posting, a legal opinion is provided that addresses the enforceability of the collateral arrangements.
- Any costs associated with the collateral posting and with the appointment of a replacement counterparty or guarantor should be borne by the counterparty that becomes ineligible.
- Depending on the type of collateral, certain advance rates (ARs) may apply. Please refer to *Appendix 2* in the "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*" report and the file entitled "*Fitch's Advance Rates (ARs) for Government Bonds and Currency Risk*" for more detail.

- For termination-type derivatives, collateral covering interest for two coupon periods is usually expected
- For continuation-type derivatives, collateral covering mark-to-market plus a volatility cushion to address potential market value changes during the replacement period and potential variation in pricing between counterparties is typically expected

For derivatives, further specific aspects will apply as described in the "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*" report, but a summary is provided here. As explained above, in case of termination-type derivatives, the contract termination will also end the securitisation transaction. As a result, the focus of the collateralisation criteria is the avoidance of allocated losses — rather than loss of future interest due to an earlier repayment caused by early termination. In particular, any principal and interest payments due up to the point of contract termination should be covered. For the purpose of this criteria, Fitch assumes that two coupon periods (subject to a minimum of six months) will in most cases be sufficient to cover the interest element. The principal aspects are usually covered by the nature of the structure through a charged asset (please see *Charged Assets in Funded Synthetic Transactions* section).

For continuation-type derivatives, Fitch's collateralisation criteria focus on the replacement costs. In addition, the collateralisation criteria provide for an additional element, the volatility cushion (VC), which is intended to cover additional costs. These can arise mainly from MtM movements between the last collateralisation date and the actual replacement date and from pricing differences that may exist between different counterparties. The former is dependent on the assumed replacement timeframe while the latter is mainly influenced by the perceived liquidity of an instrument.

For further detail on Fitch's collateralisation criteria for derivatives as well as VCs and collateral advance rates please refer to "*Counterparty Criteria for Structured Finance Transactions: Derivative Addendum*".

## Other Considerations

- Fitch expects the processes to be followed on a counterparty becoming ineligible to be expressed clearly in documentation
- This includes an alternative party having the responsibility for sourcing the counterparty's replacement in the event the counterparty proves unable to fulfil this responsibility

### Counterparty Capacity, Documentation and Operational Considerations

Any collateral arrangements and replacement assumptions are based on the overarching assumption that, ultimately, the appointment of a replacement counterparty is possible. Fitch expects that a transaction's documentation provides clarity on:

- the processes that will be followed if a counterparty becomes ineligible, which may ultimately lead to the appointment of a replacement counterparty. This includes a specification of the party that is responsible for finding a replacement. In the first instance such responsibility usually lies with the original counterparty, but an alternative party is also expected to be specified in case the original counterparty is not able to replace itself (for example, due to default prior to effecting replacement).
- the coverage of costs that may arise from remedial action. Again, such costs are expected to be borne by the ineligible counterparty.


- particularly in the context of complex derivatives, the process that will be followed if a replacement derivative with an eligible counterparty on substantially the same terms as the original contract terms is not possible.

- Fitch expects counterparties to provide an estimate of the MtM value at the time of closing to help assess whether any excessive credit support is provided by the derivative to the transaction
- Fitch expects details of collateral posted to be included in investor reports

By entering into a counterparty role, the party assumes certain roles and obligations. Derivative contracts are unique in that they can take a very complex form, such that the ongoing monitoring and performance of the contract will require specific operational expertise and will also require the availability of sufficient systems and risk control mechanisms. While both of these can usually be assumed for the major derivative counterparties, they may become obstacles for smaller players with limited expertise in the derivatives market. Also, in certain cases, Fitch would expect to receive legal opinions that address the legal capacity of the counterparty to enter into and perform its derivative obligations.

In addition, Fitch expects that a derivative counterparty will provide an estimate of the MtM of the derivative at or around transaction closing to help assess whether any excessive credit support is provided by the derivative contract at the outset. In the event that collateral is posted during the transaction life, it is expected that details of the collateral amount and the type of collateral posted will be included in the periodic investor reports for an SF transaction.

To assess operational ability in terms of ongoing risk management, Fitch's SF analysts will assess, in conjunction with the relevant financial institution analysts, the nature of the expertise of the financial institution and its ability to fulfil its obligations. In the event that Fitch believes that the proposed counterparty may not have the ability to fulfil the obligation, regardless of whether the proposed counterparty may fulfil other aspects of the agency's criteria, the agency may not be able to assign high investment-grade ratings to the associated SF transaction — or even any rating at all.

## Transaction Liquidity

In Fitch's view, the structural mitigants presented in this report can sufficiently reduce the counterparty exposure to support high investment-grade ratings. However, some mitigants may not be available immediately or may not actually be effected prior to a counterparty failure. For example, for certain trust account arrangements, the legal opinion may not address the timely access to money or assets held within the trust structures. In such situations, Fitch will look for the legal arrangements as set forth in the transaction documentation and the supporting legal opinions to assess whether the available liquidity — independent of the exposed counterparty — is of a sufficient size to cover the possible exposure period.

- Notwithstanding remedies described in this report, certain counterparty exposures could be so excessive for the transaction that they cannot be addressed by remedies
- Examples may include derivatives that have embedded material credit enhancement or structures in which an account bank holds the majority of enhancement for high investment-grade notes
- In such cases, isolation may not be achievable even with structural mitigants, such that ratings above those of the counterparty are not possible

## Excessive or Undue Counterparty Dependency

Certain transaction structures, by their nature, provide for a significant reliance on a single counterparty or group of counterparties and hence need specific consideration beyond the mitigants that have been described in this report. This includes hedging arrangements, often with a large notional, that seek to significantly increase the distributions to the SPV as a means of providing credit enhancement at high investment-grade levels. Other examples would be account bank structures where large sums are held with one bank outside of the trust or security arrangements that may provide protection against the bank's default. This would usually be the case where large cash reserves (often the whole credit enhancement supporting notes rated at high investment-grade levels) are deposited with account banks, in soft bullet amortisation structures or in funded synthetic structures with investments in GICs or other single party dependencies. Fitch will assess in each case whether effective isolation can be achieved, despite the other structural mitigants described in this report.



For derivative contracts, this can mean that limited credit will be given in Fitch's analysis for certain features, such as guaranteed excess spread or coverage of senior expenses, if they offer an excessive benefit contingent on the counterparty. However, the mere presence of guaranteed excess spread or senior cost coverage is in and of itself not a conclusive sign of excessive credit dependency. Rather, Fitch may look at indicators such as the MtM of the derivative as of transaction closing and the degree to which spread payments received from the derivative may exceed the margin received from the asset portfolio. Essentially, Fitch may in such instances analyse the arrangements as if this counterparty contingent benefit, or some of it, would not be available. Notwithstanding, if additional mitigating mechanisms (for example, back-up swap arrangements with an independent counterparty) are available, full credit may still be given to these features.

Similarly, structures where large amounts of cash can be held with one account bank may not, in Fitch's analysis, in the absence of mechanisms in addition to the standard eligible counterparty provisions, be viewed as sufficiently isolated to achieve ratings higher than the counterparty. This could particularly be the case if deposits are held with a financial institution, for example in cash reserve accounts or in soft bullet amortisation structures that aggregate to a material amount. In this context, material means any holdings with an account bank for the longer of (i) 12 months and (ii) one payment period, which are of a magnitude that, under a scenario where the account bank defaults without the protection mechanisms functioning as intended (for example, a so-called "jump-to-default"), the transaction notes rated higher than the counterparty would be expected to be downgraded by 10 notches or more.

- Where (1) account bank structures are such that if the account bank were to default without the minimal structural mitigants being effective, and (2) the transaction notes rated higher than the counterparty could face downgrade by 10 notches or more, then the exposure will be deemed excessive and "isolation" may not achieved

In such instances, Fitch would expect additional comfort with respect to the isolation from the counterparty supported by robust legal opinions, for example the transaction documents could provide that cash is to be invested in government securities held by a custodian or trustee (where any market value risk would also need to be addressed, for example through matched maturities). Day-one guarantees or back-up arrangements from independent third parties may also be an alternative, although these may be difficult and costly to obtain.

Depositing such amounts with a bank with a Support Rating of '1' (when it reflects support from a highly-rated sovereign rather than a parent company) can in some cases also, in Fitch's view, sufficiently mitigate the risk. The agency believes that the risk of loss of deposits in such systemically important banks, upon which the effective functioning of the sovereign's financial system will likely depend, is sufficiently remote to support the highest note ratings, including 'AAA'. This could, for example, be the case in soft bullet amortisation structures with an accumulation period of more than 12 months. However, this alone would typically not be sufficient to address concerns at a high investment-grade level regarding a structure where all credit enhancement was in the form of cash held with the counterparty.

It should be noted that dividing material deposit amounts between several bank account providers may reduce the single entity dependency, but in turn will begin to increase the likelihood of a negative counterparty event occurring for one of these institutions ("first-to-default" risk). Fitch will, in its analysis, assess this risk as well, with the result that the agency may decide that a distribution of material deposit amounts between multiple providers does also not achieve isolation.

Further examples include ABCP programmes that rely on significant or full liquidity and/or credit support. Here, ratings above the IDR of the relevant counterparty will usually not be achievable, as has been described elsewhere.

The examples provided in this section do not provide a fully comprehensive overview. If, in the agency's opinion, a given transaction structure is characterised by an undue reliance on a single counterparty or group of counterparties — and



thereby conflicts with the principle of isolation — ratings may be capped at the rating of the counterparty with the lowest rating, unless additional mitigants are included in the structure. Such assessments will be made on a transaction-specific basis by the relevant rating committee and disclosed in the related rating communication.

- Fitch will describe its analysis of the nature of counterparty risks in its rating communication
- The analysis will include a discussion of the degree to which a transaction is thought to be reliant upon counterparties, including excessive dependency, and mitigants available

## Enhancing Transparency - Explaining Counterparty Risk

Not all counterparty exposure is equal for every transaction and the default of transaction counterparties will have varying degrees of impact on different transactions. Fitch's framework for counterparty criteria recognises the differences in importance and role amongst counterparties (eg, derivative counterparties vs. direct support vs. indirect support counterparties). The "isolation" from counterparties is only achieved if the structural mitigants specified effectively reduce the counterparty risk to a limited residual exposure.

Fitch will provide a description of its analysis of a transaction's counterparty risks in the corresponding presale and new issue reports. The analysis will in each case focus on the degree to which transactions are reliant upon counterparties, the mechanisms available to mitigate the counterparty exposure (if any) and Fitch's conclusions with regard to the potential impact on the ratings. In particular, instances of excessive counterparty dependency will be described, as well as any supplementary provisions that provide additional protection in such cases.

- The principles of these criteria also apply to national scale ratings
- In most cases, Fitch's definition of an eligible counterparty will be converted into a national scale by using the same letter scale

## Application to National Scale Ratings

While this criteria report is aimed primarily at international scale ratings, the principles also apply to national scale ratings. In most cases, Fitch's definition of an eligible counterparty will be converted into a national scale by using the same letter scale. For example, an eligible account bank for a national scale transaction would usually be 'A (national scale)' and 'F1 (national scale)'. However, owing to the specific nature of some local national scale markets, the definition of an eligible counterparty may in some cases deviate from this principle — this will be disclosed in relevant criteria reports relating to the country involved.

The principles of these criteria, for example with respect to remedial actions, collateral posting and the assessment of replaceability, will also apply to national scale ratings but may, in some cases, prove more difficult to achieve. As a consequence it may not be possible for Fitch to assign ratings to the transaction notes above the rating of the relevant counterparty.

It should be noted that, as a consequence of this approach, an exact mapping between national scale and international scale ratings is not achievable for SF ratings. For example, a counterparty may be in line with the rating criteria for the national scale, but not with the criteria for an international scale rating. As a result, the international scale note ratings could be capped at the international scale rating of the counterparty, while the national scale note ratings could exceed the counterparty's national scale rating.


## Appendix

### Summary of Fitch's Eligible Counterparty Definition

| Highest notes' rating | Minimum counterparty rating | Minimum counterparty rating with collateral from transaction closing |
|---|---|---|
| 'AA-' or better | 'A' and 'F1' | 'BBB+' and 'F2' |
| 'A+' or lower | 'BBB+' and 'F2' | 'BBB-' and 'F3' |
| 'BBB+' or lower | Counterparty's IDR to be as good as highest rated notes | 'BBB-' and 'F3' |

Source: Fitch

The above table summarises the definition of an eligible counterparty, depending on the minimum Fitch ratings to be maintained, given the rating of the highest-rated notes.

Unrated strategically important subsidiaries of eligible parent institutions may be eligible, provided the structural mitigants are applied to the parent entity and additional mechanisms addressing the potential for a change in the ownership structure are included (typically ownership of less than 100% will trigger the ineligibility). Unrated non-strategically important subsidiaries of rated entities may also be eligible provided they benefit from an unconditional and irrevocable guarantee of the eligible parent entity and the structural mitigants are applied to the guarantor/parent entity.


ALL FITCH CREDIT RATINGS ARE SUBJECT TO CERTAIN LIMITATIONS AND DISCLAIMERS. PLEASE READ THESE LIMITATIONS AND DISCLAIMERS BY FOLLOWING THIS LINK: HTTP://FITCHRATINGS.COM/UNDERSTANDINGCREDITRATINGS. IN ADDITION, RATING DEFINITIONS AND THE TERMS OF USE OF SUCH RATINGS ARE AVAILABLE ON THE AGENCY'S PUBLIC WEB SITE AT WWW.FITCHRATINGS.COM. PUBLISHED RATINGS, CRITERIA, AND METHODOLOGIES ARE AVAILABLE FROM THIS SITE AT ALL TIMES. FITCH'S CODE OF CONDUCT, CONFIDENTIALITY, CONFLICTS OF INTEREST, AFFILIATE FIREWALL, COMPLIANCE, AND OTHER RELEVANT POLICIES AND PROCEDURES ARE ALSO AVAILABLE FROM THE CODE OF CONDUCT SECTION OF THIS SITE.

Copyright © 2009 by Fitch, Inc., Fitch Ratings Ltd. and its subsidiaries. One State Street Plaza, NY, NY 10004.Telephone: 1-800-753-4824, (212) 908-0500. Fax: (212) 480-4435. Reproduction or retransmission in whole or in part is prohibited except by permission. All rights reserved. All of the information contained herein is based on information obtained from issuers, other obligors, underwriters, and other sources which Fitch believes to be reliable. Fitch does not audit or verify the truth or accuracy of any such information. As a result, the information in this report is provided "as is" without any representation or warranty of any kind. A Fitch rating is an opinion as to the creditworthiness of a security. The rating does not address the risk of loss due to risks other than credit risk, unless such risk is specifically mentioned. Fitch is not engaged in the offer or sale of any security. A report providing a Fitch rating is neither a prospectus nor a substitute for the information assembled, verified and presented to investors by the issuer and its agents in connection with the sale of the securities. Ratings may be changed, suspended, or withdrawn at anytime for any reason in the sole discretion of Fitch. Fitch does not provide investment advice of any sort. Ratings are not a recommendation to buy, sell, or hold any security. Ratings do not comment on the adequacy of market price, the suitability of any security for a particular investor, or the tax-exempt nature or taxability of payments made in respect to any security. Fitch receives fees from issuers, insurers, guarantors, other obligors, and underwriters for rating securities. Such fees generally vary from US$1,000 to US$750,000 (or the applicable currency equivalent) per issue. In certain cases, Fitch will rate all or a number of issues issued by a particular issuer, or insured or guaranteed by a particular insurer or guarantor, for a single annual fee. Such fees are expected to vary from US$10,000 to US$1,500,000 (or the applicable currency equivalent). The assignment, publication, or dissemination of a rating by Fitch shall not constitute a consent by Fitch to use its name as an expert in connection with any registration statement filed under the United States securities laws, the Financial Services and Markets Act of 2000 of Great Britain, or the securities laws of any particular jurisdiction. Due to the relative efficiency of electronic publishing and distribution, Fitch research may be available to electronic subscribers up to three days earlier than to print subscribers.