UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| In re:<br><br>LEHMAN BROTHERS HOLDINGS, INC., et al.<br><br>    Debtors. | Chapter 11<br><br>Case No. 08-13555 (JMP) |
| LEHMAN BROTHERS SPECIAL FINANCING INC.,<br><br>    Plaintiff,<br><br>  - against -<br><br>BNY CORPORATE TRUSTEE SERVICES LIMITED,<br><br>    Defendant. | Adv. Proc. No. 09-01242 (JMP) |

## REPLY MEMORANDUM OF LAW OF
## BNY CORPORATE TRUSTEE SERVICES LIMITED
## IN FURTHER SUPPORT ITS MOTION FOR SUMMARY JUDGMENT

REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450
 Eric A. Schaffer
 Michael J. Venditto
 David M. Schlecker

*Attorneys for BNY Corporate Trustee
Services Limited*

Dated: November 9, 2009

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

ADDITIONAL FACTUAL BACKGROUND .................................................................... 3

    The High Court Judgment .............................................................................................. 5

    Judgment of the Court of Appeal .................................................................................. 6

I.    LBSF CANNOT USE THE BANKRUPTCY CODE TO REVERSE THE PREPETITION EFFECTIVENESS OF NOTEHOLDER PRIORITY AND CONDITION 44. .......................................................................................................... 9

    A.    Noteholder Priority and Condition 44 Governed the Parties' Rights on the Date of LBSF's Chapter 11 Petition ..................................................... 9

    B.    Sections 365(e)(1)(B) and 541(c)(1) Cannot Reverse the Pre-Petition Change of Priority ............................................................................... 11

II.    THIS COURT SHOULD DEFER TO THE ENGLISH COURT'S DETERMINATIONS ON ISSUES OF ENGLISH LAW ............................................... 17

    A.    Principles of Comity Require Recognition of the English Judgment ................... 18

    B.    *Res Judicata* Precludes Relitigation of Issues Decided by the English Courts ................................................................................................................. 23

    C.    Even Without Giving *Res Judicata* Effect under the Doctrine of Comity, this Court should Follow the Decision of the English Court ............................... 26

III.    NOTEHOLDER PRIORITY AND CONDITION 44 ARE ENFORCEABLE IN ACCORDANCE WITH SECTION 510(a) ................................................................. 26

    A.    Section 5.5 and Condition 44 are Subordination Agreements Entitled to Enforcement Under Section 510(a) ..................................................................... 27

    B.    Sections 365(e)(1) and 541(c)(1)(B) Cannot Nullify Rights Protected By Section 510(a) ................................................................................................... 29

IV.    SECTION 560 OF THE CODE PROTECTS THE EXERCISE OF RIGHTS UNDER SECTION 5.5 AND CONDITION 44 ............................................................. 33

    A.    Section 5.5 and Condition 44 are Swap Agreements Within the Meaning of Section 101(53B) .......................................................................................... 33

      B.     Congress Created Broad Protections for Swap Agreements....................................38

V.    IF THE TRUSTEE'S MOTION IS DENIED, THE COURTS MUST CONDUCT
       FURTHER HEARINGS TO DETERMINE HOW TO PROCEED..................................40

CONCLUSION...........................................................................................................................43

# TABLE OF AUTHORITIES

**Cases**                                                                  **Page**

Ackerman v. Ackerman,
517 F.Supp. 614 (S.D.N.Y. 1981), *aff'd*, 676 F.2d 898 (2d Cir. 1982) ............................ 17, 18

Alfadda v. Fenn,
966 F.Supp. 1317 (S.D.N.Y. 1997) .................................................................................. 17, 18

Allied Bank Int'l v. Banco Credito Agricola De Cartago,
757 F.2d 516 (2d Cir. 1985).................................................................................................. 22

Alpert's Newspaper Delivery Inc. v. The New York Times Co.,
876 F.2d 266 (2d Cir. 1989).................................................................................................. 25

Am. Home Mortgage Holdings, Inc. v. Lehman Brothers Inc.
(In re Am. Home Mortgage Holdings, Inc.),
388 B.R. 69 (Bankr. D. Del. 2008) ....................................................................................... 39

Bulova Watch Co. v. United States,
365 U.S. 753 (1961)............................................................................................................... 29

Butner v. United States,
440 U.S. 48 (1979)............................................................................................................. 9, 19

Cervantes-Ascencio v. United Stated I.N.S.,
326 F.3d 83 (2d Cir. 2003).................................................................................................... 13

Chase Manhattan Bank, N.A. v. Celotex Corp.,
56 F.3d 343 (2d Cir. 1995).................................................................................................... 24

Colonial Bank v. Worms,
550 F.Supp. 55 (S.D.N.Y. 1982)........................................................................................... 20

Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.),
136 B.R. 636 (Bankr. S.D.N.Y. 1992) .................................................................................. 10

Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.,
No. 08 Civ. 9565 (DLC), 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) ............................ 36

Cousins v. Duane St Assocs.,
No. 00-7580, 2001 WL 327084 (2d Cir. Apr. 2, 2001) ........................................................ 25

Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc.,
233 F.3d 697 (2d Cir. 2000)................................................................................................... 25

Departmental Disciplinary Comm. for the First Judicial Dep't v. Shapiro
(In re Friedman & Shapiro, P.C.),
185 B.R. 143 (S.D.N.Y. 1995)............................................................................................... 29

Enron Corp. v. UBS AG (In re Enron Corp.),
2005 WL 3873897 (Aug. 10, 2005) (Bankr. S.D.N.Y.) ........................................................ 38

# TABLE OF AUTHORITIES
## (Continued)

| Cases | Page |
|---|---|

Films by Jove, Inc. v. Berov,
250 F.Supp.2d 156 (E.D.N.Y. 2003) ................................................................. 22

Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.,
--- U.S. ---, 128 S. Ct. 2326 (2008) ................................................................. 9

Galloway v. United States,
492 F.3d 219 (3d Cir. 2007).............................................................................. 12

GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.),
336 B.R. 843 (S.D. Fl. 2005) ........................................................................... 28

Gozlon-Peretz v. United States,
498 U.S. 395 (1991).......................................................................................... 13

Hartford Underwriters v Union Planters Bank (In re Hen House),
530 U.S. 1 (2000).................................................................................... 14, 16

Hilton v. Guyot,
159 U.S. 113 (1895).............................................................................. 18, 21, 23

HSBC Bank USA v. Branch (In re Bank of New England Corp.),
364 F.3d 355 (1st Cir. 2004)........................................................... 27, 29, 32

Hutson v. E.I du Pont de Nemours and Co. (In re Nat'l Gas Distribs., LLC),
556 F.3d 247 (4th Cir. 2009) ........................................................................... 39

In re Amcor Funding Corp.,
117 B.R. 549 (Bankr. D. Ariz. 1990)............................................................... 16

In re Amsterdam Ave. Development Associates,
103 B.R. 454 (Bankr. S.D.N.Y. 1989).............................................................. 14

In re B-E Holdings, Inc.,
228 B.R. 414 (Bankr. E.D. Wis. 1999) ............................................................ 20

In re Best Products Co., Inc.,
168 B.R. 35 (Bankr. S.D.N.Y. 1994)................................................................ 27

In re C.A.F. Bindery, Inc.,
199 B.R. 828 (Bankr. S.D.N.Y. 1996).............................................................. 30

In re Hashim,
213 F.3d 1169 (9th Cir. 2000) ......................................................................... 20

In re Higgins,
270 B.R. 147 (Bkrtcy. S.D.N.Y. 2001)............................................................. 16

# TABLE OF AUTHORITIES
## (Continued)

| Cases | Page |
|---|---|

*In re Maxwell Comm. Corp.*,
93 F.3d 1036 (2d Cir. 1996) ........................................................................ 20

*In re Seven Stars Restaurant, Inc.*,
122 B.R. 213 (Bankr. S.D.N.Y. 1990) ....................................................... 10, 11

*Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd)*,
240 B.R. 195 (Bankr. S.D.N.Y. 1999) ......................................................... 34

*Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd.*,
909 F.2d 698 (2d Cir. 1990) ........................................................................ 15

*Jamaica Shipping Co. v. Orient Shipping Rotterdam
(In re Millennium Seacarriers)*,
354 B.R. 674 (Bankr. S.D.N.Y. 2006) ......................................................... 20

*Koons Buick Pontiac GMC, Inc. v. Nigh*,
543 U.S. 50 (2004) ....................................................................................... 13

*LaMonica v. N. of Eng. Protecting & Indemn. Ass'n Ltd. (In re Probulk Inc.)*,
407 B.R. 56 (Bankr. S.D.N.Y. 2009) ........................................................... 20

*Official Comm. of Unsecured Creditors of Operation Open City
v. New York State Dep't of State (In re Operation Open City)*,
170 B.R. 818 (S.D.N.Y. 1994) ..................................................................... 13

*Petition of Brierley*,
145 B.R. 151 (Bankr. S.D.N.Y. 1992) ......................................................... 42

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
109 F.3d 850 (2d Cir. 1997) ........................................................................ 22

*Stoltz v. Brattleboro Housing Authority (In re Stoltz)*,
315 F.3d 80 (2d Cir. 2002) .......................................................................... 29

*Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (In re Holly's, Inc.)*,
140 B.R. 643 (Bankr. W.D. Mich. 1992) ..................................................... 28

*Union Sav. Bank v. Augie/Restivo Baking Co., Ltd.
(In re Augie/Restivo Baking Co., Ltd.)*,
860 F.2d 515 (2d Cir. 1988) ........................................................................ 15

*United Sav. Assn. of Tex. V. Timbers of Inwood Forest Associates, Ltd.*,
484 U.S. 365 (1988) ..................................................................................... 13

**Cases**                                                       **Page**

United States Lines v. Am. Steamship Owners Mut. Protection &
   Indemn. Assoc. (In re United States Lines, Inc.),
   197 F.3d 631 (2d Cir. 1999) ............................................................. 20

United States v. Ron Pair Enterprises, Inc.,
   489 U.S. 235 (1989) ......................................................................... 14

Vedatech K.K. v. Crystal Decisions, Inc.,
   No. 03-4578, 2009 WL 1151778 (N.D. Cal. Apr. 28, 2009) ............ 20

Voreep v. Tarom Romanian Air Transport,
   No. 96-1384, 1999 WL 311811 (S.D.N.Y. May 18, 1999) ......... 23, 24

Wachovia Bank, N.A. v. United States,
   455 F.3d 1261 (11th Cir. 2006) ....................................................... 12

Welzel v. Advocate Realty Invs., LLC (In re Welzel),
   275 F.3d 1308 (11th Cir. 2001) .................................................. 14, 16

## STATUTES, RULES, AND LEGISLATIVE MATERIAL

11 U.S.C. § 101(53B) ........................................................... 34, 38

11 U.S.C. § 106 ............................................................................. 13

11 U.S.C. § 301(a) ........................................................................ 14

11 U.S.C. § 362(a)(3) .................................................................... 11

11 U.S.C. § 362(b)(17) ............................................ 34, 38, 39, 40

11 U.S.C. § 365(e)(1) ............................................................. passim

11 U.S.C. § 506(b) ........................................................................ 14

11 U.S.C. § 510(a) ................................................................. passim

11 U.S.C. § 525 ............................................................................. 30

11 U.S.C. § 525(b)(2) .................................................................... 14

11 U.S.C. § 541(a)(1) ...................................................................... 9

11 U.S.C. § 541(c)(1) ............................................................. passim

11 U.S.C. § 560 ...................................................................... passim

# TABLE OF AUTHORITIES
### (Continued)

## OTHER REFERENCES

                                                                          Page

Bryan A. Garner, BLACK'S LAW DICTIONARY (7th ed. 1999) ........................................ 28

CHITTY ON CONTRACTS, Common Law Library, Vol. I (13th ed.) ............................................. 37

COLLIER ON BANKRUPTCY, .......................................................................................... 27

H.R. Rep No. 101-484, 1990 U.S.C.C.A.N. 223 (1990) ............................................ 39

H.R. Rep No. 109-31 (2005) ................................................................................... 40

H.R. Rep No. 109-648, 109th Cong., 2d Sess. (2006) ............................................. 40

Leech, Geoffrey and Svartrik, Jan *A Communicative Grammar of English,* 2d Ed., London: Longman (1994) ¶¶ 473, 474 at 237-38 ........................................................... 15

Nelson, Gerald *English: An Essential Grammar,* London: Routledge (2001) ¶ 2.10 at 75 .......... 15

**TO THE HONORABLE JAMES M. PECK**
**UNITED STATES BANKRUPTCY JUDGE:**

Defendant BNY Corporate Trustee Services Limited (the "Trustee"), by its undersigned

counsel, respectfully submits this Reply Memorandum of Law in further support of the Trustee's

motion for summary judgment seeking dismissal of this adversary proceeding, which was

initiated by Lehman Brothers Special Financing Inc. ("LBSF"), and (i) in reply to LBSF's

Memorandum of Law in Opposition to BNY Corporate Trustee Services Limited's Motion for

Summary Judgment [Dkt. No. 68] (hereinafter the "LBSF Memo"); and, (ii) in response to the

Statement of the Official Committee of Unsecured Creditors in Support of Debtor's Motions for

Summary Judgment and in Opposition to BNY Corporate Trustee Services Limited's Motion for

Summary Judgment [Dkt. No. 72] (hereinafter the "Committee Memo").[1]

## INTRODUCTION

The threshold issue in this adversary proceeding, as posited by the Trustee in its Motion,

is: "what interests did LBSF hold when it filed its bankruptcy petition?" The answer to that

question has come into sharp focus with the November 6, 2009, unanimous judgment of the

English Court of Appeal (the "Court of Appeal") affirming the holding of the High Court.[2] In

doing so, the Court of Appeal ruled that:

> Noteholder Priority automatically replaced Swap Counterparty Priority and
> Condition 44.2 automatically replaced Condition 44.1 on (or shortly after) that
> date [September 15, 2008], which, crucially, was before LBSF filed for Chapter
> 11.

---

[1]     Capitalized terms not defined herein have the meaning ascribed to those terms in the Memorandum of Law in Support of Motion for Summary Judgment of BNY Corporate Trustee Services Limited (the "Trustee's Memorandum") [Dkt. No. 61].

[2]     A copy of the Judgment of the Court of Appeal, dated November 6, 2009, in the appeal entitled *"Perpetual Trustee Co. Ltd. & Anor v. BNY Corporate Trustee Services Ltd & Anor."* (hereinafter the *"Perpetual Appeal"*) is annexed as Exhibit "A" to the supplemental affirmation of Michael Venditto ("Venditto Supp. Aff."), which is submitted herewith.

Judgment of the Court of Appeal ¶ 74 (Neuberger, MR).[3]

The Court of Appeal unanimously dismissed LBSF's appeal of the High Court's Judgment, eliminating any doubts as to the interpretation of the Transaction Documents and the limited extent of the rights LBSF held when it filed its bankruptcy petition on October 3, 2008. In opposing the Trustee's Motion in this Court, both LBSF and the Committee attacked the ruling of the High Court as contrary to English law and as effecting an impermissible, post-petition change in LBSF's interests.[4] With this decision in *Perpetual Appeal*, however, there cannot be any doubt as to English law or the time when Noteholder Priority and subordination under Condition 44 took effect.[5]

LBSF and the Committee cannot dispute the fundamental principle that a debtor's property interests at the time a case is commenced are determined under applicable non-bankruptcy law at the time of its petition. Now that the nature and extent of LBSF's interest on its petition date has been determined conclusively under applicable English law in a judicial proceeding in which LBSF participated voluntarily, the limited nature and scope of LBSF's interest under the Transaction Documents cannot be disputed. Nothing in LBSF's subsidiary

---

[3]     This citation is to the portion of the leading judgment written by the Master of the Rolls, in which Lord Justice Longmore expressly agreed (*see* Judgment of the Court of Appeal ¶ 99), and in which Lord Justice Patten concurred ("I agree with the order proposed by the Master of the Rolls but, because of the general interest of these appeals and the importance of the issues which they raise, I add some observations of my own.") (*see* Judgment of the Court of Appeal ¶ 111). The Master of the Rolls, Lord Neuberger of Abbotsbury, is the third most senior judge in England and Wales, after the President of the Supreme Court of the United Kingdom and the Lord Chief Justice.

[4]     The Committee, for example, asserts: "Here, BNY attempts to modify LBSF's property interests pursuant to Clause 5.5 and Condition 44 as a result of LBSF's bankruptcy filing." Committee Memo ¶ 17. Of course, the Trustee did not attempt to modify anyone's rights. LBSF brought this action to prevent Perpetual from pursuing claims against Collateral in which LBSF and Perpetual have interests.

[5]     Although LBSF has requested that the Court of Appeal grant LBSF permission to appeal to the Supreme Court of the United Kingdom, there has not yet been a ruling on that request. Under English law, an application for permission to appeal must be made first to the Court of Appeal; an application to the Supreme Court may be made only if the court below has refused to grant permission to appeal. Rule 10(2) of the Supreme Court Rules 2009.

arguments reverses or affects the consequences of the ruling that Noteholder Priority and Condition 44 were effective when LBSF filed its Chapter 11 petition.

Similarly, LBSF's assertion that Section 5.5 and Condition 44 are not enforceable as subordination provisions is inconsistent with the ruling of the Court of Appeal. Delivering the leading judgment, the Master of the Rolls found them to be subordination provisions: "LBSF had to rank behind, rather than ahead of, the Noteholders, no doubt because it was those Noteholders whose money had been used to purchase the collateral." Judgment of the Court of Appeal ¶ 63 (Neuberger, MR).

Finally, LBSF's argument that Section 5.5 and Condition 44 are outside the "safe harbors" for derivatives is unsupported by the Bankruptcy Code or legislative history. The tortured interpretation offered by LBSF would treat the safe harbors as meaningless surplusage. This Court should not adopt a statutory interpretation that would undo repeated congressional efforts to create a meaningful safe harbor for financial contracts.

In light of the Judgment of the Court of Appeal, this Court need not consider the subordination and safe harbor arguments. With the affirmance of the Chancellor's ruling, LBSF's arguments in opposition to the Trustee's Motion fail.

For these reasons, and as discussed below, this adversary proceeding should be dismissed.

## ADDITIONAL FACTUAL BACKGROUND

The common focus of this adversary proceeding and the English Action is the competing claims of LBSF and Perpetual under the Transaction Documents to receive the proceeds to be

realized from the Collateral held by the Trustee.[6]  This Court has already recognized the issues associated with simultaneous litigation proceeding in two different countries with regard to the interpretation of the Transaction Documents.  At the August 11, 2009, oral argument on the Trustee's motion to dismiss or stay this adversary proceeding, this Court said:

> I'm sensitive to the issues of comity and cooperation and coordination that have been discussed throughout the argument.  But I also recognize that the only rational outcome here that makes good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal if not exclusive decider of issues relating to U.S. bankruptcy law.  And similarly, it makes sense for the High Court in London to be the principal if not exclusive decider of issues of English law.  I think it's very difficult for rational and fair-minded people to disagree with that proposition.

Hearing Transcript 69:14-23 (August 11, 2009) (Venditto Supp. Aff., Exh. C).

Despite this Court's guidance, LBSF and the Committee devoted substantial portions of their opposition papers to challenging the High Court's determination of English law.  By way of example, LBSF offered the declaration of Gerard McCormack to support its contention that no deference should be accorded to the High Court's ruling.  The subsequent decision from the Court of Appeal – rejecting LBSF's arguments and affirming the Judgment of the High Court – obviates consideration of this attack on the High Court's Judgment.

LBSF raised many of the issues presented here in its appeal in England, and this Court now has the benefit of a detailed ruling on the English law issues from an English court which, as this Court has recognized, should be "the principal if not exclusive decider of issues of

---

[6]     The Trustee has no beneficial interest in the Collateral other than to recover its fees and expenses in accordance with the governing documents, and it is entitled to reimbursement of such fees and expenses regardless of whether Swap Counterparty Priority or Noteholder Priority is controlling.  The Collateral is held in England and Australia.  Perpetual is the Australian trustee for individual investors and is the sole holder of synthetic portfolio notes issued by Saphir Finance Public Limited Company ("Saphir"), an Irish company organized by Lehman Brothers International (Europe) ("LBIE"), to act as an issuer.  The repayment of these notes is secured by the Collateral and contract rights that are held by BNY as trustee.  See Second Witness Statement of Anna Patricia O'Sullivan ("O'Sullivan") ¶¶ 28-29, submitted to the High Court in the *Perpetual* litigation, a copy of which is annexed to the Venditto Supp. Aff. as Exhibit B.

English law." Id. Because the decision from the English Court of Appeal determines the non-bankruptcy law issues that are the point of departure for this Court's analysis of the bankruptcy issues in this adversary proceeding, it is useful to highlight the most significant portions of the Judgment of the Court of Appeal.

**The High Court Judgment**

On July 28, 2009, the Chancellor issued his Judgment in which he held, *inter alia*, that Noteholder Priority became effective automatically on September 15, 2008, when LBHI (the Credit Support Provider under the Derivative Agreements to which LBSF was Swap Counterparty) filed its Chapter 11 petition. See Judgment ¶¶ 24, 49 ("Accordingly I do not think there can be any doubt that an event of default, as defined, arose on 15th September 2008, Lehman BSF was the defaulting party in respect of it and that that was an event other than the insolvency of Lehman BSF."). (Venditto Aff. as Ex. 7).

In so holding, the Chancellor expressly rejected LBSF's argument that Noteholder Priority became effective only upon termination of the swap transactions. See Judgment ¶ 52. LBSF argues in the High Court that, because the Notices of Early Termination of the swap agreements identified the bankruptcy filing of LBSF as the event of default triggering Saphir's right to terminate the swaps and causing Noteholder Priority to become effective, the LBHI bankruptcy filing had no effect upon the parties' rights. The Chancellor explicitly rejected LBSF's argument and held that Noteholder Priority became effective independently of the early termination of the swap transactions and was not a function of the swap default referenced in the Notices of Early Termination:

> I do not accept [LBSF's] submission. The security may become enforceable under clause 5.5 of the [Supplemental] Trust Deed otherwise than on the termination of the swap agreement. Had it been intended that the priorities should depend on any such termination, clause 5.5 of the Supplemental Trust Deed could easily have so provided. Plainly the event of default sufficient to trigger clause

5.5 of the Supplemental Trust Deed must precede the termination of the swap agreement. I see no reason why . . . Perpetual . . . should not be entitled to rely on the event of default constituted by Lehman Brothers Holdings Inc filing for Chapter 11 protection as triggering clause 5.5 of the Supplemental Trust Deed.

Judgment ¶ 55.

### Judgement of the Court of Appeal

In opposing the Trustee's motion for summary judgment, LBSF dismissed the High Court's finding as to the effect of LBHI's filing as *dicta*. LBSF took a completely opposite position, however, when it asked the English Court of Appeal to reverse this finding. See Notice of Appeal ¶ 3(10); Skeleton Argument on Behalf of the Appellant/Second Defendant Lehman Brothers Special Financing Inc. to Court of Appeal ¶¶ 23, 30, annexed as Exhibits D and E, respectively, to the Venditto Supp. Aff.[7]

In rejecting LBSF's argument, the Master of the Rolls explicitly found that the LBHI bankruptcy filing – and not the subsequent swap terminations – was the event that triggered Noteholder Priority and Condition 44:

> I do not consider that the rule [against deprivation] would have been engaged in the present case, because the triggering event was LBHI filing for Chapter 11 which occurred on 15 September 2008, some 18 days before LBSF filed for Chapter 11. As it is common ground that filing for Chapter 11 is for the purposes of the rule equivalent to the making of a winding up order, the deprivation occurred before, not on or after, the liquidation or its equivalent.

---

[7]     In the leading judgment of the Court of Appeal, the Master of the Rolls described the Chancellor's ruling and LBSF's argument as follows:

> 22.     LBSF contended that Perpetual and Belmont, as Noteholders, were not entitled to rely on these Events of Default as triggering Noteholder Priority under clause 5.5, or triggering Condition 44.2, as this would fall foul of the rule. This argument was rejected by the Chancellor on two grounds. First, he held that, even if the triggering event had been the Chapter 11 filing by LBSF, there would have been nothing to which the rule applied; secondly, he held that, even if that was wrong, as the Event of Default which effected the trigger was the Chapter 11 filing by LBHI, which preceded the administration of LBSF, so the rule did not apply.

Judgment of the Court of Appeal ¶ 69 (Neuberger, MR). LBSF cannot dismiss this ruling as

*dicta* because the Court of Appeal expressly adopted the Lord Chancellor's determination on this

critical point:

> 21.    As to the facts giving rise to the dispute, I gratefully adopt the
> Chancellor's summary of them (in a slightly modified form) as regards Saphir I:
>
> (1)  On 15 September 2008, LBHI filed for Chapter 11. As it was specified
> in Clause 10(iv) of the Swap Confirmation as the Credit Support Provider
> of LBSF, the filing constituted an Event of Default for the purposes of the
> swap agreements, by virtue of clause 5(a)(vii)(4) of the ISDA. Prima facie,
> that event gave rise to Noteholder Priority and triggered Condition 44.2.
>
> (2)  From 15 September 2008, interest payments due under the Notes were
> not paid on their respective due dates and remain unpaid. Such non-
> payment also, at least prima facie, constituted an Event of Default by virtue
> of Condition 10 in Part C of Schedule 2 to the PTD.
>
> (3)  On 3 October 2008 LBSF filed for Chapter 11. Such filing also
> constituted an Event of Default for the purposes of the swap agreements,
> and, prima facie, gave rise to Noteholder Priority and triggered Condition
> 44.2.

Id. ¶ 21 (Neuberger, MR).

LBSF and the Committee try to obscure an important distinction made by the English

courts in their respective rulings. The English courts determined that Noteholder Priority and

Condition 44 became effective ***automatically upon and independently of*** the early termination

of the swap transactions. By repeatedly referring to subsequent Notices of Early Termination of

the swap agreements, LBSF and the Committee seek to blur this crucial distinction and

undermine the English court's rulings. The swap terminations are simply irrelevant for purposes

of the English courts' decisions, based as they are on the consequences of the September 15,

2008 defaults.

Moreover, as determined by the Court of Appeal, no property right or interest of LBSF

was lost or alienated as a result of the September 15, 2008, "waterfall flip." LBSF's interests in

the Collateral held by the Trustee were contractually subordinated in accordance with the parties'
agreement:

> 62.    The effect of the "flip" provisions was thus not to divest LBSF of monies,
> property, or debts, currently vested in it, and to revest them in the Noteholders,
> nor even to divest LBSF of the benefit of the security rights granted to it. It was
> merely to change the order of priorities in which the rights were to be exercised in
> relation to the proceeds of sale of the collateral in the event of a default. Further,
> as Mr Moss QC, for Perpetual, and Mr Salter QC, for Belmont, pointed out, the
> right granted to LBSF was a security right over assets purchased with the
> Noteholders' money, and, from the very inception, the priority, and the extent of
> the benefits, enjoyed by LBSF in respect of the security were contingent upon
> there being no Event of Default. Thus, the security rights, as granted to LBSF,
> included the "flip" provisions, and even at the date the "flips" operated, the
> priority enjoyed by LBSF was no more than a contingent right. As Patten LJ
> points out in his judgment, the effect of the "flip" provisions in clause 5.5 and
> Condition 44.2 is merely to ensure that, as far as possible, the proceeds of sale of
> the collateral are used to repay the Noteholders their subscription monies in full,
> before LBSF recovers any sums from those proceeds. There is no question of the
> "flip" provisions giving the Noteholders more than they subscribed, at least before
> LBSF is paid the sums which are secured in its favour on the collateral.

> 63.    In other words, the position, when the transaction came to be redeemed
> early, and "unwound", following an Event of Default, was not that LBSF had
> agreed, subsequent to the grant of the right, that it would lose the right it had been
> granted in relation to the proceeds of sale of the collateral as a result of the
> Default. Notwithstanding the Default, it retained its right, but, as had always been
> an agreed feature of that right, as a result of the Default, LBSF had to rank
> behind, rather than ahead of, the Noteholders, no doubt because it was those
> Noteholders whose money had been used to purchase the collateral.

Judgment of the Court of Appeal ¶¶ 62-63 (Neuberger, MR).[8]

---

[8]    LBSF and the Committee repeatedly err in stating that the Trustee denies that LBSF has any interest in the
Collateral. The Trustee has asserted that LBSF's interests in the Collateral are subordinate; it has never stated that
LBSF has no interest in the Collateral. The Trustee has consistently argued that LBSF's rights are whatever they
may have had as of their petition date and in any event, as found by the English Courts, are subordinate to the rights
of the Noteholder. See, e.g., Trustee's Memorandum at p.1 ("If LBSF only had a subordinated interest in trust
property at the time of filing, it cannot use its bankruptcy filing as a basis to assert a senior interest"); id. at p. 20
n.18 ("LBSF never had an unqualified right to Swap Counterparty Priority in the first place and its rights do not
expand postpetition"); id. at p. 24 ("LBSF's interest here is that one of two competing claimants to certain assets . . ..
LBSF's claims are subordinated in accordance with the Supplemental Trust Deed, the Notes, and section 510(a) of
the Bankruptcy Code"); Memorandum of Law in Opposition to Plaintiff Lehman Brothers Special Financing Inc's
Motion for Summary Judgment at p. 9  [Dkt. No. 66] ("Trustee's Opposition Memo") ("Trustee's interest in the
Collateral, if any, "that interest is defined by Noteholder Priority and subordination under Condition 44"); id. at p.
11 ("LBSF's rights under the Transaction Documents are subordinated to those of the Noteholder").

- 8 -

I.    **LBSF CANNOT USE THE BANKRUPTCY CODE TO REVERSE THE PREPETITION EFFECTIVENESS OF NOTEHOLDER PRIORITY AND CONDITION 44.**

The Trustee previously explained that property interests of the estate are determined as of the petition date.  <u>See</u> Trustee's Memorandum at pp. 18-19; 11 U.S.C. § 541(a)(1) (estate includes all property and legal and equitable interests of the debtor "as of the commencement of the case").  Neither LBSF nor the Committee seriously disputed this fundamental proposition. They focused instead on arguments about the <i>post</i>petition effectiveness of alleged <i>ipso facto</i> clauses and application of the so-called safe harbors.  Based on the rulings of the two English courts, this Court need not reach these issues.

The threshold issue remains, "what rights did LBSF actually have when it filed its bankruptcy petition on October 3, 2008?"  If LBSF's interest in the Collateral was subordinated to the interests of the Noteholder on or before that date, LBSF cannot use bankruptcy to enhance its interest.  The automatic stay will not protect an interest the Debtor did not have as of the petition date.  And the prohibition on enforcement of <i>ipso facto</i> clauses has no relevance to actions or events occurring prior to the petition date.

A.    **Noteholder Priority and Condition 44 Governed the Parties' Rights on the Date of LBSF's Chapter 11 Petition**

Any determination of LBSF's interests in the Collateral is made under applicable non-bankruptcy law, and its rights are limited to those that existed on the petition date.  <u>Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc.</u>, --- U.S. ---, 128 S. Ct. 2326, 2339 (2008) (court looks to applicable non-bankruptcy law to determine the debtor's property rights in assets); <u>Butner v. United States</u>, 440 U.S. 48, 53-55 (1979) (applying state law to determine debtor's interest in post-petition, pre-foreclosure rents).  As discussed in the Trustee's Memorandum, bankruptcy does not enable LBSF to resurrect any claim of Swap Counterparty Priority that was lost prior to

its petition, nor any right to require subtraction of the swap termination payment from the Noteholder's Early Redemption Amount.  See Trustee's Memorandum at pp. 20-24 (citing, *inter alia*, Comp III, Inc. v. Computerland Corp. (In re Comp III, Inc.), 136 B.R. 636, 639 (Bankr. S.D.N.Y. 1992) (court had no power to reinstate franchise agreement even where termination was solely on account of impending bankruptcy filing); In re Seven Stars Restaurant, Inc., 122 B.R. 213, 218 (Bankr. S.D.N.Y. 1990).

Turning then to the applicable non-bankruptcy law, the English courts have left no room for doubt as to the interests LBSF held on the date it commenced its Chapter 11 case:

> In the present case, it appears to me that the way in which clause 5.5 of the STD operated, and the terms in which Condition 44 of the T&C was expressed, mean that, when, on 15 September 2008, an Event of Default, namely LBHI's filing for Chapter 11 occurred, Noteholder Priority *automatically* replaced Swap Counterparty Priority and Condition 44.2 *automatically* replaced Condition 44.1 on that date [September 15,2009], which, crucially, was before LBSF filed for Chapter 11.  It is true that the consequences of these two replacements were only enjoyed, in terms of their financial effect, after LBSF had filed for Chapter 11.  However, the essential point seems to me to be that the replacement rights were vested on 15 September.  Mr Snowden's argument[9] that either or both replacement rights should be treated as occurring after 3 October (when LBSF filed for Chapter 11) presents him with a logical difficulty. If the replacement rights (i.e. Noteholder Priority and Condition 44.2) were not vested before 3 October, then ex hypothesi the original rights (ie. Swap Counterparty Priority and Condition 44.1) were never vested, and, if that is right, it is hard to see how LBSF could say that they had been deprived of those rights.

Judgment of the Court of Appeal ¶ 74 (Neuberger, MR) (emphasis added).  Because the LBSF estate, as of the filing of the bankruptcy petition, never had a right to claim Swap Counterparty

---

[9]     Mr. Richard Snowden QC was the counsel engaged by Weil Gotshal & Manges to argue the appeal for LBSF.  See Judgment of the Court of Appeal at p. 2.

Priority or to seek a swap termination payment under Condition 44, section 541(c)(1) simply does not apply in this case. [10]

For the same reason, application of Noteholder Priority and Condition 44 do not violate the automatic stay of section 362(a)(3). Section 362(a)(3) enjoins any act to obtain possession of or exercise control over estate property. 11 U.S.C. § 362(a)(3). It does not apply to property the estate does not have, and LBSF's bankruptcy does not provide a basis for it to create any rights or claims it lost prepetition. See, e.g., In re Seven Stars Restaurant, Inc., 122 B.R. at 218 (debtor could not resurrect lease terminated prepetition because it never became property of the debtor's estate).

LBSF pays lip service to the principle that its rights are limited to those on the petition date, while exhorting the Court to find that the change in priority somehow required some affirmative postpetition act. See LBSF Memo ¶ 16. LBSF's argument ignores the finding of the High Court, now affirmed by the Court of Appeal, that the subordination of its interests occurred *automatically* before the filing of LBSF's petition. See, e.g., Judgment of the Court of Appeal ¶ 74.[11]

### B. Sections 365(e)(1)(B) and 541(c)(1) Cannot Reverse the Pre-Petition Change of Priority

LBSF's tries to evade the English court judgments by arguing that LBSF should be treated as if it really filed its petition on September 15, 2008. LBSF Memo ¶¶ 36 and 39; see

---

[10]     While LBSF admits that LBHI filed its petition 18 days before LBSF filed its own petition, Comp. ¶ 11, LBSF is careful to avoid any reference to the effect of the LBHI bankruptcy under the Transaction Documents. To the contrary, LBSF's Complaint repeatedly alleges that its rights have been diminished "solely because it filed a chapter 11 bankruptcy case." Comp. ¶¶ 1, 2, 16, 20, 21.

[11]     The Court of Appeal's ruling negates LBSF's contention that "the Transaction Documents expressly require affirmative acts to be taken prior to any modification of LBSF's property rights." LBSF Memo ¶ 18. The English Courts rejected LBSF's attempt to conflate two distinct provisions of the Transaction Documents (*i.e.*, the change in priority interests in the Collateral and the early termination under the swap).

_also_ Committee Memo ¶¶ 41-50.  While LBSF could have filed a petition on that date, it did not, and the Bankruptcy Code cannot be molded or re-written to sustain such an argument.

LBSF's theory, echoed by the Committee, is that the omission of the phrase "of the debtor" from Bankruptcy Code section 365(e)(1)(B) and 541(c)(1)(B) serves as an unlimited, _ex post facto_ extension of the statutory invalidation of "_ipso facto_" provisions whenever any case is commenced under the Bankruptcy Code.  They contend that the Court should read the phrase "a case," as used in sections 365(e)(1)(B) and 541(c)(1)(B), as applying to the commencement of "any" case rather than the case of the debtor to which these sections are applied.  As discussed below, this strange interpretation of the statute is inconsistent with basic principles of grammar and maxims of statutory interpretation, most especially the rule that a court should not adopt an interpretation that creates an ambiguity.  See Galloway v. United States, 492 F.3d 219, 224 (3d Cir. 2007) ("[W]here, as here, the language of the statute is clear and unambiguous, [courts] will not create an ambiguity through the use of legislative history.").

The court in Wachovia Bank, N.A. v. United States, 455 F.3d 1261, 1267 (11th Cir. 2006), cautioned against such a myopic approach to statutory interpretation, saying: "[c]ourts should avoid slicing a single word from a sentence, mounting it on a definitional slide, and putting it under a microscope in an attempt to discern the meaning of an entire statutory provision."  That, however, is exactly what LBSF and the Committee attempt, suggesting that the phrase "a case" allows sections 365(e)(1)(B) and/or 541(c)(1)(B) to reach backwards to a time before the clause became operative and freeze a debtor's rights at the point when some other entity filed a case.

Cases cited by LBSF offer no support for drawing a negative inference from the omission of the qualifying phrase "of the debtor" in section 541(c)(1)(B)(i). [12] These decisions gave significance to the omission from a statutory provision of particular language that appeared throughout the same statute. In the Bankruptcy Code, however, the qualifying phrase "of the debtor" is not used anywhere in connection with "commencement of a case." For that reason, LBSF's authorities actually undercut its reading of the statute.

An initial problem with this argument is that it presumes, incorrectly, that "a case" means "a bankruptcy case filed by a person or entity other than the debtor that filed the case before the court." No evidence supports this thesis. The detailed legislative history laid out at pages 18 through 22 of the Committee's memorandum contains no evidence that Congress gave any consideration to the consequences of using either the indefinite article or the definite article in these Code sections. Looking instead to the Code itself, and employing a holistic statutory interpretation required here, [13] Congress uses the phrases "a case" and "the case" almost interchangeably, sometimes using both phrases in the same sections. [14] Moreover, if Congress

---

[12]    See LBSF Memo ¶ 36, citing Gozlon-Peretz v. United States, 498 U.S. 395, 404-05 (1991) (absence of an effective date in subject provision when other provisions of the same Act contained effective dates, indicated Congress wished the provision to be effective upon enactment); Official Comm. of Unsecured Creditors of Operation Open City v. New York State Dep't of State (In re Operation Open City), 170 B.R. 818, 823 (S.D.N.Y. 1994) (with respect to a former version of 11 U.S.C. § 106, finding that the use of "claim" in subsection (a) as opposed to "allowed claim" in subsection (b) evidenced Congress's intent that states need not file a proof of claim to waiver sovereign immunity under that section); Cervantes-Ascencio v. United Stated I.N.S., 326 F.3d 83 (2d Cir. 2003), is similarly unhelpful to LBSF (rejecting plaintiff's request that an exception present elsewhere in the statute be read into the subpart relevant to her case).

[13]    See United Sav. Assn. of Tex. V. Timbers of Inwood Forest Associates, Ltd., 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor. A provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory scheme . . . ."); see also Koons Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 60 (2004).

[14]    For example, the phrases are used interchangeably in section 525 with both phrases used in a single sentence in subparagraph (b)(2). 11 U.S.C. §525(b)(2). The implication here is that "a case" refers to a case that may be filed in the future. This is consistent with the natural reading of section 365(e)(1) and 541(c)(1)(B), as discussed in the next textual paragraph. Interchangeable usage also appears in sections 348(a) and 349(a). The danger of assuming that "a case" must meaning something other than the case actually before the court is

Continued on following page

had intended to depart from the general rule that the estate's property interests are fixed on the date that the petition is filed, it surely could have found a clear way to express that intent. See In re Amsterdam Ave. Development Associates, 103 B.R. 454, 459 (Bankr. S.D.N.Y. 1989). "Absent such, the plain meaning of the statutory language should be conclusive." Id. (citing United States v. Ron Pair Enterprises, Inc., 489 U.S. 235 (1989)); see also Hartford Underwriters v Union Planters Bank (In re Hen House), 530 U.S. 1, 7 (2000) (had Congress intended section 506(c) to be available to non-debtors, "it could simply have said so," as it did in describing parties who could act under other sections); Welzel v. Advocate Realty Invs., LLC (In re Welzel), 275 F.3d 1308, 1315 (11th Cir. 2001) (had Congress intended to exclude certain attorney's fees from 11 U.S.C. § 506(b), "it would have spelled this out").

By looking at the language in a vacuum, LBSF and the Committee overlook the most obvious and logical explanation for the choice of wording, settling instead on a result-driven, conclusive analysis that is not consistent with anything in the statute. The most natural reading of "a case" in sections 365(e)(1)(B) and 541(c)(1)(B) is as a reference, not to the bankruptcy case, but to provisions in an agreement, contract, lease, or instrument pertaining to the potential filing of a case. These sections logically relate to prepetition written documents that refer, not to a particular bankruptcy case – none being then in existence – but more generally to a potential bankruptcy case. The sections apply to the termination or modification of an executory contract or unexpired lease because of a provision in such contract or lease that is conditioned on the commencement of a bankruptcy case. This interpretation is consistent with the rules of

---

Continued from previous page

demonstrated by section 301(a), 11 U.S.C. § 301(a), where "a case" is "the case" ("A voluntary case under a chapter of this title is commenced by the filing with the bankruptcy court of a petition under such chapter by an entity that may be a debtor under such chapter.").

grammar, which require use of the indefinite article "a" when referring to any one of a group or class of things, and the definite article "the" when referring to a particular thing.[15]  LBSF's construction is misplaced because LBSF ignores the subject of these statutory provisions.

LBSF's construction is also inconsistent with settled law respecting the separateness of corporate entities.  See, e.g., Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 702 (2d Cir. 1990) (There is a "presumption that corporations are separate entities whose form is to be respected").  This theory would eliminate the corporate veil for selected purposes, without any evidentiary proceeding – indeed, without any established standard for disregarding the "other debtor's" corporate veil.  Cf. Union Sav. Bank v. Augie/Restivo Baking Co., Ltd. (In re Augie/Restivo Baking Co., Ltd.), 860 F.2d 515, 518 (2d Cir. 1988) ("[S]ubstantive consolidation is no mere instrument of procedural convenience . . . but a measure vitally affecting substantive rights . . . to be used sparingly") (internal citations, quotations omitted).  Although it is possible that the estates of LBHI and LBSF may be substantively consolidated, that is a determination that can only be made upon notice to the affected creditors and a sufficient evidentiary showing.  LBSF cannot "back-in" to consolidation without complying with the statutory and caselaw requirements.[16]

---

[15]  A summary of proper grammatical usage of the definite and indefinite articles in English can be found in: Nelson, Gerald *English: An Essential Grammar,* London: Routledge (2001) ¶ 2.10 at 75; Leech, Geoffrey and Svartrik, Jan *A Communicative Grammar of English,* 2d Ed., London: Longman (1994) ¶¶ 473, 474 at 237-38.

[16]  The English Court of Appeal similarly rejected this sort of qualified substantive consolidation of entities. The Master of the Rolls noted in the leading judgment that "it is not open to the court to treat 'a closely-integrated group of companies as a single economic unit' as a matter of law (save if the rather limited grounds for piercing the veil of incorporation exist)." Court of Appeal Judgment ¶ 75. The Master of Rolls also noted that permitting a debtor to claw back rights lost prepetition as a result of another entity's insolvency would lead to substantial uncertainty as to whether or when a transaction was proscribed, and that it makes no sense to apply the rule to the petition of a third party, even if an affiliate. Id. ¶¶ 72-73.  Lord Justice Patten agreed that, where the corporate veil cannot be pierced, there is no basis to effect the same result by invoking the anti-deprivation rule. Id. ¶ 170.

Finally, LBSF's strained interpretation would lead to potentially absurd results. If the statute were read as applying to bankruptcy filings by parties other than the debtor, the Court would be left to wonder what cases are covered.[17] Once the phrase is separated from the meaning of the statute, myriad possibilities exist. Would the statute apply to any bankruptcy case, filed in any court? Would the phrase "a case" also encompass non-bankruptcy insolvency cases filed in the state courts? How far back would this new rule reach?

LBSF apparently recognizes the *Pandora's Box* its interpretation would open, so it proposes an artificial limitation, suggested nowhere by any language in the statute. LBSF suggests that its sprawling interpretation of the statute should be reigned in by limiting it to "the bankruptcy filing of a closely related affiliate corporation." LBSF Memo ¶ 38. LBSF offers no explanation for the textual inference of this limitation. Indeed, it offers a term not found in the Bankruptcy Code, but apparently crafted to fit the facts of this litigation.[18] Here again, LBSF is advancing an argument that is inconsistent with the maxims of statutory construction. In re Higgins, 270 B.R. 147, 152 (Bkrtcy. S.D.N.Y. 2001) ("Statutory provisions should be construed in accordance with the language employed by Congress in the statute itself, not by reference to the facts presented in a particular case.").

---

[17]  LBSF cites no case in support of this proposition. Although LBSF seeks to distinguish In re Amcor, nothing alters the clear finding by that court that "[e]ach of the three § 365(e)(1) conditions are premised on the debtor's . . . insolvency" and not that of a third party. In re Amcor Funding Corp., 117 B.R. 549, 551 (D. Ariz. 1990).

[18]  Congress clearly understood how to refer to close relationships between a debtor and a third party when such a reference was intended. For example, sections 547 and 548 have special provisions applicable to insiders, as defined in section 101(31). The Code also contains special provisions for co-debtors in section 509, and joint cases in section 302. Although the term "affiliate" is defined in section 101(2), the phrase "a closely related affiliate corporation" does not appear in the Bankruptcy Code. Surely, if Congress meant to create some special rights where another debtor was somehow related, it would have done so expressly. See In re Hen House, 530 U.S. at 7; In re Welzel, 275 F.3d at 1315.

This Court should not interpret the Bankruptcy Code in a manner that ignores rules of grammar and statutory construction. And the Court should decline LBSF's invitation to create ambiguity and then resolve it through an amorphous, result-driven construction of the Code. Applying the statute in a manner that is consistent with the words Congress actually used confirms that the interests of LBSF's estate are defined by and limited to those existing under the Transaction Documents under governing English law as of its petition date. For this reason, the Court should grant the Trustee's motion for summary judgment.

## II. THIS COURT SHOULD DEFER TO THE ENGLISH COURT'S DETERMINATIONS ON ISSUES OF ENGLISH LAW

LBSF has twice litigated and lost on its claims of Swap Counterparty Priority under the Transaction Documents. It seeks a third bite of the apple, now in this Court, by arguing that the issue resolved in England is not an issue presented here. The reality, however, is that the Judgments of the English High Court and the Court of Appeal established that Noteholder Priority and subordination under Condition 44 became effective under English law on September 15, 2008, "which, crucially, was before LBSF filed for Chapter 11." Judgment of the Court of Appeal ¶ 74 (Neuberger, MR).

The High Court Judgment, as affirmed by the Court of Appeal Judgment, is entitled to full and preclusive effect because: (1) it is entitled to recognition under the doctrine of comity; and (2) principles of *res judicata* apply. See Alfadda v. Fenn, 966 F.Supp. 1317, 1325 (S.D.N.Y. 1997); Ackerman v. Ackerman, 517 F.Supp. 614, 623-26 (S.D.N.Y. 1981), *aff'd*, 676 F.2d 898, 905-06 (2d Cir. 1982) (discussing issues of *res judicata* and comity in deferring to an English judgment).[19] Alternatively, even if not binding on LBSF, the Court of Appeal Judgment is

---

[19]     The Committee's contention that the Trustee neglected to give notice that comity should be given to the rulings of the English courts is unfounded. Comity is part of the courts' analysis when deciding whether to give *res*

Continued on following page

extremely persuasive authority on the issues of English law presented in this adversary proceeding.

## A. Principles of Comity Require Recognition of the English Judgment

The Court of Appeal Judgment is entitled to recognition as a matter of comity. Comity is "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its law." Hilton v. Guyot, 159 U.S. 113, 164 (1895). In the seminal Hilton case, the Supreme Court explained:

> [W]e are satisfied that where there has been an opportunity for a full and fair trial abroad before a court of competent jurisdiction, conducting the trial upon regular proceedings, after due citation or voluntary appearance of the defendant, and under a system of jurisprudence likely to secure an impartial administration of justice between the citizens of its own country and those of other countries, and there is nothing to show either prejudice in the court, or in the system of laws under which it was sitting, or fraud in procuring the judgment, or any other special reason why the comity of this nation should not allow it full effect, the merits of the case should not, in an action brought in this country upon the judgment, be tried afresh ....

Id. at 202-03.

Of course, this Court previously considered the doctrine of comity in this adversary proceeding in a different context. This Court's denial of the Trustee's motion to dismiss does not, however, mean that comity has no place in this case. See LBSF Memo ¶ 44. The motion to dismiss raised the question of comity as it relates to the exercise of jurisdiction. The parties' summary judgment motions require consideration of comity as it relates to a final judgment of a

---

Continued from previous page

*judicata* effect to a foreign judgment. See Alfadda v. Fenn, 966 F.Supp. 1317, 1325 (S.D.N.Y. 1997). The Trustee's Memorandum cited Ackerman v. Ackerman, 676 F.2d 898, 905-06 (2d Cir. 1982), involving the appeal of a decision giving effect to an English judgment on the basis of comity and *res judicata*. See Ackerman v. Ackerman, 517 F.Supp. 614, 623-26 (S.D.N.Y. 1981).

foreign court determining issues of foreign law. As noted above, at the hearing on the Trustee's motion to dismiss, the Court recognized "that the only rational outcome here that makes good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal if not exclusive decider of issues relating to U.S. bankruptcy law. And similarly, it makes sense for the High Court in London to be the principal if not exclusive decider of issues of English law." August 11, 2009 Transcript at 69:16-21 (Venditto Supp. Aff. Exh. C). LBSF agreed, "that is a logical and reasonable way to deal with that." Id. at 61:7-8. In the weeks that followed, however, LBSF apparently lost interest in comity. It now contends that "[g]ranting comity to the English court's decision would contravene several important policy interests of the United States."[20] LBSF Memo ¶ 44. LBSF's anti-comity argument is fundamentally flawed.

Again, under Butner v. United States, 440 U.S. 48, 53-56 (1979), LBSF's rights under the Transaction Documents as of the petition date must be determined under applicable non-bankruptcy law – here, English law. See Principal Trust Deed, § 20.1 (Complaint Ex. A) (D.I. 1), Supp. Deeds, § 14.1 (Comp. Ex. C), ISDA Master Agreement, § 13(a) (Comp. Ex. D), Schedules to ISDA Master, Part 4-(i) (Venditto Aff. Exs. 2 and 3). LBSF cannot escape the English rulings based on a generalized appeal to an ostensible policy that would contravene Butner. See LBSF Memo ¶ 58.

LBSF's insistence that comity must yield in bankruptcy cases overlooks a basic tenet of comity: where a foreign judgment does not purport to determine a core bankruptcy question, the

---

[20]     LBSF is understandably uneasy about its change of position. The quotation from LBSF's Opposition Memorandum is preceded by a footnote which recognizes that both this Court and the English court are proceeding with an understanding of how each tribunal should address the issues. LBSF reinforces the role of comity in its expert's statement that "[t]he most fundamental point is that the decision of the English High Court in *Perpetual Trustee* ... is a decision on matters of English law and on the interpretation of the relevant documentation as applied to the facts as the court found, or assumed, them to be. It does not purport in any way to be a decision on the application of the U.S. Bankruptcy Code or on the application of U.S. Bankruptcy law to the relevant documentation." LBSF Memo ¶ 44 n.10.

foreign judgment should be given effect in the bankruptcy court. See, e.g., In re Maxwell

Comm. Corp., 93 F.3d 1036, (2d Cir. 1996) (deferring to an ongoing English action); In re

Hashim, 213 F.3d 1169, 1173-73 (9th Cir. 2000) (holding that it was improper for the

bankruptcy court to refuse to enforce an English court's award of costs against debtors); In re B-

E Holdings, Inc., 228 B.R. 414, 417-19 (Bankr. E.D. Wis. 1999) (bankruptcy court extended

comity to Peruvian judgment); see also Colonial Bank v. Worms, 550 F.Supp. 55, 58 (S.D.N.Y.

1982) (giving effect to an English judgment because "English procedure comports with our

standards of due process"); Vedatech K.K. v. Crystal Decisions, Inc., No. 03-4578, 2009 WL

1151778, at *4-5 (N.D. Cal. Apr. 28, 2009) (enforcing an English judgment on comity grounds);

Hearing Transcript 22:10-15 (August 11, 2009) ("I would think that the U.K. High Court would

consider it rationale ... for the U.S. Court to deal with U.S. law issues and for the U.K. court to

deal with U.K. law issues, and for us to be coordinating so we come out with the most rationale

result possible").[21]

---

[21] Cases cited by LBSF are readily distinguishable on the basis that, unlike this case, the adverse party relied upon a foreign judgment to determine core bankruptcy issues. In LaMonica v. N. of Eng. Protecting & Indemn. Ass'n Ltd. (In re Probulk Inc.), 407 B.R. 56, 62 (Bankr. S.D.N.Y. 2009), the court found that the question of whether "cesser clauses" implicate sections 541(c)(1)(B) and 362(a) of the Code was properly one for the bankruptcy court and not an arbitration panel. Final resolution of such core issues by an arbitration panel is wholly unlike this Court being asked to recognize the application of governing English law by esteemed English jurists interpreting the Transaction Documents at issue here. See also United States Lines v. Am. Steamship Owners Mut. Protection & Indemn. Assoc. (In re United States Lines, Inc.), 197 F.3d 631, 639 (2d Cir. 1999) (finding no abuse of discretion in bankruptcy court's refusal to give effect to international arbitration provision where indemnity issues would have an impact on core proceedings).

Jamaica Shipping Co. v. Orient Shipping Rotterdam (In re Millennium Seacarriers), 354 B.R. 674 (Bankr. S.D.N.Y. 2006), is similarly inapposite. At issue in that case was which of two contracts should be deemed to have been assumed and assigned in connection with the debtor's earlier asset sale. As this Court noted in Millennium Seacarriers, the interpretation of "bankruptcy practice and bankruptcy law relating to executory contracts, and to decide question about the sale and assignment of property of the Debtor's estate" is best served by the bankruptcy court's adjudication and not an arbitration panel in London. Id. at 679. Here, the Trustee is not asking that the English Court of Appeal's application of U.S. bankruptcy law, if any, be adopted, but rather that there be recognition of that Court' interpretation of the subject agreements pursuant to governing English law. Other cases cited by LBSF fail for the same reasons.

The priority issue determined by the Court of Appeal and relied upon here involves English contract law, as applied prepetition, and it involves no core bankruptcy issues. There can be no question that the English Court is highly capable, familiar with the Transaction Documents, and well-versed in English law. Indeed, LBSF concedes that it "does not question the competency of the English court." LBSF Memo ¶ 69 n.15. Since LBSF voluntarily chose to litigate in England, and elected to appeal to the Court of Appeal, extending comity would neither prejudice LBSF nor violate public policy by impairing rights under the Bankruptcy Code.

The record on this Motion shows that the English Judgments satisfy the <u>Hilton</u> criteria for giving effect to a foreign judgment. <u>See</u> <u>Hilton</u>, 159 U.S. at 202-03.

- First, the High Court provided the parties a full and fair trial. LBSF, Perpetual, and the Trustee each appeared through counsel and submitted evidence at trial. <u>See</u> Declaration of Hugh Jonathan Lyons in Support of Motion of BNY Corporate Trustee Services Limited for Dismissal of Complaint or Other Relief at ¶¶ 4, 7, 9 [Dkt. No. 38] ("Lyons Decl.").

- Second, LBSF concedes that the English Courts are competent to determine the rights existing under documents subject to English law. <u>See</u> LBSF Memo ¶ 69 n.15.

- Third, as discussed in the Trustee's Memorandum, LBSF voluntarily participated in the English Action, moving to intervene on May 20, 2009.

- Fourth, the trial was conducted upon regular proceedings between July 7 and 9, 2009. <u>See</u> <u>id.</u> at ¶ 7.

- Fifth, nothing in the record indicates that the English Court acted improperly or in a partisan fashion in deciding this matter after a full and fair trial.

- Sixth, LBSF appealed the High Court Judgment and LBSF's request for an expedited hearing was granted. LBSF participated in a three day argument before the Court of Appeal. The Court of Appeal unanimously affirmed the High Court Judgment.

- And seventh, there is no evidence of fraud, prejudice, or any other reason why comity should not apply.

LBSF has not offered any evidence that the English court failed to conduct a full or fair trial, that the English court lacked jurisdiction, that the judgment was procured by fraud, or that the trial was not conducted upon regular proceedings. [22] The record supports the conclusion that the English courts are best able to render a decision on the English law issues presented here. O'Sullivan ¶¶ 6–8, 25; Declaration of Sanjay Jobanputra in Support of Motion for Dismissal of Complaint or Other Relief ("Jobanputra Dec.") ¶ 3 [Dkt. No. 15]. The parties to the Transaction Documents, including LBSF, each submitted to the jurisdiction of the Courts of England to adjudicate disputes arising in connection with the Transaction Documents and the Series 2004-11 and Series 2006-5 Notes. See Principal Trust Deed, § 20.1 (Comp. Ex. A), Supp. Deeds, § 14.2 (Comp. Ex. B, Comp. Ex. C), ISDA Master Agreement, § 13(b)(i) (Comp. Ex. D).

Moreover, England is the epicenter of the parties' relationship. With the exception of LBSF, the principal parties to the transactions are foreign entities. [23] The property at the heart of this dispute is held in custody accounts in England and Australia that are administered in

---

[22] Cases cited by LBSF suggesting that extending comity to foreign courts often contravenes United States policies and is prejudicial to domestic interests are readily distinguishable on the facts. See Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru, 109 F.3d 850, 855 (2d Cir. 1997) (refusing to extend comity to Brady Plan negotiations in Peru where "[i]t would first have denied Pravin its right to enforce the underlying debt – despite clear United States policy that it be able to do so – by making Pravin's rights conditional on the completion of a process which had no obvious (and reasonably proximate) termination date"); Films by Jove, Inc. v. Berov, 250 F.Supp.2d 156, 191-214 (E.D.N.Y. 2003) (refusal to defer to Russian court because Russia's system of law was almost entirely incompatible with United States law and there was substantial evidence of judicial corruption); Allied Bank Int'l v. Banco Credito Agricola De Cartago, 757 F.2d 516, 521-22 (2d Cir. 1985) (refusal to give effect to a Costa Rican directive that would unilaterally change the terms of the contracts at issue, thus resulting in an unjustified taking of property within the territory of the United States). No such issues are presented here.

[23] LBIE is a London-based entity organized under the laws of England. See 2004-11 Offering Circular (Declaration of Michael J. Venditto ("Venditto Decl.") in Support of Motion for Dismissal of Complaint and Other Relief at Ex. 4) (D.I. 14); 2006-5 Series Prospectus (Venditto Decl. Ex. 5). The Trustee is organized under English law and has its principal place of business in London. See Declaration of Sanjay Jobanputra ("Jobanputra Decl.") in Support of Motion for Dismissal of Complaint or Other Relief at ¶ 1 (D.I. 15). BNY Securities Services (Ireland) Ltd.'s is an Irish incorporated entity based in Dublin. Id. at ¶ 5, n.1. Saphir is organized under the laws of Ireland with it principal place of business in Ireland. See 2004-11 Offering Circular (cover page) (Venditto Decl. Ex. 4); 2006-5 Series Prospectus (cover page) (Venditto Decl. Ex. 5). Finally, Perpetual is organized under the laws of Australia. See Jobanputra Decl. at ¶ 18.

England pursuant to documents governed by English law. See Principal Trust Deed, § 20.1 (Complaint Ex. A) (D.I. 1), Supp. Deeds, § 14.1 (Comp. Ex. C), ISDA Master Agreement, § 13(a) (Comp. Ex. D), Schedules to ISDA Master, Part 4-(i) (Venditto Aff. Exs. 2 and 3).

On the facts presented, the Judgments of the English Courts meet all of the conditions required by the letter and spirit of Hilton, and the doctrine of comity mandates that this Court recognize the English Judgments.

**B.** *Res Judicata* **Precludes Relitigation of Issues Decided by the English Courts**

As explained in the Trustee's Memorandum at 21, *res judicata* applies if: (1) there is an identity of parties in the two proceedings; (2) the actions involve the same claims; (3) the prior judgment was rendered by a court of competent jurisdiction; and (4) the decision was final and rendered on the merits. Analyzing the undisputed facts in light of these factors demonstrates: (1) the Trustee and LBSF are parties here and in *Perpetual*; (2) both actions involve the applicability and enforceability of Noteholder Priority and Condition 44 under the Transaction Documents; (3) the High Court Judgment was rendered by a court of competent jurisdiction in connection with a transaction governed by English law and subsequently unanimously affirmed by the English Court of Appeal; and (4) the English Judgment constitutes a final disposition of the issues decided there, rendered after trial and in accordance with applicable rules of procedure, and thereafter affirmed on appeal. Accordingly, this Court should not permit re-litigation of the applicability and enforceability of Noteholder Priority and Condition 44 under the Transaction Documents.[24]

---

[24] In the event that the Court does not agree that *res judicata* applies, it must also look to the related principle of collateral estoppel. Voreep v. Tarom Romanian Air Transport, No. 96-1384, 1999 WL 311811, at *3 (S.D.N.Y. May 18, 1999). In Voreep, the Court enforced a judgment made by a Romanian court by applying principles of comity and *res judicata*. Id. After noting that the Romanian judgment should be recognized under principles of comity, the court looked to the preclusive effect of the judgment. The Court defined *res judicata* and then noted that "[u]nder the related, but narrower, principle of collateral estoppel, 'once an issue is actually and necessarily

Continued on following page

In attempting to escape the English Court's determination that Noteholder Priority and Condition 44 took effect prior to LBSF's petition date, LBSF concedes jurisdiction, but challenges the identity of the parties, the identity of the claims, and the finality of the decision. Each of these challenges fails.

It is ironic that LBSF disputes the identity of parties. In opposing the Trustee's motion to dismiss based on, *inter alia*, lack of a necessary and indispensible party, LBSF insisted that the Trustee was an adequate representative of Perpetual's interests. Hearing Transcript (August 11, 2009) at 47:4-5; 55:9-23. Even now, LBSF refers to the Trustee as Perpetual's "proxy." <u>See</u> LBSF Memo ¶ 72. The Trustee is here because the Court concluded, in denying the Trustee's Motion, that the Trustee was an adequate representative for Perpetual. <u>See</u> Hearing Transcript 70:20-22 (August 11, 2008) ("Accordingly, it seems to me clear that BNY will at least indirectly be adequately representing the interests of Perpetual."). While the Trustee moved to dismiss this adversary proceeding on the basis that it is not a surrogate for Perpetual, and it has no duty to represent Perpetual here, the Court found that it was a "fair representative" and on that basis denied the Trustee's motion. Because the Trustee has been deemed to stand in Perpetual's shoes for purposes of this proceeding, LBSF's argument that *res judicata* does not apply as between co-defendants is inapposite.

*Res judicata* applies "when the interests involved in the prior litigation are virtually identical to those in later litigation." Chase Manhattan Bank, N.A. v. Celotex Corp., 56 F.3d 343, 345 (2d Cir. 1995). Termed "virtual representation" or privity, this concept "includes those

---

Continued from previous page

determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation.'" <u>Id</u>. (quotation omitted). The Court explained that "[b]oth claim and issue preclusion apply to matters decided by courts of foreign countries." <u>Id</u>. (citation omitted).

who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action." Id. (citation omitted); Alpert's Newspaper Delivery Inc. v. The New York Times Co., 876 F.2d 266, 270-71 (2d Cir. 1989) (explaining that "literal privity" is not required for parties to be found identical for purposes of *res judicata*; "[t]he issue is one of substance rather than the names in the caption of the case"). While the Trustee and LBSF were co-defendants in the English action, the Trustee is here deemed to be the representative of Perpetual. If the Trustee is deemed to represent Perpetual's interest, the Trustee cannot be denied attendant rights. Accordingly, there can be no question that there is an identity of parties.

The second element of *res judicata*, whether the actions involve the same claim, also is satisfied. There can be no question that the English Court and this Court are being asked to decide the same question. See Lyons Decl. at ¶¶ 4, 13, 25; cf. Perpetual Claim Form (CPR Part 8) (Comp. Ex. H.) with Complaint at 11-12. LBSF is asking this Court to declare LBSF's rights under the Transaction Documents, including Noteholder Priority and Condition 44, as they existed on the petition date. Such rights are determined under applicable non-bankruptcy law in the first instance, and this exact question was joined by Perpetual and LBSF and decided by the English Court. The actions unquestionably involve the same claims.[25]

---

[25] LBSF's suggestion that *res judicata* does not apply here because only compulsory, and not permissive, counterclaims are subject to *res judicata* is simply incorrect. See LBSF's Memorandum of Law in Opposition to BNY Corporate Trustee Services Limited's Motion for Summary Judgment at ¶ 71. The cases cited by LBSF for this proposition hold that *res judicata* does not cover claims that were not raised, and not required to be raised, in the prior litigation. Critical-Vac Filtration Corp. v. Minuteman Int'l, Inc., 233 F.3d 697, 702 (2d Cir. 2000) (the party failed to raise a compulsory counterclaim in an earlier action and thus was barred from raising it in a subsequent action); Cousins v. Duane St Assocs., No. 00-7580, 2001 WL 327084, at *2 (2d Cir. Apr. 2, 2001). Unlike these cases, the applicability of Noteholder Priority and subordination under Condition 44 were raised and decided in *Perpetual*.

Finally, it is clear that the English decision is final and rendered on the merits. The Court of Appeal unanimously affirmed the High Court's decision. There can be no dispute that there has been a final disposition of the issue in the English courts.

All of the required elements necessary to give *res judicata* effect are present here and the Court, therefore, should give such effect to the Court of Appeal Judgment.

> **C.** **Even Without Giving *Res Judicata* Effect under the Doctrine of Comity, this Court should Follow the Decision of the English Court**

Even if the Court were to conclude that *res judicata* does not apply here, English law still must be applied to determine LBSF's rights under the Transaction Documents as of the petition date. Given that the Court of Appeal issued a Judgment holding that Noteholder Priority and Condition 44 became effective on September 15, 2008, any suggestion that this Judgment is not persuasive as it relates to the interpretation of the Transaction Documents is frivolous. Indeed, how better to construe the Transaction Documents under English law than to follow the decision of the Court of Appeal in construing the same documents?

Accordingly, for reasons discussed above, this Court should follow the decision of the English Court and grant the Trustee's motion for summary judgment.

**III.** **NOTEHOLDER PRIORITY AND CONDITION 44 ARE ENFORCEABLE IN ACCORDANCE WITH SECTION 510(A)**

To the extent this case is not resolved based on a determination that Noteholder Priority and subordination under Condition 44 were effective prepetition, these provisions are enforceable postpetition in accordance with section 510(a). 11 U.S.C. § 510(a). Section 510(a) provides that a subordination agreement is enforceable in a bankruptcy case to the same extent it is enforceable under non-bankruptcy law. The English courts have found that Section 5.5 and Condition 44 are enforceable subordination provisions under English law, and these provisions should be given effect by this Court.

LBSF's response is to attempt to read Section 5.5 and Condition 44 out of the scope of section 510(a) and, alternatively, to attempt to read section 510(a) out of the Bankruptcy Code. Neither argument is supported by the facts or the law. Section 510(a) applies to a broad range of agreements establishing the relative priorities of competing claims, and nothing in the Bankruptcy Code permits the nullification of subordination agreements.

### A. Section 5.5 and Condition 44 are Subordination Agreements Entitled to Enforcement Under Section 510(a)

Section 510(a) states that "[a] subordination agreement is enforceable in a case under this title to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a). As Collier explains, Section 510(a) is of "unqualified breadth" and it mandates enforcement of a subordination agreement in accordance with its terms. See COLLIER ¶ 510.03[2]. If Section 5.5 and Condition 44 constitute enforceable subordination agreements under applicable non-bankruptcy law, they are enforceable under section 510(a). See In re Best Products Co., Inc., 168 B.R. 35, 69 (Bankr. S.D.N.Y. 1994); see also HSBC Bank USA v. Branch (In re Bank of New England Corp.), 364 F.3d 355, 362 (1st Cir. 2004) ("[T]he enactment of section 510(a) means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notion of what may (or may not) be equitable.").

"A contractual subordination agreement is simply a contractual arrangement whereby one creditor agrees to subordinate its claim against a debtor in favor of the claim of another." Best Products, 168 B.R. at 69. This is how the English Court of Appeal viewed the parties' agreement. It treated Section 5.5 and Condition 44 as subordination agreements, which determine "the order of priorities in which the rights were to be exercised." Judgment of the Court of Appeal ¶ 62; see also id. ¶ 64 ("[T]his is a case where all that is changing is the priorities relating to the right, pursuant to a provision in the very document creating the right.").

In arguing that Section 5.5 and Condition 44 do not fit present a "classic" subordination agreement, LBSF seeks to impose limitations not found in the statute. Section 5.5 and Condition 44 fit squarely within case law defining a subordination agreement "as one in which a party having a *superior right of some sort* agrees with someone having an *inferior right* that, as between the two of them, the inferior right shall be treated as if it were superior." <u>GMGRSST, Ltd. v. Menotte (In re Air Safety Int'l, L.C.)</u>, 336 B.R. 843, 857 (S.D. Fl. 2005) (internal quotation marks omitted) (emphasis added); <u>see</u> <u>also</u> Bryan A. Garner, BLACK'S LAW DICTIONARY (7th ed. 1999) (defining subordination agreement as "an agreement by which one who holds an otherwise senior interest agrees to subordinate that interest to a normally lesser interest ...."). A subordination agreement need not reference "debtors," "creditors," or "debt" as LBSF would require, <u>see</u> LBSF Memo ¶¶ 76-77. Rather, as in this case, the necessary elements are an agreement between parties to determine the relative priorities of their respective rights or interests.

That subordination agreements need not rigorously follow some prescribed form is demonstrated in some of the cases cited by LBSF. In <u>Air Safety</u>, the debtor, chapter 7 trustee, and certain creditors and interest holders entered into a stipulation determining their respective rights in certain estate assets. The bankruptcy court subsequently enforced the parties' agreement, even though it prevented the debtor from receiving amounts it otherwise would have received. The district court treated the stipulation as a subordination agreement within section 510(a) of the Code and affirmed. Although the parties' agreement in no way resembled the form LBSF holds out as the standard, <u>see</u> LBSF Memo ¶ 77, the district court enforced it under section 510(a). <u>Air Safety</u>, 336 B.R. at 858 (stipulation is a valid subordination agreement as long as it is enforceable under applicable non-bankruptcy law); <u>see</u> <u>also</u> <u>Sumitomo Trust & Banking Co.,</u>

Ltd. v. Holly's, Inc. (In re Holly's, Inc.), 140 B.R. 643 (Bankr. W.D. Mich. 1992) (discussing types of subordination agreements, including a "contingent" subordination that "springs into effect" upon the occurrence of a condition subsequent).

Although subordination agreements need not follow LBSF's model, Section 5.5 and Condition 44 satisfy LBSF's narrow definition. The Trustee, LBSF, and the Noteholder hold competing claims to certain collateral. As long as no default had occurred, the Noteholder subordinated its claim to LBSF's claim. Upon an event of default, LBSF subordinated its claim to the Noteholder's claim. Nothing more is required to have an enforceable subordination agreement, and section 510(a) does not exalt form over substance. See, e.g., HSBC Bank USA v. Branch (In re Bank of New England Corp.), *supra*.

On the facts presented here, Section 5.5 of the Supplemental Trust Deed and Condition 44 are enforceable pursuant to section 510(a) of the Code and LBSF's claims to the collateral are subordinated to that of the Noteholder.

**B.       Sections 365(e)(1) and 541(c)(1)(B) Cannot Nullify Rights Protected By Section 510(a)**

LBSF provides no support for its position that section 510(a) must yield to the more general dictates of section 365(e)(1) or section 541(c)(1)(B). LBSF's position is contrary to the rule that a specific statutory provision controls a general provision. See, e.g., Bulova Watch Co. v. United States, 365 U.S. 753, 758 (1961) ("it is familiar law that a specific statute controls over a general one 'without regard to priority of enactment'"); Departmental Disciplinary Comm. for the First Judicial Dep't v. Shapiro (In re Friedman & Shapiro, P.C.), 185 B.R. 143 (S.D.N.Y. 1995) ("It is a well established rule of statutory construction that a specific, narrowly drawn statute takes precedence over a more generally applicable statute."); see also Stoltz v. Brattleboro Housing Authority (In re Stoltz), 315 F.3d 80, 93 (2d Cir. 2002) (11 U.S.C. § 525 prohibition on

eviction of debtors by governmental entities takes precedence over rights established in section 365). While 365 applies to the wide and varied universe of all executory contracts and unexpired leases, section 510(a) addresses a very narrow subset of agreements: subordination agreements, such as Section 5.5 and Condition 44, that are enforceable under applicable non-bankruptcy law. The latter controls in the event a conflict is found.

Enforcing the Transaction Documents pursuant to section 510(a) does not, as LBSF warns, represent an opportunistic avoidance of section 365(e)(1), nor would it lead to "the exception swallowing the rule." To the contrary, enforcement of Section 5.5 and Condition 44 pursuant to section 510(a) serves the purpose of reading the Code in a manner that gives effect to all provisions and permits sophisticated parties to realize the benefit of their respective bargains in a manner expressly approved under this section.

Further, because Section 5.5 and Condition 44 neither terminate or modify LBSF's rights under the Transaction Documents, they are not *ipso facto* clauses. Section 365(e)(1) applies only to termination and modification of contracts. See, e.g., In re C.A.F. Bindery, Inc., 199 B.R. 828, 832 (Bankr. S.D.N.Y. 1996); see also LBSF Memo ¶ 78. Section 5.5 and Condition 44 do neither, however. They merely subordinate the counterparty's interest upon the occurrence of an event of default under the Transaction Documents. As explained by the Court of Appeal:

> The essence of the arrangements embodied in the extensive documentation appears to me to be as follows: (i) The collateral, over which the rights in question were created, was acquired mainly with money derived from the Noteholders, through their subscription monies. (ii) LBSF provided little by way of subscription monies: it simply agreed to pay the interest and capital due to the Noteholders through the SPV in exchange for the interest and collateral, albeit that it was able to reduce the payments to the Noteholders by reference to failings in the credit standing of the "reference entities". (iii) So long as there was no risk of default, the Noteholders were prepared for the scheme to provide that LBSF would have priority when it came to "unwinding" the transaction. (iv) However, the scheme provided, and was sold on the basis that, if LBSF or LBHI defaulted so that they could not, or did not, pay the interest and the capital on the Notes,

then it would be the Noteholders who would have priority both in relation to repayment and in relation to the Unwind Costs. (v) The effect of the "flips" would not be to entitle the Noteholders to more than they had subscribed (with interest), and, if there was no shortfall, LBSF would not have been out of pocket as a result of the "flips".

* * *

*The effect of the "flip" provisions was thus not to divest LBSF of monies, property, or debts, currently vested in it, and to revest them in the Noteholders, nor even to divest LBSF of the benefit of the security rights granted to it. It was merely to change the order of priorities in which the rights were to be exercised in relation to the proceeds of sale of the collateral in the event of a default.* Further, as Mr Moss QC, for Perpetual, and Mr Salter QC, for Belmont, pointed out, the right granted to LBSF was a security right over assets purchased with the Noteholders' money, and, from the very inception, the priority, and the extent of the benefits, enjoyed by LBSF in respect of the security were contingent upon there being no Event of Default. Thus, the security rights, as granted to LBSF, included the "flip" provisions, and even at the date the "flips" operated, the priority enjoyed by LBSF was no more than a contingent right. As Patten LJ points out in his judgment, the effect of the "flip" provisions in clause 5.5 and Condition 44.2 is merely to ensure that, as far as possible, the proceeds of sale of the collateral are used to repay the Noteholders their subscription monies in full, before LBSF recovers any sums from those proceeds. There is no question of the "flip" provisions giving the Noteholders more than they subscribed, at least before LBSF is paid the sums which are secured in its favour on the collateral.

Judgment of the Court of Appeal ¶¶ 61-62 (Neuberger, MR) (emphasis added).

Restated, LBHI's bankruptcy (or that of LBSF) could not result in the termination or modification of any contract rights in contravention of section 365(e)(1) because, as found by the Court of Appeal, Section 5.5 and Condition 44 did not divest LBSF of any rights. As a matter of English law, LBSF never had a vested right to Swap Counterparty Priority. Id. ¶ 62. It did not lose any right to priority because it never had an unqualified right. Id. ¶ 63. The parties' agreement was a true subordination agreement, in which the default served "merely to change the order of priorities in which the rights were to be exercised." Id. ¶ 62. As "a result of the Default, LBSF had to rank behind, rather than ahead of, the Noteholders." Id. ¶ 63. "[A]ll that is changing is the priorities relating to the right, pursuant to a provision in the very document

creating the right," Id. ¶ 64. Contrary to suggestions by the Committee that Section 5.5 or

Condition 44 impose a penalty on LBSF or grant a windfall to the Noteholder, see Committee

Memo ¶¶ 25-26, the Court of Appeal found that Noteholder was merely getting its bargained for

return of Collateral that was purchased with the Noteholder's own money.[26] See Judgment of the

Court of Appeal ¶¶ 61-62.

> Lord Patton agreed:
>
> The reversal of the order of priority under clause 5.5 was always a facet of the
> security designed to regulate the competing interests over the collateral of LBSF
> and the Noteholders. To say that its operation in the event of the company's
> bankruptcy constitutes the removal of an asset from the liquidation is to confuse
> the security itself with the operation of its terms in the events prescribed by the
> charge. LBSF retains the same asset it had before its bankruptcy and is free to
> deal with any recoveries for the benefit of its general creditors in accordance with
> the applicable statutory regime. Likewise the Noteholders do not obtain any
> security over the collateral which they did not have before. This was essentially
> the reasoning of the Chancellor and I agree with it.
>
>                        \* \* \*
>
> The same point can be made about . . . condition 44 of the terms and conditions
> attached to the prospectus which establishes the amounts due under the swap
> agreements if terminated on an Event of Default. ... Condition 44 does not
> therefore remove an asset from LBSF. Nor does it give to the Noteholders
> security over an asset in which they previously had no interest. It merely
> regulates the order in which the company and the Noteholders are entitled to be
> recouped out of the security.

Judgment of the Court of Appeal ¶¶ 135, 136 (Patton, J.). Because there was no termination or

modification of the Transaction Documents, but merely a subordination of LBSF's rights to

distributions from the Collateral, Section 5.5 and Condition are not *ipso facto* clauses and cannot

be invalidated by section 365(e)(1) or 541(c)(1)(B).

---

[26] Indeed, rewriting the Transaction Documents to eliminate the "waterfall flip" in Section 5.5 and Condition 44 would give LBSF an unjustified windfall. See Bank of New England Corp., 364 F.3d at 362 ("Enforcing such agreements was necessary to prevent junior creditors from receiving windfalls after having explicitly agreed to accept less lucrative payment arrangements.").

LBSF's forewarning that a ruling for Trustee will open a "gaping loophole" for future parties to exploit, see LBSF Memo ¶ 81, is without merit. This issue arises only where a debtor is acting as a claimant under a subordination agreement. Enforcement of section 510(a) in accordance with its terms does not deprive the debtor of any protections in its capacity as an obligor.

Moreover, LBSF ignores the fact that it is hardly an "innocent third party." Lehman drafted the agreements at issue, see Witness Statement of Sanjay Jobanputra ¶ 27, annexed as Exhibit A to LBSF's Opposition to BNY Corporate Trustee Services Limited's Motion for Dismissal of Complaint [Dkt. No. 30]; see also Judgment of the Court of Appeal ¶ 61, and did so in a way that made these deals more liquid and therefore attractive to the marketplace. It marketed and sold the Notes on the basis of the waterfall flip following an event of default. To permit LBSF to deny the Noteholder the priority established in the parties' agreement would not only be inequitable, it would upend contract law and chill the derivatives markets.[27]

Section 5.5 and Condition 44 must therefore be given their full effect pursuant to section 510(a) of the Code.

## IV.    SECTION 560 OF THE CODE PROTECTS THE EXERCISE OF RIGHTS UNDER SECTION 5.5 AND CONDITION 44

### A.    Section 5.5 and Condition 44 are Swap Agreements Within the Meaning of Section 101(53B)

LBSF's argument that Section 5.5 and Condition 44 are not swap agreements under 11 U.S.C. § 101(53B) ignores the integral relationship between and among the various components

---

[27]    Commenting on this litigation, one rating agency wrote: "In the event that this litigation overturns the subordination of termination payments as described, the agency would need to assess the legal situation after the ruling. This could result in a criteria revision and may result in substantial ratings actions on transactions in which the counterparty could be subject to bankruptcy proceedings that would overturn subordination of these payments." See Fitch Ratings Global Cross-Sector Criteria Report: Counterparty Criteria for Structured Finance Transactions, dated October 22, 2009, at p. 8, annexed as Exhibit E to the Venditto Supp. Aff.

of the Transaction Documents, the parties' obvious intent that all such documents be read

together, and the logical conclusion that such documents must be construed as one agreement.

Because these provisions are part and parcel of a single agreement, they come within the scope

of the safe harbor protections of sections 560 and 362(b)(17).

Determination of the scope of the "swap agreements" in this case focuses on the

documents themselves. Under section 101(53B)(A), a swap agreement includes "the terms and

conditions incorporated by reference in such agreement ...." 11 U.S.C. § 101(53B)(A)(i).

Under section 101(53B)(A)(vi), swap agreements include any security "arrangement" related to a

swap agreement and the waterfall flip is clearly such a security arrangement. Accordingly, the

swap agreement includes the Derivative Agreement (defined in Trustee's Motion to Dismiss as

the ISDA Master Agreement, ISDA Schedules, annexes, and Confirmation) *and* the documents

containing conditions incorporated by reference (such as the Principal Trust Deed, the

Supplemental Trust Deed, and the Notes).[28] In this case, the Transaction Documents form a

single, integrated agreement entitled to protection under section 560.

As noted in Trustee's Memorandum at p. 29, the Transaction Documents contain more

than 40 internal cross-references, demonstrating their interdependence and confirming that the

individual component documents of each Derivative Agreement would not have been executed

on a stand-alone basis without execution of the other Transaction Documents. Indeed, LBSF

previously acknowledged the integrated nature of these documents. See Hearing Transcript

103:25-104:2 (June 3, 2009) ("For example, the indenture and the other documents are actually

---

[28]     LBSF's reliance on Interbulk, Ltd. v. Louis Dreyfus Corp. (In re Interbulk, Ltd), 240 B.R. 195, 201 (Bankr. S.D.N.Y. 1999), is misplaced because that case did not involve any dispute as to the parties' agreement and did not address "incorporated by reference" of provision section 101(53B). Accordingly, the narrow definition applied in Interbulk is of no relevance here.

signed by all the parties and they're adopted in the swap agreement"). Evidence as to the

integrated nature of the transaction includes, *inter alia*, the following:

- The Principal Trust Deed and the ISDA Master Agreement were executed contemporaneously on October 10, 2002;

- The Supplemental Trust Deed, incorporating by reference and amending the terms and conditions of the Principal Trust Deed, and the Notes were executed contemporaneously (see Terms and Conditions of the Notes, Schedule 2, Part C to the Principal Trust Deed at 73 (Comp. Ex. A) ("The Notes are constituted and secured by a relevant supplemental trust deed . . . dated the date of issue of the Notes")) and with the execution of the Confirmation effecting the Derivative Agreement;

- The Supplemental Trust Deed defines the transaction (*i.e.*, each series issuance) as comprising the Notes, the Derivative Agreement, and the Trust Deed. See Supplemental Trust Deed, Section I, Details of the Transaction, ¶ 1 (Comp. Exs. B, C);

- The Deed of Accession, to which LBSF is a party, treats the Derivative Agreement and the Trust Deed as parts of an integrated transaction. See Deed of Accession §§ 2.1, 2.2.

As further evidence of the interrelationship of the documents, the ISDA Schedules cross-

reference the Trust Deeds.[29] Examples include the following subsections:

| SECTION | DESCRIPTION OF CROSS-REFERENCE |
|---|---|
| ISDA Schedules ¶ 5(a) | Incorporates into the Swap Agreement and Confirmation the defined terms used in the Trust Deed. |
| ISDA Schedules ¶ 5(b) | Contains representations that the parties have the power to execute, deliver and perform obligations under both the Swap Agreement and the Trust Deed. |
| ISDA Schedules ¶ 5(c) | Contains representations regarding the beneficial ownership of Party B (Dante Finance Public Limited Company) in the securities pledged as collateral and referred to as the Mortgaged Property under the Trust Deed. |
| ISDA Schedules ¶ 5(d) | References the enforcement of rights under the Trust Deed or otherwise where the Trustee is bound to do so under the Trust Deed. |
| ISDA Schedules ¶ 5(g) | Contains confirmation that "each party . . . is bound by the terms of the Trust Deed " and further "that the terms of such Trust Deed prevail to the extent they conflict with terms relating to such Transaction."[30] |

---

[29]  "Trust Deed," as used in this summary, is defined as the Principal Trust Deed, as supplemented and modified by the Supplemental Trust Deed.

| ISDA Schedules ¶ 5(g) | Discusses recourse to assets "secured pursuant to the Trust Deed" and the "right to enforce the Security . . . as provided in the Trust Deed." |

Additionally, logic dictates that the Transaction Documents be construed as a single agreement. There is no reasonable basis for any party to enter into any constituent document, such as the Supplemental Trust Deed, except as part of a larger agreement. Indeed, the Court of Appeal, after reviewing the individual documents, referred to "the arrangements embodied in the extensive documentation" as part of a "scheme" that "provided, and was sold on the basis that, if LBSF or LBHI defaulted so that they could not, or did not, pay the interest and the capital on the Notes, then it would be the Noteholders who would have priority both in relation to repayment and in relation to the Unwind Costs." Judgment of the Court of Appeal ¶ 61. These documents must be read together as a single contract. See, e.g., Cooperative Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd., No. 08 Civ. 9565 (DLC), 2008 WL 5170178, at *11-*12 (S.D.N.Y. Dec. 10, 2008) (hedge agreement had to be read in conjunction with indenture containing waterfall provision and other transaction documents that comprised single, integrated transaction).[31]

This conclusion is consistent with the non-bankruptcy law applied to determine whether the documents form an integrated agreement. Under English law, courts consider the nature of the transaction as a whole, and hold that multiple documents comprise a single, indivisible

---

Continued from previous page

[30]     Contrary to LBSF's contention, LBSF Memo ¶ 88, the parties agreed to be bound by the terms of the Trust Deeds and related documents. ISDA Schedule, ¶ 5(g)'s incorporation of the terms and conditions of the Trust Deed into the Derivative Agreement, the provision that the Trust Deed controls in the event of any conflict, and the degree of interdependence described herein, demonstrate that the Trust Deed and the terms contained therein are parts of a single, integrated agreement.

[31]     As noted in Trustee's Memorandum at p. 30 n.26, LBSF's position on this issue is inconsistent with the position taken by LBSF in other adversary proceedings in these bankruptcy cases, involving similar documents, where it has conceded that the documents "operate together inextricably."

contract where it would make little sense for one of the documents to exist without reference to the others. See CHITTY ON CONTRACTS, Common Law Library, Vol. I at 12-067 (13th ed.) ("Several instruments made to effect one object may be construed as one instrument, and be read together, but so that each shall have its distinct effect in carrying out the main design."). As there would be no purpose for one agreement without the other, under applicable non-bankruptcy law, Section 5.5 and Condition 44 must be construed as parts of an integrated agreement with the swap agreement.

LBSF attacks application of the safe harbor provisions from multiple directions without focusing on the core issues. The Trustee is not trying to squeeze a garden variety contract into the definition of swap agreement. See LBSF Memo ¶ 89. Section 5.5 and Condition 44 only make sense as part of a derivative contract. The legislative history, reviewed at length in the Trustee's Opposition Memo at pp. 12-17, leaves no doubt that payment to the non-defaulting party comes within the scope of the safe harbor. As explained there, a contrary construction of sections 560 and 362(b)(17) would leave the parties' relationship unresolved and would fail to satisfy the goals of certainty and liquidity. To ensure liquidity, the counterparty must be able to collect amounts owed it, so that it can enter into a substitute agreement. See id. at pp. 16-17. Nothing in the Code or the history supports LBSF's argument that a right to foreclosure should be limited to permitting a setoff, thereby denying the non-debtor the full benefit of its right to self-help or enforcement of other remedies. Cf. LBSF Memo ¶ 95; see Trustee's Opposition Memo at 16. Payment in accordance with the priority set forth in the parties' contract cannot be "ancillary," see LBSF Memo ¶ 97, because it is an essential part of the liquidation process. The argument that this would permit a non-debtor to seize assets "in advance and to the detriment of other secured and unsecured creditors," LBSF Memo ¶ 95, makes no sense because remedies

cannot be exercise until after an event of default and because the non-debtor counterparty's rights are senior to those of other creditors.

As a final point, LBSF ignores the Trustee's argument that the market's understanding of what constitutes a swap agreement is particularly relevant in defining the agreement. See Enron Corp. v. UBS AG (In re Enron Corp.), 2005 WL 3873897, * 7 (Aug. 10, 2005) (Bankr. S.D.N.Y.) (citing S.Rep.No. 101-285, 8 (1990)) ("[E]quity swaps and credit derivatives should include what the swap market understands to be a swap agreement."). By incorporating flexibility in statutory provisions such as section 101(53B), Congress recognized that this area of the financial marketplace is evolving and a rigid definition could not possibly contemplate every permutation of swap agreements.[32] The congressional purpose underlying safe harbors provisions, such as certainty in the marketplace, requires deference to the market's understanding of what constitutes swap a agreement. Consistent with the English Judgments, the market views Section 5.5 and Condition 44 as parts of a "swap agreement" for purposes of sections 560 and 362(b)(17). See High Court Judgment ¶ 45 ("[I]t is necessary to consider the structure of the transaction as a whole not the terms of clause 5.5 of the Supplemental Trust Deed in isolation.").

### B. Congress Created Broad Protections for Swap Agreements

Because Section 5.5 and Condition 44 are integrated parts of the parties' swap agreement, exercise of rights pursuant to these provisions is protected by the safe harbors of sections 560 and 362(b)(17). As explained in the Trustee's Memorandum and Opposition Brief, Congress has enacted special measures to exempt swaps, derivatives, and commodities transactions from the

---

[32] Section 101(53B) provides in pertinent part that a "swap agreement" means "any agreement or transaction that is similar to any other agreement or transaction referred to in this paragraph and that . . . is of a type that has been, is presently, or in the future becomes, the subject of recurrent dealings in the swap or other derivatives markets (including terms and conditions incorporated by reference therein)." See 11 U.S.C. § 101(53B)(A)(ii)(I).

limitations imposed by the Bankruptcy Code. See, e.g., H.R. Rep. No. 101-484, at 2, 1990

U.S.C.C.A.N. 223, 224 (1990). LBSF acknowledges that these measures are aimed at providing

certainty to the financial markets and avoiding a liquidity crises. See LBSF Summary Judgment

Memo ¶ 45; see also Hutson v. E.I du Pont de Nemours and Co. (In re Nat'l Gas Distribs., LLC),

556 F.3d 247, 252 (4th Cir. 2009) ("Without safe harbors, markets might suffer shocks-perhaps

even a systemic liquidity crisis, causing markets to collapse-when debtors enter bankruptcy");

Am. Home Mortgage Holdings, Inc. v. Lehman Brothers Inc. (In re Am. Home Mortgage

Holdings, Inc.), 388 B.R. 69, 78 (Bankr. D. Del. 2008).

    In arguing that courts narrowly interpret the scope of the safe harbor provisions of the

Code, see LBSF Opp. Br. ¶ 89, LBSF seeks to impose limitations that find no support in the

statute. Nothing in the wording of sections 560 or 362(b)(17) or any other provision of the Code

suggests that the safe harbors should be read narrowly and applied only in limited circumstances.

Rather, the sweeping amendments to the Code in 2005 were designed to insulate "entire

markets" from the effects of a bankruptcy filing. H.R. Rep. No. 101-484, at 2. In furtherance of

this goal, Congress gave "swap agreements" the broadest possible definition. See In re Nat'l Gas

Distribs., 556 F.3d at 259 (the safe harbors "serve a countervailing policy of protecting financial

markets and therefore favoring an entire class of instruments and participants"). As previously

explained by the Trustee, the language of the Code and legislative history preclude a narrow

construction of sections 560 and 362(b)(17) and provide support for affording Section 5.5 and

Condition 44 with the full protections of that safe harbor. See Trustee's Memorandum at p. __.

Section 362(b)(17) confirms that the safe harbor extends to distributions made in accordance

with the parties' written agreement. In particular, these sections of the Code protect and permit,

not just setoffs but foreclosure on and exercise of self-help with regard to collateral pledged in connection with a swap transaction.[33]

## V.   IF THE TRUSTEE'S MOTION IS DENIED, THE COURTS MUST CONDUCT FURTHER HEARINGS TO DETERMINE HOW TO PROCEED

Under applicable bankruptcy and non-bankruptcy law, the Trustee's Motion should be granted. It is possible, however, that this Court may conclude that there are unresolved issues of fact that require it to deny summary judgment. For example, the Court might find that there are unresolved factual issues that bear upon the issue of comity or the intent of the parties. In such event the Court could defer ruling on the Motion and order limited discovery to develop those factual issues. As the Court is aware, there has been no discovery in this adversary proceeding and limited discovery might be warranted to resolve some material issue.

If LBSF's motion is granted, any further proceedings in this adversary proceeding will require coordination with the High Court. Given that LBSF filed this adversary proceeding in reaction to the *Perpetual* action, it is hardly surprising that the relationship between the two nations' courts goes to the heart of this litigation. In the context of the Trustee's motion to dismiss, the Court acknowledged the Trustee's concern that it not be faced with conflicting judgments and affirmed the need for coordination with the English Court:

> BNY has quite appropriately sought to extricate itself from a difficult situation here so as not to be at the wrong end of conflicting directions from two courts. I believe that coordination is the most appropriate answer to this problem.

*  *  *

---

[33]    Section 362(b)(17)'s legislative history makes clear that this section was intended to protect from the automatic stay, a party's "right to foreclose on … collateral securing swap agreements[,]" and "self-help foreclosure-on-collateral rights …." See H.R. Rep. No. 109-31 at 132 (2005); H.R. Rep. No. 109-648 at 7, 109th Cong., 2d Sess. (2006).

> Given that, and given what I believe to be BNY's real purpose here, which is to avoid being torn apart by conflicting decisions, the best means to achieve that is through coordination. That doesn't mean that that will be the outcome.

Hearing Transcript 71:1-5 and 72:16-19 (August 11, 2009). Importantly, Perpetual still has not provided the Trustee with indemnification in accordance with the parties' agreement.

LBSF recognized the Trustee's concern and assured the Court that the Trustee would not have to pay twice:

> In other words there's no real possibility that BNY is going to have to pay this money twice. And I think it's also safe to assume it's not going to release the money until it's certain that it's not going to have to pay it twice. Finally, in terms of this, sort of, hypothetical conflict, I cannot imagine any possibility where the vice chancellor and this Court would both issue contempt citations or directions to BNY if their judgments were in conflict. That's precisely what this coordination is for. It's too early to decide how that's going to happen . . ..The question is which of two parties will get those notes and BNY has those notes in its control and its possession and they're only going to go out once. And they're going to go out after the issues are sorted out as to which court has authority to direct the payment of those notes.

Hearing Transcript 49:24-50:9; 50:11-16 (August 11, 2009).[34] More recently, LBSF advised the High Court that there can be no enforcement action, including action on any judgment in the US court, without further hearings.

Following this Court's August 11, 2009 hearing, this Court corresponded with the Chancellor concerning the advisability of coordination between the Courts. In its letter dated August 20, 2009, this Court stated its intention to "communicate further … in an attempt to reach a coordinated result in light of each Court's ruling." A copy of this Court's letter is annexed as Exhibit E to the Declaration of Ralph I. Miller ("Miller Decl."). By letter dated September 9,

---

[34] As noted previously, LBSF told the High Court at trial: "It would be wholly wrong for the English Court needlessly to place BNY in a position where it might become subject to conflicting decisions and orders of the Courts in England and the US." Skeleton Argument on Behalf of Lehman Brothers Special Financing Inc., dated July 3, 2009, ¶ 23.

2009, the Chancellor advised that he looked forward to cooperating with this Court. Exhibit A to the Miller Decl.

Further, LBSF represented to this Court and the High Court that it was seeking the appointment of a foreign representative in England under the UNCITRAL Model Law on Cross-Border Insolvency. At the August 11, 2009 hearing, when this Court asked about the status of that application, LBSF advised the Court that it had been filed. Hearing Transcript 56:9 – 57:6. (August 11, 2009). In his September 9, 2009, letter to this Court, the Chancellor advised that he had appointed Justice Briggs to deal with the Lehman related issues in England. Exhibit A to the Miller Decl. at 2. Since that time, it does not appear that LBSF has taken any action in connection with the UNCITRAL proceedings as they may relate to this litigation. Presumably, however, the High Court is available to assist this Court's coordination in England.

Consistent with the foregoing and the expectations of the parties, no enforcement action should proceed on any order in this litigation absent further communication and coordination between the Courts and further hearing on any legal or factual issues related to enforcement.

To summarize, the parties recognize the need to have consistent decisions from the two Courts. LBSF has stated its intention to make requests under the UNCITRAL Model Law, including a request for application of the Bankruptcy Code. See LBSF's Motion Pursuant to Section 1505 of the Bankruptcy Code for Authorization to Act as Foreign Representative of its Estate in the United Kingdom [Dkt. No. 4308] ¶¶ 14, 17-18 (by its section 1505 Motion, LBSF stated that it will ask the High Court to recognize the Chapter 11 case, apply an automatic stay, and "grant comity to the full breadth of the automatic stay extant under section 362(a) of the Bankruptcy Code."). Such communication and coordination is entirely appropriate for, as Judge Brozman wrote in Petition of Brierley, 145 B.R. 151, 164 (Bankr. S.D.N.Y. 1992), "Lurking in

all transnational bankruptcies is the potential for chaos if the courts involved ignore the importance of comity. ... Yet it is critical to harmonize the proceedings in the different courts lest decrees at war with one another result." With all this in mind, if LBSF's motion for summary judgment is granted, the Bankruptcy Court should not enter a final, enforceable judgment pending coordination with the English Court and such further hearings as may be appropriate.

## CONCLUSION

For the foregoing reasons, the Trustee respectfully requests that the Court grant the Trustee's motion for summary judgment and dismiss the Debtor's claims for declaratory judgment and for such other and further relief as the Court deems just and proper.

Dated: November 9, 2009
New York, New York

**REED SMITH LLP**

/s/ *Eric A. Schaffer*
Eric A. Schaffer
Michael J. Venditto
David M. Schlecker
599 Lexington Avenue
New York, New York 10022
Tel.: 212.521.5400
Fax: 212.521.5450

*Attorneys for BNY Corporate Trustee Services Limited*

- 43 -