Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan R. Fleck
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1 Chase Manhattan Plaza
New York, NY 10005
Telephone:  (212) 530-5000

and

David S. Cohen (admitted *pro hac vice*)
Adrian C. Azer (admitted *pro hac vice*)
MILBANK, TWEED, HADLEY & M<sup>c</sup>CLOY LLP
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500

Counsel for Official Committee of Unsecured
Creditors of Lehman Brothers Holdings Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

―――――――――――――――――――――――――――――x

In re:                                              :

LEHMAN BROTHERS HOLDINGS INC., *et al.*    :

                    Debtors.                         :

―――――――――――――――――――――――――――――x

LEHMAN BROTHERS SPECIAL FINANCING INC.    :

                    Plaintiff,                       :

-against-                                           :

BNY CORPORATE TRUSTEE SERVICES LIMITED
                                                    :

                    Defendant.                       :

―――――――――――――――――――――――――――――x

Chapter 11

Case No. 08-13555 (JMP)

Adversary Proceeding
No.: 09-01242 (JMP)

**STATEMENT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS IN**
**FURTHER SUPPORT OF DEBTORS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ..................................................................................... ii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT .............................................................................................................. 2

I.     LBSF Has Contractual Rights Under English Law That Are Protected By the Bankruptcy Code............................................................................................ 2

     A.     The Court of Appeal and the Parties Agree That Enforcement of Clause 5.5 and Condition 44 Would Deprive LBSF of Its Contractual Rights ............................................................................... 4

     B.     The Bankruptcy Code Provides LBSF With Unique Substantive Rights Against Deprivation of Its Contractual Rights Pursuant to *Ipso Facto* Clauses ...................................................................... 6

          i.     The Bankruptcy Code Protects a Broader Range of Property Interests than the English Common Law Anti-Deprivation Principle ................................................................. 6

          ii.     The Bankruptcy Code Prohibits *Ipso Facto* Deprivations that Are Triggered by Pre-Petition Events Other than the Debtor's Own Bankruptcy Filing................................... 7

II.     Sections 560 and 362(b)(17) Do Not Apply to Clause 5.5 and Condition 44................................................................................................................. 9

     A.     Congressional Hearings Are Relevant in Construing the Swap Agreement Safe Harbors....................................................................... 10

     B.     The Enforcement of Clause 5.5 and Condition 44 Does Not Involve the Exercise of Contractual Rights by a Swap Participant Under or in Connection with a Swap Agreement ................................... 11

     C.     The Enforcement of Noteholder Priority and Condition 44 Does Not Involve the Exercise of Rights of the Kind That Are Protected by Sections 560 and 362(b)(17),............................................................. 13

          i.     Congress Chose Not To Include "Modification" When Expanding Safe Harbors ............................................................. 17

          ii.     A Recent Decision From the Southern District of New York Supports the View that Section 560 Was Not Intended to Safe Harbor Modification ......................................... 19

CONCLUSION.......................................................................................................... 20

Page

**CASES**

Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savs. & Loan
  Ass'n, (In re Bevill, Bresler & Schulman Asset Management Corp.),
  878 F.2d 742 (3d Cir. 1989) ..................................................................................... 10

Camp v. Nat'l Union Fire Ins. Co. (In re Gov't Secs. Corp.),
  111 B.R. 1007 (S.D. Fl. 1990), aff'd, 972 F.2d 328 (11th Cir. 1992), cert.
  denied, 507 U.S. 952 (1993) ........................................................................................ 3

Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset
  Management Corp.),
  67 B.R. 557 (D.N.J. 1986) ......................................................................................... 10

Cohen v. Savings Building & Loan Co. (In re Bevill, Bresler & Schulman Asset
  Management Corp.),
  896 F.2d 54 (3d Cir. 1990)......................................................................................... 10

Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics,
  905 F. Supp. 169 (S.D.N.Y. 1995)............................................................................... 4

Gustafson v. Alloyd Co.,
  513 U.S. 561 (1995).................................................................................................... 17

Hirt v. Equitable Ret. Plan for Employees, Managers, and Agents,
  533 F.3d 102 (2d Cir. 2008)....................................................................................... 18

In re Amcor Funding Corp.,
  117 B.R. 549 (D. Ariz. 1990)..................................................................................... 10

In re American Home Mortgage Holdings, Inc.,
  411 B.R. 181 (Bankr. D. Del. 2009) .......................................................................... 10

In re American Home Mortgage, Inc.,
  379 B.R. 503 (Bankr. D. Del. 2008) .......................................................................... 10

In re Calpine Corp.,
  No. 05-60200, 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009) ....................... 19

In re Enron I,
  306 B.R. 465 (Bankr. S.D.N.Y. 2004) ....................................................................... 17

In re Gilbreath,
  395 B.R. 356 (Bankr. S.D. Tex. 2008) ........................................................................ 6

In re Grafton Partners, L.P.,
  321 B.R. 527 (B.A.P. 9th Cir. 2005).......................................................................... 10

Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.),
  263 B.R. 406 (S.D.N.Y. 2001).................................................................................... 10

Kaiser Steel Corp. v. Charles Schwab & Co.,
  913 F.2d 846 (10th Cir. 1990) .................................................................................... 10

Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.),
  952 F.2d 1230 (10th Cir. 1991) .................................................................................. 10

LaMonica v. N. of England Protecting and Indemnity Ass'n Ltd.(In re Probulk),
  407 B.R. 56 (Bankr. S.D.N.Y. 2009).............................................................. 3, 5, 7, 8

Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island
    Hosp., Inc.),
    276 F.3d 123, 128 (2d Cir. 2002)...................................................................................... 6

Nebraska Dep't of Revenue v. Lowevnstein,
    513 U.S. 123 (1994).................................................................................................... 10

Official Committee of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re
    Grand Eagle Companies, Inc.),
    288 B.R. 484 (Bankr. N.D. Ohio 2003) ...................................................................... 10

Raleigh v. Schottenstein,
    131 B.R. 655 (N.D. Ill.1991) ...................................................................................... 10

Union of Needletrades v. I.N.S.,
    202 F. Supp. 2d 265 (S.D.N.Y. 2002)......................................................................... 18

## STATUTES

11 U.S.C. § 362(b)(17) ..................................................................................................... passim

11 U.S.C. § 362(o) ......................................................................................................... 9, 11

11 U.S.C. § 365(e)(1)(B). ................................................................................................. passim

11 U.S.C. § 541(c)(1)(B) ................................................................................................... passim

11 U.S.C. § 556 ................................................................................................................ 19

11 U.S.C. § 560................................................................................................................ passim

Pub L. No. 109-390, § 5(a)(2), 119 Stat. 23 (2006).......................................................... 15

Pub. L. No. 101-311, § 102(3), 104 Stat. 267 (1990) ....................................................... 13

Pub. L. No. 103-394, § 501(d)(7)(B)(vi), 108 Stat. 4144 (1994) ..................................... 13

Pub. L. No. 109-8, § 560, 119 Stat. 23, 179 (2005).................................................... 17, 18

Pub. L. No. 109-8, § 907(d), 119 Stat. 176-77 (2005)...................................................... 15

Pub. L. No. 97-222, § 3(c), 96 Stat. 236 (1982) .............................................................. 14

## LEGISLATIVE MATERIALS AND OTHER AUTHORITIES

136 Cong. Rec. S7536 (daily ed. June 6, 1990)................................................................ 11

Adam R. Waldman, OTC Derivatives & Systemic Risk: Innovative Finance or the
    Dance into the Abyss?, 43 Am. U. L. Rev. 1023, 1058 (1994)............................... 17

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, H.R. Rep.
    No. 109-31 (2005)...................................................................................................... 15

Bankruptcy Treatment of Swap Agreements and Forward Contracts, H.R. Rep.
    No. 101-484 (1990)..................................................................................................... 14

Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing
    Before the Subcomm. on Economic and Commercial Law of the House
    Judiciary Comm., 101st Cong. 13 (1990) ................................................................. 11

Edward R. Morrison & Joerg Riegel, Financial Contracts and the New
    Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy
    Judges, 13 Am. Bankr. Inst. L. Rev. 641 (2005) .................................................... 18

Financial Netting Improvements Act of 2006, H.R. Rep. No. 109-648 (2006)........................ 16

Financial Netting Improvements Act of 2006, H.R. Rep. No. 109-648, pt. 1. at 7

(2006)...........................................................................................................................16

H. R. Rep. No. 97-420 (1982)...................................................................................17

H.R. Rep. No. 101-484 (1990)...................................................................................19

Omnibus Bankruptcy Improvements Act of 1983, H.R. Rep. No. 98-65 (1983) .......................14

Rhett G. Campbell, <u>Financial Market Contracts and BAPCA</u>, 79 Am. Bankr. L. J.
    697 (2005)..................................................................................................18

Technical and Substantive Changes in Bankruptcy Law with Respect to Securities
    and Commodities, H.R. Rep. No. 97-420 (1982) ....................................................14

Thomas G. Kelch & Howard J. Weg, <u>Forward Contracts, Bankruptcy Safe
    Harbors and the Electricity Industry</u>, 51 Wayne L. Rev. 49, 86-87 (2005).........................17

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Lehman

Brothers Holdings Inc. ("<u>LBHI</u>") and its affiliated debtors and debtors in possession

(collectively, the "<u>Debtors</u>"), hereby files this Statement in Further Support of Debtors' Motion

for Summary Judgment ("<u>Debtors' Motion</u>") in the above-captioned matter.[1]  In support thereof,

the Committee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.        Despite its prior acknowledgment that the Bankruptcy Court is the proper

forum for deciding issues arising under the Bankruptcy Code, BNY now seeks to avoid any

substantive review by the Bankruptcy Court of certain *ipso facto* clauses, the enforcement of

which would result in the transfer of tens of millions of dollars of LBSF's property from its

estate.  Instead, BNY urges this court to defer to a foreign judgment decided under foreign law

that has no binding effect in the United States.  The English High Court Judgment cited by BNY,

and the recent decision of the Court of Appeal, Royal Courts of Justice, London, England (the

"<u>Court of Appeal</u>"), at most, concerned the English common law "anti-deprivation principle."

As recognized by both the High Court and the Court of Appeal, however, the English common

law anti-deprivation principle has no bearing on either the *ipso facto* provisions of the

Bankruptcy Code or the application of those provisions to this case.

2.        The Court of Appeal's decision reveals stark differences between the

English common law anti-deprivation principle and the protections against the enforcement of

*ipso facto* provisions mandated by the Bankruptcy Code.  Specifically, sections 541(c)(1)(B) and

365(e)(1)(B) of the Bankruptcy Code protect a broad scope of property interests, including

contingent property interests.  Moreover, the Bankruptcy Code prohibits the enforcement of *ipso*

---

[1]          Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Debtors' Motion.

*facto* provisions triggered by the "commencement of a case," not merely the commencement of

the debtor's bankruptcy case. Accordingly, when evaluating the effectiveness of Clause 5.5 and

Condition 44 of the Trust Documents in the context of LBSF's bankruptcy case, this Court,

unlike the English courts, must consider these provisions of the Bankruptcy Code. As applied

here, sections 541(c)(1)(B) and 365(e)(1)(B) of the Bankruptcy Code render Clause 5.5 and

Condition 44 of the Trust Documents unenforceable.

   3.  BNY's assertion that Clause 5.5 and Condition 44 fall under the limited

safe-harbor provided by section 560 of the Bankruptcy Code is without merit. The enforcement

of Clause 5.5 and Condition 44 do not involve the enforcement of rights by a swap participant.

And even if it did, such enforcement would not be protected by the Bankruptcy Code. In

particular, Clause 5.5 and Condition 44 modify the amount and priority of payments to be made

under the Trust Documents, a fact recognized in the Court of Appeal's decision. The safe-harbor

afforded by section 560 applies only to contractual provisions triggering liquidation, termination,

or acceleration of the CDS Agreements; it does not safe-harbor otherwise unenforceable *ipso*

*facto* provisions that modify payment amounts or priority. Indeed, if Congress had intended

section 560 to allow for modification, it would have used the term "modify," as it did in section

365(e)(1) of the Bankruptcy Code.

## <u>ARGUMENT</u>

## I. **LBSF Has Contractual Rights Under English Law That Are Protected By the Bankruptcy Code**

   4.  As the Court has previously recognized, this is the proper forum for

deciding issues arising under the Bankruptcy Code. (<u>See</u> Debtors' Omnibus Hr'g Tr. (Aug. 11,

2009) at 69:16-17 (Peck, J.) ("But I also recognize that the only rational outcome here that makes

good sense in a cross-border setting, is for the United States Bankruptcy Court to be the principal

if not exclusive decider of issues relating to U.S. bankruptcy law.").)  Specifically, with respect

to the *ipso facto* clauses at issue in this case, the Bankruptcy Code provides substantive rights

beyond those afforded under non-bankruptcy law, and this Court should decide those issues.

See, e.g., Camp v. Nat'l Union Fire Ins. Co. (In re Gov't Secs. Corp.), 111 B.R. 1007, 1010 (S.D.

Fl. 1990) ("11 U.S.C. Section 541(c)(1)(B) creates substantive rights unknown at state law . . . .

[a debtor-in-possession's] ability to preserve rights . . . exists solely under [section 541(c)(1)(B)]

of the Bankruptcy Code."), aff'd, 972 F.2d 328 (11th Cir. 1992), cert. denied, 507 U.S. 952

(1993).[2]  The English courts involved in the parallel proceedings did not and should not decide

those issues.[3]  Indeed, the Court of Appeal expressly acknowledged that a different conclusion

could be reached under the insolvency laws of other countries:

> "There is nothing in the English authorities which supports the
> extension of the anti-deprivation principle to encompass
> transactions which do not alter the property of the insolvent
> company in the asset in question and it would require, I think, a
> significant amendment to the provisions of the Insolvency Act
> before such transactions could be struck down.  ***Although such
> provisions exist in other jurisdictions, they are not yet part of the
> English statutory regime***."

(See Decl. of Ralph I. Miller, dated November 9, 2009 [Docket No. 76] (the "Miller

Declaration"), Ex. A Court of Appeal Decision ¶ 174 (emphasis added).)

---

[2]  See also, e.g., LaMonica v. N. of England Protecting and Indemnity Ass'n Ltd. (In re Probulk), 407 B.R.
56, 60-61 (Bankr. S.D.N.Y. 2009) ( "Section 541(c) applies 'notwithstanding any provision in ... applicable
nonbankruptcy law'" and thus, "the fact that the provisions of the Clubs' contracts are authorized under
U.K. law or that the contracts are governed by U.K. law is not determinative" of whether debtor's property
rights in an insurance contract became property of the estate under section 541(c)(1)).

[3]  See High Court Judgment ¶ 63. ("Similarly it would be inappropriate for me now, as counsel for Perpetual
and Belmont invited me to do, to make the orders and declarations that they seek subject only to the
provision to the Trustee of appropriate indemnities.  Such relief would effectively preclude any request or
other application made by the foreign representative or the US Bankruptcy Court.  As these claims have to
be adjourned to enable the issue of indemnities to be agreed or determined and as they cannot be listed for
any further hearing before October 2009 that ought to give the foreign representative and the US
Bankruptcy Court sufficient time to determine what they wish to do in relation to these proceedings and in
the light of my conclusion on the validity of clause 5.5 of the Supplemental Trust Deeds under English law
by which all the relevant documents are governed and are to be interpreted.")

5.     Here, the Court must apply U.S. law, as set forth in the Bankruptcy Code, to provisions of CDS Agreements and Trust Documents that are otherwise governed by English law and subject to parallel proceedings before the courts of England. Those English courts determined that the relevant provisions of the Saphir Transaction Documents – Clause 5.5 and Condition 44 – are valid and enforceable pursuant to English law and do not violate the anti-deprivation principle of English common law. Neither decision, however, can obviate this Court's responsibility for analyzing those provisions under the unique protections provided to the Debtors by the Bankruptcy Code.[4]

A.     **The Court of Appeal and the Parties Agree That Enforcement of Clause 5.5 and Condition 44 Would Deprive LBSF of Its Contractual Rights**

6.     It is undisputed that LBSF's contractual right to payment of the Collateral pursuant to Clause 5.5's Swap Counterparty Priority and calculation of an Early Termination Amount pursuant to Condition 44's Original Formula are property interests within the meaning of section 541 of Bankruptcy Code. (See, e.g., BNY Mem. of Law in Support of Mot. for Summary J. [hereinafter "BNY Memorandum"] at 17-21 (discussing contractual rights as property of estate); BNY Opp'n to Debtors' Mot. for Summary J. [hereinafter "BNY Opposition"] at 2-6 (same).) It is also undisputed that, after an Event of Default by LBSF, Clause 5.5 and Condition 44 operate to deprive LBSF of its property right by effecting a "flip" from Swap Counterparty Priority to Noteholder Priority and from calculating an Early Termination Amount under the Original Formula to calculating under the Penalty Formula:

The effect of the 'flip' provisions was . . . to change the order of priorities in which the rights were to be exercised in relation to the

---

[4]     Decisions of foreign courts are not binding on this Court. See Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics, 905 F. Supp. 169, 179 (S.D.N.Y. 1995) ("It is well-established that United States courts are not *obliged* to recognize judgments rendered by a foreign state, but may *choose* to give *res judicata* effect on the basis of comity.").

proceeds of the sale of the collateral in the event of a default. Thus … at the date the 'flips' operated, the priority enjoyed by LBSF was no more than a contingent right…. In other words, the effect of the documentation was that the Noteholders were granting to LBSF rights over assets derived from their monies, which rights were liable to be modified on the happening of an Event of Default…. [A]nd the right to recoup money under a change in priority to another charge is every bit as much of an asset as the right to monies . . . arising in the future.

(See Miller Decl., Ex. A ¶¶ 62-67.)

7.      Analyzing these provisions under English law, the Court of Appeal found that LBSF's forfeiture of its right to Swap Counterparty Priority and calculation of an Early Termination Amount pursuant to the Original Formula based on an Event of Default could not constitute a "deprivation" as that term is used in connection with the common law "anti-deprivation principle" in English law. (See, e.g., Miller Decl., Ex. A ¶ 65 ("[I]f one applies [the English common-law anti-deprivation] principles to the facts of this case, they support the Chancellor's conclusion that the rule does not apply to the operation of the 'flips' in clause 5.5 and Condition 44.2 [the Penalty Formula].").) Thus, the Court of Appeal concluded that, under England's common-law anti-deprivation principle, the switch in priority under Clause 5.5 and calculation method under Condition 44 "*was a valid arrangement, enforceable even on or after LBSF's Chapter 11 filing*." (Id. (emphasis supplied).) This determination, however, conflicts with the protections afforded by the Bankruptcy Code.

8.      As this Court recently held in In re Probulk, "[s]ection 541(c) applies 'notwithstanding any provision in . . . applicable nonbankruptcy law.' Thus the fact that the provisions of the [relevant] contracts are authorized under English law or that the contracts are governed by U.K. law is not determinative." Id., 407 B.R. at 60-61. Thus, notwithstanding the Court of Appeal's analysis of Clause 5.5 and Condition 44 under the English common law anti-deprivation principle, the Debtors have substantive rights against enforcement of *ipso facto*

clauses arising under sections 541(c)(1)(B) and 365(e)(1)(B) of Bankruptcy Code[5] that must be independently analyzed by this Court. See, e.g., In re Gilbreath, 395 B.R. 356, 358-59 (Bankr. S.D. Tex. 2008) ("It is this Court's duty to see that the rules are complied with and that the letter and purpose of the Bankruptcy Code are carried out.").

**B.      The Bankruptcy Code Provides LBSF With Unique Substantive Rights Against Deprivation of Its Contractual Rights Pursuant to *Ipso Facto* Clauses**

**i.      The Bankruptcy Code Protects a Broader Range of Property Interests than the English Common Law Anti-Deprivation Principle**

9.      The common law anti-deprivation principle under English law and the Bankruptcy Code significantly differ with respect to protections afforded a debtor's property interests. The Bankruptcy Code protects ***all the property of the estate***, which is broadly defined and includes even strictly contingent interests. See, e.g., Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.), 276 F.3d 123, 128 (2d Cir. 2002). Pursuant to the Bankruptcy Code, a debtor's estate includes property interests subject to *ipso facto* clauses. See 11 U.S.C. §§ 541(c)(1)(B), 365(e)(1)(B). Thus, a debtor's estate includes contingent property interests, even if those property interests may have been burdened with default provisions that would divest the debtor of that interest as a result of its insolvency or a bankruptcy petition. Id. In contrast, the Court of Appeal held that the English common law anti-deprivation principle did not protect LBSF's interests because it was "*contingent* upon there being no Event of Default." (Miller Decl., Ex. A ¶¶ 62, 65-66). Although the English common law anti-deprivation principle does not protect contingent property interests like those at issue in this case, the Bankruptcy Code does. See 11 U.S.C. §§ 365(e)(1)(B); 541(c)(1).

---

[5]      See In re Gov't Secs. Corp., 111 B.R. at 1010.

**The Bankruptcy Code Prohibits *Ipso Facto* Deprivations that Are Triggered by Pre-Petition Events Other than the Debtor's Own Bankruptcy Filing.**

10.     Furthermore, of considerable significance, the English common law anti-deprivation principle and the Bankruptcy Code differ greatly regarding *ipso facto* clauses triggered by events other than the actual filing of a debtor's own bankruptcy case.  Unlike the English common law anti-deprivation principle, the Bankruptcy Code explicitly protects property from forfeitures under *ipso facto* clauses that are triggered by events prior to the debtor filing its petition.  Section 541(c)(1)(B) provides, in relevant part, that "an interest of the debtor in property becomes property of the estate . . . notwithstanding any provision in an agreement . . . that is conditioned on the insolvency or financial condition of the debtor [or] commencement of a case under this title."  11 U.S.C. 541(c)(1)(B).  The In re Probulk decision provides a recent example of the application of section 541(c)(1)(B) to prevent the enforcement of an *ipso facto* clause that was triggered prepetition and, therefore, purported to deprive a debtor of its property interest prepetition.

11.     In In re Probulk, certain foreign insurers (the "Probulk Insurers") of the debtor ("Probulk") asserted that the provisions of the insurance agreement—which was governed by and valid under English law—automatically terminated the insurance coverage of Probulk's ships upon Probulk's board authorizing the filing of a bankruptcy petition.  See 407 B.R. at 60-61.  The Probulk Insurers "claim[ed] that this clause results in a termination of coverage even before a bankruptcy or insolvency filing, apparently recognizing (without conceding) that the U.S. Bankruptcy Code may invalidate certain forfeitures that result from the act of filing a petition under Title 11."  Id. at 60.  The court concluded that "[t]he Bankruptcy Code is not so easily evaded," and that Probulk's rights under the contract continued pursuant to section 541(c)(1)(B) notwithstanding the enforceability of the termination provisions under non-

bankruptcy law.  Id.  As applied here, the Court of Appeal's conclusion regarding Clause 5.5 and Condition 44 act to deprive LBSF of its interest prepetition, but LBSF's interests are protected by sections 541(c)(1)(B) and 365(e)(1)(B) of the Bankruptcy Code.

12.     Moreover, as discussed in the Statement of Official Committee of Unsecured Creditors in Support of Debtors' Motion for Summary Judgment (hereinafter the "Committee's Statement in Support") (see Committee's Statement in Support ¶¶ 40-50, as filed in Lehman Bros. Special Fin. v. BNY Corporate Trustee Servs. Ltd., No. 09-1242 (Bankr. S.D.N.Y. Oct. 23, 2009) [Docket No. 72]), the Bankruptcy Code prohibits the enforcement of *ipso facto* clauses triggered by "the commencement of *a case* under this title."  11 U.S.C. § 541(c)(1)(B) (emphasis supplied); see also 11 U.S.C. § 365(e)(1)(B) (same).  The legislative history makes clear that Congress considered restricting the protections of sections 541(c)(1)(B) and 365(e)(1)(B) to *ipso facto* clauses triggered by "*the commencement of a case under this title concerning the debtor*," see, e.g., H.R. 6 § 541(c), 95th Cong. (introduced Jan. 4, 1977) (emphasis supplied), but ultimately rejected that language in favor the broader language of 11 U.S.C. §§ 541(c)(1)(B) and 365(e)(1)(B) that includes the filing of "a case."  (See Committee's Statement in Support ¶¶ 40-50.)  As a result, the Bankruptcy Code protects LBSF's property rights from being deprived based on LBHI's bankruptcy filing, whether that filing preceded or followed LBSF's own bankruptcy filing.

13.     In stark contrast, the English common law anti-deprivation principle applied by the Court of Appeal protects property from forfeiture only after the commencement of the debtor's bankruptcy estate and only because of the debtor's own bankruptcy.  (See Miller Decl., Ex. A ¶¶ 64, 72.)  In relevant part, the Court of Appeal stated that it "adhere[s] to the simple proposition that, if the deprivation occurs before winding up, it does not fall within the

scope of the rule, whereas if it occurs after the winding up, it does so" (id. ¶ 72), and that the English common law anti-deprivation principle applies only to "assets which were vested in the person on whose bankruptcy the deprivation is to occur" (id. ¶ 64).

14. Thus, as discussed above, the Bankruptcy Code provides significantly different (and broader) protections against *ipso facto* deprivations of a debtors' property than the English common law anti-deprivation principle. To the extent this Court accepts BNY's argument that LBSF's property right was deprived under Clause 5.5 and Condition 44 *ipso facto* prepetition because of LBHI's bankruptcy filing (see BNY Opposition at 2-3), that deprivation is unenforceable pursuant to sections 541(c)(1)(B) and 365(e)(1)(B) of the Bankruptcy Code.[6]

## II. Sections 560 and 362(b)(17) Do Not Apply to Clause 5.5 and Condition 44

15. BNY contends that Noteholder Priority and Condition 44 are "liquidation mechanisms . . . [that] are exempted from Code limitations by section 560, 362(b)(17), and 362(o)." (BNY Opp'n at 16.)[7] In support of this contention, BNY asserts that (1) "[t]he broadly worded provisions of section 560, in conjunction with sections 362(b)(17) and 362(o), have far-reaching application," (id. at 11), and (2) "[n]othing in the wording of section 560 or any other provision of the Code suggests that the safe harbors should be read narrowly and applied only in limited circumstances," (id. at 12). But however "broadly worded" these provisions of the Bankruptcy Code may be, and however "far-reaching" their application, they are not limitless.

---

[6]     Although the Court of Appeal determined that LBSF's interests "flipped" as a result of LBHI's bankruptcy filing (see Miller Decl., Ex. A ¶ 62-65), the Committee disagrees with the Court of Appeal decision, believes it was wrongly decided, and notes that the decision is still subject to further appeal. Nevertheless, to the extent that the Court finds that the Court of Appeal correctly decided that LBSF lost its property interest prepetition upon LBHI's bankruptcy filing and further holds that this does not constitute a violation of the Bankruptcy Code's prohibition on the enforcement of *ipso facto* provisions, the Committee joins in the Debtors' request for leave to amend their complaint to assert avoidance claims pursuant to sections 547 and 548 of the Bankruptcy Code.

[7]     Although BNY cites both section 362(b)(17) and 362(o) (see BNY Opposition at 16), because section 362(o) merely incorporates section 362(b)(17) by reference (see 11 U.S.C. § 362(o)) , this memorandum discusses only section 362(b)(17).

Indeed, contrary to what BNY contends, these provisions do in fact "appl[y] only in [the] limited circumstances" that are embraced by the provisions' plain language and intended purpose.

### A. Congressional Hearings Are Relevant in Construing the Swap Agreement Safe Harbors

16.     Although BNY criticizes the use of "statements made by third parties" at Congressional hearings to determine the meaning and scope of the swap agreement safe harbors (see BNY Opp'n at 14 n.14), many courts have cited and relied on exactly that type of legislative history to construe the safe-harbor provisions of the Bankruptcy Code for specified derivatives transactions.[8] The use of such legislative history is particularly appropriate as an aid to understanding the meaning and scope of provisions of the Bankruptcy Code that, as members of Congress themselves have admitted, deal with "an exceedingly complex area of commercial law

---

[8]     See, e.g., Cohen v. Army Moral Support Fund (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 67 B.R. 557, 596 (D.N.J. 1986) (citing Senate hearing on 1984 repurchase agreement amendments); Bevill, Bresler & Schulman Asset Management Corp. v. Spencer Savs. & Loan Ass'n, (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 878 F.2d 742 (3d Cir. 1989) (citing Senate and House hearings on 1984 repurchase agreement amendments); Cohen v. Savings Bldg. & Loan Co. (In re Bevill, Bresler & Schulman Asset Mgmt. Corp.), 896 F.2d 54, 60 (3d Cir. 1990) (citing House hearings on 1984 repurchase agreement amendments); In re Amcor Funding Corp., 117 B.R. 549, 551-52 (D. Ariz. 1990) (citing House hearings on 1982 commodity contract and securities contract amendments); Kaiser Steel Corp. v. Charles Schwab & Co., 913 F.2d 846, 850 (10th Cir. 1990) (citing House hearings on 1982 commodity contract and securities contract amendments); Raleigh v. Schottenstein, 131 B.R. 655, 664 nn.9-10 (N.D. Ill.1991) (citing House hearings on 1982 commodity contract and securities contract amendments); Kaiser Steel Corp. v. Pearl Brewing Co. (In re Kaiser Steel Corp.), 952 F.2d 1230, 1237, 1238 & n.5 (10th Cir. 1991) (citing House hearing on 1982 commodity contract amendments), cert. denied, 505 U.S. 1213 (1992); Jackson v. Mishkin (In re Adler, Coleman Clearing Corp.), 263 B.R. 406, 476 n.47 (S.D.N.Y. 2001) (citing House hearings on 1984 repurchase agreement amendments); Neb. Dep't of Revenue v. Loewnstein, 513 U.S. 123, 136 n.7 (1994) (citing House hearing on 1982 Commodity contract and securities contract amendments); Official Committee of Unsecured Creditors v. Asea Brown Boveri, Inc. (In re Grand Eagle Companies, Inc.), 288 B.R. 484, 492-93 (Bankr. N.D. Ohio 2003) (quoting Kaiser Steel, 952 F.2d at 1237-38, and citing House hearings on 1982 commodity contract and securities contract amendments); In re Grafton Partners, L.P., 321 B.R. 527, 536 n.17 (B.A.P. 9th Cir. 2005)(citing House hearings on 1982 commodity contract and securities contract amendments); In re Am. Home Mortgage, Inc., 379 B.R. 503, 512 n.8 (Bankr. D. Del. 2008) (following Bevill, 878 F.2d at 746, and citing 1983 Senate hearings on 1984 repurchase agreement amendments); In re Am. Home Mortgage Holdings, Inc., 411 B.R. 181, 190 n.33 (Bankr. D. Del. 2009) (quoting Bevill, 878 F.2d at 746, and citing Senate hearings on 1984 repurchase agreement amendments).

and bankruptcy."[9]  It is certainly more relevant than the views of rating agencies about how such statutory provisions should operate.

### B. The Enforcement of Clause 5.5 and Condition 44 Does Not Involve the Exercise of Contractual Rights by a Swap Participant Under or in Connection with a Swap Agreement

17.     Sections 560 and 362(b)(17) protect only particular, specified actions taken by a swap participant under or in connection with a swap agreement.  As the Committee has previously pointed out, in BNY's Memorandum, BNY spent ten pages arguing that Noteholder Priority and Condition 44 are enforceable under section 560 and related provisions; however, BNY never identified the swap participant that would be enforcing those rights.  (See Committee's Statement in Support ¶ 54.)  Indeed, as the Committee also has previously noted (see id.), in the entire thirty-five pages of the BNY Memorandum, BNY used the term "swap participant" a mere two times, and then only when quoting provisions of the Bankruptcy Code.

18.     BNY repeats that performance in its Opposition, in which, once again, BNY (a) spends ten pages arguing that Noteholder Priority and Condition 44 are enforceable under section 560 and related provisions, (b) uses the term "swap participant" only twice in the

---

[9]     136 Cong. Rec. S7536 (daily ed. June 6, 1990) (statement of Sen DeConcini regarding swap agreement amendments); see also Bankruptcy Treatment of Swap Agreements and Forward Contracts:  Hearing Before the Subcomm. on Economic and Commercial Law of the House Judiciary Comm., 101st Cong. 13 (1990) (statement of Rep. Synar) ("To say that it took some time for me to comprehend the intricacies of this swap transaction would be an understatement.  I always wondered what it would be like to be tortured as a POW.   Trying to learn this issue is very similar to what I suspect is the experience . . . ."); id. at 77 (statement of Rep. Glickman) ("[T]his is an arcane discussion of something that I doubt very many people in this world have the foggiest idea what we are talking about."); id. 83 (statement of Rep. Brooks) ("These are clearly pretty technical matters . . . ."); 136 Cong. Rec. S7536 (daily ed. June 6, 1990) (statement of Sen. DeConcini) ("I would like to thank the swap and forward contracts industry, especially the International Swap Dealers Association, for all their technical help in drafting this legislation.  This is a complicated subject matter and their help was invaluable.").

entire twenty-five-page Opposition,[10] and (c) never identifies the swap participant that would be exercising rights under Noteholder Priority and Condition 44.

19.     As the Committee demonstrated in its Statement in Support, the reason for this repeated omission on BNY's part is the inconvenient fact that the entity that would be exercising rights under Noteholder Priority and Condition 44 – that is, either the Noteholder, or the Trustee acting on behalf of the Noteholder – is not a swap participant.  (See Committee's Statement in Support ¶¶ 56-57.)  The basic transaction structure illustrates this point:

- LBSF and Saphir are parties to the CDS Agreements, which the Committee assumes, for purposes of this proceeding, constitute "swap agreements" under section 101(53B) of the Bankruptcy Code.

- If the CDS Agreements are swap agreements, then Saphir is a "swap participant" under section 101(53C) of the Bankruptcy Code.

- Neither the Trustee nor the Noteholder is a party to the CDS Agreements, or to any other agreement with LBSF that qualifies as a swap agreement under section 101(53B).  For that reason, neither the Trustee nor the Noteholder is a swap participant under section 101(53C).

- Rather, the Noteholder is merely a creditor of Saphir, having made loans to Saphir that are (a) evidenced by the Notes and (b) secured by the same property of Saphir – that is, the Collateral – that secures Saphir's obligations to LBSF under the CDS Agreements.

20.     In its Opposition, BNY makes sixteen references to "swap agreements," and eight references to "financial markets," apparently in the hope that it will somehow benefit from the repetition of, and an implied association of some kind with, these terms.  But reduced to its essence, BNY's argument is that, in a debtor's bankruptcy case, a secured lender to a swap participant is protected by the swap agreement safe harbors in the same manner as the swap participant.  That argument is groundless, however, because a lender, whether a lender to the

---

[10]     See BNY Opp'n at 15 n.16 (quoting legislative history); see id. at 16 (describing sections 362(b)(17) and (o)).

debtor or a lender to a swap participant, is not a swap participant, and therefore is not entitled to the protections that the Bankruptcy Code expressly provides only to swap participants.

### C. The Enforcement of Noteholder Priority and Condition 44 Does Not Involve the Exercise of Rights of the Kind That Are Protected by Sections 560 and 362(b)(17),

21. In the BNY Opposition, BNY shifts its argument from (a) one that relies on "liquidation" in section 560 covering the exercise of these rights to (b) one that that relies more generally on "the termination or liquidation process" (see BNY Opposition at 15), particularly the exercise of rights under section 362(b)(17) (see id. at 16). There are two fundamental problems with BNY's argument.

22. First, as even BNY itself admits, section 362(b)(17) protects only "*a swap participant's* exercise of its contractual rights to . . . enforce its interest in collateral governed by swap agreements." (BNY Opp'n at 16 (emphasis supplied).) The enforcement of Noteholder Priority and Condition 44, however, would not be done by a swap participant. Second, even if the only swap participant in this transaction – Saphir – could somehow be characterized as the party that would be enforcing Noteholder Priority and Condition 44, such enforcement would not constitute the exercise of rights of the kind that section 362(b)(17) protects.

23. Section 362(b)(17) was originally enacted in 1990 as section 362(b)(14)[11] and redesignated as section 362(b)(17) in 1994.[12] It was based on the previously enacted sections 362(b)(6) and section 362(b)(7), and was intended to "provide[] the same exemption from the Bankruptcy Code's automatic stay . . . that [prior amendments] provide[d] to other similar types of financial agreements, including repurchase agreements, securities contracts, commodities contracts, and forward contracts." Bankruptcy Treatment of Swap Agreements and

---

[11]     See Pub. L. No. 101-311, § 102(3), 104 Stat. 267 (1990).
[12]     See Pub. L. No. 103-394, § 501(d)(7)(B)(vi), 108 Stat. 4144 (1994).

Forward Contracts, H.R. Rep. No. 101-484, at 1 (1990); see id. at 2-3.  The legislative history of

section 362(b)(6), which Congress enacted in 1982, see Pub. L. No. 97-222, § 3(c), 96 Stat. 236

(1982), states that it was:

> intended to clarify that, despite the automatic stay of section
> 362(a), a commodity broker, forward contract merchant
> stockbroker, or securities clearing agency may set off a claim for a
> margin or settlement payment arising out of commodities
> contracts, forward contracts, or securities contract[s] against cash,
> securities or other property which it is holding to margin,
> guarantee, or secure such contracts, notwithstanding the
> bankruptcy of he party for whose account such cash, securities, or
> property is held.

Technical and Substantive Changes in Bankruptcy Law with Respect to Securities and

Commodities, H.R. Rep. No. 97-420, at 3 (1982).  The legislative history of section 362(b)(7)

similarly states that section 362(b)(7) was:

> intended to clarify that, despite the automatic stay of section
> 362(a), a repo participant may set off a claim for a margin or
> settlement payment arising out of repurchase agreements against
> the repo participant's obligations to the debtor in respect of cash,
> securities or other property that the repo participant is holding, or
> that is due to the debtor, to margin, guarantee, secure or settle
> repurchase agreements, notwithstanding the bankruptcy of the
> party for whose account such cash, securities, or property is held.
> This provision is essentially parallel to the one in existing Code
> section 362(b)(6).

Omnibus Bankruptcy Improvements Act of 1983, H.R. Rep. No. 98-65, at 71 (1983).  The

legislative history of section 362(b)(17) states that it "permits the swap participant to use any

collateral previously pledged by the debtor to guarantee, secure, or settle any sway agreement."

Bankruptcy Treatment of Swap Agreements and Forward Contracts, H.R. Rep. No. 101-484, at 5

(1990).

24.     The legislative history of section 907(d) of the 2005 amendments to the

Bankruptcy Code, which amended section 362(b)(17) and its counterparts,[13] states:

> Subsection (d) amends section 362(b) of the Bankruptcy Code to
> protect enforcement, free from the automatic stay, of setoff or
> netting provisions in swap agreements and in . . . security
> agreements or arrangements related to one or more swap
> agreements . . . .  This provision parallels the other provisions of
> the Bankruptcy Code that protect netting provisions of securities
> contracts, commodity contracts, forward contracts, and repurchase
> agreements. . . .  [T]he references to "setoff" in these provisions, as
> well as in section 362(b)(6) and (7) of the Bankruptcy Code, are
> intended to refer also to rights to foreclose on, and to set off
> against obligations to return, collateral securing swap agreements,
> master netting agreements, repurchase agreements, securities
> contracts, commodity contracts, or forward contracts.  Collateral
> may be pledged to cover the cost of replacing the defaulted
> transactions in the relevant market, as well as other costs and
> expenses incurred or estimated to be incurred for the purpose of
> hedging or reducing the risks arising out of such termination.
> Enforcement of these agreements and arrangements free from the
> automatic stay is consistent with the policy goal of minimizing
> systemic risk.
>
> Subsection (d) also clarifies that the provisions protecting setoff
> and foreclosure in relation to securities contracts, commodity
> contracts, forward contracts, repurchase agreements, swap
> agreements, and master netting agreements free from the automatic
> stay apply to collateral pledged by the debtor but that cannot
> technically be "held by" the creditor, such as receivables and book-
> entry securities, and to collateral that has been repledged by the
> creditor and securities re-sold pursuant to repurchase agreements.

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, H.R. Rep. No. 109-31, pt.

1, at 132 (2005).

25.     Section 362(b)(17) and its counterpart provisions were most recently

amended by the Financial Netting Improvements Act of 2006, Pub L. No. 109-390, § 5(a)(2),

119 Stat. 23 (2006), which made a number of technical and clarifying changes in these and other

---

[13]     See Pub. L. No. 109-8, § 907(d), 119 Stat. 176-77 (2005).

provisions of the Bankruptcy Code and other statutes.[14]  The legislative history of these

amendments states:

> Section 5(a)(2) amends section 362(b) of the Bankruptcy Code to
> protect enforcement, free from the automatic stay, of collateral,
> setoff or netting provisions in commodity contracts, forward
> contracts, securities contracts, repurchase agreements or swap
> agreements and in master netting agreements and security
> agreements or arrangements or other credit enhancements related
> to one or more swap agreements or master netting agreements.
> These changes conform the provisions of the Bankruptcy Code to
> the parallel provisions of the [Federal Deposit Insurance Act] and
> [Federal Credit Union Act] to confirm that Sections 362(b)(6), (7)
> and (17) protect, free from the automatic stay, all rights previously
> protected by Sections 362(b)(6), (7) and (17), including self-help
> foreclosure-on-collateral rights, setoff rights and netting rights
> (including foreclosure on, and setoff against, cash and securities
> held to margin or secure claims for margin payments and
> settlement payments, title transfer arrangements and the right to
> offset obligations owed against collateral pledged to the debtor).

Financial Netting Improvements Act of 2006, H.R. Rep. No. 109-648, pt. 1. at 7 (2006).

26.     This legislative history, spanning twenty-seven years, establishes that the

purpose of section 362(b)(17) is to protect a swap participant's rights (1) to realize on collateral

pledged by the debtor to the swap participant to secure the debtor's obligations to the swap

participant, and (2) to have collateral pledged by the swap participant to the debtor applied in

satisfaction of the obligations owed by the swap participant to the debtor.  Section 362(b)(17)

does not protect a swap participant's "distributions of cash or other property" (BNY Opp'n at

16), to mere lenders such as the Noteholders.

27.     Moreover, as the Committee previously demonstrated, the term

"liquidation" in section 560 does not apply to the exercise of rights such as those under

---

[14]     See Financial Netting Improvements Act of 2006, H.R. Rep. No. 109-648, pt. 1. at 1 ("technical changes"),
2 ("clarifying the treatment"; "technical changes"; "clarifying the enforceability"; "technical changes . . . to
update the language to reflect current market and regulatory practices"; "clarifying the treatment of certain
financial products") (2006).

Noteholder Priority and Condition 44. (See Committee's Statement in Support ¶¶ 64-81.) By its plain terms, section 560 protects *only* the liquidation,[15] termination, or acceleration of a swap agreement, and the offsetting or netting out[16] of positions under or in connection with a swap agreement. See 11 U.S.C. § 560; see also In re Enron I, 306 B.R. 465, 473 (Bankr. S.D.N.Y. 2004) ("[s]ection 560 . . . preserves the rights of a non-defaulting counterparty to a swap agreement to ***terminate*** the contract based upon . . . the filing of a bankruptcy petition") (emphasis added). Nothing in the language of section 560 suggests that it protects the ***modification*** of rights or obligations under a swap agreement, and Congressional intent and recent case law support the fact that section 560 is not intended to include modification.

### i. Congress Chose Not To Include "Modification" When Expanding Safe Harbors

28. Congress had the opportunity to include "modify" within the scope of protected rights set forth in section 560 when it amended that section in 2005 by enacting the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCA"). See BAPCA, Pub. L. No. 109-8, § 560, 119 Stat. 23, 179 (2005). When significantly expanding the scope of

---

[15] "Liquidate" refers to the right to "close out" a position. See H. R. Rep. No. 97-420, at 2 (1982), reprinted in 1982 U.S.C.C.A.N. 583, 584, 1982 WL 25042 (defining "liquidate" with respect to section 556 as "to close out an open position"); Gustafson v. Alloyd Co., 513 U.S. 561, 570 (1995) (identical words used in different parts of the same act are intended to have the same meaning); see also Thomas G. Kelch & Howard J. Weg, Forward Contracts, Bankruptcy Safe Harbors and the Electricity Industry, 51 Wayne L. Rev. 49, 86-87 (2005) ("Under any definition, 'liquidation' allows determination of amounts owing under a contract").

[16] "Netting" refers to the right to "aggregate reciprocal claims." Adam R. Waldman, OTC Derivatives & Systemic Risk: Innovative Finance or the Dance into the Abyss?, 43 Am. U. L. Rev. 1023, 1058 (1994). For example,

> assume two parties create two open contracts for the sale of derivative products. As the result of market movement, party A owes party Z $10 million on one contract, and party Z owes party A $10 million on the other contract. If party Z becomes bankrupt, and netting is enforceable, party A has the right to immediately terminate the agreement, calculate damages on a net basis, and "set-off" the $10 million it has incurred against the $10 million it is owed.

Id.

section 560's and other financial safe harbors,[17] Congress chose to expand the rights protected under section 560 to include "liquidat[ion], terminat[ion], or accelerat[ion]" of swap agreements, but **not** modification.  See 11 U.S.C. § 560 (2005).

29.     Section 365(e)(1), which is specifically referenced in section 560, demonstrates that Congress knew how to reference contractual "modification" if it so desired. See 11 U.S.C. § 365(e)(1) ("an executory contract or unexpired lease of the debtor may not be terminated **or modified** . . ."); cf. Hirt v. Equitable Ret. Plan for Employees, Managers, and Agents, 533 F.3d 102, 108 (2d Cir. 2008) (declining to ascribe to "rate of benefit accrual" the meaning of "accrued benefit" where Congress "knew how to reference accrued benefit" but did not do so in respect of ERISA § 204(b)(1)(H)(i)).  "When Congress uses particular language in one section of a statute and different language in another, we presume its word choice was intentional."  Hirt, 533 F.3d at 108 (citation omitted).[18]  Accordingly, pursuant to the well-established canons of statutory construction, it must be presumed that by including "modification" in section 365(e)(1) and excluding it from section 560, Congress purposefully excluded the modification of swap agreements or related contracts from the section 560 safe harbor.  See id.

30.     Moreover, this conclusion is supported by the legislative history of section 560.  In enacting section 560, Congress stated:

---

[17]     BANKRUPTCY, *inter alia*: (1) enlarged the scope of financial contracts, *i.e.*, *which* financial contracts, would be protected under the safe harbors, including "massive changes to the definition of 'swap agreement'"; (2) increased *who*, *i.e.*, which parties, would be protected under the safe harbors; and (3) broadened certain contractual rights (*i.e.*, allowing cross-netting).  See id.; see also Edward R. Morrison & Joerg Riegel, Financial Contracts and the New Bankruptcy Code: Insulating Markets from Bankrupt Debtors and Bankruptcy Judges, 13 Am. Bankr. Inst. L. Rev. 641 (2005); Rhett G. Campbell, Financial Market Contracts and BAPCA, 79 Am. Bankr. L. J. 697 (2005).

[18]     See also Union of Needletrades v. I.N.S., 202 F. Supp. 2d 265, 271 (S.D.N.Y. 2002) ("The presumption that in all enactments every choice of words is purposeful, manifesting legislative intent to convey particular meaning, and that statutory use of different terms evinces intent to express different meanings.") (citations omitted).

> The new section 560 makes clear that a swap participant may exercise other contractual rights to *terminate or net out* a swap agreement in the event that the other party files a bankruptcy petition, notwithstanding the automatic stay and trustee avoidance provisions of the Bankruptcy Code. . . . The *intent* of this provision is to permit either the non-debtor swap participant or the trustee to *terminate* a swap agreement, so that a swap agreement may continue after the bankruptcy petition is filed only by mutual consent of both the non-debtor swap participant and the trustee.

H.R. Rep. No. 101-484, at 6 (1990), reprinted in 1990 U.S.C.C.A.N. 233, 228 (emphasis added).

There is absolutely no reference to "modification" in the legislative history.

31.     Accordingly, the legislative history makes clear that Congress meant to protect *financial markets*, from the volatility associated with swap agreements by allowing swap counterparties to *terminate* existing swap agreements upon the bankruptcy of the other counterparty.  Congress expressed no intent to safe harbor a swap counterparty's right to modify its priority in the payment scheme or the amount of the payment it is due.

> ### ii.     A Recent Decision From the Southern District of New York Supports the View that Section 560 Was Not Intended to Safe Harbor Modification

32.     Moreover, the Southern District of New York's recent decision in In re Calpine Corp., No. 05-60200, 2009 WL 1578282 (Bankr. S.D.N.Y. May 7, 2009), regarding section 556 of the Bankruptcy Code, a safe harbor provision for commodities contracts and forward contracts that is substantially similar to section 560, supports the view that section 560 does not safe harbor modification.[19]  See generally id.

33.     In In re Calpine, this Court held that section 556 "clearly limits its reach to *only those clauses that trigger termination* upon the occurrence of a condition specified in section 365(e)(1) of the Code."  Id. at *7 (emphasis added); see also id. at *6 ("[S]ection 556 of

---

[19]     Compare 11 U.S.C. § 556 with 11 U.S.C. § 560.

the Code allows a creditor to exercise a prepetition contractual right to terminate a forward contract based upon the debtor's filing of a bankruptcy petition. However, by its terms, section 556 of the Code is limited to enforcing *only those terms that trigger termination* upon the occurrence of one of the three specified conditions listed in section 365(e)(1) of the Code." (emphasis supplied)). It follows that the parallel provisions of section 560 safe harbored the timely exercise of "*only those terms that trigger termination*" upon the filing of a bankruptcy petition and does not protect the *modification* of rights or obligations under a swap agreement. See id. at *6.

## CONCLUSION

WHEREFORE, the Committee respectfully requests that the Court grant Debtors' Motion for Summary Judgment, deny BNY's Motion for Summary Judgment, and grant such other and further relief as the Court deems just and proper.

Dated: New York, New York
November 9, 2009

MILBANK, TWEED, HADLEY & McCLOY LLP

By: /s/ Dennis F. Dunne
Dennis F. Dunne
Wilbur F. Foster, Jr.
Evan Fleck
1 Chase Manhattan Plaza
New York, NY 10005
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

David S. Cohen (admitted *pro hac vice*)
Adrian C. Azer (admitted *pro hac vice*)
1850 K Street N.W., Suite 1100
Washington, DC 20006
Telephone: (202) 835-7500
Facsimile: (202) 835-7586

Counsel for the Official Committee
of Unsecured Creditors of Lehman Brothers
Holdings, Inc., et al.
