# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | ) Case No. 08-13555 (JMP) |
| | ) |
| Debtors. | ) |
| | ) |

| | |
|---|---|
| | ) |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | ) |
| | ) |
| Plaintiff, | ) Adversary Proceeding |
| -against- | ) No.: 09-01242 (JMP) |
| BNY CORPORATE TRUSTEE SERVICES LIMITED | ) |
| | ) |
| Defendant. | ) |
| | ) |

## MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT AND DECLARING APPLICABLE PAYMENT PRIORITIES

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors*
1300 Eye Street, N.W.
Suite 900
Washington, DC 20005

      Ralph I. Miller, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors*
767 Fifth Avenue
New York, NY 10163

      Peter Gruenberger, Esq.

WEIL, GOTSHAL & MANGES LLP
*Attorneys for Debtors*
700 Louisiana
Suite 1600
Houston, TX 77022

Meredith B. Parenti, Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Attorneys for Official Committee of Unsecured Creditors*
One Chase Manhattan Plaza
New York, NY 10005

Wilbur F. Foster, Jr., Esq.

MILBANK, TWEED, HADLEY & MCCLOY LLP
*Attorneys for Official Committee of Unsecured Creditors*
10 Gresham St.
London EC2V 7JD England

James Warbey, Esq.

REED SMITH LLP
*Attorneys for BNY Corporate Trustee Services Limited*
599 Lexington Avenue
New York, NY 10022

Eric A. Schaffer, Esq.

REED SMITH LLP
*Attorneys for BNY Corporate Trustee Services Limited*
Broadgate Tower
20 Primrose Street
London EC2A 2RS England

Ian B. Fagelson, Esq.

JAMES M. PECK
United States Bankruptcy Judge

### *Introduction*

This is a matter arising out of a complex financial structure that includes an added layer of complexity due to the pendency of parallel and potentially conflicting legal proceedings in this Court and the United Kingdom. The litigation in England (the "English Litigation") was first commenced in the High Court of Justice, Chancery Division (the "High Court") followed by an

2

appeal to the Court of Appeal, Civil Division (the "Court of Appeal" and, together with the High Court, the "English Courts"). At issue both here and in the English Courts is the priority of payment to beneficiaries (one a noteholder and the other a swap counterparty) that hold competing interests in collateral securing certain credit-linked synthetic portfolio notes. The swap counterparty is Lehman Brothers Special Financing Inc. ("LBSF"), one of the Lehman entities whose chapter 11 case is before this Court.

The English Litigation was filed in the High Court by Perpetual Trustee Company Limited ("Perpetual"), as holder of various credit-linked synthetic portfolio notes, against BNY Corporate Trustee Services Limited ("BNY") seeking priority payment pursuant to so-called "Noteholder Priority" (as defined below) under the terms of certain swap agreements (each a "Swap Agreement")[1] among LBSF and Dante Finance Public Limited Company ("Dante").

LBSF intervened in the English Litigation and has participated both in the English Litigation and in this adversary proceeding.[2] After a trial, the High Court issued a judgment in which it held, *inter alia*, that LBSF's interest in the collateral securing the Swap Agreements (the "Collateral") was "always limited and conditional," and, therefore, payment pursuant to Noteholder Priority did not violate the so-called "anti-deprivation principle" under English law. (Venditto Aff. Ex. 7 at ¶¶ 45, 49-55). The High Court also noted that Noteholder Priority became effective on September 15, 2008, the date on which Lehman Brothers Holdings Inc. ("LBHI"), credit support provider for LBSF's payment obligations under each Swap Agreement, filed its petition in this Court for protection under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). (Venditto Aff. Ex. 7 at ¶¶ 24, 49).

---

[1] Each Swap Agreement consists of an ISDA Master Agreement, appurtenant schedules and written confirmation.

[2] Perpetual is not a party to the adversary proceeding, and it is unclear whether Perpetual is subject to the jurisdiction of this Court.

During the pendency of the English Litigation in the High Court, on May 20, 2009, LBSF (collectively with LBHI and its affiliated debtors, the "Debtors") commenced this action by filing a two-count complaint (the "Complaint") against BNY. Count I of the Complaint seeks a declaratory judgment that the provisions in the Swap Agreements that modify LBSF's payment priority upon an event of default constitute unenforceable *ipso facto* clauses that violate Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B), thereby enabling LBSF to retain its right to receive a priority payment under the Swap Agreements ("Swap Counterparty Priority"). Count II seeks a declaratory judgment from this Court that any action to enforce the provisions purportedly modifying LBSF's right to priority of payments as a result of its bankruptcy filing violates the automatic stay under Bankruptcy Code section 362(a).

The interplay between this litigation and the English Litigation has been obvious from the start, and both this Court and the English Courts have been aware of the potential for conflicting rulings due to differences in the law being applied by each tribunal to the underlying dispute. With this trans-Atlantic aspect of the cases in mind, LBSF requested and received permission to file its motion for summary judgment prior to the deadline for BNY to file a responsive pleading so that it could be used in the English Litigation. (06/03/09 Tr. 110: 1-6). LBSF filed its motion for summary judgment on June 10, 2009. On June 22, 2009, BNY filed a motion to dismiss the Complaint, arguing that Perpetual, as the real party-in-interest in this matter, is an "indispensable party" under Federal Rule of Civil Procedure 19, made applicable to this proceeding by Federal Rule of Bankruptcy Procedure 7019. LBSF opposed the motion to dismiss.

At a hearing held on August 11, 2009, the Court found that BNY had the capacity to adequately represent Perpetual's interests in this litigation[3] and denied the motion to dismiss. (08/11/09 Tr. 68:11-25, 69:24-70:3). Thereafter, pursuant to a briefing schedule ordered by the Court, BNY filed a cross motion for summary judgment. In addition, the official committee of unsecured creditors appointed in the Debtors' bankruptcy cases requested and received permission to intervene in this matter and has filed various statements in support of LBSF's pleadings.

LBSF filed a notice of appeal of the High Court's judgment on August 17, 2009. (Venditto Aff. Ex. 8). On November 6, 2009, the Court of Appeal issued a unanimous judgment in which it affirmed the holding of the High Court. (Venditto Supp. Aff. Ex. A). Specifically, the Court of Appeal determined that (i) the LBHI bankruptcy filing on September 15, 2008 gave rise to the application of Noteholder Priority and triggered the calculation of a subordinated Early Termination Payment (as defined below) to LBSF under Condition 44 of the Terms and Conditions of the Notes ("Condition 44"), and (ii) this was independent of the early termination of the Swap Agreements effected by Saphir Finance Public Limited Company ("Saphir"), as issuer of the credit-linked synthetic portfolio notes at issue. (Venditto Supp. Aff. Ex. A at ¶ 21). The Court of Appeal also determined that LBSF lost no property right or interest as a result of the shift to Noteholder Priority and the subordinated Early Termination Payment, because LBSF's interest in the Collateral always had been contingent. (Venditto Supp. Aff. Ex. A at ¶ 62). Stated differently, LSBF was not deprived of any right by virtue of the fact that the

---

[3] At the time of this hearing, BNY was a party to another adversary proceeding involving similar issues relating to the application of the *ipso facto* provisions of the Bankruptcy Code, and so the Court considered BNY to be particularly well positioned to make the same arguments in this case in Perpetual's absence. That other case was settled prior to a hearing on dispositive motions.

applicable payment priority had shifted to Noteholder Priority because it "had always been an agreed feature of that right, as a result of [an event of default on its part], LBSF had to rank behind, rather than ahead of, [Perpetual]." (Venditto Supp. Aff. Ex. A at ¶ 63). On November 13, 2009, the Court of Appeal issued an order denying LBSF's motion for leave to appeal to the Supreme Court of England and Wales. (Venditto 2d Supp. Aff. Ex. A).

Throughout these proceedings, the parties have kept the Court apprised of the progress of the English Litigation. In addition, the Court has exchanged various communications with the High Court regarding coordination of and cooperation with respect to the litigation here and in London. Most recently, this Court received a letter from the High Court (i) explaining that "[t]he English court has confined itself to making a declaration that the relevant contractual provisions are 'valid, effective and enforceable as a matter of English law as the proper law of such contracts, so as to give effect to Noteholder Priority,'" and (ii) requesting that if this Court concludes that "the relevant provisions are void or otherwise unenforceable under U.S. bankruptcy law" it "go no further at that stage than to make a declaratory judgment to that effect." At a hearing on the cross motions for summary judgment on November 19, 2009, the parties agreed that it is appropriate for this Court to determine at this time only whether declaratory relief is appropriate in this matter and to further coordinate with the High Court should it become necessary after a decision is rendered. (11/19/2009 Tr. 64: 1-3, 65: 5-11).

It is in this context that the Court has evaluated the motions for summary judgment and has decided to grant LBSF's motion for summary judgment and to deny the cross motion of BNY. This Court concludes that the relevant provisions purporting to reverse the priority of payment on account of the occurrence of a default due to commencement of a case under the

Bankruptcy Code are unenforceable and violate the *ipso facto* provisions of the Bankruptcy Code.

### *Standard*

Summary judgment is appropriate where there is "no genuine issue as to any material fact," so that the moving party is entitled to "judgment as a matter of law." Fed. R. Civ. P. 56(c). The court must view the facts in the light most favorable to the non-moving party, and must resolve all ambiguities and draw all inferences against the moving party. *Coach Leatherware Co. v. AnnTaylor, Inc.*, 933 F.2d 162, 167 (2d Cir. 1991). In determining whether to grant a motion for summary judgment, the court is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. 242 at 249, 91 L. Ed. 2d 202, 106 S. Ct. 2505. The parties acknowledge that there are no genuine issues of material fact and that the questions presented purely involve the application of relevant provisions of the Bankruptcy Code to undisputed facts.

### *Background*

On October 10, 2002, BNY's predecessor entered into a Principal Trust Deed (the "Principal Trust Deed") with Dante, pursuant to which a multi-issuer secured obligation program (the "Dante Program") was established. BNY currently serves as Trustee under the Dante Program.

Under the Dante Program, Saphir, a special purpose entity created by Lehman Brothers International (Europe), issued various series of credit-linked synthetic portfolio notes. At issue for purposes of this litigation are two series of such notes held by Perpetual: (i) Series 2004-11 AUD 75,000,000 Synthetic Portfolio Notes Due 2011, and (ii) Series 2006-5 AUD 50,000,000 Synthetic Portfolio Notes due 2011 and Extendable Up to 2016 (collectively, the "Notes").

The Notes are secured by the Collateral, which BNY holds in trust for the benefit of creditors of Saphir, including Perpetual (as holder of the Notes) and LBSF (as swap counterparty). The Collateral comprises various assets and secured obligations. Each series of Notes is governed by a Supplemental Trust Deed (each, a "Supplemental Trust Deed" and collectively with all agreements underlying the Notes, the "Transaction Documents"). Each Supplemental Trust Deed, in turn, references a Swap Agreement. The events of default under each of the Swap Agreements include the bankruptcy filing of any party.

Pursuant to the terms of the Transaction Documents, the rights of LBSF in the Collateral ordinarily take priority ("Swap Counterparty Priority") over those of Perpetual. However, if an event of default occurs on the part of LBSF under a Swap Agreement, the Transaction Documents call for a reversal of priorities so that Perpetual would then be entitled to priority over amounts otherwise payable to LBSF ("Noteholder Priority"). In addition, Condition 44 modifies the calculation of the Early Redemption Amount (i.e., the amount payable upon the early redemption of a Note) in the event that LBSF defaults under the related Swap Agreement.

LBHI commenced a voluntary case under chapter 11 of the Bankruptcy Code on September 15, 2008. LBSF commenced its own voluntary case under the Bankruptcy Code on October 3, 2008 (the "LBSF Petition Date"). On November 25, 2008, counsel to the Debtors sent a letter to Bank of New York Mellon Trust Company, National Association, and Bank of New York Mellon stating that (i) any action with respect to transactions in which BNY serves as trustee may be subject to the automatic stay provisions of section 362 of the Bankruptcy Code, and (ii) any provisions purporting to subordinate any amounts payable to LBSF would be unenforceable and unlawful. (LBSF Br. Supp. Ex. G). On December 1, 2008, Saphir sent notices to LBSF terminating the Swap Agreements designating (i) the filing by LBSF of a

chapter 11 petition as the relevant event of default and (ii) December 1, 2008 as the Early

Termination Date under section 6(a) of each ISDA Master Agreement. (LBSF Br. Supp. Exs. H,

I). Under the terms of the Principal Trust Deed, such termination obligated Saphir to redeem the

Notes.

### *Motions for Summary Judgment*

In its motion for summary judgment, LBSF argues that the contractual provisions in the

Transaction Documents that modify the scheme for payment priority are unenforceable *ipso*

*facto* clauses that inappropriately modify a debtor's interest in a contract solely because of a

bankruptcy filing in violation of Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B). LBSF

also maintains that any attempt to modify its payment priority violates the automatic stay, in

violation of Bankruptcy Code section 362(a)(3), because it improperly seeks to exercise control

over the property of LBSF's estate. Finally, LBSF argues that the so-called "safe harbor"

provisions of the Bankruptcy Code do not protect the purported modification of the payment

priority.[4]

In its motion, BNY argues that because the Transaction Documents are to be governed by

and construed in accordance with English law, this Court must defer to the determination by both

the High Court and the Court of Appeal that Noteholder Priority and subordinated payment

under Condition 44 became effective automatically on September 15, 2008. If the Court defers

to such finding, LBSF's interests already were governed by Noteholder Priority and subordinated

to the interests of Perpetual under Condition 44 as of the date it filed its chapter 11 petition.

Under this theory, LBSF never had the right to claim Swap Counterparty Priority or its preferred

method of calculation of the Early Redemption Amount under Condition 44. BNY maintains

---

[4] The scope of the safe harbor provisions is discussed later in this opinion.

that LBSF cannot use its status as a bankruptcy debtor to attempt to garner any greater rights with respect to the Collateral than it possessed prepetition.

BNY also argues that even if the payment modification provisions at issue constitute unenforceable *ipso facto* clauses, inasmuch as they are the agreed mechanisms pursuant to which the parties' transactions are liquidated, the provisions fall within the scope of the protections provided by the safe harbor provisions of the Bankruptcy Code. Finally, BNY asserts that Noteholder Priority and Condition 44 constitute subordination agreements, which agreements have been found by the English Courts to be enforceable under applicable non-bankruptcy law. Given that subordination agreements are enforceable under the Bankruptcy Code "to the same extent that such agreement[s] [are] enforceable under applicable nonbankruptcy law," BNY submits that Noteholder Priority and Condition 44 are enforceable against LBSF. *See* 11 U.S.C. § 510(a).

The Court will examine in turn each of these issues – *ipso facto*, automatic stay, safe harbor and Bankruptcy Code section 510.

### *Ipso Facto/Automatic Stay*

The Bankruptcy Code of 1978 effected a change in the treatment of contract or lease clauses that would seek to modify the relationships of contracting parties due to the filing of a bankruptcy petition – so-called *ipso facto* clauses. *See Reloeb Co. v. LTV Corp.* (*In re Chateaugay Corp.*), 1993 U.S. Dist. LEXIS 6130, *14 n.3 (S.D.N.Y. 1993). It is now axiomatic that *ipso facto* clauses are, as a general matter, unenforceable. *See*, *e.g.*, *Id.* at *15-*16 (S.D.N.Y. 1993) (explaining that Bankruptcy Code section 365 "abrogates the power of *ipso facto* clauses" and, therefore, "[n]o default may occur pursuant to an *ipso facto* clause"). Under Bankruptcy Code section 365(e)

> an executory contract … may not be terminated or modified, and any right or obligation under such contract … may not be terminated or modified, at any time after the commencement of the case solely because of a provision in such contract … that is conditioned on … the commencement of a case under this title … .

11 U.S.C. § 365(e)(1).

Bankruptcy Code section 541, in addition to describing what constitutes property of the bankruptcy estate, also invalidates *ipso facto* clauses, providing that a debtor's interest in property

> becomes property of the estate … notwithstanding any provision in an agreement, transfer instrument, or applicable nonbankruptcy law … that is conditioned on … the commencement of a case under this title … and that effects or gives an option to effect a forfeiture, modification, or termination of the debtor's interest in property.

11 U.S.C. § 541(c)(1)(B).

The intriguing question presented is whether it is the bankruptcy filing of LBHI or the later filing of LBSF that is the relevant commencement of a case for purposes of invalidating the shifting of priorities under the Transaction Documents. Before reaching that question, the Court needs to determine whether the Transaction Documents constitute executory contracts and, therefore, whether LBSF is entitled to the protections provided by Bankruptcy Code section 365. BNY, in its papers, baldly states that "the only performance due [under the Transaction Documents] – if *any* – is payment" and, therefore, the Transaction Documents are not executory contracts. (Br. Opp'n at 7) (citing cases that found contracts were not executory where the only performance remaining was payment). BNY does not offer any additional analysis or make any further argument on the issue, relying on the assertion that Noteholder Priority and subordination under Condition 44 took effect prior to the date on which LBSF filed its bankruptcy petition. (Id).

Regardless of whether and when Noteholder Priority and subordination under Condition 44 took effect, there is no question that the parties' obligations under the Transaction Documents are continuing, that performance remains outstanding and that the Transaction Documents satisfy the functional definition of executory contracts.

The Bankruptcy Code does not define the term "executory contract." The Second Circuit has characterized an executory contract as one "on which performance remains due to some extent on both sides," *Eastern Air Lines, Inc. v. Ins. Co. of Pa. (In re Ionosphere Clubs, Inc.)*, 85 F.3d 992, 998-99 (2d Cir. 1996) (quoting *Nat'l Labor Relations Bd. v. Bildisco & Bildisco*, 465 U.S. 513, 522 n.6 (1984)) (internal quotation marks omitted). In *COR Route 5 Co., LLC v. Penn Traffic Co. (In re Penn Traffic Co.)*, 524 F.3d 373, the Second Circuit addressed the question of the extent to which performance must remain due on both sides for a contract to be treated as executory under section 365. The *Penn Traffic* court adopted the so-called "Countryman"[5] approach to its determination; that is, "an executory contract is one 'under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing performance of the other.'" *Id.* at 379-80.

The language and structure of the ISDA Master Agreement that forms a central part of the Swap Agreement demonstrate that these contracts are executory. Paragraph 9(c) of each ISDA Master agreement expressly provides that the obligations of the parties under the relevant Swap Agreement shall survive the termination of any transaction. (LBSF Br. Supp. Ex. E § 9(c); Ex. F § 9(c)). Given that all obligations of the parties under the ISDA Master Agreement remain outstanding, the failure of either party to complete performance would constitute a material

---

[5] *See* Vern Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 MINN. L. REV. 439, 460 (1973).

breach excusing the performance of the other.  In addition, each of LBSF and BNY has unsatisfied contractual obligations to make various payments.  (*See, e.g.*, LBSF Br. Supp. Ex. C Sched. 2 Annex 3 § 3(c); Ex. D Sched. 2 Annex 3 § 3(b)).  These outstanding obligations to make payments pursuant to the Swap Agreement constitute sufficient grounds to find that the contract in question is executory.  *See Penn Traffic*, 524 F.3d 379-80 (holding that a contract was executory based upon unsatisfied contractual obligation to pay).  Given the foregoing, the Transaction Documents are executory contracts and the provisions of section 365 are applicable to the Swap Agreement.

This leads to an examination of how to apply the *ipso facto* prohibitions of section 365 to the unusual challenges presented by the current facts and circumstances.  In particular, the Court must consider the shifting priorities under the Transaction Documents caused by the separate defaults that occurred when LBHI and LBSF filed for bankruptcy, the distribution priorities that were in effect as of the LBSF Petition Date and any impact of the *ipso facto* provisions on the legal rights of the parties to enforce those priorities.  The cross-border procedural posture further complicates this already challenging question of statutory interpretation.

In its motion, BNY argues that because the Transaction Documents are to be governed by and construed in accordance with English law, under the principles of comity and *res judicata*, this Court must defer to the determination by both the High Court and the Court of Appeal that September 15, 2008 should be viewed as the operative date with respect to the reversal in payment priorities under the Transaction Documents.

The English Courts authoritatively have interpreted the Transaction Documents in accordance with applicable English law.  The Court, while respecting that determination as valid and binding between the parties, is not obliged to recognize a judgment rendered by a foreign

court, but instead may choose to give *res judicata* effect on the basis of comity. *See Gordon and Breach Sci. Publishers S.A. v. Am. Inst. of Physics* 905 F. Supp. 169, 178-79 (S.D.N.Y. 1995). In deciding whether to recognize the decision of the English Courts in relation to the determination that Perpetual is entitled to a distribution based on Noteholder Priority, this Court will evaluate whether the English Courts, in rendering their respective decisions, sufficiently considered the applicability and impact of section 365 of the Bankruptcy Code. It appears that the English Courts did not take into account principles of United States bankruptcy law and understood, as did the parties themselves, that the outcome of the dispute might well be different in this Court. Indeed, BNY has been concerned from the very outset of this litigation about the prospect of being caught in the middle between conflicting decisions as to the rights of Perpetual and LBSF to the Collateral. From BNY's perspective, consistent guidance from courts of competent jurisdiction on both sides of the Atlantic would be highly desirable and would avoid the unwanted result of conflicting judgments as to which party is entitled to the Collateral.

As a general matter, "courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States." *Pravin Banker Assoc., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997). It is relevant that in adjudicating this dispute the English Courts addressed only (i) the breadth of the English common-law anti-deprivation principle in the context of the shift in payment priorities under the Transaction Documents based on LBSF's bankruptcy filing; (ii) if such shift is invalid under the anti-deprivation principle, whether it still is applicable if LBSF is not in insolvency proceedings in England; and (iii) if such shift is invalidated under the anti-deprivation principle, whether it still is applicable if the shift in payment priorities operates on account of  an event other than the bankruptcy of LBSF. (Venditto Aff. Ex. 7 at ¶ 28). Upon considering the identified issues, the

14

High Court (as confirmed by the Court of Appeal) determined that the relevant provisions of the Transaction Documents are valid and enforceable under English law and do not violate the anti-deprivation principle. The English Courts did not consider any provisions of the Bankruptcy Code in connection with their decisions. Importantly, neither of the English Courts purported to bind this Court in any respect, and the High Court explicitly declined to "preclude any request or other application made by the … US Bankruptcy Court." (Venditto Aff. Ex. 7 at ¶ 63). Therefore, the English Courts have been most gracious in allowing room for this Court to express itself independently on matters of importance to the administration of the LBHI and LBSF bankruptcy cases. In applying the Bankruptcy Code to these facts, this Court recognizes that it is interpreting applicable law in a manner that will yield an outcome directly at odds with the judgment of the English Courts.

Despite the resulting cross-border conflict, the United States has a strong interest in having a United States bankruptcy court resolve issues of bankruptcy law, particularly in a circumstance such as this where the relevant provisions of the Bankruptcy Code provide far greater protections than are available under applicable provisions of foreign law. *See, e.g., Bank of N.Y. v. Alison J. Treco (In re Treco)*, 240 F.3d 148, 159-60 (2d Cir. 2001) (declining to extend comity to foreign proceeding where "special protected status that secured creditors enjoy under United States law" was lacking under applicable foreign law). Given the responsibility of the Court to interpret and apply the Bankruptcy Code, the thoughtful and otherwise binding decisions of the English Courts do not prevent this Court from examining relevant provisions of the Transaction Documents under the broad protections afforded to debtors by the Bankruptcy Code. Accordingly, the Court declines to give preclusive effect to the respective judgments rendered by the High Court and the Court of Appeal and will apply relevant provisions of the

Bankruptcy Code to determine the questions presented in the pending motions for summary judgment.

Under section 541, the bankruptcy estate is comprised of, *inter alia*, "all legal or equitable interests of the debtor in property *as of the commencement of the case*." 11 U.S.C. § 541(a)(1) (emphasis added). The Second Circuit has recognized that "[t]his definition is broad and includes even strictly contingent interests." *Mid-Island Hosp., Inc. v. Empire Blue Cross & Blue Shield (In re Mid-Island Hosp., Inc.)* 276 F.3d 123, 128 (2d Cir. 2002). When determining whether a debtor has a property interest in an executory contract as of the commencement of a bankruptcy case so that the contract constitutes property of the estate, courts examine whether "termination requires the non-debtor party to undertake some post-petition affirmative act." *In re Margulis*, 323 B.R. 130, 135 (Bankr. S.D.N.Y. 2005) (citations omitted); *accord In re St. Casimir Dev. Corp.*, 358 B.R. 24, 44 (S.D.N.Y. 2007) (allowing assumption of contract as executory because removal of debtor as general partner of partnership required post-petition affirmative act of non-debtor party, which act was prohibited by automatic stay). BNY's position is that Noteholder Priority replaced Swap Counterparty Priority as of the date of LBHI's bankruptcy, such that the property right claimed by LBSF already was lost before the date of commencement of its own bankruptcy case. That interpretation is inconsistent with the structure of the Transaction Documents.

As of the LBSF Petition Date, the Transaction Documents required certain affirmative acts be to taken prior to the effectiveness of any modification of payment priority or method of calculation of the Early Termination Payment. No provision in any of the Transaction Documents automatically causes a change in legal rights immediately upon an event of default.

16

Pursuant to the terms of the Principal Trust Deeds, Noteholder Priority becomes effective only when there are amounts to be paid "in connection with the realisation or enforcement of the [Collateral]." (LBSF Br. Opp'n Ex. C § 5.5; Ex. D § 5.5). Similarly, Condition 44 requires certain payments to be made, which payments may be made only after the "sale or realisation of the Collateral." (LBSF Br. Opp'n Ex. C; Ex. D, Sched. 2). It is undisputed that the Collateral had not been sold as of October 3, 2008, nor has it been sold to date. Indeed, Perpetual commenced the English Litigation on the grounds that BNY had failed to enforce rights in the Collateral. (LBSF Mot. Sum. J. Ex. 7).

Certain other payments required by Condition 44 cannot be calculated until after termination of the relevant Swap Agreement. (Id). The relevant termination events took place after commencement of the LBSF case. Saphir sent termination notices to LBSF on December 1, 2008 and such notices designated the filing of LBSF's chapter 11 petition as the triggering event of default. (LBSF Br. Supp. Exs. H, I). Given these undisputed facts, LBSF held a valuable property interest in the Transaction Documents as of the LBSF Petition Date and, therefore, such interest is entitled to protection as part of the bankruptcy estate.

This sequence of events supports the conclusion that the relevant date for purposes of testing whether any shifting of priorities occurred under the Transaction Documents is the LBSF Petition Date, and not the commencement of the LBHI case on September 15, 2008. However, even if LBHI's petition date were to be considered as the operative date for a claimed reversal of the payment priority under the Transaction Documents, the *ipso facto* protections provided by sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code would bar the efficacy of such a change in distribution rights. Each of these sections of the Bankruptcy Code prohibits modification of a debtor's right solely because of a provision in an agreement conditioned upon

17

"the commencement of *a case* under this title." 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B) (emphasis added). Notably, the language used is not limited to the commencement of a case *by or against the debtor*. Given the legislative history, the absence of such precise limiting language is significant.

The legislative history of section 365(e)(1) and section 541(c)(1)(B) provides helpful guidance in understanding the meaning of these sections and in analyzing how to interpret the words "a case" as used in these sections. An early version of what eventually became section 365(e)(1) referred to "the commencement of a case under this Act *by or against the debtor*." Pub. L. No. 91-354, § 4-602(b) (emphasis added). Similarly, a draft of the language that became section 541(c)(1) at one time referred to "the commencement of a case under this title *concerning the debtor*." H.R. 6, 95th Cong. § 541(c). This initial use and later rejection of limiting language demonstrates that Congress considered, but ultimately rejected, drafting sections 365(e)(1) and 541(c)(1)(B) in a manner that would have expressly restricted their application to the bankruptcy case of the debtor counterparty.

The language used – "commencement of a case under this title" – appears simple enough at first reading, but what has been left out raises a number of questions. The plain meaning of the words applies to the commencement of a case (presumably any case that is related in some appropriate manner to the contracting parties). If the words are not tied to the case filed by the particular debtor that is party to a specified executory contract, under what circumstances is the bankruptcy case of another debtor sufficiently related to rights of the parties to such an executory contract that it is reasonable to trigger the *ipso facto* protections of these sections? Opening up the subject to cases filed by debtors other than the counterparty itself has the potential of opening

up a proverbial "can of worms" that may lead to speculation as to the nature and degree of the relationship between debtors that is needed in order to properly apply the provision.[6]

The Court recognizes the potential for future disputes over the interpretation of this language but declines here to make any broad pronouncements, interpret the language in the abstract or to expand on the various relationships between or among debtor entities that would make it appropriate for one debtor to invoke *ipso facto* protection due to the filing of another affiliated member of a corporate family. The description of the kind of relationship that is sufficient to trigger such protections affecting the rights of contracting parties is best left to a case-by-case determination. With this principle of restraint in mind, the Court will apply the language of these sections of the Bankruptcy Code to the situation presented by the sequential filings of the LBHI and LBSF bankruptcy cases and confine its conclusions to the Debtors' business structure and circumstances.

This Court has been presiding over the Debtors' bankruptcy cases for just over 16 months. During the multiple hearings and status conferences that have taken place during this period, the Court has learned that the Debtors are perhaps the most complex and multi-faceted business ventures ever to seek the protection of chapter 11. Their various corporate entities comprise an "integrated enterprise" and, as a general matter, "the financial condition of one affiliate affects the others." *See JPMorgan Chase Bank, N.A. v. Charter Communications Operating, LLC (In re Charter Communications)* 2009 Bankr. LEXIS 3609 *67-*68 (Bankr. S.D.N.Y. 2009). The LBHI chapter 11 petition was filed without adequate advance planning as

---

[6] For example, one possible interpretation is that multiple subsidiaries under common control are sufficiently related to permit application of the *ipso facto* protections. Another possibility, in the context of swap agreements, might treat counterparties and their credit support providers as sufficiently related to impose *ipso facto* protections if either the principal or the guarantor were to file for bankruptcy relief. This opinion identifies these possibilities, but makes no ruling as to whether any of these relationships is sufficiently close to mandate that the bankruptcy of one debtor entity necessarily would lead to the protection of property interests of any other entity.

the first of multiple related filings, each of which necessarily impacted the Lehman corporate

family.  Everyone knows that together these filings constitute the largest business bankruptcy in

history.

Due to the sheer size of the corporate family[7] and to the emergency, unplanned nature of

the Debtors' bankruptcy cases,[8] the impact of each bankruptcy case in the Lehman chain on non-

debtor affiliates has yet to be fully determined.  The Debtors continue to discover that certain

non-debtor affiliates need to seek the protections of the Bankruptcy Code.  For example, two

LBHI affiliates filed chapter 11 petitions as recently as December 21, 2009.  (*See* Case Nos. 09-

17503, 09-17505).  Under these circumstances, the first filing at the holding company level of

the corporate structure has significance, especially in the context of the *ipso facto* provisions that

speak in terms of the commencement of "a" case under this title.  Regardless of how this

language may be interpreted in other settings, the Court is convinced that the chapter 11 cases of

LBHI and its affiliates is a singular event for purposes of interpreting this *ipso facto* language.

Nothing in this decision is intended to impact issues of substantive consolidation, the importance

of each of the separate petition dates for purposes of allowing claims against each of the debtors

or any other legal determination that may relate to the date of commencement of a case.

However, for purposes of applying the *ipso facto* provisions of 365(e)(1) and 541(c)(1)(B), what

happened on September 15, 2008 was a bankruptcy filing that precipitated subsequent related

events.  LBHI commenced a case that entitled LBSF, consistent with the statutory language,

fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because

---

[7] The Debtors, together with their non-debtor affiliates, once ranked as the fourth largest investment bank in the United States.

[8] The Court is convinced the 18-day delay in filing a bankruptcy petition for LBSF never would have occurred if the markets had been more forgiving and the Debtors had enough time to devote to a coordinated process of bankruptcy planning.

its ultimate corporate parent and credit support provider, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code.

The Court finds that the provisions in the Transaction Documents purporting to modify LBSF's right to a priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses. Moreover, any attempt to enforce such provisions would violate the automatic stay. The stay is triggered upon the filing of a bankruptcy petition, and it operates to prevent "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(3). Thus, any attempt by any party to enforce Noteholder Priority or subordinated payment under Condition 44 would violate the automatic stay because it would deprive LBSF and its creditors of a valuable property interest.

### *Safe Harbor*

BNY argues that if Noteholder Priority and subordination under Condition 44 are deemed not to have taken effect prior to the LBSF Petition Date, they nonetheless are enforceable as part of an integrated "swap agreement" that qualifies for the safe harbor protections set forth in section 560 of the Bankruptcy Code.

The safe harbor provisions of Section 560 of the Bankruptcy Code protect a non-defaulting swap participant's contractual rights to (i) liquidate, terminate or accelerate "one or more swap agreements because of condition of the kind specified in section 365(e)(1)" or (ii) "offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements." 11 U.S.C. § 560. These provisions specifically permit termination solely "because of a condition of the kind

specified in section 365 (e)(1)" – that is, the insolvency or financial condition of the debtor and the commencement of a bankruptcy case.  11 U.S.C. §§ 560, 561.

BNY maintains that the Noteholder Priority provision and Condition 44 comprise part of the Swap Agreements as "terms and conditions incorporated by reference and all documents that the market deems part of the parties' transaction" in accordance with Bankruptcy Code section 101(53B)(A).  (BNY Br. Supp. at 29).  A review of the components of each Swap Agreement – the ISDA Master Agreement, schedules and written confirmation – reveals that there is no reference at all to the Supplemental Trust Deeds, the Noteholder Priority provision or Condition 44.  The provisions at issue dictate the means by which the proceeds of each Swap Agreement will be distributed, but do not comprise part of the Swap Agreements themselves.  Because the provisions of section 560 deal expressly with liquidation, termination or acceleration (not the alteration of rights as they then exist) and refer specifically to "swap agreements," it follows that the Noteholder Priority provision and Condition 44 do not fall under the protections set forth therein.

### *11 U.S.C. § 510*

BNY argues that Noteholder Priority and Condition 44 constitute subordination agreements, which agreements have been found by the English Courts to be enforceable under applicable non-bankruptcy law.  Given that subordination agreements are enforceable under the Bankruptcy Code "to the same extent that such agreement[s] [are] enforceable under applicable nonbankruptcy law," then, according to BNY, Noteholder Priority and Condition 44 are enforceable against LBSF.  *See* 11 U.S.C. § 510(a).

Although not defined in the Bankruptcy Code, a subordination agreement is an "agreement by which one who holds an otherwise senior interest agrees to subordinate that

interest to a normally lesser interest … ."  BLACK'S LAW DICTIONARY (8th ed. 2004).  The

Noteholder Priority provision and Condition 44 may be construed as subordination agreements –

that is, LBSF agreed that upon the occurrence of certain conditions precedent, its interest in the

Collateral and in the Early Termination Payment would be subordinated to the interest of

Perpetual.  Nonetheless, BNY cannot overcome the shifting nature of the subordination that is

being activated by reason of a bankruptcy filing.  This subordination agreement differs, as result,

from those enforceable agreements that establish lien or payment priorities that are permanently

fixed without regard to the unenforceable future contingency of a bankruptcy filing.

Were it not for the bankruptcy filings of LBHI and LBSF, the provisions at issue in the

Transaction Documents would be enforceable as expressions of the intent of the parties to

allocate the priority for distributing the Collateral between them.[9]  However, the shift in payment

priority upon the commencement of a bankruptcy case renders unenforceable this aspect of the

subordination agreement.  BNY has cited no case law or provision of the Bankruptcy Code that

would allow a contract that is otherwise valid under Bankruptcy Code section 510(a) to escape

application of the disabling *ipso facto* provisions of sections 365 and 541.

### Conclusion

The Court finds that there is no material undisputed fact with respect to unenforceability

of Noteholder Priority and subordination under Condition 44 and that LBSF is therefore entitled

to judgment as a matter of law.  The Court will enter a declaratory judgment that (i) the

---

[9] The Court recognizes that there is an element of commercial expectation that underlies the subordination argument.  LBSF was instrumental in the development and marketing of the complex financial structures that are now being reviewed from a bankruptcy perspective.  The Court assumes that a bankruptcy affecting any of the Lehman entities was viewed as a highly remote contingency at the time that the Transaction Documents were being prepared.  At that time, LBSF agreed to a subordination of its Swap Counterparty Priority in the hard-to-imagine event that it should be in default at some time in the future.  Capital was committed with this concept embedded in the transaction.  But the *ipso facto* protections of sections 365 and 541 of the Bankruptcy Code apply uniformly, regardless of prepetition market expectations.  They exist and should be enforced to preserve property interests for the benefit of all creditor constituencies.

provisions in the Swap Agreements that seek to modify LBSF's payment priority upon an event of default constitute unenforceable *ipso facto* clauses that violate Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B) and (ii) any action to enforce such provisions as a result of LBSF's bankruptcy filing violates the automatic stay under Bankruptcy Code section 362(a). LBSF is directed to submit a draft order consistent with this decision for the Court's consideration.

The issues presented in this litigation are, as far as the Court can tell, unique to the Lehman bankruptcy cases and unprecedented. The Court is not aware of any other case that has construed the *ipso facto* provisions of the Bankruptcy Code under circumstances comparable to those presented here. No case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself but may be a case filed by a related entity -- in this instance the counterparty's parent corporation as credit support provider. Because this is the first such interpretation of the *ipso facto* language, the Court anticipates that the current ruling may be a controversial one, especially due to the resulting conflict with the decisions of the English Courts.

One of the distinguishing characteristics of the Lehman bankruptcy cases is the complexity of the underlying financial structures many of which are being analyzed for the first time from a real world bankruptcy perspective. It is to be expected, as a result, that the cases of LBHI and LBSF on occasion would break new ground as to unsettled subject matter. This is one such occasion.

This decision places BNY in a difficult position in light of the contrary determination of the English Courts confirming that Noteholder Priority applies to claims made against it in England by Perpetual. This is a situation that calls for the parties, this Court and the English Courts to work in a coordinated and cooperative way to identify means to reconcile the

conflicting judgments.  The Court directs that the parties attend a status conference to be held on

the next available omnibus hearing date in the Debtors' cases for purposes of exploring means to

harmonize the decisions of this Court and the English Courts.


SO ORDERED.


Dated: New York, New York        */s/ James M. Peck*_____
         January 25, 2010              JAMES M. PECK
                                       United States Bankruptcy Judge