UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---

LEHMAN BROTHERS HOLDINGS INC., *et al.*

    Debtors,

Chapter 11

Case No. 08-13555 (JMP)

---

LEHMAN BROTHERS SPECIAL FINANCING INC.,

    Plaintiff,

v.

BNY CORPORATE TRUSTEE SERVICES LIMITED,

    Defendant.

Adversary Proceeding

No.: 09-01242 (JMP)

---

**MEMORANDUM OF LAW OF DEFENDANT BNY CORPORATE TRUSTEE SERVICES LIMITED IN SUPPORT OF ITS MOTION FOR ENTRY OF AN ORDER OR, ALTERNATIVELY, TO REOPEN AND REARGUE THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT**

REED SMITH LLP
599 Lexington Avenue
New York, New York 10022
Telephone: 212.521.5400
Facsimile: 212.521.5450

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035

*Attorneys for Defendant*
*BNY Corporate Trustee Services Limited*

Defendant BNY Corporate Trustee Services Limited ("BNY"), as Trustee, respectfully submits this Memorandum of Law in support of its Motion for Entry of an Order or, Alternatively, to Reopen and Reargue the Cross-Motions for Summary Judgment filed by BNY and Plaintiff Lehman Brothers Special Financing Inc. ("LBSF" or the "Debtor").

I. **THE COURT SHOULD ENTER AN ORDER MEMORIALIZING ITS MEMORANDUM DECISION.**

It has now been more than three months since this Court issued a Memorandum Decision in LBSF's favor that it is entitled to a declaratory judgment here. At the time, the Court directed the parties to submit proposed orders memorializing its decision. The parties submitted proposed orders more than two months ago. Yet since then, the Court has declined to enter an order from which BNY could appeal. As its stated reason for delaying entry of an order, the Court has cited ongoing proceedings in parallel litigation between LBSF and Perpetual Trustee Company Limited ("Perpetual") in the English courts. But as recent developments confirm, appellate review in England has now reached the highest—and last possible—stage. That counsels in favor of this Court's issuing its declaratory judgment order so that the inevitable and lengthy U.S. appellate process can at least begin. This Court's delay means BNY is unable to obtain appellate review of a decision that all parties acknowledge not only affects the millions of dollars at issue between LBSF and Perpetual here but also many billions more in other similar types of transactions in the Lehman bankruptcy and elsewhere. BNY thus respectfully renews the request it has made each of the past three months that this Court enter an order memorializing its Memorandum Decision.

In 2009, LBSF and BNY filed cross-motions for summary judgment to determine, among other things, the enforceability of the priority swap provision in the Transaction Documents. After briefing and oral argument, this Court issued a decision on January 25, 2010 (the

"Memorandum Decision") stating that it intended—at some point in the future—to grant LBSF's motion and deny BNY's cross-motion:

> The Court will enter a declaratory judgment that (i) the provisions in the Swap Agreements that seek to modify LBSF's payment priority upon an event of default constitute unenforceable *ipso facto* clauses that violate Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B) and (ii) any action to enforce such provisions as a result of LBSF's bankruptcy filing violates the automatic stay under Bankruptcy Code section 362(a).

Mem. Decision 23–24.

Shortly thereafter, and pursuant to this Court's direction, each party submitted a proposed order for entry by the Court. The parties' proposed orders were identical in substance; they differed by only a few words. But the Court has since declined to enter an order. At status conferences on February 19, 2010, March 17, 2010, and April 14, 2010, BNY requested that the Court enter an order that would permit BNY to pursue an efficient appeal of the Memorandum Decision. *See* Rev. Tr. 39:9–23 (Feb. 19, 2010); Tr. 131:13–20 (Mar. 17, 2010). This Court declined those entreaties.

In holding off on entry of an order here, this Court has cited its desire to coordinate its ruling with the English courts that are presiding over litigation between LBSF and Perpetual and that have thus far consistently ruled in Perpetual's favor, putting the rulings there in direct conflict with the Court's ruling here in LBSF's favor. At the March 17 status conference, the Court stated its belief that "it would be prudent under the circumstances for me to defer taking any action, pending further developments in the United Kingdom." Tr. 134:13–15 (Mar. 17, 2010). But it would be more prudent for the case here to proceed through the appellate level, as it has in England, so that any later coordination reflected the confirmed judgment of the courts at all levels of the two jurisdictions.

2

Appellate review of the original English court decision has continued to progress. Most recently, on March 26, 2010, the Supreme Court of the United Kingdom—that country's highest court—granted LBSF permission to appeal the decision of the English High Court of Justice. Meanwhile, in this proceeding, the original, bankruptcy-court-level decision has yet to be reduced to a final, appealable order that could be appealed to as many as three higher courts.

Throughout this proceeding, as the appellate process has advanced in the English courts, the Chancellor of the High Court (the trial-level judge in the U.K.) has requested only that this Court "defer entering any judgment or taking any action which might pre-empt any decision of [the English] Court." Letter at 1 (Apr. 23, 2010) (emphasis added); *see also* Tr. 7:13–14 (Apr. 14, 2010). BNY respectfully submits that entering a declaratory judgment order in this action would be wholly consistent with the Chancellor's request. Such an order would not "pre-empt any decision" of the English courts. By definition, it would merely embody this Court's Memorandum Decision. It would not require any party to pay money or incur any other obligations. The order would simply memorialize this Court's already-expressed view of the Transaction Documents under U.S. law, and it would enable an appeal to go forward, just as it has in England. It would have no effect on the English courts whatsoever—and certainly no more effect than the Memorandum Decision, in which the Court already declared how it intends to rule.

As it now stands, this proceeding is several steps behind the litigation in the U.K., which has already proceeded to the highest possible appellate court. This Court's immediate entry of an order memorializing the Memorandum Decision would at least allow the U.S. appellate process to begin. Otherwise, if this Court continues to decline to do so until the English litigation is at a definitive end, the process of resolving the two countries' rulings may prove

3

even more daunting and will have the unintended consequence of placing the U.S. litigants at a disadvantage because the English judicial process will have run its entire course up to the point of actually enforcing a remedy. In that posture, only after the English High Court's final ruling would the parties in this case begin their appeals to the District Court, then the Second Circuit, and possibly even the U.S. Supreme Court. It is BNY's understanding that the U.K. Supreme Court argument has been scheduled for March 1–3, 2011—nearly a year from now—with an opinion to follow even later. At that rate, if this Court immediately issued its order, the appellate issues here could be briefed and argued—and potentially decided, at least at the first level of appeal—before the Supreme Court of the United Kingdom holds its hearing.

This Court has acknowledged that the issues presented in this case are "unprecedented." Mem. Decision at 24. It noted in its Memorandum Decision that its ruling is "the first" that "interpret[s] the *ipso facto* language" to mean that "the operative bankruptcy filing . . . may be a case filed by a related entity," and it "anticipate[d]" that the Memorandum Decision might be "controversial." *Id.* This Court also observed that the underlying issues in this case are "unique" and stated it was "not aware of any other case that has construed the *ipso facto* provisions of the Bankruptcy Code under circumstances comparable to those presented here." *Id.* It even recognized that "[n]o case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself." *Id.* And it described its ruling as "break[ing] new ground as to unsettled subject matter." *Id.* In short, this is a decision that cries out for appellate review.[1]

---

[1] Indeed, consistent with the express language in its Memorandum Decision, this Court could, *sua sponte*, certify the ruling for immediate appellate review, pursuant to 28 U.S.C. § 158(d)(2). *See, e.g., In re SemCrude, L.P.*, 407 B.R. 82, 88 (Bankr. D. Del. 2009) (granting summary judgment and *sua sponte* certifying a direct appeal to the Third Circuit because the ruling concerned "issues of great significance" and there was "little doubt that this ruling will be appealed").

BNY has consistently asked this Court to enter an order so that BNY could consider pursuing an appeal. BNY now wishes to begin the appellate process as quickly as possible, but it cannot do so as long as this Court continues to decline to enter its order. BNY respectfully submits that there is no reason to delay the inevitable appeal here any longer.[2] This Court should therefore now issue an order memorializing its Memorandum Decision.

## II. IN THE ALTERNATIVE, THE COURT SHOULD GRANT REOPENING AND REARGMENT OF THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT.

In the alternative, BNY respectfully requests that the parties' cross-motions for summary judgment be reopened and reargued to permit consideration of new information that has only recently come to light. *See Marconi Wireless T. Co. of Am. v. United States*, 320 U.S. 1, 48 (1943) (before issuing a final order, a court is "free in its discretion to grant a reargument . . . or to reopen the case for further evidence").[3] The Memorandum Decision includes factual findings regarding the relationship between Lehman Brothers Holding Inc. ("LBHI") and LBSF that were not addressed in the parties' respective cross-motions for summary judgment as a matter of law. Mem. Decision at 13, 19–20. Moreover, new information revealed for the first time in the Report of the Lehman Brothers Holdings Inc. Chapter 11 Proceedings Examiner (the "Examiner's Report"), which was commissioned by the Court and released on March 11, 2010, appears to contradict those factual findings. BNY continues to believe it was entitled to

---

[2] The Debtor's counsel has openly acknowledged the advantage the Debtor perceives from this ruling remaining in place without any prospect of appeal, but that is no legal reason for this Court to prevent an appeal from going forward.

[3] *See* Fed. R. Civ. P. 60(b)(2), made applicable here by Fed. R. Bankr. P. 9024 (court may order relief from final judgments, orders, and proceedings on grounds of "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)"); Bankr. S.D.N.Y. R. 9023-1(a) (setting deadlines for motions for reargument of court orders). Although these rules pertain to rearguing judgments or orders, the Court here has considerably more latitude to reopen the matter because it has not yet entered an order memorializing its Memorandum Decision.

summary judgment as a matter of law. BNY further submits that the Examiner's Report makes clear that LBSF was not entitled to summary judgment, and that factual issues apparent from the Examiner's Report preclude summary judgment as a matter of law in LBSF's favor and, indeed, serve only to reinforce BNY's entitlement to summary judgment.

Accordingly, even if this Court continues to decline to enter an order memorializing its Memorandum Decision, it should reopen the matter, permit reargument as to why BNY is entitled to summary judgment and LBSF is not, and, as further warranted, permit discovery and an evidentiary hearing on any outstanding factual issues. Indeed, in the absence of entry of an order disposing of the parties' cross-motions, and with the English High Court appeal expecting to last for the better part of the next year, there would be ample time for this Court to take up these issues and ensure a complete record based on the new information in the Examiner's Report.

### A. The Memorandum Decision Reached Factual Issues Not Addressed by the Parties in Their Respective Cross-Motions for Summary Judgment as a Matter of Law.

The Memorandum Decision rested in pertinent part on factual determinations, despite the fact that the parties had not addressed those factual issues in their respective cross-motions for summary judgment as a matter of law. The Decision treated the bankruptcy filing of one entity, LBHI, as sufficient to enable a separate entity, LBSF, to take advantage of the *ipso facto* provisions of the Bankruptcy Code when it filed for bankruptcy protection itself 18 days later—a ruling this Court acknowledged "breaks new ground" and had never been reached in any other case by any other court. Mem. Decision at 24. The Court found the separate bankruptcy filings of these two separate entities separated in time to be a "singular event." *Id.* at 20. The Court reached its decision only after making numerous other factual findings, including:

- considering "the unusual challenges presented by the current *facts and circumstances*," *id.* at 13 (emphasis added);
- relying on the "Debtors' *business structure and circumstances*," *id.* at 19 (emphasis added);
- emphasizing what it had "learned" while "presiding over the Debtors' bankruptcy cases for just over 16 months" involving "perhaps the most complex and multi-faceted business ventures ever to seek the protection of chapter 11," *id.*;
- finding that the Debtors' "various corporate entities comprise an integrated enterprise and [that], as a general matter, the financial condition of one affiliate affects the others," *id.* (internal quotation marks omitted);
- finding that "[t]he LBHI chapter 11 petition was filed without adequate advance planning as the first of multiple related filings, each of which necessarily impacted the Lehman corporate family," *id.* at 19–20; and
- crediting "the emergency, unplanned nature of the Debtors' bankruptcy cases," *id.* at 20.

Based on those factual determinations, the Court concluded that "LBHI commenced a case that entitled LBSF . . . to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider, *at a time of extraordinary panic in the global markets*, had filed a case under the Bankruptcy Code." *Id.* at 20–21 (emphasis added). Ultimately, the Court was "convinced that the chapter 11 cases of LBHI and its affiliates is a singular event for purposes of interpreting this *ipso facto* language." *Id.* at 20. But it was not the Debtor that "convinced" the Court to reach that conclusion, for the Debtor did not address it as material to its cross-motion for summary judgment. Rather, the Court reached that conclusion on its own, based on its own observations and findings about LBHI, LBSF, the corporate relationships among various Lehman entities, and the nature and motivation behind the timing of various entities' bankruptcy filings. And it was on that factual basis that this Court concluded, "for purposes of applying the *ipso facto* provisions," that the bankruptcy filing of LBHI "precipitated subsequent related events" that collapsed the distinction in the corporate form between LBHI and the related entity LBSF. *Id.* at 20.

7

No record had been developed by the parties on summary judgment establishing these facts. Indeed, neither party's cross-motion papers addressed these factual issues: the parties' Rule 7056-1 statements of undisputed facts merely set forth the dates of certain events and the parties' opposing views of the transactions.[4]

BNY moved for summary judgment on purely legal grounds, contending that Perpetual's rights to Noteholder Priority and subordination took effect automatically as a matter of English law upon LBHI's bankruptcy filing (as Credit Support Provider). BNY Brief, D.E. 61, at 20. Accordingly, BNY argued, the *ipso facto* provisions under which LBSF claimed protection as a result of its own filing weeks later (and thus the automatic stay under 11 U.S.C. §§ 362(a)(3) and (6)) were irrelevant. *Id.* at 17–18. Under 11 U.S.C. § 510(a), subordination agreements are enforceable in bankruptcy cases "to the same extent that such agreement[s are] enforceable under applicable nonbankruptcy law"; because the subordination agreements in this case had been held enforceable under English law by English courts, BNY maintained, Noteholder Priority and subordination were likewise enforceable in this proceeding. *Id.* at 24–26. Moreover, BNY argued, even if the Court were to find the *ipso facto* clauses applicable, Noteholder Priority and subordination were nevertheless enforceable because those rights arose through a swap agreement that qualifies as a matter of law for the expansive safe harbor protections of the Bankruptcy Code. *Id.* at 26.

LBSF also moved for summary judgment purely on legal grounds. It argued that LBSF's filing was the relevant event of default and that the *ipso facto* provisions precluded that filing from triggering modification of the payment priorities. LBSF Brief, D.E. 6, at 12. LBSF also

---

[4] Of note, the parties' statements of undisputed facts did not include any references to the relationship between LBHI and LBSF, any interest of LBSF in LBHI's bankruptcy filing, or the reasons behind the timing of LBHI's and LBSF's separate bankruptcy filings. *See* LBSF Statement of Undisputed Facts, D.E. 6; BNY Statement of Undisputed Facts, D.E. 63.

8

maintained that the Transaction Documents were executory contracts and, thus, the swaps were invalidated by the *ipso facto* provisions. *Id.* at 18–20.[5] LBSF further argued that, if the Court accepted its argument concerning the relevant event of default, Perpetual could not take advantage of the safe harbor provisions because, LBSF claimed, those provisions do not apply to priority swaps. *Id.* at 20–22. Finally, LBSF argued that enforcement of the Noteholder Priority and subordination provisions would violate the automatic stay to which it contended it was entitled. *Id.* at 32.

Thus, the parties' briefs addressed only legal questions. It was the Memorandum Decision that, for the first time, resolved these other factual issues that it treated as dispositive. Summary judgment is proper only where there is "no genuine issue as to any material fact." Fed. R. Civ. P. 56(c). Here, the Memorandum Decision resolved factual issues that would have been disputed had the parties based their respective cross-motions on them. And those factual disputes have now come into sharp focus as a result of the new information recently revealed in the Examiner's Report.

### B. The Examiner's Report Contains Findings that Appear to Contradict the Factual Determinations Made Earlier by This Court in Its Memorandum Decision and that Therefore Warrant Reopening and Reargument.

The Examiner's Report sheds new light on the presumed "facts" that seemed to compel this Court to rule in LBSF's favor in its Memorandum Decision. Indeed, the revelations in the Examiner's Report appear to undermine this Court's earlier factual determinations and warrant this Court's reopening and permitting reargument on the parties' cross-motions for summary judgment.

---

[5] BNY responded that the Transaction Documents were not executory but that the distinction was irrelevant because Noteholder Priority and subordination took effect prior to LBSF's filing and thus the *ipso facto* bar was inapplicable. BNY Opposition Brief, D.E. 66, at 7.

The Court stated in its Memorandum Decision that it was "convinced" that, after LBHI's filing on September 15, 2008, the "18-day delay in filing a bankruptcy petition for LBSF never would have occurred if the markets had been more forgiving and the Debtors had enough time to devote to a coordinated process of bankruptcy planning." Mem. Decision at 20 n.8. After its investigation, however, the Examiner effectively found that there was no "delay": LBSF's filing occurred 18 days later because of just the kind of "coordinated process" that this Court asserted did not occur. *See* Examiner's Report at 1979 (noting LBHI purposely rushed to minimize the size of its estate by, among other things, transferring billions of dollars in assets to its subsidiaries, including LBSF).

On the eve of its bankruptcy, LBHI deliberately moved assets to its affiliates, including LBSF, for its own commercial benefit to reduce the size of the bankruptcy estate. As revealed by the Examiner's Report and set forth in BNY's letter to the Court of April 13, 2010, in the week before LBHI filed for bankruptcy, it continuously transferred more than $7 billion net in cash to three Lehman entities, including $2.7 billion net to LBSF alone. *See* Examiner's Report at 1950. The final transfer to LBSF—of approximately $650 million net—occurred just four days before LBHI's filing. *Id.* at 1951. These eleventh-hour transfers demonstrate that the LBHI and LBSF bankruptcy filings were separated to permit LBHI to move assets into LBSF before LBHI filed for bankruptcy, thereby allowing LBSF to continue to operate or to restructure itself before its own later bankruptcy filing.

In the wake of LBHI's filing, and relying on corporate status separate from LBHI, LBSF and other LBHI affiliates continued to operate. They engaged in billions of dollars of transactions—either because they believed they could stay afloat, despite LBHI's bankruptcy, or because they were consciously restructuring themselves in anticipation of their own bankruptcy

filings. Either way, LBSF and these other affiliates clearly took advantage of the fact that LBHI was a completely separate entity. Among other things, LBSF "engage[d] in a material amount of trading with [Lehman Brothers Inc.] during the week of September 15." Examiner's Report at 2024. According to the Examiner's Report, "[d]uring the week following LBHI's bankruptcy and thereafter, LBHI Affiliate counterparties terminated derivatives and other contracts at balance sheet losses estimated to be in the tens of billions of dollars; the securities in which certain LBHI Affiliates held an interest at LBI were transferred to Barclays; and exchange-traded derivatives positions cleared by LBI for the benefit of LBHI Affiliates (such as LBSF and LBCS) at clearing organizations such as the CME and OCC were liquidated." *Id.* at 1593 (footnotes omitted). The separation afforded by the corporate form permitted LBSF the latitude to engage in these transfers while its parent was in bankruptcy.

As a result, it is now apparent that the factual predicates on which this Court resolved to award summary judgment to LBSF were incorrect, as the Examiner's Report, which was commissioned by this Court and issued after its Memorandum Decision, makes clear.[6] Hence, upon reopening and reargument, BNY should be awarded summary judgment in its favor.

### C. In Reopening and Permitting Reargument of the Parties' Cross-Motions for Summary Judgment, This Court Should Order Targeted Discovery and an Evidentiary Hearing, as Warranted, to Resolve the Case.

At the very least, the Examiner's Report appears to create questions of material fact as to whether LBHI and LBSF should be considered so interrelated that they are one and the same for purposes of the *ipso facto* provisions with their separate bankruptcy filings treated as a "singular

---

[6] This Court may take judicial notice of findings in an official report it commissioned. *See, e.g.*, *In re Bennett Funding Group, Inc.*, 367 B.R. 302, 325 (Bankr. N.D.N.Y. 2007) (taking judicial notice of an order based on report of court-appointed Independent Examiner); *see also* Fed. R. Evid. 201.

11

event." *See* Mem. Decision at 16–17, 20, 23–24. Yet these were the fundamental factual underpinnings of this Court's Memorandum Decision that caused it to decide in favor of LBSF. These are also among the many questions of material fact that render the Memorandum Decision entered by this Court in LBSF's favor inappropriate and require reopening the matter for further proceedings.

The Court has yet to enter an order memorializing its Memorandum Decision, and it keeps declining to do so in deference to ongoing English proceedings that could continue for the better part of the next year. Under these circumstances, and in light of the revelations in the Examiner's Report, it is particularly appropriate to reopen the matter (and, as warranted, order targeted discovery and an evidentiary hearing) to give this Court the benefit of a complete record on which to base its judgment.

## CONCLUSION

For the foregoing reasons, BNY respectfully requests that this Court issue an order memorializing its Memorandum Decision of January 25, 2010. In the alternative, BNY respectfully requests that this Court reopen and permit reargument on the parties' cross-motions for summary judgment, and then enter a declaratory judgment in BNY's favor or, as warranted, order targeted discovery and an evidentiary hearing to resolve the case.

Dated: New York, New York
April 28, 2010

GIBSON, DUNN & CRUTCHER LLP

By: /s/
   Randy M. Mastro
   Michael A. Rosenthal

200 Park Avenue, 47th Floor
New York, New York 10166-0193
Telephone: 212.351.4000
Facsimile: 212.351.4035
rmastro@gibsondunn.com
mrosenthal@gibsondunn.com

REED SMITH LLP

By: /s/
   Eric A. Schaffer

599 Lexington Avenue
New York, New York 10022
Telephone: 212.521.5400
Facsimile: 212.521.5450
eschaffer@reedsmith.com

*Attorneys for Defendant*
*BNY Corporate Trustee Services Limited*