WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

———————————————————————— x

In re:                                                          :        Chapter 11

LEHMAN BROTHERS HOLDINGS INC., *et al.*     :        Case No. 08-13555 (JMP)

                 Debtors.     :

———————————————————————— x

LEHMAN BROTHERS SPECIAL FINANCING INC.      :

                 Plaintiff,     :

-against-                                                       :        Adversary Proceeding
                             :        No.: 09-01242 (JMP)

BNY CORPORATE TRUSTEE SERVICES LIMITED     :

                 Defendant.     :

———————————————————————— x

**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO BNY CORPORATE**
**TRUSTEE SERVICES LIMITED'S MOTION FOR ENTRY OF**
**AN ORDER OR TO REOPEN AND REARGUE THE PARTIES'**
**CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ...................................................................................................... ii

Introduction ................................................................................................................... 1

Factual Background ....................................................................................................... 5

    A.    The Courts' Agreement to Defer Entry of Final Orders Until They Can Attempt to Reconcile Their Decisions .................................................................. 5

    B.    BNY's Previous Requests That This Court Defer Entry of a Final Order ............ 8

I.    The Court Should Continue to Defer Entry of a Final Order ........................................... 9

    A.    Deferring Entry of a Final Order Will Promote Judicial Efficiency ..................... 9

    B.    Deferring Entry of a Final Order Will Promote International Comity ................ 12

II.    The Court Should Deny the Alternative Request for Reopening and Reargument of the Parties' Cross-Motions for Summary Judgment .................................................... 15

    A.    BNY Has Not Met Its Burden of Showing That New Evidence Would Have Changed the Outcome of This Court's Decision or That It Is Admissible .......................................................................................................... 17

    B.    The Memorandum Opinion Did Not *Sua Sponte* Make Material Factual Findings .............................................................................................................. 21

    C.    The Examiner's Report Does Not Contradict Any Material Factual Determinations in the Memorandum Opinion .................................................... 23

Conclusion and Relief Requested ............................................................................... 27

**CASES**

Breeden v. Bennett (*In re Bennett Funding Group, Inc.*),
    367 B.R. 302 (Bankr. N.D.N.Y. 2007) ........................................................................19, 20

Chasser v. Achille Lauro Lines,
    844 F.2d 50 (2d Cir. 1988), *aff'd*, 490 U.S. 495 (1989) ....................................................11

Halpin v. David,
    No. 4:06cv457-RH/WCS, 2009 WL 455354 (N.D. Fla. Feb. 19, 2009) ...........................10

Harriscom Svenska AB v. Harris Corp.,
    947 F.2d 627 (2d Cir. 1991)................................................................................................11

Hilton v. Guyot,
    159 U.S. 113 (1895)............................................................................................................13

In re Delta Air Lines, Inc.,
    386 B.R. 518 (Bankr. S.D.N.Y. 2008)...............................................................................23

In re Elmendorf,
    345 B.R. 486 (Bankr. S.D.N.Y. 2006)...............................................................................10

In re FiberMark, Inc.,
    339 B.R. 321 (Bankr. D. Vt. 2006)....................................................................................19

In re Flores,
    291 B.R. 44 (Bankr. S.D.N.Y. 2003).................................................................................10

In re Granite Broad. Corp.,
    369 B.R. 120 (Bankr. S.D.N.Y. 2007)...............................................................................19

In re Pied Piper Casuals, Inc.,
    40 B.R. 723 (Bankr. S.D.N.Y. 1984).................................................................................19

Martens v. Smith Barney, Inc.,
    238 F. Supp. 2d 596 (S.D.N.Y. 2002)................................................................................11

Maxwell Commc'n Corp. v. Societe Generale (*In re Maxwell Commc'n Corp.*),
    93 F.3d 1036 (2d Cir. 1996)...............................................................................................13

Penoro v. Rederi A/B Disa,
    376 F.2d 125 (2d Cir. 1967)...............................................................................................10

*Rickel & Assocs., Inc. v. Smith* (*In re Rickel & Assoc., Inc.*),
    272 B.R. 74 (Bankr. S.D.N.Y. 2002) .......................................................................4, 18, 19

*Sears, Roebuck & Co. v. Spivey*,
    265 B.R. 357 (E.D.N.Y. 2001) ...............................................................................................10

*Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.*,
    No. 88 Civ. 9127 (DNE), 1992 WL 296314 (S.D.N.Y. Oct. 6, 1992),
    *aff'd*, 17 F.3d 38 (2d Cir. 1994) .....................................................................3, 4, 15, 21

*United States v. Adegbite*,
    877 F.2d 174 (2d Cir. 1989) ....................................................................................................15

*United States v. Village of Island Park*,
    No. 90 CV 992(ILG), 2008 WL 4790724 (E.D.N.Y. Nov. 3, 2008) ...................15, 16, 21

*United States v. Int'l Bhd. of Teamsters*,
    247 F.3d 370 (2d Cir. 2001) .............................................................................................16, 20

## STATUTES AND RULES

11 U.S.C. § 105(a) ..........................................................................................................................10

11 U.S.C. § 365(e)(1) ............................................................................................................ *passim*

11 U.S.C. § 541(c)(1)(B) ...................................................................................................... *passim*

28 U.S.C. § 1292 ..............................................................................................................................11

FED. R. CIV. P. 60(b)(2) ...........................................................................................................16, 20

FED. R. EVID. 201 ...........................................................................................................................20

FED. R. EVID. 802 ...........................................................................................................................19

TO THE HONORABLE JAMES M. PECK
UNITED STATES BANKRUPTCY JUDGE:

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 case of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), files this memorandum of law in opposition to the motion ("BNY's Motion") for entry of an order, or, alternatively, to reopen and reargue the parties' cross-motions for summary judgment filed by BNY Corporate Trustee Services Limited ("BNY").

## INTRODUCTION

This Court should continue to defer any ruling on BNY's request for entry of an appealable order and should immediately deny BNY's alternative request to reopen the cross-motions for summary judgment. This Court has appropriately declined to enter a final, appealable order in light of the English High Court of Justice's (the "High Court") requests that no judgment be entered until the courts are able to communicate to reconcile their decisions, after the *Perpetual* appeal in the Supreme Court of the United Kingdom (the "U.K. Supreme Court") has concluded. Nothing in BNY's motion should cause this Court to reconsider this course of action, to which both courts have agreed. Indeed, until its recent addition of new counsel, BNY consistently had argued that this Court "should not enter a final, enforceable judgment pending coordination with the English Court." *See, e.g.*, BNY Reply Mem. of Law at 43. As explained below, BNY's initial assessment was consistent with the courts' agreement and principles of international comity. This approach is also consistent with federal law governing interlocutory appeals.

Although BNY has fully participated in the drafting of correspondence from this Court to the High Court, it ignores both courts' agreement to engage in this communication and coordination prior to this Court's entry of a final order or judgment. BNY makes no mention of this correspondence in its Motion or the fact that its own trust beneficiary, Perpetual, prompted the High Court's request that no order be entered here at this time. Nor has BNY informed the High Court that it planned to ask this Court to enter a final judgment—contrary to the expressed wishes of its beneficiary, Perpetual. Principles of international comity support this Court's maintenance of its agreement with the English court. The appropriate course is to defer any ruling on BNY's primary request for relief until clarity is obtained from the Supreme Court of the United Kingdom. That court's decision likely will illuminate the need for a final order from this Court and, if needed, the scope of that order.

BNY's central argument is also inconsistent with basic principles designed to promote judicial efficiency by avoiding interlocutory appeals, other than in the most exceptional cases. That argument boils down to a simplistic proposition: this Court has made an important decision, on an unsettled area of bankruptcy law, and thus it should be open to appeal as soon as possible. If accepted, that argument would justify a disruptive and expensive appeal any time a trial court makes an important interlocutory decision, would flood the appellate system with unnecessary appeals, and would deprive trial courts of their ability to manage their own dockets. Further, what BNY conveniently overlooks in advancing its Motion, despite its past pleadings, is that this is not just a case about U.S. law and the interpretation of the Bankruptcy Code. It involves contracts governed by English law and a parallel proceeding now pending before the U.K. Supreme Court, whose decision, whether for or against LBSF, will have important implications for the U.S. proceedings.

If the U.K. Supreme Court rules in LBSF's favor on appeal, it would moot all further proceedings in the United States, making it unnecessary for the courts or the parties to expend resources on a complex appeal. If the U.K. Supreme Court rules against LBSF, then the English High Court must still decide whether to defer to the application of U.S. bankruptcy law, as this Court has requested in correspondence. If the High Court does so, that would clarify issues in this Court and on appeal here, eliminating arguments regarding deference to the English courts. Accordingly, interests of judicial efficiency, as well as the existing arrangements between this Court and the High Court, compel that this Court defer entry of a final judgment until the *Perpetual* appeal has concluded and the courts have had the opportunity to communicate and reach a coordinated outcome.

This Court should adopt a different approach toward BNY's alternative motion to reopen the cross-motions for summary judgment to allow for consideration of the Report of the LBHI Chapter 11 Proceedings Examiner (the "Examiner's Report"), additional discovery, and re-argument. The Court should simply reject that alternative request. BNY claims that reopening the cross-motions is justified because of "findings" or "revelations" in the Examiner's Report that "appear to undermine" the "factual determinations" on which this Court based its decision that LBHI's bankruptcy filing triggered the payment priority shift under the Transaction Documents. BNY Mot. at 5, 9. However, BNY has failed to satisfy its burden of showing "compelling justification" to reopen this Court's interlocutory summary judgment decision, as required by courts in the Southern District of New York. *Tri-Star Pictures, Inc. v. Leisure Time Prod., B.V.*, No. 88 Civ. 9127 (DNE), 1992 WL 296314, at *2 (S.D.N.Y. Oct. 6, 1992), *aff'd* 17 F.3d 38 (2d Cir. 1994). In these circumstances, strong "policy considerations demand that both

litigants and the court be spared the delay and expense inexorably linked to reconsideration of a decision." *Id.* at *5.

After moving for summary judgment and agreeing that there were no disputed material issues of fact and the record was closed, BNY is now asking this Court to reopen its decision based on *factual* contentions in the Examiner's Report—contentions that are inadmissible hearsay.[1]  In order to sidestep the contradiction inherent in its request, BNY claims that this Court based its Memorandum Decision on factual findings it made *sua sponte*, an insupportable reading of both the record before this Court and of its decision.  BNY Mot. at 7.  This Court based its decision regarding which entity's bankruptcy filing shifted the payment priorities on its legal interpretation of the Transaction Documents, not on any factual findings.  It reached an alternative holding on this issue based on its interpretation of the "commencement of a case" language in sections 365(e)(1) and 541(c)(1)(B), but this alternative holding was based on undisputed facts presented and briefed by both parties, namely that LBHI was LBSF's corporate parent and credit support provider.  As this Court stated at the April 14, 2010 status hearing, "I completely disagree that there's anything in the examiner's report, anything in the report, that relates to the issues of the *Perpetual* case, as I know them."  Hr'g Tr. at 13, Apr. 14, 2010.

Moreover, even though BNY claims that the Examiner's Report contradicts numerous factual findings by this Court, *see* BNY Mot. at 7, BNY provides excerpts from the Examiner's Report only for the purpose of purportedly contradicting a single footnote in this Court's

---

[1] *See Rickel & Assocs., Inc. v. Smith* (*In re Rickel & Assoc., Inc.*), 272 B.R. 74, 87 (Bankr. S.D.N.Y. 2002) ("Initially, the evidence and findings in the Report are not binding. The Examiner conducted an investigation, but he was not charged—nor could he be—with the duty to 'hear and determine' any claims in this case. The Report is hearsay, and does not permit denial of the motion to vacate as a matter of law without more."  (internal citation omitted)).

opinion.[2]  *See id.* at 10.  In fact, if anything, the portions of the Examiner's Report cited *support*, rather than contradict, this Court's conclusions.

There is an inherent contradiction between the alternative request to reopen argument and BNY's request for immediate appeal.  If BNY really believed "[t]he Memorandum Decision rested in pertinent part on factual determinations," BNY Mot. at 6, and that these determinations were contradicted by the Examiner's Report, it would not be pressing for a final order and appeal, after which it would have no possibility of supplementing the record.

The Court should deny BNY's alternative request to reopen the cross-motions for summary judgment as unjustified, internally inconsistent with its primary request for relief, and unsupported by admissible evidence.  As noted above, this Court should continue to defer any further interpretation of its January 25, 2010 memorandum decision pending further coordination with courts in England.

### FACTUAL BACKGROUND

**A.  The Courts' Agreement to Defer Entry of Final Orders Until They Can Attempt to Reconcile Their Decisions.**

Even before this Court granted LBSF's motion for summary judgment, this Court and the High Court commenced a dialogue through a series of letters.  *See* Ex. A (Aug. 20, 2009 Ltr. of J. Peck); Ex. B (Sept. 9, 2009 Ltr. of A. Morritt).  Throughout this correspondence, the High Court has consistently requested that this Court "defer entering any judgment or taking any action which might pre-empt any decision" of the High Court.  Ex. C at 2 (Mar. 10, 2010 Ltr. of A. Morritt).

---

[2]  In its Motion, BNY contends that "[t]he Court stated in its Memorandum Decision that it was 'convinced' that after LHBI's filing on September 15, 2008, the '18-day delay in filing a bankruptcy petition for LBSF never would have occurred if the markets had been more forgiving and the Debtors had enough time to devote to a coordinated process of bankruptcy planning.'"  BNY Mot. at 10 (quoting Mem. Op. at 20 n.8.)  BNY then spends the next several pages of its Motion attempting to demonstrate that footnote 8 was incorrect.

Similarly, in the High Court's letter of November 18, 2009, it stated:

> I would respectfully ask you, if contrary to the submissions of BNY you conclude that the relevant provisions are void or otherwise unenforceable under US bankruptcy law, to go no further at that stage than to make a declaratory judgment to that effect.
>
> In particular, I would invite you not to make any order which would either (a) require BNY to act in any particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or deal in any particular way with the collateral or its proceeds, until (in each case) further communication has taken place between the US and English courts, as envisaged in the penultimate paragraph of your letter of 20 August 2009.

Ex. D at 2 (Nov. 18, 2009 Ltr. of L. Henderson). This letter was specifically requested by BNY's beneficiary Perpetual, which filed an urgent application to the High Court requesting such a letter because of its concern that the declaratory judgment sought by LBSF "would have the purported effect of binding [BNY] and so purportedly pre-empt the further proceedings or decision of the English Court." Ex. E at 5, ¶ 16 (Nov. 6, 2009 Witness Statement of D. McNaughton Cory-Wright). Based on this concern, Perpetual requested that the High Court ask this Court "not to make any order which required the Trustee to act in any way contrary to or different from its obligations under English law . . . ." Ex. F (Nov. 6, 2009 Draft Order Submitted by Perpetual to High Court). The High Court did not adopt Perpetual's precise formulation, but requested that this Court not require BNY to act in any particular way with the collateral pending further communication between the courts.

After its decision on the cross-motions for summary judgment, this Court sent the High Court a letter—with BNY's and LBSF's participation and consent—agreeing not to enter an order in this case until the courts had an opportunity to communicate "in an effort to reach a coordinated resolution of these matters." Ex. G at 1 (Feb. 19, 2010 Ltr. of J. Peck). BNY wrote a letter to the High Court on March 8, 2010 stating that it "supports the comments in Judge

Peck's recent letter, and in previous letters between the Courts, concerning the importance of efforts by all parties to avoid an outcome which involves conflicting orders of the English and the US Courts." Ex. H at 2 (Mar. 8, 2010 Letter of Lovells LLP). In a March 10, 2010 letter, the High Court responded to this Court's request by stating:

> As and when the Supreme Court has made a decision, be it the refusal of permission to appeal or at the conclusion of a full appeal, I will arrange a further hearing attended by the parties to consider your request and the appropriate action in the light of events as they then are. In the meantime I hope that you will feel able to defer entering any judgment or taking any action which might pre-empt any decision of this court.

Ex. C at 2 (Mar. 10, 2010 Ltr. of A. Morritt).

This letter was also based, in part, on input from Perpetual. In March, Perpetual wrote to the High Court in response to this Court's resolution of the cross-motions of summary judgment. It said that "[a]s stated throughout the proceedings before the English courts, Perpetual's position is that the correct forum for the resolution of this matter is the English Courts . . . ." Ex. I at 2 (Mar. 8, 2010 Ltr. of Sidley Austin LLP to A. Morritt). Accordingly, it requested that the High Court ask this Court to "not to make any order which would . . . declare that BNY is required to act or deal in any particular way with the collateral or its proceeds" until further proceedings were completed in England. *Id*. at 3. BNY's counsel conceded at the May 12, 2010 status hearing that its request for an immediate appeal was not being done at Perpetual's behest. Hr'g Tr. at 94-95, May 12, 2010.

On April 23, 2010, the High Court wrote to this Court again, informing this Court that the Supreme Court of the United Kingdom had granted LBSF permission to appeal, and recommending that any further proceedings await the outcome of the appeal given that "English law is unclear until the appeal is decided." Ex. J at 1 (Apr. 23, 2010 Ltr. of A. Morritt). The High Court again expressed its "hope that you will continue to feel able to defer entering any

judgment or taking any action which might pre-empt any decision of this Court." *Id.* As noted below, this Court has agreed to that requested deferral.

**B.  BNY's Previous Requests That This Court Defer Entry of a Final Order.**

Perpetual has argued in England that English law should govern these proceedings exclusively.  Similarly, BNY, here, has repeatedly invoked English law as controlling  and requested that this Court abstain or delay its judgment in deference to the English courts.

In its June 2009 Motion to Dismiss, BNY requested that this Court stay all U.S. proceedings because "the decision of the English Court could significantly reduce, or wholly resolve, issues before this Court, and in doing so reduce or eliminate the risk of multiple, inconsistent judgments.  On all the facts presented here, if this case is not dismissed, a stay is appropriate."  BNY Mot. to Dismiss at 29.  For similar reasons, in its summary judgment briefing, BNY requested that "if LBSF's motion for summary judgment is granted, the Bankruptcy Court should not enter a final, enforceable judgment pending coordination with the English Court and such further hearings as may be appropriate."  BNY Reply Mem. of Law at 43.

BNY reiterated this request at the November 19, 2009 hearing on the parties' cross-motions for summary judgment, in which BNY's counsel stated:

> What happens if Lehman wins and if we have conflicting decisions?  We said that there should not be the ability to enforce any decision until there has been further coordination. . . . I think [LBSF] agrees that if they prevail, there has to be something more, there has to be what was referred to as an enforcement stage.  I think we agree that there would be an opportunity for briefing, if appropriate, for submission of evidence.  That's not before you today.  But it could be if Lehman prevailed on summary judgment.

Hr'g Tr. at 62-63, Nov. 19, 2009.  LBSF concurred in this request for a delay in a final judgment until there was further coordination with the High Court and this Court has, at status conferences over the past several months, declined to enter a final order until such coordination could occur.

## I.  THE COURT SHOULD CONTINUE TO DEFER ENTRY OF A FINAL ORDER.

BNY's request for an immediate order conflicts with its own initial position that this Court should defer entry of a final judgment pending communication between this Court and the English High Court.  But not only is BNY's motion inconsistent with its own previous position, it conflicts with the understanding reached between this Court and the High Court after several rounds of correspondence seeking to reach a coordinated outcome.  For this Court to enter an order now after it has agreed not to do so might well be construed to be highly offensive to the High Court and the principles of international comity.  Entering an order now would also precipitate an extreme waste of judicial and party resources.  BNY states that it seeks a final order so that it may appeal this Court's decision.  But an appeal would be rendered moot by the outcome of the English appeal should the U.K. Supreme Court rule that the anti-deprivation principle invalidates the payment-priority shift in the Transaction Documents.  Even if the U.K. Supreme Court does not rule in LBSF's favor, the case would return to the High Court for further consideration of this Court's request that the High Court recognize and give effect to this Court's decision.  Appellate proceedings in the U.S. could prove to be an entirely unnecessary waste of judicial resources.  Given the coordination contemplated by the courts, this is a classic case of an interlocutory decision in which more remains to be done before an appellate court can appropriately step in to review any order by the Court.  The Court should deny BNY's motion.

### A.  Deferring Entry of a Final Order Will Promote Judicial Efficiency.

Although BNY contends that it "has consistently asked this Court for an order so that BNY could consider pursuing an appeal," BNY Mot. at 5, that is not the case.  BNY once contended that a final, appealable order should not be entered until the English courts resolve the matters pending there.  BNY Reply Mem. of Law at 43; Hr'g Tr. at 62-63, Nov. 19, 2009; *see supra* Factual Background at 6-7.

The decision to delay entry of a final order constitutes an exercise of this Court's inherent powers and thus is well within its discretion. *See Penoro v. Rederi A/B Disa*, 376 F.2d 125, 128 (2d Cir. 1967) ("The general principle is that where a court stays a proceeding on its own docket, that is not an injunction but merely a calendar order issued under the court's inherent power to regulate the administration of its own business."); *In re Elmendorf*, 345 B.R. 486, 503 (Bankr. S.D.N.Y. 2006) ("The Court has an inherent right to manage its case docket . . . ."); 11 U.S.C. § 105(a) ("The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title.").[3] BNY has cited no authority to the contrary, nor are its arguments that this Court should exercise its discretion to enter a final order otherwise persuasive.

BNY now contends that this case should proceed through all levels of appeal in the United States "so that any later coordination reflected the confirmed judgment of the courts at all levels of the two jurisdictions." BNY Mot. at 2. Although BNY is eager to champion its cause and expend the resources of potentially three appellate courts, there is no reason appeals in the U.S. and U.K. must proceed in parallel rather than *seriatim*. Compelling interests of judicial efficiency counsel in favor of delaying the entry of a final order. A judgment by the U.K. Supreme Court in favor of LBSF would moot any further proceedings in the United States. If the U.K. Supreme Court holds that the payment priority shift is invalid under the anti-deprivation principle, then any future litigation in the United States would be unnecessary. The contracts at

---

[3] *See also In re Flores*, 291 B.R. 44, 54 (Bankr. S.D.N.Y. 2003), *superseded by statute on other grounds as recognized in In re Elmendorf*, 345 B.R. 486, 503 (Bankr. S.D.N.Y. 2006) ("The fundamental purpose of Section 105 is 'to assure the bankruptcy courts power to take whatever action is appropriate or necessary in aid of the exercise of their jurisdiction.'"); *Sears, Roebuck & Co. v. Spivey*, 265 B.R. 357, 371 (E.D.N.Y. 2001) (discussing the broad discretion section 105 affords bankruptcy courts); *Halpin v. David*, No. 4:06cv457-RH/WCS, 2009 WL 455354, at *2 (N.D. Fla. Feb. 19, 2009) ("The court has discretion whether to direct the entry of a judgment. This is a discretion that district courts exercise regularly—sometimes directing the entry of judgment, but often choosing not to do so.").

issue are undisputedly governed by English law and the issue in the United States is whether the Bankruptcy Code provides protection to LBSF beyond that of English law. If English law provides for the payment-priority shift to be invalidated, that would be consistent with this Court's decision under U.S. law, obviating the need for additional litigation regarding the *ipso facto* protections of the Bankruptcy Code.

Thus, if this Court's order is appealed before the U.K. Supreme Court has ruled, there is a strong risk that efforts of the district court or court of appeals would be wasted once the U.K. Supreme Court's decision is issued. This risk of mootness is precisely why the Second Circuit cautions against review of interim decisions. *See Chasser v. Achille Lauro Lines*, 844 F.2d 50, 52 (2d Cir. 1988), *aff'd*, 490 U.S. 495 (1989) ("[J]udicial efficiency may be promoted by the denial of interim review because some interlocutory orders will have become moot by the time a final judgment is entered, either because the order is modified prior to final judgment, or because the party disadvantaged by the interlocutory order prevails in the action, or for some other reason."). Interlocutory appeals are only permitted in limited, appropriate circumstances, *see, e.g.*, 28 U.S.C. § 1292, and in deciding whether to certify such appeals, courts are to consider the "efficiency of both the district court and the appellate court . . . and the benefit to the district court of avoiding unnecessary trial time must be weighed against the inefficiency of having the relevant Court of Appeals hear multiple appeals in the same case." *Martens v. Smith Barney, Inc.*, 238 F. Supp. 2d 596, 600 (S.D.N.Y. 2002); *see also Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 631 (2d Cir. 1991) ("It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case . . . ."). These same efficiency considerations

are at play here, not to mention the potential waste in legal fees that could be incurred by the Debtor's estate and by Perpetual's trustee, BNY, in litigating this issue on appeal.[4]

Even if the U.K. Supreme Court rules against LBSF, however, further deliberations in the English courts could eliminate potential issues on appeal. The High Court has not considered this Court's letter of February 19, 2010, in which it requested the English court to give effect to the U.S. judgment. It has postponed resolution of that issue until the U.K. Supreme Court has resolved the appeal. *See* Ex. J (Apr. 23, 2010 Ltr. from A. Morritt). If the Supreme Court rules against LBSF but the High Court, on remand, decides to defer to the application of U.S. law, then issues of granting comity to the English judgment will be eliminated from appellate consideration.[5] Moreover, issuing an appealable order now would make a comity determination very difficult for a higher court. As the High Court recognized in its March 10, 2010 letter, due to the U.K. Supreme Court's acceptance of LBSF's appeal, English law is in flux. *See* Ex. C at 1 (Mar. 10, 2010 Ltr. of A. Morritt). There is no final judgment yet for a U.S. court to grant comity to, should it be so inclined.

### B. Deferring Entry of a Final Order Will Promote International Comity.

Interests of comity also speak in favor of acceding to the High Court's repeated requests that this Court "defer entering any judgment or taking any action which might pre-empt any

---

[4] Notably, BNY does not suggest that the U.S. appellate process could ever moot the need for review in England; it merely argues "if this Court immediately issued its order, the appellate issues here could be briefed and argued—and potentially decided, at least at the first level of appeal—before the Supreme Court of the United Kingdom holds its hearing." BNY Mot. at 4. Even if appellate review by a federal district court could be completed before argument in England, which seems overly optimistic, that process offers no apparent advantage in resolving this matter or promoting international comity, but maintaining management of this case in this Court holds great promise for avoiding the risk of conflict regardless of the outcome in England.

[5] The issue of whether to grant comity to the English judgment is one of consequence. BNY and LBSF spent significant time addressing the issue in their summary judgment papers. *See, e.g.,* BNY Mem. of Law in Supp. of Mot. for Summ. J. at 20-21; BNY Mem. of Law in Opp. to LBSF Mot. for Summ. J. at 5, 23-26; BNY Reply Mem. of Law at 17-26; LBSF Mem. of Law in Opp. to BNY Mot. for Summ. J. at 23-37; LBSF Reply Mem. of Law at 15-20.

decision of this court." Ex. C at 2 (Mar. 10, 2010 Ltr. of A. Morritt). As the Second Circuit has emphasized, "tribunals, guided by comity, should approach cases touching the laws and interests of more than one country" in a "spirit of cooperation" and "the interest of the system as a whole—that of promoting 'a friendly intercourse between the sovereignties,' also furthers American self-interest." *Maxwell Commc'n Corp. v. Societe Generale* (*In re Maxwell Commc'n Corp.*), 93 F.3d 1036, 1053 (2d Cir. 1996) (quoting *Hilton v. Guyot*, 159 U.S. 113, 165 (1895)). In light of these principles, BNY's request for a final order has placed this Court in a potentially difficult position. If this Court is inclined to issue a final order, it risks offending the High Court and, at the very least, some correspondence would be necessary to explain why this Court has decided unilaterally to issue a final order without prior consultation with its English counterpart.

To avoid placing this Court in that position, BNY could have approached the High Court, or its beneficiary Perpetual could have done so, and requested that the High Court send correspondence supporting the entry of a final order to begin the appellate process in the United States. Neither one has done so. Such failure to first raise this issue in England implies either that BNY is uncertain of the High Court's response to such a request or that its beneficiary would not have supported this maneuver.

Against these interests of efficiency and comity—interests that BNY once emphasized to this Court—BNY can only offer the refrain that this "unprecedented" decision "cries out for appellate review," suggesting that this Court certify "the ruling for immediate appellate review." BNY Mot. at 4 n.1. The importance of this Court's decision, though, supports the continuation of its heretofore taken prudent approach of deferring appeal until the English law issues are resolved. This ensures that English law is fully developed if and when the U.S. courts begin to consider an appeal. And, perhaps more importantly, deferring the entry of an order and BNY's

anticipated appeal ensures that the district court and court of appeals are not forced to begin consideration of an important issue of bankruptcy law, when that issue could be mooted by a decision of the U.K. Supreme Court in favor of LBSF.

BNY contends that "an order would not 'pre-empt any decision of the English courts" because it need not include an order to "pay money or incur any other obligations." BNY Mot. at 3. However, nothing has changed since this Court sent its February 19, 2010 letter to the English court, with BNY's participation and consent. Ex. G at 1 (Feb. 19, 2010 Ltr. of J. Peck); Ex. H at 2 (Mar. 8, 2010 Ltr. of Lovells LLP). BNY has been aware of LBSF's pending appeals to the English courts since July 2009. BNY can point to no exigency requiring an immediate U.S. appeal now, especially given that the parties' rights could be adequately protected by waiting for the English appeal to conclude. The result of that appeal potentially could narrow the issues for any subsequent U.S. appeal that follows entry of a final order here.

In addition, BNY has no interest in the distribution of collateral at stake here. Its beneficiary, Perpetual, does. But its beneficiary has remained silent. It has not asked the High Court to correspond with this Court in support of a final order. It has not appeared in this Court for any purpose, much less in support of entry of a final order. And, as BNY's counsel made clear at the May 12, 2010 status conference, Perpetual has not encouraged BNY to push for a final order. Hr'g Tr. at 94-95, May 12, 2010. Nor has BNY argued in its motion that its beneficiary is being harmed by a delay in the U.S. appellate process. It appears that Perpetual and LBSF—the only parties with money actually at stake—are perfectly content with this Court waiting for the U.K. Supreme Court to rule.

In sum, any interest BNY has in obtaining a reversal of this Court's decision, whether in this case or in other similar disputes, does not override the significant interests of judicial

efficiency and international comity in favor of postponing a final order and any appeal until the English courts have reached a final decision and then determined whether to defer to the courts of this country.

## II. THE COURT SHOULD DENY THE ALTERNATIVE REQUEST FOR REOPENING AND REARGUMENT OF THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT.

Outright and prompt denial is the appropriate ruling for BNY's alternative request that this Court should reopen "the parties' cross-motions for summary judgment . . . to permit consideration of new information . . . in the Report of the Lehman Brothers Holdings Inc. Chapter 11 Proceedings Examiner . . . ." BNY Mot. at 5. In making this argument, BNY claims that the "Memorandum Decision includes factual findings regarding the relationship between [LBHI] and LBSF that were not addressed in the parties' respective cross-motions" and that these findings were "dispositive" to this Court's determination of which entity's bankruptcy filing triggered the payment priority shift under the Transaction Documents. *Id.* at 5, 9.

The decision whether to reconsider an interlocutory decision is "discretionary with the . . . court." *Tri-Star Pictures, Inc.*, 1992 WL 296314, at *2, *5. The District Court for the Southern District of New York has further explained that:

> This authority should be exercised sparingly, however, in light of the strong policy considerations favoring finality with regard to adjudicated issues. . . . *Absent truly compelling justification, policy considerations demand that both litigants and the court be spared the delay and expense inexorably linked to reconsideration of a decision.*

*Id.* (citing *United States v. Adegbite*, 877 F.2d 174, 178 (2d Cir. 1989) (emphasis added)). Because of these policy considerations in favor of finality, in order for a court to order a rehearing based on newly discovered factual evidence, the movant "must demonstrate that the evidence was unavailable notwithstanding the exercise of due diligence to obtain it and the Court's declining to reconsider its prior decision will result in a manifest injustice." *United*

*States v. Village of Island Park*, No. 90 CV 992(ILG), 2008 WL 4790724, at \*3 (E.D.N.Y. Nov. 3, 2008).  As discussed below, BNY has not satisfied its burden to show compelling justification to override the strong policies of avoiding additional expense and delay necessitated by reopening summary judgment proceedings.

Nor can BNY satisfy its burden for seeking reconsideration pursuant to Fed. R. Civ. P. 60(b)(2), upon which it also relies in its Motion.  *See* BNY Mot. at 5 n.2.  Rule 60(b)(2) requires BNY to meet an "onerous standard" and demonstrate:

> (1) the newly discovered evidence was of facts that existed at the time of trial or other dispositive proceeding, (2) the movant must have been justifiably ignorant of them despite due diligence, (3) *the evidence must be admissible and of such importance that it probably would have changed the outcome*, and (4) the evidence must not be merely cumulative or impeaching.

*United States v. Int'l Bhd. of Teamsters*, 247 F.3d 370, 392, 395 (2d Cir. 2001) (holding that "assuming *arguendo*" the court found a witness to have committed perjury, this would be insufficient to re-open judgment "because [appellant] cannot establish that any of the perjurious statements are sufficiently material to the . . . underlying decision" (emphasis added)).

BNY has failed to meet either the common-law standard for the exercise of this Court's discretion or the standard under Rule 60(b)(2).  Both essentially require the movant to demonstrate that, but for the absent evidence, a court would have reached a different decision.  *See Int'l Bhd. of Teamsters*, 247 F.3d at 392 ("the evidence must be admissible and of such importance that it probably would have changed the outcome"); *Village of Island Park*, 2008 WL 4790724, at \*3 (requiring movant to show that "Court's declining to reconsider its prior decision will result in a manifest injustice").  BNY falls far short from making such a showing.

### A. BNY Has Not Met Its Burden of Showing That New Evidence Would Have Changed the Outcome of This Court's Decision or That It Is Admissible.

As an initial matter, it seems odd that BNY would push for a final judgment now if it truly believed that this Court's decision had been based on "dispositive" factual findings that were allegedly contradicted by the Examiner's Report. BNY Mot. at 9. As these alleged findings could not be challenged on appeal, it would seem that BNY's sole goal at this point should be to establish an accurate record, not to push for an immediate appeal.

BNY's seemingly contradictory positions indicate that, despite its claims, it realizes this Court did not make its decision on *sua sponte* factual findings. This implicit concession is correct, as this Court's decision was first and foremost premised on its reading of the Transaction Documents. As this Court explained:

> BNY's position is that Noteholder Priority replaced Swap Counterparty Priority as of the date of LBHI's bankruptcy, such that the property right claimed by LBSF already was lost before the date of commencement of its own bankruptcy case. *That interpretation is inconsistent with the structure of the Transaction Documents.*

Mem. Op. at 16 (emphasis added). Based on this Court's interpretation of the Transaction Documents, it held that "LBSF held a valuable property interest in the Transaction Documents as of the LBSF Petition Date and, therefore, such interest is entitled to protection as part of the bankruptcy estate." *Id.* at 17. This Court explained that even if this was not the case, its decision would be the same:

> This sequence of events supports the conclusion that the relevant date for purposes of testing whether any shifting of priorities occurred under the Transaction Documents is the LBSF Petition Date, and not the commencement of LBHI case on September 15, 2008. However, *even if* LBHI's petition date were to be considered as the operative date for a claimed reversal of the payment priority . . . the *ipso facto* protections provided by sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code would bar the efficacy of such a change in distribution rights.

*Id.* at 17 (emphasis added). Only after this Court reached its primary holding based on its interpretation of the Transaction Documents did it discuss why LBHI's filing constituted the "commencement of a case" under sections 365(e)(1) and 541(c)(1)(B) that "entitled LBSF . . . to claim the protections of the *ipso facto* provisions of the Bankruptcy Code . . . ." *Id.* at 20-21. In the course of this alternative discussion, the Memorandum Opinion made the alleged factual findings regarding the Debtors' "business structure and circumstances" to which BNY now objects. *Id.* at 19.

Thus, BNY's claim that this Court's comments about the "business structure and circumstances" of LBSF and LBHI "were the fundamental factual underpinnings of this Court's Memorandum Decision that caused it to decide in favor of LBSF" is plainly incorrect. BNY Mot. at 12. This Court's holding was independently based on its purely legal interpretation of the Transaction Documents. What BNY is asking this Court to do, then, is to reopen discovery and allow for an evidentiary hearing to address alleged factual findings that, at most, were the basis of an alternative holding. And after all the additional expense and time associated with new discovery and a hearing, even if BNY were proved correct as to the factual assertions it makes in its Motion, it would still make no difference to this Court's ultimate decision on summary judgment.

Moreover, the information contained within an examiner's report is inadmissible hearsay. *See In re Rickel & Assoc., Inc.*, 272 B.R. at 88-89 ("Initially, the evidence and findings in the Report are not binding. The Examiner conducted an investigation, but he was not charged-nor could he be-with the duty to 'hear and determine' any claims in this case. The Report is hearsay, and does not permit denial of the motion to vacate as a matter of law without more." (internal

citation omitted)).[6]  In *Rickel*, this Court held that the defendants could not rely on an examiner's report alone to defeat the plaintiffs' motion for reconsideration because the report was hearsay. *Id.*  This case presents the inverse of the facts in *Rickel*.  BNY is relying on the Examiner's Report to support its motion for reconsideration, but the underlying logic remains the same—as a matter of law, a party cannot rely on hearsay evidence alone to support a motion.  *See In re FiberMark*, 339 B.R. at 327 ("[In *Rickel*,] Judge Bernstein held that an examiner's report was hearsay and a party could not rely on such a report to prevail on his or her motion without more. This Court finds the *Rickel* holding to be well reasoned and will follow it."  (internal citation omitted)).

Despite this clear authority, BNY cites to *Breeden v. Bennett* (*In re Bennett Funding Group, Inc.*), 367 B.R. 302, 307 (Bankr. N.D.N.Y. 2007), for the proposition that "[t]his Court may take judicial notice of findings in an official report it commissioned," implying that this Court could somehow admit the Examiner's Report into evidence through judicial notice in contravention of FED. R. EVID. 802.  BNY Mot. at 11 n.6.  But *Bennett* does not stand for that proposition.

In *Bennett*, Patrick Bennett, the former owner of the Bennett Funding Group, was sued by the U.S. Trustee for, *inter alia*, fraud and breach of fiduciary duty.  367 B.R. at 307.  In response, Bennett, who had been convicted on multiple federal fraud charges and was representing himself

---

[6] *See also In re Granite Broad. Corp.*, 369 B.R. 120, 129 n.10 (Bankr. S.D.N.Y. 2007) ("The Court recognizes, as the Debtors and Silver Point argue, that the Examiner's Report is not evidence, and that the Examiner's conclusions are not based on a full factual record and are technically hearsay."); *In re Pied Piper Casuals, Inc.*, 40 B.R. 723, 728 (Bankr. S.D.N.Y. 1984) (Noting that Examiner's Report was "largely based on hearsay and questionable estimates and contains little if any independent verification"); *In re FiberMark, Inc.*, 339 B.R. 321, 326-27 (Bankr. D. Vt. 2006) ("Furthermore, as discussed above, and as found by our sister court in the Southern District of New York, the evidence and findings in an examiner's report that underlie the examiner's conclusions are not binding. . . . The facts, as found by the Examiner, are not 'true' just because they are in the Report. They explain and justify the Examiner's conclusions.  That is all.  The Examiner's rendition of the facts may not be relied upon to prove the truth of the matter asserted.").

*pro se*, filed a counterclaim against the Trustee, alleging, in part, that the Trustee had engaged in an improper personal relationship with a Bennett Funding Group employee. *Id.* at 308-10, 312.

The court dismissed this allegation by "tak[ing] judicial notice of its own October 30, 2006 Order Denying Motion of [Bennett] for Removal of the Chapter 11 Trustee," which found that Bennett's allegations regarding the Trustee's relationship with an employee were baseless. *Id.* at 325. That order's findings, in turn, were based in some part on a report conducted by an "Independent Examiner" appointed by the court "specifically to investigate Bennett's allegations regarding the Trustee's relationship with this former employee." *Id.*

*Bennett* stands for the relatively uncontroversial proposition that a court may take judicial notice of its own prior orders and findings, and that those prior findings may be based on conclusions reached in an examiner's report regarding a specific allegation against a Trustee, not—as BNY contends—that it may take judicial notice of "findings in an official report it commissioned." BNY Mot. at 11 n.6. Here, this Court has issued no orders or findings based on the Examiner's Report. Indeed, this Court explained at the April 14, 2010 status hearing that it "completely disagree[d] that there's anything in the examiner's report, anything in the report, that relates to the issues of the *Perpetual* case, as I know them." Hr'g Tr. at 13, Apr. 14, 2010. *Bennett* is entirely inapposite.[7]

Because the Examiner's Report would not have changed the outcome of this Court's decision and it is inadmissible, BNY has failed to demonstrate that it meets either the common-law or Rule 60(b)(2) standards for reconsideration. *See Int'l Bhd. of Teamsters*, 247 F.3d at 392;

---

[7] Similarly, BNY's citation to FED. R. EVID. 201, BNY Mot. at 11 n.6, does not support its claim that this Court may admit the Examiner's Report into evidence by judicial notice. Rule 201, "Judicial Notice of Adjudicative Facts," provides that "[a] judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." The Examiner's Report clearly does not fall within either category.

*Village of Island Park*, 2008 WL 4790724, at *3; *Tri-Star Pictures, Inc.*, 1992 WL 296314, at *2, *5.

**B.    The Memorandum Opinion Did Not *Sua Sponte* Make Material Factual Findings.**

Not only is BNY incorrect regarding the basis of this Court's decision, it also errs in asserting that this Court made *sua sponte* findings of material facts and in its interpretation of Examiner's Report and its relationship to this Court's decision.  *See* BNY Mot. at 7  ("Rather, the Court reached that conclusion on its own, based on its own observations and findings about LBHI, LBSF, [and] the corporate relationships among various Lehman entities . . . .").

This Court did not consider the relationship between LBHI and LBSF *sua sponte* in interpreting the "commencement of a case" language in sections 365(e)(1) and 541(c)(1)(B). This issue was briefed by both LBSF and BNY.  In LBSF's Memorandum of Law in Opposition to BNY's Motion for Summary Judgment, LBSF argued that this Court should look to the relationship between LBHI and LBSF in interpreting sections 365(e)(1) and 541(c)(1)(B):

> As this, and many other recent corporate bankruptcies have demonstrated, the modern corporate structure often consists of multiple layers of subsidiaries and affiliates.  Because many such affiliates have interlinked obligations, if one files for bankruptcy many more within the corporate chain also are likely to do so. Thus, if a party were permitted to enforce a provision that terminated or modified a contract based on the commencement of a bankruptcy case of a closely related corporate affiliate, then parties could create *de facto ipso facto* provisions and contract around important bankruptcy protections.  This Court should not construe the Bankruptcy Code to create such a gaping loophole . . . .

LBSF Mem. of Law in Opp. to BNY Mot. for Summ. J. at 20-21.

It then called this Court's attention to LBHI's role as LBSF's guarantor under the Transaction Documents, explaining that "[m]oreover, the provision relied upon by BNY also is directly connected to the 'financial condition' of LBSF.  The sole purpose of LBHI's guarantee

of LBSF's performance and the existence of LBHI as a Credit Support Provider is to protect against the financial condition of LBSF." *Id*. at 20-21.

BNY did not respond to this argument by claiming that LBSF had raised issues of material fact and that additional discovery was necessary. It replied:

> LBSF's construction is also inconsistent with settled law respecting the separateness of corporate entities. This theory would eliminate the corporate veil for selected purposes, without any evidentiary proceedings—indeed, without any established standard for disregarding the 'other debtor's' corporate veil. Although it is possible that the estates of LBHI and LBSF may be substantively consolidated, that is a determination that can only be made upon . . . a sufficient evidentiary showing.

BNY Reply Mem. of Law at 15. BNY's memorandum of law in support of its motion for summary judgment conceded there were no material factual issues in dispute. BNY Mem. of Law in Supp. of Mot. for Summ. J. at 16-17. And, at the November 19 oral argument, BNY's counsel expressly stated that he had not identified any issues of material fact currently before this Court. Counsel stated: "Let me address a few additional issues, quickly. Are there genuine issues of material fact? We haven't pointed to any, but, of course, if the Court thinks that there are . . . that would be a basis to deny summary judgment." Hr'g Tr. at 62, Nov. 19, 2009.

This Court, after consideration of the parties' briefing and oral argument, concluded that, contrary to BNY's argument, "[n]othing in this decision is intended to impact issues of substantive consolidation." Mem. Op. at 20. Rather, for purposes of applying sections 365(e)(1) and 541(c)(1)(B), it observed that

the chapter 11 cases of LBHI and its affiliates is a singular event[8] for purposes of interpreting this *ipso facto* language . . . . [W]hat happened on September 15, 2008 was a bankruptcy filing that precipitated subsequent related events. LBHI commenced a case that entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because *its ultimate corporate parent and credit support provider*, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code.

Mem. Op. at 20-21 (emphasis added); *see also In re Delta Air Lines, Inc.*, 386 B.R. 518, 521 n.2 (Bankr. S.D.N.Y. 2008) (recognizing that a bankruptcy court may "take[ ] judicial notice of certain undisputed facts established in . . . bankruptcy proceedings").[9]

In sum, this Court interpreted sections 365 and 541 in light of undisputed and uncontroversial facts—LBHI was LBSF's corporate parent and credit support provider—that were raised in LBSF's briefing and to which BNY took no exception.

### C. The Examiner's Report Does Not Contradict Any Material Factual Determinations in the Memorandum Opinion.

The Examiner's Report does not contradict this Court's views regarding LBHI's role as LBSF's "ultimate corporate and credit support provider." Mem. Op. at 21. Indeed, the Examiner's Report supports these conclusions, stating that LBSF "was fully guaranteed by LBHI" and that "LBSF could not have survived as a stand-alone entity." Examiner's Rep. at 1978, 1980.

---

[8] BNY has seized on this "singular event" language, claiming that the "Court found the separate bankruptcy filings of these two separate entities separated in time to be a 'singular event'" and that this Court reached this decision "only after making numerous other factual findings." BNY Mot. at 6. Of course, this Court did not find that the two bankruptcy filings were a "singular event." It held that on the undisputed facts here, they could be treated as such pursuant to sections 365 and 541. The use of the term "singular event" was only another way of stating that the commencement of LBHI's case had the legal effect as if LBSF had commenced a case on the same day. Yet BNY has persisted in fixating on this "singular event" language and characterizing it as a factual finding even after the April 14, 2010 status conference, at which this Court explained to BNY's counsel that it disliked such a characterization of its opinion: "THE COURT: One thing: Don't use the word 'singular' again in your argument and you'll be on better footing." Hr'g Tr. at 13, Apr. 14, 2010.

[9] BNY mischaracterizes this Court's decision by asserting that this Court concluded "that the bankruptcy filing of LBHI precipitated 'subsequent related events' *that collapsed the distinction in the corporate form between LBHI and the related entity LBSF*." BNY Mot. at 7 (emphasis added). Of course, this Court made no such findings.

BNY, however, claims that the Report "sheds new light on the presumed 'facts' that seemed to compel this Court to rule in LBSF's favor in its Memorandum Decision." BNY Mot. at 9. It lists six bullet points of alleged "factual determinations" that purportedly formed the basis for this Court's holding regarding sections 365(e)(1) and 541(c)(1)(B), *id.* at 7, and states that "the revelations in the Examiner's Report appear to undermine this Court's earlier factual determinations." *Id.* at 9.

However, despite this initial claim, and after presumably scouring the two-thousand-page Examiner's Report, BNY only provides excerpts from the Examiner's Report to purportedly contradict a single footnote in this Court's opinion. *See id.* at 10. Footnote eight, the statement in issue, reads as follows: "The Court is convinced the 18-day delay in filing a bankruptcy petition for LBSF never would have occurred if the markets had been more forgiving and the Debtors had enough time to devote to a coordinated process of bankruptcy planning." Mem. Op. at 20 n.8.

BNY spends two pages of its twelve-page motion attempting to demonstrate how the Examiner's report contradicts footnote eight of the Memorandum Opinion. BNY Mot. at 10-11. In this effort to attack this Court's observation, BNY claims that the Examiner's Report shows "there was no 'delay': LBSF's filing occurred 18 days later because of just the kind of 'coordinated process' that this Court asserted did not occur." *Id.* at 10. It claims that "the LBHI and LBSF bankruptcy filings were separated to permit LBHI to move assets into LBSF before LBHI filed for bankruptcy, thereby allowing LBSF to continue to operate or to restructure itself before its own later bankruptcy filings." *Id.*

As an initial matter, footnote eight is immaterial to any legal conclusions reached in this Court's opinion. This Court's holding regarding what entity's filing caused the payment priority

to shift was based, first, on this Court's interpretation of the Transaction Documents and then, alternatively, on its interpretation of the "commencement of a case" language in sections 365(e)(1) and 541(c)(1)(B). And this alternative holding was based on this Court's recognition that LBHI's filing inexorably linked to LBSF's filing—not on why there was an 18-day delay in the filing or whether there was a coordinated process in the filings of the two entities. *See* Mem. Op. at 20 ("[W]hat happened on September 15, 2008 was a bankruptcy filing that precipitated subsequent related events."). Thus, even if BNY's interpretation of the Examiner's Report was correct, it would have no bearing on this Court's ultimate judgment.

But BNY's interpretation of the Examiner's Report is not correct. The portions of the Examiner's Report relied on by BNY to contravert footnote eight do not support its claims. BNY claims that page 1979 of the Examiner's Report "not[es] LBHI purposely rushed to minimize the size of its estate by, among other things, transferring billions of dollars in assets to its subsidiaries, including LBSF." BNY Mot. at 10. Page 1979, though, states nothing of the sort. Pages 1978-80, in full, state:

> Lehman Brothers Special Financing, Inc. ("LBSF") was used by Lehman as its primary vehicle for trading in derivatives, and was fully guaranteed by LBHI. LBSF was used to book transactions for products including interest rate swaps, interest rate and equity derivatives, mortgage-backed securities, currency derivatives, credit default swaps, total return swaps, collateralized debt obligations (including structured finance collateralized debt obligations and corporate-backed synthetic collateralized debt obligations) and municipal bonds and derivatives.
>
> Although LBSF was Lehman's primary swap trading entity, other entities also were used to book swaps for, among other things, hedging purposes. LBSF also was used as a swap counterparty for trades originating at other Lehman entities. If a client maintained a relationship with a different Lehman entity, but wanted to execute a trade in a product that LBSF typically booked, LBSF would often make the trade back-to-back with the other Lehman entity.
>
> LBSF had a dedicated trading desk that was used to trade and manage the products described above. However, LBSF did not have its own sales force. LBSF could not have survived as a stand-alone entity.

Examiner's Rep. at 1978-80. This text says nothing regarding LBHI "purposely rush[ing] to minimize the size of its estate" nor would such a claim make any sense. LBHI would receive no benefit by minimizing the size of its estate through transfers to subordinate entities when those entities were inevitably also going to file for chapter 11 protection.

Additionally, BNY claims that "the week before LBHI filed for bankruptcy" it transferred significant funds to LBSF and that "[t]hese eleventh-hour transfers demonstrate that the LBHI and LBSF bankruptcy filings were separated to permit LBHI to move assets into LBSF before LBHI filed for bankruptcy . . . ." BNY Mot. at 10. To the extent that BNY is claiming that LBHI engaged in improper transfers of funds, this, again, has no bearing on any issue before this Court on summary judgment. Moreover, the section of the Examiner's Report BNY cites expressly disclaims this implication, stating: "[t]he Examiner was not asked to investigate the existence of potentially colorable claims, but rather to provide a narrative relating to accounts and transfer among LBHI and various other Lehman entities of interest in the thirty days prior to LBHI's bankruptcy." Examiner's Rep. at 1928-39. Thus, the nefarious motives BNY attributes to LBHI in transferring certain funds are entirely of its own supposition and have no basis in the Examiner's conclusions.

Ultimately, the Examiner's Report, if it has any bearing on this Court's decision, supports its conclusion in footnote eight that the Debtors lacked sufficient time "to devote to a coordinated process of bankruptcy planning." Mem. Op. at 20 n.8. The Report makes clear that the first legal work regarding a bankruptcy was performed only five days before the filing, Examiner's Rep. at 719; that "it appeared by early September 14 that a deal had been reached with Barclays which would save Lehman from collapse," *id*. at 12; and that LBHI did not decide to file until the evening of Sunday, September 14, when Federal Reserve officials told LBHI's

representatives "that Lehman needed to file by midnight that night." *Id.* at 723. In short, the Examiner's Report portrays LBHI as filing under rushed, high-pressure circumstances, after government representatives ordered that it file before the market opened on Monday, September 15.

BNY has not met its high burden of demonstrating that the Examiner's Report would have made any difference to this Court's opinion and its request for re-opening the motions for summary judgment, additional discovery, and re-argument should be denied.

### CONCLUSION AND RELIEF REQUESTED

The inherent inconsistencies in BNY's alternative requests for relief reveal their fundamental weaknesses. BNY once argued that this Court should dismiss this suit or stay it in favor of the English proceedings. It now complains about the length of the English proceedings and urges a speedy appellate process in the U.S. courts. It claims both that an immediate appeal is necessary and "that the factual predicates on which this Court resolved to award summary judgment to LBSF were incorrect," positions that cannot be reconciled with each other. *See* BNY Mot. at 11. And, perhaps most remarkably, it claims that the Memorandum Opinion is based on an enumerated bullet-point list of factual findings, *id.* at 7, and it promises that "the revelations in the Examiner's Report appear to undermine this Court's earlier factual determinations." *Id.* at 9. But then BNY only attacks one footnote in this Court's opinion and its purported "revelations" do not call that footnote into question. *Id.* at 10.

BNY has failed to justify either the primary or alternative relief it seeks. Allowing an appeal now would risk wasting the courts' and the parties' limited time and resources if the U.K. Supreme Court rules in LBSF's favor or if the High Court in London later decides to defer to U.S. bankruptcy law. Moreover, any meaningful order would violate principles of international comity and the agreements reached between this Court and its English counterpart. As to BNY's

alternative request that this Court reconsider its decision, it has failed to meet the high standard required of showing how the alleged factual "revelations" in the Examiner's Report (even if they are assumed, *arguendo*, to constitute evidence to support this extraordinary relief) would cause this Court to alter its decision.

For the foregoing reasons, LBSF respectfully requests that this Court defer ruling on the BNY's request for any further order and deny its alternative request to reopen the cross-motions for summary judgment.

Respectfully submitted,

/s/ *Ralph I. Miller*
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
June 16, 2010

## EXHIBITS

A.   Aug. 20, 2009 Ltr. of J. Peck

B    Sept. 9, 2009 Ltr. of A. Morritt

C.   Mar. 10, 2010 Ltr. of A. Morritt

D.   Nov. 18, 2009 Ltr. of L. Henderson

E.   Nov. 6, 2009 Witness Statement of D. McNaughton Cory-Wright

F.   Nov. 6, 2009 Draft Order Submitted by Perpetual to High Court

G.   Feb. 19, 2010 Ltr. of J. Peck

H.   Mar. 8, 2010 Letter of Lovells LLP

I.   Mar. 8, 2010 Ltr. of Sidley Austin LLP to A. Morritt

J.   Apr. 23, 2010 Ltr. of A. Morritt