WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Ralph I. Miller
Peter Gruenberger

Attorneys for Debtors
and Debtors in Possession

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| ———————————————————— x | | |
| In re: | : | Chapter 11 |
| LEHMAN BROTHERS HOLDINGS INC., *et al.* | : | Case No. 08-13555 (JMP) |
| Debtors. | : | |
| ———————————————————— x | | |
| LEHMAN BROTHERS SPECIAL FINANCING INC. | : | |
| Plaintiff, | : | |
| -against- | | Adversary Proceeding |
| | : | No.: 09-01242 (JMP) |
| BNY CORPORATE TRUSTEE SERVICES LIMITED | : | |
| Defendant. | : | |
| ———————————————————— x | | |

**LEHMAN BROTHERS SPECIAL FINANCING INC.'S**
**MEMORANDUM OF LAW IN OPPOSITION TO BNY CORPORATE**
**TRUSTEE SERVICES LIMITED'S MOTION FOR LEAVE TO APPEAL THE JULY 19,**
**2010 ORDER ON SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Table of Authorities ..................................................................................................... iii

Introduction ................................................................................................................. 1

Factual Background ..................................................................................................... 3

    A.    The Lehman Bankruptcy .................................................................. 3

    B.    The Transactions at Issue ................................................................ 3

    C.    Litigation Ensues in England and the United States ....................... 5

    D.    The Bankruptcy Court Denies BNY's Motion to Dismiss and Initiates Communication with the English Court ........................... 6

        1.    The Bankruptcy Court Expresses Concern Over Conflicting Judgments .................................................... 7

        2.    The English Court and the Bankruptcy Court Agree to Defer Final Judgments Pending Further Communication ........................................................... 8

    E.    The Parties' Cross-Motions for Summary Judgment ....................... 9

        1.    The Parties Agree on a "Remedies Stage" to Reconcile the Judgments of the English Court and Bankruptcy Court ......................... 10

    F.    The Bankruptcy Court Issues a Memorandum Decision ................. 11

    G.    The Bankruptcy Court and English Court Maintain Their Agreement to Defer Final Judgments .......................................... 14

    H.    BNY Moves the Bankruptcy Court for a Final, Appealable Order ............................ 15

    I.    The Bankruptcy Court Grants an "Interlocutory" Order and Retains Jurisdiction .................................................................... 16

I.    BNY May Not Appeal as of Right the Bankruptcy Court's Nonfinal Order .................. 17

    A.    The Bankruptcy Court Has Not Ruled on All of LBSF's Requested Relief ....... 19

    B.    The English Court Has Requested That the Bankruptcy Court Refrain From Entering Final Relief at This Time ........................... 24

II.    The Bankruptcy Court's Order Does Not Warrant Interlocutory Appeal ...................... 29

    A.    BNY Has Failed to Establish That There Is Substantial Ground for Difference of Opinion Regarding the Order ....................... 32

B.  BNY Has Not Demonstrated That Immediate Appeal of the Order Would
    Materially Advance the Ultimate Termination of the Litigation ......................... 36

III.  BNY Cannot Rely on Media Coverage or a Parade of Horribles to Justify
      Interlocutory Review .................................................................................................. 39

Conclusion and Relief Requested ................................................................................................ 42

CASES

*Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp.*
    *(In re Enron Creditors Recovery Corp.)*,
    Adv. Nos. 03-92677 (AJG) M-47(a), 03-92682(AJG) M-47,
    2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009) ...................................................33

*Aluminum Co. of America v. Beazer East, Inc.*,
    124 F.3d 551 (3d Cir. 1997)...........................................................................22

*Arp Films, Inc. v. Marvel Entm't Group, Inc.*,
    905 F.2d 687 (2d Cir. 1990)...........................................................................18

*Back v. LTV Corp. (In re Chateaugay Corp.)*,
    213 B.R. 633 (S.D.N.Y. 1997).......................................................................30

*BancTexas Dallas, N.A. v. Chateaugay Corp. (In re Chateaugay Corp.)*,
    880 F.2d 1509 (2d Cir. 1989).........................................................................20

*Behrens v. Pelletier*,
    516 U.S. 299 (1996)......................................................................................17

*Catlin v. United States*,
    324 U.S. 229 (1945)......................................................................................17

*Chasser v. Achille Lauro Lines*,
    844 F.2d 50 (2d Cir. 1988), *aff'd*, 490 U.S. 495 (1989) ....................................38

*Cohen v. Beneficial Indus. Loan Corp.*,
    337 U.S. 541 (1949)................................................................................ 17-18

*Colon v. BIC USA, Inc.*,
    No. 00 Civ. 3666, 2001 WL 88230 (S.D.N.Y. Feb. 1, 2001) ............................33

*Cunningham v. Hamilton County*,
    527 U.S. 198 (1999)......................................................................................17

*Dicola v. Am. S.S. Owners Mut. Protection & Indem. Ass'n, Inc.*
    *(In re Prudential Lines, Inc.)*,
    59 F.3d 327 (2d Cir. 1995)..............................................................18, 19, 28

*Dow Jones & Co. v. Harrods, Ltd.*,
    237 F. Supp. 2d 394 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) ......................37

*EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*,
    356 B.R. 631 (Bankr. D. Del. 2006) ...........................................................36

*Ellender v. Schweiker*,
    781 F.2d 314 (2d Cir. 1986)........................................................................21

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    Adv. Nos. 05-01025, 05-01029, 05-01074, 05-01105, 05-010, M-47,
    2006 WL 2548592 (S.D.N.Y. Sept. 5, 2006)........................................30, 31, 33

*Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*,
    Adv. Nos. 05-01025, 06 Civ. 7828, 07 Civ. 1957,
    2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007).......................................31

*Escondido Mission Vill. L.P. v. Best Prods., Co.*,
    137 B.R. 114 (S.D.N.Y. 1992).....................................................................30

*Flor v. BOT Fin. Corp. (In re Flor)*,
    79 F.3d 281 (2d Cir. 1996).....................................................................33, 34

*German v. Fed. Home Loan Mortg. Corp.*,
    896 F. Supp. 1385 (S.D.N.Y. 1995)..............................................................31

*Gibson v. Kassover (In re Kassover)*,
    343 F.3d 91 (2d Cir. 2003)..........................................................................33

*Harriscom Svenska AB v. Harris Corp.*,
    947 F.2d 627 (2d Cir. 1991)........................................................................39

*Henrietta D. v. Giuliani*,
    246 F.3d 176 (2d Cir. 2001)...................................................................21, 23

*In re Elmendorf*,
    345 B.R. 486 (Bankr. S.D.N.Y. 2006).........................................................29

*In re Oversight & Control Comm'n of Avanzit, S.A.*,
    385 B.R. 525 (Bankr. S.D.N.Y. 2008).........................................................25

*Kennedy & Assocs., Inc. v. Worldcom, Inc. (In re Worldcom, Inc.)*,
    No. 1:08-cv-10354-RJH, 2009 WL 2215296 (S.D.N.Y. July 23, 2009) ...........18

*Klinghoffer v. S.N.C. Achille Lauro*,
    921 F.2d 21 (2d Cir. 1990)..........................................................................30

*LTV Steel Co. v. United Mine Workers of Am. (In re Chateaugay Corp.)*,
    922 F.2d 86 (2d Cir. 1990)..........................................................................19

iv

*Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.*
  *(In re Lehman Bros. Holdings Inc.),*
  422 B.R. 407 (Bankr. S.D.N.Y. 2010) .................................................................... *passim*

*Liberty Mut. Ins. Co. v. Wetzel,*
  424 U.S. 737 (1976) ................................................................................................22

*Liebert v. Levine (In re Levine),*
  No. 94-44257, 2004 WL 764709 (S.D.N.Y. Apr. 9, 2004) ...............................30

*MCI Worldcom Commc'ns v. Commc'ns Network Int'l, Ltd. (In re Worldcom, Inc.),*
  358 B.R. 76 (S.D.N.Y. 2006) ............................................................................ 33-34

*Marlin v. U.S. Tr.,*
  333 B.R. 14 (W.D.N.Y. 2005) ......................................................................31, 32

*Martens v. Smith Barney, Inc.,*
  238 F. Supp. 2d 596 (S.D.N.Y. 2002) ................................................................30

*Max Daetwyler Corp. v. Meyer,*
  575 F. Supp. 280 (E.D. Pa. 1983) ......................................................................34

*Maxwell Communications Corp. v. Societe Generale*
  *(In re Maxwell Communications Corp.),*
  93 F.3d 1036 (2d Cir. 1996) .........................................................................25, 26

*Mid-Hudson Realty Corp. v. Duke & Benedict, Inc. (In re Duke & Benedict, Inc.),*
  278 B.R. 334 (S.D.N.Y. 2002) ...............................................................20, 23, 24

*O'Leary v. Maxum Marine (In re Orange Boat Sales),*
  239 B.R. 471 (S.D.N.Y. 1999) ............................................................................30

*Official Comm. of Subordinated Bondholders v. Integrated Res., Inc.*
  *(In re Integrated Res., Inc.),*
  3 F.3d 49 (2d Cir. 1993) ................................................................................18, 21

*Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.),*
  4 F.3d 1095 (2d Cir. 1993) ..................................................................................21

*Penoro v. Rederi A/B Disa,*
  376 F.2d 125 (2d Cir. 1967) ................................................................................29

*Pollack v. Laidlaw Holdings, Inc.,*
  No. 90 Civ. 5799, 1993 WL 254932 (S.D.N.Y. June 25, 1993) ........................33

*Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*,
    109 F.3d 850 (2d Cir. 1997).............................................................................11

*Presbyterian  Church of Sudan v. Talisman Energy, Inc.*,
    244 F. Supp. 2d 289 (S.D.N.Y. 2003).............................................................37

*Private Retreats Belize, LLC v. Gram (In re Complete Retreats, LLC)*,
    No. 3:07mc152 (SRU), 2008 WL 220752 (D. Conn. Jan. 23, 2008) ...............33

*Quigley Co. v. Coleman (In re Quigley Co.)*,
    323 B.R. 70 (S.D.N.Y. 2005).............................................................................33

*Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*,
    No. 92-7054, 1993 WL 159969 (S.D.N.Y. May 10, 1993) ...............................36

*Robinson v. Silverman (In re Johns-Manville Corp.)*,
    47 B.R. 957 (S.D.N.Y. 1985).............................................................................30

*Shimer v. Fugazy (In re Fugazy Express, Inc.)*,
    982 F.2d 769 (2d Cir. 1992).............................................................................18

*Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*,
    310 F.3d 118 (3d Cir. 2002).............................................................................25

*Tex. Att'y Gen. v. Brown (In re Fort Worth Osteopathic Hosp., Inc.)*,
    387 B.R. 706 (N.D. Tex. 2008).........................................................................36

*United States v. Bond*,
    No. 09-CV-1824, 2009 WL 3254472 (E.D.N.Y. Oct. 9, 2009).........................31

*Wachovia Bank, N.A. v. Foster Bancshares, Inc.*,
    457 F.3d 619 (7th Cir. 2006) .....................................................................22, 23

*Weber v. U.S. Tr.*,
    484 F.3d 154 (2d Cir. 2007).............................................................................30

*Westwood Pharm., Inc. v. Nat'l Fuel Gas Distribution Corp.*,
    964 F.2d 85 (2d Cir. 1992).............................................................................31

*Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.)*,
    188 B.R. 287 (M.D. Fla. 1994), *aff'd*, 68 F.3d 1304 (11th Cir. 1995) .............36

*Yerushalmi v. Shiboleth*,
    405 B.R. 44 (E.D.N.Y. 2009) ...........................................................................32

STATUTES AND RULES

11 U.S.C. § 365(e)(1) ................................................................................ *passim*

11 U.S.C. § 541(a)(1) .........................................................................................11

11 U.S.C. § 541(c)(1)(B) ........................................................................... *passim*

11 U.S.C. § 1501 ..........................................................................................6, 25

11 U.S.C. § 1525 ........................................................................................24, 26

28 U.S.C. § 158(a)(1) ........................................................................................17

28 U.S.C. § 158(a)(3) .......................................................................................2, 29

28 U.S.C. § 1292(b) ................................................................................. *passim*

28 U.S.C. § 2201(a) ..........................................................................................23

BANKR. R. 2002(q)(2) .....................................................................................24, 26

BANKR. R. 9019 ................................................................................................23

FED. R. CIV. P. 19 ...............................................................................................6


OTHER AUTHORITIES

H.R. REP. NO. 109-31(I) (2005) ........................................................................25

MODEL LAW ON CROSS-BORDER INSOLVENCY WITH GUIDE TO ENACTMENT, Preamble
      (UNCITRAL 1997) ...............................................................................6, 26

Note, *Interlocutory Appeals in the Federal Courts Under 28 U.S.C. § 1292(b)*, 88 HARV.
      L. REV. 607 (1975) ............................................................................... 30-31

Evan Jones, Deborah Festa, William Satchell & Michael Heinrichs, *Lehman Bankruptcy
      Judge Prevents Trigger of CDO Subordination Provision Based on Credit
      Support Provider and Swap Counterparty Bankruptcy Filings,* 127 BANKING L.J.
      338 (2010) ................................................................................................41

Ralph R. Mabey & Susan Power Johnston, *Coordination Among Insolvency Courts in the
      Rescue of Multinational Enterprises*, 2009 NORTON ANN. REV. OF INT'L
      INSOLVENCY 3 (2009) ...............................................................................26

Andrew McKnight, *A Review of Developments in English Law During 2006: Part 2*, J. INT'L BANKING L. & REG. 2007, 22(4), 187 (2007) ........................................................7

Prof. Schecter, *Debtor's Prepetition Loss of Priority Under Springing Subordination Agreement Triggered by Parent Corporation's Bankruptcy Filing is Unenforceable Ipso Facto Provision*, 2010 Com. Fin. Newsl. 16 (2010) ........................40

David B. Stratton & Michael J. Custer, *Shot Heard Around the CDO World: Flip Clauses Found to be Unenforceable Ipso Facto Provisions*, 29 AM. BANKR. INST. J. 30, Apr. 2010 ..................................................................................................................41

Jay Lawrence Westerbrook, *Multinational Insolvency: A First Analysis of Unilateral Jurisdiction*, 2009 NORTON ANN. REV. OF INT'L INSOLVENCY (2009) ................................7

2-21 SALLY WILLCOCK, COLLIER INT'L BUS. INSOLVENCY GUIDE: ENGLAND & WALES (2008)..................................................................................................................................6

15B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3915.2 (2d ed. 1992)..........................................................23

Lehman Brothers Special Financing Inc. ("LBSF"), a debtor and debtor in possession in the above-captioned jointly administered chapter 11 cases of Lehman Brothers Holdings Inc. ("LBHI") and its affiliated debtors (collectively, the "Debtors," and collectively with its nondebtor affiliates "Lehman"), files this memorandum of law in opposition to the motion filed by BNY Corporate Trustee Services Limited ("BNY") for leave to appeal the July 19, 2010 order granting LBSF summary judgment.

## INTRODUCTION

BNY's attempt to appeal an expressly interlocutory order under the pretense that it is final and appealable should be rejected, as should its alternative motion for leave to appeal. On its face, the Bankruptcy Court's order is interlocutory and subject to further proceedings after the court communicates and coordinates with the English High Court of Justice. The Bankruptcy Court explained in meticulous detail the necessity of coordination and why its order necessarily would be interlocutory. BNY previously *requested* this very coordination by asking the Bankruptcy Court not to enter an enforceable order until the court had completed its communications with the English court.[1] Specifically, BNY once sought to "avoid an outcome which involves conflicting orders of the English and the US Courts."[2] Similarly, BNY once agreed that the Bankruptcy Court should hold a remedies stage only after it entered a final decision on summary judgment.[3] Yet, BNY now turns its back on its own previous request for coordination and disavows a remedies stage entirely, opting instead for an immediate appeal. BNY's motivation for its premature appeal is evident in its unfounded assertion that the

---

[1] Dkt. 5963 at 62-63 (Hr'g Tr. Nov. 19, 2009); Dkt. 78 at 42 (BNY Reply Br.).

[2] Dkt. 92 Ex. H (LBSF Opp. to BNY Mot. for Order).

[3] Dkt. 5963 at 62-63 (Hr'g Tr. Nov. 19, 2009).

Bankruptcy Court's decision has "profound ramifications in a lot of cases right now." Dkt. 9351 at 94 (Hr'g Tr. May 12, 2010).[4]  Although this desire to protect its corporate interest in other matters not before the Bankruptcy Court may explain the ferocity of its attack on the ruling below, the precedential effect of a trial court ruling on other, unidentified cases provides no justification for pursuit of an appeal of an order that, on its face, is not ripe for review. Notwithstanding BNY's inconsistent positions, BNY's attempt to appeal the Bankruptcy Court's order fails.

More specifically, BNY cannot appeal as of right because the order is clearly interlocutory.  Nor can BNY satisfy the essential criteria for obtaining leave to appeal under 28 U.S.C. § 158(a)(3):  that there is a substantial ground for difference of opinion over the questions of law decided; or that an immediate appeal will materially advance the ultimate termination of this litigation.  On the contrary, given that the Bankruptcy Court anticipates further proceedings after coordinating with the High Court, an immediate appeal would in fact delay the ultimate termination of the litigation.

There is no basis for BNY to invoke the appellate process now and expend limited judicial and party resources when the issues on appeal may ultimately become moot depending on the outcome of further proceedings in the Bankruptcy Court and the United Kingdom.  Nor can BNY demonstrate the existence of exceptional circumstances warranting immediate review on appeal.  Accordingly, its motion should be denied.

---

[4] *See also* Dkt. 96 at 3 n.1 (BNY's Reply Mem. of Law) ("BNY alone chose to bring this motion for the simple reason that, as a trustee in this and other similar cases, it continues to find itself trapped in the middle and in need of the clarity that only an appeal can provide.")

## A. The Lehman Bankruptcy.

Lehman was formerly the fourth largest investment bank in the United States. For more than 150 years, Lehman was a leader in the global financial markets by serving the financial needs of corporations, governmental units, institutional clients, and individuals worldwide. Lehman's headquarters in New York and regional headquarters in London and Tokyo were complemented by a network of offices in North America, Europe, the Middle East, Latin America, and the Asia Pacific region. Commencing on September 15, 2008, LBHI and certain of its direct and indirect subsidiaries commenced in the Bankruptcy Court voluntary cases under chapter 11 of the Bankruptcy Code. LBSF commenced its case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code on October 3, 2008. LBHI's and LBSF's chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015(b). LBSF and LBHI are authorized to operate their businesses and manage their properties as debtors-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

## B. The Transactions at Issue.

In October 2002, BNY's predecessor-in-interest entered into a Principal Trust Deed with Dante Finance Public Limited Company ("Dante"), pursuant to which a multi-issuer secured obligation program (the "Dante Program") was established. *See id*. at 4-5. Under the Dante Program, Saphir Finance Public Limited Co. ("Saphir"), a special purpose vehicle created by Lehman Brothers International (Europe), issued various series of credit-linked synthetic portfolio notes, including the Saphir 2004-11 and Saphir 2006-5 transactions (the "Notes") (collectively, the agreements underlying the Notes are referred to as the "Transaction Documents"). *See id.* at 5.

Perpetual Trustee Company Limited ("Perpetual"), an Australian company, is the sole holder of the Notes. *See id.* at 7. Perpetual is not a party to this suit.

These Notes were secured by various assets and certain secured obligations, including credit-default swap transactions between LBSF and Saphir that were executed in connection with the issuance of the Notes. *See id.* at 5. LBSF is the swap counterparty under the credit-default swap transactions. *See id.*

The Supplemental Trust Deeds governing the Notes reference a Swap Agreement that incorporates the terms of an ISDA Master Agreement between Dante and LBSF. *See* Dkt. 30 at 5-6 (LBSF's Opp. to BNY's Mot. for Leave to Appeal Order Denying Mot. to Dismiss). Under the applicable Master Agreements, the bankruptcy filing of any party constitutes an "Event of Default." Dkt. 1 at 5 (Compl.). Ordinarily, absent an Event of Default by LBSF, the Transaction Documents provide that LBSF receives any payments before noteholders, *i.e.*, "Swap Counterparty Priority" applies. *Id.*

However, upon an Event of Default by LBSF under the Swap Agreement, such as its chapter 11 filing, the Transaction Documents provide that LBSF's payment priority would change such that LBSF would receive payments, if any, after payments are made to Perpetual, the sole noteholder, *i.e.*, a change from "Swap Counterparty Priority" to "Noteholder Priority." *Id.* at 5-6.

BNY holds the security over the mortgaged property granted under the agreements as continuing security for (among other things), (i) the payment of all sums due under the Supplemental Trust Deeds and the Notes and (ii) the performance of Saphir's obligations under the Swap Agreement, and shall release the mortgaged property when it becomes payable or

deliverable to LBSF or Perpetual. Dkt. 30 at 7-8 (LBSF's Opp. to BNY's Mot. for Leave to Appeal Order Denying Mot. to Dismiss).

The various Transaction Documents provide that they are governed by English law and that disputes "may be brought in [English] courts" but also specify that this choice-of-law provision "shall not limit the right of any of [the parties] to take Proceedings in any other court of competent jurisdiction nor shall the taking of Proceedings in any one or more jurisdiction preclude the taking of Proceedings in any other jurisdiction (whether concurrently or not)." *Id.* at 6.

### C. Litigation Ensues in England and the United States.

On May 13, 2009, Perpetual, in an effort to seek control of the Debtors' property but circumvent the proper forum—the Bankruptcy Court—filed a claim in the High Court of Justice Chancery Division, Royal Courts of Justice (the "High Court"), in London, seeking an order that BNY must pay it in accordance with Noteholder Priority under the Principal Trust Deed (the "Perpetual action"). Dkt. 1 at 7 (Compl.). Thus, LBSF was forced to intervene in the Perpetual action to ensure its rights were protected, although it preferred to litigate these issues in the Bankruptcy Court—the court of the Debtors' main proceeding. The issue before the High Court was, in main, whether the English common law "anti-deprivation principle" would invalidate the shift to Noteholder Priority after the bankruptcy filing.

On May 20, 2009, LBSF filed the adversary proceeding below seeking a declaratory judgment that (1) the provisions in the Transaction Documents that purport to modify LBSF's right to receive priority of payments solely because of its chapter 11 filing are unenforceable because they violate the Bankruptcy Code's prohibitions on "*ipso facto*" clauses, and that, as a result, LBSF is entitled to payment under "Swap Counterparty Priority," and (2) any attempt to enforce these *ipso facto* clauses would violate the automatic stay. *Id.* at 8-11.

Following a pre-motion for summary judgment conference and requisite authorization from the Bankruptcy Court, on June 10, 2009, LBSF filed its summary judgment motion. Dkt. 6 (LBSF Mot. for Summ. J.).

### D. The Bankruptcy Court Denies BNY's Motion to Dismiss and Initiates Communication with the English Court.

BNY moved to dismiss LBSF's Complaint, arguing that FED. R. CIV. P. 19 mandated dismissal if Perpetual, the "real party in interest," could not be joined to the litigation or that the adversary proceeding should be dismissed on the ground of *forum non conveniens*. Dkt. 16 at 1-4 (BNY Mot. to Dismiss). In addition, in the first of its many arguments in favor of allowing a full adjudication of the issues by the English courts, BNY claimed that the Bankruptcy Court, if it did not dismiss, should "abstain from adjudicating the merits of this dispute, at least temporarily, as a matter of international comity." *Id.* at 25. BNY contended that the Bankruptcy Court should abstain because "the decision of the English Court could significantly reduce, or wholly resolve, issues before this Court, and in doing so reduce or eliminate the risk of multiple, inconsistent judgments." *Id.* at 29.

On July 28, 2009, the English High Court issued its ruling in the Perpetual action following a three-day trial. The English court ruled that the Noteholder Priority provisions were not rendered inoperative by the "anti-deprivation" principle. *See* Dkt. 41 Ex. A ¶ 65 (LBSF Surreply Mot. to Dismiss). Importantly, the High Court cited provisions of the UNCITRAL Model Law of Insolvency[5] providing for coordination between foreign courts in insolvency

---

[5] The Model Law of Insolvency was adopted by the United Nations Commission on International Trade Law ("UNCITRAL") in 1997. 2-21 SALLY WILLCOCK, COLLIER INT'L BUS. INSOLVENCY GUIDE: ENGLAND & WALES, 21.06[3] (2008). The Model Law's purpose is to "provide effective mechanisms for dealing with cases of cross-border insolvency," MODEL LAW ON CROSS-BORDER INSOLVENCY WITH GUIDE TO ENACTMENT, Preamble (UNCITRAL 1997), by "provid[ing] a procedural framework to facilitate cooperation between courts and office holders in differing states." COLLIER: ENGLAND & WALES, 21.06[3]. The United States enacted the Model Law in the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (codified as 11 U.S.C. § 1501 and effective October 17, 2005). The United Kingdom enacted it into law in the Cross-Border Insolvency Regulations ("CBIR"),

proceedings and observed that the Bankruptcy Court may wish to make requests for assistance from the English court. *Id.* ¶¶ 59-63. The High Court also ruled that BNY was entitled to indemnification from Perpetual, but adjourned further determination relating to indemnification until after October 1, 2009. *Id.* ¶¶ 10, 56, 63. The English court noted that the adjournment "ought to give . . . the US Bankruptcy Court sufficient time to determine what [it] wish[es] to do in relation to these proceedings." *Id.* ¶ 63.

### 1. The Bankruptcy Court Expresses Concern Over Conflicting Judgments.

On August 11, 2009, the Bankruptcy Court heard oral argument on BNY's motion to dismiss. BNY argued that "[its] goal here and in England is to avoid getting caught in the middle of a fight between LBSF and Perpetual. We have a real risk of conflicting judgments." Dkt. 4929 at 8-9 (Hr'g Tr. Aug. 11, 2009). In order to avoid these "conflicting judgments," BNY encouraged inter-court communication, explaining "[w]e agree the courts should coordinate. And we think that letting the two cases proceed independently risk [sic] chaos." *Id.* at 16; *see also id.* at 38. LBSF fully concurred with BNY's suggestion for inter-court communication. *Id.* at 39:16-40:17.

The Bankruptcy Court ruled against BNY on its motion to dismiss but understood its desire to avoid conflicting judgments and agreed with the parties' suggestion that inter-court communication be initiated. It stated "BNY has quite appropriately sought to extricate itself from a difficult situation here so as not to be at the wrong end of conflicting directions from two courts. I believe that coordination is the most appropriate answer to this problem." *Id.* at 71.

---

effective April 4, 2006. 2006 S.I. 2006/1030. Both countries enacted the Model Law with only limited revisions. *See* Jay Lawrence Westerbrook, *Multinational Insolvency: A First Analysis of Unilateral Jurisdiction*, 2009 NORTON ANN. REV. OF INT'L INSOLVENCY 2, 3 (2009); Andrew McKnight, *A Review of Developments in English Law During 2006: Part 2*, J. INT'L BANKING L. & REG. 2007, 22(4), 187 (2007).

The Bankruptcy Court also concluded that it was the appropriate forum to resolve issues of United States bankruptcy law and stated that it understood the High Court's decision in the Perpetual action to "allow[ ] time for the U.S. Bankruptcy Court to hear, consider and determine issues that are unique to U.S. bankruptcy practice." *Id.* at 72.

### 2. The English Court and the Bankruptcy Court Agree to Defer Final Judgments Pending Further Communication.

In order to facilitate inter-court communication, the Bankruptcy Court instructed LBSF to work in conjunction with BNY to draft a letter to the High Court. *Id.* at 71. This letter, sent with all parties' approval, requested that the High Court not make any final disposition until the Bankruptcy Court could consider the bankruptcy law issues:

> . . . . I would invite your Lordship to consider this Court's schedule and not to make any final disposition of the High Court Proceedings . . . until I am able to consider and rule on the United States bankruptcy law issues raised in the summary judgment briefing. Once I have considered and ruled on the issues in the Adversary Proceeding, *I intend to communicate further with your Lordship in an attempt to reach a coordinated result in light of each Court's rulings.*

*See* Dkt. 92 Ex. A at 2 (LBSF Opp. to BNY Mot. for Order) (emphasis added). On August 17, 2009, six days after the Bankruptcy Court denied BNY's motion to dismiss, BNY moved for leave to appeal the decision to the District Court. On October 14, 2009, the District Court denied BNY's motion for leave to appeal. *See* Dkt. 91 (Decision and Order).

While that motion was pending, the High Court responded to Judge Peck's letter, stating that it "look[ed] forward to receiving your rulings in due course and any further requests you decide to make" and that it welcomed "further co-operat[ion] with you in the future. *See* Dkt. 92 Ex. B at 2 (LBSF Opp. to BNY Mot. for Order).

### E. The Parties' Cross-Motions for Summary Judgment.

In September 2009, BNY responded to LBSF's motion for summary judgment with its own motion for summary judgment. Dkt. 61 (BNY Mot. for Summ. J). BNY emphasized the

importance of the coordination with the High Court, especially if LBSF's motion for summary judgment were granted. BNY requested that "[c]onsistent with the . . . expectations of the parties, no enforcement action should proceed on any order in this litigation absent further communication and coordination between the Courts and further hearing on any legal or factual issues related to enforcement." Dkt. 78 at 42 (BNY Reply Br.). LBSF had no objection to additional proceedings after the issuance of a judgment. Dkt. 75 at 20 ¶ 39 (LBSF Reply Br.).[6]

While the cross-motions for summary judgment were pending before the Bankruptcy Court, the English Court of Appeal issued a judgment on November 6, 2009 affirming the holding of the High Court. LBSF subsequently moved for permission to appeal to the Supreme Court of the United Kingdom. In light of the appellate ruling, Perpetual, BNY's beneficiary, urgently requested the High Court to send a letter asking the Bankruptcy Court "not to make any order which would require the Trustee to act in any way contrary to or different from its obligations under English law . . . ." Dkt. 92 Ex. F (LBSF Opp. to BNY Mot. for Order). The High Court did not adopt Perpetual's precise formulation, but did send a letter requesting that the Bankruptcy Court not take any action requiring BNY to act in a manner inconsistent with its ruling:

> . . . . I would invite you not to make any order which would either (a) require BNY to act in any particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or deal in any particular way with the collateral or its proceeds, until (in each case) further communication has taken place between the US and English courts, as envisaged in the penultimate paragraph of your letter of 20 August 2009.

Dkt. 92 Ex. D (LBSF Opp. to BNY Mot. for Order).

---

[6] LBSF's Reply Brief stated: "Once this Court has ruled on the application of the Bankruptcy Code to this case, then, if necessary, the parties, this Court, and the English court can resolve any conflicts through additional briefing, if requested, and inter-court communication." Dkt. 75 at 20 (LBSF Reply Br.).

### 1. The Parties Agree on a "Remedies Stage" to Reconcile the Judgments of the English Court and Bankruptcy Court.

Having reviewed the High Court's letter and the parties' pleadings, the Bankruptcy Court reiterated its concern about conflicting judgments at oral argument on the cross-motions for summary judgment. Seeking a procedural mechanism by which this conflict could be avoided, it asked LBSF's counsel: "Let's just say you are right . . . and we end up in a situation where we have a High Court decision validating under the laws of England and Wales noteholder priority and we have a determination by this Court that determines that Lehman should have priority . . . . How is that dilemma to be resolved appropriately?" Dkt. 5963 at 25-26 (Hr'g Tr. Nov. 19, 2009).

LBSF's counsel proposed a two-stage proceeding in which, first, the Bankruptcy Court would rule on the bankruptcy law issues before it and second, "there will be another remedies phase if you rule . . . in favor LBSF." *Id.* at 27. During that second phase, LBSF's counsel suggested, the courts could resolve the conflicts of law issue, considering the "policy [underlying the] conflicts of laws issues" and coordinate the fashioning of an appropriate remedy. *Id.* at 26-27.

BNY's counsel agreed with this proposal for a two-stage resolution, stating:

> What happens if Lehman wins and if we have conflicting decisions? We said that there should not be the ability to enforce any decision until there has been further coordination. . . . *I think [LBSF] agree[s] that if they prevail, there has to be something more, there has to be what was referred to as an enforcement stage. I think we agree that there would be an opportunity for briefing, if appropriate, for submission of evidence.* That's not before you today. But it could be if Lehman prevailed on summary judgment.

*Id.* at 62-63 (emphasis added).

**F.        The Bankruptcy Court Issues a Memorandum Decision.**

On January 25, 2010, the Bankruptcy Court issued its "Memorandum Decision Granting Motion for Summary Judgment and Declaring Applicable Payment Priorities" (the "Memorandum Decision").  *Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd. (In re Lehman Bros. Holdings Inc.)*, 422 B.R. 407 (Bankr. S.D.N.Y. 2010).  In the Memorandum Decision, the court held that the *ipso facto* prohibitions of sections 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code invalidated the shift to Noteholder Priority upon either LBSF's or LBHI's bankruptcy filing.  *Id.* at 418-19.

In reaching this holding, the Bankruptcy Court first rejected BNY's argument that the judgments of the English courts had a preclusive effect.  *Id.* at 416-17.[7]  The Bankruptcy Court then turned to its interpretation of the Bankruptcy Code.  It recited that "under section 541, the bankruptcy estate is comprised of, *inter alia*, 'all legal or equitable interests of the debtor in property *as of the commencement of the case.*'"  *Id.* at 418 (citing 11 U.S.C. § 541(a)(1)).  Pursuant to section 541(a)(1), the Court first considered whether LBSF had a property interest in the Notes as of its filing.  It concluded that it did given that "Saphir sent termination notices to LBSF . . . and such notices designated the filing of LBSF's chapter 11 petition as the triggering

---

[7] BNY had argued, despite having lost its motion to dismiss, that the judgment of the High Court (as affirmed on appeal) was entitled to "full and preclusive effect" under the doctrines of comity and *res judicata*.  Dkt. 78 at 17 (BNY Reply Br.).  The Bankruptcy Court correctly recognized, however, that it was "not obliged to recognize a judgment rendered by a foreign court, but instead may choose to give *res judicata* effect on the basis of comity."  422 B.R. at 416.  It declined to do so.

The Bankruptcy Court first acknowledged that "neither of the English Courts purported to bind this Court in any respect, and the High Court explicitly declined to 'preclude any request or other application made by the . . . U.S. Bankruptcy Court.'"  *Id.* at 417.  It then cited to a Second Circuit decision for the well-established proposition that "'courts will not extend comity to foreign proceedings when doing so would be contrary to the policies or prejudicial to the interests of the United States.'"  *Id.* (citing *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 854 (2d Cir. 1997)).  Based on this proposition, it reasoned that "the United States has a strong interest in having a United States bankruptcy court resolve issues of bankruptcy law, particularly in a circumstance such as this where the relevant provisions of the Bankruptcy Code provide far greater protections than are available under applicable provisions of foreign law."  *Id.*

event of default . . . ." *Id*. In light of these facts, the Bankruptcy Court interpreted the Transaction Documents to hold that "LBSF held a valuable property interest in the Transaction Documents as of the LBSF Petition Date and, therefore, such interest is entitled to protection as part of the bankruptcy estate." *Id.*

Only then did the Bankruptcy Court turn to its alternative holding regarding whether the shift to Noteholder Priority was invalidated based on LBHI's earlier September 15, 2008 filing. The court held that "even if LBHI's petition date were to be considered as the operative date for a claimed reversal of the payment priority under the Transaction Documents, the ipso facto protections provided by sections 365(e)(1) and 541(c)(1)(B) . . . would bar the efficacy of such a change in distribution rights." *Id.* at 418-19. In support of this conclusion, the Bankruptcy Court noted:

> each of these sections of the Bankruptcy Code prohibits modification of a debtor's right solely because of a provision in an agreement conditioned upon "the commencement of *a* case under this title." Notably, the language used is not limited to the commencement of a case *by or against the debtor*. Given the legislative history, the absence of such precise limiting language is significant.

*Id.* at 419 (internal citation omitted). The Bankruptcy Court found the legislative history indicated that "Congress considered, but ultimately rejected, drafting sections 365(e)(1) and 541(c)(1)(B) in a manner that would have expressly restricted their application to the bankruptcy case of the debtor counterparty." *Id.* To effectuate Congress's intent, the Bankruptcy Court was faced with the difficult task of determining "under what circumstances is the bankruptcy case of another debtor sufficiently related to rights of the parties to such an executory contract that it is reasonable to trigger the ipso facto protections of these sections?" *Id.*

The Bankruptcy Court forthrightly recognized that the "description of the kind of relationship that is sufficient to trigger such protections affecting the rights of contracting parties is best left to a case-by-case determination" and "with this principle of restraint in mind," it

applied sections 365(e)(1) and 541(c)(1)(B) to the facts of this case. *Id.* at 419-20. Based on its sixteen months of experience in presiding over the Lehman bankruptcy, the Court concluded that the various Lehman entities "compromis[ed] an integrated enterprise and, as a general matter, the financial condition of one affiliate affects the others." *Id.* at 420 (internal quotation marks and citation omitted).[8] Thus, on the limited and extraordinary facts of this case, the Bankruptcy Court reasoned:

> LBHI commenced a case that entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the ipso facto provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code.

*Id.* at 420.

In its Memorandum Decision, the Bankruptcy Court once again recognized that "both this Court and the English Courts have been aware of the potential for conflicting rulings." *Id.* at 411. Indeed, it concluded the Memorandum Decision by recognizing that this decision "places BNY in a difficult position" and, accordingly, "direct[ed] that the parties attend a status conference to be held on the next available omnibus hearing date in the Debtors' cases for purposes of exploring means to harmonize the decisions of this Court and the English Courts." *Id.* at 423.

---

[8] BNY mistakenly asserts in its Memorandum of Law that "the Bankruptcy Court expressly based its holding on its own observations about the consolidated Lehman bankruptcy proceeding—issues that had not been briefed or argued by the parties *at all*." BNY Mem. at 13. BNY made this same factually incorrect argument in its pleadings before the Bankruptcy Court, which was not swayed. LBSF repeats its objection to this mischaracterization of the record. The Bankruptcy Court did not consider the relationship between LBHI and LBSF *sua sponte* in interpreting the "commencement of a case" language in sections 365(e)(1) and 541(c)(1)(B). This issue was briefed by both LBSF and BNY. In LBSF's Memorandum of Law in Opposition to BNY's Motion for Summary Judgment, LBSF argued that this Court should look to the relationship between LBHI and LBSF in interpreting sections 365(e)(1) and 541(c)(1)(B). Dkt. 68 at 20-21 (LBSF Mem. of Law in Opp. to BNY Mot. for Summ. J.). BNY did not respond to this argument by claiming that LBSF had raised new arguments or issues of material fact. It replied, in part: "LBSF's construction is also inconsistent with settled law respecting the separateness of corporate entities." Dkt. 78 at 15 (BNY Reply Mem. of Law). In addition, BNY's memorandum of law in support of its motion for summary judgment conceded there were no material factual issues in dispute. Dkt. 61 at 16-17 (BNY Mem. of Law in Supp. of Mot. for Summ. J.).

**G.     The Bankruptcy Court and English Court Maintain Their Agreement to Defer Final Judgments.**

At the February 19, 2010 status conference, the parties and the Bankruptcy Court discussed the form of a letter to be sent to the High Court, informing it of the judgment in the United States.  That same day, Judge Peck wrote to the High Court, with BNY's and LBSF's consent, explaining that he had "limited [his] ruling so as to award only a declaratory judgment as to the nature of United States bankruptcy law on this issue.  I have not entered an order requiring BNY to tender the collateral to LBSF at this time.  Prior to entering any such order, I wish first to communicate with your Lordship . . . ."  Dkt. 92 Ex. G at 1 (LBSF Opp. to BNY Mot. for Order).  The Bankruptcy Court then requested that "Your Lordship recognize and give effect to my January 25, 2010 declaratory judgment in the cases pending before you in a manner that you deem appropriate."  *Id.* at 2.

The High Court replied on March 10, 2010.  It stated the English Supreme Court was considering LBSF's application for permission to appeal and therefore "English law is unclear and I cannot do anything further."  Accordingly, the High Court wrote, requesting that the Bankruptcy Court defer taking any action that would preempt any decision of the High Court:

> As and when the Supreme Court has made a decision, be it the refusal of permission to appeal or at the conclusion of a full appeal, I will arrange a further hearing by the parties to consider your request . . . . In the meantime, I hope you will feel able to defer entering any judgment or taking any action which pre-empt any decision of this court.

*Id.* Ex. C at 1-2.  Notably, this letter was preceded by submissions to the High Court by the parties in the Perpetual action.  On March 8, BNY's English counsel wrote a letter stating that it "supports the comments in Judge Peck's recent letter, and in previous letters between the Courts, concerning the importance of efforts by all parties to avoid an outcome which involves conflicting orders of the English and the US Courts."  *Id.* Ex. H at 2.

On March 31, 2010, the English Supreme Court agreed to hear LBSF's appeal. The High Court then wrote again to the Bankruptcy Court, informing it of the Supreme Court's decision, and stating that it was "not proposing any further hearings pending the outcome of the appeal" given that "English law is unclear until the appeal is decided." *Id.* Ex. J at 1.

## H.    BNY Moves the Bankruptcy Court for a Final, Appealable Order.

Five days after the High Court's letter, *id.*, BNY, through new counsel, moved the Bankruptcy Court to issue a final, appealable order. *See* Dkt. 90 (BNY's Mot. for Entry of an Order). It did so despite its numerous representations that it approved a two-stage proceeding and its participation in drafting the correspondence between the courts, both in England and in the United States.[9] At the May 12, 2010 status hearing, the Bankruptcy Court, understandably, probed BNY's counsel for the rationale behind its shift in position and asked whether this had occurred at Perpetual's behest. BNY's counsel replied that it was pursuing this course of action because of the ramifications of the Bankruptcy Court's decision on other matters in which BNY has an interest:

> No, your Honor. It is at the direction of my own client, a trustee without indemnification, who sees the profound ramifications for itself in this one instance, and also sees the profound ramifications in a lot of cases right now, where the decision that Your Honor issued that broke new ground, by all accounts, is now something that is having far-ranging ramifications.

Dkt. 9351 at 94 (Hr'g Tr. May 12, 2010). Implicit in BNY's counsel's response was its acknowledgment that the "profound ramifications" of this adversary proceeding were affecting BNY in various other proceedings against the Lehman estate.[10]

---

[9] In that Motion, BNY also sought, inconsistently, to re-open the proceedings before the Bankruptcy Court for additional discovery.

[10] BNY may have been referring to transactions in which BNY has already paid noteholders under similar transactions containing *ipso facto* clauses.

# I.    The Bankruptcy Court Grants an "Interlocutory" Order and Retains Jurisdiction.

LBSF filed a brief opposing the entry of a final order and the Bankruptcy Court heard argument on June 30, 2010.  After counsel had concluded, the Bankruptcy Court explained that, because of the necessary coordination with the High Court, it intended only to provide the parties an interlocutory order and avoid a double appellate process:

> It was never my contemplation, given the existing communication that took place between this Court and the High Court in London, that I was setting up a multiyear double-blind appellate process. It was, in fact, my view that I was simply entering a memorandum decision that was, at that point, regardless of the form of order, interlocutory in nature.

Dkt. 99 at 55 (Hr'g Tr. June 30, 2010).  The Court continued, stating,

> It is not the declaration of the law that creates the conflict, it is the application of the law that creates the conflict.  It is for that reason that I am anxious to maintain the cooperative posture with my colleagues in the UK and to be in a position to try to ameliorate the  potentially conflicting aspects of applying the law.

*Id.*  At the conclusion of the hearing, the Bankruptcy Court decided to enter an order, which it characterized as "heavily procedural," because it "will at least get us past this episode in the litigation." *Id.* at 56.

Accordingly, a few days later on July 19, 2010, the court entered an order granting LBSF's motion for summary judgment and stating "in view of this Court's expectation that further coordination and communication between the High Court and this Court shall take place," that it is

> ORDERED that, consistent with the statements made by the Court on the record of the hearing on June 30, 2010, this Order is interlocutory; and it is further;

> ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

Dkt. 100 at 4 (Order). BNY subsequently filed its motion for leave to appeal the Bankruptcy Court's interlocutory order.

## I. BNY MAY NOT APPEAL AS OF RIGHT THE BANKRUPTCY COURT'S NONFINAL ORDER.

BNY boldly contends that the Bankruptcy Court's order "is final and subject to appellate review as of right" under 28 U.S.C. § 158(a)(1). BNY Mem. at 17. BNY makes this contention in the face of the order's plain language that it is "interlocutory," Dkt. 100 at 4 (Order), and the Bankruptcy Court's statements on the record making clear that the order is "interlocutory because there is additional work that needs to be done in order to complete the determination of liability consistent with that ruling." Dkt. 99 at 50:23-51:4 (Hr'g Tr. June 30, 2010). Notably, the fourth decretal paragraph of the July 19, 2010 order provides:

> ORDERED that, consistent with the statements made by the Court on the record of the hearing on June 30, 2010, this Order is interlocutory . . . .

Dkt. 100 at 4 (Order). The Bankruptcy Court explained that "[i]t was, in fact, my view that I was simply entering a memorandum decision that was, at that point, regardless of the form of order, interlocutory in nature." Dkt. 99 at 55:8-11 (Hr'g Tr. June 30, 2010). In addition to the Bankruptcy Court's statements, the surrounding circumstances also lead to the ineluctable conclusion that this order (and the adversary proceeding underlying it) is very much a work in progress that is not ripe for appeal.

A decision is "final" if it "ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States*, 324 U.S. 229, 233 (1945); *see also Cunningham v. Hamilton County*, 527 U.S. 198, 204 (1999) (same). "The requirement of finality precludes consideration of decisions that are subject to revision, and even of 'fully consummated decisions [that] are but steps towards final judgment in which they will merge.'" *Behrens v. Pelletier*, 516 U.S. 299, 305 (1996) (alteration in original) (quoting *Cohen v.*

*Beneficial Indus. Loan Corp.*, 337 U.S. 541 (1949)). Although finality is somewhat more flexible in bankruptcy appeals, there remains a "strong federal policy against piecemeal appeals." *Shimer v. Fugazy (In re Fugazy Express, Inc.)*, 982 F.2d 769, 775 (2d Cir. 1992).

Courts in the Second Circuit apply the same standards of finality to bankruptcy appeals under section 158 as for appeals under 28 U.S.C. § 1291. *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 3 F.3d 49, 52-53 (2d Cir. 1993). For a bankruptcy court order to be final, "the order need not resolve all of the issues raised by the bankruptcy; but *it must completely resolve all of the issues pertaining to a discrete claim, including issues as to the proper relief.*" *Id.* at 53 (holding that bankruptcy court order approving agreement for a breakup fee was not final because it did not "finally dispose of the dispute"); *see also Fugazy*, 982 F.2d at 775-76 (holding that bankruptcy court order was nonfinal because it did not finally dispose of the dispute by determining damages); *Kennedy & Assocs., Inc. v. Worldcom, Inc. (In re Worldcom, Inc.)*, No. 1:08-cv-10354-RJH, 2009 WL 2215296, at *2 (S.D.N.Y. July 23, 2009) (holding that bankruptcy court's discovery order was not final because issues as to proper relief remained to be decided). "[O]nly when nothing save ministerial tasks relating to computation of damages remains can a mere determination of liability be construed as a . . . 'final decision.'" *Integrated Res.*, 3 F.3d at 53 (quoting *Arp Films, Inc. v. Marvel Entm't Group, Inc.*, 905 F.2d 687, 689 (2d Cir. 1990)).

When an adversary proceeding seeks a declaratory judgment, "resolution of the 'discrete dispute' requires a final determination of the actual controversies between the parties that are the subject of the adversary proceeding." *Dicola v. Am. S.S. Owners Mut. Protection & Indem. Ass'n, Inc. (In re Prudential Lines, Inc.)*, 59 F.3d 327, 332 (2d Cir. 1995). Accordingly, BNY "cannot separate out discrete claims made within the adversary proceeding and appeal the lower

courts' resolution of these issues piecemeal. . . . [T]he disposition of a discrete dispute is generally considered to be the *resolution of the adversary proceeding* within the bankruptcy action." *Id.* (emphasis added) (internal quotation marks and citation omitted); *see also LTV Steel Co. v. United Mine Workers of Am. (In re Chateaugay Corp.)*, 922 F.2d 86, 90 (2d Cir. 1990) (same). The adversary proceeding has not been resolved in this case, however, because, as discussed below, the Bankruptcy Court has not yet ruled on all of the declaratory relief requested by LBSF.

### A. The Bankruptcy Court Has Not Ruled on All of LBSF's Requested Relief.

The Bankruptcy Court has issued a memorandum decision outlining its declaratory judgment that the contractual provisions at issue are unenforceable *ipso facto* clauses that violate the automatic stay. But the court refrained from addressing the declaratory judgment requested by LBSF "that LBSF is entitled to payment under Swap Counterparty Priority." Dkt. 1 at 11 (Compl).

BNY completely ignores this request for relief, contending that the Bankruptcy Court has granted LBSF all the relief it has requested.[11] BNY Mem. at 18. However, LBSF has made clear that it seeks this declaratory relief and wishes to pursue it during a "remedies phase" in the proceedings. Dkt. 99 at 16:7-11 (Hr'g Tr. June 30, 2010). Although BNY now feigns questions as to whether there is "some further 'remedy'" sought by LBSF, BNY previously argued that an enforcement stage of the proceedings was essential in order to protect it from conflicting decisions. BNY previously requested that any enforcement of the Bankruptcy Court's decision

---

[11] Although BNY omits mention of LBSF's additional request for relief, BNY is well aware of it because LBSF has referred to it repeatedly at several hearings before the Bankruptcy Court. *See* Dkt. 99 at 30:2-31:3, 40:22-23 (Hr'g Tr June 30, 2010); Dkt. 5896 at 27:18-22 (Hr'g Tr. Nov. 19, 2009). BNY's statement that the Bankruptcy Court "expressly granted LBSF's summary judgment motion *in full*" is inaccurate. BNY Mem. at 20 n.21. Instead, the order expressly addressed the English High Court's request, and the Bankruptcy Court's agreement, "not to enter an order requiring BNY to tender any collateral to LBSF *at this time*." Dkt. 100 at 3 (Order) (emphasis added).

be stayed pending further coordination with the English court and agreed to what LBSF had referred to as a "remedies phase," which counsel for BNY paraphrased as an "enforcement stage."[12]

The Bankruptcy Court has likewise recognized LBSF's request for a "remedies phase and the enforcement phase of this decision." Dkt. 99 at 48:4-5 (Hr'g Tr. June 30, 2010). The Bankruptcy Court made clear that it has yet to grant LBSF's requested relief for a declaration that it is entitled to payment: "[T]he memorandum decision quite deliberately and explicitly refrained from directing any coercive relief as against BNY." *Id.* at 56:24-57:1. "[T]here's no coercive order that has been lodged against BNY. You're not adversely affected in any legal, economic way at this moment." *Id.* at 48:6-8. The Bankruptcy Court's statement of intent that it intends to consider these issues in the future is a significant factor in determining whether the order is final or interlocutory. *Mid-Hudson Realty Corp. v. Duke & Benedict, Inc. (In re Duke & Benedict, Inc.)*, 278 B.R. 334, 341 (S.D.N.Y. 2002) (citing *BancTexas Dallas, N.A. v. Chateaugay Corp. (In re Chateaugay Corp.)*, 880 F.2d 1509, 1513 (2d Cir. 1989)). Indeed, the Second Circuit has recognized that the intent of the lower court, including its contemplation of

---

[12] *See supra* Statement of Facts § E.1. At the hearing on the parties' cross-motions for summary judgment, BNY's counsel stated:

> What happens if Lehman wins and if we have conflicting decisions? We said that *there should not be the ability to enforce any decision until there has been further coordination.* And based on the filings that were made last week in the High Court by LBSF, I think they agreed. You've now received the High Court's letter. Looking to what Lehman filed last week in the High Court, they say they're only looking for an order declaring the effect of bankruptcy law, they're not looking for an order that would require BNY to take any action. To quote: "*No order is sought at this stage requiring BNY, for example, to distribute the collateral to LBSF. Further orders from the US Bankruptcy Court would be required for this to occur, and none are presently sought.*" I think [LBSF] agree[s] that if they prevail, there has to be something more, *there has to be what was referred to as an enforcement stage.* I think we agree that there would be an opportunity for briefing, if appropriate, for submission of evidence. That's not before you today. But it could be if Lehman prevailed on summary judgment.

Dkt. 5963 at 62-63 (Hr'g Tr. Nov. 19, 2009) (emphasis added); *see also* Dkt. 78 at 43 (BNY Reply Mem. of Law).

further proceedings, is relevant to the finality determination.  *See Henrietta D. v. Giuliani*, 246 F.3d 176, 181 (2d Cir. 2001) (citing *Ellender v. Schweiker*, 781 F.2d 314, 317 (2d Cir. 1986)). The Bankruptcy Court's statements of intent that the order is interlocutory and subject to further proceedings after communication with the English court strongly support a finding that the order is nonfinal.[13]

In addition to the order's express statement that it is interlocutory, the Bankruptcy Court also expressly "retain[ed] jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order."  Dkt. 100 at 4 (Order).  The inclusion of such language also indicates that the order is interlocutory.  In *Integrated Resources*, the Second Circuit noted that the bankruptcy court had "explicitly retained jurisdiction 'over any matters related to or arising from the implementation of'" its order, and thus "the parties should proceed to a final determination by the bankruptcy court," which may then result in a subsequent appeal. 3 F.3d at 54.  By including this language along with its other statements regarding the interlocutory nature of the order, the Bankruptcy Court has made clear that it has not yet entered a final, appealable order, and that more remains to be done in the Bankruptcy Court before such an order can be entered.

Thus, BNY's contention that the Bankruptcy Court was primarily concerned with maintaining its continuing jurisdiction to enforce its order, BNY Mem. at 22, is not a fair representation of the Bankruptcy Court's retention of jurisdiction, which was clearly intended to permit the Bankruptcy Court to take further action including issuing orders in light of the outcome of coordination with the English court.  Judgments "where assessment of damages or

---

[13] *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.)*, 4 F.3d 1095 (2d Cir. 1993), cited by BNY for the proposition that a bankruptcy court can "mislabel" its order, BNY Mem. at 21, is beside the point. Here, the Bankruptcy Court clearly and correctly labeled its order "interlocutory" and explained the reasons for this designation.

awarding of other relief remains to be resolved have never been considered to be 'final.'" *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976).

BNY cites the Third Circuit's decision in *Aluminum Co. of America v. Beazer East, Inc.*, 124 F.3d 551 (3d Cir. 1997), for the proposition that a declaratory judgment is final even if further remedial action is requested. BNY Mem. at 20. However, in reality, *Beazer* supports a finding that the Bankruptcy Court's order is interlocutory only, because that court held that an order is final only if, *inter alia*, "it finally resolves all issues which any party before it wishes it to resolve" and it "is clearly intended by the court to be its final act in the proceeding." 124 F.3d at 559. Moreover, that court recognized that the parties to a litigation determine the issues to be presented to the court, and an action is not complete until the "court did all that the parties asked of it." *Id.* at 560. Here the Bankruptcy Court has not yet resolved all of the issues LBSF has placed before it, and the order is clearly not intended to be the Bankruptcy Court's "final act." Because the Bankruptcy Court has not yet considered LBSF's request for a declaration that it is entitled to be paid in accordance with Swap Counterparty Priority, its order is necessarily interlocutory.

As a result, BNY's general contention that a declaratory judgment that merely determines liability without specifying the relief can be deemed final, BNY Mem. at 22, does not support a finding of finality in this case. While in some cases it is clear that the lower court has "washed [its] hands of the case," when it is clear that the lower court has not done so, an order is not final and appealable. *See Wachovia Bank, N.A. v. Foster Bancshares, Inc.*, 457 F.3d 619, 621 (7th Cir. 2006).

BNY also relies upon *Wachovia*, BNY Mem. at 22-23, but that decision is both distinguishable and instructive. In *Wachovia*, the district court granted declaratory judgment

without specifying the relief to be granted, but it was clear that the plaintiff "got everything it asked for in the judgment" and that the district judge did not intend to enter a further order specifying relief. 457 F.3d at 621. The court of appeals held that it was clearly a final, appealable judgment. By contrast, not only has LBSF not gotten everything it asked for, but it is clear that the Bankruptcy Court intends to enter a further order after coordinating with the English court.[14]

BNY's suggestion that the Declaratory Judgments Act, 28 U.S.C. § 2201(a), automatically provides for review of declaratory judgments is not accurate. BNY Mem. at 18. Although section 2201(a) provides that a declaratory judgment "shall have the force and effect of a final judgment," courts have recognized that a "declaratory judgment does not have the force of a final judgment" when other remedial issues remain unresolved. *Duke & Benedict*, 278 B.R. at 341 n.9; *Henrietta*, 246 F.3d at 180. In *Henrietta*, the court of appeals explained that "[a]n award of declaratory relief *on all claims* is a final order in a case in which only declaratory relief is sought, . . . but a declaration has no such effect when other remedial issues remain unresolved." 246 F.3d at 180 (emphasis added). Because the declaratory judgment had determined only liability, without ruling on relief, it was "a classic example of non-finality." *Id.* As the court explained, "[a] partial determination [of relief] cannot be elevated to finality simply by characterizing it as a declaratory 'judgment.'" *Id.* at 181 (second alteration in the original) (quoting 15B CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 3915.2 (2d ed. 1992)).

---

[14] For this reason, *In re Bennett Funding Group*, which BNY cites for the proposition that orders are final even when they condition enforceability on action by other courts, BNY Mem. at 19 n.19, is distinguishable because the bankruptcy court in *Bennett* had granted a Bankruptcy Rule 9019 motion and "there was simply nothing further to be done in the Bankruptcy Court, and the case was ripe for appeal despite the pending approvals of other courts." 439 F.3d 155, 164 (2d Cir. 2006).

Similarly, in *Duke & Benedict*, the district court held that the declaratory judgment at issue was not a final order because it did not dispose of all of the parties' claims. 278 B.R. at 341. The Bankruptcy Court had deferred decision on certain claims and expressly reserved decision on issues presented on summary judgment. *Id.* at 342. In addition, the court noted that the issues on appeal could become moot depending on developments in a related zoning proceeding. *Id.* at 342-43. Likewise, further proceedings in the English High Court and in the Bankruptcy Court could moot the issues BNY raises on appeal. *See infra* Part II.B.

**B.    The English Court Has Requested That the Bankruptcy Court Refrain From Entering Final Relief at This Time.**

Contrary to BNY's unfounded assertion that the Bankruptcy Court is attempting to insulate its decision from appeal by labeling its order "interlocutory," BNY Mem. at 4, the Bankruptcy Court has a sound basis for declining to enter a final order at this time. The court has expressly refrained from entering a final order in response to repeated requests by the English High Court of Justice to "defer entering any judgment or taking any action which might pre-empt any decision" of the High Court. Dkt. 92 Ex. C at 2 (LBSF Opp. to BNY Mot. for Order).

Chapter 15 of Title 11 encourages the establishment of inter-court communication. For example, section 1525 provides:

> (a) Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee.
>
> (b) The court is entitled to communicate directly with, or to request information or assistance directly from, a foreign court or a foreign representative, subject to the rights of a party in interest to notice and participation.

11 U.S.C. § 1525.[15]

---

[15] Bankruptcy Rule of Procedure 2002(q)(2) provides further guidance for the establishment of inter-court communication.

The congressional intent underlying this provision was to facilitate efficient international reorganizations by promoting communication and cooperation between courts. *See* H.R. REP. NO. 109-31, pt. 1, at 117 (2005) ("The right of courts to communicate with other courts in worldwide insolvency cases is of central importance. [Section 1525] authorizes courts to do so."); 11 U.S.C. § 1501 (identifying the purposes of section 15 as the "fair and efficient administration of cross-border insolvencies" and "facilitation of the rescue of financially troubled businesses").[16]

Circuit courts have likewise endorsed inter-court cooperation. In *Stonington Partners, Inc. v. Lernout & Hauspie Speech Prods. N.V.*, the Third Circuit encouraged the bankruptcy court in an international insolvency proceeding to initiate communication with its Belgian counterpart, stating "[w]e strongly recommend, in a situation such as this, that an actual dialog occur or be attempted between the courts of the different jurisdictions in an effort to reach an agreement as to how to proceed or, at the very least, an understanding as to the policy considerations underpinning salient aspects of the foreign laws." 310 F.3d 118, 133 (3d Cir. 2002). Similarly, in *Maxwell Communications Corp. v. Societe Generale (In re Maxwell Communications Corp.)*, the Second Circuit noted with approval the establishment of a protocol governing the administration of the insolvent entity by the bankruptcy court and its English counterpart, stating that "[t]his collaborative effort exemplifies the 'spirit of cooperation' with which tribunals, guided by comity, should approach cases touching the laws and interests of more than one country." 93 F.3d 1036, 1053 (2d Cir. 1996). The court also observed that

---

[16] *See In re Oversight & Control Comm'n of Avanzit, S.A.,* 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008) ("The express purpose of Chapter 15 is to promote cooperation between the courts of foreign nations and the United States in the efficient administration of cross-border insolvencies.").

"comity argues decidedly against the risk of derailing that cooperation by the selfish application of our law." *Id.*

Additionally, in May 2000, the American Law Institute approved model Guidelines Applicable to Court-to-Court Communications in Cross-Border Cases ("Guidelines"). These Guidelines were subsequently approved by the International Insolvency Institute,[17] and have since been incorporated into inter-court communication protocols in several U.S. cases, including at least three cases in the Southern District of New York Bankruptcy Court. *See* Ralph R. Mabey & Susan Power Johnston, *Coordination Among Insolvency Courts in the Rescue of Multinational Enterprises*, 2009 NORTON ANN. REV. OF INT'L INSOLVENCY 3, 6 (2009) ("The Guidelines . . . are cited and used by courts around the world to coordinate cross-border insolvencies.").[18]

Here, in August 2009, the Bankruptcy Court began a dialogue with the English Court through a series of letters. *See id.* Ex. A, Ex. B. Citing the UNCITRAL Model Law on Cross-Border Insolvency, as adopted in chapter 15 of title 11 of the United States Bankruptcy Code, 11 U.S.C. § 1525, and Bankruptcy Rule 2002(q)(2), the Bankruptcy Court stated its intention to communicate with the High Court "in an attempt to reach a coordinated result in light of each Court's rulings." Dkt. 92 Ex. A (LBSF Opp. to BNY Mot. for Order). BNY agreed to the letter sent by Judge Peck and this stated course of action. *Id.*

---

[17] The International Insolvency Institute is "a non-profit, limited-membership organization dedicated to advancing and promoting insolvency as a respected discipline in the international field." *See www.iiiglobal.org.*

[18] Indeed, this is not the Bankruptcy Court's first time dealing with international insolvencies. The court has adopted protocols based on the Guidelines and providing for inter-court communication in other matters arising in the *Lehman* bankruptcy and in *In re Quebecor World, Inc. See* June 17, 2009, Order Approving the Proposed Cross-Border Insolvency Protocol for the Lehman Brothers Group of Companies (Dkt. 4020 filed in the main bankruptcy case, Case No. 08-13555), granting the Debtors' Motion Pursuant to Sections 105 and 363 of the Bankruptcy Code for Approval of a Cross-Border Insolvency Protocol (the "Protocol Motion") (Dkt. 3467 filed in the main bankruptcy case, Case No. 08-13555); "Cross-Border Insolvency Protocol *In re Quebecor World, Inc.*" *http://www.iiiglobal.org/e-library* (follow "insolvency topics" hyperlink; then follow "Cross-Border Insolvency Orders and Protocols (Alphabetical)" hyperlink).

Throughout this correspondence, the High Court has consistently requested that the Bankruptcy Court "defer entering any judgment or taking any action which might pre-empt any decision" of the High Court. *Id.* Ex. C at 2. Specifically, the High Court has requested the Bankruptcy Court "not to make any order which would either (a) require BNY to act in any particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or deal in any particular way with the collateral or its proceeds, until (in each case) further communication has taken place between the US and English courts, as envisaged in the penultimate paragraph of your letter of 20 August 2009." *Id.* Ex. D at 2. The High Court's request was specifically requested by BNY's beneficiary Perpetual, which filed an urgent application to the High Court requesting such a letter because of its concern that the declaratory judgment sought by LBSF "would have the purported effect of binding [BNY] and so purportedly pre-empt the further proceedings or decision of the English Court." *Id.* Ex. E at 5 ¶ 16. Based on this concern, Perpetual requested that the High Court ask the Bankruptcy Court "not to make any order which would require the Trustee to act in any way contrary to or different from its obligations under English law . . . ." *Id.* Ex. F. The High Court did not adopt Perpetual's precise formulation, but requested that the Bankruptcy Court not require BNY to act in any particular way with respect to the collateral pending further communication between the courts.

After its decision on the cross-motions for summary judgment, the Bankruptcy Court sent the High Court a letter—with BNY's and LBSF's participation and consent—agreeing not to enter "an order requiring BNY to tender the collateral to LBSF at this time" and stating that it would not do so until the courts had an opportunity to communicate "in an effort to reach a coordinated resolution of these matters." *Id.* Ex. G at 1. BNY subsequently wrote a letter to the

High Court on March 8, 2010 stating that it "supports the comments in Judge Peck's recent letter, and in previous letters between the Courts, concerning the importance of efforts by all parties to avoid an outcome which involves conflicting orders of the English and the US Courts." *Id.* Ex. H at 2. In a March 10, 2010 letter, the High Court responded to the Bankruptcy Court's request by stating:

> As and when the Supreme Court has made a decision, be it the refusal of permission to appeal or at the conclusion of a full appeal, I will arrange a further hearing attended by the parties to consider your request and the appropriate action in the light of events as they then are. In the meantime I hope that you will feel able to defer entering any judgment or taking any action which might pre-empt any decision of this court.

*Id.* Ex. C at 1-2.

As a result of this correspondence, agreed to by the parties, the Bankruptcy Court has postponed entry of a final order until after it has had the opportunity to communicate further with the High Court. The final order that the Bankruptcy Court ultimately enters will be appealable as of right, but this interlocutory order is not. BNY's appeal is clearly premature given that further "proceedings in the bankruptcy court may render moot" the issues BNY now attempts to appeal. *Dicola*, 59 F.3d at 332; *see infra* Part II.B.

Moreover, BNY repeatedly ascribes improper motives to the Bankruptcy Court in issuing an interlocutory order, accusing it of "resist[ing] appellate review," "mak[ing] clear that it does not wish that ruling to be subject to appellate review," and "attempt[ing] to forestall appellate review of it decision," BNY Mem. at 4, 15, 16. These accusations ignore that the Bankruptcy Court, in attempting to resolve a possible inter-court conflict through communication with the English court before finalizing its decision, is acting in accordance with statutory authority,

guidance from multiple appellate courts, respected scholarly authorities, and of equal importance, prior requests made by BNY and Perpetual.[19]

The Bankruptcy Court's decision to coordinate with the English court prior to entering final judgment is well within the proper exercise of its discretion *See Penoro v. Rederi A/B Disa*, 376 F.2d 125, 128 (2d Cir. 1967) ("The general principle is that where a court stays a proceeding on its own docket, that is not an injunction but merely a calendar order issued under the court's inherent power to regulate the administration of its own business."); *In re Elmendorf*, 345 B.R. 486, 503 (Bankr. S.D.N.Y. 2006) ("The Court has an inherent right to manage its case docket . . . ."). Furthermore, it exemplifies the "spirit of cooperation" commended by the Second Circuit in *Maxwell*. BNY's rush to appeal before the Bankruptcy Court has completed its task should be rejected.

## II.   THE BANKRUPTCY COURT'S ORDER DOES NOT WARRANT INTERLOCUTORY APPEAL.

Perhaps aware that it cannot validly characterize the order as final, *see supra* Part I, BNY claims that authority for interlocutory appeal exists under 28 U.S.C. § 158(a)(3), which grants parties a limited right to appeal nonfinal bankruptcy court orders. BNY Mem. at 23. But this argument fails as well: BNY has not demonstrated that the order merits appeal under the standard set forth in 28 U.S.C. § 1292(b), which governs interlocutory appeals from district courts to the courts of appeals and which district courts generally apply to determine whether to

---

[19] In addition, BNY's repeated attacks on Judge Peck are both inappropriate and nonsensical. It would make no sense for Judge Peck to attempt to defer appellate review out of some misguided desire to protect his ruling, as BNY implies. *See* BNY Mem. at 15 ("Yet, despite acknowledging the critical importance of its ruling, the Bankruptcy Court made clear that it does not wish that ruling to be subject to appellate review—going so far as to lament the fact that an appeal will 'neuter the effectiveness of the current ruling by creating a global doubt as to [its] correctness.'") (alteration in original). Judge Peck, of course, is aware that his decision must be subject to appellate review. Rather, Judge Peck wishes to fully resolve any potential conflict with his English counterpart before finalizing his decision. *See* Dkt. 99 at 55 (Hr'g Tr. June 30, 2010) ("It is not the declaration of the law that creates the conflict, it is the application of the law that creates the conflict. It is for that reason that I am anxious to maintain the cooperative posture with my colleagues in the UK and to be in a position to try to ameliorate the  potentially conflicting aspects of applying the law.").

permit interlocutory appeals of bankruptcy court orders under section 158(a)(3). *See*, *e.g.*, *Liebert v. Levine (In re Levine)*, No. 94-44257, 2004 WL 764709, at *2 (S.D.N.Y. Apr. 9, 2004); *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, Adv. Nos. 05-01025, 05-01029, 05-01074, 05-01105, 05-010, M-47, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006); *Back v. LTV Corp. (In re Chateaugay Corp.)*, 213 B.R. 633, 636 (S.D.N.Y. 1997); *Escondido Mission Vill. L.P. v. Best Prods., Co.*, 137 B.R. 114, 116 (S.D.N.Y. 1992); *Robinson v. Silverman (In re Johns-Manville Corp.)*, 47 B.R. 957, 960 (S.D.N.Y. 1985).

Under section 1292(b), a movant seeking interlocutory appeal must show that the order being appealed (1) involves a controlling question of law (2) over which there is substantial ground for difference of opinion, and that (3) an immediate appeal would materially advance the ultimate termination of the litigation. 28 U.S.C. § 1292(b); *Enron Corp.*, 2006 WL 2548592, at *3; *Liebert*, 2004 WL 764709, at *2. The decision whether to grant leave to appeal an interlocutory order of a bankruptcy court "lies with the district court's discretion." *Enron Corp.*, 2006 WL 2548592, at *3; *see also O'Leary v. Maxum Marine (In re Orange Boat Sales)*, 239 B.R. 471, 473 (S.D.N.Y. 1999).

Despite this discretion, leave to appeal under section 1292(b) is rarely granted and "strictly limited to the precise conditions stated in the law." *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990); *see also Martens v. Smith Barney, Inc.*, 238 F. Supp. 2d 596, 600 (S.D.N.Y. 2002) ("Section 1292(b) was not intended to open the floodgates to a vast number of appeals from interlocutory orders in ordinary litigation . . . or to be a vehicle to provide early review of difficult rulings in hard cases." (internal quotation marks and citation omitted)); *Weber v. U.S. Tr.*, 484 F.3d 154, 159 n.3 (2d Cir. 2007) ("Congress did not intend 28 U.S.C. § 1292(b) to serve an error-correction function." (citing Note, *Interlocutory Appeals in the Federal Courts*

*Under 28 U.S.C. § 1292(b)*, 88 HARV. L. REV. 607, 631 (1975))). Because strong policy considerations militate against time-consuming and piecemeal litigation, "[t]he Second Circuit has repeatedly 'urged the district courts to exercise great care in making a § 1292(b) certification' . . . [and c]ertification of a permissive interlocutory appeal is limited to 'extraordinary cases where appellate review might avoid protracted and expensive litigation.'" *Liebert*, 2004 WL 764709, at *2 (citing *Westwood Pharm., Inc. v. Nat'l Fuel Gas Distribution Corp.*, 964 F.2d 85, 89 (2d Cir. 1992) and *German v. Fed. Home Loan Mortg. Corp.*, 896 F. Supp. 1385, 1398 (S.D.N.Y. 1995)); *see also United States v. Bond*, No. 09-CV-1824, 2009 WL 3254472, at *5 (E.D.N.Y. Oct. 9, 2009) ("The interlocutory appeal is strongly disfavored in federal courts as it may prolong judicial proceedings, add delay and expense to litigants, burden appellate courts, and present issues for decisions on uncertain and incomplete records, tending to weaken the precedential value of judicial opinions . . . . Judges have unfettered discretion to deny certification of an order for interlocutory appeal even when a party has demonstrated that the criteria of 28 U.S.C. § 1292(b) are met." (internal quotation marks and citation omitted)); *Marlin v. U.S. Tr.*, 333 B.R. 14, 20 (W.D.N.Y. 2005).

As a result, Second Circuit courts permit interlocutory appeal under section 1292(b) only with caution and in rare cases where the movant demonstrates that "exceptional circumstances" merit appellate review of a non-final order. *Enron Corp.*, 2006 WL 2548592, at *3 (explaining that "interlocutory appeals from bankruptcy courts' decisions are disfavored in the Second Circuit" and that "leave to appeal is warranted only when the movant demonstrates the existence of exceptional circumstances" (internal quotation marks and citation omitted)); *Enron Corp. v. Springfield Assocs., L.L.C. (In re Enron Corp.)*, Adv. Nos. 05-01025, 06 Civ. 7828, 07 Civ. 1957, 2007 WL 2780394, at *1 (S.D.N.Y. Sept. 24, 2007) (holding that interlocutory appeal

under section 1292 "is warranted only when the movant demonstrates the existence of exceptional circumstances sufficient to overcome the general aversion to piecemeal litigation" (internal quotation marks and citation omitted)); *Yerushalmi v. Shiboleth*, 405 B.R. 44, 48 (E.D.N.Y. 2009) (denying a motion for leave to appeal under section 1292(b) because "interlocutory appeals are strongly disfavored in federal practice" and because "Appellant has not met his burden of showing 'exceptional circumstances' to warrant appellate review of an interlocutory order" (internal citations omitted)).

BNY has failed to establish any such exceptional circumstances.

LBSF does not dispute that the order involves controlling questions of law; however, BNY has not demonstrated that there is substantial ground for difference of opinion regarding the order or that immediate appeal would materially advance the ultimate termination of this litigation. As a result, BNY's motion does not satisfy section 1292(b)'s second and third elements. Because BNY has neither shown exceptional circumstances warranting interlocutory appeal nor met section 1292(b)'s standard on its face, its motion for leave to appeal must be denied.

### A. BNY Has Failed to Establish That There Is Substantial Ground for Difference of Opinion Regarding the Order.

In its memorandum supporting its motion for leave to appeal, BNY cites certain words and phrases from the Bankruptcy Court's decision out of context to create the illusion that substantial ground exists for difference of opinion regarding the order. BNY Mem. at 25. By emphasizing these decontextualized words and phrases, which note that the Bankruptcy Court's decision involved certain novel issues and questions of first impression, BNY mischaracterizes the order in an attempt to circumvent the narrow standards governing section 1292(b)'s second element. However, Second Circuit courts have consistently held that "the mere presence of a

disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *Flor v. BOT Fin. Corp. (In re Flor)*, 79 F.3d 281, 284 (2d Cir. 1996); *Enron Corp.*, 2006 WL 2548592, at *4 (ruling that a question of first impression, without more, does not satisfy the second element of section 1292(b)'s standard); *Pollack v. Laidlaw Holdings, Inc.*, No. 90 Civ. 5799, 1993 WL 254932, at *2 (S.D.N.Y. June 25, 1993) ("The mere fact that a disputed issue is a question of legal impression is insufficient to demonstrate a substantial ground for difference of opinion.").[20]  Equally misguided is BNY's attempt to cite the rulings of the English courts as sufficient basis to establish section 1292(b)'s second element.  BNY Mem. at 27-29.  Second Circuit courts have ruled that "[d]isagreement among courts outside the Second Circuit does not establish a substantial ground for difference of opinion." *Colon v. BIC USA, Inc.*, No. 00 Civ. 3666, 2001 WL 88230, at *2 (S.D.N.Y. Feb. 1, 2001); *Marlin*, 333 B.R. at 21.[21]

BNY's attempts at misdirection notwithstanding, Second Circuit courts have held that a substantial ground for difference of opinion exists only if there is "a genuine doubt as to whether the bankruptcy court applied the correct legal standard." *MCI Worldcom Commc'ns v.*

---

[20] These rulings make clear that BNY's reliance on *Alfa, S.A.B. de C.V. v. Enron Creditors Recovery Corp. (In re Enron Creditors Recovery Corp.)*, Adv. Nos. 03-92677 (AJG) M-47(a), 03-92682(AJG) M-47, 2009 WL 3349471 (S.D.N.Y. Oct. 16, 2009), is misplaced.  BNY Mem. at 26.  Although the bankruptcy court ruling there that plaintiffs sought leave to appeal involved an issue never before addressed by the Second Circuit, the district court's decision to allow the appeal was primarily based on its finding that the bankruptcy court's ruling "appears to run contrary to 20 years of decisions from at least five circuit courts of appeal." *Enron Creditors Recovery Corp.*, 2009 WL 3349471, at *7.

[21] Nor may BNY argue the merits of the Bankruptcy Court's determination unless this Court first grants leave to appeal.  *See Gibson v. Kassover (In re Kassover)*, 343 F.3d 91, 95 (2d Cir. 2003) (explaining that "under Section 158(a)(3), if a district court denies leave to appeal . . . . [i]t has lawfully declined to hear the merits"); *Quigley Co. v. Coleman (In re Quigley Co.)*, 323 B.R. 70, 73 (S.D.N.Y. 2005) ("This Court cannot rule on the merits of the Committee's appeal unless it determines that the Preliminary Injunction is a final order or, if the injunction is interlocutory, that leave to appeal the injunction should be granted pursuant to the provisions of 28 U.S.C. § 158(a) and 28 U.S.C. § 1292(b)."); *Private Retreats Belize, LLC v. Gram (In re Complete Retreats, LLC)*, No. 3:07mc152 (SRU), 2008 WL 220752, at *1 (D. Conn. Jan. 23, 2008) (agreeing with defendants' contention that movant "ha[d] incorrectly focused on the merits of the decision [of the bankruptcy court and] not why an interlocutory appeal [wa]s merited" and denying leave to appeal under section 1292(b)).

*Commc'ns Network Int'l, Ltd. (In re Worldcom, Inc.)*, 358 B.R. 76, 79 (S.D.N.Y. 2006); *Yerushalmi*, 405 B.R. at 48 (finding that appellant had failed to establish a substantial ground for difference of opinion because "upon reviewing Appellant's opposition papers, including Appellant's Brief, the issues raised in Appellant's appeal do not collectively establish a genuine doubt as to whether the [B]ankruptcy [C]ourt applied the correct legal standard" (internal quotation marks and citation omitted) (alteration in the original)); *Flor*, 79 F.3d at 284 (holding that "[i]t is the duty of the district judge . . . to analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute" (quoting *Max Daetwyler Corp. v. Meyer*, 575 F. Supp. 280, 283 (E.D. Pa. 1983)) (alteration in the original)).

Because there can be no genuine doubt that the Bankruptcy Court has applied the correct legal standard, BNY has failed to meet section 1292(b)'s second element. BNY seeks to contest the Bankruptcy Court's decision that the date of LBSF's bankruptcy petition, rather than LBHI's, was the operative "commencement of a case" for purposes of invalidating the shifting of payment priorities under the Transaction Documents' unenforceable *ipso facto* clauses. *Lehman Bros. Special Fin.*, 422 B.R. at 418. But this ruling was based on the language of the Transaction Documents, the sequence of events following LBHI's and LBSF's chapter 11 filings, and a reading of the plain language of 11 U.S.C. §§ 541(c)(1)(B) and 365(e)(1)—the provisions that render *ipso facto* clauses unenforceable. The Bankruptcy Court found that the behavior of the parties suggested that LBSF's petition was the operative filing: "Saphir sent termination notices to LBSF . . . and such notices designated the filing of LBSF's chapter 11 petition as the triggering event of default . . . . Given these undisputed facts, LBSF held a valuable property interest in the Transaction Documents as of the LBSF Petition Date and, therefore, such interest

is entitled to protection . . . ." 422 B.R. at 418. And despite BNY's accusation that "the Bankruptcy Court ignored basic rules of statutory construction and overlooked the most obvious and logical reading of the statute," BNY Mem. at 27, the Bankruptcy Court's analysis followed the plain language of the provisions at issue: "Each of these sections of the Bankruptcy Code prohibits modification of a debtor's right solely because of a provision in an agreement conditioned upon 'the commencement of *a case* under this title.' . . . Notably, the language used is not limited to the commencement of a case *by or against the debtor*." 422 B.R. at 419 (citing 11 U.S.C. §§ 541(c)(1)(B), 365(e)(1)). The Bankruptcy Court found further justification for its determination in the statutes' legislative history: "An early version of what eventually became section 365(e)(1) referred to 'the commencement of a case under this Act *by or against the debtor*.' . . . This initial use and later rejection of limiting language demonstrates that Congress considered, but ultimately rejected, drafting sections 365(e)(1) and 541(c)(1)(B) in a manner that would have expressly restricted their application to the bankruptcy case of the debtor counterparty." *Id.* Given the plain language and legislative history of sections 541(c)(1)(B) and 365(e)(1), and the events that transpired between the parties, the Bankruptcy Court necessarily concluded that the relevant date for purposes of evaluating the Transaction Documents' *ipso facto* clauses was the date of LBSF's petition.[22]

The Bankruptcy Court recognized that its opinion implicated some novel legal issues; in fact, several of the phrases that BNY quotes out of context comment on the intricacies of the Lehman entities' relationships, and not, as BNY implies, on the validity of the Court's decision.

---

[22] BNY emphasizes the Bankruptcy Court's recognition that "*[n]o case* has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself." BNY Mem. at 13 (alteration in original). This is because no other court has addressed the issue of whether the "commencement of a case" language under 365(e)(1) and 541(c)(1)(B) extends to protect a debtor's direct subsidiaries, much less considered this issue in light of the dramatic events surrounding the Lehman bankruptcy filing.

422 B.R. at 422 (noting that "[t]he issues presented in this litigation are, as far as the Court can tell, unique to the Lehman bankruptcy cases and unprecedented" and that "[i]t is to be expected, as a result, that the cases of LBHI and LBSF on occasion would break new ground as to unsettled subject matter"). In concluding its opinion, the Bankruptcy Court noted that its decision depended on "the complexity of the underlying financial structures many of which are being analyzed for the first time from a real world bankruptcy perspective." *Id.* In this light, the cases BNY has cited—each of which involved a single debtor's bankruptcy filing rather than interrelated entities' separate filings—are irrelevant to an analysis of the Bankruptcy Court's opinion. BNY Mem. at 27 n.24.[23]

BNY cannot establish substantial ground for difference of opinion regarding the order with the irrelevant arguments and inapposite cases that it presents in its memorandum supporting its motion for leave to appeal. In addition, applicable Second Circuit precedent makes clear that the order fails to meet the actual standards for satisfaction of section 1292(b)'s second element. Because BNY has failed to meet these standards, its motion seeking leave to appeal must be denied.

### B.  BNY Has Not Demonstrated That Immediate Appeal of the Order Would Materially Advance the Ultimate Termination of the Litigation.

BNY argues that section 1292(b)'s third element favors appellate review of the order because "this litigation has *already* terminated . . . . There is no remaining issue for the

---

[23] *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92-7054, 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (invalidating *ipso facto* clauses where the parties did not dispute which debtor's filing triggered the provisions in question); *Tex. Att'y Gen. v. Brown (In re Fort Worth Osteopathic Hosp., Inc.)*, 387 B.R. 706, 711 (Bankr. N.D. Tex. 2008) (evaluating a contract provision triggered by a single bankruptcy filing under sections 541(c)(1)(B) and 365(e)(1)); *Whitaker v. Power Brake Supply, Inc. (In re Olympia Holding Corp.)*, 188 B.R. 287, 294 (M.D. Fla. 1994) (applying a section 541(c)(1) analysis to a provision that would have abrogated the rights of a single debtor entity pursuant to one bankruptcy filing), *aff'd*, 68 F.3d 1304 (11th Cir. 1995); *EBC I, Inc. v. Am. Online, Inc. (In re EBC I, Inc.)*, 356 B.R. 631, 640 (Bankr. D. Del. 2006) (discussing the Bankruptcy Code's prohibition of *ipso facto* clauses with reference to the bankruptcy filing of a single debtor entity).

Bankruptcy Court to decide." BNY Mem. at 30. But BNY is mistaken—the Bankruptcy Court has expressly withheld judgment on LBSF's request for a declaration that it is entitled to be paid in accordance with Swap Counterparty Priority, in deference to the English High Court's request that it refrain from directing the disposition of the collateral. Dkt. 99 at 48:4-8, 56:24-57:1 (Hr'g Tr. June 30, 2010). Moreover, the Bankruptcy Court has repeatedly noted that it intends to continue communicating with the English court in an attempt to reach a coordinated result regarding the issues involved in its ruling. *Lehman Bros. Special Fin.*, 422 B.R. at 423 ("This is a situation that calls for the parties, this Court and the English Courts to work in a coordinated and cooperative way to identify means to reconcile the conflicting judgments."); *see supra* Statement of Facts ¶¶ D, G. The consideration that the Bankruptcy Court intends to extend to the English courts accords with principles of international comity. *See Presbyterian Church of Sudan v. Talisman Energy, Inc.*, 244 F. Supp. 2d 289, 341-42 (S.D.N.Y. 2003) ("International comity has been defined as the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation." (internal quotation marks and citation omitted)); *Dow Jones & Co. v. Harrods, Ltd.*, 237 F. Supp. 2d 394, 444 (S.D.N.Y. 2002), *aff'd* 346 F.3d 357 (2d Cir. 2003) ("The concept of international comity is based on the principle that giving due recognition to acts and proceedings of foreign tribunals promotes international cooperation, strengthens mutual ties, fosters reciprocal treatment and thereby enhances the rule of law on the international scale, both within and among nations."). By prudently deferring appeal of the order, this Court may ensure that the English law issues implicated in the Bankruptcy Court's decision are resolved and fully developed if and when an appeal is considered. Conversely, premature appellate review of the order would disrupt the Bankruptcy

Court's good faith efforts to coordinate with the English courts and would hinder the courts' ability to reach mutual understanding with respect to the issues presented in this case.

In fact, an interlocutory appeal would prolong the ultimate termination of the litigation, rather than advancing it. The Bankruptcy Court would be precluded from effectively communicating with the English court until BNY's appeals are exhausted, which could take years if appeals continue on to the Second Circuit and possibly the United States Supreme Court. And even if BNY succeeds in invoking the U.S. appellate process, an appeal could be rendered moot if the Supreme Court of the United Kingdom holds that the *ipso facto* provisions in the transaction documents are unenforceable under English law, eliminating the basis for BNY's primary challenge on appeal that the Bankruptcy Court should have deferred to English law and the English High Court's ruling interpreting the documents. *See* BNY Mem. at 24-25 (listing issues BNY intends to appeal). This risk of mootness is precisely why the Second Circuit cautions against review of interim decisions. *See Chasser v. Achille Lauro Lines*, 844 F.2d 50, 52 (2d Cir. 1988) ("[J]udicial efficiency may be promoted by the denial of interim review because some interlocutory orders will have become moot by the time a final judgment is entered, either because the order is modified prior to final judgment, or because the party disadvantaged by the interlocutory order prevails in the action, or for some other reason."), *aff'd*, 490 U.S. 495 (1989). Even if the Supreme Court of the United Kingdom upholds the enforceability of the transaction documents, the case would return to the High Court for further consideration of the Bankruptcy Court's request that the High Court recognize and give effect to the Bankruptcy Court's decision. *See* Dkt. 92 Ex. G at 2 (LBSF Opp. to Mot. for Order). The courts could then craft the coordinated result that they have discussed in their correspondence. Permitting an interlocutory appeal now before the Bankruptcy Court has completed its work in

this case would prove to be contrary to the interests of judicial efficiency. *Harriscom Svenska AB v. Harris Corp.*, 947 F.2d 627, 631 (2d Cir. 1991) ("It does not normally advance the interests of sound judicial administration or efficiency to have piecemeal appeals that require two (or more) three-judge panels to familiarize themselves with a given case . . . .").

BNY's motion reflects its corporate self-interest rather than a genuine effort to facilitate this litigation's termination: BNY has already admitted that the Bankruptcy Court's ruling has "profound ramifications in a lot of cases right now." Dkt. 9351 at 94 (Hr'g Tr., May 12, 2010). But BNY's desire to prevail in other matters it may be litigating does not justify interlocutory appeal of the Bankruptcy Court's ruling—section 1292(b)'s third prong allows only those appeals that would "materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). Interlocutory appeals are not designed to advance one party's interests in its other proceedings: BNY's motivation has nothing to do with the material advancement of the ultimate termination of this litigation and its motion thus fails to meet section 1292(b)'s standard for discretionary review.

BNY has not shown that unwarranted interlocutory appeal of the order would "materially advance the ultimate termination of this litigation." To the contrary, premature review would both frustrate the Bankruptcy Court's efforts to cooperate with the English court in the spirit of international comity and delay ultimate termination of the litigation. Because BNY has failed to satisfy section 1292(b)'s third element, its motion for leave to appeal must be denied.

## III. BNY CANNOT RELY ON MEDIA COVERAGE OR A PARADE OF HORRIBLES TO JUSTIFY INTERLOCUTORY REVIEW.

Given the weakness of its arguments in support of review of the Bankruptcy Court's order as either a final order or an interlocutory order, BNY resorts to citing media coverage of the memorandum decision and conjures a parade of horribles to justify appellate intervention.

This Court's decision as to whether to grant BNY leave to appeal should be influenced by neither strategy.

Press coverage of a decision is not an appropriate consideration in determining whether to grant interlocutory review.[24]  Whatever market expectations may have been prior to the Bankruptcy Court's decision, it is perfectly appropriate for a court to upset those expectations if they are contrary to the law.  When parties employ methods contrary to the Bankruptcy Code— such as provisions that deprive a bankruptcy debtor of property solely because of a chapter 11 petition—they do so at their own peril.  Indeed, the standard master agreements used in these transactions and others expressly address the possibility that courts may rule that certain provisions are "illegal."  *See* Dkt. 6 Ex. E § 5(b)(i), (c), Ex. F § 5(b)(i), (c) (LBSF Mot. for Summ. J.).

In addition to its extensive use of press reports, BNY breathlessly claims that "[u]nder the Bankruptcy Court's decision, however, anytime a parent entity is the first to file for bankruptcy protection, any subsidiary will receive the protections of the Code . . . ." and warns that "[s]uch a rule would allow subsidiaries to continue to conduct business without restraint . . . ."  BNY Mem. at 33.  These speculations are unfounded.  The Bankruptcy Court's decision was expressly and narrowly tailored to the Lehman bankruptcy filing, an extraordinary event.  *See Lehman Bros. Special Fin.*, 422 B.R. at 420 ("[T]he Court will apply the language of these sections of the Bankruptcy Code to the situation presented by the sequential filings of the LBHI and LBSF bankruptcy cases and confine its conclusions to the Debtors' business structure and

---

[24] The commentary on the Bankruptcy Court's opinion has, in fact, been mixed.  Some commentators either do not question the accuracy of the decision or believe the decision was correctly decided.  *See, e.g.*, Prof. Schecter, *Debtor's Prepetition Loss of Priority Under Springing Subordination Agreement Triggered by Parent Corporation's Bankruptcy Filing is Unenforceable Ipso Facto Provision*, 2010 Com. Fin. Newsl. 16 (2010) ("I predict that . . . this decision will be upheld by the district court and the Second Circuit . . . .").

circumstances."). Because of the unique nature of the facts underlying the Bankruptcy Court's decision, it is far too soon to predict the impact of its decision.[25]

BNY's attempts to invoke the Court's concern about "trustees and noteholders in countless derivative transactions worldwide," BNY Mem. at 34, moreover, ignores the silence of Perpetual—the only party other than LBSF with funds actually at issue in this case. BNY's beneficiary has not asked the High Court to correspond with the Bankruptcy Court in support of an appealable order. It has not appeared before the Bankruptcy Court for any purpose, much less in support of entry of an appealable order. And, as BNY's counsel represented at the May 12, 2010 status conference, Perpetual has not encouraged BNY to push for a final order. Dkt. 9351 at 94-95 (Hr'g Tr. May 12, 2010). Nor has BNY argued in its motion that its beneficiary is being harmed by a delay in the U.S. appellate process. The only party to this litigation that has an immediate interest in an appeal is BNY and its interest is largely strategic. BNY is a trustee in similar swap agreements with Lehman entities and it appears to be concerned with the "ramifications," as its counsel put it at the May 12, 2010 hearing, of this decision in cases in which it may have monetary interests at stake. *See id.* at 94. But this case, with its intricate cross-border proceedings, is not an appropriate place for BNY's attempt at proxy litigation.

---

[25] *See* Evan Jones, Deborah Festa, William Satchell & Michael Heinrichs, *Lehman Bankruptcy Judge Prevents Trigger of CDO Subordination Provision Based on Credit Support Provider and Swap Counterparty Bankruptcy Filings*, 127 BANKING L.J. 338, 339 (2010) ("Judge Peck's decision is expressly limited to the extraordinary facts of Lehman and does not address whether his analysis would apply in other situations. It is not clear how broadly the decision will apply if sustained on appeal."); David B. Stratton & Michael J. Custer, *Shot Heard Around the CDO World: Flip Clauses Found to be Unenforceable Ipso Facto Provisions*, 29 AM. BANKR. INST. J. 30, Apr. 2010 at 67 ("It remains to be seen whether this holding will gain traction and be used in future disputes involving the *ipso facto* protections of the Bankruptcy Code or other Code provisions.")

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated above, BNY's attempt to docket an expressly interlocutory order under the pretense that it is final should be rejected, and its alternative motion for leave to appeal should be denied.

Respectfully submitted,

 /s/ *Ralph I. Miller*
Ralph I. Miller
Peter Gruenberger
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

Attorneys for Debtors
and Debtors in Possession

Dated: New York, New York
August 16, 2010