DOC # 130

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

LEHMAN BROTHERS HOLDINGS INC., et al.,     Chapter 11
                                                 No. 08-13555 (JMP)
                Debtors.
--------------------------------------------------------------x
--------------------------------------------------------------x

LEHMAN BROTHERS SPECIAL FINANCING
INC.,

                Plaintiff,

    -against-                             Adversary Proceeding
                                       No. 09-01242 (JMP)

BNY CORPORATE TRUSTEE SERVICES
LIMITED,

                Defendant.
--------------------------------------------------------------x

**DECISION AND ORDER GRANTING BNY CORPORATE TRUSTEE
SERVICES LIMITED'S MOTION FOR LEAVE TO APPEAL**

McMahon, J.:

### INTRODUCTION

BNY Corporate Trustee Services Limited ("BNY") moves for leave to appeal the July 19, 2010 order (the "Order") of the United States Bankruptcy Court for the Southern District of New York (Hon. James M. Peck) (the "Bankruptcy Court") granting summary judgment for Lehman Brothers Special Financing Inc. ("LBSF"). Judge Peck's Order memorialized his memorandum decision of January 25, 2010, which he described as "break[ing] new ground as to unsettled subject matter" and likely to be "controversial." <u>Lehman Bros. Special Fin. Inc. v. BNY Corporate Tr. Servs. Ltd.</u>, 422 B.R. 407, 422 (Bankr. S.D.N.Y. 2010) ("<u>LBSF</u>"). For the reasons set forth herein, BNY's motion for leave to appeal is granted.

Copies mailed/faxed/handed to counsel on 9/20/10

## BACKGROUND

On September 18, 2008, Lehman Brothers Holdings Inc. ("LBHI"), one of the largest investment banks in the U.S. at the time, filed for chapter 11 bankruptcy protection in the Bankruptcy Court. LBSF, 422 B.R. at 411. Eighteen days later, on October 3, 2008, LBSF, an LBHI subsidiary, filed its chapter 11 petition in the Bankruptcy Court. Id. at 413.

On May 20, 2009, LBSF initiated this adversary proceeding (the "Adversary Proceeding") against BNY. Id. at 411. The Adversary Proceeding arises out of a complex series of synthetic collateralized debt obligations ("CDOs") and related credit default swaps, and has been further complicated by the pendency of parallel and potentially conflicting legal proceedings in the United Kingdom (the "English Litigation").

The facts relevant to today's decision are not in dispute, and are set forth below. For additional background information regarding the underlying structured financial transaction, the English Litigation and the proceedings in the Bankruptcy Court, the reader should refer to the Bankruptcy Court's January 25, 2010 decision, see id. at 410-14.

### I. The Underlying Transaction

The Adversary Proceeding involves two series of credit-linked synthetic portfolio notes (the "Notes") that are now held by non-party Perpetual Trustee Company Limited ("Perpetual"), an Australian company. LBSF, 407 B.R. at 410, 413. The Notes were secured by various assets and certain secured obligations (the "Collateral"), including credit default swap transactions between LBSF and the issuer of the Notes (a special-purpose vehicle created by Lehman Brothers International (Europe) called Saphir Finance Public Limited Co. ("Saphir")). Id. at 412-13. The Collateral was held by BNY in trust for creditors of Saphir, including LBSF (as

swap counterparty) and Perpetual (as the noteholder). Id. at 413. LBHI was the credit support provider for LBSF's payment obligations under the swap agreements. Id. at 411.

Pursuant to the terms of the Transaction Documents, LBSF's interest in the Collateral ordinarily takes priority over Perpetual's interest—this is called "Swap Counterparty Priority." Id. at 413. However, in the event of a default by LBSF under a swap agreement, the Transaction Documents provide for a "flip" from Swap Counterparty Priority to "Noteholder Priority," such that Perpetual receives payments *before* LBSF. Id. Among the events of default under each of the swap agreements are a filing in bankruptcy of any party to the transaction, including LBSF or LBHI. See id.

On December 1, 2008, after LBHI and LBSF had separately filed for bankruptcy, Saphir exercised its right to terminate the swap agreements, obligating it to redeem the Notes. Id. at 413-14. The question in this Adversary Proceeding is whether the Swap Counterparty Priority or Noteholder Priority distribution scheme applies—i.e., whether Perpetual or LBSF has priority in the payment of proceeds to satisfy Saphir's obligations. BNY holds the Collateral that is subject to these competing claims.

## II. The English Litigation

On May 13, 2009, Perpetual filed an action against BNY in the High Court of Justice, Chancery Division (the "High Court"), seeking an order requiring BNY to pay it in accordance with Noteholder Priority. LBSF, 422 B.R. at 410. One week later, LBSF intervened in the English Litigation. Id. at 411. After a trial, the High Court (applying English law) ruled in favor of Perpetual, holding, *inter alia*, that Noteholder Priority became effective on September 15, 2008, when LBHI filed for bankruptcy. See Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd., [2009] EWHC 1912, 2009 WL 2221998.

3

LBSF appealed the High Court's judgment. LBSF, 422 B.R. at 412. On November 6, 2009, the English Court of Appeal unanimously affirmed the High Court, finding, *inter alia*, that the event "triggering" the flip from Swap Counterparty Priority to Noteholder Priority "was LBHI filing for Chapter 11 which occurred on 15 September 2008, some 18 days before LBSF filed for Chapter 11." Perpetual Tr. Co. Ltd. v. BNY Corporate Tr. Servs. Ltd., [2009] EWCA (Civ) 1160, ¶ 69, 2009 WL 3643805.

On March 31, 2010, the Supreme Court of the United Kingdom agreed to hear LBSF's appeal. (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J.) BNY asserts, and LBSF does not dispute, that a hearing is scheduled to take place in March 2011, and that an opinion is expected to issue sometime in late 2011.

### III. The Adversary Proceeding

#### A. LBSF's Complaint

On the same day it intervened in the English Litigation, LBSF initiated the instant Adversary Proceeding against BNY. LBSF, 422 B.R. at 411.[1] Count I of LBSF's two-count Complaint seeks a declaratory judgment that the contractual provisions modifying LBSF's payment priority upon an event of default "constitute unenforceable *ipso facto* clauses" that violate the Bankruptcy Code, 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that, as a result, "LBSF is entitled to payment under Swap Counterparty Priority." (LBSF, No. 09-01242 (JMP), Docket No. 1 at 10.) Count II seeks a declaratory judgment that any action to enforce such provisions "constitutes a willful violation of the automatic stay under [Bankruptcy Code] section 362(a)(3)." (Id. at 11.)

---

[1] On June 22, 2009, BNY moved to dismiss, arguing that Perpetual is an "indispensable party" under Federal Rule of Civil Procedure 19. LBSF, 422 B.R. at 411. The Bankruptcy Court found that BNY had the capacity to adequately represent Perpetual's interests in the litigation, and denied the motion. Id.

4

B.  **Inter-Court Communication**

From the start, "[t]he interplay between [the Adversary Proceeding] and the English Litigation has been obvious . . . , and both [the Bankruptcy] Court and the English Courts have been aware of the potential for conflicting rulings due to differences in the law being applied." LBSF, 422 B.R. at 411. Judge Peck and the parties agreed that the Bankruptcy Court should "communicat[e] with the High Court regarding coordination of and cooperation with respect to the litigation here and in London." See id. at 412; see also 11 U.S.C. § 1501 et seq. (providing for cooperation and direct communication between U.S. and foreign courts in cases of cross-border insolvencies).

Numerous such inter-court communications have occurred. For example, after LBSF and BNY cross-moved for summary judgment, Judge Peck wrote to the High Court, requesting that it not make any final disposition until "I am able to consider and rule on the United States bankruptcy law issues raised in the summary judgment briefing" and stating that, "Once I have considered and ruled on the issues in the Adversary Proceeding, I intend to communicate further with your Lordship in an attempt to reach a coordinated result in light of each Court's ruling." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. A at 2.)

The High Court responded that it "look[ed] forward to receiving [the Bankruptcy Court's] rulings in due course and any further requests," and that it welcomed "further co-operat[ion]." (Id. Ex. B at 2.) After the English Court of Appeal affirmed the High Court on November 6, 2009, the High Court sent another letter to the Bankruptcy Court, requesting that it not enter an order that would conflict with the Court of Appeal's judgment—specifically, that the Bankruptcy Court "not . . . make any order which would either (a) require BNY to act in any particular way with the collateral or its proceeds; or (b) declare that BNY is required to act or

deal in any particular way with the collateral or its proceeds, until . . . further communication has taken place between the US and English courts." (Id. Ex. D at 2); see LBSF, 422 B.R. at 412.

## C. The Bankruptcy Court's Memorandum Decision

On January 25, 2010, the Bankruptcy Court issued a "Memorandum Decision Granting Motion for Summary Judgment and Declaring Applicable Payment Priorities." LBSF, 422 B.R. 407, 410. Judge Peck's opinion granted summary judgment to LBSF, holding that "the provisions in the Transaction Documents purporting to modify LBSF's right to a priority distribution solely as a result of a chapter 11 filing constitute unenforceable *ipso facto* clauses" under 11 U.S.C. §§ 365(e)(1) and 541(c)(1)(B), and that "any attempt to enforce such provisions would violate the automatic stay" under § 362(a). Id. at 420-21. Judge Peck indicated that he would enter a declaratory judgment memorializing the decision. Id. at 422.

At the outset of his opinion, Judge Peck confronted BNY's argument that, pursuant to principles of comity and res judicata, the Bankruptcy Court should defer to the English courts' determinations that LBHI's chapter 11 filing on September 15, 2008 was the trigger event for the flip in payment priorities. Id. at 416. Judge Peck declined to afford preclusive effect to the English judgments because he concluded that the English courts had not taken into account the relevant provisions of U.S. bankruptcy law, which afford debtors broader protections than those available under applicable foreign law. Id. at 417-18.

Judge Peck ultimately reached the scope of the *ipso facto* protections provided by §§ 365(e)(1) and 541(c)(1)(B) of the Bankruptcy Code. Those sections prohibit the modification of a debtor's right solely because of a provision in an agreement conditioned on "the commencement of *a case* under this title." 11 U.S.C. §§ 365(e)(1), 541(c)(1)(B) (emphasis added).

Relying on his interpretation of the legislative history and "plain meaning" of these *ipso facto* provisions, Judge Peck held that they apply to contract terms conditioned on the commencement of "presumably any [bankruptcy] case that is related in some appropriate manner to the contracting parties." LBSF, 422 B.R. at 419. Judge Peck acknowledged that this interpretation was unprecedented, stating that, "No case has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself but may be a case filed by a related entity." Id. at 422. He further admitted that his interpretation of the Bankruptcy Code's *ipso facto* provisions as applying "to cases filed by debtors other than the counterparty itself has the potential of opening up a proverbial 'can of worms' that may lead to speculation as to the nature and degree of the relationship between debtors that is needed in order to properly apply the provision." Id. at 419.

Judge Peck then applied his novel statutory interpretation to the circumstances at hand, and concluded that the separate bankruptcy filings of LBHI and its affiliates, including LBSF, constituted "a singular event" for *ipso facto* purposes—but not for purposes of "any other legal determination that may relate to the date of commencement of a case." Id. at 420. Accordingly, Judge Peck held that LBHI's petition "entitled LBSF, consistent with the statutory language, fairly read, to claim the protections of the *ipso facto* provisions of the Bankruptcy Code because its ultimate corporate parent and credit support provider, at a time of extraordinary panic in the global markets, had filed a case under the Bankruptcy Code." Id.

### D. Further Communication with the High Court

At the close of his decision, Judge Peck reiterated that "[the] situation . . . calls for the parties, this Court and the English Courts to work in a coordinated and cooperative way to identify means to reconcile the conflicting judgments," and "direct[ed] that the parties attend a

7

status conference to be held . . . for purposes of exploring means to harmonize the decisions of this Court and the English Courts." LBSF, 422 B.R. at 423.

After the status conference on February 19, 2010, Judge Peck wrote to the High Court, with the parties' consent, explaining that: "I limited my ruling so as to award only a declaratory judgment as to the nature of United States bankruptcy law on th[e] issue [of whether 'a shift in payment priority to favor Perpetual based on the bankruptcy filings of either LBSF or its corporate parent, [LBHI], would violate the *ipso facto* prohibitions of the United States Bankruptcy Code']. I have not entered an order requiring BNY to tender the collateral to LBSF at this time. Prior to entering any such order, I wish first to communicate with your Lordship in an effort to reach a coordinated resolution of these matters." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. G at 1.) Judge Peck "request[ed] that Your Lordship recognize and give effect to my January 25, 2010 declaratory judgment in the cases pending before you in a manner that you deem appropriate." (Id. at 2.)

On March 10, 2010, and again on March 31, the date the English Supreme Court accepted LBSF's appeal, the High Court responded, stating that it was "not proposing to have any further hearings pending the outcome of the appeal," and that "the position under English law is unclear until the appeal is decided." (LBSF, No. 09-01242 (JMP), Docket No. 92, Ex. J at 1.)

### E. The Bankruptcy Court's July 19, 2010 Order

On July 19, 2010, the Bankruptcy Court entered an Order memorializing its January 25 decision in favor of LBSF. In the months following the decision, LBSF had opposed the entry of any such order, forcing BNY to move for the entry of an order. (See Decl. of Randy M. Mastro in Supp. of Mot. of BNY for Leave to Appeal, Aug. 2, 2010 ("Mastro Decl."), Ex. H;

LBSF, No. 09-01242 (JMP), Docket No. 90.) At the June 30, 2010 hearing on BNY's motion, Judge Peck stated:

> It was never my contemplation, given the existing communication that took place between this Court and the High Court in London, that I was setting up a multiyear double-blind appellate process. It was, in fact, my view that I was simply entering a memorandum decision that was, at that point, regardless of the form of order, interlocutory in nature. . . . I am anxious to maintain the cooperative posture with my colleagues in the UK and to be in a position to try to ameliorate the potentially conflicting aspects of applying the law.

(LBSF, No. 09-01242 (JMP), Docket No. 99 at 55.) Ultimately, at the conclusion of the hearing, Judge Peck decided to enter an order, "because it will at least get us past this episode in the litigation." (Id. at 56.)

Accordingly, a few days later, Judge Peck entered an Order granting LBSF's motion for summary judgment and ordering that:

> the contractual provisions . . . that purport to modify LBSF's payment priority as a result of its chapter 11 filing and the chapter 11 filing of LBSF's corporate parent, [LBHI], are unenforceable *ipso facto* clauses under United States Bankruptcy Code sections 365(e)(1) and 541(c)(1)(B), and any action to enforce such provisions is prohibited by the automatic stay under Bankruptcy Code section 362(a).

(Mastro Decl. Ex. A at 3-4.) The Order further stated that "in view of this Court's expectation that further coordination and communication between the High Court and this Court shall take place," it is

> ORDERED that, consistent with the statements made by the Court on the record of the hearing on June 30, 2010, this Order is interlocutory; and it is further
>
> ORDERED that this Court shall retain jurisdiction to hear and determine all matters arising from or related to the implementation and/or interpretation of this Order.

9

(Id.) BNY's motion for leave to appeal the Order followed.

## DISCUSSION

BNY first asserts that the Bankruptcy Court's Order is final and therefore appealable as of right pursuant to 28 U.S.C. § 158(a)(1). However, most of the space in BNY's papers is spent arguing that, even if the Order is not final, the Court should grant BNY leave to appeal the Order on an interlocutory basis pursuant to § 158(a)(3).

The Court will assume, without expressly deciding, that Judge Peck's self-styled "interlocutory" Order is, in fact, not final. The Court does so because, as explained below, it is readily apparent that the Order satisfies the requirements for granting an interlocutory appeal. Accordingly, the Court grants BNY's motion for leave to appeal.

### I. The Bankruptcy Court's Order Warrants Interlocutory Appeal

Appeals from non-final bankruptcy court orders may be taken pursuant to 28 U.S.C. § 158(a)(3). In deciding whether to grant leave to appeal, reviewing courts apply the standards of 28 U.S.C. § 1292(b), which governs interlocutory appeals from district court orders. See, e.g., In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *3 (S.D.N.Y. Sept. 5, 2006).

Interlocutory review is warranted under § 1292(b) if (1) the order being appealed "involves a controlling question of law," (2) there is "substantial ground for difference of opinion" as to that question, and (3) "an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). As the Second Circuit has cautioned, "use of this certification procedure should be strictly limited because 'only 'exceptional circumstances' [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'" In re Flor, 79 F.3d 281, 284 (2d Cir. 1996) (quoting Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir.1990)). "The

decision whether to grant an interlocutory appeal from a bankruptcy court order lies with the district court's discretion." In re Enron Corp., 2006 WL 2548592, at *3.

Here, LBSF concedes that the Bankruptcy Court's Order involves controlling questions of law. (LBSF's Mem. in Opp'n to BNY's Mot. for Leave to Appeal, Aug. 16, 2010 ("LBSF Mem."), at 32.) For the reasons discussed below, the second and third prongs of § 1292(b) are also satisfied.

## A. There Is Substantial Ground for Difference of Opinion

Substantial ground for difference of opinion "must arise out of a genuine doubt as to whether the Bankruptcy Court applied the correct legal standard." In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *4 (S.D.N.Y. Sept. 5, 2006). The substantial ground requirement may be met when there is conflicting authority on the issue, id., or the issue is "difficult and of first impression" in this Circuit, Klinghoffer v. S.N.C. Achille Lauro, 921 F.2d 21, 25 (2d Cir. 1990). Indeed, "When a controlling question of law presents an issue of first impression, permission to appeal is often granted." In re Enron Creditors Recovery Corp., No. 01-16034, 2009 WL 3349471, at *6 (S.D.N.Y. Oct. 16, 2009). However, "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." In re Flor, 79 F.3d 281, 284 (2d Cir. 1996). The district court must "analyze the strength of the arguments in opposition to the challenged ruling when deciding whether the issue for appeal is truly one on which there is a *substantial* ground for dispute." Id. (internal quotations and citation omitted).

Judge Peck's decision resolved a difficult, dispositive legal question of first impression. He forthrightly acknowledged that his unprecedented ruling—which he predicted would be "controversial"—was the "first such interpretation of the *ipso facto* language" in the Bankruptcy

Code. LBSF, 422 B.R. at 422. He stated that he was not aware of any case that "has ever declared that the operative bankruptcy filing is not limited to the commencement of a bankruptcy case by the debtor-counterparty itself." Id. Indeed, prior cases in this and other circuits appear to assume—albeit in circumstances that are factually distinguishable—that the Bankruptcy Code's *ipso facto* provisions invalidate clauses that condition an event of default on the contracting party's *own* bankruptcy filing. See, e.g., In re Chateaugay Corp., No. 92 CIV. 7054(PKL), 1993 WL 159969, at *5 (S.D.N.Y. May 10, 1993) (interpreting §§ 365(e)(1) and § 541(c) as "render[ing] unenforceable contract provisions that altered the rights or obligations of a debtor as a result of the *debtor's* commencement of a case under the Bankruptcy Code" (emphasis added)); accord, e.g., In re EBC I, Inc., 356 B.R. 631, 640 (Bankr. D. Del. 2006) (describing *ipso facto* clauses as provisions "by which a contract is terminated as a result solely of the debtor's insolvency or bankruptcy").

In short, Judge Peck's decision involved a difficult question of first impression in this (and, apparently, any other) Circuit. That is enough to establish substantial ground for difference of opinion. See, e.g., Klinghoffer, 921 F.2d at 25; In re Trace Int'l Holdings, Inc., No. 04 Civ. 1295(KMW), 2009 WL 3398515, at *3 (S.D.N.Y. Oct. 21, 2009); Republic of Colom. v. Diageo N. Am., Inc., 619 F. Supp. 2d 7, 11 (E.D.N.Y. 2007).

Furthermore, BNY has pointed to numerous legal and other commentaries questioning the correctness of Judge Peck's ruling. See, e.g., Latham & Watkins LLP, Client Alert, The "Flip" Flap: Lehman Bankruptcy Judge Invalidates Payment Priority Clause, at 4 (May 13, 2010) (Decl. of Randy M. Mastro in Further Supp. of Mot. by BNY for Leave to Appeal, Aug. 23, 2010 ("Mastro Reply Decl."), Ex. B) ("[T]his decision is troubling for a number of reasons . . . ."); Hunton & Williams LLP, Client Alert, Bankruptcy Court Rules for Lehman on Flip

12

Clause, at 2 (Feb. 2010) (Mastro Reply Decl. Ex. A) ("[W]e believe that there are significant arguments that the decision is wrong in a number of respects."); Cleary Gottlieb Steen & Hamilton LLP, Alert Memo, Lehman Bankruptcy Court Holds That CDO Provision Subordinating Swap Termination Payments to Lehman Is Unenforceable, at 5 (Jan. 26, 2010) (Mastro Reply Decl. Ex. C) ("This case . . . creates significant uncertainty regarding which contractual provisions constitute unenforceable *ipso facto* clauses under the Bankruptcy Code.").

LBSF meekly responds, citing a single article, that the commentary on the Bankruptcy Court's decision has, in fact, been "mixed." (LBSF Mem. at 40 n.11.) But even that lone article, which predicts that Judge Peck's decision will be upheld on appeal, supports BNY's position that an interlocutory appeal is warranted—it highlights the "groundbreaking nature" of Judge Peck's ruling, and warns of the possibility that "savvy guarantors will soon begin to use the 'related entity bankruptcy' ploy as a means of invalidating *ipso facto* cross-corporate default provisions." Dan Schechter, Debtor's Prepetition Loss of Priority Under Springing Subordination Agreement Triggered by Parent Corporation's Bankruptcy Filing Is Unenforceable Ipso Facto Provision, 2010 Com. Fin. Newsl. 16 (2010). Moreover, even if LBSF were correct that mainstream views are "mixed," that is consistent with the conclusion that "substantial ground for difference of opinion" exists.

In sum, the Court concludes that there is substantial ground for difference of opinion over whether Judge Peck applied the correct legal standard in reaching his decision that LBHI's bankruptcy filing entitled LBSF to claim the protections of the *ipso facto* provisions. Thus, the Bankruptcy Order satisfies the second element required by § 1292(b) for interlocutory appeal.

## B. Review Will Materially Advance the Ultimate Termination of the Litigation

The third prong of the § 1292(b) analysis is whether immediate review of the Bankruptcy Court's order "may materially advance the ultimate termination of the litigation." This prong, like the other two, is satisfied.

Judge Peck's decision resolved controlling questions of law that may dispose of the ultimate issue in this Adversary Proceeding—that is, whether Swap Counterparty Priority or Noteholder Priority applies. Accordingly, immediate review of his ruling will materially advance the ultimate termination of the litigation. See In re Enron Corp., No. 01-16034, 2006 WL 2548592, at *8 (S.D.N.Y. Sept. 5, 2006) (finding that "[t]he third prong is easily met" where, as here, "granting leave to appeal . . . may result in the disposition of the Adversary Proceedings in their entirety").

Nor do there appear to be any factual disputes that might impede this Court's review of the Bankruptcy Court's decision. As Judge Peck noted at the outset of his opinion, "The parties acknowledge that there are no genuine issues of material fact and that the questions presented purely involve the application of relevant provisions of the Bankruptcy Code to undisputed facts." LBSF, 422 B.R. at 413.

LBSF, in arguing that immediate review of Judge Peck's Order would *not* materially advance this litigation, relies exclusively on the pendency of the proceedings in England. It asserts that an interlocutory appeal would actually *prolong* the ultimate termination of the litigation because "[t]he Bankruptcy Court would be precluded from effectively communicating with the English court until BNY's appeals are exhausted," and that no such appeal should go forward because it might be rendered "moot" by the final result in the English Litigation. (LBSF Mem. at 38.)

14

These contentions are easily discounted. LBSF cannot credibly claim that an immediate appeal would delay the ultimate termination of the litigation when LBSF is apparently (if not expressly) taking the position that U.S. courts should essentially do *nothing* while waiting for the English Litigation to run its course. LBSF's assertion that the English Litigation could somehow "moot" any appeal is somewhat puzzling, particularly in light of LBSF's view (adopted by the Bankruptcy Court) that U.S. bankruptcy law governs the dispute.

In the end, it is not difficult to see LBSF's arguments for what they really are: an attempt to use the English proceedings to insulate Judge Peck's decision from appellate review for as long as possible. For many months, LBSF opposed the entry of any order memorializing the Bankruptcy Court's decision; now, it vigorously seeks to forestall any review. LBSF's efforts to shield Judge Peck's unprecedented and—for LBSF—extremely favorable decision from review are, of course, not surprising; indeed, LBSF does not deny that, since the decision was handed down, it has used it as leverage in settlement negotiations concerning billions of dollars worth of similar transactions. LBSF's desire to insulate Judge Peck's ruling from appellate scrutiny only further demonstrates the need for immediate review.

For the reasons set forth above, the Court concludes that the Bankruptcy Court's Order satisfies the third and final requirement for an interlocutory appeal.

### C. Extraordinary Circumstances Are Present

The Bankruptcy Court's Order not only meets the § 1292(b) test on its face; it also presents precisely the sort of "extraordinary circumstances" that warrant an interlocutory appeal.

Judge Peck's decision is of obvious and critical importance to the LBHI bankruptcy, as it could allow LBSF to recover billions of dollars from various other structured finance deals that would otherwise be distributed to noteholders. Beyond the LBHI bankruptcy—which is itself a

15

massive and extraordinary proceeding—Judge Peck's interpretation of the Bankruptcy Code's *ipso facto* provisions has potentially far-reaching ramifications for the international securities markets, and has triggered significant uncertainty in the financial community. See, e.g., Aline van Duyn & Nicole Bullock, Lehman Ruling Creates New Doubts for CDOs, Fin. Times, Feb. 9, 2010 (Mastro Decl. Ex. C) (stating that "uncertainty looms" as a result of the Bankruptcy Court's Decision, and that the ruling "may turn the conventional wisdom which has driven many of these deals on its head"); Andrew Cavenagh, Dante's Inferno, FTSE Global Markets, June 2010 (Mastro Decl. Ex. J), at 14-18 ("[A]ttempts to revive securitisation in the US and Europe are hamstrung by doubts over whether a fundamental historical tenet of the business—that securitised bonds are protected from the bankruptcy of the deal's participants—will withstand legal scrutiny."). Indeed, at the June 30, 2010 hearing on BNY's motion for entry of an order embodying the Bankruptcy Court's decision, Judge Peck "recognize[d] the importance" of his ruling "to parties who are not in the room, including . . . market participants who are looking at the risks of securitization transactions in light of the consequences of the *ipso facto* clause as I have interpreted those consequences." (LBSF, No. 09-01242 (JMP), Docket No. 99 at 53-54.)

LBSF essentially acknowledges that Judge Peck's decision upset market expectations, but counters that "it is perfectly appropriate for a court to upset those expectations if they are contrary to the law." (LBSF Mem. at 40.) That may be. And to be clear, this Court is not suggesting that the financial community's reaction to Judge Peck's decision necessarily casts doubt on its *legal* correctness.[2] But the decision's potentially game-changing effect on the structured finance business *does* militate in favor of reviewing the decision *now*—not months, or even years, from now.

---

[2] Nor, for that matter, should anything in today's decision be interpreted as indicative of whether this Court will or will not uphold Judge Peck's decision; the Court expresses no opinion on the merits of BNY's appeal.

In sum, having found that the Bankruptcy Court's Order meets the requirements of § 1292(b) and presents extraordinary circumstances warranting an interlocutory appeal, the Court holds that immediate review of Judge Peck's decision is appropriate.

## CONCLUSION

For the reasons set forth above, BNY's motion for leave to appeal the Bankruptcy Court's July 19, 2010 Order is granted. The parties must appear on Friday, October 1, 2010, at 12:30 p.m., for a conference to set an expedited briefing schedule for the appeal.

Dated: September 20, 2010

_____
U.S.D.J.

BY FAX TO ALL COUNSEL